# Exhibit 1

# K&L|GATES

K&L Gates LLP
599 Lexington Avenue
New York, NY 10022-6030

T 212.536.3900   www.klgates.com

Walter P. Loughlin
D 212.536.4065
F 212.536.3901
walter.loughlin@klgates.com

February 22, 2011

**By PDF and FedEx**
George Tzanetopoulos, Esq.
Baker & Hostetler LLP
191 North Wacker Drive
Chicago, IL 60601-1901

Re:  Ross University v. Brooklyn Queens Health Care, et al., 09cv1410 (KAM)(RLM)

Dear George:

Enclosed please find a CD containing defendants Brooklyn Queens Health Care, Inc. and Wyckoff Heights Medical Center's supplemental document production. The documents bear the bates numbers "BQHC 03718" through "BQHC 04005."

The enclosed documents relate to a number of the categories of materials you have requested during our recent meet and confer discussions, including: corporate formation documents pertaining to Caritas Health Care, Inc.; Wyckoff Heights Medical Center's Board of Directors meeting minutes dating back to 2006; employment contracts relating to requested custodians; and inter-company agreements.

The enclosed documents do not yet contain email communications from electronically stored information (ESI) responsive to your discovery requests. In response, and following our meet and confer discussions, over 35 GB of ESI from the requested custodians, for the relevant time period, have been retrieved. This data is being processed and reviewed for privilege and responsiveness as quickly as possible. We will produce non-privileged, responsive ESI material as soon as it becomes available.

In addition, we are still in the process of contacting each of the individuals for whom you issued subpoenas on October 7, 2010. We expect to receive responses from each of these individuals this week. At that time, we will either produce responsive material or, if no such responsive material exists, we will notify you.

NY-855927 v1

# K&L|GATES

George Tzanetopoulus
February 22, 2011
Page 2

    Finally, some material you have requested pertaining to Caritas Health Care, Inc. is not in the possession, custody, or control of Defendants.  However, I am authorized to accept service of a third-party subpoena for Caritas Health Care, Inc. in relation to this litigation and, upon receipt of such subpoena, can facilitate the production of Caritas related documentation responsive to your requests.

Sincerely yours,

Walter P. Loughlin

# Group Exhibit 2

# Baker Hostetler

Baker&Hostetler LLP

191 North Wacker Drive
Suite 3100
Chicago, IL 60606-1901

T 312.416.6200
F 312.416.6201
www.bakerlaw.com

George J. Tzanetopoulos
direct dial: 312.416.6225
gtzanetopoulos@bakerlaw.com

October 4, 2010

**VIA EMAIL AND FIRST CLASS MAIL**

Walter P. Loughlin
K&L Gates
599 Lexington Avenue
New York, NY  10022-6030

Re:   *Ross University School of Medicine*
       *v. Brooklyn Queens Healthcare, et al.*

Dear Pat:

I would like to schedule a telephone call with you next week to discuss the shortcomings of defendants' responses to plaintiff's discovery requests.  Please let me know when you are available to talk.

In order to make our time more productive, I have set forth below a summary of the issues separately for each of defendants' responses numbered according to the response number.

## BQHC INTERROGATORY ANSWERS

1.      The objections are not well taken.  The Wyckoff and the Caritas entities are relevant and, if BQHC has information about those entities, then BQHC should provide it.  BQHC does purport to answer, but the answer merely refers Ross to documents produced by BQHC.  However, the documents produced do not provide a complete answer to this interrogatory.  BQHC should provide a complete answer.

Chicago     Cincinnati     Cleveland     Columbus     Costa Mesa
Denver     Houston     Los Angeles     New York     Orlando     Washington, DC

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 2

2.    The objections are not well taken.  The Wyckoff and the Caritas entities are relevant and, if BQHC has information about those entities, then BQHC should provide it.  BQHC does purport to answer, but the answer merely refers Ross to documents produced by BQHC.  However, the documents produced do not provide a complete answer to this interrogatory.  BQHC should provide a complete answer.

3.    The objections are not well taken.  The Wyckoff and the Caritas entities are relevant and, if BQHC has information about those entities, then BQHC should provide it.  BQHC does purport to answer, but the answer merely refers Ross to documents produced by BQHC.  However, the documents produced do not provide a complete answer to this interrogatory.  BQHC should provide a complete answer.

4.    The objections are not well taken.  The Wyckoff and the Caritas entities are relevant and, if BQHC has information about those entities, then BQHC should provide it.  BQHC does purport to answer, but the answer merely refers Ross to documents produced by BQHC.  However, the documents produced do not provide a complete answer to this interrogatory.  BQHC should provide a complete answer.

5.    Although Wyckoff is specifically identified in the answer, the answer suggests that other BQHC facilities might have been able to offer clerkships.  If there are or were other facilities that could offer clerkships, those facilities should be identified specifically.  If there in fact were no others, then the answer should state that fact.

6.    The objection is not well taken.  BQHC does purport to answer, but the answer merely refers Ross to documents produced by BQHC.  However, the documents produced do not provide a complete answer to this interrogatory.  BQHC should provide a complete answer.

7.    The interrogatory is permissible and asks that BQHC identify the "statutes and government regulations" that are referred to in BQHC's own pleading.  To satisfy the requirements of Fed. R. Civ. P. 11, BQHC must clearly have been in a position to make those identifications at the time that it filed the answer.  It should do so in response to the interrogatory.

## WYCKOFF INTERROGATORY ANSWERS

1.    The objections are not well taken.  The BQHC and the Caritas entities are relevant and, if Wyckoff has information about those entities, then Wyckoff should provide it.  Wyckoff does purport to answer, but the answer merely refers Ross to

# Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 3

documents produced by Wyckoff. However, the documents produced do not provide a complete answer to this interrogatory. Wyckoff should provide a complete answer.

