# K&L|GATES

K&L Gates LLP
599 Lexington Avenue
New York, NY 10022-6030

T 212.536.3900  www.klgates.com

May 2, 2011

Walter P. Loughlin
D 212.536.4065
F 212.536.3901
walter.loughlin@klgates.com

Honorable Roanne L. Mann
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  *Ross University School of Medicine v. Brooklyn-Queens Health Care Inc. and Wyckoff Heights Medical Center*, No. 09 Civ. 1410 (KAM) (RLM)

Dear Judge Mann:

I write on behalf of the defendants in the above-captioned case to respond to Ross's application for a sixty-day extension of the current fact discovery deadline of May 15, 2011, and for an order compelling discovery with respect to three issues.[1]

The Motion for an Extension of Fact Discovery

There are at least two curious aspects to Ross's application. First, it fails to advise the Court of the defendants' position, which I communicated to Ross's counsel before the application was filed with the Court. By letter dated April 25, 2011, which was e-mailed to Ross's counsel that morning, I confirmed what I had told Ross's counsel the week before: "The defendants will consent to your request for an extension of fact discovery on the condition that plaintiff serves no further requests for discovery during that extension." (Letter from Walter P. Loughlin to George J. Tzanetopolous, April 25, 2011 at p. 1).[2] Second, the application fails to explain why an extension of 60 days is necessary or what Ross intends to do if granted an additional two months.

The reason defendants have conditioned their consent on the proviso that Ross serve no further discovery requests during any extension of fact discovery is that the only appropriate rationale for extending the deadline is to allow the parties to absorb the documentary discovery that has been produced, prepare deposition witnesses, and take and defend depositions. A two-month extension is not justified if that period of time will be consumed with further rounds of documentary discovery.

---

[1] Recognizing that the applicable Local Rules limit the length of letter briefs on discovery motions to three pages, Defendants respectfully request that this Court accept this slightly longer submission in light of the fact that Plaintiff has moved for both an extension of the discovery schedule and to compel the production of documents, and it was necessary to respond fully to both of these applications.

[2] A copy of the April 25 letter is annexed to this letter as Exhibit A.

K&L|GATES

Honorable Roanne L. Mann
May 2, 2011
Page 2

The original fact discovery deadline in this case was May 31, 2010, a date set at the July 30, 2009 initial conference. That date was later adjourned to December 15, 2010. When the parties' counsel notified the Court in December that they were exploring mediation, the Court declined to extend fact discovery, but later "reluctantly" did so, to March 15, 2010. Two weeks before that date, in a transparent attempt to extend discovery, Ross moved for default, alleging various purported lapses of defendants' discovery obligations. The Court denied the motion and extended discovery once again, to May 15, 2011, the current deadline. Now, on the eve of the latest in a succession of fact discovery deadlines, Ross seeks another 60-day extension, once again alleging defense discovery delinquencies. The facts are that in the two weeks between March 11, the date of the conference with the Court on Ross's default motion, and March 25, defendants produced 47,103 pages of ESI and 541 pages of hard copy documents, for an overall production in this case of nearly 52,000 pages of discovery materials -- all of which was produced and has been in Ross's hands for more than a month.[3]

For these reasons, if the Court grants Ross's application, it should do so on condition that the additional time not be expended in further documentary discovery, which after two years, successive extensions, and the production of a massive amount of material -- at great cost and disruption for a non-profit hospital serving a historically disadvantaged community[4] -- should come to an end so that the parties can move on to depositions and the further stages of the case.

The Discovery Disputes

*Wyckoff's Contracts with Medical Schools Other Than Ross*

Turning to the three issues which the parties have not been able to resolve, Ross first seeks copies of all contracts for the provision of medical student clerkships at Wyckoff from April 6, 2009 through January 31, 2013, and all documents referring or relating to the number of medical students who had clerkships at Wyckoff from December 28, 2006 to the present. Ross's stated rationale for compelling the discovery of the specific contracts Wyckoff has entered into with Ross's competitors, over a lengthy multi-year period, is that it relates to Ross's claim of specific performance. However, Ross contends in its motion that

---

[3] The material produced on April 12, 2011 was in response to a subpoena Ross served on Caritas, a third-party which is not a defendant in the case. In order to facilitate discovery, we agreed to produce Caritas documents readily accessible to the defendants. This production was timely with respect to when the subpoena was served.

