# APPENDIX A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – x

| | | |
|---|---|---|
| ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD., | : | 09 Civ. 1410 (KAM) (RLM) |
| | : | |
| Plaintiff, | : | **SECOND AMENDED** |
| | | **COMPLAINT** |
| | : | **Jury Trial Demanded** |
| – against – | : | |
| | : | |
| BROOKLYN-QUEENS HEALTH CARE, INC. and WYCKOFF HEIGHTS MEDICAL CENTER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

– – – – – – – – – – – – – – – – – – – x

Plaintiff Ross University School of Medicine, Ltd. ("Ross"), by its

attorneys, Mayer Brown LLP, as and for its second amended complaint against defendants

Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center

("Wyckoff"), alleges as follows:

### Nature of the Action

1. This is an action for specific performance and other relief.

2. Ross, a medical school, and BQHC, a hospital holding company,

entered into a prepaid contract to place Ross medical students in clinical clerkship rotations

at two BQHC hospitals.  Those two hospitals have gone out of business, a prospect

contemplated and addressed in the parties' contract, which provides:  "In the event the

[now defunct] Hospitals are not operative, and [Ross] is not in material breach of the

Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its other facilities."

3.    The "other facilities" at which BQHC promised to make clerkships were at Wyckoff.  BQHC was and is the sole member of Wyckoff, and BQHC has the power to appoint Wyckoff's board.  BQHC, however, has failed to cause Wyckoff to make slots available to Ross, and this action seeks specific performance of BQHC's obligations under that contract and other relief stemming from BQHC's failure to supply the promised clerkships.

4.    BQHC now says that it is powerless to force Wyckoff to accommodate Ross students, and BQHC furthermore claims to be judgment-proof.  If so, then the corporate veil should be pierced and Wyckoff forced to answer directly for the obligations of a sham parent company.

**Parties**

*Ross*

5.    Ross is a corporation organized under the laws of the Commonwealth of Dominica.  Its principal place of business is in Dominica.

6.    Ross is a medical school located in the Commonwealth of Dominica, West Indies.  Ross provides a four-year course of medical education to qualified students, leading to a medical degree recognized by the United States Department of Education and all fifty States.

7.    Ross' student body is overwhelmingly composed of students who come from the United States and who intend to become physicians in the United States.

2

***BQHC and Wyckoff***

8.      BQHC is a corporation organized under the laws of the state of New York.  Its principal place of business is in Brooklyn, New York.

9.      BQHC owns and controls teaching hospitals that provide clinical clerkships to medical schools.

10.     BQHC, through its wholly owned subsidiary, Caritas, owns and controls two hospitals in Queens, St. Johns Queens Hospital and Mary Immaculate Hospital (the "Caritas Hospitals").

11.     BQHC also owns and controls Wyckoff Heights Medical Center ("Wyckoff") in Brooklyn.

12.     Wyckoff is a corporation organized under the laws of the state of New York.  Its principal place of business is in Brooklyn, New York.

13.     BQHC is the sole member of Wyckoff and has the power to appoint the members of the Wyckoff board.

14.     The boards of BQHC and Wyckoff overlap.

15.     Wyckoff operates, *inter alia*, a teaching hospital named Wyckoff Heights Medical Center.

16.     Wyckoff operates a program under which medical students are placed at Wyckoff for clinical clerkship rotations.

### Jurisdiction and Venue

17.     Subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.   Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because the both defendants, being corporations headquartered in this District, are deemed under 28 U.S.C. § 1391(c) to reside in this District.  Furthermore, the parties' agreement requires that any litigation between them be conducted in Brooklyn.

### Factual Allegations Relevant To Both Counts

*Clinical Clerkships*

19.   The final two years of the four-year M.D. degree program at Ross entails two years of clinical science instruction, which is typically conducted in teaching hospitals in the United States under pre-established arrangements between Ross and the teaching hospitals.  The clinical education is provided by a series of successively scheduled clinical "clerkships."

20.   The first year of a Ross medical student's two-year clinical clerkship rotation consists of "core" clerkships – compulsory courses of clinical study in the teaching hospitals – each lasting a number of weeks.  The second year consists of rotations of "elective" clerkships in those hospitals.

