# REDACTED



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,

               Plaintiff,

      - against -                             09 Civ. 1410 (KAM) (RLM)

BROOKLYN-QUEENS HEALTH CARE, INC. and
WYCKOFF HEIGHTS MEDICAL CENTER,

               Defendants.

-------------------------------------------------------------X

## RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

       Defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center ("Wyckoff") (together, "Defendants") respectfully submit this Rule 56.1 Statement of Undisputed Facts in support of their motion for partial summary judgment, dated December 2, 2011, dismissing two of the principal theories of liability alleged by Plaintiff Ross University School of Medicine, Ltd. ("Ross"). The following undisputed facts entitle Defendants to partial summary judgment as a matter of law.

## BACKGROUND FACTS

### Wyckoff's Long History as a Not-For-Profit Hospital

       1.      Originally known as the German Hospital Society of Brooklyn, Wyckoff was formed on September 18, 1889. *See* Declaration of Justin H. Roeber, Esq., sworn to on December 2, 2011 ("Roeber Dec."), submitted herewith, Exh. 1, at BQHC 00368. For more than a century, Wyckoff's stated mission has been to "maintain a public Hospital . . . in the City of Brooklyn . . . ." *Id.* at BQHC 00367.

2.      Consistent with that mission, Wyckoff's corporate Bylaws provide that Wyckoff's purpose is:

> [T]o *establish[,] maintain, and operate, on a not-for-profit basis, a Medical Center facility* for the prevention, diagnosis, treatment and/or rehabilitation of inpatients, ambulatory service patients and out-patients who visit, live and work in the community . . . *in compliance with the spirit and letter of the law and all pertinent regulatory and accreditation standards .* . . .

Roeber Dec., Exh. 1, at BQHC 00344-00345 (emphasis added).

## The New York Public Health Law

3.      In New York, the delivery of healthcare services by a licensed hospital is a highly regulated activity.  For instance, among the statutory and regulatory requirements that Wyckoff must follow are those set forth in Article 28 of New York's Public Health Law ("Article 28"). *See* Declaration of David N. Hoffman, Esq., sworn to on November 30, 2011 ("Hoffman Dec."), submitted herewith, ¶¶ 6, 12-13 & Exh. 1.

4.      Article 28 provides, among other things, that:

- A hospital may not operate in New York State unless it has been "established" by New York's Public Health and Health Planning Council (formerly known as the Public Health Council) ("PHHPC") and has received an "operating certificate" from New York State's Commissioner of Health (the "Commissioner");

- A corporation may not file a "certificate of incorporation . . . which includes among its corporate purposes or powers the establishment or operation of any hospital" without PHHPC's written approval;

- PHHPC must similarly approve "[a]ny change in the person" who operates a hospital or "[a]ny transfer . . . of ten percent or more of the stock of a corporation which is the operator of a hospital"; and

- PHHPC shall not approve an entity to operate a hospital unless it is "satisfied" as to the "character, competence, and standing in the community" of the operator, and is further satisfied that the proposed operator provides "a substantially consistent high level of care."

- 2 -

*See id.* at Exh. 1, at N.Y. Pub. Health Law §§ 2801-a(1), 2801-a(2), 2801-a(3), 2801-a(4)(a), 2801-a(4)(c), and 2805(1)(a).

5.     In accordance with these statutory provisions, PHHPC has "established" Wyckoff, which maintains an "operating certificate" from the Commissioner permitting Wyckoff to operate a hospital in New York State. *See* Hoffman Dec., ¶ 14 & Exh. 2 (Wyckoff's operating certificate).

6.     Article 28's implementing regulations further define the "operator" of a hospital as the person or entity with "decision-making authority" over any of a number of enumerated items, including: (a) hospital operating procedures; (b) hospital debt; and (c) "hospital contracts for management or for clinical services." *See* Hoffman Dec, Exh. 1, at 10 N.Y.C.R.R. § 405.1(c).

7.     Article 28's implementing regulations also require each hospital operating in New York State to have a governing body that is "legally responsible for directing the operation of the hospital," and expressly prohibit any limitation on that governing body's powers, stating:

> *No contracts/arrangements* or other agreements *may limit or diminish* the responsibility of the governing body *in any way.*

*Id.* at 10 N.Y.C.R.R. § 405.2(b)(1) (emphasis added).

8.     Finally, Article 28's implementing regulations require each hospital operating in New York State to have a Chief Executive Officer ("CEO") responsible for the "daily management and operational affairs of the hospital." Hoffman Dec., Exh. 1, at 10 N.Y.C.R.R. § 405.3; *see also id.* at §§ 405.2(d), 405.3(a), 405.3(b). Article 28's implementing regulations permit a hospital operating in New York State to delegate certain of the CEO's powers by contract provided that the Commissioner expressly consents to the delegation. *See id.* at 10 N.Y.C.R.R. §§ 405.3(f)(1)-(2), 405.3(f)(3)(iii). However, certain of the CEO's powers may not

be delegated under any circumstances; these powers include "the authority to incur on behalf of the [hospital] liabilities not normally associated with the day-to-day operation of a facility." *Id.* at 10 N.Y.C.R.R. § 405.3(f)(3)(iii); *see also id.* at §§ 405.3(f)(1)-(2).

