Walter P. Loughlin
Justin H. Roeber
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

*Attorneys for Defendants Brooklyn-Queens Health
Care, Inc. and Wyckoff Heights Medical Center*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                        :

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,  :

                        :

          Plaintiff,          :

                        :

     - against -         :    09 Civ. 1410 (KAM) (RLM)

                        :

BROOKLYN-QUEENS HEALTH CARE, INC. and   :
WYCKOFF HEIGHTS MEDICAL CENTER,     :

                        :

         Defendants.      :

                        :
------------------------------------------------------------------X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING
<u>TWO OF PLAINTIFF'S PRINCIPAL THEORIES OF LIABILITY</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS .............................................................................................4

I.      The Parties ......................................................................................................4

II.     Wyckoff Attempts To Rescue Two Fellow Not-For-Profits From Being Shuttered...........6

III.    Ross And BQHC Enter Into Their Affiliation Agreement ................................................8

IV.     Wyckoff And Caritas Operate Their Hospitals Separately Under BQHC
        As Their "Passive Parent" ...........................................................................................10

V.      Caritas Files For Bankruptcy, And Ross Sues BQHC And Wyckoff................................12

ARGUMENT ...................................................................................................................13

I.      Summary Judgment Standard ......................................................................................13

II.     Ross's Veil Piercing Claim Should Be Dismissed ........................................................14

        A.      There is no evidence that Wyckoff "completely dominated" BQHC with
                respect to the Affiliation Agreement ................................................................15

        B.      There is no evidence that BQHC was used as an instrument of fraud or to
                otherwise harm Ross with respect to the Affiliation Agreement...........................19

III.    Ross's Specific Performance Claim Should Be Dismissed Because It Seeks Relief
        Prohibited By New York's Public Health Law .............................................................23

        A.      BQHC is not authorized to operate a hospital under Article 28 of the
                Public Health Law ...........................................................................................23

        B.      Ross's Specific Performance Claim should be dismissed because any
                order of specific performance would violate the Public Health Law ...................27

CONCLUSION................................................................................................................28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Adelphia Commc'ns Corp.*, 322 B.R. 509 (Bankr. S.D.N.Y. 2005)....................16, 17

*Am. Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir. 1988)........................................16, 17

*Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130 (2d Cir. 1997).........14, 17, 18, 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................................13

*Barkley v. Olympia Mortg. Co.*, No. 04-CV-875 (RJD) (KAM), 2007 WL 656250
    (E.D.N.Y. Feb. 27, 2007)..............................................................................................19

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996).........................................15

*Johnson & Johnson Consumer Cos. v. Aini*, No. 02-CV-6624 (DLI) (RLM), 2009
    WL 6055841 (E.D.N.Y. Dec. 1, 2009)..........................................................................20

*Johnson v. Medisys Health Network*, No. 10-CV-1596 (ERK) (VVP), 2011 WL
    4101389 (E.D.N.Y. Apr. 28, 2011) .......................................................................14, 17

*Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91
    (E.D.N.Y. 1999)......................................................................................................19, 20

*Matican v. City of New York*, 524 F.3d 151 (2d Cir. 2008)..............................................13

*McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132 (E.D.N.Y. 2009)..............14, 15, 17

*Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009)...............................................13

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131
    (2d Cir. 1991)................................................................................................................15

## STATE CASES

*Brito v. DILP Corp.*, 282 A.D.2d 320, 723 N.Y.S.2d 459 (1st Dep't 2001)...............15, 22

*Christiano v. Whalen, M.D.*, 92 Misc. 2d 961, 401 N.Y.S.2d 976 (Sup. Ct.
    Monroe Co. 1978)..........................................................................................................24

*F&M Precise Metals, Inc. v. Goodman*, Index No. 6546-04, 2004 WL 2059567
    (Sup. Ct. Nassau Co. Aug. 25, 2004)............................................................................22

*Feigen v. Advance Capital Management Corp.*, 150 A.D.2d 281, 541 N.Y.S.2d 797 (1st Dep't 1989) .................................................................................22

*Healthnet System Consulting, Inc. v. Brooklyn-Queens Healthcare, Inc. et al.*, 2009 N.Y. Misc. LEXIS 4239 (Sup. Ct. Queens Co. July 27, 2009) ..........26

*M. Sobol, Inc. v. James*, 180 Misc. 2d 110, 691 N.Y.S.2d 293 (Sup. Ct. App. Term 2d Dep't 1999) ...........................................................................22

*Palombi v. Volpe*, 249 N.Y. 194, 163 N.E. 607 (1928) .....................................27

*Pebble Cove Homeowners' Assoc'n v. Fidelity New York FSB*, 153 A.D.2d 843, 545 N.Y.S.2d 362 (2d Dep't 1989) ..................................................17

*Spiegel v. Whalen*, 44 N.Y.2d 745, 405 N.Y.S.2d 679 (1978) ...........................24

*TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 680 N.Y.S.2d 891 (1998) .............................................................14, 19, 21

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) .....................................................................................1, 13

## STATE STATUTES

N.Y. Pub. Health Law §§ 2801-a .................................................................24, 26

N.Y. Pub. Health Law § 2805(1)(a) ..................................................................24

## STATE REGULATIONS

10 N.Y.C.R.R. § 405.1(c) .................................................................................24

10 N.Y.C.R.R. § 405.2(b)(1) .............................................................................25

10 N.Y.C.R.R. § 405.2(d) .................................................................................25

10 N.Y.C.R.R. §405.3(a) ..................................................................................25

10 N.Y.C.R.R. §405.3(b) ..................................................................................25

10 N.Y.C.R.R. §405.3(f) ..............................................................................25, 26

10 N.Y.C.R.R. § 405.3(f)(3)(iii) ................................................................................25, 26

## TREATISES

12-64 Corbin on Contracts § 1170 (Matthew Bender 2011) ...........................................27

Defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center ("Wyckoff") (together, "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, for partial summary judgment dismissing two of the principal theories of liability alleged by Plaintiff Ross University School of Medicine, Ltd. ("Ross").

## PRELIMINARY STATEMENT

This action arises out of Defendants' attempt to rescue two hospitals in Queens, New York – St. John's Queens ("St. John's Queens") and Mary Immaculate ("Mary Immaculate") (together, the "Hospitals") – from the brink of closure. In 2006, St. Vincent's Catholic Medical Centers ("St. Vincent's"), then in bankruptcy, agreed to allow Wyckoff to save the Hospitals, provided that they would continue to be operated in accordance with the religious and ethical directives of the United States Conference of Catholic Bishops. To comply with that condition and others imposed on the acquisition by New York's Department of Health ("DOH"), a corporate structure was adopted that is frequently used in the not-for-profit health care context to allow a non-Catholic institution to work with a Catholic one.

