# Exhibit 5

EXECUTION COPY

ASSET PURCHASE AGREEMENT

BY AND AMONG

SAINT VINCENTS CATHOLIC MEDICAL CENTERS
OF NEW YORK,

CMC OCCUPATIONAL HEALTH SERVICES, P.C.,

CMC PHYSICIAN SERVICES, P.C.,

CMC RADIOLOGICAL SERVICES, P.C.,

CMC CARDIOLOGY SERVICES, P.C.

AND

CARITAS HEALTH CARE PLANNING, INC.

Dated as of May 9, 2006

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00558

BQHC 00512-00047

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **Article I** | **DEFINITIONS** | |
| 1.1 | Certain Definitions | 2 |
| 1.2 | Terms Defined Elsewhere in this Agreement | 11 |
| 1.3 | Other Definitional and Interpretive Matters | 14 |
| **Article II** | **PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES** | |
| 2.1 | Purchase and Sale of Assets | 15 |
| 2.2 | Excluded Assets | 18 |
| 2.3 | Assumption of Liabilities | 20 |
| 2.4 | Excluded Liabilities | 21 |
| 2.5 | Cure Amounts | 23 |
| 2.6 | Further Conveyances and Assumptions | 24 |
| 2.7 | Bulk Sales Laws | 25 |
| 2.8 | Accounts Receivable | 25 |
| 2.9 | Agreement Regarding Confidentiality of Patient Information | 25 |
| 2.10 | Research Programs | 26 |
| 2.11 | Pre-Closing Accounts Receivable; Section 4204 Bond Costs | 26 |
| 2.12 | Parsons Manor Lease | 27 |
| 2.13 | Behavioral Health Agreement | 27 |
| 2.14 | Ambulance Services Operating Certificate | 27 |
| **Article III** | **CONSIDERATION** | |
| 3.1 | Consideration | 27 |
| 3.2 | Purchase Price Deposit | 28 |
| 3.3 | Payment of Purchase Price | 28 |
| 3.4 | Transition Patient Payments | 29 |
| 3.5 | Additional Purchased Assets | 30 |
| 3.6 | Purchase Price Adjustment | 30 |
| 3.7 | Third-Party Financing Election | 32 |
| **Article IV** | **CLOSING AND TERMINATION** | |
| 4.1 | Closing Date | 33 |
| 4.2 | Deliveries by SVCMC | 34 |
| 4.3 | Deliveries by Purchaser | 36 |
| 4.4 | Termination of Agreement | 37 |
| 4.5 | Procedure For Termination | 39 |
| 4.6 | Effect of Termination | 40 |

BQHC 00559

BQHC 00512-00048

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| **Article V** | **REPRESENTATIONS AND WARRANTIES OF SVCMC** | |
| 5.1 | Organization and Good Standing | 41 |
| 5.2 | Authorization of Agreement | 42 |
| 5.3 | Consents of Third Parties; Contractual Consents | 42 |
| 5.4 | Financial Information | 43 |
| 5.5 | Title to Purchased Assets | 43 |
| 5.6 | Absence of Certain Developments | 44 |
| 5.7 | Taxes | 45 |
| 5.8 | Real Property | 45 |
| 5.9 | Tangible Personal Property | 47 |
| 5.10 | Intellectual Property | 47 |
| 5.11 | Material Contracts | 48 |
| 5.12 | Employees; Employee Benefits | 49 |
| 5.13 | Employment and Labor | 50 |
| 5.14 | Litigation | 51 |
| 5.15 | Compliance with Laws; Permits | 51 |
| 5.16 | Compliance with Medical Reimbursement Program Laws | 52 |
| 5.17 | Environmental Matters | 53 |
| 5.18 | Medicare and Medicaid Certification; Cost Reports | 54 |
| 5.19 | Insurance | 54 |
| 5.20 | Financial Advisors | 54 |
| 5.21 | Medical Staff; Physician Relations | 54 |
| 5.22 | Credit Balance Reports | 54 |
| 5.23 | Hill-Burton Loan | 54 |
| 5.24 | Sufficiency of Assets | 54 |
| 5.25 | Acknowledgement Regarding Representations and Warranties by Purchaser | 55 |
| 5.26 | No Other Representations or Warranties; Schedules | 55 |
| **Article VI** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | |
| 6.1 | Organization and Good Standing | 56 |
| 6.2 | Authorization of Agreement | 56 |
| 6.3 | Conflicts; Consents of Third Parties | 57 |
| 6.4 | Litigation | 57 |
| 6.5 | Financial Advisors | 58 |
| 6.6 | Healthcare Regulatory Compliance Status | 58 |

BQHC 00560

BQHC 00512-00049

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 6.7 | Acknowledgement Regarding Condition of the Business | 58 |
| 6.8 | No Other Representations or Warranties; Schedules | 59 |
| **Article VII** | **BANKRUPTCY COURT MATTERS** | |
| 7.1 | Approval of Break-Up Fee | 60 |
| 7.2 | Competing Transaction | 60 |
| 7.3 | Bankruptcy Court Filings | 61 |
| 7.4 | Notice of Sale | 61 |
| 7.5 | Treatment of Monetary Obligations | 61 |
| **Article VIII** | **COVENANTS** | |
| 8.1 | Access to Information | 62 |
| 8.2 | Conduct of the Business Pending the Closing | 63 |
| 8.3 | Consents; Insurance | 65 |
| 8.4 | Regulatory Approvals | 66 |
| 8.5 | Further Assurances | 69 |
| 8.6 | Confidentiality | 70 |
| 8.7 | Preservation of Records | 71 |
| 8.8 | Publicity | 72 |
| 8.9 | Use of Name | 72 |
| 8.10 | Supplementation and Amendment of Schedules | 73 |
| 8.11 | Covenant Not to Solicit Employees | 73 |
| 8.12 | Covenant Not to Compete | 73 |
| 8.13 | Final Cost Report | 74 |
| 8.14 | Cooperation | 74 |
| 8.15 | Expiring Real Property Leases | 74 |
| 8.16 | Surrender of Operating Certificate | 75 |
| 8.17 | Responsibility for Pre-Closing Medicare and Medicaid Liabilities | 75 |
| 8.18 | Repair of Damage; Condemnation | 76 |
| **Article IX** | **EMPLOYEES AND EMPLOYEE BENEFITS** | |
| 9.1 | Offers of Employment | 77 |
| 9.2 | Employment Terms; Employee Benefits | 78 |
| **Article X** | **CONDITIONS TO CLOSING** | |
| 10.1 | Conditions Precedent to Obligations of Purchaser | 80 |
| 10.2 | Conditions Precedent to Obligations of the Sellers | 81 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and SVCMC | 81 |
| 10.4 | Frustration of Closing Conditions | 82 |

BQHC 00561

BQHC 00512-00050

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| **Article XI** | **INDEMNIFICATION** | |
| 11.1 | Survival of Representations and Warranties | 82 |
| 11.2 | Indemnification by SVCMC | 82 |
| 11.3 | Indemnification by Purchaser | 83 |
| 11.4 | Indemnification Procedures | 84 |
| 11.5 | Certain Limitations on Indemnification | 86 |
| 11.6 | Calculation of Losses | 87 |
| 11.7 | Tax Treatment of Indemnity Payments | 88 |
| 11.8 | No Consequential Damages | 88 |
| 11.9 | Exclusive Remedy | 88 |
| **Article XII** | **TAXES** | |
| 12.1 | Transfer Taxes | 88 |
| 12.2 | Prorations | 89 |
| 12.3 | Purchase Price Allocation | 89 |
| 12.4 | Cooperation on Tax Matters | 89 |
| **Article XIII** | **MISCELLANEOUS** | |
| 13.1 | Expenses | 89 |
| 13.2 | Seller Representative | 90 |
| 13.3 | Allocations among the Sellers | 92 |
| 13.4 | Injunctive Relief | 93 |
| 13.5 | Submission to Jurisdiction; Consent to Service of Process | 93 |
| 13.6 | Waiver of Right to Trial by Jury | 94 |
| 13.7 | Entire Agreement; Amendments and Waivers | 94 |
| 13.8 | Governing Law | 94 |
| 13.9 | Notices | 94 |
| 13.10 | Severability | 95 |
| 13.11 | Binding Effect; Assignment | 95 |
| 13.12 | No Personal Liability | 96 |
| 13.13 | Counterparts | 96 |

BQHC 00562

BQHC 00512-00051

## SCHEDULES

A.....................The Business
B.....................Other Businesses
1.1(a) .................Knowledge
1.1(b) .................Permitted Exceptions
2.1(b)(ii) ............Excluded Artworks and Tangible Property
2.1(b)(iii) ...........Purchased Vehicles
2.1(c) .................Purchased Intellectual Property Licenses
2.1(d) .................Assigned Contracts
2.1(m) .................Charitable Gifts
2.1(n) .................Medicare and Medicaid Provider Agreements
2.1(r) .................Research Programs
2.2(e) .................Excluded Personal Property Leases
2.2(f)(i) ..............Excluded Owned Property
2.2(f)(ii) .............Excluded Real Property Leases
2.2(o) .................Excluded Research Programs
2.2(u) .................Excluded Personal, Tangible and Intangible Property
2.5.....................Cure Amounts
2.8.....................Procedures for Transitioning Accounts Receivable
2.12...................Terms of Parsons Manor Lease
2.13...................Behavioral Health Agreement
3.3.....................Terms of the Notes
3.6(a) .................Fixed Assumed Liabilities
3.7.....................Acceptable Third-Party Lenders
5.3(a) .................Seller Consents
5.3(b) .................No Seller Conflicts
5.3(c) .................Non-Assignable Purchased Assets
5.4.....................Financial Information
5.5.....................Title to Purchased Assets
5.6.....................Absence of Certain Developments
5.7.....................Taxes
5.8(a) .................Seller Properties
5.8(b) .................Real Property Lease Defaults
5.8(c)(i) ..............Purchased Real Property Improvements
5.8(c)(ii) .............Purchased Real Property Legal Actions
5.8(f)..................Security Deposits
5.9.....................Personal Property Leases
5.10(a) ...............Intellectual Property Rights

BQHC 00563

BQHC 00512-00052

5.10(b) ...............Rights to Use Intellectual Property Rights
5.10(c) ...............Intellectual Property Rights Granted
5.10(d) ...............Software
5.11(a) ...............Material Contracts
5.11(b) ...............Material Excluded Contracts
5.11(d) ...............Material Contract Defaults
5.11(e) ...............Material Contracts Assignments
5.12(a) ...............Employee Benefit Plans
5.12(b) ...............Multiemployer Plans and Multiple Employer Plans
5.13(a) ...............Employees
5.13(b) ...............Employment Agreements
5.13(c) ...............Labor and Collective Bargaining Agreements
5.13(d) ...............Labor Disputes
5.13(e) ...............Compliance with Employment Laws
5.13(f) ................Controversies
5.14....................Seller Litigation
5.15(b) ...............Healthcare Program Proceedings
5.15(c) ...............Compliance With Laws
5.15(d) ...............Orders
5.15(e) ...............Permits
5.16(a) .................Investigations Related to Medical Reimbursement Program Laws
5.16(b) ...............Compliance With Medical Reimbursement Program Laws
5.17....................Environmental Matters
5.19....................Insurance
5.20....................Financial Advisors
5.21....................Medical Staff Disputes; Physicians
5.24....................Sufficiency of Assets
6.3(a) .................Purchaser Consents
6.3(b) .................No Purchaser Conflicts
6.4.....................Purchaser Litigation
6.6.....................Purchaser Healthcare Regulatory Compliance
8.1.....................Contact Persons for Access to Information
8.2(a) .................Affirmative Conduct of Business
8.2(a)(viii) ..........Environmental Compliance Matters
8.2(a)(ix) ............Capital Expenditures
8.2(a)(x) .............JCAHO Accreditation Requirements for Improvement
8.2(b) .................Negative Covenants
8.12....................Existing Operations

BQHC 00564

BQHC 00512-00053

10.3(d) ................Required Governmental Consents

**EXHIBITS**
A ...........................Form of Bidding Procedures Order
B .........................Form of Sale Order
C .........................Form of Medical Records Custody Agreement
D .........................Form of Clinical Sponsorship Agreement
E .........................Form of Residency Rotation Agreement
F .........................Form of Cardiac Patient Transfer and Affiliation Agreement

BQHC 00565

BQHC 00512-00054

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of May 9, 2006 (this "Agreement"), by and among **Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers**, a New York not-for-profit corporation ("SVCMC"), **CMC Occupational Health Services, P.C.**, a New York professional corporation ("CMCOHS"), **CMC Physician Services, P.C.**, a New York professional corporation ("CMCPS"), **CMC Radiological Services, P.C.**, a New York professional corporation ("CMCRS"), **CMC Cardiology Services, P.C.**, a New York professional corporation ("CMCCS" and, together with CMCOHS, CMCPS and CMCRS, the "PCs", and the PCs and SVCMC collectively, the "Sellers") and **Caritas Health Care Planning, Inc.**, a New York not-for-profit corporation ("Purchaser").

### W I T N E S S E T H:

WHEREAS, each Seller is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 5, 2005 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 05-14945 (PCB)) (the "Bankruptcy Case"); and

WHEREAS, SVCMC presently owns and operates, among other enterprises, two hospitals located in Queens County, New York, known as Mary Immaculate Hospital and Saint John's Queens Hospital (the "Hospitals"), and provides hospital services and other health care programs and services at the Hospitals and at related facilities, including those identified in Schedule A (the Hospitals, the related facilities and the services and programs provided thereat are collectively referred to as the "Business"); and

WHEREAS, the PCs own certain assets of the Business, and are subject to certain liabilities of the Business; and

WHEREAS, SVCMC presently also owns and operates other hospitals, including those in the locations identified in Schedule B, providing hospital services and other health care facilities and programs, including those identified in Schedule B, providing other health care services (collectively, the "Other Businesses"); and

WHEREAS, certain terms used in this Agreement are defined in Article I below; and

WHEREAS, the Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from the Sellers pursuant to Sections 363 and 365 of the Bankruptcy Code all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

BQHC 00566

BQHC 00512-00055

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1  <u>Certain Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Additional Pre-Closing Liabilities</u>" means the Liabilities for overpayments under the Medicare or Medicaid provider number and provider agreements used in the Business, identified in <u>Schedule 2.1(n)</u>, arising before the date hereof and described in items 3 through 6 of <u>Schedule 5.15(b)</u>, to the extent remaining unpaid by SVCMC immediately prior to the Closing Date.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. Without limiting the generality of the foregoing, (i) the members of SVCMC and any Person under common control with a member shall be considered an Affiliate of SVCMC and (ii) for all purposes of this Agreement, Wyckoff shall be deemed to be an Affiliate of Purchaser. The parties acknowledge and agree that Saint Vincent's Midtown Hospital, a New York not-for-profit corporation, is not an Affiliate of the Sellers for purposes of this Agreement.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court, substantially in the form of <u>Exhibit A</u> hereto, with such changes as are reasonably acceptable to Purchaser and SVCMC.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>CMS</u>" means the Centers for Medicare and Medicaid Services.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>CON Application</u>" means the Certificate of Need application with respect to the Business to be submitted by Purchaser to DoH.

"<u>CON Approval</u>" means the approval by DoH of Purchaser's CON Application without contingencies or conditions that have not been satisfied, other than

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00567

BQHC 00512-00056

contingencies or conditions that may be satisfied in accordance with their terms after the Closing.

"Contract" means any written contract, indenture, note, bond, lease, license or other agreement, other than a real property lease, a personal property lease or an Intellectual Property License.

"Copyrights" means all copyrights and registrations and applications therefor and works of authorship, and mask work rights.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Creditors' Committee" means the official committee of unsecured creditors of the Sellers appointed in connection with the Bankruptcy Case.

"DIP Agreement" means the Debtor-in-Possession Credit Agreement, dated as of December 30, 2005, by and among the Sellers, Medical Service of St. Vincent's Hospital & Medical Center, P.C. and Surgical Service of St. Vincent's P.C., as debtors in possession, each of the other persons designated therein as Credit Parties (as defined therein), the financial institutions who were or thereafter became parties to the agreement as Lenders (as defined therein), and General Electric Capital Corporation, as the initial L/C Issuer (as defined therein) and as Agent (as defined therein).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business or the Purchased Assets in each case whether or not in electronic form, other than Patient Records.

"DoH" means the Department of Health of the State of New York.

"Employees" means all individuals, as of any date specified herein, whether or not actively at work as of such date, who are employed by any of the Sellers in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing; provided, however, that "Employees" shall not include (i) any officer of the Sellers or (ii) individuals who regularly perform administrative functions for the Sellers relating to both the Business and in any material respect any of the Other Businesses except that, at any time before the third (3rd) Business Day prior to the deadline set forth in the Bidding Procedure Order for the submission of bids, Purcahser may elect to include designated individuals described in the forgoing clause (ii) as Employees (and, in accordance with Section 9.1(b) make offers of employment to such individuals).

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00568

BQHC 00512-00057

"Environmental Compliance Matters" means the matters set forth on Schedule 8.2(a)(viii).

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that would be deemed to be a "single-employer" with SVCMC under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Contracts" means every Contract that is not an Assigned Contract or not otherwise specifically identified in Sections 2.1(a) through 2.1(r) as a Purchased Asset.

"Expenses" means any and all costs and expenses, including attorneys' and other professionals' fees and disbursements sustained or reasonably incurred incident to investigating, responding to or defending against any claim, investigation, action, suit or proceeding relating to a matter subject to indemnification under this Agreement.

"Facilities" means the healthcare facilities utilized in the Business and included among the Purchased Assets as further identified on Schedule A and in Section 2.1, but excluding any healthcare facility identified in Section 2.2(f)(i) or Section 2.2(f)(ii) as an Excluded Asset or on Schedule A as not being included.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by the Sellers, used by the Sellers in the conduct of the Business and located in the Ordinary Course of Business at the Purchased Real Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by the Sellers, the telephone numbers associated therewith used in the Ordinary Course of Business and not used in any of Sellers' Other Businesses), cubicles and miscellaneous office furnishings.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

BQHC 00569

BQHC 00512-00058

"GME Pool" means all payments under the graduate medical education pool of the State of New York, including all cash and non-cash proceeds, accretions or substitutions thereof as funded and/or provided for pursuant to any relevant statutes, rules or regulations of the State of New York or any agency or instrumentality thereof, including Article 28 of the New York Public Health Law and Part 86 of Title 10 of the New York Codes, Rules and Regulations, as such statutes, rules and regulations may be modified from time to time, and all such mechanisms as may replace the GME Pool as the means by which the a party is reimbursed by the State of New York for its costs of graduate medical education.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any substance, material or waste which is regulated by any Government Body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Healthcare Program Liabilities" means all Liabilities under any Medical Reimbursement Program Laws, including any obligations for settlement and retroactive adjustments under the Medicare and Medicaid programs for open periods ending on or before the Closing Date.

"Healthcare Regulatory Consents" means in respect of Sellers or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Body as shall be required to be obtained and such notifications to any Governmental Body as shall be required to be given by such party in order for it to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health Council, the Fire Department of the City of New York, the U.S. Department of Housing and Urban Development, CMS, DoH, OMH, OASAS and shall include Purchaser obtaining a Certificate of Need from DoH with respect to its operation of the Business and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Government Body needed for them to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

BQHC 00570

BQHC 00512-00059

"HHS" means the United States Department of Health and Human Services.

"Indigent Care Pool" means the Indigent Care Pool, being the successor to the Regional Bad Debt and Charity Care Pool and the Statewide Financially Distressed Hospital Pool promulgated under the New York Health Care Reform Act of 1996, codified as New York Public Health Law § 2807(k), and all cash and non-cash proceeds, accretions or substitutions thereof or thereto as funded and/or provided for pursuant to any relevant statutes, rules or regulations of the State of New York or any agency or instrumentality thereof including Article 28 of the New York Public Health Law and Part 86 of Title 10 of the New York Codes, Rules and Regulations, as such statutes, rules and regulations may be modified from time to time.

"Intellectual Property Licenses" means (i) any grant by a Seller to a third Person of any right to use any of the Purchased Intellectual Property owned by the Sellers and (ii) any grant to the Sellers of a right to use in connection with the Business any Intellectual Property Rights owned by any other Person (other than the SVCMC Marks and the Facility Marks), to the extent, and only to the extent, such right is transferable by the Sellers.

"Intellectual Property Rights" means all intellectual property rights available in respect of Copyrights, Marks (other than the SVCMC Marks and the Facility Marks), Software, trade secrets and Patents, whether registered or unregistered, and whether owned or licensed.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"IRS" means the Internal Revenue Service.

"Knowledge" means the actual knowledge of those officers of Purchaser or Wyckoff or of those officers of SVCMC or senior managers of the Business as of or prior to the Closing, as applicable, each of which is identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

BQHC 00571

BQHC 00512-00060

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Marks" means all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (i) a material adverse effect on the Business (taken as a whole), including its assets, properties, results of operations or condition (financial or otherwise), or (ii) a material adverse effect on the ability of SVCMC to consummate the Contemplated Transactions or to perform its obligations under this Agreement, in each case other than an effect resulting from an Excluded Matter. "Excluded Matter" means any one or more of the following: (i) the effect of any change in the United States or foreign economies or securities or financial markets in general; (ii) the effect of any change that generally affects any industry in which the Sellers operate (including a general adverse change in medical reimbursement rates); (iii) the effect of any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) the effect of any action taken by Purchaser, Wyckoff or their respective Affiliates with respect to the transactions contemplated hereby or with respect to the Sellers, including their respective employees; (v) any matter of which Purchaser has Knowledge on the date hereof or, solely for purposes of determining whether the condition to Closing set forth in Section 10.1(a) has been satisfied, on the Closing Date; (vi) the effect of any changes in applicable Laws or accounting rules; or (vii) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement; or (viii) any effect resulting from the filing or pendency of the Bankruptcy Case or proceedings relating thereto and reasonably anticipated effects thereof.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518;

BQHC 00572

BQHC 00512-00061

and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Authority.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"OASAS" means the Office of Alcoholism and Substance Abuse Services of the State of New York.

"OMH" means the Office of Mental Health of the State of New York.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, subject, however, in respect of the period after the Petition Date, to those actions necessary and incident to the Bankruptcy Case.

"Parsons Manor" means the real property, commonly referred to as Parsons Manor, located at 88-25 153rd Street in Jamaica, New York, together the two parking lots located at 153-10 88th Street (Block 9762 Lot 16) and 88-09 153rd Street (Block 9762 Lot 10) in Jamaica, New York.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Patient Records" shall mean any Documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, encroachments, covenants, reservations, declarations, state of facts, rights of way and encumbrances disclosed in policies of title insurance, surveys and other documentation related to such policies and surveys that have been made available to Purchaser; (ii) statutory liens for current Taxes, assessments or other governmental

BQHC 00573

BQHC 00512-00062

charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, provided the same could not reasonably be expected to result in a loss of the property and an appropriate reserve is established therefore; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business for sums not yet due and payable; (iv) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Body provided that such regulations or designations have not been violated, which, in each case, do not materially interfere with the operation of the Business as currently conducted at the applicable site; (v) title of a lessor under a capital or operating lease; (vi) Liens set forth on Schedule 1.1(b) and (vii) solely with respect to the use of this defined term in Section 5.5 and Section 5.8(a), such other imperfections in title, charges, easements, restrictions, encroachments, covenants, reservations, declarations, state of facts or physical condition which would not result in a Material Adverse Effect, and in the case of clauses (i) through (vii), solely to the extent that such Liens cannot be removed by operation of Sections 105, 363(f) and/or 1141 of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation, disability, accident, sick, vacation, holiday, unemployment, incentive, commission, retention, change in control, noncompetition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by the Sellers or any ERISA Affiliate or (b) with respect to which the Sellers or any ERISA Affiliate has or has had any obligation, in each case, under which any Transferred Employee may receive benefits or may otherwise be subject.

"Pre-Closing Accounts Receivable" means accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to the Closing Date; provided, that Pre-Closing Accounts Receivable shall not include payments under the Indigent Care Pool, the GME Pool, grant programs, endowments, or the U.S. Family Health Plan (other than accounts receivable attributable to SVCMC's role as a health care provider under such plan).

"Purchased Intellectual Property" means all Intellectual Property Rights (other than rights under an Intellectual Property License and other than the SVCMC Marks and the Facility Marks) owned by the Sellers and used by the Sellers (i) primarily in connection with the Business and (ii) not used to a material degree in any of Sellers' Other Businesses, including any in the form of or arising from or in respect of Patents, Marks, Copyrights, Software or Technology, except for any that is an Excluded Asset.

