# Exhibit 23

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------X

ROSS UNIVERSITY SCHOOL OF

MEDICINE, LTD.,

                    Plaintiff,

          -against-               Index No.:
                                  09CIV1410
BROOKLYN QUEENS HEALTH CARE,

INC., and WYCKOFF HEIGHTS MEDICAL

CENTER,

                    Defendants.

------------------------------------------X

                         45 Rockefeller Plaza
                         11th Floor
                         New York, New York

                         July 1, 2010
                         10:12 p.m.


        EXAMINATION BEFORE TRIAL of

JULIUS ROMERO, a representative of the

Defendants in the above-entitled action,

taken on behalf of the Plaintiff, held at

the above time and place, and taken before

Binita Shrestha, a reporter and Notary

Public within and for the State of New York.

2

```
1    A P P E A R A N C E S :
2
3    BAKER HOSTETLER, LLP.
4       Attorneys for Plaintiff
5       45 Rockefeller Plaza, 11th Floor
6       New York, New York, 10111
7       Tel: 212-589-4200
8    BY: GEORGE J. TZANETOPOULOS, ESQ.
9
10   K & L GATES, LLP.
11      Attorneys for Defendants
12      599 Lexington Avenue
13      New York, New York, 10022
14      Tel: 212-536-3900
15   BY: WALTER P. LOUGHLIN, ESQ.
16
17   Also Present:
18      Michael Augusta - Legal Intern
19              K & L Gates, LLP.
20
21
22
23
24
25
```

3

```
1       IT IS HEREBY STIPULATED AND AGREED by
2    and between the attorneys for the respective
3    parties herein that the sealing, filing and
4    certification of the within deposition be
5    waived; that such deposition may be signed
6    and sworn to before any officer authorized
7    to administer an oath, with the same force
8    and effect as if signed and sworn to before
9    whom said deposition was taken.
10      IT IS FURTHER STIPULATED AND AGREED that
11   all objections, except as to form, are
12   reserved to the time of trial.
13      IT IS FURTHER STIPULATED AND AGREED that
14   counsel for the witnesses appearing herein
15   shall be furnished with a copy of the within
16   deposition without cost.
17
18
19
20
21
22
23
24
25
```

4

```
1                    J. ROMERO
2    JULIUS ROMERO,
3       the witness herein, having first been
4       duly sworn by a Notary Public of the
5       State of New York, was examined and
6       testified as follows:
7    EXAMINATION BY
8    MR. TZANETOPOULOS:
9           (Documents premarked as Romero
10          Exhibits 1 through 7 for
11          identification as of this date.)
12      Q.  Please state your name for the
13   record.
14      A.  Julius Romero.
15      Q.  Please state your business address.
16      A.  Wyckoff Heights Medical Center, 374
17   Stockholm Street, Brooklyn, New York, 11237.
18      Q.  Mr. Romero, have you ever given a
19   deposition before?
20      A.  No.
21      Q.  Let me tell you a little bit -- I'm
22   sure Mr. Loughlin has talked to you but let
23   me tell you a little bit about what will
24   happen today.  I'll ask a series of
25   questions.  I'll ask you to answer them.  A
```

5

```
1                    J. ROMERO
2    court reporter will write down what's said.
3    Because she is writing it down, just a few
4    rules that people sometimes forget:  You do
5    have to answer in words, so nodding your
6    head or saying uh-huh or uh-uh doesn't work.
7    You're likely to forget that.  Between the
8    two of us, we'll help you remember, but if
9    you can try that, it will be great, okay?
10      A.  Okay.
11      Q.  If at any time you need a break, let
12   us know.  I'll be happy to take one.  If you
13   don't understand me or don't hear my
14   question, just ask me to say the question
15   again, and I'll be happy to repeat it, okay?
16      A.  Okay.
17      Q.  What did you do to prepare for
18   today's deposition?
19      A.  Can you be more specific?
20      Q.  Sure.  Did you meet with anyone to
21   prepare for today?
22      A.  Yes.
23      Q.  With whom?
24      A.  With Mr. Loughlin.
25      Q.  Was anybody else present when you
```

6

```
 1            J. ROMERO
 2  met with Mr. Loughlin?
 3      A. Yes.
 4      Q. Who else was there?
 5      A. Mr. Rober, R-O-B-E-R.
 6          MR. LOUGHLIN: That's an
 7      associate of mine.
 8      Q. Was anybody else present other than
 9  Mr. Loughlin and Mr. Rober?
10      A. No.
11      Q. Where did you meet them?
12      A. At Wyckoff Heights Medical Center.
13      Q. And for how long?
14      A. About half a day.
15      Q. Did you review documents to help
16  refresh your memory about events?
17      A. Yes.
18      Q. What documents did you look at?
19      A. Some e-mails.
20      Q. Anything else?
21      A. I believe the contract.
22      Q. Anything else?
23      A. No.
24      Q. Aside from Mr. Loughlin and Mr.
25  Rober, have you talked to anybody at the
```

7

```
 1            J. ROMERO
 2  hospital about the events to help refresh
 3  your recollection for today?
 4      A. Yes.
 5      Q. With whom did you speak?
 6      A. David Hoffman.
 7      Q. And in substance, what did you and
 8  Mr. Hoffman say to one another?
 9          MR. LOUGHLIN: Objection.
10      That's privileged. I instruct you
11      not to answer.
12          MR. TZANETOPOULOS: I asked it
13      to refresh his recollection.
14          MR. LOUGHLIN: You can't probe
15      communications between Mr. Romero
16      and the general counsel of the
17      hospital in preparation of his
18      testimony today. That's privileged.
19          MR. TZANETOPOULOS: Under Rule
20      612 it's admissible and it's
21      discoverable.
22          MR. LOUGHLIN: I'm instructing
23      him not to answer just because you
24      phrased the question in a way to
25      trick him into saying that he spoke
```

8

```
 1            J. ROMERO
 2  to the general counsel about the
 3  subject of his testimony today
 4  doesn't affect the fact that it's
 5  privileged.
 6          MR. TZANETOPOULOS: We can take
 7      that up later.
 8      Q. Mr. Romero, other than Mr. Hoffman,
 9  did you speak to anyone at the hospital to
10  refresh your recollection about events?
11          MR. LOUGHLIN: Objection to
12      form.
13          MR. TZANETOPOULOS: You can
14      answer.
15          THE WITNESS: What is the
16      question, please?
17      Q. Sure. You say you talked to Mr.
18  Loughlin, Mr. Rober, and Mr. Hoffman. My
19  question is is there anybody else at Wyckoff
20  that you talked with to refresh yourself
21  about the events that might come up today?
22      A. No.
23      Q. Have you spoken with Harold McDonald
24  in the last week?
25      A. No.
```

9

```
 1            J. ROMERO
 2      Q. When is the last time that you did
 3  speak with Mr. McDonald?
 4      A. About a month ago.
 5      Q. And what was the topic of your
 6  conversation between you and he?
 7      A. It was about hiring an attending
 8  physician for him at Kingsbrook.
 9      Q. How old are you, sir?
10      A. 38.
11      Q. What is your home address?
12      A. 2 Bay Club Drive, Bayside, New York.
13      Q. What is the highest level of
14  education which you've attained?
15      A. Bachelors.
16      Q. Where did you take your Bachelor's
17  degree?
18      A. New York University.
19      Q. In what year did you receive that
20  degree?
21      A. 1995.
22      Q. In what was your degree?
23      A. Health administration.
24      Q. If you could give us the short
25  version of the Julius Romero CV from when
```

**10**

J. ROMERO

you got out of school to the present?

A. I was employed at Wyckoff since college, NYU, since 1990, intermittently employed, laid off in '95 for six months, went back to Wyckoff again. So it's pretty much Wyckoff Heights Medical Center all throughout, 21 years.

Q. You started at Wyckoff in 1990. What was your position then?

A. I was a night clerk.

Q. What did you do?

A. Data entry for ER records.

Q. And then after the night clerk position, what was next?

A. Manager of medical records.

Q. During what period of time did you hold that position?

A. I believe '92 to '95.

Q. And the '95 layoff, was it from the medical records position?

A. Yes. In '95 I worked at the Long Island College Hospital.

Q. When did you return to Wyckoff?

A. October '95.

**11**

J. ROMERO

Q. When you returned to Wyckoff, in what position were you employed?

A. Yes.

Q. What was your position then?

A. Manager of gastroenterology.

Q. What did you do as the manager of gastroenterology?

A. I managed the GI unit of the institution, and I did special projects for the hospital.

Q. And when you say you managed the GI unit, the day-to-day tasks, what does that involve?

A. It would be payroll, billing, scheduling, staffing.

Q. And the payroll and scheduling, would that be payroll and scheduling for staff or also for physicians?

A. Only staff.

Q. How long did you hold the position as manager of the GI unit?

A. About five years.

Q. So until about 2000. What did you do next?

**12**

J. ROMERO

A. In 2000 I was hired as coordinator for medical education.

Q. How long did you hold that position?

A. A good two years.

Q. Give or take 2002?

A. 2002.

Q. What did you do as coordinator for medical education?

A. I was asked to schedule and to form affiliation agreements with medical schools under my supervisor.

Q. Who was your supervisor?

A. Dr. Ken Freiberg, F-R-E-I-B-E-R-G.

Q. Did your position as coordinator for medical education encompass tasks with respect to residence, or just medical students, or both?

A. It's both.

Q. Is it correct that at Wyckoff Heights at the time, the hospital provided clinical clerkship rotations for students who were in medical school, correct?

MR. LOUGHLIN: Are you saying around 2000?

**13**

J. ROMERO

MR. TZANETOPOULOS: 2000 to 2002.

THE WITNESS: Correct.

Q. Also, the hospital provided residencies for graduates of the medical schools also, correct?

A. Yes.

Q. And your job encompassed managing schedules and affiliation contracts with respect to both?

A. With respect to medical schools.

Q. Let me try it again. So you had affiliations contracts with medical schools for medical students, right?

A. Right.

Q. You scheduled medical students in their rotations at Wyckoff?

A. For medical students, yes.

Q. What did you do with respect to residency?

A. I assisted the director of medical education in orientation, and scheduling, and credits.

Q. And that director would be Dr.

**14**

J. ROMERO
1 J. ROMERO
2 Freiberg?
3   A.  Correct.
4   Q.  Is there anything else that your job
5 encompassed in the 2000-2002 time frame?
6   A.  Just daily administrative tasks.
7   Q.  In and around residency of medical
8 students?
9   A.  That's correct.
10   Q.  After being coordinator of medical
11 education, what was the next job?
12   A.  Assistant director.
13   Q.  Assistant director for medical
14 education?
15   A.  That's correct.
16   Q.  At the time, was there a department
17 of medical education or something like that
18 at Wyckoff?
19   A.  Yes.
20   Q.  What was the name of the department?
21   A.  It's the department of medical
22 education.
23   Q.  During what period of time were you
24 assistant director?
25   A.  I believe 2002 to 2006.

**16**

1 J. ROMERO
2   A.  From the hospital side, no.
3   Q.  During that period of time, I take
4 it, it was Mr. Gio who had final say so on
5 your side on contract terms?
6   MR. LOUGHLIN:  2002 to 2006?
7   MR. TZANETOPOULOS:  Yes.
8   THE WITNESS:  Yes.
9   Q.  Let's roll forward.  After the
10 assistant director for medical education,
11 what was your next job?
12   A.  Assistant vice president.
13   Q.  For medical education?
14   A.  Yes.
15   Q.  During what period of time were you
16 assistant vice president for medical
17 education?
18   A.  2006 to 2010.
19   Q.  Did your job change at all with this
20 change of title?
21   A.  Not in function.
22   Q.  Did it change at all?
23   A.  Yes.
24   Q.  How did it change?
25   A.  It was just more expansive

**15**

1 J. ROMERO
2   Q.  Did your tasks change at all with
3 the change of title?
4   A.  It was, in my opinion, the same.
5   Q.  Hopefully pay raise at least?
6   A.  Yes.
7   Q.  So better title, pay raise, but same
8 job?
9   A.  It is the same job.
10   Q.  During the period from 2002 through
11 2006 when you were a coordinator for medical
12 education and assistant director for medical
13 education at Wyckoff, did you do the actual
14 negotiating with medical schools for
15 affiliation agreements?
16   A.  I was involved.
17   Q.  During that period of time, who else
18 was involved?
19   A.  My supervisor, Dr. Frieberg.
20   Q.  Anybody else?
21   A.  It would be our president and CEO at
22 that time.
23   Q.  Is that Dominick Gio?
24   A.  Yes.
25   Q.  Anyone else?

**17**

1 J. ROMERO
2 volume-wise as far as the demand for time
3 and hours spent.
4   Q.  Is it correct then that the tasks
5 were the same but you got assigned more of
6 them?
7   A.  Correct.
8   Q.  To whom did you report when you were
9 assistant vice president for medical
10 education?
11   A.  To the CEO, CFO, and the COO.
12   Q.  So is it correct that once you
13 became assistant vice president for medical
14 education, you no longer reported to Dr.
15 Freiberg?
16   A.  I still worked with Dr. Freiberg.
17   Q.  My question is supervising and
18 reporting relationships.  Once you became
19 assistant vice president, was Dr. Freiberg
20 your boss, or the CEO, or CFO, or COO --
21   A.  Yes, he was still my boss.
22   Q.  What was Dr. Freiberg's title again?
23   A.  He's vice president for medical
24 education and director of medical education.
25   Q.  After the assistant vice president

18

J. ROMERO

1
2 for medical education position, what's next?
3     A. Associate vice president.
4     Q. How did your task change once you
5 became associate vice president for medical
6 education?
7     A. I had additional responsibilities.
8     Q. What were those?
9     A. Budgeting, departmental budgeting,
10 and physician payment.
11     Q. Any other additional
12 responsibilities?
13     A. No.
14     Q. Did you continue to have the
15 responsibility that you did before for
16 affiliation agreements and scheduling?
17     A. Yes.
18     Q. Is the associate vice president for
19 medical education position the one that you
20 hold today?
21     A. Yes.
22     Q. In any period of time did you hold a
23 position for Brooklyn Queens Health Care?
24     A. No, I'm not aware.
25     Q. And at any period of time, did you

19

J. ROMERO

1
2 hold a position for Caritas Health Care?
3     A. Yes.
4     Q. What was your position there?
5     A. Assistant vice president.
6     Q. For medical education?
7     A. Medical education.
8     Q. During what period of time did you
9 hold the position as assistant vice
10 president of medical education for Caritas
11 Health Care?
12     A. I believe 2007 until closure.
13     Q. Closure was February or March of
14 2009?
15     A. I'm not sure.
16     MR. TZANETOPOULOS: Let's mark
17     these as Exhibits 8 and 9.
18     (Whereupon, the aforementioned
19     documents were marked as Romero
20     Exhibit 8 and 9 for
21     identification as of this date.)
22     Q. Mr. Romero, let me show you a
23 document that the court reporter has marked
24 as Exhibit 8. It appears to be a paper
25 filed in the case in the United States

20

J. ROMERO

1
2 District Court Southern District of Florida
3 captioned American University of the
4 Caribbean and some others v. Caritas Health
5 Care. It's a notice of filing supplemental
6 declaration of Julius Romero, and then
7 attached to the notice is the supplemental
8 declaration of Julius Romero. I'll show you
9 that. Take a minute to look at it and then
10 I'll have some questions.
11     A. Ready.
12     Q. Mr. Romero, have you had a chance to
13 review Exhibit Number 8?
14     A. Yes.
15     Q. And on page 2 of 2 of the affidavit,
16 is that your signature?
17     A. It is.
18     Q. This is a declaration that you
19 signed in connection with the lawsuit
20 between American University of the Caribbean
21 and Caritas, Wyckoff, and Brooklyn Queens
22 Health Care, is it not?
23     A. Yes.
24     Q. Are the statements set forth in the
25 this declaration correct?

21

J. ROMERO

1
2     A. Yes.
3     Q. Is it correct then that you were
4 assistant vice president for medical
5 education for Brooklyn Queens Health Care,
6 Inc.?
7     A. As stated on the document, yes.
8     Q. Is there any other way that you
9 were?
10     MR. LOUGHLIN: If you don't
11     remember whether or not you were
12     ever appointed to that position, you
13     can say that, but just, you know,
14     explain to him whether you believe
15     at that time that you had that
16     position.
17     THE WITNESS: At that time, I
18     believed I was working at Wyckoff
19     Heights Medical Center and Caritas
20     Health Care.
21     Q. My question, sir, is was there a
22 time that you signed the declaration in
23 Exhibit 9 as assistant vice president for
24 medical education for Brooklyn Queens Health
25 Care?

22

J. ROMERO

2    A. Yes, in that capacity.
3    Q. Is it true that it is in your
4    capacity as assistant vice president for
5    medical education for Brooklyn Queens Health
6    Care that you oversaw the clinical clerkship
7    programs at Caritas's two hospitals and at
8    Wyckoff?
9    A. Yes.
10   Q. You were aware, were you not, at the
11   time you signed the declaration marked
12   Exhibit 8 that Wyckoff and Brooklyn Queens
13   Health Care and Caritas Health Care were in
14   a lawsuit with the American University of
15   the Caribbean?
16   A. Yes.
17   Q. You knew that AUC was looking to
18   recover money from Caritas, and Wyckoff, and
19   BQHC, correct?
20   A. Could you restate that question?
21   Q. At the time you signed this, you
22   knew that AUC was suing to get money from
23   the hospitals.
24   A. I knew that AUC was suing for money
25   from Caritas.

23

J. ROMERO

2    Q. Did you know that they wanted money
3    from Wyckoff and Brooklyn Queens also?
4    A. I don't remember.
5    Q. When you signed this declaration,
6    did you understand it to be the case that
7    the declaration would be filed to support
8    the hospital's position in this lawsuit,
9    this lawsuit being the AUC lawsuit?
10   A. No, I have a vague recollection of
11   the time when I signed the declaration.
12   Q. Did you know what this declaration
13   was going to be used for?
14   A. In a limited way, yes.
15   Q. What did you understand its purpose
16   to be?
17   A. It would be used by our counsel to
18   attest to the clerkship placements made to
19   AUC students.
20   Q. Did you understand at the time that
21   you signed it that what was said in here
22   must be true?
23   A. Correct.
24   Q. And you understood at that time that
25   if it were untrue, you were stating this

24

J. ROMERO

2    under the penalty of perjury?
3    A. Yes.
4    Q. Mr. Romero, let me show to you a
5    document that the court reporter has marked
6    as Exhibit Number 9. Exhibit 9 is a
7    different notice of filing supplemental
8    declaration of Julius Romero, and the
9    caption is American University of the
10   Caribbean and others versus Caritas Health
11   Care and others pending in the United States
12   District Court for the Southern District of
13   Florida and attached to that another and
14   different supplemental declaration of Julius
15   Romero. Again, sir, take a moment to look
16   at that and I'll ask you questions.
17   A. Okay.
18   Q. Mr. Romero, have you had a chance to
19   review Exhibit Number 9?
20   A. Yes.
21   Q. On page 7 of 7 of the declaration,
22   is that your signature?
23   A. Yes.
24   Q. And again, you understood, at the
25   time you signed this, that you were making

25

J. ROMERO

2    these statements under penalty of perjury?
3    A. Yes.
4    Q. Are the statements in the
5    declaration marked Exhibit 9 true?
6    A. Yes.
7    Q. If I can direct your attention,
8    please, to paragraph 6 of your declaration,
9    it says, "As I stated in my original
10   declaration, I was directly involved in the
11   negotiations that led to the execution of a
12   December 1, 2006 promissory note agreement
13   between Defendant Caritas and Plaintiff
14   American University of the Caribbean." Is
15   that correct?
16   A. Yes.
17   Q. Who else from the hospital side was
18   involved in those negotiations?
19   A. Our general counsel, Mr. Hoffman.
20   Q. David Hoffman?
21   A. Yes, our COO at that time, Harold
22   McDonald, our CEO at that time, Dominick
23   Gio, our CFO at that time, Wah Chung Hsu,
24   W-A-H, C-H-U-N-G, H-S-U, and the Caritas
25   CFO, Richard Sarli, S-A-R-L-I, from Caritas

7 (Pages 22 to 25)

26

J. ROMERO

1
2  Planning.
3      Q. Anybody else from the hospital side?
4      A. In a limited way, Dr. Freiberg.
5      Q. Anybody else?
6      A. None that I can recall.
7      Q. How about for the American
8  University of the Caribbean, with whom did
9  you deal with from AUC?
10     A. Cynthia Holden, counsel; the
11  clinical dean, I can't recall his name,
12  sorry; their clinical manager at that time,
13  I don't have the name; Mr. Yife Tien, and
14  there was another lawyer, I believe, Robert
15  Black.
16     Q. As indicated in paragraph 6 of your
17  declaration, those negotiations did in fact
18  lead to the execution of the December 1,
19  2006 promissory note agreement, correct?
20     A. Correct.
21     Q. Mr. Romero, I have handed to you a
22  document that the court reporter has marked
23  as Deposition Exhibit Number 4 entitled
24  Promissory Note, December 1, 2006.  Is
25  deposition Exhibit 4 the promissory note to

28

J. ROMERO

1
2  100 medical student core clerkships at the
3  two Caritas hospitals?
4      A. Yes.
5      Q. Were there more than 100 core
6  clerkships ever provided at those two
7  hospitals during that time frame?
8      A. No.
9      Q. Is it also correct that for core
10  clerkships, only two medical schools
11  provided medical students for those
12  rotations?
13     A. Only two to my knowledge.
14     Q. And that was Ross University School
15  of Medicine and the American University of
16  the Caribbean; is that correct?
17     A. That's correct.
18     Q. How many elective clerkship
19  rotations were offered at St. John's and
20  Mary Immaculate?
21     A. It varied.
22     Q. What was the range?
23     A. The range would be 20 to 50 to my
24  recollection.
25     Q. Did the American University of the

27

J. ROMERO

1
2  which you referred in paragraph 6 of the
3  declaration?
4      A. I believe this is the promissory
5  note.
6      Q. If I could refer back to the
7  declaration, Exhibit 9, and in particular to
8  paragraph 10 of your declaration, I'm
9  summarizing, it says that from the inception
10  of the AUC Caritas relationship of December
11  2006, 50 of the -- let me just ask you this:
12  Caritas owned, did it not, two hospitals?
13     A. Operated two hospitals.
14     Q. And those hospitals were Mary
15  Immaculate Hospital and St. John's Hospital,
16  correct?
17     A. Yes.
18     Q. Who owned those hospitals?
19     A. I didn't know.
20     Q. Did Caritas operate any other
21  hospitals other than Mary Immaculate
22  Hospital and St. John's?
23     A. Not to my knowledge.
24     Q. Is it correct that during the 2006
25  to March 2008 time frame, there were only

29

J. ROMERO

1
2  Caribbean send its students through those
3  elective clerkships?
4      A. At certain times.
5      Q. Did Ross?
6      A. Yes.
7      Q. Were there any other medical schools
8  that had students for elective rotations at
9  the Caritas hospitals?
10     A. Yes.
11     Q. Which other schools?
12     A. New York Medical College.
13     Q. How many clerks at any given time
14  did you have from New York Medical College?
15     A. I don't know.  I didn't operate
16  them.  I didn't place them.
17     Q. Who did the placing of medical
18  schools for clerkships at the two Caritas
19  hospitals?
20     A. I believe at that time New York
21  Medical College.
22     Q. And from the hospital side, who made
23  the arrangements?
24     A. I don't know.
25     Q. Administratively did the New York

8 (Pages 26 to 29)

30

J. ROMERO

1
2  college clerks run outside the ambit of your
3  group?
4      A.  They were absolutely separate and
5  distinct.
6      Q.  So when you were assistant vice
7  president for medical education for BQHC,
8  you had a group of clerks for whom you had
9  administrative responsibility, and New York
10  Medical did their own thing; is that
11  correct?
12      A.  That's correct.
13      Q.  For those that you had
14  responsibility for, were the only two
15  schools who had clerks at the Caritas
16  hospitals Ross and AUC?
17      A.  From my recollection, yes.  Every
18  now and then, physicians would bring in an
19  observer or two, which did not go through my
20  office, which I objected to.
21      Q.  Is it correct that the only medical
22  student clerks at the Caritas hospitals for
23  whom any BQHC affiliate was paid by a
24  medical school were from AUC or from Ross?
25      A.  From my recollection, yes.

31

J. ROMERO

1
2      Q.  Mr. Romero, let me show you two
3  documents that the court reporter has marked
4  as Exhibits 1 and 2.  Have you had a chance
5  to look at Exhibits 1 and 2?
6      A.  Yes.
7      Q.  Exhibit 1 is a letter dated
8  August 21st, 2006, from Dominick Gio,
9  president and chief executive officer of
10  Wyckoff Heights Medical Center to Yife Tien,
11  chief executive officer of the American
12  University of the Caribbean.  It's been
13  marked with Bates numbers ROSS 0607 and ROSS
14  0608.  Exhibit 2 is an August 21st, 2006,
15  letter from Dominick Gio, president and
16  chief executive officer of Wyckoff Heights
17  Medical Center to Nancy Perri, vice
18  president, academic affairs, Ross University
19  School of Medicine.  Mr. Romero, did you work
20  on preparing these offer letters?
21      A.  No.
22      Q.  Who put these together?
23          MR. LOUGHLIN:  If you know.
24          THE WITNESS:  I don't.
25      Q.  Before August 21st, 2006, had you,

32

J. ROMERO

1
2  either on your own or with anybody else,
3  worked on plans for prepaid clinical
4  rotation contracts for the Caritas
5  hospitals?
6      A.  No.
7      Q.  Did you know who did?
8      A.  From what I recall, it was Dominick
9  Gio and Harold McDonald.
10      Q.  And at that time, Mr. Gio was
11  president and chief executive officer of
12  Wyckoff, wasn't he?
13      A.  Yes.
14      Q.  And Mr. McDonald was chief operating
15  officer of Wyckoff.
16      A.  Yes.
17      Q.  Do you know if offer letters like
18  Exhibits 1 and 2 went to any other medical
19  schools?
20      A.  Yes.
21      Q.  Which schools did they go to?
22      A.  From what I recall, St. Matthews
23  University, and Hope Medical Institute.
24      Q.  Any other schools?
25      A.  No, none that I can recall.

33

J. ROMERO

1
2      Q.  Now, you said you worked on the
3  negotiations that led up to the AUC
4  agreement.  Did you also work on the
5  negotiations that led up to the agreement
6  with Ross?
7      A.  Yes.
8      Q.  Who directed you to work on those
9  agreements or on these negotiations?
10      A.  Mr. Gio and Mr. McDonald.
11      Q.  What was your role in the
12  negotiations with Ross?
13      A.  In my terms, a liaison for messages
14  between the hospital and the school.
15      Q.  What was your role in the
16  negotiations with American University of the
17  Caribbean?
18      A.  It would be the same way, as a
19  liaison.
20      Q.  For the hospital side of things,
21  were you the business person with
22  decision-making authority on deal points in
23  these negotiations?
24      A.  No.
25      Q.  For the hospital side, let's talk

9 (Pages 30 to 33)

34

**J. ROMERO**

1      **J. ROMERO**
2  for a moment about the negotiation with
3  Ross, and then we'll talk about AUC, but
4  with respect to negotiations leading up to
5  the Ross contract, was it the usual practice
6  on the hospital side, when a substantive
7  deal point came up, that you got direction
8  either from Mr. Gio or Mr. McDonald to
9  transmit to Ross?
10     A.  I would always check on deal points
11 with my superiors.
12     Q.  Which people?
13     A.  Mr. Gio, Mr. McDonald, at times Dr.
14 Freiberg, Mr. Hoffman, and even sometimes
15 the chairman, chairman of the clinical
16 services involved in teaching the medical
17 students.
18     Q.  Who was that person?
19     A.  For medicine it would be doctor
20 Chandra Pradeep, C-H-A-N-D-R-A,
21 P-R-A-D-E-E-P.
22     Q.  Anybody else?  Was there
23 Dr. Denton involved here?
24     A.  That's for the Caritas side later
25 on.  The answer is no.

35

1      J. ROMERO
2      Q.  Well, on the hospital side in terms
3  of money, price, interest, guarantees --
4  would it be fair, as a general matter, to
5  call those commercial terms of these
6  contracts?
7      MR. LOUGHLIN:  Objection, form.
8      Q.  In terms of price, the amount of the
9  money to be prepaid and guarantees that were
10 involved, who were the business people on
11 the hospital side that had decision-making
12 authority about those kinds of terms?
13     A.  It would be the CEO, COO, and CFO.
14     Q.  Mr. Gio, Mr. McDonald, and Mr.
15 Sarli?
16     A.  And Mr. Hsu, H-S-U.
17     Q.  Anybody else?
18     A.  None that I can recall.
19     Q.  Now, in your negotiations with
20 American University of the Caribbean, would
21 that be the same arrangement, those were the
22 four people who would have decision-making
23 authority about the price, deposits,
24 interest, and guarantees?
25     A.  Yes.

36

1      J. ROMERO
2      Q.  Let's talk about the AUC promissory
3  note again, that's Exhibit 4.  Mr. Loughlin
4  pointed to this part earlier but what I
5  would like to direct your attention to in
6  Exhibit 4 is paragraph 4 on page 6 of 10.
7  If I could direct your attention to the
8  signature page, the last page of the
9  exhibit.  Is that Mr. Gio's signature for
10 each of Brooklyn Queens Health Care, and
11 Caritas Health Care Planning, and Wyckoff
12 Heights Medical Center?
13     A.  I believe so.
14     Q.  Paragraph 4 on page 6 of 10 reads,
15 "Brooklyn Queens acknowledges and agrees on
16 behalf of its wholly-owned subsidiary,
17 Wyckoff, that a default, as defined in
18 section 2 paragraph 5 herein, by Brooklyn
19 Queens, Caritas, MIH, and SJQH collectively
20 during the term of the note agreement will
21 obligate Wyckoff to assume responsibility to
22 this note agreement," and then it goes on to
23 talk about what the responsibilities are. In
24 your role as liaison on in this negotiation,
25 did you have discussions about this term or

37

1      **J. ROMERO**
2  something like that with AUC?
3      A.  I had some vague discussions with
4  the clinical director of AUC.
5      Q.  Who was that person?
6      A.  I don't remember her name.
7      Q.  Were those discussions in person, by
8  telephone, by e-mail?
9      A.  In person and by telephone.
10     Q.  And however your recollection works,
11 it works.  Can you recall any of those
12 distinctly or just the topic never just
13 merged together?
14     A.  Just a general discussion on
15 placement of students should they require
16 students to be placed at Wyckoff.
17     Q.  In substance, what do you recall
18 about those discussions, what you said to
19 them and what they said to you?
20     A.  At that time AUC had an agreement at
21 Wyckoff, and at that time I informed the
22 clinical manager, the lady that I was
23 speaking with, that she can place her
24 students at Wyckoff should anything occur
25 with Caritas.

10  (Pages 34 to 37)

38

1          J. ROMERO
2     Q.  Is there anything else of substance
3  that you recall concerning your discussions
4  with AUC of the topic matter set forth in
5  paragraph 4?
6     A.  I just recall she did -- I do recall
7  she did say that she was discussing this
8  with her superiors including at that time
9  Mr. Tien and Cynthia Holden.
10    Q.  Is there anything else that you
11  recall with the substance of those
12  discussions?
13    A.  No.
14    Q.  Were you present when anybody else
15  on behalf of the hospital discussed this
16  topic matter with the folks at AUC?
17       MR. LOUGHLIN:  Do you understand
18       the question?
19       THE WITNESS:  If you could
20       restate the question, please?
21    Q.  Sure.  We've talked about the
22  discussions you personally had with AUC
23  about the topic in paragraph 4.
24    A.  Right.
25    Q.  The next question is were you

39

1          J. ROMERO
2  present when anybody else from the hospital
3  talked to AUC about that topic?
4     A.  Not about the topic.
5     Q.  Were you involved in any way in the
6  exchange of drafts between AUC and the
7  hospitals for this promissory note as it was
8  negotiated?
9     A.  Yes.
10    Q.  What I would like to talk about is
11  once the parties get close and then
12  ultimately agree to a draft, the mechanism
13  by which it got to Mr. Gio to sign, did
14  somebody send that to you to give to Mr. Gio
15  or did that happen elsewhere?
16    A.  All drafts were transmitted to
17  Wyckoff via fax or e-mail.  If it's e-mail,
18  either through my office or Mr. Hoffman's
19  office.
20    Q.  In this case, Exhibit 4, were you
21  the one that presented it to Mr. Gio to be
22  signed?
23    A.  I don't recall.
24    Q.  Mr. Romero, I have handed to you a
25  document that the court reporter has marked

40

1          J. ROMERO
2  as Exhibits Number 5, 6, and 7.  Number 5 is
3  entitled Affiliation Agreement between Ross
4  University School of Medicine and Brooklyn
5  Queens Health Care.  Exhibit 6 is entitled
6  Amendment to Affiliation Agreement between
7  Ross University School of Medicine and
8  Brooklyn Queens Health Care.  Exhibit 7 is
9  the Second Amendment to the Affiliation
10  Agreement between Ross and Brooklyn Queens
11  Health Care.  Did you work on each of these
12  agreements in some respect?
13    A.  Yes.
14    Q.  I would like to direct your
15  attention to the signature page of
16  Exhibit 6, that's the amendment.  Is that
17  your signature in the signature block on the
18  last page?
19    A.  Yes.
20    Q.  If I could direct your attention to
21  the signature block in Exhibit 7, on
22  Exhibit 7 there is a signature block at the
23  end of the amendment on the page with
24  identification number BQHC 42915.  Is that
25  you?

