# Exhibit 25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,

       Plaintiff,

      vs.     No. 09 CV 01410(KAM)(RLM)

BROOKLYN-QUEENS HEALTH CARE, LTD. And WYCKOFF
HEIGHTS MEDICAL CENTER,

      Defendants.
------------------------------------------------

DEPOSITION OF HAROLD McDONALD

New York, New York

Monday, June 27th, 2011

Reported by:
Jeremy Frank, MPM
JOB NO. 77969

**2**

```
 1
 2                  June 27th, 2011
 3                  10:26 a.m.
 4
 5
 6      Deposition of HAROLD McDONALD, held at
 7  the offices of Baker Hostetler, Esqs, 45
 8  Rockefeller Plaza, New York, New York,
 9  pursuant to Subpoena, before Jeremy Frank,
10  a Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED, by
 3  and between counsel for the respective
 4  parties hereto, that the filing, sealing and
 5  certification of the within deposition shall
 6  be and the same are hereby waived;
 7          IT IS FURTHER STIPULATED AND AGREED that
 8  all objections, except as to the form of the
 9  question, shall be reserved to the time of the
10  trial;
11          IT IS FURTHER STIPULATED AND AGREED that
12  the within deposition may be signed before any
13  Notary Public with the same force and effect
14  as if signed and sworn to before the Court.
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1
 2  A P P E A R A N C E S :
 3
 4      BAKER HOSTETLER, ESQS.
 5      Attorneys for Plaintiff
 6          191 North Wacker Drive, Suite 3100
 7          Chicago, IL 60606
 8      BY:  GEORGE J. TZANETOPOULOS, ESQ.
 9
10      K&L GATES LLP
11      Attorneys for Defendants
12          599 Lexington Avenue
13          New York, NY 10022
14      BY:  WALTER P. LOUGHLIN, ESQ.
15
16      GARFUNKEL WILD, P.C.
17      Attorneys for Nonparty Witness
18          111 Great Neck Road
19          Great Neck, NY 11021
20      BY:  ANDREW L. ZWERLING, ESQ.
21
22
23
24
25
```

**5**

```
 1                     McDonald
 2      H A R O L D   M c D O N A L D,   called as a
 3  witness, having been duly sworn by a Notary
 4  Public, was examined and testified as follows:
 5  EXAMINATION BY
 6  MR. TZANETOPOULOS:
 7      Q.   Mr. McDonald, have you ever given
 8  a deposition before?
 9      A.   Yes.
10      Q.   How many times?
11      A.   Two or three times.
12      Q.   You have been through the drill,
13  we will go through the short version.  As you
14  know I'll be asking you a series of questions
15  and you will answer, the court reporter will
16  take down what is said.  If at any time you
17  don't understand me or don't hear me, please
18  let me know and I'll be happy to rephrase or
19  say it again.
20          All right?
21      A.   Yes.
22      Q.   That's the next thing, you have to
23  answer out loud in words.
24          Please state your full name and
25  home address for the record.
```

2 (Pages 2 to 5)

**McDonald**

1
2    A.   Harold E. McDonald, 28 Overlook
3    Road, Lattingtown, New York, 11560.
4        **Q.   By whom are you presently**
5    **employed?**
6        A.   Kingsbrook Jewish Medical Center.
7        **Q.   In what capacity?**
8        A.   Senior vice president for network
9    development and long-term care.
10       **Q.   In general terms what are your**
11   **responsibilities in that position?**
12       A.   To manage the operations of a
13   nursing home, develop relationships with
14   physicians, and manage the development of an
15   undergraduate medical education program.
16       **Q.   How long have you been in your**
17   **present position?**
18       A.   Since November 2010.
19       **Q.   How old are you, sir?**
20       A.   60.
21       **Q.   What is the highest level of**
22   **education that you have obtained?**
23       A.   Masters.
24       **Q.   From what university did you get**
25   **your master's degree?**

---

**McDonald**

1
2    A.   Long Island University.
3        **Q.   When did you receive your master's**
4    **degree?**
5        A.   I don't remember the exact date.
6        **Q.   Give or take the decade will do.**
7        A.   Within the past 10 years.
8        **Q.   What was the degree in?**
9        A.   In public administration with an
10   emphasis in health care administration.
11       **Q.   How about your bachelor's degree?**
12       A.   Also from Long Island University
13   in business management.
14       **Q.   We don't need to spend a lot of**
15   **time on this.  If you can take us through the**
16   **Harold McDonald CV short version from college**
17   **forward.**
18       A.   It has been a mix of for-profit
19   and not-for-profit health care.  I started in
20   1972 in the hospital business, from there
21   moved into a not-for-profit nursing home, got
22   out of the business for a couple of years,
23   number of years, got into construction, back
24   into health care where I was CFO for a chain
25   of for-profit nursing homes, moved on from

---

**McDonald**

1
2    that organization to a not-for-profit nursing
3    home, a member of the New York Presbyterian
4    health care system.  Spent about 14-plus
5    years, 17 years with the New York Presbyterian
6    system working at different nursing home care
7    agencies, hospitals primarily doing
8    turnarounds.
9        **Q.   Were you employed for a period of**
10   **time at the Wyckoff Heights Medical Center?**
11       A.   Yes.
12       **Q.   What positions did you hold at**
13   **Wyckoff?**
14       A.   My initial position was as chief
15   financial officer, that was back in 1996,
16   though I quickly moved into the chief
17   operating officer's position after a
18   turnaround at the hospital.
19       **Q.   What was that last part?**
20       A.   After a turnaround at the
21   hospital.
22       **Q.   In laymen's terms, what does that**
23   **mean?**
24       A.   If a business isn't functioning
25   appropriately financially it is putting

---

**McDonald**

1
2    together a corrective action plan, a
3    management action plan and implementing the
4    plan to correct the financial condition of the
5    hospital.
6        **Q.   How long did you work at Wyckoff?**
7        A.   I worked at Wyckoff from September
8    '96 to October, November 2010.
9        **Q.   What were the circumstances of**
10   **your departure from Wyckoff?**
11       A.   I had a job offer which I pursued.
12       **Q.   From the time that you became**
13   **chief operating officer shortly after 1996**
14   **through November 2010, were you continuously**
15   **the chief operating officer at Wyckoff?**
16       A.   From about 1997 to the time I left
17   I was chief operating officer.
18       **Q.   During the time that you were**
19   **chief operating officer to whom did you**
20   **report, if it changed at different times, let**
21   **me know that too.**
22       A.   I reported to the CEO, president/
23   CEO my entire month stay at the hospital.
24       **Q.   During that time did different**
25   **people occupy that position?**

3   (Pages 6 to 9)

10

McDonald

A. Yes.
Q. Who were those people?
A. Primarily it was Dominick Gio, was there from beginning back in '96 until 2007 roughly.
Q. After Mr. Gio?
A. There was a succession of CEOs.
Q. Who were they?
A. Dr. Nirmal Mattoo, N-I-R-M-A-L M-A-T-T-O-O.
Q. After Dr. Mattoo?
A. It was a consulting firm, it was FTI Cambio.
Q. And the person from FTI Cambio, was that Tom Singleton?
A. Yes.
Q. During what period of time did you report to Mr. Singleton?
A. From mid-2007 to the Fall 2009, could have been '08.
Q. I think '08.
A. '08.
Q. After Mr. Singleton to whom did you report?

11

McDonald

A. To Rajiv Garg.
Q. That closes it out?
A. That is a wrap.
Q. All right.
Did hold any position at Caritas Health Care?
A. Yes.
Q. What positions?
A. Chief operating officer.
Q. During what period of time were you chief operating officer at Caritas Health Care?
A. From January 1st, 2007 to mid-2007.
Q. What were the circumstances that led you to cease being chief operating officer at Caritas in 2007?
A. When FTI Consultants came in and took over management control.
Q. The people from FTI moved you out?
A. Yes.
Q. Who replaced you in the COO position at Caritas in mid-2007?
A. I'm not sure what the management

12

McDonald

structure was.
Q. Have you ever held positions at Brooklyn-Queens Health Care?
A. Yes.
Q. What positions?
A. Chief operating officer.
Q. During what period of time were you chief operating officer at Brooklyn-Queens Health Care?
A. It would have been similar to the length that I was COO of Caritas.
Q. So again approximately beginning 2007 through mid-2007?
A. Correct.
Q. Circumstances of departure also was that FTI moved you out?
A. Right, yes.
Q. Is it correct that for the period of time roughly beginning 2007 through mid-2007, you were simultaneously chief operating officer of Wyckoff Heights Medical Center, Caritas Health Care and Brooklyn-Queens Health Care?
A. Yes.

13

McDonald

Q. Which of the entities paid your paycheck?
A. Wyckoff Heights Medical Center.
Q. Did either of the others pay you?
A. No.
Q. Okay.
Did you serve on the Board of Trustees of Wyckoff Heights Medical Center?
A. Yes.
Q. During what periods?
A. From my inception through to my departure.
Q. For that entire time I take it you were a management member of the board?
A. Yes.
Q. Did you serve on the board at any time of Brooklyn-Queens Health Care?
A. No.
Q. About how about Caritas Health Care?
A. You know, I never that I can recall attended any of the --
MR. ZWERLING: Just to the best of your recollection.

4 (Pages 10 to 13)

14

```
 1                McDonald
 2      A.   I can't recall.
 3      Q.   What did you do to prepare for
 4   today's deposition?
 5      A.   Had a brief meeting a week or so
 6   ago with my attorney.
 7      Q.   Did you do anything else to
 8   prepare for the deposition?
 9      A.   No.
10      Q.   Did you review any documents?
11      A.   Yes.
12      Q.   The meeting with your attorney,
13   who was present?
14      A.   Just this gentleman and Robert
15   Wild.
16      Q.   By this gentleman are you
17   referring to Mr. Loughlin?
18      A.   Yes.
19      Q.   In substance who said what to whom
20   during the course of that meeting?
21      A.   It was an open dialogue.
22      Q.   What was the substance of the
23   conversation?
24      A.   To explain to me what this process
25   would be like and to inform me of what
```

15

```
 1                McDonald
 2   potential questions that might be related to
 3   the agreement between Ross and Caritas.
 4      Q.   What did Mr. Loughlin tell you
 5   about the positions of Wyckoff and of Ross in
 6   this lawsuit?
 7      A.   Can you --
 8           MR. ZWERLING:  You mean generally
 9      what did he say about the dispute?
10      A.   That there is an allegation on the
11   part of Ross that if Caritas was not in a
12   position to fulfill its obligations to Ross,
13   that either Brooklyn-Queens Health Care or
14   Wyckoff would be responsible for fulfilling
15   those obligations.
16      Q.   Did Mr. Loughlin tell you anything
17   else about Ross' position here?
18      A.   Not that I can recall.
19      Q.   What did Mr. Loughlin tell you
20   about the defendants' position in this case?
21      A.   That the belief on the part of
22   Brooklyn-Queens Health Care and Wyckoff was
23   that they were not responsible for the
24   liabilities of Caritas.
25      Q.   Anything else?
```

16

```
 1                McDonald
 2      A.   That was in general what was
 3   discussed.
 4      Q.   Do you recall anything else about
 5   the conversation concerning either side's
 6   position?
 7      A.   Nothing significant.
 8      Q.   Anything at all?
 9      A.   No.
10      Q.   You said that Mr. Loughlin
11   discussed with you what questions might be
12   asked of you.
13           What did he say about what
14   questions might be asked?
15      A.   I read through the agreement
16   between Caritas and Ross.
17      Q.   What did he say might be a source
18   of questions?
19      A.   That there would be questions
20   related to the agreement.
21      Q.   You say you looked at the
22   affiliation agreement.  Did you look at any
23   other documents?
24      A.   No.
25      Q.   How long did you meet with Mr.
```

17

```
 1                McDonald
 2   Loughlin?
 3      A.   About an hour or so.
 4      Q.   Is Wyckoff either paying for or
 5   reimbursing you for the cost of your counsel
 6   today?
 7      A.   They are paying for my counsel
 8   today.
 9      Q.   Is Wyckoff reimbursing you for
10   your time today?
11      A.   Unfortunately, no.
12      Q.   At present do you have any type of
13   financial arrangements with Wyckoff, a
14   separation agreement of any kind, a financial
15   arrangement with the hospital following your
16   departure?
17      A.   No, I don't.
18      Q.   Any noncompete?
19      A.   No.
20      Q.   Let's take you back in time to the
21   period of time around 2005-2006, what
22   responsibilities did you have at Wyckoff in
23   connection with the acquisition, Wyckoff's
24   acquisition of St. John's and Mary Immaculate
25   Hospitals?
```

18

McDonald

    A.   During 2006 it was to work with
the team at Wyckoff to put the deal together,
and from September '06 to January '07 I was
the acting executive director of St. John's
and Mary Immaculate, working and reporting to
St. Vincent's Medical Center.
    Q.   **During what period of time did you
say?**
    A.   This was prior to the closing,
this was '06, fall, early fall to January when
they the deal was closed.
    Q.   **Let's focus on your work as part
of the team that put the deal together for
Wyckoff.**
        **Who was on that team?**
    A.   It was David Hoffman, Emil
Rucigay, Dominick Gio, myself, and Rich Sarli.
    Q.   **What was Mr. Hoffman's role?**
    A.   Mr. Hoffman managed all of the
legal aspects.
    Q.   **At that time was David Hoffman
general counsel of Wyckoff Heights Medical
Center?**
    A.   Yes, to my knowledge.

19

McDonald

    Q.   **His too.**
        **What was your role?**
    A.   As chief operating officer.
    Q.   **On the team?**
    A.   On the team, it was to develop a
transition plan.
    Q.   **Mr. Rucigay?**
    A.   Was to manage or oversee as a
board member, he was chair of the board.
    Q.   **Mr. Sarli?**
    A.   Chief financial officer for
Caritas.
    Q.   **And Mr. Gio?**
    A.   President and CEO of Wyckoff
Caritas and Brooklyn-Queens Health Care.
        MR. TZANETOPOULOS:  Let's mark
these as Plaintiff's 1, 2 and 3, for
identification.
        (Plaintiff's Exhibits 1 through 3,
affiliation agreement and letters, marked
for identification, as of this date.)
    Q.   **Take a minute, look at them, when
you're ready, I'll ask you questions.**
        **Are you ready?**

20

McDonald

    A.   Yes.
    Q.   **Mr. McDonald, have you ever had a
chance to review Exhibits 1, 2 and 3?**
    A.   Yes.
        MR. TZANETOPOULOS:  For the record,
Exhibit 1 is entitled the affiliate
agreement between Ross University School
of Medicine and Brooklyn-Queens Health
Care, it has been marked with Bates
numbers ROSS0056 through ROSS0067.  The
last page, 0067, is a fax cover sheet.
        Exhibit 2 is a two-page letter from
Dominick Gio president and chief
executive officer of Wyckoff Heights
Medical Center, to Nancy Perri, vice
president academic affairs Ross
University School of Medicine dated
August 21st, 2006, Bates numbered
ROSS031314 through 031315.
        And Exhibit 3 is another letter
from Mr. Gio dated August 21st, 2006 this
time to Yife Tien, chief executive
officer of the American University of the
Caribbean that has been marked ROSS0607

21

McDonald

and 0608.
    Q.   **The first question is easy, I
hope, the signature on Exhibit 1 on the page
marked ROSS0066, is that yours?**
    A.   Yes.
    Q.   **Okay.**
        **If you look at the last sentence
of what appears to be identical letters except
for the addressee in Exhibits 2 and 3, is the
Harold E. McDonald to which Mr. Gio refers
you?**
    A.   Yes.
    Q.   **What responsibilities did you have
at this time a little before in connection
with the medical student clerkship proposals
that are contained in Mr. Gio's letters in
Exhibits 2 and 3?**
    A.   The responsibility was to develop
a plan with the medical schools to ramp up as
quickly as possible to the number of clerkship
rotations that we were planning which involved
a considerable amount of work.
    Q.   **My next question is what work was
done in the development of that plan?**

6 (Pages 18 to 21)

22

McDonald

1
2     A.   It was developing faculty,
3 developing the curriculum, finding the space,
4 making sure that the curriculum was acceptable
5 to the medical school, and also to the staff
6 at the hospital that the undergraduate medical
7 education program was integrated with the
8 graduate medical education program, space for
9 lectures, space for rotations in the clinics,
10 space for lockers, its administrative staff to
11 manage all of the paperwork involved with the
12 programs.
13     Q.   Just so we are clear on terms,
14 when you refer to undergraduate medical
15 education programs, the reference is to
16 students who are in medical school?
17     A.   Correct.
18     Q.   When you speak of graduate medical
19 education program that refers to residents who
20 have finished medical school?
21     A.   Yes.
22     Q.   Mr. Gio's letters in Exhibits 2
23 and 3 refer to some prepaid clerkship
24 opportunities, we will talk in more detail
25 about the Ross 1, but in general terms what

23

McDonald

1 were Wyckoff's plans for the money that would
2 be raised by such contracts?
3     A.   To build the infrastructure which
4 was necessary to support the medical student
5 program at Caritas.
6     Q.   Did you have other plans for the
7 money?
8     A.   Yes.
9     Q.   What other plans?
10     A.   Initially there was going to be a
11 cash need as receivables ramped up at Caritas,
12 so the money would be used to fund the
13 operations of the hospital. Once the
14 receivables ramped up and cash was collected
15 on a regular basis, the money would be spent
16 to improve the facilities and the faculty and
17 the infrastructure at the medical student
18 program.
19     Q.   All right.
20     Were there also plans to use some
21 of the funds raised by these contracts to
22 build a central business office for the
23 Brooklyn-Queens Health Care system?
24     A.   There were a central business

24

McDonald

1 office that was being developed. I don't
2 recall that the money was being used to
3 develop the business, the business office was
4 there already, it was operated by Catholic
5 Medical Centers, so it was staff from CMC and
6 staff from Wyckoff coming together in one
7 central location.
8     Q.   Let's see if we can discuss what
9 you testified to regarding the ramping up of
10 receivables in laymen's terms. Let me put it
11 to you in laymen's terms.
12     When you're talking about using
13 money while receivables are ramping up, can
14 you describe that in more plain English?
15     A.   When the transaction closed on
16 January 1st, 2007, there was a certain amount
17 of working capital to carry on the day-to-day
18 operations of the Caritas hospitals. New
19 revenue coming in would take time to build up.
20 You can't bill for an inpatient until their
21 discharged. As the patients are seen in the
22 clinic, bills are dropped within a week or
23 two, it would take a month for the cash to
24 come in. As your whole revenue cycle ramping
25

25

McDonald

1 up for the new organization which it was,
2 Caritas was it a new organization at that
3 point, there was going to be a period of time
4 where there would be a cash shortage that
5 would be supplemented by these funds. And
6 within 60 to 90 days if everything went
7 smoothly with the accounting system and the
8 patient accounting process, the new cash
9 should have been flowing in and Wyckoff and
10 Caritas and Brooklyn-Queens Health Care,
11 everybody would have been in a better cash
12 position.
13     Q.   So is it correct then that the
14 plan was for late 2006 Wyckoff anticipated
15 that in the initial period after acquiring St.
16 John's and Mary Immaculate Hospitals Caritas
17 would be providing or paying to provide
18 services but there would be some time before
19 payment for those services would be received.
20 Is that correct?
21     A.   Correct.
22     Q.   One of the plans for the funds
23 raised by these prepayment contracts for
24 medical school clerkships was to fund hospital
25

7 (Pages 22 to 25)

26

McDonald

1 McDonald
2 operations during a period of time before you
3 received that money?
4     A.   Correct, which typically is a 60
5 to 90-day period.
6     Q.   To what medical schools were
7 offers like those reflected in Mr. Gio's
8 letters in Exhibits 2 and 3 made?
9     A.   What additional schools?
10     Q.   Yes, sir.
11     A.   I'm not sure.
12     Q.   Were there any?
13     A.   I can't recall.
14     Q.   Who was responsible for selecting
15 the medical schools to whom offers would be
16 made?
17     A.   I would have to speculate and I
18 don't remember, if I remembered I could state,
19 but I don't remember exactly.
20     Q.   Are you familiar with someone
21 named Julius Romero?
22     A.   Yes.
23     Q.   What is Mr. Romero's job at this
24 time?
25     A.   He ran the undergraduate program

27

McDonald

1 at Wyckoff.
2     Q.   Was Mr. Romero in the 2006 time
3 frame also working on these proposals?
4     A.   Yes.
5     Q.   What was Mr. Romero's job in
6 connection with the proposals to medical
7 schools?
8     A.   He was working with Dominick Gio
9 and David Hoffman to develop their
10 relationships.
11     Q.   Who was responsible for following
12 up with the medical school if a medical school
13 expressed interest in the offers outlined in
14 Mr. Gio's letters in Exhibits 2 and 3?
15     A.   It would have been those three
16 parties.
17     Q.   Mr. Gio and Mr. Hoffman and Mr.
18 Romero?
19     A.   Correct.
20     Q.   How is it that your name was the
21 person to contact in Mr. Gio's letter?
22     A.   Because I was the person
23 responsible for all the operational issues
24 which is the most significant part of the

28

McDonald

1 McDonald
2 agreement.
3     Q.   In terms of putting together the
4 business terms of negotiations for these
5 contracts at that time, who on the Wyckoff
6 side had responsibility for conducting
7 negotiations with medical schools?
8     A.   It would have been David Hoffman,
9 Julius Romero and Dominick Gio.
10     Q.   Was it Dominick Gio that assigned
11 to you the role that you had in connection
12 with putting together these medical school
13 clerkship programs?
14     A.   Yes.
15     Q.   Was it Dominick Gio that made the
16 assignments to David Hoffman and Julius Romero
17 that you have testified about?
18         MR. ZWERLING:  If you know.
19     A.   It would have been his recommenda-
20 tion to have Julius and David work on the
21 contracts.
22     Q.   Did Mr. Romero report to you?
23     A.   He reported to a Dr. Ken Freiberg
24 who was responsible for overall education.
25     Q.   To whom did Dr. Freiberg report?

