# Exhibit 28

| | |
|---|---|
| **From:** | St. James, John |
| **To:** | 'ris9022@nyp.com'; 'jur9004@nyp.org' |
| **Cc:** | Shepherd, Dr. Thomas; Perri, Dr.Nancy; Raymundo, Wilfredo R. |
| **Sent:** | Friday, December 15, 2006 1:32 PM |
| **Subject:** | FW: draft affiliation agreement |
| **Attachments:** | AFFILIATION AGREEMENT BETWEEN CARITAS AND ROSS 2006-12-08.doc |
| **Importance:** | High |
| **Sensitivity:** | Confidential |
| **Tracking:** | **Recipient**       **Read**<br>'ris9022@nyp.com'<br>'jur9004@nyp.org'<br>Shepherd, Dr. Thomas<br>Perri, Dr.Nancy<br>Raymundo, Wilfredo R. |


AFFILIATION
AGREEMENT BET...

Mr. Sarli and Mr. Romeo,

I am sending the original draft to you as agreed on the phone this morning. I apologize for the delays but my top assistant was hospitalized this week with multiple strokes and my time had to be directed to other areas for the short-term.

However, I reviewed the contract language with our management last night. That review and subsequent discussion created serious questions on the commercial aspects of this proposal. Please remember that Ross remains committed to an arrangement and wants to move ahead but we need both clarity and movement on important issues.

First is the number of slots. Schedule A stipulates a total of 50 core slots plus an additional 20 electives will be provided. We currently have about 50 students per week already at the two facilities (St. John's and Mary Immaculate). The original proposal indicated for the level of prepayment ($5 million) a participant (Ross) would receive an incremental 100 rotation slots (Letter dated August 21, 2006 from Mr. Dominick Gio). The proposal as written appears to add only 20 slots not 100 as was first projected. Our interest remains in "real" incremental growth of clinical slots. This is a major issue to Ross.

Second is the 16,000 weeks also mentioned in Schedule A. That figure represents about 4 and 1/2 years of rotations at the 70 rotation level at STJ and MI (This assumes 100% utilization every week or 3,640 weeks per year). It would mean that the prepayment would represent over 4 years of rotations rather than the two or less years originally discussed (the term of the contract is stated as 4 years versus the 2 originally discussed. There is no mention that the rotations done at Wyckoff are part of the agreement and would apply to the prepayment which we discussed. The risk of the longer term may create problems for Ross in selling this proposal to DeVry.

Third, there is no mention of how the pay down process would work and the agreement is silent on the interest to be paid on the unamortized balance of the prepayment (referred to in Mr. Gio's letter). Also the agreement is silent on the Ross proposal to take the interest payments in the form of rotation weeks to help Caritas with cash flow issues.

Fourth, there is no mention of a price freeze for the term of the contract mentioned in the letter and as we discussed; conversely the proposal contains an increase in the rate we currently pay STJ and MI for core rotations by 4.2% and the rate for electives by 108%. Ross want to maintain the status quo on rates for the term of the agreement.

Additionally no mention is made of the 5% discount feature from current rates mentioned in Mr. Gio's letter

ROSS015333

Fifth, there has been an estimated increase in our expected contribution for secretarial by $24,000 and our contribution for library support by $5,000, neither of which we discussed. Point c under section II indicates that library access will be made if available, why is this constraint there if we are paying for library support.

And we didn't see a mention of the first right of refusal for additional slots nor the non-dilutive position relative to new slots.

Our lawyers continue to work on the language in the contract itself. However we have to have agreement on the commercial terms to have their work be meaningful.

I will call you at 2:30 today to discuss.

JTS

---

**From:** Perri, Dr.Nancy
**Sent:** Friday, December 15, 2006 11:51 AM
**To:** St. James, John; Canderozzi, Judi
**Subject:** FW: draft affiliation agreement

---

**From:** St. James, John
**Sent:** Fri 12/8/2006 5:37 PM
**To:** Shepherd, Dr. Thomas; Perri, Dr.Nancy; Wahlig, Bruce C.; Raymundo, Wilfredo R.
**Cc:** Caggiano, Christopher; Webster, David
**Subject:** FW: draft affiliation agreement

Please review, we will discuss Monday.

The first e-mail from Mr. Hoffman, did not have an attachment.

