# Exhibit 39

| | |
|---|---|
| **From:** | Smith, Virginia A |
| **To:** | jur9004@NYP.org; djg@NYP.org |
| **Cc:** | Hamburger, Daniel; Gunst, Richard; Webster, David; Shepherd, Dr. Thomas; St. James, John; Perri, Dr.Nancy |
| **Sent:** | Thursday, December 28, 2006 12:17 PM |
| **Subject:** | Affiliation agreements |
| | |
| **Attachments:** | Ross - BQHC affiliation agreement 122806(clean).doc |

Ross - BQHC
affiliation agreemen...

Julius,

Attached is a revised draft of the above-referenced agreement.  This is a clean copy, suitable for execution.

In accordance with our conversation earlier this morning, the sole change to the document is the deletion in Exhibit of the paragraph referencing the existing agreement between Ross and Wyckoff.  As we discussed, the Wyckoff agreement currently provides for a rate of $312.50 per week, per clinical clerkship, until the parties mutually agree otherwise.

You have represented to me that it is your intention that the term of Wyckoff rate be, at a minimum, co-extensive with the term of the rate for the Caritas agreement.  You have agreed to confirm this in writing, subsequent to our closure of the Caritas agreement.

If the agreement is now satisfactory to you, please print two copies, sign both, and provide them to Ross.  They should sign both, and return one fully executed original for your records.

It was a pleasure speaking with you this morning.  Please do not hesitate to contact me if you have any questions or require additional assistance in connection with this matter.

Kind regards,

Virginia A. Smith
Assistant General Counsel
Legal Department
DeVry Inc.
One Tower Lane
Oakbrook Terrace, IL 60181
630-706-3308
630-574-1693 (fax)
vsmith@devry.com

ROSS015104

**AFFILIATION AGREEMENT**

**BETWEEN**

**ROSS UNIVERSITY SCHOOL OF MEDICINE,
SCHOOL OF VETERINARY MEDICINE, LIMITED
Portsmouth, Dominica**

**AND**

**BROOKLYN QUEENS HEALTH CARE, INC.**

This Agreement is made between **Ross University School of Medicine,
School of Veterinary Medicine, Limited,** hereinafter referred to as the
"University", and **Brooklyn Queens Health Care, Inc.** ("BQHC"), which through
its subsidiary, Caritas Healthcare Planning, Inc., owns and operates Mary
Immaculate Hospital and Saint John's Queens Hospital in New York, hereinafter
referred to as "Caritas" or "the Hospitals", (collectively, BQHC and the University
shall be "the Parties").

WHEREAS, the Hospitals have facilities for furnishing a clinical medical
education to the University's students; and

WHEREAS, the University has an established Clinical Curriculum; and

WHEREAS, the University has determined that it would be beneficial for students
to participate in clinical clerkships at the Hospitals.

NOW, THEREFORE, in consideration of the premises and the mutual promises
and undertakings of the parties set forth below, the Parties agree to conduct
structured core, required and elective clinical clerkships for the University's
medical students at the Hospitals according to the terms and conditions set out
below:

**SECTION I**

**The parties agree:**

1. That this Agreement will commence January 1, 2007 and will continue
   until December 31, 2010. It may be earlier terminated by either party
   only for material breach of this Agreement, remaining un-remedied for
   thirty days after written notice of such breach, and only after a
   subsequent notice of intention to terminate this agreement has been
   delivered by registered mail to the other party in writing, allowing
   sufficient time for response. In event of such termination, the students

who have commenced clerkships at the Hospitals will be allowed to complete their scheduled clerkships.

2.  The Hospitals acknowledge that they have received and reviewed the University's Clinical Curriculum Guide (incorporated into this Agreement by reference and attached hereto as Exhibit A), and BQHC agrees to direct the Hospitals to provide clinical medical education consistent with all requirements therewith, as a minimum standard.

