# Exhibit 47

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                    Plaintiff,

    vs.                                        CASE NO.
                                    09 CV 01410(KAM)(RLM)

BROOKLYN-QUEENS HEALTH CARE, LTD
and WYCKOFF HEIGHTS MEDICAL
CENTER,

                    Defendants.

_____


DEPOSITION OF

THOMAS SINGLETON

Taken on Behalf of the Plaintiff

July 8, 2011

(9:00 a.m. - 11:30 a.m.)


_____


Trine M. Mitchell, RPR

(615) 830-5544

Tennessee LCR No. 284
Expires 6/30/2012

2

APPEARANCES:
For the Plaintiff:
    GEORGE TZANETOPOULOS, ESQ.
    Baker & Hostetler
    191 North Wacker Drive
    Suite 3100
    Chicago, Illinois 60606
    (312)416-6200
    gtzanetopoulos@bakerlaw.com
For the Defendants:
    WALTER P. LOUGHLIN, ESQ.
    K&L Gates
    599 Lexington Avenue
    New York, New York 10022
    (212)536-4065
    walter.loughlin@klgates.com

For Mr. Singleton:
    THOMAS H. SEAR, ESQ.
    Jones Day
    222 E. 41st Street
    New York, New York 10017
    (212)326-3939
    thsear@jonesday.com

Also Present: David Hoffman
           In-house Counsel for Wyckoff

3

### INDEX
### INDEX OF EXAMINATIONS
PAGE

Examination by Mr. Tzanetopoulos   5
Examination by Mr. Loughlin   64
Examination by Mr. Tzanetopoulos   103

### INDEX OF EXHIBITS
PAGE

No. 1 Affiliation Agreement   11
No. 2 Amendment to Affiliation   11
    Agreement
No. 3 Second Amendment to   11
    Affiliation Agreement
No. 4 Presentation-Caritas Operating   16
    Scenarios
No. 5 Consolidated Financial   16
    Statements
No. 6 Administrative Agreement   27
No. 7 Administrative Agreement   28
No. 8 E-mail String Re: Caritas   40
    Student Program
No. 9 Wyckoff Heights Minutes   51
    December 20, 2007
No. 10 Wyckoff Heights Minutes   60
    January 10, 2008

4

The deposition of THOMAS SINGLETON, taken on behalf of the Plaintiff, on the 8th day of July, 2011, at the Davidson County Courthouse, 1 Public Square, Nashville, Tennessee, for all purposes under the New York Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Trine M. Mitchell, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness is not waived.

* * *

THOMAS SINGLETON, was called as a witness, and after having been first duly sworn, testified as follows:

5

EXAMINATION

BY MR. TZANETOPOULOS:

Q.    Thank you very much.

Mr. Singleton, would you state your full name and home address, please?

A.    Thomas Wallace Singleton, 4564 Peytonsville Road, Franklin, Tennessee 37064.

Q.    Have you given a deposition before?

A.    Yes.

Q.    How many times?

A.    Lots.

Q.    Yeah.  You know the ground rules.  I'll give you the very short version.

I'll obviously be asking questions, you'll be giving answers.  Our court reporter will write down those answers.  If, at any point, you don't hear me or understand me, let me know; all right?

A.    (Indicating.)

Q.    That's -- you have to answer out loud. You can't shake your body.

A.    Yes.  You're right.  It's been a while. Yes.

Q.    And if you need a break, let me know, and we'll be happy to accommodate that.

6

1  **What did you do to prepare for your**
2  **deposition today?**
3  A.    Spent about an hour with Tom here
4  yesterday.
5  **Q.    And Tom is Mr. Sear?**
6  A.    Yes.
7  **Q.    Anything else?**
8  A.    No.
9  **Q.    What's your present occupation?**
10  A.    Retired.
11  **Q.    How old are you, sir?**
12  A.    I will be 63 next Wednesday.
13  **Q.    Early happy birthday.**
14  **What's the highest level of education**
15  **that you've attained?**
16  A.    I have a master's, MBA, in finance.
17  **Q.    From what school did you receive the**
18  **MBA?**
19  A.    University of Chicago.
20  **Q.    And what year?**
21  A.    '72.
22  **Q.    And you have bachelor's degree?**
23  A.    BA in math and economics from
24  Vanderbilt in 1970.
25  **Q.    We'll take the short version, but if**

7

1  **you could run us from when you got your MBA to**
2  **when you retired, the short version of the Tom**
3  **Singleton CV.**
4  A.    All right.  When I got out of graduate
5  school, I came back to Nashville, went to work
6  for an apparel company Genesco in 1974.
7      January 1974, I entered the health care
8  industry with Hospital Affiliates.  Progressed
9  with Hospital Affiliates, until they were
10  purchased by HCA, Hospital Corporation of
11  America, in 1981.
12      Started a company, with a couple of
13  other guys, in 1981 called Hospital Management
14  Professionals.  We built that company until
15  1992, and we sold that company to Quorum and I
16  went to work for Quorum.
17      We had started a restructuring turn
18  around division in Hospital Management
19  Professionals in '89, which I was running and
20  continued to run that for Quorum.
21      In around 2001, 2002 -- well, I had
22  a -- I left Quorum briefly for about 18 months,
23  became CEO of a publicly traded company called
24  New American Health Care.  We liquidated that
25  company and then I went back to work for

8

1  Quorum, running what had then become Cambio,
2  which was the turn around company.
3      In 2002, Triad bought Quorum, and Triad
4  decided they wanted to sell the turn around
5  business.  So they sold it to the employees, by
6  letting the employee buy out of the company in
7  2002.
8      We then sold that company in 2004 to
9  FTI, and I worked with FTI until 2008, when I
10  retired.
11      Was that short enough?
12  **Q.    Just right.**
13  **You made reference to hospital turn**
14  **around business.  In layman's terms, what is**
15  **that?**
16  A.    Well, the way we did it, we would go in
17  and typically take over the management of a
18  financially distressed hospital, and turn
19  that -- try to improve the earnings of that
20  hospital to such an extent, over two to five
21  years, they could either stand on their own or
22  we would sell the hospital, sell the assets,
23  the operating assets, to pay off the debt.
24      Usually these were highly leveraged
25  institutions.  They were not-for-profit

9

1  hospitals, so they had no way of raising
2  equity.  They can only raise debt.
3      So that's what we call turn around.  We
4  did other things related to that, but that was
5  our primary business.
6  **Q.    In connection with your work at FTI**
7  **Cambio, did you do work at Brooklyn-Queens**
8  **Health Care and its affiliates?**
9  A.    Yes.
10  **Q.    What work?**
11  A.    Well, initially we did a consulting
12  project between April -- I think it would be
13  '07 to June of '07, trying to determine how
14  deep the hole was, the financial hole.
15      BQHC, Brooklyn-Queens Health Care, had
16  just purchased out of bankruptcy Mary
17  Immaculate and St. John's, and they had run
18  into financial troubles, cash flow problems.
19  So we were in there trying to determine how
20  serious those cash flow problems were.  That
21  was the first task, I think, if I remember
22  correctly.
23  **Q.    And then?**
24  A.    The way I recollect it is, the state of
25  New York, which was funding BQHC -- BQHC had

10

1 two corporate entities; Wyckoff, which was an
2 existing hospital; and Caritas, which was
3 St. John's and Mary Immaculate. And St. John's
4 and Mary Immaculate, Caritas, was having
5 significant financial problems, cash flow
6 problems. And state of New York was funding --
7 helping fund those cash flow problems.
8      And the state of New York decided that
9 they needed -- that BQHC needed to bring in new
10 management, and basically instructed them that
11 if they wanted to continue to get funding from
12 the state of New York, they had to bring in a
13 turn around firm.
14      And so the board looked at a number of
15 firms and selected our firm. One of the
16 stipulations that the board made was that I
17 would have to be CEO of BQHC, if they hired us,
18 which was unusual. I didn't normally do that.
19 I mean, I normally supervised a number of
20 projects.
21 Q.    So once you entered management at BQHC
22 and its affiliates, you were full time there?
23 A.    Yes.
24      MR. TZANETOPOULOS: Let me ask you
25 to mark that one, two and three.

11

1      (The above-referred to document
2 was thereupon marked Singleton Exhibit No. 1.)
3      (The above-referred to document
4 was thereupon marked Singleton Exhibit No. 2.)
5      (The above-referred to document
6 was thereupon marked Singleton Exhibit No. 3.)
7      MR. LOUGHLIN: Off the record.
8      (Discussion off the record.)
9 BY MR. TZANETOPOULOS:
10 Q.    Mr. Singleton, let me show you three
11 documents that the court reporter has marked as
12 deposition exhibits. The first is marked as
13 Deposition Exhibit 1, entitled Affiliation
14 Agreement between Ross University School of
15 Medicine and Brooklyn-Queens Health Care. It's
16 been stamped with identification numbers Ross
17 56 through 67.
18      Exhibit 2 is entitled Amendment to
19 Affiliation Agreement between Ross and
20 Brooklyn-Queens Health Care, stamped Ross 52
21 through 54.
22      And Exhibit 3 is the Second
23 Amendment to the Affiliation Agreement between
24 Ross and Brooklyn-Queens Health Care, stamped
25 BQHC 42911 through 917.

12

1      Give you those three. Take a
2 look, if you will, then I'll have a couple of
3 questions
4 A.    You want me to look at them?
5 Q.    Sure.
6      MR. SEAR: I would go with one,
7 first.
8      THE WITNESS: Do you want me to
9 read? What --
10      MR. TZANETOPOULOS: No. You can
11 just take a quick look at them and I'll take
12 you through them all.
13      Off the record.
14      (Discussion off the record.)
15 BY MR. TZANETOPOULOS:
16 Q.    All right. Have you had a chance to
17 look at the three exhibits?
18 A.    Yes.
19 Q.    I can direct your attention to
20 Exhibit 3, and that's the Second Amendment, and
21 a side letter attached to the Second Amendment.
22      And at Page 5 of the Second Amendment,
23 is that your signature?
24 A.    Yes.
25 Q.    And on the last page of the exhibit,

13

1 the signatures on the letter agreement, are
2 those yours?
3 A.    Yes.
4 Q.    If I can direct you back to the
5 original contract, Exhibit 1, the Affiliation
6 Agreement between Ross and BQHC. And, in
7 particular, to a provision in Exhibit B of the
8 agreement, at page stamped Ross 64.
9      It says: In the event the hospitals
10 are not operative and the university is not in
11 material breach of the agreement, BQHC agrees
12 to provide the university with an equivalent
13 number of clerkships, as agreed to herein, at
14 one or more of its other facilities.
15      See where I am?
16 A.    Uh-huh.
17      MR. SEAR: You have to say yes or
18 no.
19      THE WITNESS: Yes.
20 BY MR. TZANETOPOULOS:
21 Q.    At the time when you were serving in
22 hospital management, did Wyckoff provide
23 clerkships for medical students at Wyckoff
24 facilities?
25 A.    Yes.

14

```
 1    Q.    Did St. John's Hospital?
 2    A.    Yes.
 3    Q.    Did Mary Immaculate?
 4    A.    Yes.
 5    Q.    Were there any other BQHC facilities
 6    that provided clerkships to medical students?
 7    A.    No.
 8    Q.    On the Exhibit 2, the first Amendment,
 9    Paul Goldberg told us earlier this week that he
10    had signed that at your direction.
11         Do you recall directing Mr. Goldberg to
12    sign this contract?
13    A.    No.
14    Q.    Do you know why it was that he signed
15    it rather than you?
16    A.    My mother-in-law died during that time,
17    and I took some time off.  That's the only
18    thing that I could guess that that might be why
19    he signed it, but that's just a speculation.
20    Q.    Okay.
21    A.    I probably shouldn't do that.
22    Q.    That's okay.
23         Were you Mr. Goldberg's boss at the
24    time?
25    A.    Yes.
```

15

```
 1    Q.    And the document's also been signed by
 2    Julius Romero.  Were you Mr. Romero's boss
 3    ultimately at that time?
 4    A.    Ultimately, yeah.
 5    Q.    All right.  You spoke earlier about a
 6    consulting phase of FTI in your work at the
 7    BQHC entities.
 8         What work did you perform during that
 9    phase of the job?
10    A.    Well, we looked at the liabilities and
11    the cash flows to try to determine how much
12    additional funding the state would be required
13    to make in order to stabilize the organization.
14    Q.    All right.
15         MR. LOUGHLIN:  Did we have some
16    specification about which hospital the
17    consulting phase related to?
18         MR. TZANETOPOULOS:  You'll get to
19    ask questions, Pat.
20         MR. LOUGHLIN:  Pardon me?
21         MR. TZANETOPOULOS:  I said, you'll
22    get your turn.
23         MR. LOUGHLIN:  Just interested in
24    the accuracy of the record.
25
```

16

```
 1    BY MR. TZANETOPOULOS:
 2    Q.    Did FTI produce a report at the
 3    conclusion of the consulting project?
 4    A.    I believe we did, yes.
 5         MR. TZANETOPOULOS:  Please mark
 6    this.
 7         (The above-referred to document
 8    was thereupon marked Singleton Exhibit No. 4.)
 9    BY MR. TZANETOPOULOS:
10    Q.    Mr. Singleton, let me show to you a
11    document that the court reporter has marked as
12    Deposition Exhibit Number 4.  It's been stamped
13    with identification BQHC 12550 through 12608.
14         MR. TZANETOPOULOS:  Go off the
15    record.
16         (Discussion off the record.)
17         MR. TZANETOPOULOS:  You can do the
18    next one too, please.
19         (The above-referred to document
20    was thereupon marked Singleton Exhibit No. 5.)
21    BY MR. TZANETOPOULOS:
22    Q.    Is Exhibit 4 a presentation prepared by
23    you and your team?
24         MR. SEAR:  Just for the record,
25    note my objection, since this is a 57-page
```

17

```
 1    document.  I mean, he can do his best
 2    understanding, but I don't think he's in a
 3    position, in some absolute way, to answer that
 4    question.
 5         But do the best you can.
 6         THE WITNESS:  We prepared a
 7    presentation.  I cannot -- I mean, this has the
 8    appearance of that presentation.  I can't
 9    testify exactly that this is the presentation,
10    but we did prepare one that would have this
11    format.  I mean...
12    BY MR. TZANETOPOULOS:
13    Q.    Any reason to think that this isn't
14    something that you and your team presented to
15    the board?
16    A.    I don't think we presented it to the
17    board.  I may be mistaken about that.  We
18    presented it to the state, I think.  That's my
19    recollection, but...
20    Q.    All right.
21    A.    Okay.
22    Q.    And to whom at the state do you believe
23    you made that presentation?
24    A.    Oh, I don't know.  A whole group of
25    people from the state health department.  I
```

18

1  don't remember their names particularly.
2  **Q.   Let me show you a document that the**
3  **court reporter has marked as Exhibit 7.**
4      MR. LOUGHLIN: I think we're on
5  five, if it's the financial statement.
6      MR. SEAR: Yes, it's five.
7  BY MR. TZANETOPOULOS:
8  **Q.   And let me just tell you that we have,**
9  **in this exhibit, stuck together two financial**
10 **statements; the audited financial statements**
11 **for Caritas, for year ended December 31, 2007,**
12 **and the audited financials for Wyckoff for that**
13 **same period.**
14     **Let me direct your attention -- let me**
15 **ask another question first.**
16     **Did you, or people that worked for you,**
17 **provide information to the auditors for the**
18 **financial statements during this period?**
19 A.   Yes.
20 **Q.   As part of your tasks, would it be one**
21 **of your tasks to review the audited financial**
22 **statements when they came out?**
23 A.   That would be in the normal course of
24 business, yes.
25 **Q.   If I can direct you to Page 18 of the**

19

1  Caritas financials; in particular, Note 4, the
2  deferred revenue note.
3  A.   Okay.
4  **Q.   Is the -- well, it says: The $5**
5  **million in advances were received from Ross on**
6  **December 26; and four million -- or**
7  **December 26, 2006; $4 million received from**
8  **Ross on December 5, 2007.**
9      **Is the $5-million figure, that was**
10 **received from Ross referred to here, the**
11 **$5 million that was paid under the original**
12 **Affiliation Agreement?**
13 A.   I don't know.
14 **Q.   Is the $4 million, the four million**
15 **paid under the first Amendment?**
16 A.   I don't have any recollection whether
17 that's true or not.
18 **Q.   All right. You were aware that there**
19 **had been advances paid under these contracts?**
20 A.   Yes.
21 **Q.   The -- note the financial reflects**
22 **advances from Ross and advances from the**
23 **American University of the Caribbean.**
24     **Did Caritas provide medical clerkships**
25 **at this period to any other medical school?**

20

1  A.   I don't know. I don't remember for
2  sure.
3  **Q.   If I can direct you back to the slides**
4  **in Exhibit 4.**
5  A.   Okay. That's the four.
6  **Q.   In particular, Page 11.**
7      **Is it correct that the material that**
8  **follows this was information that considered**
9  **what might happen if the board decided to close**
10 **Mary Immaculate Hospital and operate only**
11 **St. John's?**
12     MR. LOUGHLIN: Can I have a
13 continue objection to the use of the term
14 board, without the specification which entity
15 we're talking about?
16     MR. TZANETOPOULOS: Sure.
17     MR. LOUGHLIN: It's just going to
18 confuse the record.
19     MR. TZANETOPOULOS: Sure.
20     THE WITNESS: Based on the title,
21 I would say yes.
22 BY MR. TZANETOPOULOS:
23 **Q.   And if I can direct you to Pages 17 and**
24 **18. Mr. Goldberg told us Monday that he**
25 **thought this was material that you would have**

21

1  been responsible for putting together.
2      **Was he correct?**
3  A.   You talking about, specifically, 17 and
4  18? Are you talking about in general?
5  **Q.   Seventeen and 18, in particular.**
6      MR. SEAR: Object to form.
7      Your memory would be better than
8  mine, but I'm not sure that Mr. Goldberg so
9  testified. The record will reflect whatever it
10 is.
11     But answer it as best you can.
12     THE WITNESS: If this is the
13 report that we produced and gave to the state
14 of New York, or presented to the state of New
15 York, then I would have had overall
16 responsibility for what went into this report.
17 BY MR. TZANETOPOULOS:
18 **Q.   All right. If I can turn you to**
19 **Page 18 -- or direct you to Page 18. The**
20 **bottom bullet on that page reads: The**
21 **$8.5 million of deferred revenue accrued for**
22 **medical student education will be amortized by**
23 **later rotations done at SJQH and Wyckoff with**
24 **no impact on cash flow.**
25     **See where I am?**

22

1 A.    Yes.
2 Q.    SJQH is St. John's Hospital?
3 A.    St. John's Queens Hospital, yeah.
4 Q.    The presentation -- why is it that --
5 let me ask it differently.
6     Was the point that medical student
7 education, if St. John's closed, would be
8 provided at -- I said that wrong. Let me
9 strike that, say it over.
10     Is the point reflected on Page 18 of
11 the exhibit -- that medical student education
12 would be amortized by rotations at St. John's
13 and Wyckoff, if Mary Immaculate were closed --
14 in part, based on understanding that the
15 contract that we marked as Exhibit 1 provides
16 for provision of clerkships at other
17 facilities, if the hospital closed?
18     MR. LOUGHLIN: Objection, form.
19     THE WITNESS: Can you read back
20 that question?
21     (The question was read back by the
22 reporter.)
23     THE WITNESS: No.
24     I'm sorry. Did --
25     MR. LOUGHLIN: I was going to

23

1 object to the foundation and the fact that the
2 question was incomprehensive, even to me.
3     THE WITNESS: I'm sorry. I
4 thought I understood it.
5     MR. LOUGHLIN: It's up to you.
6 It's up to you. You're the witness.
7     THE WITNESS: Okay.
8 BY MR. TZANETOPOULOS:
9 Q.    All right. The eight and a half
10 million dollars -- is Ross' prepayment for
11 medical clerkships included in the eight a half
12 million that's referred to here?
13 A.    I would assume so. My recollection of
14 exactly what makes up that eight and a half
15 million dollars four years ago is -- you know,
16 but I would assume that whatever they paid is
17 in the eight and a half.
18 Q.    All right. And when you talked
19 about -- or when the presentation speaks of
20 amortizing later rotations, in layman's terms,
21 what does that mean?
22 A.    Well, they prepaid. And for that
23 prepayment, the corporation had committed to
24 take so many students over a certain period of
25 time, to amortize that prepayment.

24

1 Q.    And the plan proposed here does not
2 show those amortizations to medical student
3 clerkships at both St. John's and at Wyckoff,
4 correct?
5 A.    This assumption seems to say that, yes.
6 Q.    What was the basis of amortizing --
7 planning to amortize clerkships for those sums
8 at Wyckoff?
9 A.    Because -- what it says, so it would
10 have no impact on cash flow for the total
11 organization.
12 Q.    And why would doing the rotations in
13 that fashion have no impact on cash flow?
14 A.    Well, if we couldn't provide the
15 clerkships, then we would have to -- my
16 understanding of the contract -- refund money,
17 which would be a negative impact on cash flow.
18     If we could provide the total
19 clerkships at the two remaining hospitals, then
20 we would not have to refund money and would not
21 have a negative impact on cash flow.
22     So that was -- these are assumptions.
23 It says assumptions. So that was the
24 assumption that we made to do this analysis.
25 Q.    Why were you considering closing Mary

25

1 Immaculate, but not St. John's?
2     MR. LOUGHLIN: Object to the form.
3     Witness said these are
4 assumptions. This is an analytic piece. It's
5 not an operational piece.
6     MR. SEAR: Just ignore all the
7 commentary. Just answer the question.
8     THE WITNESS: Mary Immaculate was
9 a older facility. It was a larger cash flow
10 loss. And there was some thinking that if we
11 closed Mary Immaculate, some of those patients
12 would go to St. John's and help St. John's be a
13 positive. Which, at the current time we were
14 looking at this, they were both negative cash
15 flow.
16     So that was the reason why we were
17 considering that.
18 BY MR. TZANETOPOULOS:
19 Q.    Ultimately, did the boards, any of the
20 affiliate boards -- let me ask a different one.
21     What was your recommendation, when you
22 concluded your consulting project, about what
23 to do with these hospitals?
24 A.    I don't recollect that that was part of
25 our assignment.

