# Exhibit 52

## *PROMISSORY NOTE AGREEMENT*

U.S. $3,500,000

As of December 1, 2006

### Section 1. Recitals:

WHEREAS Caritas Healthcare Planning, Inc. ("Caritas" or "Borrower") a New York corporation with offices located at 374 Stockholm Street, Brooklyn, New York 11237, and a wholly-owned subsidiary of Brooklyn Queens Healthcare, Inc. ("Brooklyn Queens") has completed, or will soon complete, the acquisition of Mary Immaculate Hospital ("MIH") and Saint John's Queens Hospital ("SJQH") pursuant to the agreement reached with creditors, certain New York state regulators or agencies properly charged with the review and approval of such acquisitions, and the bankruptcy court as a precondition of such acquisition and;

WHEREAS the American University of the Caribbean N.V. ("AUC" or "Lender"), a company established under the laws of the Netherlands Antilles with offices at One Jordan Road at University Drive, Cupecoy, St. Maarten, Netherlands Antilles has agreed to provide a loan in the amount of Three Million Five Hundred Thousand Dollars (U.S. $3,500,000) (the "Principal Amount") to Caritas for the completion of the acquisition of MIH and SJQH and financing requirements related thereto and;

WHEREAS Brooklyn Queens also operates Wyckoff Heights Medical Center ("Wyckoff") with offices located at 374 Stockholm Street, Brooklyn, New York 11237 which, as of the Commencement Date of this Promissory Note (or "Note Agreement"), maintains an independent agreement (the "Primary Wyckoff Agreement") for AUC medical student clinical education services not otherwise the subject of this Promissory Note except as such Core Rotations (as defined below) provided under the Primary Wyckoff Agreement contribute to the total maximum Core Rotations offered at Wyckoff in the event of a Default (as defined below) hereunder and;

WHEREAS repayment of the Principal Amount of Three Million Five Hundred Thousand Dollars (U.S. $3,500,000) may be setoff in an equivalent value of medical student clinical education services, rendered to students of the Lender at MIH or SJQH (or both) pursuant to an Affiliation Agreement to be executed between the Borrower and Lender and where such services shall provide for Core and Elective Rotations (as defined below) and;

WHEREAS this Promissory Note is being executed and delivered by Lender to Borrower, subject to the terms and conditions contained herein, formally evidencing the obligations of Lender and Borrower (or collectively the "Parties") identified herein.

Page 1 of 10

ROSS031414

NOW THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender, on demand, the Principal Amount together with interest on the unpaid Principal Amount outstanding from day to day at the rate hereafter set forth. Interest shall be calculated and paid in cash at the rate of 1/360th of annual interest for each day that the Principal Amount, or any portion thereof, is outstanding. The Lender hereby agrees to forbear from demanding repayment of the Principal Amount and shall accept as an incremental setoff thereof the Borrower's provision of medical student clinical education services in the form of Core and Elective Rotations (as defined herein) so long as the terms and conditions of this Note Agreement and the Affiliation Agreement are met, and which, if provided in a value equivalent to the Principal Amount and accrued interest, shall constitute a satisfaction of the debt.

Interest shall accrue at the rate of Three-Month LIBOR plus 1.00% percent per annum, and be payable quarterly (in cash) to the Lender not more than five business days following the end of each calendar quarter (defined as March 31, June 30, September 30 and December 31) during the term of the Note Agreement, on the Principal Amount outstanding at the end of each calendar quarter. The Three-Month LIBOR rate applicable to the computation of interest payable to Lender shall be that available in the daily *Wall Street Journal* on the date of the end of the calendar quarter, or the closest date available prior to the end of the calendar quarter. Interest paid under this Note Agreement is payable in United States Dollars at the Lender's offices or at such other place as the Lender may hereafter designate in writing.

The fees for each Core Rotation or Elective Rotation, as defined herein, will be US $ 341.25 per week (US $ 350.00 per week less a 2.5% discount), and Lender agrees fees for such Core or Elective Rotations will be invoiced and payable quarterly in the form of quarterly reductions in the Principal Amount of U.S. $3,500,000. Such price per Core Rotation or Elective Rotation shall be effective until the complete repayment to Lender of the Principal Amount and satisfaction of this Note Agreement or early termination of this Note Agreement upon the occurrence of an Early Termination Event, as defined herein.