2.  The objections are not well taken. The BQHC and the Caritas entities are relevant and, if Wyckoff has information about those entities, then Wyckoff should provide it. Wyckoff does purport to answer, but the answer merely refers Ross to documents produced by Wyckoff. However, the documents produced do not provide a complete answer to this interrogatory. Wyckoff should provide a complete answer.

3.  The objections are not well taken. The BQHC and the Caritas entities are relevant and, if Wyckoff has information about those entities, then Wyckoff should provide it. Wyckoff does purport to answer, but the answer merely refers Ross to documents produced by Wyckoff. However, the documents produced do not provide a complete answer to this interrogatory. Wyckoff should provide a complete answer.

4.  The objections are not well taken. Wyckoff and the Caritas entities are relevant and if Wyckoff has information about those entities, then Wyckoff should provide it. Wyckoff does purport to answer, but the answer merely refers Ross to documents produced by Wyckoff. However, the documents produced do not provide a complete answer to this interrogatory. Wyckoff should provide a complete answer.

5.  Although Wyckoff is specifically identified in the answer, the answer suggests that other BQHC facilities might have been able to offer clerkships. If there are or were other facilities that could offer clerkships, those facilities should be identified specifically. If there in fact were no others, then the answer should state that fact.

6.  The objection is not well taken. Wyckoff does purport to answer, but the answer merely refers Ross to documents produced by Wyckoff. However, the documents produced do not provide a complete answer to this interrogatory. Wyckoff should provide a complete answer.

7.  The interrogatory is permissible and asks that BQHC identify the "statutes and government regulations" that are referred to in BQHC's own pleading. To satisfy the requirements of Fed. R. Civ. P. 11, BQHC must clearly have been in a position to make those identifications at the time that it filed the answer. It should do so in response to the interrogatory.

## BQHC DOCUMENT REQUEST RESPONSES

2.  BQHC clearly did not produce all responsive records. They should all be produced.

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 4

3.    The objection is not well taken.  If BQHC has custody or control of these clearly relevant records, it must produce them.

4.    The objections are not well taken.  Records from January 1, 2006 to the present were requested.  The records produced did not cover that entire time period. All requested records should be produced.

6.    The objections are not well taken.  It appears that BQHC did not produce any responsive records.

7.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

8.    The requests are relevant to piercing claims and defendants' claims that BQHC has or had few assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

9.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

10.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

11.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.  No responsive records were produced.

12.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

13.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 5

15.   No responsive records were produced.   These requests go to the piercing claims at issue in this action.  Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

16.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

17.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

18.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

19.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

20.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

21.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

22.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

23.   All responsive documents clearly have not been produced.   The requests go to defendants' assertion that FTI and its employees lacked authority in these transactions.

24.   All responsive documents clearly have not been produced.   The requests go to defendants' assertion that FTI and its employees lacked authority in these transactions.

25.   These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 6

26.     These requests go to the piercing claims at issue in this action.  The records produced clearly do not constitute all responsive documents.  All requested records should be produced.

27.     These requests go to the piercing claims at issue in this action.  Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

34.     These requests go to the piercing claims at issue in this action.   All requested records should be produced.

35-36.  All responsive documents plainly have not been produced.   All requested records should be produced.

37-41.  These requests go to issues of contract interpretation, performance, and breach.  All requested records should be produced.

44.     All documents, not just a selected bylaws and the like should be produced.

46-48.  The objections are not well-taken.  These requests go to the piercing claims at issue in this action.  All requested records should be produced.

## WYCKOFF RESPONSES TO DOCUMENT REQUESTS

2.     BQHC clearly did not produce all responsive records.  They should all be produced.

3.     The objection is not well taken.  If BQHC has custody or control of these clearly relevant records, it must produce them.

4.     The objections are not well taken.  Records from January 1, 2006 to the present were requested.  The records produced did not cover that entire time period.  All requested records should be produced.

6.     The objections are not well taken.  It appears that BQHC did not produce any responsive records.

7.     These requests go to the piercing claims at issue in this action.  Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 7

8.    The requests are relevant to the piercing claims and defendants' claims that BQHC has or had few assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

9.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

10.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

11.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.  No responsive records were produced.

12.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

13.    The requests are relevant to the piercing claims at issue in this action and defendants' claims that BQHC has or had no assets.  They are also relevant to the question of whether BQHC's board may have improperly transferred assets from BQHC to make it judgment proof.

15.    No responsive records were produced.  These requests go to the piercing claims at issue in this action.  Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

16.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

17. These requests go to the piercing claims at issue in this action.  Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

18.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record.  All requested records should be produced.

Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 8

19.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

20.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

21.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

22.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

23.    All responsive documents clearly have not been produced.    The requests go to defendants' assertion that FTI and its employees lacked authority in these transactions.

24.    All responsive documents clearly have not been produced.    The requests go to defendants' assertion that FTI and its employees lacked authority in these transactions.

25.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

26.    These requests go to the piercing claims at issue in this action.    The records produced clearly do not constitute all responsive documents. All requested records should be produced.

27.    These requests go to the piercing claims at issue in this action. Improper transfers among the BQHC affiliates at issue here are a matter of public record. All requested records should be produced.

34.    These requests go to the piercing claims at issue in this action.    All requested records should be produced.

35-36. All responsive documents plainly have not been produced.    All requested records should be produced.

# Baker Hostetler

Walter P. Loughlin
K&L Gates
October 4, 2010
Page 9

37-41. These requests go to issues of contract interpretation, performance, and breach. All requested records should be produced.

44.    All documents, not just a selected bylaw and the like should be produced.

46-48. The objections are not well-taken. These requests go to the piercing claims at issue in this action. All requested records should be produced.