[4] Press accounts have predicted that Wyckoff may be forced to close if anticipated reductions in Medicaid funding are imposed. *See Gov's Medicaid Cuts May Kill 10 City Hosps*, N.Y. Post, Jan. 22, 2011 (including Wyckoff in a list of ten city hospitals facing possible closure due to pending reductions). Wyckoff serves a patient population that is primarily comprised of Medicaid-eligible recipients.

K&L|GATES

Honorable Roanne L. Mann
May 2, 2011
Page 3

this discovery is justified on the basis of a contract between Ross and Wyckoff that is not even involved in this litigation.

The Second Amended Complaint ("SAC") alleges a breach by BQHC of a December 28, 2006 contract, as amended, between Ross and BQHC (also described in the SAC as the "Affiliation Agreement") and alleges that "by reason" of that alleged breach "an order of *specific performance of the contract is appropriate*." (SAC ¶ 39) (emphasis added). Similarly, the SAC seeks "specific performance" of the *Affiliation Agreement* . . . ." (SAC ¶ 80A) (emphasis added). This 2006 contract between Ross and BQHC, and its amendments, are attached to the SAC as exhibits.

However, Ross invokes an entirely different contract in support of its discovery request. Ross's motion refers to a "separate contract" (Ross Letter Motion pg. 2) that Ross entered into with Wyckoff in 1997, which was amended in 2007, and pursuant to which Ross students have occupied clerkships at Wyckoff for the last 14 years. It is difficult to discern how discovery of contracts between Wyckoff and medical schools other than Ross, i.e., its competitors, can be justified on the basis of a contract different from the contract that is the basis of the claim of breach and specific performance alleged in this case.

Indeed, as this case moves into its third year of litigation, precisely how Ross expects the Court to "shape[] a specific performance remedy" is unclear. *Id.* Presumably, the Ross students who lost clerkships at Caritas in 2009 due to its bankruptcy obtained clerkships elsewhere, and Ross's specific performance claim cannot refer to them. Ross was free, at the time of the Caritas bankruptcy, to seek immediate equitable relief, including specific performance of BQHC's alleged breach of contract, arguing that an interruption in its students' clinical education amounted to irreparable harm. It chose not to do so.

Perhaps Ross intends to argue that the Court should require Wyckoff to provide clerkships for Ross students corresponding to the balance of the Ross pre-payment for Caritas clerkships which it alleges were lost following the Caritas bankruptcy. If that is so, the specific contracts between other schools and Wyckoff from 2006 (three years before this lawsuit was filed) are irrelevant. The only relevant facts, in the event Ross establishes its liability claims, and persuades the Court that equity favors a specific performance remedy, are the number of such clerkships and the ability of Wyckoff -- at the time the Court entertains the specific performance remedy -- to accommodate those students. That is why defendants have proposed an Interrogatory Answer about Wyckoff's capacity to provide clerkships, the accuracy of which can be tested by Ross in depositions. Such information may be relevant to the claim of specific performance, but other contracts going back years before this lawsuit was filed are not.[5]

---

[5] Of course, Ross is not in the dark about Wyckoff's capacity. Ross has been negotiating with Wyckoff for its students to have clerkships there since 1997. Further, when Ross was offered clerkships at Caritas in 2006, Wyckoff's CEO described the clerkship capacity at Wyckoff and the Caritas hospitals. *See* annexed Exhibit B.

K&L|GATES

**REDACTED**

Honorable Roanne L. Mann
May 2, 2011
Page 4

*The "Board Packages" Issue*

Ross seeks to compel production of "board packages" distributed to the Wyckoff and BQHC trustees in advance of board meetings. Unlike most of defendants' production of documents, which were computerized and which could be downloaded onto discs for production, the approximately 4,000 pages of board package material are maintained solely in hard copy in thirty different 3-ring binders. Because we have already produced to Ross the minutes of these board meetings, I suggested to Ross that the "board packages" might be of limited evidentiary value, and it would make sense for Ross's counsel to first inspect this material and decide what portions of it, if any, it wished to have copied.