21.   Ross students intend and expect to complete their clinical clerkship training in U.S. teaching hospitals in order to secure their M.D. degrees from Ross, which then enables them to obtain medical residency in U.S. hospitals.  They rely upon Ross' ability to place them in clinical clerkships in U.S. teaching hospitals.  Ross' ability to place students in clinical clerkships at hospitals in the United States, therefore, is essential to Ross' ability to deliver a medical education to its students and to Ross' students' ability to complete their medical educations.

4

22.   The supply of clinical clerkships at U.S. teaching hospitals is very limited and increasingly inadequate to accommodate demand from the growing number of medical students who need to complete clinical training in order to complete their medical educations.

23.   Ross competes for clinical clerkship slots with medical schools from state-sponsored universities, private universities in the U.S., and international medical schools.

24.   One way in which Ross is able to achieve a competitive advantage, to secure a reliable supply of clinical clerkships for its students, and simultaneously to control the cost of the clerkship slots is by locking in future supplies of clinical clerkship slots at fixed costs under prepaid contracts with teaching hospitals.  These arrangements are attractive to the teaching hospitals, in part, because Ross pre-pays for the slots, thereby providing operating capital for the hospitals.

*Importance of the Location of Clerkships to Ross and Its Students*

25.   The location and type of the clinical clerkships offered by Ross are of great importance to Ross' medical students.

26.   Over the two years of their clerkship training at institutions in the U.S., medical students begin to develop academic and professional relationships and connections with clinicians at these institutions.

27.   Following graduation, many Ross graduates will start residencies at the hospitals at which they completed their clinical clerkships.  Many others will start residencies at hospitals in the same geographic area where they trained in their clerkship programs.

5

28.     Thus, the location of the clerkships at issue here, *viz.*, New York City, is significant to Ross and its students.

***Timing of Clerkships***

29.     The timing of entry into the clerkships dictates the completion date upon which students will earn their medical degrees, and thus is of critical importance to Ross' students, particularly as it impacts the students' commencement of their requisite post-graduate residency training.

30.     Hospital residency positions are allocated once each year on May 31st through a nation-wide process conducted by the National Residency Match Program.  This program matches medical students with hospitals offering residency training.

31.     A student who intends to start a residency must have completed all academic, financial and other requirements no later than May 31st of that year.  Students who do not complete their course of clinical rotations by the May 31st deadline will miss qualifying for the nationwide match program.

32.     Thus, if a student misses that May 31st deadline for completion of his or her clinical instruction, the student will be prevented from beginning his or her residency for another entire year.

33.     In addition to the harm caused in and of itself by that delay, the failure to begin residency on time can have other drastically adverse consequences.  In many cases, a hiatus in full-time medical education will trigger repayment obligations for student loans.  Such loans typically defer repayment only as long as a student is a full-time medical student or resident, subject to a single 6-month grace period.

34.    Thus, any interruption, even for a short time, in the course of a medical student's clinical clerkship can have devastating consequences on a student's medical education, financial circumstances, and career.

35.    The loss of clinical clerkship slots therefore causes financial and reputational loss to Ross' academic program, the probable loss of current students, the probable loss of incoming students, and irreparable harm to Ross' reputation and goodwill.

36.    The fact that medical schools currently are attempting to secure an increasing number of clinical clerkship slots in a market in which supply is very limited is a fact that is generally known by all those who are engaged in clinical education and is and was at all material times known by defendant BQHC.

37.    The importance of the timing of the clerkships to the students and Ross is a fact that affects and is generally known by all who are engaged in clinical education and is and has been at all material times known by defendant BQHC.

38.    In sum, when BQHC accepted very substantial pre-payments from Ross and in return guaranteed clerkships to Ross, BQHC knew the importance to Ross of that guaranty and the catastrophic harm that Ross would suffer, should BQHC breach the parties' agreement.

*Affiliation Agreement Between Ross and BQHC*

39.    On or about December 28, 2006, BQHC and Ross entered into the "Affiliation Agreement" reproduced as Exhibit 1 hereto.

40.    Under the terms of the Affiliation Agreement, Ross advanced $5,000,000 to BQHC.  In exchange, BQHC guaranteed that it would cause the Caritas

Hospitals to provide 50 core clerkships and 50 elective clerkships to Ross for use by Ross' students.