9.    In accordance with these implementing regulations, Wyckoff's Bylaws provide that Wyckoff is governed by a Board of Trustees that is tasked with, among other things:

      a.   Ensuring compliance with federal, state, and local laws;

      b.   Appointing Wyckoff's officers, including its President/CEO; and

      c.   Appointing Wyckoff's medical staff, including its medical director.

*See* Roeber Dec., Exh. 1, at BQHC 00345-00349.

10.    Wyckoff's Bylaws further grant Wyckoff's President/CEO "the general powers . . . necessary to operate [Wyckoff] and all of its activities," including responsibility "to maintain [Wyckoff]'s compliance with statutory and regulatory requirements." *Id.* at BQHC 00350.

11.    Wyckoff's Board and corporate officers have abided by the requirements of Article 28, its implementing regulations, and New York's Public Health Law generally since those statutes and regulations went into effect. *See* Hoffman Dec., ¶ 18; *see also* Declaration of A.C. Rao, M.D., sworn to on November 14, 2011 ("Rao Dec."), submitted herewith, ¶ 14. In particular, Wyckoff's Board and corporate officers have strictly adhered to Article 28's requirement that only an entity licensed under Article 28 may operate a hospital located in New York State. Wyckoff's Board has never permitted any Wyckoff-affiliated entity to operate Wyckoff's hospital facilities. *See* Rao Dec., ¶¶ 14-15.

## THE ST. VINCENT'S BANKRUPTCY

### Defendants Come to the Rescue of Two Hospitals About to Be Shuttered

12.     On July 5, 2005, St. Vincent's Catholic Medical Centers ("St. Vincent's") filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. *See In re Saint Vincent's Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Jt. Admin. Ch. 11 Case No. 05-14945 (Bankr. S.D.N.Y.).

13.     Two of the hospitals within the St. Vincent's system at the time were Mary Immaculate Hospital ("Mary Immaculate") and St. John's Queens Hospital ("St. John's Queens"), located in the Queens, New York neighborhoods of Elmhurst and Jamaica, respectively. *See id.* at Dkt. No. 437 (October 3, 2005 schedule of St. Vincent's assets and liabilities showing ownership of St. John's Queens and Mary Immaculate); *see also* Roeber Dec., Exh. 2 (Deposition Transcript of John St. James ("St. James Tr.")), p. 49:9-19; *id.* at Exh. 3 (Deposition Transcript of David N. Hoffman, Esq. ("Hoffman Tr.")), p. 49:9-24.

14.     In connection with its bankruptcy, St. Vincent's planned to close Mary Immaculate and St. John's Queens permanently if a buyer could not be found. *See* Roeber Dec., Exh. 4, at BQHC 00195 (minutes from the March 6, 2008 meeting of BQHC's Board of Trustees, reporting that St. Vincent's planned to close St. John's Queens and Mary Immaculate "if Wyckoff had not submitted a bid" for them). Prior to May 2006, Wyckoff approached St. Vincent's and offered to rescue Mary Immaculate and St. John's Queens from closure. *See id.* at BQHC 00195; *see also* Hoffman Tr., p. 100:16-20 (describing Wyckoff's efforts to "rescue" Mary Immaculate and St. John's Queens).

15.     Subsequently, Wyckoff and St. Vincent's executed a May 9, 2006 Asset Purchase Agreement for the acquisition of St. John's Queens and Mary Immaculate (the "Acquisition Agreement"). *See* Roeber Dec., Exh. 5 ("Acquisition Agreement"), at BQHC 00558-00663.

16.     Pursuant to the Acquisition Agreement, Wyckoff agreed that St. John's Queens and Mary Immaculate would "continue to [follow] the ethical and religious directives of the [C]onference of Catholic Bishops for so long as the hospitals were known as St. John's [Queens] and Mary Immaculate." Hoffman Tr., p. 113:16-23; *see also* Acquisition Agreement § 8.9, at BQHC 00636-00637.

17.     The ethical and religious directives in effect from the time the Acquisition Agreement was signed in May 2006 through November 2009 prohibited certain practices, centering on reproductive and end-of-life issues, which could conflict with Roman Catholic Church doctrine. *See* Roeber Dec., Exh. 6. The directives also prohibited "cooperation between institutions that honor the [Conference's] ethical and religious directives and those that do not." Hoffman Tr., p. 112:5-8; *see* Roeber Dec., Exh. 6, at Directives 67-72.

**New Wyckoff Affiliates Are Created to Comply With the Directives**
**Issued By the Conference of Catholic Bishops**

18.     Due to the increasing trend of consolidation among hospitals throughout the country, many hospitals and hospital systems have undergone changes in their corporate structure when secular hospitals merged with, or acquired, Catholic hospitals. *See* Roeber Dec., Exh. 7 (news articles describing these trends over the last 20 years);[1] Hoffman Dec., ¶¶ 26-27.