In particular, a small group of individuals who were members of Wyckoff's Board of Trustees created a new entity, Caritas Health Care Planning, Inc., later converted to Caritas Health Care, Inc. ("Caritas"), to acquire the Hospitals, and Wyckoff turned a pre-existing affiliate into BQHC, which became the "passive parent" and sole corporate member of both Caritas and Wyckoff. Caritas and Wyckoff, in turn, then functioned as the operating entities, with Caritas running St. John's Queens and Mary Immaculate and Wyckoff running its own hospital located in the Bushwick neighborhood of Brooklyn. This structure maintained the corporate separateness between Wyckoff and Caritas that was a condition of the acquisition of

the Hospitals imposed by both the Catholic Church and DOH. And that separateness continued until Caritas, burdened by the Hospitals' debts dating back to when they were operated by St. Vincent's, filed for bankruptcy in February 2009.

Now, Ross – a for-profit Caribbean medical school owned by DeVry Inc. whose students were in clinical clerkships at the Hospitals pursuant to contracts with St. Vincent's and later BQHC – asks this Court to disregard the corporate structure that resulted from Caritas's acquisition of the Hospitals. In particular, Ross alleges in its Second Amended Complaint ("SAC") that:

- Although Ross only signed an agreement with BQHC (the "Affiliation Agreement"), Ross is entitled to "pierce the corporate veil and impose [BQHC's] liability for breach of the Affiliation Agreement . . . upon Wyckoff" because, according to Ross, "Wyckoff controlled and controls BQHC" (the "Veil Piercing Claim"), *see infra,* pp. 14-23; and

- Ross is further entitled to "an order of specific performance" forcing BQHC to direct Wyckoff to give Ross's students clerkships at Wyckoff because, according to Ross, BQHC controls Wyckoff and may properly direct its actions (the "Specific Performance Claim"). *Id.* at pp. 23-27.

Preliminarily, Ross's claims flatly contradict one another because Ross alleges in the same breath that Wyckoff controls BQHC and that BQHC controls Wyckoff. More importantly, Ross's Veil Piercing and Specific Performance Claims fail as a matter of law.

*First*, Ross's Veil Piercing Claim should be dismissed because Ross cannot meet the justifiably high bar that New York law sets for piercing the corporate veil. The record elicited during discovery shows that BQHC, Wyckoff, and Caritas observed corporate formalities and maintained their separate corporate identities, even going so far as to swiftly terminate a corporate officer who ignored that separateness. Further, there is no evidence that BQHC was used to perpetrate a fraud on Ross, or that it was used illegitimately or deceitfully to cause Ross harm with respect to the Affiliation Agreement. Indeed, it was Ross that insisted – at the

eleventh hour of negotiations, based on what it described as its own independent legal and financial interests – that BQHC be the contracting party to the Affiliation Agreement instead of Caritas. The record further shows that BQHC was formed as an entirely valid "passive parent" entity to comply with the terms of Caritas's acquisition of the Hospitals, and to preserve the separate corporate identities of: (a) Caritas, a Catholic hospital system that followed the ethical and religious directives of the Conference of Catholic Bishops; and (b) Wyckoff, a secular hospital that did not. For all these reasons, Ross's Veil Piercing Claim fails as a matter of law.

*Second*, Ross's Specific Performance Claim fails because it seeks to force BQHC to take actions – specifically, to direct Wyckoff's clinical operations – that BQHC is prohibited from taking as a matter of law. Article 28 of New York's Public Health Law mandates that only an entity licensed by DOH may direct a hospital's clinical operations; no other entity may do so. *See infra*, pp. 23-27. While Wyckoff is licensed to operate its own hospital, BQHC has never been licensed to operate a hospital and, in fact, is prohibited from doing so by its own certificate of incorporation. Accordingly, any Order directing BQHC to compel Wyckoff to modify its clinical education program to accommodate Ross's students would force BQHC to violate the express terms of the Public Health Law (a directive that Wyckoff's Board would be duty bound to refuse in any event).

Indeed, if the Court were to order BQHC to force Wyckoff to create clerkships for Ross's students, BQHC would be confronted by a classic Catch-22 – it would have to choose to either: (a) follow the Court's Order and violate the express terms of the Public Health Law and its own certificate of incorporation; or (b) follow the Public Health Law and its corporate governance requirements and disobey the Court's Order. Even if BQHC were to remove every member of Wyckoff's Board of Trustees and replace them with new members, a power BQHC has, the

newly named Wyckoff Board members would still be obligated to make decisions regarding Wyckoff in accordance with their fiduciary duties to Wyckoff, without regard to any instructions given to them by BQHC.   Respectfully, the Court cannot put BQHC, or its appointees to Wyckoff's Board of Trustees, in such an untenable position.   Ross's Specific Performance Claim should be dismissed.

In sum, Ross's Veil Piercing and Specific Performance Claims both seek to impute BQHC's alleged liability under the Affiliation Agreement to Wyckoff.   Because Ross cannot establish any basis for disregarding the corporate form, its Claims should be dismissed, and this case should proceed to trial solely on Ross's claims against BQHC.

## STATEMENT OF FACTS

While a full recitation of the facts is set forth in Defendants' Rule 56.1 Statement of Undisputed Facts ("SOUF"), which Defendants incorporate by reference herein, the most pertinent facts are set forth below.

### I.      The Parties

#### *Ross*

Ross is a medical school, located on the Caribbean island of Dominica, that is owned by DeVry Inc. ("DeVry"), a for-profit, publicly traded educational conglomerate whose annual revenues exceed $2 billion.  *See* SOUF, ¶¶ 34-35.  Ross regularly contracts with many hospitals in the United States to secure medical clerkship positions for its students.  *Id.* at ¶ 36.

#### *Wyckoff*

Wyckoff is a not-for-profit hospital that has served the Brooklyn/Queens community for over a century.  *See* SOUF, ¶ 1.  According to its corporate Bylaws, Wyckoff's purpose is:

> [T]o *establish[,] maintain, and operate, on a not-for-profit basis, a Medical Center facility* for the prevention, diagnosis, treatment and/or rehabilitation of inpatients, ambulatory

> service patients and out-patients who visit, live and work in the community . . . *in compliance with the spirit and letter of the law and all pertinent regulatory [] standards . . . .*

SOUF, ¶ 2 (emphasis added).

Consistent with these goals, Wyckoff is licensed to operate a hospital under Article 28 of New York's Public Health Law, which governs the conduct of all hospitals in New York State ("Article 28"). SOUF, ¶¶ 3-11. As such, DOH has "established" Wyckoff as a licensed hospital operator, and Wyckoff has an "operating certificate" permitting it to operate a licensed hospital, as all hospitals in New York State must have pursuant to Article 28. *Id.* at ¶¶ 4-5. Further, as required by Article 28's implementing regulations, Wyckoff's corporate Bylaws provide that Wyckoff is governed by a Board of Trustees that is tasked with, among other things: (a) ensuring compliance with federal, state, and local laws; (b) appointing Wyckoff's officers, including its President/CEO; and (c) appointing Wyckoff's medical staff, including its medical director. *See id.* at ¶¶ 6-9.

### *BQHC*

BQHC is a not-for-profit corporation that is the passive parent and sole corporate member of Wyckoff. *See* SOUF, ¶¶ 24-25, 28. BQHC is not, and never has been, licensed to operate a hospital under Article 28. *See id.* at ¶ 26. In fact, BQHC's certificate of incorporation expressly prohibits it from doing so:

> *Nothing contained in this certificate of incorporation shall authorize [BQHC] to establish, operate, construct, lease or maintain a hospital . . . as defined in and covered by Articles 28*, 36, 40 and 44 . . . of [New York's] Public Health Law.