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00574

BQHC 00512-00063

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Remedial Action" means any and all actions as required by a Governmental Body to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

"Research Program" means a clinical study or other research program conducted at the Facilities, including any grants, data, books and records or other Documents, Contracts and intellectual property related thereto.

"Sale Motion" means the motion or motions of the Sellers, in form and substance reasonably acceptable to Purchaser and SVCMC, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Purchaser and SVCMC.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business. That portion of the Software that is owned by the Sellers is referred to herein as the "Proprietary Software," and that portion of the Software that is owned by any Person other than the Sellers is referred to herein as the "Third-Party Software."

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem,

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00575

BQHC 00512-00064

value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4358 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

"Wyckoff" means Wyckoff Heights Medical Center, a New York not-for-profit corporation and an affiliate of Purchaser.

1.2     Terms Defined Elsewhere in this Agreement.     For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Accounting Principles | 3.6(a) |
| Accounting Referee | 3.6(d) |
| Additional Note | 3.1 |
| Additional Purchased Assets | 3.5 |
| Agreement | Recitals |
| Ambulance Operating Certificate | 2.14 |
| Antitrust Bureau | 8.4(b) |
| Antitrust Division | 8.4(b) |
| Antitrust Laws | 8.4(f) |
| Asset Acquisition Statement | 12.3 |
| Assigned Contracts | 2.1(d) |
| Assumed CBAs | 5.13(c) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Base Purchase Price | 3.1 |

BQHC 00576

BQHC 00512-00065

| Term | Section |
|------|---------|
| Behavioral Health Agreement | 2.13 |
| Break-Up Fee | 7.1 |
| Business | Recitals |
| Business Confidential Information | 8.6(b) |
| Cap | 11.5(a)(iii) |
| Charities Bureau | 5.3(a) |
| Clinical Sponsorship Agreement | 4.2(k) |
| Residency Rotation Agreement | 4.2(k) |
| Cardiac Patient Transfer and Affiliation Agreement | 4.2(k) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Closing Statement | 3.6(c) |
| CMCCS | Recitals |
| CMCOHS | Recitals |
| CMCPS | Recitals |
| CMCRS | Recitals |
| COBRA | 9.2(g) |
| Commitment Letter | 3.7 |
| Competing Bid | 7.2(a) |
| CON Termination Date | 4.4(d)(iv) |
| Contemplated Transactions | 2.1 |
| Cure Amount | 2.5 |
| Deductible | 11.5(a)(ii) |
| Disputed Item | 3.6(d) |
| DRG | 3.4(a) |
| DRG Transition Patients | 3.4(a) |
| Escrow Agent | 3.2 |
| Escrow Agreement | 3.2 |
| Escrowed Funds | 3.2 |
| Estimated Fixed Amount | 3.6(b) |
| Estimated Purchase Price | 3.6(b) |
| Estimated Purchase Price Adjustment | 3.6(b) |
| Evaluation Material | 8.6(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Excluded Owned Property | 2.2(f)(i) |
| Excluded Personal Property Leases | 2.2(e) |
| Excluded Real Property | 2.2(f)(ii) |
| Excluded Real Property Leases | 2.2(f)(ii) |
| Expense Reimbursement | 7.1 |
| Facility Mark | 8.9 |
| Final Fixed Amount | 3.6(c) |
| Final Purchase Price | 3.6(c) |
| Final Purchase Price Adjustment | 3.6(c) |
| Financial Statements | 5.4 |

BQHC 00577

BQHC 00512-00066

| Term | Section |
|------|---------|
| Financing | 3.7 |
| Fixed Assumed Liabilities | 3.6(a) |
| FTC | 8.4(b) |
| Healthcare Applications | 8.4(a) |
| Healthcare Programs | 5.15(b) |
| Hospitals | Recitals |
| Indemnification Claim | 11.4(a) |
| JCAHO | 5.15(b) |
| Losses | 11.2(a) |
| Material Contracts | 5.11(a) |
| Medicaid Agreement | 8.17(b) |
| Medical Records Custody Agreement | 2.9 |
| Medicare Agreement | 8.17(a) |
| Multiemployer Plan | 5.12(b) |
| Multiple Employer Plan | 5.12(b) |
| N-PCL | 5.3(a) |
| Nonassignable Assets | 2.6(b) |
| Notes | 3.1 |
| Objection | 3.6(d) |
| Objection Period | 3.6(d) |
| Other Businesses | Recitals |
| Owned Properties | 5.8(a) |
| Parsons Manor Lease | 2.12 |
| PCs | Recitals |
| Personal Property Leases | 5.9 |
| Petition Date | Recitals |
| Purchased Assets | 2.1 |
| Pre-Closing Underpayment | 8.17(a) |
| Primary Note | 3.1 |
| Purchased Intellectual Property Licenses | 2.1(c) |
| Purchased Owned Property | 2.1(a) |
| Purchased Pre-Closing Accounts Receivable | 2.11(a) |
| Purchased Personal Property Leases | 2.1(b)(iv) |
| Purchased Real Property | 2.1(a) |
| Purchased Real Property Leases | 2.1(a) |
| Purchased Vehicles | 2.1(b)(iii) |
| Purchaser | Recitals |
| Purchaser Documents | 6.2 |
| Purchaser Indemnified Parties | 11.2(a) |
| Purchaser Plans | 9.2(b) |
| Real Property Leases | 5.8(a) |
| Response Date | 3.6(d) |
| Revised Statements | 12.3 |
| Seller Confidential Information | 8.6(a) |
| Seller Documents | 5.2 |

BQHC 00578

BQHC 00512-00067

| Term | Section |
|------|---------|
| Seller Indemnified Parties | 11.3(a) |
| Seller Representative | 13.2 |
| Sellers | Recitals |
| Survival Period | 11.1 |
| St. Dominic's Mortgage | 2.3(g) |
| SVCMC | Recitals |
| SVCMC Marks | 8.9 |
| Target Fixed Amount | 3.6(a) |
| Tax Benefit | 11.6(b) |
| Third-Party Financing Certificate | 3.7 |
| Third-Party Financing Election | 3.7 |
| Transferred Employees | 9.1(b) |
| Transfer Tax Party | 12.1 |
| Transfer Taxes | 12.1 |
| Transferred Union Represented Employees | 9.1(a) |
| Transition Patients | 3.4 |
| Transitional Patient Services | 3.4 |
| True-Up Amount | 3.6(c) |
| Unassigned Research Programs | 2.10 |

1.3     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#161 ]810.DOC

BQHC 00579

BQHC 00512-00068

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Made available to Purchaser.  The phrase "made available to Purchaser" shall mean made available to Purchaser or Wyckoff through posting in SVCMC's electronic data room, via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

Survival of Certain Covenants.  Any covenant which by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

(b)     The parties hereto have been advised by experienced counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall, subject to Section 2.5, sell, transfer, assign, convey and deliver to Purchaser (the "Contemplated Transactions"), all of the Sellers' respective right, title and interest in, to and under the Purchased Assets, free and clear of any and all Liens or adverse claims other than Permitted Exceptions.  "Purchased Assets" means all of the Sellers' assets, rights and properties primarily pertaining to or used in connection with the Business as existing on the Closing Date, other than the Excluded Assets, and in each case subject to Section 2.6(b), including:

(a)     all right, title and interest of the Sellers in and to each Owned Property set forth in Schedule 5.8(a) (other than any identified in Section 2.2(f)(i) as Excluded Owned Property) (the "Purchased Owned Property") and under each Real Property Lease set forth in Schedule 5.8(a) (other than any identified in Section 2.2(f)(ii)

BQHC 00580

BQHC 00512-00069

as Excluded Real Property Leases) (along with any additional Real Property Leases primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of Purchaser in accordance with Section 8.2(b), the "Purchased Real Property Leases", and the real property that is the subject of the Purchased Real Property Leases, collectively with the Purchased Owned Property, the "Purchased Real Property"), together with all improvements and fixtures thereto and other appurtenances and rights in respect thereof and any deposits held by the Sellers as landlord under any Purchased Real Property Lease;

(b)  (i) the Furniture and Equipment; (ii) the tools, spare parts, supplies (including all of the Sellers' Inventory), artwork and all other tangible personal property owned by the Sellers, used by the Sellers in the conduct of the Business and located in the Ordinary Course of Business at the Purchased Real Property (excluding, however, any artworks or other tangible personal property (A) having religious significance which may be removed without materially damaging the property or (B) identified on Schedule 2.1(b)(ii); (iii) the vehicles owned by the Sellers that are identified on Schedule 2.1(b)(iii) (the "Purchased Vehicles"); and (iv) the Personal Property Leases identified in Schedule 5.9, other than any identified on Schedule 2.2(e) as Excluded Personal Property Leases (along with any additional Personal Property Leases primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of Purchaser in accordance with Section 8.2(b), the "Purchased Personal Property Leases");

(c)  (i) the Purchased Intellectual Property; (ii) the rights of the Sellers as licensor under the Intellectual Property Licenses identified in Schedule 2.1(c) and all rights of the Sellers as licensee under any Intellectual Property Licenses used by the Sellers (A) primarily in connection with the Business and (B) not used to a material degree in any of the Other Businesses (along with any additional Intellectual Property Licenses primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of Purchaser in accordance with Section 8.2(b), the "Purchased Intellectual Property Licenses"); and (iii) any right or interest of SVCMC in the Facility Marks, subject to Section 8.9;

(d)  all Contracts set forth on Schedule 2.1(d) and all rights arising out of such Contracts (along with any additional Contracts primarily pertaining to or used in connection with the Business that are entered into after the date hereof but prior to the Closing with the consent of Purchaser in accordance with Section 8.2(b), the "Assigned Contracts");

(e)  all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract) and prepaid charges and expenses of the Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(f)  subject to the provisions of Sections 2.9 and 8.7, all Documents that are primarily used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to the services provided by the

BQHC 00581

BQHC 00512-00070

Business, the marketing of the Business's services (including advertising and promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and files including credit information and supplier lists, to the extent physically located at the Facilities, but excluding any Documents and Patient Records described in Section 2.2(h) or 2.2(i);

(g)   all Permits used by the Sellers in the Business;

(h)   all rights of the Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(i)   all rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to the Sellers after the Closing or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(j)   all goodwill and other intangible assets (other than Intellectual Property Rights) owned by the Sellers and associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(k)   all rights of the Sellers in or to distributions from the Indigent Care Pool and the GME Pool that pertain to the Business to the extent attributable to the period from and after the Closing Date;

(l)   operating licenses with respect to ambulance services;

(m)   any right to receive or expectancy of SVCMC in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate) (i) listed on Schedule 2.1(m) or (ii) received or arising after the date hereof that is specifically designated by the terms of such gift, grant, bequest or legacy to be applied or used solely in respect of the Business and not the Other Businesses or the Excluded Assets;

(n)   the Hospitals' Medicare and Medicaid provider numbers and related provider agreements used in the Business, as identified on Schedule 2.1(n);

(o)   all of Sellers' rights to the programs listed in Schedule A, including the part-time clinic at the Ottilie Campus of SCO Family of Services in Queens County, New York;

(p)   all of Sellers' rights and assets pertaining to the medical office at John F. Kennedy International Airport in Queens County, New York;

BQHC 00582

BQHC 00512-00071

(q)     all of Sellers' rights and assets pertaining to the methadone clinics (all three licensed operations) on Archer Avenue in Queens County, New York, including any licenses in connection therewith;

(r)     the Research Programs listed on Schedule 2.1(r), along with any Unassigned Research Programs as to which Purchaser and the applicable sponsors of such Unassigned Research Programs reach agreement in writing prior to the Closing in accordance with Section 2.10 stating that such Unassigned Research Programs should remain with the Business and thereby be transferred to Purchaser; and

(s)     any other asset owned by the Sellers that is material to the operation of the Business in the Ordinary Course of Business and located at the Facilities, other than Excluded Assets.

2.2     Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser or Wyckoff, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets, properties, interests and rights of the Sellers:

(a)     all cash, cash equivalents, bank deposits or similar cash items of the Sellers, all securities owned by the Sellers and any accounts receivable or trade receivables owned by the Sellers (subject to Section 2.11);

(b)     the Excluded Contracts;

(c)     any rights to refunds, settlements and retroactive adjustments to the extent applicable to periods ending on or before the Closing Date arising in connection with the Hospitals' Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Hospitals and the PCs;

(d)     any other Contract to which a Seller is a party or under which it has rights that is not used primarily in the Business or, though used primarily in the Business, is used to a material degree in any of the Other Businesses, unless included in Schedule 2.1(d) among the Assigned Contracts;

(e)     the Personal Property Leases identified on Schedule 2.2(e) (the "Excluded Personal Property Leases");

(f)     (i) the Owned Property identified on Schedule 2.2(f)(i) and, subject to Section 3.7, Parsons Manor (collectively the "Excluded Owned Property"), and (ii) the Real Property Leases identified on Schedule 2.2(f)(ii) (the "Excluded Real Property Leases", and the real property that is the subject of the Excluded Real Property Leases, collectively with the Excluded Owned Property, the "Excluded Real Property");

(g)     any Intellectual Property Rights of the Sellers other than the Purchased Intellectual Property; it being understood that the Sellers shall not convey, and

BQHC 00583

BQHC 00512-00072

Purchaser shall not acquire, pursuant to this Agreement any right in or to any website or e-mail address owned or used by the Sellers (whether or not used in the Business);

(h)     any (i) personnel files for Employees of the Sellers who are not Transferred Employees; (ii) other books and records that the Sellers is required by Law to retain; provided, however, that, subject to Section 2.9, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing (except as prohibited by Law) or that relate to any of the Purchased Assets; (iii) Documents which the Sellers is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party (other than any patient confidentiality obligation referred to in the foregoing clause (ii) or in Section 2.9); (iv) books and records and other Documents related to malpractice prevention programs, credentialing, incident reporting or quality assurance to the extent confidential under applicable Law; (v) documents relating to proposals to acquire the Business by Persons other than Purchaser; and (vi) any Documents primarily related to or that are required to realize the benefits of any Excluded Assets;

(i)     any Patient Records, provided, however, that, subject to Section 2.9, the Sellers shall provide Purchaser with access to Patient Records;

(j)     any claim, right or interest of the Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom;

(k)     all insurance policies or rights to proceeds thereof relating to the Business or the Purchased Assets;

(l)     all of the Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(m)     any rights, claims or causes of action of the Sellers against third parties relating to assets, properties, business or operations of the Sellers, including any actions under chapter 5 of the Bankruptcy Code, arising out of events occurring prior to the Closing Date or arising out of the Closing, other than any arising under or pursuant to any warranties, representations and guarantees referred to in Section 2.1(i);

(n)     except as set forth on Schedule 2.1(m), any right to receive or expectancy of the Sellers in any charitable gift, grant, bequest or legacy (including any income or remainder interest in or under any trust or estate);

(o)     the Research Programs listed on Schedule 2.2(o), along with any Unassigned Research Programs as to which Purchaser and the applicable sponsors of such Unassigned Research Programs do not reach agreement in writing prior to the Closing in accordance with Section 2.10 stating that such Unassigned Research Programs should remain with the Business;

BQHC 00584

BQHC 00512-00073

(p)      all rights of the Sellers in or to distributions from the Indigent Care Pool and the GME Pool that pertain to the Business, to the extent attributable to periods prior to the Closing Date;

(q)      the amounts described in Section 3.4 and all other rights of the Sellers under this Agreement, the Seller Documents and the Contemplated Transactions;

(r)      any assets of the Other Businesses not otherwise described in Section 2.1;

(s)      the PCs' Medicare and Medicaid provider numbers and related participation agreements;

(t)      any artworks or other tangible personal property (i) having religious significance which may be removed from the Purchased Real Property without materially damaging the property or (ii) identified on Schedule 2.1(b)(ii); and

(u)      any personal, tangible and intangible property of the Sellers identified on Schedule 2.2(u).

2.3      Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the following Liabilities (collectively, the "Assumed Liabilities"):

(a)      (i) in each case to the extent and only to the extent specifically provided in Article IX, those Liabilities arising out of, relating to or with respect to the employment by, or performance of services for, the Sellers or any of their Affiliates of any Transferred Employee on or before the Closing Date (including any arising under any Plan) and (ii) workers' compensation claims against the Sellers of Transferred Employees that relate to the period ending on the Closing Date, irrespective of whether such claims are made prior to or after the Closing;

(b)      accounts payable incurred in the Ordinary Course of Business existing on the Closing Date and not paid by the Sellers in the Ordinary Course of Business by the Closing Date (including, for the avoidance of doubt, invoiced accounts payable and accrued but uninvoiced accounts payable), which accounts payable shall be set forth in a written statement to be provided by SVCMC to Purchaser no later than five (5) Business Days prior to the Closing;

(c)      fifty percent (50%) of the Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement, if any;

(d)      all Liabilities accruing from and after the Closing with respect to the Assigned Contracts, the Purchased Intellectual Property Licenses, the Purchased Real Property Leases and the Purchased Personal Property Leases;

BQHC 00585

BQHC 00512-00074

(e)     subject to any limitations contained in the Medicare Agreement and, if any, the Medicaid Agreement contemplated by Section 8.17, (i) all Liabilities, if any, under SVCMC's Medicare and Medicaid provider numbers and related provider agreements used in the Business, identified in Schedule 2.1(n) (including the Additional Pre-Closing Assumed Liabilities) for periods ending before the Closing Date, but only on a secondary basis to the extent provided in the Medicare Agreement and, if any, the Medicaid Agreement, and (ii) all Liabilities arising under such Medicare or Medicaid provider numbers and provider agreements out of events occurring on or after the Closing Date; provided, however, that (A) nothing contained in this Section 2.3(e) shall limit the rights of any Purchaser Indemnified Party under Section 11.2(a)(iv) in respect of Liabilities arising out of events occurring before the Closing (excluding the Additional Pre-Closing Assumed Liabilities), and (B) Purchaser's obligation to pay the Additional Pre-Closing Assumed Liabilities shall be primary in nature and shall not be affected by either the Medicare Agreement or the Medicaid Agreement;

(f)     all Liabilities accruing from and after the Closing with respect to the Operating Lease Agreement, dated October 1, 1996, between Catholic Medical Center of Brooklyn and Queens, Inc. and Primary Care Development Corporation relating to St. Dominic's Family Health Center, together with the related Mortgage of the same date (collectively, with such operating lease, "St. Dominic's Mortgage"); and

(g)     those Employee-related Liabilities of Sellers that Purchaser has specifically agreed to assume in Article IX, but only to the extent provided in Article IX.

2.4     Excluded Liabilities.  Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of the Sellers of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent ("Excluded Liabilities"), including the following, which shall remain Liabilities of the Sellers:

(a)     any Liability based upon any wrongful or negligent act or omission of the Sellers prior to the Closing;

(b)     except as otherwise provided in Section 2.3(e) and Article XII, any Liability for Taxes of the Sellers arising from the operation of the Business for periods prior to the Closing or any Taxes in the nature of income tax imposed upon the Sellers in connection with the sale of the Assets contemplated hereby; .

(c)     any Liability associated with any Excluded Assets;

(d)     any Liability relating to any breach of contract, breach of warranty, tort, infringement, or violation of Law by the Sellers;

(e)     any Liabilities relating to or arising out of (i) non-compliance with or violations of Environmental Laws prior to the Closing Date or (ii) any "Natural Resource Damages," any contamination of off-site properties, and any disposal of Hazardous Materials at third-party owned off-site locations, which, in the cases of clauses

BQHC 00586

BQHC 00512-00075

(i) and (ii), relate to conditions existing at the Purchased Real Property or result from the operations by the Sellers prior to the Closing Date;

(f)     any Liability arising out of events or omissions occurring prior to the Closing Date from or relating to any overpayment, duplicate payment, refunds, discounts or adjustments due to Blue Cross, Blue Shield, or any other similar private sector healthcare cost reimbursement program or insurance coverage;

(g)     any Liability or obligation to DoH or the State of New York, to the extent that it arose, accrued, occurred, or was incurred prior to the Closing Date, in contract, tort or otherwise, including any for which DoH or the State of New York is entitled to assert a right of set-off, recoupment or other claim against the Purchased Assets, the Sellers and/or Purchaser (other than any referred to in Section **Error! Reference source not found.**);

(h)     any Liability related to claims of medical malpractice and/or other professional Liability of the Sellers, or any of its employees, attending physicians, agents or independent contractors to the extent incurred prior to the Closing Date arising out of events or omissions occurring prior to the Closing Date;

(i)     all Healthcare Program Liabilities with respect to the Business arising from events prior to the Closing Date, except as otherwise provided by Section **Error! Reference source not found.**, which are nonetheless subject to Section 11.2(a)(iv);

(j)     any Liability arising out of or in connection with any Legal Proceedings (whether instituted prior to or after Closing) to the extent arising from acts or omissions which occurred prior to the Closing Date (except as otherwise provided by Section **Error! Reference source not found.**, which are nonetheless subject to Section 11.2(a)(iv);

(k)     any Liability arising under the Hill-Burton Act or any medical school construction program to the extent arising from events which occurred prior to the Closing Date, or to the extent arising from the Sellers' participation prior to the Closing Date in restricted grant or loan programs of any grant provider or Governmental Body;

(l)     except as described in Section 2.3(a) and Article IX, any Liability relating to the Sellers' Employees (whether current, former or retired) who are not Transferred Union Represented Employees, including Liabilities under any Plan or Multiemployer Plan or Multiple Employer Plan for all wages, salary, sick leave pay, vacation pay, unemployment benefits, post-employment benefits, salary continuation, termination, disability, death, retirement, health, medical, pension or welfare benefits (including for this purpose all Liabilities and obligations arising under the Plans);

(m)     any Liability related to Cost Report settlement payables arising from Cost Report periods ending on or before the Closing Date (except as otherwise provided by Section **Error! Reference source not found.**, which are nonetheless subject to Section 11.2(a)(iv));

22

BQHC 00587

BQHC 00512-00076

(n)　　any mortgage debt on the Owned Property (other than as set forth in Section 2.3(f));

(o)　　any Liability related to penalties, fines, settlements, interest, costs and expenses to the extent arising out of or incurred as a result of any violation by the Sellers prior to the Closing Date of any Law or Order; and

(p)　　all Liabilities relating to amounts required to be paid by the Sellers hereunder.

2.5　　Cure Amounts. Except as otherwise permitted by the next sentence of this paragraph, at the Closing and pursuant to Section 365 of the Bankruptcy Code, the Sellers shall assign to Purchaser, and Purchaser shall assume from the Sellers, the Assigned Contracts, Personal Property Leases, Real Property Leases and Intellectual Property Licenses referred to in Section 2.1. The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of the Sellers under the Assigned Contracts, Personal Property Leases, Real Property Leases and Intellectual Property Licenses referred to in Section 2.1 shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to SVCMC amounts sufficient to pay any claim therefor that remains disputed as of the Closing, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing, (except as otherwise agreed to by the other party to the Assigned Contracts, Personal Property Leases, Real Property Leases and Intellectual Property Licenses referred to in Section 2.1) and the Sellers shall have no liability for any such cure amount; provided, however, that, if the aggregate of all such cure amounts (including such reserved amounts) as of the anticipated Closing Date is in excess of five hundred and fifty-six thousand dollars ($556,000), Purchaser shall not be required to pay any of such amounts as Purchaser selects by notice given to SVCMC not less than three (3) Business Days before the Closing Date which amounts, if paid, would result in Purchaser's payment of cure amounts aggregating more than such sum and Purchaser may instead exclude the Assigned Contract, Personal Property Lease, Real Property Lease or Intellectual Property License to which such cure amount relates from among the Purchased Assets; provided further, however, that SVCMC in such event may in its discretion elect by notice to Purchaser given before the Closing to pay the cure amount associated therewith, in which case Purchaser at the Closing shall assume such Assigned Contract, Personal Property Lease, Real Property Lease or Intellectual Property License. The cure amounts to be paid by Purchaser in accordance with the foregoing provisions of this Section 2.5 are hereinafter sometimes referred to as the "Cure Amounts". Without limiting the Sellers' obligations under Section 8.3, Purchaser shall not have the right to terminate this Agreement as a result of the failure by the Sellers or inability of the Sellers to assign to Purchaser (on terms and conditions no less favorable than those in existence as of the date hereof) at the Closing any Assigned Contract, Personal Property Lease, Real Property Lease or Intellectual Property License referred to in Section 2.1 or Purchaser's decision not to assume any Assigned Contract, Personal Property Lease, Real Property Lease of Intellectual Property License as to which Purchaser has not paid the related Cure Amount in accordance with the second sentence of this Section 2.5, unless any such

BQHC 00588

BQHC 00512-00077

failure or inability results in a Material Adverse Effect. To the Knowledge of the Sellers, an estimate as of the date hereof of the Cure Amounts described in this Section 2.5 is set forth on Schedule 2.5.