41

1          J. ROMERO
2     A.  Yes.
3       MR. LOUGHLIN:  I don't know if
4       you intended it, but Exhibit 7 does
5       include, in addition to the second
6       amendment, a side letter.  I just
7       called it to your attention.  I
8       didn't know whether you wanted it
9       included.
10    Q.  Have you signed affiliation
11  agreements on behalf of any of the BQHC
12  affiliated entities -- strike that.
13       On behalf of BQHC or any of the
14  affiliated entities, have you signed
15  affiliation agreements with medical schools
16  other than the two we've just looked at?
17    A.  No.
18    Q.  In Exhibit 6, who directed you to
19  sign that?
20    A.  To my recollection, it was Mr.
21  Singleton.
22    Q.  And in Exhibit 7, who directed you
23  to sign the amendment where you signed on
24  Exhibit 7?
25    A.  That's correct.

11  (Pages 38 to 41)

42

J. ROMERO

1
2  Q. The question was who directed you?
3  A. Thomas Singleton.
4      MR. LOUGHLIN: Just so the
5  testimony is clear, because there
6  may have been a little bit of a
7  misunderstanding there, I think the
8  testimony was that Mr. Singleton
9  instructed Mr. Romero to sign
10  Exhibit 6 and Exhibit 7.
11  Q. Is that correct?
12  A. That's correct.
13  Q. During the time that Mr. Singleton
14  was at the hospitals -- and we'll talk about
15  that in more detail, but let's focus on that
16  period of time when we're talking
17  signatures. Now, during the time that Mr.
18  Singleton was at the hospitals, did he sign
19  other medical school affiliation agreements
20  or their amendments?
21  A. None that I can recall.
22  Q. During the time that Mr. Singleton
23  was at the hospitals, did any of the
24  hospitals enter into amendment affiliation
25  agreements for medical student clerkships?

43

J. ROMERO

1
2  A. I just want to capture that question
3  one more time.
4  Q. I'll ask it in a more precise form.
5  You've said Mr. Singleton signed these two.
6  I'm just wondering if there were any others.
7  So let me ask a question that captures that.
8  During the time that Mr. Singleton was at
9  the hospital, were there any other
10  affiliation agreements or amendments to
11  affiliation agreements that were executed on
12  behalf of any of the affiliated hospital
13  entities?
14  A. I don't remember.
15  Q. Up until the time in December 2006
16  when the AUC promissory note was executed,
17  had Wyckoff entered into prepaid contracts
18  with medical schools for clerkships or was
19  that the first prepaid deal?
20  A. 2006 was the first prepaid.
21  Q. So AUC was the first?
22  A. Yes.
23  Q. I take it Ross was the second.
24  A. Ross was the second.
25  Q. There has been other testimony in

44

J. ROMERO

1
2  this matter to the effect that the Caritas
3  acquisition closed 1st of January 2007. At
4  that time, at the closing in 2007, were the
5  only prepaid contracts for clerkships at the
6  Caritas hospitals the promissory note with
7  AUC and the Ross contract?
8  A. Yes.
9  Q. Throughout the time when the Caritas
10  hospitals were open, did that continue to be
11  true that Ross and AUC were the only ones
12  that had prepaid deals?
13  A. Yes.
14      (Romero Exhibit 10 marked for
15      identification as of this date.)
16  Q. Mr. Romero, the court reporter has
17  handed you a document that has been marked
18  as Deposition Exhibit Number 10. Exhibit 10
19  is an e-mail chain and attachment marked
20  with identification numbers ROSS 009216
21  through ROSS 009223.
22      MR. LOUGHLIN: In the copy of
23      the exhibit, I have the just one
24      e-mail.
25      MR. TZANETOPOULOS: There is one

45

J. ROMERO

1
2  from Mr. Romero to Dr. Perri and one
3  from Dr. Perri to Mr. Perri.
4      MR. LOUGHLIN: Oh, I see.
5  Q. Have you had an opportunity to
6  review Exhibit 10?
7  A. Yes.
8  Q. Before we start on the exhibit, did
9  you know Dr. Nancy Perri before August of
10  2006?
11  A. Yes.
12  Q. How did you know Dr. Perri?
13  A. I knew Dr. Perri as the clinical
14  dean of Ross University.
15  Q. Ross had, did it not, medical
16  students doing clerkship rotations at
17  Wyckoff before any of the Caritas deals?
18  A. Yes.
19  Q. And was it in connection with your
20  work placing and supervising at medical
21  students at Wyckoff that you knew Dr. Perri?
22  A. Yes.
23  Q. Up until then or up until the
24  negotiations for the Ross affiliation
25  agreement concerning clerkships at the

12  (Pages 42 to 45)

46

1    J. ROMERO
2    Caritas hospitals, what had your interaction
3    with Dr. Perri been?
4        A. Clinical placement, slots,
5    disciplinary issues.
6        Q. So in short, scheduling students,
7    and if there was a problem with the
8    students, dealing with that problem?
9        A. Correct, and billing.
10       Q. At this period of time, that is fall
11   of 2006, was the contract between Wyckoff
12   and Ross for placement of medical students
13   for clerkships at Wyckoff pay as go?
14       A. Yes.
15       Q. Let's focus back on Exhibit 10.
16   Exhibit 10, if we ignore the forwarding
17   portion from Mr. Perri to Dr. Perri, the
18   original message as it's marked there in the
19   attachment, is that an e-mail and attachment
20   that you sent to Dr. Perri?
21       A. Yes.
22       Q. I guess you did copy Philip Perri.
23       A. Right.
24       Q. Did you know Mr. Perri from
25   scheduling students as well?

47

1    J. ROMERO
2        A. Yes.
3        Q. You write, "To complement a proposal
4    submitted by the Brooklyn Queens Health
5    Care, Inc. last month, I am attaching a
6    matrix analysis based on current clerkship
7    slots at the Catholic Mary Medical Center
8    campuses (Mary Immaculate and St. John's.)
9    Is the proposal by the Brooklyn Queens
10   Health Care, Inc., to which you refer in
11   this e-mail Mr. Gio's letter of August 21st,
12   2006 that we have marked as Deposition
13   Exhibit Number 2?
14       A. It's in relation to the proposal of
15   August 21st, 2006.
16       Q. Maybe I need to be more clear with
17   my question. Your e-mail of October 5, 2006
18   in Exhibit 10 refers to a proposal submitted
19   by the Brooklyn Queens Health Care, Inc. My
20   question is is the proposal that you
21   referred to the letter on Exhibit 2?
22       A. Yes.
23       Q. Your e-mail in Exhibit 10 has some
24   numbered points where you describe the deal
25   and then the attached matrix. In layman's

48

1    J. ROMERO
2    terms, can you describe what it is you were
3    proposing?
4        A. The proposal was a discussion on
5    possible opportunities for Ross University
6    at the proposed site at the then Catholic
7    Medical Center of Brooklyn for clerkship
8    placements.
9        Q. And you have numbers 1 through 5.
10   We can go through individually if it helps
11   with your recollection or as a group if that
12   works, either way your recollection works,
13   but there is discussion of continuous
14   back-to-back scheduling, continuing of
15   WYCKOFF2, and things like that. In layman's
16   terms, do you have a recollection of the
17   overall structure of what the proposal at
18   this time was?
19       A. It was a discussion on slots at
20   St. John's and Mary Immaculate Hospital,
21   should we offer it and should they agree to
22   continue to send students there after
23   January 2007.
24       Q. In paragraph 2, there is discussion
25   of continuous back-to-back scheduling of

49

1    J. ROMERO
2    core rotations. For those who aren't
3    involved in the day-to-day of medical
4    student clerkships, in layman's terms what
5    is that that it refers to?
6        A. It means that students who are
7    scheduled at Caritas are scheduled in
8    rotation blocks, and rotation blocks are
9    continuous, and it basically allows a
10   medical student to be placed in a rotation
11   from one block to the next without any gaps,
12   any time gaps.
13       Q. So you are proposing here or at
14   least the advantage of what you were
15   proposing is that at a single hospital, one
16   student could do a number of rotations back
17   to back without having to move between
18   places?
19       A. Not having to move between places.
20   If I may, Ross University, in the past, over
21   the past ten years or six years that we have
22   been working together, had always requested,
23   if not demanded, slots from hospitals like
24   Wyckoff for continuous rotations for their
25   students because of (i), there aren't enough

50

J. ROMERO

1 slots for their students to place, and (ii),
2 they have what they call scheduling gaps,
3 which are reported in some sort of the
4 matrix, from what I recall, from Phil Perri
5 at the school.
6     Q. From your understanding, from the
7 student's perspective, it's advantageous to
8 be able to do a number of different kinds of
9 rotations at a single hospital without
10 having a time gap so that you can get the
11 clerkships done as quickly was possible
12 without moving?
13     A. At different hospitals, at different
14 hospitals.
15     Q. In Exhibit 10, point 3 of your
16 e-mail, it says, "All contingency slots
17 listed under WYCKOFF2 for five years." In
18 layman's terms, what's the proposal on that
19 point?
20     A. This proposal was a discussion. I
21 was trying to get a discussion on slots that
22 could be -- core clerkship slots that can be
23 created for Ross University outside of their
24 current agreement at the time.

51

J. ROMERO

1     Q. And the slots that were being
2 discussed in point 3 would be slots to be
3 provided at Wyckoff?
4     A. Yes.
5     Q. Is it correct that between
6 August 21, 2006, when Mr. Gio sent to the
7 letter to Dr. Perri, and your e-mail, I
8 guess it appears that you hadn't talked
9 about Mr. Gio's proposal yet with Dr. Perri
10 but were trying to provoke a discussion with
11 this e-mail; is that correct?
12     A. No, I had spoken with Dr. Perri and
13 Mr. Perri on the phone in between.
14     Q. Tell me what you remember about
15 those discussions.
16     A. They were very brief, and it was
17 merely an update of whether or not they
18 received the proposal and what they plan on
19 doing about it.
20     Q. What did they say to you?
21     A. It was a basic "We'll get back to
22 you, and we are reviewing the proposal."
23 And that's pretty much it.
24     (Whereupon, a recess was taken.)

52

J. ROMERO

1     Q. Mr. Romero, before the break we were
2 discussing Deposition Exhibit Number 10,
3 your October 5, 2006 e-mail to Dr. Perri.
4 If I could direct your attention to the
5 attachment to the e-mail which is entitled,
6 Draft Ross University School of Medicine
7 Medical Student Matrix. Did you prepare the
8 attachment or did somebody else?
9     A. I did.
10     Q. Your attachment begins, "From the
11 data presented, BQHC provides and guarantees
12 'green-book' clerkships at its Caritas
13 campuses (Mary Immaculate Hospital and Saint
14 John's Queens Hospital) for sixty (60) core
15 slots each year for five consecutive years."
16 Where did you get that information from?
17     A. The information was gathered from
18 interviewing academic-type faculty at Mary
19 Immaculate Hospital and Saint John's Queens
20 Hospital.
21     Q. What are green-book clerkships?
22     A. Green-book clerkships are rotations
23 that are approved by the accreditation
24 counsel for graduate medical education

53

J. ROMERO

1 allowing medical student clerkships to be
2 completed under the auspices of the ACGMA
3 residency training programs.
4     Q. After you had prepared the
5 attachment, did anybody else in the hospital
6 review it before you sent it out to
7 Dr. Perri?
8     A. I don't recall.
9     Q. Would it have been your usual
10 practice at this time to have somebody else
11 at the hospital review a piece like this
12 before you sent it out?
13     A. Yes.
14     Q. And per your usual practice, who
15 would you submit it to for reading?
16     A. Dr. Freiberg. I would also send it
17 to Mr. Gio's office and Mr. McDonald's
18 office.
19     Q. Was it your usual practice to get
20 approval from those people before you sent
21 out a piece like this?
22     A. Yes.
23     (Document marked as Romero
24 Exhibit 11 for identification as

14 (Pages 50 to 53)

54

1        J. ROMERO
2        of this date.)
3        Q. Mr. Romero, let me show you a
4    document that the court reporter has marked
5    as Exhibit Number 11. It's an e-mail
6    exchanged between you and Dr. Perri which
7    appears to be labeled ROSS 009186. Is
8    Exhibit 11 an e-mail that you sent to
9    Dr. Perri and her reply to you?
10       A. Yes.
11       Q. Your e-mail dated October 24, 2006
12   says that it's a follow-up to a conversation
13   that morning. Did you talk to Dr. Perri
14   that morning?
15       A. I can't recall. However, it is my
16   practice to document my conversations
17   usually on the day of the conversation.
18       Q. So your standard practice at work
19   would be to, if you have a conversation of
20   substance, follow up with an e-mail noting
21   what was discussed?
22       A. Yes.
23       Q. Is Exhibit 11 such an e-mail?
24       A. Yes.
25       Q. Was Mr. Gio in on this conversation?

55

1        J. ROMERO
2        A. I don't recall.
3        Q. Do you recall who else was?
4        A. No.
5        Q. Other than what is written in the
6    e-mail, do you remember anything else about
7    this phone call?
8        A. No.
9        Q. At this point in time, had AUC
10   expressed an interest in the slots that had
11   been offered for the clerkships at the
12   Caritas hospitals?
13       A. I'm not certain about the timeline
14   for that.
15       Q. Had any other schools expressed
16   interest in those slots?
17       A. No.
18       Q. Your e-mail asks Dr. Perri to advise
19   preferably within the next two days so that
20   you can hold these clerkship slots for Ross.
21   Was that negotiating attempt on your part to
22   move them along on the process?
23       A. On the hospital's part.
24       Q. Had someone asked you to indicate to
25   them that they needed to act quickly?

56

1        J. ROMERO
2        A. Absolutely.
3        Q. Who asked you to do that?
4        A. It would be the president of the
5    hospital, Dominick Gio.
6        Q. And the reason, at least as you
7    understood it, of why Mr. Gio wanted Ross to
8    act quickly was to get money into the
9    hospitals quickly, correct?
10       MR. LOUGHLIN: Objection to the
11   form. You can go ahead and answer.
12   You can give your testimony subject
13   to the objections.
14       THE WITNESS: I believe so,
15   including the placement of students
16   who might be vacated in January of
17   2007, from my perspective.
18       Q. So let's sort that out if we can.
19   From your perspective, one issue is that
20   beginning January 7, 2007, you would be in
21   charge of scheduling students at the two
22   Caritas hospitals, correct?
23       A. I didn't assume that at the time.
24   However, from my perspective, my concern was
25   the displacement of CMC-based medical

57

1        J. ROMERO
2    students.
3        Q. I understand. So your concern was
4    that students who were presently doing
5    rotations at St. John's and Mary Immaculate
6    Hospital might be displaced once the deal
7    closed unless you made other arrangements?
8        A. From my recollection, we had a
9    number of students who were starting
10   rotations in December of 2006, and if Ross
11   did not have an agreement at then St.
12   Vincent's Brooklyn Queens, those same
13   students will be displaced in the middle of
14   their rotations.
15       Q. And that was an issue with which you
16   were concerned because that's part of your
17   job?
18       A. Absolutely.
19       Q. Mr. Gio's concern was, was it not,
20   getting money at the door as quickly as he
21   could, at least as you understood it?
22       A. It's possible.
23       Q. Well, is it correct to say to your
24   understanding?
25       A. Yes.

15  (Pages 54 to 57)

J. ROMERO

1
2   Q. Did you have an understanding as to
3   what that money was going to be used for?
4   A. No.
5      (Document marked as Romero
6      Exhibit 12 for identification as
7      of this date.)
8   Q. Mr. Romero, let me show you a
9   document that has been marked as Deposition
10  Exhibit Number 12. It has been marked as
11  identification numbers ROSS 009177 through
12  9179. Is Exhibit 12 an e-mail and its
13  attachment that you sent to Dr. Perri?
14  A. Yes.
15  Q. What, if anything, had occurred
16  between the October e-mail and this one that
17  caused you to send a new e-mail and a new
18  attachment?
19  A. From what I recall, it was a follow
20  up.
21  Q. Is it correct then it was just one
22  more effort to get Ross to move?
23  A. Yes.
24  Q. It notes that you sent copies to
25  Keisha, K-E-I-S-H-A, Cole, Harold McDonald

J. ROMERO

1
2   A. Yes.
3   Q. You write, "Per our discussion,
4   please review comment as needed and sign.
5   The clinical affiliation agreement with CMS
6   is intact except for the compensation
7   agreement during the term covered in this
8   amendment (four years, $5 million or until
9   prepaid clerkship fees are exhausted)." And
10  then attached to your e-mail is a draft of
11  the amendment. Who prepared the draft
12  amendment that's attached here?
13  A. I don't recall.
14  Q. Did you?
15  A. No.
16  Q. In the ordinary course of the
17  hospital's business, is this something that
18  likely came from legal?
19      MR. LOUGHLIN: If you know.
20      THE WITNESS: I'm not certain.
21  Q. This was provided to you to send to
22  Ross?
23  A. Yes.
24  Q. Who provided it to you?
25  A. I'm not certain who in particular

J. ROMERO

1
2   and Dominick Gio. Who is Ms. Cole?
3   A. From what I recall, Ms. Cole was one
4   of Dr. Perri's assistants and a hospital
5   liaison.
6   Q. Had Mr. McDonald and Mr. Gio both
7   asked you to do this or were they copied
8   just to keep them on the loop?
9   A. It would be both.
10  Q. So they had asked to see if you
11  could move Ross?
12  A. Yes.
13  Q. And then you sent this e-mail?
14  A. Yes. It's important to note that I
15  have a standing order to follow up on these
16  things.
17      (Document marked as Romero
18      Exhibit 13 for identification as
19      of this date.)
20  Q. The court reporter has handed to you
21  a document marked as Exhibit 13. Exhibit 13
22  has been stamped with identification numbers
23  BQHC 24771 and 24772. Is Exhibit 13 a
24  November 13, 2006 e-mail and its attachment
25  that you sent to Dr. Perri?

J. ROMERO

1
2   but at the time all correspondence for CMC
3   would be coming from Mr. McDonald's office.
4   Q. So as you sit here today, do you
5   think it likely that somebody in Mr.
6   McDonald's office provided this document to
7   you to send to Ross?
8      MR. LOUGHLIN: Objection. Don't
9      ask him to speculate.
10     MR. TZANETOPOULOS: It's
11     discovery deposition.
12     MR. LOUGHLIN: You're asking him
13     is it likely that the source of it
14     was a particular person when he said
15     he doesn't recall who gave it to
16     him.
17  Q. Do you think this came from Mr.
18  McDonald's office to be forwarded to Ross?
19  A. Probably.
20  Q. Your e-mail refers to a discussion
21  with Dr. Perri that afternoon. Was anybody
22  else on that call?
23  A. None that I can recall.
24  Q. In substance what did you say to
25  Dr. Perri and she to you?

16  (Pages 58 to 61)

62

J. ROMERO

1
2    A. Could you repeat that question?
3    Q. I wouldn't expect you to remember
4  the exact words, but in substance, what did
5  Dr. Perri say to you and you to her during
6  this telephone call?
7    A. Whenever I had conversations with
8  Dr. Perri, including this, Dr. Perri would
9  ask general questions on the agreement, and
10 in this particular discussion, from what I
11 recall, it was a discussion on CMC in
12 particular at that time, Catholic Medical
13 Center, and the students that they have
14 there, and in response to my concern of what
15 would happen to her students at CMC once
16 Caritas takes over.
17   Q. What is it that you recall of you
18 and she saying to each other about those
19 topics?
20   A. Simply we had to get it done.
21   Q. Other than what you've testified to
22 and what's written down here, do you
23 remember anything else about that
24 conversation?
25   A. No.

63

J. ROMERO

1
2    Q. I would note that the attachment you
3  sent to Dr. Perri on November 13, 2006 is in
4  the form of an amendment to a contract
5  between Ross and Catholic Medical Center of
6  Brooklyn and Queens, Inc.  Did an entity
7  called Catholic Medical Center of Brooklyn
8  and Queens, Inc. exist at this point in
9  time?
10   A. From what I recall, yes.  To be
11 specific, from what I recall, it's St.
12 Vincent's Catholic Medical Center Brooklyn
13 and Queens.
14   Q. So at least your thought at the time
15 was that the mechanism by which Ross and the
16 BQHC entities would amend the contract was
17 simply to amend that earlier agreement as
18 it's set forth here?
19   A. It was that discussion, yes.
20      (Document marked as Romero
21      Exhibit 14 for identification as
22      of this date.)
23   Q. Mr. Romero, let me show you a
24 document that the court reporter has marked
25 as Deposition Exhibit Number 14.  It's been

64

J. ROMERO

1
2  stamped with identification number ROSS
3  009110 and 9111.  Is Exhibit 14 a copy of an
4  e-mail to that you sent to Dr. Perri, her
5  apply to you, and your response to her reply
6  on November 16, 2006?
7    A. Yes.
8    Q. Your first e-mail of November 2006,
9  the one time stamped 12:56 p.m., has a
10 series of points under the heading, Current
11 Understanding.  Had you and she talked about
12 those deal points that are listed under
13 Current Understanding?
14   A. Yes.
15   Q. What's your recollection of where
16 the two of you stood on those deal points on
17 that date?
18   A. Dr. Perri and I had numerous
19 discussions over the phone, and for the most
20 part, she would not commit to any specific
21 monetary payments or agreements.  However,
22 she was always positive in her response as
23 to getting the agreement done as far as
24 student slots are concerned.
25      MR. TZANETOPOULOS:  Read the

65

J. ROMERO

1
2  answer back, please.
3      (Whereupon, the referred answer
4      was read back by the Reporter.)
5    Q. For the hospital side of the
6  monetary payments and agreements deal points
7  that you just testified about, were those
8  provided to you by others to communicate to
9  Ross?
10   A. These were discussions with the
11 president of the hospital.
12   Q. Discussions between?
13   A. Between myself and the president of
14 the hospital.
15   Q. So Mr. Gio would communicate with
16 you about those points and you with Dr.
17 Perri?
18   A. Mr. Gio and I would discuss them,
19 and then he would say, Well, send it to or
20 call Dr. Perri.
21   Q. And at this point, Dr. Perri
22 wouldn't commit on those points but was
23 positive about getting the deal done?
24   A. Yes.
25   Q. At the top of the exhibit, you sent

17 (Pages 62 to 65)

J. ROMERO

1 another e-mail at 1:40 p.m. which reads,
2 "Okay, thanks Dr. Perri. I can hold the
3 offer at bay for possibly a week." Again,
4 were there really bidders at the doorstep or
5 were you again trying to move Ross along?
6     A. We were trying to get the agreement
7 done.
8     Q. Was there anybody else ready to grab
9 those slots at that time?
10     A. We had AUC, American University of
11 the Caribbean, on the other side of the
12 negotiating table.
13     Q. Did you really think at that point
14 in time that those slots would be gone in a
15 week if Dr. Perri didn't commit right then
16 and there?
17     A. Possibly.
18     Q. But not for sure?
19     A. But not for sure.
20         (Document marked as Romero
21         Exhibit 15 for identification as
22         of this date.)
23     Q. Mr. Romero, let me show you a
24 document the court reporter has marked as

66

J. ROMERO

1     Q. Mr. Romero, Mr. Rucigay,
2 R-U-C-I-G-A-Y, testified at a deposition in
3 the last two weeks that the first meeting of
4 the Caritas board of trustees occurred some
5 time in January of 2007. Did you in fact
6 report this to the Wyckoff board?
7     A. This was the Caritas Planning board,
8 from what I understood it, at that time.
9     Q. Who made up the Caritas Planning
10 board?
11     A. I don't know.
12     Q. Do you remember anybody on it?
13     A. From what I understood at that time,
14 it was Mr. McDonald, and Dr. Mandava,
15 M-A-N-D-A-V-A. By way of that statement, I
16 was alluding to the board where Mr. McDonald
17 was a participant at Caritas.
18     Q. So to your understanding, was the
19 board, to which you referred, a group of the
20 hospital administration that was planning
21 for the acquisition of the Caritas
22 hospitals?
23     A. During that time leading to 2007, I
24 participated in several meetings of what

68

J. ROMERO

1 Exhibit 15. It has been stamped with
2 identification number ROSS 009048. Is
3 Exhibit 15 a copy of an e-mail that you sent
4 to Dr. Perri on November 29, 2006 and her
5 response to you?
6     A. I acknowledged the e-mail.
7     Q. The bottom part is an e-mail from
8 you; is that correct?
9     A. Yes.
10     Q. And the top part is hers back to
11 you.
12     A. That's correct.
13     Q. You write, "Kindly acknowledge
14 receipt of this draft agreement submitted
15 earlier and the terms by way of a formal
16 letter. I have informed our board that you
17 have agreed, in principle, to take and
18 prepay a specific number of core and
19 elective slots beginning January 2007 at a
20 set prepayment schedule (December 15, 2006,
21 and January 15, 2007)." Had you in fact
22 informed the board of this fact?
23     A. Yes, I informed the Caritas planning
24 board about this.

67

J. ROMERO

1 they would refer as a board of physicians
2 and administrators at St. Vincent's at that
3 time, and discussions were, of course, made
4 during those meetings regarding planning
5 purposes including this proposed clerkship
6 prepayment by Ross University.
7     Q. Mr. Romero, during those meetings
8 that you attended of this board, was there
9 any discussion of the use to which the
10 prepayment money would be brought?
11     A. No.
12         (Document marked as Romero
13         Exhibit 16 for identification as
14         of this date.)
15     Q. Mr. Romero, the court reporter has
16 handed to you a document marked Deposition
17 Exhibit Number 16. It's a two-page document
18 marked as identification numbers ROSS 009019
19 and 9020. Is Exhibit 16 a December 1st
20 e-mail from you to Dr. Perri, her reply to
21 you, and your response back to her?
22     A. Yes.
23     Q. The first e-mail from you to Dr.
24 Perri on this exhibit is dated December 1st,

69

18  (Pages 66 to 69)

70

J. ROMERO

1
2  2006, and shows some carbon copies. One is
3  to Mr. McDonald, correct?
4     A. Yes.
5     Q. And I think people have told us
6  throughout the course of depositions here
7  that the nyp.org section of the e-mail
8  address is a reference to New York
9  Presbyterian.org which Wyckoff used at the
10 time?
11    A. That's correct.
12    Q. That's because Wyckoff was part of
13 the New York Presbyterian system.
14    A. Yes.
15    Q. The carbon copy shown after Mr.
16 McDonald is ris9022@nyp.org. Is that to Mr.
17 Richard Sarli?
18    A. From what I recall, yes.
19    Q. And then another copy to
20 dnh9001@nyp.org, is that to David N.
21 Hoffman?
22    A. Yes.
23    Q. So you sent a copy of this e-mail to
24 Dr. Perri and a copy to Mr. McDonald, Mr.
25 Sarli, and Mr. Hoffman, correct?

71

J. ROMERO

1     A. Yes.
2     Q. You write, "Per our telephone
3  meeting this morning, the following items
4  were discussed," and then you list them. Is
5  this another of your confirming e-mails
6  following the conversation with Dr. Perri?
7     A. Yes.
8     Q. And in fact, did each of those
9  points come up in the conversation with her
10 that day?
11    A. Yes.
12    Q. At point 2, you write, "A call from
13 Mr. McDonald is requested by Mr. St. James.
14 Mr. McDonald has returned the call to Mr.
15 St. James today and will be followed up with
16 Mr. Rich Sarli (Caritas CFO)." Do you see
17 where I am?
18    A. Yes.
19    Q. At that point, was it the case that
20 during the call with Dr. Perri on
21 December 1st, she asked you to have Mr.
22 McDonald call Mr. St. James?
23    A. I don't recall.
24    Q. And you write that Mr. McDonald has

72

J. ROMERO

1
2  returned the call to Mr. St. James. Had Mr.
3  McDonald told you that he had done so?
4     A. From what I recall, in my practice I
5  would have called the different people
6  involved and asked them where they are in
7  their own individual responsibilities
8  leading to this agreement.
9     Q. So what you knew at the time that
10 you wrote this was that earlier that morning
11 Dr. Perri asked you have Mr. McDonald call
12 Mr. St. James. Mr. McDonald had done so and
13 said that Mr. Sarli would follow up.
14    A. It may not be. It may have been a
15 telephone call that I received from John St.
16 James or had asked me to call Mr. McDonald
17 or have Mr. McDonald call him regarding the
18 terms of the agreement.
19    Q. So as of this time, it's possible
20 that you had heard this from Mr. McDonald or
21 Mr. St. James?
22    A. That's correct.
23    Q. Do you know which?
24    A. I was merely trying to put everyone
25 on the same page with the conversation.

73

J. ROMERO

1
2     Q. At this point in time, do you
3  remember who gave you the information?
4     A. No. At that time, I would be making
5  calls to Mr. McDonald's office, and he had
6  three secretaries and an administrator. As
7  far as Dr. Perri and Mr. St. James, I would
8  usually be dealing with them directly on the
9  phone.
10    Q. Did you understand Mr. St. James to
11 be the CFO at Ross?
12    A. Yes.
13    Q. In the course of your earlier
14 dealings with Ross, was it the case that
15 negotiations would proceed or did proceed
16 with you and Dr. Perri working out the
17 academic arrangements and then later
18 Mr. St. James coming into talk about the
19 commercial and money arrangements?
20       MR. LOUGHLIN: Objection. Are
21    you referring to the agreement
22    between Ross and Wyckoff or the
23    negotiations that led to the
24    BQHC-Ross agreement for the Caritas
25    purchase.

19 (Pages 70 to 73)

**74**

J. ROMERO

2  MR. TZANETOPOULOS: The later
3  one, I think, I took off the table.
4  MR. LOUGHLIN: Okay, I
5  misunderstood.
6  MR. TZANETOPOULOS: I was
7  talking about your earlier dealings
8  with Ross.
9  THE WITNESS: Kindly restate.
10 Q. Sure. What I'm trying to find out
11 is in the usual course of your negotiations
12 with Ross started with Dr. Perri in the
13 academic group to talk about those topics,
14 and then once you got through those, the
15 money guys like Mr. St. James entered?
16 A. No, this would be the first time.
17 Q. So was it the case in this
18 negotiation that you and Dr. Perri first
19 talk about the academic issues, and then Mr.
20 St. James comes in to talk about money?
21 A. That's correct.
22 Q. I suppose on your side of things,
23 the divide was you and perhaps Dr. Freiberg
24 on the academic side of things, and Mr.
25 McDonald, and Mr. Sarli, and Mr. Gio on the

**75**

1  J. ROMERO
2  money side of things?
3  MR. LOUGHLIN: Objection to
4  form.
5  THE WITNESS: In the past, Dr.
6  Perri would be handling all of the
7  negotiations and the transactions,
8  both academic and commercial.
9  Q. And let me make my question a little
10 more clear. For this particular negotiation
11 on the BQHC-Ross affiliation agreement on
12 the hospital side of things, was it you and
13 Dr. Freiberg on the academic side, and then
14 Mr. Sarli, Mr. McDonald, and Mr. Gio on the
15 money side?
16 A. That would pretty much sum it up.
17 Q. And just to help orient you, Dr.
18 Perri writes back in this exhibit that Mr.
19 Sarli spoke with Mr. St. James this
20 afternoon about a new agreement, and she
21 writes that she will be meeting with John
22 St. James and Dr. Shepherd, and that he is
23 scheduled to follow up with Mr. Sarli
24 afterwards. Do you know who Dr. Shepherd
25 was?