29

McDonald

1 McDonald
2     A.   Dr. Freiberg reported to Dr.
3 Nirmal Mattoo.
4     Q.   Ultimately up to Mr. Gio?
5     A.   And Mattoo reported to Dominick
6 Gio.
7     Q.   Did you perform any work in
8 putting together the offer letters that are
9 contained in Exhibits 2 and 3?
10     A.   Not to my recall.
11     Q.   Who did?
12     A.   I would just, I'm not sure.
13     Q.   Given what we know about the
14 hospital operation at that time, in the
15 ordinary course whose job would it be to
16 prepare such an offer letter?
17     A.   It would have been either, could
18 have been one of the three people, it could
19 have been their assistants.
20     Q.   The three people is Dominick Gio,
21 David Hoffman and Julius Romero?
22     A.   Correct.
23     Q.   Did any medical schools in
24 response to the offers contained in Exhibit 2
25 and 3 or other offers like them get in touch

8 (Pages 26 to 29)

30

McDonald

1  with you?
2      A.   Not that I can recall.
3      Q.   Did you participate in the
4  discussions with any of the interested schools
5  about the prepaid clerkship contracts?
6      A.   Related to the operations.
7      Q.   Which schools did you talk with?
8      A.   AUC, I can't remember if I spoke
9  to Ross.  It would have been strictly related
10  to the ability to train a certain number of
11  students and certain clerkships and faculty,
12  those operational type issues.
13      Q.   AUC is the American University of
14  the Caribbean.
15          Is that correct?
16      A.   Correct.
17      Q.   Other than AUC and perhaps Ross,
18  did you speak with any other medical schools
19  about these prepaid clerkship offers?
20      A.   Not that I can recall.
21      Q.   You're aware, are you not,
22  obviously that there was a contract with Ross,
23  correct?
24      A.   Correct.

31

McDonald

1      Q.   There was also a contract reached
2  with American University of the Caribbean?
3      A.   Yes.
4      Q.   Okay.
5          Were contracts reached at this
6  time with any other medical schools for
7  prepaid clerkship contracts?
8      A.   I can't recall.
9      Q.   So the only two that you know of
10  are AUC and Ross?
11      A.   Correct.
12      Q.   You have said that you have
13  responsibilities for the operational aspect of
14  negotiations.
15          Who had responsibilities for
16  negotiating the commercial terms with the
17  medical schools?
18      A.   I'm not sure but it would have
19  been one of the three, Julius, David Hoffman
20  or Dominick.
21          MR. ZWERLING:  If I can interject,
22      are you asking about this specific
23      contract or just generally what would
24      normally be involved in that process?

32

McDonald

1          MR. TZANETOPOULOS:  This set of
2  offers.
3      A.   This set of offers.
4      Q.   Exhibit 2 and 3 offers.
5          MR. ZWERLING:  Do you recall who
6  was involved?
7      A.   It would have been Julius.
8          MR. ZWERLING:  Do you know?
9          THE WITNESS:  I don't know.
10          MR. ZWERLING:  Listen carefully to
11      counsel's question, he wants accurate
12      answers.
13      A.   I'm not sure.
14      Q.   Did you ever meet with anybody
15  from Ross?
16      A.   I can't recall.
17      Q.   Do you have any notes concerning
18  your work on medical school clerkship
19  contracts?
20      A.   Not that I recall.
21      Q.   Did you receive from Mr. Gio or
22  anybody else I guess any guidelines for your
23  negotiations regarding this these contracts?
24      A.   Not that I can recall.

33

McDonald

1      Q.   Are you aware of any guidelines
2  being discussed for negotiations concerning
3  the commercial terms of these contracts?
4      A.   Not that I can recall.
5      Q.   All right.
6          I would like to focus now if we
7  can on the discussions leading up to the
8  contracts between Ross and Brooklyn-Queens
9  Health Care that has been marked as Exhibit 1.
10  Did you receive and comment on contract drafts
11  as they went back and forth between Ross and
12  the hospital?
13      A.   I can't recall.
14      Q.   Were there any kind of regular
15  meetings about these contracts?
16      A.   I can't recall.
17          At the time six months, not six
18  months, from September through December I was
19  at St. John's Mary Immaculate managing the day
20  to day operations of those two hospitals.  So
21  the focus was on managing the day-to-day
22  operations, and then it was a weekly
23  conference call where everybody just gave an
24  update on where they stood with the

9 (Pages 30 to 33)

34

McDonald

1
2 transition.
3    Q.   Thank you.
4         Let's talk about that a little
5 bit, that may be helpful to the jury.  You
6 were employed under a contract, were you not,
7 in the Fall 2006 to work at Mary Immaculate
8 and St. John's before the transaction closed?
9    A.   Yes.
10   Q.   What did you do there?
11   A.   I was acting as executive director
12 of the two hospitals and managing day to day
13 operations.
14   Q.   So at that time you would have
15 been the senior business executive of those
16 two hospitals?
17   A.   The senior administrator at the
18 hospitals.
19   Q.   I think you said there was a
20 weekly conference call then with the
21 acquisition team where everyone brought each
22 other up to speed on acquisition issues?
23   A.   Correct.
24   Q.   Who participated in those calls?
25   A.   The staff of St. Vincent's and the

35

McDonald

1
2 staff of Caritas and the staff of Wyckoff.
3    Q.   Staff would be administrative
4 staff?
5    A.   The administrative staff, the vice
6 president for the organizations.
7    Q.   Was Mr. Gio a regular participant
8 in those calls?
9    A.   No.
10   Q.   How about Mr. Romero?
11   A.   I can't recall.
12        MR. TZANETOPOULOS:  Can you mark
13 this as the next one please, for
14 identification.
15        (Plaintiff's Exhibit 4, e-mail and
16 amendment, marked for identification, as
17 of this date.)
18   Q.   Mr. McDonald, let me show you a
19 document that the court reporter has marked as
20 deposition Exhibit 4.  It's a two-page
21 document Bates numbered BQHC24771 to 24772, an
22 e-mail from Julius Romero to Nancy Perri.
23        Mr. McDonald, the Exhibit 4 is an
24 e-mail that shows a copy going to you.  Did
25 you get a copy of this?

36

McDonald

1
2    A.   I can't recall.
3    Q.   It also shows a copy going to
4 Wah-Chung Hsu.
5         Whose Mr. Hsu?
6    A.   Mr. Hsu was one of the chief
7 financial officers.
8    Q.   Of which entity?
9    A.   In November 2006 Wyckoff, Wyckoff
10 Heights Medical Center.
11   Q.   The subject line makes reference
12 to an amendment to a CMC agreement.
13        What does CMC refer to as you
14 understand it?
15   A.   Catholic Medical Center.
16   Q.   Did you have any discussions with
17 anybody at Wyckoff before Mr. Romero sent this
18 out or was he keeping you in the loop with
19 what he was up to?
20   A.   I can't recall.
21        MR. TZANETOPOULOS:  Mark this as
22 Exhibit 5, for identification.
23        (Plaintiff's Exhibit 5, e-mail
24 chain, marked for identification, as of
25 this date.)

37

McDonald

1
2    Q.   Mr. McDonald, let me show you a
3 document the court reporter has marked as
4 Deposition Exhibit 5.  Exhibit 5 is an e-mail
5 string two pages, bears Bates numbers
6 ROSS009019 to 009020.  Look at it as much as
7 you would like, you seem to come into it in
8 the middle of the page.
9         Mr. McDonald, the e-mail in
10 Exhibit 5 that is dated Friday, December 1st
11 shows a copy going to you.  Did you receive a
12 copy?
13   A.   I can't recall.
14   Q.   The other cc lines show an RIS9022
15 and NYP.org.
16        Is that to Mr. Sarli?
17   A.   I'm not sure, but, I'm not sure.
18   Q.   The NYP.org is an e-mail address
19 that you used at times at Wyckoff, was it not?
20   A.   Yes.
21   Q.   What does the NYP stand for?
22   A.   New York Presbyterian.
23   Q.   Was Wyckoff at that time part of
24 the New York Presbyterian system?
25   A.   Yes.

10  (Pages 34 to 37)

38

McDonald

1
2  Q.  The DNH9901, was that to Mr.
3  Hoffman, David Hoffman?
4  A.  I'm not sure.
5  Q.  Mr. Romero's December 1st e-mail
6  begins, "Dear Dr. Perri, per our telephone
7  meeting this morning," then it goes on to some
8  items.
9  Were you a part of that telephone
10  meeting?
11  A.  I can't recall.
12  Q.  Item two indicates that, "A call
13  from Mr. McDonald is requested by Mr. St.
14  James, a Mr. McDonald has returned a call to
15  Mr. St. James today and will be followed up by
16  Mr. Rich Sarli."
17  Did you in fact call John St.
18  James?
19  A.  I can't recall.
20  Q.  Have you ever spoken with him?
21  A.  I'm not sure.
22  Q.  Do you recall anything of
23  substance of any conversation that you ever
24  had with John St. James?
25  A.  No.

39

McDonald

1
2  Q.  Do you recall anything of
3  substance in your conversation you ever had
4  with anybody from Ross?
5  A.  No.
6  MR. TZANETOPOULOS:  Mark this
7  Plaintiff's 6, for identification.
8  (Plaintiff's Exhibit 6, e-mail
9  chain, marked for identification, as of
10  this date.)
11  Q.  Mr. McDonald, have you had a
12  chance to review Exhibit 6?
13  A.  Yes.
14  Q.  Exhibit 6 is a one-page e-mail
15  string bearing ROSS027421.
16  The second e-mail in the string is
17  one that says it is from Julius Romero to John
18  St. James dated December 16th, 2006.  It shows
19  a copy going to you.
20  Did you receive a copy?
21  A.  I don't recall.
22  Q.  The e-mail address showed in this
23  cc section of Exhibit 6, was that your e-mail
24  address at Wyckoff?
25  A.  Yes.

40

McDonald

1
2  Q.  Mr. Romero writes to Mr. St. James
3  opening, "I thought our teleconference meeting
4  today was proactive," he goes on to discuss
5  it.
6  Were you a part of that telephone
7  conference meeting?
8  A.  I don't recall.
9  Q.  In the ordinary course of
10  negotiations with medical schools about these
11  contracts, if there were telephone conferences
12  in which Mr. Romero was negotiating with
13  medical schools, would you have been part of
14  that?
15  A.  Not necessarily.
16  Q.  Were you part of some?
17  A.  Not that I can recall.
18  Q.  Okay.
19  Midway through the page Mr. Romero
20  writes, "A summary of our discussions are
21  outlined below."  He uses a series of points.
22  Point seven states, "A contingency of an equal
23  number of core clerkship slots at Wyckoff
24  Heights Medical Center will serve as
25  collateral should any guaranteed, prepaid core

41

McDonald

1
2  clerkship at Caritas is not provided to Ross
3  University during the term of this agreement."
4  Do you see where I am?
5  A.  Yes.
6  Q.  At any time before or at any time
7  during this December 2006 time frame have you
8  been a part of any discussion internally at
9  Wyckoff concerning using slots at Wyckoff as
10  collateral for the prepaid deals for
11  clerkships at Caritas?
12  A.  Not that I recall.
13  Q.  You would agree, would you not,
14  that assuming the e-mail came to you, you had
15  information available to you from Mr. Romero
16  that at least as of December 16th he was
17  discussing with Ross using clerkships slots at
18  Wyckoff as collateral for prepaid core
19  clerkships at Caritas?
20  MR. ZWERLING:  Objection form, can
21  you rephrase that?
22  MR. TZANETOPOULOS:  Sure.
23  Q.  Mr. McDonald, if you got the
24  e-mail in Exhibit 6, you would agree that Mr.
25  Romero had provided you with the information

11 (Pages 38 to 41)

42

McDonald

1        McDonald
2  that he was discussing with Ross?
3        MR. ZWERLING:  As outlined in his
4  e-mail?
5        MR. TZANETOPOULOS:  Correct.
6     Q.  Using core clerkship slots at
7  Wyckoff to serve as collateral for prepaid
8  core clerkships at Caritas?
9        MR. ZWERLING:  Same objection.
10     A.  I would have objected to that one.
11     Q.  If you got the e-mail you had at
12  least available to you, the information that
13  he lists in his point seven --
14        MR. LOUGHLIN:  Had he got the
15  e-mail and read it he would have gotten
16  the e-mail, it is just a hypothetical.
17  Objection to form.
18     Q.  You can answer.
19     A.  I could speculate if you want me
20  to speculate.
21     Q.  Sure.
22     A.  If I did receive the e-mail and I
23  did read it, I would have been aware of it.
24     Q.  Whether or not you aware of it, if
25  you received the e-mail --

43

McDonald

1     A.  I would have disagreed with it.
2        MR. LOUGHLIN:  Let him finish the
3  question.
4     Q.  Let me finish.
5     A.  I would have disagreed with it,
6  but if I had received it and read it, I would
7  have been aware of it.
8     Q.  Do you have any reason to think
9  you did not receive this e-mail?
10     A.  Only that I don't recall it.
11     Q.  Does the fact that you don't
12  recall it make you think you didn't receive
13  it?
14        MR. LOUGHLIN:  Objection.
15        MR. ZWERLING:  Objection.
16        MR. LOUGHLIN:  You're inviting him
17  to speculate.
18        MR. ZWERLING:  He's already
19  answered he can't recall it.
20     Q.  I'm asking do you have a reason to
21  think that you didn't get it?
22     A.  I don't recall receiving the
23  e-mail.
24     Q.  Do you dispute that you received

44

McDonald

1  it?
2        MR. LOUGHLIN:  Objection.
3        MR. ZWERLING:  He already answered
4  the question, if he doesn't recall it,
5  that's the answer.
6     A.  If I don't recall it how can I
7  dispute it?
8        MR. TZANETOPOULOS:  Mark this
9  Exhibit 7, for identification.
10        (Plaintiff's Exhibit 7, e-mail
11  chain and affiliation agreement, marked
12  for identification, as of this date.)
13        MR. TZANETOPOULOS:  Let's go off
14  the record.
15        (Whereupon, an off-the-record
16  discussion was held.)
17        (Time noted:  11:43 a.m.)
18        (Time noted:  11:50 a.m.)
19        MR. TZANETOPOULOS:  We are back on
20  the record.
21     Q.  Mr. McDonald, have you had a
22  chance to review Deposition Exhibit 7?
23     A.  Yes.
24     Q.  Exhibit 7 is an e-mail string and

45

McDonald

1  an attachment bearing Bates numbers ROSS008477
2  through 8492.
3     The very first page is an e-mail
4  from Mr. Romero to Dr. Thomas Shepherd which
5  shows a copy going to the e-mail address
6  HAM9001@NYP.org.
7     Was that your e-mail address?
8     A.  Yes.
9     Q.  The next e-mail address on the cc
10  line is DJG9001@NYP.org.
11     Is that Mr. Gio's e-mail address?
12     A.  I'm not sure.
13     Q.  Did you receive a copy of this
14  e-mail?
15     A.  I don't recall.
16     Q.  Did you have any discussions at
17  this time with Mr. Romero about what parts of
18  Ross' contract proposal that are discussed
19  here would be acceptable to the hospital and
20  what wouldn't?
21     A.  I don't recall.
22     Q.  Is there anything that would
23  refresh your recollection on that point that
24  you can think of?

46

McDonald

1
2     A.   I recall general discussions
3  related to residency programs and the
4  undergraduate programs focusing on the ability
5  of the hospitals to absorb the students.
6     Q.   Anything else?
7     A.   No.
8     Q.   All right.
9          Let me direct your attention back
10 again to Exhibit 1, that's the affiliation
11 agreement.  Let's start at the very last page
12 which is the fax cover sheet, it is titled St.
13 Vincent's CMC.
14         MR. LOUGHLIN:  Are you referring to
15 Exhibit 1?
16         MR. ZWERLING:  I don't have that
17 page, but --
18         MR. TZANETOPOULOS:  Here you go.
19    Q.   At this time were you located at
20 St. John's Hospital, is that where you were
21 officed?
22    A.   I was back and forth between St.
23 John's and Mary Immaculate.
24    Q.   Who asked you to sign this
25 contract in Exhibit 1?

47

McDonald

1
2     A.   I don't recall.
3     Q.   Who presented it to you?
4     A.   I don't recall.
5     Q.   Had the final version of the
6  contract been presented to the hospital's
7  legal counsel for check off before you signed?
8     A.   I'm not sure, I don't recall.
9     Q.   In the ordinary course of how you
10 conducted your business at the time, would you
11 have signed a contract like that in Exhibit 1
12 without first knowing that the hospital's
13 legal counsel had checked off?
14    A.   In the normal course of business,
15 I would have made sure the hospital's legal
16 counsel agreed to it and had reviewed it.
17    Q.   Had Dominick Gio checked off on
18 this contract before you signed it?
19    A.   In the normal course of business,
20 Dominick who have also reviewed it and
21 approved it.
22    Q.   Before you signed it?
23    A.   Before I signed it.
24    Q.   Do you think that's what happened
25 here?

48

McDonald

1
2     MR. ZWERLING:  Are you asking him
3  to speculate?
4     MR. TZANETOPOULOS:  I'm asking what
5  he thinks.
6     MR. ZWERLING:  You're asking him to
7  speculate, he said he can't recall.  If
8  you're asking him to speculate, he's
9  speculating.
10    A.   I don't recall signing the
11 document.  I recall all the operational
12 issues, I recall working with Dr. Mandava,
13 that was the medical director at Caritas to
14 assure that we would be able to manage the
15 education of the students.
16         MR. LOUGHLIN:  Let's go off the
17 record.
18         (Whereupon, an off-the-record
19 discussion was held.)
20         (Time noted:  11:56 a.m.)
21         (Time noted:  11:57 a.m.)
22         MR. TZANETOPOULOS:  Let's go back
23 on the record.
24    Q.   To be thorough, let me ask one
25 more question about Exhibit 1.  Did you read

49

McDonald

1
2  it before you signed it?
3     A.   In the normal course of business,
4  I would have.
5     Q.   Did you in this case?
6     A.   I don't recall.
7     Q.   All right.
8          At any time before you left
9  Wyckoff had anyone criticized you for signing
10 the contract that is in Exhibit 1?
11    A.   No, that I would recall.
12    Q.   At any time before you left
13 Wyckoff, has anyone from Wyckoff or Brooklyn-
14 Queens Health Care or Caritas suggested that
15 you did not have the authority to sign the
16 contract that is in Exhibit 1?
17    A.   No.
18    Q.   Did you have anything to do with
19 negotiating or having signed the first
20 amendment to the affiliation agreement that's
21 Exhibit 1?
22    A.   Not that I can recall.
23    Q.   The second amendment to this
24 contract?
25    A.   I can't recall amendments to the

13 (Pages 46 to 49)

50

1 McDonald
2 contract.
3 MR. TZANETOPOULOS: Mark these as
4 Exhibits 8 and 9, for identification.
5 (Plaintiff's Exhibits 8 and 9,
6 affiliation agreements, marked for
7 identification, as of this date.)
8 Q. Mr. McDonald, have you had a
9 chance to review Exhibits 8 and 9?
10 A. Yes.
11 Q. Did you perform any work in
12 connection with the first amendment in
13 Exhibit 8?
14 A. No.
15 Q. Did you perform any work in
16 connection with the second amendment to the
17 contract in Exhibit 9?
18 A. No.
19 MR. TZANETOPOULOS: I'll leave it
20 to the rest of the group, I probably have
21 an hour, we can take a lunch break
22 or take five minutes or carry on.
23 Let's go off the record.
24 (Whereupon, an off-the-record
25 discussion was held.)

51

1 McDonald
2 (Time noted: 12:08 p.m.)
3 (Time noted: 12:17 p.m.)
4 MR. TZANETOPOULOS: Let's go back
5 on the record.
6 Q. Let's go back sir and talk about
7 the original affiliation agreement. Was the
8 money that Ross promised to pay in the
9 original affiliation agreement in Exhibit 1
10 received?
11 A. It is my recollection that it was
12 received, I don't recall the exact amount.
13 Q. Was it spent?
14 A. Everything was spent.
15 MR. TZANETOPOULOS: Mark this
16 Exhibit 10, for identification.
17 (Plaintiff's Exhibit 10, promissory
18 note agreement, marked for identifica-
19 tion, as of this date.)
20 Q. Mr. McDonald, the court reporter
21 has handed you a document marked Exhibit 10.
22 Exhibit 10 is entitled promissory note, on the
23 last page it has signatures for AUC, NV,
24 Brooklyn-Queens Health Care Caritas Health
25 Care and Wyckoff Heights Medical Center.

52

1 McDonald
2 Did you work on this transaction?
3 A. I was involved in the initial
4 discussions, I was at the dinner meeting and
5 that was my extent of involvement.
6 Q. Who was at that dinner meeting?
7 A. Representative from AUC and
8 representatives from Wyckoff.
9 Q. Who from Wyckoff?
10 A. I don't recall exactly.
11 Q. Do you remember anybody other than
12 you?
13 A. I seem to recall just myself and
14 the attorney for AUC.
15 Q. Okay.
16 A. Those are the two that stand out
17 in my mind.
18 Q. You do believe others from Wyckoff
19 were there?
20 A. Yes, and I think others from CMC,
21 but I'm not sure.
22 Q. Where was that meeting?
23 A. At a restaurant in Queens.
24 Q. I know you're not going to know
25 the precise date give or take, what's the best

53

1 McDonald
2 you can do in terms of its time frame?
3 A. Would have been the Fall of 2006,
4 early winter, could have been late winter.
5 MR. ZWERLING: Of 2007?
6 A. 2006.
7 Q. You think its sometime --
8 A. Now that I have got a better grasp
9 of the seasons, it would have been most likely
10 the fourth quarter 2006, we will leave out the
11 seasons.
12 Q. Was it before the December 1st,
13 2006 date of this promissory note?
14 A. Yes.
15 Q. All right.
16 The purpose of the meeting was to
17 discuss the potential transaction?
18 A. Yes.
19 Q. Again, I know you're not going to
20 recall the exact words, but in substance who
21 said what to whom?
22 A. It was a social dinner meeting and
23 so there was discussion with different people
24 as the night progressed.
25 Q. Were the terms of the potential

14 (Pages 50 to 53)

54

McDonald

1
2 clerkship contract discussed?
3     A.  You know what, I'm not sure what
4 terms were discussed, but it was a social
5 business dinner.
6     Q.  Let me direct your attention if I
7 may to paragraph four of Exhibit 10 that's on
8 page six of the exhibit.  That paragraph
9 begins, "Brooklyn-Queens acknowledges and
10 decrees on behalf of its wholly owned
11 subsidiary Wyckoff, any default as defined in
12 section two paragraph five herein by
13 Brooklyn-Queens, Caritas, MIH, SJQH
14 individually and collectively during the term
15 of the note will obligate Wyckoff to assume
16 responsibility for this note agreement."
17     Did the potential of using Wyckoff
18 as a backstop for this sort of transaction
19 come up during your dinner?
20     A.  I don't remember.
21     My focus for the evening was on
22 the quality and number of the rotations at
23 Caritas and how he would be able to manage the
24 education.
25     Q.  All right.