JTS

---

**From:** DHoffman [mailto:DHoffman@wyckoffhospital.org]
**Sent:** Friday, December 08, 2006 5:36 PM
**To:** St. James, John; St. James, John
**Cc:** Kenneth Frieberg; Dominick Gio; Harold Mcdonald; Julius Romero; Hal McNeil; Richard Sarli
**Subject:** draft affiliation agreement

Dear Mr. St James,

Attached please find the draft affiliation agreement. Please let me know if you would like anything revised. To speed the process of review I am circulating this draft to all concerned parties, so it remains subject to revision by Caritas.

Very truly yours,

DAVID N. HOFFMAN

GENERAL COUNSEL &
VICE PRESIDENT FOR
 ETHICS AND COMPLIANCE
WYCKOFF HEIGHTS MEDICAL CENTER
374 STOCKHOLM STREET
BROOKLYN, N.Y. 11237
718-963-6117

ROSS015334

FAX: 718-963-6788
PAGE: 917-895-2140
DNH9001@NYP.ORG

This electronic message is intended to be for the use only of the named recipient, and may contain information that is confidential or privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the contents of this message is strictly prohibited. If you have received this message in error or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

ROSS015335

AFFILIATION AGREEMENT BETWEEN

ROSS UNIVERSITY SCHOOL OF MEDICINE
Portsmouth, Dominica

And

CARITAS HEALTHCARE PLANNING, INC.
374 Stockholm Street, Brooklyn, New York 11237

**Ross University** and Caritas Healthcare Planning, Inc., which operates Mary Immaculate Hospital and Saint John's Queens Hospital in New York ("Caritas " or "the Hospitals"), (collectively "the Parties"), hereby agree to conduct structured core, required and elective clinical clerkships for the University's medical students at the Hospitals according to the terms and conditions set out below.

## SECTION I

**The parties agree:**

1. That this agreement will commence January 1st, 2007 and will continue until December 31st, 2010. It may be earlier terminated by either party only for material breach of this agreement, remaining un-remedied for thirty days after notice of such breach, and only after notice of intention to terminate this agreement has been given to the other party in writing. In event of such termination, the students who have commenced clerkships at the Hospitals will be allowed to complete their scheduled clerkships.

2. The Hospitals acknowledge that they have received and reviewed the University's Clinical Curriculum Guide (incorporated into this agreement by reference) and agree to provide clinical medical education consistent therewith, as a minimum standard.

3. After considering the number of qualified University medical students, the number of clinical faculty in various disciplines at the Hospitals, the availability of relevant patient populations, and the total number of clerkships to be apportioned between the medical schools affiliated with the Hospitals, the parties have agreed that the hospital shall provide the clerkships set forth in Exhibit A.

ROSS015336

4. The provisions of this Agreement shall be construed and interpreted and all rights and obligations hereunder determined in accordance with New York law. Parties consent that jurisdiction and venue of any dispute arising from this Agreement shall be in Kings County, New York.

## SECTION II

**THE HOSPITALS AGREE:**

1. To permit students of the University appropriate access to patients in the Hospitals while they are formally enrolled in clerkships.

2. To provide appropriate clinical supervision and training of University students, including their performance of relevant clinical procedures, while taking core clerkships in Internal Medicine, Surgery, Obstetrics & Gynecology, Psychiatry, and Family Medicine as well as elective rotations at the Hospitals. The parties may agree to add or delete elective clerkships from time to time in writing during the term of this agreement.

3. To inform the appropriate officials of the University, in a timely and confidential manner, of any substantially inappropriate behavior on the part of any student, which may indicate the need for sustained counseling or correction.

4. To provide students with appropriate and timely counsel/feedback/notification, approximately every three weeks, concerning performance and behavior in relation to their assigned rotation.

5. To submit, in a timely and appropriate manner, a written Clinical Evaluation on each student at the completion of clerkships by the supervising physician, and where appropriate countersigned by the Director of Undergraduate Medical Education, which shall be delivered to the University within six weeks of completion of the clerkship.

6. To provide to the University accurate and contemporary data concerning student clinical activities. Documentation will include patient census (i.e. average daily census) for each course area of clinical instruction.