3.  After considering the number of qualified University medical students, the number of clinical faculty in various disciplines at the Hospitals, the availability of relevant patient populations, and the total number of clerkships to be apportioned between the medical schools affiliated with the Hospitals, the Parties have agreed that the Hospitals shall provide the clerkships set forth in Exhibit B, attached hereto and incorporated by reference herein.

4.  The provisions of this Agreement shall be construed and interpreted and all rights and obligations hereunder determined in accordance with New York law.  The Parties consent that jurisdiction and venue of any dispute arising from this Agreement shall be in Kings County, New York.

5.  The relationship of the Parties is that of independent institutions, which shall be observed at all times.  No partnership, agency, or fiduciary relationship is implied, and none shall be construed.

6.  BQHC shall ensure that the Hospitals shall make no distinction in the admission of students to a clinical clerkship on the basis of race, sex, creed, color, national origin, age, marital status, height, weight or handicap status.

7.  This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged or hypothecated in any way, without the written consent of the other party, except in the case of a sale of all or a majority of assets, or otherwise by operation of law, in which case transfer is permitted without consent; provided, however, that any successors in interest shall be obligated to comply with all of the terms and conditions of this Agreement.

ROSS015106

**SECTION II**

**BQHC AGREES that the Hospitals shall:**

1. permit students of the University appropriate access to patients in the Hospitals while they are formally enrolled in clerkships.

2. provide appropriate clinical supervision and training of University students, including their performance of relevant clinical procedures, while taking core clerkships in Internal Medicine, Surgery, Obstetrics & Gynecology, Psychiatry, and Family Medicine as well as elective rotations at the Hospitals. The Parties may agree to add or delete elective clerkships from time to time in writing during the term of this Agreement, provided that such agreement is mutual.

3. inform the appropriate officials of the University, in a timely and confidential manner, of any substantially inappropriate behavior, as defined by the Hospitals code of conduct and/or professional standards of conduct (copies of which shall be provided), on the part of any student, which may indicate the need for sustained counseling or correction.

4. provide any orientation, administrative guidance and procedures and other media deemed essential to the student's experience.

5. be responsible for the activities of the students during the clerkship, to directly supervise such activities and to provide students with appropriate and timely counsel/feedback/notification, no less than every three weeks, concerning performance and behavior in relation to their assigned rotation.

6. submit, in a timely and appropriate manner, a written Clinical Evaluation on each student at the completion of clerkships by the supervising physician, and where appropriate countersigned by the Director of Undergraduate Medical Education, which shall follow a format mutually acceptable to the parties and be delivered to the University within six weeks of completion of the clerkship.

7. provide to the University accurate and contemporary data concerning student clinical activities as reasonably requested by the University, but in no event less than weekly. Documentation will include patient census (i.e. average daily census) for each course area of clinical instruction.

8. make available the following health services to the University's students while they are assigned to clerkships at the Hospitals, provided that the usual fees and costs for such services shall be paid by the students:

ROSS015107

    a. Medical referrals through the Hospitals' Employee Health Services
    b. Emergency services provided by the Emergency Department; and
    c. Basic health services as required by regulatory agencies from time to
       time.

9. permit the use of its medical library by and computer access to the University's students while they are assigned to clerkships at the Hospitals on the same basis as any other personnel.

10. provide the following support services to the University's students while they are assigned to clerkships at the Hospitals:

    a. Housing referrals, if available; and
    b. In house accommodations for on-call personnel, including call
       rooms, shared lockers as available, dietary, uniform and linen
       services.

11. provide the University a right of first refusal as to half of all new core/elective clerkships slots developed by the Hospitals; provided, however, that the Hospitals will not hold any new slots empty unless payment of the Pre-payment Funds has been made in accordance with Exhibit B. The Hospitals shall provide the University with written notice, sent by registered mail, of such new core/elective clerkship slots and thereafter hold such slots available for the University for no less than 30 calendar days following delivery of such notice. The University shall notify in writing the Hospitals of its decision to exercise (or not) its right of first refusal within such notice period. BQHC shall provide, or shall cause the Hospitals to provide, on a quarterly basis, the University with a certified report of available clinical rotation slots at the Hospitals, on which the available slots guaranteed to the University was calculated.