26

1    Our assignment, the way I recollect it,
2  was the state wanted to know what it was going
3  to cost under various assumptions, and that's
4  what we tried to do here; is present to the
5  state how much funding would be required,
6  depending on what they chose to do, what the
7  board chose to do, along with the consulting
8  with the state.
9  Q.    Between the boards and the state, was a
10 decision made about how to move forward?
11 A.    Not finally, while I was there.
12 Q.    At least for a period of time, did they
13 attempt to operate both hospitals?
14 A.    Yes.
15     MR. LOUGHLIN:  When you say they,
16 I'll repeat my continuing objection to the fact
17 that there's a lack of specification, you know,
18 to the particular board, or other entity or
19 other decision maker.
20     THE WITNESS:  Excuse me.  I'll
21 turn it off.
22     MR. LOUGHLIN:  Off the record.
23     (Discussion off the record.)
24 BY MR. TZANETOPOULOS:
25 Q.    All right.  If I recall correctly,

27

1  Mr. Singleton -- and you can correct me on the
2  timing -- you said about June or so you were
3  engaged to run the hospitals?
4  A.    I think it was middle of July.
5  Q.    All right.  Of 2007?
6  A.    Of 2007.
7  Q.    What was FTI's role, once you were
8  engaged to do that?
9      MR. SEAR:  Object to form.
10     Answer it as best you can.
11     THE WITNESS:  Well, I mean,
12 basically, we were -- we had the CEO, CFO
13 functions, and other functions, reporting to
14 the board of the three hospitals.
15     Actually, there was -- Caritas was
16 one corporation that had both St. John's and
17 Mary Immaculate that had a board, Wyckoff had a
18 board; and then BQHC was the parent board.  And
19 we basically reported to all three, and we were
20 responsible for the day-to-day operations of
21 the hospitals.
22     MR. TZANETOPOULOS:  Mark that one,
23 please.
24     (The above-referred to document
25 was thereupon marked Singleton Exhibit No. 6.)

28

1  BY MR. TZANETOPOULOS:
2  Q.    In particular, what were your jobs at
3  the hospitals at that time?
4      MR. SEAR:  You mean his
5  personally?
6      MR. TZANETOPOULOS:  Yes.  Tom
7  Singleton's job at each of the three entities?
8      THE WITNESS:  I was CEO of the
9  three hospitals and BQHC.
10     MR. TZANETOPOULOS:  Mark that one
11 next.
12     (The above-referred to document
13 was thereupon marked Singleton Exhibit No. 7.)
14 BY MR. TZANETOPOULOS:
15 Q.    Mr. Singleton, the court reporter has
16 marked as Exhibits 6 and 7, two contracts.  I
17 kindly direct your attention to the signature
18 page of Exhibit 6.
19 A.    Okay.
20 Q.    Is that yours?
21 A.    Yes.  Yes, that is my signature.
22 Q.    And above that, is that Dominick Gio on
23 behalf of Wyckoff?
24 A.    It looks like it.  I mean, I can't
25 testify that's his signature.  It does say, I

29

1  think -- underneath, it says his name.
2  Q.    Who is Mr. Gio, or what was his
3  position at that time?
4  A.    He was -- I believe he was CEO of
5  Caritas and Wyckoff at that time.
6  Q.    And then, Exhibit 7, it's the other
7  contract.
8  A.    Okay.
9  Q.    In the signature block, is that your
10 signature for FTI?
11 A.    Yes.  That is my signature.
12 Q.    And it shows Emil Rucigay on behalf of
13 the other entities.
14     Who was Emil Rucigay at that time; what
15 was his role?
16 A.    He was chairman of the board of each of
17 the three corporations.
18 Q.    There are two agreements, in pretty
19 short order, between FTI and the entities.
20 Why -- why were there two?
21 A.    I have no recollection as to why.  I
22 was just wondering that myself.
23 Q.    If I can direct your attention, please,
24 to -- in Exhibit 7, Page 11.
25 A.    Uh-huh.

30

1 Q. Under the fees section, it says BQHC
2 will pay FTI Cambio. And there's some
3 provisions for allocation lower down, and the
4 reimbursement section. Again, BQHC will
5 reimburse FTI Cambio.
6 Why was it that BQHC was to do the
7 paying?
8 A. I have no recollection as to why.
9 Q. Did BQHC, while you were at the
10 hospitals, have any assets?
11 A. It is my recollection they did not.
12 Q. Who actually paid FTI?
13 A. I have no recollection of that.
14 Q. Were you present during any of the
15 meetings between the hospital, either
16 management or boards, and the state, where the
17 state described what the state officials wanted
18 your authority to be?
19 A. Yeah.
20 MR. LOUGHLIN: Objection to form.
21 You have to specify which hospital
22 you're talking about.
23 MR. TZANETOPOULOS: Any of them.
24 THE WITNESS: Yes.
25

31

1 BY MR. TZANETOPOULOS:
2 Q. All right. Who from the hospitals --
3 hospital entities was there?
4 A. Typically it would be Mr. Rucigay, Rick
5 Zall, who was the outside counsel for the
6 hospital. Mr. Hoffman was there for some of
7 them. I can't remember if anybody else from
8 the hospital.
9 I mean, there would be people from our
10 team, FTI. Paul Goldberg, people like that,
11 that were FTI people who fill roles at the
12 hospital.
13 Q. And during those meetings, what did the
14 state say they wanted FTI's authority to be?
15 MR. SEAR: Object to form.
16 Answer it as best you can.
17 MR. LOUGHLIN: Object to form.
18 THE WITNESS: They expected us to
19 run those three hospitals, operate those three
20 hospitals. Make decisions a CEO would make;
21 and if the board didn't go along with us, then
22 we're to report to the state.
23 It's as simple as I can put it.
24 BY MR. TZANETOPOULOS:
25 Q. And during the course of those

32

1 meetings, did the state officials say the
2 continued financial aid to Caritas, Wyckoff or
3 both depended upon you being given that
4 authority?
5 A. I think that was explicit and implicit
6 in what they were doing.
7 Q. During the meetings from which you were
8 present, did the representatives from the
9 hospital entities agree to give FTI that
10 authority?
11 MR. SEAR: Object to form.
12 Answer it as best you can.
13 MR. LOUGHLIN: Object to form.
14 THE WITNESS: It's my recollection
15 they did, yes.
16 BY MR. TZANETOPOULOS:
17 Q. Once you began in July of 2007, were
18 you the top official at -- top management
19 official at Caritas?
20 MR. LOUGHLIN: Object to form.
21 THE WITNESS: At Caritas?
22 MR. TZANETOPOULOS: Yes, sir.
23 THE WITNESS: Yes, at Caritas.
24 BY MR. TZANETOPOULOS:
25 Q. Did everybody else at Caritas, during

33

1 that period, report to you, or through somebody
2 to you?
3 A. Yes.
4 Q. During the period of time while you
5 were there, following July of 2007, was that
6 also true at Wyckoff?
7 A. Yes, on paper. Probably actually
8 didn't take place at Wyckoff for a few months.
9 Q. At some point, were you the top
10 management official at Wyckoff as well?
11 MR. LOUGHLIN: Object to form.
12 THE WITNESS: Yes.
13 BY MR. TZANETOPOULOS:
14 Q. During what period?
15 A. I can't recollect exactly.
16 Q. It was within a few months of
17 July 2007?
18 A. Probably. It would have been whenever
19 Mr. Gio left. It was pretty clear then.
20 In effect, it was true from the
21 beginning. But as long as he was there, you
22 know, obviously there was some question in some
23 people's mind.
24 Q. Did you also have that same position at
25 BQHC?

34

1     MR. LOUGHLIN: Object to form.
2     THE WITNESS: On paper, but there
3  was -- I mean, there was nothing at BQHC. I
4  mean, yes.
5  BY MR. TZANETOPOULOS:
6     Q.    Did you report to each of the boards;
7  BQHC's, Caritas' and Wyckoff's?
8     A.    Yes.
9     Q.    Was there anyone between you -- in the
10  reporting chain, between each of the boards and
11  you; or did you report directly to the boards?
12     A.    I reported directly to the board --
13  boards.
14     Q.    Did you sign contracts on behalf of
15  Wyckoff?
16     A.    Yes.
17     Q.    And did you sign contracts on behalf of
18  Caritas?
19     A.    Yes.
20     Q.    And did you sign contracts on behalf of
21  BQHC?
22     A.    It's my recollection that I did, or had
23  the authority to do that. I can't recollect
24  whether we actually ever signed the contract
25  from BQHC.

35

1     Q.    What made you think that you had
2  authority to sign contracts on behalf of each
3  of those entities?
4     A.    Because that's normal operating
5  procedures and situations like this for me.
6  Rick Zall made it very clear to me, who I had
7  talked to constantly.
8     MR. LOUGHLIN: I'm going to
9  object --
10     THE WITNESS: What?
11     MR. LOUGHLIN: I have to object on
12  privilege grounds, if you were going to move
13  into discussing any communications between you
14  and Mr. Zall, who was outside counsel for
15  Wyckoff during this period.
16     MR. SEAR: Okay. And let me say,
17  we're following the direction of counsel for
18  the hospitals. And, Mr. Singleton, you should
19  not, absent a specific direction to the
20  contrary, go into the substance of
21  communications between you and counsel for the
22  hospitals, whether it's inside counsel or
23  outside counsel. But you may disclose the fact
24  of conversations that you had concerning
25  different subject matters.

36

1     I understand that may not be
2  self-explanatory, but don't go into the
3  substance of your communications with counsel
4  relating to these matters, unless I
5  specifically tell you to.
6     THE WITNESS: Okay.
7     MR. SEAR: So I think we're in the
8  middle of a question and an answer, and maybe
9  it will be helpful that we ought to read the
10  question back. And if you have anything you
11  need to add, you should add it.
12     (The question and answer were read
13  back by the reporter.)
14     THE WITNESS: And Mr. Rucigay, who
15  I also talked to constantly.
16     Now, this is all subject to board
17  approval at certain levels, okay? But that's
18  the standard. I'm the CEO. I'm the guy that
19  signs the contracts usually.
20     MR. TZANETOPOULOS: And let me get
21  back --
22     THE WITNESS: Can I confer with my
23  attorney?
24     MR. TZANETOPOULOS: Absolutely.
25     MR. SEAR: Sure.

37

1     MR. LOUGHLIN: Or we can jump out,
2  if you want.
3     MR. SEAR: No. We can go out.
4     (Discussion off the record.)
5     MR. TZANETOPOULOS: And let me, on
6  the record with opposing counsel -- as I
7  understand it, Mr. Loughlin, the position of
8  defendants in this case is Mr. Singleton was
9  not an authorized agent or an employee of BQHC
10  or Caritas or Wyckoff. So what is the basis of
11  the privilege?
12     MR. LOUGHLIN: I don't think we
13  have to specify. But it's fairly clear that
14  the witness testified he was operating in
15  the -- a variety of management functions at
16  Caritas, Wyckoff and BQHC.
17     And he said, in that capacity, in
18  response to your questions, that he consulted
19  with counsel who was representing one or more
20  of those entities. It seems obvious.
21     MR. TZANETOPOULOS: All right.
22  And I understand his testimony, but your
23  position has been to the contrary.
24     So, again, I'm going to ask you to
25  put on the record the basis for an

38

```
1   attorney/client privilege as between
2   Mr. Singleton and counsel for the hospital.
3           MR. LOUGHLIN:  Well, I think I
4   just did.
5           MR. TZANETOPOULOS:  I disagree.
6   BY MR. TZANETOPOULOS:
7   Q.     Who was Mr. Zall?
8   A.     He was a partner with a large law firm
9   in New York City.
10  Q.     Proskauer Rose?
11  A.     That's it.  Proskauer Rose, who was
12  very involved with BQHC, Caritas and Wyckoff,
13  particularly in advising them on legal matters,
14  and also involving the relationship with the
15  state; which obviously was very critical then.
16  Q.     Could the Caritas hospitals operate
17  without state aid?
18  A.     At that time?
19  Q.     Yes, sir.
20  A.     No.
21  Q.     Was Mr. Zall the hospital's legal
22  counsel already at the time that you began
23  there?
24  A.     Yes.
25  Q.     What did Mr. Zall tell you about your
```

39

```
1   authority?
2           MR. LOUGHLIN:  Objection,
3   privileged.
4           MR. SEAR:  I'm going to direct the
5   witness not to answer, totally pursuant to the
6   position taken by the hospitals.  I want to
7   make clear, we're completely a third party
8   here.  But at the request of, and in light of
9   the position taken by counsel, that's why we're
10  doing that.
11          So don't answer the question.
12  BY MR. TZANETOPOULOS:
13  Q.     During your time at the hospitals, did
14  you hire and fire employees, or direct others
15  to do so?
16  A.     Yes.
17  Q.     Did the boards know that you were
18  hiring and firing employees?
19  A.     Yes.
20  Q.     Did anybody object to you doing so?
21  A.     Not on principle.  But in specific
22  cases, there might have been board objections.
23  I can think of one in particular.
24  Q.     Is it correct that they disagreed with
25  your decision, but not your authority to fire
```

40

```
1   people?
2   A.     Right.  Correct.  That is the issue.
3   Q.     Did the boards know that you were
4   signing contracts on behalf of each of the
5   entities?
6   A.     Yes.
7   Q.     Did they object to you doing so?
8   A.     No.
9   Q.     How did they know that?
10  A.     Because most of the contracts I would
11  have signed, I got approval by the board
12  before.  Or certainly communicated with
13  Mr. Rucigay, who was my main contact with the
14  board outside the board meetings.
15          (A document was thereupon marked
16  Singleton Exhibit No. 8.)
17          THE WITNESS:  Can I take a break?
18          MR. TZANETOPOULOS:  Absolutely.
19  You can indeed.
20          (Discussion off the record.)
21  BY MR. TZANETOPOULOS:
22  Q.     All right.  Back on the record.
23          Mr. Singleton, the court reporter has
24  handed you a document that she's marked as
25  Exhibit 8.  And it's an e-mail string.  You're
```

41

```
1   in there sometimes.  And it's been Bates
2   labeled BQHC 19857 through 19861.
3           If we go to the page that's marked
4   19859, looks like that's the first one from a
5   fellow named Julius Romero to Richard Sarli,
6   David Hoffman and you.
7           What was Mr. Romero's job?
8   A.     Oh, he was kind of the coordinator of
9   all these clerkship slots that we had to
10  people.  They would come in, he would get them
11  acclimated.  He ran the program, in a sense, on
12  a day-to-day basis.
13  Q.     And the clerkship slots would be
14  clerkships for students at medical schools?
15  A.     Yeah.
16  Q.     And it is correct, is it not, that the
17  arrangement between the hospital entities and
18  medical schools where students were clerks
19  there, were the medical schools paid the
20  hospitals for the privilege of sending these
21  students through these clerkships?
22  A.     Yes.
23  Q.     During the time that you were at the
24  hospitals, did Mr. Romero play a role in
25  negotiating those contracts with the medical
```

42

1   schools?
2   A.   Yes.
3   Q.   What was his role?
4   A.   He was kind of the front line contact
5   person.  He was very familiar with the
6   arrangements.  He would advise me on what was
7   possible, what could be done.
8   Q.   And this e-mail string looks like he's
9   doing just that, correct, advising you about
10  possible alternatives for these contracts?
11  A.   Uh-huh.
12  Q.   You have to use words.
13  A.   Yes.  Sorry.
14  Q.   Let's discuss, in this instance, what
15  some of what you and Mr. Romero are e-mailing
16  about.
17       If I could direct your attention to
18  that same page, 19859, he writes that attached
19  is an AUC's counter offer.  Speaks of interest
20  being rolled over, and a cap being relaxed.
21       What was the point with respect --
22  A.   I'm not -- I don't see where you are,
23  I'm sorry.
24  Q.   Okay.  Right here.
25  A.   Oh.  I'm sorry.  So what's your

43

1   question?
2   Q.   He talks about interest being rolled
3   over.
4        What's the point there?  Is that
5   interest on their prepayment?
6   A.   I believe so, that there was some
7   sort -- in the contract, there was some sort of
8   requirement to potentially pay interest on
9   their prepayment.  You know, that's my
10  recollection -- that's my recollection.
11  Q.   All right.  Did the contract with AUC
12  put a limit on the number of medical school
13  clerkships that could be provided at St. John's
14  and Mary Immaculate?  Is that the cap that's
15  being discussed here?
16  A.   Again, it's my recollection that is
17  correct.
18  Q.   Mr. Romero writes, a little further
19  down:  In reaction, we have quietly discussed
20  options, Plan B, and received feedback from
21  Ross University.
22       Then he writes:  Ross is offering
23  Caritas 4.5 million for AUC's share of Caritas
24  slots, Plan B.
25       Go to the next page.  He lays out his

44

1   Plan B.
2        Did you understand his Plan B to be --
3   that one possibility was returning the
4   $3.2 million of prepayment that the hospital
5   had from AUC, and selling those same slots to
6   Ross for $4.5 million?
7   A.   I don't remember the exact numbers, but
8   that was -- that strategy was discussed.
9   Q.   And if we go back to Page 19859, I
10  guess the preceding page there is your response
11  to him at the top; is that correct?
12  A.   So you're saying that on Page 58.
13  Q.   Starting at 58, onto 59, that's your
14  response.
15  A.   That's why you think it's from me,
16  because of what's over on 58?
17  Q.   Yes, sir.  And the comment.
18  A.   Sounds like me.  Tough to beat, yes.  I
19  think that's probably -- I don't remember it.
20  I don't remember specifically saying that, but
21  that seems like would be my response.
22  Q.   All right.  And the 1.3 million you
23  discussed, that would be the difference between
24  4.5 million Ross was being -- or was offering
25  to pay, and the 3.2 that Caritas -- or strike

45

1   that.  Let me start again.
2        $1.3 million you discuss here would be
3   the difference between the 4.5 million Ross was
4   offering to pay, and the 3.2 that AUC had in in
5   prepayment?
6   A.   I think the 3.2 would include accrued
7   interest and other things.  But, I mean, I'm
8   just -- you know, that's my -- I don't have any
9   recollection of the numbers, as I've already
10  said.  But looking -- the 1.3 is clearly the
11  difference.  And the 3.2 would have been the
12  total cost of exiting the Ross -- the AUC
13  contract, per the contract.
14  Q.   And so, as best you can put together
15  now, the discussion at this point is that you
16  could come away with $1.3 million more, if you
17  cashed out AUC and replaced AUC with Ross here.
18  A.   Plus, we'd have additional slots to
19  sell, based on what I said on Page 59.
20  Q.   All right.  And that would be that if
21  you took AUC out, and replaced it with Ross,
22  the cap you discussed would be eliminated,
23  correct?
24  A.   I don't recollect that.  I recollect
25  there was a cap.

46

1    Q.    Right.
2    A.    I don't recollect that that's what this
3  is referring to, but it's possible.
4    Q.    Now, if we can go to the front page of
5  the exhibit -- all right.  Before we do that, I
6  apologize.  Let's go back to your e-mail to
7  Mr. Romero.
8    A.    On 59?
9    Q.    Yes, sir.
10         You ask:  What is the downside to Plan
11  B?
12   A.    Where is that?
13   Q.    Right here.
14   A.    Okay.  I see.
15   Q.    And if we move forward in the e-mail
16  string, he apparently responds.  And I'm, in
17  particular, looking at the e-mail from him to
18  you, Thursday, October 25, 2007 at 11:37 p.m.
19   A.    Okay.  All right.
20   Q.    Take a minute, look through it.
21   A.    Okay.
22   Q.    All right.  And he sets out his Plan B
23  scenario, which reads:  AUC is pulled out of
24  Caritas.  Ross gets exclusivity for the next
25  three years, coma, plus options year four and

47

1  five, period.  We get 1.3 million, period.
2         In a worst-case scenario, a fallout by
3  the residency programs or institutions will
4  make us responsible for unamortized payments,
5  plus interest of up to 9.5 million, paren,
6  initial five million, plus 4.5 million, closed
7  paren, period.  Slots lost at Caritas are
8  guaranteed at Wyckoff, as per both contracts.
9         Did you understand Mr. Romero to be
10  telling you that, if you entered into this
11  deal, the initial $5 million Ross contract, and
12  the 4.5 million proposal, would be guaranteed
13  at Wyckoff if Caritas couldn't perform?
14   A.    Can you repeat that for me?
15         (The question was read back by the
16  reporter.)
17         THE WITNESS:  I don't recollect
18  what I understood.  I mean, I can read what
19  this says, but I don't recollect what I
20  understood at the time.  I don't recollect this
21  e-mail, but I assume it's a legitimate e-mail
22  string.
23  BY MR. TZANETOPOULOS:
24   Q.    If I can direct your attention back to
25  Exhibit 2.  That's the Amendment --

48

1    A.    Uh-huh.
2    Q.    -- to the agreement between Ross and
3  BQHC.
4         Did you personally participate in any
5  of the negotiations with Ross over that
6  contract?
7    A.    Over this Amendment?
8    Q.    Yes, sir.
9    A.    I don't recollect.  I assume that I
10  did.  It would be something that I would
11  normally do, but I don't recollect doing it
12  specifically.
13   Q.    Would it be your regular practice to
14  check off with the hospital's legal counsel
15  before entering into a contract like Exhibit 2?
16   A.    Absolutely.
17         MR. LOUGHLIN:  Object to the form.
18  BY MR. TZANETOPOULOS:
19   Q.    Did you do so in this instance?
20   A.    If I don't recollect -- I mean, I don't
21  have any recollection of doing that
22  specifically, but that would be my normal
23  course of action.
24   Q.    All right.  If I could direct your
25  attention to Exhibit 3.  It's the Second

49

1  Amendment, or the letter.  Here you go.
2         Did you personally participate in
3  negotiations with Ross over the contract in the
4  letter of Exhibit 3?
5    A.    I have no recollection of whether I did
6  or did not.
7    Q.    Now, do you recall -- I know the
8  answer, but I'll ask anyway.
9         Do you recall any discussions with
10  anybody at Ross about any of these affiliation
11  agreements?
12         MR. SEAR:  Object to form.  Which
13  agreements are we talking about?
14         MR. TZANETOPOULOS:  Any of he
15  them.  The original, the Amendment, the Second
16  Amendment.
17         MR. SEAR:  Let me object to that
18  question.  I think it's such a sweeping
19  question.
20         But answer it as best you can.
21         MR. LOUGHLIN:  I'll also object.
22  I mean, the first one was signed in
23  December 2006 --
24         THE WITNESS:  That's what I was
25  going to say.