Lender shall be invoiced quarterly for the total number of Core Rotation and Elective Rotations, as defined herein, active and outstanding at the Friday end of each week in a calendar quarter as multiplied by the fee of US $ 341.25 per week. Fees for weeks not having a Friday end in a given calendar quarter will be invoiced by Borrower in the subsequent calendar month.

### Section 2. Definitions:

1. A "Core Discipline" shall be defined as one of the following medical specialties: (a) Internal Medicine, (b) General Surgery, (c) Obstetrics & Gynecology, (d) Pediatrics (e) Psychiatry and (f) Family Medicine.

ROSS031415

course of study, and Family Medicine shall be defined as one (1) four to six week course of study, depending on the prior rotations undertaken by each student.

3. An "Elective Discipline" shall include, but not be limited to, one of the following medical specialties, departments or programs: (a) Anesthesiology, (b) Cardiology, (c) Emergency Medicine, (d) Geriatrics, (e) Hematology & Oncology, (f) Infectious Diseases; (g) Neurology; (h) Ophthalmology; (i) Orthopedics; (j) Pathology; (k) Pulmonary Medicine; (l) Radiology; (m) Surgical Intensive Care; (n) Intensive Care; (o) Trauma Surgery; (p) Gastro-Intestinal Medicine; (q) Surgical Sub-Internship and; (r) Internal Medicine Sub-Internship.

4. An "Elective Rotation" is generally defined as one (1) four-week course of study in the Elective Disciplines, but other courses of study in Elective Disciplines, with varying time periods, may apply.

5. A "Default" is defined as the occurrence of one, or several, of the following events: (a) the failure to make interest or principal payments on the financial obligations authorized, undertaken or assumed by Brooklyn Queens Healthcare, Inc., Caritas, Inc. Mary Immaculate Hospital and Saint John's Queens Hospital (individually or collectively) to complete the purchase of the MIH and SJQH pursuant to the agreement reached with creditors, New York state regulators or agencies with jurisdiction over such acquisitions, and approved by the bankruptcy court as a precondition of such purchase; (b) restructuring or renegotiating debt agreements authorized, undertaken or assumed by Brooklyn Queens Healthcare, Inc., Caritas, Inc., Mary Immaculate Hospital and Saint John's Queens Hospital (individually or collectively) in a manner that is deleterious to creditors or investors, or stipulates the acceptance of less favorable financial terms than those offered as a precondition of the purchase of MIH and SJQH pursuant to the agreement reached with creditors, New York state regulators or agencies with jurisdiction over such acquisitions, and approved by the bankruptcy court; (c) a filling for relief or reorganization under the U.S. Bankruptcy Code.

6. An "Early Termination Event" shall be defined as the occurrence of one, or several, of the following items: (a) a failure to meet the Program Requirements as fully described in Section (4), Paragraph (1) (including a loss of accreditation for residencies from the *Accreditation Council for Graduate Medical Education* "ACGME" for any Core Rotation); (b) non-compliance with teaching faculty to AUC students per Core Discipline ratios specified in Section (4), Paragraph (2); (c) exceeding the total maximum Core Rotations stipulated for MIH and SJQH in Section (4), Paragraph (3) and the total maximum core rotations permissible for Wyckoff as contained in Section (4), Paragraph (4); (d) a Default, as defined in Section (2), Paragraph (5) or where Wyckoff may be unwilling or unable to assume the responsibility for performance hereunder resulting from such Default by Brooklyn Queens Healthcare, Inc., Caritas, Inc. Mary Immaculate Hospital and Saint John's Queens Hospital (individually or collectively); (e) the occurrence of a Default that was not communicated to Lender, in writing, within thirty (30) days of such Default;

ROSS031416

(f) failure of Borrower, to perform any agreement hereunder or to pay in full, when due, any interest due to Lender; (g) an application for the appointment of a receiver for the making of a general assignment for the benefit of creditors by, or the insolvency of, Borrower; (h) the issuing of any attachments or garnishment, or the filing of any lien, against any property of Borrower; (i) the taking of possession of any substantial part of the property of Borrower at the instance of any governmental authority; (j) the dissolution, merger, consolidation, change in control or reorganization of Borrower.

7. A "Team" for purposes of Core Rotations in Obstetrics & Gynecology is defined as one (1) teaching faculty member, one (1) senior resident and (1) junior resident.