Sincerely,

George J. Tzanetopoulos

**Tzanetopoulos, George J.**

| | |
|---|---|
| **From:** | Loughlin, Walter P. [Walter.Loughlin@klgates.com] |
| **Sent:** | Wednesday, October 06, 2010 10:45 AM |
| **To:** | Tzanetopoulos, George J. |
| **Subject:** | RE: Ross School of Medicine v. BQHC |

I was able to determine that I can accept service of the subpoenas. Just send them on to me. And I understand you want to set up a time next week to discuss the objections to the interrogatories. How about Tues or Wed afternoon the 12th or 13th?

---

**From:** Tzanetopoulos, George J. [mailto:gtzanetopoulos@bakerlaw.com]
**Sent:** Tuesday, October 05, 2010 2:47 PM
**To:** Loughlin, Walter P.
**Subject:** Ross School of Medicine v. BQHC

Pat:

  I left a voice message for you yesterday.  I have a couple of questions.  First, plaintiff intends to serve additional subpoenas duces tecum on the trustees of defendants' boards.  Will you accept service of those subpoenas or shall we serve them directly?

  Also, we have not received any response to the earlier served subpoenas to defendants' trustees. Are you the right person with whom to discuss that issue or shall I take that matter up with the trustees themselves?

Best regards,
George Tzanetopoulos

My Bio  |  Web site  |  V-card

T 312.416.6225  George J. Tzanetopoulos
F 312.416.6201  gtzanetopoulos@bakerlaw.com

www.bakerlaw.com  Baker & Hostetler LLP
      191 North Wacker Drive
      Chicago, Illinois 60601-1901



--------------------------------------------

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you

that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or other matter addressed herein.

---------------------------------------------

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Walter.Loughlin@klgates.com.

## Tzanetopoulos, George J.

**From:** Loughlin, Walter P. [Walter.Loughlin@klgates.com]
**Sent:** Thursday, October 21, 2010 10:39 AM
**To:** Tzanetopoulos, George J.
**Subject:** Re: Ross v. BQHC

George: I don't remember whether we agreed on a time for a call this afternoon. Would 4 pm NY time work for you?
Walter P. Loughlin
K & L Gates
599 Lexington Avenue
New York, New York 10022
212 536-4065 (o)
917 251-5574 (cell)
walter.loughlin@klgates.com

**From:** Tzanetopoulos, George J. [mailto:gtzanetopoulos@bakerlaw.com]
**Sent:** Wednesday, October 13, 2010 04:37 PM
**To:** Loughlin, Walter P.
**Subject:** Ross v. BQHC

Pat:

It was good to talk to you this afternoon. To confirm our conversation, you and your colleagues will go over defendants' discovery responses again and determine what revisions to interrogatory answers you will make and what additional documents you will produce. We will have another telephone conference on Thursday, October 21, 2010 to discuss where you are on those issues. If information can be produced before that time, you will do so.

Best regards,
George Tzanetopoulos

**My Bio  |  Web site  |  V-card**

T 312.416.6225
F 312.416.6201

www.bakerlaw.com

George J. Tzanetopoulos
gtzanetopoulos@bakerlaw.com

Baker & Hostetler LLP
191 North Wacker Drive
Chicago, Illinois 60601-1901



3/1/2011

------------------------------------------

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or other matter addressed herein.

------------------------------------------

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Walter.Loughlin@klgates.com.

## Tzanetopoulos, George J.

**From:** Tzanetopoulos, George J. [gtzanetopoulos@bakerlaw.com]
**Sent:** Tuesday, November 30, 2010 1:29 PM
**To:** Loughlin, Walter P.
**Subject:** RE: Ross v. BQHC

Pat:

    All things being equal, I would tend to agree.  However, it was in October when your clients first acceded to Ross' suggestion that the parties mediate and we still have not been able to settle on a mediator.  On November 18th I proposed a means for breaking through the deadlock on selecting a mediator.  We still have not received a response from your clients to that proposal, let alone made any progress on scheduling a session with whomever the mediator might be.

    We have already asked the court for (and received) a number of extensions of the discovery deadlines.   Ross is not willing be put in a position where discovery rights are lost due to defendants' inability to get to the mediation table promptly.

    Thus, if we can agree on a mediator and make substantial progress on scheduling a session by the close of business this Thursday, Ross will agree to defer the discovery responses due from defendants pending further instruction from the Court.  If not, we must insist on receiving the discovery responses on Friday.

Best regards,
George Tzanetopoulos

---

**From:** Loughlin, Walter P. [mailto:Walter.Loughlin@klgates.com]
**Sent:** Tuesday, November 30, 2010 7:38 AM
**To:** Tzanetopoulos, George J.
**Subject:** RE: Ross v. BQHC

George: Wouldn't it make more sense to focus our attention on the effort to see if mediation can work to resolve this case than to spend more time, effort, and our client's resources on discovery. I am willing to agree to suspend discovery with the proviso that it is understood that Ross retains its right to demand all the discovery it is entitled to, if mediation doesn't work. Now that I understand better the method of selection you proposed, do you think we can settle on a specific mediator this week? Pat

---

**From:** Tzanetopoulos, George J. [mailto:gtzanetopoulos@bakerlaw.com]
**Sent:** Monday, November 29, 2010 10:53 AM
**To:** Loughlin, Walter P.
**Subject:** Ross v. BQHC

Pat:

    We have not received a response to our proposal for mediator selection.  Ross still wishes to attempt to resolve this dispute through mediation, but we cannot hold up the discovery process any longer while we await agreement on a means of selecting a mediator.

Please provide to us no later than Friday of this week (December 3, 2010), the outstanding discovery information that was discussed in my letter to you of October 4, 2010 and the records that were requested in the subpoenas to the individuals that you represent.

Best regards,
George Tzanetopoulos

My Bio | Web site | V-card

T 312.416.6225          George J. Tzanetopoulos
F 312.416.6201          gtzanetopoulos@bakerlaw.com

www.bakerlaw.com        Baker & Hostetler LLP
                        191 North Wacker Drive
                        Chicago, Illinois 60601-1901



------------------------------------------

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or other matter addressed herein.