Initially, it appeared that Ross agreed to this proposal. A lawyer from the firm representing Ross contacted our firm to inquire about the volume of the materials, suggesting that she was attempting to determine whether the inspection of the "board packages" was worth the candle. Subsequently, Ross's position apparently changed, and it now characterizes the inspection and copying proposal as "gamesmanship." The proposal was made in good faith and is consistent with Federal Rule of Civil Procedure 34(b)(2)(B). Given the burden of having already produced more than 50,000 pages of documents in connection with a lawsuit involving a very narrow range of legal and factual issues, including the burden of gathering, reviewing, and preparing for production such a vast amount of material, Defendants' inspection and copying proposal is reasonable.

*Wyckoff's Bank Account Statements*

Finally, Ross seeks Wyckoff's bank account statements from January 1, 2006 to the date of defendants' discovery response, on the ground that this evidence is relevant to its "piercing claim," i.e., the allegation that the BQHC breach of its contract with Ross for Caritas clerkships should be attributed to Wyckoff because "BQHC has few, if any, assets . . . [and] [i]n all meaningful respects, Wyckoff controlled and controls BQHC." (SAC ¶69-78).

Rather than explain how Wyckoff's bank account statements are probative of the allegation that "Wyckoff controlled and controls BQHC," Ross asserts the relevance of these bank records by pointing to snippets from a highly selective group of documents which it characterizes as "substantial evidence of misuse of the corporate form." As the following demonstrates, this contention is contradicted by Ross's exhibits themselves and by other documents it chose not to call to the Court's attention.

First, Ross cites to a March 2007 press release issued by the New York State Department of Health, which states: "hospital officials admitted that funds have been transferred between Caritas and Wyckoff contrary to representations made earlier that they would not do so." (Ross Ex. 6).

**K&L|GATES**

Honorable Roanne L. Mann
May 2, 2011
Page 5

**REDACTED**

      Further, the defense has also provided Ross with a detailed log of Wyckoff expenses related to the Caritas hospitals, known as the "due to/due from" record. This log recorded the value of benefits received by Caritas from Wyckoff and the amounts owed to Wyckoff by Caritas in return. This log, totaling 66 pages, not only reflects Defendants' observance of separate corporate formalities, it is far more probative of Ross's piercing claim than Wyckoff's bank account statements.

      Second, defendants are unaware of any claim of fraudulent conveyance ever having been made by any creditor in the Caritas bankruptcy. Third, Ross has failed to explain why, even if its contention was not so demonstrably wrong, this would support compelling the production of Wyckoff's bank account statements.

      Second, in all likelihood, the draft memorandum was referring to the late 2006 episode, set forth in the then-Wyckoff CEO's March 2007 email to board members and New York State Department of Health representatives, annexed as Exhibit E, which describes one unauthorized transfer of funds from Caritas to Wyckoff by Wyckoff's CFO, whose employment was terminated after the unauthorized transfer came to the attention of the board. Not only does this episode demonstrate the importance to the defendants of maintaining separate corporate formalities, it contradicts yet another of Ross's purported catalogue of "substantial evidence of misuse of

---

[6] Ross also refers to a January 1, 2007 subordination agreement, which relates to the financing by Healthcare Finance Group, Inc., of the acquisition of the Caritas hospitals, pursuant to which Defendants' subordinated their investments in Caritas to that of the commercial lender. Since Caritas was not even launched until January 2007, the date of this document, it can hardly be evidence of Defendants' disregard of Caritas's separate corporate form.

# K&L|GATES

Honorable Roanne L. Mann
May 2, 2011
Page 6

the corporate form," which is the asserted but unexplained rationale for compelling the production of Wyckoff's bank account records.

For all of the foregoing reasons, defendants respectfully submit that the requested extension be granted only on condition that no further requests for documentary discovery be served during any such extension and that the motion to compel be denied in all respects.

Respectfully submitted,

Walter P. Loughlin /JHR

Walter P. Loughlin

cc: George J. Tzanetopolous, Esq.