41.   The Affiliation Agreement provides that the rate for those clerkship slots would be $312.50 per week and that Ross would be entitled to the clerkship slots until the prepaid sums and accrued interest at the contractually provided rate had been exhausted by provision to Ross of clerkship slots at that rate.

42.   Exhibit B to the Affiliation Agreement also expressly provides that "[i]n the event the [Caritas] Hospitals are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its other facilities."

43.   The parties have amended the Affiliation Agreement to increase the sums advanced by Ross and the number of Caritas Hospital clerkships guaranteed to Ross by BQHC.  Exhibit 2 hereto is a true and correct copy of the First Amendment to the Affiliation Agreement.  Exhibit 3 hereto is a true and correct copy of the Second Amendment to the Affiliation Agreement.  Exhibit 4 is a true and correct copy of a letter agreement entered into by Ross and BQHC.

44.   At present, under the Affiliation Agreement as amended, Ross has advanced more than $6.1 million to BQHC that remains unearned through the provision of Caritas Hospital clerkship slots, and Ross is entitled to 135 core clerkship slots and 135 elective clerkship slots per week until January 31, 2015.

***Closure of the Caritas Hospitals***

45.   In early 2009, BQHC announced that it was closing St. Johns and Mary Immaculate Hospitals.

8

46. On February 6, 2009, Caritas and certain affiliates filed for protection under Chapter 11 of the Bankruptcy Code, *In re Caritas Healthcare, Inc. et al.*, Jt. Admin. Ch. 11 Case No. 09-B-40901 (Bankr. E.D.N.Y.).

47. The Caritas Hospitals are now closed. As a result of the fact that the Caritas Hospitals are not operating, Ross students scheduled for rotation at the Caritas Hospitals do not have access to clerkships at the Caritas Hospitals.

*BQHC's Breach*

48. Initially, BQHC provided clerkships at Wyckoff for 34 Ross students who were scheduled for clerkships at the now-closed Caritas Hospitals.

49. However, in breach of the parties' contract, the other guaranteed clerkships were denied to the Ross students who had been scheduled to use them.

50. Ross has been able to place some but not all of those displaced students at other facilities.

51. Ross has paid to those other facilities sums in excess of the Affiliation Agreement's contract rate for clinical clerkships. Ross has also incurred other losses in connection with placing students in other facilities for clerkships.

52. Ross has not been able to place at other facilities all of the students that were scheduled for clerkships at the Caritas Hospitals.

53. Recently, BQHC has informed Ross that BQHC will no longer provide any additional replacement clerkship slots at Wyckoff.

**Count I**
***Claim for Relief Against BQHC***

54. Ross repeats and realleges the allegations of paragraphs 1 through 52 as if fully set forth herein.

55.   BQHC's failure to provide replacement slots to Ross for all Ross students displaced when the Caritas Hospitals ceased to operate is a breach of the parties' contract.

56.   BQHC's refusal to provide to Ross additional clerkships at Wyckoff is a breach of BQHC's contractual obligation to provide at its other facilities an equivalent number of clerkships to those lost to Ross when the Caritas Hospitals ceased to operate.

57.   The contracts for clinical clerkships at these New York City hospitals are unique.  They cannot be replicated exactly at any other institution.

58.   On information and belief, contracts between BQHC (and/or Wyckoff) and other medical schools for the provision of clerkship slots at Wyckoff expire during the term of the contract between BQHC and Ross.

59.   Clerkships that are in any sense reasonably comparable are in extremely short supply and the market cost for the few that can be found is well above the rate established in the Affiliation Agreement, as amended.  The guarantee of a reliable future supply of clinical clerkships at attractive hospital locations and at fixed rates was what enticed Ross to pre-pay several millions of dollars to BQHC.

60.   To the extent that any sufficiently similar American institution can be located to provide a reasonably comparable clinical clerkship program, the cost of those clerkships will be greatly in excess of the price for which BQHC agreed to provide clerkship slots to Ross.

61.   To build and maintain credibility and viability in the provision of quality medical education for international medical schools is extremely difficult.  The loss of goodwill occasioned by adverse circumstances is correspondingly rapid.