19.     Because Wyckoff was a secular institution, it could not comply with the ethical and religious directives from the Conference of Catholic Bishops without altering its corporate

---

[1]     Specifically, the news articles attached as Exhibit 7 to the Roeber Declaration are: (a) Mark Hayward, *Proposed CMC Deal Given Boost*, N.H. UNION LEADER, Dec. 12, 2009, at 01; (b) Melanie Evans, *Faith Permeates Hospital Merger; Miller-Dwan Strives to Prevent Catholic Influence From Limiting Patient Choices*, DULUTH NEWS-TRIBUNE, Sept. 7, 2001, at 01A; (c) Roni Rabin, *Takeover Deal for 2 Hospitals*, NEWSDAY, Feb. 4, 1998, at A30; (d) Julie Sneider, *Mixing Catholic, Secular Hospitals a Delicate Balancing Act*, BUSINESS JOURNAL-MILWAUKEE, July 9, 1994, at 1; (e) Bruce Japsen, *Church Puts Faith in System Mergers in Light of Healthcare Reforms, Catholic Hospitals Face the Challenge of Non-Catholic Collaborations*, MODERN HEALTHCARE, June 6, 1994, at 32; and (f) John George, *Two Montco Hospitals Form Partnership to Mesh Services*, PHILADELPHIA BUS. J., Sept. 7, 1992, at 6.

structure. *See* Hoffman Tr., pp. 111:23-115:2 (noting that "the whole purpose behind the particular passive parent sole corporate member structure that we adopted" for the acquisition of St. John's Queens and Mary Immaculate was that Wyckoff did "not adhere to the ethical and religious directives" of the Conference of Catholic Bishops); *see also* Hoffman Dec., ¶ 5.

20.     Accordingly, five individuals who were senior members of Wyckoff's Board of Trustees created a new, separate and distinct Wyckoff affiliate – Caritas Health Care Planning, Inc., later renamed Caritas Health Care, Inc. ("Caritas") – to acquire and operate Mary Immaculate and St. John's Queens. *See* Acquisition Agreement, at BQHC 00558; *see also* Hoffman Tr., p. 19:7-17 (discussing Caritas's corporate history); Roeber Dec., Exh. 8, at BQHC 00522-00523 (Caritas certificate of incorporation). Those five individuals – Emil Rucigay, Esq., Adam Figueroa, John H. Cook, Jr., Esq., Vincent Arcuri, and Frederick T. Haller, Esq. – were also the initial Trustees of Caritas. *See* Roeber Dec., Exh. 8, at BQHC 00522-00523.

21.     Caritas's certificate of incorporation, as amended, describes its corporate purpose as being:

> To establish, maintain and/or *operate a hospital or hospitals within the State of New York* for the medical and surgical care and treatment of inpatients and outpatients *and to operate residency and related programs* in connection with the provision of such care.

*Id.* at BQHC 00530 (emphasis added). Caritas was thus "formed to be the license holder of St. John's [Queens] and Mary Immaculate" for Article 28 purposes. Roeber Dec., Exh. 9, at BQHC 03784 (minutes from the December 14, 2006 meeting of Wyckoff's Board of Trustees).

22.     To ensure Caritas's adherence to the ethical and religious directives of the Conference of Catholic Bishops, the Bishop of the Roman Catholic Diocese of Brooklyn was entitled, pursuant to Caritas's corporate Bylaws, to designate one or more members of the Caritas Board of Trustees. *See* Roeber Dec., Exh. 10, at BQHC 01833-01834.

- 7 -

23.     From 2007-2009, Caritas's Board of Trustees included two members nominated by the Bishop of the Roman Catholic Diocese of Brooklyn – Reverend Patrick Frawley, a Roman Catholic priest, and Mark Lane, a layperson – neither of whom served on Wyckoff's Board of Trustees. *See* Declaration of Emil Rucigay, Esq., sworn to on November 17, 2011 ("Rucigay Dec."), submitted herewith, ¶ 32.

24.     Pursuant to Section 8.9 of the Acquisition Agreement and the Conference of Catholic Bishops's directives, Wyckoff:   (a) took a pre-existing affiliate entity, WHMC Properties, Inc.; (b) renamed that affiliate entity as BQHC; and (c) made BQHC the "sole member" of both Wyckoff and Caritas. *See* Roeber Dec., Exh. 11, at BQHC 00466-00469 (BQHC's Certificates of Incorporation and Amendment); *see also id.* at Exh. 8, at BQHC 00531 (Caritas's August 25, 2006 Certificate of Amendment noting BQHC is Caritas's "sole member"); Hoffman Tr., pp. 26:16-27:10.

25.     As Wyckoff's General Counsel testified, BQHC was created because:

> The only way that we could accomplish that requirement [of ensuring that St. John's Queens and Mary Immaculate did not cooperate with institutions that did not honor the Conference of Catholic Bishops's ethical and religious directives] and also be able to operate Caritas was to have a *passive* parent entity that didn't engage in practices which violate the ethical and religious directives.  ***BQHC was that nonclinical passive parent entity.  That's a standard mechanism*** used when you have Catholic institutions put under the management of non-Catholic institutions.

Hoffman Tr., p. 112:9-18 (emphasis added); *see generally* Roeber Dec., Exh. 7.