*Id.*

II.     **Wyckoff Attempts To Rescue Two Fellow Not-For-Profits From Being Shuttered**

In 2005, Wyckoff's corporate structure was simple:  one principal entity, Wyckoff, operating its own hospital in Brooklyn's Bushwick neighborhood.  But when St. Vincent's filed for bankruptcy protection in July 2005, Wyckoff was faced with a stark choice:  (a) sit and watch the permanent closure of two local hospitals that, like Wyckoff, were committed to serving the public; or (b) step in and try to save those hospitals and the lower-income patients that relied upon them.  *See* SOUF, ¶¶ 12-14.  Wyckoff chose the latter, agreeing to attempt the rescue of St. John's Queens and Mary Immaculate Hospitals from the wreckage of St. Vincent's bankruptcy pursuant to a May 2006 agreement (the "Acquisition Agreement").  *See id.* at ¶¶ 14-15.

As part of the Acquisition Agreement, Wyckoff agreed, among other things, that St. John's Queens and Mary Immaculate would "continue to [follow] the ethical and religious directives of the [C]onference of Catholic Bishops" for as long as the Hospitals used the names St. John's Queens and Mary Immaculate.  SOUF, ¶ 16.  This created a dilemma for Wyckoff: one of those directives prohibits cooperation between institutions that honor the Conference's ethical and religious directives and those, such as Wyckoff, that do not.  *Id.* at ¶¶ 17-18.  Because it has been a strictly secular institution for more than a century, Wyckoff was not able, in the first instance, to comply with this non-cooperation directive.  *Id.* at ¶ 19.

To address this problem (and avoid violating the express terms of the Acquisition Agreement), Wyckoff embarked on a significant corporate restructuring, as follows:

- *First*, five individuals who were members of Wyckoff's Board of Trustees created a new affiliate entity – Caritas – to be the "license holder of St. John's [Queens] and Mary Immaculate" for Article 28 purposes and thus operate those Hospitals separate and apart from Wyckoff's hospital;

- *Second*, Wyckoff took a pre-existing affiliate entity, WHMC Properties, Inc., and renamed it BQHC; and

- *Third,* Wyckoff's Board agreed to make BQHC the "sole member" and "passive parent" of Wyckoff, and Caritas's Board did the same.

SOUF, ¶¶ 20-24. As Wyckoff's General Counsel explained, this structure was necessary because:

> ***The only way*** that we could accomplish that requirement [of abiding by the Conference of Catholic Bishops' ethical and religious directives] and also be able to operate Caritas was to have a ***passive*** parent entity that didn't engage in practices which violate the ethical and religious directives. ***BQHC was that nonclinical passive parent entity. That's a standard mechanism*** used when you have Catholic institutions put under the management of non-Catholic institutions.

*Id.* at ¶ 25 (emphasis added).

Consistent with its corporate purpose as a "nonclinical passive parent entity," BQHC's certificate of incorporation prohibits it from "operat[ing] . . . a hospital as defined in and covered by Article 28[]," and BQHC has thus never been licensed to operate a hospital under Article 28. *See* SOUF, ¶ 26. Nor has BQHC ever had any of the characteristics of an operating entity, such as significant assets, salaried employees, operating revenues, or even bank accounts of its own. *See id.* at ¶ 28. Instead, BQHC's powers with respect to Wyckoff and Caritas are limited to two functions: (1) electing and removing members of Wyckoff's and Caritas's Boards of Trustees; and (2) authorizing certain discrete corporate acts by Caritas and/or Wyckoff relating to merger, consolidation, or the sale of assets. *Id.* at ¶ 29.

Caritas, on the other hand, was expressly formed to be the Article 28 "license holder" for St. John's Queens and Mary Immaculate, and its certificate of incorporation, as amended, accordingly identified Caritas's corporate purpose as being:

> To establish, maintain and/or ***operate a hospital or hospitals within the State of New York*** for the medical and surgical care and treatment of inpatients and outpatients ***and to operate residency and related programs*** in connection with the provision of such care.

- 7 -

SOUF, ¶ 21 (emphasis added).  Caritas's Bylaws specified that the Bishop of the Roman Catholic Diocese of Brooklyn could appoint one or more members to Caritas's Board of Trustees in order to ensure that the Hospitals were operated in accordance with the Conference of Catholic Bishops' directives.  *See id.* at ¶ 22.  From 2007-2009, Caritas's Board of Trustees included two members nominated by the Bishop of the Roman Catholic Diocese of Brooklyn – Reverend Patrick Frawley, a Catholic priest, and Mark Lane, a lay person – neither of whom served on either Wyckoff's or BQHC's Boards.  *See id.* at ¶ 23.

With this revised corporate structure in place – Caritas and Wyckoff operating as separate entities under the umbrella of passive parent BQHC – Caritas obtained a license to operate St. John's Queens and Mary Immaculate pursuant to Article 28 of the Public Health Law.  *See* SOUF, ¶¶ 30-32.  Days later, Caritas completed its acquisition of the Hospitals.  *See id.* at ¶ 33.

### III.   Ross And BQHC Enter Into Their Affiliation Agreement

At the time St. Vincent's filed for bankruptcy in July 2005, Ross had an agreement in place with St. Vincent's for Ross medical students to have clinical clerkships at St. John's Queens and Mary Immaculate.  *See* SOUF, ¶ 37.  When Caritas began preparations to take over the Hospitals, Ross and Caritas began negotiating an agreement that would allow Ross's students then at St. John's Queens and Mary Immaculate to continue their clerkships after the Hospitals became part of Caritas, and would also provide Ross's students with future clerkships at the Hospitals.  *Id.* at ¶ 38.  In exchange for these clerkships, Ross agreed to provide Caritas with a "prepayment" of clerkship funds that Caritas could use as working capital to get the Hospitals up and running.  *Id.* at ¶ 39.[1]

---

[1]     Wyckoff invested $17 million in Caritas as part of the effort to rescue the Hospitals from closure.  *See* SOUF, ¶ 66.  This investment was lost in its entirety when the Hospitals failed in 2009.  *Infra*, p. 12.

From Fall 2006 until late December 2006, Ross and Caritas negotiated the terms of this proposed "Affiliation Agreement." *See* SOUF, ¶¶ 40-45. Throughout that process, representatives of BQHC, Caritas, and Wyckoff repeatedly told Ross that Wyckoff would not be part of the Affiliation Agreement, which was intended to bind Caritas alone. *Id.* at ¶¶ 58-59, 61.

On December 22, 2006, just days before signing, Ross demanded, for the first time, that BQHC be the contracting party to the Affiliation Agreement instead of Caritas, even though all prior drafts of the Affiliation Agreement had listed Ross and Caritas as the only parties to that Agreement. *See* SOUF, ¶¶ 41-43. This change was made at the insistence of DeVry's counsel. *Id.* at ¶¶ 42-43. BQHC assented to Ross's demand. *Id.* at ¶ 46. Both parties were then ready to execute the apparently final Affiliation Agreement before Christmas 2006, but the signing was delayed because DeVry's President was not available, apparently due to a skiing holiday. *Id.* at ¶ 44.