    2.6    Further Conveyances and Assumptions.

    (a)    From time to time following the Closing, each party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to the Sellers and their Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby. In the event that Purchaser or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Purchaser shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to SVCMC. In the event that the Sellers or their Affiliates receives any Purchased Assets (or any payments or proceeds related thereto) following the Closing, the Sellers shall promptly deliver such Purchased Assets (or any payments or proceeds related thereto) to Purchaser.

    (b)    To the extent that the assignment of any Purchased Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset"), nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained. With respect to Assigned Contracts or Permits that are material for the Business as a going concern after the Closing Date, the Sellers shall, and shall cause their Affiliates to, use their commercially reasonable efforts to cooperate with Purchaser at its request for up to one hundred and eighty (180) days following the Closing Date in endeavoring to obtain such consents promptly; provided, however, that such efforts shall not require the Sellers or any of their Affiliates to incur any expenses or Liabilities or provide any financial accommodation or to remain secondarily liable or contingently liable for any Assumed Liability in order to obtain any such consent. The parties shall use their respective commercially reasonable efforts to obtain, or cause to be obtained, any consent, substitution, approval or amendment required to novate (i) all Liabilities arising from and after the Closing Date under any and all Assigned Contracts, Purchased Real Property Leases, Purchased Personal Property Leases and Purchased Intellectual Property Licenses and (ii) other Assumed Liabilities or to obtain in writing the unconditional release of the Sellers and their Affiliates so that, in any such case, Purchaser shall be solely responsible for such Liabilities. To the extent permitted by applicable Law, in the event consents to the assignment thereof cannot be obtained, such Nonassignable Assets shall be held, as of and from the Closing Date, by the Sellers or the applicable Affiliate of the Sellers in trust

BQHC 00589

BQHC 00512-00078

for Purchaser and the covenants and obligations thereunder shall be performed by Purchaser in the Sellers' or such Affiliate's name and all benefits and obligations existing thereunder shall be for Purchaser's account. The Sellers shall take or cause to be taken at Purchaser's expense such actions in its name or otherwise as Purchaser may reasonably request so as to provide Purchaser with the benefits of the Nonassignable Assets and to effect collection of money or other consideration that becomes due and payable under the Nonassignable Assets, and the Sellers or the applicable Affiliate of the Sellers shall promptly pay over to Purchaser all money or other consideration received by it in respect of all Nonassignable Assets. As of and from the Closing Date, the Sellers on behalf of itself and their Affiliates authorizes Purchaser, to the extent permitted by applicable Law and the terms of the Nonassignable Assets, at Purchaser's expense, to perform all the obligations and receive all the benefits of the Sellers or their Affiliates under the Nonassignable Assets and appoints Purchaser its attorney-in-fact to act in its name on its behalf or in the name of the applicable Affiliate of the Sellers and on such Affiliate's behalf with respect thereto, and Purchaser agrees to indemnify and hold the Sellers and their Affiliates, agents, successors and assigns harmless from and against any and all Liabilities and Losses based upon, arising out of or relating to Purchaser's performance of, or failure to perform, such obligations under the Nonassignable Assets.

2.7     Bulk Sales Laws.   The parties hereto hereby waive compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

2.8     Accounts Receivable.   The parties shall follow the procedures set forth on Schedule 2.8 with respect to transitioning accounts receivable for the Business. Subject to Sections 3.4 and 2.10, Purchaser shall use its commercially reasonable efforts for a period of one hundred and twenty (120) days after the Closing Date to assist the Sellers in collecting any accounts receivable arising out of the Business before the Closing Date, at no cost to the Sellers. Each of Purchaser and SVCMC agrees that it will pay over or cause to be paid over, insofar as practicable within three (3) Business Days of receipt, to the other (and until so paid, shall hold in trust for the other) all sums received by it or any of its Affiliates in respect of or on account of the other's receivables, and provide therewith information available to it identifying the source of the amounts so paid over so to permit the other to apply correctly such amounts to the other's accounts receivable. In addition, upon reasonable request, each recipient shall allow the other (at the other's cost) to audit, access and copy any of its records relating thereto. All payments for accounts receivable arising out of the Business received from an obligor after the Closing shall be applied to the receivable specifically designated by such obligor; provided, that in the event that the obligor does not specifically designate a receivable, the payment shall be applied in the order of the age of the accounts receivable of such obligor, starting with the oldest such accounts receivable. The provisions of this Section 2.8 shall survive the Closing to the extent contemplated herein.

2.9     Agreement Regarding Confidentiality of Patient Information.   The Sellers shall have no obligation to make available to Purchaser hereunder any confidential patient information until the Sellers and Purchaser enter into a Medical Records Custody

25

BQHC 00590

BQHC 00512-00079

Agreement (the "Medical Records Custody Agreement") in the form attached hereto as Exhibit C, and then any such obligation of the Sellers is subject to Purchaser's compliance with such Medical Records Custody Agreement.

2.10    Research Programs.    Following the date hereof and prior to Closing, Purchaser and SVCMC shall mutually review the Research Programs (other than those listed on Schedules 2.1(r) or 2.2(o)) (the "Unassigned Research Programs") conducted at the Facilities to determine which, if any, of the Unassigned Research Programs should remain with the Business after Closing (and thereby become Purchased Assets) and which should remain with the Sellers after Closing (and thereby constitute Excluded Assets).  The determination as to whether any given Unassigned Research Program shall remain with the Business shall be made by Purchaser and the applicable sponsors of such Unassigned Research Programs prior to the Closing.  Purchaser shall promptly notify SVCMC in writing of any agreement reached with such sponsors regarding which Unassigned Research Programs, if any, shall remain with the Business and thereby become a Purchased Asset as to which Purchaser shall assume full responsibility.

2.11    Pre-Closing Accounts Receivable; Section 4204 Bond Costs.

(a)     Purchaser shall have the right, to be exercised within ninety (90) days after the entry of the Sale Order by the Bankruptcy Court (but in any event at least ten (10) Business Days prior to the Closing Date), to acquire at the Closing Date all or a portion of the Sellers' Pre-Closing Accounts Receivable for additional consideration.  Upon the exercise of such right, SVCMC and Purchaser shall negotiate in good faith the types and amounts of Pre-Closing Accounts Receivable to be acquired (the "Purchased Pre-Closing Accounts Receivable"), the discount rate for each type of Purchased Pre-Closing Accounts Receivable and the procedures for collecting and distributing the proceeds of the Purchased Pre-Closing Accounts Receivable.  Upon the parties executing a definitive written agreement with respect to the Purchased Pre-Closing Accounts Receivable, for all purposes of this Agreement, (i) the Purchased Pre-Closing Accounts Receivable shall be deemed a Purchased Asset and (ii) the Base Purchase Price (and the principal amount of the Primary Note, if applicable) in Section 3.1 shall be increased by the amount of consideration to be paid by Purchaser for the Purchased Pre-Closing Accounts Receivable as set forth in such agreement.  Notwithstanding anything to the contrary contained in this Section 2.10, the effectiveness of any such agreement and the resulting inclusion of any Pre-Closing Accounts Receivable as a Purchased Asset and assignment thereof to Purchaser on the Closing Date is conditioned upon the Sellers obtaining the prior written consent of General Electric Capital Corporation under the DIP Agreement to the transfer of such Pre-Closing Accounts Receivable and the release of its security interest therein, which consent the Sellers shall use its commercially reasonable efforts to obtain in connection with such agreement.

(b)     SVCMC shall at the Closing, at its election, either (i) reimburse Purchaser for the actual out-of-pocket cost incurred (or agreed to be incurred) by Purchaser in obtaining the bond required to be obtained by Purchaser pursuant to Section 9.2(e) in order to comply with ERISA Section 4204, in which case such amount shall reduce the Base Purchase Price (and principal amount of the Primary Note, if applicable)

BQHC 00591

BQHC 00512-00080

in accordance with Section 3.1, or (ii) provide to Purchaser (at SVCMC's cost), but on Purchaser's behalf, the bond so required of Purchaser (in which case no adjustment shall be made to the Base Purchase Price (or in the amount of the Primary Note)).

2.12   Parsons Manor Lease.  Prior to the Closing, Purchaser and SVCMC shall, in good faith, negotiate and agree (subject to approval by the Bankruptcy Court as may be required pursuant to the Bankruptcy Code) upon a lease by SVCMC to Purchaser of Parsons Manor (the "Parsons Manor Lease") containing the terms set forth in Schedule 2.12 hereto and other customary terms and conditions; provided, that if Purchaser has made the Third-Party Financing Election pursuant to Section 3.7, neither such party shall have any obligation under this Section 2.12, nor any obligation to execute and deliver the Parsons Manor Lease to the other party at the Closing

2.13   Behavioral Health Agreement.   Prior to the Closing, Purchaser and SVCMC shall in good faith, negotiate and agree (subject to approval by the Bankruptcy Court as may be required pursuant to the Bankruptcy Code) upon a Behavioral Health Services Consulting Agreement (the "Behavioral Health Agreement") relating to certain consulting services to be performed in connection with the behavioral health programs at the Hospitals.  The Behavioral Health Agreement shall contain the principal terms and conditions set forth in Schedule 2.13 hereto, such other terms and conditions customary for such agreements and such other terms and conditions as Purchaser and SVCMC may otherwise reasonably in good faith agree upon in writing not later than three (3) Business Days prior to the deadline set forth in the Bidding Procedures Order for the submission of bids.

2.14   Ambulance Services Operating Certificate.   SVCMC shall use its reasonable best efforts to separate its ambulance services operating certificate into multiple certificates, with one or more of such certificates solely being for those ambulances services provided at the Hospitals, and to transfer (or cause to be issued) to Purchaser at the Closing such operating certificate or certificates relating solely to the Hospitals.   The provisions of Section 8.4 regarding cooperation by Purchaser and Wyckoff shall also apply to the matters described in the preceding sentence. [In addition, each of Purchaser and Wyckoff shall use its commercially reasonable efforts, and SVCMC shall cooperate with them, to obtain an ambulance services operating certificate covering Queens County].  In the event that SVCMC cannot separate and transfer the operating certificate(s) for the Hospitals to Purchaser at the Closing, (i) SVCMC and Purchaser shall in good faith negotiate and agree upon an Ambulance Services Agreement (the "Ambulance Services Agreement"), whereby SVCMC will provide ambulance services in Queens County under SVCMC's ambulance services operating certificate for an amount equal to SVCMC's costs plus one dollar ($1) until such time as Purchaser has obtained an ambulance services operating certificate covering such service area and (ii) Purchaser shall continue to use commercially reasonable efforts to obtain such a certificate.

BQHC 00592

BQHC 00512-00081

# ARTICLE III

# CONSIDERATION

3.1    Consideration.    The consideration for the Purchased Assets shall be, subject to adjustment as provided in Sections 2.11, 3.5, 3.6 and 3.7, (i) (A) a promissory note (the "Primary Note") from Purchaser to SVCMC with a principal amount equal to thirty-six million five hundred thousand dollars ($36,500,000) less the sum of the Target Fixed Amount and the Escrowed Funds (such net amount, as adjusted prior to the Closing pursuant to Sections 2.11, 3.5, and 3.7, the "Base Purchase Price"), and (B) a promissory note (the "Additional Note" and, together with the Primary Note, the "Notes") from Purchaser to SVCMC with a principal amount equal to five million dollars ($5,000,000) less the Additional Pre-Closing Assumed Liabilities, (ii) the payment of the Escrowed Funds to the Sellers pursuant to Section 3.2; (iii) the assumption by Purchaser of the Assumed Liabilities and (iv) the aggregate Cure Amounts payable or reserved by Purchaser under Section 2.5; provided, however, that the Sellers shall also be entitled to receive the amounts provided by Section 3.4. Notwithstanding the foregoing, in the event that the Additional Pre-Closing Assumed Liabilities are greater than or equal to five million dollars ($5,000,000) at the Closing, Purchaser will not be obligated to deliver the Additional Note, and the Additional Note shall be disregarded for all purposes of this Agreement.

3.2    Purchase Price Deposit.    Purchaser shall immediately deposit with Commerce Bank, National Association, in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, SVCMC and the Escrow Agent (the "Escrow Agreement"), by wire transfer of immediately available funds, (i) an amount equal to five hundred thousand dollars ($500,000) upon execution of this Agreement, and (ii) an amount equal to two hundred and fifty thousand dollars ($250,000) upon the entry of the Sale Order by the Bankruptcy Court (the aggregate amount so deposited, the "Escrowed Funds"), each such deposit to be released by the Escrow Agent and delivered to either Purchaser or SVCMC, in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

(a)    if the Closing shall occur, the Escrowed Funds shall be delivered to SVCMC as partial consideration for the Purchased Assets, and all accrued investment income on the Escrowed Funds shall be delivered to Purchaser at the Closing;

(b)    if this Agreement is terminated by SVCMC pursuant to Section 4.4(c)(ii), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to SVCMC; or

(c)    if this Agreement is terminated pursuant to Section 4.4, other than by SVCMC pursuant to Section 4.4(c)(ii), the Escrowed Funds, together with all accrued investment income thereon, shall in each case be returned to Purchaser.

BQHC 00593

BQHC 00512-00082

3.3   <u>Payment of Purchase Price</u>.  On the Closing Date, Purchaser shall (i) pay the Estimated Purchase Price to SVCMC, which shall be paid (A) by delivering to SVCMC the executed Primary Note, in a form reasonably acceptable to SVCMC and containing the terms and conditions set forth in <u>Schedule 3.3</u> as applying to such Note, or, (B) in the event that Purchaser makes the Third-Party Financing Election pursuant to <u>Section 3.7</u>, by wire transfer of immediately available funds into an account designated by SVCMC, (ii) deliver to SVCMC the executed Additional Note, in a form reasonably acceptable to SVCMC and containing the terms and conditions set forth in <u>Schedule 3.3</u> as applying to such Note, and (iii) deposit cash in escrow equal to such amount (if any) as is required by <u>Section 2.5</u>.

3.4   <u>Transition Patient Payments</u>.  To compensate the Sellers for services rendered and medicine, drugs, and supplies provided on or before the Closing Date ("<u>Transitional Patient Services</u>") with respect to individuals who are patients of the Business on or before the Closing Date but who are not discharged until after the Closing Date ("<u>Transition Patients</u>"), SVCMC and Purchaser shall take the following actions:

(a)   As soon as practicable after the Closing Date, SVCMC shall deliver to Purchaser a statement itemizing the Transitional Patient Services provided by the Sellers on or through the Closing Date to Transition Patients whose care is reimbursed by the Medicare, Medicaid or other healthcare insurance or reimbursement programs on a diagnostic related group ("<u>DRG</u>") or other "all-inclusive" or "global" fee basis ("<u>DRG Transition Patients</u>").  With respect to such DRG Transition Patients, the Sellers shall, unless otherwise required by law, be entitled to receive from Purchaser as hereinafter provided an amount equal to:  the remainder of (i) the global fee/DRG payments plus the outlier payments, if any, received by Purchaser in respect of a DRG Transition Patient, multiplied by a fraction of which the numerator shall be the number of inpatient days of the DRG Transition Patient prior to the Closing Date and of which the denominator shall be appropriate inlier length of stay of the DRG Transition Patient (as calculated in accordance with Medicare/Medicaid regulations), minus (ii) the sum of any deposits or co-payments made by such DRG Transition Patient to the Sellers; <u>provided, however</u> that, if the fraction described in the clause (i) of this sentence (which fraction is to be multiplied by the global fee/DRG payments plus the outlier payments, if any, received by Purchaser in respect of the patient) is greater than 1, then such fraction shall be deemed to be equal to 1.  Such payment shall be made by Purchaser to SVCMC within thirty (30) days after receipt of such global fee/DRG or outlier payments, accompanied by copies of remittances and other supporting documentation as reasonably required by SVCMC.  To the extent SVCMC received payments from Medicare, Medicaid or other healthcare insurance or reimbursement programs on a DRG or other "all-inclusive" or "global" fee basis with respect to Transition Patients in excess of amounts to which it was entitled, such excess shall be taken into account in determining the amount of the payment to be made by Purchaser pursuant to the immediately preceding sentence.  In the event that Purchaser and SVCMC are unable to agree on the amount to be paid to the Sellers under this <u>Section 3.4</u>, then such amount shall be determined by an accounting firm mutually and reasonably acceptable to Purchaser and SVCMC, the cost of engagement of which shall be shared half by Purchaser and half by SVCMC.  The parties acknowledge and agree that the intent of this <u>Section 3.4</u> is to ensure that each party gets

BQHC 00594

BQHC 00512-00083

properly compensated for services to Transition Patients performed by each party. Accordingly, the parties each agree to use their reasonable best efforts to carry out such intent.

(b)     Immediately prior to the Closing Date, SVCMC shall prepare cut-off billings for all then patients of the Business not covered by Section 3.4(a) (which shall include Medicare patients whose care is reimbursed on a cost basis). SVCMC shall be entitled to bill for and receive all amounts collected in respect of such cut-off billings and Purchaser shall have no right thereto.

3.5     Additional Purchased Assets.  If between the date of this Agreement and the Closing Date, the Sellers acquires with the consent of Purchaser in accordance with Section 8.2(b)(iii) any material properties or assets that would be Purchased Assets ("Additional Purchased Assets"), the Base Purchase Price (and the principal amount of the Primary Note, if applicable) in Section 3.1 shall for all purposes of this Agreement be increased by the total cost incurred by the Sellers and their Affiliates (including any Taxes or delivery charges) for such Additional Purchased Assets.

3.6     Purchase Price Adjustment.

(a)     Set forth on Schedule 3.6(a) is an estimate of the amount as of the date stated therein of certain categories of Assumed Liabilities as described therein and Cure Amounts (the "Fixed Assumed Liabilities") to be assumed by Purchaser pursuant to Sections 2.3 and 2.5 of this Agreement (such estimate, as of such date, the "Target Fixed Amount").  Such estimates have been prepared in accordance with (A) the books and records of the Business and (B) the Accounting Principles.  The "Accounting Principles" means United States generally accepted accounting principles and the past accounting practices of the Business.

(b)     At least three (3) Business days prior to the Closing Date, SVCMC shall prepare and deliver to Purchaser a statement setting forth a reasonably detailed calculation of SVCMC's good faith estimate of (i) the Fixed Assumed Liabilities as of the Closing Date (the "Estimated Fixed Amount"), prepared in accordance with the books and records of the Business and the Accounting Principles, and (ii) an adjustment to the Base Purchase Price (such adjustment, the "Estimated Purchase Price Adjustment", and the sum of the Base Purchase Price (as it may be adjusted at any time prior to the Closing pursuant to Sections 2.10, 3.5 and 3.7) and the Estimated Purchase Price Adjustment being the "Estimated Purchase Price"), which may be positive or negative, equal to the Target Fixed Amount minus the Estimated Fixed Amount.  The principal amount of the Primary Note to be delivered by Purchaser or, in the event that Purchaser makes the Third-Party Financing Election pursuant to Section 3.7, the amount of cash to be paid by Purchaser, on the Closing Date pursuant to Section 3.3 will be increased (or decreased by such amount if negative) by the amount of the Estimated Purchase Price Adjustment.

(c)     Purchaser shall prepare and deliver to SVCMC, within ninety (90) days following the Closing Date, a statement (the "Closing Statement") setting forth a reasonably detailed calculation of (i) the Fixed Assumed Liabilities as of the Closing

BQHC 00595

BQHC 00512-00084

Date (the "Final Fixed Amount"), prepared in accordance with the books and records of the Business and the Accounting Principles, (ii) a reasonably detailed explanation of the variance from the Estimated Fixed Amount, (iii) an aggregate adjustment to the Base Purchase Price (such adjustment, the "Final Purchase Price Adjustment", and the sum of the Base Purchase Price and the Final Purchase Price Adjustment being the "Final Purchase Price"), which may be positive or negative, equal to the Target Fixed Amount minus the Final Fixed Amount; and (iv) a true-up amount (the "True-Up Amount"), which may be positive or negative, equal to the Estimated Purchase Price Adjustment minus the Final Purchase Price Adjustment.

(d)    SVCMC shall have twenty (20) days from its receipt of the Closing Statement (the "Objection Period") to review the Closing Statement. Purchaser shall grant SVCMC and its Representatives access at reasonable times and places to all books and records of the Business that are reasonably requested by SVCMC in connection with SVCMC's review of the Closing Statement. Upon the expiration of the Objection Period, the Sellers shall be deemed to have accepted, and shall be bound by, the Closing Statement and the calculation therein of the Final Purchase Price Adjustment, unless SVCMC shall have informed Purchaser in writing of its disagreement with the Closing Statement prior to the expiration of the Objection Period (the "Objection"), specifying each disputed item and setting forth in reasonable detail the basis for each such dispute (each, a "Disputed Item"). Purchaser shall have twenty (20) days from the date on which it receives the Objection (the date on which such twenty (20) day period ends, the "Response Date") to review and respond to such Objection. If Purchaser and SVCMC are able to negotiate a mutually agreeable resolution of each Disputed Item, and each signs a certificate to that effect, the Closing Statement and the calculation therein of the Final Purchase Price Adjustment and, if applicable, the True-Up Amount, as adjusted to reflect such resolution, shall be deemed final, non-appealable and binding for purposes of this Agreement. If within twenty (20) days of the Response Date any Disputed Items have not been resolved, SVCMC and Purchaser shall refer such Disputed Items to an independent accounting expert (the "Accounting Referee"), who shall be a partner of a nationally recognized accounting firm to be mutually agreed upon by SVCMC and Purchaser, and who shall accept its appointment within five (5) days after such referral, to make a final, non-appealable and binding determination as to such remaining Disputed Items pursuant to the terms hereof. If Purchaser and SVCMC cannot agree on the selection of a partner at an independent accounting firm to act as the Accounting Referee, the parties shall request the Bankruptcy Court to appoint such a partner and such appointment shall be conclusive and binding on the parties. The Accounting Referee shall be directed to make a determination in accordance with Section 3.6(e) below of the Disputed Items promptly, but no later than thirty (30) days, after acceptance of its appointment. SVCMC and Purchaser agree to use their commercially reasonable efforts to effect the selection and appointment of the Accounting Referee pursuant to this Section 3.6(d). The parties shall make readily available to the Accounting Referee all relevant books, records and employees of the Business that are reasonably requested by the Accounting Referee in connection with the Accounting Referee's review of any Disputed Items; provided, that the parties and their respective Affiliates shall not be obligated to provide any information the disclosure of which would jeopardize any professional privilege available to such Person relating to such information or which

BQHC 00596

BQHC 00512-00085

would cause such Person to breach a confidentiality obligation to which it is bound; provided, further, that the parties and their respective Affiliates shall use their best efforts to minimize the effects of any such limitations.

(e)     If Disputed Items are referred to the Accounting Referee for resolution pursuant to Section 3.6(d) above, the Accounting Referee (i) shall determine only with respect to the Disputed Items submitted whether and to what extent, if any, the Final Purchase Price Adjustment and, if applicable, the True-Up Amount set forth in the Closing Statement requires adjustment, (ii) shall utilize the Accounting Principles without modification and (iii) shall not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.  Any finding by the Accounting Referee shall be a reasoned award stating in reasonable detail the findings of fact on which it is based, shall be final, non-appealable and binding upon the parties and shall be the sole and exclusive remedy between the parties regarding the Disputed Items so presented.  The fees and expenses of the Accounting Referee shall be borne by the Sellers and Purchaser in the same proportion that the dollar amount of Disputed Items which are not resolved in favor of the Sellers or Purchaser, as applicable, bears to the total dollar amount of Disputed Items resolved by the Accounting Referee.  The Sellers and Purchaser shall each bear the fees, costs and expenses of their own accountants and all of its other expenses incurred in connection with matters contemplated by this Section 3.6.

(f)     If the True-Up Amount is a negative number, then Purchaser shall pay to SVCMC such amount in cash; provided that, so long as Purchaser has not made the Third-Party Financing Election pursuant to Section 3.7, in lieu of a cash payment, the principal amount of the Primary Note shall be increased by an aggregate amount equal to the absolute value of the True-Up Amount.  If the True-Up Amount is a positive number, then SVCMC shall pay to Purchaser such amount in cash; provided that, so long as Purchaser has not made the Third-Party Financing Election pursuant to Section 3.7, in lieu of a cash payment, the principal amount of the Primary Note will be decreased by an aggregate amount equal to the True-Up Amount.  Subject to the preceding sentence, payment of the True-Up Amount shall be made by wire transfer of immediately available funds to an account designated by the parties receiving such funds.  Such payment of the True-Up Amount calculated pursuant to this Section 3.6 or adjustment to the principal amount of the Primary Note pursuant to this Section 3.6 shall be made (i) if no Objection is made by SVCMC during the Objection Period, within five (5) Business Days following the expiration of the Objection Period or (ii) if SVCMC submits an Objection within the Objection Period, within five (5) Business Days following final resolution of all Disputed Items by the parties or the Accounting Referee.