**76**

1  J. ROMERO
2  A. Yes.
3  Q. Who is Dr. Shepherd?
4  A. Dr. Thomas Shepherd is or was at the
5  time the president of Ross University School
6  of Medicine and School of Veterinary
7  Medicine.
8  Q. And then you write back to Dr.
9  Shepherd -- referring back again to
10 Exhibit 16, on December 3rd you write back
11 to Dr. Perri that you have informed Rich and
12 Harold that the draft agreement will be
13 coming from your office with approval from
14 John St. James and Tom Shepherd. Rich and
15 Harold, is that Rich Sarli and Harold
16 McDonald?
17 A. Yes.
18 Q. Had you informed both of them about
19 the fact?
20 A. Yes.
21 Q. Is it the case that Dr. Perri had
22 told you that Ross would be sending his
23 draft agreement?
24 A. Yes.
25 Q. And then a couple of lines down, you

**77**

1  J. ROMERO
2  write, "In addition as a backup, I have
3  designed a contingency plan in effect for at
4  least the next four years at Wyckoff that
5  can then collateralize any committed
6  corporatiship at Caritas. This can be the
7  expressed or implied on the business
8  agreement." Did you have a discussion about
9  that point over the telephone with Dr.
10 Perri?
11 A. I believe on numerous occasions.
12 Q. Numerous occasions before this
13 e-mail?
14 A. Before this e-mail, yes.
15 Q. Had you had discussions on the
16 hospital side within your group about that
17 point?
18 A. Yes.
19 Q. Let's start with the discussions
20 within your group. With whom did you speak
21 and what was the substance of those
22 discussions?
23 A. I had spoken with Dominick Gio, CEO
24 at Wyckoff and Harold McDonald, the
25 administrator at Caritas Planning, and the

20 (Pages 74 to 77)

78

J. ROMERO

1
2  discussions were basically to get things
3  moving and to get things done.  There are
4  certain requests that Ross, in particular
5  Dr. Perri and Phil Perri, have insinuated or
6  requested directly from me regarding
7  clerkship placements at Wyckoff and at
8  Caritas.
9      Q.  With respect to collateralizing
10  Wyckoff and committed clerkships at Caritas,
11  what was the substance of internal
12  discussions on the hospital side?
13      A.  The discussion was, from my
14  recollection, a parallel program wherein the
15  core clerkship capacities at Caritas would
16  have an equal or more of the same core
17  clerkship capacities at Wyckoff.  And in
18  this case, my discussion with Mr. Gio and
19  Harold McDonald at that time was that should
20  Ross decide to use Wyckoff or should Ross
21  decide to use Caritas, their students,
22  within those capacities, are portable in as
23  far as placing the students.  This was part
24  of my discussion internally with them that I
25  wanted from my perspective a more fluid

79

J. ROMERO

1
2  scheduling process within the facilities.
3      Q.  Had Dr. Perri expressed to you
4  Ross's concern -- strike that.
5      Had Dr. Perri expressed to you
6  Ross's wish that if the Caritas hospitals
7  could not provide the promised clerkships,
8  that Ross wanted those at Caritas?
9      MR. LOUGHLIN:  You mean at
10  Wyckoff?
11      MR. TZANETOPOULOS:  At Wyckoff,
12  sorry.
13      MR. LOUGHLIN:  Do you understand
14  the question?
15      THE WITNESS:  I do understand
16  the question but specifically that
17  question, no.
18      Q.  Had Mr. Sarli or Mr. McDonald
19  reported to you at the time you wrote this
20  e-mail that Mr. St. James had expressed to
21  either of them the desire on Ross's part to
22  have, as part of this arrangement, a
23  provision that required a provision of
24  clerkships at Wyckoff if they couldn't be
25  provided at Caritas?

80

J. ROMERO

1
2      A.  No.
3      Q.  At this point in time, had Mr.
4  McDonald or Mr. Sarli reported to you
5  discussions with Mr. St. James in which Mr.
6  St. James had expressed concern about
7  finding protection for the $5 million
8  prepayment if anything happened to the
9  Caritas hospitals?
10      MR. LOUGHLIN:  When you say at
11  this point in time, do you mean the
12  first week of December?
13      MR. TZANETOPOULOS:  December
14  3rd, 2006.
15      THE WITNESS:  From what I
16  recall, the only discussion that Mr.
17  Sarli mentioned or at least conveyed
18  to me is that Mr. St. James wanted
19  Ross to be a secured creditor, and
20  that's what I recall about that.
21  There was no discussion on the
22  hospital going -- Caritas going --
23  shutting down and having their
24  students be added to Wyckoff.
25      Q.  Other than what's written in

81

J. ROMERO

1
2  Exhibit 16 and what you've testified about
3  today, is there anything else that you
4  recall about the conversations that you and
5  Dr. Perri had reflected in the exhibit?
6      A.  Dr. Perri and I and Phil Perri --
7      MR. LOUGHLIN:  The question is
8  directed to a recollection that you
9  may have about the conversation on
10  or about that date, not generally
11  your recollection of all of your
12  conversations with Dr. Perri during
13  this period.
14      THE WITNESS:  The answer is no.
15      Q.  Was one of your e-mail addresses at
16  Wyckoff jur9004@nyp.org?
17      A.  Yes.
18      (Document marked as Romero
19      Exhibit 17 for identification as
20      of this date.)
21      (Whereupon, a recess was taken.)
22      Q.  Mr. Romero, let me show you a
23  document that the court reporter has marked
24  as Deposition Exhibit Number 17.  It's been
25  marked with identification numbers ROSS

21  (Pages 78 to 81)

82

J. ROMERO

1  033055, 056.  They were marked at an earlier
2  deposition.  Is Exhibit 17 an e-mail that
3  you sent to Mr. St. James on December 16,
4  2006?
5  A. Yes.
6  Q. Did you also send copies to Mr.
7  Sarli and to Mr. McDonald?
8  A. Yes.
9  Q. Your e-mail begins with, "I thought
10 our telephone conference meeting today was
11 productive" and so forth.  Is this another
12 one of your e-mails where you summarized a
13 phone call that you had?
14 A. Yes.
15 Q. Had you in fact spoken with Mr. St.
16 James on December 16th?
17 A. I remember speaking with him.
18 Q. Was anybody else on the telephone
19 call?
20 A. None that I recall.
21 Q. How is it that it came to be the
22 case that you and Mr. St. James were talking
23 about these deal points without others?
24 A. From my recollection, he had called

83

J. ROMERO

1  me about the proposals at Caritas for Ross.
2  Q. And this is on a Saturday, holiday
3  time.  Were you in the office at the time?
4  A. I don't recall.  I do work from my
5  BlackBerry and computer at home.
6  Q. If you go down a little to the
7  summary points that you write about, point 2
8  reads, "The current affiliation agreement
9  between and Ross and St. Vincent's Catholic
10 Medical Center would be null and void after
11 December 31, 2006 when Caritas takes over
12 management and ownership of the hospitals."
13 What was the discussion between you and Mr.
14 St. James on that point?
15 A. From my recollection, my main
16 concern was, again, the students who were
17 there rotating during that month who would
18 be continuing on to January, and since their
19 contract, the Ross contract with St.
20 Vincent's, would be null and void, then I
21 would be concerned about their continuation
22 of their clerkships.
23 Q. Going down to point 7 on Exhibit 17,
24 you write, "A contingency of an equal number

84

J. ROMERO

1  of clerkship slots at Wyckoff Heights
2  Medical Center will serve as collateral
3  should any guarantee prepaid core clerkship
4  at Caritas is not provided to Ross
5  University during the term of this
6  agreement."  What was your discussion with
7  Mr. St. James with respect to that point?
8  A. This discussion point on number 7
9  is, from what I recall, the continued
10 discussion between Caritas and Ross
11 regarding slots at Caritas.  The concept of
12 this being that there is a parallel capacity
13 of slots at Wyckoff that we can use for
14 Caritas students.  Mr. St. James, at that
15 time, was the one who brought up this
16 discussion.
17 Q. Other than what you just testified
18 to, do you recall anything about the
19 conversation between you and Mr. St. James
20 on that point?
21 A. None that I can recall.
22 Q. Point 8 in your e-mail says, "A
23 separate agreement on clerkship training
24 including a set allocated for clerkships

85

J. ROMERO

1  will remain at Wyckoff Heights Medical
2  Center."  What was the discussion between
3  you and Mr. St. James on that?
4  A. From what I recall from this
5  conversation, I was explaining to Mr. St.
6  James that in the past Dr. Perri and I were
7  talking about the core clerkships at Wyckoff
8  Heights Medical Center, and at that point I
9  just reiterated to Mr. St. James that
10 Wyckoff is a separate clinical site and is
11 not the same site as Caritas.
12 Q. Anything else about that point that
13 you recall discussing with Mr. St. James?
14 A. None that I recall.
15 Q. Other than what's written in this
16 e-mail and what you just testified to, do
17 you remember anything else about the
18 conversation between you and Mr. St. James
19 on December 16, 2006?
20 A. No, not from my recollection.
21 Q. At any point after December 16, 2006
22 through the time when the affiliation
23 agreement was signed between the two
24 parties, did you ever again speak to

22 (Pages 82 to 85)

86

J. ROMERO

1  Mr. St. James?
2    A. I may have.
3    Q. Do you recall one way or another?
4    A. I don't recall.
5    Q. Other than your confirming e-mails
6  you testified about, did you keep notes of
7  conversations that you had with people from
8  Ross about this contract?
9    A. I took notes for myself, yes.
10   Q. Did you retain those notes?
11   A. No. I would use sticky notes and
12 yellow pads and would summarize them by
13 e-mail right after. After the e-mail is
14 submitted, I'll dispose off my rough notes.
15   Q. Is it your practice to jot down, in
16 any sort of calender or journal, telephone
17 conversations that you had with Ross?
18   A. At that time, yes.
19   Q. Would it be a calender or a journal?
20   A. It would just be a pad, a legal pad.
21   Q. Did you retain those notes?
22   A. No.
23   Q. When did you dispose off the notes
24 that you just testified about?

87

J. ROMERO

1    A. The rough drafts were disposed as
2  soon as I typed up the summary for my own
3  records.
4      MR. LOUGHLIN: I think the
5      record should reflect that
6      Mr. Romero, in answering the
7      question, was, at various times,
8      pointing to Exhibit 17 as an example
9      of one of his e-mail records of
10     telephone conversation.
11       (Document marked as Romero
12       Exhibit 18 for identification as
13       of this date.)
14   Q. Mr. Romero, the court reporter has
15 handed to you a document marked Deposition
16 Exhibit Number 18. Exhibit 18 is a string
17 of e-mails marked with identification
18 numbers ROSS 023723 through 23730. There is
19 an awful lot of back and forth here. You
20 can look as much as you would like. I'll
21 tell you that it is your e-mail to Dr. Perri
22 on December 20, 2006 that I will have
23 questions, but take your time as much as you
24 like and let me know when you're ready.

88

J. ROMERO

1    A. Okay.
2    Q. Have you had a chance to review
3  Exhibit 18?
4    A. Yes.
5    Q. Toward the top of Exhibit 18 there
6  is a message marked from Julius Romero on
7  December 20, 2006 to Dr. Nancy Perri,
8  subject, Final Affiliation Agreement. Is
9  that an e-mail message that you sent to Dr.
10 Perri?
11   A. Yes.
12   Q. Your note says, "I was relieved to
13 have the teleconference with you, Mr. Gio,
14 Dr. Freiberg, and Mr. Shepherd yesterday,"
15 and then you go on. Were you a part of the
16 teleconference that is referenced there?
17   A. Yes.
18   Q. And so the participants were Dr.
19 Perri, you, Mr. Gio, Dr. Freiberg, and Tom
20 Shepherd?
21   A. From what I recall, yes.
22   Q. Was anybody else on the line?
23   A. I'm not certain only because there
24 are multiple sites when the telephone

89

J. ROMERO

1  conferences happened at Wyckoff, Caritas,
2  and at Ross, and historically, when speaking
3  with Ross administrators, there would be
4  instances where someone would be listening
5  in from other lines either from Chicago
6  DeVry or Dominica.
7    Q. Do you remember anybody else
8  participating in this telephone conference?
9    A. I don't.
10   Q. In substance, who said what to whom
11 during that conversation?
12   A. I believe mainly it was a discussion
13 between Mr. Gio and Dr. Shepherd.
14   Q. So we've moved on to the bosses
15 speaking to each other about the points; is
16 that correct?
17   A. From what I recall, yes.
18   Q. Toward the bottom of your message,
19 you write, "As for the rate, the standard
20 medical student clerkship set by BQHC for
21 Caritas and Wyckoff affiliates is $350."
22 Who set that clerkship rate at BQHC?
23   A. It would have been Mr. Gio and Mr.
24 Hsu, and Mr. Sarli based on the current

23 (Pages 86 to 89)

90

1    J. ROMERO
2  market.
3    Q.  What was the rate for the AUC
4  clerkships that were offered as part of that
5  December 1, 2006 agreement?
6    A.  I don't recall.
7    Q.  During this conversation, had the
8  representatives of Ross asked the hospitals
9  to promise to lock in the weekly rate for
10  clerkships at Wyckoff at a rate of $312.50
11  per week for the four-year term of the
12  Caritas agreement?
13    A.  I believe that was a negotiating
14  point from Ross.
15    Q.  So they asked for that?
16    A.  Yes.
17    Q.  And as the discussions evolved, they
18  did, did they not, ask that a provision
19  promising that the Wyckoff rate would be
20  $312.50 per week for four years be included
21  in the BQHC Ross affiliation agreement; did
22  they not?
23    A.  I'm sorry, can you restate that?
24    Q.  On the Ross side they were pressing,
25  were they not, to have the $312.50 weekly

91

1    J. ROMERO
2  rate at Wyckoff be included as part of the
3  BQHC-Ross contract?
4    A.  From what I recall -- I'll try to
5  answer this the best way I can.  From what I
6  recall, the Caritas agreement and the
7  separate Wyckoff agreement had the same
8  rates.
9    Q.  And their point, was it not, is they
10  wanted their rate at Wyckoff to be
11  guaranteed for four more years?
12    A.  On a separate agreement, Ross --
13  Dr. Perri had requested to lock in $312.50
14  for four years at Wyckoff.
15    (Document marked as Romero
16    Exhibit 19 for identification as
17    of this date.)
18    Q.  Mr. Romero, the court reporter has
19  handed to you a document marked Deposition
20  Exhibit Number 19.  It's been stamped with
21  identification numbers ROSS 0630 through
22  0643.  And it looks like it's an e-mail from
23  Dr. Shepherd to Mr. Gio.  It shows copies
24  going to Dr. Perri, John St. James, Virginia
25  Smith and Richard Gunst.  And I would note

92

1    J. ROMERO
2  that you're not on the CC list here.  My
3  first question is did you end up getting a
4  copy of this e-mail and this draft?
5    A.  I don't recall getting a copy of
6  this e-mail, but I recall having seen this
7  draft in the past.
8    Q.  At or about the time of the e-mail,
9  in the December 22, 2006 time frame?
10    A.  I don't recall.
11    Q.  What I'm trying to sort out is I'm
12  sure you've looked at a lot to prepare for
13  today.  What I'm trying to sort out is
14  whether you saw this during the course of
15  the deal or whether you saw it later?
16    MR. LOUGHLIN:  For instance, in
17    preparation of your testimony today?
18    THE WITNESS:  Yes.
19    Q.  Can you recall whether you saw it at
20  the time that you were working on the deal?
21    A.  No, I can't recall.
22    (Document marked as Romero
23    Exhibit 20 for identification as
24    of this date.)
25    Q.  Mr. Romero, let me show you a

93

1    J. ROMERO
2  document that the court reporter has marked
3  as Exhibit 20.  It's an e-mail string and an
4  attachment that has been marked ROSS 008477
5  through 8492.  The first page is an e-mail,
6  it looks like an exchange between you and
7  Dr. Shepherd.  Then there's a few pages of
8  e-mails, looks as if it's internal to Ross,
9  and then a draft red line affiliation
10  agreement.  I'll tell you that's the way it
11  came out of Ross's files.  Part of my
12  question for you will be to see what went
13  with what, if you can remember.  At least
14  the first page is an e-mail exchange between
15  you and Dr. Shepherd, is it not?
16    A.  Yes.
17    Q.  Dr. Shepherd's e-mail to you, on
18  that first page says, "I am sorry for the
19  delay in getting the clarifications to you
20  which are attached.  If we have a signed
21  agreement, then we can proceed with the
22  transfer," and he goes on to talk about
23  being out of town, et cetera, et cetera.
24  You respond saying, "Thank you for the
25  information.  The file document was reviewed

94

```
          J. ROMERO
 1
 2   and determined to be acceptable except for
 3   any reference to the existing Wyckoff
 4   Heights Medical Center agreement [Exhibit B,
 5   (b), (i)].
 6        On the page marked ROSS 008489, the
 7   red line seems to indicate the insertion of
 8   an Exhibit B, subparagraph (b)(i).  Is it
 9   the case that the red line draft in
10   Exhibit 20 is the attachment that you and
11   Dr. Shepherd were discussing in your e-mails
12   on the first page of the exhibit?
13        A.  Yes.
14        Q.  So Dr. Shepherd had sent the red
15   line draft in Exhibit 20 to you and then you
16   had commented back.
17        A.  Yes.
18        Q.  You write that the file document was
19   reviewed.  Who on the hospital side reviewed
20   it?
21        A.  I don't recall, but agreements were
22   submitted to Mr. McDonald and Mr. Hoffman at
23   the time.
24        Q.  So if you followed the hospital's
25   usual business practice on entering the
```

95

```
          J. ROMERO
 1
 2   contracts, this agreement should have been
 3   submitted to Mr. McDonald and to Mr.
 4   Hoffman?
 5        A.  And Mr. Gio.
 6        Q.  And when you wrote back to Dr.
 7   Shepherd that it was acceptable except for
 8   the provision that you indicated, is that a
 9   decision you made on your own or is that you
10   communicating a decision that had been made
11   by others?
12        A.  I recall writing this e-mail after
13   discussing this with Mr. Gio.
14        Q.  So is it the case that Mr. Gio made
15   the decision and then asked you to
16   communicate this message to Ross?
17        A.  Yes.  It was always Mr. Gio's
18   position that Caritas and Wyckoff be
19   separate.
20        Q.  Between the time that Dr. Shepherd
21   sent the red line draft in Exhibit 20 to you
22   and you sent the return message to him, did
23   you speak with anybody at Ross?
24        MR. LOUGHLIN:  You mean other
25   than the consultation that he
```

96

```
          J. ROMERO
 1
 2   described with Mr. Gio?
 3        MR. TZANETOPOULOS:  I asked him
 4   if he spoke to anybody else.
 5        THE WITNESS:  I don't recall.
 6   However, at this time I would be
 7   calling Dr. Perri's office or Phil
 8   Perri for any updates or
 9   Mr. St. James.
10        Q.  Do you remember doing so between the
11   time Dr. Shepherd sent this draft to you and
12   you sent it back to him?
13        A.  I don't recall receiving this draft
14   from Dr. Shepherd.  I recall receiving this
15   draft internally at the hospital.  Then I
16   responded to the draft.
17        MR. LOUGHLIN:  That's your
18   recollection?
19        THE WITNESS:  I don't recall
20   ever receiving a direct e-mail from
21   Dr. Shepherd on the draft agreement.
22   We did go through multiple drafts
23   with Virginia's input and without,
24   with Mr. St. James's input and
25   without, so in this particular case,
```

97

```
          J. ROMERO
 1
 2   I don't recall receiving this
 3   particular draft from Tom Shepherd.
 4        Q.  The draft that's in Exhibit 20, from
 5   whom at the hospital did you receive it?
 6        A.  I don't recall.
 7        Q.  In any event, once you did get it
 8   and spoke with Mr. Gio about it, the message
 9   Mr. Gio sent you to communicate to Ross is
10   contained in your e-mail in Exhibit 20?
11        A.  Yes.
12        Q.  The third paragraph down, you write,
13   "A decision was made by Caritas that this
14   agreement has exhausted a lot of resources
15   already including time and opportunity.
16   Caritas will cease any more discussions or
17   negotiations after the end of the business
18   day today, December 28, 2006."  Do you see
19   that?
20        A.  Yes.
21        Q.  I take it Mr. Gio told you to send
22   that message as well?
23        A.  It was a combination of Mr. Gio and
24   Mr. McDonald.
25        Q.  And the message they wanted
```

98

J. ROMERO

1  delivered to Ross was take it or leave it at
2  this point, correct?
3
4      A. That's correct.
5      Q. If we could stay for just a moment
6  on Exhibit 20, in the course of your work at
7  the hospital, I take it you've worked with
8  red line or track changes documents?
9      A. Yes.
10     Q. So if we can look at Exhibit 20,
11  what I would like to talk about is your
12  understanding of how the red line or the
13  track changes works in this draft, all
14  right? Let's look, if we might, at that
15  Exhibit B language we were discussing on
16  ROSS 8489. And so if we look on that page,
17  under (b)(i), there is some language and
18  some underlining. Do you understand that to
19  be language that Ross had added to the prior
20  draft?
21     A. Yes.
22     Q. Now, if we look at subparagraph (c),
23  there are some boxes in the right-hand
24  margin that says deleted. Do you understand
25  that to be language that Ross had taken out

99

J. ROMERO

1  from the prior draft?
2      A. Yes.
3      Q. And if we go to the last two pages
4  of Exhibit B of this draft marked ROSS 8490
5  and 8491, there is some other underlined
6  language on those two pages, correct?
7      A. Correct.
8      Q. And do you understand that those
9  underlined portions to be language that Ross
10  added to a prior draft?
11     A. Ross or its attorneys, yes.
12     Q. And on your e-mail at the first page
13  of Exhibit 20, what you wrote back to Dr.
14  Shepherd was that the file document was
15  reviewed and determined to be acceptable
16  except for any reference to the existing
17  Wyckoff Heights Center agreement, Exhibit B,
18  (b), (i), correct?
19     A. Correct.
20     Q. That reference is, is it not, the
21  language on page ROSS 008489 under (b)(i)?
22     A. Yes.
23         (Document marked as Romero
24     Exhibit 21

100

J. ROMERO

1  for identification as of this
2  date.)
3      Q. Mr. Romero, let me show you a
4  document that the court reporter has marked
5  as Exhibit 21. It's an e-mail and an
6  attachment from Virginia Smith to, it looks
7  like, you and Mr. Gio, but we'll discuss
8  that, and it's been marked as Ross 0614 to
9  0625. Is the e-mail address jur9004@nyp.org
10  yours?
11     A. Yes.
12     Q. And djg@nyp.org Mr. Gio's?
13     A. Yes.
14     Q. And is this an e-mail that Virginia
15  Smith sent to you on December 28, 2006?
16     A. Yes.
17     Q. Virginia Smith, as you understood,
18  she was an inhouse lower for DeVry, correct?
19     A. No, I did understand that she was an
20  attorney for Ross -- or DeVry.
21     Q. And she writes to you, "Attached is
22  a revised draft of the above-referenced
23  agreement. This is a clean copy, suitable
24  for execution. In accordance with our

101

J. ROMERO

1  conversation earlier this morning, the sole
2  change to the document is the deletion in
3  Exhibit of the paragraph referencing the
4  existing agreement between Ross and Wyckoff.
5  As we discussed, the Wyckoff agreement
6  currently provides for a rate of $312.50 per
7  week, per clinical clerkship, until the
8  parties mutually agree otherwise." What did
9  you do with this version of the agreement
10  when you got it?
11     A. From what I recall, I printed it and
12  left a copy to be read by Mr. Gio, and I
13  left a printed copy for Mr. McDonald of
14  Caritas.
15     Q. Did you compare the draft that Ms.
16  Smith sent in Exhibit 21 with the red line
17  in Exhibit 20 at this time?
18         MR. LOUGHLIN: By this time, he
19     means the morning of December 28th.
20         THE WITNESS: I don't recall
21     comparing it.
22     Q. In the ordinary course of the
23  hospital's business, would comparing drafts
24  of contracts like this be your job or would

102

J. ROMERO

1
2  that be something for Mr. Gio or Mr.
3  McDonald to take care of?
4     A. It would be for Mr. McDonald and Mr.
5  Gio to delegate.
6     Q. Did they delegate that to you?
7     A. I don't recall.
8     Q. Can you recall taking any further
9  steps with the draft of the agreement in
10 Exhibit 21?
11    A. I just recall reading it and giving
12 copies to both administrators.
13    Q. Anything else that you did with the
14 draft?
15    A. No.
16    Q. Mr. Romero, let me direct your
17 attention back to Deposition Exhibit
18 Number 5. It's the affiliation agreement
19 that's signed. Now, if I can direct your
20 attention to the last page whenever you're
21 ready, which is a fax cover sheet, indicates
22 from you to Mr. St. James and Dr. Perri, did
23 you in fact fax or cause to be faxed this
24 signed agreement to Mr. St. James and Dr.
25 Perri?

104

J. ROMERO

1
2  signature process before sending it to Ross?
3     A. Yes.
4     Q. Tell us about every step you took in
5  the process.
6     A. From my recollection, the draft that
7  I received was submitted -- was printed from
8  my e-mail and given to Mr. Gio's office and
9  to McDonald's office at St. John's Hospital.
10 These are two locations. So I would leave a
11 draft in Brooklyn at Wyckoff, and I would
12 leave a draft in Queens with Mr. McDonald at
13 Caritas. And then I would leave it with the
14 administrative assistant and then ask that
15 they call me once there are any comments or
16 directives from both administrator. At
17 Caritas, of course, my request at that time
18 was to call me once the signatures were
19 executed.
20    Q. And you physically were located at
21 the time at Wyckoff?
22    A. Yes.
23    Q. When is it that you received a call
24 that the document had been signed?
25    A. From my recollection, when I

103

J. ROMERO

1
2     A. I recall sending the document.
3     Q. So you faxed this yourself?
4     A. Yes.
5     Q. Were you the person who provided the
6  draft to Mr. McDonald to be signed?
7     A. I don't recall giving the final
8  draft for him to sign, but I do recall
9  giving him the draft.
10    Q. The signature below Mr. McDonald's
11 on the signed document is Dr. Mandava's, is
12 it not?
13    A. Yes.
14    Q. Did you provide a draft for Dr.
15 Mandava to be signed?
16    A. I left a draft in his office -- I
17 left a draft in McDonald's office for Dr.
18 Mandava.
19    Q. In terms of the process of -- let's
20 take a step back. What I am driving at here
21 is I'm trying to understand the process by
22 which Mr. McDonald came to sign it and then
23 you sent it to Ross, so let me ask questions
24 about that. Were you the person who
25 shepherded the final draft through the

105

J. ROMERO

1
2  received the call, it was the same day as I
3  picked up the agreement, the signed
4  agreement, and I faxed it from my McDonald's
5  office.
6     Q. So if we have this right, first you
7  left a copy with Mr. Gio's office and then
8  you went to Queens and left one with Mr.
9  McDonald.
10    A. Yes.
11    Q. Then you went to your office.
12    A. Yes.
13    Q. Then when you received word that Mr.
14 McDonald and Dr. Mandava had signed the
15 agreement, you went back to Queens and faxed
16 it back to Ross from there?
17    A. That's correct. Just for the
18 record, the day I left the draft with Mr.
19 Gio and Mr. McDonald is not necessarily the
20 same day it was signed.
21       (Document marked as Romero
22       Exhibit 22 for identification as
23       of this date.)
24    Q. Mr. Romero, the court reporter has
25 marked as Exhibit 22 a two-page document

27 (Pages 102 to 105)

106

J. ROMERO

1          J. ROMERO
2 stamped BQHC 47342 and 343. Is that an
3 e-mail that you sent to Mr. McDonald with a
4 copy to Mr. Gio on February 10, 2007?
5      A. Yes.
6      Q. You write, "Sir, thank you for
7 meeting with me before the medical board
8 meeting on Thursday and your assurance of my
9 role at BQHC." What were the discussions
10 that you had with Mr. McDonald about that?
11      A. Mr. McDonald at the time of his
12 first few months at Caritas wanted to define
13 several roles that I had in medical
14 education in particular with medical
15 students, and he wanted me to summarize my
16 role at Caritas in what I can do at Caritas.
17      Q. Under point 1, which is Caritas
18 clerkships, you write, "Orientation for all
19 BQHC students will be at the MIH cafeteria."
20 What orientation are you referring to here?
21      A. It would be the general introductory
22 orientation of hospital rules and policies
23 for students, for Caritas students, at the
24 MIH cafeteria, and on the second line there
25 is, "All students will be at Wyckoff for

107

1          J. ROMERO
2 more orientation."
3      Q. I misread that, and I apologize to
4 you. Let me start again. Under point 1,
5 you write, "AUC and Ross students are
6 scheduled to begin at Caritas on 2/21/07.
7 Briefing will be at the MIH cafeteria."
8 Let's talk about the next sentence. You
9 write, "Orientation for all BQHC students
10 will be at Wyckoff on February 20, 2007."
11 What students would be included in the "all
12 BQHC students" that you discuss there?
13      A. It would encompass all students from
14 affiliated medical schools at all the
15 clinical sites.
16      Q. So that would include Wyckoff, Mary
17 Immaculate and St. John's medical students?
18      A. That's correct.
19      Q. Were there any other clinical sites?
20      A. We had satellite sites which are
21 out-patient clinics at Caritas and at
22 Wyckoff.
23      Q. But in each case, those students
24 would be running through either St. John's,
25 or Mary Immaculate, or Wyckoff?

108

1          J. ROMERO
2      A. Yes.
3      Q. At the present time, is the only
4 BQHC affiliate that has the capacity to
5 provide clinical clerkship rotations for
6 medical students Wyckoff? I'm talking about
7 today.
8      A. I'm not certain about your question
9 because BQHC does not exist in my view.
10      Q. Is the only entity to which you're
11 affiliated -- let me ask you a better
12 question. Does Wyckoff have any other
13 affiliates at which it can place medical
14 students for clinic clerkship rotations?
15      A. Only within its clinical sites which
16 includes the out-patient clinic that I
17 mentioned.
18      Q. In those instances, it would be
19 Wyckoff's outpatient clinics?
20      A. Only Wyckoff's.
21         (Document marked as Romero
22         Exhibit 23 for identification as
23         of this date.)
24      Q. Mr. Romero, the court reporter has
25 handed to you a document that has been

109

1          J. ROMERO
2 marked as Deposition Exhibit Number 23.
3 It's been stamped with identification
4 numbers BQHC 13451 through 13453, and it is
5 an e-mail from someone named Joann Purcell,
6 P-U-R-C-E-L-L, to MIH Distribution A, SJQ
7 Distribution A, and WHMC Distribution A.
8 Were you included on any of these
9 distribution lists?
10      A. I'm not sure.
11      Q. Did you get this memo?
12      A. I don't recall.
13      Q. There was, was there not, a time
14 when Tom Singleton became chief
15 restructuring officer at all the hospital
16 entities?
17      A. Yes.
18      Q. At some point in time, for your
19 purposes in dealing with medical education,
20 was it Mr. Singleton who was ultimately
21 making the decisions about those topics?
22      A. Yes.
23      Q. And at that point, Mr. Gio was no
24 longer making those decisions.
25      A. For the most part.

110

J. ROMERO

1  Q. As you understood it, during the
2  period of time Mr. Singleton was at the
3  hospitals, he had the final say so?
4  A. Yes, except --
5  Q. What exception?
6  A. For a few matters.
7  Q. Which matters were those?
8  A. May I say as an example?
9  Q. Sure.
10  A. And example would be when Ross
11  University decided to renew or revise their
12  agreement with Wyckoff, Mr. Singleton had
13  instructed me to involve Mr. Gio.
14  Q. And there was, was there not, an
15  amendment in 2007 or 2008 to the
16  Wyckoff-Ross affiliation agreement?
17  A. Yes.
18  Q. And so Mr. Singleton directed you to
19  involve Mr. Gio in that process?
20  A. Yes.
21  Q. And Mr. Singleton was the one who
22  actually signed that amendment, did he not?
23  A. I'm not certain.
24  Q. Wyckoff continues to supply to Ross

111

J. ROMERO

1  clinical clerkships for Ross's medical
2  students at Wyckoff under that amendment,
3  correct?
4  A. Yes.
5  Q. And Ross pays Wyckoff for those
6  clerkships?
7  A. Yes.
8  Q. At some point in time, did you begin
9  discussing with Ross the potential for
10  amending the affiliation agreement in
11  Exhibit 5 to add additional prepayments and
12  additional clerkship slots?
13  A. May I review that?
14  Q. Absolutely.
15  A. Yes.
16  Q. Were those discussions about
17  amendment of the agreement, when you had
18  them, primarily with someone named Joseph
19  Chu, C-H-U?
20  A. Yes.
21  Q. What did you understand Mr. Chu's
22  role at Ross to be?
23  A. Dr. Chu was, at that time, the
24  clinical dean for Ross University and is in

112

J. ROMERO

1  charge of developing clinical agreements
2  with hospitals for Ross University.
3  Q. So at that point, your liaison for
4  contract negotiations at Ross changed from
5  being Dr. Perri to Dr. Chu?
6  A. Yes.
7  Q. On your side of things, on the
8  hospital side of things, the major deal
9  points -- strike that.
10  Is it the case that once Mr.
11  Singleton arrived at the hospital, that the
12  decision maker for you on deal points became
13  Mr. Singleton?
14  A. Yes.
15  (Document marked as Romero
16  Exhibit 24 for identification as
17  of this date.)
18  Q. Mr. Romero, the court reporter has
19  marked as Exhibit 24 an e-mail that's been
20  stamped with identification number BQHC
21  40627. Is that an e-mail from you to Dr.
22  Chu and it looks like it returned back.
23  It's kind of tough to figure.
24  A. The body of this e-mail is from Dr.