55

McDonald

1
2     Again, if I can direct your
3 attention to the last page of the exhibit,
4 page 10 of 10, do you recognize Mr. Gio's
5 signature?
6     A.  Yes.
7     Q.  I take it you were familiar with
8 his signature?
9     A.  Yes.
10     Q.  That is his signature on behalf of
11 Brooklyn-Queens Health Care and of Caritas
12 Health Care Planning and on behalf of Wyckoff
13 Heights Medical Center?
14     A.  Yes.
15     Q.  Other than what you have testified
16 to, did you do any other work in connection
17 with the AUC prepaid contract described in the
18 promissory note in Exhibit 10?
19     A.  Just the management of the
20 rotations at Caritas.
21     Q.  Who was responsible for placing
22 schedules of students, placing them in the
23 rotation?
24     A.  Julius Romero.
25     Q.  Was Mr. Romero responsible for

56

McDonald

1
2 placement of scheduling at both Caritas and
3 Wyckoff?
4     A.  Yes.
5     Q.  We know there were medical student
6 clerks at the Caritas hospitals.
7     Is that correct?
8     A.  Yes.
9     Q.  They were also medical student
10 clerks at Wyckoff?
11     A.  Yes.
12     Q.  Did Brooklyn-Queens Health Care
13 have an interest in any other facilities where
14 medical students did clerkships?
15     A.  At Caritas?
16     Q.  We knew there were Caritas, we
17 know there were at Wyckoff, did the system
18 have any other Brooklyn-Queens Health Care
19 system have any other affiliates with --
20     A.  Kennedy Medical Center.
21     Q.  What's the Kennedy Medical Center?
22     A.  It is an or it was an ambulatory
23 facility at Kennedy Airport.  St. John's had a
24 large ambulatory site at 95-25 Queens
25 Boulevard, outpatient, it is a detox program

57

McDonald

1
2 that Mary Immaculate had.  Part of Mary
3 Immaculate was also they had a 110-bed skilled
4 nursing facility Monsignor Fitzpatrick, and
5 they had a psych operation at Mary Immaculate
6 also.
7     Q.  When St. John's Hospital and Mary
8 Immaculate Hospitals closed in early 2009, did
9 Wyckoff or Brooklyn-Queens Health Care
10 continue to have an interest in any of those
11 facilities that you just described?
12     A.  Not to my knowledge.
13     Q.  Is it correct that once Mary
14 Immaculate and St. John's closed in 2009, the
15 only Brooklyn-Queens Health Care facility with
16 medical student clerkships was Wyckoff?
17     A.  No, actually there was another
18 site I think that was sold off to Addabo
19 (phonetic), it was a family practice site and
20 ambulatory family practice site in I forget
21 the address, I forget the name of it.
22     Q.  When was that site sold off?
23     A.  I don't remember.  I wasn't
24 involved with the operations at the Caritas
25 from the Spring '07 on.

15  (Pages 54 to 57)

58

McDonald

1
2   Q.   I guess what I'm trying to get my
3   arms around, one, Caritas closed.
4         Is it correct that the only
5   Brooklyn-Queens Health Care facilities with
6   medical student clerks was Wyckoff?
7   A.   I wasn't involved with any of the
8   bankruptcy closings at Caritas so I'm not sure
9   if there were educational opportunities that
10  remained after the fact.
11  Q.   Are the only ones that you knew of
12  at Wyckoff?
13  A.   I know that Wyckoff did try to,
14  actually submitted a grant to maintain the
15  clinics at 95-25, and that wasn't approved.
16  And I just wasn't involved, the only Wyckoff
17  effort towards maintaining any of the Caritas
18  facilities to my knowledge was just the
19  clinics at St. John's which were substantial,
20  it was a fairly large operation.  I think the
21  family practice site is still in operation but
22  I'm not sure, under somebody else, a different
23  sponsorship.
24       MR. TZANETOPOULOS:  Mark this as
25  Exhibit 11, for identification.

59

McDonald

1
2   (Plaintiff's Exhibit 11, memo,
3   marked for identification, as of this
4   date.)
5   Q.   Mr. McDonald, the court reporter
6   has handed to you a document he marked as
7   Exhibit 11.  It's a two-page memo from Emil
8   Rucigay dated July 30th, 2007 bears Bates
9   numbers BQHC13452 and 13453.  The first
10  question on terminology, a number of documents
11  that the defendants have produced in this case
12  refer to the senior cabinet of different
13  hospital entities.
14       To your understanding what's the
15  reference, whose encompassed in the senior
16  cabinet?
17  A.   It is the executive team and the
18  vice presidents.
19  Q.   All right.
20       So in this case at this time that
21  would include you?
22  A.   Yes.
23  Q.   I take it you remember the arrival
24  of FTI at the hospitals?
25  A.   Absolutely.

60

McDonald

1
2   Q.   Did you receive the memo in
3   Exhibit 11?
4   A.   I don't recall the memo but I
5   certainly recall everything that is in the
6   memo.
7   Q.   Were you involved in the
8   discussions with the State that led to FTI's
9   arrival at the hospitals?
10  A.   Yes.
11  Q.   What was your involvement in those
12  discussions?
13  A.   It was my responsibility to go to
14  the central business office to determine the
15  fix that is needed to be implemented and to
16  put together a corrective action plan to get
17  those fixes in place as quickly as possible.
18  Q.   With whom at the State did you
19  speak?
20  A.   We spoke to a number of people.
21  There were numerous conference calls, there
22  were a couple of meetings, it was Jim Klein
23  was the primary individual that we dealt with.
24  Q.   A fellow named Benjamin?
25  A.   Neil Benjamin, Neil reported to

61

McDonald

1
2   Jim at the time.
3   Q.   Okay.
4         What were the problems that
5   required the fixes that you have just
6   testified about?
7   A.   The most significant fixes were to
8   the computer systems to correct the problems
9   with the billing process at Caritas.
10  Q.   What were those problems?
11  A.   The inability to create a bill,
12  the inability to submit the bill to a payer,
13  the inability for the edits in the hospital
14  system to let the bill as they say in the
15  business go out the door.  The ability for the
16  payers to receive the bill from Caritas, so
17  there were a series of problems in the system
18  that needed to be corrected.
19  Q.   What other problems were there
20  that you were to address?
21  A.   It was business office growing
22  pains that needed to be corrected.  Before
23  that time there was a CMC central business
24  office and Wyckoff had its own business office
25  located at Wyckoff.  So Wyckoff moved its

16 (Pages 58 to 61)

62

McDonald

1 business office and consolidated with the
2 Catholic Medical Center business office, and
3 it was the integration of the systems and the
4 integration of the staff, and while going up
5 on a new computer system made the whole
6 process challenging, to say the least.
7     Q.    What are the problems that were
8 addressed?
9     A.    In reference to?
10     Q.    Whatever corrective action you
11 have testified about?
12     A.    In reference to the leadership at
13 the business office which was the CFO in
14 charge, the business office was Hal McNeil and
15 to sit with him and take a look and see what
16 was working and what wasn't working and what
17 was reported timely to management and what
18 wasn't reported timely, and the movement of
19 funds from one organization to another
20 organization. Cash flow projections, so the
21 operations of the business office and also the
22 reporting of the financial condition of the
23 individual business entities.
24     Q.    On that last point of the movement

63

McDonald

1 of funds between entities, defendant produced
2 some documents that you can look at that have
3 indicated that funds from Caritas were
4 commingled with funds from Wyckoff and to pay
5 Wyckoff's bills.
6     Were you involved in the
7 investigation or the remedy regarding that
8 commingling?
9     A.    Yes.
10     Q.    Were you involved in the investi-
11 gation?
12     A.    Yes.
13     Q.    How did the problem come to light?
14     A.    The problem came to light when we
15 received notice at St. John's that we couldn't
16 drop bills. So I mentioned earlier where your
17 receivables ramp up, there comes a point in
18 time, three weeks, four weeks, five weeks into
19 the new sponsorship where we should start
20 dropping bills and generating cash flow, and
21 it was announced to myself and Rich Sarli that
22 there was a problem with the computer system
23 and we couldn't drop the bill.
24     Q.    How did that lead to learning

64

McDonald

1 funds had been commingled?
2     A.    Well, at that point we are burning
3 through cash rather quickly and the announce-
4 ment that we couldn't drop a bill was pretty
5 devastating. So at that point it was all
6 hands over to the business office and let's
7 find out what's happening there, what do we
8 need to do to pull together to get the problem
9 fixed.
10     Q.    Is it the case that Caritas' funds
11 were in fact used to pay Wyckoff's bills?
12     A.    Funds were being moved around to
13 cover the cash needed for a specific point in
14 time. So there were Caritas funds going to
15 pay for Wyckoff liabilities and Wyckoff funds
16 going to pay for Caritas liabilities. There
17 was a thorough accounting done and it was
18 determined exactly who owed who what.
19     Q.    So what you found when you looked
20 into it was that whichever entity had cash,
21 those funds were being used to pay bills
22 regardless of the entity whose bills they
23 were?
24     A.    Correct.

65

McDonald

1     Q.    During what period of time was
2 cash being moved between entities in that
3 fashion?
4     A.    I can't remember the exact date,
5 but it would have been the early part of first
6 quarter of 2007.
7     Q.    Who had authorized the use of one
8 entity's funds for the other entity's bills?
9     A.    It wasn't authorized.
10     Q.    Who had done it?
11     A.    Hal McNeil.
12     Q.    How did he do that, mechanically
13 how did he move the money?
14     A.    He would be paying different
15 vendors from different accounts.
16     Q.    So in some instances Mr. McNeil
17 would pay Wyckoff's vendors with Caritas'
18 funds and in other instances Caritas' vendors
19 with Wyckoff's funds?
20     A.    Correct.
21     Q.    All right.
22     During that period of time when
23 Mr. McNeil was doing so, what was the process
24 for getting a vendor paid for either of the

17 (Pages 62 to 65)

McDonald

1  entities?
2
3      A.   There should have been a voucher
4  system in place where the expense invoice
5  would be identified for the correct
6  institution and it would have been processed
7  for that institution and paid through the
8  funds of that specific institution.
9         MR. TZANETOPOULOS:  Can you read
10  the question back, please.
11        (Whereupon the aforementioned
12        testimony was read back by the Court
13        Reporter.)
14      Q.   You described what should have
15  been done.
16         My question was what was done?
17      A.   There were improprieties related
18  to the transfer of funds and the use of funds,
19  I can't recall exactly what they were, but it
20  was done inappropriately.
21      Q.   Were there more people during that
22  period of time when there were improprieties
23  involved in the actual receipt and writing of
24  checks to pay vendors than Mr. McNeil, or was
25  he just a one-person shop?

McDonald

1  systems and the policies and procedures were
2  in the office that needed to be corrected.
3      Q.   Who was in charge of the investi-
4  gation?
5      A.   The internal investigation or the
6  audit?
7      Q.   The internal investigation.
8      A.   I was in charge of the internal
9  investigation.
10      Q.   Did you determine that anybody
11  other than Mr. McNeil knew about the fact that
12  the funds were being transferred from one
13  entity to another?
14      A.   Yes, I'm not sure who knew Hal
15  McNeil had the authority to release the
16  checks.
17      Q.   My question was did your
18  investigation determine that anybody else knew
19  that this was being done?
20      A.   My investigation was focused on
21  the revenue cycle.  We had thousands of
22  employees who needed to live on that paycheck
23  they got every other week, so the bulk of my
24  time that was spent in the business office was

McDonald

1      A.   Mr. McNeil was in charge of a
2  large business office, and there were numerous
3  departments and numerous employees.
4      Q.   In order to engage in the transfer
5  of funds that you described as being improper,
6  more people than Mr. McNeil would have been
7  involved in getting those bills paid from
8  whatever funds were available?
9      A.   Yes.
10      Q.   Which people?
11      A.   Accounts payable, purchasing.
12      Q.   What did you do to investigate?
13      A.   Went in, took a look at what was
14  happening in the business office, and we had
15  Deloitte come in and do forensic audit.  We
16  brought in FTI Cambio initially to take a look
17  at the receivables, and we brought in a number
18  of consultants that were familiar with the
19  Meditech computer system to get the fixes in
20  place for the computer system.
21         And so it was bringing in
22  additional staff and additional expertise to
23  fix the problems that were happening in the
24  business office and to determine what the

McDonald

1  trying to figure out how to fix the problems
2  with the accounting system so we would get
3  bills out the door, we can start getting cash
4  in.
5         The investigation of Hal McNeil
6  was relatively quick and it was clear that
7  there were cash flow statements that were
8  produced that were inaccurate and that the
9  cash was moving back and forth.  And it was a
10  quick decision to terminate Hal McNeil for two
11  reasons, one because the problems with the
12  system and I believed he was aware of early
13  enough that something could have been done to
14  prevent the catastrophe we had.
15         The other was covering up in the
16  problem, moving cash around to make it appear
17  we had enough cash that we weren't running
18  into a problem.  The third piece was producing
19  cash flow statements that were totally
20  inaccurate when the problem was pretty
21  significant.  He was terminated because he
22  covered up because he moved funds and because
23  he didn't ask for help when he needed help.
24      Q.   Okay.

18  (Pages 66 to 69)

70

```
1                    McDonald
2            Let's go back to my precise
3    question which was in your investigation did
4    you determine whether anybody other than Mr.
5    McNeil knew that money was being moved
6    inappropriately?
7        A.   I can't recall.
8        Q.   You testified earlier about
9    Caritas having a limited amount of working
10   capital in the revenue cycle.
11           How much working capital was
12   available to Caritas during those initial
13   months?
14       A.   About 10 million if I remember
15   correctly.
16       Q.   From whom was that working capital
17   provided?
18       A.   It was a combination of borrowing
19   advance payments and part of the deal with St.
20   Vincent's.
21       Q.   The advance payments, those would
22   be advance payments from Ross and AUC on the
23   clerkship contracts?
24       A.   Part of it.
25           You know what, I'm not sure if it
```

71

```
1                    McDonald
2    was 10 million, I'm not sure of the exact
3    amount.
4        Q.   Was some or all of the Caritas
5    money that was used to pay Wyckoff bills funds
6    received from Ross and AUC?
7        A.   I don't recall the details.
8            MR. TZANETOPOULOS:  Mark this
9        Exhibit 12, for identification.
10           (Plaintiff's Exhibit 12, e-mail,
11       marked for identification, as of this
12       date.)
13       Q.   Mr. McDonald, the court reporter
14   has handed to you a document marked deposition
15   Exhibit 12.  The exhibit itself is a two-page
16   document, an e-mail dated March 6th, 2007 from
17   Wah-Chung Hsu to a number of people, and
18   another page Bates labeled BQHC06981.
19           So the record is clear, the e-mail
20   and attachments were produced in a native
21   format, some documents were very large.  In
22   order make the document manageable we selected
23   one of the attachments, just a spreadsheet
24   that you see there.
25       A.   Yes.
```

72

```
1                    McDonald
2        Q.   Was Mr. Hsu part of your team that
3    investigated the issues that you described?
4        A.   Yes.
5        Q.   At this time what was his
6    position?
7        A.   He was the chief financial officer
8    for Wyckoff.
9        Q.   Do you recognize the document
10   that's a spreadsheet?
11       A.   You know, I know that there was a
12   spreadsheet, I can't say this is the exact
13   spreadsheet, but there was an accounting of
14   the to due from.
15       Q.   Mr. Hsu was given the task of
16   preparing?
17       A.   Yes.
18       Q.   Do you understand the spreadsheet
19   in the exhibit enough to be able to describe
20   it?  Describe what is being described there.
21       A.   I can say it is a reconciliation
22   of funds that went from Caritas to Wyckoff and
23   from Wyckoff to Caritas.
24       Q.   There is a column headed Caritas
25   to Wyckoff Heights Medical Center.
```

73

```
1                    McDonald
2            What do you understand that to
3    reflect?
4        A.   These were funds that went from
5    Caritas to Wyckoff.
6        Q.   As you understand it, were the
7    funds first transferred from a Caritas account
8    to a Wyckoff account and then Wyckoff bills
9    were paid or was it the case Wyckoff bills
10   were paid out of the Caritas account?
11       A.   Can you restate the question.
12       Q.   Sure.
13           The round numbers make me curious.
14   Is it the case --
15       A.   It was just moving lump sums of
16   money to cover specific checks that would be
17   cut.
18       Q.   So when checks were cut to a
19   Wyckoff vendor, the check was from a Wyckoff
20   account but money was moved from Caritas to
21   cover it?
22           MR. ZWERLING:  If you know.
23       A.   And back and forth.
24       Q.   All right.
25           Mr. McDonald, let me refer you
```

19 (Pages 70 to 73)

74

McDonald

1  back to Exhibit 10, it is the AUC agreement.
2  The agreement reflects that AUC was to pay
3  $3.5 million.
4      Did AUC in fact pay that money?
5      A.   I don't recall the exact amount.
6      Q.   They did pay in though?
7      A.   They paid, yes.
8      Q.   If we can go back to Exhibit 1
9  which is the Ross affiliation agreement, if I
10 can direct your attention to Exhibit B to the
11 Ross contract, it provides that the university
12 will deposit with Brooklyn-Queens Health Care
13 $5 million.
14     I would like to see if I can
15 trigger some recollections from your
16 investigation. AUC agreements says that as of
17 December 1st it was going to pay $3.5 million,
18 and we see that on December 8th and
19 December 22nd about $3.4 million went from
20 Caritas to Wyckoff.
21     Is that correct?
22     MR. ZWERLING:  Are you referring
23 Exhibit 12, the second page?
24     Q.   Yes.

75

McDonald

1      Then we have the Ross contract as
2  of December 28th and Ross promised to pay $5
3  million, on December 29th Exhibit 12 reflect
4  four and a half million going from Caritas to
5  Wyckoff.
6      Was it the case that Mr. McNeil
7  was using the AUC funds, the $3.5 million to
8  make the 3.4 million transfer and the Ross $5
9  million to make the December 29th four and a
10 half million dollars transfer?
11     MR. ZWERLING:  Only if you know.
12     A.   I don't remember, I don't recall.
13     Q.   Were there other sources of funds
14 available to Caritas at that time for Mr.
15 McNeil to make those transfers?  Let me
16 preface that question for a second.
17     The Caritas transaction closed
18 December 1st, 2007, right?
19     A.   Yes.
20     Q.   Did Wyckoff have access to Caritas
21 funds at any time before January 1st, 2007?
22     MR. ZWERLING:  You gave the wrong
23 date.
24     MR. TZANETOPOULOS:  I'll start

76

McDonald

1  over.  Strike that.
2      Q.   The Caritas purchase closed
3  January 1st, 2007.
4      Is that correct?
5      A.   Yes.
6      Q.   Did Wyckoff have access to
7  Caritas' funds at any time before January 1st,
8  2007?
9      A.   I don't recall the exact date, but
10 there was a period of time where because there
11 was no Caritas until it was provided by New
12 York State where there were expenses related
13 to the acquisition that were being paid for by
14 Wyckoff with the understanding that the money
15 that Wyckoff was laying out would eventually
16 be returned, these were in the millions of
17 dollars.  And then there were additional
18 expenses that Wyckoff began assuming for the
19 closing of the deal prior to January 1st.  The
20 establishment of the business office began in
21 Fall 2006, definitely long before the close
22 took place there was money that was being sent
23 by Wyckoff prior to January 1st.
24     Q.   Those would be Wyckoff's

77

McDonald

1  expenditures of Wyckoff's funds, correct?
2      A.   They would be liabilities of the
3  Caritas organization that were being paid for
4  by Wyckoff.
5      Q.   That was Wyckoff's funds?
6      A.   Out of Wyckoff's funds they were
7  limited.
8      Q.   My question is running the other
9  direction which is before January 1st, 2007,
10 did Wyckoff have access to Caritas' funds?
11     A.   They had access to funds once the
12 funds were deposited and with the
13 organization.
14     Q.   Is it your testimony that Wyckoff
15 had access to --
16     A.   Caritas had access.
17     MR. ZWERLING:  The question was
18 asking also for a specific time as to a
19 specific time frame.  Not just generally;
20 am I correct?
21     MR. TZANETOPOULOS:  Right, let me
22 start again, this is a very precise
23 question.
24     Q.   Let me, I'll be transparent in

20  (Pages 74 to 77)

**78**

McDonald

1
2 what I am asking. Exhibit 12 reflects that
3 money was moved in December 2006 from Caritas
4 accounts to Wyckoff Heights Medical Center.
5 That's a period of time before the acquisition
6 of Caritas closed.
7 The question is did Wyckoff have
8 access to Caritas' funds before January 1st,
9 2007?
10 A. I'm not sure, I don't think, I'm
11 not sure.
12 MR. ZWERLING: Then that's the
13 answer.
14 A. There should be an accounting --
15 MR. ZWERLING: Do you know?
16 THE WITNESS: I don't know.
17 MR. ZWERLING: That's the answer.
18 Q. Okay.
19 Are you aware of any source of
20 funds during December 2006 other than funds
21 received from AUC or Ross that Mr. McNeil
22 could have moved from Caritas to Wyckoff?
23 A. I don't recall.
24 Q. While on Exhibit 12 if I can
25 direct you to the e-mail on the first page of

**79**

McDonald

1
2 the exhibit.
3 Mr. Gio we know, who was Neil
4 Benjamin?
5 A. Neil Benjamin was an employee of
6 the Department of Health.
7 Q. Edward Dowling?
8 A. Was an employee of Brooklyn-Queens
9 Health Care.
10 Q. What was Mr. Dowling's job?
11 A. Strategic planning.
12 Q. Mr. Hoffman we know, do you know
13 who DSB10 from the State, do you know who that
14 is?
15 A. No.
16 Q. DVW?
17 A. I'm not sure.
18 Q. Lora L-E-F-E-B-V-R-E?
19 A. From the Department of Health.
20 Q. MVG?
21 A. Not sure.
22 Q. And Richard Zall, Z-A-L-L?
23 A. Attorney from Proskauer, Wyckoff's
24 attorney.
25 MR. TZANETOPOULOS: Mark this

**80**

McDonald

1
2 Exhibit 13, for identification.
3 (Plaintiff's Exhibit 13, e-mail
4 chain and attachment, marked for
5 identification, as of this date.)
6 Q. When was all of this reported to
7 the State?
8 MR. ZWERLING: When was all of what
9 reported to the State?
10 MR. TZANETOPOULOS: The commingling
11 of funds.
12 MR. LOUGHLIN: I object to the use
13 of the term commingling of funds. I
14 think the document is actually headed
15 transfers, and I think the witness has
16 testified these were unauthorized
17 transfers leading to the termination of
18 the CFO.
19 Q. When were these transfers in
20 Exhibit 12 reported to the State?
21 MR. LOUGHLIN: I object as well,
22 you say the State in your exhibit which
23 is Exhibit 13. There are references both
24 to the Dormitory Authority of the State
25 of New York and also the Department of

**81**

McDonald

1
2 Health.
3 MR. TZANETOPOULOS: Go ahead.
4 MR. LOUGHLIN: The witness can
5 specify, but I don't know whether you're
6 referring to either the Dormitory
7 Authority or the Department of Health.
8 MR. TZANETOPOULOS: You've made
9 your objection.
10 A. As per this document, it was March
11 6th, 2007, the exact amounts were sent to
12 them.
13 Q. Had the fact that funds been
14 transferred between entities been reported to
15 state agencies earlier than March 6th?
16 A. I'm not sure, I don't recall.
17 Q. All right.
18 Who was in charge on the hospital
19 side of interacting with the State concerning
20 this issue, the State Department of Health?
21 A. It was a team.
22 Q. Who was on that team?
23 A. Dominick Gio, myself, Ed Dowling,
24 David Hoffman.
25 Q. Did any of those people have

21 (Pages 78 to 81)

82

McDonald

1   principal day to day responsibility for the

2   interactions?