7. To make available the following health services to the University's students while they are assigned to clerkships at the Hospitals – provided that the usual fees and costs for such services shall be paid by the students:

    a. Medical referrals through the Hospitals' Employee Health Services
    b. Emergency services provided by the Emergency Department; and
    c. Basic health services as required by regulatory agencies from time to time.

ROSS015337

8. To provide the following support services to the University's students while they are assigned to clerkships at the Hospitals:

    a. Housing referrals, if available;
    b. Computer access, if available;
    c. Medical library access, if available; and
    d. In house accommodations for on-call personnel, including call rooms, shared lockers as available, dietary, uniform and linen services.

9. To will afford University a right of first refusal as to half of all new core clerkships slots developed by the Hospitals provided however, that the Hospitals will not hold any new slots empty unless prepayment has been made.

## SECTION III

**THE UNIVERSITY AGREES:**

1. With the advice and counsel of the Hospitals, to offer and confer a faculty academic appointment upon all hospital teaching faculty. This appointment shall be at least an adjunct clinical appointment at the University.

2. In a timely manner, to inform the Hospitals of any substantive changes in its Clinical Curriculum Guide.

3. To appoint for clinical clerkship only those students who have satisfied all academic requirements in the pre-clinical sciences and who are qualified to begin their clinical clerkship experiences.

4. To state as its policy that the Hospital Medical Director shall have the authority to immediately suspend any student of the University, whose behavior is sufficiently inappropriate to warrant this action.

5. To provide appropriate malpractice coverage (one million /three million minimum limits) and confirmation of health insurance for all students of the University while they are formally enrolled in clerkships at the hospital.

6. To provide medical library and secretarial support set forth in Exhibit A.

7. To require each student, prior to commencing of the clinical experience, to provide results to the Hospital of physical examination which complies with the requirements of section 405.3 of the New York Code of Rules and Regulations. All clinical clerks will be offered by the University the opportunity the opportunity to receive a Hepatitis B vaccination. In addition, all clinical clerks will have completed the OSHA Bloodborne Pathogens Workshop prior to beginning clerkships.

ROSS015338

8. In the event of impending bankruptcy the Hospitals will give to the University such notice as they are legally permitted to provide.

9. In the event that the Hospitals are unable to accept the specified number of students, as set forth in exhibit A, for the core or elective rotations, the Hospital will refund to the University that portion of the prepayment funds which have not then been earned.

**THIS AGREEMENT IS SIGNED AND DATED AS FOLLOWS:**

On behalf of **CARITAS HEALTHCARE PLANNING INC.:**

_____     _____
**Harold McDonald**, Chief Administrative Officer     Date

_____     _____
**Neal Mandava, M.D.,** Chief Medical Officer     Date

On Behalf of **ROSS UNIVERSITY SCHOOL OF MEDICINE:**

_____     _____
**Nancy Perri, M.D.,** Vice President, Academic Affairs     Date

_____     _____
**John St. James**, Chief Financial Officer     Date

ROSS015339

# EXHIBIT A

This exhibit sets forth the financial terms of the above contract, whereby Ross University School of Medicine hereby agrees that it will pay Caritas Healthcare Planning, Inc.:

a. $2,900,000.00 USD on or before December 15, 2006
b. $2,100,000.00 USD on or before January 15, 2007

The above amount is pre-payment for core and elective clerkship weeks, calculated at a rate of $312.50 per week, at Mary Immaculate Hospital and Saint John's Hospital Queens, for a total of sixteen thousand (16,000) instructional weeks. During the term of this agreement, Ross University is minimally guaranteed and allocated the following core clerkship slots:

| Surgery | 16 |
|---|---|
| Medicine | 20 |
| Ob/Gyn | 8 |
| Family Medicine | 6 |

A minimum guarantee of twenty (20) elective clerkship slots will also be provided during the term of the agreement.

The clerkship rate is locked in for four years from the date of the agreement.

The University will provide to the Hospital, annual library support of $10,000.00 paid semi-annually.

The University also agrees that it will pay the Hospitals for secretarial support required to implement this Agreement. The amount to be paid by the University to the Hospitals for secretarial support will be determined by the parties, based upon the size of the student program. In no event shall the amount paid by the University to the Hospitals for secretarial support for any given year be less than $ 36,000.00, so long as the Hospital provides at least (50) core clerkship positions for the University's students.