12. maintain the confidentiality of the students' personal information in accordance with State and Federal laws and regulations.

13. provide the University, upon reasonable request therefor, with proof of insurance in commercially reasonable amounts and with such coverages as may be standard for hospitals in the area in which the Hospitals are located.


**SECTION III**

**THE UNIVERSITY AGREES:**

1. upon mutual agreement of the Parties, to offer and confer, upon those hospital teaching faculty satisfying University requirements, a clinical appointment as "adjunct faculty" to the University. Such appointment shall not

ROSS015108

create, nor be construed to create, an employer/employee relationship between any adjunct faculty and the University. In addition, conferment of adjunct faculty status on Hospital teaching faculty is not intended to, nor shall be construed to, mean that the University accepts the responsibility for teaching faculty's or the Hospitals' acts or omissions.

2.      In a timely manner, to inform the Hospitals of any substantive changes in its Clinical Curriculum Guide.

3.      To appoint for clinical clerkship only those students who have satisfactorily completed the prerequisite instructional portion of the curriculum, in the pre-clinical sciences in the University's sole discretion.

4.      To state as its policy that the Hospital Medical Director shall have the authority to immediately suspend any student of the University, whose behavior is sufficiently inappropriate to warrant this action, provided that the student is allowed a timely opportunity to appeal and the University is notified immediately.

5.      To require each student enrolled in clerkships to maintain at least $1,000,000/$3,000,000 malpractice coverage, protecting both the University and the Hospitals from liability which could occur as a result of the student's fault or negligence. The University shall maintain on file evidence of the existence of insurance required and shall provide a copy of the insurance to the Hospitals upon request. Each party agrees to give the other notice in writing within thirty (30) days of any claim made against it which is covered by this section.

6.      To provide medical library and secretarial support for the students engaged in clerkships, as set forth in Exhibit B.

7.      To require each student, prior to the commencement of the clinical experience, to provide results to the Hospital of physical examination which complies with the requirements of section 405.3 of the New York Code of Rules and Regulations. All clinical clerks will be offered by the University the opportunity the opportunity to receive a Hepatitis B vaccination. In addition, all clinical clerks will have completed the OSHA Bloodborne Pathogens Workshop prior to beginning clerkships.

8.      In the event of impending bankruptcy, BQHC will give to the University such notice as promptly as they are legally permitted to provide. On a quarterly basis, no later than 90 days after the close of the quarter, BQHC shall cause the Hospitals to provide the University with a report on its financial condition.

9.      In the event that the Hospitals are unable to accept the specified number of students, as set forth in exhibit A, for the core or elective rotations, BQHC will refund to the University that portion of the prepayment funds which have not then been earned.

ROSS015109

**THIS AGREEMENT IS SIGNED AND DATED AS FOLLOWS**:

Brooklyn Queens Health Care, Inc.

_____
Date

_____
Date

On Behalf of **ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE:**

_____
**Nancy Perri, M.D.,** Vice President, Academic Affairs

Date

_____
**John St. James**, Chief Financial Officer

Date

ROSS015110

EXHIBIT A

UNIVERSITY'S CLINICAL CURRICULUM GUIDE

[TO BE ATTACHED]

ROSS015111

**EXHIBIT B**

This exhibit sets forth the financial terms of the above Agreement, whereby the University hereby agrees that it will pay BQHC as follows:

> a.    The University will deposit with BQHC $5,000,000 US Dollars (the "Pre-Payment Funds") on or before December 27, 2006, by wire transfer or such other commercially reasonable manner as may be agreed upon between the Parties;

> b.    In consideration of such payment, BQHC shall cause the Hospitals to provide clinical clerkships to the University's eligible students during the term of this Agreement,  and until the Pre-Payment Funds have been exhausted; and

> c.    The University will pay for subsequent clinical clerkships at the Hospitals on a "service performed" basis, at the rate set forth below, once the Pre-payment Funds have been fully amortized.