50

1 MR. LOUGHLIN: -- before
2 Mr. Singleton was on the scene.
3 THE WITNESS: I had nothing to do
4 with the first one, because it was signed
5 before I got there.
6 I do not have -- I do have
7 recollections of meeting with the officials
8 from Ross, at least coming in and shaking their
9 hands and saying hello to them. And I think it
10 was at a Wyckoff -- in the Wyckoff conference
11 room. Because, as I've already mentioned, Tom
12 Sheppard, who I have a relationship with a long
13 time ago, I remember meeting him.
14 Now, I have no recollection of
15 whether I actually was in the negotiations of
16 these contracts or not. But normally -- I
17 certainly normally would have approved them,
18 but I don't have any recollection about whether
19 I negotiated -- actually did the negotiations.
20 BY MR. TZANETOPOULOS:
21 **Q. Well, let's go ahead and close out on**
22 **the Second Amendment, Exhibit 3.**
23 **Was it your normal practice to check**
24 **off with the hospital's legal counsel before**
25 **signing contracts like that in Exhibit 3?**

51

1 MR. LOUGHLIN: Objection. Object
2 to form.
3 MR. SEAR: You may answer.
4 THE WITNESS: Yes, I would never
5 sign anything unless legal counsel told me to
6 do that.
7 BY MR. TZANETOPOULOS:
8 **Q. Do you remember doing so here?**
9 A. Again, I have no specific recollection
10 of doing that, but that would be my normal
11 course of action.
12 (A document was thereupon marked
13 Singleton Exhibit No. 9.)
14 BY MR. TZANETOPOULOS:
15 **Q. Mr. Singleton, during your time at**
16 **these hospitals, was it your practice to attend**
17 **the Wyckoff Heights Board of Trustees meetings?**
18 A. Yes.
19 **Q. Was it your practice to attend the**
20 **Caritas Board of Trustees meetings?**
21 A. Yes.
22 **Q. Was it your practice to attend the**
23 **Brooklyn-Queens Health Care Board of Trustees**
24 **meetings?**
25 A. Yes.

52

1 **Q. The court reporter has handed you a**
2 **document that she marked as Exhibit 9. It's**
3 **the minutes from the December 20, 2007 Board of**
4 **Trustees meetings. It reflects that you were**
5 **there, and Mr. Goldberg as well.**
6 **Look at it as much as you care to.**
7 **Where I'd like to direct your attention, and**
8 **have some questions, is in Pages 3 and 4, the**
9 **report of the chief restructuring officer.**
10 **I guess before we get there, is chief**
11 **restructuring officer the formal title you were**
12 **given at these entities?**
13 A. Internally, yes.
14 **Q. On Page -- and during the course of the**
15 **meetings, was it a regular part of the meetings**
16 **that you would report to each of the boards?**
17 A. Yes.
18 **Q. If I can direct your attention to**
19 **Page 4 of the minutes.**
20 A. Page 4?
21 **Q. Page 4.**
22 MR. SEAR: It would be listed at
23 the top. There you go.
24 BY MR. TZANETOPOULOS:
25 **Q. And the minutes recite that:**

53

1 **Mr. Singleton reported that he, along with**
2 **Mr. Gio and Julius Romero, have been**
3 **negotiating with the Caribbean medical schools**
4 **over the last two months to generate additional**
5 **cash for Wyckoff and Caritas.**
6 **He stated that, we have been successful**
7 **in both cases. Wyckoff received a wire**
8 **transfer today from Ross University in the**
9 **amount of $4 million for prepaid medical**
10 **student clerkship rotations. This should help**
11 **relieve some of the cash flow problems for**
12 **Wyckoff.**
13 **He mentioned that Caritas received**
14 **$3.7 million last week from Ross University.**
15 **Mr. Singleton commented that this was done**
16 **without expanding the slots.**
17 **When you made this report, did anybody**
18 **at the board object to you having entered into**
19 **any of these deals?**
20 A. Again, I don't recollect the specific
21 board meeting or this specific report. Sounds
22 like a report I would make, and I have no
23 recollection that anybody objected to the
24 report.
25 **Q. During your time at the hospitals, did**

54

1    any board member ever object to you entering
2    into a prepaid -- strike that. Start again.
3            During your time at the hospitals, did
4    any board member ever object to you entering
5    into a contract for prepaid medical student
6    clerkships?
7    A.    Not to my recollection.
8    Q.    Did they express some satisfaction that
9    cash was coming in the door?
10   A.    We were in desperate need of cash.
11   That would be my recollection; everybody was
12   happy with these, because it did generate cash.
13   Q.    Was one of the tasks you were given to
14   generate cash for the hospitals?
15   A.    Sorry. Repeat that.
16           (The question was read back by the
17   reporter.)
18           THE WITNESS: Yes.
19   BY MR. TZANETOPOULOS:
20   Q.    At any time while you were serving at
21   the hospitals, did anyone on behalf of the
22   hospitals, board members, management, anybody,
23   suggest returning to Ross any of the money that
24   Ross had paid under prepaid medical clerkship
25   contracts?

55

1    A.    That's a pretty sweeping statement.
2    I -- I don't have any recollection one way or
3    the other. I mean, that's a...
4    Q.    Who was -- or in what capacity did
5    Claire Mullally work?
6    A.    To the best of my recollection, she was
7    an attorney who actually lived here in
8    Nashville and was returning to New York. And I
9    believe Mr. Hoffman recommended that we hire
10   her part time to help us with some legal
11   issues. Somebody did, brought her to my
12   attention, and we hired her part time to help
13   us with legal issues at the three hospitals.
14   Q.    Did you terminate or cause the
15   termination of Mr. Gio's employment?
16           MR. SEAR: I'll object to the
17   form.
18           But answer it.
19           THE WITNESS: Yes.
20   BY MR. TZANETOPOULOS:
21   Q.    Why?
22   A.    The state -- from the very beginning of
23   our assignment, the state wanted Mr. Gio
24   terminated. And I didn't do that initially,
25   because I didn't think that was best for the

56

1    hospital. But the state kept agitating for it.
2    And since they were funding us, eventually
3    we -- the board and I succumbed to the pressure
4    to do that.
5    Q.    Did you terminate or cause to be
6    terminated David Hoffman's employment?
7    A.    Yes.
8    Q.    Why?
9    A.    I guess I have to answer that, huh?
10           Mr. Hoffman and I had disagreements on
11   a number of issues. David -- really, it got to
12   a point where we couldn't work together, so one
13   of us had to go.
14   Q.    On what issues did you disagree?
15   A.    I --
16           MR. SEAR: Let me say that, you
17   know, it's your deposition, but I'm not sure
18   that this inquiry is really relevant to what's
19   going on here. But, again, I just put that out
20   there.
21           But, you know, Mr. Singleton, you
22   should answer the question.
23           MR. LOUGHLIN: I'll put on the
24   record as well, that if Mr. Tzanetopoulos
25   wasn't going into this, we would as well.

57

1            THE WITNESS: You would?
2            MR. LOUGHLIN: Yeah.
3            THE WITNESS: Okay.
4            MR. SEAR: Well, then you're both
5    wrong.
6            Go right ahead. Do you recall the
7    specific question?
8            THE WITNESS: Yes. Well, repeat
9    the question.
10           (The question was read back by the
11   reporter.)
12   BY MR. TZANETOPOULOS:
13   Q.    Let me ask another question. And it
14   goes back to the why question.
15           In detail, why is it that -- what
16   disagreements caused you to terminate
17   Mr. Hoffman?
18   A.    Okay. Initially, the way I recollect
19   it, it started over a fundraiser that the
20   hospital was having. I made, personally, a
21   fairly significant contribution to that
22   fundraiser, because I felt like the hospital
23   needed the money. And I sent out an e-mail to
24   all the senior managers requesting that they
25   consider making a contribution to the

15 (Pages 54 to 57)

58

1    fundraiser.
2         Mr. Hoffman objected to that, felt like
3    that was unfair pressure on senior managers to
4    make contribution -- personal contributions to
5    the fundraiser.
6         He began agitating with other senior
7    managers about this issue, accusing me of
8    things, by notes and other methods. Just was
9    bizarre, in my opinion, and in the opinion of
10   the other senior managers. It was bizarre.
11        I counseled David, asked him to stop.
12   He, at one point, threatened to take me to the
13   board over some issue. And I can't remember
14   what the issue was.
15        And I asked what his basis was, and he
16   refused to tell me. He said he would only tell
17   the committee of the board. I said, well, go
18   ahead and tell them. We need to get this
19   resolved.
20        I can't recollect whether he ever did
21   that or not, but it reached the point where I
22   went to the board and said that he needed to be
23   terminated. We couldn't work together as -- I
24   mean, as you can see, signing all of these
25   contracts and doing all this, I depended

59

1    heavily on the general counsel of the hospital,
2    which was David Hoffman.
3         In fact, when I took over the
4    hospitals, I put my office at Mary Immaculate,
5    because I felt like that symbolically the
6    best place to put it, as apposed to Wyckoff or
7    St. John's. And I moved David there with me,
8    because we worked so closely together and I was
9    so dependent upon him as general counsel. And
10   we just couldn't work together any longer, so I
11   went to the board and I said, you know, he
12   needs to go.
13        The board was very reluctant.
14   Mr. Rucigay and David had a very strong
15   relationship, and Mr. Rucigay was obviously the
16   chairman of the board.
17        And eventually I had to say, well,
18   look, I can't continue in this position, if
19   David is my general counsel. And so the board
20   finally acquiesced and terminated David. He
21   had a contract, so I think he got paid out of
22   his contract.
23        Now, that's the best of my
24   recollection. It's been, I don't know, three
25   years, but that's the best of my recollection.

60

1    **Q.    After Mr. Hoffman's departure, who was**
2    **the -- or did the hospital have in-house**
3    **counsel on which you relied?**
4    A.    We -- what we did is we -- best of my
5    recollection, we gave the lady you mentioned
6    before --
7    **Q.    Claire Mullally?**
8    A.    Claire Mullally, made her -- I think
9    her title was interim general counsel. And we
10   brought someone in from Proskauer, a junior
11   person who I can't remember his name. But he
12   was there, not full time, but significant
13   amount of time helping fill in in David's role.
14        (The above-referred to document
15   was thereupon marked Singleton Exhibit No. 10.)
16   BY MR. TZANETOPOULOS:
17   **Q.    Mr. Singleton, the court reporter has**
18   **handed you a document that she's marked as**
19   **Exhibit Number 10. It's the January 10, 2008**
20   **Wyckoff Heights Medical Center Board of**
21   **Trustees minutes. Again, read as much as you**
22   **like, but I'll have questions about your report**
23   **on Page 4.**
24   A.    Okay.
25   **Q.    There's discussion of transferring**

61

1    **senior management employees from the payroll of**
2    **Wyckoff Heights Medical Center to the payroll**
3    **of Caritas.**
4        **What was the purpose of that transfer?**
5    A.    To the best of my recollection, there
6    was a central business office that primarily
7    did -- collected accounts receivable, paid
8    payables, did other accounting functions and
9    central functions for all three hospitals.
10        There were two separate corporations.
11   Caritas was St. John's and Mary Immaculate, and
12   Wyckoff was a separate corporation. But there
13   was one business office that did the same
14   functions for all three hospitals for both
15   corporations. Most of those employees, or all
16   of those employees, were on Wyckoff's payroll.
17        Let me see if I can say this right.
18        Most of those business employees were
19   on Wyckoff's payroll, but they obviously did
20   work for Caritas. So to keep the cooperations
21   separate, Caritas should pay Wyckoff for that
22   service, and so -- Caritas didn't have the
23   cash, so it was always something that didn't
24   get paid. So we were building up an accounts
25   payable, and the state didn't like funding us

**62**

1 to make payments to Wyckoff.
2 Remember, the state was only funding
3 Caritas. They were not funding Wyckoff. And
4 so we were building up this payable to Wyckoff,
5 and the state didn't want us to fund it. So we
6 couldn't move the employees in the business
7 office to Caritas' payroll, because they were
8 unionized, and that was an issue. The union
9 would not agree to that.
10 So we took management employees that
11 would be equal to the amount -- the monthly
12 amount that we were building up, and moved them
13 to Caritas' payroll, so that we would not be
14 building up a -- in other words, the two would
15 wash out with each other.
16 And so that was the purpose of that --
17 of this transfer of employees, to the best of
18 my recollection.
19 Q. So the objective of this was to, I
20 guess, protect Wyckoff's balance sheet, when
21 you get done with it all?
22 MR. SEAR: Object to form.
23 MR. LOUGHLIN: Object to form.
24 MR. TZANETOPOULOS: Let me ask a
25 better question, because they're right about

**63**

1 that. You won't hear me admit that often.
2 BY MR. TZANETOPOULOS:
3 Q. Was the financial beneficiary of this
4 transfer Wyckoff?
5 A. Yeah. I guess that's a fair way to
6 describe it. We were building up a payable to
7 Wyckoff. They weren't getting paid. This
8 meant that we weren't building -- that payable
9 wasn't growing any because of what we did, so
10 that was a benefit to Wyckoff.
11 Q. Were Wyckoff and BQHC parties to
12 subordination agreements -- I'm sorry.
13 Were Wyckoff and BQHC parties to
14 subordination agreements that would have been
15 reached had Caritas repaid, in cash, debts owed
16 to Wyckoff?
17 A. I'm sorry. I'm going to have to have
18 that repeated.
19 MR. SEAR: That's fine.
20 (The question was read back by the
21 reporter.)
22 THE WITNESS: I'm sorry. I don't
23 follow that question.
24 BY MR. TZANETOPOULOS:
25 Q. Okay. You were aware, were you not,

**64**

1 that loans had been made by a number of state
2 agencies to Caritas?
3 A. I was aware that cash advances had been
4 made to Caritas by the state.
5 Q. Were you aware that, as part of those
6 agreements, Wyckoff had promised to subordinate
7 any of its claims for repayment from Caritas to
8 the agencies that had made those advances?
9 MR. LOUGHLIN: Objection; lack of
10 foundation.
11 THE WITNESS: I don't have any
12 recollection of whether that's true or not.
13 MR. TZANETOPOULOS: Those are all
14 the questions I have right now.
15 MR. LOUGHLIN: Okay. We have a
16 few questions, but I don't think it will take
17 that long.
18 E X A M I N A T I O N
19 BY MR. LOUGHLIN:
20 Q. Mr. Singleton, my name is Walter
21 Loughlin, and I represent the defendants in the
22 case of BQHC and Wyckoff.
23 You testified, in response to some
24 questions from Mr. Tzanetopoulos, that when the
25 FTI Cambio July 2007 agreement was entered

**65**

1 into, there was a stipulation that you would
2 have to assume a chief executive officer role;
3 is that correct?
4 MR. SEAR: Object to form.
5 Are you asking him what his
6 testimony was or --
7 MR. TZANETOPOULOS: Same
8 objection.
9 BY MR. LOUGHLIN:
10 Q. Do you recall?
11 A. Yes.
12 Q. And what was the source of that
13 stipulation?
14 MR. TZANETOPOULOS: Object to
15 form.
16 THE WITNESS: I guess I can
17 answer, since he's asking?
18 MR. SEAR: Yeah.
19 THE WITNESS: Rick Zall, Rick Zall
20 said -- he was negotiating the contract. He
21 said if you want this contract, you have to
22 commit to be the full time CEO, and Bob
23 Goldberg has to commit to be the full time CFO.
24 BY MR. LOUGHLIN:
25 Q. Are you drawing a distinction between

66

1 the chief executive officer function and the
2 title of chief executive officer?
3           MR. TZANETOPOULOS: Object to
4 form.
5           THE WITNESS: I don't think so.
6 BY MR. LOUGHLIN:
7 Q.     Earlier I think you testified that the
8 title of chief restructuring officer was for
9 internal purposes.
10          Was the CEO title used by you for
11 external purposes?
12          MR. SEAR: Object to form.
13          But answer.
14          MR. TZANETOPOULOS: Object to
15 form.
16          THE WITNESS: Yes. I mean, any
17 time I was dealing with a contractor or
18 whatever, I was CEO of the hospitals in an
19 external capacity.
20 BY MR. LOUGHLIN:
21 Q.     Who was it that appointed you CEO of
22 BQHC?
23 A.     I assume the board.
24 Q.     Are you aware of any -- are you aware
25 of any writing that reflects that appointment?

67

1 A.     I have no recollection one way or the
2 other. State made it very clear that that was
3 the requirement, if they were going to continue
4 to fund.
5 Q.     When you say the state, do you mean the
6 Department of Health?
7 A.     Yes. People we met with at the state.
8 Q.     And who appointed you as CEO of
9 Caritas?
10 A.     I assume the board.
11 Q.     You mean the board of Caritas?
12 A.     The board of Caritas.
13 Q.     Are you aware of any writing that
14 reflects that appointment?
15 A.     I have no recollection one way or the
16 other. That's the way that I functioned. The
17 board knew that I functioned that way. There
18 was never any question about it.
19 Q.     And did someone appoint you CEO of
20 Wyckoff?
21          MR. TZANETOPOULOS: Object to
22 form.
23          THE WITNESS: That's my
24 recollection, yes.
25

68

1 BY MR. LOUGHLIN:
2 Q.     It's your recollection that the board
3 appointed you?
4 A.     Yes.
5 Q.     And are you aware of any board minutes,
6 or other writing, that reflects that?
7 A.     No.
8 Q.     Do you have Exhibit 7 in front of you,
9 which is the Administrative Services Agreement?
10 A.     Yes.
11 Q.     If I could ask you to turn to Page 3 of
12 23, which is BQHC 00491.
13          And before I ask you a question about
14 it, I mean, this is the -- this is the formal
15 agreement between FTI Cambio and BQHC, Wyckoff
16 and Caritas with respect to the assignment that
17 you've testified about today, isn't it?
18          MR. TZANETOPOULOS: Object to
19 form.
20          THE WITNESS: I mean, I can't
21 testify that it is or isn't. I mean, it
22 appears to be, but I mean, I don't --
23 BY MR. LOUGHLIN:
24 Q.     Well, I think you were asked earlier --
25 and I could direct your attention to the final

69

1 page, which I believe you testified bears your
2 signature --
3 A.     Yes.
4 Q.     -- on behalf of FTI Cambio.
5 A.     Yes. I think the other one does too,
6 though, the one that preceded this.
7          Is there not two? I thought there was
8 two.
9 Q.     Yes. I think Exhibit 6.
10          If you're able to shed any light on the
11 differences between the two, I'd appreciate it.
12 But I thought your testimony this morning was
13 that you weren't sure.
14 A.     I'm not. I'm not sure why there was
15 two.
16 Q.     But if I could direct your attention
17 back to Page 3 of 23 of Exhibit 7, Article II,
18 direct your attention to the following
19 language, which is 2.1 --
20 A.     Wait. Wait. Okay.
21 Q.     Are you with me?
22 A.     2.1, special employees.
23 Q.     Yeah. I mean, it does say, does it
24 not, that FTI Cambio shall provide BQHC with
25 the on-site services of individuals to serve in

70

1    the following positions, and it goes on to
2    describe you as the chief restructuring
3    officer; isn't that correct?
4    A.    That's what this says, yes.
5    Q.    Are you aware of any provision in this
6    agreement that specifies that you should be
7    chief executive officer of BQHC, Caritas or
8    Wyckoff?
9            MR. TZANETOPOULOS:  Object to
10   form.
11           MR. SEAR:  Note my objection to
12   this line.  The document is what it is.  Either
13   it's there or it isn't there.
14           Asking him that kind of question,
15   under these circumstances, I think is just a
16   waste of time.
17           But go ahead, answer it.
18           THE WITNESS:  What was the
19   question again?
20   BY MR. LOUGHLIN:
21   Q.    The question was whether you're aware,
22   with respect to Exhibit 7 -- which you signed
23   on behalf of FTI Cambio -- whether it specifies
24   any role other than chief restructuring
25   officer, such as CEO of Wyckoff, Caritas or

71

1    BQHC?
2            MR. TZANETOPOULOS:  Object to
3    form.
4            THE WITNESS:  I mean, I have to
5    read the documents.  I'm not -- to answer your
6    specific question, I am not aware.  But without
7    reading the entire document, I wouldn't know.
8            But I would say that, in my
9    experience, CRO is typically the CEO of the
10   organization.  And that's my experience of
11   20-something years in this business.  But we
12   could quibble over whether that's true or not.
13           But anyway, that's my experience
14   and that's the way I operated in this
15   situation.  And that's certainly the way the
16   state expected me to operate, and the board
17   never told me not to operate that way.
18   BY MR. LOUGHLIN:
19   Q.    I'm not trying to quibble with you,
20   Mr. Singleton.
21   A.    Okay.
22   Q.    My job is to ask questions, okay?
23   A.    All right.  Okay.
24   Q.    Could I ask you to turn over to Page 2
25   of 23, which is BQHC 00490, and direct your

72

1    attention to the language that is set out
2    under, paren, small D, closed paren; which
3    says:  Cambio shall have no authority to incur
4    any liability on behalf of the hospital.
5            Do you see that?
6    A.    Yes.
7    Q.    During the time that you were working
8    on this assignment, did you ever give any
9    consideration to whether that provision, which
10   states that Cambio has no authority to incur
11   any liability, was consistent with signing
12   contracts on behalf of BQHC or Wyckoff or
13   Caritas?
14           MR. SEAR:  I'd like to have an
15   understanding as to whether he's permitted to
16   go into attorney/client communications, that is
17   communication with Mr. Hoffman or Proskauer or
18   any other lawyer in answering the question.
19           MR. LOUGHLIN:  The pending
20   question is simply whether Mr. Singleton gave
21   any consideration to the consistency.
22           If he goes on to answer a question
23   that says it was considered and it was
24   discussed, you know, with counsel, we'll reach
25   that when we reach that.  But we're not waiving

73

1    any privilege with respect to communications.
2            MR. SEAR:  Then, at this point,
3    I'm going to say he's -- all he's asked you is
4    whether you gave any consideration to that
5    subject matter.
6            THE WITNESS:  Yes.
7            MR. TZANETOPOULOS:  Object to
8    form.
9            THE WITNESS:  What?
10           MR. TZANETOPOULOS:  I objected to
11   the form.
12           MR. SEAR:  Fine.  Okay.
13   BY MR. LOUGHLIN:
14   Q.    And did you resolve, in your own mind,
15   that there was no constraint arising from that
16   provision in the Administrative Services
17   Agreement, to you entering into contracts?
18           MR. TZANETOPOULOS:  Object to
19   form.
20           MR. SEAR:  You're just asking him
21   a yes or no answer.  You're not asking him
22   to --
23           MR. LOUGHLIN:  Yes.  Did he
24   resolve it, in his own mind, that there was no
25   constraint to entering into the contracts by

74

1  virtue of the ASA prohibition on incurring
2  liabilities.
3       MR. SEAR: Okay. I'll object to
4  the form.
5       I don't know what it means to
6  resolve in his own mind, whether that includes
7  communications with others or not.
8       MR. TZANETOPOULOS: Object to
9  form.
10       MR. SEAR: But as I understand the
11  substance of the question, is that -- well, let
12  me object to the form of the question.
13       You know, answer it the best you
14  can.
15       Again, I don't know what it means
16  to resolve in his own mind, whether that
17  includes communications with others, the board,
18  lawyers.
19       But I think, at this point, he's
20  not asking you for the substance of
21  communications with counsel or the board.
22       THE WITNESS: Well, I -- I mean,
23  on a number of occasions, I asked various
24  people in authority if I had the authority to
25  sign contracts, and I was instructed that I

76

1  authority to enter into contracts.
2       MR. LOUGHLIN: I was following up
3  on the witness' prior answer, that he discussed
4  the issue of his ability to enter into
5  contracts with various people in authority.
6       MR. SEAR: Right.
7       MR. LOUGHLIN: Then I asked
8  whether, in those discussions with people in
9  authority, he discussed that provision in
10  Paragraph D of the ASA.
11       MR. SEAR: Okay. Do you
12  understand the question? It's focused on the
13  particular provision.
14       THE WITNESS: I have no
15  recollection that I discussed that particular
16  clause.
17       I did ask people in authority, and
18  attorneys, given the agreement, did I have
19  the -- the whole agreement that we had signed,
20  did I have the authority to sign contracts.
21  The answer came back yes.
22  BY MR. LOUGHLIN:
23  **Q.    Can you tell me what -- first identify**
24  **the people who you discussed this with.**
25  A.    Rick Zall, David Hoffman, Mr. Rucigay.