## Section 3. Term and Termination:

1. This Note will commence on December 1, 2006 (the Commencement Date") and will terminate upon either: (a) repayment of the Principal Amount or satisfaction of the debt by setoff from the provision and delivery of Core and Elective Rotations to the Lender's medical students pursuant to an Affiliation Agreement that cumulatively total the Principal Amount of U.S. $3,500,000, together with applicable interest fees due and payable to Lender on outstanding principal amounts; or (b) the occurrence of those Early Termination Events specified in Section (2), Paragraph (6).

2. The Parties agree that this Note Agreement shall be voidable by the Lender, without penalty, in the event the acquisition of MIH or SJQH (or both) by Caritas pursuant to agreements reached with creditors, certain New York state regulators or agencies properly charged with the review and approval of such acquisitions, and the bankruptcy court is not consummated by the Commencement Date.

3. The Parties acknowledge and agree that failing to provide total student census information required by, or exceeding the student census limits for total Core Rotations, as set forth in Section (4), Paragraph (3) at MIH and SJQH, and Wyckoff in Section (4), Paragraph (4) (in the event of a Default) without an independent written agreement, acceptable to the Parties, specifying the terms and conditions of other total Core Rotation limits, shall constitute a material breach of this Note Agreement.

4. Borrower acknowledges an affirmative duty to advise Lender, in writing, of a Default (as defined herein) within thirty (30) days of such event, and recognizes Lender will be relying on Borrower's representations with respect thereto. Borrower understands that a failure to advise Lender of a Default is a serious and substantial breach of this Note Agreement.

5. The Parties acknowledge and agree that upon the occurrence of an Early Termination Event, the Lender may, in its sole discretion, provide the Borrower with ninety (90) days notice to either: (a) enter into a written modification of this Note Agreement,

ROSS031417

mutually acceptable to the Parties, or; (b) terminate the agreement. In the event of a termination of the Note Agreement, the remaining unpaid Principal Amount together with any then outstanding accrued interest shall become immediately due and payable, in cash, by Borrower to Lender without notice or further demand. Failure to notify the Borrower as set out above shall not constitute a waiver of its subsequent right to provide such notice. WHILE IN DEFAULT, THIS NOTE AGREEMENT SHALL BEAR INTEREST AT THE MAXIMUM RATE PERMITTED BY LAW. IN THE EVENT THAT AT THE TIME OF THE OCCURRENCE OF AN EARLY TERMINATION EVENT THERE IS NO MAXIMUM RATE IN EFFECT THEN THE DEFAULT RATE SHALL BE EIGHTEEN PERCENT PER ANNUM.

## Section 4. Additional Provisions:

The Parties further agree the following provisions shall also apply to this Promissory Note;

1. All Core and Elective Rotations will meet the Program Requirements (available, by medical specialty, at www.acgme.org), as amended, promulgated by the respective Residency Review Committees from time to time on behalf of the ACGME.

2. Notwithstanding other provisions that may be contained in the Program Requirements, as amended, promulgated by the respective Residency Review Committees on behalf of the Accreditation Council for Graduate Medical Education, the Parties agree that the teaching faculty to student ratio for AUC medical students at MIH and SJQH (and Wyckoff, in the event of a default) shall not be less than one (1) teaching faculty member to four (4) AUC students per Core Discipline, as such ratio is determined by the Chief Academic Officer of AUC, in his sole professional opinion.

3. The Parties acknowledge and agree that the quality of the medical student clinical educational experience is an important consideration with respect to the terms and conditions set forth in this Note Agreement. Therefore, Brooklyn Queens, Caritas, MIH, and SJQH (individually and collectively) agree to provide no more than the following number of total Core Rotations for all medical students receiving training at MIH or SJQH at any one time:
   (a) MIH: 50 Student Core Rotation Maximum
   (b) SJQH: 50 Student Core Rotation Maximum
and that AUC shall have the right to schedule students to 50% of any such core clerkships offered (the "AUC Service").

During the term of the Note Agreement; authorized representatives of Caritas, MIH and SJQH agree to provide periodic written confirmation of the number of total Core Rotations for all medical students receiving training at MIH or SJQH, to the AUC Chief Academic Officer.