------------------------------------------

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not

3/1/2011

an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this e-mail in error, please contact me at Walter.Loughlin@klgates.com.

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

**Tzanetopoulos, George J.**

---

| | |
|---|---|
| **From:** | Tzanetopoulos, George J. |
| **Sent:** | Tuesday, February 15, 2011 1:58 PM |
| **To:** | Loughlin, Walter P. |
| **Subject:** | Ross v. BQHC |

Pat:

I write to follow up on our telephone conversation of yesterday afternoon regarding the subpoenas that plaintiff served on the individuals whom you represent and defendants' responses to plaintiff's interrogatories and document requests.

I noted that none of the individuals have produced documents in response to the subpoenas. You stated that some of those individuals may not have possess the requested documents, but that you will produce the documents of those who do possess them and provide an attestation of those who claim not to have responsive records.

With respect to the responses to the discovery requests served on defendants, I noted two overarching issues with defendants' responses:

First, it is clear that defendants did not produce any electronically stored information. In order to assist you in expediting defendants' search, but without in any respect limiting plaintiff's insistence that defendants conduct all searches necessary to respond completely to the discovery requests, we suggest that at minimum the following custodians' email accounts and other electronic records be searched: Rajiv Garg, Dominick Gio, Paul Goldberg, David Hoffman, Harold MacDonald, Neal Mandava, Claire Mullally, Julius Romero, Thomas Singleton, and the members of defendants' boards.

Second, defendants' objections take the position that, even if defendants possess responsive records of Caritas, St. John's Hospital, or Mary Immaculate Hospital, they will not produce those records. As we discussed, defendants should produce all responsive records in their possession custody and control, including those of Caritas and the hospitals.

As to the individual requests and interrogatories, we discussed the relationship of these discovery requests to the key issues in the case. Plaintiff's bottom line remains that defendants should produce the documents requested and answer fully the interrogatories that were served. I also noted that, although my letter to you of October 4, 2010 did not raise any issues regarding Plaintiff's Document Requests Nos. 30-33 (to both Wyckoff and BQHC), our review of the Caritas bankruptcy pleadings shows that there are in fact documents responsive to those requests that have not been produced. I asked that defendants search for and produce such documents.

As to depositions, I stated that I would do my best to get to you by week's end a list of the defendants' employees that we will notice for deposition so that we can work on a mutually convenient schedule. I would appreciate if you would do the same with respect to employees of plaintiff whose depositions you intend to take.

Thanks very much.

Best regards,

3/1/2011

George Tzanetopoulos

<u>My Bio</u>  |  <u>Web site</u>  |  <u>V-card</u>

T 312.416.6225
F 312.416.6285

<u>www.bakerlaw.com</u>

George J. Tzanetopoulos
gtzanetopoulos@bakerlaw.com

Baker & Hostetler LLP
191 North Wacker Drive
Chicago, Illinois 60601-1901



---------------------------------------------

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the IRS in Circular 230, we inform you that, unless we expressly state otherwise in this communication (including any attachments), any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or other matter addressed herein.

---------------------------------------------

# Exhibit 3

# Troubled Queens Hospitals Will Receive State Aid and Review Management and Fiscal Practices

## Use of Money Restricted to Payroll, Benefits and Overdue Taxes

**ALBANY**, March 16, 2007 - Acting New York State Health Commissioner Richard F. Daines, M.D. today announced that the State will be offering a $6 million loan to two affiliated Queens hospitals, St. John's Queens and Mary Immaculate, so that they can pay workers, continue providing employee health and pension benefits, and pay overdue taxes and penalties. Before receiving the funds, however, the hospitals and their affiliate, Wyckoff Heights Medical Center in Brooklyn, must agree to retain an independent monitor to review and reform their problematic financial operations, management practices and governance structure.

"We summoned Wyckoff's management team to come to Albany earlier this week to discuss the situation," said Dr. Daines. "We believe that the system's financial problems were caused by serious management and governance issues. Our finance and legal teams will continue to look into this situation."

St. John's and Mary Immaculate, now collectively known as Caritas Health Care, changed hands in late 2006 when they were sold by St. Vincent Catholic Medical Centers to the owners of Wyckoff as part of a bankruptcy proceeding. In the course of the Department's current inquiry, hospital officials admitted that funds had been transferred between Caritas and Wykoff, contrary to representations made earlier that they would not do so.

Dr. Daines indicated that the loan offer to Caritas will contain restrictions on how it can be spent and a list of other conditions. These include a requirement that Caritas and Wyckoff retain a management consultant, to be selected from a list provided by the Department, which will, among other things:

- Conduct an analysis of the financial operations of the hospitals during the months leading up to the shortfalls, including a forensic audit of financial transactions and transfers between the affiliates;
- Evaluate the adequacy of internal controls, systems and procedures and make recommendations for improvement which the hospitals must follow;
- Assess the qualifications and performance of management, the reasonableness of compensation, and make recommendations for change;
- Assess the composition and governance of the Boards of Trustees and recommend any needed changes.

Dr. Daines said, "Our top priority is to assure patient access to needed services. But we can no longer bail out poorly run hospitals without taking steps to improve and assure proper management. With these funds Caritas will be able to make its next payroll. We are nonetheless conducting a full investigation into what went wrong here and we are making management take responsible steps to stabilize the hospitals."

Revised: March 2007

# Exhibit 4

BROOKLYN QUEENS HEALTHCARE, INC.

BOARD OF TRUSTEES MEETING

MINUTES

JANUARY 8, 2009

**PRESENT:**

Emil Rucigay, Esq.
Fred T. Haller, Esq.
Herman Hochberg
Rajiv Garg
Vito J. D'Alessandro, M.D.
Gary Goffner
Vincent Arcuri

David Hoffman, Esq. — Legal Counsel

**EXCUSED:**

John H. Cook, Jr., Esq
Adam Figueroa
Frank Chiarello
Krishna Mehta

Mr. Arcuri called the meeting to order at 3 p.m.