62.    The loss to Ross caused by BQHC's threatened conduct has and will cause enormous loss of reputation and goodwill within the current student body, diminish the value of Ross degrees in the medical community and with the future employers of Ross' students, and likely would discourage many potential students from even considering enrolling at Ross in the future.

63.    The loss of the New York slots also will cause substantial "backing up" throughout the clerking system and put many more of Ross' students out-of-synch with residency programs.

64.    By reason of the matters aforesaid, an order of specific performance of the contract is appropriate.

## Count II
### *Claim for Relief Against Wyckoff*

65.    Ross repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

66.    The corporate veil of Wyckoff should be pierced to impose upon Wyckoff the liability for the claims set forth in Count I herein.

67.    Wyckoff formed BQHC in connection with Wyckoff's purchase of the Caritas Hospitals out of a bankruptcy estate.

68.    Wyckoff believed that, by consolidating in BQHC the responsibility for general policies, financial management, strategic planning, legal counseling, and billing operations (among other things) of Wyckoff and Caritas, the financial situation of both entities would be enhanced.

69.    BQHC has few, if any, assets, and was never adequately capitalized.

70.    BQHC has no physical location other than Wyckoff's.

11

71.   BQHC and Wyckoff have overlapping officers and directors.

72.   BQHC has no employees.

73.   BQHC does not have information technology systems.  Yet, the email addresses for a number of Wyckoff employees and officers conclude (or at one time concluded) with the domain name "bqhcny.org."

74.   BQHC's regulatory and corporate filings list as its address the address of Wyckoff.

75.   The initial Affiliation Agreement at issue in this action (Ex. 1) was executed on behalf of BQHC by Harold MacDonald under the title "Executive Vice President and Chief Operating Officer."  At the time of execution of this agreement, MacDonald was Executive Vice President and Chief Operating Officer of Wyckoff.

76.   The December 2007 amendment to the Affiliation Agreement (Ex. 2) was executed on behalf of BQHC by Paul Goldberg under the title "Chief Financial Officer" and Julius Romero under the title "AVP Medical Education."  At the time of the execution of this amendment Goldberg was Chief Financial Officer of Wyckoff and Romero was Assistant Vice President Medical Education of Wyckoff.

77.   The Second Amendment to the Affiliation Agreement was executed on behalf of BQHC by Julius Romero under the title "AVP Medical Education" and by Thomas Singleton under the title "Chief Executive Officer."  At the time of the execution of this amendment Romero was Assistant Vice President Medical Education of Wyckoff and Singleton was the Chief Executive Officer of Wyckoff.

78.   In all meaningful respects, Wyckoff controlled and controls BQHC.

79.   Permitting Wyckoff to escape liability in this action by employing the shell of BQHC as the contracting party in these transactions would work an injustice on Ross.

80.   Accordingly, the court should pierce the corporate veil and impose liability for breach of the Affiliation Agreement and amendments upon Wyckoff.

WHEREFORE, Ross respectfully requests that the Court enter judgment in favor of Ross and against BQHC and Wyckoff:

A.   Decreeing specific performance of the Affiliation Agreement and ordering BQHC and Wyckoff to provide to Ross during the term of the parties' contract with all clerkships presently available at Wyckoff or that become available whether by reason of the expiration of contracts with other medical schools or otherwise;

B.   Awarding damages in an amount to be proved at trial for the costs of replacing clerkships slots lost to Ross;

C.   Awarding the other incidental and consequential damages flowing from the defendants' breaches; and,

D.   Granting interest; costs and such other relief as to the Court appears just and proper.

**Jury Trial Demand**

Ross demands trial by jury of all issues so triable.

Dated: New York, New York
       September 22, 2009

                          MAYER BROWN LLP

                          By: _____
                             Michael O. Ware
                             *mware@mayerbrown.com*
                             Andrew J. Calica
                             *acalica@mayerbrown.com*

                          1675 Broadway
                          New York, N.Y. 10019
                          (212) 506-2500

                          *Attorneys for plaintiff*

*Of Counsel:*

George J. Tzanetopoulos
David K. Cole, III
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, Ill. 60606
(312) 782-0600

GREENBERG TRAURIG LLP
Ronald D. Lefton (RL 2666)
Serena Boscia Montalbano (SB 2009)
Metlife Building
200 Park Avenue
New York, NY 10166
Telephone:  212-801-9200
Fax:  212-801-6400