26.     Because it was created as a "nonclinical" entity, BQHC is not licensed to operate a hospital under Article 28 of New York's Public Health Law.  *See* Hoffman Tr., p. 112:9-18; *see also* Declaration of Vincent Arcuri, sworn to on November 14, 2011 ("Arcuri Dec."), submitted herewith, ¶ 12; Rucigay Dec., ¶ 14; Declaration of John H. Cook, Jr., Esq., sworn to

- 8 -

on November 16, 2011 ("Cook Dec."), submitted herewith, ¶ 12; Declaration of Adam Figueroa,

sworn to on November 29, 2011 ("Figueroa Dec."), submitted herewith, ¶ 12.  Indeed, BQHC's

certificate of incorporation expressly states that:

> *Nothing contained in this certificate of incorporation shall authorize [BQHC] to establish, operate, construct, lease or maintain a hospital . . . as defined in and covered by Articles 28*, 36, 40 and 44, respectively, of the Public Health Law.

Roeber Dec., Exh. 11, at BQHC 00467-00468 (emphasis added).

27.     Accordingly, BQHC has separate Bylaws, which, unlike Wyckoff's Bylaws,

provide that BQHC's corporate purpose is to:

> [F]urther, support or benefit Wyckoff [] and Caritas [], which [] operate, or will operate upon receiving requisite regulatory approvals, the hospitals in Kings and Queens Counties, respectively known as Wyckoff Heights Medical Center, St. John's Queens Hospital and Mary Immaculate Hospital . . . for the purpose of serving as a holding corporation . . . .

Roeber Dec., Exh. 12, at BQHC 00443.

28.     Consistent with its role as a "nonclinical passive parent" of both Caritas and

Wyckoff, BQHC has no substantial assets, salaried employees, revenues, or bank accounts of its

own.  *See* Arcuri Dec., ¶ 13; Cook Dec., ¶ 13; Rucigay Dec., ¶ 15; Figueroa Dec., ¶ 13; *see also*

Hoffman Dec., Exh. 4 (BQHC's 2007 Form 990 tax return showing BQHC does not pay any

employees directly, but instead allocates compensation and benefits from Wyckoff).

29.     BQHC's Bylaws specify that BQHC's powers are limited to two functions with

respect to Wyckoff and Caritas:

- Electing and removing members of Wyckoff's and Caritas's Boards of Trustees; and

- Authorizing certain discrete corporate acts by Caritas and/or Wyckoff, specifically, the amendment and restatement of their certificates of incorporation and bylaws, their merger or consolidation with another entity, the disposition of their assets, and/or their voluntary dissolution.

- 9 -

*See* Roeber Dec., Exh. 12, at BQHC 00443-00444.

30.     Under this new corporate structure, Wyckoff and Caritas were licensed hospital operators, with BQHC as their "passive parent" to preserve Wyckoff's and Caritas's separate identities, as required by the Conference of Catholic Bishops and Section 8.9 of the Acquisition Agreement. *See* Hoffman Tr., pp. 111:23-115:2; Acquisition Agreement § 8.9, at BQHC 00636-00637; Roeber Dec., Exh. 13 (Deposition Transcript of P. Goldberg ("Goldberg Tr.")), pp. 10:2-12, 27:20-22, 44:5-8 (BQHC's outside consultant who testified that "[t]here was a clear delineation, which was the point of BQHC, [] to make sure that one organization [wasn't] responsible for the other organization's debts").

**Caritas Successfully Acquires St. John's Queens and Mary Immaculate**

31.     One of the conditions to closing Caritas's acquisition of St. John's Queens and Mary Immaculate was that Caritas obtain a license, pursuant to Article 28, to operate those hospitals from New York State's Department of Health ("DOH"). *See* Acquisition Agreement § 8.4(a), at BQHC 00630-631; *see also* Roeber Dec., Exh. 14, at BQHC 00791 (Schedule 5.3(a)(1) to the Acquisition Agreement, requiring that DOH approval be obtained before closing); *id.* at Exh. 15, at BQHC 00881 (Schedule 10.3(d) to the Acquisition Agreement, also requiring "DOH approval"). DOH, in turn, conditioned its approval of Caritas' Article 28 license on, among other things, Caritas and Wyckoff being separate operating entities. *See* Hoffman Dec., ¶ 10.

32.     In late December 2006, Caritas received DOH approval to operate St. John's Queens and Mary Immaculate and thus became the "licensed operator" of those hospitals under Article 28. *See* Roeber Dec., Exh. 16, at BQHC 00535; *see also* Hoffman Tr., pp. 19:22-24, 49:9-24; Hoffman Dec., Exh. 5 (Caritas operating certificate, effective January 1, 2007).

33.     Caritas's acquisition of St. John's Queens and Mary Immaculate closed shortly thereafter, on or about January 1, 2007. *See* Roeber Dec., Exh. 17, at BQHC 00512.

# REDACTED

## DEFENDANTS' RELATIONSHIP WITH ROSS

34.     Ross is a corporation organized under the laws of Dominica that operates a medical school. *See* Roeber Dec., Exh. 18 (Ross's Second Amended Complaint ("SAC")), ¶¶ 5-6.