Several days later, and mere hours before Ross and BQHC were scheduled to sign the Affiliation Agreement, Ross circulated to BQHC a revised draft of the Agreement that added, for the first time, a provision stating that "In the event [Mary Immaculate and St. John's Queens] are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships . . . at one or more of its other facilities." SOUF, ¶ 45. Ross and BQHC both executed the Affiliation Agreement on December 28, 2006, and Ross transferred $5 million to Caritas that same day. *See id.* at ¶ 46.[2]

---

[2]      The Affiliation Agreement was purportedly amended on December 5, 2007 and on February 28, 2008. SOUF, ¶ 47. Although not relevant to the grounds on which Defendants' summary judgment motion is based, BQHC disputes the validity of these amendments. BQHC's Board of Trustees never authorized any amendments to the Affiliation Agreement.    Rather, these amendments were the initiative of a consultant whose firm's Administrative Services Agreement explicitly prohibited him or his firm from incurring any liabilities on behalf of Wyckoff, Caritas, or BQHC.

IV.   **Wyckoff And Caritas Operate Their Hospitals Separately**
      **Under BQHC As Their "Passive Parent"**

Caritas formally took over Mary Immaculate and St. John's Queens in January 2007 and, from that point forward, Wyckoff and Caritas operated their respective hospitals separately, from a governance perspective, in accordance with Article 28 of the Public Health Law, but cooperatively in terms of shared services and purchasing, a very common arrangement for health care systems in New York.[3]  *See* SOUF, ¶¶ 48-56.

Among other things, the licensing scheme embodied by Article 28 and its implementing regulations placed strict requirements on Wyckoff's and Caritas's corporate forms and governance.   For instance, Article 28 imposes significant "character and competence requirements" on hospital operators, who must provide "a substantially consistent high level of care" to operate a hospital in New York State.  *See* SOUF, ¶¶ 3-4.  To comply with Article 28's implementing regulations, a hospital must be governed by a Board of Trustees tasked with specific duties, and a hospital must confer upon its President/CEO certain powers, many of which – including "the authority to incur on behalf of the [hospital] liabilities not normally associated with the day-to-day operation of a facility" – may not be delegated under any circumstances.  *Id.* at ¶¶ 6-8.

From 2007-2009, Wyckoff and Caritas abided by these and other Article 28 requirements in its operation of the Hospitals.  SOUF, ¶ 48.  Throughout this time, BQHC preserved the separateness between Caritas's Hospitals, which had to follow the Conference of Catholic Bishops' ethical and religious directives, and Wyckoff, which did not.  *See id.* at ¶¶ 30, 49-56.

---

[3]        Due to the increasing trend of consolidation among hospitals throughout the country, many hospitals and hospital systems have undergone changes in their corporate structure when secular hospitals merge with, or acquire, Catholic hospitals.  SOUF, ¶ 18.

Accordingly, despite having certain overlapping Board members, the Boards of Wyckoff, Caritas, and BQHC at all times acted independently of one another from 2007-2009, with each Board making its own decisions in the best interests of its own corporation. *See id.* at ¶ 49.

In particular, as Wyckoff's General Counsel testified, Wyckoff's Board of Trustees never sought to make decisions for BQHC or to influence or control BQHC because:

> ***Wyckoff has not, does not, and could not,*** given the nature of the structure agreed to with St. Vincent's [in the Acquisition Agreement], ***control BQHC*** because BQHC, in turn, was the passive parent and sole corporate member of Caritas and that would constitute prohibited cooperation between an entity that conforms to the ethical and religious directives [of the Conference of Catholic Bishops] and one that does not.

SOUF, ¶ 50 (emphasis added).  Similarly, BQHC's Board did not seek to make decisions for Wyckoff or to influence or control Wyckoff's clinical clerkship operations in any way from 2007-2009. *See id.* at ¶¶ 51-52.  Indeed, from January 1, 2007 on, Wyckoff's Board of Trustees met separately from the Boards of BQHC and Caritas, and BQHC's and Caritas's Boards met separately from Wyckoff's Board, with the exception of a single "special" informational meeting of both Wyckoff's and Caritas's Boards held on an emergency basis. *See id.* at ¶ 53.

Further, the record shows that Wyckoff, Caritas, and BQHC maintained separate operations throughout this time, as evidenced by the fact that:

- BQHC, Caritas, and Wyckoff each filed its own, separate tax returns, and maintained its own corporate books and records, from 2007 – present;

- Wyckoff and Caritas kept detailed records of the value of benefits provided by one entity to the other in "due to/due from" financial logs maintained from January 2007 forward; and

- Wyckoff and Caritas maintained separate payrolls in order to ensure that one entity was not assuming the financial obligations of the other.

*See* SOUF, ¶¶ 54-56.  Wyckoff even went so far as to terminate its Chief Financial Officer ("CFO") when it discovered that he had ignored the separate operations between Wyckoff and

Caritas by transferring funds from Caritas to Wyckoff without authorization.   *Id.* at ¶ 57. Wyckoff promptly reported these unauthorized transfers to DOH in early 2007.   *Id.*

## V.   Caritas Files For Bankruptcy, And Ross Sues BQHC And Wyckoff

Despite its best efforts, Caritas could not turn the Hospitals around and, in February 2009, Caritas filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York.   *See* SOUF, ¶¶ 62-63.   Instead of filing a proof of claim in Caritas's bankruptcy, as a typical creditor would do, Ross responded to the bankruptcy by demanding that *Wyckoff* replace the clerkships previously in place for Ross's students at *Caritas's* Hospitals.   In particular, Ross's position was that Wyckoff should either:   (a) repudiate its existing contracts with other medical schools and expel the students from those schools who were currently clerking at Wyckoff to make room for Ross's students; or (b) hire enough new physicians as teaching faculty to accommodate Ross's students at Wyckoff.   *See id.* at ¶¶ 64, 66.   At the time, Wyckoff could not offer Ross additional clerkships due to existing contractual commitments to other medical schools, nor could it feasibly hire enough new faculty to meet Ross's demands. *See id.* at ¶¶ 67-68.   In fact, Wyckoff's capacity to provide clinical clerkships is constrained by practical considerations such as the number of teaching faculty and patients that its hospital can accommodate at any given time, as well as Wyckoff's policy, guided by regulatory recommendations, of maintaining a ratio of between four and eight medical students per teaching physician.   *See id.* at ¶ 68.

Having failed to file a proof of claim in Caritas's bankruptcy, Ross sued BQHC and Wyckoff in this Court on April 6, 2009.   SOUF, ¶ 69.   Ross subsequently amended its complaint on August 20, 2009 and September 22, 2009.   *Id.* at ¶ 70.   Among other things, Ross's SAC alleges that:

- When Caritas's Hospitals ceased operations, BQHC became obligated to provide Ross's students with clerkships at Wyckoff;

- Ross is therefore entitled to "an order of specific performance" directing BQHC to force Wyckoff to provide Ross's students with clerkships at Wyckoff; and

- Ross is further entitled to "pierce the corporate veil and impose [BQHC's] liability for breach of the Affiliation Agreement . . . upon Wyckoff" because, according to Ross, BQHC:  (a) has "few, if any assets"; (b) has no employees or offices; (c) shares "overlapping officers and directors" with Wyckoff; and (d) has been "controlled" by Wyckoff generally.