3.7     Third-Party Financing Election.  Notwithstanding anything to the contrary contained in this Agreement, at any time on or before the third (3rd) Business Day prior to the deadline set forth in the Bidding Procedures Order for the submission of bids, Purchaser may elect (the "Third-Party Financing Election") to pay the entire Estimated Purchase Price (along with any other adjustments to the purchase price that take place after the Closing) to Seller in cash in lieu of the Primary Note.  In order to make the Third-Party Financing Election, Purchaser must provide to SVCMC (i) written notice of

BQHC 00597

BQHC 00512-00086

such election, (ii) a copy of a binding commitment letter relating to debt financing for Purchaser (the "Commitment Letter") in a form reasonably acceptable to SVCMC with customary terms and conditions from a third-party lender reasonably acceptable to SVCMC (SVCMC hereby acknowledges that for this purpose the lenders set forth on Schedule 3.7 are acceptable third-party lenders) and (iii) a certificate executed by Purchaser (the "Third-Party Financing Certificate") (x) agreeing to notify SVCMC if Purchaser becomes aware of any facts that would cause Purchaser to reasonably believe that the Financing contemplated by the Commitment Letter more likely than not will not be consummated in accordance with the terms thereof and (y) making the following representations and warranties to SVCMC: (A) the copy of the Commitment Letter provided to SVCMC in connection with making the Third-Party Financing Election is a true, correct and complete copy of the Commitment Letter; (B) the Commitment Letter, together with all other resources available to Purchaser, covers all funds necessary to fully pay the Estimated Purchase Price at Closing (and any True-Up Amount in accordance with Section 3.6), all fees and expenses of Wyckoff and Purchaser incurred in connection with the Contemplated Transactions and any other financial obligations of Purchaser under this Agreement or the Purchaser Documents (excluding the Behavioral Health Agreement) (the "Financing"); (C) as of the date of such certificate, Purchaser and its Affiliates were not aware of any facts that would cause Purchaser to believe that the Financing contemplated by the Commitment Letter would not be consummated in accordance with the terms thereof; and (D) assuming that it receives the Financing, Purchaser at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations under this Agreement, and Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities. Upon Purchaser making the Third-Party Financing Election, (i) the Base Purchase Price shall decrease by one million and five hundred thousand dollars ($1,500,000), (ii) Parsons Manor shall deemed to be part of the Purchased Owned Property for all purposes of this Agreement and (iii) the covenants, representations and warranties given by Purchaser in the Third-Party Financing Certificate shall be deemed given by Purchaser under this Agreement as if set forth herein, and shall automatically be incorporated into and form a part of this Agreement for all purposes. Notwithstanding the first sentence of this Section 3.7, after the entry of the Sale Order by the Bankruptcy Court, Purchaser shall be entitled to make the Third-Party Financing Election at any time on or before the earlier of (i) if a notice is given by either party pursuant to Section 4.4(d)(iii) or Section 4.4(d)(iv), the end of twenty (20) Business Day notice period specified in such section or (ii) the tenth (10th) Business Day prior to the Closing Date.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Proskauer Rose LLP located at 1585 Broadway, New

BQHC 00598

BQHC 00512-00087

York, NY 10036 (or at such other place as SVCMC and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by SVCMC and Purchaser that is not less than five (5) nor more than seven (7) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by SVCMC and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by SVCMC and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of SVCMC in any asset to be acquired by Purchaser hereunder, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

4.2     Deliveries by SVCMC.    At the Closing, SVCMC shall deliver to Purchaser:

(a)     a certificate of good standing of each Seller from the State of New York;

(b)     a true and complete copy of the certificate of incorporation of each Seller and all amendments thereto certified by the State of New York;

(c)     true and complete copies of the bylaws of each Seller, each certified by an authorized officer;

(d)     certificates from authorized officers of each Seller that the certificates of incorporation of such Seller have not been amended since the date of the certificate described in subsection (b) above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in subsection (a) above, that would adversely affect such Seller's corporate existence or good standing;

(e)     true and complete copies of the resolutions of the Board of Directors of each of the Sellers, each certified by its Secretary, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by such Seller;

(f)     certificates from the Secretary of each of the Sellers as to the incumbency and signatures of each officer of such Seller executing this Agreement and any other documents required under this Agreement;

(g)     a duly executed bill of sale in a form reasonable acceptable to Purchaser and SVCMC;

(h)     a duly executed assignment and assumption agreement in a form reasonable acceptable to Purchaser and SVCMC, and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual

BQHC 00599

BQHC 00512-00088

Property, in a form suitable for recording in the U.S. Patent and Trademark office, and general assignments of all other Purchased Intellectual Property;

(i)    the officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(j)    the the Medical Records Custody Agreement between Purchaser and the Sellers, substantially in the form attached hereto as Exhibit C, duly executed by the Sellers;

(k)    the following agreements, each duly executed by SVCMC: (i) the Behavioral Health Agreement; (ii) the Clinical Sponsorship Agreement between Purchaser and SVCMC in the form attached hereto as Exhibit D (the "Clinical Sponsorship Agreement") with respect to the Cardiac Catheterization program; (iii) the Residency Rotation Agreement (the "Residency Rotation Agreement") between Purchaser and SVCMC in the form attached hereto as Exhibit E; and (iv) the Cardiac Patient Transfer and Affiliation Agreement (the "Cardiac Patient Transfer and Affiliation Agreement") between Purchaser and SVCMC relating to Saint John's Queens Hospital and St. Vincent's Hospital Manhattan in the form attached hereto as Exhibit F.

(l)    a duly executed Non-Foreign Person Affidavit for each Seller in compliance with Section 1445 of the Code;

(m)    copies of all consents required by Section 10.3(d) for which the Sellers are responsible;

(n)    duly executed warranty or bargain and sale deeds with covenants against grantor's acts with respect to each of the Purchased Owned Properties, together with duly executed affidavits of title in customary form;

(o)    original counterparts of each Assigned Contract that is in each Seller's possession, custody or control;

(p)    all security deposits described in Schedule 5.8(f), which schedule shall be updated by SVCMC immediately prior to the Closing (but which update shall not be deemed to be a breach of the representations and warranties of SVCMC contained herein for any purpose of this Agreement), to the extent transferable;

(q)    estoppel certificates executed by SVCMC, in form and substance reasonably acceptable to Purchaser, with respect to each Real Property Lease;

(r)    all other instruments of conveyance and transfer executed by the Sellers, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens (except Permitted Exceptions), including certificates of title for the Purchased Vehicles;

BQHC 00600

BQHC 00512-00089

(s)    unless Purchaser makes the Third-Party Financing Election pursuant to Section 3.7, the Parsons Manor Lease in accordance with the terms set forth in Schedule 2.12, duly executed by SVCMC;

(t)    the ambulance services operating certificate or certificates for the Hospitals or, as permitted by and in accordance with Section 2.14, the Ambulance Services Agreement, duly executed by SVCMC; and

(u)    such other documents, instruments and certificates as Purchaser may reasonably request.

4.3    Deliveries by Purchaser.    At the Closing, Purchaser shall deliver to SVCMC:

(a)    if Purchaser makes the Third-Party Financing Election pursuant to Section 3.7, the Estimated Purchase Price, in immediately available funds, as set forth in Section 3.3 hereof;

(b)    a duly executed assignment and assumption agreement in a form reasonable acceptable to Purchaser and SVCMC;

(c)    the following agreements, each duly executed by Purchaser: (i) the Behavioral Health Agreement; (ii) the Medical Records Custody Agreement substantially in the form attached hereto as Exhibit C; (iii) the Clinical Sponsorship Agreement in the form attached hereto as Exhibit D; (iv) the Residency Rotation Agreement, in the form attached hereto as Exhibit E; and (v) the Cardiac Patient Transfer and Affiliation Agreement in the form attached hereto as Exhibit F.

(d)    the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b);

(e)    a certificates of good standing of Purchaser and Wyckoff from the State of New York;

(f)    true and complete copies of the certificates of incorporation of Purchaser and Wyckoff and all amendments thereto certified by the State of New York;

(g)    true and complete copies of the bylaws of Purchaser and Wyckoff, each certified by one of its authorized officers;

(h)    certificates from authorized officers of Purchaser and Wyckoff that the certificates of incorporation of Purchaser and Wyckoff have not been amended since the date of the certificate described in subsection (f) above, and that nothing has occurred since the date of issuance of the certificate of good standing specified in subsection (e) above, that would adversely affect Purchaser's or Wyckoff's corporate existence or good standing;

BQHC 00601

BQHC 00512-00090

(i)     true and complete copies of the resolutions of the Board of Directors of each of Purchaser and Wyckoff, each certified by its Secretary, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transactions contemplated hereby by Purchaser and Wyckoff;

(j)     certificates from the Secretary of each of Purchaser and Wyckoff as to the incumbency and signatures of each officer of Purchaser and Wyckoff executing this Agreement and any other documents required under this Agreement;

(k)     copies of all consents required by Section 10.3(d) for which Purchaser is responsible;

(l)     the following instruments, each duly executed by Purchaser: (i) the Additional Note, in a form reasonably acceptable to SVCMC containing the terms and conditions set forth in Schedule 3.3 hereto as applying to the Additional Note and, (ii) unless Purchaser makes the Third-Party Financing Election pursuant to Section 3.7, the Primary Note, in a form reasonably acceptable to SVCMC containing the terms and conditions set forth in Schedule 3.3 hereto as appling to the Primary Note;

(m)     unless Purchaser makes the Third-Party Financing Election pursuant to Section 3.7, the Parsons Manor Lease in accordance with the terms set forth in Schedule 2.12, duly executed by Purchaser;

(n)     a copy of any notification that Purchaser is required under the Escrow Agreement to deliver to the Escrow Agent in order for the Escrow Agent to release the Escrowed Funds to SVCMC at the Closing;

(o)     evidence reasonably acceptable to SVCMC of Purchaser's deposit in escrow of such amounts (if any) required by Section 2.5;

(p)     in the event that SVCMC cannot transfer to Purchaser at the Closing the ambulance services operating certificate or certificates for the Hospitals, the Ambulance Services Agreement in accordance with Section 2.14, duly executed by Purchaser; and

(q)     such other documents, instruments and certificates as SVCMC may reasonably request.

4.4     Termination of Agreement.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)     Termination Due to Events in Bankruptcy Case.  This Agreement shall terminate immediately if the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or a Chapter 11 trustee is appointed.

BQHC 00602

BQHC 00512-00091

(b)     Termination by Purchaser.     Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser or Wyckoff of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii)     if there shall be a material breach by the Sellers of any material representation or warranty, or any material covenant or agreement contained in this Agreement which breach cannot be cured or has not been cured by the earlier of (A) twenty (20) Business Days after the giving of written notice by Purchaser to SVCMC of such breach and (B) March 31, 2007;

(iii)     if there is a Material Adverse Effect; or

(iv)     so long as neither Purchaser nor Wyckoff is then in breach of their respective obligations under this Agreement in any material respect, if (A) the Bidding Procedures Order is not entered within sixty (60) days from the date hereof or (B) the Sale Order is not entered within one hundred and twenty (120) days from the date hereof.

(c)     Termination by SVCMC.  SVCMC may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of the Sellers to close that are set forth in Sections 10.2 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by the Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by SVCMC; or

(ii)     if there shall be a material breach by Purchaser of any material representation or warranty, or by Purchaser or Wyckoff of any material covenant or agreement contained in this Agreement (including any representations, warranties and covenants made in the Third-Party Financing Certificate), which breach cannot be cured or has not been cured by the earlier of (A) twenty (20) Business Days after the giving of written notice by SVCMC to Purchaser of such breach and (B) March 31, 2007.

(d)     Termination by Purchaser or SVCMC.     Either Purchaser or SVCMC may terminate this Agreement upon the occurrence of any of the following:

(i)     by mutual written consent of SVCMC and Purchaser;

(ii)     if the Bankruptcy Court shall enter an order approving a Competing Bid, subject to the limitations set forth in the Bidding Procedures Order and subject to Purchaser's right to payment of the Break-Up Fee and

BQHC 00603

BQHC 00512-00092

Expense Reimbursement in accordance with the provisions of this Agreement and the Bidding Procedures Order;

(iii)     upon twenty (20) Business Days' written notice to the other party after the later of either (A) September 1, 2006 or (B) four (4) months after the entry of the Sale Order by the Bankruptcy Court, if either Purchaser or SVCMC determines in good faith, after consultation with the other party, that insufficient progress is being made on the CON Application so that it is more likely than not that DoH will not provide the CON Approval by the later of six (6) months after the entry of the Sale Order or the CON Termination Date. Notwithstanding the foregoing, neither Purchaser nor SVCMC may terminate this Agreement under this Section 4.4(d)(iii) if within such twenty (20) Business Day period DoH provides the CON Approval or SVCMC receives from DoH reasonably satisfactory assurances that Purchaser will receive the CON Approval by the later of six (6) months after the entry of the Sale Order or the CON Termination Date;

(iv)     upon twenty (20) Business Days' written notice to the other party if the Closing shall not have occurred by the close of business on December 31, 2006 (the "CON Termination Date"); provided, that such termination pursuant to this Section 4.4(d)(iv) shall not be effective if within such twenty (20) Business Day period (A) all outstanding required regulatory approvals shall have been obtained and all other closing conditions shall have been satisfied or (B) SVCMC has received reasonably satisfactory assurances that all required approvals and closing conditions shall be satisfied prior to the date which is eight (8) months after entry of the Sale Order by the Bankruptcy Court; provided, further, that if the Closing shall not have occurred on or before the CON Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement, then the breaching party or its Affiliates may not terminate this Agreement pursuant to this Section 4.4(d)(iv). Notwithstanding the foregoing, if (A) DoH provides the CON Approval on or prior to the CON Termination Date, (B) an action or failure to act by a Governmental Body prevents the consummation of the Contemplated Transactions and (C) the non-terminating party and its Affiliates are otherwise capable of satisfying the conditions to their obligation to consummate the Contemplated Transactions set forth in Article X, then neither SVCMC nor Purchaser may terminate this Agreement pursuant to this Section 4.4(d)(iv) for a period of ninety (90) days after the receipt of the CON Approval from DoH; or

(v)     if the Closing shall not have occurred by the close of business on March 31, 2007; provided, that such termination pursuant to this Section 4.4(d)(v) shall not be effective if (A) an action or failure to act by a Governmental Body prevents the consummation of the Contemplated Transactions and (B) the non-terminating party and its Affiliates are otherwise capable of satisfying the conditions to its obligation to consummate the Contemplated Transactions set forth in Article X.

BQHC 00604

BQHC 00512-00093

(e)    Extension of Time Periods.  The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

4.5    Procedure For Termination.  In the event of termination of this Agreement by Purchaser or SVCMC, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6, without further action by the parties.

4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any party; provided, however, that the obligations of the parties set forth in the Confidentiality Agreement, Escrow Agreement, Sections 3.2, 4.6, 7.1 and 8.6 and Article XIII of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms.  In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)    Nothing in this Section 4.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination.  Notwithstanding the foregoing, subject to Section 7.1, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated hereby shall be payable to or out-of-pocket expense reimbursement or other fees shall be made to any party upon termination of this Agreement pursuant to Section 4.4, except that SVCMC shall be obligated to pay the Expense Reimbursement to Purchaser within sixty (60) days after the valid termination of this Agreement if SVCMC terminates this Agreement pursuant to Section 4.4(d)(iii) or 4.4(d)(iv); provided, however, that the maximum amount of the Expense Reimbursement shall be increased to seven hundred and fifty thousand dollars ($750,000) if SVCMC validly terminates pursuant to Section 4.4(d)(iv) and (A) Purchaser has already received the CON Approval at the time of such termination, (B) an action or failure to act by a Governmental Body has prevented the consummation of the Contemplated Transactions and (C) at the time of termination, Purchaser was otherwise capable of satisfying the conditions to its obligation to consummate the Contemplated Transactions set forth in Article X.

(c)    If this Agreement is terminated in accordance with Sections 4.4 and 4.5, Purchaser and Wyckoff agree that they each shall not, directly or indirectly, and shall cause their Affiliates not to, for a period of two (2) years from the date of this

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

Agreement, solicit any employee of the Sellers to join the employ of Purchaser, Wyckoff or any of their Affiliates or solicit any member of Seller's medical or professional staff to join the professional staff of Purchaser, Wyckoff or their Affiliates.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SVCMC

SVCMC hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  SVCMC is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each PC is a professional corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization.

5.2    Authorization of Agreement.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), (i) each Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its members or shareholders (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by such Seller in connection with such Seller entering into this Agreement and (ii) subject to the satisfaction of the conditions referred to in clause (iv) of Section 5.3(a), each Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, each agreement, document, or instrument or certificate contemplated by this Agreement to be executed by such Seller in connection with the consummation of the transactions contemplated by this Agreement (together with the other documents, other than this Agreement, referred to in clause (i) of this sentence, the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement and each of the Seller Documents contemplated to be executed and delivered in connection with the Sellers entering into this Agreement have been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by the applicable Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to the Sellers' obligations under Section 7.1, the entry of the Bidding Procedures Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Sellers enforceable against each Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00606

BQHC 00512-00095

creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity). None of the execution and delivery by a Seller of this Agreement and the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by a Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of the certificate of incorporation and bylaws or comparable organizational documents of a Seller.

    5.3    <u>Consents of Third Parties; Contractual Consents</u>.

        (a)    To the Knowledge of the Sellers, except as described on <u>Schedule 5.3(a)</u>, the Sellers are not required to obtain any consent, waiver, approval, Order, Permit or authorization of, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Seller Documents by the Sellers, the compliance by the Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Sellers of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order with respect to the Sellers' obligations under <u>Section 7.1</u>, (iii) subject to the next following sentence, the approval of the Supreme Court of the State of New York referred to in Sections 510 and 511 of the New York Not-for-Profit Corporation Law (the "<u>N-PCL</u>") and any related notice to the Charities Bureau of the Office of the Attorney General of the State of New York (the "<u>Charities Bureau</u>"), (iv) the Healthcare Regulatory Consents, and (v) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications of which the failure to have obtained or made same would not have a Material Adverse Effect. As soon as practicable after the date hereof, SVCMC shall notify Purchaser if, based on advice of SVCMC's counsel, SVCMC has determined that the approval of the court required by Sections 510 and 511 of the N-PCL is not required for the Contemplated Transactions, in which event, upon such notice, clause (iii) of the immediately preceding sentence shall have no further force or effect (but the Sellers shall, nonetheless, give such notices and make such filings with the Charities Bureau as SVCMC determines are appropriate).

        (b)    Except as set forth on <u>Schedule 5.3(b)</u> and as otherwise superseded by the applicable provisions of the Bankruptcy Code, to the Knowledge of the Sellers, none of the execution and delivery by the Sellers of this Agreement or any of the Seller Documents, the consummation of the Contemplated Transactions by the Sellers, or compliance by the Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which a Seller is a party or by which any of the properties or assets of a Seller are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a Material Adverse Effect.

        (c)    To Seller's Knowledge, as of the date hereof, except as set forth on Schedule 5.3(c), all of the Purchased Assets can be assigned to Purchaser pursuant to

BQHC 00607

BQHC 00512-00096

Section 365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Body, as applicable.

5.4     Financial Information. SVCMC has made available to Purchaser copies of certain balance sheet items described in Schedule 5.4 for each of the Hospitals as at October 31, 2005 and as at December 31, 2005, and the income statements for each Hospital and each of Monsignor Fitzpatrick Pavilion, CMCCS, CMCPS and CMCRS for the ten (10) month period then ended and the twelve (12) month period then ended, as well as income statements for each Hospital and each of Monsignor Fitzpatrick Pavilion, CMCCS, CMCPS and CMCRS for the twelve (12) month periods ending December 31, 2002, 2003 and 2004 (collectively, the "Financial Statements").   Such Financial Statements have been compiled in the Ordinary Course of Business from the books and records of each of the Hospitals as at the date and for the period then ended.  To the Knowledge of the Sellers, the books and records of each of the Hospitals (i) are complete and accurate in all material respects and do not contain or reflect any material inaccuracies or discrepancies except for periodic accruals and adjustments consistent with past practice and immaterial audit adjustments and (ii) have been maintained by SVCMC in all material respects in accordance with good business and accounting practices.

5.5     Title to Purchased Assets.  Except as set forth in Schedule 5.5, and other than the real property subject to the Real Property Leases, intellectual property licensed to the Sellers and the personal property subject to the Personal Property Leases, the Sellers own each of the Purchased Assets, and Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.6     Absence of Certain Developments.  Except as expressly contemplated by this Agreement (including Section 8.2) or as set forth on Schedule 5.6, since December 31, 2005 (i) each Seller has conducted the Business only in the Ordinary Course of Business consistent with past practices in substantially the same manner as presently conducted, with all reasonable efforts made consistent with past practices to preserve the goodwill of the Business and its relationships with patients, suppliers and others with whom it deals in connection with its business and to keep available the services of its officers and employees, (ii) no Seller has, with respect to the Business, entered into any Contract, assumed any Liability or otherwise conducted its business other than in the Ordinary Course of Business consistent with past practice, (iii) there has not been any event, change, occurrence or circumstance related to the Business that has had a Material Adverse Effect, (iv) other than in the Ordinary Course of Business, no Seller has removed from the Purchased Real Property Furniture and Equipment or other tangible personal property used in the Ordinary Course of Business (other than Furniture and Equipment or other tangible personal property that has been replaced by substantially equivalent or better property) with an aggregate value of greater than fifty thousand dollars ($50,000) and (v) except as would not have a Material Adverse Effect, no Seller has done any of the following with respect to the Business other than in the Ordinary Course of Business consistent with past practice:

BQHC 00608

BQHC 00512-00097

(a)    granted any increase in compensation to any of its officers, employees or agents, or paid or agreed to pay to any such person any bonus, severance or termination payment;

(b)    incurred any material change in its overhead costs, number of patients treated at the Business, accounts receivable or accounts payable;

(c)    made any change in any method of accounting or accounting practice or policy, or materially revised its accounting reserves;

(d)    acquired any assets that are material to the operation of the Business;

(e)    sold, leased, licensed or otherwise disposed of any of its material assets;

(f)    except to the extent reasonably necessary to effectuate the Contemplated Transactions, entered into, canceled or modified any Contract (whether or not reduced to writing and specifically including any note, bond, mortgage, lease, license or other instrument), or assumed any Liability;

(g)    adopted or amended any Plan;

(h)    billed or collected any accounts receivable in advance; or

(i)    agreed, whether in writing or otherwise, to do any of the foregoing

5.7    Taxes.  SVCMC is an entity exempt from federal income tax under Section 501(c)(3) of the Code and exempt from New York State income, corporate or franchise tax under the comparable provisions of the Tax Law of the State of New York and there is no action pending by any Tax Authority to revoke its tax-exempt status. Except as set forth on Schedule 5.7 and except for matters that would not have a Material Adverse Effect, (i) each Seller has timely filed on or before the due date all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of such Seller) and (ii) all Taxes shown to be payable on such Tax Returns with respect to the Purchased Assets on or before the date hereof have been timely paid (along with any interest and penalties with respect thereto). SVCMC has made available to Purchaser copies of (i) all Tax Returns relating to the Purchased Assets, including amendments thereto, for the last three (3) taxable years and (ii) all examination reports and statements of deficiencies assessed with respect to the Purchased Assets for the last five (5) taxable years.

5.8    Real Property.

(a)    Schedule 5.8(a) sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by the Sellers and used in any material degree in the Business (the "Owned Properties"), and (ii) all real property and

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00609

BQHC 00512-00098

interests in real property leased or licensed by the Sellers and used in any material degree in the Business, as lessee, lessor, licensee or licensor (the "Real Property Leases"). The Sellers have (A) good and marketable fee title to all Purchased Owned Property, free and clear of all Liens of any nature whatsoever except Liens set forth on Schedule 5.8(a) and Permitted Exceptions and (B) a valid leasehold interest in any Purchased Real Property leased by the Sellers, free and clear of all Liens other than Permitted Exceptions. The Purchased Real Property includes all the real property interests necessary to permit the Sellers to conduct the Business in all material respects as it is being conducted as of the date of this Agreement. To the Knowledge of the Sellers, no Seller has received any notice of any default or event that with notice or lapse of time, or both, would constitute a default by a Seller under any of the Purchased Real Property Leases.