113

J. ROMERO

1  Chu.
2  Q. What confuses me is your signature
3  block is up there some place. Before we get
4  to the document, let's take a sideline.
5  There's a number of documents that the
6  defendant has produced in this case, e-mails
7  where your signature block lists you as
8  assistant vice president medical education
9  for Brooklyn Queens Health Care, Inc.,
10  Wyckoff Heights Medical Center, Caritas-Mary
11  Immaculate, and Caritas-St. John's. During
12  the period of time when your e-mail lists
13  facilities at which you were -- strike that.
14  The signature block on this e-mail
15  lists you as assistant vice president
16  medical education for Brooklyn Queens Health
17  Care, Inc., Wyckoff Heights Medical Center,
18  Caritas-Mary Immaculate Hospital and
19  Caritas-St. John's Queens Hospital. During
20  the time when your signature block on your
21  e-mail listed different facilities, did you
22  hold that office at each of those entities
23  listed?
24  A. I held that office at Wyckoff and at

29 (Pages 110 to 113)

114

J. ROMERO

1  Mary Immaculate physically.
2
3      MR. LOUGHLIN:  I'm not sure that
4  you understood the question.  I
5  don't think it refers to where you
6  actually had a physical office.
7      MR. TZANETOPOULOS:  Right.  I
8  was not asking about where your
9  office was physically located.  My
10  question is were you vice president
11  at the entities listed in your
12  signature block whenever they were
13  on your signature block?
14      MR. LOUGHLIN:  You should just
15  describe what roles you had.
16  Whether or not you wrote this or
17  Joseph Chu wrote this, if there are
18  other e-mails that list you as
19  having those roles, you should just
20  describe your understanding of what
21  those roles involved.
22      THE WITNESS:  It was indeed my
23  understanding that I represent
24  student-related activities for
25  Wyckoff Heights Medical Center and

116

J. ROMERO

1
2  A.  No.
3      Q.  So we could agree, can we not, that
4  at this time you were assistant vice
5  president of medical education at Brooklyn
6  Queens Health Care, Inc., correct?
7      MR. LOUGHLIN:  Objection to
8  form.
9      THE WITNESS:  In that role, in
10  those particular roles for those
11  hospitals.  There is no -- Brooklyn
12  Queens Health Care was established
13  by Mr. Gio or whoever it is that
14  established it.  There was no formal
15  appointment for individuals to have
16  specific titles, although we all had
17  our roles marked for us
18  individually, and in this case,
19  these were marked for my role with
20  the medical education program.
21      Q.  Let's go back to the topic that came
22  up earlier.  At this period of time, you had
23  an office at Wyckoff, did you not?
24      A.  Yes.
25      Q.  And you also had an office at St.

115

J. ROMERO

1  the Caritas hospitals.
2
3      (Document marked as Romero
4      Exhibit 25 for identification as
5      of this date.)
6      Q.  Mr. Romero, the court reporter has
7  handed you a document marked Exhibit 25.
8  It's been marked as identification numbers
9  ROSS 007674 and 7675.  Is it, is it not, an
10  e-mail exchange between you and Dr. Chu?
11      A.  Yes.
12      Q.  And the bottom e-mail is the one
13  that you sent to Dr. Chu on October 15,
14  2007?
15      A.  Yes.
16      Q.  And if you look, your signature
17  block or your identification block in your
18  e-mail to Dr. Chu lists you as assistant
19  vice president medical education Brooklyn
20  Queens Health Care, Inc., Wyckoff Heights
21  Medical Center, Caritas-Mary Immaculate
22  Hospital, and Caritas-St. John's Queens
23  Hospital.  Would you ever send out, sir, an
24  e-mail listing you as an officer of an
25  entity where you were not an officer?

117

J. ROMERO

1  John's?
2
3      A.  No.
4      Q.  Was your only physical office at
5  Wyckoff?
6      A.  No, I had an office at Mary
7  Immaculate Hospital and at Wyckoff.
8      Q.  That's 50-50.  Did Brooklyn Queens
9  Health Care have a physical location?
10      A.  None that I recall.
11      Q.  If I can take your attention back to
12  Exhibit 24, Dr. Chu writes to you, "As we
13  discussed on the telephone yesterday and
14  today, Ross University has reached an
15  agreement with Caritas and Wyckoff Heights
16  Medical Center.  Ross University will prepay
17  $4.5 million to Caritas for the following:"
18  and then there is a list.  What do you
19  recall about those discussions?
20      A.  Dr. Chu, from my recollection, was
21  renegotiating the existing agreement at
22  Caritas and was also trying to renegotiate
23  the agreement at Wyckoff.
24      Q.  There are references throughout the
25  text to positions for XXX.  Do you see where

30 (Pages 114 to 117)

118

J. ROMERO

1  I am in 2 and 3, 1?
2  A. Yes.
3  Q. Did you have an understanding of
4  what XXX meant?
5  A. No.
6  Q. Is it the case that you were really
7  discussing with Dr. Chu positions then
8  contractually committed to AUC?
9  A. It's possible          .
10  (Document marked as Romero
11  Exhibit 26 for identification as
12  of this date.)
13  Q. Mr. Romero, the court reporter has
14  handed you a document that's marked as
15  Exhibit 26. It's an e-mail string marked
16  with identification numbers BQHC 19857
17  through 19861. This is, is it not, an
18  e-mail exchange between you and Mr.
19  Singleton, and a little bit later, there is
20  an inclusion of Barbara Aubel, A-U-B-E-L,
21  Paul Goldberg, and Ajay Lodha, A-J-A-Y,
22  L-O-D-H-A; is that correct?
23  A. Yes.
24  Q. What was the purpose of your e-mails

119

J. ROMERO

1  to Mr. Singleton?
2  A. Mr. Singleton had, at that time,
3  asked all the parties concerned, myself
4  included, to evaluate the contracts that we
5  had at Wyckoff and at Caritas.
6  Q. And who other than you had Mr.
7  Singleton asked to do so?
8  A. Mr. Paul Goldberg from his company,
9  Dr. Ajay Lodha, chief medical officer of
10  Caritas, Lee Barkan. I think that's all I
11  can recall.
12  Q. Mr. Barkan was an attorney at the
13  Proskauer Rose law firm?
14  A. I believe so.
15  Q. And he was the hospital's legal
16  counsel outside?
17  A. I believe from my recollection, Mr.
18  Barkan came on board after Mr. Hoffman left.
19  I would add Mr. Hoffman to this discussion.
20  Q. Mr. Singleton asked you to evaluate
21  whether additional funds could be raised for
22  the hospitals by entering into amendments or
23  additional affiliation agreements with
24  medical schools?

120

J. ROMERO

1  A. Yes.
2  Q. And is that what you were evaluating
3  in the different scenarios that are listed
4  in this e-mail?
5  A. I wanted to open up a discussion for
6  them to review the contracts, and I wanted
7  them to have a summary of my own discussions
8  regarding possibilities between the two
9  medical schools involved at Caritas at that
10  time, AUC and Ross.
11  Q. And are the scenarios listed in this
12  exhibit a result of that work?
13  A. Yes, the scenarios are the
14  discussions of that.
15  Q. If I can direct your attention to
16  the page stamped BQHC 19859, that looks to
17  be your first e-mail to Mr. Sarli, Mr.
18  Hoffman, and Mr. Singleton in this exhibit,
19  correct?
20  A. I'm not certain if this is the first
21  e-mail.
22  Q. But at least in this exhibit.
23  A. Yes, this is my e-mail.
24  Q. And you write, "The attached is

121

J. ROMERO

1  AUC's counteroffer." Counter to what?
2  A. In the fall of 2007, AUC had
3  proposed to revise the agreement, the
4  promissory note, with Caritas, and
5  discussions were made between Dr. Kaplan,
6  the clinical dean at AUC and Mr. Singleton,
7  and myself present in some of those
8  discussions, to modify their existing
9  promissory note.
10  Q. And what modifications were they
11  looking for?
12  A. They were looking for -- in my
13  recollection, they were basically looking
14  for two modifications, qualitative and
15  quantitative modifications in the number of
16  slots that are placed and the number of
17  slots that are vacated, whether or not they
18  should pay for vacated or unscheduled slots.
19  Qualitative-wise they wanted limitations in
20  the number of students that are seen by
21  faculty by way of a ratio, and they wanted
22  to increase clinical cases just for their
23  own students separate from Ross, as I recall
24  it.

31 (Pages 118 to 121)

122

J. ROMERO

Q. Let me see if I can fairly translate that in layman's terms. Is it the case that the hospitals wanted AUC to be charged for clerkship rotations if it had been reserved for AUC but AUC didn't provide a student, and then AUC did not want to be charged for those instances?

A. Yes.

Q. And that was the one point. They also, at AUC, wanted a limit on the number of clerks that would be present at the hospitals based on some ratio --

A. Yes.

Q. -- of clerks to doctors?

A. Correct.

Q. And they wanted special treatment on clinical cases just for their own students.

A. That's correct.

Q. And what is it that you were looking for in this negotiation?

A. I believe -- if I may, I believe I was looking for some balance between Ross University and AUC. I could not make a comment on the clinical and the quality

123

J. ROMERO

issues, but at the time I was pushing for balance.

Q. And you were also, were you not, looking for the opportunity -- let's go back a step. Was it a problem between the hospitals and AUC that AUC would have reserved slots but then not turn up students for those slots?

A. Yes.

Q. Did you have such a problem with Ross?

A. Yes.

Q. To the same degree?

A. No.

Q. I take it AUC was the bigger problem?

A. To that extent, yes.

Q. Now, your e-mail goes down on that same page to reflect that "Ross is offering Caritas $4.5 million for AUC's share of Caritas slots (Plan B)." And then if you go on your e-mail, there is a Plan B on the next page. Is it the case that you were in discussions with Dr. Chu in which he had

124

J. ROMERO

offered to pay $4.5 million prepayment if you were willing to commit to him the 50 slots that AUC held at the Caritas hospitals?

A. To the extent that the 50 slots are vacant.

Q. And you write on your plan B, "Release the cap." Does that reference the fact that if you vacated AUC and replaced those slots would Ross students, you wouldn't have the issue of having this ratio cap of a number of clerkships offered by the hospital?

A. There was a cap on the promissory note with AUC, and that was the cap I was alluding to.

Q. So if you replaced AUC with Ross, that cap would be released, correct?

A. Yes.

Q. And the reason that was advantageous to the hospitals is that it would mean that you could offer more clinical clerkship rotations, correct?

A. Yes.

125

J. ROMERO

Q. And by offering additional rotations, potentially raise additional funds by charging for those rotations.

A. The reason for the release of the cap, the reason I requested for the release of the cap is because we opened up electives and core rotations particularly in psychiatry, and that's one of the main reasons why I needed the cap released.

Q. It is the case, is it not, though, that releasing the cap would enable the hospitals to earn more money by selling more clerkships slots?

A. We would be able to charge for more clerkship slots.

Q. And then there is a Plan C, and there is some discussion of modifications. In layman's terms, is it the case that what you were conveying there, one was that an option was to attempt to negotiate with both Ross and AUC modifications which would have students from both schools there but change caps, and ratios, and prices?

A. Specific to the interest payments

32 (Pages 122 to 125)

126

J. ROMERO

1
2  and the caps.  I was trying to encourage Mr.
3  Singleton to have a dialogue with both
4  medical schools in this plan.
5      Q. So if you can summarize Plans A, B
6  and C on a very high level, Plan A is no
7  change but deal with the interest payments,
8  Plan B is replace AUC with Ross, and Plan C
9  is talk to both schools but modify the
10  contracts.
11      A. Correct.
12      Q. If we go to page BQHC 19859, Mr.
13  Singleton responds, and he writes, "It seems
14  the Plan B produces $1.3 million of
15  immediate cash plus gives us additional
16  slots to sell.  If this is correct, Plan B
17  is tough to beat.  What is the down side to
18  plan B?"  Did you understand what he was
19  talking about there?
20      A. Yes.
21      Q. The 1.3 in cash that Mr. Singleton
22  discusses there that would be produced for
23  the hospitals is the result of the fact that
24  there was $3.2 million of unamortized
25  prepayment from AUC for slots that Ross had

127

J. ROMERO

1
2  offered $4.5 million to acquire, correct?
3      A. That's my understanding.
4      Q. So if you swapped out AUC and
5  replaced it with Ross at those prices, that
6  would generate an immediate gain of
7  $1.3 million, correct?
8      A. Yes.
9      Q. Also, you lose the cap; you like
10  that part, correct?
11      A. Yes.
12      Q. And then he asked you what's the
13  down side.
14      A. That's correct.
15      Q. Your response to Mr. Singleton's
16  question about the down side begins, does it
17  not, at BQHC 19857 at the bottom of the
18  page?
19      A. Yes.
20      Q. So your response to Mr. Singleton's
21  question begins at the bottom of the first
22  page of Exhibit 26.
23      A. Yes.
24      Q. And what you write to Mr. Singleton
25  in response to his question about the down

128

J. ROMERO

1
2  side is, "We could indeed infuse some cash
3  with Plan B (and it is still available).  I
4  was exploring our long-term relationship
5  with the schools and the possibility of a
6  monopoly by one school," right?
7      A. Yes.
8      Q. The next thing you say is, "Plan B
9  Scenario:"  The Plan B Scenario refers, does
10  it not, to the Plan B of your first e-mail
11  and the Plan B in Mr. Singleton's question?
12      A. Yes.
13      Q. Then you write, "AUC is pulled out
14  of Caritas.  Ross gets exclusivity for
15  the next three years, options for year 4 and
16  5.  We get $1.3 million."  What discussions
17  had you had with Ross about a three-year
18  term in options?
19      A. This discussion, from my
20  recollection, is what Dr. Chu was trying to
21  propose to Caritas at the time.
22      Q. And your statement, "We get
23  $1.3 million," that is a reference to the
24  difference between the price that you
25  testified about earlier?

129

J. ROMERO

1
2      A. Yes.
3      Q. And then you write to Mr. Singleton,
4  "In a worst-case scenario, a fall-out by the
5  residency programs or institution will make
6  us responsible for unamortized payments plus
7  interest of up to $9.5 million (initial
8  $5 million plus $4.5 million).  Slots lost
9  at Caritas are guaranteed at Wyckoff as per
10  both contracts."
11      A. That's what I wrote to Mr.
12  Singleton.
13      Q. The two contracts that you were
14  referring to in that part of your e-mail are
15  the AUC contract, the AUC promissory note,
16  and the Ross affiliation agreement, correct?
17      A. In this last line, "Slots lost at
18  Caritas are guaranteed at Wyckoff as per
19  both contracts," I was really alluding to
20  AUC.  From what I recall, the promissory
21  note is what we had at Wyckoff, and what I
22  was discussing with Mr. Singleton with Ross
23  in this particular case is the monetary
24  obligation on the unamortized monies that
25  was being proposed by Dr. Chu.

33  (Pages 126 to 129)

J. ROMERO

**Q. Did you have more than one contract with AUC for the Caritas hospitals?**

A. No. If I recall, we only had a promissory note.

**Q. Earlier you may have discussed about the fact that the unamortized balance on the AUC notes was only $3.2 million, correct?**

A. Yes.

**Q. So it's not the case, is it, that if AUC pulled out of Caritas, you would be responsible for $9.5 million, correct?**

A. Correct.

**Q. The contract with Ross involved a $5 million prepayment, correct?**

A. That's correct.

**Q. And the proposal on the table from Ross was an additional $4.5 million.**

A. That's correct.

**Q. And that adds up to $9.5 million, correct?**

A. Correct.

**Q. So the responsibility for $9.5 million really refers, does it not, to the $5 million from Ross's original affiliation**

**J. ROMERO**

**agreement and the four and a half from the proposal, right?**

A. That's correct.

**Q. If we go down further to the bottom of that page, you write to Mr. Singleton, "If we go with Plan B, I recommend an airtight exit, with a complete review of the agreement with AUC. I sent David Hoffman a copy of the contract last month. To maintain good relations, we can offer them electives and some cores (if Ross agrees)." Your concern was, was it not, that if you replaced AUC with Ross, AUC might sue the hospitals?**

A. Yes, it's a possibility.

**Q. So your concern, as expressed to Mr. Singleton here, was that if you were going to engage in this transaction, you first must decide that you really could get out of the AUC contract?**

A. At that time, AUC was in discussion with Mr. Singleton already, so yes, I did encourage him to have a dialogue with both schools.

J. ROMERO

**Q. And your concern here that you expressed to Singleton is that if you were going to make the swap, Ross with AUC, the hospitals needed to know that they could get out of the AUC contract without liability.**

A. Yes.

**Q. And it says here that you sent a copy of that contract to Mr. Hoffman last month, correct?**

A. Correct.

**Q. That was the AUC contract?**

A. Yes.

**Q. And your purpose in doing so was to ask him to review whether or not it was possible to get out of it?**

A. Yes.

**Q. At the top e-mail on the first page of Exhibit 26, toward the top of the e-mail, Mr. Singleton says that he would like to meet with Julius, Paul, and Dr. L. I take it you understand Julius to be you.**

A. Yes.

**Q. Paul is Paul Goldberg.**

A. Goldberg.

J. ROMERO

**Q. And Dr. L is Dr. Lodha, I take it?**

A. Might have been.

**Q. Was there such a meeting?**

A. I don't recall the meeting.

(Document marked as Romero Exhibit 27 for identification as of this date.)

**Q. Mr. Romero, the court reporter has handed to you a document marked Exhibit 27. It's been stamped with identification numbers ROSS 7512 and 7513. It's an e-mail exchange between you and Dr. Chu, is it not?**

A. Yes.

**Q. Now, just to be fair to you, I'll fast forward to save us time. There had been negotiations and additional e-mails between and you Dr. Chu on mainly both the Caritas and Wyckoff contracts during this period of time, had there not?**

A. Yes.

**Q. And at this point in time, the two of you had exchanged some draft contracts.**

A. I believe so.

**Q. Your e-mail to Dr. Chu on the first**

www.uslegalsupport.com

134

J. ROMERO

1  page dated November 27, 2007 at 12:33 p.m.,
2  it says, "Legal reviewing final touches on
3  contract." And then at the bottom, it says,
4  "If you can, please call me or Clair
5  Mullally, Esq. at (718)558-2001." Who is
6  Claire Mullally?
7      A. Claire Mullally was a counsel for
8  Caritas at that time who was involved in
9  viewing the draft issues. M-U-L-L-A-L-L-Y.
10     Q. So Ms. Mullally was the hospital's
11  inhouse lawyer?
12     A. Yes, of Caritas.
13     Q. During the course of your work
14  exchanging draft amendments to the BQHC-Ross
15  affiliation agreement with Dr. Chu, had Ms.
16  Mullally been involved in the process?
17     A. Yes, she was the person who was
18  exchanging drafts with Dr. Chu.
19     Q. So from your side, it was the
20  hospital's lawyer swapping drafts with Dr.
21  Chu?
22     A. Yes, copied to me.
23     Q. For ease of reference, Mr. Romero,
24  I'm going to put Exhibit 6, that's the

135

J. ROMERO

1  amendment to the affiliation agreement
2  before you. Before I do that let's mark
3  this.
4         (Document marked as Romero
5         Exhibit 28 for identification as
6         of this date.)
7      Q. Exhibit 28, as marked by the court
8  reporter, is an e-mail string marked with
9  identification numbers BQHC 47571 and 572,
10  that is, is it not, copies of an e-mail
11  exchange between you, Mr. Goldberg, Mr.
12  Sarli, and Mr. Haas, H-A-A-S?
13     A. Yes.
14     Q. Who is Mr. Haas?
15     A. I can only recall that he worked for
16  Mr. Goldberg.
17     Q. You write in the top e-mail on
18  December 4, 2007, "Final signatures to be
19  made. Paul G will need to sign two docs
20  with me today. Wire is set up and will be
21  sent once the signatures are received." Do
22  you see that?
23     A. Yes.
24     Q. The two documents, are those the

136

J. ROMERO

1  amendments to the Ross-BQHC affiliation
2  agreement and also the Ross-Wyckoff
3  affiliation agreement?
4      A. I can only recall the Caritas
5  agreement. I'm not certain about the second
6  reference.
7      Q. At least one of those documents
8  would be the amendment to the Ross-BQHC
9  agreement?
10     A. The Ross-Caritas agreement.
11     Q. That would be Romero Exhibit 6
12  entitled Amendment to Affiliation Agreement
13  between Ross University School of Medicine
14  and School of Veterinary Medicine and
15  Brooklyn Queens Health Care, Inc. through
16  Caritas Health Care?
17     A. Yes.
18     Q. Why was it that you know that Mr.
19  Goldberg was going to be signing these
20  agreements?
21     A. I remember the particular day. Mr.
22  Singleton nor Dr. Lodha were present at the
23  time. We were instructed by Mr. Singleton
24  through Mr. Goldberg to take care of the

137

J. ROMERO

1  signatures through Mr. Goldberg's office.
2      Q. So your contact on this signature
3  was from Mr. Goldberg?
4      A. Yes.
5      Q. I take it what he told you was that
6  Mr. Singleton was away from the hospitals,
7  so get the agreements to Mr. Goldberg for
8  signature?
9      A. Someone had mentioned that Mr.
10  Goldberg would be handling it for Mr.
11  Singleton.
12     Q. Do you remember who that was?
13     A. No.
14     Q. If we can refer back to the
15  amendment in Exhibit 6, please, the
16  amendment does, does it not, call for Ross
17  to make additional prepayments and get some
18  additional slots, correct?
19     A. Yes.
20     Q. Were you the one that presented the
21  final draft to Mr. Goldberg for signature or
22  was that something that Ms. Mullally did?
23     A. Everything at that time was through
24  Ms. Mullally.

35 (Pages 134 to 137)

138

J. ROMERO

1  Q.  So it would have been the inhouse
2  lawyer that gave it to him to be signed?
3  A.  And to myself, yes.
4  Q.  Next question:  Who gave it to you?
5  A.  Ms. Mullally.
6  Q.  Did she instruct you to sign it?
7  A.  Yes.
8  Q.  Let's take a ten-minute break.
9       (Whereupon, a recess was taken.)
10      (Document marked as Romero
11      Exhibit 29 for identification as
12      of this date.)
13  Q.  Mr. Romero, the court reporter has
14  handed you a document that she has marked as
15  Exhibit 29.  It's an e-mail exchange between
16  you and Mr. Singleton forwarding material
17  you received from Dr. Chu.  It's been marked
18  BQHC 39559 through 39560.  This is an e-mail
19  that -- the last page has been redacted but
20  appears to be one from Dr. Chu to you and
21  Ms. Mullally, correct?
22  A.  Yes.
23  Q.  Looks like a draft agreement, red
24  line and clean copy.  The first page, is
25

139

J. ROMERO

1  that your e-mail forwarding on clean and red
2  line to Mr. Singleton?
3  A.  Yes.
4  Q.  I guess from your indication in your
5  note it is correct, is it not, that Ross had
6  already signed the contract?
7  A.  From my understanding, yes.
8  Q.  And Claire would be Claire Mullally?
9  A.  Yes.
10  Q.  The question for Mr. Singleton is
11  whether you and Mr. Goldberg should sign it
12  at that point?
13  A.  Yes.
14  Q.  He indicates you got to wait until
15  he gets back tomorrow.
16  A.  Yes.
17  Q.  Does it spark any recollection about
18  how this actually happened?
19  A.  No.
20      (Document marked as Romero
21      Exhibit 30 for identification as
22      of this date.)
23  Q.  Mr. Romero, I'm handing you a
24  document which has been marked as
25

140

J. ROMERO

1  Exhibit 30.  It's been stamped with
2  identification numbers ROSS 001564 and
3  001565.  This is, is it not, a copy of an
4  e-mail that Claire Mullally sent to Wilfredo
5  Raymundo, R-A-Y-M-U-N-D-O, with a copy to
6  you and Dr. Chu?
7  A.  Yes.
8  Q.  And where I would like to direct
9  your attention is to the name or signature
10  block of Ms. Mullally.  It lists her as
11  interim counsel for Brooklyn Queens Health
12  Care, Inc., Wyckoff Heights Medical Center,
13  and Caritas.  Earlier in your testimony, you
14  said that Ms. Mullally was lawyer for
15  Caritas.  Does this refresh your
16  recollection, sir, that she was also inhouse
17  counsel for Brooklyn Queens Health Care and
18  Wyckoff Heights Medical Center?
19  A.  I was not aware that she was.
20  Q.  The commercial deal points for the
21  first amendment in Exhibit 6, were those
22  points that were substantively negotiated
23  between Dr. Chu and someone from the
24  hospital other than you?
25

141

J. ROMERO

1  MR. LOUGHLIN:  Objection to
2  form.  Do you understand the
3  question?
4  THE WITNESS:  If Dr. Chu
5  discussed with other --
6  Q.  I'm talking about the hospital side.
7  Were you the deal point guy for the hospital
8  with Dr. Chu or was there somebody else?
9  A.  It would be Mr. Singleton as well.
10  Q.  We've also marked as Exhibit 7 the
11  second amendment to the affiliation
12  agreement.  The drafts of that agreement
13  that went back and forth between the
14  parties, were you the source of the exchange
15  for the hospital side, or did Ms. Mullally
16  or somebody else do that?
17  A.  Ms. Mullally and I worked together
18  in receiving the draft proposals.
19  Q.  On the hospital side, who was
20  responsible for the substance of the
21  negotiation?
22  A.  At that time, it was Mr. Singleton.
23  Q.  Were you at all responsible for the
24  substantive points?
25

36 (Pages 138 to 141)

142

**J. ROMERO**

1
2    MR. LOUGHLIN: Objection to
3    form. Can you answer the question?
4    MR. TZANETOPOULOS: Actually, I
5    think he already has. I withdraw
6    that. I think we did that early on.
7    I apologize.
8    Q. Again, you can look at this as much
9    as you would like. Where I would like to
10   direct your attention ultimately is to the
11   provisions of the contract contained --
12   MR. LOUGHLIN: Are you referring
13   to the second amendment?
14   MR. TZANETOPOULOS: Yes,
15   Exhibit 7, the second amendment.
16   Portions on the exhibit, pages 3 and
17   4, under the heading, Litigation.
18   Take a minute, take a look, and then
19   I'll ask you some questions.
20   Q. At the time that Ross and BQHC
21   signed Exhibit 7, AUC had sued Caritas and
22   BQHC and Wyckoff, had it not?
23   A. Yes.
24   Q. Had you played a part in the
25   discussions with AUC informing AUC that it

143

**J. ROMERO**

1
2    was the hospital's intention to prepay the
3    AUC promissory note and provide those slots
4    to a school other than the American
5    University of the Caribbean?
6    A. Could you repeat that question?
7    (Whereupon, the referred
8    question was read back by the
9    Reporter.)
10   THE WITNESS: I don't recall
11   that language.
12   Q. To your understanding, were those
13   discussions conducted either by Mr.
14   Singleton or by counsel?
15   A. I believe, from my recollection,
16   these were discussed, all of these items
17   were discussed, but I'm not particularly
18   sure about the prepaying the -- if you're
19   referring to unamortized monies, to pay off
20   unamortized monies, I was aware of that.
21   MR. LOUGHLIN: I think the
22   question was whether you personally
23   participated in discussing with AUC
24   the steps that would be taken
25   leading to Exhibit 7, the second

144

J. ROMERO

1
2    amendment agreement with Ross or
3    whether you know whether someone
4    else participated in those
5    discussions.
6    THE WITNESS: I was aware of it,
7    I was aware of it.
8    Q. Were you one of the ones that talked
9    with AUC about prepaying the unamortized
10   portion?
11   A. I don't recall anything official to
12   AUC.
13   Q. But anything unofficial?
14   A. I recall, I believe, a telephone
15   discussion with an AUC employee that
16   something in that nature is being discussed
17   and that it's best to have a dialogue with
18   Caritas administration.
19   Q. With whom did you speak with?
20   A. I believe I spoke with Ed Kulesa,
21   former employee at Wyckoff who now works for
22   AUC. K-U-L-E-S-A.
23   Q. You were aware, were you not, that
24   the hospitals did in fact attempt to return
25   payment of the unamortized funds to AUC on

145

**J. ROMERO**

1
2    the promissory note, correct?
3    A. I was aware of that.
4    Q. And you were also aware, were you
5    not, that hospital administration's plans
6    for those slots were to sell them to Ross,
7    correct?
8    A. To replace vacated slots with the
9    Ross amendment.
10   Q. And in effect, hospital
11   administration had, had it not, executed
12   what in your e-mail in Exhibit 26 was your
13   Plan B?
14   A. A part of that.
15   Q. Other than the change in price, was
16   it essentially your Plan B?
17   MR. LOUGHLIN: Meaning the
18   second amendment?
19   MR. TZANETOPOULOS: Yes.
20   THE WITNESS: Essentially, yes.
21   Q. By the time the parties signed the
22   second amendment, as you testified, AUC had
23   sued the hospital entities. Were you
24   involved in the discussions with Ross about
25   how to deal between the parties with the

37 (Pages 142 to 145)

J. ROMERO

1  fact that AUC had sued?

2    A.  Yes, to an extent, yes.

3    Q.  With whom did you talk at Ross about

4  that?

5    A.  Dr. Chu, I believe, for the most

6  part.

7    Q.  And what were the substance of the

8  conversations between you and Dr. Chu?

9    A.  To my recollection, most of our

10  discussions were directly just related to

11  the vacated slots that are now available for

12  Ross to fill and for Dr. Chu's department,

13  the clinical department, to place their

14  students at Caritas.

15    Q.  Did you or Dr. Chu discuss the

16  potential effect of an injunction should AUC

17  have obtained an injunction in its suit on

18  the ability to place those students?

19    A.  I don't recall a direct discussion

20  with me and Dr. Chu, but I do recall -- at

21  that time I was aware of the possibility

22  from what I have heard from Lee Barkan or

23  Claire Mullally.

24    Q.  Were the discussions about --

J. ROMERO

1    MR. LOUGHLIN:  Just don't

2  discuss anything about

3  communications with Mr. Barkan or

4  Ms. Mullally.  That's privileged

5  communications.

6    Q.  Were the discussions about how to

7  deal about an injunction being had at least

8  to your understanding between the lawyers

9  for the two parties?

10    A.  I have no idea.

11    Q.  Would you have any idea as to who

12  was conducting the discussions?

13    A.  No.

14    Q.  Is your only understanding of the

15  communications between the parties about how

16  to handle a potential injunction what was

17  told to you by the hospital's lawyers?

18    A.  No.  I have no recollection of

19  having anyone discuss the injunction with me

20  directly.

21    Q.  How about indirectly?

22    A.  Or indirectly for that matter.

23    Q.  The litigation section of the second

24  amendment, Exhibit 7, between pages 3 and 4,

J. ROMERO

1  generally addresses what would happen if,

2  and I'm quoting on page 3, "As a result of

3  such injunction or other court order, BQHC

4  is unable to provide 135 core clerkship

5  slots to Ross guaranteed hereunder," and

6  there is some -- what do you do if that

7  happens.

8    MR. LOUGHLIN:  To make sure that

9  the record is clear, the last

10  portion of the exhibit that you were

11  reading from says that if those

12  things happen, this amendment shall

13  automatically terminate and be of no

14  further force and effect except with

15  respect to the indemnification.

16    MR. TZANETOPOULOS:  It goes on

17  to say much more than that but --

18    MR. LOUGHLIN:  Well, that is the

19  paragraph that you were reading

20  from.  That is the final sentence in

21  that paragraph.

22    Q.  Here is my question for you,

23  Mr. Romero:  After this agreement was

24  signed, did in fact the hospitals provide

J. ROMERO

1  ultimately 135 core rotations to Ross's

2  students?

3    MR. LOUGHLIN:  When you say the

4  hospitals, you mean Caritas?

5    MR. TZANETOPOULOS:  St. John's

6  and Mary Immaculate.

7    THE WITNESS:  Eventually we did.

8    (Document marked as Romero

9  Exhibit 31 for identification as

10  of this date.)