3      A.   The interactions weren't

4   day-to-day, they were week to week.  No set

5   time schedule, but as I can recall probably

6   once a week on average.

7      Q.   On your side was there someone who

8   was the principal liaison for communications

9   with the State Department of Health?

10      A.   It was again the phone calls, the

11   correspondence was usually everybody was cc'd,

12   so if you're looking for one person who headed

13   up the communications, probably me.

14      Q.   Let me show you what has been

15   marked as Deposition Exhibit 13.  It is an

16   e-mail string and attachment that has been

17   marked with Bates numbers BQHC07617 through

18   7623, and again so the record is clear, there

19   were a few attachments produced by the

20   defendants but to keep the mass manageable, we

21   attached here only the one.  Go ahead, take a

22   look, let me know when you are ready.  I take

23   it back, we have attached two of the three

24   attachments.

83

McDonald

1   Mr. Hsu's e-mails in the exhibit

2   have the subject line references to a Wyckoff

3   investigation report and relevant cash flows.

4   Is the attachment to the e-mail a

5   report that was prepared under your

6   supervision?

7      A.   I think I prepared it myself.

8      Q.   All right.

9      A.   If I remember correctly.

10      Q.   The attachment in Exhibit 13 is

11   your work?

12      A.   Yes.

13      Q.   What was the purpose of which you

14   prepared this report?

15      A.   To explain to the Dormitory

16   Authority and the Department of Health exactly

17   what the situation was leading up to the

18   present state of the situation at the business

19   office.

20      Q.   What were the sources of

21   information from which you drew when you

22   prepared this report?

23      A.   The information that was available

24   to me.

84

McDonald

1      Q.   Where did you get that?

2      A.   From documents in the business

3   office, the legal documents, documents at the

4   executive offices.

5      Q.   Did you interview --

6      A.   Past history.

7      Q.   Did you interview any people?

8      A.   Not that I recall.

9      Q.   Did others interview people and

10   report the results of those interviews to you?

11      A.   The financial information would

12   have been provided for me, that likely would

13   have come from either Rich Sarli or Wah-Chung

14   Hsu or a combination of the two.

15      Q.   Any other interviews that were

16   reported to you as a source for this report?

17      A.   No, just a narrative that was

18   created by myself, written by myself.

19      Q.   Having reviewed it as you just

20   did, is there anything in this report prepared

21   in Exhibit 13 that you think now would be

22   inaccurate?

23      A.   At this point in time, there has

24   been too much time so I can't remember the

85

McDonald

1   accuracy of the numbers.  I remember the

2   document, I can't recall whether something

3   after reading it now whether it is accurate or

4   inaccurate.

5      Q.   Is the report that you prepared in

6   Exhibit 13 an accurate reflection of what you

7   knew at the time that you prepared the report?

8      A.   Yes.

9      Q.   When is it that you prepared the

10   report in Exhibit 13?

11      A.   I don't remember the exact date,

12   but if it was attached to the e-mail that was

13   sent out on February 22nd, I'm speculating

14   that it was prepared prior to the 22nd of

15   February.

16      Q.   If I can direct your attention to

17   the first page of your report in Exhibit 13,

18   that's the one that has the identification

19   number BQHC07619, and I would like to direct

20   your attention to the passages following the

21   heading anticipated potential periods of cash

22   shortage.

23      Do you see where I am?

24      A.   Yes.

86

```
 1              McDonald
 2    Q.   You write that, "The first period
 3  was anticipated just prior to the closing as
 4  some of the expenses related to the
 5  installation of the Caritas Meditech computer
 6  system and the development of the BQHC central
 7  business office would need to be paid.
 8  Wyckoff had longstanding relationships with
 9  two international medical schools that had
10  expressed interest in investing in the Caritas
11  project.  These preclosing cash needs were
12  expected to be funded and were funded with
13  prepaid Caritas clerkship fees."
14          It goes on to say Caritas received
15  three and a half million from AUC and five
16  million from Ross.  Is that correct that
17  passage there that it was anticipated that, is
18  it correct that the expenses for the
19  installation of the Meditech computer system
20  and the development of the Brooklyn-Queens
21  Health Care central business office were
22  expected to be funded and were funded with
23  those prepaid clerkship fees?
24    A.   Yes.
25          And in addition to those funds
```

87

```
 1              McDonald
 2  there were Wyckoff funds that were allocated
 3  for the acquisition or the establishment of
 4  Brooklyn-Queens Health Care and Caritas, and
 5  then there were additional expenses in
 6  addition to the business office and computer
 7  expenses related to just closing the
 8  transaction.
 9    Q.   At some point did one or more
10  state agencies insist that Brooklyn-Queens
11  Health Care Caritas and Wyckoff engage a
12  restructuring consultant?
13    A.   Yes.
14    Q.   And what were the circumstances
15  that led up to the State insisting that the
16  hospitals do so?
17    A.   When Caritas and Wyckoff couldn't
18  afford or didn't have the cash to carry the
19  expenses of the organizations through this
20  ramp up of the receivables period.  So there
21  was a request made by Brooklyn-Queens Health
22  Care to the Department of Health for
23  assistance, and the Department of Health said
24  that we will provide assistance but only if
25  there is a restructuring officer in place.
```

88

```
 1              McDonald
 2    Q.   By assistance you mean the State
 3  provided money to the hospitals?
 4    A.   Yes.
 5    Q.   Were you part of the discussions
 6  with State agencies in which they insisted on
 7  a restructuring officer?
 8    A.   Yes.
 9    Q.   Which State agencies were involved
10  in those discussions?
11    A.   The Dormitory Authority and the
12  Department of Health, the Department of Health
13  took the lead.
14    Q.   Okay.
15          What authority over the hospitals'
16  operations did the State insist the
17  restructuring officer be given?
18    A.   That they be given control,
19  management control of the organization.
20    Q.   By organization, that's Brooklyn-
21  Queens Health Care, Caritas and Wyckoff?
22    A.   Yes.
23    Q.   Did Brooklyn-Queens Health Care,
24  Caritas and Wyckoff agree?
25    A.   Yes.
```

89

```
 1              McDonald
 2    Q.   Who was the restructuring
 3  consultant that was engaged in response to the
 4  states' demand?
 5    A.   FTI Cambio.
 6    Q.   What people did FTI Cambio supply
 7  in its role as restructuring consultant?
 8    A.   They had a team of management
 9  staff, management and staff.
10    Q.   Who was in charge of that team?
11    A.   Tom singleton.
12    Q.   Once in place was Mr. Singleton in
13  charge of the hospital organizations?
14    A.   Yes.
15    Q.   That would be each of Brooklyn-
16  Queens Health Care, Caritas and Wyckoff?
17    A.   Yes.
18    Q.   He brought with him somebody named
19  Paul Goldberg, did he not?
20    A.   Yes.
21    Q.   What was Mr. Goldberg's function
22  while he was at the hospital organizations?
23    A.   I'm not sure of his exact title,
24  but he acted as chief financial officer.
25    Q.   Once Mr. Singleton was in place at
```

23 (Pages 86 to 89)

90

McDonald

1 the hospital organizations, did all management
2 at Brooklyn-Queens Health Care, Wyckoff and
3 Caritas either report to Mr. Singleton or
4 through someone else to Mr. Singleton?
5     A.  Yes.
6     Q.  Let me shift gears on you.
7        At any time when you were on the
8 Wyckoff Board of Trustees, was a medical
9 school clerkship contract ever presented to
10 the board for approval or disapproval?
11     A.  I don't recall.
12     Q.  You testified earlier about a
13 request for assistance that triggered the
14 State's demand for a restructuring consultant.
15        How much did the State provide in
16 connection with that request for assistance?
17     A.  I wasn't involved with it at that
18 point in time and I can't recall exactly how
19 much was provided.
20     Q.  Would the ballpark be tens of
21 millions of dollars?
22     A.  Yes.
23     Q.  Did you perform any of the work in
24 connection with closing of the Caritas

91

McDonald

1 hospitals when they were making plans for
2 closure?
3     A.  The only involvement I had was to
4 find a hospital to accept two of their
5 patients that were having trouble. So Wyckoff
6 took two of their patients that were difficult
7 to place, and we provided ambulance service
8 for both hospitals during the last few days of
9 operation.
10     Q.  All right.
11        Did you perform any other work in
12 connection with planning for closing or
13 closing the hospitals?
14     A.  No.
15     MR. TZANETOPOULOS: Mark this
16 Exhibit 14, for identification.
17     (Plaintiff's Exhibit 14, minutes,
18 marked for identification, as of this
19 date.)
20     MR. TZANETOPOULOS: Let's go off
21 the record.
22     (Time noted: 1:35 p.m.)
23     (Time noted: 1:44 p.m.)
24     MR. TZANETOPOULOS: We are back on

92

McDonald

1 the record.
2     Q.  Mr. McDonald, the court reporter
3 has handed to you a document that he has
4 marked as Exhibit 14. Exhibit 14 is the
5 minutes from the Wyckoff Heights Medical
6 Center Board of Trustees meeting of
7 December 20th, 2007.
8        Let's start with the first page.
9 Among the invited guests is someone named
10 Claire with an E, Mullally, Esq.
11        Who was Ms. Mullally?
12     A.  She is the corporate compliance
13 officer at Wyckoff.
14     Q.  You can take a look at much of
15 this as you would like. Where I have a
16 question is at page four which continues a
17 report that begins on page three, the report
18 of chief restructuring officer, that's Mr.
19 Singleton.
20        Is that correct?
21     A.  Yes.
22     Q.  All right.
23        At page four the minutes reflect,
24 "Mr. Singleton reported that he along with Mr.

93

McDonald

1 Gio and Julius Romero had been negotiating
2 with Caribbean medical schools over the last
3 two months to generate additional cash for
4 Wyckoff and Caritas." He stated that, "We
5 have been successful in both cases. Wyckoff
6 received a wire transfer today from Ross
7 University in the amount of $4 million for
8 prepaid medical student clerkship rotations.
9 This should help relieve some of the cash flow
10 problems for Wyckoff. He mentioned that
11 Caritas received $3.7 million last week from
12 Ross University."
13        Let's go back a step before I ask
14 a question about that. At the beginning of
15 the minutes it reflects you were there; is
16 that correct?
17     A.  Correct.
18     Q.  Do you recall anybody at that
19 meeting objecting to Mr. Singleton entering
20 into these deals with Ross?
21     A.  No.
22     Q.  At any time when you were still at
23 Wyckoff did you have discussions with anybody
24 concerning the decision not to provide

24 (Pages 90 to 93)

94

McDonald

1
2 placement clerkships to Ross at Wyckoff when
3 the Caritas hospitals closed?
4     A.  I had concerns from the very
5 beginning that Wyckoff shouldn't be assuming
6 any of the debts of Caritas, and that there
7 should be protections in place to make sure
8 that none of those liabilities fell back to
9 Wyckoff; that was my position.
10    Q.  When the hospitals closed did you
11 talk, before we get there, when you stated
12 your position, to whom did you express that
13 position?
14    A.  I expressed it to the board, to
15 Dominick Gio, to the senior management team.
16    Q.  If we can refer back to Exhibit
17 10 which is the promissory note we looked
18 together at paragraph four, we know Mr. Gio
19 signed an agreement that said that, "Brooklyn-
20 Queens acknowledges and agrees it would
21 obligate Wyckoff as is reflected," right?
22    A.  Yes.
23    Q.  So Mr. Gio overrode your position
24 in that case?
25    A.  Correct.

95

McDonald

1
2     Q.  We know you signed an agreement
3 with Ross in Exhibit 1 that provides that,
4 "Absent in the event hospitals are not
5 operative and the university is not in
6 material breach of the agreement, BQHC agrees
7 to provide the university with an equivalent
8 number of clerkships as agreed to herein at
9 one or more of its other facilities."
10    MR. ZWERLING:  With the
11 understanding that the agreement speaks
12 for itself.
13    A.  I signed the document.
14    Q.  Mr. Gio I take it overrode you, if
15 your usual practice was followed in this case
16 too, correct?
17    A.  Well, it was my belief that
18 Wyckoff shouldn't be assuming liabilities for
19 Caritas, that was my belief.
20    DI
21    Q.  But if your usual habit in
22 connection with signing agreements was
23 following, Mr. Gio checked off on your signing
24 that contract.
25    Is that correct?

96

McDonald

1
2     MR. ZWERLING:  I object to the
3 question, I ask that you try to rephrase,
4 what exactly are you asking him?
5     MR. TZANETOPOULOS:  You don't even
6 have a place here to object so --
7     MR. ZWERLING:  Then don't answer
8 the question.
9     MR. LOUGHLIN:  I object, the
10 testimony he gave earlier was that it was
11 his usual practice to read a document
12 before signing it.  And he said that he
13 believed that he would not sign a
14 document if it hadn't been reviewed by
15 counsel and by Mr. Gio.
16    Q.  Does Mr. Loughlin have your view
17 correct?
18    A.  Yes.
19    MR. LOUGHLIN:  He said he had no
20 recollection of even signing this
21 document.
22    Q.  Let's go back to my original
23 question which started all of this fun.  Let
24 me start again.
25    At the time that the Caritas

97

McDonald

1
2 hospitals closed did you participate in any
3 discussions within the hospital organizations
4 concerning whether or not the placement of
5 clerkships to Ross University were to be
6 provided at Wyckoff?
7     A.  Not that I can remember.  And
8 very, I had very little involvement with the
9 closure of the Caritas hospitals.
10    Q.  In that early 2009 time frame when
11 Caritas hospitals closed, did you play any
12 part in the decision not to provide at Wyckoff
13 with placement clerkships for those that Ross
14 lost at the Caritas hospitals?
15    A.  I wasn't involved in the decision.
16    Q.  I'll tell you Mr. Garg, Rajiv Garg
17 said he was the person that made the decision,
18 he testified to that last week.
19    At any time before he did so did
20 he talk to you about any of the contract
21 negotiations concerning the original
22 affiliation agreement with Ross?
23    A.  No.
24    Q.  Did he talk to you at all about
25 the contract with Ross before he made his

98

McDonald

1  decision?
2      A.  No.
3      MR. TZANETOPOULOS:  Mark that
4  Exhibit 15, for identification.
5      (Plaintiff's Exhibit 15, minutes,
6  marked for identification, as of this
7  date.)
8      Q.  Page four is where I'm going to
9  ask, but take your time.
10      All set?
11      A.  Yes.
12      Q.  Mr. McDonald, the court reporter
13  has handed to you a document that he has
14  marked as Deposition Exhibit 15.  It is the
15  minutes to the January 10th, 2008 Wyckoff
16  Heights Board of Trustees meeting.  Again the
17  first page reflects that you were there.  If I
18  can direct your attention page four of the
19  exhibit, and in particular the passage
20  entitled chief restructuring officer.
21      The minutes recite that, "Ms.
22  Singleton reported as of January 1st, 2008
23  senior management employees from Wyckoff
24  Heights Medical Center were transferred to the

99

McDonald

1  Caritas payroll.  He stated it should be
2  understood that there is a commitment on the
3  part of Wyckoff to these employees and they'll
4  be hired back by Wyckoff in the event anything
5  should happen to Caritas.  Mr. Singleton
6  stated this particular move was made in order
7  to stem the growth and money owed by Caritas
8  to Wyckoff.  He went on to say there would be
9  an employer change for the employees working
10  with the central business office if anything
11  did happen to Caritas."
12      Were you one of the people who got
13  switched from Wyckoff to Caritas?
14      A.  Yes.
15      Q.  So this transfer discussed in the
16  minutes did take place?
17      A.  Yes.
18      Q.  What management employees were
19  transferred from Wyckoff's payroll to Caritas'
20  payroll?
21      A.  I don't remember exactly, there
22  was a list of senior executives, vice
23  presidents.
24      Q.  Approximately how many?

100

McDonald

1      A.  I don't recall.
2      Q.  If as the note suggests Caritas
3  had cash sufficient to make payroll for these
4  people, what was to be gained by switching
5  employees from the payroll of Wyckoff to
6  Caritas?
7      A.  From the inception of Caritas
8  before Caritas came into existence, Wyckoff
9  had assumed the business office from CMC, so
10  all of those employees were on the Wyckoff
11  payroll.  And there was a desire to keep them
12  on the Wyckoff payroll and not put them on the
13  appropriate hospitals because of union issues,
14  delegate issues.  So it was decided early on
15  that those employees would remain on the
16  Wyckoff payroll even though they were doing
17  work for Caritas, so over the years that
18  liability from Caritas to Wyckoff grew.
19      So instead of moving the business
20  office, rank and file staff onto the Caritas
21  payroll, Tom Singleton decided he would move
22  the Wyckoff senior staff over onto the Caritas
23  payroll to balance out the expenses.
24      Q.  Okay.

101

McDonald

1      Did Wyckoff's books and Caritas'
2  carry over the period you talked about, the
3  liability for those shared services?
4      A.  On the monthly basis there should
5  have been an accounting of whose on whose
6  payroll and doing work for which organization,
7  and at the end of each month it was supposed
8  to settle on who owed who.
9      Q.  The problem here was that Caritas
10  kept accruing liability but not paying
11  Wyckoff?
12      A.  Correct.
13      Q.  Which gets me back to my original
14  question that if Caritas had the cash to pay
15  the people who were transferred, what was to
16  be gained by transferring those people rather
17  than just simply having Caritas pay the cash
18  that it owed to Wyckoff, at least in those
19  sums?
20      A.  You would have to ask Tom
21  Singleton.
22      Q.  To your understanding was Wyckoff
23  a party to subordination agreements with
24  lenders to Caritas or Brooklyn-Queens Health

26 (Pages 98 to 101)

102

McDonald

1  Care which it would have breached had Wyckoff
2  received from Caritas payment of debts before
3  the lenders received theirs?
4      A.   Not that I'm aware of, not that I
5  can recall.
6      Q.   Was Mr. Singleton the sole
7  authority who made these decisions to transfer
8  these people?
9      A.   Yes.
10     MR. TZANETOPOULOS:  Mark this
11 Exhibit 16, for identification.
12     (Plaintiff's Exhibit 16, board
13 minutes, marked for identification, as of
14 this date.)
15     Q.   Ready?
16     A.   Yes.
17     Q.   All right.
18     Mr. McDonald, the court reporter
19 has handed you a document that he marked as
20 Exhibit 16.  It is a copy of the minutes for
21 the December 14th, 2006 Wyckoff Heights
22 Medical Center Board of Trustees.  We will see
23 page four there is some discussion of you
24 reporting to the board about the acquisition

103

McDonald

1  transaction.
2      That was a regular part of your
3  job at that time, I take it?
4      A.   Yes.
5      Q.   All right.
6      Where I have a question is on page
7  three of the minutes, the report of the
8  president to CEO.  There the minutes say, "Mr.
9  Gio presented the new logos for Caritas and
10 Wyckoff Heights Medical Center.  He explained
11 that due to the acquisition of St. John's and
12 Mary Immaculate Hospitals, new companies had
13 to be formed, one of them being Brooklyn-
14 Queens Health Care which is the parent company
15 of Caritas and Wyckoff."
16     He went on to say that, "Caritas
17 was formed to be the license holder of St.
18 John's and Mary Immaculate Hospitals.  Mr. Gio
19 circulated the logos and asked for approval
20 from the board for the new logos."  And the
21 minutes reflect, "An action/recommendation on
22 a motion properly made by Mr. Cook seconded by
23 Dr. Rao all in favor of the logos for Caritas
24 and Wyckoff Heights Medical Center were

104

McDonald

1  unanimously approved by the Board of
2  Trustees."
3      Do you see where I am?
4      A.   Yes.
5      Q.   Is this correct sir, somebody
6  formed a foreign corporation and the only
7  thing that was approved was new logos?
8      A.   No, the corporations were
9  approved.
10     Q.   Who decided to form new
11 corporations for this transaction?
12     A.   Ultimately it is the board who
13 approves.
14     Q.   Were the corporations formed
15 before December 14th, 2006?
16     A.   I don't recall the exact date.
17     MR. TZANETOPOULOS:  Mark this
18 Exhibit 17, for identification.
19     (Plaintiff's Exhibit 17, employment
20 agreement, marked for identification, as
21 of this date.)
22     MR. TZANETOPOULOS:  Mark this
23 Exhibit 18, for identification.
24     (Plaintiff's Exhibit 18, amendment

105

McDonald

1  to agreement, marked for identification,
2  as of this date.)
3      Q.   Mr. McDonald, the court reporter
4  has marked as Exhibit 17 what looks to be an
5  employment contract for you, and as Exhibit 18
6  what looks to be an addendum to that contract.
7      Is Exhibits 17 in fact your
8  employment agreement with the hospital group?
9      A.   It was my contract, yes.
10     Q.   Is that your signature on the last
11 page?
12     A.   Yes.
13     Q.   Around the signature block I
14 should say?
15     A.   Yes.
16     MR. TZANETOPOULOS:  Let me fix the
17 exhibit, I'll make the record clear.
18 There has been some trouble stapling
19 exhibits so let me make the record clear.
20 Exhibit 17 is entitled employment
21 agreement, it is a four-page document
22 bears Bates numbers BQHC03941 through
23 03944.  And Exhibit 18 is a two-page
24 addendum with Bates numbers BQHC03945 and

27 (Pages 102 to 105)

106

McDonald

946.