The Pre-Payment Funds represent an advance payment for core and elective clerkship weeks, calculated at a rate of $312.50 per week, per clerkship, at either of the Hospitals, for a total of sixteen thousand (16,000) instructional weeks.  For avoidance of all doubt, the Pre-Payment Funds are intended to cover the total number of weeks for each clinical clerkship guaranteed hereunder until the Pre-Payment Funds have been exhausted.

During the term of this Agreement, BQHC guarantee that the Hospitals shall provide the University with a minimum number of fifty (50) core clerkship slots, allocated as follows:

| | |
|---|---|
| Surgery | 16 |
| Medicine | 20 |
| Ob/Gyn | 8 |
| Family Medicine | 6 |

In addition, BQHC further guarantees that the Hospitals shall provide the University with fifty (50) elective clerkship slots during the term of the Agreement, to be allocated in accordance with the mutual agreement of the Parties..

The clerkship rate of $312.50 per week is guaranteed for the entire term of the Agreement.  In other words, once the University has exhausted the Pre-Payment Funds deposited with BQHC, the University shall be entitled to pay for additional clinical clerkships at this rate for the remaining balance of the term of the Agreement.

ROSS015112

The University will provide to BQHC, on behalf of the Hospitals, annual library support of $10,000.00 USD paid semi-annually in consideration for the use of the Hospitals' library facilities by University students engaged in clinical clerkships during the term of the Agreement.

The University also agrees that it will pay BQHC, on behalf of the Hospitals, for reasonable secretarial support required to implement this Agreement. The amount to be paid by the University for secretarial support will be determined by the Parties, based upon the size of the student program and shall be agreed upon in writing. In no event shall the amount paid by the University for secretarial support for any given year be less than $36,000.00 USD, so long as the Hospitals are providing at least fifty (50) core clerkship positions for the University's students.

The Hospitals will submit invoices for such expenses and the invoices will be supported by appropriate documentation. Payment terms are net 30 days.

In consideration of the Pre-Payment under this Agreement, BQHC shall pay, or shall cause the Hospitals to pay, the University an amount equivalent to interest, paid at a rate of LIBOR + 1% per annum and calculated on the unamortized amount of prepayment (the "Monetary Consideration"). Such amortization is based upon the amount expended for the clinical clerkships on a monthly basis over the term of this Agreement, as set forth in Exhibit C, which is attached hereto and incorporated by reference herein.

The Monetary Consideration is due and payable on or before the end of the month following the period set forth in the amortization schedule. If unpaid within 60-days following the applicable period, a late fee, in the same rate as the effective rate for the amortization period, will accrue, beginning with the first day of the second month following the amortization period.

The University reserves the right to apply any Monetary Consideration against any monies to be paid by the University under this Agreement for secretarial support, library support, or additional clerks. In the event the University elects to exercise such right, BQHC shall provide, or cause the Hospitals to provide, within the same time frame as the payment schedule in the paragraph above, a written accounting of such disbursements from the Monetary Consideration owed the University.

In the event of failure to pay the Monetary Consideration hereunder and/or the filing of bankruptcy by BQHC, or by one or both of the Hospitals, BQHC agrees, and shall cause the Hospitals to agree, that the University shall be considered a secured creditor in the amount of any unpaid Monetary Consideration and any unamortized portion of the Pre-Payment Amount.

ROSS015113

Absent material breach of this Agreement by the University, the Hospitals shall not withhold Services while the Hospitals remain operative. In the event the Hospitals are not operative, and the University is not in material breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.

**NOTE: Neither the Hospital's provision of services nor the payment to the University of any monetary consideration under this Agreement in exchange for the Pre-Payment Funds constitutes a lending arrangement. The University is not a lender or a financial institution, and is not in the business of making commercial loans or financial transactions, which may be subject to state or federal regulation. Pre-payment for services is at the express request of BQHC, and is solely for the convenience of BQHC and the Hospitals.**

ROSS015114

EXHIBIT C
[agreed upon amortization table]

ROSS015115