75

1  did. And so I did sign contracts.
2  BY MR. LOUGHLIN:
3  **Q.    And did you seek any advice from**
4  **someone in authority with respect to the**
5  **provision in the ASA, which prohibits the**
6  **incurring of liabilities on behalf of the**
7  **hospitals?**
8       MR. SEAR: I object. I'm going to
9  direct him not to answer the question.
10       You can characterize this
11  agreement; I can characterize this agreement.
12  It's a false characterization. And I object to
13  the form of the question, because I'm not clear
14  whether you're asking him whether he discussed
15  this particular provision, or the substance of
16  his authority.
17       So I ask you to rephrase the
18  question.
19       MR. LOUGHLIN: Why don't you just
20  read the pending question again.
21       (The question was read back by the
22  reporter.)
23       MR. SEAR: Are you asking him
24  whether he sought legal advice with respect to
25  this particular clause, or the substance of

77

1  People in authority at the hospital. I don't
2  sign contracts that they don't think I should
3  sign, or that I didn't have the authority to
4  sign.
5       I also discussed it with the attorneys
6  at FTI. Not this particular clause, but what
7  is the scope of my authority under this
8  agreement.
9  **Q.    Could you describe what the process**
10  **would be when you enter into a -- excuse me.**
11       **What procedure was established for you**
12  **to submit contracts for board approval?**
13       MR. TZANETOPOULOS: Object to
14  form.
15       MR. SEAR: Object to form. That
16  assumes a fact not in evidence, and I don't
17  know what you mean by procedure being
18  established.
19       But answer it, if you can.
20       THE WITNESS: To my recollection,
21  I never signed a contract at BQHC, Caritas or
22  Wyckoff without the approval of Rick Zall and
23  Mr. Rucigay, and they would tell me whether it
24  had to go to the board or not.

78

BY MR. LOUGHLIN:

Q.    **With respect, for instance, to the**
**first Amendment to the Affiliation Agreement,**
**which I believe is marked Exhibit 2, do you**
**have a recollection of obtaining prior approval**
**for that contract to be signed?**

MR. SEAR:  Let me ask counsel,
you're asking that question and you're still
saying you're asserting the attorney/client
privilege?  I don't know how you can do that
fairly.

We've been very careful and
observant, in terms of your implication of the
privilege.  You have now waded into with a line
of questions -- after the witness has made it
clear that the approval process included
counsel, both in-house counsel and outside
counsel, I don't see how he can fairly answer
the question, that question, without going into
privileged communications.

MR. LOUGHLIN:  I'm not asking him
for any communications.  I asked him -- I think
the pending question was whether he obtained
prior approval before the first Amendment was
executed.

79

MR. SEAR:  You're simply asking
him for the fact.

MR. LOUGHLIN:  Yes.  Yes.

MR. TZANETOPOULOS:  Object to
form.

MR. SEAR:  Do you understand the
distinction?

THE WITNESS:  Yes, I think I do.

I don't have a specific
recollection of who I talked to, if anyone,
about this agreement, the first Amendment.

I can tell you that I didn't draft
it, I didn't review it.  Legal counsel drafted
it, and -- their legal counsel may have
drafted, I don't remember.  But our legal
counsel certainly reviewed it, either
Mr. Hoffman or Mr. Zall, or someone they
appointed, and they told me it was approved for
signature.  That's the way it always worked.

And they would talk to Mr. Rucigay
about it, or I would talk to Mr. Rucigay about
it.  And if it needed to go to the board, it
would go to the board.  I mean, that was the
process.

I don't have any specific

80

recollection about this being any different
than the process.

MR. LOUGHLIN:  Let me just take a
break for a second.

(Discussion off the record.)

BY MR. LOUGHLIN:

Q.    **Mr. Singleton, directing your attention**
**to the time that you began in the CRO role in**
**the summer of 2007, was there a procedure**
**established for the review of and approval of**
**contracts that would be entered into?**

MR. TZANETOPOULOS:  Object to
form.

MR. SEAR:  Note my objection to
the form, and I think he's already answered
that.

But if you have anything to add,
go right ahead.

THE WITNESS:  To the best of my
recollection, I have told you what I thought
the procedure was.  If you want me to repeat
that, I will.

BY MR. LOUGHLIN:

Q.    **I would appreciate it if --**

MR. SEAR:  No.  We're not here to

81

repeat anything.  No.  We're not.  It's a total
waste.

I'll be happy -- you want to go to
the judge on this?  We're not here to have the
witness repeat his testimony.

I'm directing him not to answer.
It's just abusive.

BY MR. LOUGHLIN:

Q.    **Let me try once again.**

**Directing your attention to the**
**beginning of your engagement as CRO, was there**
**a procedure established whereby drafts of**
**agreements were reviewed by Mr. Hoffman, prior**
**to the execution of those agreements by you?**

MR. TZANETOPOULOS:  Object to
form.

MR. LOUGHLIN:  Objection.

To the extent you have any facts,
recollection to add to what you've already
testified to, please add.

THE WITNESS:  My recollection is,
and my normal practice is, I would never sign a
contract without it being reviewed by legal
counsel for the hospital.

So yes, it's my recollection that

82

1  Mr. Hoffman, as long as he was functioning as
2  general counsel, reviewed it.
3  BY MR. LOUGHLIN:
4  Q.    And then subsequently it would be
5  submitted to the board for approval?
6          MR. TZANETOPOULOS: Object to the
7  form.
8          MR. SEAR: Object to the form.
9          THE WITNESS: Depended on what
10 Mr. Rucigay wanted to do.
11         I do not recollect that there was
12 any -- I don't recollect there were any
13 specific levels of contracts that had to be
14 submitted to the board. It was more about what
15 general counsel and Mr. Rucigay would
16 recommend, and Rick Zall would recommend, is my
17 recollection.
18 BY MR. LOUGHLIN:
19 Q.    And your recollection is that these
20 kinds of discussions about contracts, with
21 Mr. Rucigay and others, would occur outside of
22 board meetings?
23 A.    I certainly had lots of conversations
24 with Mr. Rucigay and Mr. Zall outside of board
25 meetings, yes.

83

1  Q.    Could I ask you to place Exhibit 10 in
2  front of you, which is the January 10, 2008
3  Wyckoff board meeting minutes.
4  A.    Okay.
5  Q.    Directing your attention to Page 5,
6  which is BQHC 0010.
7  A.    Okay.
8  Q.    In particular, the first full paragraph
9  on that page, there is a reference, is there
10 not -- and you should read it to yourself if
11 you want.
12        You're reporting to the board that you
13 intended to make an application for $50 million
14 in funding from the -- from the state. I
15 assume the Department of Health, but you can
16 specify. It doesn't say here.
17        Can you tell me whether that
18 application was, in fact, made?
19        MR. TZANETOPOULOS: Object to
20 form.
21        THE WITNESS: I made a number of
22 presentations to the state. I would assume
23 that this probably was made, but I don't have
24 any specific recollection of it or not.
25

84

1  BY MR. LOUGHLIN:
2  Q.    Do you have any recollection of whether
3  the funding actually was received?
4  A.    Fifty million was not received. I do
5  recollect that.
6  Q.    Could I ask you to place Exhibit 9 in
7  front of you? And may I direct your attention
8  to Page 3 of the exhibit, which is the
9  December 20, 2007 Wyckoff Board of Trustees
10 minutes.
11 A.    Page 3 of this exhibit?
12 Q.    Yes, which is BQHC 03882.
13 A.    Right.
14 Q.    At the bottom of the page, there's a
15 sentence under the heading of the report of the
16 chief restructuring officer: Mr. Singleton
17 reported that he submitted a request to the
18 state to reduce the current $14 million to the
19 board approved $10 million.
20        Can you tell me what that refers to?
21 A.    No, cannot.
22 Q.    Do you have a recollection of what the
23 level of investment in Caritas was from
24 Wyckoff?
25        MR. SEAR: Object to the form.

85

1          But answer.
2          THE WITNESS: No. I don't have a
3  recollection. I wouldn't characterize it as an
4  investment, but I don't have a recollection --
5  it would actually be a loan, but I don't have a
6  recollection of the amount.
7  BY MR. LOUGHLIN:
8  Q.    Well, could I ask you to direct your
9  attention to Exhibit 4, and Page 18 of that
10 exhibit?
11 A.    Okay.
12 Q.    I think you described this earlier as
13 a -- as a report that was prepared for the
14 state about various scenarios with respect to
15 the Caritas hospitals.
16 A.    I think I described it as something in
17 the form that we would have done. I can't
18 testify to the fact that this was the very
19 report that we presented to them, but yes.
20 Q.    Well, if I could direct your attention
21 to Page 18, and ask you whether the reference
22 to the $3 million loan due Wyckoff will be paid
23 off by December 31, and the $9.6 million in
24 related-party payables for shared services and
25 IT will be paid to Wyckoff by December 31,

86

1    whether that refreshes your recollection about
2    the level of loans or investment made by
3    Wyckoff in Caritas?
4        A.    No.  It doesn't refresh my
5    recollection.  I have no reason to believe
6    these numbers are inaccurate, if that's what
7    you're asking.  But it doesn't -- I mean, it
8    doesn't help me remember, without looking at
9    this sheet, what those were.  I mean, I have no
10   recollection, but I have no reason to believe
11   those are incorrect.
12       Q.    Directing your attention to the subject
13   that you testified about earlier, about the
14   transfer of nonunion employees from Wyckoff
15   payroll to the Caritas payroll --
16       A.    Uh-huh.  Yes.
17       Q.    -- I believe you testified, did you
18   not, that the -- a purpose of that was to
19   reduce the growth of a payable from Caritas to
20   Wyckoff; is that right?
21       A.    Yes.  That's what I testified to.
22       Q.    And do you have a recollection of what
23   the level of that payable was?
24       A.    No.  I assume -- this 9.6 refers to
25   that issue, shared services and IT.  That was

87

1    the payable that was building up.  That's what
2    that's referring to.
3            That it was at the level of
4    9.6 million, I have no recollection.  But,
5    again, I have no reason to believe this is
6    inaccurate.
7        Q.    Did anyone, during the time period of
8    time that you were there -- which, I believe
9    was summer of 2007 until September of 2008 --
10       A.    End of September.
11       Q.    -- did any board member or management
12   of Wyckoff express concern to you about the
13   level of Wyckoff resources which were being
14   devoted to Caritas?
15       A.    Yes.
16            MR. TZANETOPOULOS:  Object to
17   form.
18            THE WITNESS:  I'm sorry?
19   BY MR. LOUGHLIN:
20       Q.    And who was it who would have expressed
21   that concern to you?
22       A.    Well, Wyckoff was an independent
23   hospital that had a board.  When they decided
24   to buy Caritas, they formed BQHC, and most of
25   the board members at BQHC were board members of

88

1    Wyckoff.  And all, but three board members, at
2    Caritas were board members of Wyckoff.  I
3    believe that's the number, to best of my
4    recollection.
5            So a while, their main interest was
6    Wyckoff.  They did not want Caritas to bring
7    down Wyckoff.  And so a lot of them expressed
8    that legitimate concern.
9        Q.    Do you have a recollection, for
10   instance, of Mr. Rucigay saying to you, in
11   substance, that if the Wyckoff resources
12   continued to flow to Caritas, there could be
13   three bankrupt hospitals?
14       A.    Absolutely.
15            MR. TZANETOPOULOS:  Object to
16   form.
17            THE WITNESS:  I mean, whether he
18   used those exact words, I don't know.  But that
19   was obviously his concern.
20   BY MR. LOUGHLIN:
21       Q.    Can you tell me, Mr. Singleton, what
22   your understanding was of the goals of the FTI
23   Cambio engagement --
24            MR. TZANETOPOULOS:  Object to the
25   form.

89

1            MR. LOUGHLIN:  -- from summer of
2    '07 to fall of '08?
3            MR. TZANETOPOULOS:  Object to
4    form.
5            THE WITNESS:  Was to try to
6    stabilize these three hospitals, primarily the
7    two Caritas hospitals, from a cash flow
8    standpoint.
9    BY MR. LOUGHLIN:
10       Q.    You mean stabilize the financial
11   condition?
12       A.    Right.
13       Q.    How many full-time employees from FTI
14   Cambio worked on the engagement, if you can
15   estimate?
16       A.    You know, at various times, various
17   numbers.  I would say anywhere from a low of
18   five, maybe to a high of 15 to 20.
19            Those are rough -- I mean, there are
20   detailed records at FTI about how many there
21   are, but I don't remember exactly.
22       Q.    What would you say were the
23   accomplishments of the engagement?
24            MR. TZANETOPOULOS:  Object to the
25   form.

90

1      MR. SEAR: Object to the form.
2      But answer as best you can.
3      THE WITNESS: We tried a number of
4   different strategies to try to stabilize those
5   hospitals.
6   BY MR. LOUGHLIN:
7   Q.   And did you achieve that?
8   A.   No.
9   Q.   I believe you testified -- directing
10  your attention to the first Amendment of the
11  Affiliation Agreement -- that the -- that that
12  involved a strategy of paying the balance of
13  the note to AUC, and selling the AUC slots to
14  Ross; is that right?
15     MR. TZANETOPOULOS: Object to
16  form.
17     MR. SEAR: Are you asking him what
18  he testified to or --
19     MR. LOUGHLIN: Well, in substance,
20  what I'm trying to do is direct his attention
21  to the subject.
22     MR. SEAR: Fine.
23     Do you recall that testimony,
24  whatever it was?
25     THE WITNESS: Yes.

91

1   BY MR. LOUGHLIN:
2   Q.   And was that strategy successful?
3      MR. TZANETOPOULOS: Object to
4   form.
5      THE WITNESS: As I recollect, I
6   was advised by legal counsel --
7      MR. SEAR: Okay. Don't -- at this
8   point --
9      MR. LOUGHLIN: Yeah. I don't want
10  you to -- I don't want you to disclose any
11  communications that you had with counsel at the
12  time.
13     My question was -- my question to
14  you was whether the strategy of replacing the
15  ACU slots --
16     THE WITNESS: Well, the strategy
17  was to get -- as all the strategies were, was
18  to get more cash into these institutions, so
19  they can continue to survive while we
20  stabilized them. My recollection is we
21  achieved that end, but not the way that we
22  intended to.
23  BY MR. LOUGHLIN:
24  Q.   You are aware, are you not, that that
25  strategy gave rise to a lawsuit --

92

1   A.   Right. Yes. I am aware of that.
2   Q.   -- by AUC against Caritas, Wyckoff and
3   BQHC?
4   A.   Yes, I am.
5   Q.   And that that lawsuit has resulted in a
6   $5 million judgment against BQHC and Wyckoff?
7   A.   No. I wasn't aware of that. I'm
8   surprised. I guess I got bad counsel.
9   Q.   Could we go back to Exhibit 4 for a
10  minute? I have to find that myself. I think
11  that's the PowerPoint.
12     MR. SEAR: Yep.
13  BY MR. LOUGHLIN:
14  Q.   If I can direct your attention to
15  Page 18, which had a sentence that
16  Mr. Tzanetopoulos asked you about. It states:
17  The $8.5 million of deferred revenue accrued
18  for medical student education will be amortized
19  by later rotations done at St. John's Queens
20  Hospital and Wyckoff with no impact on cash
21  flow.
22     Do you have a recollection, at any time
23  while you were involved in the engagement in
24  '07 and '08, whether you were authorized to
25  move students from one hospital to another who

93

1   were involved in clerkship rotations?
2      MR. TZANETOPOULOS: Object to the
3   form.
4      MR. SEAR: I'll object to form.
5      But answer it as best you can.
6      THE WITNESS: It is my
7   recollection that we moved students fairly
8   freely between St. John's and Mary Immaculate,
9   because they were the same corporation.
10     I don't have any recollection that
11  we did that with Wyckoff. But, again, that's
12  my recollection.
13     MR. LOUGHLIN: That's all I can
14  ask you for, is your best recollection.
15     Could I just have a moment?
16  BY MR. LOUGHLIN:
17  Q.   Mr. Singleton, did you have any
18  awareness, during the time that you were
19  involved, that there were clerkship rotations
20  available at one or more ambulatory
21  facilities --
22     MR. TZANETOPOULOS: Object to
23  form.
24  BY MR. LOUGHLIN:
25  Q.   -- of Caritas, such as St. Matthew's.

94

1     A.    Sorry.  Repeat the question.
2         (The question was read back by the
3    reporter.)
4         THE WITNESS:  I have no
5    recollection about that one way or the other.
6    BY MR. LOUGHLIN:
7     Q.    Mr. Tzanetopoulos asked you about your
8    employment, and I believe you responded that
9    you were currently retired.
10        Are you doing any consulting for any
11   hospital or hospital systems?
12    A.    I'm doing a project for FTI currently,
13   consulting project as an independent
14   contractor.
15    Q.    And do you have any equity interest in
16   FTI?
17    A.    No.
18    Q.    You were an equity owner of FTI Cambio,
19   were you not?
20    A.    We sold Cambio to FTI.  We got cash and
21   stock in FTI.  It's not FTI Cambio.  I mean, it
22   was stock in FTI.
23    Q.    FTI consulting?
24    A.    Yeah.
25    Q.    Do you know who conferred various

95

1    titles on Mr. Romero, such as a title at BQHC?
2         MR. TZANETOPOULOS:  Object to
3    form.
4         THE WITNESS:  I have no
5    recollection what his title was or who
6    conferred him.
7    BY MR. LOUGHLIN:
8     Q.    Directing your attention to the first
9    agreement, the Affiliation Agreement, which is
10   Exhibit 1.  I know this is the agreement that
11   was entered into in 2006, before you're arrival
12   on the scene.
13    A.    Oh, okay.  Yes.
14    Q.    But did you review this, either on your
15   own or with counsel, in connection with the
16   work that was done on the first and Second
17   Amendments to this agreement?
18    A.    Again, I do not specifically recollect
19   doing that.  But that would have been a normal
20   course of action that I would take, is review
21   the existing agreement with legal counsel.
22    Q.    And you know the period of time that
23   the first and second agreements were entered
24   into was the period of time that Mr. Hoffman
25   was not there; isn't that right?

96

1     A.    I don't remember when Mr. Hoffman left
2    for sure.
3     Q.    But I think you testified, did you not,
4    that when Mr. Hoffman was gone, you tended to
5    seek counsel from either Proskauer or
6    Miss Mullally; is that right?
7     A.    Primarily Proskauer.
8     Q.    If I can direct your attention to that
9    portion of Exhibit 1, which has the language
10   that Mr. Tzanetopoulos referred you to.
11        It's at Ross 0064.  It's toward the end
12   of the exhibit, about a page or two before the
13   signature block.
14    A.    Uh-huh.
15    Q.    Do you have any recollection,
16   independent of this document, of ever being
17   familiar with the particular issue that's set
18   forth in that language?
19        MR. TZANETOPOULOS:  Object to
20   form.
21        MR. SEAR:  You're talking about
22   the first full sentence, or the second
23   sentence?
24        MR. LOUGHLIN:  No.  The sentence
25   begins, in the event the hospital; and ends

97

1    with, other facilities.
2         THE WITNESS:  I must be --
3         MR. SEAR:  You're on the right
4    page.  It's this sentence.
5         THE WITNESS:  Oh.
6         Okay.  What's the question again?
7    BY MR. LOUGHLIN:
8     Q.    The question was whether you have any
9    independent recollection of this term, during
10   2007 and 2008, when you were working on the FTI
11   Cambio engagement?
12        MR. TZANETOPOULOS:  Object to the
13   form.
14        MR. SEAR:  I'll object to the
15   form.
16        MR. LOUGHLIN:  Why don't you read
17   the pending question?
18        (The question was read back by the
19   reporter.)
20   BY MR. LOUGHLIN:
21    Q.    I'll just repeat the language, just so
22   there is no ambiguity.
23        In the event the hospitals are not
24   operative, and the university is not in
25   material breach of the agreement, BQHC agrees

98

1    to provide the university with an equivalent
2    number of clerkships, as agreed to herein, at
3    one or more of its other facilities.
4         MR. TZANETOPOULOS: Object to
5    form.
6         MR. SEAR: Object to the form.
7         But you may answer.
8         THE WITNESS: Okay. The form of
9    the question is, do I have any independent
10   knowledge?
11   BY MR. LOUGHLIN:
12   Q.    Did you have any independent
13   recollection of being familiar with this --
14   A.    No.
15   Q.    -- during 2007 and 2008?
16   A.    No. No.
17   Q.    What was your understanding of the
18   purpose of BQHC?
19        MR. SEAR: Object to the form.
20        You may answer.
21        MR. TZANETOPOULOS: Object to
22   form.
23        THE WITNESS: The purpose of BQHC,
24   is that how it was said?
25        MR. LOUGHLIN: Yes.