ROSS031418

4. Brooklyn Queens acknowledges and agrees, on behalf of its wholly-owned subsidiary Wyckoff, that a Default (as defined in Section (2), Paragraph (5), herein) by Brooklyn Queens, Caritas, MIH, and SJQH (individually and collectively) during the term of this Note Agreement will obligate Wyckoff to assume responsibility for this Note Agreement, including scheduling the maximum of fifty (50) AUC students receiving medical student clinical education in the Core Disciplines at MIH and SJQH, and the maximum of twenty (20) AUC students receiving medical student clinical education in the Elective Disciplines at MIH and SJQH. Further, in the event of a Default, Brooklyn Queens and Wyckoff agree to provide no more than 150 total Core Rotations for all medical students receiving training at Wyckoff including those AUC medical students transferred from MIH and SJHQ and those AUC students training at Wyckoff pursuant to the Primary Wyckoff Agreement. The Parties agree that Brooklyn Queens and Wyckoff will have a period of ninety days from the date of default to accommodate and re-schedule the AUC medical students so transferred to Wyckoff (as a consequence of the Default) from MIH and SJHQ, and otherwise comply with the 150 Core Rotation maximum student census applicable to Wyckoff.

During the term of the Note Agreement, authorized representatives of Brooklyn Queens and Wyckoff agree to provide periodic written confirmation of the number of total Core Rotations for all medical students receiving training at Wyckoff to the AUC Chief Academic Officer.

5. The duly authorized representatives of Brooklyn Queens and Wyckoff executing this Note Agreement on behalf of these entities covenant that they are lawfully authorized to commit, and do so commit, Brooklyn Queens and Wyckoff to the obligations set forth in Section (4), Paragraph (4) in the event of a Default, as defined herein.

6. The parties acknowledge and agree that the AUC Service for students participating in MIH and SJQH Core Rotations in Surgery will number no less than six (6) and no more than eighteen (18) at any time during the term of this Note Agreement. The Lender agrees that modules within the Core Rotations in Surgery may be split between assignments at MIH and SJQH, provided the AUC Chief Academic Officer has determined, in his sole professional opinion, the academic equivalence of such split Core Rotations in Surgery.

7. The parties acknowledge and agree that the AUC Service for students participating in MIH and SJQH Core Rotations in Internal Medicine will number no less than ten (10) and no more than twenty (20) at any time during the term of this Note Agreement. The Lender agrees that modules within Core Rotations in Internal Medicine for AUC medical students may be split between assignments at MIH and SJQH, provided the AUC Chief Academic Officer has determined, in his sole professional opinion, the academic equivalence of such split Core Rotations in Internal Medicine.

8. The parties acknowledge and agree that the AUC Service for students participating in MIH and SJQH Core Rotations in Obstetrics & Gynecology will number no less than three (3) and no more than six (6) at any time during the term of this Note Agreement.

ROSS031419

A maximum of two (2) AUC medical students may be assigned per "Team" as defined in Section (2), Paragraph (7). The Lender agrees that modules within Core Rotations in Obstetrics & Gynecology for AUC medical students may be split between assignments at MIH and SJQH, provided the AUC Chief Academic Officer has determined, in his sole professional opinion, the academic equivalence of such concurrent Core Rotations in Obstetrics & Gynecology.

9. The parties acknowledge and agree that the AUC Service for students participating in MIH and SJQH Core Rotations in Family Medicine will number no less than one (1) and no more than six (6) at any time during the term of this Note Agreement. The Lender agrees that modules within Core Rotations in Family Medicine for AUC medical students may be split between assignments at MIH and SJQH, provided the AUC Chief Academic Officer has determined, in his sole professional opinion, the academic equivalence of such concurrent Core Rotations in Family Medicine.

10. The Parties agree that this Note Agreement shall be voidable by the Lender, without penalty, in the event the operation of MIH or SJQH (or both) by Caritas is not approved (in writing) for the provision of medical student clinical education services by the New York State Education Department by the Commencement Date.

11. MIH and SJQH will identify employees at those facilities responsible for regular communication with designated agents of the Lender to manage and coordinate Core and Elective Rotations for AUC medical students.

12. In the event Caritas, MIH or SJQH establish additional ACGME-accredited residency programs in the Core Disciplines during the term of this Note Agreement, Lender shall be offered the right of first refusal to use 50% of any additional Core Rotations(s) in the Core Disciplines, where a written addendum to this Note Agreement includes a price term of US $ 350.00 per week for such additional Core Rotations. In the event of a reduction in ACGME-accredited residency programs at Caritas, MIH or SJQH during the term of this Note Agreement, where such reduction results in fewer than of fifty (50) Core Rotations at Caritas, MIH or SJQH, the Parties agree that Lender shall continue to maintain 50% of total Core Rotations at Caritas, MIH or SJQH in a written addendum to the Note Agreement providing for such a reduction in Core Rotations.