APPROVAL OF THE MINUTES OF THE PREVIOUS MEETING:

ON A MOTION PROPERLY MADE BY MR. HALLER, SECONDED BY DR. D'ALESSANDRO, ALL IN FAVOR, THE MINUTES OF THE PREVIOUS MEETING OF DECEMBER 4, 2008 WERE APPROVED BY THE BOARD OF TRUSTEES.

RESOLUTION:

Mr. Arcuri mentioned that a resolution for Caritas to obtain an interest free loan from the Dormitory Authority in the amount of $3,500,000 was unanimously approved by the BQHC Board on January 6th. (APPENDED TO THE MINUTES).

Mr. Garg advised the Board Members that there is need to establish a new tax I.D. number for BQHC. Following some discussion it was decided that this issue will be discussed further at a separate meeting with Mr. Garg, Mr. Hoffman and Mr. Haller. Discussion then ensued regarding the tax laws (17) and review of the properties owned by Wyckoff Heights Medical Center. Mr. Garg reported that we have the opportunity to potentially raise $4 million through the financing of certain real estate owned by Wyckoff and/or BQHC.

Mr. Arcuri provided an update on yesterday's Caritas Board meeting, which was attended by Ms. Paula Miceli, a representative of the Queens Borough President's Office. A February 16, 2009 meeting will be held to discuss alternatives to a likely Caritas

BQHC Meeting – January 8, 2009
Page 2

bankruptcy filing and closure. Several local elected officials are expected to attend the meeting. Mr. Arcuri stated that the elected officials will be notified that the Department of Health will no longer continue to subsidize the Caritas operations and the hospitals will likely close. The impact of a closure on the Queens communities will also be discussed. Mr. Hochberg expressed his concerns in reference to potential unsafe conditions at the hospitals during a prolonged closure process.

Mr. Arcuri informed the Board Members that Caritas has only two weeks of cash to maintain operations. He went on to say that additional funds may be available to New York State as a result of a Federal stimulus package. We are hoping that the elected officials can convince the State to continue the Caritas subsidies until the availability of additional Federal funds is determined.

Mr. Hoffman advised the Board of Trustees that Wyckoff has engaged a law firm to provide advice in an effort to protect the interests of Wyckoff in the event of a Caritas bankruptcy. Mr. Goffner inquired as to Wyckoff's Caritas related contractual obligations. Mr. Hoffman replied that at this time there are two which we are aware of; one is a medical school obligation and the other is a pension obligation.

North Shore's interest in St. John's Queens Hospital was discussed. Mr. Hoffman stated that while the Department of Health may not provide guarantees for the financing necessary to rebuild the hospital, North Shore may decide to proceed with an acquisition without State financing guarantees.

Dr. D'Alessandro inquired as to whether the Medical Staff of Caritas is fully aware of the status of the current situation. Mr. Hoffman replied that Mr. John Kastanis, CEO of Caritas, recently held Town Hall Meetings at both of the hospitals and announced a likely bankruptcy filing and closure of the hospitals.

Mr. Garg mentioned that there is an opportunity to raise working capital of approximately $4 million dollars through the financing of certain BQHC and/or Wyckoff properties. The potential financing was discussed in great detail by the Board Members and it was suggested that the following resolution be adopted as follows:

Resolved that the BQHC Board Members voted to transfer all ancillary properties currently owned by BQHC, Inc. into a new holding corporation with a new tax I.D. number.

Mr. Rucigay stated that at yesterday's Caritas meeting he tried to stress to the elected officials the importance of the continuance of the Hospitals for the sake of the community's financial future. He inquired as to whether the Board Members felt it would be proper for Mr. Arcuri to contact Paula Miceli from the Borough President's

BQHC 00212

BQHC Meeting – January 8, 2009
Page 3

Office and, through her, contact the Queens Chamber of Commerce. He mentioned that the loss of 2,500 jobs would have a dire impact on Queens County economy.

Mr. Lavan advised the Board of Trustees that Caritas must act quickly due to numerous cash flow problems which the hospitals are now experiencing. He went on to say that we are approximately two weeks away from a filing, absent political intervention, and discussed the ramifications of this with the Board Members. Mr. Lavan stated that it is our preference to have the Caritas Hospitals remain open.

Mr. Lavan stated that the Department of Health is slowly running out of re-structuring money at a time when more and more hospitals are facing similar financial problems. He noted that North Shore cannot not secure financing for their proposed SJQ construction project. I n light of the current situation, we will begin to plan for the closure of the two Caritas hospitals. We will prepare for a chapter eleven filing followed by a chapter seven liquidation. In open discussion, Mr. Lavan mentioned that North Shore may still be interested in an acquisition even without State financing guarantees.

Mr. Lavan stated that a non-bankruptcy alternative will be formulated for Wyckoff. In an attempt to clean up some of the balance sheet we will need the following:

$14 million dollars in receivables owed to Wyckoff which is fully reserved on the balance sheet.

A mortgage holiday for a period of one year period of time.

A temporary loan from DASNY on the Garity Post property to provide Wyckoff the funds necessary to make it's February 2009 bond holder payments.

Refund of an excess malpractice umbrella insurance policy which could generate $4 million dollars in cash.

Mr. Lavan stated that the above package in total, would help us to manage cash needs to maintain Wyckoff's operations through the end of 2009.

Mr. Rucigay commented on yesterday's meeting and stated that he felt that the Department's concern is the fiscal stability of Wyckoff and what they would like to see is improvement in the Hospital's finances.

Lively discussion ensued regarding the proposed Medicaid cuts and it was mentioned by Mr. Rucigay that at no point did the Department indicate that assistance to the poor, needy, and indigent be diminished.