*Attorneys for Defendants*
*Brooklyn-Queens Health Care, Inc.*
*and Wyckoff Heights Medical Center*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ROSS UNIVERSITY SCHOOL OF                )
MEDICINE, LTD.,                                       )
                                                                )   09 Civ. 1410 (KAM) (RLM)
                                        Plaintiff,         )
                                                                )   **ANSWER TO SECOND**
                -against-                                )   **AMENDED COMPLAINT**
                                                                )
BROOKLYN-QUEENS HEALTH CARE,    )
INC. and WYCKOFF HEIGHTS MEDICAL  )
CENTER,                                                  )
                                                                )
                                        Defendants.      )
                                                                )
------------------------------------------------------x

     Defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical

Center ("Wyckoff") (collectively the "Defendants"), by their undersigned attorneys,

GREENBERG TRAURIG, LLP, as and for their Answer to the Second Amended Complaint

dated September 22, 2009 (the "Second Amended Complaint"), allege as follows:

     1.     Paragraph 1 of the Second Amended Complaint is a conclusion of law that does

not call for an admission or denial, but to the extent any response is required, Defendants deny

all such allegations.

     2.     To the extent that Paragraph 2 of the Second Amended Complaint makes factual

allegations, Defendants deny all such allegations except admit that Plaintiff relies upon an

alleged contract that purported to provide clinical clerkships at two Queens hospitals owned and operated by a New York corporation which is not a party to this action and which is in bankruptcy proceedings under chapter 11 of the United States Bankruptcy Code, and that both of the subject hospitals are closed and out of business.

3.      Defendants deny the allegations contained in Paragraph 3 of the Second Amended Complaint, except admit that BQHC is a New York not-for-profit corporation and the sole corporate member of Wyckoff and Caritas Health Care, Inc. ("Caritas"), and, as such, it elects the Trustees of both the Wyckoff and Caritas corporations, but neither operates nor controls said entities.

4.      Defendants deny the allegations contained in Paragraph 4 of the Second Amended Complaint except admit that BQHC does not have the authority to force Wyckoff to accommodate Ross' students.

5.      Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Second Amended Complaint.

6.      Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Second Amended Complaint.

7.      Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Second Amended Complaint.

8.      Defendants deny the allegations contained in Paragraph 8 of the Second Amended Complaint except admit that BQHC is a not-for-profit corporation existing under and by virtue of the laws of the State of New York.

9.      Defendants deny the allegations contained in Paragraph 9 of the Second Amended Complaint.

10.     Defendants deny the allegations contained in Paragraph 10 of the Second Amended Complaint except admit that Defendant BQHC is the sole corporate member of Caritas and that Caritas was the owner and, in accordance with the New York State Health Law and all applicable regulations, Caritas was the exclusive operator of the two Queens hospitals, St. John's Queens Medical Center and Mary Immaculate Hospital, before their closure.

11.     Defendants deny the allegations contained in Paragraph 11 of the Second Amended Complaint except admit that Defendant BQHC is the sole corporate member of Wyckoff.

12.     Defendants admit the allegations contained in Paragraph 12 of the Second Amended Complaint.

13.     Defendants admit the allegations contained in Paragraph 13 of the Second Amended Complaint.

14.     Defendants deny the allegations contained in Paragraph 14 of the Second Amended Complaint except admit that certain members of the Board of Trustees of Wyckoff are also members of the Board of Trustees of BQHC.

15.     Defendants admit the allegations contained in Paragraph 15 of the Second Amended Complaint.

16.     Defendants admit the allegations contained in Paragraph 16 of the Second Amended Complaint.

17.     Paragraph 17 of the Second Amended Complaint is a conclusion of law that does not call for an admission or denial.

18.     Defendants admit the allegations contained in Paragraph 18 of the Second Amended Complaint as to venue under 28 U.S.C. § 1391(a)(1).  Defendants further admit that a

provision of the agreement on which Plaintiff relies requires that any litigation between certain of the parties be conducted in Brooklyn.

19.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of the Second Amended Complaint.

20.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Second Amended Complaint.

21.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Second Amended Complaint.

22.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Second Amended Complaint.