35.     Ross is owned by DeVry Inc. ("DeVry"), a for-profit, publicly traded corporation which, according to its most recent SEC filings, has annual revenues of more than $2 billion. *See* St. James Tr., p. 45:20-21; Roeber Dec., Exh. 19, p. 49 (DeVry Form 10-K filed with the SEC for the fiscal year ending June 30, 2011).

36.     Ross regularly contracts with dozens of hospitals around the United States to obtain medical clerkship positions for Ross's students. *See* Roeber Dec., Exh. 20, at Ross 038243-038279 (August 2011 document discussing Ross's "Affiliated Clinical Training Sites," including                                  St. James Tr., pp. 12:22-13:25.

## The Ross-BQHC Affiliation Agreement for Caritas Clerkships

37.     Since at least 1998, eight years before BQHC and Caritas were formed, Ross had an agreement with St. Vincent's for Ross students to have clerkships at St. John's Queens and Mary Immaculate Hospitals. *See* St. James Tr., p. 49:6-8; *see also id.* at Exh. 21, at Ross 032636-032640 (February 2, 1998 agreement between Ross and St. Vincent's); *id.* at Exh. 22, at Ross 032641-032642 (Addendum to February 2, 1998 agreement between Ross and St. Vincent's).

38.     In Fall 2006, Ross and Caritas began negotiating an agreement that would:  (a) allow Ross's students then at St. John's Queens and Mary Immaculate to continue their clerkships after those hospitals were transferred from St. Vincent's to Caritas; and (b) provide Ross's students with future clerkships at St. John's Queens and Mary Immaculate for a period of years. *See* Roeber Dec., Exh. 23 (Deposition Transcript of Julius Romero ("Romero Tr.")), pp.

31:2-35:18, 57:3-14, 83:7-23 (testifying that "the Ross contract with St. Vincent's" "would be null and void" after Caritas's acquisition of St. John's Queens and Mary Immaculate, and that there was "concern[] about the [students's] continuation of their clerkships"); *see also* St. James Tr., pp. 8:24-13:25; Roeber Dec., Exh. 24, at Ross 033055-033056 (December 16, 2006 email from Julius Romero to Ross's then-Chief Financial Officer).

39.     In exchange for these clerkships, Ross agreed to make a "prepayment" for Caritas clerkships, which Caritas intended to use as working capital for St. John's Queens and Mary Immaculate. *See* Roeber Dec., Exh. 25 (Deposition Transcript of Harold McDonald ("McDonald Tr.")), pp. 22:22-26:5, 70:11-24, 86:2-24; Hoffman Tr., p. 100:17-20 (noting "management was entering into prepayment arrangements in order to raise additional funds to support the rescue of St. John's [Queens] and Mary Immaculate"); St. James Tr., pp. 44:14-45:10; Romero Tr., pp. 43:15-44:13.

40.     From Fall 2006 until late December 2006, Ross and Caritas negotiated the terms of this proposed "Affiliation Agreement." *See generally* Romero Tr., pp. 44:16-102:15; St. James Tr., pp. 8:24-61:13; *see also* Roeber Dec., Exh. 26, at Ross 0023753 (November 7, 2006 emails regarding initial proposal for clerkships at Caritas's hospitals).

41.     From December 8, 2006 through December 21, 2006, drafts of the Affiliation Agreement listed Ross and Caritas as the only parties to that Agreement. *See* Roeber Dec., Exh. 27, at Ross 015361-015366 (December 8, 2006 draft); *id.* at Exh. 28, at Ross 015333-015340 (December 15, 2006 draft); *id.* at Exh. 29, at Ross 015322-015329 (December 17, 2006 draft); *id.* at Exh. 30, at Ross 015297-015302 (December 19, 2006 draft); *id.* at Exh. 31, at Ross 015255-015261 (December 21, 2006 draft); *id.* at Exh. 32, at Ross 015224-015246 (December 22, 2006 drafts showing proposed changes made on December 21, 2006).

42.     On the morning of December 22, 2006, DeVry's in-house counsel, Virginia Smith, Esq., suggested to Ross that BQHC, not Caritas, be the contracting party to the Affiliation Agreement opposite Ross. *See* Roeber Dec., Exh. 33, at Ross 015209 (redline showing Ross's replacement of "Caritas Health Care Planning, Inc." with "Brooklyn Queens Health Care, Inc."); *see also* St. James Tr., p. 23:17-24.

43.     Later that same day, Ross sent a draft of the Affiliation Agreement to Dominick J. Gio, the President and CEO of BQHC, that, among other things:   (a) removed Caritas as a signatory to the Agreement; and (b) made BQHC the contracting party to the Affiliation Agreement opposite Ross. *See* Roeber Dec., Exh. 34, at Ross 00630-00643.  Ross's e-mail to Mr. Gio stated that "[t]he notated changes [to the Affiliation Agreement] are the result of our DeVry legal and financial department's review." *Id.* at Ross 00630.