SAC, ¶¶ 1-4, 55-80.

## ARGUMENT

### I.   Summary Judgment Standard

Summary judgment is appropriate where "'the pleadings, the discovery and disclosure materials [], and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).

Although the movant bears the initial burden of proof on its motion, once that burden is met, summary judgment cannot be avoided simply by alleging "the mere existence of *some* alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Rather, the non-moving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element that must be resolved at trial." *Spinelli v. City of New York*, 579 F.3d 160, 167 (2d Cir. 2009) (internal citations omitted).  Thus, "[a]t the summary judgment stage, there is no [triable] issue unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

Here, no evidence exists that would allow a reasonable jury to rule in Ross's favor at trial on either its Veil Piercing or Specific Performance Claim. Indeed, Ross's principal allegation in support of its Veil Piercing Claim (that Wyckoff "controlled" BQHC) is directly at odds with Ross's principal allegation in support of its Specific Performance Claim (that BQHC controls Wyckoff and can direct Wyckoff's Board to take certain actions). But, as set forth below, even if the Court is willing to overlook the irrationality inherent in these contradictory contentions, the evidence adduced during discovery dooms Ross's Claims as a matter of law. Summary judgment dismissing Ross's Veil Piercing and Specific Performance Claims is thus appropriate.

## II.    Ross's Veil Piercing Claim Should Be Dismissed

Ross's Veil Piercing Claim should be dismissed because Ross cannot meet the "heavy burden" required to pierce the corporate veil under New York law. *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 893 (1998). "New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). This test applies equally to a claim for "reverse [veil] piercing," where, as here, a plaintiff "seeks to hold a corporation accountable for actions of its shareholders." *Id.*

Ross cannot, as a matter of law, meet its burden as to either of these two essential requirements. *See, e.g., McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142-45 (E.D.N.Y. 2009) (granting summary judgment dismissing veil-piercing claim even though holding companies shared officers and directors with their respective subsidiaries); *Johnson v. Medisys Health Network*, No. 10-CV-1596 (ERK) (VVP), 2011 WL 4101389, at *22-23 (E.D.N.Y. Apr.

28, 2011) (granting motion to dismiss veil-piercing claim, even though the defendant not-for-profit health care corporation shared Board members with its subsidiaries and had the power to remove its subsidiaries' Boards); *Brito v. DILP Corp.*, 282 A.D.2d 320, 321, 723 N.Y.S.2d 459, 460 (1st Dep't 2001) (granting summary judgment dismissing veil-piercing claim even though the corporation whose veil was sought to be pierced had "insufficient assets or insurance to satisfy plaintiff's potential damages").

A. <u>There is no evidence that Wyckoff "completely dominated" BQHC with respect to the Affiliation Agreement</u>

Initially, Ross's Veil Piercing Claim should be dismissed as a matter of law because Ross cannot show that Wyckoff "exercised complete domination" over BQHC with respect to the Affiliation Agreement. *TNS Holdings*, 92 N.Y.2d at 339, 680 N.Y.S.2d at 893. Courts have often reiterated the black-letter law that the mere "opportunity to exercise control" over a corporation is not enough; rather, "[a]ctual domination" of the corporation whose veil is sought to be pierced "must be shown." *See, e.g., De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996). A number of factors are relevant to determining whether a corporation has been completely dominated, including, among others: (i) the absence of corporate formalities, such as a failure to elect directors or to maintain separate corporate records; (ii) the amount of business discretion exercised by the allegedly dominated corporation; (iii) whether funds have been used for personal or corporate purposes; and (iv) whether the related corporations deal with each other at arm's length. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). In applying these factors, courts apply "a presumption of [corporate] separateness . . . which is entitled to substantial weight." *McAnaney*, 665 F. Supp. 2d at 143 (internal citations omitted). Ross has not, and cannot, overcome this presumption.

Applying these factors to the undisputed facts confirms that BQHC and Wyckoff have been, and remain, separate and distinct entities, and that Wyckoff at no time "completely dominated" BQHC, either with respect to the Affiliation Agreement or otherwise.  For instance:

1.  BQHC and Wyckoff observed corporate formalities, as each had its own Board of Trustees, maintained its own books and records, and filed its own tax returns, *see* SOUF, ¶¶ 49-54;

2.  BQHC and Wyckoff operated at arms' length, with each Board meeting separately from, and acting independently of, the other, and each Board making its own decisions in the best interests of its own corporation, including with respect to clinical clerkship programs, *see* SOUF, ¶¶ 49-53;

3.  BQHC and Wyckoff further operated at arms' length with respect to the Affiliation Agreement, with BQHC agreeing to be bound to that Agreement but Wyckoff refusing to be so bound, *see* SOUF, ¶¶ 46, 58-61;

4.  Neither Wyckoff's nor BQHC's Board has ever attempted to control the other, nor could Wyckoff ever force BQHC's Board to take any particular action without breaching the corporate structure carefully designed to comply with the ethical and religious directives of the Conference of Catholic Bishops, and thus breaching the terms of the Acquisition Agreement, *see* SOUF, ¶¶ 16, 17, 19-20, 24, 30, 49-52; and

5.  The outside restructuring consultant brought in to serve temporarily as BQHC's CFO testified that there was a "clear delineation" between Wyckoff and Caritas, and that the "point of BQHC[] was to make sure that one organization [wasn't] responsible for the other organization's debts." *See* SOUF, ¶ 30.

These undisputed facts, alone, preclude Ross's claim that Wyckoff dominated BQHC. *See, e.g., Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) (finding no domination of a corporation because it "maintained its own corporate and financial records [and] held independent board meetings").

Ross may point to the fact that BQHC has no significant assets, salaried employees, or bank accounts, and that it shares offices and has overlapping Board members with Wyckoff.  But these facts have nothing to do with the Affiliation Agreement, as they must to support Ross's Veil Piercing Claim. *See, e.g., In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 524-25 (Bankr.

S.D.N.Y. 2005) ("[Plaintiff] cannot just pick a random instance of alleged self-dealing as a basis for veil piercing because New York law requires that domination and control be exercised *with respect to the transactions that caused the harm*.") (emphasis added).

Further, these facts are entirely consistent with BQHC's corporate purpose – that of a "passive parent entity" created solely to preserve the separateness between Caritas and Wyckoff required by DOH, the Conference of Catholic Bishops, and the terms of the Acquisition Agreement. SOUF, ¶¶ 24-31. Indeed, courts have repeatedly held that the mere lack of assets, or overlapping directorates, is insufficient to sustain a veil-piercing claim. *See, e.g., Am. Fuel Corp.*, 122 F.3d at 134 (dismissing veil-piercing claim even though allegedly dominated corporation had "no contracts, no employees, [] no independent office space . . . no separate bank account [and] no capital or assets," finding such evidence was "inadequate as a matter of law"); *Am. Protein Corp.*, 844 F.2d at 60 (refusing to find domination despite interlocking directorates, stating that "[t]his commonplace circumstance of modern business does not furnish such proof of control as will permit a court to pierce the corporate veil"); *McAnaney*, 665 F. Supp. 2d at 142-45 (granting summary judgment dismissing veil-piercing claim even though the parent companies shared officers and directors with their subsidiaries, because "overlapping directors and officers . . . are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness"); *Johnson*, 2011 WL 4101389, at *22-23 (granting motion to dismiss veil-piercing claim, even though the defendant not-for-profit health care corporation shared Board members with its subsidiaries and had the power to remove its subsidiaries' Boards). There is simply no evidence that Wyckoff "totally controlled the everyday operation of [BQHC]." *Pebble Cove Homeowners' Assoc'n v. Fidelity New York FSB*, 153 A.D.2d 843, 844, 545 N.Y.S.2d 362, 363-64 (2d Dep't 1989).