(b)     SVCMC has made available to Purchaser true, correct and complete copies of all of the Purchased Real Property Leases, together with all modifications and amendments thereto. All Purchased Real Property Leases are in full force and effect. Except as set forth in Schedule 5.8(b) and as otherwise superseded by the applicable provisions of the Bankruptcy Code, the Sellers and, to the Knowledge of the Sellers, the other parties under each of the Purchased Real Property Leases have complied in all material respects therewith, and are not in default thereunder. The Sellers have no Knowledge of any act or omission which, but for the passage of time or the giving of notice or both, would constitute a default under any of the Purchased Real Property Leases. Since December 31, 2005, no tenant or licensee under any of the Purchased Real Property Leases has been granted any material waiver or forbearance with respect thereto. Except as expressly set forth in Schedule 5.8(b) and as otherwise superseded by the applicable provisions of the Bankruptcy Code, the transactions contemplated hereby (i) do not require the consent of any of the landlords under any of the Purchased Real Property Leases with respect to which a Seller is a tenant, (ii) do not require the consent of any of the tenants under any of the Purchased Real Property Leases with respect to which a Seller is a landlord and (iii) shall not result in the termination of (unless otherwise required by the terms of this Agreement), or give any of the tenants or landlords under any of the Purchased Real Property Leases the right to exercise any option or right to terminate, any of the Purchased Real Property Leases.

(c)     To the Knowledge of the Sellers, all improvements on the Purchased Real Property have been completed and, except as set forth in Schedule 5.8(c)(i), there are no interior or exterior structural defects in the design, specifications, surveying, planning, supervision or construction of such improvements. To the Knowledge of the Sellers, there has been no damage to any portion of the improvements on any Purchased Real Property caused by fire or other casualty which has not been fully repaired or restored. Except as set forth in Schedule 5.8(c)(ii), to the Knowledge of the Sellers, (A) there is no pending or threatened legal action affecting any portion or all of the Purchased Real Property, including any condemnation actions, and (B) there is no basis for any such action. No written notice has been issued with respect to any pending or contemplated changes in any applicable Law that may adversely affect the use, management or operation of any Purchased Real Property, and the Sellers have no Knowledge of any such pending or contemplated changes. The Sellers have not received (and have no Knowledge of) any notice or request from any insurance company or holder

BQHC 00610

BQHC 00512-00099

of any mortgage requesting the performance of any work or alteration in respect of any Purchased Real Property or the improvements thereon.

(d) .   All public utilities adequate for the operation of the improvements on the Purchased Real Property for its present use are installed and operating and all installation, connection and capital recovery charges in connection with such public utilities have been paid in full.  All utilities, including electrical, telephone, gas, water and sewer, required for the present operation of the Purchased Real Property (or any portion thereof) enter through adjoining public streets or through valid easements across adjoining private lands.  There are no public street rights-of-way across or through the Purchased Real Property which adversely affect the use thereof.  Each parcel of Purchased Real Property is located on a public street, and there are unrestricted legal rights of ingress from, and egress to, each such public street to, and from, each respective parcel.

(e)    Certificates of occupancy (or their legal equivalent), none of which are temporary certificates, covering all portions of the improvements on each parcel of Purchased Real Property, permitting such improvements to be legally used and occupied in their present manner, have been issued, and true, correct and complete copies thereof have been made available to Purchaser.  All such certificates of occupancy are in full force and effect.  The Sellers have no Knowledge of any alteration, improvement, or change in use of any building or other improvement on any parcel of Purchased Real Property that would require the issuance of any new or amended certificate of occupancy.  Each of the parcels of Purchased Real Property and the improvements thereon, and the operation and maintenance thereof, including the number of parking spaces thereon, comply in all material respects with all applicable agreements, Laws and restrictive covenants, including requirements under applicable zoning and subdivision ordinances and regulations and building code requirements.  Other than noted on the title policies that have been made available to Purchaser, all building structures and other improvements on the Purchased Real Property are located entirely within the boundary lines of the Purchased Real Property and do not encroach on any easement or right-of-way.

(f)    Schedule 5.8(f) sets forth a true, correct and complete list of all security deposits currently held or required to be held by a Seller as lessor, sublessor, or licensor under any Purchased Real Property Leases.

5.9    Tangible Personal Property.  Schedule 5.9 sets forth all leases of personal property, including Equipment, used by the Sellers in the Business ("Personal Property Leases") that involve annual payments in excess of $50,000 and, to the Knowledge of the Sellers, all Personal Property Leases that involve annual payments of $50,000 or less.  Except as set forth on Schedule 5.9, to the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by a Seller under any of such Personal Property Leases.

5.10    Intellectual Property.

BQHC 00611

BQHC 00512-00100

(a)    Schedule 5.10(a) lists all registered Intellectual Property Rights and those that are the subject of an application for registration, in each case, that are owned by the Sellers and included in the Purchased Intellectual Property.

(b)    Except as set forth on Schedule 5.10(b), the Sellers own or have licenses to use all Intellectual Property Rights and Facility Marks used by them in the Ordinary Course of Business, except to the extent the failure to be the owner or the licensee would not have a Material Adverse Effect; provided, however, that the Sellers make no representation or warranty as to the ownership by the licensor of any Intellectual Property Rights that are licensed to them. Except as set forth on Schedule 5.10(b), to the Knowledge of the Sellers, (i) the material Purchased Intellectual Property and Facility Marks used by the Sellers are not the subject of any challenge received by the Sellers in writing and (ii) no Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any material Purchased Intellectual Property License to which a Seller is a party or by which it is bound or any challenge to the validity of such Purchased Intellectual Property License.

(c)    Except as set forth on Schedule 5.10(c) or in the Ordinary Course of Business, no Seller has granted any Person any right, license or interest whatsoever in any Intellectual Property Rights owned by the Sellers that are included in the Purchased Intellectual Property.

(d)    All Software that the Sellers use, with the exception of commercial off-the-shelf software available at a charge not exceeding one thousand dollars ($1,000) per copy, computer, user, CPU or the like in connection with the operation of the Business is listed in Schedule 5.10(d). The Sellers have licenses to use all Third-Party Software used in the operation of the Business as now operated, and the Sellers have the legal right to use all such Third-Party Software in the manner that such Third-Party Software is currently being used in the Business without the payment of any additional royalties or other fees that are not reflected in the Financial Statements, now or in the future, to any other Person. The Sellers has not sold, leased, licensed or otherwise distributed or marketed any Software to any third party during the last three (3) years in connection with the Business. The Sellers have no obligation to make any payments by way of royalty, fee or otherwise that is not reflected in the Financial Statements or in the license agreements previously made available to Purchaser to any Person in connection with any Third-Party Software. The Sellers own all right, title and interest in the Proprietary Software, including all of the Intellectual Property Rights therein.

(e)    To the Knowledge of the Sellers, the present and projected use by each Seller of all of its Software and Intellectual Property Rights does not, and Purchaser's use of all Software and Intellectual Property Rights transferred to Purchaser pursuant to this Agreement (to the extent such transferred Software and Intellectual Property Rights are employed by Purchaser in a manner consistent with the operation of the Business by the Sellers) will not, infringe the rights of any other Person. No claim has been asserted by any Person (i) that such Person has any right, title or interest in or to a Seller's Intellectual Property Rights; (ii) to the effect that any past, present or projected act or omission by a Seller infringes any rights of such Person to any Intellectual Property

BQHC 00612

BQHC 00512-00101

Rights; or (iii) that challenges a Seller's right to use any of its Intellectual Property Rights or that seeks to deny, modify or revoke any registration or application therefor or renewal thereof. To the Knowledge of the Sellers, no facts or circumstances exist that, with or without the passing of time or the giving of notice or both, might reasonably serve as the basis for any such claim.

5.11    Material Contracts.

(a)    Schedule 5.11(a) sets forth a list of all of the following Contracts to which a Seller is a party or by which it is bound and that are primarily related to the Business or by which the Purchased Assets may be bound or affected and that are Assigned Contracts (collectively, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer or director of a Seller (other than Contracts made in the Ordinary Course of Business on terms generally available to similarly situated non-affiliated parties);

(ii)    Contracts with any labor union or association representing any employees of a Seller;

(iii)    Contracts for the sale of any of the assets of the Business (other than an Excluded Asset or a sale made in the Ordinary Course of Business) for consideration in excess of $100,000;

(iv)    Contracts relating to the acquisition by a Seller for use in the Business of any operating business or the capital stock or other ownership interest of or in any other Person, in each case for consideration in excess of $100,000; or

(v)    Contracts which involve the annual expenditure of more than $100,000 in the aggregate or require performance by any party more than one year from the date hereof that, in either case, are not terminable by a Seller without penalty on less than one hundred eighty (180) days' notice.

(b)    Schedule 5.11(b) sets forth a list of all Excluded Contracts to which a Seller is a party or by which it is bound, that are primarily related to the Business and that are described in clauses (i) to (v) of Section 5.11(a).

(c)    True and correct copies of the Material Contracts have been made available to Purchaser by SVCMC prior to the date of this Agreement. No Seller is party to any oral arrangement or understanding relating to the Business that if in writing would constitute a Material Contract.

(d)    Except (i) as otherwise provided in the Bankruptcy Code, (ii) for events of default arising as a result of any Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, (iii) for general principles of equity that may limit the specific performance of particular provisions or (iv) or as set forth on Schedule 5.11(d), each Material Contract is a legal, valid and binding obligation of the Seller that is

BQHC 00613

BQHC 00512-00102

party thereto and is enforceable by such Seller against the other party or parties to such Material Contract in accordance with its terms, and no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by such Seller under any Material Contract, except for defaults that would not have a Material Adverse Effect.  As of the date hereof, no Seller has given written notice within the past twelve (12) months to any other party to a Material Contract that such party is in default thereunder or in breach thereof, which default or breach remains uncured, or given notice of termination thereof.

(e)     Except as disclosed in Schedule 5.11(e), (i) the Sellers have the right to assign to Purchaser each of the Material Contracts on the Closing Date under Section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Purchaser shall have all of the rights of the Sellers thereunder, and (ii) no Material Contract to which a Seller is a party may be terminated by any other party thereto as a result of the transactions contemplated by this Agreement.

5.12    Employees; Employee Benefits.

(a)     Schedule 5.12(a) hereto sets forth a true and complete list of all Plans.  With respect to each Plan listed in Schedule 5.12(a), SVCMC has made available to Purchaser true and complete copies of the following: (i) the two most recent annual reports on the applicable Form 5500 series filed with the IRS (including all schedules, financial statements and any other attachments filed); (ii) the Plan document, including all amendments thereto; (iii) each trust agreement and insurance contract relating to such Plan, including all amendments thereto; (iv) the most recent summary plan description for such Plan (or a summary of terms of any Plan which does not have a Summary Plan description); (v) the two most recent actuarial reports or valuations for each Plan that is a "pension plan" within the meaning of Section 3(2) of ERISA; and (vi) with respect to each Plan that is intended to satisfy the requirements of Section 401(a) or Section 403(b) of the Code, as applicable, the most recent determination letter issued by the IRS with respect to such Plan.  Each Plan of a Seller governed by the requirements of Section 401(a), Section 403(b) or Section 457 of the Code and subject to regulation by the IRS, the PBGC or the U.S. Department of Labor has been operated by the Sellers in conformity with the requirements of the Code and the provisions of ERISA, as applicable, and in accordance with all other applicable laws and regulations, including written rulings, bulletins and other announcements issued by the applicable regulatory governmental agency in all material respects.

(b)     Except as set forth in Schedule 5.12(b), none of the Sellers, any ERISA Affiliate, or any of their respective predecessors has within the last six (6) years contributed to, contributes to, has been required to contribute to, has otherwise participated in, or has any liability with respect to any "multiemployer plan" within the meaning of Section 3(37) of ERISA or Section 414(f) of the Code ("Multiemployer Plan") or any single-employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) which is subject to Sections 4063 and 4064 of ERISA ("Multiple Employer Plan") with respect to Employees.

BQHC 00614

BQHC 00512-00103

5.13    <u>Employment and Labor.</u>

(a)    <u>Schedule 5.13(a)</u> hereto (to be delivered in accordance with <u>Section 9.1(b))</u> sets forth a true and complete list of all Employees as of the date set forth therein.   With respect to each Employee, such schedule accurately sets forth the following information: (i) the position; (ii) date of hire; (iii) current annual salary or hourly wage; (iv) average number of hours worked per week; (v) date of last salary increase; (vi) accrued vacation, holidays and/or sick leave as a result of the individual's employment with SVCMC; and (vii) to the Knowledge of SVCMC, the union, if any, of which the individual is a member.

(b)    SVCMC has made available to Purchaser complete and accurate copies of each employment, consulting and similar agreement pertaining to the Business to which a Seller is a party, all of which are listed on <u>Schedule 5.13(b)</u>.   Except as disclosed on <u>Schedule 5.13(b)</u>, SVCMC is not a party to or bound by any written agreement, employment manual, employment handbook, employment practice or policy constituting a contractual obligation, or any consent decree, court order or statutory obligation pertaining to the Business (i) for the employment of any individual, or the provision of services by any individual, who is not terminable by such Seller without penalty upon thirty (30) days notice or less or (ii) relating to the payment of any severance or termination payment, bonus or death benefit to any employee or former employee or his or her estate or designated beneficiary.

(c)    <u>Schedule 5.13(c)</u> identifies the labor or collective bargaining agreement applicable to Employees to be assumed by Purchaser at the Closing in accordance with the provisions of this Agreement (the "<u>Assumed CBAs</u>").  Prior to the date hereof, SVCMC has made available to Purchaser a copy of each Assumed CBA and has also made available to Purchaser a list of all its Employees as of a recent date, indicating their position, current annual rate of compensation or current hourly wage rate or other basis of compensation and date of hire by SVCMC.   Except as described in <u>Schedule 5.13(c)</u>, in connection with SVCMC's operation of the Business, (i) no labor union or employee association has been certified as exclusive bargaining agent for any group of Employees and (ii) there are no current, outstanding or threatened attempts to organize or establish any labor union, employee association or bargaining unit with respect to any Employees, nor have there been any such attempts in the past two years to the Knowledge of SVCMC.

(d)    Except as set forth on <u>Schedule 5.13(d)</u>, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving a Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any employee or group of employees of a Seller, except in each case as would not have a Material Adverse Effect.

(e)    Except as described in <u>Schedule 5.13(e)</u>, each Seller is in compliance with all Laws and other obligations relating to employment, denial of employment or employment opportunity and termination of employment, including Title

BQHC 00615

BQHC 00512-00104

VII of the Civil Rights Act of 1964; the Civil Rights Acts of 1866, 1871, and 1991, the Age Discrimination in Employment Act, ERISA, the Americans With Disabilities Act of 1993, the Family and Medical Leave Act, the WARN Act, the National Labor Relations Act, the Labor Management and Reporting and Disclosure Act and the Fair Labor Standards Act, all as amended, and any other federal, state, county or municipal statute or ordinance relating to any condition of employment or employment discrimination, except where noncompliance would not have a Material Adverse Effect.

(f)     Except as set forth on Schedule 5.13(f), there is no material controversy pending or, to the Knowledge of SVCMC, threatened between SVCMC and any of its current or former officers, directors, senior supervisory personnel or any group of Employees, in each case, in connection with the Business.

5.14     Litigation.  Except for Legal Proceedings that have been stayed and as set forth on Schedule 5.14, there are no Legal Proceedings pending or, to the Knowledge of the Sellers, threatened against a Seller or involving the Business or the Purchased Assets before any Governmental Body, which, if adversely determined, would have a Material Adverse Effect.

5.15     Compliance with Laws; Permits.

(a)     SVCMC is duly licensed by DoH to operate the Business at Mary Immaculate Hospital as a 246 bed acute care hospital and at Saint John's Queens Hospital as a 346 bed acute care hospital, and is also duly licensed by OMH to operate the Business's mental health treatment facilities and by OASAS to operate the Business's alcoholism and substance abuse treatment facilities.

(b)     SVCMC is eligible to receive payment under Titles XVIII and XIX of the Social Security Act and is a "provider" under existing provider agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.  Except as described on Schedule 5.15(b), there is not pending, nor to the Knowledge of the Sellers is there threatened, any proceeding or investigation under the Healthcare Programs involving the Business.  The Business is conditionally accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  SVCMC has made available to Purchaser a true and complete copy of SVCMC's most recent JCAHO accreditation survey report pertaining to the Business.

(c)     To the Knowledge of the Sellers, each Seller is in compliance in all material respects with all Laws and Permits applicable to the Purchased Assets or the Business (other than any Laws concerning the matters addressed separately in Sections 5.15(a) and 5.15(b) or otherwise relating to health care or healthcare services of any kind), except where the failure to be in compliance would not have a Material Adverse Effect and except with respect to Environmental Laws (which are addressed below). Except as described in Schedule 5.15(c), to Knowledge of the Sellers, no Seller has received any written notice of, or been charged with, any material violation of any such Laws.

BQHC 00616

BQHC 00512-00105

(d)     Except as a result of the Bankruptcy Case or as described on Schedule 5.15(d), there are no outstanding Orders, injunctions or decrees of any Government Body that apply to the Business or the Purchased Assets that restrict the conduct of the Business or the ownership, disposition or use of the Purchased Assets, except as would not have a Material Adverse Effect.

(e)     The Sellers have all Permits that are necessary to enable them to own, lease or otherwise hold the Purchased Assets and to enable them to operate the Business as currently conducted, except where the absence of which would not have a Material Adverse Effect. Schedule 5.15(e) lists all Permits of the Sellers material to the operation of the Business. Except as set forth on Schedule 5.15(e), such Permits are in full force and effect and no proceedings are pending or, to the Knowledge of the Sellers, threatened, that would have the effect of revoking, limiting or affecting the transfer or renewal of the Permits.

5.16    Compliance with Medical Reimbursement Program Laws.

(a)     In connection with the Business, neither SVCMC nor, to the Knowledge of the Sellers, any of the Transferred Employees, have, during the twelve (12) month period preceding the date hereof, been assessed criminal or civil penalties by, or has been excluded, terminated or suspended, or received notice of any proceeding to exclude, terminate or suspend from participation in any Medical Reimbursement Program. Neither SVCMC nor, to the Knowledge of the Sellers, any of the Transferred Employees, has been charged within the twelve (12) month period preceding the date hereof with or, to the Knowledge of the Sellers and except as described on Schedule 5.16(a), investigated for committing a violation of, any Medical Reimbursement Program Law in connection with the Business. To the Knowledge of the Sellers, none of the Sellers nor any Transferred Employee, is under investigation by the Office of the Inspector General of HHS or any other Governmental Body in connection with the Business.

(b)     To the Knowledge of the Sellers, except as set forth on Schedule 5.16(b), the operation by SVCMC of the Business is presently in material compliance with the Medical Reimbursement Program Laws, including the conditions and standards of coverage, participation and certification imposed by Medicare.

(c)     SVCMC has developed and distributed to its employees involved in the Business written standards of conduct, as well as written policies and procedures, that promote its commitment to compliance and address specific areas of potential fraud, such as the claims submission process, coding and financial relationships with providers.

5.17    Environmental Matters. The representations and warranties contained in this Section 5.17 are the sole and exclusive representations and warranties of the Sellers pertaining or relating to any environmental, health or safety matters, including any arising under any Environmental Laws. Except as set forth on Schedule 5.17 hereto:

BQHC 00617

BQHC 00512-00106

(a)     the operation of the Business and the Purchased Assets are in compliance in all material respects with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws or otherwise;

(b)     the Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business;

(c)     the Sellers are not the subject of any outstanding Order or Contract with any Governmental Body respecting (i) Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened Release, in each case, relating to the operation of the Business or to any Purchased Asset;

(d)     no Seller has received any written communication alleging that such Seller may be in violation of any Environmental Law, or any Permit issued pursuant to any Environmental Law, or may have any liability under any Environmental Law, in each case related to the Business or to any Purchased Asset;

(e)     there are no investigations of the Business, or currently owned, operated or leased real property of the Sellers used in the Business pending or, to the Knowledge of the Sellers, threatened which would reasonably be expected to result in the imposition of any material liability pursuant to any Environmental Law; and

(f)     to the Knowledge of the Sellers, there are no conditions existing at any of the Purchased Assets or with respect to the Business, that require, or which with the giving of notice is reasonably likely to require Remedial Action pursuant to the Environmental Laws or any requirement of a Government Body.

5.18    Medicare and Medicaid Certification; Cost Reports.

(a)     The Business is certified under the conditions of coverage and participation in the Medicare and Medicaid programs.  SVCMC has made available to Purchaser correct copies of all surveys, reports and deficiency notices concerning the Business by the Medicare program, any state survey agency, and the New York Medicaid program.  The Medicare certification of the Business is in full force and effect.

(b)     SVCMC has made available to Purchaser true and correct copies of all Cost Reports which SVCMC has filed with the Medicare and Medicaid programs for the last three (3) years.  SVCMC has made all filings of Cost Reports due prior to the Closing Date.

5.19    Insurance.  Schedule 5.19 lists all of the insurance policies maintained by the Sellers as of the Closing Date relating to the Business, and indicates the insurer's name, policy number, expiration date and amount and type of coverage.  SVCMC has made available to Purchaser certificates evidencing such insurance policies and complete copies of such insurance policies.

5.20    Financial Advisors.  Except as set forth on Schedule 5.20, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in

BQHC 00618

BQHC 00512-00107

connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.21   Medical Staff; Physician Relations.   SVCMC has made available to Purchaser complete and genuine copies of the Bylaws, Rules and Regulations of the Medical Staff of SVCMC as well as the rules of the Medical Board of SVCMC's Queens Division, as currently in effect.   Except as set forth on Schedule 5.21, there are no pending or, to the Knowledge of the Sellers, threatened proceedings with the Business' medical staff members or applicants or allied health professionals and all appeal periods in respect of any medical staff member against whom an adverse action has been taken have expired. Schedule 5.21 lists all attending physicians and all physicians or groups of physicians with admitting privileges at the Hospitals.

5.22   Credit Balance Reports.   SVCMC has made available to Purchaser true, accurate and complete copies of its Medicare and Medicaid quarterly credit balance reports for the past four quarters, as well as the current credit balances due any third party with respect to services provided by the Business.

5.23   Hill-Burton Loan.   No Seller has any outstanding obligation to repay any loans, grants, or loan guarantees, or to provide uncompensated care in consideration thereof, under the Hill-Burton Act, as amended.

5.24   Sufficiency of Assets.   Subject to the provisions of Sections 2.5 and 2.6, and except (i) for the Excluded Assets and (ii) as set forth in Schedule 5.24, the Purchased Assets being transferred to Purchaser pursuant to this Agreement constitute all of the assets used by the Sellers in connection with the operation of the Business in the Ordinary Course of Business and all of the assets necessary to conduct the Business as presently conducted.

5.25   Acknowledgement Regarding Representations and Warranties by Purchaser.   Notwithstanding anything contained in this Agreement to the contrary, each Seller acknowledges and agrees that neither Purchaser nor its Affiliates are making any representations or warranties whatsoever, express or implied, beyond those expressly given by Purchaser in Article VI hereof (as modified by the Schedules hereto as supplemented or amended) and, if Purchaser makes the Third-Party Financing Election, in the Third-Party Financing Certificate.   Any claims a Seller may have for breach of representation or warranty shall be based solely on the representations and warranties of Purchaser set forth in Article VI hereof (as modified by the Schedules hereto as supplemented or amended) and, if Purchaser makes the Third-Party Financing Election, in the Third-Party Financing Certificate.   Each Seller further represents that neither Purchaser nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Purchaser or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Purchaser, any of its Affiliates or any other Person will have or be subject to any liability to a Seller or any other Person resulting from the distribution to SVCMC or its Representatives or a Seller's use of, any such information, including any confidential memoranda distributed on behalf of Purchaser or its Affiliates,

BQHC 00619

BQHC 00512-00108

or any other document or information in any form provided to SVCMC or its Representatives in connection with the transactions contemplated hereby. The Sellers acknowledge that they have conducted to their satisfaction, their own independent investigation of Purchaser and its Affiliates, and, in making the determination to proceed with the transactions contemplated by this Agreement, the Sellers have relied on the results of their own independent investigation.

5.26    No Other Representations or Warranties; Schedules.   Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), none of the Sellers nor any other Person makes any other express or implied representation or warranty with respect to the Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and the Sellers disclaims any other representations or warranties, whether made by the Sellers, their Affiliates or any of their respective officers, directors, employees, agents or other Representatives.   Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), each Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, employee, agent, consultant, or other Representative of the Sellers or any of their Affiliates). The Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

**ARTICLE VI**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to the Sellers that:

6.1    Organization and Good Standing.   Purchaser is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    Authorization of Agreement.