11    Q.  Mr. Romero, the court reporter has

12  marked as Exhibit 31 a document has been

13  stamped with identification number BQHC

14  49172.  Is that an e-mail that you sent to

15  Dr. Chu on May 23rd of 2008?

16    A.  Yes.

17    Q.  You write to Dr. Chu, "We will have

18  a separate meeting with the chairs on that

19  day."  You go on to say that he should feel

20  free to observe during the orientation on

21  the given day.  "Tom Singleton and the team

22  (lawyer/myself) have discussed the issues

23  including the recent preliminary injunction

24  order and will keep all Ross students in the

150

J. ROMERO

1  core rotations at every rotation block
2  scheduled," correct?
3      A. Correct.
4      Q. This was, was it not, an e-mail that
5  you sent to Dr. Chu after the Federal
6  District Court in Florida had entered on
7  injunction on behalf of AUC, correct?
8      A. I'm not certain about the timeline.
9      Q. You are aware, are you not, that in
10 fact the Federal District Court of Florida
11 did have an injunction on behalf of AUC?
12     A. I am aware of that, yes.
13     Q. And that injunction required, did it
14 not, that the AUC students continue to be
15 provided slots at Mary Immaculate and St.
16 John's?
17     A. I believe that was the directive.
18     Q. And I take it that posed a problem
19 for you potentially because you had hoped to
20 commit some of those slots to Ross, right?
21     A. It was a scheduling challenge.
22     Q. And the challenge being presented by
23 the fact that Ross had paid money for slots
24 that it hoped to be vacated but now weren't

151

J. ROMERO

1  as a result of the injunction?
2      A. That's correct.
3      Q. What discussions did you have with
4  the folks at Ross about how to address that
5  challenge?
6      A. From my recollection, the cap at
7  that time was released, and we kept the
8  students at Caritas as scheduled. Ross
9  would be sending the names of students and
10 the number of students to Caritas, and we
11 basically accommodated what they sent to us.
12     Q. So what the hospitals did was expand
13 a number of clerks accommodated at the
14 hospitals and then provide both schools with
15 the appropriate numbers?
16     A. Based on the agreement, yes.
17         (Document marked as Romero
18         Exhibit 32 and 33 for
19         identification as of this date.)
20     THE WITNESS: I think when I
21 mentioned agreement, what I meant
22 was the number of core clerkships in
23 the agreement.
24     MR. LOUGHLIN: Just for

152

J. ROMERO

1  avoidance of confusion, what you
2  meant, I think, is when you were
3  referring to the scheduling
4  challenge that you were able to
5  accommodate the AUC and the Ross
6  clerkships at least with respect to
7  the core clerkships identified in
8  the agreements; is that your
9  testimony?
10     THE WITNESS: Yes. Thank you.
11     Q. Mr. Romero, the court reporter has
12 handed you two documents that have been
13 marked as Exhibits 32 and 33. Exhibit 32 is
14 Plaintiff's Second Set of Interrogatories to
15 Defendants, and Exhibit 33 is Defendant
16 Wyckoff Heights Medical Center's Responses
17 and Objections to Plaintiff's Second Set of
18 Interrogatories. Mr. Romero, counsel told
19 us, I think, at Mr. Garg's, G-A-R-G,
20 deposition that you were given the task of
21 providing the answers to these
22 interrogatories; is that correct?
23     A. I was given this, yes.
24     Q. Let me start with interrogatory

153

J. ROMERO

1  number 1. What is it that you did to arrive
2  at the answers to interrogatory number 1?
3  Take your time, read it and be familiar with
4  it, and then we'll talk about how you got to
5  answers.
6      A. Go ahead.
7      Q. What did you do to arrive at the
8  answers to interrogatory number 1? Let's
9  start with 1(a).
10     A. "The current maximum number of
11 medical students for whom Wyckoff has the
12 capacity to provide clinical clerkships at
13 any one time is 406. If current business,
14 political, and economic conditions remain
15 unchanged, the maximum number of medical
16 students for whom Wyckoff has the capacity
17 to provide clinical clerkships at any one
18 time will remain 406 through the year 2020."
19     MR. LOUGHLIN: His question was
20 how did you determine that number?
21     THE WITNESS: This number is the
22 current capacity at Wyckoff Heights
23 Medical Center based on current
24 resources, meaning personnel

39 (Pages 150 to 153)

154

J. ROMERO

2   services and other than personnel
3   services, faculty, classrooms, and
4   the current policies of the New York
5   State Education Department and other
6   regulatory agencies.
7     It would be hard for us to
8   determine anything past this year as
9   far as determining what the number
10  might be next year, so we arrived at
11  this number as the status quo
12  number, and if everything remains
13  the same, I believe we will have the
14  same number of clerkship positions.
15  **Q. Do you presently, when schools**
16  **provide the maximum that they provide**
17  **whatever medical students make arrangements**
18  **with you if they do, max out at 406?**
19  A. I don't know of any number from
20  anyone.
21  **Q. Have you had this year 406 medical**
22  **students in the building at any one time?**
23  A. It's possible, yes.
24  **Q. Have you ever had more?**
25  A. Probably not.

155

J. ROMERO

2  **Q. The regulatory constraints that you**
3  **speak of, what are the ratios that are**
4  **involved?**
5  A. From what I know, there are no
6  specific limitations on the number of
7  faculty to trainees.  However, there are
8  recommendations, and that is in the range of
9  1 is to 8, one faculty member to eight
10  trainees.
11  **Q. And was that number, this 406**
12  **number, calculated using that 1 to 8 ratio?**
13  A. Yes, and even more conservative
14  formula.  The range is 1 is to 4 to 1 is to
15  8 depending on the rotation.
16  **Q. And you used the 1 to 8 or the 1 to**
17  **4 ratio?**
18  A. Depending on the rotation, we would
19  use 1 is to 8 on some and on other
20  rotations, 1 is to 4.
21  **Q. To get to 406, on which rotations**
22  **did you use which ratios?**
23  A. We currently base it on the number
24  of students that the chairman can take at
25  any given time.  We did say to them, to the

156

J. ROMERO

2  core rotations, that the maximum is 1 is to
3  8.  So I can say that in medicine, in
4  surgery, and pediatrics, and OB/GYN, and
5  family medicine, these rotations were
6  advised to use the 1 is to 8 ratio.
7  **Q. And what ratios were used for the**
8  **other rotations?**
9  A. For the most part, elective
10  rotations or subspecialty rotations use a
11  range of 1 is to 4 or 1 is to 6.  It
12  fluctuates depending on staff vacation and
13  the availability of faculty and space.
14  **Q. Is it correct that the only prepaid**
15  **clerkship contracts with a medical school**
16  **for clerkships at Mary Immaculate and St.**
17  **John's Queens Hospital were the contracts**
18  **with Ross and AUC?**
19  A. From my recollection, yes.
20  **Q. Is it true that the only prepaid**
21  **clerkship contract between a medical school**
22  **and Wyckoff is that with Ross?**
23  A. No.
24  **Q. When plans were being made to close**
25  **Mary Immaculate and St. John's, were you**

157

J. ROMERO

2  **given any tasks in connection with what to**
3  **do with the medical students doing rotations**
4  **at those hospitals?**
5  A. Yes.
6  **Q. What tasks?**
7  A. To complete and secure their files.
8  **Q. Were you given any other tasks?**
9  A. During the time leading to the
10  closure of Mary Immaculate and St. John's
11  Hospital, we asked the subspecialty
12  departments to stop scheduling medical
13  students past a time in the future for the
14  electives.
15  **Q. Did you make such an instruction**
16  **with respect to the core rotations?**
17  A. None that I can recall.  It was our
18  aim to continue the core rotations.
19  **Q. And how were you going to do that**
20  **with the hospitals being closed?**
21  A. I'm sorry, I was talking about the
22  time leading to the closure.
23  **Q. I'm sorry.  In layman's terms, was**
24  **the plan to shut down the cores a little**
25  **earlier or rather shut down the electives a**

158

J. ROMERO

1 little earlier and run the course as long as
2 you could?
3    A. We had the rotation blocks, and our
4 immediate plan was to ensure that all
5 rotation blocks -- as long as the hospital
6 is open, we would maintain a complete
7 rotation block for each core and elective.
8    Q. The defendants in this case have
9 produced documents that laid out in writing
10 plans for closing St. John's and Mary
11 Immaculate, and there's discussions with
12 some of those plans about what to do with
13 those medical students. Did you participate
14 in providing information on any of those
15 plans?
16    A. I don't recall any particular
17 requests, but I may have given information
18 on the number of medical students we had at
19 Caritas.
20    Q. When you were providing information
21 for those plans, to whom did you provide the
22 information?
23    A. From what I recall, I probably
24 provided them to Mr. Singleton or his staff,

159

J. ROMERO

1 I'm not sure, but certainly to Dr. Denton.
2    Q. Let me help you with the time frame
3 a little bit. Mr. Singleton, I believe the
4 documents reflect, and FTI were out of the
5 hospitals in fall of 2008. Hospitals closed
6 February/March 2009. If you want some names
7 of the people who you dealt with over there,
8 see if it helps your recollection, there is
9 a John Kastanis, K-A-S-T-A-N-I-S, Buzz
10 Dowling, D-O-W-L-I-N-G, Dr. Denton,
11 D-E-N-T-O-N. Did you deal with any of those
12 folks in closure planning?
13    A. I believe I dealt with Dr. Denton.
14 I don't recall any of other two other
15 gentlemen you mentioned, but I also dealt
16 with Chris Mastromano, M-A-S-T-R-O-M-A-N-O,
17 who at the time was the administrator at
18 Mary Immaculate Hospital.
19    Q. How about a John Lavan, L-A-V-A-N?
20    A. I haven't spoken with Mr. Lavan at
21 all in my career.
22    Q. Do you now recall that before the
23 hospitals were closed, Mr. Singleton and the
24 folks at FTI left hospital administration?

160

J. ROMERO

1    A. Yes.
2    Q. After they left, who did you
3 understand to be in charge of hospital
4 administration?
5       MR. LOUGHLIN: Which hospital?
6       MR. TZANETOPOULOS: Any of them.
7       THE WITNESS: Caritas was, in my
8 recollection now, being run by Chris
9 Mastromano for Mary Immaculate and
10 Annette Hastings at St. John's
11 Queens Hospital, and they did report
12 to William Buzz Dowling and John
13 Lavan, but that's the extent of what
14 I know.
15    Q. How about at Wyckoff? After Mr.
16 Singleton left, who was in charge at
17 Wyckoff?
18    A. If I recall, the administrator at
19 that time was Rajiv Garg, R-A-J-I-V,
20 G-A-R-G.
21    Q. And in the time between when Mr.
22 Singleton and the folks from FTI left the
23 hospital administration for any of these
24 entities  and the time Caritas hospitals

161

J. ROMERO

1 closed, were you ever present for any
2 discussion in which anybody suggested that
3 the contracts we have marked as Exhibits 5,
4 6, or 7 were unauthorized?
5    A. No.
6    Q. Have you ever been present during
7 that time frame for a discussion in which
8 anybody ever suggested returning to Ross the
9 money that it had paid under those
10 contracts?
11    A. Could you kindly restate that?
12    Q. During the time between when Mr.
13 Singleton and FTI left hospital
14 administration for these entities, any of
15 them, and the time the Caritas hospitals
16 closed, were you ever present when anyone
17 suggested that the money that Ross had paid
18 under these contracts be returned to Ross?
19    A. No.
20    Q. Did you have discussions with
21 anybody at Ross about what was going to
22 happen to Ross's students who were in the
23 middle of rotations when Mary Immaculate and
24 St. John's Hospital closed?

41 (Pages 158 to 161)

162

J. ROMERO

1    A.  Yes, to the extent of a concern of
2 clerkship placements for the students, I
3 did.
4    Q.  With whom at Ross did you speak?
5    A.  I believe it was with Dr. Enrique
6 Fernandez.
7    Q.  What was the substance of the
8 conversation between you and Dr. Fernandez
9 on those topics?
10    A.  From what I recall, I had asked Dr.
11 Fernandez about the future rotations of the
12 students that were at Caritas at that time.
13 I offered my assistance, both personal and
14 through my office, as to -- I offered my
15 assistance as to how I can maybe assist him
16 in scheduling his students at that time.
17    Q.  Were there in fact Ross medical
18 students at the Caritas hospitals who were
19 in rotation at the time the hospitals
20 closed?
21    A.  I believe there were some.
22    Q.  Were any of those students placed at
23 Wyckoff to complete their rotations?
24    A.  Yes.

163

J. ROMERO

1    Q.  How many?
2    A.  I don't recall the number.
3    Q.  Who made the arrangements for those
4 rotations to be completed at Wyckoff?
5    A.  Dr. Fernandez and I discussed it
6 from the hospital side.  I asked the
7 chairman of the departments to take some of
8 the students.
9    Q.  From the hospital side, was anybody
10 else involved in that decision other than
11 you and each of the department chairs?
12    A.  No.
13    Q.  I believe those are all the
14 questions I have for Mr. Romero today.
15 EXAMINATION BY
16 MR. LOUGHLIN:
17    Q.  Maybe I'll just follow up with one
18 or two things.  Mr. Romero, you made
19 reference to the capacity of clerkships at
20 Wyckoff to be approximately 406.  Are there
21 Ross students who are occupying some of
22 those clerkships today?
23    A.  Yes.
24    Q.  Can you approximate the number of

164

J. ROMERO

1 Ross students who are occupying clerkship
2 slots at Wyckoff?
3    A.  Approximately 110 students at any
4 given day or month at Wyckoff.
5    Q.  Let me direct your attention to the
6 document that's been marked as Romero
7 Exhibit 5, and in particular -- I'll show it
8 to you and what we can do is look at it side
9 by side.  Directing your attention to the
10 page which is Bates stamped ROSS 0064, I'll
11 read this in order to make sure it's clear
12 what I'm referring you to.  It says, "Absent
13 material breach of this agreement by the
14 university, the hospitals," which is a
15 defined term under the agreement as the
16 Caritas hospitals, "shall not withhold
17 services while the hospitals remain
18 operative.  In the event the hospitals are
19 not operative, and the university is not in
20 material breach of the agreement, BQHC
21 agrees to provide the university with an
22 equivalent number of clerkships as agreed to
23 herein at one or more of its other
24 facilities."

165

J. ROMERO

1    My question to you, Mr. Romero, is
2 during the period that you were in
3 discussions with people at Ross, in November
4 and December 2006, did anyone from Ross at
5 any time, either in an e-mail, or telephone
6 conversation, or otherwise, bring this
7 language to your attention?
8    MR. TZANETOPOULOS:  Object to
9 the form.
10    THE WITNESS:  The answer is no.
11    Q.  In your discussions in November and
12 December 2006 with people from Ross leading
13 to this affiliation agreement, which was
14 executed on December 28, 2006, do you recall
15 any conversation with anyone in which you
16 were told in substance that Ross needed to
17 have a provision in the affiliation
18 agreement, which indicated that BQHC would
19 have an obligation to find replacement
20 clerkships for Ross students in the event
21 the Caritas hospitals closed?
22    MR. TZANETOPOULOS:  Object to
23 the form.
24    THE WITNESS:  No.

42 (Pages 162 to 165)

166

J. ROMERO

1          J. ROMERO
2      MR. LOUGHLIN:  I just have one
3 exhibit that I would like to have
4 marked as the next numbered exhibit.
5      (Document marked as Romero
6      Exhibit 34 for identification as
7      of this date.)
8    Q.  I'm placing before you a document
9 which has been marked as Exhibit 34 of your
10 deposition.  You had earlier testified that
11 it was your practice when you had telephone
12 conversations with representatives of Ross
13 that you would take notes and then translate
14 those notes into an e-mail.
15    A.  Yes.
16    Q.  And is Exhibit 34 an example of that
17 practice?
18    A.  Yes.
19    Q.  I have nothing further.
20 EXAMINATION BY
21 MR. TZANETOPOULOS:
22    Q.  Mr. Romero, let me refer you back to
23 Deposition Exhibit Number 20.  It's the
24 e-mail exchange between you and Dr. Shepherd
25 and the red line that we discussed earlier.

167

1         J. ROMERO
2 In particular, I would like to call your
3 attention to the page marked ROSS 8491.  Are
4 you there with me?
5    A.  Yes.
6    Q.  Mr. Loughlin asked whether your
7 attention had been called by anything Ross
8 did, I think, or something to that effect,
9 to the language he pointed out in the final
10 agreement, Exhibit 5.  This red line
11 contains, does it not, markings showing that
12 Ross proposed to add that very language,
13 correct?
14      MR. LOUGHLIN:  I'll stipulate
15      that in this exhibit the language
16      that I just read is redlined.
17    Q.  My question for Mr. Romero is that
18 was called out in this very draft, was it
19 not?
20      MR. LOUGHLIN:  Objection to the
21      form.
22      THE WITNESS:  It is on this
23      page.
24    Q.  And marked as a proposed insertion;
25 is that correct?

168

1         J. ROMERO
2      MR. LOUGHLIN:  It's redlined.
3      THE WITNESS:  It is part of the
4 discussion, yes.
5      MR. TZANETOPOULOS:  I'm done.
6 Thank you.
7      (Whereupon, at 4:15 p.m., the
8 examination of this witness was
9 concluded.)
10
11
        —————————————————
           JULIUS ROMERO
12
13
14 Subscribed and sworn to before me
15 this _____ day of _____, 2011.
16
        —————————————————
17      NOTARY PUBLIC
18
19
20
21
22
23
24
25

169

1        I N D E X
2
3 WITNESS     EXAMINATION BY     PAGE
4 Mr. Romero    Mr. Tzanetopoulos    4
5           Mr. Loughlin    163
6           Mr. Tzanetopoulos   166
7
8        E X H I B I T S
9 ROMERO  DESCRIPTION        PAGE
10 1, 2   Offer letters dated 8/21/06   31
11 3, 4   Promissory note agreements   26
12 5     Affiliation agreement    40
13 6     Amendment to affiliation   40
14      agreement
15 7     Second amendment to affiliation 40
16      agreement
17 8, 9   Notice of filing supplemental  19
18      declaration
19 10    E-mail dated 10/5/06    45
20 11    E-mail dated 10/24/06   53
21 12    E-mail dated 11/1/06    58
22 13    E-mail dated 11/13/06   59
23 14    E-mail dated 11/16/06   65
24 15    E-mail dated 11/29/06   66
25 16    E-mail dated 12/1/06   69

43 (Pages 166 to 169)

**170**

E X H I B I T S (Continued)

| ROMERO | DESCRIPTION | PAGE |
|---|---|---|
| 17 | E-mail dated 12/16/06 | 81 |
| 18 | E-mail dated 12/22/06 | 87 |
| 19 | E-mail dated 12/22/06 | 91 |
| 20 | E-mail dated 12/28/06 | 92 |
| 21 | E-mail dated 12/28/06 | 99 |
| 22 | E-mail dated 2/10/07 | 105 |
| 23 | E-mail dated 7/30/07 | 108 |
| 24 | E-mail dated 10/9/07 | 112 |
| 25 | E-mail dated 10/15/07 | 115 |
| 26 | E-mail dated 10/19/07 | 118 |
| 27 | E-mail dated 11/27/07 | 133 |
| 28 | E-mail dated 12/4/07 | 135 |
| 29 | E-mail dated 12/4/07 | 138 |
| 30 | E-mail dated 2/28/08 | 139 |
| 31 | E-mail dated 5/23/08 | 149 |
| 32 | Plaintiff's second set of interrogatories | 152 |
| 33 | Defendant's responses and objections | 152 |
| 34 | E-mail dated 1/12/07 | 166 |

**171**

I N S E R T S

| DESCRIPTION | PAGE/LINE |
|---|---|
| None | |

R E Q U E S T S  F O R  P R O D U C T I O N

| DESCRIPTION | PAGE |
|---|---|
| None | |

Q U E S T I O N S  M A R K E D  F O R  R U L I N G

| QUESTIONING ATTORNEY | PAGE/LINE |
|---|---|
| None | |

**172**

C E R T I F I C A T E

STATE OF NEW YORK )
         ss.:
COUNTY OF NEW YORK )

I, BINITA SHRESTHA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of July, 2011.

_____

BINITA SHRESTHA

**173**

STATE OF NEW YORK )
         ss.:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE
____ ____ CHANGE:_____
        REASON:_____

____ ____ CHANGE:_____
        REASON:_____

____ ____ CHANGE:_____
        REASON:_____

____ ____ CHANGE:_____
        REASON:_____

____ ____ CHANGE:_____
        REASON:_____

____ ____ CHANGE:_____
        REASON:_____

44  (Pages 170 to 173)

## A

ability 146:19
able 50:9 125:15
152:5
above-entitled
1:20
above-referenced
100:23
Absent 164:13
absolutely 30:4
56:2 57:18
111:15
academic 31:18
73:17 74:13,19
74:24 75:8,13
academic-type
52:19
acceptable 94:2
95:7 99:16
accommodate 152:6
accommodated
151:12,14
accreditation
52:24
ACGMA 53:3
acknowledge 67:14
acknowledged 67:7
acknowledges 36:15
acquire 127:2
acquisition 44:3
68:22
act 55:25 56:8
action 1:20 172:15
activities 114:24
actual 15:13
add 111:12 119:20
167:12
added 80:24 98:19
99:11
addition 41:5 77:2
additional 18:7,11
111:12,13 119:22
119:24 125:2,3
126:15 130:18
133:17 137:18,19
address 4:15 9:11
70:8 100:10
151:5
addresses 81:15
148:2
adds 130:20
administer 3:7
administration
9:23 68:21
144:18 145:11
159:25 160:5,24
161:15
administration's

145:5
administrative
14:6 30:9 104:14
Administratively
29:25
administrator 73:6
77:25 104:16
159:18 160:19
administrators
69:3 89:4 102:12
admissible 7:20
advantage 49:14
advantageous 50:8
124:21
advise 55:18
advised 156:6
affairs 31:18
affect 8:4
affidavit 20:15
affiliate 30:23
108:4
affiliated 41:12
41:14 43:12
107:14 108:11
affiliates 89:22
108:13
affiliation 12:11
13:10 15:15
18:16 40:3,6,9
41:10,15 42:19
42:24 43:10,11
45:24 60:5 75:11
83:9 85:23 88:9
90:21 93:9
102:18 110:17
111:11 119:24
129:16 130:25
134:16 135:2
136:2,4,13
141:12 165:14,18
169:12,13,15
affiliations 13:14
aforementioned
19:18
afternoon 61:21
75:20
agencies 154:6
ago 9:4
agree 39:12 48:21
101:9 116:3
agreed 3:1,10,13
67:18 164:23
agreement 25:12
26:19 33:4,5
36:20,22 37:20
40:3,6,10 45:25
50:25 57:11 60:5
60:7 62:9 63:17
64:23 66:7 67:15

72:8,18 73:21,24
75:11,20 76:12
76:23 77:8 83:9
84:7,24 85:24
88:9 90:5,12,21
91:6,7,12 93:10
93:21 94:4 95:2
96:21 97:14
99:18 100:24
101:5,6,10 102:9
102:18,24 105:3
105:4,15 110:13
110:17 111:11,18
117:15,21,23
121:4 129:16
131:2,9 134:16
135:2 136:3,4,6
136:10,11,13
138:24 141:13,13
144:2 148:24
151:17,22,24
164:14,16,21
165:14,19 167:10
169:12,14,16
agreements 12:11
15:15 18:16 33:9
40:12 41:11,15
42:19,25 43:10
43:11 64:21 65:6
94:21 112:2
119:24 136:21
137:8 152:9
169:11
agrees 36:15
131:12 164:22
ahead 56:11 153:7
aim 157:18
airtight 131:8
Ajay 118:22 119:10
allocated 84:25
allowing 53:2
allows 49:9
alluding 68:17
124:17 129:19
ambit 30:2
amend 63:16,17
amending 111:11
amendment 40:6,9
40:16,23 41:6,23
42:24 60:8,11,12
63:4 110:16,23
111:3,18 135:2
136:9,13 137:16
137:17 140:22
141:12 142:13,15
144:2 145:9,18
145:22 147:25
148:13 169:13,15
amendments 42:20

43:10 119:23
134:15 136:2
American 20:3,20
22:14 24:9 25:14
26:7 28:15,25
31:11 33:16
35:20 66:11
143:4
amount 35:8
analysis 47:6
Annette 160:11
answer 4:25 5:5
7:11,23 8:14
34:25 56:11 65:2
65:3 81:14 91:5
142:3 165:11
answering 87:7
answers 152:22
153:3,6,9
anybody 5:25 6:8
6:25 8:19 15:20
26:3,5 32:2
34:22 35:17
38:14 39:2 53:6
61:21 66:9 68:13
82:19 88:23 89:8
95:23 96:4 161:3
161:9,22 163:10
apologize 107:3
142:7
appearing 3:14
appears 19:24 51:9
54:7 138:21
apply 64:5
appointed 21:12
appointment 116:15
appropriate 151:16
approval 53:21
76:13
approved 52:24
approximate 163:25
approximately
163:21 164:4
arrangement 35:21
79:22
arrangements 29:23
57:7 73:17,19
154:17 163:4
arrive 153:2,8
arrived 112:12
154:10
Aside 6:24
asked 7:12 12:10
55:24 56:3 59:7
59:10 71:22 72:6
72:11,16 90:8,15
95:15 96:3 119:4
119:8,21 127:12
157:11 162:11

163:7 167:6
asking 61:12 114:8
asks 55:18
assigned 17:5
assist 162:16
assistance 162:14
162:16
assistant 14:12,13
14:24 15:12
16:10,12,16 17:9
17:13,19,25 19:5
19:9 21:4,23
22:4 30:6 104:14
113:9,16 115:18
116:4
assistants 59:4
assisted 13:22
associate 6:7 18:3
18:5,18
assume 36:21 56:23
assurance 106:8
attached 20:7
24:13 47:25
60:10,12 93:20
100:22 120:25
attaching 47:5
attachment 44:19
46:19,19 52:6,9
52:11 53:6 58:13
58:18 59:24 63:2
93:4 94:10 100:7
attained 9:14
attempt 55:21
125:21 144:24
attended 69:9
attending 9:7
attention 25:7
36:5,7 40:15,20
41:7 52:5 102:17
102:20 117:11
120:16 140:10
142:10 164:6,10
165:8 167:3,7
attest 23:18
attorney 100:21
119:13 171:11
attorneys 2:4,11
3:2 99:12
Aubel 118:21
AUC 22:17,22,24
23:9,19 26:9
27:10 30:16,24
33:3 34:3 36:2
37:2,4,20 38:4
38:16,22 39:3,6
43:16,21 44:7,11
55:9 66:11 90:3
107:5 118:9
120:11 121:3,7

122:4,6,6,7,11
122:24 123:7,7
123:16 124:4,10
124:16,18 125:22
126:8,25 127:4
128:13 129:15,15
129:20 130:3,8
130:11 131:9,14
131:14,21,22
132:4,6,12
142:21,25,25
143:3,23 144:9
144:12,15,22,25
145:22 146:2,17
150:8,12,15
152:6 156:18
AUC's 121:2 123:21
August 31:8,14,25
45:9 47:11,15
51:7
Augusta 2:18
auspices 53:3
authority 33:22
35:12,23
authorized 3:6
automatically
148:14
availability
156:13
available 128:3
146:12
Avenue 2:12
avoidance 152:2
aware 18:24 22:10
140:20 143:20
144:6,7,23 145:3
145:4 146:22
150:10,13
awful 87:20
A-J-A-Y 118:22
A-U-B-E-L 118:21

_____

**B**

b 94:4,5,8,8 98:15
98:17 99:5,18,19
99:22 123:22,23
124:8 126:5,8,14
126:16,18 128:3
128:8,9,10,11
131:7 145:13,16
169:8 170:1
Bachelors 9:15
Bachelor's 9:16
back 10:6 27:6
46:15 49:16,17
51:22 65:2,4
67:11 69:22
75:18 76:8,9,10
87:20 94:16 95:6

96:12 99:14
102:17 103:20
105:15,16 112:23
116:21 117:11
123:5 137:15
139:16 141:14
143:8 166:22
backup 77:2
back-to-back 48:14
48:25
BAKER 2:3
balance 122:23
123:3 130:7
Barbara 118:21
Barkan 119:11,13
119:19 146:23
147:4
base 155:23
based 47:6 89:25
122:13 151:17
153:24
basic 51:22
basically 49:9
78:2 121:14
151:12
Bates 31:13 164:11
bay 9:12 66:4
Bayside 9:12
beat 126:17
beginning 56:20
67:20
begins 52:11 82:10
127:16,21
behalf 1:21 36:16
38:15 41:11,13
43:12 150:8,12
believe 6:21 10:19
14:25 19:12
21:14 26:14 27:4
29:20 36:13
56:14 77:11
89:13 90:13
119:15,18 122:22
122:22 133:24
143:15 144:14,20
146:6 150:18
154:13 159:4,14
162:6,22 163:14
believed 21:18
best 91:5 144:17
better 15:7 108:11
bidders 66:5
bigger 123:16
billing 11:15 46:9
Binita 1:23 172:7
172:23
bit 4:21,23 42:6
118:20 159:4
Black 26:15

BlackBerry 83:6
block 40:17,21,22
49:11 113:4,8,15
113:21 114:12,13
115:17,17 140:11
150:2 158:8
blocks 49:8,8
158:4,6
blood 172:16
board 67:17,23,25
68:5,7,8,11,17
68:20 69:2,9
106:7 119:19
body 112:25
boss 17:20,21
bosses 89:15
bottom 67:8 89:19
115:12 127:17,21
131:5 134:4
boxes 98:23
BQHC 22:19 30:7,23
40:24 41:11,13
52:12 59:23
63:16 89:21,23
90:21 106:2,9,19
107:9,12 108:4,9
109:4 112:21
118:17 120:17
126:12 127:17
135:10 138:19
142:20,22 148:4
149:14 164:21
165:19
BQHC-Ross 73:24
75:11 91:3
134:15
breach 164:14,21
break 5:11 52:2
138:9
brief 51:17
Briefing 107:7
bring 30:18 165:7
Brooklyn 1:8 4:17
18:23 20:21 21:5
21:24 22:5,12
23:3 36:10,15,18
40:4,8,10 47:4,9
47:19 48:7 57:12
63:6,7,12 104:11
113:10,17 115:19
116:5,11 117:8
136:16 140:12,18
brought 69:11
84:16
budgeting 18:9,9
building 154:22
business 4:15
33:21 35:10
60:17 77:7 94:25

97:17 101:24
153:14
**Buzz** 159:10 160:13

**C**

**c** 2:1 98:22 125:17
126:6,8 171:5
172:1,1
**cafeteria** 106:19
106:24 107:7
**calculated** 155:12
**calender** 86:17,20
**call** 35:5 50:3
55:7 61:22 62:6
65:20 71:13,15
71:21,23 72:2,11
72:15,16,17
82:14,20 104:15
104:18,23 105:2
134:5 137:17
167:2
**called** 41:7 63:7
72:5 82:25 167:7
167:18
**calling** 96:7
**calls** 73:5
**campuses** 47:8
52:14
**cap** 124:9,13,15,16
124:19 125:6,7
125:10,12 127:9
151:7
**capacities** 78:15
78:17,22
**capacity** 22:2,4
84:13 108:4
153:13,17,23
163:20
**caps** 125:24 126:2
**caption** 24:9
**captioned** 20:3
**capture** 43:2
**captures** 43:7
**carbon** 70:2,15
**care** 1:8 18:23
19:2,11 20:5,22
21:5,20,25 22:6
22:13,13 24:11
36:10,11 40:5,8
40:11 47:5,10,19
102:3 113:10,18
115:20 116:6,12
117:9 136:16,17
136:25 140:13,18
**career** 159:22
**Caribbean** 20:4,20
22:15 24:10
25:14 26:8 28:16
29:2 31:12 33:17

35:20 66:12
143:5
**Caritas** 19:2,10
20:4,21 21:19
22:13,18,25
24:10 25:13,24
25:25 27:10,12
27:20 28:3 29:9
29:18 30:15,22
32:4 34:24 36:11
36:19 37:25 44:2
44:6,9 45:17
46:2 49:7 52:13
55:12 56:22
62:16 67:24 68:5
68:8,10,18,22
71:17 73:24 77:6
77:25 78:8,10,15
78:21 79:6,8,25
80:9,22 83:2,12
84:5,11,12,15
85:12 89:2,22
90:12 91:6 95:18
97:13,16 101:15
104:13,17 106:12
106:16,16,17,23
107:6,21 115:2
117:15,17,22
119:6,11 120:10
121:5 123:21,22
124:4 128:14,21
129:9,18 130:3
130:11 133:19
134:9,13 136:5
136:17 140:14,16
142:21 144:18
146:15 149:5
151:9,11 158:20
160:8,25 161:16
162:13,19 164:17
165:22
**Caritas's** 22:7
**Caritas-Mary**
113:11,19 115:21
**Caritas-St** 113:12
113:20 115:22
**case** 19:25 23:6
39:20 71:20
73:14 74:17
76:21 78:18
82:23 94:9 95:14
96:25 107:23
112:11 113:7
116:18 118:7
122:3 123:24
125:11,19 129:23
130:10 158:9
**cases** 121:23
122:18