Q.  Let's go back to 17, the last page is your signature?

A.  Yes.

Q.  Is that Mr. Gio on behalf of each of the three hospital entities?

A.  Yes.

Q.  Exhibit 18, is that your signature on the last page?

A.  Yes.

Q.  And Mr. Garg on behalf of Wyckoff?

A.  Yes.

Q.  Exhibit 17 reflects that the system which is defined as Brooklyn-Queens Health Care is your employer.

Do you know why that was done?

A.  Say that again.

Q.  Sure.  I tried to do some steps to save a little time, let me break them up.

Exhibit 17 says, "The agreement is made by and between Brooklyn-Queens Health Care, Inc which contract defines as the system, Wyckoff, Caritas" and you, Mr. McDonald.  Paragraph one, employment says,

107

McDonald

"The system shall employ employees, executives, vice presidents," it goes on.

Do you know why this contract was arranged so that the system or Brooklyn-Queens Health Care would be your employer?

A.  I was doing work for all three business entities.

Q.  The addendum in Exhibit 18 is dated May 22nd, 2008, in that case only Wyckoff is your employer.

Do you know why that changed?

A.  I moved back to Wyckoff in 2007 and I had no responsibilities once Tom Singleton came in, all of my responsibilities were related solely to Wyckoff.

Q.  Is there any discussion that you recall or any work that you performed concerning the contract between Brooklyn-Queens Health Care and Ross you haven't testified yet about today?

A.  Not that I can recall.

MR. TZANETOPOULOS:  Those are all the questions I have for Mr. McDonald at this time.

108

McDonald

MR. LOUGHLIN:  I just have one or two follow up questions just as a matter of clarification.

EXAMINATION BY
MR. LOUGHLIN:

Q.  Directing your attention to Exhibit 12 on your deposition, I'll hand you my copy so you don't have to fish for it.

Is it your testimony that the amounts listed on this exhibit are at least as of the date of that exhibit an accounting of the unauthorized transfers done by Mr. McNeil?

A.  Yes, it is an accounting, it is my an accounting that was done by Wah-Chung Hsu to identify the transactions that went back and forth between the business entities that were inappropriate transfers of funds.

Q.  And when those inappropriate transfers came to light, what happened to Mr. McNeil?

A.  He was terminated.

Q.  By whom?

A.  By myself, I terminated him.

Q.  Acting under the authority of the

109

McDonald

Board of Trustees and Wyckoff?

A.  Acting under --

MR. TZANETOPOULOS:  Objection, legal conclusion.

A.  Acting under the approval of the president and CEO.

Q.  Mr. Gio?

A.  Yes.

Q.  You testified earlier that it was your position from the beginning of the acquisition of the Caritas hospitals that liabilities or obligations of Caritas should not flow to Wyckoff.

Is that correct?

A.  Correct.

Q.  Were there other members of senior management at Wyckoff and members of the Board of Trustees who also shared that position?

A.  Yes.

Q.  Would you say that was essentially the position of Wyckoff?

MR. TZANETOPOULOS:  Objection, conclusion, foundation.

Q.  You can answer.

28 (Pages 106 to 109)

110

```
1                McDonald
2       A.  Yes.
3           MR. LOUGHLIN:  I have nothing
4       further.
5       CONTINUED EXAMINATION BY
6       MR. TZANETOPOULOS:
7       Q.  Notwithstanding that testimony, we
8       can agree Mr. Gio signed at least one contract
9       that you know of that violated that.
10          Is that correct?
11      A.  Yes.
12          MR. LOUGHLIN:  Objection, calls for
13      legal conclusion.
14      Q.  You signed a contract that said --
15          MR. ZWERLING:  Exhibit 1.
16      Q.  -- "In the event hospitals are not
17      operative and the university is not in
18      material breach of the agreement, BQHC agrees
19      to provide the university with an equivalent
20      number of clerkships as agreed to herein in
21      one or more of its other facilities."
22          Is that correct, you signed one
23      that said that?
24          MR. LOUGHLIN:  Objection.
25      A.  I signed that.
```

112

```
1                McDonald
2       reporter to have transcribed it
3       accurately and waive signature.  That's
4       entirely the decision of you and your
5       counsel.
6           MR. ZWERLING:  We will take a look
7       at it.
8           MR. TZANETOPOULOS:  Signature
9       reserved, thank you.
10          Off the record.
11          (Whereupon, an off-the-record
12      discussion was held.)
13          (Time noted: 2:19 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

111

```
1                McDonald
2       Q.  At any time have you ever heard
3       anybody at Brooklyn-Queens Health Care or
4       Caritas or Wyckoff suggest that any of the
5       hospital entities return Ross' funds because
6       these contracts violated any position of the
7       hospital entities?  Let me qualify that.
8           Have you ever heard anybody from
9       any of the hospital entities suggest that the
10      funds should be returned to Ross?
11      A.  Not that I can recall.
12      Q.  We can agree Ross' funds were
13      spent.
14          Is that correct?
15      A.  Correct.
16          MR. LOUGHLIN:  I object, this has
17      been asked and answered, it really is
18      just rhetorical, argumentative questions.
19          MR. TZANETOPOULOS:  That's all I
20      have, we are done, signature.
21          Mr. McDonald, your call, you have a
22      right if you wish to have the transcript,
23      to review the transcript when it is
24      written up, make corrections and sign it,
25      and/or you can rely upon the court
```

113

```
1                McDonald
2            C E R T I F I C A T E.
3
4       UNITED STATES DISTRICT COURT:
5       EASTERN DISTRICT OF NEW YORK:
6
7       Before me, this day, personally appeared
8       HAROLD McDONALD, who, being duly sworn, states
9       that the foregoing transcript of his
10      Deposition, taken in the matter, on the date,
11      and at the time and place set out on the title
12      page hereof, constitutes a true and accurate
13      transcript of said deposition.
14
15
16          HAROLD McDONALD
17
18      SUBSCRIBED and SWORN to before me this
19      _____ day of _____, 2011, in the
20      jurisdiction aforesaid.
21
22
23
24
25      My Commission Expires    Notary Public
```

29  (Pages 110 to 113)

114

```
 1              McDonald
 2       C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4               : ss.
 5   COUNTY OF NEW YORK  )
 6
 7       I, Jeremy Frank, a Notary Public within
 8   and for the State of New York, do hereby
 9   certify:
10       That HAROLD McDONALD, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by the witness.
14       I further certify that I am not related
15   to any of the parties to this action by blood
16   or marriage, and that I am in no way
17   interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereby
19   set my hand on the 27th day of June, 2011.
20
21       _____
22       JEREMY FRANK, MPM
23
24
25
```

116

```
 1              McDonald
 2       Exhibits continued:
 3
 4   Plaintiff's 6      12/06 e-mail chain
 5            Between St. James and
 6            Romero         39
 7   Plaintiff's 7      E-mail chain and
 8            Affiliation agreement   44
 9   Plaintiff's 8      Amendment to affiliation
10            Agreement       50
11   Plaintiff's 9      Second amendment to
12            Affiliation agreement   50
13   Plaintiff's 10     Promissory note agreement
14            As of 12/1/06       51
15   Plaintiff's 11     7/30/07 memo Rucigay to
16            Senior cabinet      59
17   Plaintiff's 12     3/6/07 Hsu e-mail to
18            Group and attachment   71
19   Plaintiff's 13     2/22/07 e-mail chain and
20            Caritas organization
21            Period and start up   80
22   Plaintiff's 14     Wyckoff board minutes,
23            12/20/07        91
24
25       (Exhibits continued)
```

115

```
 1              McDonald
 2   ----------------- I N D E X ---------------
 3
 4   WITNESS       EXAMINATION BY       PAGE
 5   MR. McDONALD     MR. TZANETOPOULOS 5, 110
 6            MR. LOUGHLIN    108
 7
 8   ----------- INFORMATION REQUESTS ----------
 9
10   DIRECTIONS:      Page 95
11
12   ------------------ EXHIBITS ---------------
13
14   Plaintiff's 1     Affiliation agreement  19
15   Plaintiff's 2     8/21/06 letter Gio to
16            Dr. Perri      19
17   Plaintiff's 3     8/21/06 letter Gio to
18            Tien          19
19   Plaintiff's 4     11/13/06 e-mail Romero
20            To Dr. Perri and amendment
21            To contract      35
22   Plaintiff's 5     12/06 e-mail chain
23            Between Dr. Perri and
24            Romero         36
25       (Exhibits continued)
```

117

```
 1              McDonald
 2       Exhibits continued:
 3
 4   Plaintiff's 15     Wyckoff board minutes,
 5            1/10/08         98
 6   Plaintiff's 16     Wyckoff board minutes,
 7            12/14/06        102
 8   Plaintiff's 17     12/27/06 employment
 9            Agreement       104
10   Plaintiff's 18     Addendum to employment
11            Agreement       104
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**www.uslegalsupport.com**

118

```
1              McDonald
2      INSTRUCTIONS TO WITNESS
3
4        Please read your deposition over
5   carefully and make any necessary corrections.
6   You should state the reason in the appropriate
7   space on the errata sheet for any corrections
8   that are made.
9        After doing so, please sign the errata
10  sheet and date it.
11       You are signing same subject to the
12  changes you have noted on the errata sheet,
13  which will be attached to your deposition.
14       It is imperative that you return the
15  original errata sheet to the deposing attorney
16  within thirty (30) days of receipt of the
17  deposition transcript by you.  If you fail to
18  do so, the deposition transcript may be deemed
19  to be accurate and may be used in court.
20
21
22
23
24
25
```

119

```
1              McDonald
2        *** ERRATA SHEET ***
3
    NAME OF CASE: ROSS v. BROOKLYN-QUEENS
4   DATE OF DEPOSITION:  June 27th, 2011
    NAME OF WITNESS:  McDonald
5   PAGE  LINE     FROM      TO
6   ____|____|_____|_____|_____
7   ____|____|_____|_____|_____
8   ____|____|_____|_____|_____
9   ____|____|_____|_____|_____
10  ____|____|_____|_____|_____
11  ____|____|_____|_____|_____
12  ____|____|_____|_____|_____
13  ____|____|_____|_____|_____
14  ____|____|_____|_____|_____
15  ____|____|_____|_____|_____
16  ____|____|_____|_____|_____
17  ____|____|_____|_____|_____
18
19      _____
        HAROLD McDONALD
20  Subscribed and sworn to before me
    this ____ day of _____, 2011.
21
    _____     _____
22  JEREMY FRANK    My Commission Expires:
23
24
25
```

31  (Pages 118 to 119)

**www.uslegalsupport.com**

| A | | | |
|---|---|---|---|

**A**

**ability** 30:11 46:4 61:15
**able** 48:14 54:23 72:19
**Absent** 95:4
**Absolutely** 59:25
**absorb** 46:5
**academic** 20:17
**accept** 91:5
**acceptable** 22:4 45:20
**access** 75:21 76:7 77:11,12,16,17 78:8
**account** 73:7,8,10 73:20
**accounting** 25:8,9 64:18 69:3 72:13 78:14 101:6 108:12,14,15
**accounts** 65:16 67:12 78:4
**accruing** 101:11
**accuracy** 85:2
**accurate** 32:12 85:4,7 113:12 118:19
**accurately** 112:3
**acknowledges** 54:9 94:20
**acquiring** 25:16
**acquisition** 17:23 17:24 34:21,22 76:14 78:5 87:3 102:25 103:12 109:12
**acted** 89:24
**acting** 18:5 34:11 108:25 109:3,6
**action** 9:2,3 60:16 62:11 114:15
**action/recomme...** 103:22
**actual** 66:23
**Addabo** 57:18
**addendum** 105:7,25 107:9 117:10
**addition** 86:25 87:6
**additional** 26:9 67:23,23 76:18 87:5 93:4
**address** 5:25 37:18 39:22,24 45:6,8 45:10,12 57:21 61:20
**addressed** 62:9

**addressee** 21:10
**administration** 7:9 7:10
**administrative** 22:10 35:3,5
**administrator** 34:17
**advance** 70:19,21 70:22
**affairs** 20:17
**affiliate** 20:7
**affiliates** 56:19
**affiliation** 16:22 19:21 44:12 46:10 49:20 50:6 51:7,9 74:10 97:22 115:14 116:8,9,12
**afford** 87:18
**aforementioned** 66:11
**aforesaid** 113:20
**agencies** 8:7 81:15 87:10 88:6,9
**ago** 14:6
**agree** 41:13,24 88:24 110:8 111:12
**agreed** 4:2,7,11 47:16 95:8 110:20
**agreement** 15:3 16:15,20,22 17:14 19:21 20:8 28:2 36:12 41:3 44:12 46:11 49:20 51:7,9,18 54:16 74:2,3,10 94:19 95:2,6,11 97:22 104:21 105:2,9,22 106:21 110:18 115:14 116:8,10 116:12,13 117:9 117:11
**agreements** 50:6 74:17 95:22 101:24
**agrees** 94:20 95:6 110:18
**ahead** 81:3 82:22
**Airport** 56:23
**allegation** 15:10
**allocated** 87:2
**ambulance** 91:8
**ambulatory** 56:22 56:24 57:20
**amendment** 35:16 36:12 49:20,23

50:12,16 104:25 115:20 116:9,11
**amendments** 49:25
**American** 20:24 30:14 31:3
**amount** 21:23 24:17 51:12 70:9 71:3 74:6 93:8
**amounts** 81:11 108:11
**ANDREW** 3:20
**and/or** 111:25
**announce** 64:4
**announced** 63:22
**answer** 5:15,23 42:18 44:6 78:13 78:17 96:7 109:25
**answered** 43:20 44:4 111:17
**answers** 32:13
**anticipated** 25:15 85:22 86:3,17
**anybody** 32:15,23 36:17 39:4 52:11 68:11,19 70:4 93:19,24 111:3,8
**appear** 69:17
**appeared** 113:7
**appears** 21:9
**appropriate** 100:14 118:6
**appropriately** 8:25
**approval** 90:11 103:20 109:6
**approved** 47:21 58:15 104:2,8,10
**approves** 104:14
**approximately** 12:13 99:25
**argumentative** 111:18
**arms** 58:3
**arranged** 107:5
**arrangement** 17:15
**arrangements** 17:13
**arrival** 59:23 60:9
**asked** 16:12,14 46:24 103:20 111:17
**asking** 5:14 31:23 43:21 48:2,4,6,8 77:19 78:2 96:4
**aspect** 31:14
**aspects** 18:21
**assigned** 28:10
**assignments** 28:16
**assistance** 87:23 87:24 88:2 90:14

90:17
**assistants** 29:19
**assume** 54:15
**assumed** 100:10
**assuming** 41:14 76:19 94:5 95:18
**assure** 48:14
**attached** 82:22,24 85:13 118:13
**attachment** 45:2 80:4 82:17 83:5 83:11 116:18
**attachments** 71:20 71:23 82:20,25
**attended** 13:23
**attention** 46:9 54:6 55:3 74:11 85:17,21 98:19 108:7
**attorney** 14:6,12 52:14 79:23,24 118:15
**Attorneys** 3:5,11 3:17
**AUC** 30:9,14,18 31:11 51:23 52:7 52:14 55:17 70:22 71:6 74:2 74:3,5,17 75:8 78:21 86:15
**audit** 67:16 68:7
**August** 20:19,22
**authority** 49:15 68:16 80:24 81:7 83:17 88:11,15 102:8 108:25
**authorized** 65:8,10
**available** 41:15 42:12 67:9 70:12 75:15 83:24
**Avenue** 3:12
**average** 82:7
**aware** 30:22 33:2 42:23,24 43:8 69:13 78:19 102:5
**a.m** 2:4 44:18,19 48:20,21

| B | | | |
|---|---|---|---|

**B** 74:11
**bachelor's** 7:11
**back** 7:23 8:15 10:5 17:20 33:12 44:20 46:9,22 48:22 51:4,6 66:10,12 69:10 70:2 73:23 74:2 74:9 82:24 91:25

93:14 94:8,16
96:22 99:5
101:14 106:3
107:13 108:16
**backstop** 54:18
**Baker** 2:7 3:4
**balance** 100:24
**ballpark** 90:21
**bankruptcy** 58:8
**basis** 23:16 101:5
**Bates** 20:10,19
35:21 37:5 45:2
59:8 71:18 82:18
105:23,25
**bearing** 39:15 45:2
**bears** 37:5 59:8
105:23
**began** 76:19,21
**beginning** 10:5
12:13,20 93:15
94:5 109:11
**begins** 38:6 54:9
92:18
**behalf** 54:10 55:10
55:12 106:6,12
**belief** 15:21 95:17
95:19
**believe** 52:18
**believed** 69:13
96:13
**Benjamin** 60:24,25
79:4,5
**best** 13:24 52:25
**better** 25:12 53:8
**bill** 24:21 61:11
61:12,14,16
63:24 64:5
**billing** 61:9
**bills** 24:23 63:6
63:17,21 64:12
64:22,23 65:9
67:8 69:4 71:5
73:8,9
**bit** 34:5
**block** 105:14
**blood** 114:15
**board** 13:8,15,17
19:10,10 90:9,11
92:7 94:14 98:17
102:13,23,25
103:21 104:2,13
109:2,18 116:22
117:4,6
**books** 101:2
**borrowing** 70:18
**Boulevard** 56:25
**BQHC** 86:6 95:6
110:18
**BQHC03941** 105:23

**BQHC03945** 105:25
**BQHC06981** 71:18
**BQHC07617** 82:18
**BQHC07619** 85:20
**BQHC13452** 59:9
**BQHC24771** 35:21
**breach** 95:6 110:18
**breached** 102:2
**break** 50:21,21
106:20
**brief** 14:5
**bringing** 67:22
**Brooklyn** 12:23
49:13 88:20
89:15 94:19
103:14 107:19
**Brooklyn-Queens**
1:9 12:4,9 13:18
15:13,22 19:16
20:9 23:24 25:11
33:9 51:24 54:9
54:13 55:11
56:12,18 57:9,15
58:5 74:13 79:8
86:20 87:4,10,21
88:23 90:3
101:25 106:15,22
107:5 111:3
119:3
**brought** 34:21
67:17,18 89:18
**build** 23:4,23
24:20
**bulk** 68:24
**burning** 64:3
**business** 7:13,20
7:22 8:24 23:23
23:25 24:4,4
28:4 34:15 47:10
47:14,19 49:3
54:5 60:14 61:15
61:21,23,24 62:2
62:3,14,15,22,24
64:7 67:3,15,25
68:25 76:21
83:19 84:3 86:7
86:21 87:6 99:11
100:10,20 107:8
108:17

---
**C**
---
**c** 3:2 5:2 113:2,2
114:2,2
**cabinet** 59:12,16
116:16
**call** 33:24 34:20
38:12,14,17
111:21
**called** 5:2

**calls** 34:24 35:8
60:21 82:11
110:12
**Cambio** 10:14,15
67:17 89:5,6
**capacity** 6:7
**capital** 24:18
70:10,11,16
**care** 1:9 6:9 7:10
7:19,24 8:4,6
11:7,13 12:4,10
12:23,24 13:18
13:21 15:13,22
19:16 20:10
23:24 25:11
33:10 49:14
51:24,25 55:11
55:12 56:12,18
57:9,15 58:5
74:13 79:9 86:21
87:4,11,22 88:21
88:23 89:16 90:3
102:2 103:15
106:16,23 107:6
107:20 111:3
**carefully** 32:11
118:5
**Caribbean** 20:25
30:15 31:3 93:3
**Caritas** 11:6,12,18
11:24 12:12,23
13:20 15:3,11,24
16:16 19:13,16
23:6,12 24:19
25:3,11,17 35:2
41:2,11,19 42:8
48:13 49:14
51:24 54:13,23
55:11,20 56:2,6
56:15,16 57:24
58:3,8,17 61:9
61:16 63:4 64:11
64:15,17 65:18
65:19 70:9,12
71:4 72:22,23,24
73:5,7,10,20
74:21 75:5,15,18
75:21 76:3,8,12
77:4,11,17 78:3
78:6,8,22 86:5
86:10,13,14 87:4
87:11,17 88:21
88:24 89:16 90:4
90:25 93:5,12
94:3,6 95:19
96:25 97:9,11,14
99:2,6,8,12,14
99:20 100:3,7,8
100:9,18,19,21