99

1         THE WITNESS: Was to coordinate
2    the activities between the two corporations,
3    Caritas and Wyckoff.
4    BY MR. LOUGHLIN:
5    Q.    Was it an operating entity?
6         MR. TZANETOPOULOS: Object to
7    form.
8         THE WITNESS: I would not define
9    it as an operating entity. It had no operating
10   assets, if that's what you mean, to my
11   recollection.
12   BY MR. LOUGHLIN:
13   Q.    Do you have a recollection of when the
14   board at Wyckoff first asked for the flow of
15   assets and money from Wyckoff to Caritas to
16   stop?
17        MR. TZANETOPOULOS: Object to
18   form.
19        MR. SEAR: Object to the form,
20   because it assumes a fact not in evidence.
21        But go ahead and answer.
22        THE WITNESS: My recollection
23   would be very early in the assignment. That
24   was a constant concern of the board at Wyckoff.
25

100

1    BY MR. LOUGHLIN:
2    Q.    Directing your attention to your
3    testimony earlier today, in which you described
4    Mr. Hoffman's activities in relation to the
5    fundraiser as being thought of as bizarre, do
6    you have a recollection of what Mr. Hoffman did
7    or said that was regarded by your or others as
8    bizarre?
9         MR. SEAR: I think that misstates
10   the testimony. I think the testimony was
11   actions going well beyond the initial instance
12   of the fundraiser were described by the witness
13   as bizarre.
14        But answer the question.
15        THE WITNESS: That would certainly
16   be my testimony, yes. No. No.
17        MR. LOUGHLIN: I understand.
18        THE WITNESS: At one point, he was
19   slipping notes under other senior management
20   doors, closed office doors, accusing me of
21   certain things that seemed bizarre to me and
22   other managers. That's one thing, one instance
23   that sticks out.
24   BY MR. LOUGHLIN:
25   Q.    Accusing you of what?

101

1    A.    I don't remember. I mean, I really
2    don't remember. It was so -- I don't remember
3    exactly what his accusations were.
4    Q.    Well, do you have a recollection of
5    what you believe he was saying to senior staff
6    about the fundraiser?
7    A.    Let's separate the two issues.
8         I remember, specifically, the
9    fundraiser was the first time that I remember
10   that he and I had a controversy. I am not
11   saying -- as I said, I don't intend to say that
12   that was the controversy that continued. I
13   just said that was the first time I remember a
14   controversy between he and I, was over the
15   fundraiser.
16        Then it morphed into other things,
17   which, to be honest with you, I cannot remember
18   exactly what they were. Maybe we can put him
19   on the stand and he can testify as to what they
20   were and that might refresh my memory.
21   Q.    Let me just try one last time.
22        Direct your attention solely to the
23   issue of the fundraiser.
24   A.    Okay.
25   Q.    Do you have a recollection of what

102

1   Mr. Hoffman was saying to other senior staff
2   about the request that they participate in the
3   fundraiser?
4       A.    I don't recollect, one way or the
5   other, whether he said anything to the other
6   senior staff about whether they participate in
7   the fundraiser.  He and I had some conversation
8   about his participation in the fundraiser.
9       Okay.  Again, I did not intend for my
10  testimony to say that was the issue that he was
11  addressing with other senior managers.  It
12  could have been initially, but then that
13  morphed into other things, but I don't remember
14  exactly what they were.
15      But, at one point, he said he was going
16  to the board's -- committee on the board with
17  an accusation against me.  And when I asked him
18  what that accusation was, he wouldn't tell me.
19  I do remember that.  But I don't remember if he
20  ever went to the committee or not.
21      I mean, but anyway.
22          MR. LOUGHLIN:  I think we're done.
23  Thank you very much, Mr. Singleton.
24          MR. TZANETOPOULOS:  Just a few
25  more, raised by Mr. Loughlin's questions.

103

1       E X A M I N A T I O N
2   BY MR. TZANETOPOULOS:
3       Q.    Let me direct your attention to
4   Exhibit 8.  That's the e-mail chain between you
5   and Mr. Romero.
6           MR. LOUGHLIN:  Off the record.
7           (Discussion off the record.)
8   BY MR. TZANETOPOULOS:
9       Q.    You and Mr. Loughlin had some
10  discussion about strategy, selling slots to
11  Ross and buying out AUC.  And I believe you
12  testified that you consulted with legal counsel
13  about the strategy.
14      If I can direct your attention to the
15  bottom of Exhibit 8.  Mr. Romero writes --
16          MR. SEAR:  Which page?
17          MR. TZANETOPOULOS:  Second one,
18  19858.
19  BY MR. TZANETOPOULOS:
20      Q.    If we go with Plan B, I recommend an
21  airtight exit with a complete review of the
22  agreement with AUC.  I sent David Hoffman a
23  copy of the contract last month, then he goes
24  on.
25      Was it Mr. Hoffman that you consulted

104

1   with about this strategy?
2       A.    Again, if he was still an employee of
3   the company, that's where I would have started;
4   but I have no specific recollection of that.
5       Q.    Fair enough.  Mr. Loughlin asked you
6   about your understanding of your authority to
7   sign contracts on behalf of the different
8   entities, and you identified some individuals
9   that you talked to about that authority.
10      And if I'm remembering this right, you
11  talked to Mr. Rucigay, Mr. Hoffman and
12  Mr. Zall, correct?
13      A.    That's my recollection, yes.
14      Q.    Anybody else?
15      A.    Again, I think I testified I talked to
16  people from FTI about their understanding of
17  the contract.
18      Q.    Let's start with Mr. Rucigay.  What did
19  Mr. Rucigay tell you about your authority to
20  sign contracts?
21      A.    He said I had the authority to sign
22  contracts.
23      Q.    What did Mr. Zall tell you about your
24  authority to sign contracts?
25          MR. HOFFMAN:  Objection --

105

1           MR. LOUGHLIN:  Objection,
2   privileged.
3           MR. TZANETOPOULOS:  You've opened
4   that door.
5           MR. LOUGHLIN:  No.
6           MR. SEAR:  Without -- I'm not
7   going to take a position on whether the
8   privilege has been waived or not.
9       But in light of the position taken
10  by counsel for the hospital, I'm going to
11  direct the witness not to answer.
12  BY MR. TZANETOPOULOS:
13      Q.    What did Mr. Hoffman tell you about
14  your authority to sign contracts?
15          MR. LOUGHLIN:  Objection,
16  privileged.
17          MR. TZANETOPOULOS:  You've opened
18  the door.
19          MR. SEAR:  Same direction.
20  BY MR. TZANETOPOULOS:
21      Q.    After consulting with Mr. Zall and
22  Mr. Hoffman, did you think you had authority to
23  sign contracts on behalf of these entities?
24          MR. LOUGHLIN:  Objection.  That's,
25  essentially, a backdoor way of asking what the

106

1  substance of the communication was. We'll
2  invoke the privilege.
3         MR. TZANETOPOULOS: And, again,
4  you've gone exactly that route in the opposite
5  direction. You cannot use conversations with
6  counsel as a sword, and then assert the shield.
7         MR. LOUGHLIN: I don't think that
8  there's any particular reason to burden the
9  record with colloquy on this. We've asserted
10  privilege. Counsel for the witness has
11  instructed him not to answer, with respect to
12  this line.
13         If you want to go to the Court,
14  we'll take it up with the judge.
15         MR. TZANETOPOULOS: Okay.
16         MR. SEAR: Note my objection.
17         We raised this issue of privilege
18  weeks and weeks and weeks ago, and we've had --
19  this witness has been available. He was
20  preliminary scheduled for his first deposition.
21  So the fact that we're now at this point is not
22  our fault, or doesn't lay with us.
23         But I'm going to have to follow
24  with the position taken by counsel, given the
25  importance of the privilege.

107

1         MR. LOUGHLIN: I'll just say on
2  the record, as well, because there was no way
3  of avoiding it, because we had no knowledge
4  beforehand of what the witness would testify to
5  about the basis of some of his beliefs were.
6         And we learned today that, you
7  know, he said that some of his understanding of
8  certain issues were based on consultation with
9  counsel, and we didn't pursue to elicit any
10  communications with respect to those
11  consultations.
12         MR. SEAR: Let me make it clear
13  that I absolutely disagree with that factual
14  statement.
15         In connection with the lawsuits
16  brought against my client, by Mr. Loughlin's
17  clients, we made it perfectly clear, on no
18  uncertain terms, that the contracts and the
19  actions of Mr. Singleton and Mr. Goldberg were
20  fully authorized, not simply by the board, not
21  simply by Mr. Rucigay, but by counsel at
22  Proskauer and internal counsel. That's been
23  the clear position that we have articulated to
24  counsel for the hospitals at all times.
25         And so we have a factual

108

1  disagreement on that. But nonetheless, I'm
2  going to follow the position of counsel, and
3  I'm going to direct you not to answer.
4         I think the record is clear now.
5  I don't think you need to make more of a
6  record, in terms of the implication of the
7  privilege, and whatever you want to do with
8  that.
9  BY MR. TZANETOPOULOS:
10  Q.    Referring you back to your testimony
11  about the transfer of senior management
12  employees between the payrolls of Wyckoff and
13  Caritas, was it you that made the decision to
14  make those transfers?
15  A.    My recollection is it was my
16  recommendation to the board -- boards that we
17  make those transitions. It was my idea.
18         MR. TZANETOPOULOS: That's all I
19  have.
20         Thank you. Thank you very much,
21  sir.
22         THE REPORTER: Do you want to
23  order this?
24         MR. TZANETOPOULOS: Yes, please.
25         THE REPORTER: Do you want a copy

109

1  of this?
2         MR. LOUGHLIN: Yes, I do.
3         MR. SEAR: He does not waive
4  signature.
5         THE REPORTER: Do you want a copy
6  of this?
7         MR. SEAR: Not a separate copy.
8         MR. LOUGHLIN: Mini and an
9  E-transcript.
10         MR. TZANETOPOULOS: Mini and an
11  E-tran.
12         FURTHER DEPONENT SAITH NOT.

110

```
 1              E R R A T A
 2
 3       I, THOMAS SINGLETON, having read the
     foregoing deposition, Pages 1 through 109,
 4   taken July 8, 2011, do hereby certify said
     testimony is a true and accurate transcript,
 5   with the following changes, if any:
 6
 7   PAGE   LINE    SHOULD HAVE BEEN
 8   ____   ____    _____   _____
 9   ____   ____    _____
10   ____   ____    _____
11   ____   ____    _____
12   ____   ____    _____   _____
13   ____   ____    _____
14   ____   ____    _____
15   ____   ____    _____
16   ____   ____    _____
17   ____   ____    _____   _____
18
19
20          _____
21          THOMAS SINGLETON
22
23
24   _____
       Notary Public
25   My commission expires: _____
```

111

```
 1         CERTIFICATE OF REPORTER
 2        I, Trine M. Mitchell, RPR, Notary
 3   Public and Court Reporter, do hereby certify
 4   that I recorded to the best of my skill and
 5   ability by machine shorthand all the
 6   proceedings in the foregoing transcript, and
 7   that said transcript is a true, accurate and
 8   correct transcript to the best of my ability.
 9        I FURTHER CERTIFY that I am not
10   an attorney or counsel of any of the parties,
11   nor a relative or employee of any attorney or
12   counsel connected with the action, nor
13   financially interested in the action.
14        Signed this 19th day of July,
15   2011.
16
17
18
19
20
21
22          _____
            Trine M. Mitchell, RPR
23
24   My commission expires: 1/6/15
     Tennessee LCR No.  284
25   Expires:  6/30/2012
```

**A**

**ability** 76:4 111:5
  111:8
**able** 69:10
**above-referred**
  11:1,3,5 16:7,19
  27:24 28:12
  60:14
**absent** 35:19
**absolute** 17:3
**absolutely** 36:24
  40:18 48:16
  88:14 107:13
**abusive** 81:7
**acclimated** 41:11
**accommodate** 5:25
**accomplishments**
  89:23
**accounting** 61:8
**accounts** 61:7,24
**accrued** 21:21 45:6
  92:17
**accuracy** 15:24
**accurate** 110:4
  111:7
**accusation** 102:17
  102:18
**accusations** 101:3
**accusing** 58:7
  100:20,25
**achieve** 90:7
**achieved** 91:21
**acquiesced** 59:20
**action** 48:23 51:11
  95:20 111:12,13
**actions** 100:11
  107:19
**activities** 99:2
  100:4
**ACU** 91:15
**add** 36:11,11 80:17
  81:19,20
**additional** 15:12
  45:18 53:4
**address** 5:5
**addressing** 102:11
**Administrative**
  3:13,14 68:9
  73:16
**admit** 63:1
**advances** 19:5,19
  19:22,22 64:3,8
**advice** 75:3,24
**advise** 42:6
**advised** 91:6
**advising** 38:13
  42:9
**affiliate** 25:20
**affiliates** 7:8,9
  9:8 10:22

**affiliation** 3:9,9
  3:11 11:13,19,23
  13:5 19:12 49:10
  78:3 90:11 95:9
**agencies** 64:2,8
**agent** 37:9
**agitating** 56:1
  58:6
**ago** 23:15 50:13
  106:18
**agree** 32:9 62:9
**agreed** 4:11 13:13
  98:2
**agreement** 3:9,10
  3:11,13,14 11:14
  11:19,23 13:1,6
  13:8,11 19:12
  48:2 64:25 68:9
  68:15 70:6 73:17
  75:11,11 76:18
  76:19 77:8 78:3
  79:11 90:11 95:9
  95:9,10,17,21
  97:25 103:22
**agreements** 29:18
  49:11,13 63:12
  63:14 64:6 81:13
  81:14 95:23
**agrees** 13:11 97:25
**ahead** 50:21 57:6
  58:18 70:17
  80:18 99:21
**aid** 32:2 38:17
**airtight** 103:21
**allocation** 30:3
**alternatives** 42:10
**ambiguity** 97:22
**ambulatory** 93:20
**Amendment** 3:9,10
  11:18,23 12:20
  12:21,22 14:8
  19:15 47:25 48:7
  49:1,15,16 50:22
  78:3,24 79:11
  90:10
**Amendments** 95:17
**America** 7:11
**American** 7:24
  19:23
**amortizations** 24:2
**amortize** 23:25
  24:7
**amortized** 21:22
  22:12 92:18
**amortizing** 23:20
  24:6
**amount** 53:9 60:13
  62:11,12 85:6
**analysis** 24:24
**analytic** 25:4
**answer** 5:20 17:3

  21:11 25:7 27:10
  31:16 32:12 36:8
  36:12 39:5,11
  49:8,20 51:3
  55:18 56:9,22
  65:17 66:13
  70:17 71:5 72:22
  73:21 74:13 75:9
  76:3,21 77:19
  78:18 81:6 85:1
  90:2 93:5 98:7
  98:20 99:21
  100:14 105:11
  106:11 108:3
**answered** 80:15
**answering** 72:18
**answers** 5:15,16
**anybody** 31:7 39:20
  49:10 53:17,23
  54:22 104:14
**anyway** 49:8 71:13
  102:21
**apologize** 46:6
**apparel** 7:6
**apparently** 46:16
**appearance** 17:8
**APPEARANCES** 2:1
**appears** 68:22
**application** 83:13
  83:18
**appoint** 67:19
**appointed** 66:21
  67:8 68:3 79:18
**appointment** 66:25
  67:14
**apposed** 59:6
**appreciate** 69:11
  80:24
**approval** 36:17
  40:11 77:12,22
  78:5,16,24 80:10
  82:5
**approved** 50:17
  79:18 84:19
**April** 9:12
**arising** 73:15
**arrangement** 41:17
**arrangements** 42:6
**arrival** 95:11
**Article** 69:17
**articulated** 107:23
**ASA** 74:1 75:5
  76:10
**asked** 58:11,15
  68:24 73:3 74:23
  76:7 78:22 92:16
  94:7 99:14
  102:17 104:5
**asking** 5:14 65:5
  65:17 70:14
  73:20,21 74:20

  75:14,23 78:8,21
  79:1 86:7 90:17
  105:25
**assert** 106:6
**asserted** 106:9
**asserting** 78:9
**assets** 8:22,23
  30:10 99:10,15
**assignment** 25:25
  26:1 55:23 68:16
  72:8 99:23
**assume** 23:13,16
  47:21 48:9 65:2
  66:23 67:10
  83:15,22 86:24
**assumes** 77:16
  99:20
**assumption** 24:5,24
**assumptions** 24:22
  24:23 25:4 26:3
**attached** 12:21
  42:18
**attained** 6:15
**attempt** 26:13
**attend** 51:16,19,22
**attention** 12:19
  18:14 28:17
  29:23 42:17
  47:24 48:25 52:7
  52:18 55:12
  68:25 69:16,18
  72:1 80:7 81:10
  83:5 84:7 85:9
  85:20 86:12
  90:10,20 92:14
  95:8 96:8 100:2
  101:22 103:3,14
**attorney** 36:23
  55:7 111:10,11
**attorneys** 76:18
  77:5
**attorney/client**
  38:1 72:16 78:9
**AUC** 43:11 44:5
  45:4,12,17,17,21
  46:23 90:13,13
  92:2 103:11,22
**AUC's** 42:19 43:23
**audited** 18:10,12
  18:21
**auditors** 18:17
**authority** 30:18
  31:14 32:4,10
  34:23 35:2 39:1
  39:25 72:3,10
  74:24,24 75:4,11
  76:1,5,9,17,20
  77:1,3,7 104:6,9
  104:19,21,24
  105:14,22
**authorized** 37:9

92:24 107:20
**available** 93:20
  106:19
**Avenue** 2:9
**avoiding** 107:3
**aware** 19:18 63:25
  64:3,5 66:24,24
  67:13 68:5 70:5
  70:21 71:6 91:24
  92:1,7
**awareness** 93:18
**a.m** 1:18,18

_____
**B**
**B** 13:7 43:20,24
  44:1,2 46:11,22
  103:20
**BA** 6:23
**bachelor's** 6:22
**back** 7:5,25 13:4
  20:3 22:19,21
  36:10,13,21
  40:22 44:9 46:6
  47:15,24 54:16
  57:10,14 63:20
  69:17 75:21
  76:21 92:9 94:2
  97:18 108:10
**backdoor** 105:25
**bad** 92:8
**Baker** 2:3
**balance** 62:20
  90:12
**bankrupt** 88:13
**bankruptcy** 9:16
**based** 20:20 22:14
  45:19 107:8
**basically** 10:10
  27:12,19
**basis** 24:6 37:10
  37:25 41:12
  58:15 107:5
**Bates** 41:1
**bears** 69:1
**beat** 44:18
**began** 32:17 38:22
  58:6 80:8
**beginning** 33:21
  55:22 81:11
**begins** 96:25
**behalf** 1:16 4:2
  28:23 29:12
  34:14,17,20 35:2
  40:4 54:21 69:4
  70:23 72:4,12
  75:6 104:7
  105:23
**beliefs** 107:5
**believe** 16:4 17:22
  29:4 43:6 55:9
  69:1 78:4 86:5

86:10,17 87:5,8
  88:3 90:9 94:8
  101:5 103:11
**beneficiary** 63:3
**benefit** 63:10
**best** 17:1,5 21:11
  27:10 31:16
  32:12 45:14
  49:20 55:6,25
  59:6,23,25 60:4
  61:5 62:17 74:13
  80:19 88:3 90:2
  93:5,14 111:4,8
**better** 21:7 62:25
**beyond** 100:11
**birthday** 6:13
**bizarre** 58:9,10
  100:5,8,13,21
**block** 29:9 96:13
**board** 10:14,16
  17:15,17 20:9,14
  26:7,18 27:14,17
  27:18,18 29:16
  31:21 34:12
  36:16 39:22
  40:11,14,14
  51:17,20,23 52:3
  53:18,21 54:1,4
  54:22 56:3 58:13
  58:17,22 59:11
  59:13,16,19
  60:20 66:23
  67:10,11,12,17
  68:2,5 71:16
  74:17,21 77:12
  77:24 79:22,23
  82:5,14,22,24
  83:3,12 84:9,19
  87:11,23,25,25
  88:1,2 99:14,24
  102:16 107:20
  108:16
**boards** 25:19,20
  26:9 30:16 34:6
  34:10,11,13
  39:17 40:3 52:16
  108:16
**board's** 102:16
**Bob** 65:22
**body** 5:21
**boss** 14:23 15:2
**bottom** 21:20 84:14
  103:15
**bought** 8:3
**BQHC** 9:15,25,25
  10:9,17,21 11:25
  13:6,11 14:5
  15:7 16:13 27:18
  28:9 30:1,4,6,9
  33:25 34:3,21,25
  37:9,16 38:12

41:2 48:3 63:11
  63:13 64:22
  66:22 68:12,15
  69:24 70:7 71:1
  71:25 72:12
  77:21 83:6 84:12
  87:24,25 92:3,6
  95:1 97:25 98:18
  98:23
**BQHC's** 34:7
**breach** 13:11 97:25
**break** 5:24 40:17
  80:4
**briefly** 7:22
**bring** 10:9,12 88:6
**Brooklyn-Queens**
  1:8 9:7,15 11:15
  11:20,24 51:23
**brought** 55:11
  60:10 107:16
**building** 61:24
  62:4,12,14 63:6
  63:8 87:1
**built** 7:14
**bullet** 21:20
**burden** 106:8
**business** 8:5,14
  9:5 18:24 61:6
  61:13,18 62:6
  71:11
**buy** 8:6 87:24
**buying** 103:11

_____
**C**
**call** 9:3
**called** 4:23 7:13
  7:23
**Cambio** 8:1 9:7
  30:2,5 64:25
  68:15 69:4,24
  70:23 72:3,10
  88:23 89:14
  94:18,20,21
  97:11
**cap** 42:20 43:14
  45:22,25
**capacity** 37:17
  55:4 66:19
**caption** 4:8
**care** 1:8 7:7,24
  9:8,15 11:15,20
  11:24 51:23 52:6
**careful** 78:12
**Caribbean** 19:23
  53:3
**Caritas** 3:14 10:2
  10:4 18:11 19:1
  19:24 27:15 29:5
  32:2,19,21,23,25
  34:7,18 37:10,16
  38:12,16 43:23