13. Lender shall be obligated to advise those Caritas, MIH and SJQH employees identified in Section (4), Paragraph (11) at least thirty (30) days in advance of those Elective Rotations to be used by AUC medical students at Caritas, MIH and SJQH as per the Lender's policies and procedures for the communication of such information.

14. The Borrower, and each one of them, if more than one, jointly and severally, promises and agrees to pay in the event of a Default, all costs and expenses incurred in the collection of this Note Agreement, including reasonable attorney's fees and costs

ROSS031420

15. The provisions of this Note Agreement shall be construed and interpreted and all rights and obligations hereunder determined in accordance with Florida law. Borrower consents that jurisdiction and venue of any dispute arising from this Note Agreement shall be in Miami-Dade County, Florida. All nouns and pronouns contained in this instrument shall mean and include the plural as well as the singular, and the masculine, feminine and neuter gender whenever and wherever the context so admits or requires.

16. Upon the occurrence and during the continuance of any Early Termination Event, Lender is authorized, without notice to Borrower (the giving of notice being expressly waived by Borrower) to set off and apply any indebtedness owing by Lender to Borrower against the indebtedness evidenced by this Note Agreement, although then contingent or unmatured. Lender agrees to notify Borrower after any such setoff and application; provided however, that failure to give such notice shall not affect the validity of such setoff and application; and Lender shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of an event of default even though such charge is made or entered on the books of Lender subsequent thereto. The rights of Lender under this provision are in addition to any other rights and remedies which Lender may have.

17. Borrower and all sureties, endorsers and guarantors of this Note Agreement hereby (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit and diligence in collecting this Note Agreement, in enforcing any of the security rights or in proceeding against any of the collateral securing the obligations evidenced by this Note Agreement; (b) agree to any substitution, exchange, addition or release of any of the Collateral or the addition or release of any party or person primarily or secondarily liable hereon; (c) agree that Lender shall not be required first to institute any suit, or to exhaust his, their or its remedies against Borrower or any other person or party to become liable hereunder or against the Collateral in order to enforce payment of this Note Agreement; (d) consent to any extension, rearrangement, renewal or postponement of time of payment of this Note Agreement and to any other indulgency with respect hereto without notice, consent or consideration to any of the foregoing; and (e) agree that, notwithstanding the occurrence of any of the foregoing (except the express written release by Lender or any such person), they shall be and remain jointly and severally, directly and primarily, liable for all sums due under this Note Agreement, and any other documents securing this Note Agreement.

18. The Lender does not intend to violate any applicable usury laws. Accordingly, all agreements between Borrower and Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid Principal Amount hereof, or otherwise, shall the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note Agreement, any loan fees payable in connection herewith, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note Agreement, or any

ROSS031421

other document securing this Note Agreement, which, under applicable laws is, or may be deemed, to be interest) exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, fulfillment of any obligation hereof or any other document securing this Note Agreement, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced by this Note Agreement to exceed the maximum rate of interest allowed by applicable law, then the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Lender shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid Principal Amount due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Borrower. This provision shall control every other provision of all agreements between the Borrower and the Lender.

19. Brooklyn Queens Healthcare, Inc., Caritas, Inc., Mary Immaculate Hospital and Saint John's Queens Hospital acknowledge and agree that a representative of Lender will be permitted to attend the board meetings of these organizations, as necessary in the opinion of Lender, for the purpose of monitoring financial and operating performance. The attendance of a representative of Lender at such board meetings shall not waive, or diminish, Borrower's responsibility as set forth in Section (3), Paragraph (4).

20. LENDER AND BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AGREEMENT, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER EXTENDING CREDIT TO BORROWER. FURTHER, BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF LENDER, NOR LENDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.

ROSS031422

**Section 5. Signatures:**

Signed on behalf of AUC N.V.

*[signature]*

Paul R. Suid, CPA, Chief Financial Officer


Signed on behalf of Brooklyn Queens Healthcare, Inc.

*[signature]*

Dominick J. Gio, Chairman


Signed on behalf of Caritas Healthcare Planning, Inc.

*[signature]*

Dominick J. Gio, Chairman


Signed on behalf of Wyckoff Heights Medical Center

*[signature]*

Dominick J. Gio, President & CEO

ROSS031423