BQHC Meeting – January 8, 2009
Page 4

**ADJOURNMENT:**

ON A MOTION DULY MADE BY MR. HOCHBERG, SECONDED BY MR.
HALLER, ALL IN FAVOR, THE MEETING ADJOURNED AT 5:45 P.M.

RESPECTFULLY SUBMITTED:                    APPROVED BY:

PATRICIA MILLSPAUGH                         EMIL RUCIGAY, ESQ.
EXECUTIVE SECRETARY                         CHAIRMAN

BQHC 00214

# Exhibit 5

AFFILIATE SUBORDINATION AGREEMENT, dated as of January 1, 2007 (as it may be amended, modified or supplemented from time to time, this "*Agreement*"), by and among HFG HEALTHCO-4 LLC, a Delaware limited liability company (in the capacities described below, together its successors and assigns, "*HF-4*"), HFG HEALTHCO-5 LLC, a Delaware limited liability company (in the capacity described below, together its successors and assigns, "*HF-5*"), HEALTHCARE FINANCE GROUP INC. (in the capacities described below, together its successors and assigns, "*HFG*" ; and collectively, with HF-4 and HF-5 with the respect to the subordination rights set forth herein, the "*Senior Creditor*"), BROOKLYN-QUEENS HEALTH CARE, INC., a New York not-for-profit corporation (together its successors and assigns, "*BQHC*"), WYCKOFF HEIGHTS MEDICAL CENTER, a New York not-for-profit corporation (together its successors and assigns, "*Wyckoff*" collectively, with BQHC with the respect to the subordination set forth herein, each a "*Junior Creditor*" and collectively, the "*Junior Creditors*"), and CARITAS HEALTH CARE, INC., a New York not-for-profit corporation (the "*Company*").

The Company and BQHC have entered into that certain Administrative Services Agreement, dated as August 21, 2006 (as it may amended modified or supplemented from time to time in a manner permitted hereunder, the "*Services Agreement*"), and (ii) BQHC and Wyckoff have entered into that certain Administrative Services Subcontract, dated as of August 21, 2006 (as it may amended modified or supplemented from time to time in a manner permitted hereunder, the "*Services Subcontract*"; together with the Services Agreement, the "*Administrative Services Agreements*"). The "Service Fee" under the Administrative Services Agreements and the "Subcontract Service Fee" under the Services Subcontract are herein referred to as "*Admin Payments*".

BQHC has loaned to the Borrower $1,000,000 in cash (the "*BQHC Obligation*"), and Wyckoff has entered into lease obligations for equipment provided to the Borrower with a fair value of not less than $3,200,000 (the "*Wyckoff Obligation*"; together with the BQHC Obligation, are herein referred to as the "*Affiliate Obligations*"; the Affiliate Obligations together with the Admin Payments, are herein referred to as the "*Junior Payments*"). The BQHC Obligation is not documented between BQHC and the Borrower and the Wyckoff Obligation is not documented between Wyckoff and the Borrower.



The Company has entered into that certain Revolving and Term Loan and Security Agreement, dated as of January 1, 2007 (such agreement, as it may be amended, modified or supplemented from time to time, together with all instruments, and other related Documents (as defined therein), and together with any agreements in connection with the replacement, refunding or refinancing the same, the "*Senior Loan Agreement*"), among HF-4 as a Revolving Lender and as agent for the Revolving Lenders (in such capacity, together with its successors and assigns, the "*Revolving Agent*"), HF-5 as the "*Term Loan Lender*", and together with the Revolving Lenders, collectively, the "*Senior Creditors*"), HFG, in its capacity as administrative agent for the Senior Creditors (in such capacity, the "*Administrative Agent*") and in its capacity as collateral agent for the Senior Creditors, (in such capacity, the "*Collateral Agent*"). Terms not otherwise defined herein shall have the meanings set forth in the Senior Loan Agreement.

The fundings under the Senior Loan Agreement constitute a direct and significant benefit to the Junior Creditors. In connection with the consummation of the Senior Loan Agreement,

31387413.WPD

the Senior Creditor requires that the Junior Creditors subordinate, to the extent and in the manner hereinafter set forth, the Junior Payments to the Senior Obligations.

Accordingly, in consideration of the foregoing premises and the covenants contained herein, the parties hereto agree as follows:

Section 1.    Definitions.

As used in this Agreement, the terms defined above shall have their respective meanings set forth above and the following terms shall have the following meanings:

1.1.    *"Business Day"* shall mean any day on which banks are not authorized or required to close in New York City, New York.

1.2.    *"Senior Default"* shall mean any Default or Event of Default under the Senior Loan Agreement.

1.3.    *"Senior Obligations"* shall have the meaning of "Lender Debt" under the the Senior Loan Agreement.

Section 2.    Subordination; Acknowledgment of Senior Liens.

2.1.    Subordination. So long as any Senior Obligations are outstanding, the Junior Creditors agree that the Junior Payments are and shall be expressly subordinate and junior in right of payment and satisfaction to the payment in full of all Senior Obligations on the terms set forth herein.

The expression *"payment in full"* or *"paid in full"* or any similar term or phrase when used in this Agreement shall mean the final and indefeasible payment in full in cash of all such Senior Obligations, which payment shall have been retained by the Senior Creditor for a period of time in excess of all applicable preference or other similar periods under applicable bankruptcy, insolvency or creditors' rights laws.

2.2.    Special Representation. The Junior Creditors represent and warrant that (i) the Junior Payments represent the only payment obligations, contractual or otherwise, owing or to be owing by the Company to the Junior Creditors, and (ii) the transactions relating to the Wyckoff Obligation, including the related payment obligations, are no less favorable to the Borrower than would be obtained in a comparable arm's-length transaction with a third party who is not an Affiliate.

2.3.    Acknowledgment of Senior Lien. The Junior Creditor hereby agrees and acknowledges that (i) the Senior Creditor has been granted a Lien upon the Collateral, and (ii) the Junior Creditors have no Lien on the Collateral or on any other assets of the Company.