23.     Defendants admit the allegations contained in Paragraph 23 of the Second Amended Complaint.

24.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Second Amended Complaint, except admit that, under the contract on which Ross relies, Ross prepaid certain amounts to Caritas for the clerkship slots.

25.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Second Amended Complaint.

26.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Second Amended Complaint.

27.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Second Amended Complaint.

28.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Second Amended Complaint.

29.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Second Amended Complaint.

30.     Defendants deny the allegations contained in Paragraph 30 of the Second Amended Complaint.

31.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Second Amended Complaint.

32.     Defendants deny the allegations contained in Paragraph 32 of the Second Amended Complaint.

33.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 of the Second Amended Complaint.

34.     Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 of the Second Amended Complaint.

35.     Defendants deny the allegations contained in Paragraph 35 of the Second Amended Complaint.

36.     Defendants deny the allegations contained in Paragraph 36 of the Second Amended Complaint.

37.     Defendants deny the allegations contained in Paragraph 37 of the Amended Complaint.

38.     Defendants deny the allegations contained in Paragraph 38 of the Second Amended Complaint.

39.     Defendants deny the allegations contained in Paragraph 39 of the Second Amended Complaint.

40.     Defendants deny the allegations contained in Paragraph 40 of the Second Amended Complaint.

41.     Defendants deny the allegations contained in Paragraph 41 of the Second Amended Complaint, which characterize a provision of the agreement on which Plaintiff relies and refers the Court to the entire alleged agreement as amended for a complete statement of its terms and conditions.

42.     Defendants deny the allegations contained in Paragraph 42 of the Second Amended Complaint, which characterize a provision of the agreement on which Plaintiff relies and refers the Court to the entire alleged agreement as amended for a complete statement of its terms and conditions.

43.     Defendants deny the allegations contained in Paragraph 43 of the Second Amended Complaint, which characterize a provision of the agreement on which Plaintiff relies and refers the Court to the entire alleged agreement as amended for a complete statement of its terms and conditions.

44.     Defendants deny the allegations contained in Paragraph 44 of the Amended Complaint.

45.     Defendants deny the allegations contained in Paragraph 45 of the Second Amended Complaint except admit that Caritas announced the closing of St. John's Queens Medical Center and Mary Immaculate Hospital.

46.     Defendants admit the allegations contained in Paragraph 46 of the Second Amended Complaint.

47.   Defendants admit the allegations contained in Paragraph 47 of the Second Amended Complaint.

48.   Defendants deny the allegations contained in Paragraph 48 of the Second Amended Complaint except admit that Wyckoff provided some clerkships for some Ross students.

49.   Defendants deny the allegations contained in Paragraph 49 of the Second Amended Complaint.

50.   Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 of the Second Amended Complaint.

51.   Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 51 of the Second Amended Complaint.

52.   Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52 of the Second Amended Complaint.

53.   Defendants deny the allegations contained in Paragraph 53 of the Second Amended Complaint.

54.   Answering Paragraph 54 of the Second Amended Complaint, Defendants repeat and reallege their responses to each and every allegation contained in paragraphs 1 through 53.

55.   Defendants deny the allegations contained in Paragraph 55 of the Second Amended Complaint.

56.   Defendants deny the allegations contained in Paragraph 56 of the Second Amended Complaint.

57.   Defendants deny the allegations contained in Paragraph 57 of the Second Amended Complaint.

58.   Defendants deny the allegations contained in Paragraph 58 of the Second Amended Complaint.

59.   Defendants deny the allegations contained in Paragraph 59 of the Second Amended Complaint.

60.   Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 60 of the Second Amended Complaint.

61.   Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 61 of the Second Amended Complaint.

62.   Defendants deny the allegations contained in Paragraph 62 of the Second Amended Complaint.

63.   Defendants deny the allegations contained in Paragraph 63 of the Second Amended Complaint.

64.   Defendants deny the allegations contained in Paragraph 64 of the Second Amended Complaint.

65.   Answering Paragraph 65 of the Second Amended Complaint, Defendants repeat and reallege their responses to each and every allegation contained in Paragraphs 1 through 64.

66.   Defendants deny the allegations contained in Paragraph 66 of the Second Amended Complaint.

67.   Defendants deny the allegations contained in Paragraph 67 of the Second Amended Complaint.

68.   Defendants deny the allegations contained in Paragraph 68 of the Second Amended Complaint.

69.     Defendants deny the allegations contained in Paragraph 69 of the Second Amended Complaint except admit that BQHC has few assets.