44.     Although both parties believed the Affiliation Agreement was in final form and ready to be executed before Christmas 2006, execution of the Agreement was delayed until after Christmas due, apparently, to a ski trip by Daniel Hamburger, DeVry's President and CEO. *See* Roeber Dec., Exh. 35, at Ross 15144-15145 (email chain including December 22, 2006 email to Ross transmitting a "finalized Clinical Training Affiliation Agreement [] between Ross University and Caritas"); *id.* at Exh. 36, at Ross 015152-015154 (December 22, 2006 emails reflecting Ross's belief that the Agreement was ready for "sign off" and that execution was delayed because of Mr. Hamburger's "snow time"); *see also id.* at Exh. 19, at p. 42 (DeVry Form 10-K identifying Mr. Hamburger as DeVry's President and CEO).

45.     Between the evening of December 27, 2006 and the morning of December 28, 2006, Ross circulated to BQHC a revised draft of the Affiliation Agreement that added, for the first time, the following language:  "In the event [Mary Immaculate and St. John's Queens] are

not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide

[Ross] with an equivalent number of clerkships . . . at one or more of its other facilities."

*See* Roeber Dec., Exh. 37, at Ross 015127-015140 (December 27, 2006 internal Ross draft

adding the quoted language); *id.* at Exh. 38, at Ross 015124 (Ross transmitting the draft to

BQHC between December 27, 2006 and December 28, 2006); *id.* at Exh. 39, at Ross 015104-

15115 (December 28, 2006 email from DeVry's counsel to BQHC attaching the final copy of the

Affiliation Agreement as "suitable for execution"); St. James Tr., pp. 55:10-56:17.

46.     On December 28, 2006, Ross and BQHC executed the Affiliation Agreement.

*See* Roeber Dec., Exh. 40.  Later that day, Ross sent $5 million to Caritas.  *See* Roeber Dec.,

Exh. 41, at Ross 036437 (email noting "[t]he wire transaction was confirmed this afternoon").

47.     On December 5, 2007 and on February 28, 2008, Ross signed two documents

entitled, respectively, "Amendment" and "Second Amendment" to the Affiliation Agreement.

*See* Roeber Dec., Exhs. 42 & 43.[2]

**Wyckoff and Caritas Begin Operations Under the
Common Ownership of Their "Passive Parent" BQHC**

48.     After Caritas acquired Mary Immaculate and St. John's Queens, Wyckoff and

Caritas operated their respective hospitals in accordance with applicable laws and regulations,

including Article 28.  *See* Rucigay Dec., ¶¶ 10, 28; Arcuri Dec., ¶ 26; Cook Dec., ¶ 26.

49.     Despite having certain overlapping Board members since January 2007, the

Boards of Wyckoff, Caritas, and BQHC at all times acted independently of one another, with

each Board making its own decisions as appropriate for its specific corporation.  *See* Arcuri Dec., '

---

[2]     Although not pertinent to Defendants' summary judgment motion, it is nonetheless appropriate to note that
the validity of these amendments is disputed.  BQHC's Board of Trustees never authorized any amendments to the
Affiliation Agreement, which were done on the initiative of a consultant whose Administrative Services Agreement
explicitly prohibited him and his firm from incurring any liabilities on behalf of Wyckoff, Caritas, or BQHC.

¶ 15; Rucigay Dec., ¶ 17; Cook Dec., ¶ 15; Rao Dec., ¶ 10; Figueroa Dec., ¶ 15.  Wyckoff and Caritas operated their respective hospitals cooperatively in terms of shared services and purchasing, which is common for health care systems in New York.  Hoffman Dec., ¶ 27.

50.   Since BQHC's creation as a "passive parent," Wyckoff's Board of Trustees has not sought to make decisions for BQHC or to influence or control BQHC's decision making in any way.  *See* Cook Dec., ¶¶ 23-24; Rao Dec., ¶¶ 12-13; Arcuri Dec., ¶¶ 23-24; Rucigay Dec., ¶¶ 26-27; Figueroa Dec., ¶¶ 23-24.  As Wyckoff's General Counsel explained at his deposition:

> *Wyckoff has not, does not, and could not,* given the nature of the structure agreed to with St. Vincent's, *control BQHC* because BQHC, in turn, was the passive parent and sole corporate member of Caritas and that would constitute prohibited cooperation between an entity that conforms to the ethical and religious directives [of the Conference of Catholic Bishops] and one that does not.

Hoffman Tr., p. 132:13-22 (emphasis added).

51.   Since its creation as a "passive parent," BQHC's Board has not sought to make decisions for Wyckoff or to influence or control Wyckoff's operational decision making in any way, including with respect to clinical clerkship programs.  *See* Figueroa Dec., ¶¶ 17-18, 28; Rucigay Dec., ¶¶ 19-20, 30; Arcuri Dec., ¶¶ 17-18, 28; Cook Dec., ¶¶ 17-18, 28.

52.   Since BQHC's formation in late 2006, BQHC's Board of Trustees has had fewer than half the members of Wyckoff's Board of Trustees.  BQHC's Board of Trustees is currently comprised of 10 members (all of whom are also members of Wyckoff's Board), while Wyckoff's Board of Trustees is comprised of 22 members.  *See* Arcuri Dec., ¶ 19; Cook Dec.; ¶ 19; Rucigay Dec., ¶ 21; Figueroa Dec., ¶ 19.