The Second Circuit's decision in *American Fuel Corporation* is particularly instructive. 122 F.3d 130 (2d Cir. 1997). There, American Fuel Corporation ("AFC") moved to compel Utah Energy Development Company ("UEDC") to arbitrate a breach of contract claim, contending that: (a) AFC's agreement with UEDC's president, Robert Nead, required arbitration; and (b) UEDC was merely Mr. Nead's "alter ego." *Id.* at 132. The district court granted AFC's motion and ordered the parties to arbitrate, finding that "UEDC did not function as a distinct entity from Nead," largely because UEDC had failed to observe corporate formalities and had "no contracts, no employees, [] no independent office space . . . no separate bank account [and] no capital or assets." *Id.* at 134-35. The Second Circuit reversed, however, finding that this evidence was "inadequate as a matter of law" because it "show[ed] no more than that UEDC was a start-up company" and was further outweighed by the lack of evidence showing that Nead had ever used UEDC's funds for personal matters or otherwise commingled UEDC's funds with his own. *Id.* at 135.

Here, similarly, Ross contends that BQHC was effectively Wyckoff's "alter ego," relying, at best, on evidence that BQHC lacks significant assets, salaried employees, or bank accounts, and shares offices and has overlapping Board members with Wyckoff. *See* SOUF, ¶¶ 28, 49-54. Just as in *American Fuel*, however, there is no evidence that Wyckoff ever used BQHC's funds for its own purposes, that funds were ever commingled with Wyckoff's, or that Wyckoff ever exercised any ***actual*** control over BQHC's Board. *See id.* at ¶¶ 49-56; 122 F.3d at 134-35. Further, as Ross was well aware, BQHC had no need for the powers and capabilities of an operating company because it was not the purpose or objective of BQHC to be one. SOUF, ¶¶ 25-30, 42-45. At best, then, Ross is left with evidence showing "no more than that" BQHC was exactly what it was created to be – a passive parent entity that did not have hospital

operations of its own, but existed to preserve the separate identities of Wyckoff and Caritas. *Id.* at ¶¶ 25-31.  And, just as in *American Fuel*, such evidence is "inadequate as a matter of law" to pierce BQHC's corporate veil here.  Simply put, if *American Fuel* was correctly decided, then *a fortiori*, Ross's Veil Piercing Claim – which is much weaker than the similar claim in *American Fuel* – must also fail.

Because there is no evidence that would permit a reasonable jury to find that Wyckoff actually and completely dominated BQHC, either with respect to the Affiliation Agreement or otherwise, Ross's Veil Piercing Claim should be dismissed as a matter of law.

> B.    <u>There is no evidence that BQHC was used as an instrument of fraud<br>or to otherwise harm Ross with respect to the Affiliation Agreement</u>

Even if Ross could show that Wyckoff exercised "complete domination" over BQHC with respect to the Affiliation Agreement – a point we do not concede for even a moment – Ross's Veil Piercing Claim would nonetheless fail because there is no evidence that BQHC was used to perpetrate a fraud or to otherwise illegitimately or deceitfully harm Ross with respect to the Affiliation Agreement.  *See, e.g., TNS Holdings*, 92 N.Y.2d at 339, 680 N.Y.S.2d at 893 ("Evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud, or malfeasance."); *Barkley v. Olympia Mortg. Co.*, No. 04-CV-875 (RJD) (KAM), 2007 WL 656250, at *6 (E.D.N.Y. Feb. 27, 2007) ("'While complete domination of the corporation is the key to piercing the corporate veil, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward the plaintiff is required.'").  In other words, complete domination is a necessary, but not sufficient, condition to justify veil piercing.

Moreover, courts have repeatedly held that piercing the corporate veil requires "evidence of fraud or wrongful conduct" for "each and every transaction" with respect to which the veil is sought to be pierced.  *See, e.g., Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91,

99 (E.D.N.Y. 1999) (denying plaintiff summary judgment because it failed to present evidence that the defendant shareholder "used his domination of [the corporation] to commit fraud with respect to" a number of the transactions at issue); *see also Johnson & Johnson Consumer Cos. v. Aini*, No. 02-CV-6624 (DLI) (RLM), 2009 WL 6055841, at *9 (E.D.N.Y. Dec. 1, 2009) (recommending denying plaintiff summary judgment on its veil-piercing claim because there was no evidence that the alleged domination "was used to commit the trademark infringements at issue"). Here, there is no evidence that BQHC was used to defraud Ross or to otherwise deceive or illegitimately harm Ross with respect to the Affiliation Agreement.

*First*, Ross cannot establish that BQHC was used either to perpetrate a fraud on Ross or for some other wrongful purpose with respect to the Affiliation Agreement because Ross alone insisted, based on what it deemed to be in its own best legal and financial interests, that BQHC be a signatory to that Agreement. *See* SOUF, ¶¶ 40-43. For the first two months of negotiations with Ross, it was Caritas, not BQHC, that was the contracting party to the proposed Affiliation Agreement opposite Ross. *Id.* at ¶¶ 40-41. Wyckoff had steadfastly refused to be a party to the agreement at all. *Id.* at ¶¶ 58-59, 61. Then, just days before signing, Ross insisted – at the behest of DeVry's counsel – that BQHC replace Caritas as the contracting party to the Affiliation Agreement. *Id.* at ¶¶ 42-43.[4] Because BQHC was Ross's preferred contracting party to the Affiliation Agreement, and BQHC entered into that Agreement solely at Ross's request, Ross cannot fairly claim that BQHC was used to perpetrate a fraud upon Ross, or to otherwise deceive or illegitimately harm Ross, with respect to the Affiliation Agreement. *Id.* For this reason alone, Ross's Veil Piercing Claim fails.

---

[4]   The Defendants are not privy to why, during the course of the arm's length negotiations, Ross decided BQHC, not Caritas, was its preferred contracting party. At the time, Ross explained that its choice was "the result of our DeVry legal and financial department's review." SOUF, ¶ 43.