(a)    Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the

BQHC 00620

BQHC 00512-00109

consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(b)      Wyckoff has full corporate power and authority to execute and deliver this Agreement, and to perform its obligations under the Sections identified above its name on the signature page hereof. The execution, delivery and performance by Wyckoff of this Agreement has been duly authorized by all necessary corporate action on behalf of Wyckoff. This Agreement has been duly executed and delivered by Wyckoff, and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement constitutes, the legal, valid and binding obligations of Wyckoff, enforceable against Wyckoff in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3      Conflicts; Consents of Third Parties.

(a)      To Purchaser's Knowledge, except as described on Schedule 6.3(a), neither Wyckoff nor Purchaser is required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Wyckoff or Purchaser, the compliance by Wyckoff or Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Wyckoff or Purchaser of any other action contemplated hereby or thereby, except for (i) the Healthcare Regulatory Consents and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Contemplated Transactions.

(b)      Except as set forth on Schedule 6.3(b), to Purchaser's Knowledge, none of the execution and delivery by Wyckoff or Purchaser of this Agreement or any of

BQHC 00621

BQHC 00512-00110

the Purchaser Documents, the consummation of the Contemplated Transactions by Purchaser, or compliance by Wyckoff or Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Wyckoff or Purchaser is a party or by which any of the properties or assets of Wyckoff or Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.4    Litigation.    Except as set forth in Schedule 6.4, there are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Wyckoff or Purchaser, or to which Wyckoff or Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Wyckoff or Purchaser to perform their respective obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.  Other than as set forth in Schedule 6.4, neither Wyckoff nor Purchaser is subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Wyckoff and Purchaser to perform their respective obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

6.5    Financial Advisors.    No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6    Healthcare Regulatory Compliance Status.

(a)    To the Knowledge of Purchaser, except as described on Schedule 6.6, neither Wyckoff, Purchaser nor any of their Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Body which, if determined or resolved adversely, would have a material adverse impact on the ability of Purchaser to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Purchaser to conduct the Business and to own or use the Purchased Assets, as the Business is conducted and the Purchased Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Purchaser or the performance by Wyckoff or Purchaser of any of their respective material obligations under this Agreement.

(b)    To Purchaser's Knowledge, neither Purchaser, Wyckoff nor any of their respective members, directors or officers has (i) been indicted or convicted of a crime, (ii) been suspended or excluded from the Healthcare Programs, (iii) had a professional license suspended or revoked, or (iv) had a Certificate of Need application

BQHC 00622

BQHC 00512-00111

denied or failed to pass a character and competency review by DoH or comparable Governmental Body of another state. To the Knowledge of Purchaser, there is no reason why Purchaser's officers and directors should fail to obtain character and competency approval by DoH in connection with DoH's review of the CON Application.

6.7    Acknowledgement Regarding Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that the Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by SVCMC to Purchaser in Article V hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred to Purchaser on a "where is" and, as to condition, "as is" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of SVCMC set forth in Article V hereof (as modified by the Schedules hereto as supplemented or amended). Purchaser further represents that none of the Sellers nor any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Sellers, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of the Sellers, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its Affiliates of, any such information, including any confidential memoranda distributed on behalf of any Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Business and the transactions contemplated hereby. Purchaser acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has, or will have, relied on the results of its own independent investigation. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT THE SELLERS HAVE NOT MADE ANY REPRESENTATION RELATING TO THE OWNED PROPERTY OR ANY PROPERTY THAT IS THE SUBJECT OF A REAL PROPERTY LEASE REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, ENVIRONMENTAL LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE LAND, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES REGULATIONS OR ORDINANCES.

BQHC 00623

BQHC 00512-00112

PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

     6.8   No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article VI (as modified by the Schedules hereto) and, if Purchaser makes the Third-Party Financing Election, in the Third-Party Financing Certificate, Purchaser nor any other Person makes any other express or implied representation or warranty with respect to Purchaser or the transactions contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of its officers, directors, employees, agents or other Representatives.  Except for the representations and warranties contained in this Article VI (as modified by the Schedules hereto) and, if Purchaser makes the Third-Party Financing Election, in the Third-Party Financing Certificate, Purchaser disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Sellers or their respective Representatives (including any opinion, information, projection, or advice that may have been or may be provided to any Seller by any director, officer, employee, agent, consultant, or other Representative of Purchaser or any of its Affiliates).  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

     7.1   Approval of Break-Up Fee.  In consideration for Purchaser and Wyckoff having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, SVCMC shall pay Purchaser a break-up fee in an amount equal to one million dollars ($1,000,000) (the "Break-Up Fee") on the first Business Day following the date of consummation of a transaction that is a Competing Bid (as hereinafter defined) or five (5) Business Days after the valid termination of the definitive agreement therefore, along with and up to four hundred thousand dollars ($400,000) of the reasonable out-of-pocket expenses incurred by Purchaser and Wyckoff up to such date (the "Expense Reimbursement").  The Sellers acknowledge and agree that (i) the approval of the Break-Up Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of SVCMC's obligation to pay the Break-Up Fee and Expense Reimbursement and its agreement to request such status, Purchaser would not have entered into this Agreement, (iii) the entry of Purchaser into this Agreement is necessary for preservation of the estates of the Sellers and is beneficial to the Sellers, (iv) the Break-Up Fee and Expense Reimbursement are reasonable in relation to Purchaser's and Wyckoff's efforts and to the magnitude of the transactions contemplated hereby, and (v) time is of the essence with respect to entry of the Bidding Procedures Order.

     7.2   Competing Transaction.

59

BQHC 00624

BQHC 00512-00113

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by SVCMC of higher or better competing bids (each a "Competing Bid").

(b)     From the date of this Agreement until the earlier of the date that the Bankruptcy Court enters the Bidding Procedures Order or the termination of this Agreement, except as otherwise required by the Bankruptcy Court, the Sellers shall not, and shall cause their respective Affiliates and officers, trustees, employees, agents and representatives not to directly or indirectly, solicit or initiate any inquiry, offer or proposal from any Person regarding the sale or other disposition of all or any part of the Purchased Assets; provided, however, that the Sellers and their respective Representatives shall be permitted at all times to respond to any unsolicited inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of the Sellers to prospective purchasers and negotiating a Competing Bid. For the avoidance of doubt, any statements made by the Sellers in the Bidding Procedures Motion or in the hearing in connection therewith shall not be deemed to be a solicitation for purposes of this Agreement. Prior to the Sellers furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Purchased Assets, SVCMC must enter into a customary confidentiality agreement with such Person on terms no less favorable to SVCMC than those contained in Section 8.6.

(c)     Following the entry of the Bidding Procedures Order by the Bankruptcy Court and until the Contemplated Transactions are consummated, the Sellers are permitted to cause their respective Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Purchased Assets, alone or in connection with the sale or other disposition of any other asset of the Sellers. In addition, during such time period, the Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of the Sellers to prospective purchasers.

7.3     Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, but in no event later than ten (10) Business Days after the date of this Agreement, SVCMC shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, including the Break-Up Fee and the Expense Reimbursement, and the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Break-Up Fee and the Expense Reimbursement. Purchaser agrees that it will promptly take such actions as are reasonably requested by SVCMC to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this

Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, SVCMC shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within three (3) Business Days a copy of the relevant notice of appeal or order of stay. SVCMC shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

7.4    Notice of Sale. Notice of the sale of Purchased Assets contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable Law (including, to the extent applicable, Bankruptcy Rules 2002, 3016, 3017 and 6004 and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice under applicable Law.

7.5    Treatment of Monetary Obligations. All monetary obligations of the Sellers, including any and all indemnification claims asserted by Purchaser under this Agreement shall be entitled to administrative expense priority in the Sellers' chapter 11 cases pursuant to sections 503(b) and 507(a) of the Bankruptcy Code. To the extent the Sellers' liability on such claims shall be fixed prior to confirmation of a chapter 11 plan for the Sellers, such claims shall be paid on or prior to the effective date of such plan. To the extent that the Sellers' liability on such claims remains contingent at confirmation of a chapter 11 plan for SVCMC and has not previously been assumed by a successor in interest to SVCMC pursuant to a sale approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code, such plan shall provide for (i) assumption of such claims by the reorganized SVCMC on the effective date of the plan, (ii) assumption of such claims by any successor in interest to SVCMC on the effective date of such plan, or (iii) if there is no reorganized SVCMC or successor that has assumed such obligations, the establishment on the effective date of such plan of a cash reserve, letter of credit or similar financial instrument, that is available to satisfy such claims in an amount and on terms to be agreed to among SVCMC and Purchaser or, if no agreement is reached, as determined by the Bankruptcy Court.

## ARTICLE VIII

## COVENANTS

8.1    Access to Information. Subject to Section 2.9 and the other provisions of this Section 8.1 and subject to compliance with applicable Antitrust Laws, the Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to make such investigation of the assets, properties and operations of the Business and such examination of the books and records of the Sellers pertaining to the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access (i) the books, records and Documents referred to in Section 2.2(h), (ii) any books, records or Documents that SVCMC

BQHC 00626

BQHC 00512-00115

reasonably determines that access to which by Purchaser would be competitively disadvantageous to the Sellers in any material respect or (iii) any books, records or Documents the disclosure of which by a Seller to Purchaser would (A) notwithstanding Section 2.9, violate any patient confidentiality obligation of a Seller or (B) any other agreement or any obligation of confidentiality to which a Seller is a party or is bound prior to the date hereof or (C) any obligation of confidentiality by which a Seller is bound under applicable Law.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one of the Persons identified on Schedule 8.1 and any access to any of the Facilities by Purchaser must be approved by one of such Persons, and Purchaser's access to such information shall be subject to any restrictions on disclosure by a Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which a Seller is a party or is bound prior to the date hereof or under applicable Law.  The Sellers shall cause their respective Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with the Sellers and their respective Representatives and shall use their commercially reasonable efforts to minimize any disruption to each Seller's business and operations, including the Business. Notwithstanding anything herein to the contrary, no Seller shall be required to permit any such investigation or examination if, and to the extent that, SVCMC, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of  any attorney-client or attorney work product privilege available to a Seller.

    8.2    <u>Conduct of the Business Pending the Closing.</u>

    (a)    Prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), SVCMC (and, except with respect to clauses (ii), (viii), (ix) and (x) below, the PCs) shall:

    (i)    conduct the Business only in the Ordinary Course of Business;

    (ii)    use its commercially reasonable efforts to retain the provider numbers for the Hospitals' Medicare and Medicaid programs, and other major payors;

    (iii)    use its commercially reasonable efforts to (A) maintain the Purchased Assets in good working order and condition consistent with past practices, ordinary wear and tear excepted and (B) maintain the insurance coverage currently in place with respect to the Purchased Assets (or comparable replacement coverage);

BQHC 00627

BQHC 00512-00116

(iv)    perform when due all obligations under the Assigned Contracts, Purchased Real Property Leases and Purchased Intellectual Property Licenses except to the extent such performance is excused under the Bankruptcy Code or by order of the Bankruptcy Court or refusal to perform is justified by valid business reasons (e.g., failure of counterparty to perform);

(v)     comply in all material respects with all material Laws and Orders pertaining to the Business;

(vi)    accurately maintain the books and records of the Business consistent with past practice;

(vii)   operate the Business consistent with past practices in substantially the same manner as presently conducted, using commercially reasonable efforts consistent with past practices to preserve the goodwill thereof and such Seller's relationships with the patients, suppliers and others with whom it deals;

(viii)  use its best efforts to undertake and complete all corrective actions for those Environmental Compliance Matters set forth on Schedule 8.2(a)(viii); provided, however, that to the extent the Sellers have not completed all such corrective actions prior to the Closing, either (A) the Sellers shall promptly complete such corrective actions following the Closing and Purchaser shall provide the Sellers and Sellers' Representatives (including its environmental consultant) such limited, non-exclusive access to the Facilities during normal business hours as is reasonably necessary for the performance of all remaining corrective actions or (B) at Purchaser's option, Purchaser may complete any remaining corrective actions after the Closing and the Sellers or their successors shall reimburse Purchaser for Purchaser's reasonable out of pocket expenses in so doing;

(ix)    use its commercially reasonable efforts to make all capital expenditures set forth on Schedule 8.2(a)(ix); provided, that to the extent that SVCMC has not made all such capital expenditures prior to the Closing, SVCMC shall be responsible for Purchaser's reasonable out-of-pocket costs incurred in making any such capital expenditures following the Closing Date that were not made prior to the Closing Date; and

(x)     take the actions set forth in Schedule 8.2(a)(x) to resolve the accreditation requirements for improvement identified by the JCAHO on Schedule 8.2(a)(x) in the time frame set forth by the JCAHO.

(b)     Except (1) as set forth on Schedule 8.2(b), (2) as required by applicable Law, (3) as otherwise contemplated by this Agreement or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), each Seller shall not, solely as it relates to the Business:

BQHC 00628

BQHC 00512-00117

(i)  other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any employee who works in the Business, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any employee who works in the Business, (C) with respect to any employee who works in the Business, increase the coverage or benefits available under any (or create any new) Plan or (D) except for any key employee retention plan or similar agreement that has been approved by the Bankruptcy Court, enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) with any employee who works in the Business, except, in each case, as required by applicable Law from time to time in effect or by any of the Plans or the employee pension plans maintained by the Sellers;

(ii)  subject any of the Purchased Assets to any Lien, except for Permitted Exceptions; provided, however, that nothing herein shall prevent a Seller from granting any Lien on Purchased Assets in connection with any debtor-in-possession financing approved by the Bankruptcy Court;

(iii)  acquire any material properties or assets that would be Purchased Assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(iv)  cancel or compromise any material debt or claim or waive or release any material right of a Seller that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)  enter into any commitment for capital expenditures in excess of $100,000 for any individual commitment and $300,000 for all commitments in the aggregate;

(vi)  enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(vii)  permit or allow relocation of (other than within the Facilities or onto the Facilities from other locations), or changes in, or disposition of, any services or programs of the Business;

(viii)  other than in the Ordinary Course of Business, remove from the Purchased Real Property any Furniture and Equipment or other tangible personal property used in the Ordinary Course of Business without replacing such property with substantially equivalent or better property; or

(ix)  agree to do anything prohibited by this Section 8.2(b).

BQHC 00629

BQHC 00512-00118

(c)     SVCMC shall notify Purchaser of any written notice given prior to Closing to any other party to a Material Contract that such party is in default thereunder or in breach thereof, which default or breach remains uncured, or any notice of termination thereof.

8.3     Consents; Insurance.

(a)     Each Seller shall use its commercially reasonable efforts, and Purchaser and Wyckoff shall each cooperate with the Sellers, including by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by the Sellers (including all consents listed in Schedule 5.3(a)), and to give at the earliest practicable date any notices required to be given by the Sellers, in order for the Sellers to consummate the transactions contemplated by this Agreement on the terms and in the manner provided hereby; provided, however, that no Seller shall be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.4 and except for a proceeding with respect to the Contemplated Transactions required by Sections 510 and 511 of the N-PCL. Each of Purchaser and Wyckoff shall use its commercially reasonable efforts, and the Sellers shall cooperate with them, including by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, licenses and Permits required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the transactions contemplated by this Agreement on the terms and in the manner provided hereby and to operate the Business after the Closing; provided, however, that neither Purchaser nor Wyckoff shall be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Body) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4. Other than amounts to be paid by Purchaser pursuant to Section 2.5, nothing contained herein shall require the Sellers to expend any funds in order to remove or eliminate any Lien on any Purchased Asset in order to deliver such Purchased Asset to Purchaser pursuant to this Agreement free of such Lien; provided, however, in respect of any such Lien, Purchaser nevertheless shall not be required to consummate the Contemplated Transactions unless the conditions referred to in Sections 10.1 are satisfied or waived by Purchaser.

(b)     As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Business consistent with what would be maintained under good industry business practices.

8.4     Regulatory Approvals.

(a)     Purchaser shall, at its own cost and expense, (i) within three (3) Business Days of the date of this Agreement, provide to SVCMC a draft of the CON Application (which draft CON Application and the contents thereof shall be kept strictly

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00630

BQHC 00512-00119

confidential by SVCMC, not disclosed to any third party without the written consent of Purchaser, and only disclosed to Representatives who need to see the draft CON Application for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential) and consult with SVCMC regarding such application; (ii) within three (3) Business Days after the entry of the Bidding Procedures Order by the Bankruptcy Court, cooperate with SVCMC in initiating informal discussions with DoH concerning the form and substance of the CON Application; (iii) within three (3) Business Days after the entry of the Sale Order by the Bankruptcy Court, formally submit the CON Application to DoH; and (iv) promptly after the entry of the Sale Order by the Bankruptcy Court, submit to OMH, OASAS and any other Governmental Body all other applications for any Healthcare Regulatory Consents required in order for Purchaser to consummate the Contemplated Transactions and to operate the Business in accordance with Law (collectively with the CON Application, the "Healthcare Applications"). Purchaser shall provide SVCMC with an opportunity to review the Healthcare Applications in advance of filing, and both parties shall cooperate in the preparation and prosecution of the Healthcare Applications. Purchaser shall diligently prosecute the Healthcare Applications and shall timely submit all information and documents requested in connection therewith by DoH, OMH or OASAS and any other Government Body. Without limiting the generality of the foregoing, Purchaser shall take such actions as may be reasonably necessary to cure any character or competency objection that DoH may raise to the CON Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DoH. Purchaser shall provide SVCMC with prompt written notice of Purchaser's submission of a Healthcare Application. Within five (5) Business Days of its submission or receipt, Purchaser shall deliver to SVCMC a complete copy of all correspondence to or from DoH, OMH, OASAS or any other applicable Governmental Body having jurisdiction concerning a Healthcare Application. Purchaser shall provide SVCMC with periodic reports of Purchaser's efforts to obtain all Healthcare Regulatory Approvals. In addition, Purchaser shall provide SVCMC with notice as promptly as practicable of its receipt of DoH's approval, contingent approval or a rejection of the CON Application, along with a copy of any documentation related thereto. Purchaser and Wyckoff shall not knowingly take any action prior to the Closing intended to disqualify Purchaser as an established and licensed operator of the Business.

(b)     If necessary, each of Purchaser, Wyckoff and Sellers shall use its reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days in connection with all submission to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under Antitrust Laws for information, documents, or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission (the "FTC"), the Antitrust Division of the United States

BQHC 00631

BQHC 00512-00120

Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Body in respect of such filings or the transactions contemplated by this Agreement, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction.

(c)     If necessary, each of Purchaser, Wyckoff and Sellers shall use its reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Sections 8.4(a) or 8.4(b), including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedules 5.3(a) or 6.3(a), as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the transactions contemplated by this Agreement, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Body under such Laws with respect to any such filing or any such transaction.

(d)     Each of Purchaser, Wyckoff and Sellers shall use its reasonable best efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No such party shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.

(e)     Subject to applicable law, Purchaser, Wyckoff and Sellers will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside

BQHC 00632

BQHC 00512-00121

counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(f)      Each of Purchaser, Wyckoff and Sellers shall use its reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the Donnelly Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as is in violation of any Antitrust Law, each such party shall cooperate and use its reasonable best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and SVCMC decide that litigation is not in their respective reasonable best interests. Each such party shall use its reasonable best efforts to take such action as may be required to cause the expiration of the notice periods under Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. In connection with and without limiting the foregoing, each of Purchaser, Wyckoff and Sellers agrees to use its reasonable best efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Purchaser and Sellers to close the Contemplated Transactions as expeditiously as possible. Notwithstanding anything to the contrary provided herein, Purchaser and its Affiliates shall not be required to accept or comply with any conditions, qualifications or other restrictions imposed in connection with obtaining any required approval under any Antitrust Laws other than conditions, qualifications and restrictions that would not constitute a Material Adverse Effect or have a material adverse effect on Wyckoff and its Affiliates, taken as a whole. Under no circumstances will Purchaser or Wyckoff be required under Antitrust Laws to hold separate or divest any of its or their businesses or assets.

8.5     Further Assurances.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, promptly after the discovery by a Seller or any of its Affiliates after the Closing of any item included within the definition of Purchased Assets but not transferred, conveyed or assigned to Purchaser, (i) SVCMC will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance or non-assumption of such item and provide

BQHC 00633

BQHC 00512-00122

Purchaser with all the information in the Sellers' possession about, and with access to such item as Purchaser may reasonably request, and (ii) if requested by Purchaser, the Sellers shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to transfer, convey or assign to Purchaser such item in the manner and on the terms and conditions as applicable to a Purchased Asset. In addition, if a Seller or its Affiliate after the Closing receives payment on any account receivable that is a Purchased Asset, it shall as soon as practicable remit such amount received to Purchaser, together will such information identifying the account to which such payment relates as is reasonably available to the Sellers, and, if Purchaser or its Affiliates after the Closing receives payment on any account receivable that is an Excluded Asset it shall as soon as practicable remit such amount received to SVCMC, together will such information identifying the account to which such payment relates as is reasonably available to Purchaser. Without limiting the generality of the foregoing, if Purchaser or any of its Affiliates shall at any time after the Closing receive any charitable gift, contribution or bequest that might be an Excluded Asset, or receives any notice that such a charitable gift, contribution or bequest may be received or available to Purchaser, Purchaser shall give notice thereof to SVCMC and make available to SVCMC upon reasonable request such information that Purchaser or any of its Affiliates has available to it regarding such gift, contribution or bequest and will cooperate with SVCMC in determining whether such gift, contribution or bequest should be characterized as an Excluded Asset or a Purchased Asset. The provisions of this Section 8.5 shall survive the Closing.

8.6    Confidentiality.

(a)    From and after the date hereof, Wyckoff and Purchaser shall, and shall cause their respective Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of the Sellers, and not use to the detriment of the Sellers, any Seller Confidential Information relating to or obtained from the Sellers or their Representatives. For purposes of this Section 8.6, "Seller Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities, the Business, the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Wyckoff or Purchaser or any of their Representatives, (ii) becomes available to Wyckoff or Purchaser on a non-confidential basis from a source other than the Sellers or their Representatives, provided that such source is not known by Wyckoff or Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, the Sellers, (iii) is lawfully received by Wyckoff or Purchaser from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure or (iv) can be shown by Wyckoff or Purchaser through written documents or evidence maintained by Wyckoff or Purchaser to have been independently developed by either of them; and provided further, that upon the Closing, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to

BQHC 00634

BQHC 00512-00123

the Purchased Assets, the Assumed Liabilities or the Business. Wyckoff and Purchaser may disclose any of the Seller Confidential Information to their Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. Wyckoff and Purchaser shall instruct their Representatives having access to the Seller Confidential Information of such obligation of confidentiality. If Wyckoff or Purchaser or anyone to whom they have transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Wyckoff or Purchaser shall provide the respective Seller with prompt notice prior to making any disclosure so that such Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or such Seller waives compliance with the provisions of this Section 8.6, Wyckoff or Purchaser shall furnish only that portion of the Seller Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(b)     From and after the date on which the Sale Order is entered, unless this Agreement is terminated, the Sellers shall, and shall cause their Representatives to, maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) operating the Other Businesses in the ordinary course before and after the Closing Date, (iii) any investigations by Governmental Bodies, (iv) compliance activities prior to or after the Closing related to periods occurring prior the Closing Date, (v) any Legal Proceedings, (vi) enforcing any rights or other claims of the Sellers under this Agreement, (vii) performing any obligations of the Sellers under this Agreement, including billing and collecting Pre-Closing Account Receivable and other related activities, or (viii) as permitted by the Medical Records Custody Agreement. For purposes of this Section 8.6(b), "Business Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Purchased Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, the Excluded Liabilities or the Other Businesses, including methods of operation, patient information, prices, fees, costs, Technology, Software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by the Sellers or any of their Representatives, (ii) becomes available to the Sellers on a non-confidential basis from a source other than the Sellers or their Representatives, provided that such source is not known by the Sellers to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by the Sellers from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. The Sellers may disclose any of the Business Confidential Information to their Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential. The Sellers shall instruct their Representatives having access to the Business Confidential Information of such obligation of confidentiality. If a Seller or anyone to whom it has transmitted

BQHC 00635

BQHC 00512-00124

Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information, such Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 8.6(b), such Seller shall furnish only that portion of the Business Confidential Information that they are advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 8.6 shall survive the Closing.

8.7     Preservation of Records.  The Sellers and Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the operation of the Business prior to the Closing Date for a period of seven (7) years from the Closing Date or the maximum period of time required by law, whichever is longer, and shall, subject to Section 2.9, make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, Purchaser's operation of the Business, any insurance claims by, Legal Proceedings or tax audits against or other governmental or healthcare payor investigations or audits of the Sellers or Purchaser or any of their Affiliates or in order to enable the Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby or to enable Purchaser to operate the Business after the Closing Date in the manner operated by the Sellers prior to the Closing Date.  In the event the Sellers or Purchaser wish to destroy such records before or after that time, such party shall first give ninety (90) days prior written notice to the other party and, if it is then existing and functioning, to the Creditors' Committee, and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8     Publicity. Each of the Sellers, Purchaser and Wyckoff agrees that it shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of either Purchaser or SVCMC, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.