**cash** 126:15,21
128:2
**Catholic** 47:7 48:6
62:12 63:5,7,12
83:10
**cause** 102:23
**caused** 58:17
**CC** 92:2
**cease** 97:16
**Center** 1:10 4:16
6:12 10:7 21:19
31:10,17 36:12
47:7 48:7 62:13
63:5,7,12 83:11
84:3 85:3,9 94:4
99:18 113:11,18
114:25 115:21
117:16 140:13,19
153:24
**Center's** 152:17
**CEO** 15:21 17:11,20
25:22 35:13
77:23
**certain** 29:4 55:13
60:20,25 78:4
88:24 108:8
110:24 120:21
136:6 150:9
**certainly** 159:2
**certification** 3:4
**certify** 172:9,14
**cetera** 93:23,23
**CFO** 17:11,20 25:23
25:25 35:13
71:17 73:11
**chain** 44:19
**chairman** 34:15,15
155:24 163:8
**chairs** 149:19
163:12
**challenge** 150:22
150:23 151:6
152:5
**chance** 20:12 24:18
31:4 88:3
**Chandra** 34:20
**change** 15:2,3
16:19,20,22,24
18:4 101:3
125:23 126:7
145:15 173:8,11
173:14,17,20,23
**changed** 112:5
**changes** 98:8,13
173:4
**charge** 56:21 112:2
125:15 160:4,17
**charged** 122:4,7
**charging** 125:4

**check** 34:10
**Chicago** 89:6
**chief** 31:9,11,16
32:11,14 109:14
119:10
**Chris** 159:17 160:9
**Chu** 111:20,24
112:6,23 113:2
114:17 115:10,13
115:18 117:12,20
118:8 123:25
128:20 129:25
133:13,18,25
134:16,19,22
138:18,21 140:7
140:24 141:5,9
146:6,9,16,21
149:16,18 150:6
**Chung** 25:23
**Chu's** 111:22
146:13
**Clair** 134:5
**Claire** 134:7,8
139:9,9 140:5
146:24
**clarifications**
93:19
**classrooms** 154:3
**clean** 100:24
138:25 139:2
**clear** 42:5 47:16
75:10 148:10
164:12
**clerk** 10:11,14
**clerks** 29:13 30:2
30:8,15,22
122:12,15 151:14
**clerkship** 12:22
22:6 23:18 28:18
45:16 47:6 48:7
50:23 55:20 60:9
69:6 78:7,15,17
84:2,4,24 89:21
89:23 101:8
108:5,14 111:13
122:5 124:23
125:16 148:5
154:14 156:15,21
162:3 164:2
**clerkships** 28:2,6
28:10 29:3,18
42:25 43:18 44:5
45:25 46:13 49:4
50:12 52:13,22
52:23 53:2 55:11
78:10 79:7,24
83:23 84:25 85:8
90:4,10 106:18
111:2,7 124:13

125:14 151:23
152:7,8 153:13
153:18 156:16
163:20,23 164:23
165:21
**clinic** 108:14,16
**clinical** 12:22
22:6 26:11,12
32:3 34:15 37:4
37:22 45:13 46:4
60:5 85:11 101:8
107:15,19 108:5
108:15 111:2,25
112:2 121:7,23
122:18,25 124:23
146:14 153:13,18
**clinics** 107:21
108:19
**close** 39:11 156:24
**closed** 44:3 57:7
157:20 159:6,24
161:2,17,25
162:21 165:22
**closing** 44:4
158:11
**closure** 19:12,13
157:10,22 159:13
**Club** 9:12
**CMC** 61:2 62:11,15
**CMC-based** 56:25
**CMS** 60:5
**Cole** 58:25 59:2,3
**collateral** 84:3
**collateralize** 77:5
**collateralizing**
78:9
**collectively** 36:19
**college** 10:4,23
29:12,14,21 30:2
**combination** 97:23
**come** 8:21 71:10
**comes** 74:20
**coming** 61:3 73:18
76:13
**comment** 60:4
122:25
**commented** 94:16
**comments** 104:15
**commercial** 35:5
73:19 75:8
140:21
**commit** 64:20 65:22
66:16 124:3
150:21
**committed** 77:5
78:10 118:9
**communicate** 65:8
65:15 95:16 97:9
**communicating**

95:10
**communications**
7:15 147:4,6,16
**company** 119:9
**compare** 101:16
**comparing** 101:22
101:24
**compensation** 60:6
**complement** 47:3
**complete** 131:8
157:7 158:7
162:24
**completed** 53:3
163:5
**computer** 83:6
**concept** 84:12
**concern** 56:24 57:3
57:19 62:14 79:4
80:6 83:17
131:13,17 132:2
162:2
**concerned** 57:16
64:24 83:22
119:4
**concerning** 38:3
45:25
**concluded** 168:9
**conditions** 153:15
**conducted** 143:13
**conducting** 147:13
**conference** 82:11
89:9
**conferences** 89:2
**confirming** 71:6
86:6
**confuses** 113:3
**confusion** 152:2
**connection** 20:19
45:19 157:2
**consecutive** 52:16
**conservative**
155:13
**constraints** 155:2
**consultation** 95:25
**contact** 137:3
**contained** 97:10
142:11
**contains** 167:11
**contingency** 50:17
77:3 83:25
**continuation** 83:22
**continue** 18:14
44:10 48:22
150:15 157:18
**continued** 84:10
170:1
**continues** 110:25
**continuing** 48:14
83:19

**continuous** 48:13
48:25 49:9,24
**contract** 6:21 16:5
34:5 44:7 46:11
63:4,16 83:20,20
86:9 91:3 112:5
129:15 130:2,14
131:10,21 132:6
132:9,12 134:4
139:7 142:11
156:21
**contracts** 13:10,14
32:4 35:6 43:17
44:5 95:2 101:25
119:5 120:7
126:10 129:10,13
129:19 133:19,23
156:15,17 161:4
161:11,19
**contractually**
118:9
**conversation** 9:6
54:12,17,19,25
62:24 71:7,10
72:25 81:9 84:20
85:6,19 87:11
89:12 90:7 101:2
162:9 165:7,16
**conversations**
54:16 62:7 81:4
81:12 86:8,18
146:9 166:12
**conveyed** 80:17
**conveying** 125:20
**COO** 17:11,20 25:21
35:13
**coordinator** 12:2,8
12:15 14:10
15:11
**copied** 59:7 134:23
**copies** 58:24 70:2
82:7 91:23
102:12 135:11
**copy** 3:15 44:22
46:22 64:3 67:4
70:15,19,23,24
92:4,5 100:24
101:13,14 105:7
106:4 131:10
132:9 138:25
140:4,6
**core** 28:2,5,9 49:2
50:23 52:15
67:19 78:15,16
84:4 85:8 125:8
148:5 149:2
150:2 151:23
152:8 156:2
157:16,18 158:8

**cores** 131:12
157:24
**corporateship** 77:6
**correct** 12:20,23
13:4,7 14:3,9,15
17:4,7,12 20:25
21:3 22:19 23:23
25:15 26:19,20
27:16,24 28:9,16
28:17 30:11,12
30:21 41:25
42:11,12 46:9
51:6,12 56:9,22
57:23 58:21 67:9
67:13 70:3,11,25
72:22 74:21
89:17 98:3,4
99:7,8,19,20
100:19 105:17
107:18 111:4
116:6 118:23
120:20 122:16,19
124:19,24 126:11
126:16 127:2,7
127:10,14 129:16
130:8,12,13,15
130:16,19,21,22
131:4 132:10,11
137:19 138:22
139:6 145:2,7
150:3,4,8 151:3
152:23 156:14
167:13,25
**correspondence**
61:2
**cost** 3:16
**counsel** 3:14 7:16
8:2 23:17 25:19
26:10 52:25
119:17 134:8
140:12,18 143:14
152:19
**Counter** 121:2
**counteroffer** 121:2
**COUNTY** 172:4 173:2
**couple** 76:25
**course** 60:16 69:4
70:6 73:13 74:11
92:14 98:6
101:23 104:17
134:14 158:2
**court** 1:1 5:2
19:23 20:2 24:5
24:12 26:22 31:3
39:25 44:16 54:4
59:20 63:24
66:25 69:16
81:23 87:15
91:18 93:2 100:5

105:24 108:24
112:19 115:6
118:14 133:9
135:8 138:14
148:4 149:12
150:7,11 152:12
**cover** 102:21
**covered** 60:7
**created** 50:24
**creditor** 80:19
**credits** 13:24
**current** 47:6 50:25
64:10,13 83:9
89:25 153:11,14
153:23,24 154:4
**currently** 101:7
155:23
**CV** 9:25
**Cynthia** 26:10 38:9
**C-H-A-N-D-R-A**
34:20
**C-H-U** 111:20
**C-H-U-N-G** 25:24

___

**D**

**D** 169:1 171:5,9
**daily** 14:6
**data** 10:13 52:12
**date** 4:11 19:21
44:15 54:2 58:7
59:19 63:22
64:17 66:23
69:15 81:10,20
87:14 91:17
92:24 100:3
105:23 108:23
112:18 115:5
118:13 133:8
135:7 138:13
139:23 149:11
151:20 166:7
**dated** 31:7 54:11
69:25 134:2
169:10,19,20,21
169:22,23,24,25
170:3,4,5,6,7,8
170:9,10,11,12
170:13,14,15,16
170:17,22
**David** 7:6 25:20
70:20 131:9
**day** 6:14 54:17
71:11 97:18
105:2,18,20
136:22 149:20,22
164:5 168:15
172:20
**days** 55:19
**day-to-day** 11:13

49:3
**deal** 26:9 33:22
34:7,10 43:19
47:24 57:6 64:12
64:16 65:6,23
82:24 92:15,20
112:9,13 126:7
140:21 141:8
145:25 147:8
159:12
**dealing** 46:8 73:8
109:19
**dealings** 73:14
74:7
**deals** 44:12 45:17
**dealt** 159:8,14,16
**dean** 26:11 45:14
111:25 121:7
**December** 25:12
26:18,24 27:10
43:15 57:10
67:21 69:20,25
71:22 76:10
80:12,13 82:4,17
83:12 85:20,22
87:23 88:8 90:5
92:9 97:18
100:16 101:20
135:19 165:5,13
165:15
**decide** 78:20,21
131:20
**decided** 110:12
**decision** 95:9,10
95:15 97:13
112:13 163:11
**decisions** 109:21
109:24
**decision-making**
33:22 35:11,22
**declaration** 20:6,8
20:18,25 21:22
22:11 23:5,7,11
23:12 24:8,14,21
25:5,8,10 26:17
27:3,7,8 169:18
**default** 36:17
**defendant** 25:13
113:7 152:16
**defendants** 1:11,20
2:11 152:16
158:9
**Defendant's** 170:20
**define** 106:12
**defined** 36:17
164:16
**degree** 9:17,20,22
123:14
**delay** 93:19

**delegate** 102:5,6
**deleted** 98:24
**deletion** 101:3
**delivered** 98:2
**demand** 17:2
**demanded** 49:23
**Denton** 34:23 159:2
159:11,14
**department** 14:16
14:20,21 146:13
146:14 154:5
163:12
**departmental** 18:9
**departments** 157:12
163:8
**depending** 155:15
155:18 156:12
**deposition** 3:4,5,9
3:16 4:19 5:18
26:23,25 44:18
47:12 52:3 58:9
61:11 63:25 68:3
69:17 81:24 82:3
87:16 91:19
102:17 109:2
152:21 166:10,23
**depositions** 70:6
**deposits** 35:23
**describe** 47:24
48:2 114:15,20
**described** 96:2
**DESCRIPTION** 169:9
170:2 171:2,6
**designed** 77:3
**desire** 79:21
**detail** 42:15
**determine** 153:21
154:8
**determined** 94:2
99:16
**determining** 154:9
**developing** 112:2
**DeVry** 89:7 100:19
100:21
**dialogue** 126:3
131:24 144:17
**difference** 128:24
**different** 24:7,14
50:9,14,14 72:5
113:22 120:4
**direct** 25:7 36:5,7
40:14,20 52:5
96:20 102:16,19
120:16 140:9
142:10 146:20
164:6
**directed** 33:8
41:18,22 42:2
81:8 110:19

**Directing** 164:10
**direction** 34:7
**directive** 150:18
**directives** 104:16
**directly** 25:10
73:8 78:6 146:11
147:21
**director** 13:22,25
14:12,13,24
15:12 16:10
17:24 37:4
**disciplinary** 46:5
**discoverable** 7:21
**discovery** 61:11
**discuss** 65:18
100:8 107:12
146:16 147:3,20
**discussed** 38:15
51:3 54:21 71:5
101:6 117:13
130:6 141:6
143:16,17 144:16
149:23 163:6
166:25
**discusses** 126:22
**discussing** 38:7
52:3 85:14 94:11
95:13 98:15
111:10 118:8
129:22 143:23
**discussion** 37:14
48:4,13,19,24
50:21,22 51:11
60:3 61:20 62:10
62:11 63:19
69:10 77:8 78:13
78:18,24 80:16
80:21 83:14 84:7
84:9,11,17 85:3
89:13 119:20
120:6 125:18
128:19 131:22
144:15 146:20
161:3,8 168:4
**discussions** 36:25
37:3,7,18 38:3
38:12,22 51:16
64:19 65:10,12
69:4 77:15,19,22
78:2,12 80:5
90:17 97:16
106:9 111:17
117:19 120:8,15
121:6,9 123:25
128:16 142:25
143:13 144:5
145:24 146:11,25
147:7,13 151:4
158:12 161:21

165:4, 12
displaced 57:6, 13
displacement 56:25
dispose 86:15, 24
disposed 87:2
distinct 30:5
distinctly 37:12
distribution 109:6
  109:7, 7, 9
District 1:1, 2
  20:2, 2 24:12, 12
  150:7, 11
divide 74:23
djg@nyp.org 100:13
dnh9001@nyp.org
  70:20
docs 135:20
doctor 34:19
doctors 122:15
document 19:23
  21:7 24:5 26:22
  39:25 44:17
  53:24 54:4, 16
  58:5, 9 59:17, 21
  61:6 63:20, 24
  66:21, 25 69:13
  69:17, 18 81:18
  81:23 87:12, 16
  91:15, 19 92:22
  93:2, 25 94:18
  99:15, 24 100:5
  101:3 103:2, 11
  104:24 105:21, 25
  108:21, 25 112:16
  113:5 115:3, 7
  118:11, 15 133:6
  133:10 135:5
  138:11, 15 139:21
  139:25 149:9, 13
  151:18 164:7
  166:5, 8
documents 4:9 6:15
  6:18 19:19 31:3
  98:8 113:6
  135:25 136:8
  152:13 158:10
  159:5
doing 45:16 51:20
  57:4 96:10
  132:14 157:3
Dominica 89:7
Dominick 15:23
  25:22 31:8, 15
  32:8 56:5 59:2
  77:23
door 57:20
doorstep 66:5
Dowling 159:11
  160:13

Dr 12:14 13:25
  15:19 17:14, 16
  17:19, 22 26:14
  34:13, 23 45:2, 3
  45:9, 12, 13, 21
  46:3, 17, 20 51:8
  51:10, 13 52:4
  53:8, 17 54:6, 9
  54:13 55:18
  58:13 59:4, 25
  61:21, 25 62:5, 8
  62:8 63:3 64:4
  64:18 65:16, 20
  65:21 66:3, 16
  67:5 68:15 69:21
  69:24 70:24 71:7
  71:21 72:11 73:7
  73:16 74:12, 18
  74:23 75:5, 13, 17
  75:22, 24 76:3, 4
  76:8, 11, 21 77:9
  78:5 79:3, 5 81:5
  81:6, 12 85:7
  87:22 88:8, 10, 15
  88:19, 20 89:14
  91:13, 23, 24 93:7
  93:15, 17 94:11
  94:14 95:6, 20
  96:7, 11, 14, 21
  99:14 102:22, 24
  103:11, 14, 17
  105:14 111:24
  112:6, 6, 22, 25
  115:10, 13, 18
  117:12, 20 118:8
  119:10 121:6
  123:25 128:20
  129:25 132:21
  133:2, 2, 13, 18, 25
  134:16, 19, 21
  136:23 138:18, 21
  140:7, 24 141:5, 9
  146:6, 9, 13, 16, 21
  149:16, 18 150:6
  159:2, 11, 14
  162:6, 9, 11 163:6,
  166:24
draft 39:12 52:7
  60:10, 11 67:15
  76:12, 23 92:4, 7
  93:9 94:9, 15
  95:21 96:11, 13
  96:15, 16, 21 97:3
  97:4 98:13, 20
  99:2, 5, 11 100:23
  101:16 102:9, 14
  103:6, 8, 9, 14, 16
  103:17, 25 104:6
  104:11, 12 105:18

133:23 134:10, 15
137:22 138:24
141:19 167:18
drafts 39:6, 16
  87:2 96:22
  101:24 134:19, 21
  141:13
Drive 9:12
driving 103:20
duly 4:4 172:11
D-E-N-T-O-N 159:12
D-O-W-L-I-N-G
  159:11

_____ E _____

E 2:1, 1 169:1, 8
  170:1 171:1, 5, 5
  171:9, 9 172:1, 1
earlier 36:4 63:17
  67:16 72:10
  73:13 74:7 82:2
  101:2 116:22
  128:25 130:6
  140:14 157:25
  158:2 166:10, 25
early 142:6
earn 125:13
ease 134:24
EASTERN 1:2
economic 153:15
Ed 144:20
education 9:14
  12:3, 9, 16 13:23
  14:11, 14, 17, 22
  15:12, 13 16:10
  16:13, 17 17:10
  17:14, 24, 24 18:2
  18:6, 19 19:6, 7
  19:10 21:5, 24
  22:5 30:7 52:25
  106:14 109:19
  113:9, 17 115:19
  116:5, 20 154:5
effect 3:8 44:2
  77:3 145:10
  146:17 148:15
  167:8
effort 58:22
eight 155:9
either 32:2 34:8
  39:18 48:12
  79:21 89:6
  107:24 143:13
  165:6
elective 28:18
  29:3, 8 67:20
  156:9 158:8
electives 125:7
  131:12 157:14, 25

employed 10:3, 5
  11:3
employee 144:15, 21
enable 125:12
encompass 12:16
  107:13
encompassed 13:9
  14:5
encourage 126:2
  131:24
engage 131:19
Enrique 162:6
ensure 158:5
enter 42:24
entered 43:17
  74:15 150:7
entering 94:25
  119:23
entities 41:12, 14
  43:13 63:16
  109:16 113:23
  114:11 145:23
  160:25 161:15
entitled 26:23
  40:3, 5 52:6
  136:13
entity 63:6 108:10
  115:25
entry 10:13
equal 78:16 83:25
equivalent 164:23
ER 10:13
Esq 2:8, 15 134:6
essentially 145:16
  145:20
established 116:12
  116:14
et 93:23, 23
evaluate 119:5, 21
evaluating 120:3
event 97:7 164:19
  165:21
events 6:16 7:2
  8:10, 21
Eventually 149:8
evolved 90:17
exact 62:4
examination 1:18
  4:7 163:16
  166:20 168:8
  169:3 172:10, 12
examined 4:5
example 87:9 110:9
  110:11 166:16
exception 110:6
exchange 39:6 93:6
  93:14 115:10
  118:19 133:13
  135:12 138:16

141:15 166:24
**exchanged** 54:6
133:23
**exchanging** 134:15
134:19
**exclusivity** 128:14
**executed** 43:11,16
104:19 145:11
165:15
**execution** 25:11
26:18 100:25
**executive** 31:9,11
31:16 32:11
**exhausted** 60:9
97:14
**exhibit** 19:20,24
20:13 21:23
22:12 24:6,6,19
25:5 26:23,25
27:7 31:7,14
36:3,6,9 39:20
40:5,8,16,21,22
41:4,18,22,24
42:10,10 44:14
44:18,18,23 45:6
45:8 46:15,16
47:13,18,21,23
50:16 52:3 53:25
54:5,8,23 58:6
58:10,12 59:18
59:21,21,23
63:21,25 64:3
65:25 66:22 67:2
67:4 69:14,18,20
69:25 75:18
76:10 81:2,5,19
81:24 82:3 83:24
87:9,13,17,17
88:4,6 91:16,20
92:23 93:3 94:4
94:8,10,12,15
95:21 97:4,10
98:6,10,15 99:5
99:14,18,25
100:6 101:4,17
101:18 102:10,17
105:22,25 108:22
109:2 111:12
112:17,20 115:4
115:7 117:12
118:12,16 120:13
120:19,23 127:22
132:19 133:7,10
134:25 135:6,8
136:12 137:16
138:12,16 139:22
140:2,22 141:11
142:15,16,21
143:25 145:12

147:25 148:11
149:10,13 151:19
152:14,16 164:8
166:3,4,6,9,16
166:23 167:10,15
**Exhibits** 4:10
19:17 31:4,5
32:18 40:2
152:14 161:4
**exist** 63:8 108:9
**existing** 94:3
99:17 101:5
117:21 121:9
**exit** 131:8
**expand** 151:13
**expansive** 16:25
**expect** 62:3
**explain** 21:14
**explaining** 85:6
**exploring** 128:4
**expressed** 55:10,15
77:7 79:3,5,20
80:6 131:17
132:3
**extent** 123:18
124:6 146:3
160:14 162:2
**e-mail** 37:8 39:17
39:17 44:19,24
46:19 47:11,17
47:23 50:17 51:8
51:12 52:4,6
54:5,8,11,20,23
55:6,18 58:12,16
58:17 59:13,24
60:10 61:20 64:4
64:8 66:2 67:4,7
67:8 69:21,24
70:7,23 77:13,14
79:20 81:15 82:3
82:10 84:23
85:17 86:14,14
87:10,22 88:10
91:22 92:4,6,8
93:3,5,14,17
95:12 96:20
97:10 99:13
100:6,10,15
104:8 106:3
109:5 112:20,22
112:25 113:13,15
113:22 115:10,12
115:18,24 118:16
118:19 120:5,18
120:22,24 123:19
123:23 128:10
129:14 132:18,19
133:12,25 135:9
135:11,18 138:16

138:19 139:2
140:5 145:12
149:15 150:5
165:6 166:14,24
169:19,20,21,22
169:23,24,25
170:3,4,5,6,7,8
170:9,10,11,12
170:13,14,15,16
170:17,22
**e-mails** 6:19 71:6
82:13 86:6 87:18
93:8 94:11 113:7
114:18 118:25
133:17

_____

| F |
|---|

**F** 171:5,9 172:1
**facilities** 79:2
113:14,22 164:25
**fact** 8:4 26:17
67:22,23 68:6
71:9 76:19 82:16
102:23 124:10
126:23 130:7
144:24 146:2
148:25 150:11,24
162:18
**faculty** 52:19
121:22 154:3
155:7,9 156:13
**fair** 35:4 133:15
**fairly** 122:2
**fall** 46:10 121:3
159:6
**fall-out** 129:4
**familiar** 153:4
**family** 156:5
**far** 17:2 64:23
73:7 78:23 154:9
**fast** 133:16
**fax** 39:17 102:21
102:23
**faxed** 102:23 103:3
105:4,15
**February** 19:13
106:4 107:10
**February/March**
159:7
**Federal** 150:6,11
**feel** 149:20
**fees** 60:9
**Fernandez** 162:7,9
162:12 163:6
**figure** 112:24
**file** 93:25 94:18
99:15
**filed** 19:25 23:7
**files** 93:11 157:7

**filing** 3:3 20:5
24:7 169:17
**fill** 146:13
**final** 16:4 88:9
103:7,25 110:4
134:3 135:19
137:22 148:21
167:9
**find** 74:10 165:20
**finding** 80:7
**firm** 119:14
**first** 4:3 43:19,20
43:21 64:8 68:4
69:24 74:16,18
80:12 92:3 93:5
93:14,18 94:12
99:13 105:6
106:12 120:18,21
127:21 128:10
131:19 132:18
133:25 138:25
140:22
**five** 11:23 50:18
52:16
**Floor** 1:13 2:5
**Florida** 20:2 24:13
150:7,11
**fluctuates** 156:12
**fluid** 78:25
**focus** 42:15 46:15
**folks** 38:16 151:5
159:13,25 160:22
**follow** 54:20 58:19
59:15 72:13
75:23 163:18
**followed** 71:16
94:24
**following** 71:4,7
117:17 173:4,5
**follows** 4:6
**follow-up** 54:12
**force** 3:7 148:15
**forget** 5:4,7
**form** 3:11 8:12
12:10 35:7 43:4
56:11 63:4 75:4
116:8 141:3
142:3 165:10,24
167:21
**formal** 67:16
116:14
**former** 144:21
**formula** 155:14
**forth** 20:24 38:4
63:18 82:12
87:20 141:14
172:11
**forward** 16:9
133:16

forwarded 61:18
forwarding 46:16
  138:17 139:2
four 35:22 60:8
  77:4 90:20 91:11
  91:14 131:2
four-year 90:11
frame 14:5 27:25
  28:7 92:9 159:3
  161:8
free 149:21
Freiberg 12:14
  14:2 17:15,16,19
  26:4 34:14 53:17
  74:23 75:13
  88:15,20
Freiberg's 17:22
Frieberg 15:19
FTI 159:5,25
  160:23 161:14
function 16:21
funds 119:22 125:4
  144:25
furnished 3:15
further 3:10,13
  102:8 131:5
  148:15 166:19
  172:14
future 157:13
  162:12
F-R-E-I-B-E-R-G
  12:14

_____
          G
_____

G 135:20 171:10
gain 127:6
gap 50:11
gaps 49:11,12 50:3
Garg 160:20
Garg's 152:20
gastroenterology
  11:6,8
Gates 2:10,19
gathered 52:18
general 7:16 8:2
  25:19 35:4 37:14
  62:9 106:21
generally 81:10
  148:2
generate 127:6
gentlemen 159:16
GEORGE 2:8
getting 57:20
  64:23 65:23 92:3
  92:5 93:19
GI 11:9,12,22
Gio 15:23 16:4
  25:23 31:8,15
  32:9,10 33:10

34:8,13 35:14
  39:13,14,21 51:7
  54:25 56:5,7
  59:2,6 65:15,18
  74:25 75:14
  77:23 78:18
  88:14,20 89:14
  89:24 91:23 95:5
  95:13,14 96:2
  97:8,9,21,23
  100:8 101:13
  102:2,5 105:19
  106:4 109:23
  110:14,20 116:13
Gio's 36:9 47:11
  51:10 53:18
  57:19 95:17
  100:13 104:8
  105:7
give 9:24 12:6
  39:14 56:12
given 4:18 29:13
  104:8 149:22
  152:21,24 155:25
  157:2,8 158:18
  164:5 172:13
gives 126:15
giving 102:11
  103:7,9
go 30:19 32:21
  46:13 48:10
  56:11 83:7 88:16
  96:22 99:4
  116:21 123:5,22
  126:12 131:5,7
  149:20 153:7
goes 36:22 93:22
  123:19 148:17
going 23:13 58:3
  80:22,22 83:24
  91:24 131:18
  132:4 134:25
  136:20 157:19
  161:22
Goldberg 118:22
  119:9 132:24,25
  135:12,17 136:20
  136:25 137:4,8
  137:11,22 139:12
Goldberg's 137:2
good 12:5 131:11
grab 66:9
graduate 52:25
graduates 13:6
great 5:9
green-book 52:13
  52:22,23
group 30:3,8 48:11
  68:20 74:13

77:16,20
guarantee 84:4
guarantee 91:11
  129:9,18 148:6
guarantees 35:3,9
  35:24 52:12
guess 46:22 51:9
  139:5
Gunst 91:25
guy 141:8
guys 74:15
G-A-R-G 152:20
  160:21

_____
          H
_____

H 169:8 170:1
Haas 135:13,15
half 6:14 131:2
hand 172:20
handed 26:21 39:24
  44:17 59:20
  69:17 87:16
  91:19 108:25
  115:7 118:15
  133:10 138:15
  152:13
handing 139:24
handle 147:17
handling 75:6
  137:11
happen 4:24 39:15
  62:15 148:2,13
  161:23
happened 80:8 89:2
  139:19
happens 148:8
happy 5:12,15
hard 154:7
Harold 8:23 25:21
  32:9 58:25 76:12
  76:15,15 77:24
  78:19
Hastings 160:11
head 5:6
heading 64:10
  142:17
Health 1:8 9:23
  18:23 19:2,11
  20:4,22 21:5,20
  21:24 22:5,13,13
  24:10 36:10,11
  40:5,8,11 47:4
  47:10,19 113:10
  113:17 115:20
  116:6,12 117:9
  136:16,17 140:12
  140:18
hear 5:13
heard 72:20 146:23

Heights 1:9 4:16
  6:12 10:7 12:21
  21:19 31:10,16
  36:12 84:2 85:2
  85:9 94:4 99:18
  113:11,18 114:25
  115:20 117:15
  140:13,19 152:17
  153:23
held 1:21 113:25
  124:4
help 5:8 6:15 7:2
  75:17 159:3
helps 48:10 159:9
hereinbefore
  172:11
hereunder 148:6
hereunto 172:19
high 126:6
highest 9:13
hired 12:2
hiring 9:7
historically 89:3
Hoffman 7:6,8 8:8
  8:18 25:19,20
  34:14 70:21,25
  94:22 95:4
  119:19,20 120:19
  131:9 132:9
Hoffman's 39:18
hold 10:18 11:21
  12:4 18:20,22
  19:2,9 55:20
  66:3 113:23
Holden 26:10 38:9
holiday 83:3
home 9:11 83:6
Hope 32:23
hoped 150:20,25
Hopefully 15:5
hospital 7:2,17
  8:9 10:23 11:11
  12:21 13:5 16:2
  25:17 26:3 27:15
  27:15,22 29:22
  33:14,20,25 34:6
  35:2,11 38:15
  39:2 43:9,12
  48:20 49:15
  50:10 52:14,15
  52:20,21 53:6,12
  56:5 57:6 59:4
  65:5,11,14 68:21
  75:12 77:16
  78:12 80:22
  94:19 96:15 97:5
  98:7 104:9
  106:22 109:15
  112:9,12 113:19

113:20 115:22,23
117:7 124:14
140:25 141:7,8
141:16,20 145:5
145:10,23 156:17
157:11 158:6
159:19,25 160:4
160:6,12,24
161:14,25 163:7
163:10
**hospitals** 22:7,23
27:12,13,14,18
27:21 28:3,7
29:9,19 30:16,22
32:5 39:7 42:14
42:18,23,24 44:6
44:10 46:2 49:23
50:14,15 55:12
56:9,22 68:23
79:6 80:9 83:13
90:8 110:4 112:3
115:2 116:11
119:23 122:4,13
123:7 124:5,22
125:13 126:23
130:3 131:15
132:5 137:7
144:24 148:25
149:5 151:13,15
157:4,20 159:6,6
159:24 160:25
161:16 162:19,20
164:15,17,18,19
165:22
**hospital's** 23:8
55:23 60:17
94:24 101:24
119:16 134:11,21
143:2 147:18
**HOSTETLER** 2:3
**hours** 17:3
**Hsu** 25:23 35:16
89:25
**H-A-A-S** 135:13
**H-S-U** 25:24 35:16

---
' **I**
---

**idea** 147:11,12
**identification**
4:11 19:21 40:24
44:15,20 53:25
58:6,11 59:18,22
63:21 64:2 66:22
67:3 69:14,19
81:19,25 87:13
87:18 91:16,21
92:23 100:2
105:22 108:22
109:3 112:17,21

115:4,8,17
118:12,17 133:7
133:11 135:6,10
138:12 139:22
140:3 149:10,14
151:20 166:6
**identified** 152:8
**ignore** 46:16
**ii** 50:2
**Immaculate** 27:15
27:21 28:20 47:8
48:20 52:14,20
57:5 107:17,25
113:12,19 114:2
115:21 117:7
149:7 150:16
156:16,25 157:10
158:12 159:19
160:10 161:24
**immediate** 126:15
127:6 158:5
**implied** 77:7
**important** 59:14
**inception** 27:9
**include** 41:5
107:16
**included** 41:9
90:20 91:2
107:11 109:8
119:5
**includes** 108:16
**including** 38:8
56:15 62:8 69:6
84:25 97:15
149:24
**inclusion** 118:21
**increase** 121:23
**indemnification**
148:16
**Index** 1:7
**indicate** 55:24
94:7
**indicated** 26:16
95:8 165:19
**indicates** 102:21
139:15
**indication** 139:5
**indirectly** 147:22
147:23
**individual** 72:7
**individually** 48:10
116:18
**individuals** 116:15
**information** 52:17
52:18 73:3 93:25
158:15,18,21,23
**informed** 37:21
67:17,23,24
76:11,18

**informing** 142:25
**infuse** 128:2
**inhouse** 100:19
134:12 138:2
140:17
**initial** 129:7
**injunction** 146:17
146:18 147:8,17
147:20 148:4
149:24 150:8,12
150:14 151:2
**input** 96:23,24
**insertion** 94:7
167:24
**insinuated** 78:5
**instance** 92:16
**instances** 89:5
108:18 122:8
**Institute** 32:23
**institution** 11:10
129:5
**instruct** 7:10
138:7
**instructed** 42:9
110:14 136:24
**instructing** 7:22
**instruction** 157:15
**intact** 60:6
**intended** 41:4
**intention** 143:2
**interaction** 46:2
**interest** 35:3,24
55:10,16 125:25
126:7 129:7
**interested** 172:17
**interim** 140:12
**intermittently**
10:4
**Intern** 2:18
**internal** 78:11
93:8
**internally** 78:24
96:15
**interrogatories**
152:15,19,23
170:19
**interrogatory**
152:25 153:3,9
**interviewing** 52:19
**introductory**
106:21
**involve** 11:14
110:14,20
**involved** 15:16,18
25:10,18 34:16
34:23 35:10 39:5
49:3 72:6 114:21
120:10 130:14
134:9,17 145:24