100:23 101:2,10
101:15,18,25
102:3 103:10,16
103:17,24 106:24
109:12,13 111:4
116:20
**carry** 24:18 50:22
87:18 101:3
**case** 15:20 49:5
59:11,20 64:11
73:9,14 75:7
94:24 95:15
107:10 119:3
**cases** 93:6
**cash** 23:12,15
24:24 25:5,9,12
62:21 63:21 64:4
64:14,21 65:3
69:4,8,10,17,18
69:20 83:4 85:22
86:11 87:18 93:4
93:10 100:4
101:15,18
**catastrophe** 69:15
**Catholic** 24:5
36:15 62:3
**cc** 37:14 39:23
45:10
**cc'd** 82:12
**cease** 11:17
**Center** 1:9 6:6
8:10 12:23 13:4
13:9 18:7,24
20:16 36:10,15
40:24 51:25
55:13 56:20,21
62:3 72:25 78:4
92:7 98:25
102:23 103:11,25
**Centers** 24:6
**central** 23:23,25
24:8 60:14 61:23
86:6,21 99:11
**CEO** 9:22,23 19:15
103:9 109:7
**CEOs** 10:8
**certain** 24:17
30:11,12
**certainly** 60:5
**certification** 4:5
**certify** 114:9,14
**CFO** 7:24 62:14
80:18
**chain** 7:24 36:24
39:9 44:12 80:4
115:22 116:4,7
116:19
**chair** 19:10
**challenging** 62:7

chance 20:4 39:12
44:23 50:9
change 99:10
changed 9:20
107:12
changes 118:12
charge 62:15 67:2
68:4,9 81:18
89:10,13
check 47:7 73:19
checked 47:13,17
95:23
checks 66:24 68:17
73:16,18
Chicago 3:7
chief 8:14,16 9:13
9:15,17,19 11:10
11:12,17 12:7,9
12:21 19:4,12
20:14,23 36:6
72:7 89:24 92:19
98:21
circulated 103:20
circumstances 9:9
11:16 12:16
87:14
Claire 92:11
clarification
108:4
clear 22:13 69:7
71:19 82:19
105:18,20
clerks 56:6,10
58:6
clerkship 21:16,21
22:23 28:13 30:6
30:20 31:8 32:19
40:23 41:2 42:6
54:2 70:23 86:13
86:23 90:10 93:9
clerkships 25:25
30:12 41:11,17
41:19 42:8 56:14
57:16 94:2 95:8
97:5,13 110:20
clinic 24:23
clinics 22:9 58:15
58:19
close 76:22
closed 18:12 24:16
34:8 57:8,14
58:3 75:18 76:3
78:6 94:3,10
97:2,11
closes 11:3
closing 18:10
76:20 86:3 87:7
90:25 91:13,14
closings 58:8

closure 91:3 97:9
CMC 24:6 36:12,13
46:13 52:20
61:23 100:10
collateral 40:25
41:10,18 42:7
collected 23:15
collectively 54:14
college 7:16
column 72:24
combination 70:18
84:15
come 24:25 37:7
54:19 63:14
67:16 84:14
comes 63:18
coming 24:7,20
comment 33:11
commercial 31:17
33:4
commingled 63:5
64:2
commingling 63:9
80:10,13
Commission 113:25
119:22
commitment 99:3
communications
82:9,14
companies 103:13
company 103:15
compliance 92:13
computer 61:8 62:6
63:23 67:20,21
86:5,19 87:6
concerning 16:5
32:18 33:3 41:9
81:19 93:25 97:4
97:21 107:19
concerns 94:4
conclusion 109:5
109:24 110:13
condition 9:4
62:23
conducted 47:10
conducting 28:6
conference 33:24
34:20 40:7 60:21
conferences 40:11
connection 17:23
21:15 27:7 28:11
50:12,16 55:16
90:17,25 91:13
95:22
considerable 21:23
consolidated 62:2
constitutes 113:12
construction 7:23
consultant 87:12

89:3,7 90:15
consultants 11:19
67:19
consulting 10:13
contact 27:22
contained 21:17
29:9,24
contingency 40:22
continue 57:10
continued 110:5
115:25 116:2,25
117:2
continues 92:17
continuously 9:14
contract 30:23
31:2,24 33:11
34:6 45:19 46:25
47:6,11,18 49:10
49:16,24 50:2,17
54:2 55:17 74:12
75:2 90:10 95:24
97:20,25 105:6,7
105:10 106:23
107:4,19 110:8
110:14 115:21
contracts 23:3,22
25:24 28:5,21
30:6 31:6,8
32:20,24 33:4,9
33:16 40:11
70:23 111:6
control 11:20
88:18,19
conversation 14:23
16:5 38:23 39:3
COO 11:23 12:12
Cook 103:23
copy 35:24,25 36:3
37:11,12 39:19
39:20 45:6,14
102:21 108:9
core 40:23,25
41:18 42:6,8
corporate 92:13
corporation 104:7
corporations 104:9
104:12,15
correct 9:4 12:15
12:19 22:17
25:14,21,22 26:4
27:20 29:22
30:16,17,24,25
31:12 34:23 42:5
56:7 57:13 58:4
61:8 64:25 65:21
66:5 74:22 76:5
77:2,21 86:16,18
92:21 93:17,18
94:25 95:16,25

96:17 101:13
104:6 109:15,16
110:10,22 111:14
111:15
corrected 61:18,22
68:3
corrections 111:24
118:5,7
corrective 9:2
60:16 62:11
correctly 70:15
83:10
correspondence
82:12
cost 17:5
counsel 4:3 17:5,7
18:23 47:7,13,16
96:15 112:5
counsel's 32:12
COUNTY 114:5
couple 7:22 60:22
course 14:20 29:15
40:9 47:9,14,19
49:3
court 1:2 4:14
5:15 35:19 37:3
51:20 59:5 66:12
71:13 92:3 98:13
102:19 105:4
111:25 113:4
118:19
cover 20:12 46:12
64:14 73:16,21
covered 69:23
covering 69:16
create 61:11
created 84:19
criticized 49:9
curious 73:13
curriculum 22:3,4
cut 73:17,18
CV 1:7 7:16
cycle 24:25 68:22
70:10

| D |
|---|
D 5:2,2,2 115:2
date 7:5 19:22
35:17 36:25
39:10 44:13 50:7
51:19 52:25
53:13 59:4 65:5
71:12 75:24
76:10 80:5 85:12
91:20 98:8
102:15 104:17,22
105:3 108:12
113:10 118:10
119:4

dated 20:18,22
  37:10 39:18 59:8
  71:16 107:10
David 18:17,22
  27:10 28:8,16,20
  29:21 31:20 38:3
  81:24
day 33:20,21 34:12
  34:12 82:2,2
  113:7,19 114:19
  119:20
days 25:7 91:9
  118:16
day-to-day 24:18
  33:22 82:5
deal 18:3,12,14
  70:19 76:20
deals 41:10 93:21
dealt 60:23
Dear 38:6
debts 94:6 102:3
decade 7:6
December 33:19
  37:10 38:5 39:18
  41:7,16 53:12
  74:18,19,20 75:3
  75:4,10,19 78:3
  78:20 92:8
  102:22 104:16
decided 100:15,22
  104:11
decision 69:11
  93:25 97:12,15
  97:17 98:2 112:4
decisions 102:8
decrees 54:10
deemed 118:18
default 54:11
defendant 63:2
defendants 1:10
  3:11 15:20 59:11
  82:21
defined 54:11
  106:15
defines 106:23
definitely 76:22
degree 6:25 7:4,8
  7:11
delegate 100:15
Deloitte 67:16
demand 89:4 90:15
Department 79:6,19
  80:25 81:7,20
  82:10 83:17
  87:22,23 88:12
  88:12
departments 67:4
departure 9:10
  12:16 13:13

17:16
deposing 118:15
deposit 74:13
deposited 77:13
deposition 1:15
  2:6 4:5,12 5:8
  14:4,8 35:20
  37:4 44:23 71:14
  82:16 98:15
  108:8 113:10,13
  114:11,12 118:4
  118:13,17,18
  119:4
describe 24:15
  72:19,20
described 55:17
  57:11 66:14 67:6
  72:3,20
desire 100:12
detail 22:24
details 71:7
determine 60:14
  67:25 68:11,19
  70:4
determined 64:19
detox 56:25
devastating 64:6
develop 6:13 19:6
  21:19 24:4 27:10
developed 24:2
developing 22:2,3
development 6:9,14
  21:25 86:6,20
DI 95:20
dialogue 14:21
different 8:6 9:20
  9:24 53:23 58:22
  59:12 65:15,16
difficult 91:7
dinner 52:4,6
  53:22 54:5,19
direct 46:9 54:6
  55:2 74:11 78:25
  85:17,20 98:19
Directing 108:7
direction 77:10
DIRECTIONS 115:10
director 18:5
  34:11 48:13
disagreed 43:2,6
disapproval 90:11
discharged 24:22
discuss 24:9 40:4
  53:17
discussed 16:3,11
  33:3 45:19 54:2
  54:4 99:16
discussing 41:17
  42:2

discussion 41:8
  44:17 48:19
  50:25 53:23
  102:24 107:17
  112:12
discussions 30:5
  33:8 36:16 40:20
  45:17 46:2 52:4
  60:8,12 88:5,10
  93:24 97:3
dispute 15:9 43:25
  44:8
DISTRICT 1:2,3
  113:4,5
DJG9001@NYP.org
  45:11
DNH9901 38:2
document 35:19,21
  37:3 48:11 51:21
  59:6 71:14,16,22
  72:9 80:14 81:10
  85:3 92:4 95:13
  96:11,14,21
  98:14 102:20
  105:22
documents 14:10
  16:23 59:10 63:3
  71:21 84:3,4,4
doing 8:7 65:24
  100:17 101:7
  107:7 118:9
dollars 75:11
  76:18 90:22
Dominick 10:4
  18:18 20:14 27:9
  28:9,10,15 29:5
  29:20 31:21
  47:17,20 81:23
  94:15
door 61:15 69:4
Dormitory 80:24
  81:6 83:16 88:11
Dowling 79:7 81:23
Dowling's 79:10
Dr 10:10,12 28:23
  28:25 29:2,2
  38:6 45:5 48:12
  103:24 115:16,20
  115:23
drafts 33:11
drew 83:22
drill 5:12
Drive 3:6
drop 63:17,24 64:5
dropped 24:23
dropping 63:21
DSB10 79:13
due 72:14 103:12
duly 5:3 113:8

114:11
DVW 79:16

_____E_____

E 3:2,2 6:2 21:11
  92:11 113:2,2
  114:2,2 115:2
earlier 63:17 70:8
  81:15 90:13
  96:10 109:10
early 18:11 53:4
  57:8 65:6 69:13
  97:10 100:15
EASTERN 1:3 113:5
easy 21:3
Ed 81:23
edits 61:13
education 6:15,22
  22:7,8,15,19
  28:24 48:15
  54:24
educational 58:9
Edward 79:7
effect 4:13
effort 58:17
either 13:5 15:13
  16:5 17:4 29:17
  65:25 81:6 84:14
  90:4
Emil 18:17 59:7
emphasis 7:10
employ 107:2
employed 6:5 8:9
  34:6
employee 79:5,8
employees 67:4
  68:23 98:24 99:4
  99:10,19 100:6
  100:11,16 107:2
employer 99:10
  106:16 107:6,11
employment 104:20
  105:6,9,21
  106:25 117:8,10
encompassed 59:15
engage 67:5 87:11
engaged 89:3
English 24:15
entering 93:20
entire 9:23 13:14
entirely 112:4
entities 13:2
  59:13 62:24 63:2
  65:3 66:2 81:14
  106:7 107:8
  108:17 111:5,7,9
entitled 20:7
  51:22 98:21
  105:21

entity 36:8 64:21
  64:23 68:14
entity's 65:9,9
equal 40:22
equivalent 95:7
  110:19
errata 118:7,9,12
  118:15 119:2
Esq 3:8,14,20
  92:11
Esqs 2:7 3:4
essentially 109:21
establishment
  76:21 87:3
evening 54:21
event 95:4 99:5
  110:16
eventually 76:16
everybody 25:12
  33:24 82:12
exact 7:5 51:12
  53:20 65:5 71:2
  72:12 74:6 76:10
  81:11 85:12
  89:23 104:17
exactly 26:19
  52:10 64:19
  66:19 83:17
  90:19 96:4 99:22
EXAMINATION 5:5
  108:5 110:5
  115:4
examined 5:4
executive 18:5
  20:15,23 34:11
  34:15 59:17 84:5
executives 99:23
  107:3
exhibit 20:7,13,21
  21:4 29:24 32:5
  33:10 35:15,20
  35:23 36:22,23
  37:4,4,10 39:8
  39:12,14,23
  41:24 44:10,11
  44:23,25 46:10
  46:15,25 47:11
  48:25 49:10,16
  49:21 50:13,17
  51:9,16,17,21,22
  54:7,8 55:3,18
  58:25 59:2,7
  60:3 71:9,10,15
  71:15 72:19 74:2
  74:9,11,24 75:4
  78:2,24 79:2
  80:2,3,20,22,23
  82:16 83:2,11
  84:22 85:7,11,18

91:17,18 92:5,5
  94:16 95:3 98:5
  98:6,15,20
  102:12,13,21
  104:19,20,24,25
  105:5,6,18,21,24
  106:9,14,21
  107:9 108:8,11
  108:12 110:15
exhibits 19:20
  20:4 21:10,18
  22:22 26:8 27:15
  29:9 50:4,5,9
  105:8,20 115:12
  115:25 116:2,25
  117:2
existence 100:9
expected 86:12,22
expenditures 77:2
expense 66:4
expenses 76:13,19
  86:4,18 87:5,7
  87:19 100:24
expertise 67:23
Expires 113:25
  119:22
explain 14:24
  83:16
explained 103:11
express 94:12
expressed 27:14
  86:10 94:14
extent 52:5
e-mail 35:15,22,24
  36:23 37:4,9,18
  38:5 39:8,14,16
  39:22,23 41:14
  41:24 42:4,11,15
  42:16,22,25
  43:10,24 44:11
  44:25 45:4,6,8
  45:10,12,15
  71:10,16,19
  78:25 80:3 82:17
  83:5 85:13
  115:19,22 116:4
  116:7,17,19
e-mails 83:2

_____
              F
_____
F 113:2 114:2
facilities 23:17
  56:13 57:11 58:5
  58:18 95:9
  110:21
facility 56:23
  57:4,15
fact 38:17 43:12
  58:10 64:12

68:12 74:5 81:13
  105:8
faculty 22:2 23:17
  30:12
fail 118:17
fairly 58:20
fall 10:20 18:11
  18:11 34:7 53:3
  76:22
familiar 26:20
  55:7 67:19
family 57:19,20
  58:21
fashion 65:4
favor 103:24
fax 20:12 46:12
February 85:14,16
fees 86:13,23
fell 94:8
fellow 60:24
figure 69:2
file 100:21
filing 4:4
final 47:5
financial 8:15 9:4
  17:13,14 19:12
  36:7 62:23 72:7
  84:12 89:24
financially 8:25
find 64:8 91:5
finding 22:3
finish 43:3,5
finished 22:20
firm 10:13
first 21:3 45:4
  47:12 49:19
  50:12 59:9 65:6
  73:7 78:25 85:18
  86:2 92:9 98:18
fish 108:9
Fitzpatrick 57:4
five 50:22 54:12
  63:19 86:15
fix 60:15 67:24
  69:2 105:17
fixed 64:10
fixes 60:17 61:5,7
  67:20
flow 62:21 63:21
  69:8,20 93:10
  109:14
flowing 25:10
flows 83:4
focus 18:13 33:7
  33:22 54:21
focused 68:21
focusing 46:4
follow 108:3
followed 38:15

95:15
following 17:15
  27:12 85:21
  95:23
follows 5:4
force 4:13
foregoing 113:9
foreign 104:7
forensic 67:16
forget 57:20,21
form 4:8 41:20
  42:17 104:11
format 71:21
formed 103:14,18
  104:7,15
forth 33:12 46:22
  69:10 73:23
  108:17 114:11
forward 7:17
for-profit 7:18,25
found 64:20
foundation 109:24
four 54:7 63:19
  75:5,10 92:17,24
  94:18 98:9,19
  102:24
fourth 53:10
four-page 105:22
frame 27:4 41:7
  53:2 77:20 97:10
Frank 1:23 2:9
  114:7,12 119:22
Freiberg 28:23,25
  29:2
Friday 37:10
FTI 10:14,15 11:19
  11:21 12:17
  59:24 67:17 89:5
  89:6
FTI's 60:8
fulfill 15:12
fulfilling 15:14
full 5:24
fun 96:23
function 89:21
functioning 8:24
fund 23:13 25:25
funded 86:12,12,22
  86:22
funds 23:22 25:6
  25:23 62:20 63:2
  63:4,5 64:2,11
  64:13,15,16,22
  65:9,19,20 66:8
  66:18,18 67:6,9
  68:13 69:23 71:5
  72:22 73:4,7
  75:8,14,22 76:8
  77:2,6,7,11,12

77:13 78:8,20,20
80:11,13 81:13
86:25 87:2
108:18 111:5,10
111:12
**further** 4:7,11
110:4 114:14

_____

**G**

**gained** 100:5
101:17
**GARFUNKEL** 3:16
**Garg** 11:2 97:16,16
106:12
**GATES** 3:10
**gation** 63:12 68:5
**gears** 90:7
**general** 6:10 16:2
18:23 22:25 46:2
**generally** 15:8
31:24 77:20
**generate** 93:4
**generating** 63:21
**gentleman** 14:14,16
**GEORGE** 3:8
**getting** 65:25 67:8
69:4
**Gio** 10:4,7 18:18
19:14 20:14,22
21:11 27:9,18
28:9,10,15 29:4
29:6,20 32:22
35:7 47:17 79:3
81:23 93:2 94:15
94:18,23 95:14
95:23 96:15
103:10,19 106:6
109:8 110:8
115:15,17
**Gio's** 21:17 22:22
26:7 27:15,22
45:12 55:4
**give** 7:6 52:25
**given** 5:7 29:13
72:15 88:17,18
114:13
**go** 5:13 44:14
46:18 48:16,22
50:23 51:4,6
60:13 61:15 70:2
74:9 81:3 82:22
91:21 93:14
96:22 106:3
**goes** 38:7 40:4
86:14 107:3
**going** 23:11 25:4
35:24 36:3 37:11
39:19 45:6 52:24
53:19 62:5 64:15

64:17 74:18 75:5
98:9
**Goldberg** 89:19
**Goldberg's** 89:21
**gotten** 42:15
**graduate** 22:8,18
**grant** 58:14
**grasp** 53:8
**Great** 3:18,19
**grew** 100:19
**group** 50:20 105:9
116:18
**growing** 61:21
**growth** 99:8
**guaranteed** 40:25
**guess** 32:23 58:2
**guests** 92:10
**guidelines** 32:23
33:2

_____

**H**

**H** 5:2
**habit** 95:21
**Hal** 62:15 65:12
68:15 69:6,11
**half** 75:5,11 86:15
**HAM9001@NYP.org**
45:7
**hand** 108:8 114:19
**handed** 51:21 59:6
71:14 92:4 98:14
102:20
**hands** 64:7
**happen** 99:6,12
**happened** 47:24
108:20
**happening** 64:8
67:15,24
**happy** 5:18
**Harold** 1:15 2:6
6:2 7:16 21:11
113:8,16 114:10
119:19
**headed** 72:24 80:14
82:13
**heading** 85:22
**health** 1:9 7:10,19
7:24 8:4 11:7,12
12:4,10,23,24
13:18,20 15:13
15:22 19:16 20:9
23:24 25:11
33:10 49:14
51:24,24 55:11
55:12 56:12,18
57:9,15 58:5
74:13 79:6,9,19
81:2,7,20 82:10
83:17 86:21 87:4

87:11,21,22,23
88:12,12,21,23
89:16 90:3
101:25 103:15
106:16,22 107:6
107:20 111:3
**hear** 5:17
**heard** 111:2,8
**Heights** 1:9 8:10
12:22 13:4,9
18:23 20:15
36:10 40:24
51:25 55:13
72:25 78:4 92:6
98:17,25 102:22
103:11,25
**held** 2:6 12:3
44:17 48:19
50:25 112:12
**help** 69:24,24
93:10
**helpful** 34:5
**hereinbefore**
114:11
**hereof** 113:12
**hereto** 4:4
**highest** 6:21
**hired** 99:5
**history** 84:7
**Hoffman** 18:17,20
18:22 27:10,18
28:8,16 29:21
31:20 38:3,3
79:12 81:24
**Hoffman's** 18:19
**hold** 8:12 11:6
**holder** 103:18
**home** 5:25 6:13
7:21 8:3,6
**homes** 7:25
**hope** 21:4
**hospital** 7:20 8:18
8:21 9:5,23
17:15 22:6 23:14
25:25 29:14
33:13 45:20
46:20 57:7 59:13
61:13 81:18
89:13,22 90:2
91:5 97:3 105:9
106:7 111:5,7,9
**hospitals** 8:7
17:25 24:19
25:17 33:21
34:12,16,18 46:5
56:6 57:8 59:24
60:9 87:16 88:3
88:15 91:2,9,14
94:3,10 95:4

97:2,9,11,14
100:14 103:13,19
109:12 110:16
**hospital's** 47:6,12
47:15
**Hostetler** 2:7 3:4
**hour** 17:3 50:21
**Hsu** 36:4,5,6 71:17
72:2,15 84:15
108:15 116:17
**Hsu's** 83:2
**hypothetical** 42:16

_____

**I**

**identical** 21:9
**identifica** 51:18
**identification**
19:19,22 35:14
35:16 36:22,24
39:7,9 44:10,13
50:4,7 51:16
58:25 59:3 71:9
71:11 80:2,5
85:19 91:17,19
98:5,7 102:12,14
104:19,21,24
105:2
**identified** 66:5
**identify** 108:16
**IL** 3:7
**Immaculate** 17:24
18:6 25:17 33:20
34:7 46:23 57:2
57:3,5,8,14
103:13,19
**imperative** 118:14
**implemented** 60:15
**implementing** 9:3
**improper** 67:6
**improprieties**
66:17,22
**improve** 23:17
**inability** 61:11,12
61:13
**inaccurate** 69:9,21
84:23 85:5
**inappropriate**
108:18,19
**inappropriately**
66:20 70:6
**inception** 13:12
100:8
**include** 59:21
**indicated** 63:4
**indicates** 38:12
**individual** 60:23
62:24
**individually** 54:14
**inform** 14:25

**information** 41:15
  41:25 42:12
  83:22,24 84:12
  115:8
**infrastructure**
  23:4,18
**initial** 8:14 25:16
  52:3 70:12
**initially** 23:11
  67:17
**inpatient** 24:21
**insist** 87:10 88:16
**insisted** 88:6
**insisting** 87:15
**installation** 86:5
  86:19
**instances** 65:17,19
**institution** 66:6,7
  66:8
**INSTRUCTIONS** 118:2
**integrated** 22:7
**integration** 62:4,5
**interacting** 81:19
**interactions** 82:3
  82:4
**interest** 27:14
  56:13 57:10
  86:10
**interested** 30:5
  114:17
**interject** 31:22
**internal** 68:6,8,9
**internally** 41:8
**international** 86:9
**interview** 84:6,8
  84:10
**interviews** 84:11
  84:16
**investi** 63:11 68:4
**investigate** 67:13
**investigated** 72:3
**investigation** 63:8
  68:6,8,10,19,21
  69:6 70:3 74:17
  83:4
**investing** 86:10
**invited** 92:10
**inviting** 43:17
**invoice** 66:4
**involved** 21:22
  22:11 31:25 32:7
  52:3 57:24 58:7
  58:16 60:7 63:7
  63:11 66:22 85:7
  88:9 90:18 97:15
**involvement** 52:5
  60:11 91:4 97:8
**Island** 7:2,12
**issue** 81:20