43:23 44:25
  46:24 47:7,13
  51:20 53:5,13
  61:3,11,20,21,22
  62:3,7,13 63:15
  64:2,4,7 67:9,11
  67:12 68:16 70:7
  70:25 72:13
  77:21 84:23
  85:15 86:3,15,19
  87:14,24 88:2,6
  88:12 89:7 92:2
  93:25 99:3,15
  108:13
**case** 1:6 37:8
  64:22
**cases** 39:22 53:7
**cash** 9:18,20 10:5
  10:7 15:11 21:24
  24:10,13,17,21
  25:9,14 53:5,11
  54:9,10,12,14
  61:23 63:15 64:3
  89:7 91:18 92:20
  94:20
**cashed** 45:17
**cause** 55:14 56:5
**caused** 57:16
**Center** 1:9 60:20
  61:2
**central** 61:6,9
**CEO** 7:23 10:17
  27:12 28:8 29:4
  31:20 36:18
  65:22 66:10,18
  66:21 67:8,19
  70:25 71:9
**certain** 23:24
  36:17 100:21
  107:8
**certainly** 40:12
  50:17 71:15
  79:16 82:23
  100:15
**certificate** 4:8
  111:1
**certify** 110:4
  111:3,9
**cetera** 4:8
**CFO** 27:12 65:23
**chain** 34:10 103:4
**chairman** 29:16
  59:16
**chance** 12:16
**changes** 110:5
**characterization**
  75:12
**characterize** 75:10
  75:11 85:3
**check** 48:14 50:23
**Chicago** 2:5 6:19

**chief** 52:9,10 65:2
  66:1,2,8 70:2,7
  70:24 84:16
**chose** 26:6,7
**circumstances**
  70:15
**City** 38:9
**Civil** 4:6
**claims** 64:7
**Claire** 55:5 60:7,8
**clause** 75:25 76:16
  77:6
**clear** 33:19 35:6
  37:13 39:7 67:2
  75:13 78:16
  107:12,17,23
  108:4
**clearly** 45:10
**clerks** 41:18
**clerkship** 41:9,13
  53:10 54:24 93:1
  93:19
**clerkships** 13:13
  13:23 14:6 19:24
  22:16 23:11 24:3
  24:7,15,19 41:14
  41:21 43:13 54:6
  98:2
**client** 107:16
**clients** 107:17
**close** 20:9 50:21
**closed** 22:7,13,17
  25:11 47:6 72:2
  100:20
**closely** 59:8
**closing** 24:25
**collected** 61:7
**colloquy** 106:9
**coma** 46:25
**come** 41:10 45:16
**coming** 50:8 54:9
**comment** 44:17
**commentary** 25:7
**commented** 53:15
**commission** 110:25
  111:24
**commit** 65:22,23
**committed** 23:23
**committee** 58:17
  102:16,20
**communicated** 40:12
**communication**
  72:17 106:1
**communications**
  35:13,21 36:3
  72:16 73:1 74:7
  74:17,21 78:20
  78:22 91:11
  107:10
**company** 7:6,12,14
  7:15,23,25 8:2,6

8:8 104:3
**complete** 103:21
**completed** 4:15
**completely** 39:7
**concern** 87:12,21
  88:8,19 99:24
**concerning** 35:24
**concluded** 25:22
**conclusion** 16:3
**condition** 89:11
**confer** 36:22
**conference** 50:10
**conferred** 94:25
  95:6
**confuse** 20:18
**connected** 111:12
**connection** 9:6
  95:15 107:15
**consider** 57:25
**consideration** 72:9
  72:21 73:4
**considered** 20:8
  72:23
**considering** 24:25
  25:17
**consistency** 72:21
**consistent** 72:11
**Consolidated** 3:12
**constant** 99:24
**constantly** 35:7
  36:15
**constraint** 73:15
  73:25
**consultation** 107:8
**consultations**
  107:11
**consulted** 37:18
  103:12,25
**consulting** 9:11
  15:6,17 16:3
  25:22 26:7 94:10
  94:13,23 105:21
**contact** 40:13 42:4
**continue** 10:11
  20:13 59:18 67:3
  91:19
**continued** 7:20
  32:2 88:12
  101:12
**continuing** 26:16
**contract** 13:5
  14:12 22:15
  24:16 29:7 34:24
  43:7,11 45:13,13
  47:11 48:6,15
  49:3 54:5 59:21
  59:22 65:20,21
  77:21 78:6 81:23
  103:23 104:17
**contractor** 66:17
  94:14

**contracts** 19:19
  28:16 34:14,17
  34:20 35:2 36:19
  40:4,10 41:25
  42:10 47:8 50:16
  50:25 54:25
  58:25 72:12
  73:17,25 74:25
  75:1 76:1,5,20
  77:2,12 80:11
  82:13,20 104:7
  104:20,22,24
  105:14,23 107:18
**contrary** 35:20
  37:23
**contribution** 57:21
  57:25 58:4
**contributions** 58:4
**controversy** 101:10
  101:12,14
**conversation** 102:7
**conversations**
  35:24 82:23
  106:5
**cooperations** 61:20
**coordinate** 99:1
**coordinator** 41:8
**copy** 103:23 108:25
  109:5,7
**corporate** 10:1
**corporation** 7:10
  23:23 27:16
  61:12 93:9
**corporations** 29:17
  61:10,15 99:2
**correct** 20:7 21:2
  24:4 27:1 39:24
  40:2 41:16 42:9
  43:17 44:11
  45:23 65:3 70:3
  104:12 111:8
**correctly** 9:22
  26:25
**cost** 26:3 45:12
**counsel** 2:17 31:5
  35:14,17,21,22
  35:23 36:3 37:6
  37:19 38:2,22
  39:9 48:14 50:24
  51:5 59:1,9,19
  60:3,9 72:24
  74:21 78:7,17,17
  78:18 79:13,14
  79:16 81:24 82:2
  82:15 91:6,11
  92:8 95:15,21
  96:5 103:12
  105:10 106:6,10
  106:24 107:9,21
  107:22,24 108:2
  111:10,12

**counseled** 58:11
**counter** 42:19
**County** 4:4
**couple** 7:12 12:2
**course** 18:23 31:25
  48:23 51:11
  52:14 95:20
**court** 1:1 4:12
  5:15 11:11 16:11
  18:3 28:15 40:23
  52:1 60:17
  106:13 111:3
**Courthouse** 4:4
**critical** 38:15
**CRO** 71:9 80:8
  81:11
**current** 25:13
  84:18
**currently** 94:9,12
**CV** 1:7 7:3

───────────────
**D**

**D** 3:1 72:2 76:10
**David** 2:17 41:6
  56:6,11 58:11
  59:2,7,14,19,20
  76:25 103:22
**Davidson** 4:3
**David's** 60:13
**day** 2:13 4:3
  11:14
**day-to-day** 27:20
  41:12
**deal** 47:11
**dealing** 66:17
**deals** 53:19
**debt** 8:23 9:2
**debts** 63:15
**December** 3:16
  18:11 19:6,7,8
  49:23 52:3 84:9
  85:23,25
**decided** 8:4 10:8
  20:9 87:23
**decision** 26:10,19
  39:25 108:13
**decisions** 31:20
**deep** 9:14
**defendants** 1:10
  2:7 37:8 64:21
**deferred** 19:2
  21:21 92:17
**define** 99:8
**degree** 6:22
**department** 17:25
  67:6 83:15
**departure** 60:1
**depended** 32:3
  58:25 82:9
**dependent** 59:9

**depending** 26:6
**DEPONENT** 109:12
**deposition** 1:14
  4:1,15 5:8 6:2
  11:12,13 16:12
  56:17 106:20
  110:3
**describe** 63:6 70:2
  77:9
**described** 30:17
  85:12,16 100:3
  100:12
**desperate** 54:10
**detail** 57:15
**detailed** 89:20
**determine** 9:13,19
  15:11
**devoted** 87:14
**died** 14:16
**difference** 44:23
  45:3,11
**differences** 69:11
**different** 25:20
  35:25 80:1 90:4
  104:7
**differently** 22:5
**direct** 12:19 13:4
  18:14,25 20:3,23
  21:19 28:17
  29:23 39:4,14
  42:17 47:24
  48:24 52:7,18
  68:25 69:16,18
  71:25 75:9 84:7
  85:8,20 90:20
  92:14 96:8
  101:22 103:3,14
  105:11 108:3
**directing** 14:11
  80:7 81:6,10
  83:5 86:12 90:9
  95:8 100:2
**direction** 14:10
  35:17,19 105:19
  106:5
**directly** 34:11,12
**disagree** 38:5
  56:14 107:13
**disagreed** 39:24
**disagreement** 108:1
**disagreements**
  56:10 57:16
**disclose** 35:23
  91:10
**discuss** 42:14 45:2
**discussed** 43:15,19
  44:8,23 45:22
  72:24 75:14 76:3
  76:9,15,24 77:5
**discussing** 35:13
**discussion** 11:8

12:14 16:16
  26:23 37:4 40:20
  45:15 60:25 80:5
  103:7,10
**discussions** 49:9
  76:8 82:20
**distinction** 65:25
  79:7
**distressed** 8:18
**DISTRICT** 1:1,1
**division** 7:18
**document** 11:1,3,5
  16:7,11,19 17:1
  18:2 27:24 28:12
  40:15,24 51:12
  52:2 60:14,18
  70:12 71:7 96:16
**documents** 11:11
  71:5
**document's** 15:1
**doing** 24:12 32:6
  39:10,20 40:7
  42:9 48:11,21
  51:8,10 58:25
  94:10,12 95:19
**dollars** 23:10,15
**Dominick** 28:22
**door** 54:9 105:4,18
**doors** 100:20,20
**downside** 46:10
**draft** 79:12
**drafted** 79:13,15
**drafts** 81:12
**drawing** 65:25
**Drive** 2:4
**due** 85:22
**duly** 4:24

**E**

**E** 2:14 3:1 5:1
  64:18 103:1
  110:1
**earlier** 14:9 15:5
  66:7 68:24 85:12
  86:13 100:3
**early** 6:13 99:23
**earnings** 8:19
**EASTERN** 1:1
**economics** 6:23
**education** 6:14
  21:22 22:7,11
  92:18
**effect** 33:20
**eight** 23:9,11,14
  23:17
**either** 8:21 30:15
  70:12 79:16
  95:14 96:5
**elicit** 107:9
**eliminated** 45:22

**Emil** 29:12,14
**employee** 8:6 37:9
  104:2 111:11
**employees** 8:5
  39:14,18 61:1,15
  61:16,18 62:6,10
  62:17 69:22
  86:14 89:13
  108:12
**employment** 55:15
  56:6 94:8
**ended** 18:11
**ends** 96:25
**engaged** 27:3,8
**engagement** 81:11
  88:23 89:14,23
  92:23 97:11
**enter** 76:1,4 77:10
**entered** 7:7 10:21
  47:10 53:18
  64:25 80:11
  95:11,23
**entering** 48:15
  54:1,4 73:17,25
**entire** 71:7
**entities** 10:1 15:7
  28:7 29:13,19
  31:3 32:9 35:3
  37:20 40:5 41:17
  52:12 104:8
  105:23
**entitled** 11:13,18
**entity** 20:14 26:18
  99:5,9
**equal** 62:11
**equity** 9:2 94:15
  94:18
**equivalent** 13:12
  98:1
**ESQ** 2:3,8,13
**essentially** 105:25
**established** 77:11
  77:18 80:10
  81:12
**estimate** 89:15
**et** 4:8
**event** 13:9 96:25
  97:23
**eventually** 56:2
  59:17
**everybody** 32:25
  54:11
**evidence** 77:16
  99:20
**exact** 44:7 88:18
**exactly** 17:9 23:14
  33:15 89:21
  101:3,18 102:14
  106:4
**Examination** 3:4,4
  3:5

**EXAMINATIONS** 3:2
**exclusivity** 46:24
**excuse** 26:20 77:10
**executed** 78:25
**execution** 81:14
**executive** 65:7
  66:1,2 70:7
**exhibit** 11:2,4,6
  11:13,18,22
  12:20,25 13:5,7
  14:8 16:8,12,20
  16:22 18:3,9
  20:4 22:11,15
  27:25 28:13,18
  29:6,24 40:16,25
  46:5 47:25 48:15
  48:25 49:4 50:22
  50:25 51:13 52:2
  60:15,19 68:8
  69:9,17 70:22
  78:4 83:1 84:6,8
  84:11 85:9,10
  92:9 95:10 96:9
  96:12 103:4,15
**exhibits** 3:7 11:12
  12:17 28:16
**existing** 10:2
  95:21
**exit** 103:21
**exiting** 45:12
**expanding** 53:16
**expected** 31:18
  71:16
**experience** 71:9,10
  71:13
**expires** 1:24
  110:25 111:24,25
**explicit** 32:5
**express** 54:8 87:12
**expressed** 87:20
  88:7
**extent** 8:20 81:18
**external** 66:11,19
**e-mail** 3:14 40:25
  42:8 46:6,15,17
  47:21,21 57:23
  103:4
**e-mailing** 42:15
**E-tran** 109:11
**E-transcript** 109:9

**F**

**facilities** 13:14
  13:24 14:5 22:17
  93:21 97:1 98:3
**facility** 25:9
**fact** 23:1 26:16
  35:23 59:3 77:16
  79:2 83:18 85:18
  99:20 106:21

**facts** 81:18
**factual** 107:13,25
**fair** 63:5 104:5
**fairly** 37:13 57:21
  78:11,18 93:7
**fall** 89:2
**fallout** 47:2
**false** 75:12
**familiar** 42:5
  96:17 98:13
**fashion** 24:13
**fault** 106:22
**feedback** 43:20
**fees** 30:1
**fellow** 41:5
**felt** 57:22 58:2
  59:5
**Fifty** 84:4
**figure** 19:9
**fill** 31:11 60:13
**final** 68:25
**finally** 26:11
  59:20
**finance** 6:16
**financial** 3:12
  9:14,18 10:5
  18:5,9,10,18,21
  19:21 32:2 63:3
  89:10
**financially** 8:18
  111:11
**financials** 18:12
  19:1
**find** 92:10
**fine** 63:19 73:12
  90:22
**fire** 39:14,25
**firing** 39:18
**firm** 10:13,15 38:8
**firms** 10:15
**first** 4:24 9:21
  11:12 12:7 14:8
  18:15 19:15 41:4
  49:22 50:4 76:23
  78:3,24 79:11
  83:8 90:10 95:8
  95:16,23 96:22
  99:14 101:9,13
  106:20
**five** 8:20 18:5,6
  47:1,6 89:18
**flow** 9:18,20 10:5
  10:7 21:24 24:10
  24:13,17,21 25:9
  25:15 53:11
  88:12 89:7 92:21
  99:14
**flows** 15:11
**focused** 76:12
**follow** 63:23
  106:23 108:2

**following** 33:5
  35:17 69:18 70:1
  76:2 110:5
**follows** 4:24 20:8
**foregoing** 110:3
  111:6
**form** 4:9 21:6
  22:18 25:2 27:9
  30:20 31:15,17
  32:11,13,20
  33:11 34:1 48:17
  49:12 51:2 55:17
  62:22,23 65:4,15
  66:4,12,15 67:22
  68:19 70:10 71:3
  73:8,11,19 74:4
  74:9,12 75:13
  77:14,15 79:5
  80:13,15 81:16
  82:7,8 83:20
  84:25 85:17
  87:17 88:16,25
  89:4,25 90:1,16
  91:4 93:3,4,23
  95:3 96:20 97:13
  97:15 98:5,6,8
  98:19,22 99:7,18
  99:19
**formal** 52:11 68:14
**formalities** 4:7
**format** 17:11
**formed** 87:24
**forth** 96:18
**forward** 26:10
  46:15
**foundation** 23:1
  64:10
**four** 19:6,14 20:5
  23:15 46:25
**Franklin** 5:7
**freely** 93:8
**front** 42:4 46:4
  68:8 83:2 84:7
**FTI** 8:9,9 9:6 15:6
  16:2 29:10,19
  30:2,5,12 31:10
  31:11 32:9 64:25
  68:15 69:4,24
  70:23 77:6 88:22
  89:13,20 94:12
  94:16,18,20,21
  94:21,22,23
  97:10 104:16
**FTI's** 27:7 31:14
**full** 5:5 10:22
  60:12 65:22,23
  83:8 96:22
**fully** 107:20
**full-time** 89:13
**function** 66:1
**functioned** 67:16

  67:17
**functioning** 82:1
**functions** 27:13,13
  37:15 61:8,9,14
**fund** 10:7 62:5
  67:4
**funding** 9:25 10:6
  10:11 15:12 26:5
  56:2 61:25 62:2
  62:3 83:14 84:3
**fundraiser** 57:19
  57:22 58:1,5
  100:5,12 101:6,9
  101:15,23 102:3
  102:7,8
**further** 43:18
  109:12 111:9

_____

**G**

**Gates** 2:8
**general** 21:4 59:1
  59:9,19 60:9
  82:2,15
**generate** 53:4
  54:12,14
**Genesco** 7:6
**GEORGE** 2:3
**getting** 63:7
**Gio** 28:22 29:2
  33:19 53:2 55:23
**Gio's** 55:15
**give** 5:13 12:1
  32:9 72:8
**given** 5:8 32:3
  52:12 54:13
  76:18 106:24
**giving** 5:15
**go** 8:16 12:6 16:14
  25:12 31:21
  35:20 36:2 37:3
  41:3 43:25 44:9
  46:4,6 49:1
  50:21 52:23
  56:13 57:6 58:17
  59:12 70:17
  72:16 77:24
  79:22,23 80:18
  81:3 92:9 99:21
  103:20 106:13
**goals** 88:22
**goes** 57:14 70:1
  72:22 103:23
**going** 20:17 22:25
  26:2 35:8,12
  37:24 39:4 49:25
  56:19,25 63:17
  67:3 73:3 75:8
  78:19 100:11
  102:15 105:7,10
  106:23 108:2,3

**Goldberg** 14:9,11
  20:24 21:8 31:10
  52:5 65:23
  107:19
**Goldberg's** 14:23
**graduate** 7:4
**ground** 5:12
**grounds** 35:12
**group** 17:24
**growing** 63:9
**growth** 86:19
**gtzanetopoulos...**
  2:6
**guaranteed** 47:8,12
**guess** 14:18 44:10
  52:10 56:9 62:20
  63:5 65:16 92:8
**guy** 36:18
**guys** 7:13

_____

**H**

**H** 2:13
**half** 23:9,11,14,17
**handed** 40:24 52:1
  60:18
**hands** 50:9
**happen** 20:9
**happy** 5:25 6:13
  54:12 81:3
**HCA** 7:10
**heading** 84:15
**health** 1:8 7:7,24
  9:8,15 11:15,20
  11:24 17:25
  51:23 67:6 83:15
**hear** 5:17 63:1
**hearing** 4:10
**heavily** 59:1
**Heights** 1:8 3:15
  3:16 51:17 60:20
  61:2
**hello** 50:9
**help** 25:12 53:10
  55:10,12 86:8
**helpful** 36:9
**helping** 10:7 60:13
**high** 89:18
**highest** 6:14
**highly** 8:24
**hire** 39:14 55:9
**hired** 10:17 55:12
**hiring** 39:18
**Hoffman** 2:17 31:6
  41:6 55:9 56:10
  57:17 58:2 59:2
  72:17 76:25
  79:17 81:13 82:1
  95:24 96:1,4
  100:6 102:1
  103:22,25 104:11
  104:25 105:13,22

**Hoffman's** 56:6
  60:1 100:4
**hole** 9:14,14
**home** 5:5
**honest** 101:17
**hospital** 7:8,9,10
  7:13,18 8:13,18
  8:20,22 10:2
  13:22 14:1 15:16
  20:10 22:2,3,17
  30:15,21 31:3,6
  31:8,12 32:9
  38:2 41:17 44:4
  56:1 57:20,22
  59:1 60:2 72:4
  77:1 81:24 87:23
  92:20,25 94:11
  94:11 96:25
  105:10
**hospitals** 9:1 13:9
  24:19 25:23
  26:13 27:3,14,21
  28:3,9 30:10
  31:2,19,20 35:18
  35:22 38:16 39:6
  39:13 41:20,24
  51:16 53:25 54:3
  54:14,21,22
  55:13 59:4 61:9
  61:14 66:18 75:7
  85:15 88:13 89:6
  89:7 90:5 97:23
  107:24
**hospital's** 38:21
  48:14 50:24
**Hostetler** 2:3
**hour** 6:3
**huh** 56:9

_____
**I**

**idea** 108:17
**identification**
  11:16 16:13
**identified** 104:8
**identify** 76:23
**ignore** 25:6
**II** 69:17
**Illinois** 2:5
**Immaculate** 9:17
  10:3,4 14:3
  20:10 22:13 25:1
  25:8,11 27:17
  43:14 59:4 61:11
  93:8
**impact** 21:24 24:10
  24:13,17,21
  92:20
**implication** 78:13
  108:6
**implicit** 32:5

**importance** 106:25
**improve** 8:19
**inaccurate** 86:6
  87:6
**include** 45:6
**included** 23:11
  78:16
**includes** 74:6,17
**incomprehensive**
  23:2
**incorrect** 86:11
**incur** 72:3,10
**incurring** 74:1
  75:6
**independent** 87:22
  94:13 96:16 97:9
  98:9,12
**INDEX** 3:2,7
**Indicating** 5:19
**individuals** 69:25
  104:8
**industry** 7:8
**information** 18:17
  20:8
**initial** 47:6,11
  100:11
**initially** 9:11
  55:24 57:18
  102:12
**inquiry** 56:18
**inside** 35:22
**instance** 42:14
  48:19 78:2 88:10
  100:11,22
**institutions** 8:25
  47:3 91:18
**instructed** 10:10
  74:25 106:11
**intend** 101:11
  102:9
**intended** 83:13
  91:22
**interest** 42:19
  43:2,5,8 45:7
  47:5 88:5 94:15
**interested** 15:23
  111:13
**interim** 60:9
**internal** 66:9
  107:22
**Internally** 52:13
**investment** 84:23
  85:4 86:2
**invoke** 106:2
**involved** 38:12
  90:12 92:23 93:1
  93:19
**involving** 38:14
**in-house** 2:17 60:2
  78:17
**issue** 40:2 58:7,13

  58:14 62:8 76:4
  86:25 96:17
  101:23 102:10
  106:17
**issues** 55:11,13
  56:11,14 101:7
  107:8