31387413.WPD

2

2.4.   No Challenge. Each Junior Creditor hereby agrees that it shall not challenge, contest or seek to avoid the rights of the Senior Creditor under the Senior Loan Agreement, including without limitation, the Lien of the Senior Creditor thereunder.

2.5.   Permitted Payments.

(a)   The Junior Creditors hereby acknowledge and agree that the Senior Creditor is an intended third party beneficiary of the contractual provisions containing limitations to the making of the Admin Payments set forth under Section 4.2 of the Services Agreement and under Section 6 of the Services Subcontract (the *"Payment Limitation Provisions"*). Accordingly, the Borrower and each Junior Creditor each covenants and agrees that, without the prior written consent of the Senior Creditor, (i) the Borrower will not pay, and no Junior Creditor will receive or retain any direct or indirect payment of Admin Payments in violation of the Payment Limitation Provisions, or (ii) amend, modify or waive the Payment Limitation Provisions in any manner. Each Junior Creditor covenants and agrees that, without the prior written consent of the Senior Creditor, it will not commence any action or proceeding against the Company to enforce payment on all or any part of the Admin Payments.

(b)   The Senior Creditor agrees that the Junior Creditor may receive and retain any direct or indirect payments of Admin Payments that are not in violation of the Payment Limitation Provisions.

(c)   The Borrower and each Junior Creditor each covenants and agrees that, without the prior written consent of the Senior Creditor, the Borrower will not pay, and no Junior Creditor will receive or retain any direct or indirect payment on account of the BQHC Obligation (i) prior to January 1, 2008, (ii) in an amount in any month in excess of $83,333, or (iii) at any time that a Senior Default exists is continuing or would occur as a result of such payment.   Each Junior Creditor covenants and agrees that, without the prior written consent of the Senior Creditor, it will not commence any action or proceeding against the Company to enforce payment on all or any part of the BQHC Obligation.

(d)   The Senior Creditor agrees that BQHC may receive and retain any direct or indirect payments pertaining to the BQHC Obligation that are not in violation of this Agreement, including Section 2.5(c).

(e)   The Borrower and each Junior Creditor each covenants and agrees that, without the prior written consent of the Senior Creditor, (i) the Borrower will not pay, and no Junior Creditor will receive or retain any direct or indirect payment on account of the Wyckoff Obligation (i) prior to March 15, 2007, (ii) in an amount in any month in excess of $320,000, or (iii) at any time that a Senior Default exists is continuing or would occur as a result of such payment. Each Junior Creditor covenants and agrees that, without the prior written consent of the Senior Creditor, it will not commence any action or proceeding against the Company to enforce payment on all or any part of the Wyckoff Obligation.

3

BQHC 00432

(f)     The Senior Creditor agrees that Wyckoff may receive and retain any direct or indirect payments pertaining to the Wyckoff Obligation that are not in violation of this Agreement, including Section 2.5(e).

2.6.    Insolvency, Etc.

(a)     In the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceedings, relative to the Company or to its property, or in the event of any proceedings for voluntary liquidation, dissolution or other winding up of the Company, whether or not involving insolvency or bankruptcy, so long as any Senior Obligations are outstanding, the holders of Senior Obligations shall be entitled in any such proceedings to receive payment in full of all Senior Obligations before the Junior Creditors are entitled in such proceedings to receive any payment on account of the Junior Payments, and to that end in any such proceedings, so long as any Senior Obligations remain outstanding, any payment or distribution of any kind or character, whether in cash or in other property, to which the Junior Creditors would be entitled but for the provisions hereof shall be delivered to the holders of Senior Obligations to the extent necessary to make payment in full of all Senior Obligations remaining unpaid, after giving effect to any concurrent payment or distribution to or for the holders of Senior Obligations in respect thereof.

2.7.    Turnover of Payments Received.  Should any Junior Creditor receive a payment, distribution, security or instrument with respect to the Junior Payments in violation of the provisions of Section 2.5 of this Agreement, such Junior Creditor shall receive and hold the same in trust, as trustee, for the benefit of the Senior Creditor, segregated from other funds and property of such Junior Creditor, and shall be paid over promptly (and in any event within two Business Days) to the Senior Creditor for application to the Senior Obligations remaining due and payable until the same shall have been paid in full.  The Borrower shall adjusts its books and records to indicate that such the amount reflected in such Junior Payment remains due and owing.

If it is later determined (for example, following the delivery of the Borrower's financial statements) that a Junior Payment was made during a period in which a Senior Default existed, the Junior Creditor that was recipient of such Junior Payment shall receive and hold the same in trust, as trustee, for the benefit of the Senior Creditor, segregated from other funds and property of such Junior Creditor, and such amount shall be paid over promptly (and in any event within two Business Days) to the Senior Creditor for application to the Senior Obligations remaining due and payable until the same shall have been paid in full. The Borrower shall adjusts its books and records to indicate that such the amount reflected in such Junior Payment remains due and owing.

2.8.    Subordination Not Affected.  Without the necessity of any reservation of rights against or any notice to or further assent by any Junior Creditor, any demand for payment of any Senior Obligations made by any holder of Senior Obligations may be rescinded in whole or in part by such holder and any Senior Obligations may be continued, the holders of Senior Obligations may exercise or refrain from exercising any rights and remedies against the Company and others, the Senior Obligations, or any collateral security therefor or right of offset with respect thereto, may be extended, modified, accelerated, compromised, waived, surrendered or released by the holders of

31387412.WPD

4

the Senior Obligations, and any agreement or instrument evidencing, securing or otherwise relating to the Senior Obligations may be amended or modified, all without impairing, abridging, releasing or affecting the subordination provided for herein. The Junior Creditors waive any and all notice (except notices specifically provided for herein) of the creation or modification of any Senior Obligations and notice of or proof of reliance by the Senior Creditor upon the subordination provided for herein. The Senior Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon the provisions of this Agreement.