70.     Defendants deny the allegations contained in Paragraph 70 of the Second Amended Complaint.

71.     Defendants deny the allegations contained in Paragraph 71 of the Second Amended Complaint except admit that certain members of the Board of Trustees of Wyckoff are also members of the Board of Trustees of BQHC.

72.     Defendants admit the allegations contained in Paragraph 72 of the Second Amended Complaint except state that BQHC had unpaid officers and trustees.

73.     Defendants deny the allegations contained in Paragraph 73 of the Second Amended Complaint except admit that BQHC facilitated the operation of a central business office and IT system cooperatively with Wyckoff and Caritas.

74.     Defendants deny the allegations contained in Paragraph 74 of the Second Amended Complaint except admit that at the time of its creation BQHC listed its address for service of process, and business address, as 374 Stockholm Street, Brooklyn, New York.

75.     Defendants admit the allegations contained in Paragraph 75 of the Second Amended Complaint except state that Harold MacDonald was also an officer of Caritas during the relevant time period and acted in that capacity with respect to the alleged agreement with Ross.

76.     Defendants admit the allegations contained in Paragraph 76 of the Second Amended Complaint except deny that at the time of the December 2007 amendment Paul Goldberg was Chief Financial Officer of Wyckoff and deny that the December 2007 amendment was executed by anyone in their capacity as a representative of Wyckoff.

9

77.     Defendants admit the allegations contained in Paragraph 77 of the Second Amended Complaint except deny that at the time of the Second Amendment to the Affiliation Agreement Thomas Singleton was Chief Executive Officer of Wyckoff and deny that the Second Amendment to the Affiliation Agreement was executed by anyone in their capacity as a representative of Wyckoff.

78.     Defendants deny the allegations contained in Paragraph 78 of the Second Amended Complaint.

79.     Defendants deny the allegations contained in Paragraph 79 of the Second Amended Complaint.

80.     Defendants deny the allegations contained in Paragraph 80 of the Second Amended Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

81.     The Second Amended Complaint fails to state a claim upon which relief may be granted.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

82.     The Second Amended Complaint fails to join a necessary and indispensable party, i.e. Caritas Health Care, Inc.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

83.     The allegations in the Second Amended Complaint are not sufficient to pierce the corporate veil as to Defendant Wyckoff.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

84.     The Second Amended Complaint is barred by the doctrine of impossibility.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

85.    The Agreement upon which Plaintiff relies is unenforceable by reasons of the doctrine of ultra vires in connection with Defendant BQHC as an entity and the individuals who signed the alleged agreement and amendments.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

86.    The Second Amended Complaint is barred on the ground that Defendant BQHC acted as agent for a disclosed principal, Caritas.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

87.    The Second Amended Complaint is barred on the ground that Defendant BQHC lacked the authority to enter into the alleged Agreement.

## AS AND FOR AN EIGHT AFFIRMATIVE DEFENSE

88.    The Second Amended Complaint is barred by the doctrine of mutual mistake.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

89.    The Second Amended Complaint is barred as contrary to public policy.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

90.    Plaintiff has failed to mitigate its alleged damages.

## AS AN FOR AN ELEVENTH AFFIRMATIVE DEFENSE

91.    The relief requested is barred by statute and government regulations.

## AS AN FOR A TWELFTH AFFIRMATIVE DEFENSE

92.    The Second Amended Complaint fails for lack of consideration.

93.    Defendants reserve the right to add, amend or withdraw their affirmative defenses as further investigation or discovery so dictates.

WHEREFORE, Defendants respectfully request that the Court dismiss the Second Amended Complaint with prejudice, together with awarding to Defendants such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 6, 2009

GREENBERG TRAURIG, LLP

By: /S/ Ronald D. Lefton
    Ronald D. Lefton (RL 2666)
    Serena Boscia Montalbano (SB 2009)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
leftonr@gtlaw.com
bosciamontalbanos@gtlaw.com
*Attorneys for Defendants*
*Brooklyn-Queens Health Care, Inc. and Wyckoff Heights Medical Center*

12