53.   From January 1, 2007 on, Wyckoff's Board of Trustees always met separately from the Boards of BQHC and Caritas, and BQHC's and Caritas's Boards always met separately from Wyckoff's Board, with the exception of a single "special" meeting of Wyckoff's and

Caritas's Boards held on an emergency basis. *See* Arcuri Dec., ¶ 15 n.1; Rucigay Dec., ¶ 17 n.1; Figueroa Dec., ¶ 15 n.1; Rao Dec., ¶ 10 n.1; Cook Dec., ¶ 15 n.1; *see also* Roeber Dec., Exh. 44, at BQHC 03811 (minutes from March 12, 2007 "special" meeting of Wyckoff and Caritas Boards).

54.     Each of BQHC, Wyckoff, and Caritas has filed its own, separate tax returns and maintained its own corporate books and records. *See* Rao Dec., ¶ 11; Arcuri Dec., ¶¶ 14, 25; Rucigay Dec., ¶¶ 16, 25; Cook Dec., ¶¶ 14, 25; Figueroa Dec., ¶¶ 14, 25; *see also* Hoffman Dec., Exh. 4 (BQHC's 2007 Form 990 tax return); *id.* at Exh. 3 (Wyckoff's 2007 Form 990 tax return); Roeber Dec., Exh. 45, at BQHC 14000-14030 (Caritas's 2007 Form 990 tax return).

55.     Further, each of Wyckoff and Caritas kept detailed records of any financial obligations due to or from the other entity from January 2007 forward. *See* Roeber Dec., Exh. 46, at BQHC 04006-04071 (logs reflecting amounts due to/due from Caritas and Wyckoff).

56.     Wyckoff and Caritas maintained separate payrolls to ensure that one entity was not assuming the financial obligations of the other. *See* Goldberg Tr., pp. 40:2-45:6, 48:16-51:11; *see also id.* at p. 44:5-8 ("There was a clear delineation, which was the point of BQHC [] to make sure that one organization [wasn't] responsible for the other organization's debts."); Roeber Dec., Exh. 47 (Deposition Transcript of Thomas Singleton), pp. 60:7-63:10, 86:12-87:15, 108:10-17; *id.* at Exh. 48, at BQHC 03874-03875 (minutes from November 1, 2007 meeting of Wyckoff's Board); *id.* at Exh. 49, at BQHC 03882 (minutes from the December 20, 2007 meeting of Wyckoff's Board).

57.     Indeed, Wyckoff terminated its Chief Financial Officer ("CFO") in early 2007, upon discovering that he had transferred funds from Caritas to Wyckoff without authorization. The unauthorized transfers were promptly reported to DOH. *See* Roeber Dec., Exh. 50, at

BQHC 04072-04073 (March 2, 2007 email from Wyckoff CEO Dominick Gio); *see id.* at Exh. 4, at BQHC 00196 (minutes from March 6, 2008 meeting of BQHC's Board of Trustees).

58.     During the course of negotiating the 2006 Affiliation Agreement with Ross, one goal of Wyckoff's Chief Operating Officer was to maintain the separateness between Wyckoff and Caritas. *See* McDonald Tr., pp. 8:12-9:17, 93:23-94:19.

59.     During the course of negotiating the 2006 Affiliation Agreement with Ross, Wyckoff personnel insisted that there be no reference to "Wyckoff" in the Affiliation Agreement. *See* Roeber Dec., Exh. 38, at Ross 015124 (December 28, 2006 email accepting certain of Ross's proposed changes to the draft Affiliation Agreement "EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement" with Ross) (emphasis in original); *id.* at Exh. 51, at Ross 008387 ("The Ross-Caritas agreement should (will) not have any references to Wyckoff Heights Medical Center.").

60.     Shortly after the Affiliation Agreement was signed, in January 2007, both parties agreed upon the need for, and began negotiating the terms of, a separate agreement to extend the existing Ross-Wyckoff clerkship agreement, which had been in place since 1997 and remains in place today. *See* Roeber Dec., Exh. 51, at Ross 008387-008389.

61.     At no time did Wyckoff's Board of Trustees advocate for, consent to, or accept Wyckoff's taking on any liability or responsibility with respect to the Affiliation Agreement. *See* Rucigay Dec., ¶ 31; Arcuri Dec., ¶ 29; Rao Dec., ¶ 9; Cook Dec., ¶ 29; Figueroa Dec., ¶ 29.[3]

---

[3]     By contrast, in December 2006, contemporaneously with the negotiation of the Affiliation Agreement between Ross and BQHC, Wyckoff's Board of Trustees was presented with, and did consent to, the signing of a promissory note with a different medical school (American University of the Caribbean) in which Wyckoff explicitly guaranteed Caritas's obligation to repay an advance of funds if clerkships were not provided by Caritas. *See* Rucigay Dec., ¶ 31; Arcuri Dec., ¶ 29; Rao Dec., ¶ 9; Cook Dec., ¶ 29; Figueroa Dec., ¶ 29; *see also* Roeber Dec., Exh. 52, at Ross 031414-031423 (December 1, 2006 Promissory Note Agreement between American University of the Caribbean, BQHC, Caritas, and Wyckoff).