*Second*, even if Ross had not chosen BQHC as its preferred contracting party, Ross's Veil Piercing Claim would still fail because it is undisputed that BQHC was formed for valid corporate purposes. Under New York law, the corporate form may generally not be disregarded "where [the] corporation was formed for legal purposes or is engaged in legitimate business." *TNS Holdings*, 92 N.Y.2d at 339-340, 680 N.Y.S.2d at 893. The record shows that BQHC was formed for perfectly valid purposes, among them: to preserve the separateness between Wyckoff and Caritas required by DOH, the Conference of Catholic Bishops, and the terms of the Acquisition Agreement. *See* SOUF, ¶¶ 16-17, 19, 24-25, 30-31. Indeed, that purpose underscores why Wyckoff could not, despite Ross's conclusory allegations to the contrary, control BQHC – because, if Wyckoff tried to do so, it would be violating the ethical and religious directives of the Conference of Catholic Bishops and thus the terms of the Acquisition Agreement. *See id.* at ¶¶ 25, 31. For this reason, too, Ross's Veil Piercing Claim cannot stand.

*Third*, perhaps sensing its weakness with respect to this element of its Veil Piercing Claim, Ross notably avoids claiming that BQHC was used to perpetrate a fraud with respect to the Affiliation Agreement, instead contending only that the use of BQHC in the Affiliation Agreement "resulted in wrongful and inequitable consequences" for Ross. *See* Docket No. 92 (Ross's November 4, 2011 letter to the Court regarding Defendants' proposed summary judgment motion), p. 3. This argument is irrational because it is undisputed that it was Ross that insisted that BQHC be the contracting party to the Affiliation Agreement, and therefore any purportedly "wrongful and inequitable consequences" that resulted were a product of Ross's stated preference for BQHC as its contract party. *See supra*, pp. 9, 20.[5]

---

[5]      Moreover, if BQHC had not been named as the contracting party, then Caritas would have been, and, given Caritas's bankruptcy, Ross would be in the same position it finds itself today. *See* SOUF, ¶ 63.

Even if this did not completely bar Ross's Veil Piercing Claim, discovery has now revealed that the only "wrongful and inequitable consequences" that Ross might arguably raise at trial are:  (a) that BQHC breached the Affiliation Agreement with Ross (a point that BQHC disputes); and/or (b) that BQHC lacks significant assets, and thus may prevent Ross from satisfying any judgment in its favor unless it can pierce BQHC's corporate veil and reach Wyckoff's assets.    SOUF, ¶¶ 25-30, 42-43.    Neither of these supposed "inequitable consequences" is sufficient, as a matter of law, to justify veil-piercing.  *See, e.g., F&M Precise Metals, Inc. v. Goodman*, Index No. 6546-04, 2004 WL 2059567, at *3-4 (Sup. Ct. Nassau Co. Aug. 25, 2004) (breaching a contract is not sufficient wrongdoing to sustain a veil-piercing claim as a matter of law); *Feigen v. Advance Capital Mgm't Corp.*, 150 A.D.2d 281, 282, 541 N.Y.S.2d 797, 798 (1st Dep't 1989) ("The alter ego theory is simply insufficient to support claims for breach of contract against individuals in the absence of specific factual allegations demonstrating fraud or other corporate misconduct . . . ."); *Brito v. DILP Corp.*, 282 A.D.2d 320, 321, 723 N.Y.S.2d 459, 460 (1st Dep't 2001) ("Where, as here, the corporation has insufficient assets or insurance to satisfy plaintiff's potential damages, that is not a basis upon which to impose a corporate liability on an individual owner or shareholder."); *M. Sobol, Inc. v. James*, 180 Misc.2d 110, 110, 691 N.Y.S.2d 293, 294 (Sup. Ct. App. Term 2d Dep't 1999) ("The fact that the corporation subsequently filed bankruptcy proceedings under Chapter 7 of the 1978 Bankruptcy Code[], without more, cannot act to establish a fraudulent intent to deceive plaintiff.").

Indeed, Ross's position proves too much.  Ross effectively argues that any alleged breach of contract claim against a possibly judgment-proof party results in "wrongful and inequitable consequences" warranting veil-piercing.  Docket No. 92, p. 3.  Acceptance of that rationale

would effectively dismantle the settled legal standards governing resolution of veil-piercing claims, and would allow the corporate form to be routinely disregarded in contract cases. This is simply not the law in New York. Because Ross can cite to no evidence that BQHC was used to perpetrate a fraud on Ross, or to otherwise deceive or illegitimately harm Ross, with respect to the Affiliation Agreement, Ross cannot meet the second element of a veil-piercing claim under New York law. Consequently, its Veil Piercing Claim should be dismissed.

**III.   Ross's Specific Performance Claim Should Be Dismissed Because It Seeks Relief Prohibited By New York's Public Health Law**

Ross's Specific Performance Claim should be dismissed as a matter of law because it seeks to invoke the Court's equity power to require BQHC to take actions contrary to Article 28 of New York's Public Health Law. Specifically, in Count I of the SAC, Ross requests that the Court order BQHC – the only Defendant who signed the Affiliation Agreement and the passive parent and sole corporate member of Wyckoff – to direct Wyckoff to provide Ross with the clerkships that Caritas would have provided Ross at St. John's Queens and Mary Immaculate pursuant to the Affiliation Agreement, had Caritas not filed for bankruptcy. SAC, ¶¶ 54-64. Because BQHC has no authority under Article 28 of the Public Health Law to direct Wyckoff's hospital operations, including its clinical education program, the relief Ross seeks would violate that law and must therefore be denied.

**A.   BQHC is not authorized to operate a hospital under Article 28 of the Public Health Law**

To understand why Ross's Specific Performance Claim fails as a matter of law, it is necessary to describe New York's highly regulated system of laws and regulations governing the delivery of healthcare through licensed hospitals. The principal state statute governing the operation of hospitals in New York is Article 28 of New York's Public Health Law. N.Y. Pub.

Health Law §§ 2800 *et seq.*; *see also* SOUF, ¶¶ 3-11; Declaration of David N. Hoffman, Esq.

("Hoffman Dec."), Exh. 1.  Article 28 provides, among other things, that:

- A hospital may not operate in New York State unless it has been "established" by New York's Public Health and Health Planning Council ("PHHPC") (formerly the Public Health Council) and has received an "operating certificate" from New York's Commissioner of Health (the "Commissioner");

- A corporation may not file a "certificate of incorporation . . . which includes among its corporate purposes or powers the establishment or operation of any hospital" without PHHPC's written approval;

- PHHPC must similarly approve "[a]ny change in the person who" operates a hospital" or "[a]ny transfer . . . of ten percent or more of the stock of a corporation which is the operator of a hospital"; and

- PHHPC shall not approve an entity to operate a hospital unless it is "satisfied" as to the operator's "character, competence, and standing in the community."

*See* N.Y. Pub. Health Law §§ 2801-a(1), 2801-a(2), 2801-a(3), 2801-a(4)(a), 2801-a(4)(c), and 2805(1)(a).

New York courts regularly apply and enforce Article 28's requirements for the establishment and operation of hospitals in New York State. *See, e.g., Spiegel v. Whalen*, 44 N.Y.2d 745, 746, 405 N.Y.S.2d 679, 679 (1978) (recognizing that Article 28's "prerequisites" for operating a hospital in New York State are:  (i) "a grant of 'establishment' from [PHHPC]," and (ii) "an operating certificate from the Commissioner . . . ."); *Christiano v. Whalen, M.D.*, 92 Misc.2d 961, 962, 401 N.Y.S.2d 976, 977 (Sup. Ct. Monroe Co. 1978) (recognizing that "'[n]o hospital . . . shall be operated unless it shall [] possess a valid operating certificate . . . .'").