8.9     Use of Name.  Purchaser agrees that it shall (i) as soon as practicable after the Closing Date and in any event within ninety (90) days following the Closing Date, cease to make any use of the name "Saint Vincents Catholic Medical Centers" or any variation thereon or derivative thereof (including "St. Vincent's") or any service marks,

BQHC 00636

BQHC 00512-00125

trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing any of the foregoing, including any name or mark confusingly similar thereto (collectively, the "SVCMC Marks"), except that Purchaser may make historical references to the fact that the Purchased Assets were formerly owned by SVCMC, and (ii) immediately after the Closing, cease to hold itself or its Affiliates out as having any affiliation or association with SVCMC or any of its Affiliates. In furtherance thereof, as promptly as practicable but in no event later than ninety (90) days following the Closing Date, Purchaser shall remove, strike over or otherwise obliterate all SVCMC Marks from all materials including any vehicles, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, computer software and other materials; provided, that so long as Purchaser uses any SVCMC Marks and has not removed all SVCMC Marks from all materials, Purchaser shall comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the National Conference of Catholic Bishops, as amended from time to time. Purchaser shall also take, and cooperate with the Sellers in taking, such actions as are reasonably necessary to change all telephone book listings of the Business. After the Closing, as between Purchaser and the SVCMC, Purchaser shall have all rights to the names "Mary Immaculate Hospital" and "Saint John's Queens Hospital" and any variation thereon or derivative thereof or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia containing any of the foregoing, including any name or mark confusingly similar thereto (a "Facility Mark"), it being understood and agreed, however, that SVCMC's right, title and interest in the Facility Marks are among the Purchased Assets; provided, that Purchaser acknowledges that, in order to use such names, it must first obtain the consent of the Diocese of Brooklyn of the Roman Catholic Church, including, as may be required, compliance with the conditions (including the ethical and religious directives) for the operation of a healthcare facility that is associated with the Church, and no representation, warranty, understanding or assurance is provided by SVCMC or its Affiliates as to Purchaser's ability to obtain such consent and the failure by Purchaser to obtain such consent shall not relieve it of any of its obligations under this Agreement.

8.10    Supplementation and Amendment of Schedules.  Each of the parties may, at its option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules shall constitute a disclosure for all purposes of this Agreement notwithstanding any reference to a specific section in a Schedule, and all such information shall be deemed to qualify the entire Agreement and not just such section.  From time to time prior to the Closing, each party shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement.  No such supplement or amendment shall have any effect on the satisfaction of the condition to closing set forth in Section 10.1(a) or 10.2(a), as applicable; provided, however, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to

BQHC 00637

BQHC 00512-00126

Article XI hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

8.11    Covenant Not to Solicit Employees.  The Sellers agree that they have invested, and that Purchaser will invest, substantial time and effort in assembling and training their staff and personnel.  In addition, as a result of employment by the Sellers and Purchaser, such personnel have gained, or will gain, knowledge of the business affairs, marketing, patients and methods of operation of the Business that the Sellers agree are confidential information and trade secrets of the Business and Purchaser.  Accordingly, throughout the three (3) year period immediately after the Closing, each Seller shall not, and shall not permit any of its Affiliates to, at any time, directly or indirectly, solicit, encourage, entice or induce for employment any employee of Purchaser.  For the avoidance of doubt, the foregoing shall not prevent a Seller or its Affiliates from hiring an employee of Purchaser who approaches a Seller or its Affiliates without solicitation or who answers a general public solicitation for employment that is not targeted at employees of Purchaser.

8.12    Covenant Not to Compete.    Throughout the five (5) year period immediately after the Closing, each of the Sellers shall not, and the Sellers shall not permit any of its Affiliates to, at any time, (i) directly or indirectly, own, operate, manage or control any hospital or healthcare facility required to be licensed under either Article 28 of the New York Public Health Law or Article 31 of the New York Mental Hygiene Law that renders such licensed services in Queens County, New York or (ii) sponsor any controlled professional corporation that renders professional healthcare services in Queens County, New York.  Notwithstanding the foregoing and without agreeing (implicitly or otherwise) that the following activities would otherwise be subject to the provisions of this Section 8.12, nothing in this Agreement shall preclude, prohibit or restrict a Seller or any of its Affiliates from engaging in any manner in the current and contemplated businesses listed in Schedule 8.12.    Notwithstanding anything to the contrary contained herein, this Section 8.12 shall not apply to (or in any way restrict) any private practices owned, managed, operated or controlled now or in the future by any of the staff of, or any physicians affiliated with, the Sellers or their Affiliates, provided, that such practice is not now or in the future directly or indirectly (in whole or in part) owned, managed, administered or controlled by the Sellers or their Affiliates.

8.13    Final Cost Report.  SVCMC shall file or cause to be filed the final Cost Reports for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other third party payor or Governmental Body as a result of the consummation of the Contemplated Transactions.  SVCMC shall assume and be responsible for any liability incurred as a result of the filing of any of said reports or as a result of filing any previous Cost Report for periods prior to the Closing and shall be entitled to receive any refund or other benefit which may result from the filing of said reports or otherwise allocable to periods prior to the Closing.  Such reports shall be prepared in accordance with applicable Law and consistent with past practices.  SVCMC shall provide Purchaser with copies of said reports within a reasonable period of time prior to the filing thereof in order for Purchaser to review and provide SVCMC with comments thereon solely regarding reimbursement issues for periods after the Closing.

BQHC 00638

BQHC 00512-00127

SVCMC shall consider but not be required to make, Purchaser's changes and shall determine in its reasonable discretion whether or not to incorporate Purchaser's comments into any such Cost Report, by amendment or otherwise.  SVCMC shall provide to Purchaser copies of all such documents promptly after filing.

8.14   Cooperation.  The Sellers, Purchaser and Wyckoff agree to reasonably cooperate with each other, from the date hereof up through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement

8.15   Expiring Real Property Leases.

(a)   Sellers acknowledge that the lease covering the real property at JFK Airport in which CMCOHS primarily conducts its business has expired, CMCOHS is currently occupying the premises on a month-to-month basis, and CMCOHS and SVCMC are currently negotiating the terms of a new lease with the landlord of the premises.  SVCMC and CMCOHS hereby agree not to enter into a new lease for such property unless such lease is on terms reasonably acceptable to Purchaser and permits the assignment thereof to Purchaser or its designee on the Closing Date.

(b)   Promptly following the date hereof, SVCMC shall provide Purchaser with a list of all Purchased Real Property Leases that are subject to expiration or termination on or before March 31, 2007, and all Purchased Real Property Leases that are subject to automatic renewal before such date (or thereafter if the date by which any termination notice need be given is before such date). Purchaser shall, within thirty (30) days after its receipt of such list, notify SVCMC in writing of those expiring Purchased Real Property Leases that it desires to have continued.  SVCMC shall cooperate and consult with Purchaser in using their reasonable efforts to extend those Purchased Real Property Leases set forth on Purchaser's notice, on such terms as are reasonably acceptable to Purchaser, subject to the approval of the Creditors' Committee and the Bankruptcy Court.   Any Purchased Real Property Lease subject to expiration or termination on or before March 31, 2007 that is not contained on Purchaser's notice shall cease to be included among the Purchased Real Property Leases.

8.16   Surrender of Operating Certificate.  Following Closing and in accordance with the timing and other requirements of applicable Law, SVCMC shall surrender all operating certificates issued to it by DoH relating to the Hospitals.

8.17   Responsibility for Pre-Closing Medicare and Medicaid Liabilities.

(a)   The parties acknowledge that HHS has informed them that it expects to approve the assignment to and assumption by Purchaser of SVCMC's Medicare provider number and provider agreement identified in Schedule 2.1(n), subject to (i) SVCMC's agreement that it will remain primarily liable for any overpayments or other Liabilities arising out of events occurring before the Closing under such provider agreement and (ii) Purchaser's agreement to be secondarily liable for such overpayments or other Liabilities, but only to the extent that CMS has been unable to recoup such

BQHC 00639

BQHC 00512-00128

overpayments or other Liabilities from SVCMC (including from SVCMC under the provider number and provider agreement of Saint Vincents Hospital Manhattan, which is not being transferred hereunder), it being understood that, as provided elsewhere herein, the Additional Pre-Closing Liabilities shall be assumed by Purchaser hereunder and, accordingly, after the Closing, Purchaser will be primarily responsible for payment thereof. HHS has notified the parties that the U.S. Attorney's Office, in conjunction with the HHS Office of General Counsel, Region II, New York, is drafting a written agreement embodying the foregoing (the "Medicare Agreement"). The parties shall cooperate in working with HHS and the U.S. Attorney's Office, and use their commercially reasonable efforts, to finalize and execute the Medicare Agreement as soon as practicable. In the event that Purchaser, after the Closing, shall receive (i) any payment from HHS in respect of any underpayment of amounts payable to SVCMC under the Medicare provider number and provider agreement identified in Schedule 2.1(n) arising out of events occurring prior to the Closing (a "Pre-Closing Underpayment") or (ii) any credit against any overpayment by HHS owed by Purchaser to HHS under such provider number and provider agreement in respect of a Pre-Closing Underpayment (other than a credit against any overpayment or other Liaiblity arising out of events occurring prior to the Closing or against any Additional Pre-Closing Liabilities), then Purchaser shall promptly pay to SVCMC the amount of such underpayment received or such credit. Each of Purchaser and SVCMC shall make available to the other such information as the other shall reasonably request, and otherwise cooperate with the other in determining the amount of any overpayment made by HHS to SVCMC or other Liability owed by SVCMC to HHS or underpayment of amounts payable by HHS to SVCMC under the provider number and provider agreement identified in Schedule 2.1(n) in respect of any event occurring before the Closing. Purchaser shall not accept any such determination or enter into any settlement in respect thereof without SVCMC's consent and, at SVCMC's request, direction and expense, shall appeal in accordance with the laws and regulations governing Medicare any determination by HHS that any overpayment has been made by HHS or Liability is owed by SVCMC to HHS or of the amount of any underpayment payable by HHS to SVCMC under such provider number and provider agreement.

(b)     The parties shall cooperate to obtain from the State of New York, as soon as practicable, an agreement in substance similar to the Medicare Agreement, except that it will apply to overpayments made under the Medicaid program instead of the Medicare program (the "Medicaid Agreement").

(c)     Neither the Medicare Agreement, the Medicaid Agreement, nor anything contained therein, shall be construed to limit SVCMC's indemnification obligations hereunder.

8.18    Repair of Damage; Condemnation.

(a)     In the event that between the date hereof and the Closing Date, there is any damage to any tangible personal property or real property that is a Purchased Asset, Purchaser shall accept the Purchased Assets in their then-current condition and

BQHC 00640

BQHC 00512-00129

proceed with the Closing, in which case Purchaser will be entitled to an assignment of all of the Sellers' rights to any insurance proceeds covering such damage.

(b)     In the event that between the date hereof and the Closing Date, any tangible personal property or real property that is a Purchased Asset is subject to a taking by any Governmental Body, Purchaser shall accept the Purchased Assets in their then-current condition and proceed with the Closing, in which case Purchaser will be entitled to an assignment of all of the Sellers' rights to any award (to the extent relating to such Purchased Assets) in connection with such taking.  In the event of any such taking, the Sellers shall not compromise, settle or adjust any claims to such award without Purchaser's prior written consent, which may not be unreasonably withheld, delayed or conditioned.

(c)     SVCMC shall give Purchaser prompt notice if any tangible personal property or real property that is a Purchased Asset is (i) taken by a Governmental Body where SVCMC reasonably estimates that the value of the property taken is equal to or exceeds fifty thousand dollars ($50,000) or (ii) damaged or destroyed where SVCMC reasonably estimates that the damage to the property is equal to or exceeds fifty thousand dollars ($50,000).

(d)     Nothing contained in this Section 8.18 shall affect Purchaser's right to terminate this Agreement pursuant to Section 4.4(b)(iii).

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Offers of Employment.

(a)     All Employees as of immediately before the Closing who are represented by a labor union and whose terms and conditions of employment are governed by the Assumed CBAs shall become employees of Purchaser as of the Closing Date; such employees are referred to herein collectively as the "Transferred Union Represented Employees".  At the Closing, Purchaser will assume the obligations with respect to the terms and conditions of employment of the Transferred Union Represented Employees provided by the Assumed CBAs accruing from and after the Closing Date.  The Sellers shall be responsible for those obligations accruing prior to or on the Closing Date, except that Purchaser shall assume the liabilities of the Sellers for (i) delinquent contributions (and any penalties and interest thereon) existing as of the Closing Date with respect to the Local 1199 MultiEmployer Plan to the extent that such Liabilities are included in the Final Fixed Amount (as finally agreed or determined in accordance with Section 3.6) and (ii) all accrued and unpaid vacation, sick days, holidays, personal days and other paid time off to which the Transferred Union Represented Employees are entitled under the Assumed CBAs, as part of the Fixed Assumed Liabilities referred to in Schedule 3.6(a) and subject to the adjustment provided by Section 3.6 to the extent all Fixed Assumed Liabilities exceed the Target Fixed Amount.  The Sellers shall indemnify Purchaser, and Purchaser shall indemnify the Sellers, in accordance with Article XI from

BQHC 00641

BQHC 00512-00130

and against any Liabilities arising out of the obligations under the Assumed CBAs for which the other is not responsible in accordance with this Section 9.1(a). Purchaser and the Sellers shall cooperate with each other in entering into such instruments of assignment or agreements supplemental to the Assumed CBAs as shall be reasonably requested in order to give effect to the provisions of this Article IX.

(b)    Not later than thirty (30) Business Days prior to the Closing, SVCMC shall deliver to Purchaser Schedule 5.13(a).  Not later than ten (10) Business Days prior to the Closing, Purchaser shall deliver an offer of employment to those Employees listed on Schedule 5.13(a) (other than any Transferred Union Represented Employees).  Purchaser shall likewise deliver as soon as practicable such an offer to any individual not included on Schedule 5.13(a) that between the date of the delivery of Schedule 5.13(a) and the Closing Date is hired by, or transferred to, the Business as an Employee (other than a Transferred Union Represented Employee) consistent with the provisions in Section 8.2.  Such individuals who accept such offer of employment, together with all Transferred Union Represented Employees, are hereinafter referred to as the "Transferred Employees."  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-34 IRB 320, (i) Purchaser and the Sellers shall report on a predecessor/successor basis as set forth therein, (ii) the Sellers will not be relieved from filing a Form W-2 with respect to any Transferred Employees and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Employees are employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by the Sellers.  In making any offers to Employees, Purchaser shall not be obligated to change the nature of the employment of any Employee other than changing the Employee's employer (for example, Employees at will shall continue to be Employees at will).

9.2    Employment Terms; Employee Benefits.

(a)    Purchaser shall provide, or cause to be provided, for a period ending not earlier than the end of the third (3rd) month following the Closing Date or such longer period of time required by applicable Law, to each of the Transferred Employees, other than the Transferred Union Represented Employees, compensation (including salary, wages and opportunities for commissions, bonuses, incentive pay, overtime and premium pay) and a position of employment that are, in the aggregate, substantially equivalent to those provided to such Transferred Employee immediately prior to the Closing; it being understood that any compensation paid under the program described in Item 2 of Schedule 5.6 shall be disregarded in determining substantially equivalent compensation for purposes of this paragraph.  Purchaser will provide benefits to Transferred Employees, other than Transferred Union Represented Employees, in accordance with those benefit plans and policies of Purchaser as may be applicable to such Transferred Employees.

(b)    For purposes of eligibility and vesting (but not benefit accrual) under the employee benefit plans of Purchaser providing benefits to Transferred Employees other than Transferred Union Represented Employees (the "Purchaser

BQHC 00642

BQHC 00512-00131

Plans"), Purchaser shall credit each such Transferred Employee with his or her years of service with the Sellers and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Plan. The Purchaser Plans shall not deny any such Transferred Employees coverage on the basis of pre-existing conditions (to the extent not excluded under any similar Plan) and shall credit against any deductibles provided by such Purchaser Plan in respect of a Transferred Employee's participation in the Purchaser Plans for the year in which the Closing occurs for any out-of-pocket expenses paid by the Transferred Employee before the Closing during such year.

(c)     Subject to the Sellers' compliance with Section 9.1 and except as provided in Section 9.2(a), nothing contained in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee. No provision of this Agreement will create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of the Sellers in respect of continued employment (or resumed employment) with either the Business or Purchaser, and no provision of this Agreement will create any such rights in any such Persons in respect of any benefits that may be provided, directly or indirectly, under any Plan or any plan or arrangement which may be established or maintained by Purchaser. No provision of this Agreement will constitute a limitation on rights to amend, modify or terminate any employee benefit or welfare plan or arrangement of Purchaser.

(d)     As between Purchaser and the Sellers, Purchaser shall be responsible for all Liabilities with respect to the Transferred Employees referenced in Section 9.1(b) attributable to their accrued and unused vacation, sick days, personal days and other paid time off credit through the Closing Date, as part of the Fixed Assumed Liabilities referred to in Schedule 3.6(a) and subject to the adjustment provided by Section 3.6 to the extent all Fixed Assumed Liabilities exceed the Target Fixed Amount.

(e)     The sale of the Purchased Assets and the Business is intended to satisfy the requirements of Section 4204 of ERISA. The Sellers shall only be responsible for contributions due or accrued through the Closing Date to any Multiemployer Plan. Purchaser agrees, solely for purposes of Section 4204 of ERISA, to contribute with respect to the Business for substantially the same number of contribution base units to each Multiemployer Plan for which the Sellers had an obligation to contribute to such Multiemployer Plan with respect to the Business. Purchaser shall assume the obligation to contribute to all Multiemployer Plans covered by Assumed CBAs; provided, however, that Purchaser shall not have any obligation for contributions to such benefit plans due prior to the Closing or relating to the period prior to the Closing. Purchaser shall fully satisfy its obligations to pay any withdrawal liability to any Multiemployer Plans. If Purchaser withdraws in a partial or complete withdrawal with respect to the Business, at any time on or after the Closing Date through the end of the fifth plan year beginning after the Closing Date, from one of the Multiemployer Plans covered by an Assumed CBA, Purchaser shall promptly notify SVCMC in writing of such withdrawal and each Seller shall be secondarily liable for any withdrawal liability it would have had to such

BQHC 00643

BQHC 00512-00132

Multiemployer Plan with respect to the Business (but for Section 4204 of ERISA) if the liability of Purchaser with respect to such Multiemployer Plan is not paid. The parties shall reasonably cooperate with each other with respect to the Multiemployer Plans covered by an Assumed CBA.

(f)     To the extent the Sellers becomes subject to any Liabilities under the WARN Act or any comparable state or local law by reason of the termination of the employment by Purchaser (or any successor thereto) of any Transferred Employee on or after the Closing Date, Purchaser shall be responsible therefor and shall indemnify the Sellers and their directors, officers and employees against such Liability in accordance with the provisions of Article XI. Without limiting the effect of the foregoing sentence, Purchaser shall be solely responsible for giving any notice to Transferred Employees required by the WARN Act or any comparable state or local law to be given after the Closing Date. Each Seller will retain all liability for any failure of such Seller or its Affiliates to comply with any of the requirements of WARN, including applicable notice requirements related to any "plant closing" or "mass layoff" (each as defined under WARN), with respect to any Employee who is not a Transferred Employee.

(g)     The Sellers will be responsible for providing continuation coverage, as required by Section 4980B(f) of the Code and Part 6 of Title I of ERISA or any similar law ("COBRA"), under a group health plan to be maintained by the Sellers, to all employees of the Sellers (and other qualified beneficiaries under COBRA with respect to such employees) who have a COBRA qualifying event (due to termination of employment with a Seller or otherwise) prior to the Closing. Purchaser shall be responsible for any COBRA obligations in respect of Transferred Employees (if any) arising with respect to qualifying events that occur under Purchaser's group health plan after the Closing Date.

(h)     To the extent any other provision of this Agreement is inconsistent with the provisions of this Section 9.2, the provisions of this Section 9.2 will control.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser.  The obligations of Purchaser to consummate the Contemplated Transactions as provided by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of SVCMC set forth in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of SVCMC,

BQHC 00644

BQHC 00512-00133

dated the Closing Date, to the foregoing effect; provided, however, that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect;

(b)     the Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of SVCMC, dated the Closing Date, to the forgoing effect; provided, however, that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together result in a Material Adverse Effect;

(c)     SVCMC shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in clauses (a) through (t) of Section 4.2;

(d)     in the event that Purchaser has made the Third-Party Financing Election pursuant to Section 3.7, Purchaser shall have received the proceeds of the Financing on terms no less favorable to Purchaser than those set forth in the Commitment Letter;

(e)     SVCMC shall have delivered evidence reasonably acceptable to Purchaser that the Business is conditionally or otherwise accredited by JCAHO; and

(f)     SVCMC and HHS shall have entered into the Medicare Agreement contemplated by Section 8.17(a), and if the State of New York (or an applicable Governmental Body) and Purchaser shall be ready, willing and able to entered into the Medicaid Agreement on the terms contemplated by Section 8.17(b), SVCMC shall have entered into the Medicaid Agreement.

10.2     Conditions Precedent to Obligations of the Sellers.  The obligation of the Sellers to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser set forth in this Agreement (including, if Purchaser has made the Third-Party Financing Election, in the Third-Party Financing Certificate) qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that in the event any such representation or warranty has been breached the condition set forth in

BQHC 00645

BQHC 00512-00134

this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together would prevent or materially delay the ability of Purchaser and Wyckoff to perform their respective obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions;

(b)     Purchaser and Wyckoff shall have performed and complied in all material respects with all obligations and agreements required by this Agreement (including, if Purchaser has made the Third-Party Financing Election, by the Third-Party Financing Certificate) to be performed or complied with by them on or prior to the Closing Date, and SVCMC shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that the condition set forth in this Section 10.1(b) shall be deemed satisfied unless all such failures to so perform or comply taken together prevent or materially delay the ability of Purchaser and Wyckoff to perform their respective obligations under this Agreement or the ability of Purchaser to consummate the Contemplated Transactions; and

(c)     Purchaser shall have delivered, or caused to be delivered, to SVCMC all of the items set forth in clauses (a) through (p) of Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and SVCMC.   The respective obligations of the parties to consummate the Contemplate Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and SVCMC in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order;

(c)     the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a final order; and

(d)     the parties shall have received the consents, approvals, licenses or Permits, or waivers thereof, of the Governmental Bodies identified in Schedule 10.3(d) and shall have given the notices required by Schedule 10.3(d).

10.4    Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to excuse it from consummating the Contemplated Transactions if such failure was caused by such party's failure to comply with any provision of this Agreement.

8

BQHC 00646

BQHC 00512-00135

# ARTICLE XI

## INDEMNIFICATION

11.1    <u>Survival of Representations and Warranties</u>.  The representations and warranties of the parties contained in <u>Article V</u> and <u>Article VI</u> of this Agreement shall survive the Closing through and including (but only through and including) the six (6) month anniversary of the Closing Date; <u>provided</u>, <u>however</u>, that the representations and warranties of Seller set forth in <u>Section 5.16(b)</u> shall survive the Closing through and including the twelve (12) month anniversary of the Closing Date and the representations and warranties of Seller set forth in <u>Sections 5.12</u> and <u>5.17</u> shall survive the Closing through and including the fifteen (15) month anniversary of the Closing Date (such period, in each case, the "<u>Survival Period</u>"); it being understood that any obligations of a party to indemnify and hold harmless any Person hereunder against a breach of a representation or warranty contained herein shall not terminate with respect to any Losses as to which the Person to be indemnified shall have given notice (stating in reasonable detail the basis of the claim for indemnification) to the indemnifying party in accordance with <u>Section 11.4(a)</u> before the termination of the applicable Survival Period.

11.2    <u>Indemnification by SVCMC</u>.