155:4 163:11
**Island** 10:23
**issue** 56:19 57:15
124:12
**issues** 46:5 74:19
123:2 134:10
149:23
**ist** 172:20
**items** 71:4 143:16

---
**J**
---

**J** 2:8 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1

133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
**James** 71:14,16,23
72:2,12,16,21
73:7,10,18 74:15
74:20 75:19,22
76:14 79:20 80:5
80:6,18 82:4,17
82:23 83:15 84:8
84:15,20 85:4,7
85:10,14,19 86:2
91:24 96:9
102:22,24
**James's** 96:24
**January** 44:3 48:23
56:16,20 67:20
67:22 68:6 83:19
**Joann** 109:5
**job** 13:9 14:4,11
15:8,9 16:11,19
57:17 101:25
**John** 72:15 75:21
76:14 91:24
159:10,20 160:13
**John's** 27:15,22
28:19 47:8 48:20
52:15,20 57:5
104:9 107:17,24
113:12,20 115:22
117:2 149:6
150:17 156:17,25
157:10 158:11
160:11 161:25
**Joseph** 111:19
114:17
**jot** 86:16
**journal** 86:17,20
**Julius** 1:19 4:2,14
9:25 20:6,8 24:8
24:14 88:7
132:21,22 168:11
**July** 1:15 172:20
**jur9004@nyp.org**

81:16 100:10

---

**K**

**K** 2:10,19 171:9
**Kaplan** 121:6
**Kastanis** 159:10
**keep** 59:8 86:7
149:25
**Keisha** 58:25
**Ken** 12:14
**kept** 151:8
**kind** 112:24
**kindly** 67:14 74:9
161:12
**kinds** 35:12 50:9
**Kingsbrook** 9:8
**knew** 22:17,22,24
45:13,21 72:9
**know** 5:12 21:13
23:2,12 27:19
29:15,24 31:23
32:7,17 41:3,8
45:9,12 46:24
60:19 68:12
72:23 75:24
87:25 132:5
136:19 144:3
154:19 155:5
160:15
**knowledge** 27:23
28:13
**Kulesa** 144:20
**K-A-S-T-A-N-I-S**
159:10
**K-E-I-S-H-A** 58:25
**K-U-L-E-S-A** 144:22

---

**L**

**L** 2:10,19 132:21
133:2 171:10
**labeled** 54:7
**lady** 37:22
**laid** 10:5 158:10
**language** 98:15,17
98:19,25 99:7,10
99:22 143:11
165:8 167:9,12
167:15
**Lavan** 159:20,21
160:14
**law** 119:14
**lawsuit** 20:19
22:14 23:8,9,9
**lawyer** 26:14
134:12,21 138:3
140:15
**lawyers** 147:9,18
**lawyer/myself**
149:23

**layman's** 47:25
48:15 49:4 50:19
122:3 125:19
157:23
**layoff** 10:20
**lead** 26:18
**leading** 34:4 68:24
72:8 143:25
157:9,22 165:13
**leave** 98:2 104:10
104:12,13
**led** 25:11 33:3,5
73:23
**Lee** 119:11 146:23
**left** 101:13,14
103:16,17 105:7
105:8,18 119:19
159:25 160:3,17
160:23 161:14
**legal** 2:18 60:18
86:21 119:16
134:3
**letter** 31:7,15
41:6 47:11,21
51:8 67:17
**letters** 31:20
32:17 169:10
**let's** 16:9 19:16
33:5 36:2 42:15
46:15 56:18
77:19 98:14
103:19 107:8
113:5 116:21
123:5 135:3
138:9 153:9
**level** 9:13 126:6
**Lexington** 2:12
**liability** 132:6
**liaison** 33:13,19
36:24 59:5 112:4
**limit** 122:11
**limitations** 121:20
155:6
**limited** 23:14 26:4
**line** 88:23 93:9
94:7,9,15 95:21
98:8,12 101:17
106:24 129:17
138:25 139:3
166:25 167:10
173:7
**lines** 76:25 89:6
**list** 71:5 92:2
114:18 117:18
**listed** 50:18 64:12
113:22,24 114:11
120:4,12
**listening** 89:5
**listing** 115:24

**lists** 109:9 113:8
113:13,16 115:18
140:11
**litigation** 142:17
147:24
**little** 4:21,23
42:6 75:9 83:7
118:20 157:24
158:2 159:4
**LLP** 2:3,10,19
**located** 104:20
114:9
**location** 117:9
**locations** 104:10
**lock** 90:9 91:13
**Lodha** 118:22
119:10 133:2
136:23
**long** 6:13 10:22
11:21 12:4 158:2
158:6
**longer** 17:14
109:24
**long-term** 128:4
**look** 6:18 20:9
24:15 31:5 87:21
98:10,14,16,22
115:16 142:8,18
164:9
**looked** 41:16 92:12
**looking** 22:17
121:12,13,14
122:20,23 123:5
**looks** 91:22 93:6,8
100:7 112:23
120:17 138:24
**loop** 59:8
**lose** 127:9
**lost** 129:8,17
**lot** 87:20 92:12
97:14
**Loughlin** 2:15 4:22
5:24 6:2,6,9,24
7:9,14,22 8:11
8:18 12:24 16:6
21:10 31:23 35:7
36:3 38:17 41:3
42:4 44:22 45:4
56:10 60:19 61:8
61:12 73:20 74:4
75:3 79:9,13
80:10 81:7 87:5
92:16 95:24
96:17 101:19
114:3,14 116:7
141:2 142:2,12
143:21 145:17
147:2 148:9,19
149:4 151:25

153:20 160:6
163:17 166:2
167:6,14,20
168:2 169:5
**lower** 100:19
**L-A-V-A-N** 159:20
**L-O-D-H-A** 118:23

_____

**M**

**M** 171:9
**main** 83:16 125:9
**maintain** 131:11
158:7
**major** 112:9
**maker** 112:13
**making** 24:25 73:4
109:21,24
**managed** 11:9,12
**management** 83:13
**manager** 10:16 11:6
11:7,22 26:12
37:22
**managing** 13:9
**Mandava** 68:15
103:15,18 105:14
**Mandava's** 103:11
**March** 19:13 27:25
**margin** 98:24
**mark** 19:16 135:3
**marked** 19:19,23
22:11 24:5 25:5
26:22 31:3,13
39:25 44:14,17
44:19 46:18
47:12 53:24 54:4
58:5,9,10 59:17
59:21 63:20,24
66:21,25 69:13
69:17,19 81:18
81:23,25 82:2
87:12,16,18 88:7
91:15,19 92:22
93:2,4 94:6 99:5
99:24 100:5,9
105:21,25 108:21
109:2 112:16,20
115:3,7,8 116:17
116:19 118:11,15
118:16 133:6,10
135:5,8,9 138:11
138:15,18 139:21
139:25 141:11
149:9,13 151:18
152:14 161:4
164:7 166:4,5,9
167:3,24
**market** 90:2
**markings** 167:11
**marriage** 172:16

**Mary** 27:14,21
28:20 47:7,8
48:20 52:14,19
57:5 107:16,25
114:2 117:6
149:7 150:16
156:16,25 157:10
158:11 159:19
160:10 161:24
**Mastromano** 159:17
160:10
**material** 138:17
164:14,21
**matrix** 47:6,25
50:5 52:8
**matter** 35:4 38:4
38:16 44:2
147:23 172:18
**matters** 110:7,8
**Matthews** 32:22
**max** 154:18
**maximum** 153:11,16
154:16 156:2
**McDonald** 8:23 9:3
25:22 32:9,14
33:10 34:8,13
35:14 58:25 59:6
68:15,17 70:3,16
70:24 71:14,15
71:23,25 72:3,11
72:12,16,17,20
74:25 75:14
76:16 77:24
78:19 79:18 80:4
82:8 94:22 95:3
97:24 101:14
102:3,4 103:6,22
104:12 105:9,14
105:19 106:3,10
106:11
**McDonald's** 53:18
61:3,6,18 73:5
103:10,17 104:9
105:4
**mean** 79:9 80:11
95:24 124:22
149:5
**meaning** 145:17
153:25
**means** 49:6 101:20
**meant** 118:5 151:22
152:3
**mechanism** 39:12
63:15
**medical** 1:9 4:16
6:12 10:7,16,21
12:3,9,11,16,17
12:23 13:6,12,14
13:15,17,19,22

14:7,10,13,17,21
15:11,12,14
16:10,13,16 17:9
17:13,23,24 18:2
18:5,19 19:6,7
19:10 21:4,19,24
22:5 28:2,10,11
29:7,12,14,17,21
30:7,10,21,24
31:10,17 32:18
32:23 34:16
36:12 41:15
42:19,25 43:18
45:15,20 46:12
47:7 48:7 49:3
49:10 52:8,25
53:2 56:25 62:12
63:5,7,12 83:11
84:3 85:2,9
89:21 94:4 106:7
106:13,14 107:14
107:17 108:6,13
109:19 111:2
113:9,11,17,18
114:25 115:19,21
116:5,20 117:16
119:10,25 120:10
126:4 140:13,19
152:17 153:12,16
153:24 154:17,21
156:15,21 157:3
157:12 158:14,19
162:18
**medicine** 1:5 28:15
31:19 34:19 40:4
40:7 52:7 76:6,7
136:14,15 156:3
156:5
**meet** 5:20 6:11
132:21
**meeting** 68:4 71:4
75:21 82:11
106:7,8 133:4,5
149:19
**meetings** 68:25
69:5,8
**member** 155:9
**memo** 109:11
**memory** 6:16
**mentioned** 80:17
108:17 137:10
151:22 159:16
**merely** 51:18 72:24
**merged** 37:13
**message** 46:18 88:7
88:10 89:19
95:16,22 97:8,22
97:25
**messages** 33:13

**met** 6:2
**Michael** 2:18
**middle** 57:13
161:24
**MIH** 36:19 106:19
106:24 107:7
109:6
**million** 60:8 80:7
117:17 123:21
124:12 126:14,24
127:2,7 128:16
128:23 129:7,8,8
130:8,12,15,18
130:20,24,25
**mine** 6:7
**minute** 20:9 142:18
**misread** 107:3
**misunderstanding**
42:7
**misunderstood** 74:5
**modifications**
121:11,15,16
125:18,22
**modify** 121:9 126:9
**moment** 24:15 34:2
98:5
**monetary** 64:21
65:6 129:23
**money** 22:18,22,24
23:2 35:3,9 56:8
57:20 58:3 69:11
73:19 74:15,20
75:2,15 125:13
150:24 161:10,18
**monies** 129:24
143:19,20
**monopoly** 128:6
**month** 9:4 47:5
83:18 131:10
132:10 164:5
**months** 10:5 106:12
**morning** 54:13,14
71:4 72:10 101:2
101:20
**move** 49:17,19
55:22 58:22
59:11 66:6
**moved** 89:15
**moving** 50:13 78:3
**Mullally** 134:6,7,8
134:11,17 137:23
137:25 138:6,22
139:9 140:5,11
140:15 141:16,18
146:24 147:5
**multiple** 88:25
96:22
**mutually** 101:9
**M-A-N-D-A-V-A**

68:16
M-A-S-T-R-O-M-...
159:17
M-U-L-L-A-L-L-Y
134:10

**N**

N 2:1 70:20 169:1
171:1, 5, 9, 10
name 4:12 14:20
26:11, 13 37:6
140:10
named 109:5 111:19
names 151:10 159:7
Nancy 31:17 45:9
88:8
nature 144:16
necessarily 105:19
need 5:11 47:16
135:20
needed 55:25 60:4
125:10 132:5
165:17
negotiate 125:21
negotiated 39:8
140:23
negotiating 15:14
55:21 66:13
90:13
negotiation 34:2
36:24 74:18
75:10 122:21
141:22
negotiations 25:11
25:18 26:17 33:3
33:5, 9, 12, 16, 23
34:4 35:19 45:24
73:15, 23 74:11
75:7 97:17 112:5
133:17
never 37:12
new 1:2, 14, 14, 24
2:6, 6, 13, 13 4:5
4:17 9:12, 18
29:12, 14, 20, 25
30:9 58:17, 17
70:8, 13 75:20
154:4 172:3, 4, 8
173:1, 2
night 10:11, 14
nodding 5:5
Notary 1:23 4:4
168:17 172:7
note 25:12 26:19
26:24, 25 27:5
36:3, 20, 22 39:7
43:16 44:6 59:14
63:2 88:13 91:25
121:5, 10 124:16

129:15, 21 130:5
139:6 143:3
145:2 169:11
notes 58:24 86:7
86:10, 11, 12, 15
86:22, 24 130:8
166:13, 14
notice 20:5, 7 24:7
169:17
noting 54:20
November 59:24
63:3 64:6, 8 67:5
134:2 165:4, 12
null 83:11, 21
number 20:13 24:6
24:19 26:23 40:2
40:2, 24 44:18
47:13 49:16 50:9
52:3 54:5 57:9
58:10 63:25 64:2
67:3, 19 69:18
81:24 83:25 84:9
87:17 91:20
102:18 109:2
112:21 113:6
121:16, 17, 21
122:11 124:13
149:14 151:11, 14
151:23 153:2, 3, 9
153:11, 16, 21, 22
154:9, 11, 12, 14
154:19 155:6, 11
155:12, 23 158:19
163:3, 25 164:23
166:23
numbered 47:24
166:4
numbers 31:13
44:20 48:9 58:11
59:22 69:19
81:25 87:19
91:21 109:4
115:8 118:17
133:12 135:10
140:3 151:16
numerous 64:18
77:11, 12
nyp.org 70:7
NYU 10:4

**O**

O 171:5, 5, 5, 9, 9
oath 3:7
Object 165:9, 23
objected 30:20
Objection 7:9 8:11
35:7 56:10 61:8
73:20 75:3 116:7
141:2 142:2

167:20
objections 3:11
56:13 152:18
170:21
obligate 36:21
obligation 129:24
165:20
observe 149:21
observer 30:19
obtained 146:18
OB/GYN 156:4
occasions 77:11, 12
occupying 163:22
164:2
occur 37:24
occurred 58:15
68:5
October 10:25
47:17 52:4 54:11
58:16 115:13
offer 31:20 32:17
48:21 66:4
124:23 131:11
169:10
offered 28:19
55:11 90:4 124:2
124:13 127:2
162:14, 15
offering 123:20
125:2
office 30:20 39:18
39:19 53:18, 19
61:3, 6, 18 73:5
76:13 83:4 96:7
103:16, 17 104:8
104:9 105:5, 7, 11
113:23, 25 114:6
114:9 116:23, 25
117:4, 6 137:2
162:15
officer 3:6 31:9
31:11, 16 32:11
32:15 109:15
115:24, 25 119:10
official 144:11
Oh 45:4
okay 5:9, 10, 15, 16
24:17 66:3 74:4
88:2
old 9:9
once 17:12, 18 18:4
39:11 57:6 62:15
74:14 97:7
104:15, 18 112:11
135:22
ones 44:11 144:8
open 44:10 120:6
158:7
opened 125:7

operate 27:20
29:15
Operated 27:13
operating 32:14
operative 164:19
164:20
opinion 15:4
opportunities 48:5
opportunity 45:5
97:15 123:5
option 125:21
options 128:15, 18
order 59:15 148:4
149:25 164:12
ordinary 60:16
101:23
orient 75:17
orientation 13:23
106:18, 20, 22
107:2, 9 149:21
original 25:9
46:18 130:25
outcome 172:21
outpatient 108:19
outside 30:2 50:24
119:17
out-patient 107:21
108:16
overall 48:17
oversaw 22:6
owned 27:12, 18
ownership 83:13

**P**

P 2:1, 1, 15 171:5
pad 86:21, 21
pads 86:13
page 20:15 24:21
36:6, 8, 8, 14
40:15, 18, 23
72:25 93:5, 14, 18
94:6, 12 98:16
99:13, 22 102:20
120:17 123:20, 24
126:12 127:18, 22
131:6 132:18
134:2 138:20, 25
148:3 164:11
167:3, 23 169:3, 9
170:2 171:6
173:7
pages 93:7 99:4, 7
142:16 147:25
PAGE/LINE 171:2, 11
paid 30:23 150:24
161:10, 18
paper 19:24
paragraph 25:8
26:16 27:2, 8

38:23 48:24
97:12 101:4
148:20,22
**parallel** 78:14
84:13
**part** 36:4 55:21,23
57:16 64:20 67:8
67:11 70:12
78:23 79:21,22
88:16 90:4 91:2
93:11 109:25
127:10 129:14
142:24 145:14
146:7 156:9
168:3
**participant** 68:18
**participants** 88:19
**participate** 158:14
**participated** 68:25
143:23 144:4
**participating** 89:9
**particular** 27:7
60:25 61:14
62:10,12 75:10
78:4 96:25 97:3
106:14 116:10
129:23 136:22
158:17 164:8
167:2
**particularly** 125:8
143:17
**parties** 3:3 39:11
85:25 101:9
119:4 141:15
145:21,25 147:10
147:16 172:15
**Paul** 118:22 119:9
132:21,24,24
135:20
**pay** 15:5,7 46:13
121:19 124:2
143:19
**payment** 18:10
144:25
**payments** 64:21
65:6 125:25
126:7 129:6
**payroll** 11:15,17
11:18
**pays** 111:6
**pediatrics** 156:4
**penalty** 24:2 25:2
**pending** 24:11
**people** 5:4 34:12
35:10,22 53:21
70:5 72:5 86:8
159:8 165:4,13
**period** 10:17 14:23
15:10,17 16:3,15

18:22,25 19:8
42:16 46:10
81:13 110:3
113:13 116:22
133:20 165:3
**perjury** 24:2 25:2
**Perri** 31:17 45:2,3
45:3,9,12,13,21
46:3,17,17,20,22
46:24 50:5 51:8
51:10,13,14 52:4
53:8 54:6,9,13
55:18 58:13
59:25 61:21,25
62:5,8,8 63:3
64:4,18 65:17,20
65:21 66:3,16
67:5 69:21,25
70:24 71:7,21
72:11 73:7,16
74:12,18 75:6,18
76:11,21 77:10
78:5,5 79:3,5
81:5,6,6,12 85:7
87:22 88:8,11,20
91:13,24 96:8
102:22,25 112:6
**Perri's** 59:4 96:7
**person** 33:21 34:18
37:5,7,9 61:14
103:5,24 134:18
**personal** 162:14
**personally** 38:22
143:22
**personnel** 153:25
154:2
**perspective** 50:8
56:17,19,24
78:25
**Phil** 50:5 78:5
81:6 96:7
**Philip** 46:22
**phone** 51:14 55:7
64:19 73:9 82:14
**phrased** 7:24
**physical** 114:6
117:4,9
**physically** 104:20
114:2,9
**physician** 9:8
18:10
**physicians** 11:19
30:18 69:2
**picked** 105:3
**piece** 53:12,22
**place** 1:22 29:16
37:23 50:2
108:13 113:4
146:14,19

**placed** 37:16 49:10
121:17 162:23
**placement** 37:15
46:4,12 56:15
**placements** 23:18
48:8 78:7 162:3
**places** 49:18,19
**placing** 29:17
45:20 78:23
166:8
**Plaintiff** 1:6,21
2:4 25:13
**Plaintiff's** 152:15
152:18 170:18
**plan** 51:19 77:3
123:22,23 124:8
125:17 126:4,6,8
126:8,14,16,18
128:3,8,9,10,11
131:7 145:13,16
157:24 158:5
**planning** 26:2
36:11 67:24 68:8
68:10,21 69:5
77:25 159:13
**plans** 32:3 126:5
145:5 156:24
158:11,13,16,22
**played** 142:24
**Plaza** 1:13 2:5
**please** 4:12,15
8:16 25:8 38:20
60:4 65:2 134:5
137:16
**plus** 126:15 129:6
129:8
**point** 34:7 50:16
50:20 51:3 55:9
63:8 65:21 66:14
71:13,20 73:2
77:9,17 80:3,11
83:8,15,24 84:8
84:9,21,23 85:9
85:13,22 90:14
91:9 98:3 106:17
107:4 109:18,23
111:9 112:4
122:10 133:22
139:13 141:8
**pointed** 36:4 167:9
**pointing** 87:9
**points** 33:22 34:10
47:24 64:10,12
64:16 65:6,16,22
71:10 82:24 83:8
89:16 112:10,13
140:21,23 141:25
**policies** 106:22
154:4

**political** 153:15
**portable** 78:22
**portion** 46:17
144:10 148:11
**portions** 99:10
142:16
**posed** 150:19
**position** 10:10,15
10:18,21 11:3,5
11:21 12:4,15
18:2,19,23 19:2
19:4,9 21:12,16
23:8 95:15
**positions** 117:25
118:8 154:14
**positive** 64:22
65:23
**possibilities**
120:9
**possibility** 128:5
131:16 146:22
**possible** 48:5
50:12 57:22
72:19 118:10
132:16 154:23
**possibly** 66:4,18
**potential** 111:10
146:17 147:17
**potentially** 125:3
150:20
**practice** 34:5
53:11,15,20
54:16,18 72:4
86:16 94:25
166:11,17
**Pradeep** 34:20
**precise** 43:4
**preferably** 55:19
**preliminary** 149:24
**premarked** 4:9
**prepaid** 32:3 35:9
43:17,19,20 44:5
44:12 60:9 84:4
156:14,20
**preparation** 7:17
92:17
**prepare** 5:17,21
52:8 92:12
**prepared** 53:5
60:11
**preparing** 31:20
**prepay** 67:19
117:16 143:2
**prepaying** 143:18
144:9
**prepayment** 67:21
69:7,11 80:8
124:2 126:25
130:15

prepayments 111:12
137:18
Presbyterian 70:13
Presbyterian.org
70:9
present 2:17 5:25
6:8 10:2 38:14
39:2 108:3 121:8
122:12 136:23
161:2,7,17
presented 39:21
52:12 137:21
150:23
presently 57:4
154:15
president 15:21
16:12,16 17:9,13
17:19,23,25 18:3
18:5,18 19:5,10
21:4,23 22:4
30:7 31:9,15,18
32:11 56:4 65:11
65:13 76:5 113:9
113:16 114:10
115:19 116:5
pressing 90:24
pretty 10:6 51:24
75:16
price 35:3,8,23
128:24 145:15
prices 125:24
127:5
primarily 111:19
principle 67:18
printed 101:12,14
104:7
prior 98:19 99:2
99:11
privileged 7:10,18
8:5 147:5
probably 61:19
154:25 158:24
probe 7:14
problem 46:7,8
123:6,11,17
150:19
proceed 73:15,15
93:21
process 55:22 79:2
103:19,21 104:2
104:5 110:20
134:17
produced 113:7
126:22 158:10
produces 126:14
productive 82:12
program 78:14
116:20
programs 22:7 53:4

129:5
projects 11:10
promise 90:9
promised 79:7
promising 90:19
promissory 25:12
26:19,24,25 27:4
36:2 39:7 43:16
44:6 121:5,10
124:15 129:15,20
130:5 143:3
145:2 169:11
proposal 47:3,9,14
47:18,20 48:4,17
50:19,21 51:10
51:19,23 130:17
131:3
proposals 83:2
141:19
propose 128:21
proposed 48:6 69:6
121:4 129:25
167:12,24
proposing 48:3
49:13,15
Proskauer 119:14
protection 80:7
provide 79:7
103:14 108:5
122:6 143:3
148:5,25 151:15
153:13,18 154:16
154:16 158:22
164:22
provided 12:21
13:5 28:6,11
51:4 60:21,24
61:6 65:8 79:25
84:5 103:5
150:16 158:25
provides 52:12
101:7
providing 152:22
158:15,21
provision 79:23,23
90:18 95:8
165:18
provisions 142:11
provoke 51:11
psychiatry 125:9
Public 1:24 4:4
168:17 172:7
pulled 128:13
130:11
Purcell 109:5
purchase 73:25
purpose 23:15
118:25 132:14
purposes 69:6

109:19
pushing 123:2
put 31:22 72:24
134:25
P-R-A-D-E-E-P
34:21
P-U-R-C-E-L-L
109:6
p.m 1:15 64:9 66:2
134:2 168:7

**Q**

qualitative 121:15
Qualitative-wise
121:20
quality 122:25
quantitative
121:16
Queens 1:8 18:23
20:21 21:5,24
22:5,12 23:3
36:10,15,19 40:5
40:8,10 47:4,9
47:19 52:15,20
57:12 63:6,8,13
104:12 105:8,15
113:10,17,20
115:20,22 116:6
116:12 117:8
136:16 140:12,18
156:17 160:12
question 5:14,14
7:24 8:16,19
17:17 21:21
22:20 38:18,20
38:25 42:2 43:2
43:7 47:17,20
62:2 75:9 79:14
79:16,17 81:7
87:8 92:3 93:12
108:8,12 114:4
114:10 127:16,21
127:25 128:11
138:5 139:11
141:4 142:3
143:6,8,22
148:23 153:20
165:2 167:17
QUESTIONING 171:11
questions 4:25
20:10 24:16 62:9
87:24 103:23
142:19 163:15
quickly 50:12
55:25 56:8,9
57:20
quo 154:11
quoting 148:3

**R**

R 2:1 171:1,5,5,5
171:9,9,10 172:1
raise 15:5,7 125:3
raised 119:22
Rajiv 160:20
range 28:22,23
155:8,14 156:11
rate 89:20,23 90:3
90:9,10,19 91:2
91:10 101:7
rates 91:8
ratio 121:22
122:13 124:12
155:12,17 156:6
ratios 125:24
155:3,22 156:7
Raymundo 140:6
reached 117:14
read 64:25 65:4
101:13 143:8
153:4 164:12
167:16
reading 53:16
102:11 148:12,20
reads 36:14 66:2
83:9
ready 20:11 66:9
87:25 102:21
really 66:5,14
118:7 129:19
130:24 131:20
reason 56:6 124:21
125:5,6 173:9,12
173:15,18,21,24
reasons 125:10
173:5
recall 26:6,11
32:8,22,25 35:18
37:11,17 38:3,6
38:6,11 39:23
42:21 50:5 53:9
54:15 55:2,3
58:19 59:3 60:13
61:15,23 62:11
62:17 63:10,11
70:18 71:24 72:4
80:16,20 81:4
82:21 83:5 84:10
84:19,22 85:5,14
85:15 86:4,5
88:22 89:18 90:6
91:4,6 92:5,6,10
92:19,21 94:21
95:12 96:5,13,14
96:19 97:2,6
101:12,21 102:7
102:8,11 103:2,7

103:8 109:12
117:10,19 119:12
121:24 129:20
130:4 133:5
135:16 136:5
143:10 144:11,14
146:20,21 157:17
158:17,24 159:15
159:23 160:19
162:11 163:3
165:15
**receipt** 67:15
**receive** 9:19 97:5
**received** 51:19
72:15 104:7,23
105:2,13 135:22
138:18
**receiving** 96:13,14
96:20 97:2
141:19
**recess** 51:25 81:21
138:10
**recollection** 7:3
7:13 8:10 23:10
28:24 30:17,25
37:10 41:20
48:11,12,16 57:8
64:15 78:14 81:8
81:11 82:25
83:16 85:21
96:18 104:6,25
117:20 119:18
121:14 128:20
139:18 140:17
143:15 146:10
147:19 151:7
156:19 159:9
160:9
**recommend** 131:7
**recommendations**
155:8
**record** 4:13 87:6
105:18 148:10
172:12
**records** 10:13,16
10:21 87:4,10
**recover** 22:18
**red** 93:9 94:7,9,14
95:21 98:8,12
101:17 138:24
139:2 166:25
167:10
**redacted** 138:20
**redlined** 167:16
168:2
**refer** 27:6 47:10
69:2 137:15
166:22
**reference** 70:8

94:3 99:17,21
124:9 128:23
134:24 136:7
163:20
**referenced** 88:17
**references** 117:24
**referencing** 101:4
**referred** 27:2
47:21 65:3 68:20
143:7
**referring** 73:21
76:9 106:20
129:14 142:12
143:19 152:4
164:13
**refers** 47:18 49:5
61:20 114:5
128:9 130:24
**reflect** 87:6
123:20 159:5
**reflected** 81:5
**refresh** 6:16 7:2
7:13 8:10,20
140:16
**regarding** 69:5
72:17 78:6 84:12
120:9
**regulatory** 154:6
155:2
**reiterated** 85:10
**related** 146:11
172:15
**relation** 47:14
**relations** 131:11
**relationship** 27:10
128:4
**relationships**
17:18
**release** 124:9
125:5,6
**released** 124:19
125:10 151:8
**releasing** 125:12
**relieved** 88:13
**remain** 85:2 153:15
153:19 164:18
**remains** 154:12
**remember** 5:8 21:11
23:4 37:6 43:14
51:15 55:6 62:3
62:23 68:13 73:3
82:18 85:18 89:8
93:13 96:10
136:22 137:13
**renegotiate** 117:22
**renegotiating**
117:21
**renew** 110:12
**repeat** 5:15 62:2

143:6
**replace** 126:8
145:8
**replaced** 124:10,18
127:5 131:14
**replacement** 165:20
**reply** 54:9 64:5
69:21
**report** 17:8 68:7
160:12
**reported** 17:14
50:4 79:19 80:4
**reporter** 1:23 5:2
19:23 24:5 26:22
31:3 39:25 44:16
54:4 59:20 63:24
65:4 66:25 69:16
81:23 87:15
91:18 93:2 100:5
105:24 108:24
112:19 115:6
118:14 133:9
135:9 138:14
143:9 149:12
152:12
**reporting** 17:18
**represent** 114:23
**representative**
1:19
**representatives**
90:8 166:12
**request** 104:17
**requested** 49:22
71:14 78:6 91:13
125:6
**requests** 78:4
158:18
**require** 37:15
**required** 79:23
150:14
**reserved** 3:12
122:5 123:8
**residence** 12:17
**residencies** 13:6
**residency** 13:21
14:7 53:4 129:5
**resources** 97:14
153:25
**respect** 12:17
13:11,12,20 34:4
40:12 78:9 84:8
148:16 152:7
157:16
**respective** 3:2
**respond** 93:24
**responded** 96:16
**responds** 126:13
**response** 62:14
64:5,22 67:6

69:22 127:15,20
127:25
**responses** 152:17
170:20
**responsibilities**
18:7,12 36:23
72:7
**responsibility**
18:15 30:9,14
36:21 130:23
**responsible** 129:6
130:12 141:21,24
**restate** 22:20
38:20 74:9 90:23
161:12
**restructuring**
109:15
**result** 120:13
126:23 148:3
151:2
**retain** 86:11,22
**return** 10:24 95:22
144:24
**returned** 11:2
71:15 72:2
112:23 161:19
**returning** 161:9
**review** 6:15 20:13
24:19 45:6 53:7
53:12 60:4 88:3
111:14 120:7
131:8 132:15
**reviewed** 93:25
94:19,19 99:16
**reviewing** 51:23
134:3
**revise** 110:12
121:4
**revised** 100:23
**Rich** 71:17 76:11
76:14,15
**Richard** 25:25
70:17 91:25
**right** 13:15,16
38:24 46:23
66:16 86:14
98:14 105:6
114:7 128:6
131:3 150:21
**right-hand** 98:23
**ris9022@nyp.org**
70:16
**Rober** 6:5,9,25
8:18
**Robert** 26:14
**Rockefeller** 1:13
2:5
**role** 33:11,15
36:24 106:9,16

111:23 116:9,19
**roles** 106:13
114:15,19,21
116:10,17
**roll** 16:9
**Romero** 1:19 4:1,2
4:9,14,18 5:1
6:1 7:1,15 8:1,8
9:1,25 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1,19,22
20:1,6,8,12 21:1
22:1 23:1 24:1,4
24:8,15,18 25:1
26:1,21 27:1
28:1 29:1 30:1
31:1,2,19 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1,24 40:1
41:1 42:1,9 43:1
44:1,14,16 45:1
45:2 46:1 47:1
48:1 49:1 50:1
51:1 52:1,2 53:1
53:24 54:1,3
55:1 56:1 57:1
58:1,5,8 59:1,17
60:1 61:1 62:1
63:1,20,23 64:1
65:1 66:1,21,24
67:1 68:1,2 69:1
69:8,13,16 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1,18,22
82:1 83:1 84:1
85:1 86:1 87:1,7
87:12,15 88:1,7
89:1 90:1 91:1
91:15,18 92:1,22
92:25 93:1 94:1
95:1 96:1 97:1
98:1 99:1,24
100:1,4 101:1
102:1,16 103:1
104:1 105:1,21
105:24 106:1
107:1 108:1,21
108:24 109:1
110:1 111:1
112:1,16,19
113:1 114:1
115:1,3,6 116:1
117:1 118:1,11
118:14 119:1
120:1 121:1