**issues** 27:24 30:13
  34:22 48:12 72:3
  100:14,15
**Item** 38:12
**items** 38:8

**J**

**J** 3:8
**James** 38:14,15,18
  38:24 39:18 40:2
  116:5
**January** 11:14 18:4
  18:11 24:17
  75:22 76:4,8,20
  76:24 77:10 78:8
  98:16,23
**Jeremy** 1:23 2:9
  114:7,22 119:22
**Jewish** 6:6
**Jim** 60:22 61:2
**job** 1:24 9:11
  26:23 27:6 29:15
  79:10 103:4
**John** 38:17,24
  39:17
**John's** 17:24 18:5
  25:17 33:20 34:8
  46:20,23 56:23
  57:7,14 58:19
  63:16 103:12,19
**Julius** 26:21 28:9
  28:16,20 29:21
  31:20 32:8 35:22
  39:17 55:24 93:2
**July** 59:8
**June** 1:17 2:3
  114:19 119:4
**jurisdiction**
  113:20
**jury** 34:5

**K**

**keep** 82:21 100:12
**keeping** 36:18
**Ken** 28:23
**Kennedy** 56:20,21
  56:23
**kept** 101:11
**kind** 17:14 33:15
**Kingsbrook** 6:6
**Klein** 60:22
**knew** 56:16 58:11
  68:12,15,19 70:5
  85:8
**know** 5:14,18 9:21
  13:22 28:18
  29:13 31:10 32:9
  32:10 52:24,24
  53:19 54:3 56:5

  56:17 58:13
  70:25 72:11,11
  73:22 75:12
  78:15,16 79:3,12
  79:12,13 81:5
  82:23 94:18 95:2
  106:17 107:4,12
  110:9
**knowing** 47:12
**knowledge** 18:25
  57:12 58:18
**K&L** 3:10

**L**

**L** 3:20 5:2,2
**labeled** 71:18
**large** 56:24 58:20
  67:3 71:21
**late** 25:15 53:4
**Lattingtown** 6:3
**lawsuit** 15:6
**laying** 76:16
**laymen's** 8:22
  24:11,12
**lead** 63:25 88:13
**leadership** 62:13
**leading** 33:8 80:17
  83:18
**learning** 63:25
**leave** 50:19 53:10
**lectures** 22:9
**led** 11:17 60:8
  87:15
**left** 9:16 49:8,12
**legal** 18:21 47:7
  47:13,15 84:4
  109:5 110:13
**lenders** 101:25
  102:4
**length** 12:12
**letter** 20:13,21
  27:22 29:16
  115:15,17
**letters** 19:21 21:9
  21:17 22:22 26:8
  27:15 29:8
**let's** 17:20 18:13
  19:17 24:9 34:4
  44:14 46:11
  48:16,22 50:23
  51:4,6 64:7 70:2
  91:21 92:9 93:14
  96:22 106:3
**level** 6:21
**Lexington** 3:12
**liabilities** 15:24
  64:16,17 77:3
  94:8 95:18
  109:13

**liability** 100:19
  101:4,11
**liaison** 82:9
**license** 103:18
**light** 63:14,15
  108:20
**limited** 70:9 77:8
**line** 36:11 45:11
  83:3 119:5
**lines** 37:14
**list** 99:23
**listed** 108:11
**Listen** 32:11
**lists** 42:13
**little** 21:15 34:4
  97:8 106:20
**live** 68:23
**LLP** 3:10
**located** 46:19
  61:25
**location** 24:8
**lockers** 22:10
**logos** 103:10,20,21
  103:24 104:8
**long** 6:16 7:2,12
  9:6 16:25 76:22
**longstanding** 86:8
**long-term** 6:9
**look** 16:22 19:23
  21:8 37:6 62:16
  63:3 67:14,17
  82:23 92:15
  112:6
**looked** 16:21 64:20
  94:17
**looking** 82:13
**looks** 105:5,7
**loop** 36:18
**Lora** 79:18
**lost** 97:14
**lot** 7:14
**loud** 5:23
**Loughlin** 3:14
  14:17 15:4,16,19
  16:10 17:2 42:14
  43:3,15,17 44:3
  46:14 48:16
  80:12,21 81:4
  96:9,16,19 108:2
  108:6 110:3,12
  110:24 111:16
  115:6
**lump** 73:15
**lunch** 50:21
**L-E-F-E-B-V-R-E**
  79:18

**M**

**M** 5:2

maintain 58:14
maintaining 58:17
making 22:4 91:2
manage 6:12,14
  19:9 22:11 48:14
  54:23
manageable 71:22
  82:21
managed 18:20
management 7:13
  9:3 11:20,25
  13:15 55:19
  62:18 88:19 89:8
  89:9 90:2 94:15
  98:24 99:19
  109:18
managing 33:20,22
  34:12
Mandava 48:12
March 71:16 81:10
  81:15
mark 19:17 35:12
  36:21 39:6 44:9
  50:3 51:15 58:24
  71:8 79:25 91:16
  98:4 102:11
  104:18,23
marked 19:21 20:10
  20:25 21:5 33:10
  35:16,19 36:24
  37:3 39:9 44:12
  50:6 51:18,21
  59:3,6 71:11,14
  80:4 82:16,18
  91:19 92:5 98:7
  98:15 102:14,20
  104:21 105:2,5
marriage 114:16
Mary 17:24 18:6
  25:17 33:20 34:7
  46:23 57:2,2,5,7
  57:13 103:13,19
Masters 6:23
master's 6:25 7:3
material 95:6
  110:18
matter 108:3
  113:10 114:17
Mattoo 10:10,12
  29:3,5
McDONALD 1:15 2:6
  5:1,7 6:1,2 7:1
  7:16 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1,3 21:1
  21:11 22:1 23:1
  24:1 25:1 26:1

27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
35:18,23 36:1
37:1,2,9 38:1,13
38:14 39:1,11
40:1 41:1,23
42:1 43:1 44:1
44:22 45:1 46:1
47:1 48:1 49:1
50:1,8 51:1,20
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1,5 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1,13
72:1 73:1,25
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1,3 93:1 94:1
95:1 96:1 97:1
98:1,13 99:1
100:1 101:1
102:1,19 103:1
104:1 105:1,4
106:1,25 107:1
107:24 108:1
109:1 110:1
111:1,21 112:1
113:1,8,16 114:1
114:10 115:1,5
116:1 117:1
118:1 119:1,4,19
McNeil 62:15 65:12
65:17,24 66:24
67:2,7 68:12,16
69:6,11 70:5
75:7,16 78:21
108:13,21
mean 8:23 15:8
88:2
mechanically 65:13
medical 1:9 6:6,15
8:10 12:22 13:4
13:9 18:7,23
20:16 21:16,20
22:5,6,8,14,16
22:18,20 23:5,18
24:6 25:25 26:6
26:15 27:7,13,13
28:7,12 29:23
30:19 31:7,18
32:19 36:10,15

40:10,13,24
48:13 51:25
55:13 56:5,9,14
56:20,21 57:16
58:6 62:3 72:25
78:4 86:9 90:9
92:6 93:3,9
98:25 102:23
103:11,25
Medicine 1:5 20:9
20:18
Meditech 67:20
86:5,19
meet 16:25 32:15
meeting 14:5,12,20
38:7,10 40:3,7
52:4,6,22 53:16
53:22 92:7 93:20
98:17
meetings 33:16
60:22
member 8:3 13:15
19:10
members 109:17,18
memo 59:2,7 60:2,4
60:6 116:15
ment 64:5
mentioned 63:17
93:11
mid 11:14
middle 37:8
Midway 40:19
mid-2007 10:20
11:24 12:14,21
MIH 54:13
million 70:14 71:2
74:4,14,18,20
75:4,5,8,9,10,11
86:15,16 93:8,12
millions 76:17
90:22
mind 52:17
minute 19:23
minutes 50:22
91:18 92:6,24
93:16 98:6,16,22
99:17 102:14,21
103:8,9,22
116:22 117:4,6
mix 7:18
Monday 1:17
money 23:2,8,13,16
24:3,14 26:3
51:8 65:14 70:5
71:5 73:16,20
74:5 76:15,23
78:3 88:3 99:8
Monsignor 57:4
month 9:23 24:24

101:8
monthly 101:5
months 33:18,19
70:13 93:4
morning 38:7
motion 103:23
move 65:14 99:7
100:22
moved 7:21,25 8:16
11:21 12:17
61:25 64:13 65:3
69:23 70:5 73:20
78:3,22 107:13
movement 62:19,25
moving 69:10,17
73:15 100:20
MPM 1:23 114:22
Mullally 92:11,12
MVG 79:20
M-A-T-T-O-O 10:11

_____

## N

N 3:2 5:2 115:2
name 5:24 27:21
57:21 119:3,4
named 26:21 60:24
89:18 92:10
Nancy 20:16 35:22
narrative 84:18
native 71:20
necessarily 40:15
necessary 23:5
118:5
Neck 3:18,19
need 7:14 23:12
64:9 86:7
needed 60:15 61:18
61:22 64:14 68:3
68:23 69:24
needs 86:11
negotiating 31:17
40:12 49:19 93:2
negotiations 28:4
28:7 31:15 32:24
33:3 40:10 97:21
Neil 60:25,25 79:3
79:5
network 6:8
never 13:22
new 1:3,16,16 2:8
2:8,10 3:13 6:3
8:3,5 24:19 25:2
25:3,9 37:22,24
62:6 63:20 76:12
80:25 103:10,13
103:21 104:8,11
113:5 114:3,5,8
night 53:24
Nirmal 10:10 29:3

noncompete 17:18
Nonparty 3:17
normal 47:14,19
  49:3
normally 31:25
North 3:6
Notary 2:10 4:13
  5:3 113:25 114:7
note 51:18,22
  53:13 54:15,16
  55:18 94:17
  100:3 116:13
noted 44:18,19
  48:20,21 51:2,3
  91:23,24 112:13
  118:12
notes 32:18
notice 63:16
Notwithstanding
  110:7
not-for-profit
  7:19,21 8:2
November 6:18 9:8
  9:14 36:9
number 7:23 21:21
  30:11 40:23
  54:22 59:10
  60:20 67:18
  71:17 85:20 95:8
  110:20
numbered 20:19
  35:21
numbers 20:11 37:5
  45:2 59:9 73:13
  82:18 85:2
  105:23,25
numerous 60:21
  67:3,4
nursing 6:13 7:21
  7:25 8:2,6 57:4
NV 51:23
NY 3:13,19
NYP 37:21
NYP.org 37:15,18
N-I-R-M-A-L 10:10

_____

**o**

O 5:2,2
object 80:12,21
  96:2,6,9 111:16
objected 42:10
objecting 93:20
objection 41:20
  42:9,17 43:15,16
  44:3 81:9 109:4
  109:23 110:12,24
objections 4:8
obligate 54:15
  94:21

obligations 15:12
  15:15 109:13
obtained 6:22
obviously 30:23
occupy 9:25
October 9:8
offer 9:11 29:8,16
offers 26:7,15
  27:14 29:24,25
  30:20 32:3,4,5
office 23:23 24:2
  24:4 60:14 61:21
  61:24,24 62:2,3
  62:14,15,22 64:7
  67:3,15,25 68:3
  68:25 76:21
  83:20 84:4 86:7
  86:21 87:6 99:11
  100:10,21
officed 46:21
officer 8:15 9:13
  9:15,17,19 11:10
  11:12,17 12:7,9
  12:22 19:4,12
  20:15,24 72:7
  87:25 88:7,17
  89:24 92:14,19
  98:21
officers 36:7
officer's 8:17
offices 2:7 84:5
off-the-record
  44:16 48:18
  50:24 112:11
Okay 13:7 21:7
  31:5 40:18 52:15
  61:3 69:25 78:18
  88:14 100:25
old 6:19
once 23:14 57:13
  77:12 82:7 89:12
  89:25 107:14
ones 58:11
one-page 39:14
one-person 66:25
open 14:21
opening 40:3
operated 24:5
operating 8:17
  9:13,15,17,19
  11:10,12,17 12:7
  12:9,22 19:4
operation 29:14
  57:5 58:20,21
  91:10
operational 27:24
  30:13 31:14
  48:11
operations 6:12

23:14 24:19 26:2
  30:7 33:21,23
  34:13 57:24
  62:22 88:16
operative 95:5
  110:17
opportunities
  22:24 58:9
order 67:5 71:22
  99:7
ordinary 29:15
  40:9 47:9
organization 8:2
  25:2,3 62:20,21
  77:4,14 88:19,20
  101:7 116:20
organizations 35:6
  87:19 89:13,22
  90:2 97:3
original 51:7,9
  96:22 97:21
  101:14 118:15
outcome 114:17
outlined 27:14
  40:21 42:3
outpatient 56:25
overall 28:24
Overlook 6:2
overrode 94:23
  95:14
oversee 19:9
owed 64:19 99:8
  101:9,19
owned 54:10

_____

**p**

P 3:2,2,14
page 20:12 21:4
  37:8 40:19 45:4
  46:11,17 51:23
  54:8 55:3,4
  71:18 74:24
  78:25 85:18 92:9
  92:17,18,24 98:9
  98:18,19 102:24
  103:7 105:12
  106:3,10 113:12
  115:4,10 119:5
pages 37:5
paid 13:2 65:25
  66:7 67:8 73:9
  73:10 74:8 76:14
  77:4 86:7
pains 61:22
paperwork 22:11
paragraph 54:7,8
  54:12 94:18
  106:25
parent 103:15

part 8:19 15:11,21
  18:13 27:25
  37:23 38:9 40:6
  40:13,16 41:8
  57:2 65:6 70:19
  70:24 72:2 88:5
  97:12 99:4 103:3
participant 35:7
participate 30:4
  97:2
participated 34:24
particular 98:20
  99:7
parties 4:4 27:17
  114:15
parts 45:18
party 101:24
passage 86:17
  98:20
passages 85:21
patient 25:9
patients 24:22
  91:6,7
Paul 89:19
pay 13:5 51:8 63:5
  64:12,16,17,22
  65:18 66:24 71:5
  74:3,5,7,18 75:3
  101:15,18
payable 67:12
paycheck 13:3
  68:23
payer 61:12
payers 61:16
paying 17:4,7
  25:18 65:15
  101:11
payment 25:20
  102:3
payments 70:19,21
  70:22
payroll 99:2,20,21
  100:4,6,12,13,17
  100:22,25 101:7
people 9:25 10:3
  11:21 29:18,20
  53:23 60:20
  66:21 67:7,11
  71:17 81:25 84:8
  84:10 89:6 99:13
  100:5 101:16,17
  102:9
perform 29:7 50:11
  50:15 90:24
  91:12
performed 107:18
period 8:9 10:18
  11:11 12:8,19
  17:21 18:8 25:4

25:16 26:2,5
65:2,23 66:22
76:11 78:5 86:2
87:20 101:3
116:21
**periods** 13:11
85:22
**Perri** 20:16 35:22
38:6 115:16,20
115:23
**person** 10:15 27:22
27:23 82:13
97:17
**personally** 113:7
**phone** 82:11
**phonetic** 57:19
**physicians** 6:14
**piece** 69:19
**place** 60:17 66:4
67:21 76:23
87:25 89:12,25
91:8 94:7 96:6
99:17 113:11
**placement** 56:2
94:2 97:4,13
**placing** 55:21,22
**plain** 24:15
**Plaintiff** 1:6 3:5
**Plaintiff's** 19:18
19:20 35:15
36:23 39:7,8
44:11 50:5 51:17
59:2 71:10 80:3
91:18 98:6
102:13 104:20,25
115:14,15,17,19
115:22 116:4,7,9
116:11,13,15,17
116:19,22 117:4
117:6,8,10
**plan** 9:2,3,4 19:7
21:20,25 25:15
60:16
**planning** 21:22
55:12 79:11
91:13
**plans** 23:2,7,10,21
25:23 91:2
**play** 97:11
**Plaza** 2:8
**please** 5:17,24
35:13 66:10
118:4,9
**point** 25:4 40:22
42:13 45:24
62:25 63:18 64:3
64:6,14 84:24
87:9 90:19
**points** 40:21

**policies** 68:2
**position** 6:11,17
8:14,17 9:25
11:6,24 15:12,17
15:20 16:6 25:13
72:6 94:9,12,13
94:23 109:11,19
109:22 111:6
**positions** 8:12
11:9 12:3,6 15:5
**possible** 21:21
60:17
**potential** 15:2
53:17,25 54:17
85:22
**practice** 57:19,20
58:21 95:15
96:11
**precise** 52:25 70:2
77:23
**preclosing** 86:11
**preface** 75:17
**prepaid** 22:23 30:6
30:20 31:8 40:25
41:10,18 42:7
55:17 86:13,23
93:9
**prepare** 14:3,8
29:16
**prepared** 83:6,8,15
83:23 84:21 85:6
85:8,10,15
**preparing** 72:16
**prepayment** 25:24
**Presbyterian** 8:3,5
37:22,24
**present** 6:17 14:13
17:12 83:19
**presented** 47:3,6
90:10 103:10
**presently** 6:4
**president** 6:8 9:22
19:15 20:14,17
35:6 103:9 109:7
**presidents** 59:18
99:24 107:3
**pretty** 64:5 69:21
**prevent** 69:15
**primarily** 8:7 10:4
**primary** 60:23
**principal** 82:2,9
**prior** 18:10 76:20
76:24 85:15 86:3
**proactive** 40:4
**probably** 50:20
82:6,14
**problem** 63:14,15
63:23 64:9 69:17
69:19,21 101:10

**problems** 61:4,8,10
61:17,19 62:8
67:24 69:2,12
93:11
**procedures** 68:2
**process** 14:24 25:9
31:25 61:9 62:7
65:24
**processed** 66:6
**produced** 59:11
63:2 69:9 71:20
82:20
**producing** 69:19
**program** 6:15 22:7
22:8,19 23:6,19
26:25 56:25
**programs** 22:12,15
28:13 46:3,4
**progressed** 53:24
**project** 86:11
**projections** 62:21
**promised** 51:8 75:3
**promissory** 51:17
51:22 53:13
55:18 94:17
116:13
**properly** 103:23
**proposal** 45:19
**proposals** 21:16
27:4,7
**Proskauer** 79:23
**protections** 94:7
**provide** 25:18
87:24 90:16
93:25 95:7 97:12
110:19
**provided** 41:2,25
70:17 76:12
84:13 88:3 90:20
91:8 97:6
**provides** 74:12
95:3
**providing** 25:18
**psych** 57:5
**public** 2:10 4:13
5:4 7:9 113:25
114:7
**pull** 64:9
**purchase** 76:3
**purchasing** 67:12
**purpose** 53:16
83:14
**pursuant** 2:9
**pursued** 9:11
**put** 18:3,14 24:11
60:16 100:13
**putting** 8:25 28:3
28:12 29:8
**P.C** 3:16

**p.m** 51:2,3 91:23
91:24 112:13

---

**Q**

**qualify** 111:7
**quality** 54:22
**quarter** 53:10 65:7
**Queens** 12:24 49:14
52:23 56:24
88:21 89:16
94:20 103:15
107:20
**question** 4:9 21:3
21:24 32:12 43:4
44:5 48:25 59:10
66:10,16 68:18
70:3 73:11 75:17
77:9,18,24 78:7
92:17 93:15 96:3
96:8,23 101:15
103:7
**questions** 5:14
15:2 16:11,14,18
16:19 19:24
107:24 108:3
111:18
**quick** 69:7,11
**quickly** 8:16 21:21
60:17 64:4

---

**R**

**R** 3:2 5:2 113:2
114:2
**raised** 23:3,22
25:24
**Rajiv** 11:2 97:16
**ramp** 21:20 63:18
87:20
**ramped** 23:12,15
**ramping** 24:10,14
24:25
**ran** 26:25
**rank** 100:21
**Rao** 103:24
**reached** 31:2,6
**read** 16:15 42:15
42:23 43:7 48:25
66:9,12 96:11
118:4
**reading** 85:4
**ready** 19:24,25
82:23 102:16
**really** 111:17
**reason** 43:9,21
118:6
**reasons** 69:12
**recall** 13:23 14:2
15:18 16:4 24:3
26:13 29:10 30:3

---

30:21 31:9 32:6
32:17,21,25 33:5
33:14,17 35:11
36:2,20 37:13
38:11,19,22 39:2
39:21 40:8,17
41:12 43:11,13
43:20,23 44:5,7
45:16,22 46:2
47:2,4,8 48:7,10
48:11,12 49:6,11
49:22,25 51:12
52:10,13 53:20
60:4,5 66:19
70:7 71:7 74:6
75:13 76:10
78:23 81:16 82:6
84:9 85:3 90:12
90:19 93:19
100:2 102:6
104:17 107:18,22
111:11
**receipt** 66:23
118:16
**receivables** 23:12
23:15 24:11,14
63:18 67:18
87:20
**receive** 7:3 32:22
33:11 37:11
39:20 42:22
43:10,13 45:14
60:2 61:16
**received** 25:20
26:3 42:25 43:7
43:25 51:10,12
63:16 71:6 78:21
86:14 93:7,12
102:3,4
**receiving** 43:23
**recite** 98:22
**recognize** 55:4
72:9
**recollection** 13:25
45:24 51:11
96:20
**recollections**
74:16
**recommenda** 28:19
**reconciliation**
72:21
**record** 5:25 20:6
44:15,21 48:17
48:23 50:23 51:5
71:19 82:19
91:22 92:2
105:18,20 112:10
114:13
**refer** 22:14,23

36:13 59:12
73:25 94:16
**reference** 22:15
36:11 59:15
62:10,13
**references** 80:23
83:3
**referring** 14:17
46:14 74:23 81:6
**refers** 21:11 22:19
**reflect** 73:3 75:4
92:24 103:22
**reflected** 26:7
94:21
**reflection** 85:7
**reflects** 74:3 78:2
93:16 98:18
106:14
**refresh** 45:24
**regarding** 24:10
32:24 63:8
**regardless** 64:23
**regular** 23:16
33:15 35:7 103:3
**reimbursing** 17:5,9
**related** 15:2 16:20
30:7,10 46:3
66:17 76:13 86:4
87:7 107:16
114:14
**relationships** 6:13
27:11 86:8
**relatively** 69:7
**release** 68:16
**relevant** 83:4
**relieve** 93:10
**rely** 111:25
**remain** 100:16
**remained** 58:10
**remedy** 63:8
**remember** 7:5 26:18
26:19 30:9 52:11
54:20 57:23
59:23 65:5 70:14
75:13 83:10
84:25 85:2,12
97:7 99:22
**remembered** 26:18
**rephrase** 5:18
41:21 96:3
**replaced** 11:23
**report** 9:20 10:19
10:25 28:22,25
83:4,6,15,23
84:11,17,21 85:6
85:8,11,18 90:4
92:18,18 103:8
**reported** 1:23 9:22
28:23 29:2,5