_____
**J**

**January** 3:17 7:7
  60:19 83:2
**job** 15:9 28:7 41:7
  71:22
**jobs** 28:2
**John's** 9:17 10:3,3
  14:1 20:11 22:2
  22:3,7,12 24:3
  25:1,12,12 27:16
  43:13 59:7 61:11
  92:19 93:8
**Jones** 2:13
**judge** 81:4 106:14
**judgment** 92:6
**Julius** 15:2 41:5
  53:2
**July** 1:17 4:3 27:4
  32:17 33:5,17
  64:25 110:4
  111:14
**jump** 37:1
**June** 9:13 27:2
**junior** 60:10

_____
**K**

**keep** 61:20
**kept** 56:1
**kind** 41:8 42:4
  70:14
**kindly** 28:17
**kinds** 82:20
**knew** 67:17
**know** 5:12,18,24
  14:14 17:24
  19:13 20:1 23:15
  26:2,17 33:22
  39:17 40:3,9
  43:9 45:8 49:7
  56:17,21 59:11
  59:24 71:7 72:24
  74:5,13,15 77:17
  78:10 88:18
  89:16 94:25
  95:10,22 107:7
**knowledge** 98:10
  107:3
**K&L** 2:8

_____
**L**

**labeled** 41:2
**lack** 26:17 64:9

**lady** 60:5
**language** 69:19
  72:1 96:9,18
  97:21
**large** 38:8
**larger** 25:9
**law** 38:8
**lawsuit** 91:25 92:5
**lawsuits** 107:15
**lawyer** 72:18
**lawyers** 74:18
**lay** 106:22
**layman's** 8:14
  23:20
**lays** 43:25
**LCR** 1:24 111:24
**learned** 107:6
**left** 7:22 33:19
  96:1
**legal** 38:13,21
  48:14 50:24 51:5
  55:10,13 75:24
  79:13,14,15
  81:23 91:6 95:21
  103:12
**legitimate** 47:21
  88:8
**letter** 12:21 13:1
  49:1,4
**letting** 8:6
**let's** 42:14 46:6
  50:21 101:7
  104:18
**level** 6:14 84:23
  86:2,23 87:3,13
**levels** 36:17 82:13
**leveraged** 8:24
**Lexington** 2:9
**liabilities** 15:10
  74:2 75:6
**liability** 72:4,11
**light** 39:8 69:10
  105:9
**limit** 43:12
**line** 42:4 70:12
  78:14 106:12
  110:7
**liquidated** 7:24
**listed** 52:22
**little** 43:18
**lived** 55:7
**loan** 85:5,22
**loans** 64:1 86:2
**long** 33:21 50:12
  64:17 82:1
**longer** 59:10
**look** 12:2,4,11,17
  46:20 52:6 59:18
**looked** 10:14 15:10
**looking** 25:14
  45:10 46:17 86:8

**looks** 28:24 41:4
  42:8
**loss** 25:10
**lost** 47:7
**lot** 88:7
**lots** 5:11 82:23
**loud** 5:20
**Loughlin** 2:8 3:4
  11:7 15:15,20,23
  18:4 20:12,17
  22:18,25 23:5
  25:2 26:15,22
  30:20 31:17
  32:13,20 33:11
  34:1 35:8,11
  37:1,7,12 38:3
  39:2 48:17 49:21
  50:1 51:1 56:23
  57:2 62:23 64:9
  64:15,19,21 65:9
  65:24 66:6,20
  68:1,23 70:20
  71:18 72:19
  73:13,23 75:2,19
  76:2,7,22 78:1
  78:21 79:3 80:3
  80:6,23 81:8,17
  82:3,18 84:1
  85:7 87:19 88:20
  89:1,9 90:6,19
  91:1,9,23 92:13
  93:13,16,24 94:6
  95:7 96:24 97:7
  97:16,20 98:11
  98:25 99:4,12
  100:1,17,24
  102:22 103:6,9
  104:5 105:1,5,15
  105:24 106:7
  107:1 109:2,8
**Loughlin's** 102:25
  107:16
**low** 89:17
**lower** 30:3

———————————
          **M**
———————————
**M** 1:22 4:11 5:1
  64:18 103:1
  111:2,22
**machine** 111:5
**main** 40:13 88:5
**maker** 26:19
**making** 57:25
**management** 7:13,18
  8:17 10:10,21
  13:22 30:16
  32:18 33:10
  37:15 54:22 61:1
  62:10 87:11
  100:19 108:11

**managers** 57:24
  58:3,7,10 100:22
  102:11
**mark** 10:25 16:5
  27:22 28:10
**marked** 11:2,4,6,11
  11:12 16:8,11,20
  18:3 22:15 27:25
  28:13,16 40:15
  40:24 41:3 51:12
  52:2 60:15,18
  78:4
**Mary** 9:16 10:3,4
  14:3 20:10 22:13
  24:25 25:8,11
  27:17 43:14 59:4
  61:11 93:8
**master's** 6:16
**material** 13:11
  20:7,25 97:25
**math** 6:23
**matter** 73:5
**matters** 35:25 36:4
  38:13
**Matthew's** 93:25
**MBA** 6:16,18 7:1
**mean** 10:19 17:1,7
  17:11 23:21
  27:11 28:4,24
  31:9 34:3,4 45:7
  47:18 48:20
  49:22 55:3 58:24
  66:16 67:5,11
  68:14,20,21,22
  69:23 71:4 74:22
  77:17 79:23 86:7
  86:9 88:17 89:10
  89:19 94:21
  99:10 101:1
  102:21
**means** 74:5,15
**meant** 63:8
**medical** 1:8 13:23
  14:6 19:24,25
  21:22 22:6,11
  23:11 24:2 41:14
  41:18,19,25
  43:12 53:3,9
  54:5,24 60:20
  61:2 92:18
**Medicine** 1:4 11:15
**meeting** 50:7,13
  53:21 83:3
**meetings** 30:15
  31:13 32:1,7
  40:14 51:17,20
  51:24 52:4,15,15
  82:22,25
**member** 54:1,4
  87:11
**members** 54:22

  87:25,25 88:1,2
**memory** 21:7 101:20
**mentioned** 50:11
  53:13 60:5
**met** 67:7
**methods** 58:8
**middle** 27:4 36:8
**million** 19:5,6,7
  19:11,14,14
  21:21 23:10,12
  23:15 43:23 44:4
  44:6,22,24 45:2
  45:3,16 47:1,5,6
  47:6,11,12 53:9
  53:14 83:13 84:4
  84:18,19 85:22
  85:23 87:4 92:6
  92:17
**mind** 33:23 73:14
  73:24 74:6,16
**mine** 21:8
**Mini** 109:8,10
**minute** 46:20 92:10
**minutes** 3:15,16
  52:3,19,25 60:21
  68:5 83:3 84:10
**misstates** 100:9
**mistaken** 17:17
**Mitchell** 1:22 4:12
  111:2,22
**moment** 93:15
**Monday** 20:24
**money** 24:16,20
  54:23 57:23
  99:15
**month** 103:23
**monthly** 62:11
**months** 7:22 33:8
  33:16 53:4
**morning** 69:12
**morphed** 101:16
  102:13
**mother-in-law**
  14:16
**move** 26:10 35:12
  46:15 62:6 92:25
**moved** 59:7 62:12
  93:7
**Mullally** 55:5 60:7
  60:8 96:6

———————————
          **N**
———————————
**N** 3:1 5:1,1 64:18
  64:18 103:1,1
**name** 5:5 29:1
  60:11 64:20
**named** 41:5
**names** 18:1
**Nashville** 4:4 7:5
  55:8

**need** 5:24 36:11
  54:10 58:18
  108:5
**needed** 10:9,9
  57:23 58:22
  79:22
**needs** 59:12
**negative** 24:17,21
  25:14
**negotiated** 50:19
**negotiating** 41:25
  53:3 65:20
**negotiations** 48:5
  49:3 50:15,19
**never** 51:4 67:18
  71:17 77:21
  81:22
**new** 1:1 2:9,9,14
  2:14 4:5 7:24
  9:25 10:6,8,9,12
  21:14,16 38:9
  55:8
**nonunion** 86:14
**normal** 18:23 35:4
  48:22 50:23
  51:10 81:22
  95:19
**normally** 10:18,19
  48:11 50:16,17
**North** 2:4
**Notary** 4:12 110:24
  111:2
**note** 16:25 19:1,2
  19:21 70:11
  80:14 90:13
  106:16
**notes** 58:8 100:19
**notice** 4:7
**not-for-profit**
  8:25
**number** 10:14,19
  13:13 16:12
  43:12 56:11
  60:19 64:1 74:23
  83:21 88:3 90:3
  98:2
**numbers** 11:16 44:7
  45:9 86:6 89:17

———————————
          **O**
———————————
**O** 5:1 64:18 103:1
**object** 21:6 23:1
  25:2 27:9 31:15
  31:17 32:11,13
  32:20 33:11 34:1
  35:9,11 39:20
  40:7 48:17 49:12
  49:17,21 51:1
  53:18 54:1,4
  55:16 62:22,23
  65:4,14 66:3,12

66:14 67:21
68:18 70:9 71:2
73:7,18 74:3,8
74:12 75:8,12
77:13,15 79:4
80:12 81:15 82:6
82:8 83:19 84:25
87:16 88:15,24
89:3,24 90:1,15
91:3 93:2,4,22
95:2 96:19 97:12
97:14 98:4,6,19
98:21 99:6,17,19
**objected** 53:23
58:2 73:10
**objection** 16:25
20:13 22:18
26:16 30:20 39:2
51:1 64:9 65:8
70:11 80:14
81:17 104:25
105:1,15,24
106:16
**objections** 4:9
39:22
**objective** 62:19
**observant** 78:13
**obtained** 78:23
**obtaining** 78:5
**obvious** 37:20
**obviously** 5:14
33:22 38:15
59:15 61:19
88:19
**occasions** 74:23
**occupation** 6:9
**occur** 82:21
**October** 46:18
**offer** 42:19
**offering** 43:22
44:24 45:4
**office** 59:4 61:6
61:13 62:7
100:20
**officer** 52:9,11
65:2 66:1,2,8
70:3,7,25 84:16
**official** 32:18,19
33:10
**officials** 30:17
32:1 50:7
**Oh** 17:24 41:8
42:25 95:13 97:5
**okay** 14:20,22
17:21 19:3 20:5
23:7 28:19 29:8
35:16 36:6,17
42:24 46:14,19
46:21 57:3,18
60:24 63:25
64:15 69:20

71:21,22,23
73:12 74:3 76:11
83:4,7 85:11
91:7 95:13 97:6
98:8 101:24
102:9 106:15
**old** 6:11
**older** 25:9
**once** 10:21 27:7
32:17 81:9
**on-site** 69:25
**opened** 105:3,17
**operate** 20:10
26:13 31:19
38:16 71:16,17
**operated** 71:14
**operating** 3:11
8:23 35:4 37:14
99:5,9,9
**operational** 25:5
**operations** 27:20
**operative** 13:10
97:24
**opinion** 58:9,9
**opposing** 37:6
**opposite** 106:4
**options** 43:20
46:25
**order** 15:13 29:19
108:23
**organization** 15:13
24:11 71:10
**original** 13:5
19:11 49:15
**ought** 36:9
**outside** 31:5 35:14
35:23 40:14
78:17 82:21,24
**overall** 21:15
**owed** 63:15
**owner** 94:18

_____

**P**

**P** 2:8
**page** 3:3,8 12:22
12:25 13:8 18:25
20:6 21:19,19,20
22:10 28:18
29:24 41:3 42:18
43:25 44:9,10,12
45:19 46:4 52:14
52:19,20,21
60:23 68:11 69:1
69:17 71:24 83:5
83:9 84:8,11,14
85:9,21 92:15
96:12 97:4
103:16 110:7
**Pages** 20:23 52:8
110:3

**paid** 19:11,15,19
23:16 30:12
41:19 54:24
59:21 61:7,24
63:7 85:22,25
**paper** 33:7 34:2
**paragraph** 76:10
83:8
**Pardon** 15:20
**paren** 47:5,7 72:2
72:2
**parent** 27:18
**part** 18:20 22:14
25:24 52:15
55:10,12 64:5
**participate** 48:4
49:2 102:2,6
**participation**
102:8
**particular** 13:7
19:1 20:6 21:5
26:18 28:2 39:23
46:17 75:15,25
76:13,15 77:6
83:8 96:17 106:8
**particularly** 18:1
38:13
**parties** 63:11,13
111:10
**partner** 38:8
**party** 39:7
**Pat** 15:19
**patients** 25:11
**Paul** 14:9 31:10
**pay** 8:23 30:2 43:8
44:25 45:4 61:21
**payable** 61:25 62:4
63:6,8 86:19,23
87:1
**payables** 61:8
85:24
**paying** 30:7 90:12
**payments** 47:4 62:1
**payroll** 61:1,2,16
61:19 62:7,13
86:15,15
**payrolls** 108:12
**pending** 72:19
75:20 78:23
97:17
**people** 17:25 18:16
31:9,10,11 40:1
41:10 67:7 74:24
76:5,8,17,24
77:1 104:16
**people's** 33:23
**perfectly** 107:17
**perform** 47:13
**period** 18:13,18
19:25 23:24
26:12 33:1,4,14

35:15 47:1,1,7
87:7 95:22,24
**permitted** 72:15
**person** 42:5 60:11
**personal** 58:4
**personally** 28:5
48:4 49:2 57:20
**Peytonsville** 5:7
**phase** 15:6,9,17
**piece** 25:4,5
**place** 33:8 59:6
83:1 84:6
**Plaintiff** 1:5,16
2:2 4:2
**plan** 24:1 43:20,24
44:1,2 46:10,22
103:20
**planning** 24:7
**play** 41:24
**please** 5:5 16:5,18
27:23 29:23
81:20 108:24
**plus** 45:18 46:25
47:5,6
**point** 5:17 22:6,10
33:9 42:21 43:4
45:15 56:12
58:12,21 73:2
74:19 91:8
100:18 102:15
106:21
**portion** 96:9
**position** 17:3 29:3
33:24 37:7,23
39:6,9 59:18
105:7,9 106:24
107:23 108:2
**positions** 70:1
**positive** 25:13
**possibility** 44:3
**possible** 42:7,10
46:3
**potentially** 43:8
**PowerPoint** 92:11
**practice** 48:13
50:23 51:16,19
51:22 81:22
**preceded** 69:6
**preceding** 44:10
**preliminary** 106:20
**prepaid** 23:22 53:9
54:2,5,24
**prepare** 6:1 17:10
**prepared** 16:22
17:6 85:13
**prepayment** 23:10
23:23,25 43:5,9
44:4 45:5
**present** 2:17 6:9
26:4 30:14 32:8
**presentation** 16:22

17:7,8,9,23 22:4
23:19
**presentations**
83:22
Presentation-C...
3:11
**presented** 17:14,16
17:18 21:14
85:19
**pressure** 56:3 58:3
**pretty** 29:18 33:19
55:1
**primarily** 61:6
89:6 96:7
**primary** 9:5
**principle** 39:21
**prior** 76:3 78:5,24
81:13
**privilege** 35:12
37:11 38:1 41:20
73:1 78:10,14
105:8 106:2,10
106:17,25 108:7
**privileged** 39:3
78:20 105:2,16
**probably** 14:21
33:7,18 44:19
83:23
**problems** 9:18,20
10:5,6,7 53:11
**procedure** 4:6
77:11,17 80:9,21
81:12
**procedures** 35:5
**proceedings** 111:6
**process** 77:9 78:16
79:24 80:2
**produce** 16:2
**produced** 21:13
**Professionals** 7:14
7:19
**program** 3:15 41:11
**programs** 47:3
**Progressed** 7:8
**prohibition** 74:1
**prohibits** 75:5
**project** 9:12 16:3
25:22 94:12,13
**projects** 10:20
**promised** 64:6
**proposal** 47:12
**proposed** 24:1
**Proskauer** 38:10,11
60:10 72:17 96:5
96:7 107:22
**protect** 62:20
**provide** 13:12,22
18:17 19:24
24:14,18 69:24
98:1
**provided** 14:6 22:8

43:13
**provides** 22:15
**provision** 13:7
22:16 70:5 72:9
73:16 75:5,15
76:9,13
**provisions** 30:3
**Public** 4:4,12
110:24 111:3
**publicly** 7:23
**pulled** 46:23
**purchased** 7:10
9:16
**purpose** 61:4 62:16
86:18 98:18,23
**purposes** 4:5 66:9
66:11
**pursuant** 39:5
**pursue** 107:9
**put** 31:23 37:25
43:12 45:14
56:19,23 59:4,6
101:18
**putting** 21:1
**p.m** 46:18

_____
Q
_____
**Queens** 22:3 92:19
**question** 17:4
18:15 22:20,21
23:2 25:7 33:22
36:8,10,12 39:11
43:1 47:15 49:18
49:19 54:16
56:22 57:7,9,10
57:13,14 62:25
63:20,23 67:18
68:13 70:14,19
70:21 71:6 72:18
72:20,22 74:11
74:12 75:9,13,18
75:20,21 76:12
78:8,19,19,23
91:13,13 94:1,2
97:6,8,17,18
98:9 100:14
**questions** 4:10
5:14 12:3 15:19
37:18 52:8 60:22
64:14,16,24
71:22 78:15
102:25
**quibble** 71:12,19
**quick** 12:11
**quietly** 43:19
**Quorum** 7:15,16,20
7:22 8:1,3

_____
R
_____
**R** 110:1,1

**raise** 9:2
**raised** 102:25
106:17
**raising** 9:1
**ran** 41:11
**reach** 72:24,25
**reached** 58:21
63:15
**reaction** 43:19
**read** 12:9 22:19,21
36:9,12 47:15,18
54:16 57:10
60:21 63:20 71:5
75:20,21 83:10
94:2 97:16,18
110:3
**reading** 4:14 71:7
**reads** 21:20 46:23
**really** 56:11,18
101:1
**reason** 17:13 25:16
86:5,10 87:5
106:8
**recall** 14:11 26:25
49:7,9 57:6
65:10 90:23
**receivable** 61:7
**receive** 6:17
**received** 19:5,7,10
43:20 53:7,13
84:3,4
**recite** 52:25
**recollect** 9:24
25:24 26:1 33:15
34:23 45:24,24
46:2 47:17,19,20
48:9,11,20 53:20
57:18 58:20
82:11,12 84:5
91:5 95:18 102:4
**recollection** 17:19
19:16 23:13
29:21 30:8,11,13
32:14 34:22
43:10,10,16 45:9
48:21 49:5 50:14
50:18 51:9 53:23
54:7,11 55:2,6
59:24,25 60:5
61:5 62:18 64:12
67:1,15,24 68:2
76:15 77:20 78:5
79:10 80:1,20
81:19,21,25
82:17,19 83:24
84:2,22 85:3,4,6
86:1,5,10,22
87:4 88:4,9
91:20 92:22 93:7
93:10,12,14 94:5
95:5 96:15 97:9

98:13 99:11,13
99:22 100:6
101:4,25 104:4
104:13 108:15
**recollections** 50:7
**recommend** 82:16,16
103:20
**recommendation**
25:21 108:16
**recommended** 55:9
**record** 11:7,8
12:13,14 15:24
16:15,16,24
20:18 21:9 26:22
26:23 37:4,6,25
40:20,22 56:24
80:5 103:6,7
106:9 107:2
108:4,6
**recorded** 111:4
**records** 89:20
**reduce** 84:18 86:19
**reference** 8:13
83:9 85:21
**referred** 19:10
23:12 96:10
**referring** 46:3
87:2 108:10
**refers** 84:20 86:24
**reflect** 21:9
**reflected** 22:10
**reflects** 19:21
52:4 66:25 67:14
68:6
**refresh** 86:4
101:20
**refreshes** 86:1
**refund** 24:16,20
**refused** 58:16
**regarded** 100:7
**regular** 48:13
52:15
**reimburse** 30:5
**reimbursement** 30:4
**related** 9:4 15:17
**related-party**
85:24
**relating** 36:4
**relation** 100:4
**relationship** 38:14
50:12 59:15
**relative** 111:11
**relaxed** 42:20
**relevant** 56:18
**relied** 60:3
**relieve** 53:11
**reluctant** 59:13
**remaining** 24:19
**remember** 9:21 18:1
20:1 31:7 44:7
44:19,20 50:13

51:8 58:13 60:11
62:2 79:15 86:8
89:21 96:1 101:1
101:2,2,8,9,13
101:17 102:13,19
102:19
**remembering** 104:10
**repaid** 63:15
**repayment** 64:7
**repeat** 26:16 47:14
54:15 57:8 80:21
81:1,5 94:1
97:21
**repeated** 63:18
**rephrase** 75:17
**replaced** 45:17,21
**replacing** 91:14
**report** 16:2 21:13
21:16 31:22 33:1
34:6,11 52:9,16
53:17,21,22,24
60:22 84:15
85:13,19
**reported** 27:19
34:12 53:1 84:17
**reporter** 4:13 5:15
11:11 16:11 18:3
22:22 28:15
36:13 40:23
47:16 52:1 54:17
57:11 60:17
63:21 75:22 94:3
97:19 108:22,25
109:5 111:1,3
**reporting** 27:13
34:10 83:12
**represent** 64:21
**representatives**
32:8
**representing** 37:19
**request** 39:8 84:17
102:2
**requesting** 57:24
**required** 15:12
26:5
**requirement** 43:8
67:3
**reserved** 4:10
**residency** 47:3
**resolve** 73:14,24
74:6,16
**resolved** 58:19
**resources** 87:13
88:11
**respect** 42:21
68:16 70:22 73:1
75:4,24 78:2
85:14 106:11
107:10
**responded** 94:8
**responds** 46:16

**response** 37:18
44:10,14,21
64:23
**responsibility**
21:16
**responsible** 21:1
27:20 47:4
**restructuring** 7:17
52:9,11 66:8
70:2,24 84:16
**resulted** 92:5
**retired** 6:10 7:2
8:10 94:9
**returning** 44:3
54:23 55:8
**revenue** 19:2 21:21
92:17
**review** 18:21 79:13
80:10 95:14,20
103:21
**reviewed** 79:16
81:13,23 82:2
**Richard** 41:5
**Rick** 31:4 35:6
65:19,19 76:25
77:22 82:16
**right** 5:18,22 7:4
8:12 12:16 15:5
15:14 17:20
19:18 21:18 23:9
23:18 26:25 27:5
31:2 37:21 40:2
40:22 42:24
43:11 44:22
45:20 46:1,5,13
46:19,22 48:24
57:6 61:17 62:25
64:14 71:23 76:6
80:18 84:13
86:20 89:12
90:14 92:1 95:25
96:6 97:3 104:10
**rise** 91:25
**Road** 5:7
**role** 27:7 29:15
41:24 42:3 60:13
65:2 70:24 80:8
**roles** 31:11
**rolled** 42:20 43:2
**Romero** 15:2 41:5
41:24 42:15
43:18 46:7 47:9
53:2 95:1 103:5
103:15
**Romero's** 15:2 41:7
**room** 50:11
**Rose** 38:10,11
**Ross** 1:4 11:14,16
11:19,20,24 13:6
13:8 19:5,8,10
19:22 23:10