2.9.   No Limitations.  The agreements with respect to the Junior Obligations set forth in this Section 2 are not intended and shall not be construed as a limitation in any manner of the rights and remedies granted to the Senior Creditor under the Senior Loan Agreement.

Section 3.   Miscellaneous.

3.1.   Modifications.  No amendment, modification, termination or waiver of any provision of this Agreement, or consent to any departure therefrom, shall in any event be effective without the written concurrence of the Senior Creditor and the Junior Creditors.

3.2.   Termination.  This Agreement shall remain in full force and effect until payment in full of all Senior Obligations, *provided* that this Agreement shall continue to be effective or be reinstated (as the case may be) if at any time payment of any of the Senior Obligations is refunded or must otherwise be returned by the Senior Creditor upon any bankruptcy, arrangement, reorganization or similar proceeding for relief of debtors under state or federal law, all as though such payment had not been made.

3.3.   Third Party Rights.  This Agreement is solely for the benefit of the Senior Creditor and the Junior Creditors, and no other person shall have any right, benefit, priority or other interest under, or because of the existence of, this Agreement.

3.4.   Counterparts.  This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

3.5.   No Proceedings.  The Junior Creditors hereby agree that it will not institute a bankruptcy or insolvency proceeding against HF-4 or HF-5 so long as any senior indebtedness issued by HF-4 shall be outstanding or there shall not have elapsed one year plus one day since the last day on which any such senior indebtedness shall have been outstanding.

3.6.   Governing Law.  This Agreement shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the State of New York, without regard to conflicts of laws principles.

3.7.   Waiver.  No waiver by any party hereto of any breach hereof shall operate or be construed as a waiver of any subsequent breach hereof.

31387413.WPD

5

BQHC 00434

3.8.   <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are for convenience only and shall have no legal effect.

BQHC 00435

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SENIOR CREDITOR:**

HFG HEALTHCO-4 LLC
By: HFG Healthco-4, Inc., a member
as Revolving Agent and a Revolving Lender

By _Mary L. Brady_
    Name:    MARY L. BRADY
    Title:     VICE PRESIDENT

HFG HEALTHCO-5 LLC
By: HFG Healthco-5, Inc., a member
as Term Lender

By _Mary L. Brady_
    Name:    MARY L. BRADY
    Title:     VICE PRESIDENT

HEALTHCARE FINANCE GROUP INC.
as Administrative Agent, as Term Loan
Collateral Agent, Revolving Loan Collateral
Agent and Collateral Agent

By _____
    Name (Printed):
    Title:

Notice Address:
199 Water Street
New York, New York 10038
Attention: Chief Credit Officer
Fax: (212) 785-8512

With a Copy to:
Terry D. Novetsky, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Fax: (212) 836-6490

**JUNIOR CREDITORS:**

BROOKLYN-QUEENS HEALTH CARE, INC.

By: _____
    Name:
    Title:

Notice Address:

WYCKOFF HEIGHTS MEDICAL CENTER

By: _____
    Name:
    Title:

Notice Address:

With a Copy to:

BQHC 00436

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SENIOR CREDITOR:**

HFG HEALTHCO-4 LLC
By: HFG Healthco-4, Inc., a member
as Revolving Agent and a Revolving Lender

By _Mary L. Brady_
   Name:     MARY L. BRADY
   Title:      VICE PRESIDENT

HFG HEALTHCO-5 LLC
By: HFG Healthco-5, Inc., a member
as Term Lender

By _Mary L. Brady_
   Name:     MARY L. BRADY
   Title:      VICE PRESIDENT

HEALTHCARE FINANCE GROUP INC.
as Administrative Agent, as Term Loan
Collateral Agent, Revolving Loan Collateral
Agent and Collateral Agent

By _____
   Name (Printed):
   Title:

Notice Address:
199 Water Street
New York, New York 10038
Attention: Chief Credit Officer
Fax: (212) 785-8512

With a Copy to: .
Terry D. Novetsky, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Fax: (212) 836-6490

**JUNIOR CREDITORS:**

BROOKLYN-QUEENS HEALTH CARE,
INC.

By: _____
   Name:
   Title:

Notice Address:

WYCKOFF HEIGHTS MEDICAL CENTER

By: _____
   Name:
   Title:

Notice Address:

With a Copy to:

31317413.WPD

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**SENIOR CREDITOR:**

HFG HEALTHCO-4 LLC
By: HFG Healthco-4, Inc., a member
as Revolving Agent and a Revolving Lender

By_____
   Name:
   Title:

HFG HEALTHCO-5 LLC
By: HFG Healthco-5, Inc., a member
as Term Lender

By_____
   Name:
   Title:

HEALTHCARE FINANCE GROUP INC.
as Administrative Agent, as Term Loan
Collateral Agent, Revolving Loan Collateral
Agent and Collateral Agent

By _____
Name (Printed): _Robert O.Lynch_
Title: _C.O.O._

Notice Address:
199 Water Street
New York, New York 10038
Attention: Chief Credit Officer
Fax: (212) 785-8512

With a Copy to:
Terry D. Novetsky, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
Fax: (212) 836-6490

**JUNIOR CREDITORS:**

BROOKLYN-QUEENS HEALTH CARE, INC.

By:_____
   Name:
   Title:

Notice Address:

WYCKOFF HEIGHTS MEDICAL CENTER

By:_____
   Name:
   Title:

Notice Address:

With a Copy to:

31387413.WPD

7

BQHC 00438

The Company, by its execution of this Agreement, hereby acknowledges and agrees to the foregoing provisions of this Agreement.

CARITAS HEALTH CARE, INC.,

By: _____
Name:
Title:

Notice Address:

31387413.WPD

BQHC 00439