**Caritas Files for Bankruptcy, Leading Ross to Sue BQHC and Wyckoff**

62.     From January 2007 until February 2009, Caritas operated St. John's Queens and Mary Immaculate in accordance with its Article 28 license to do so. *See* Hoffman Dec., ¶ 25.

63.     On February 6, 2009, Caritas filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York. *See In re Caritas Healthcare, Inc., et al.*, Jt. Admin. Ch. 11 Case No. 09-40901 (Bankr. E.D.N.Y.); *see also* Roeber Dec., Exh. 53 (Deposition Transcript of John Kastanis ("Kastanis Tr.")), pp. 17:13-21:21; Hoffman Tr., pp. 110:19-111:10.

64.     Although it could have done so, Ross has not entered a proof of claim in Caritas's bankruptcy. *See In re Caritas Healthcare, Inc., et al.*, Jt. Admin. Ch. 11 Case No. 09-40901 (Bankr. E.D.N.Y.), at Dkt. No. 162 (April 3, 2009 schedule of assets and liabilities listing all claims, none of which was filed by Ross); *see also* Roeber Dec., Exh. 54, at Ross 035728 (March 5, 2009 internal Ross e-mail explaining decision not to file a proof of claim in Caritas's bankruptcy proceedings).

65.     Wyckoff's own substantial investment in the rescue of St. John's Queens and Mary Immaculate was lost. *See* Roeber Dec., Exh. 46, at BQHC 04071 (log reflecting a total debt of more than $17 million due from Caritas to Wyckoff).

66.     Ross's former CFO testified that, once St. John's Queens and Mary Immaculate ceased operations, Ross expected Wyckoff to replace the clerkships previously in place at those hospitals by either:  (a) repudiating contracts with other medical schools and expelling the students who were then clerking at Wyckoff; or (b) hiring additional physicians as teaching faculty at Wyckoff. St. James Tr., pp. 6:15-25, 33:14-24 ("Our expectation was [Wyckoff] had the ability to *either take those other schools out and put the Ross folks in*, or invest in Wyckoff to add enough faculty for our students to keep the rotations.") (emphasis added).

67.   At the time, Wyckoff's "capacity to offer clinical clerkships was fully utilized by students from other medical schools." *See* Roeber Dec., Exh. 55, at Ross 002827 (October 7, 2009 internal DeVry memorandum discussing BQHC's initial response to Ross's demands).

68.   Currently, Wyckoff has the capacity to provide clinical clerkships for 406 students at a time, all of which has been fully utilized by Ross and other medical schools. *See* Romero Tr., pp. 153:8-156:13; Roeber Dec., Exh. 56 (Wyckoff's Responses and Objections to Plaintiff's Second Set of Interrogatories, dated May 24, 2011), at Interrogatories 1(a), 2. Wyckoff's ability to provide clinical clerkships beyond that capacity is constrained by practical considerations such as:  (a) the number of teaching faculty and patients that it can accommodate at any given time; and (b) Wyckoff's policy, guided by regulatory recommendations, of limiting its clinical clerkships to a ratio of between four and eight medical students to each teaching physician. *See* Romero Tr., pp. 153:22-154:6, 155:2-156:13.

69.   On April 6, 2009, Ross sued BQHC and Wyckoff in this Court. *See* Roeber Dec., Exh. 57 (original Complaint).

70.   Ross subsequently amended its complaint on August 20, 2009 and on September 22, 2009. *See* Roeber Dec., Exhs. 58 (First Amended Complaint) and 18 (SAC).

71.   Among other things, Ross's SAC alleges that:

- When St. John's Queens and Mary Immaculate ceased operations, BQHC became obligated to provide Ross's students with clerkships at Wyckoff, *see* SAC, ¶¶ 1-4;

- Ross is therefore entitled to "an order of specific performance" forcing BQHC to direct Wyckoff to give Ross students clerkships at Wyckoff, *id.* at ¶¶ 55-64;

- Ross is further entitled to "pierce the corporate veil and impose [BQHC's] liability for breach of the Affiliation Agreement . . . upon Wyckoff" because, according to Ross, BQHC: (a) has "few, if any assets"; (b) has no employees or offices; (c) has

"overlapping officers and directors" with Wyckoff; and (d) is "controlled" by Wyckoff. *Id.* at ¶¶ 66-80.

72.     Defendants filed their answer to Ross's SAC on October 6, 2009. *See* Roeber Dec., Exh. 59.

Dated: New York, New York
       December 2, 2011

                                   Respectfully submitted,

                                   K&L GATES LLP

                                   By: _Walter Loughlin / JHR_

                                   Walter P. Loughlin
                                   (Walter.Loughlin@klgates.com)
                                   Justin H. Roeber
                                   (Justin.Roeber@klgates.com)

                                   599 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:  (212) 536-3900
                                   Facsimile:  (212) 536-3901

                                   *Attorneys for Defendants Brooklyn-Queens Health Care, Inc. and Wyckoff Heights Medical Center*

- 20 -