Article 28's implementing regulations further specify that the "operator" of a hospital is the person or entity with "decision-making authority" over any of a number of enumerated items, including: (a) hospital operating procedures; (b) hospital debt; and (c) "hospital contracts for management or for clinical services." *See* 10 N.Y.C.R.R. § 405.1(c).  In addition, the regulations

- 24 -

require each hospital operating in New York State to have a governing body that is "legally responsible for directing the operation of the hospital," and expressly prohibit any limitation on that governing body's powers:

> *No contracts/arrangements* or other agreements *may limit or diminish* the responsibility of the governing body *in any way*.

*Id.* at § 405.2(b)(1) (emphasis added).

Article 28's implementing regulations further require each hospital operating in New York State to have a Chief Executive Officer ("CEO") responsible for the "daily management and operational affairs of the hospital."   *Id.* at §§ 405.2(d), 405.3(a), 405.3(b).   Article 28's implementing regulations permit a hospital operating in New York State to delegate certain of the CEO's powers by contract, provided that the Commissioner expressly consents. *See id.* at §§ 405.3(f), 405.3(f)(3)(iii).   However, certain of the CEO's powers – including "the authority to incur on behalf of the [hospital] liabilities not normally associated with the day-to-day operation of a facility" – may not be delegated under any circumstances. *Id.*

Consistent with the highly regulated nature of healthcare services under New York law, Wyckoff and Caritas each have Boards of Trustees that meet and act independently of one another, as required by DOH, Article 28, and the terms of the Acquisition Agreement.  SOUF, ¶¶ 16-17, 19, 30-31, 49, 53.  In particular, and throughout the period of time relevant here, both of those Boards have made decisions in the best interests of their respective corporations, and neither of those Boards has sought to influence each other's (or BQHC's) operational decision making in any way. *Id.* at ¶¶ 48-53.

BQHC, on the other hand, was created as a "nonclinical passive parent" entity, and thus: (a) was not "established" by PHHPC; (b) does not possess an operating certificate issued by the

Commissioner; and (c) is not licensed to operate a hospital under Article 28.  SOUF, ¶¶ 24-29.

Indeed, BQHC's certificate of incorporation specifically prohibits it from operating a hospital:

> *Nothing contained in this certificate of incorporation shall authorize [BQHC] to establish, operate, construct, lease or maintain a hospital . . . as defined in and covered by Articles 28*, 36, 40 and 44, respectively, of the Public Health Law.

SOUF, ¶ 26.  Accordingly, BQHC has no authority under New York law to operate any hospital.

*See* N.Y. Pub. Health Law §§ 2801-a(1)-(4).  Further, Wyckoff may not, as a matter of law,

delegate its powers "to incur on behalf of [Wyckoff] liabilities not normally associated with the

day-to-day operation of a facility" to BQHC, and certainly did not do so here with respect to the

Affiliation Agreement.  *See* Hoffman Dec., Exh. 1, at 10 N.Y.C.R.R. §§ 405.3(f), 405.3(f)(3)(iii).

In fact, Wyckoff repeatedly refused to sign or be bound by that Agreement.  SOUF, ¶¶ 58-59, 61.

This limitation on BQHC's authority to direct hospital operations has already been

recognized by one New York court.  *See Healthnet Sys. Consulting, Inc. v. Brooklyn-Queens

Healthcare, Inc. et al.*, 2009 N.Y. Misc. Lexis 4239 (Sup. Ct. Queens Co. July 27, 2009).  In

*Healthnet*, a case involving a breach of contract claim brought by a technology consulting firm

against BQHC, Caritas, and Wyckoff, the court recognized that "only if a corporation is licensed

under Article 28 will it have the ability to operate a hospital and to implement programs and

policies to accomplish the hospital's goals."  *Id.* at *8-9.  Recognizing this statutory limitation,

the court agreed that "BQHC had no such authority [to enter into a consulting agreement for

services at Caritas or Wyckoff] because it did not and legally could not operate any hospitals."

*Id.* at *6-7.  The same is true here – BQHC does not control any aspect of Wyckoff's hospital

operations and cannot legally do so.  BQHC thus cannot legally direct Wyckoff to alter its

clinical clerkship program, even if the Court ordered BQHC to do so.

B.     Ross's Specific Performance Claim should be dismissed because any order of specific performance would violate the Public Health Law

As explained above, BQHC is not authorized to operate a hospital under Article 28 of New York's Public Health Law. *See supra*, pp. 5, 7, 23-26. Accordingly, BQHC has no legal authority to direct Wyckoff's operations by imposing on Wyckoff an obligation to admit Ross's students for clinical clerkships. Nevertheless, this is precisely the equitable relief Ross seeks by way of its Specific Performance Claim. Because Ross thus effectively asks this Court to order BQHC to take action contrary to New York law, Ross's request must be denied and its Specific Performance Claim must be dismissed.

It is black letter law that when the performance of a contract is forbidden by law, "specific performance is not available as a remedy." 12-64 Corbin on Contracts § 1170 (Matthew Bender 2011). "The court will not attempt to compel that which cannot in fact be done or that which is criminal or tortious." *Id.* (citing *Palombi v. Volpe*, 249 N.Y. 194, 196, 163 N.E. 607 (1928) ("The court cannot compel the defendant to carry out that part of the agreement which would cause a violation of the law . . . .")). Such is the case here. An order requiring BQHC to specifically perform under the Affiliation Agreement by directing Wyckoff to accept additional Ross students into Wyckoff's clinical clerkship program would force BQHC to exceed its authority as a non-clinical passive parent entity and improperly involve BQHC in decisions with respect to Wyckoff's hospital operations. Because the management of Wyckoff Heights Medical Center is exclusively the province of Wyckoff's Board and officers under Article 28 of the Public Health Law, BQHC's involvement would be contrary to that statute and its implementing regulations. Accordingly, Ross's request for specific performance cannot legally be granted, and Ross's Specific Performance Claim should be dismissed as a matter of law.

## CONCLUSION

Ross's Veil Piercing Claim should be dismissed because Ross cannot, as a matter of law, demonstrate either (1) that Wyckoff exercised complete domination over BQHC with respect to the Affiliation Agreement, or (2) that such domination was used to commit a fraud or wrong that injured Ross.  Ross's Specific Performance Claim should be dismissed because the relief it seeks is prohibited by New York's Public Health Law.  For these reasons, Defendants' motion should be granted in all respects and the Court should award Defendants such other and further relief as the Court deems just and proper.

Dated: New York, New York
      December 2, 2011

                             Respectfully submitted,

                             K&L GATES LLP

                             By: _____

                             Walter P. Loughlin
                             (Walter.Loughlin@klgates.com)
                             Justin H. Roeber
                             (Justin.Roeber@klgates.com)

                             599 Lexington Avenue
                             New York, New York 10022
                             Telephone:  (212) 536-3900
                             Facsimile:  (212) 536-3901

                             *Attorneys for Defendants Brooklyn-Queens Health*
                             *Care, Inc. and Wyckoff Heights Medical Center*