(a)    Subject to the provisions of this <u>Article XI</u>, SVCMC shall indemnify and hold Purchaser and its Affiliates, together with their respective members, directors, officers, employees, agents, successors and permitted assigns (the "<u>Purchaser Indemnified Parties</u>") harmless from and against any and all damages, penalties, judgments, demands, claims, actions, Liabilities, penalties, Expenses, obligations or losses (collectively, "<u>Losses</u>") incurred by a Purchaser Indemnified Party based upon, attributable to or resulting primarily from:

(i)    the failure of any representation or warranty of the Sellers set forth in this Agreement to be true and correct at the Closing Date (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein, other than those set forth in <u>Section 5.16(b)</u>);

(ii)    the breach of any covenant or other agreement on the part of the Sellers under this Agreement to be performed prior to the Closing;

(iii)    any Excluded Asset or any Excluded Liability (other than any Liability of the Sellers to Purchaser for breach of any covenant of the Sellers under this Agreement to be performed after the Closing, which Liability of the Sellers and remedy of Purchaser is not limited by <u>Article XI</u>, except for any Environmental Compliance Matters not completed prior to the Closing, all of which shall remain Excluded Liabilities subject to indemnification by SVCMC) or the Sellers' operation of the Business prior to the Closing Date, other than as set forth in <u>Sections 2.3(a)</u>, <u>2.3(b)</u>, **Error! Reference source not found.** and <u>2.3(g)</u>; and

BQHC 00647

BQHC 00512-00136

(iv)    all Liabilities (other than the Additional Pre-Closing Assumed Liabilites) under SVCMC's Medicare or Medicaid provider numbers and related provider agreements used in the Business referred to in Section 2.1(n), including (i) any obligations under such Medicare or Medicaid provider numbers and agreements for overpayments (or settlements in respect thereof), if any, for periods ending before the Closing Date and other Liabilities otherwise arising under such Medicare or Medicaid provider numbers and provider agreements out of events occurring before the Closing Date and (ii) any payments required to be made by Purchaser under the Medicare Agreement and the Medicaid Agreement, in each case arising from periods prior to the Closing.

(b)    Purchaser acknowledges and agrees that SVCMC shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss arises from an action or a failure to act by Purchaser or any of its Affiliates after the Closing Date.  Purchaser shall take and shall cause its Affiliates (and shall use commercially reasonable efforts to cause the other Purchaser Indemnified Parties) to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto, including incurring costs and expenses only to the minimum extent necessary to remedy the breach which gives rise to the Loss.

11.3    Indemnification by Purchaser.

(a)    Subject to the provisions of this Article XI, Purchaser shall indemnify and hold the Sellers and their Affiliates, together with their respective members, directors, officers, employees, agents, successors and permitted assigns (the "Seller Indemnified Parties") harmless from and against any and all Losses incurred by a Seller Indemnified Party based upon, attributable to or resulting primarily from:

(i)    the failure of any representation or warranty of Purchaser set forth in this Agreement (including, if Purchaser has made the Third-Party Financing Election, in the Third-Party Financing Certificate) to be true and correct at the Closing Date (without giving effect to any materiality or Material Adverse Effect qualifiers set forth therein);

(ii)    the breach of any covenant or other agreement on the part of Purchaser or Wyckoff under this Agreement (including, if Purchaser has made the Third-Party Financing Election, under the Third-Party Financing Certificate) to be performed prior to the Closing; and

(iii)    any Assumed Liability or Purchaser's operation of the Business after the Closing Date, including the employment or termination of the Transferred Employees (but not including any Liability of Purchaser to the Sellers for breach of any covenant of Purchaser or Wyckoff under this Agreement to be performed after the Closing, which Liability of Purchaser and remedy of the Sellers is not limited by Article XI), or use of the Purchased Assets after the Closing Date.

BQHC 00648

BQHC 00512-00137

(b)     The Sellers acknowledge and agree that Purchaser shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss arises from an action or a failure to act by the Sellers or any of their Affiliates after the Closing Date.   The Sellers shall take and cause their Affiliates (and shall use commercially reasonable efforts to cause the other Seller Indemnified Parties) to take all reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach which gives rise to the Loss.

11.4    Indemnification Procedures.

(a)     In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any Person in respect of which an indemnity payment may be sought under Section 11.2 and 11.3 hereof (regardless of the limitations set forth in Section 11.5) (an "Indemnification Claim"), the indemnified party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party.  The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder.   If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the indemnified party of its intent to do so.  If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the indemnified party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim.  If the indemnifying party shall assume the defense of any Indemnification Claim, the indemnified party may participate, at his or its own expense, in the defense of such Indemnification Claim; provided, however, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) so requested by the indemnifying party to participate, (ii) in the reasonable opinion of counsel to the indemnified party a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable or (iii) the indemnifying party is unable to provide reasonable assurance of its financial capability to defend such matter; and provided, further, that the indemnifying party shall not be required to pay for more than one such counsel for all indemnified parties in connection with any Indemnification Claim.  The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim.   Notwithstanding anything in this Section 11.4 to the contrary, neither the indemnifying party nor the indemnified party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim; provided that, in the event the indemnifying party has elected not to defend against,

BQHC 00649

BQHC 00512-00138

negotiate, settle or otherwise deal with the Indemnification Claim in accordance with this Section 11.4(a), the consent of the indemnifying party under this sentence may not be unreasonably withheld, delayed or conditioned.  Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of Sections 11.5 and 11.6, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Indemnification Claim, free of any participation by the indemnifying party, and the amount of any ultimate liability with respect to such Indemnification Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Indemnification Claim through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Indemnification Claim.  If the indemnifying party makes any payment on any Indemnification Claim, the indemnifying party shall be subrogated, to the extent of such payment, to all rights and remedies of the indemnified party to any insurance benefits or other claims of the indemnified party with respect to such Indemnification Claim.

(b)     After any final decision, judgment or award shall have been rendered by a Governmental Body of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

(c)     A claim for indemnification for any matter not involving a third party claim may be asserted by notice to the party from whom indemnification is sought.

(d)     Except to the extent a third party claim has not resulted in a Loss or is being actively disputed by the indemnifying party, including any appeals, within forty-five (45) days after receipt by the indemnifying party of an Indemnification Claim, the indemnifying party shall pay to the indemnified party the amount of such Indemnification Claim, subject to Sections 11.5 and 11.6.  Notwithstanding anything in this Article XI to the contrary, unless Purchaser makes the Third-Party Election pursuant to Section 3.7, so long as any outstanding balance on either of the Notes remain outstanding, SVCMC may offset any indemnification obligations owed by SVCMC to the Purchaser Indemnified Parties pursuant to Section 11.2(a) against the principal amount (and any accrued unpaid interest) of either or both of the Notes in lieu of making a cash payment as otherwise required by this Article XI.

11.5    Certain Limitations on Indemnification.

(a)     Notwithstanding anything herein to the contrary, except for any indemnification by the Sellers under Section 11.2(a)(iv), which shall not be subject to this

BQHC 00650

BQHC 00512-00139

Section 11.5(a), an indemnifying party shall not have any liability under Section 11.2(a) or 11.3(a), as applicable:

    (i)    unless the Person to be indemnified shall have given notice (stating in reasonable detail the basis of its claim for indemnification) to the party from whom indemnification is being sought within six (6) months after the Closing Date or such longer Survival Period as is provided by Section 11.1 in which such claim for indemnification may be asserted; and

    (ii)    unless and until the amount of the Losses to the indemnified parties finally determined to arise thereunder exceeds, in the aggregate two hundred and fifty thousand dollars ($250,000) (the "Deductible") and then only to the extent that such Losses exceed the Deductible; and

    (iii)    for any Losses in excess of two million five hundred thousand dollars ($2,500,000) (the "Cap") once the total amount of Losses which the indemnifying party has paid hereunder equals the Cap.

    (b)    Nothing contained herein shall extend Seller's liability to provide indemnity pursuant to Section 11.2(a)(iv) beyond the period of the statute of limitations applicable to the claim for a Healthcare Program Liability for which such indemnity is being sought.

    (c)    Notwithstanding anything herein to the contrary, Purchaser shall not make any claim for indemnification under this Article XI in respect of any amount paid by Purchaser as a cure amount pursuant the second proviso of the second sentence of Section 2.5.

11.6    Calculation of Losses.

    (a)    The amount of any Losses for which indemnification is provided under this Article XI shall be net of any amounts actually recovered or recoverable by the indemnified party under insurance policies or otherwise with respect to such Losses (net of any Tax or expenses incurred in connection with such recovery).

    (b)    If the amount of any Loss for which indemnification is provided under this Article XI gives rise to a currently realizable Tax benefit (as defined below) to the indemnified party making the Indemnification Claim, then the Indemnification Claim shall be (i) increased to take account of any net Tax cost incurred by the indemnified party arising from the receipt of indemnity payments hereunder (grossed up for such increase) and (ii) reduced to take account of any net Tax benefit realized by the indemnified party arising from the incurrence or payment of any such Loss. To the extent such Indemnification Claim does not give rise to a currently realizable Tax benefit, if the amount with respect to which any Indemnification Claim is made gives rise to a subsequently realized Tax benefit to the indemnified party that made the Indemnification Claim, such indemnified party shall refund to the indemnifying party the amount of such Tax benefit (with and including any gross-up payment made pursuant to this Section 11.6(b) with respect to such Tax benefit) when, as and if realized (it being

85

BQHC 00651

BQHC 00512-00140

understood that such indemnified party shall use its commercially reasonable efforts to realize such Tax benefit). For purposes of this Section 11.6(b), a "Tax benefit" means an amount by which the Tax liability of the party (or group of corporations including the party) is actually reduced (including by deduction, reduction of income by virtue of increased tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant taxing authority. In computing the amount of any such Tax cost or Tax benefit, the indemnified party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified Loss. For purposes of this Section 11.6(b), a Tax benefit is "currently realizable" to the extent that such Tax benefit can be realized in the current taxable period or year or in any tax return with respect thereto (including through a carryback to a prior taxable period) or in any taxable period or year prior to the date of the Indemnification Claim. The amount of any increase, reduction or payment hereunder shall be adjusted to reflect any final determination (which shall include the execution of Form 870-AD, or successor form) with respect to the indemnified party's liability for Taxes, and payments between the parties to this Agreement to reflect such adjustment shall be made if necessary. Any indemnity payment under this Article XI shall be treated as an adjustment to the value of the asset upon which the underlying Indemnification Claim was based, unless a final determination (which shall include the execution of a Form 870-AD or successor form) with respect to the indemnified party or any of its Affiliates causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

11.7   Tax Treatment of Indemnity Payments. The parties agree to treat any payment (or offset against the Notes pursuant to Section 11.4(d)) for indemnity made pursuant to this Article XI as an adjustment to the purchase price for all tax purposes, unless otherwise required by applicable Law.

11.8   No Consequential Damages. Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

11.9   Exclusive Remedy. Subject to Section 13.4 hereof and other than in the case of actual fraud by the other party and the case of a breach of a covenant to be performed after the Closing, the sole and exclusive remedy of the parties after the Closing for any breach or inaccuracy, or alleged breach or inaccuracy, of any representation, warranty, covenant or agreement made by the other parties shall be indemnification in accordance with this Article XI. In furtherance of the foregoing and other than in the case of actual fraud by the other party and the case of a breach of a covenant to be performed after the Closing, the parties hereby waive, to the fullest extent permitted by applicable Law, any and all other rights, claims and causes of action (including rights of contribution, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that it may have against the Sellers or any of their Affiliates, or Purchaser or any of its Affiliates, as the case may be, arising under or based

upon any federal, state or local Law (including any such Law relating to environmental matters or arising under or based upon any common Law or otherwise).

## ARTICLE XII

## TAXES

12.1    Transfer Taxes. Purchaser and SVCMC shall share equally any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement, if any ("Transfer Taxes"). The Sellers shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any Transfer Taxes under Bankruptcy Code Section 1146(c). The party responsible under the applicable Transfer Tax Law for paying a Transfer Tax (the "Transfer Tax Party") shall make due and timely payment of the Transfer Tax to the applicable Tax Authority; provided, that the other party pays the Transfer Tax Party, no later than two (2) Business Days prior to the date such Transfer Tax is due, such other party's equal share of such Transfer Tax. The Transfer Tax Party will provide the other party a true copy of each such Tax Return as filed and evidence of the timely filing thereof. The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes, including a refund available under Section 1146(c) of the Bankruptcy Code.

12.2    Prorations. All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between the Sellers and Purchaser as of 12:01 a.m. (Eastern time) on the day after the Closing Date. If any Taxes subject to proration are paid by Purchaser, on the one hand, and the Sellers, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

12.3    Purchase Price Allocation. For tax purposes only, prior to the Closing Date, SVCMC and Purchaser shall agree in good faith upon an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets in accordance with Section 1060 of the Code and, in accordance with such allocation, Purchaser shall prepare and deliver to SVCMC copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). The parties agree that no portion of the purchase price shall be allocated to the covenant contained in Section 8.12. Purchaser shall prepare and deliver to SVCMC from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. To the extent that SVCMC disagrees with Purchaser's allocation in the Asset Acquisition Statement or the Revised Statements, SVCMC and Purchaser shall work in good faith to resolve any such disagreements. If

BQHC 00653

BQHC 00512-00142

Purchaser and SVCMC cannot reach a final resolution of the matter, Purchaser and SVCMC will jointly retain an independent financial expert to resolve any remaining disagreements, the cost of which shall be borne equally by the parties. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to SVCMC, and all income Tax Returns and reports filed by Purchaser and SVCMC shall be prepared consistently with such allocation.

12.4    Cooperation on Tax Matters. The parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

## ARTICLE XIII

## MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Seller Representative.

(a)    Each of the Sellers hereby appoints SVCMC to act, and SVCMC hereby agrees to so act, as the Sellers' representative and attorney-in-fact for the purposes and with the powers and exclusive authority hereinafter set forth in this Section 13.2 (SVCMC, in such capacity, the "Seller Representative"), which shall include the sole and exclusive power and authority:

(i)    to execute and deliver in the name, and on behalf, of each Seller (A) amendments or modifications to this Agreement or waivers of any rights of the Sellers contained herein as the Seller Representative, in its sole discretion, determines to be desirable and (B) any and all agreements, documents, certificates or other instruments permitted or required to be delivered by the Sellers pursuant hereto as the Seller Representative, in its sole discretion, may deem necessary or desirable;

(ii)    to collect and receive, directly or indirectly, all amounts that may be distributed to the Sellers pursuant hereto and to disburse and pay the same to the Sellers in accordance herewith and in this respect the Seller Representative shall be entitled to collect the full amount of any payment due to the Sellers hereunder and conversely any payment made to the Seller Representative shall validly discharge the debtor to any payment hereunder;

8

BQHC 00654

BQHC 00512-00143

(iii)    to enforce and protect the rights and interests of the Sellers, in the name, and on behalf, of the Sellers, arising out of or under or in any manner relating to this Agreement, and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein and, in connection therewith, to (A) assert any claim or institute any action, proceeding or investigation in the name of the Seller Representative or, if the Seller Representative so elects, in the names of one or more of the Sellers; (B) investigate, defend, contest or litigate any claim, action, proceeding or investigation initiated by Purchaser or any other Person or by any Governmental Body against the Seller Representative and/or any of the Sellers, and receive process on behalf of any or all of the Sellers in any such claim, action, proceeding or investigation and compromise or settle such claim, action, proceeding or investigation on such terms as the Seller Representative shall determine to be appropriate, and give receipts, releases and discharges with respect to, any such claim, action, proceeding or investigation; (C) file any proofs of debt, claims and petitions as the Seller Representative may deem advisable or necessary; (D) settle or compromise any claims asserted hereunder; and (E) file and prosecute appeals from any decision, judgment or award rendered in any such action, proceeding or investigation in the name of the Seller Representative or, if the Seller Representative so elects, in the names of one or more of the Sellers;

(iv)    to enforce payment of amounts due to the Sellers hereunder, in each case on behalf of the Sellers and each of them, in the name of the Seller Representative or, if the Seller Representative so elects, in the names of one or more of the Sellers;

(v)    to refrain from enforcing any right of the Sellers or any of them and/or of the Seller Representative arising out of or under or in any manner relating to this Agreement or any other agreement, instrument or document in connection with the foregoing, it being understood that the Seller Representative shall not have any liability for refraining from enforcing any such right; provided, however, that no such failure to act on the part of the Seller Representative shall be deemed a waiver of any such right or interest by the Seller Representative unless such waiver is in a writing signed by the Seller Representative; and

(vi)    to make, execute, acknowledge and deliver all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, share powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Seller Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith or therewith.

(b)    From and after the date hereof, the Sellers agree that Purchaser and its Affiliates shall be entitled to rely upon the power of attorney granted in favor of the

BQHC 00655

BQHC 00512-00144

Seller Representative pursuant to this Section 13.2 and to deal exclusively with the Seller Representative in respect of all notices, disputes and other matters relating to this Agreement or the Sellers' rights or obligations hereunder. Purchaser and its Affiliates shall be entitled to rely upon any statements or actions taken by the Seller Representative made on behalf of the Sellers hereunder. The Seller Representative agrees that it will not take any action which it otherwise is authorized hereunder to take that would materially adversely affect a Seller in a manner that is disproportionate to that in which the Sellers as a group would be affected.

(c)     The grant of authority provided for in this Section 13.2: (i) is coupled with an interest and shall be irrevocable and survive the bankruptcy, liquidation or dissolution of any Seller; (ii) may be exercised by the Seller Representative either by signing separately as representative of each of the Sellers or, after listing all of the Sellers executing an instrument, by the signature of the Seller Representative acting in such capacity for all of them; and (iii) shall survive the delivery of an assignment by a Seller of any of it rights or obligations hereunder.

(d)     In connection with the performance of its rights and obligations hereunder, the Seller Representative shall have the right at any time and from time to time to select and engage, at the cost and expense of the Sellers (from amounts otherwise to be distributed to the Sellers), attorneys, accountants, investment bankers, advisors, consultants and clerical personnel and obtain such other professional and expert assistance, maintain such records and incur other out-of-pocket expenses, as the Seller Representative may deem necessary or desirable from time to time. The Seller Representative shall be entitled to withhold and retain from the funds otherwise distributable to the Sellers such amount or amounts as shall be sufficient to pay all expenses which are required to be paid or borne by the Sellers pursuant hereto or incurred by the Seller Representative in connection with the Seller Representative's performance of its obligations under this Section 13.2. The Seller Representative shall not be entitled to any fee, commission or other compensation for the performance of its services hereunder, but shall be entitled to the payment of all costs, fees and expenses incurred by it pursuant to this Section 13.2.

(e)     In dealing with this Agreement and any instruments, agreements or documents relating hereto, and in exercising or failing to exercise all or any of the powers conferred upon the Seller Representative hereunder, (i) the Seller Representative assumes and shall incur no responsibility whatsoever (whether to any Seller or any other Person (other than Purchaser and its Affiliates)) by reason of any error in judgment or other act or omission performed or omitted in connection herewith or any such other agreement, instrument or document, excepting only responsibility for any act or failure to act which represents willful misconduct or gross negligence, and (ii) the Seller Representative shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the matter at issue, and any error in judgment or other act or omission of the Seller Representative pursuant to such advice shall in no event subject the Seller Representative to liability to any Seller or any other Person (other than Purchaser and its Affiliates). Each Seller shall severally, based on their pro rata allocation of all proceeds hereunder, hold harmless and indemnify the Seller Representative against all

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00656

BQHC 00512-00145

Losses arising out of or in connection with any claim, investigation, challenge, action or proceeding or in connection with any appeal thereof, relating to the acts or omissions of the Seller Representative hereunder or otherwise, except to the extent arising out of the willful misconduct or gross negligence of the Seller Representative.   All of the indemnities releases, immunities and powers granted to the Seller Representative under this Agreement shall survive the Closing or any termination of this Agreement.

(f)     In the event the Seller Representative shall be unable or unavailable to perform its duties hereunder, the Seller Representative shall appoint a successor Seller Representative that shall have all of the authority and responsibilities conferred upon or delegated to the Seller Representative pursuant to this Agreement, and each Seller hereby agrees to the appointment of such successor Seller Representative. If the Seller Representative is unwilling or unable to appoint a successor, the Sellers shall appoint a successor Seller Representative.

(g)     No Person or Persons other than the Seller Representative (and its successors) shall be entitled to exercise any of the rights or powers of the Seller Representative hereunder

13.3    <u>Allocations among the Sellers</u>.  Each Seller shall be entitled to a pro rata portion of the consideration provided to any of the Sellers under this Agreement or any other Seller Document to which they are a party, and shall be responsible for a pro rata portion of the costs, expenses and fees provided herein or incurred by any of the Sellers in connection with this Agreement, any Seller Document to which they are a party and the Contemplated Transactions, including the negotiation of this Agreement.  The Sellers shall agree upon an allocation of the cash consideration (including an allocation of payments received by SVCMC under the Additional Note and, if Purchaser has not made the Third-Party Financing Election, the Primary Note) received for the Purchased Assets and the cost, expenses and fees incurred in connection with this Agreement (including a share of the Break-up Fee and the Expense Reimbursement, if applicable), the Seller Documents to which they are a party, and the Contemplated Transactions based upon each Seller's pro rata share of the fair market value of the assets sold and the liabilities assumed.  SVCMC, as the Seller Representative, shall transfer to the PCs, (i) promptly after the Closing, their allocable share of the cash proceeds, net of costs, fees and expenses in accordance with such agreement and, (ii) promptly after receipt of any payments under the Additional Note and, if Purchaser has not made the Third-Party Financing Election, the Primary Note, their allocable share of such payments.  Nothing contained in this <u>Section 13.3</u> shall be deemed to limit the rights of Purchaser and its Affiliates (as applicable) to recover against SVCMC or any of the other Sellers to the extent such recovery is permitted hereunder, it being understood and agreed that, unless otherwise specifically provided herein, liability of SVCMC and the other Sellers to Purchaser and its Affiliates (as applicable) hereunder is joint and several.

13.4    <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements

BQHC 00657

BQHC 00512-00146

or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 13.4 shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

13.5     Submission to Jurisdiction; Consent to Service of Process.     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.9 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.   The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.9.

13.6     Waiver of Right to Trial by Jury.   Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.7     Entire Agreement; Amendments and Waivers.   This Agreement (including the schedules and exhibits hereto) and the Escrow Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further

BQHC 00658

BQHC 00512-00147

exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.8   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.9   Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

*If to Purchaser or Wyckoff, to:*

Wyckoff Heights Medical Center
374 Stockholm Street
Brooklyn, NY 11237
Fax:  (718) 963-7196
Attn: Harold E. McDonald, Executive Vice
     President and Chief Operating Officer
     and
     Dominick Gio, President and Chief
     Executive Officer

*If to SVCMC or any PC, to:*

Saint Vincents Catholic Medical Centers
450 West 33rd Street
New York, New York  10001
Fax:  (212) 356-4990
Attn: General Counsel

*With a copy to:*

Proskauer Rose LLP
1585 Broadway
New York, NY 10036
Fax:  (212) 969-2900
Attn: Richard J. Zall, Esq.

*With a copy to:*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10016
Fax:  (212) 310-8007
Attn: Robert Messineo, Esq. and
     George Davis, Esq.

13.10   Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

C:\DOCUME~1\WIESNERR\LOCALS~1\TEMP\NOTES728100\ASSET PURCHASE AGREEMENT FOR WYCKOFF_#1611810.DOC

BQHC 00659

BQHC 00512-00148

13.11  <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  A successor to SVCMC shall include SVCMC as a reorganized debtor.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and SVCMC and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder), with the consent of SVCMC, which shall not be unreasonably withheld.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

13.12  <u>No Personal Liability</u>.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

13.13  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**\*\* REMAINDER OF PAGE INTENTIONALLY LEFT BLANK\*\***

BQHC 00660

BQHC 00512-00149

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

SAINT VINCENTS CATHOLIC
MEDICAL CENTERS OF NEW YORK
D/B/A SAINT VINCENT CATHOLIC
MEDICAL CENTERS

By: _____

    Name: Guy Sansone
    Title: Chief Executive Officer and
    Chief Restructuring Officer

CMC OCCUPATIONAL HEALTH
SERVICES, P.C.

By: _____

    Name: Mark G. Ackermann
    Title: Secretary

CMC PHYSICIAN SERVICES, P.C.

By: _____

    Name: Mark G. Ackermann
    Title:  Secretary

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

BQHC 00661

BQHC 00512-00150

CMC RADIOLOGICAL SERVICES, P.C.

By: _____
    Name: Mark G. Ackermann
    Title:  Secretary

CMC CARDIOLOGY SERVICES, P.C.

By: _____
    Name: Mark G. Ackermann
    Title:  Secretary

**CARITAS HEALTH CARE PLANNING, INC.**

By: _____
    Name:
    Title:

*Agreed and Accepted as to Sections 2.14, 4.6(c), 8.3, 8.4, 8.6, 8.8 and 8.14 Only:*

**WYCKOFF HEIGHTS MEDICAL CENTER**

By: _____
    Name:
    Title:

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

BQHC 00662

BQHC 00512-00151

CARITAS HEALTH CARE
PLANNING, INC.

By:
Name:
Title:

*Agreed and Accepted as to Sections 2.14, 4.6(c), 8.3, 8.4, 8.6, 8.8 and 8.14 Only:*

WYCKOFF HEIGHTS MEDICAL
CENTER

By:
Name:
Title:

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

BQHC 00663

BQHC 00512-00152