122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1,6,9
134:1,24 135:1,5
136:1,12 137:1
138:1,11,14
139:1,21,24
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1,24 149:1,9
149:12 150:1
151:1,18 152:1
152:12,19 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1,15
163:19 164:1,7
165:1,2 166:1,5
166:22 167:1,17
168:1,11 169:4,9
170:2
**Rose** 119:14
**Ross** 1:4 28:14
29:5 30:16,24
31:13,13,18 33:6
33:12 34:3,5,9
40:3,7,10 43:23
43:24 44:7,11,20
44:21 45:14,15
45:24 46:12 48:5
49:20 50:24 52:7
54:7 55:20 56:7
57:10 58:11,22
59:11 60:22 61:7
61:18 63:5,15
64:2 65:9 66:6
67:3 69:7,19
73:11,14,22 74:8
74:12 76:5,22
78:4,20,20 79:8
80:19 81:25 83:2
83:10,20 84:5,11
86:9,18 87:19
89:3,4 90:8,14
90:21,24 91:12
91:21 93:4,8
94:6 95:16,23
97:9 98:2,16,19
98:25 99:5,10,12
99:22 100:9,21
101:5 103:23
104:2 105:16

107:5 110:11,25
111:6,10,23,25
112:3,5 115:9
117:14,16 120:11
121:24 122:23
123:12,20 124:11
124:18 125:22
126:8,25 127:5
128:14,17 129:16
129:22 130:14,18
131:12,14 132:4
133:12 136:14
137:17 139:6
140:3 142:20
144:2 145:6,9,24
146:4,13 148:6
149:25 150:21,24
151:5,9 152:6
156:18,22 161:9
161:18,19,22
162:5,18 163:22
164:2,11 165:4,5
165:13,17,21
166:12 167:3,7
167:12
**Ross's** 79:4,6,21
93:11 111:2
130:25 149:2
161:23
**Ross-BQHC** 136:2,9
**Ross-Caritas**
136:11
**Ross-Wyckoff** 136:3
**rotating** 83:18
**rotation** 32:4 49:8
49:8,10 150:2
155:15,18 158:4
158:6,8 162:20
**rotations** 12:22
13:18 28:12,19
29:8 45:16 49:2
49:16,24 50:10
52:23 57:5,10,14
108:5,14 122:5
124:24 125:3,4,8
149:2 150:2
155:20,21 156:2
156:5,8,10,10
157:3,16,18
161:24 162:12,24
163:5
**rough** 86:15 87:2
**Rucigay** 68:2
**Rule** 7:19
**rules** 5:4 106:22
**run** 30:2 158:2
160:9
**running** 107:24
**R-A-J-I-V** 160:20

**R-A-Y-M-U-N-D-O**
140:6
**R-O-B-E-R** 6:5
**R-U-C-I-G-A-Y** 68:3

---

**S**

**S** 2:1 169:8 170:1
171:1,1,5,5,9,9
**Saint** 52:14,20
**Sarli** 25:25 35:15
70:17,25 71:17
72:13 74:25
75:14,19,23
76:15 79:18 80:4
80:17 82:8 89:25
120:18 135:13
**satellite** 107:20
**Saturday** 83:3
**save** 133:16
**saw** 92:14,15,19
**saying** 5:6 7:25
12:24 62:18
93:24
**says** 25:9 27:9
50:17 54:12
84:23 88:13
93:18 98:24
132:8,20 134:3,4
148:12 164:13
**scenario** 128:9,9
129:4
**scenarios** 120:4,12
120:14
**schedule** 12:10
67:21
**scheduled** 13:17
49:7,7 75:23
107:6 150:3
151:9
**schedules** 13:10
**scheduling** 11:16
11:17,18 13:23
18:16 46:6,25
48:14,25 50:3
56:21 79:2
150:22 152:4
157:12 162:17
**school** 1:4 10:2
12:23 28:14
30:24 31:19
33:14 40:4,7
42:19 50:6 52:7
76:5,6 128:6
136:14,15 143:4
156:15,21
**schools** 12:11 13:7
13:12,14 15:14
28:10 29:7,11,18
30:15 32:19,21

32:24 41:15
43:18 55:15
107:14 119:25
120:10 125:23
126:4,9 128:5
131:25 151:15
154:15
**sealing** 3:3
**second** 40:9 41:5
43:23,24 106:24
136:6 141:12
142:13,15 143:25
145:18,22 147:24
152:15,18 169:15
170:18
**secretaries** 73:6
**section** 36:18 70:7
147:24
**secure** 157:7
**secured** 80:19
**see** 45:4 59:10
71:17 93:12
97:18 117:25
122:2 135:23
159:9
**seen** 92:6 121:21
**sell** 126:16 145:6
**selling** 125:13
**send** 29:2 39:14
48:22 53:17
58:17 60:21 61:7
65:19 82:7 97:21
115:23
**sending** 76:22
103:2 104:2
151:10
**sent** 46:20 51:7
53:7,13,21 54:8
58:13,24 59:13
59:25 63:3 64:4
65:25 67:4 70:23
82:4 88:10 94:14
95:21,22 96:11
96:12 97:9
100:16 101:17
103:23 106:3
115:13 131:9
132:8 135:22
140:5 149:15
150:6 151:12
**sentence** 107:8
148:21
**separate** 30:4
84:24 85:11 91:7
91:12 95:19
121:24 149:19
**series** 4:24 64:10
**serve** 84:3
**services** 34:16

154:2,3 164:18
**set** 20:24 38:4
63:18 67:21
84:25 89:21,23
135:21 152:15,18
170:18 172:11,20
**share** 123:21
**sheet** 102:21
**Shepherd** 75:22,24
76:3,4,9,14
88:15,21 89:14
91:23 93:7,15
94:11,14 95:7,20
96:11,14,21 97:3
99:15 166:24
**shepherded** 103:25
**Shepherd's** 93:17
**short** 9:24 46:6
**show** 19:22 20:8
24:4 31:2 54:3
58:8 63:23 66:24
81:22 92:25
100:4 164:8
**showing** 167:11
**shown** 70:15
**shows** 70:2 91:23
**Shrestha** 1:23
172:7,23
**shut** 157:24,25
**shutting** 80:23
**side** 16:2,5 25:17
26:3 29:22 33:20
33:25 34:6,24
35:2,11 41:6
65:5 66:12 74:22
74:24 75:2,12,13
75:15 77:16
78:12 90:24
94:19 112:8,9
126:17 127:13,16
128:2 134:20
141:7,16,20
163:7,10 164:9
164:10
**sideline** 113:5
**sign** 39:13 41:19
41:23 42:9,18
60:4 103:8,22
135:20 138:7
139:12
**signature** 20:16
24:22 36:8,9
40:15,17,17,21
40:22 103:10
104:2 113:3,8,15
113:21 114:12,13
115:16 137:3,9
137:22 140:10
**signatures** 42:17

104:18 135:19,22
137:2
**signed** 3:5,8 20:19
21:22 22:11,21
23:5,11,21 24:25
39:22 41:10,14
41:23 43:5 85:24
93:20 102:19,24
103:6,11,15
104:24 105:3,14
105:20 110:23
138:3 139:7
142:21 145:21
148:25
**signing** 136:20
**simply** 62:20 63:17
**single** 49:15 50:10
**Singleton** 41:21
42:3,8,13,18,22
43:5,8 109:14,20
110:3,13,19,22
112:12,14 118:20
119:2,3,8,21
120:19 121:7
126:3,13,21
127:24 129:3,12
129:22 131:6,18
131:23 132:3,20
136:23,24 137:7
137:12 138:17
139:3,11 141:10
141:23 143:14
149:22 158:25
159:4,24 160:17
160:23 161:14
**Singleton's** 127:15
127:20 128:11
**sir** 9:9 21:21
24:15 106:6
115:23 140:17
**sit** 61:4
**site** 48:6 85:11,12
**sites** 88:25 107:15
107:19,20 108:15
**six** 10:5 49:21
**sixty** 52:15
**SJQ** 109:6
**SJQH** 36:19
**slots** 46:4 47:7
48:19 49:23 50:2
50:17,22,23 51:2
51:3 52:16 55:10
55:16,20 64:24
66:10,15 67:20
84:2,12,14
111:13 121:17,18
121:19 123:8,9
123:22 124:4,6
124:11 125:14,16

126:16,25 129:8
129:17 137:19
143:3 145:6,8
146:12 148:6
150:16,21,24
164:3
**Smith** 91:25 100:7
100:16,18 101:17
**sole** 101:2
**somebody** 39:14
52:9 53:11 61:5
141:9,17
**soon** 87:3
**sorry** 26:12 79:12
90:23 93:18
157:21,23
**sort** 50:4 56:18
86:17 92:11,13
**source** 61:13
141:15
**Southern** 20:2
24:12
**space** 156:13
**spark** 139:18
**speak** 7:5 8:9 9:3
77:20 85:25
95:23 144:19
155:3 162:5
**speaking** 37:23
82:18 89:3,16
**special** 11:10
122:17
**specific** 5:19
63:11 64:20
67:19 116:16
125:25 155:6
**specifically** 79:16
**speculate** 61:9
**spent** 17:3
**spoke** 7:25 75:19
96:4 97:8 144:20
**spoken** 8:23 51:13
77:23 82:16
159:21
**ss** 172:3 173:1
**St** 27:15,22 28:19
32:22 47:8 48:20
57:5,11 63:11
69:3 71:14,16,23
72:2,12,15,21
73:7,10,18 74:15
74:20 75:19,22
76:14 79:20 80:5
80:6,18 82:4,16
82:23 83:10,15
83:20 84:8,15,20
85:4,6,10,14,19
86:2 91:24 96:9
96:24 102:22,24

104:9 107:17,24
116:25 149:6
150:16 156:16,25
157:10 158:11
160:11 161:25
**staff** 11:19,20
156:12 158:25
**staffing** 11:16
**stamped** 59:22 64:2
64:9 67:2 91:20
106:2 109:3
112:21 120:17
133:11 140:2
149:14 164:11
**standard** 54:18
89:20
**standing** 59:15
**start** 45:8 77:19
107:4 152:25
153:10
**started** 10:9 74:12
**starting** 57:9
**state** 1:24 4:5,12
4:15 154:5 172:3
172:8 173:1
**stated** 21:7 25:9
**statement** 68:16
128:22
**statements** 20:24
25:2,4
**States** 1:1 19:25
24:11
**stating** 23:25
**status** 154:11
**stay** 98:5
**step** 103:20 104:4
123:6
**steps** 102:9 143:24
**sticky** 86:12
**stipulate** 167:14
**STIPULATED** 3:1,10
3:13
**Stockholm** 4:17
**stood** 64:16
**stop** 157:12
**Street** 4:17
**strike** 41:12 79:4
112:10 113:14
**string** 87:17 93:3
118:16 135:9
**structure** 48:17
**student** 28:2 30:22
42:25 49:4,10,16
52:8 53:2 64:24
89:21 122:6
**students** 12:18,22
13:15,17,19 14:8
23:19 28:11 29:2
29:8 34:17 37:15

37:16,24 45:16
45:21 46:6,8,12
46:25 48:22 49:6
49:25 50:2 56:15
56:21 57:2,4,9
57:13 62:13,15
78:21,23 80:24
83:17 84:15
106:15,19,23,23
106:25 107:5,9
107:11,12,13,17
107:23 108:6,14
111:3 121:21,24
122:18 123:8
124:11 125:23
146:15,19 149:3
149:25 150:15
151:9,10,11
153:12,17 154:17
154:22 155:24
157:3,13 158:14
158:19 161:23
162:3,13,17,19
162:23 163:9,22
164:2,4 165:21
**student's** 50:1
**student-related**
114:24
**subject** 8:3 56:12
88:9
**submit** 53:16
**submitted** 47:4,18
67:15 86:15
94:22 95:3 104:7
**subparagraph** 94:8
98:22
**Subscribed** 168:14
**subsidiary** 36:16
**subspecialty**
156:10 157:11
**substance** 7:7
37:17 38:2,11
54:20 61:24 62:4
77:21 78:11
89:11 141:21
146:8 162:8
165:17
**substantive** 34:6
141:25
**substantively**
140:23
**sue** 131:14
**sued** 142:21 145:23
146:2
**suggested** 161:3,9
161:18
**suing** 22:22,24
**suit** 146:18
**suitable** 100:24

**sum** 75:16
**summarize** 86:13
106:15 126:5
**summarized** 82:13
**summarizing** 27:9
**summary** 83:8 87:3
120:8
**superiors** 34:11
38:8
**supervising** 17:17
45:20
**supervisor** 12:12
12:13 15:19
**supplemental** 20:5
20:7 24:7,14
169:17
**supply** 110:25
**support** 23:7
**suppose** 74:22
**sure** 4:22 5:20
8:17 19:15 38:21
66:19,20 74:10
92:12 109:10
110:10 114:3
143:18 148:9
159:2 164:12
**surgery** 156:4
**swap** 132:4
**swapped** 127:4
**swapping** 134:21
**sworn** 3:6,8 4:4
168:14 172:11
**system** 70:13
**S-A-R-L-I** 25:25

---
**T**
---

**T** 169:8 170:1
171:1,5,5,9
172:1,1
**table** 66:13 74:3
130:17
**take** 5:12 8:6 9:16
12:6 16:3 20:9
24:15 43:23
67:18 87:24
97:21 98:2,7
102:3 103:20
113:5 117:11
123:16 132:21
133:2 136:25
137:6 138:9
142:18,18 150:19
153:4 155:24
163:8 166:13
**taken** 1:21,22 3:9
51:25 81:21
98:25 138:10
143:24
**takes** 62:16 83:12

**talk** 33:25 34:3
36:2,23 39:10
42:14 54:13
73:18 74:13,19
74:20 93:22
98:11 107:8
126:9 146:4
153:5
**talked** 4:22 6:25
8:17,20 38:21
39:3 51:9 64:11
144:8
**talking** 42:16 74:7
82:23 85:8 108:6
126:19 141:7
157:21
**task** 18:4 152:21
**tasks** 11:13 12:16
14:6 15:2 17:4
157:2,6,8
**teaching** 34:16
**team** 149:22
**Tel** 2:7,14
**teleconference**
88:14,17
**telephone** 37:8,9
62:6 71:3 72:15
77:9 82:11,19
86:17 87:11
88:25 89:9
117:13 144:14
165:6 166:11
**tell** 4:21,23 51:15
87:22 93:10
104:4
**ten** 49:21
**ten-minute** 138:9
**term** 36:20,25 60:7
84:6 90:11
128:18 164:16
**terminate** 148:14
**terms** 16:5 33:13
35:2,5,8,12 48:2
48:16 49:4 50:19
67:16 72:18
103:19 122:3
125:19 157:23
**testified** 4:6
62:21 65:7 68:3
81:2 84:18 85:17
86:7,25 128:25
145:22 166:10
**testimony** 7:18 8:3
42:5,8 43:25
56:12 92:17
140:14 152:10
172:13
**text** 117:25
**thank** 93:24 106:6

152:11 168:6
**thanks** 66:3
**thing** 30:10 128:8
**things** 33:20 48:15
59:16 74:22,24
75:2,12 78:2,3
112:8,9 148:13
163:19
**think** 42:7 61:5,17
66:14 70:5 74:3
87:5 114:5
119:11 142:5,6
143:21 151:21
152:3,20 167:8
**third** 97:12
**Thomas** 42:3 76:4
**thought** 63:14
82:10
**three** 73:6 128:15
**three-year** 128:17
**Thursday** 106:8
**Tien** 26:13 31:10
38:9
**time** 1:22 3:12
5:11 9:2 10:17
12:21 14:5,16,23
15:17,22 16:3,15
17:2 18:22,25
19:8 21:15,17,22
22:11,21 23:11
23:20,24 24:25
25:21,22,23
26:12 27:25 28:7
29:13,20 32:10
37:20,21 38:8
42:13,16,17,22
43:3,8,15 44:4,9
46:10 48:18
49:12 50:11,25
53:11 55:9 56:23
61:2 62:12 63:9
63:14 64:9 66:10
66:15 68:6,9,14
68:24 69:4 70:10
72:9,19 73:2,4
74:16 76:5 78:19
79:19 80:3,11
83:4,4 84:16
85:23 86:19
87:24 92:8,9,20
94:23 95:20 96:6
96:11 97:15
101:18,19 104:17
104:21 106:11
108:3 109:13,18
110:3 111:9,24
113:13,21 116:4
116:22 119:3
120:11 123:2

128:21 131:22
133:16,20,22
134:9 136:24
137:24 141:23
142:20 145:21
146:22 151:8
153:4,14,19
154:22 155:25
157:9,13,22
159:3,18 160:20
160:22,25 161:8
161:13,16 162:13
162:17,20 165:6
**timeline** 55:13
150:9
**times** 29:4 34:13
87:8
**title** 15:3,7 16:20
17:22
**titles** 116:16
**today** 4:24 5:21
7:3,18 8:3,21
18:20 61:4 71:16
81:3 82:11 92:13
92:17 97:18
108:7 117:14
135:21 163:15,23
**today's** 5:18
**told** 70:5 72:3
76:22 97:21
137:6 147:18
152:19 165:17
**Tom** 76:14 88:20
97:3 109:14
149:22
**tomorrow** 139:16
**top** 65:25 67:11
88:6 132:18,19
135:18
**topic** 9:5 37:12
38:4,16,23 39:3
39:4 116:21
**topics** 62:19 74:13
109:21 162:10
**touches** 134:3
**tough** 112:24
126:17
**town** 93:23
**track** 98:8,13
**trainees** 155:7,10
**training** 53:4
84:24
**transaction** 131:19
**transactions** 75:7
**transfer** 93:22
**translate** 122:2
166:13
**transmit** 34:9
**transmitted** 39:16

**treatment** 122:17
**trial** 1:18 3:12
**trick** 7:25
**true** 22:3 23:22
25:5 44:11
156:20 172:12
**trustees** 68:5
**try** 5:9 13:13 91:4
**trying** 50:22 51:11
66:6,7 72:24
74:10 92:11,13
103:21 117:22
126:2 128:20
**turn** 123:8
**two** 5:8 12:5 22:7
27:12,13 28:3,6
28:10,13 29:18
30:14,19 31:2
41:16 43:5 55:19
56:21 64:16 68:4
85:24 99:4,7
104:10 120:9
121:15 129:13
133:22 135:20,25
147:10 152:13
159:15 163:19
**two-page** 69:18
105:25
**typed** 87:3
**Tzanetopoulos** 2:8
4:8 7:12,19 8:6
8:13 13:2 16:7
19:16 44:25
61:10 64:25 74:2
74:6 79:11 80:13
96:3 114:7 142:4
142:14 145:19
148:17 149:6
160:7 165:9,23
166:21 168:5
169:4,6

---

**U**

**U** 171:5,5,9,10
**uh-huh** 5:6
**uh-uh** 5:6
**ultimately** 39:12
109:20 142:10
149:2
**unable** 148:5
**unamortized** 126:24
129:6,24 130:7
143:19,20 144:9
144:25
**unauthorized** 161:5
**unchanged** 153:16
**underlined** 99:6,10
**underlining** 98:18
**understand** 5:13

23:6,15,20 38:17
57:3 73:10 79:13
79:15 98:18,24
99:9 100:20
103:21 111:22
126:18 132:22
141:3 160:4
**understanding** 50:7
57:24 58:2 64:11
64:13 68:19
98:12 114:20,23
118:4 127:3
139:8 143:12
147:9,15
**understood** 23:24
24:24 56:7 57:21
68:9,14 100:18
110:2 114:4
**unit** 11:9,13,22
**United** 1:1 19:25
24:11
**university** 1:4
9:18 20:3,20
22:14 24:9 25:14
26:8 28:14,15,25
31:12,18 32:23
33:16 35:20 40:4
40:7 45:14 48:5
49:20 50:24 52:7
66:11 69:7 76:5
84:6 110:12
111:25 112:3
117:14,16 122:24
136:14 143:5
164:15,20,22
**unofficial** 144:13
**unscheduled** 121:19
**untrue** 23:25
**update** 51:18
**updates** 96:8
**use** 69:10 78:20,21
84:14 86:12
155:19,22 156:6
156:10
**usual** 34:5 53:10
53:15,20 74:11
94:25
**usually** 54:17 73:8

---

**V**

**v** 20:4
**vacant** 124:7
**vacated** 56:16
121:18,19 124:10
145:8 146:12
150:25
**vacation** 156:12
**vague** 23:10 37:3
**varied** 28:21

various 87:8
version 9:25
   101:10
versus 24:10
Veterinary 76:6
   136:15
vice 16:12,16 17:9
   17:13,19,23,25
   18:3,5,18 19:5,9
   21:4,23 22:4
   30:6 31:17 113:9
   113:16 114:10
   115:19 116:4
view 108:9
viewing 134:10
Vincent's 57:12
   63:12 69:3 83:10
   83:21
Virginia 91:24
   100:7,15,18
Virginia's 96:23
void 83:11,21
volume-wise 17:2

_____
        W
Wah 25:23
wait 139:15
waived 3:5
WALTER 2:15
want 43:2 122:7
   159:7
wanted 23:2 41:8
   56:7 78:25 79:8
   80:18 91:10
   97:25 106:12,15
   120:6,7 121:20
   121:22 122:4,11
   122:17
wasn't 32:12
way 7:24 21:8
   23:14 26:4 33:18
   39:5 48:12 67:16
   68:16 86:4 91:5
   93:10 121:22
   172:17
week 8:24 66:4,16
   80:12 90:11,20
   101:8
weekly 90:9,25
weeks 68:4
went 10:6 32:18
   93:12 105:8,11
   105:15 141:14
weren't 150:25
we'll 5:8 34:3
   42:14 51:22
   100:8 153:5
we're 42:16
we've 38:21 41:16

89:15 141:11
WHEREOF 172:19
WHMC 109:7
wholly-owned 36:16
Wilfredo 140:5
William 160:13
willing 124:3
Wire 135:21
wish 79:6 173:4
withdraw 142:5
withhold 164:17
witness 4:3 8:15
   13:4 16:8 21:17
   31:24 38:19
   56:14 60:20 74:9
   75:5 79:15 80:15
   81:14 92:18 96:5
   96:19 101:21
   114:22 116:9
   141:5 143:10
   144:6 145:20
   149:8 151:21
   152:11 153:22
   160:8 165:11,25
   167:22 168:3,8
   169:3 172:10,13
   172:19
witnesses 3:14
wondering 43:6
word 105:13
words 5:5 62:4
work 5:6 31:19
   33:4,8 40:11
   45:20 54:18 83:5
   98:6 120:13
   134:14
worked 10:22 17:16
   32:3 33:2 98:7
   135:16 141:18
working 21:18
   49:22 73:16
   92:20
works 37:10,11
   48:12,12 98:13
   144:21
worst-case 129:4
wouldn't 62:3
   65:22 124:12
write 5:2 47:3
   60:3 67:14 71:3
   71:13,25 76:8,10
   77:2 83:8,25
   89:20 94:18
   97:12 106:6,18
   107:5,9 120:25
   124:8 127:24
   128:13 129:3
   131:6 135:18
   149:18

writes 75:18,21
   100:22 117:12
   126:13
writing 5:3 95:12
   158:10
written 55:5 62:22
   80:25 85:16
wrote 72:10 79:19
   95:6 99:14
   114:16,17 129:11
Wyckoff 1:9 4:16
   6:12 8:19 10:3,6
   10:7,9,24 11:2
   12:20 13:18
   14:18 15:13
   20:21 21:18 22:8
   22:12,18 23:3
   31:10,16 32:12
   32:15 36:11,17
   36:21 37:16,21
   37:24 39:17
   43:17 45:17,21
   46:11,13 49:24
   51:4 68:7 70:9
   70:12 73:22 77:4
   77:24 78:7,10,17
   78:20 79:10,11
   79:24 80:24
   81:16 84:2,14
   85:2,8,11 89:2
   89:22 90:10,19
   91:2,7,10,14
   94:3 95:18 99:18
   101:5,6 104:11
   104:21 106:25
   107:10,16,22,25
   108:6,12 110:13
   110:25 111:3,6
   113:11,18,25
   114:25 115:20
   116:23 117:5,7
   117:15,23 119:6
   129:9,18,21
   133:19 140:13,19
   142:22 144:21
   152:17 153:12,17
   153:23 156:22
   160:16,18 162:24
   163:5,21 164:3,5
Wyckoff's 108:19
   108:20
Wyckoff-Ross
   110:17
WYCKOFF2 48:15
   50:18
W-A-H 25:24

_____
        X
X 1:3,12 169:1,8

170:1
XXX 117:25 118:5

_____
        Y
year 9:19 52:16
   128:15 153:19
   154:8,10,21
years 10:8 11:23
   12:5 49:21,21
   50:18 52:16 60:8
   77:4 90:20 91:11
   91:14 128:15
yellow 86:13
yesterday 88:15
   117:13
Yife 26:13 31:10
York 1:2,14,14,24
   2:6,6,13,13 4:5
   4:17 9:12,18
   29:12,14,20,25
   30:9 70:8,13
   154:4 172:3,4,8
   173:1,2

_____
        $
$1.3 126:14 127:7
   128:16,23
$3.2 126:24 130:8
$312.50 90:10,20
   90:25 91:13
   101:7
$350 89:22
$4.5 117:17 123:21
   124:2 127:2
   129:8 130:18
$5 60:8 80:7 129:8
   130:15,25
$9.5 129:7 130:12
   130:20,23

_____
        O
001564 140:3
001565 140:4
0064 164:11
007674 115:9
008477 93:4
008489 94:6 99:22
009019 69:19
009048 67:3
009110 64:3
009177 58:11
009186 54:7
009216 44:20
009223 44:21
023723 87:19
033055 82:2
056 82:2
0607 31:13
0608 31:14

**0614** 100:9
**0625** 100:10
**0630** 91:21
**0643** 91:22
**09CIV1410** 1:7

---
**1**

**1** 1:15 4:10 25:12
  26:18,24 31:4,5
  31:7 32:18 48:9
  90:5 106:17
  107:4 118:2
  153:2,3,9 155:9
  155:12,14,14,16
  155:16,19,20
  156:2,6,11,11
  169:10
**1st** 44:3 69:20,25
  71:22
**1(a)** 153:10
**1.3** 126:21
**1/12/07** 170:22
**1:40** 66:2
**10** 27:8 36:6,14
  44:14,18,18 45:6
  46:15,16 47:18
  47:23 50:16 52:3
  106:4 169:19
**10/15/07** 170:11
**10/19/07** 170:12
**10/24/06** 169:20
**10/5/06** 169:19
**10/9/07** 170:10
**10:12** 1:15
**100** 28:2,5
**10022** 2:13
**10111** 2:6
**105** 170:8
**108** 170:9
**11** 53:25 54:5,8,23
  169:20
**11th** 1:13 2:5
**11/1/06** 169:21
**11/13/06** 169:22
**11/16/06** 169:23
**11/27/07** 170:13
**11/29/06** 169:24
**110** 164:4
**112** 170:10
**11237** 4:17
**115** 170:11
**118** 170:12
**12** 58:6,10,12
  169:21
**12/1/06** 169:25
**12/16/06** 170:3
**12/22/06** 170:4,5
**12/28/06** 170:6,7
**12/4/07** 170:14,15

**12:33** 134:2
**12:56** 64:9
**13** 59:18,21,21,23
  59:24 63:3
  169:22
**133** 170:13
**13451** 109:4
**13453** 109:4
**135** 148:5 149:2
  170:14
**138** 170:15
**139** 170:16
**14** 63:21,25 64:3
  169:23
**149** 170:17
**15** 66:22 67:2,4,21
  67:22 115:13
  169:24
**152** 170:18,20
**16** 64:6 69:14,18
  69:20 76:10 81:2
  82:4 85:20,22
  169:25
**16th** 82:17
**163** 169:5
**166** 169:6 170:22
**17** 81:19,24 82:3
  83:24 87:9 170:3
**18** 87:13,17,17
  88:4,6 170:4
**19** 91:16,20 169:17
  170:5
**19857** 118:17
  127:17
**19859** 120:17
  126:12
**19861** 118:18
**1990** 10:4,9
**1995** 9:21

---
**2**

**2** 9:12 20:15,15
  31:4,5,14 32:18
  36:18 47:13,21
  48:24 71:13 83:8
  118:2 169:10
**2/10/07** 170:8
**2/21/07** 107:6
**2/28/08** 170:16
**20** 28:23 87:23
  88:8 92:23 93:3
  94:10,15 95:21
  97:4,10 98:6,10
  99:14 101:18
  107:10 166:23
  170:6
**2000** 11:24 12:2,25
  13:2
**2000-2002** 14:5

**2002** 12:6,7 13:3
  14:25 15:10 16:6
**2006** 14:25 15:11
  16:6,18 25:12
  26:19,24 27:11
  27:24 31:8,14,25
  43:15,20 45:10
  46:11 47:12,15
  47:17 51:7 52:4
  54:11 57:10
  59:24 63:3 64:6
  64:8 67:5,21
  70:2 80:14 82:5
  83:12 85:20,22
  87:23 88:8 90:5
  92:9 97:18
  100:16 165:5,13
  165:15
**2007** 19:12 44:3,4
  48:23 56:17,20
  67:20,22 68:6,24
  106:4 107:10
  110:16 115:14
  121:3 134:2
  135:19
**2008** 27:25 110:16
  149:16 159:6
**2009** 19:14 159:7
**2010** 1:15 16:18
**2011** 168:15 172:20
**2020** 153:19
**21** 10:8 51:7 99:25
  100:6 101:17
  102:10 170:7
**21st** 31:8,14,25
  47:11,15
**212-536-3900** 2:14
**212-589-4200** 2:7
**22** 92:9 105:22,25
  170:8
**23** 108:22 109:2
  170:9
**23rd** 149:16
**23730** 87:19
**24** 54:11 112:17,20
  117:12 170:10
**24771** 59:23
**24772** 59:23
**25** 115:4,7 170:11
**26** 118:12,16
  127:22 132:19
  145:12 169:11
  170:12
**27** 133:7,10 134:2
  170:13
**28** 97:18 100:16
  135:6,8 165:15
  170:14
**28th** 101:20

**29** 67:5 138:12,16
  170:15

---
**3**

**3** 50:16 51:3 118:2
  142:16 147:25
  148:3 169:11
**3rd** 76:10 80:14
**30** 139:22 140:2
  170:16
**31** 83:12 149:10,13
  169:10 170:17
**32** 151:19 152:14
  152:14 170:18
**33** 151:19 152:14
  152:16 170:20
**34** 166:6,9,16
  170:22
**343** 106:22
**374** 4:16
**38** 9:10
**39559** 138:19
**39560** 138:19

---
**4**

**4** 26:23,25 36:3,6
  36:6,14 38:5,23
  39:20 128:15
  135:19 142:17
  147:25 155:14,17
  155:20 156:11
  169:4,11
**4:15** 168:7
**40** 169:12,13,15
**406** 153:14,19
  154:18,21 155:11
  155:21 163:21
**40627** 112:22
**42915** 40:24
**45** 1:13 2:5 169:19
**47342** 106:2
**47571** 135:10
**49172** 149:15

---
**5**

**5** 36:18 40:2,2
  47:17 48:9 52:4
  102:18 111:12
  128:16 161:4
  164:8 167:10
  169:12
**5/23/08** 170:17
**50** 27:11 28:23
  124:3,6
**50-50** 117:8
**53** 169:20
**572** 135:10
**58** 169:21
**59** 169:22

**599** 2:12

---
### 6
**6** 25:8 26:16 27:2
40:6,14 40:2,5
40:16 41:18
42:10 134:25
136:12 137:16
140:22 156:11
161:5 169:13
**60** 52:15
**612** 7:20
**65** 169:23
**66** 169:24
**69** 169:25

---
### 7
**7** 4:10 24:21,21
40:2,8,21,22
41:4,22,24 42:10
56:20 83:24 84:9
141:11 142:15,21
143:25 147:25
161:5 169:15
**7/30/07** 170:9
**718) 558-2001** 134:6
**7512** 133:12
**7513** 133:12
**7675** 115:9

---
### 8
**8** 19:17,20,24
20:13 22:12
84:23 155:9,12
155:15,16,19
156:3,6 169:17
**8/21/06** 169:10
**81** 170:3
**8489** 98:16
**8490** 99:5
**8491** 99:6 167:3
**8492** 93:5
**87** 170:4

---
### 9
**9** 19:17,20 21:23
24:6,6,19 25:5
27:7 169:17
**9020** 69:20
**91** 170:5
**9111** 64:3
**9179** 58:12
**92** 10:19 170:6
**95** 10:5,19,20,22
10:25
**99** 170:7