60:25 62:18,19
80:6,9,20 81:14
84:17 92:25
98:23
**reporter** 5:15
35:19 37:3 51:20
59:5 66:13 71:13
92:3 98:13
102:19 105:4
112:2
**reporting** 18:6
62:23 102:25
**Representative**
52:7
**representatives**
52:8
**request** 87:21
90:14,17
**requested** 38:13
**REQUESTS** 115:8
**required** 61:5
**reserved** 4:9 112:9
**residency** 46:3
**residents** 22:19
**respective** 4:3
**response** 29:24
89:3
**responsibilities**
6:11 17:22 21:14
31:14,16 107:14
107:15
**responsibility**
21:19 28:6 54:16
60:13 82:2
**responsible** 15:14
15:23 26:14
27:12,24 28:24
55:21,25
**rest** 50:20
**restate** 73:11
**restaurant** 52:23
**restructuring**
87:12,25 88:7,17
89:2,7 90:15
92:19 98:21
**results** 84:11
**return** 111:5
118:14
**returned** 38:14
76:17 111:10
**revenue** 24:20,25
68:22 70:10
**review** 14:10 20:4
39:12 44:23 50:9
111:23
**reviewed** 47:16,20
84:20 96:14
**rhetorical** 111:18
**Rich** 18:18 38:16

63:22 84:14
**Richard** 79:22
**right** 5:20 11:5
12:18 23:20 33:6
46:8 49:7 53:15
54:25 59:19
65:22 73:24
75:19 77:22
81:17 83:9 91:11
92:23 94:21
102:18 103:6
111:22
**RIS9022** 37:14
**Road** 3:18 6:3
**Robert** 14:14
**Rockefeller** 2:8
**role** 18:19 19:3
28:11 89:7
**Romero** 26:21 27:3
27:19 28:9,16,22
29:21 35:10,22
36:17 39:17 40:2
40:12,19 41:15
41:25 45:5,18
55:24,25 93:2
115:19,24 116:6
**Romero's** 26:23
27:6 38:5
**Ross** 1:5 15:3,5,11
15:12,17 16:16
20:8,17 22:25
30:10,18,23
31:11 32:16 33:9
33:12 39:4 41:2
41:17 42:2 45:19
51:8 70:22 71:6
74:10,12 75:2,3
75:9 78:21 86:16
93:7,13,21 94:2
95:3 97:5,13,22
97:25 107:20
111:5,10,12
119:3
**ROSS0056** 20:11
**ROSS0066** 21:5
**ROSS0067** 20:11
**ROSS008477** 45:2
**ROSS009019** 37:6
**ROSS027421** 39:15
**ROSS031314** 20:20
**ROSS0607** 20:25
**rotation** 55:23
**rotations** 21:22
22:9 54:22 55:20
93:9
**roughly** 10:6 12:20
**round** 73:13
**Rucigay** 18:18 19:8
59:8 116:15

running 69:18  77:9

---

**S**

S 3:2
Sarli 18:18  19:11
  37:16  38:16
  63:22  84:14
save 106:20
says 39:17  74:17
  106:21,25
schedule 82:6
schedules 55:22
scheduling 56:2
school 1:5  20:8,18
  22:5,16,20  25:25
  27:13,13  28:12
  32:19  90:10
schools 21:20  26:6
  26:9,15  27:8
  28:7  29:23  30:5
  30:8,19  31:7,18
  40:10,13  86:9
  93:3
sealing 4:4
seasons 53:9,11
second 39:16  49:23
  50:16  74:24
  75:17  116:11
seconded 103:23
section 39:23
  54:12
see 24:9  41:4
  62:16  71:24
  74:15,19  85:24
  102:23  104:4
seen 24:22
selected 71:22
selecting 26:14
senior 6:8  34:15
  34:17  59:12,15
  94:15  98:24
  99:23  100:23
  109:17  116:16
sent 36:17  76:23
  81:11  85:14
sentence 21:8
separation 17:14
September 9:7  18:4
  33:19
series 5:14  40:21
  61:17
serve 13:8,17
  40:24  42:7
service 91:8
services 25:19,20
  101:4
set 32:2,4  82:5
  98:11  113:11
  114:11,19

settle 101:9
seven 40:22  42:13
shared 101:4
  109:19
sheet 20:12  46:12
  118:7,10,12,15
  119:2
Shepherd 45:5
shift 90:7
shop 66:25
short 5:13  7:16
shortage 25:5
  85:23
shortly 9:13
show 35:18  37:2,14
  82:15
showed 39:22
shows 35:24  36:3
  37:11  39:18  45:6
side 28:6  81:19
  82:8
side's 16:5
sign 46:24  49:15
  96:13  111:24
  118:9
signature 21:4
  55:5,8,10  105:11
  105:14  106:4,9
  111:20  112:3,8
signatures 51:23
signed 4:12,14
  47:7,11,18,22,23
  49:2,19  94:19
  95:2,13  110:8,14
  110:22,25
significant 16:7
  27:25  61:7  69:22
signing 48:10  49:9
  95:22,23  96:12
  96:20  118:11
similar 12:11
simply 101:18
simultaneously
  12:21
singleton 10:16,19
  10:24  89:11,12
  89:25  90:4,5
  92:20,25  93:20
  98:23  99:6
  100:22  101:22
  102:7  107:15
sir 6:19  26:10
  51:6  104:6
sit 62:16
site 56:24  57:18
  57:19,20,22
  58:21
situation 83:18,19
six 33:18,18  54:8

size 82:21
SJQH 54:13
skilled 57:3
slots 40:23  41:9
  41:17  42:6
smoothly 25:8
social 53:22  54:4
sold 57:18,22
sole 102:7
solely 107:16
somebody 58:22
  89:18  104:6
sort 54:18
source 16:17  78:19
  84:17
sources 75:14
  83:21
space 22:3,8,9,10
  118:7
speak 22:18  30:19
  60:19
speaks 95:11
specific 31:23
  64:14  66:8  73:16
  77:19,20
specify 81:5
speculate 26:17
  42:19,20  43:18
  48:3,7,8
speculating 48:9
  85:14
speed 34:22
spend 7:14
spent 8:4  23:16
  51:13,14  68:25
  111:13
spoke 30:9  60:20
spoken 38:20
sponsorship 58:23
  63:20
spreadsheet 71:23
  72:10,12,13,18
Spring 57:25
ss 114:4
St 17:24  18:5,7
  25:16  33:20  34:8
  34:25  38:13,15
  38:17,24  39:18
  40:2  46:12,20,22
  56:23  57:7,14
  58:19  63:16
  70:19  103:12,18
  116:5
staff 22:5,10  24:6
  24:7  34:25  35:2
  35:2,3,4,5  62:5
  67:23  89:9,9
  100:21,23
stand 37:21  52:16

stapling 105:19
start 46:11  63:20
  69:4  75:25  77:23
  92:9  96:24
  116:21
started 7:19  96:23
state 2:10  5:24
  26:18  60:8,18
  76:13  79:13  80:7
  80:9,20,22,24
  81:15,19,20
  82:10  83:19
  87:10,15  88:2,6
  88:9,16  90:16
  114:3,8  118:6
stated 93:5  94:11
  99:2,7
statements 69:8,20
states 1:2  40:22
  89:4  113:4,8
State's 90:15
stay 9:23
stem 99:8
step 93:14
steps 106:19
STIPULATED 4:2,7
  4:11
stood 33:25
Strategic 79:11
strictly 30:10
Strike 76:2
string 37:5  39:15
  39:16  44:25
  82:17
structure 12:2
student 21:16  23:5
  23:18  56:5,9
  57:16  58:6  93:9
students 22:16
  30:12  46:5  48:15
  55:22  56:14
subject 36:11  83:3
  118:11
submit 61:12
submitted 58:14
subordination
  101:24
Subpoena 2:9
Subscribed 113:18
  119:20
subsidiary 54:11
substance 14:19,22
  38:23  39:3  53:20
substantial 58:19
successful 93:6
succession 10:8
sufficient 100:4
suggest 111:4,9
suggested 49:14

suggests 100:3
Suite 3:6
summary 40:20
sums 73:15 101:20
supervision 83:7
supplemented 25:6
supply 89:6
support 23:5
supposed 101:8
sure 11:25 22:4
  26:11 29:12
  31:19 32:14
  37:17,17 38:4,21
  41:22 42:21
  45:13 47:8,15
  52:21 54:3 58:8
  58:22 68:15
  70:25 71:2 73:12
  78:10,11 79:17
  79:21 81:16
  89:23 94:7
  106:19
switched 99:14
switching 100:5
sworn 4:14 5:3
  113:8,18 114:12
  119:20
system 8:4,6 23:24
  25:8 37:24 56:17
  56:19 61:14,17
  62:6 63:23 66:4
  67:20,21 69:3,13
  86:6,19 106:15
  106:24 107:2,5
systems 61:8 62:4
  68:2

## T

T 113:2,2 114:2,2
take 5:16 7:6,15
  13:14 17:20
  19:23 24:20,24
  50:22 52:25 55:7
  59:23 62:16
  67:17 82:22,23
  92:15 95:14
  98:10 99:17
  103:4 112:6
taken 113:10
talk 22:24 30:8
  34:4 51:6 94:11
  97:20,24
talked 101:3
talking 24:13
task 72:15
team 18:3,14,16
  19:5,6 34:21
  59:17 72:2 81:21
  81:22 89:8,10

94:15
teleconference
  40:3
telephone 38:6,9
  40:6,11
tell 15:4,16,19
  97:16
tens 90:21
term 41:3 54:14
  80:13
terminate 69:11
terminated 69:22
  108:22,24
termination 80:17
terminology 59:10
terms 6:10 8:22
  22:13,25 24:11
  24:12 28:3,4
  31:17 33:4 53:2
  53:25 54:4
testified 5:4
  24:10 28:17
  55:15 61:6 62:12
  70:8 80:16 90:13
  97:18 107:21
  109:10
testimony 66:12
  77:15 96:10
  108:10 110:7
  114:13
thank 34:3 112:9
theirs 102:4
thing 5:22 104:8
think 10:22 34:19
  43:9,13,22 45:25
  47:24 52:20 53:7
  57:18 58:20
  78:10 80:14,15
  83:8 84:22
thinks 48:5
third 69:19
thirty 118:16
Thomas 45:5
thorough 48:24
  64:18
thought 40:3
thousands 68:22
three 5:11 27:16
  29:18,20 31:20
  63:19 82:24
  86:15 92:18
  103:8 106:7
  107:7
Tien 20:23 115:18
time 4:9 5:16 7:15
  8:10 9:12,16,18
  9:24 10:18 11:11
  12:8,20 13:14,18
  17:10,20,21 18:8

18:22 20:23
21:15 24:20 25:4
25:19 26:2,24
27:3 28:5 29:14
31:7 33:18 34:14
37:23 41:6,6,7
44:18,19 45:18
46:19 47:10
48:20,21 49:8,12
51:2,3 53:2
59:20 61:2,23
63:19 64:15 65:2
65:23 66:22
68:25 72:5 75:15
75:22 76:8,11
77:19,20 78:5
82:6 84:24,25
85:8 90:8,19
91:23,24 93:23
96:25 97:10,19
98:10 103:4
106:20 107:25
111:2 112:13
113:11
timely 62:18,19
times 5:10,11 9:20
37:19
tion 28:20 51:19
title 89:23 113:11
titled 46:12
today 17:6,8,10
38:15 40:4 93:7
107:21
today's 14:4
Tom 10:16 89:11
100:22 101:21
107:14
totally 69:20
touch 29:25
train 30:11
transaction 24:16
34:8 52:2 53:17
54:18 75:18 87:8
103:2 104:12
transactions
108:16
transcribed 112:2
transcript 111:22
111:23 113:9,13
118:17,18
transfer 66:18
67:5 75:9,11
93:7 99:16 102:8
transferred 68:13
73:7 81:14 98:25
99:20 101:16
transferring
101:17
transfers 75:16

80:15,17,19
108:13,18,20
transition 19:7
34:2
transparent 77:25
trial 4:10
tried 106:19
trigger 74:16
triggered 90:14
trouble 91:6
105:19
true 113:12 114:12
Trustees 13:9 90:9
92:7 98:17
102:23 104:3
109:2,19
try 58:13 96:3
trying 58:2 69:2
turnaround 8:18,20
turnarounds 8:8
two 5:11 24:24
31:10 33:21
34:12,16 37:5
38:12 52:16
54:12 69:11
82:24 84:15 86:9
91:5,7 93:4
108:3
two-page 20:13
35:20 59:7 71:15
105:24
type 17:12 30:13
typically 26:4
TZANETOPOULOS 3:8
5:6 19:17 20:6
32:2 35:12 36:21
39:6 41:22 42:5
44:9,14,20 46:18
48:4,22 50:3,19
51:4,15 58:24
66:9 71:8 75:25
77:22 79:25
80:10 81:3,8
91:16,21,25 96:5
98:4 102:11
104:18,23 105:17
107:23 109:4,23
110:6 111:19
112:8 115:5

## U

Ultimately 29:4
104:13
unanimously 104:2
unauthorized 80:16
108:13
undergraduate 6:15
22:6,14 26:25
46:4

**understand** 5:17 36:14 72:18 73:2 73:6

**understanding** 59:14 76:15 95:11 101:23

**understood** 99:3

**Unfortunately** 17:11

**union** 100:14

**UNITED** 1:2 113:4

**university** 1:5 6:24 7:2,12 20:8 20:18,24 30:14 31:3 41:3 74:12 93:8,13 95:5,7 97:5 110:17,19

**update** 33:25

**use** 23:21 65:8 66:18 80:12

**uses** 40:21

**usual** 95:15,21 96:11

**usually** 82:12

_____
**V**

**v** 119:3

**vendor** 65:25 73:19

**vendors** 65:16,18 65:19 66:24

**version** 5:13 7:16 47:5

**vice** 6:8 20:16 35:5 59:18 99:23 107:3

**view** 96:16

**Vincent's** 18:7 34:25 46:13 70:20

**violated** 110:9 111:6

**voucher** 66:3

**vs** 1:7

_____
**W**

**Wacker** 3:6

**Wah-Chung** 36:4 71:17 84:14 108:15

**waive** 112:3

**waived** 4:6

**WALTER** 3:14

**want** 42:19

**wants** 32:12

**wasn't** 57:23 58:7 58:15,16 62:17 62:19 65:10 90:18 97:15

**way** 114:16

**week** 14:5 24:23 68:24 82:5,5,7 93:12 97:18

**weekly** 33:23 34:20

**weeks** 63:19,19,19

**went** 25:7 33:12 67:14 72:22 73:4 74:20 99:9 103:17 108:16

**weren't** 69:18 82:4

**WHEREOF** 114:18

**whichever** 64:21

**wholly** 54:10

**Wild** 3:16 14:15

**winter** 53:4,4

**wire** 93:7

**wish** 111:22

**witness** 3:17 5:3 32:10 78:16 80:15 81:4 114:10,13,18 115:4 118:2 119:4

**words** 5:23 53:20

**work** 9:6 18:2,13 21:23,24 28:20 29:7 32:19 34:7 50:11,15 52:2 55:16 83:12 90:24 91:12 100:18 101:7 107:7,18

**worked** 9:7

**working** 8:6 18:6 24:18 27:4,9 48:12 62:17,17 70:9,11,16 99:10

**wouldn't** 45:21

**wrap** 11:4

**write** 86:2

**writes** 40:2,20

**writing** 66:23

**written** 84:19 111:24

**wrong** 75:23

**Wyckoff** 1:9 8:10 8:13 9:6,7,10,15 12:22 13:4,9 15:5,14,22 17:4 17:9,13,22 18:3 18:15,23 19:15 20:15 24:7 25:10 25:15 27:2 28:5 35:2 36:9,9,17 37:19,23 39:24 40:23 41:9,9,18 42:7 49:9,13,13 51:25 52:8,9,18 54:11,15,17

55:12 56:3,10,17 57:9,16 58:6,12 58:13,16 61:24 61:25,25 63:5 64:16,16 71:5 72:8,22,23,25 73:5,8,8,9,19,19 74:21 75:6,21 76:7,15,16,19,24 77:5,11,15 78:4 78:7,22 83:3 86:8 87:2,11,17 88:21,24 89:16 90:3,9 91:6 92:6 92:14 93:5,6,11 93:24 94:2,5,9 94:21 95:18 97:6 97:12 98:16,24 99:4,5,9,14 100:6,9,11,13,17 100:19,23 101:12 101:19,23 102:2 102:22 103:11,16 103:25 106:12,24 107:11,13,16 109:2,14,18,22 111:4 116:22 117:4,6

**Wyckoff's** 17:23 23:2 63:6 64:12 65:18,20 76:25 77:2,6,7 79:23 99:20 101:2

_____
**X**

**X** 115:2

_____
**Y**

**years** 7:7,22,23 8:5,5 100:18

**Yife** 20:23

**York** 1:3,16,16 2:8 2:8,10 3:13 6:3 8:3,5 37:22,24 76:13 80:25 113:5 114:3,5,8

_____
**Z**

**Zall** 79:22

**ZWERLING** 3:20 13:24 15:8 28:18 31:22 32:6,9,11 41:20 42:3,9 43:16,19 44:4 46:16 48:2,6 53:5 73:22 74:23 75:12,23 77:18 78:12,15,17 80:8 95:10 96:2,7

110:15 112:6

**Z-A-L-L** 79:22

_____
**$**

**$3.4** 74:20

**$3.5** 74:4,18 75:8

**$3.7** 93:12

**$4** 93:8

**$5** 74:14 75:3,9

_____
**0**

**0067** 20:12

**009020** 37:6

**01410(KAM)(RLM)** 1:7

**031315** 20:20

**03944** 105:24

**06** 18:4,11

**0608** 21:2

**07** 18:4 57:25

**08** 10:21,22,23

**09** 1:7

_____
**1**

**1** 19:18,20 20:4,7 21:4 22:25 33:10 46:10,15,25 47:11 48:25 49:10,16,21 51:9 74:9 95:3 110:15 115:14

**1st** 11:14 24:17 37:10 38:5 53:12 74:18 75:19,22 76:4,8,20,24 77:10 78:8 98:23

**1/10/08** 117:5

**1:35** 91:23

**1:44** 91:24

**10** 7:7 51:16,17,21 51:22 54:7 55:4 55:4,18 70:14 71:2 74:2 94:17 116:13

**10th** 98:16

**10:26** 2:4

**10022** 3:13

**102** 117:7

**104** 117:9,11

**108** 115:6

**11** 58:25 59:2,7 60:3 116:15

**11/13/06** 115:19

**11:43** 44:18

**11:50** 44:19

**11:56** 48:20

**11:57** 48:21

**110** 115:5

**110-bed** 57:3

**11021** 3:19
**111** 3:18
**11560** 6:3
**12** 71:9,10,15
  74:24  75:4  78:2
  78:24  80:20
  108:8  116:17
**12/06** 115:22  116:4
**12/1/06** 116:14
**12/14/06** 117:7
**12/20/07** 116:23
**12/27/06** 117:8
**12:08** 51:2
**12:17** 51:3
**13** 80:2,3,23  82:16
  83:11  84:22  85:7
  85:11,18  116:19
**13453** 59:9
**14** 91:17,18  92:5,5
  116:22
**14th** 102:22  104:16
**14-plus** 8:4
**15** 98:5,6,15  117:4
**16** 102:12,13,21
  117:6
**16th** 39:18  41:16
**17** 8:5  104:19,20
  105:5,8,21  106:3
  106:14,21  117:8
**18** 104:24,25  105:6
  105:24  106:9
  107:9  117:10
**19** 115:14,16,18
**191** 3:6
**1972** 7:20
**1996** 8:15  9:13
**1997** 9:16

---
**2**

**2** 19:18  20:4,13
  21:10,18  22:22
  26:8  27:15  29:9
  29:24  32:5
  115:15
**2/22/07** 116:19
**2:19** 112:13
**20th** 92:8
**2005-2006** 17:21
**2006** 18:2  20:19,22
  25:15  27:3  34:7
  36:9  39:18  41:7
  53:3,6,10,13
  76:22  78:3,20
  102:22  104:16
**2007** 10:5  11:14,15
  11:18  12:14,20
  24:17  53:5  59:8
  65:7  71:16  75:19
  75:22  76:4,9

  77:10  78:9  81:11
  92:8  107:13
**2008** 98:16,23
  107:10
**2009** 10:20  57:8,14
  97:10
**2010** 6:18  9:8,14
**2011** 1:17  2:3
  113:19  114:19
  119:4,20
**21st** 20:19,22
**22nd** 74:20  85:14
  85:15  107:10
**24772** 35:21
**27th** 1:17  2:3
  114:19  119:4
**28** 6:2
**28th** 75:3
**29th** 75:4,10

---
**3**

**3** 19:18,20  20:4,21
  21:10,18  22:23
  26:8  27:15  29:9
  29:25  32:5
  115:17
**3.4** 75:9
**3/6/07** 116:17
**30** 118:16
**30th** 59:8
**3100** 3:6
**35** 115:21
**36** 115:24
**39** 116:6

---
**4**

**4** 35:15,20,23
  115:19
**44** 116:8
**45** 2:7

---
**5**

**5** 36:22,23  37:4,4
  37:10  115:5,22
**50** 116:10,12
**51** 116:14
**59** 116:16
**599** 3:12

---
**6**

**6** 39:7,8,12,14,23
  41:24  116:4
**6th** 71:16  81:11,15
**60** 6:20  25:7  26:4
**60606** 3:7

---
**7**

**7** 44:10,11,23,25
  116:7

**7/30/07** 116:15
**71** 116:18
**7623** 82:19
**77969** 1:24

---
**8**

**8** 50:4,5,9,13
  116:9
**8th** 74:19
**8/21/06** 115:15,17
**80** 116:21
**8492** 45:3

---
**9**

**9** 50:4,5,9,17
  116:11
**90** 25:7
**90-day** 26:5
**91** 116:23
**946** 106:2
**95** 115:10
**95-25** 56:24  58:15
**96** 9:8  10:5
**98** 117:5