43:21,22 44:6,24
45:3,12,17,21
46:24 47:11 48:2
48:5 49:3,10
50:8 53:8,14
54:23,24 90:14
96:11 103:11
**rotations** 21:23
22:12 23:20
24:12 53:10
92:19 93:1,19
**rough** 89:19
**route** 106:4
**RPR** 1:22 111:2,22
**Rucigay** 29:12,14
31:4 36:14 40:13
59:14,15 76:25
77:23 79:20,21
82:10,15,21,24
88:10 104:11,18
104:19 107:21
**rules** 4:6 5:12
**run** 7:1,20 9:17
27:3 31:19
**running** 7:19 8:1

───────────
        **S**
───────────
**SAITH** 109:12
**Sarli** 41:5
**satisfaction** 54:8
**saying** 44:12,20
50:9 78:9 88:10
101:5,11 102:1
**says** 13:9 19:4
24:9,23 29:1
30:1 47:19 70:4
72:3,23
**scenario** 46:23
47:2
**scenarios** 3:12
85:14
**scene** 50:2 95:12
**scheduled** 106:20
**school** 1:4 6:17
7:5 11:14 19:25
43:12
**schools** 41:14,18
41:19 42:1 53:3
**scope** 77:7
**Sear** 2:13 6:5 12:6
13:17 16:24 18:6
21:6 25:6 27:9
28:4 31:15 32:11
35:16 36:7,25
37:3 39:4 49:12
49:17 51:3 52:22
55:16 56:16 57:4
62:22 63:19 65:4
65:18 66:12
70:11 72:14 73:2
73:12,20 74:3,10

75:8,23 76:6,11
77:15 78:7 79:1
79:6 80:14,25
82:8 84:25 90:1
90:17,22 91:7
92:12 93:4 96:21
97:3,14 98:6,19
99:19 100:9
103:16 105:6,19
106:16 107:12
109:3,7
**second** 3:10 11:22
12:20,21,22
48:25 49:15
50:22 80:4 95:16
95:23 96:22
103:17
**section** 30:1,4
**see** 13:15 21:25
42:22 46:14
58:24 61:17 72:5
78:18
**seek** 75:3 96:5
**selected** 10:15
**self-explanatory**
36:2
**sell** 8:4,22,22
45:19
**selling** 44:5 90:13
103:10
**sending** 41:20
**senior** 57:24 58:3
58:6,10 61:1
100:19 101:5
102:1,6,11
108:11
**sense** 41:11
**sent** 57:23 103:22
**sentence** 84:15
92:15 96:22,23
96:24 97:4
**separate** 61:10,12
61:21 101:7
109:7
**September** 87:9,10
**serious** 9:20
**serve** 69:25
**service** 61:22
**services** 68:9
69:25 73:16
85:24 86:25
**serving** 13:21
54:20
**set** 72:1 96:17
**sets** 46:22
**Seventeen** 21:5
**shake** 5:21
**shaking** 50:8
**share** 43:23
**shared** 85:24 86:25
**shed** 69:10

**sheet** 62:20 86:9
**Sheppard** 50:12
**shield** 106:6
**short** 5:13 6:25
  7:2 8:11 29:19
**shorthand** 111:5
**show** 11:10 16:10
  18:2 24:2
**shows** 29:12
**side** 12:21
**sign** 14:12 34:14
  34:17,20 35:2
  51:5 74:25 75:1
  76:20 77:2,3,4
  81:22 104:7,20
  104:21,24 105:14
  105:23
**signature** 12:23
  28:17,21,25 29:9
  29:10,11 69:2
  79:19 96:13
  109:4
**signatures** 13:1
**signed** 14:10,14,19
  15:1 34:24 40:11
  49:22 50:4 70:22
  76:19 77:21 78:6
  111:14
**significant** 10:5
  57:21 60:12
**signing** 4:14 40:4
  50:25 58:24
  72:11
**signs** 36:19
**simple** 31:23
**simply** 72:20 79:1
  107:20,21
**Singleton** 1:15
  2:12 4:2,22 5:4
  5:6 7:3 11:2,4,6
  11:10 16:8,10,20
  27:1,25 28:13,15
  35:18 37:8 38:2
  40:16,23 50:2
  51:13,15 53:1,15
  56:21 60:15,17
  64:20 71:20
  72:20 80:7 84:16
  88:21 93:17
  102:23 107:19
  110:3,21
**Singleton's** 28:7
**sir** 6:11 32:22
  38:19 44:17 46:9
  48:8 108:21
**situation** 71:15
**situations** 35:5
**SJQH** 21:23 22:2
**skill** 111:4
**slides** 20:3
**slipping** 100:19

**slots** 41:9,13
  43:24 44:5 45:18
  47:7 53:16 90:13
  91:15 103:10
**small** 72:2
**sold** 7:15 8:5,8
  94:20
**solely** 101:22
**somebody** 33:1
  55:11
**sorry** 22:24 23:3
  42:13,23,25
  54:15 63:12,17
  63:22 87:18 94:1
**sort** 43:7,7
**sought** 75:24
**Sounds** 44:18 53:21
**source** 65:12
**speaks** 23:19 42:19
**special** 69:22
**specific** 35:19
  39:21 51:9 53:20
  53:21 57:7 71:6
  79:9,25 82:13
  83:24 104:4
**specifically** 21:3
  36:5 44:20 48:12
  48:22 95:18
  101:8
**specification**
  15:16 20:14
  26:17
**specifies** 70:6,23
**specify** 30:21
  37:13 83:16
**speculation** 14:19
**Spent** 6:3
**spoke** 15:5
**Square** 4:4
**St** 9:17 10:3,3
  14:1 20:11 22:2
  22:3,7,12 24:3
  25:1,12,12 27:16
  43:13 59:7 61:11
  92:19 93:8,25
**stabilize** 15:13
  89:6,10 90:4
**stabilized** 91:20
**staff** 101:5 102:1
  102:6
**stamped** 11:16,20
  11:24 13:8 16:12
**stand** 8:21 101:19
**standard** 36:18
**standpoint** 89:8
**start** 45:1 54:2
  104:18
**started** 7:12,17
  57:19 104:3
**Starting** 44:13
**state** 4:13 5:4

  9:24 10:6,8,12
  15:12 17:18,22
  17:25 21:13,14
  26:2,5,8,9 30:16
  30:17,17 31:14
  31:22 32:1 38:15
  38:17 55:22,23
  56:1 61:25 62:2
  62:5 64:1,4 67:2
  67:5,7 71:16
  83:14,22 84:18
  85:14
**stated** 53:6
**statement** 18:5
  55:1 107:14
**statements** 3:13
  18:10,10,18,22
**states** 1:1 72:10
  92:16
**sticks** 100:23
**stipulation** 65:1
  65:13
**stipulations** 10:16
**stock** 94:21,22
**stop** 58:11 99:16
**strategies** 90:4
  91:17
**strategy** 44:8
  90:12 91:2,14,16
  91:25 103:10,13
  104:1
**Street** 2:14
**strike** 22:9 44:25
  54:2
**string** 3:14 40:25
  42:8 46:16 47:22
**strong** 59:14
**stuck** 18:9
**student** 3:15 21:22
  22:6,11 24:2
  53:10 54:5 92:18
**students** 13:23
  14:6 23:24 41:14
  41:18,21 92:25
  93:7
**subject** 35:25
  36:16 73:5 86:12
  90:21
**submit** 77:12
**submitted** 82:5,14
  84:17
**subordinate** 64:6
**subordination**
  63:12,14
**subsequently** 82:4
**substance** 35:20
  36:3 74:11,20
  75:15,25 88:11
  90:19 106:1
**successful** 53:6
  91:2

**succumbed** 56:3
**suggest** 54:23
**Suite** 2:4
**summer** 80:9 87:9
  89:1
**sums** 24:7
**supervised** 10:19
**sure** 12:5 20:2,16
  20:19 21:8 36:25
  56:17 69:13,14
  96:2
**surprised** 92:8
**survive** 91:19
**swear** 4:13
**sweeping** 49:18
  55:1
**sword** 106:6
**sworn** 4:24
**symbolically** 59:5
**systems** 94:11

---

**T**

**T** 5:1 64:18 103:1
  110:1
**take** 6:25 8:17
  12:1,11,11 23:24
  33:8 40:17 46:20
  58:12 64:16 80:3
  95:20 105:7
  106:14
**taken** 1:16 4:2
  39:6,9 105:9
  106:24 110:4
**talk** 79:20,21
**talked** 23:18 35:7
  36:15 79:10
  104:9,11,15
**talking** 20:15 21:3
  21:4 30:22 49:13
  96:21
**talks** 43:2
**task** 9:21
**tasks** 18:20,21
  54:13
**team** 16:23 17:14
  31:10
**tell** 18:8 36:5
  38:25 58:16,16
  58:18 76:23
  77:23 79:12
  83:17 84:20
  88:21 102:18
  104:19,23 105:13
**telling** 47:10
**tended** 96:4
**Tennessee** 1:24 4:5
  4:13 5:7 111:24
**term** 20:13 97:9
**terminate** 55:14
  56:5 57:16

terminated 55:24 56:6 58:23 59:20
termination 55:15
terms 8:14 23:20 78:13 107:18 108:6
testified 4:24 21:9 37:14 64:23 66:7 68:17 69:1 81:20 86:13,17 86:21 90:9,18 96:3 103:12 104:15
testify 17:9 28:25 68:21 85:18 101:19 107:4
testimony 37:22 65:6 69:12 81:5 90:23 100:3,10 100:10,16 102:10 108:10 110:4
Thank 5:3 102:23 108:20,20
thing 14:18 100:22
things 9:4 45:7 58:8 100:21 101:16 102:13
think 9:12,21 17:2 17:13,16,18 18:4 27:4 29:1 32:5 35:1 36:7 37:12 38:3 39:23 44:15 44:19 45:6 49:18 50:9 55:25 59:21 60:8 64:16 66:5 66:7 68:24 69:5 69:9 70:15 74:19 77:2 78:22 79:8 80:15 85:12,16 92:10 96:3 100:9 100:10 102:22 104:15 105:22 106:7 108:4,5
thinking 25:10
third 39:7
Thomas 1:15 2:13 4:1,22 5:6 110:3 110:21
thought 20:25 23:4 69:7,12 80:20 100:5
threatened 58:12
three 10:25 11:10 12:1,17 27:14,19 28:7,9 29:17 31:19,19 46:25 55:13 59:24 61:9 61:14 88:1,13 89:6
thsear@jonesda... 2:15

Thursday 46:18
time 10:22 13:21 14:16,17,24 15:3 23:25 25:13 26:12 28:3 29:3 29:5,14 33:4 38:18,22 39:13 41:23 47:20 50:13 51:15 53:25 54:3,20 55:10,12 60:12 60:13 65:22,23 66:17 70:16 72:7 80:8 87:7,8 91:12 92:22 93:18 95:22,24 101:9,13,21
times 5:10 89:16 107:24
timing 27:2
title 20:20 52:11 60:9 66:2,8,10 95:1,5
titles 95:1
today 6:2 53:8 68:17 100:3 107:6
told 14:9 20:24 51:5 71:17 79:18 80:20
Tom 6:3,5 7:2 28:6 50:11
top 32:18,18 33:9 44:11 52:23
total 24:10,18 45:12 81:1
totally 39:5
Tough 44:18
traded 7:23
transcript 110:4 111:6,7,8
transfer 53:8 61:4 62:17 63:4 86:14 108:11
transferring 60:25
transfers 108:14
transitions 108:17
Triad 8:3,3
tried 26:4 90:3
Trine 1:22 4:11 111:2,22
troubles 9:18
true 19:17 33:6,20 64:12 71:12 110:4 111:7
Trustees 51:17,20 51:23 52:4 60:21 84:9
try 8:19 15:11 81:9 89:5 90:4 101:21

trying 9:13,19 71:19 90:20
turn 7:17 8:2,4,13 8:18 9:3 10:13 15:22 21:18 26:21 68:11 71:24
two 8:20 10:1,25 18:9 24:19 28:16 29:18,20 53:4 61:10 62:14 69:7 69:8,11,15 89:7 96:12 99:2 101:7
typically 8:17 31:4 71:9
Tzanetopoulos 2:3 3:4,5 5:2 10:24 11:9 12:10,15 13:20 15:18,21 16:1,5,9,14,17 16:21 17:12 18:7 20:16,19,22 21:17 23:8 25:18 26:24 27:22 28:1 28:6,10,14 30:23 31:1,24 32:16,22 32:24 33:13 34:5 36:20,24 37:5,21 38:5,6 39:12 40:18,21 47:23 48:18 49:14 50:20 51:7,14 52:24 54:19 55:20 56:24 57:12 60:16 62:24 63:2,24 64:13,24 65:7,14 66:3,14 67:21 68:18 70:9 71:2 73:7,10,18 74:8 77:13 79:4 80:12 81:15 82:6 83:19 87:16 88:15,24 89:3,24 90:15 91:3 92:16 93:2 93:22 94:7 95:2 96:10,19 97:12 98:4,21 99:6,17 102:24 103:2,8 103:17,19 105:3 105:12,17,20 106:3,15 108:9 108:18,24 109:10

U
Uh-huh 13:16 29:25 42:11 48:1 86:16 96:14
ultimately 15:3,4 25:19

unamortized 47:4
uncertain 107:18
underneath 29:1
understand 5:17 36:1 37:7,22 44:2 47:9 74:10 76:12 79:6 100:17
understanding 17:2 22:14 24:16 72:15 88:22 98:17 104:6,16 107:7
understood 23:4 47:18,20
unfair 58:3
union 62:8
unionized 62:8
UNITED 1:1
university 1:4 6:19 11:14 13:10 13:12 19:23 43:21 53:8,14 97:24 98:1
unusual 10:18
use 20:13 42:12 106:5
usually 8:24 36:19

V
Vanderbilt 6:24
variety 37:15
various 26:3 74:23 76:5 85:14 89:16 89:16 94:25
version 5:13 6:25 7:2
virtue 74:1
vs 1:6

W
Wacker 2:4
waded 78:14
Wait 69:20,20
waive 109:3
waived 4:8,16 105:8
waiving 72:25
Wallace 5:6
Walter 2:8 64:20
walter.loughli... 2:10
want 12:4,8 37:2 39:6 62:5 65:21 80:21 81:3 83:11 88:6 91:9,10 106:13 108:7,22 108:25 109:5
wanted 8:4 10:11 26:2 30:17 31:14 55:23 82:10

**wash** 62:15
**wasn't** 56:25 63:9
92:7
**waste** 70:16 81:2
**way** 8:16 9:1,24
17:3 26:1 55:2
57:18 63:5 67:1
67:15,16,17
71:14,15,17
79:19 91:21 94:5
102:4 105:25
107:2
**Wednesday** 6:12
**week** 14:9 53:14
**weeks** 106:18,18,18
**went** 7:5,16,25
21:16 58:22
59:11 102:20
**weren't** 63:7,8
69:13
**we'll** 5:25 6:25
72:24 106:1,14
**we're** 18:4 20:15
31:22 35:17 36:7
39:7,9 72:25
80:25 81:1,4
102:22 106:21
**we've** 78:12 106:9
106:18
**wire** 53:7
**witness** 4:14,15,23
12:8 13:19 17:6
20:20 21:12
22:19,23 23:3,6
23:7 25:3,8
26:20 27:11 28:8
30:24 31:18
32:14,21,23
33:12 34:2 35:10
36:6,14,22 37:14
39:5 40:17 47:17
49:24 50:3 51:4
54:18 55:19 57:1
57:3,8 63:22
64:11 65:16,19
66:5,16 67:23
68:20 70:18 71:4
73:6,9 74:22
76:3,14 77:20
78:15 79:8 80:19
81:5,21 82:9
83:21 85:2 87:18
88:17 89:5 90:3
90:25 91:5,16
93:6 94:4 95:4
97:2,5 98:8,23
99:1,8,22 100:12
100:15,18 105:11
106:10,19 107:4
**wondering** 29:22
**words** 42:12 62:14

88:18
**work** 7:5,16,25 9:6
9:7,10 15:6,8
55:5 56:12 58:23
59:10 61:20
95:16
**worked** 8:9 18:16
59:8 79:19 89:14
**working** 72:7 97:10
**worst-case** 47:2
**wouldn't** 71:7 85:3
102:18
**write** 5:16
**writes** 42:18 43:18
43:22 103:15
**writing** 66:25
67:13 68:6
**wrong** 22:8 57:5
**Wyckoff** 1:8 2:17
3:15,16 10:1
13:22,23 18:12
21:23 22:13 24:3
24:8 27:17 28:23
29:5 32:2 33:6,8
33:10 34:15
35:15 37:10,16
38:12 47:8,13
50:10,10 51:17
53:5,7,12 59:6
60:20 61:2,12,21
62:1,3,4 63:4,7
63:10,11,13,16
64:6,22 67:20
68:15 70:8,25
72:12 77:22 83:3
84:9,24 85:22,25
86:3,14,20 87:12
87:13,22 88:1,2
88:6,7,11 92:2,6
92:20 93:11 99:3
99:14,15,24
108:12
**Wyckoff's** 34:7
61:16,19 62:20

_____

**X**

**X** 3:1 5:1 64:18
103:1

_____

**Y**

**yeah** 5:12 15:4
22:3 30:19 41:15
57:2 63:5 65:18
69:23 91:9 94:24
**year** 6:20 18:11
46:25
**years** 8:21 23:15
46:25 59:25
71:11
**Yep** 92:12

**yesterday** 6:4
**York** 1:1 2:9,9,14
2:14 4:5 9:25
10:6,8,12 21:14
21:15 38:9 55:8

_____

**Z**

**Zall** 31:5 35:6,14
38:7,21,25 65:19
65:19 76:25
77:22 79:17
82:16,24 104:12
104:23 105:21

_____

**$**

**$1.3** 45:2,16
**$10** 84:19
**$14** 84:18
**$3** 85:22
**$3.2** 44:4
**$3.7** 53:14
**$4** 19:7,14 53:9
**$4.5** 44:6
**$5** 19:4,11 47:11
92:6
**$5-million** 19:9
**$50** 83:13
**$8.5** 21:21 92:17
**$9.6** 85:23

_____

**0**

**0010** 83:6
**00490** 71:25
**00491** 68:12
**0064** 96:11
**01410 (KAM) (RLM)**
1:7
**03882** 84:12
**07** 9:13,13 89:2
92:24
**08** 89:2 92:24
**09** 1:7

_____

**1**

**1** 3:9 4:4 11:2,13
13:5 22:15 95:10
96:9 110:3
**1.3** 44:22 45:10
47:1
**1/6/15** 111:24
**10** 3:16,17 60:15
60:19,19 83:1,2
**10017** 2:14
**10022** 2:9
**103** 3:5
**109** 110:3
**11** 3:9,9,10 20:6
29:24
**11:30** 1:18
**11:37** 46:18

**12550** 16:13
**12608** 16:13
**15** 89:18
**16** 3:11,12
**17** 20:23 21:3
**18** 7:22 18:25
20:24 21:4,5,19
21:19 22:10 85:9
85:21 92:15
**19th** 111:14
**191** 2:4
**1970** 6:24
**1974** 7:6,7
**1981** 7:11,13
**19857** 41:2
**19858** 103:18
**19859** 41:4 42:18
44:9
**19861** 41:2
**1992** 7:15

_____

**2**

**2** 3:9 11:4,18 14:8
47:25 48:15
71:24 78:4
**2.1** 69:19,22
**20** 3:16 52:3 84:9
89:18
**20-something** 71:11
**2001** 7:21
**2002** 7:21 8:3,7
**2004** 8:8
**2006** 19:7 49:23
95:11
**2007** 3:16 18:11
19:8 27:5,6
32:17 33:5,17
46:18 52:3 64:25
80:9 84:9 87:9
97:10 98:15
**2008** 3:17 8:9
60:19 83:2 87:9
97:10 98:15
**2011** 1:17 4:3
110:4 111:15
**212)326-3939** 2:15
**212)536-4065** 2:10
**222** 2:14
**23** 68:12 69:17
71:25
**25** 46:18
**26** 19:6,7
**27** 3:13
**28** 3:14
**284** 1:24 111:24

_____

**3**

**3** 3:10 11:6,22
12:20 48:25 49:4
50:22,25 52:8
68:11 69:17 84:8

84:11
**3.2** 44:25 45:4,6
  45:11
**31** 18:11 85:23,25
**3100** 2:4
**312) 416-6200** 2:5
**37064** 5:7

———————— **4** ————————
**4** 3:11 16:8,12,22
  19:1 20:4 52:8
  52:19,20,21
  60:23 85:9 92:9
**4.5** 43:23 44:24
  45:3 47:6,12
**40** 3:14
**41st** 2:14
**4291** 11:25
**4564** 5:6

———————— **5** ————————
**5** 3:4,12 12:22
  16:20 19:8 83:5
**51** 3:15
**52** 11:20
**54** 11:21
**56** 11:17
**57-page** 16:25
**58** 44:12,13,16
**59** 44:13 45:19
  46:8
**599** 2:9

———————— **6** ————————
**6** 3:13 27:25 28:16
  28:18 69:9
**6/30/2012** 1:24
  111:25
**60** 3:16
**60606** 2:5
**615** 1:23
**63** 6:12
**64** 3:4 13:8
**67** 11:17

———————— **7** ————————
**7** 3:14 18:3 28:13
  28:16 29:6,24
  68:8 69:17 70:22
**72** 6:21

———————— **8** ————————
**8** 1:17 3:14 40:16
  40:25 103:4,15
  110:4
**8th** 4:3
**830-5544** 1:23
**89** 7:19

———————— **9** ————————

**9** 3:15 51:13 52:2
  84:6
**9.5** 47:5
**9.6** 86:24 87:4
**9:00** 1:18
**917** 11:25