# Exhibit 53

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

ROSS UNIVERSITY SCHOOL OF          )

MEDICINE,                          )

                    Plaintiff     )

VS.                                )   C.A. NO. 09CIV1410

BROOKLYN QUEENS HEALTH CARE,       )

ET AL,                             )

                    Defendants    )

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )


        TELEPHONIC DEPOSITION OF JOHN N. KASTANIS, taken

at the request of the plaintiff pursuant to the

applicable Rules of Civil Procedure before Carol A.

Whitney, a Notary Public and Certified Shorthand

Reporter in and for the Commonwealth of Massachusetts,

on July 7, 2011, commencing at 10:00 A.M. at the

offices of John N. Kastanis, Quincy Medical Center,

114 Whitwell Street, Quincy, Massachusetts.

2

APPEARANCES:

FOR THE PLAINTIFF:
GILLIAN LINDSAY WHITTLESEY, ESQ.   (VIA TELEPHONE)
Baker Hostetler
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606-1901
(312) 416-6231
gwhittlesey@bakerlaw.com

FOR THE DEFENDANTS:
WALTER P. LOUGHLIN, ESQ.       (VIA TELEPHONE)
K & L Gates
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900
walter.loughlin@klgates.com

FOR THE DEPONENT:
BARBARA HOEY, ESQ.         (VIA TELEPHONE)
Littler Mendelson, P.C.
900 Third Avenue
New York, New York 10022-3298

3

(212) 583-9600
BHoey@littler.com

INDEX

DEPONENT:  JOHN N. KASTANIS

PAGE
EXAMINATION BY MS. WHITTLESEY:           5

4

PROCEEDINGS

MS. WHITTLESEY:  Mr. Kastanis, my name is Gillian Whittlesey.  I'm here on behalf the plaintiff Ross University School of Medicine.  Mr. Loughlin is here on behalf of the defendants BQHC and Wyckoff.  Ms. Hoey is here on behalf of you, and --

MS. HOEY:  Excuse me.  We got cut off, Gillian. Go ahead.

MS. WHITTLESEY:  Oh, did I?

MS. HOEY:  Go ahead.  I'll just start over.  Mr. Kastanis, my name is Gillian Whittlesey.  I'm here on behalf of the plaintiff Ross University School of Medicine.  We also have Mr. Loughlin on the line on behalf of the defendants, and we have Ms. Hoey on the line, also, who is your counsel.

Mr. Kastanis, is the court reporter there with you?

THE WITNESS:  Yes, she is.

MS. HOEY:  Gillian, this is Barbara.  For some reason when you're talking there's like an echo.  Are you on a speaker phone?

MS. WHITTLESEY:  Yes.  Let me try something.  All right.  Shall we enter appearances?  This is Gillian Whittlesey with Baker Hostetler on behalf of the plaintiff Ross University School of Medicine.

5

Mr. Loughlin, would you like to enter your appearance?

MR. LOUGHLIN:  Walter Loughlin, K & L Gates for BQHC and Wyckoff.

MS. HOEY:  And Barbara Hoey, of Littler Mendelson representing the witness, John Kastanis.

MS. WHITTLESEY:  Let's get started.

JOHN N. KASTANIS, called as a witness, having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MS. WHITTLESEY:

Q.  Mr. Kastanis, have you ever been deposed before?

A.  Yes, I have.

Q.  On how many occasions?

A.  Once.

Q.  And was that deposition taken in person or over the phone?

A.  In person.

Q.  Okay.  Have you ever given any other testimony of any sort in any legal proceeding?

A.  No.

Q.  Okay.  And was that deposition given in a civil or criminal case?

A.  Civil.

6

1   Q.  Were you a party in that case?
2   A.  I'm not sure what that question --
3   Q.  Were you the plaintiff or defendant in that case?
4   A.  No.
5   Q.  Okay.  I'm going to go over a few things about how the
6       deposition will go just to make sure we're all on the
7       same page.  As you know, since you've been through
8       this before, I will be asking questions.  The court
9       reporter will be recording both my questions and your
10      answers.
11          I don't think we'll run into these problems as
12      often because we're doing this over the phone, but
13      it's important that you answer your questions orally,
14      using clear language.  I don't think we'll run into
15      any nodding of the head here, but if you could refrain
16      from things like uh-huh or um-hmms and use yes or no,
17      that would be a benefit to the court reporter.
18          Also, since we've run into some technical
19      difficulties already, if I ask a question and you
20      don't understand it or can't hear for any reason,
21      please let me know, and I'm happy to restate or
22      rephrase the question.  Is that fair for you?
23  A.  Yes, it is.
24  Q.  Great.  Also, if I ask a question and you provide an
25      answer, I'm going to assume that you understood and

7

1       heard the question.  Is that fair?
2   A.  Yes.
3   Q.  Okay.  As I stated earlier off the record, I don't
4       expect this deposition to last more than an hour,
5       maybe an hour and change, but if at any point you need
6       a break, just let me know.
7           I just ask that if there is a question pending
8       that you finish answering the question before we take
9       a break.  Is that fair?
10  A.  Yes.
11  Q.  Also, as we proceed if it ever occurs to you that a
12      previous answer was either incomplete or not
13      completely accurate, just let me know, and we can take
14      time to make the necessary corrections to your
15      previous answers.
16          Have you taken any medications or drugs this
17      morning that could impair your ability to understand
18      and answer my questions today?
19  A.  Only caffeine.
20  Q.  Okay.  I've had that myself.  Have you had anything
21      alcoholic to drink in the last eight hours?
22  A.  No.
23  Q.  Are you in any way feeling ill today?
24  A.  No.
25  Q.  Can you think of any reason or anything that could

8

1       impair your ability to testify today?
2   A.  No.
3   Q.  Okay.  Mr. Kastanis, how did you prepare for this
4       deposition?
5   A.  I conferred --
6           MS. HOEY:  Excuse me.  Objection.  I would just
7       caution the witness not to reveal in the answer any
8       conversations he had with counsel.
9   Q.  Correct.  Nothing about the substance of what was
10      said, but the fact that you met with counsel is fine
11      to answer about.
12          MS. HOEY:  Objection.  Go ahead, Mr. Kastanis.
13  A.  I conferred with counsel, and I reviewed the exhibits
14      that were provided to me.
15  Q.  How many times did you confer with counsel?
16  A.  I don't recall.
17  Q.  Do you recall for how long you conferred with counsel?
18  A.  It was briefly.
19  Q.  More than an hour?
20  A.  No.
21  Q.  Okay.  Was that done over the phone?
22  A.  Yes.
23  Q.  Did you review any other documents besides the
24      exhibits we provided?
25  A.  No.

9

1   Q.  Did you speak with anyone besides your attorney in
2       preparing for this deposition?
3   A.  No.
4   Q.  You did not speak with anybody at BQHC or Wyckoff in
5       preparation?
6   A.  Yes, I did.
7   Q.  Who did you speak with?
8   A.  I spoke with David Hoffman about who would represent
9       me.
10  Q.  Okay.  And who is representing you?
11  A.  Barbara Hoey.
12  Q.  Are you paying for your own legal expenses and
13      attorneys' fees?
14  A.  To my knowledge --
15          MS. HOEY:  Objection.  I would direct the witness
16      not to answer.
17          THE WITNESS:  Okay.  I'm not answering.
18          MS. HOEY:  Whatever arrangement has been made
19      between Mr. Kastanis and my firm is not and should not
20      be the subject of this.
21          MS. WHITTLESEY:  Is your objection on the basis
22      of privilege?
23          MS. HOEY:  Yes.  I'm directing him not to answer.
24  Q.  Okay.  Moving forward.  When you spoke with Mr.
25      Hoffman, did you take any notes?

3  (Pages 6 to 9)

10

1    A.  No.
2    Q.  Did you discuss anything aside from who would be
3        representing you?
4    A.  No.
5    Q.  When did you retain Littler Mendelson, Ms. Hoey, as
6        your counsel?
7        MS. HOEY:  Objection.  I'm directing him not to
8    answer.  Ms. Whittlesey, this is really going
9    overboard in terms of how he retained counsel and who
10   he retained.  I'm representing him.  You said you
11   wanted to take the man's deposition.
12       He's employed at another institution as a CEO of
13   a hospital that is in the middle of its own series of
14   crises.  Mr. Kastanis has a lot on his plate right
15   now.  Why don't you get to the guts of the questions
16   you need to ask and not about the arrangements he's
17   made and how he made arrangements to retain counsel
18   for the deposition.  I'm instructing him not to
19   answer.  Move on.
20       MS. WHITTLESEY:  I would argue that these
21   questions are relevant.
22       MS. HOEY:  How?
23       MS. WHITTLESEY:  I will also argue that your
24   speaking objections are inappropriate.  I respect any
25   objections you have as long as they're made in a

11

1    concise manner.
2        MS. HOEY:  You should move on.
3    Q.  Moving forward, Mr. Kastanis, let's get into you and
4        your background.  Can you describe your career
5        history, specifically your roles as an executive.  We
6        don't have to go into every detail, but...
7        MS. HOEY:  Objection to form.
8    Q.  Mr. Kastanis, will you describe your career history.
9    A.  My attorney's objecting.
10       MS. HOEY:  Excuse me, John.  You can answer the
11   question as long as I haven't directed you not to
12   answer.  I just made an objection to form.  You can
13   answer, if you understand.
14   A.  I've spent the past 30 years plus working my way up in
15       hospital and health systems operations.  I've had
16       extensive experience in leadership roles running urban
17       and suburban teaching hospitals predominantly in the
18       New York metropolitan area, and I am currently a
19       consultant providing interim CEO services to various
20       clients, including the one I'm with now.
21   Q.  What characteristics do your clients have?
22       MS. HOEY:  Objection to form.  Can you clarify
23   what you mean by "characteristics," Ms. Whittlesey?
24   Q.  More specifically, when you're retained, are your
25       clients looking to expand, are they in any kind of

12

1    financial distress?  Are there any common
2    characteristics your clients have when they seek your
3    services?
4        MS. HOEY:  Objection to form.  You can answer, if
5    you understand the question.
6    Q.  You can answer, Mr. Kastanis.
7    A.  I've taken on traditional executive leadership roles,
8        which require everything, expansion of programs,
9        financial challenges, labor management issues, et
10       cetera, all the traditional roles of a hospital CEO.
11   Q.  When you're brought in on the interim basis, why are
12       you brought in?
13       MS. HOEY:  Objection to form.  Are you asking him
14   what has occurred over 30 years or are you asking him
15   about specific assignments?
16   Q.  I'm just asking generally if there is anything.  If
17       there's no common characteristics, it's fine to answer
18       that there aren't any common characteristics.
19       MS. HOEY:  That wasn't your last question.  Court
20   Reporter, can you read back the last question.
21       (The reporter read back the record as requested.)
22       MS. HOEY:  That's the question I'm objecting to,
23   Gillian.  What do you mean "when you're brought in on
24   an interim basis"?
25       MS. WHITTLESEY:  He said that more recently he's

13

1    been working, being brought in on an interim basis.
2        MS. HOEY:  Okay.
3    Q.  In the instances when you've been brought in on an
4        interim basis, not for more of a permanent position,
5        why have you been retained?
6    A.  Simply because there's a vacancy.
7        MS. HOEY:  Objection.
8    Q.  How did you obtain your position at Caritas Health
9        Care?
10   A.  I was called by a representative from the Caritas
11       board.
12   Q.  Who called you?
13   A.  I don't remember.
14   Q.  When did you receive that call?
15   A.  It was to the best of my recollection, it was in
16       November of 2008.
17   Q.  Were you employed at the time you received that call?
18   A.  I was not.
19   Q.  What was discussed during that phone conversation?
20   A.  There was a need, an immediate need for a leadership
21       role at Caritas Health.
22   Q.  And what role was that?
23   A.  That was the CEO position.
24   Q.  Was there any discussion of what that position would
25       require of you?

4  (Pages 10 to 13)

---

**Page 14**

```
 1   A.  Yes.
 2   Q.  What was discussed?
 3   A.  I don't remember all the details.  What I do recall,
 4       just in general, was that the Caritas health system
 5       was in financial and operational trouble, and they
 6       needed someone with extensive experience to step in
 7       and assist the board in running the day-to-day
 8       operations of the health system.
 9   Q.  Did they communicate how they found you?
10   A.  Not specifically, no.
11   Q.  Do you know why they contacted you?
12   A.  Because of my extensive background in hospital
13       administration.
14   Q.  Now, what other -- approximately how many hospitals
15       did you work at before Caritas?
16   A.  That's going to take a few minutes.  Hold on.
17   Q.  Take your time.
18   A.  Four hospitals.
19   Q.  What positions did you have at those four hospitals?
20   A.  I was a VP for operations and also at the executive
21       level.
22   Q.  In total, how many years were you working at those
23       four hospitals?
24   A.  At that point, it was 30 years.
25   Q.  Did you ever hold any positions at Wyckoff or BQHC?
```

---

**Page 15**

```
 1   A.  No.
 2   Q.  And how long did you work at Caritas?
 3   A.  I worked as the interim CEO for approximately three
 4       months, and then we went into bankruptcy.  Then I just
 5       continued working on a consultative basis for the
 6       balance of the year 2009.
 7   Q.  Would you describe your time at Caritas, what your
 8       roles were?
 9       MS. HOEY:  Objection.  He just described his
10   roles.
11   Q.  Well, will you describe your time at Caritas in terms
12       of the health of Caritas as an institution when you
13       were there?
14       MS. HOEY:  Objection to form.
15   Q.  You may answer.
16       MS. HOEY:  Gillian, can you explain what you mean
17   by the health of the institution?  I don't know if
18   that was a pun intended.  It's a healthcare
19   institution.
20       MS. WHITTLESEY:  No, it wasn't an intended pun.
21   He said he was brought in because it was in financial
22   distress.
23       MS. HOEY:  Well, he just answered the question,
24   saying that approximately three months after he was
25   hired the institution filed bankruptcy, which I think
```

---

**Page 16**

```
 1   is not a news flash to you.
 2       MS. WHITTLESEY:  I'm looking for Mr. Kastanis'
 3   testimony here.
 4       MS. HOEY:  I don't understand what your question
 5   is.
 6   Q.  Mr. Kastanis, did you understand the question?
 7   A.  Not fully.
 8       MS. WHITTLESEY:  Court Reporter, would you read
 9   it back.
10       (The reporter read back the record as requested.)
11   Q.  Mr. Kastanis, do you understand that question?
12   A.  It's very broad, so I'm not quite sure.
13   Q.  Okay.  I can rephrase it.  From the time you began at
14       Caritas until you left Caritas, how did the financial
15       state of the hospital evolve?
16   A.  Well, the hospital had already been financially
17       challenged, and I addressed all of the financial
18       issues that were at hand.
19   Q.  When did it become clear that Caritas would go into
20       bankruptcy?
21       MS. HOEY:  Objection to form.
22   Q.  You may answer, Mr. Kastanis.
23   A.  That was probably right after the new year, early
24       January 2009.
25   Q.  How was the decision to go into bankruptcy made?
```

---

**Page 17**

```
 1       MS. HOEY:  Objection to form.
 2   Q.  You may answer.
 3       MS. HOEY:  If you know the answer, Mr. Kastanis,
 4   you can answer.
 5   A.  All right.  Thank you.  The hospital at that juncture
 6       or I should say the health system at that juncture was
 7       dependent on continuing borrowings from the New York
 8       State Department of Health and the Dormitory
 9       Authority, and we were officially informed that we
10       would no longer have access to those borrowings.
11   Q.  When you learned you wouldn't have access to those
12       borrowings, that was the trigger for filing for
13       bankruptcy or knowing you would have to file for
14       bankruptcy; is that correct?
15   A.  That is correct.
16   Q.  Who was involved in that decision-making process?
17   A.  The board of trustees of Caritas Health, my office and
18       also the Brooklyn Queens Health Care Corporation.
19   Q.  When you say your office, who all was part of your
20       office?
21   A.  It was my management team, but it was my office.  It
22       was the CEO.  It was predominantly me and the board.
23   Q.  Okay.  Did you work with any specific people
24       routinely?
25   A.  Yes.
```

5 (Pages 14 to 17)

18

```
 1   Q.  Anyone outside of like an administrative assistant
 2       role, if you could provide some names who you worked
 3       with?
 4   A.  I worked with the management team, the vice
 5       presidents, and I'm going to have a tough time
 6       recalling their names right now.  I worked with the
 7       board of trustees, with the chair Emil Rucigay, the
 8       vice chair, Vincent Arcuri, and all the other
 9       trustees.  I worked with legal counsel.
10   Q.  Do you recall any of the names of people on the
11       management team?
12   A.  I have two -- yes, I could probably remember two vice
13       presidents' names right now.
14   Q.  Who were they?
15   A.  Christopher Mastromanno and -- I'm having problems
16       remembering another name.
17   Q.  If you remember, just let me know.  We can always come
18       back to it.  Who did you report to at Caritas?
19   A.  To the board of trustees at Caritas.
20   Q.  Who reported directly to you?
21   A.  The vice presidents at Caritas Health.
22   Q.  And what were their names?
23   A.  The names of?
24   Q.  Are the vice presidents different from the management
25       team?
```

20

```
 1   Q.  You may answer, Mr. Kastanis.
 2           MS. HOEY:  It's a compound question.  You can
 3       answer, if you understand it.
 4   A.  It's as it would in any situation where you're filing
 5       Chapter 7 for liquidation and closure, yes, it did
 6       change.
 7   Q.  How did it change?
 8   A.  The priorities were to focus on a safe and orderly
 9       closure vis-a-vis state regulations and guidelines on
10       how to do that.
11   Q.  Did you work with any other people in planning for the
12       closure than you did on a regular basis before the
13       closure?
14   A.  Yes.
15   Q.  And who were those people?
16   A.  The New York State Department of Health.
17   Q.  Anyone internally?
18   A.  All of the management staff and physician leaders.
19   Q.  When you say "all," is that all at Caritas or all at
20       the hospital system, including Wyckoff and BQHC?
21   A.  All at Caritas Health.
22   Q.  All right.  Mr. Kastanis, I'd like to draw your
23       attention to Exhibit 11.  Do you have that in front of
24       you?
25   A.  I will in a moment.
```

19

```
 1   A.  No.  It's one in the same.  I just had another recall
 2       of another vice president's name.  Her name was
 3       Annette Hastings, H-a-s-t-i-n-g-s.
 4   Q.  Okay.
 5   A.  I also worked with in-house general counsel Clara
 6       Mullally.
 7   Q.  Okay.  Were you finished?
 8   A.  M-u-l-l-a-l-l-y, Mullally.
 9   Q.  Thank you.  Did you work with anyone at BQHC or
10       Wyckoff?
11   A.  At BQHC, I worked with the chief restructuring officer
12       John Lavin, L-a-v-i-n.
13   Q.  Anyone else?
14   A.  No.  Those are the persons I dealt with directly.
15   Q.  Anyone at Wyckoff?
16   A.  No.
17           MS. HOEY:  Objection to form.  Go ahead.
18   Q.  All right.  Did your responsibilities at Caritas
19       change once the decision was made to go into
20       bankruptcy?
21   A.  I'm not sure what you mean by that question.
22   Q.  Was your role as CEO of Caritas any different once you
23       were going into bankruptcy and you knew Caritas would
24       not be continuing as a hospital?
25           MS. HOEY:  Objection to form.
```

21

```
 1   Q.  Okay.
 2   A.  Yes, I do.
 3   Q.  Exhibit 11 is bates range ROSS022148 through Ross
 4       022149.  Mr. Kastanis, are you familiar with this
 5       exhibit?
 6   A.  Not really.
 7   Q.  Have you ever seen this exhibit before?
 8   A.  I'm copied on it, so I'm assuming that I did see it.
 9   Q.  Okay.
10           MS. HOEY:  Mr. Kastanis, I would caution you if
11       you don't recall for a fact receiving something,
12       please do not assume that you received it.
13   Q.  Mr. Kastanis, on the what appears to be the third
14       e-mail down in this chain, do you see where it says
15       "From:  Julius Romero," the third e-mail down sent on
16       January 27 at 12:21 P.M.?
17   A.  Yes.
18   Q.  "To:  Claire Mullally," and you were copied, correct?
19   A.  Yes.
20   Q.  Okay.  Do you recall receiving this e-mail?
21   A.  I don't.
22   Q.  Looking at the first sentence, "We still have an
23       active contractual obligation with the schools and
24       their students, but will leave the legalities to you
25       and David."
```

6  (Pages 18 to 21)

22

1    Do you have any understanding of what that meant?
2   A. No.
3   Q. Do you know why you were copied on this e-mail?
4   A. No.
5   Q. Do you know who Julius Romero is?
6   A. No.
7   Q. Did you have any interaction with Mr. Romero while
8      working at Caritas?
9   A. I don't recall.
10  Q. At the end of that e-mail in Exhibit 11, the third
11     down is a signature block, Julius Romero signature
12     block. Do you see that?
13  A. Yes.
14  Q. And it states he's assistant vice president of medical
15     education for BQHC, Wyckoff and Caritas hospitals. Do
16     you see that?
17  A. Yes.
18  Q. And you say you don't recall if you've had any
19     interaction with Mr. Romero when at Caritas?
20  A. Yes, that's correct.
21  Q. And you have no understanding of what this first
22     sentence of this e-mail meant?
23  A. I don't.
24  Q. Did you -- were you aware of any contractual
25     obligations to medical schools?

24

1   Q. When you say you did not know the details, did you not
2      know at all that they were for providing clerkships or
3      did you not know the numbers of clerkships and the
4      pricing? I'm unclear what you mean when you say
5      "details."
6      MS. HOEY: Objection to form.
7   A. I did not know the details of the arrangement.
8   Q. Can you explain what "details of the arrangement"
9      means? Can you expand on that?
10     MS. HOEY: Objection to form.
11  Q. You can answer.
12  A. Again, I didn't have time to focus on this matter.
13     There were other priorities.
14  Q. Did you have any conversations while serving as CEO of
15     Caritas about the clerkships provided for medical
16     students at the Caritas hospitals?
17  A. Can you repeat that, please.
18  Q. Did you have any conversations, whether internally or
19     externally, regarding the provision of clerkship
20     positions to medical students at the two Caritas
21     hospitals?
22  A. I had brief discussions with some of the clinical
23     chairs of the different departments at the hospitals.
24  Q. Did you have any discussions about what would be done
25     when the hospitals were closed with regards to those

23

1   A. Yes.
2   Q. What was your understanding of those obligations?
3   A. It was minimal. I wasn't there long enough to really
4      delve into it. I had other priorities when I was
5      hired.
6   Q. But what was that understanding, even if minimal?
7   A. That there was some contractual arrangement with Ross
8      University School of Medicine.
9   Q. Did you understand or know of any of the substance of
10     that contract?
11  A. No, I did not.
12  Q. Did you know if the hospitals received money from Ross
13     University?
14     MS. HOEY: Objection.
15  A. I don't recall.
16  Q. Mr. Kastanis, you may answer.
17  A. I don't recall.
18  Q. Were you aware at all that those contracts were for
19     the provision of clerkships for medical students?
20  A. I didn't know any of the details.
21  Q. Okay. But were you aware that those were for
22     clerkship positions, the contracts?
23     MS. HOEY: Objection. Asked and answered. You
24     can answer again, Mr. Kastanis.
25  A. I did not know the details.

25

1      clerkship positions?
2   A. No.
3   Q. Did you see any memoranda or notes or correspondence
4      aside from Exhibit 11 regarding what would be done
5      with the clerkship positions?
6      MS. HOEY: Objection.
7   Q. If the hospitals closed?
8   A. I don't recall.
9   Q. Do you have any understanding of who was responsible
10     for overseeing the provision of clerkship positions
11     with hospitals at Caritas?
12     MS. HOEY: Objection to form.
13  A. No.
14  Q. You can answer, Mr. Kastanis.
15  A. No.
16  Q. Did you ever have any conversations regarding the
17     contract with Ross with anyone internally or
18     externally while CEO of Caritas?
19  A. No.
20  Q. Exhibit 12, bates range BQHC17412 through BQHC17447.
21     Mr. Kastanis, do you have Exhibit 12 in front of you?
22  A. I think I will in about a minute. Hold on.
23  Q. Okay. Take your time.
24  A. Exhibit 12?
25  Q. 12, yes.

7 (Pages 22 to 25)

26

1   A. Yes.
2   Q. The first page of Exhibit 12 is an e-mail from Edward
3       Dowling; is that correct?
4   A. Yes.
5   Q. Do you know who Edward Dowling is?
6   A. Yes.
7   Q. Who is he?
8   A. I believe he was an employee of Brooklyn Queens Health
9       Care. He had a planning role working for Brooklyn
10      Queens.
11  Q. Did you work with Mr. Dowling at all?
12  A. Yes.
13  Q. In what ways?
14  A. He provided planning information for Caritas Health.
15  Q. When you say "planning," what do you mean?
16  A. Overall plans mostly focused on the Department of
17      Health and, you know, community relations. He was
18      accessible to us as a support staff person.
19  Q. Was Mr. Dowling knowledgeable about Caritas?
20  A. I would say yes.
21  Q. Was Mr. Dowling familiar with Caritas in terms of the
22      fact that it was going into bankruptcy?
23      MS. HOEY: Objection to form. Ms. Whittlesey, I
24      don't know how this witness, unless he's a mind
25      reader, could be expected to tell you what Mr. Dowling

27

1   did or did not know.
2   Q. Mr. Kastanis, you can answer.
3       MS. HOEY: Note my objection. I think it's
4       calling for speculation.
5   Q. You may answer, Mr. Kastanis.
6   A. I don't know.
7   Q. Did you ever have any meetings with Mr. Dowling?
8   A. Yes.
9   Q. Did you ever discuss the closure of Caritas with Mr.
10      Dowling?
11  A. Yes.
12  Q. What did you discuss with Mr. Dowling in regards to
13      the closing of Caritas?
14  A. He assisted us in the closure plan.
15  Q. How did he assist you?
16  A. He assisted in our, in addressing the regulations and
17      stipulations from the Department of Health on how to
18      provide an orderly and safe closure of all the
19      facilities in Caritas.
20  Q. Did you rely on Mr. Dowling in providing information
21      on those regulations for the closure of Caritas?
22  A. To an extent.
23  Q. Did you perform your own checks on Mr. Dowling's
24      recommendations?
25  A. I don't recall.

28

1   Q. Did Mr. Dowling's recommendations require your
2       approval?
3       MS. HOEY: Objection to form.
4   A. They required the board's approval.
5   Q. Can you describe the process of Mr. Dowling making
6       recommendations in regards to the Caritas?
7       MS. HOEY: Objection to form.
8   Q. You may answer.
9   A. Please repeat.
10  Q. When Mr. Dowling made recommendations, can you
11      describe that process?
12  A. I don't recall.
13  Q. Did he make recommendations to you?
14  A. I don't recall.
15  Q. Were his recommendations always made directly to the
16      board?
17      MS. HOEY: Objection to form.
18  Q. You may answer.
19  A. I don't recall.
20  Q. All right. In regards to Exhibit 12, on Page 2,
21      BQHC17415, are you familiar with this document?
22  A. I don't have a lot of recall on this.
23  Q. Have you ever seen this document before?
24  A. Yes.
25  Q. Before your preparation for this deposition?

29

1   A. Yes.
2   Q. Who drafted this document, Exhibit 12?
3   A. One more time, please.
4   Q. Who drafted Exhibit 12?
5   A. I don't recall.
6   Q. Do you know if there is — Exhibit 12 says "Draft
7       Final" at the top. Do you see that?
8   A. I do.
9   Q. Do you recall if there was ever a final version of
10      this document?
11  A. Yes.
12  Q. Do you know when this document was finalized?
13  A. I don't recall.
14  Q. How do you know that there's a final document?
15  A. Because it was received and accepted by the New York
16      State Department of Health.
17  Q. So, this was a Caritas Health Care closure plan that
18      was filed with the New York State Department of
19      Health?
20  A. Yes.
21  Q. Was that before or after Caritas closed?
22  A. It was before and during.
23  Q. Did you see the final form before it was filed?
24  A. I don't recall.
25  Q. Would a document with the Caritas Health Care closure

8  (Pages 26 to 29)

30

1  plan require your approval as the CEO of Caritas?
2      MS. HOEY: Objection to form.
3  Q. You can answer.
4  A. No.
5  Q. Did you contribute to the drafting of this document?
6  A. Yes.
7  Q. In what ways did you contribute?
8  A. I don't recall.
9  Q. Would you say you were -- how involved were you in the
10     drafting of this document?
11 A. I don't recall.
12     MS. HOEY: Objection to form. Asked and
13 answered.
14 Q. Turning to Page 14 of this document but bates number
15     BQHC17428 of Exhibit 12.
16     MS. HOEY: Gillian, maybe it's what I received,
17 but I don't have bates numbers on the exhibits.
18     MS. WHITTLESEY: You don't?
19     MS. HOEY: No. John, do you have bates numbers
20 on the exhibits?
21 Q. Mr. Kastanis, is there a small number in the bottom
22     right-hand corner beginning with BQHC on your page?
23 A. Yes.
24     MS. HOEY: Okay.
25     MS. WHITTLESEY: Okay. Barbara, I don't know

31

1  why --
2      MS. HOEY: Maybe it got cut off when it got
3  printed or something.
4      MS. WHITTLESEY: I can e-mail you.
5      MS. HOEY: It's okay. I just want to make sure
6  the witness is on the same page.
7  Q. We're on Page 14 of Exhibit 12, the Caritas closure
8      plan.
9      MS. HOEY: I can find it.
10 Q. BQHC17428. Mr. Kastanis, are you on that page?
11 A. Yes, I am.
12 Q. Great. Under where it says "Notice And Plan Re: St.
13     Vincent's Cardiology Fellows At Caritas," where it
14     says "B. Medical Students," do you see that near the
15     middle of the page?
16 A. You're continuing to break up. It's really hard to
17 understand what you're saying.
18 Q. Okay. Here it says, "Notice to Ross and AUC medical
19     schools," and then below that it says, "Approx 50
20     students to return to Wyckoff re Ross University
21     contract obligations."
22     Do you see that?
23 A. I do.
24 Q. Do you have any understanding of what that meant?
25 A. I don't recall.

32

1  Q. Have you had any conversations regarding the return of
2      students to Wyckoff from Caritas?
3  A. No.
4      MS. HOEY: Objection to form. You're asking
5  whether at the time he had any conversations?
6      MS. WHITTLESEY: Yes.
7      MS. HOEY: Okay. Just so that was clear.
8  A. My response is I don't recall.
9  Q. Did you at the time of the drafting of this Caritas
10     closure plan, did you have any discussions regarding
11     the Ross University contract?
12 A. I don't recall.
13 Q. Any conversations regarding placement --
14 A. Gillian, we didn't hear that.
15 Q. Mr. Kastanis, did you hear that?
16 A. We didn't hear any of that.
17 Q. Okay. Did you have any conversations regarding the
18     placement of any medical students from Caritas to
19     Wyckoff at the time this plan was drafted?
20 A. I don't recall.
21 Q. Who provided information for this closure plan?
22     MS. HOEY: Objection to form.
23 A. I don't think I understand the question.
24 Q. Who contributed to the drafting of this closure plan?
25     MS. HOEY: Objection to form.

33

1  A. It was various parties.
2  Q. Could you provide any names?
3  A. No. I just know that it was in general the management
4  team at Caritas Health.
5  Q. Who sent this draft to you?
6  A. I don't recall.
7  Q. Did Mr. Dowling assist in the drafting of this plan?
8      MS. HOEY: Objection. This has been asked and
9  answered, Ms. Whittlesey, now probably half a dozen
10 times. The witness has said repeatedly that he
11 doesn't remember other than the specifics of who
12 drafted this plan now, by my count at least four,
13 maybe five, six times, and you keep asking the same
14 question again.
15 Q. Mr. Kastanis, did --
16     MS. HOEY: Ms. Whittlesey, I'd appreciate if you
17 wouldn't just ignore my objections. I think this is
18 getting to the point of harassing the witness. He's
19 asked and answered that question. Please move on.
20     MS. WHITTLESEY: It is not my intention to harass
21 the witness. Before I was inquiring as to who
22 provided the facts that were incorporated into this
23 closure plan. Now, I was going to ask if any of the
24 regulatory information Buzz Dowling was providing to
25 Caritas was incorporated into this plan.

9 (Pages 30 to 33)

34

1    MS. HOEY: What?

2    MS. WHITTLESEY: I'm transitioning into any

3    regulatory information that Buzz Dowling may have

4    provided.

5    MS. HOEY: Okay. I'm totally losing track of

6    what you're asking. This witness, Mr. Kastanis, did

7    not draft the closure plan. He cannot testify as to

8    what Buzz Dowling did or did not do. Mr. Dowling

9    drafted the closure plan. If you have questions about

10   the drafting of the closure plan, I suggest you ask

11   them of Mr. Dowling.

12   MS. WHITTLESEY: Mr. Kastanis said he doesn't

13   recall who drafted the closing plan. You have said

14   Mr. Dowling drafted it just now.

15   MS. HOEY: Okay.

16   Q. Mr. Kastanis, did Mr. Dowling draft the closure plan?

17   A. I don't recall.

18   Q. Okay. Turning to Exhibit 13, Mr. Kastanis, BQHC15550

19   with the second page BQHC15551.

20   A. Okay.

21   Q. Looking at the second page, BQHC15551, are you

22   familiar with this document?

23   A. I don't recall this one.

24   Q. Do you see where it says "From: John Kastanis"?

25   A. I do.

35

1    Q. Do you know what this document is?

2    A. I don't recall.

3    Q. Who drafted this document?

4    A. I don't recall.

5    Q. Why was Exhibit 13 drafted?

6    A. I don't recall.

7    Q. Did you have any conversations about Exhibit 13 when

8    you were the CEO of Caritas?

9    A. I don't recall.

10   Q. Did you draft Exhibit 13?

11   A. No.

12   Q. Who drafted documents on your behalf, for you while

13   working as CEO of Caritas?

14   A. There was various staff.

15   Q. Would you provide names, please.

16   A. I don't recall.

17   Q. Did you review this Exhibit 13?

18   A. Yes.

19   Q. Did you approve Exhibit 13?

20   A. I don't recall that.

21   Q. Was Exhibit 13 distributed to students at the Caritas

22   hospitals?

23   A. I don't recall.

24   Q. Would a memo like Exhibit 13 require your approval to

25   be distributed to students?

36

1    A. That I don't recall.

2    Q. Was it common practice for memos or correspondence

3    with your name from you to be distributed without your

4    approval?

5    A. I don't recall that.

6    Q. Did you have any conversations with Ross about Exhibit

7    13?

8    A. I don't recall.

9    Q. Did you have any internal conversations about Exhibit

10   13?

11   A. I don't recall that.

12   Q. Have you seen Exhibit 13 before?

13   A. I don't recall.

14   Q. You don't recall if you've ever seen it?

15   A. No.

16   Q. And did you have any conversations internally about

17   the subject matter of Exhibit 13?

18   A. I don't recall.

19   Q. As CEO of Caritas, did you allow memos or letters to

20   be distributed widely to an entire group without your

21   approval ever?

22   MS. HOEY: Objection to form.

23   Q. You can answer.

24   A. I don't recall.

25   Q. In what instances might a letter or memo be

37

1    distributed to a group without --

2    MS. HOEY: Objection.

3    A. Please repeat. You're breaking up.

4    Q. In what circumstances would it be permissible for a

5    letter or memo to be distributed to a group with your

6    name on it without you seeing it or giving approval?

7    MS. HOEY: Objection to form.

8    Q. You may answer.

9    MS. HOEY: The witness has not testified that any

10   of that occurred, Ms. Whittlesey. You have no

11   foundation to ask that.

12   Q. Mr. Kastanis?

13   A. I can't think of any.

14   Q. Excuse me.

15   A. I cannot think of any instances.

16   Q. Okay. Turning to Exhibit 7, bates range BQHC12682

17   through BQHC12784. Looking at the first page of

18   Exhibit 7, Mr. Kastanis, are you on that page?

19   A. The first page, yes.

20   Q. Exhibit 7, there's an e-mail from Edward Dowling to

21   you, "Subject: M. Smith," sent on January 12, 2008 at

22   7:56 P.M. Is that correct?

23   A. Yes.

24   Q. Do you recall did you receive this e-mail?

25   A. I don't remember this one.

38

```
 1   Q.  Looking at the body of the first page of Exhibit 7,
 2       "First cut at Malcolm Smith memo."  What is the
 3       Malcolm Smith memo?
 4   A.  I'm not sure.
 5   Q.  Mr. Kastanis, you testified that you reviewed these
 6       exhibits in preparation for your deposition; is that
 7       correct?
 8   A.  Yes, I did.
 9   Q.  And you do not know what the Malcolm Smith memo is?
10       MS. HOEY:  Objection to form.
11   A.  I don't have good recall.
12   Q.  Do you know what the Malcolm Smith memo is?
13   A.  Just in reading it, I can understand what it says, but
14       I don't recall what we did with this memo.
15   Q.  Looking at Page 2 of Exhibit 7.
16   A.  Yes.
17   Q.  This is a memo that appears to be in draft form.  Do
18       you see where it says, "From:  John Kastanis,
19       President and CEO of Caritas Health Care"?
20   A.  Yes, I do.
21   Q.  And do you see where it says "To:  Hon. Malcolm Smith,
22       Senate Majority Leader"?
23   A.  I do.
24   Q.  And you see the subject is "Imminent closure of
25       Caritas facilities"?
```

39

```
 1   A.  Yes.
 2   Q.  Why was this memo drafted?
 3   A.  It was probably drafted seeking political support for
 4       our situation.
 5   Q.  What do you mean by "political support"?
 6   A.  Malcolm Smith was an elected official from our area,
 7       and we were enlightening him to our pending bankruptcy
 8       and closure.
 9   Q.  And what was the motivation in writing this?  Were you
10       seeking anything in return?
11       MS. HOEY:  Objection to form.
12   Q.  You may answer.
13   A.  I'm sure we were looking for political support for
14       continuing state support to keep the hospitals open.
15   Q.  What do you mean by "state support"?
16   A.  I mentioned earlier that we were continuing to receive
17       borrowings from the New York State Department of
18       Health and Dormitory Authority, and we were looking to
19       see if we could continue that support.
20       MR. LOUGHLIN:  This is Walter Loughlin speaking.
21   I note that the second paragraph on BQHC12683 says,
22   "We seek your intervention with the Governor to seek
23   continued support of the New York Department of Health
24   and NYS Dormitory Authority to provide ongoing
25   operating support in bankruptcy to avoid a disorderly
```

40

```
 1   closure of services and allow for development of a
 2   reorganization plan that preserves services essential
 3   to these Queens communities."
 4       I just don't understand the point of asking this
 5   witness questions about this document when this speaks
 6   for itself about what its purpose was, especially with
 7   respect to the portion I just quoted.
 8       MS. WHITTLESEY:  Mr. Loughlin, are you objecting
 9   to this line of questioning?
10       MR. LOUGHLIN:  I'm only pointing out the utter
11   uselessness of this deposition as reflected in this
12   particular line of questioning.
13       MS. HOEY:  I will also note, Ms. Whittlesey, that
14   it's now 11:00, and I do have to terminate at 11:20,
15   and we'll have to reconvene.  When I spoke with your
16   partner on the matter, George, two, three weeks ago to
17   set this up, he told me literally he had 15 minutes
18   worth of questions for Mr. Kastanis, 15 minutes.
19       MS. WHITTLESEY:  We did expect for this to move
20   along more quickly than it has today.
21       MS. HOEY:  Yeah, but you've been asking 45
22   minutes worth of useless questions, but continue.
23   We're going to have to stop at 11:20.
24       MS. WHITTLESEY:  Well, maybe we should stop a
25   little before 11 :20 so we can discuss when we will
```

41

```
 1   pick this back up.
 2       MS. HOEY:  How much longer do you have?
 3       MS. WHITTLESEY:  That really depends on how
 4   things continue to go.  I would hope that I would have
 5   no more than 30 more minutes left.  But we can try and
 6   work through Exhibit 7, wrap that up and discuss when
 7   we'll pick this back up to finish the rest before you
 8   have to go for your other obligation.
 9       MS. HOEY:  Note my agreement with Mr. Loughlin's
10   comments.  Why don't you continue.
11   Q.  Mr. Kastanis, did you draft Exhibit 7?
12   A.  I don't recall.
13   Q.  Did you contribute to the drafting of Exhibit 7?
14   A.  I don't recall.
15   Q.  Did you have any discussions with anyone internally
16       about Exhibit 7?
17   A.  Yes.
18   Q.  Who did you have discussions with?
19   A.  I don't recall.
20   Q.  Did Mr. Dowling -- on the first page you see this
21       e-mail from Mr. Dowling refers to this as the "first
22       cut."  Did Mr. Dowling review the first draft of
23       Exhibit 7?
24       MS. HOEY:  Objection to form.  The witness is not
25   Mr. Dowling.  He cannot testify about what Mr. Dowling
```

42

1    did.

2    Q.  Well, did Mr. Dowling send you this first draft?

3       MS. HOEY:  Objection to form.  Ms. Whittlesey,

4    the e-mail comes from Mr. Dowling, okay.  You cannot

5    ask this witness to tell you what another person did.

6    The question is improper.

7       Ask Mr. Kastanis, if you want to ask him, what he

8    did, not what someone else did.

9    Q.  Mr. Kastanis, did you ask Mr. Dowling to draft a memo

10   like the one in Exhibit 7?

11   A.  I don't recall.

12   Q.  Did you ask to review a memo like the one that appears

13   in Exhibit 7?

14   A.  I don't recall.

15   Q.  Was Exhibit 7 ever created in final form?

16   A.  I don't recall.

17   Q.  Was a memo similar to Exhibit 7, a later draft or a

18   final version ever sent to Senator Malcolm Smith?

19   A.  I don't recall.

20   Q.  Would a memo to Senator Malcolm Smith from you require

21   your approval to be sent?

22   A.  Yes.

23   Q.  Looking at the second page of Exhibit 7, the first

24   page of the memo, the fifth paragraph down, the second

25   after "Background," the subtitle "Background."

43

1    A.  Yes.

2    Q.  What --

3    A.  We can't hear you.

4       MS. HOEY:  That was breaking up, Gillian.

5    Q.  Do you see the second sentence in the second

6    paragraph, "The CFO of Wyckoff also intermingled

7    Caritas funds with Wyckoff funds as needed to meet

8    Wyckoff's shortfalls and very quickly after initiating

9    operations, Caritas began to fail"?

10      Do you see that?

11   A.  I do see it.

12   Q.  Did you know of any intermingling of funds?

13   A.  No.

14   Q.  Did you know of any intermingling of funds after the

15   fact?  At the time of the drafting of this letter, had

16   you heard of it?

17   A.  No.

18      MS. WHITTLESEY:  Well, it appears we are at

19   11:10.  Should we schedule a time to pick this back

20   up.

21      MS. HOEY:  Well, I don't know.  Ms. Whittlesey,

22   why don't you keep going until 11:15.

23   Q.  Mr. Kastanis, did you ever read this sentence, the

24   second sentence in Paragraph 2 under "Background"?

25   A.  I don't recall.

44

1    Q.  Okay.  Turn to Exhibit 9.  I'm at Exhibit 9, BQHC12669

2    through BQHC12673.  Do you have Exhibit 9 in front of

3    you, Mr. Kastanis?

4    A.  I do.

5    Q.  Do you see where it says it's an e-mail from Mr.

6    Dowling?

7    A.  Yes.

8    Q.  To you?

9    A.  Yes.

10   Q.  And it's on January 13, 2009, about 1:53 P.M.?

11   A.  Yes.

12   Q.  And the subject of this is M. Smith?

13   A.  Yes.

14   Q.  Do you recall receiving these e-mails from Mr.

15   Dowling?

16   A.  I do not.

17   Q.  Did you have any conversations with Mr. Dowling

18   regarding this letter to Senator Smith?

19   A.  I don't recall.

20   Q.  Did you give Mr. Dowling comments or revisions of any

21   sort for the first cut of the letter to Senator Smith?

22   A.  I don't recall.

23   Q.  Do you have any idea why he would send you a third

24   cut?

25      MS. HOEY:  Objection.  Calls for speculation.

45

1    Q.  You may answer.

2    A.  No.

3    Q.  Did you respond to the first draft or cut of the memo

4    in any way to Mr. Dowling?

5    A.  I don't recall.

6    Q.  All right.  Looking at Page 2 of Exhibit 9, bates

7    number BQHC12670, the second paragraph down from

8    "Background," looking to where the second sentence

9    that we discussed in the previous exhibit appeared, do

10   you see that that sentence is not in this draft?

11   A.  I do.

12   Q.  Do you know why that sentence was taken out?

13   A.  Perhaps because it wasn't true.

14   Q.  Did you have any discussion -- do you know that it

15   wasn't true or are you speculating?

16   A.  I just know it wasn't true.

17   Q.  You realize that you are testifying today under oath?

18   A.  Yes.

19   Q.  And your statement is that the sentence in Exhibit 7

20   regarding "The CFO of Wyckoff also intermingled

21   Caritas funds with Wyckoff funds as needed to meet

22   Wyckoff's shortfalls and very quickly after initiating

23   operations, Caritas began to fail" is untrue?

24   A.  You broke up, but I think I got the gist of what you

25   said.

12  (Pages 42 to 45)

46

1    Q.  I can restate it.  Your testimony is that the sentence
2        in Exhibit 7 on the second page that we discussed
3        earlier, "The CFO of Wyckoff also intermingled Caritas
4        funds with Wyckoff funds as needed to meet Wyckoff's
5        shortfalls and very quickly after initiating
6        operations, Caritas began to fail."
7            It's your testimony that that sentence was not
8        true?
9    A.  What I'm saying is that I wasn't aware of that.
10   Q.  So, you did not know?
11   A.  Correct.
12   Q.  Why did you state that the sentence was not true?
13   A.  Because I wasn't aware of any intermingling of funds.
14   Q.  So, looking again at Exhibit 9, that second paragraph,
15       we discussed that that sentence doesn't appear in this
16       version.  Do you know any reason, not that you didn't
17       hear something or think something, but do you know of
18       any reason or did you have any discussions of why that
19       sentence was taken out of this draft?
20   A.  No recall.
21   Q.  Did you review this third draft, Exhibit 9?
22   A.  No recall.
23   Q.  Did you give any attention to these drafts as they
24       were sent to you?
25   A.  I don't remember.

47

1            MR. LOUGHLIN:  I'm going to object to this line.
2        Ms. Whittlesey, I mean, I don't know if you know the
3        facts or not.  I assume you know the facts, because
4        you're involved in the case, but the reference in the
5        earlier draft was to unauthorized transfers done by a
6        former CFO, which when they came to light he was
7        terminated, and it happened two years before Mr.
8        Kastanis arrived on the scene.  This whole line, this
9        is pointless.
10           MS. WHITTLESEY:  Mr. Loughlin --
11           MR. LOUGHLIN:  Just go forward.  It's your
12       deposition.
13           MS. WHITTLESEY:  We have hit 11:17.  I think we
14       should arrange a time to pick this up since Ms. Hoey
15       has to leave in three minutes.  Is there a time later
16       this afternoon that works for everyone?
17           MS. HOEY:  Mr. Kastanis, let's first ask you,
18       since you're the person who's most being
19       inconvenienced, and I understand -- Walter, are some
20       people traveling today?
21           MR. LOUGHLIN:  There's a deposition scheduled for
22       9:00 in the morning in Nashville.  I will be leaving
23       the office at 1:00 this afternoon.  I could have
24       somebody sit on the end of the phone if there was a
25       desire to continue this deposition.

48

1            MS. HOEY:  Well, I have no desire to continue the
2        deposition, but I think Ms. Whittlesey does.  Mr.
3        Kastanis, unfortunately I have a meeting, I have this
4        thing at 11:30 which I don't think is going to take
5        very long, but who knows.  It's a judge.
6            It's an initial conference, so there's no real
7        drama involved.  We're simply setting a discovery
8        schedule, but I have another meeting at 12:30.
9            So, Ms. Whittlesey, how much more do you have in
10       terms of questions?
11           MS. WHITTLESEY:  I don't expect to have too much
12       more.
13           MS. HOEY:  So, like 15 minutes?
14           MS. WHITTLESEY:  Probably 15 to 30 minutes,
15       depending how things go.
16           MS. HOEY:  Let me suggest this to accommodate
17       Walter, as well.  If everyone can be a bit flexible,
18       when I get off this 11:30 call, I could e-mail you
19       all, including Mr. Kastanis.  If everyone stays tuned,
20       I could be off the call by noon, and then maybe we
21       could reconvene it and finish it before Mr. Loughlin
22       has to leave for the flight.
23           Is that workable?
24           MS. WHITTLESEY:  That would work for me.
25           MR. LOUGHLIN:  It's fine with me, too.

49

1            MS. HOEY:  John, is that okay with you?
2            THE WITNESS:  It's about the only space I have.
3        Today is a board meeting for me.
4            MS. HOEY:  The court reporter obviously has to
5        sit and wait, which I don't want to inconvenience her
6        anymore than necessary.
7            MS. WHITTLESEY:  Right.
8            MS. HOEY:  Okay.  So, let's do this.  Let's get
9        off.  Hopefully, my court conference won't take that
10       long.  When I get off the court phone call, and as I
11       said, it's just an initial conference setting a
12       schedule, I will send an e-mail around to everyone.
13       If we can reconvene, we'll just get back on the
14       conference line.
15           MS. WHITTLESEY:  Okay.  That works.
16           MS. HOEY:  All right.  Great.
17           (Recess taken from 11:20 to 12:05.)
18           MS. WHITTLESEY:  Is there anything we need to
19       discuss before we get started?
20           MS. HOEY:  No.
21           MS. WHITTLESEY:  Great.
22       CONTINUED EXAMINATION BY MS. WHITTLESEY:
23   Q.  Mr. Kastanis, we are back from approximately a
24       40-minute break.  Do you understand that you are still
25       under oath?

13  (Pages 46 to 49)

50

1    A.  Yes, I do.
2    Q.  During that break did you have any conversations
3        regarding the deposition with anyone?
4    A.  No.
5    Q.  All right.  Before we get back into the substance, I
6        just want to cover a few quick things.  Mr. Kastanis,
7        is Wyckoff paying your legal fees?
8        MS. HOEY:  Objection.  I'm going to direct the
9    witness not to answer.
10        MS. WHITTLESEY:  On what basis?
11        MS. HOEY:  On the basis that it's privileged
12   information and not relevant at all to the issues in
13   this case.
14        MS. WHITTLESEY:  Are you objecting on the basis
15   of attorney-client privilege?
16        MS. HOEY:  Yes.
17        MS. WHITTLESEY:  On what foundation?
18        MS. HOEY:  I don't have a case to cite to you,
19   Ms. Whittlesey, but I'm objecting and I'm directing
20   the witness not to answer on grounds of privilege and
21   complete lack of relevance.  Could you please just
22   move on so we can finish the deposition.  Mr. Kastanis
23   has a lot on his plate today.
24        MS. WHITTLESEY:  I am ready to move on.
25        MS. HOEY:  Okay, great.

51

1    Q.  I believe we were going to finish --
2        MS. WHITTLESEY:  Court Reporter, can you refresh
3    my memory on what exhibit we were working through
4    before the break.
5        COURT REPORTER:  9.
6    Q.  Mr. Kastanis, if I could bring your attention to
7        Exhibit 8, which is BQHC12653 through BQHC12658.  Do
8        you have that in front of you?
9    A.  I do.
10   Q.  Okay.  On the first page, bates number BQHC12653, at
11       the top of the page do you see where it's an e-mail
12       from Edward Dowling to you?
13   A.  Yes.
14   Q.  Dated January 13, 2009?
15   A.  Yes.
16   Q.  All right.  At the bottom of the page or I guess the
17       bottom of that particular e-mail do you see Edward
18       Dowling's signature block?
19   A.  I don't see it at the bottom of the page, no.
20   Q.  Oh.  It's at the bottom of that e-mail, kind of
21       halfway down the page.
22   A.  Okay.
23   Q.  It says, "Senior Vice President of Strategic Planning
24       for Brooklyn Queens Health Care, Inc."  Do you see
25       that?

52

1    A.  Yes.
2    Q.  In what ways did you work with Mr. Dowling in trying
3        to seek state funding for Caritas?
4    A.  I thought I had answered that question earlier.
5    Q.  You had mentioned a few things, but not specifically
6        in terms of seeking state funding.
7    A.  As I said, he was, you know, available to us as
8        support staff in the area of planning.
9    Q.  In regards to seeking funds from state agencies, did
10       you work with Mr. Dowling?
11   A.  I don't recall.
12        MS. HOEY:  Objection to form.  Ms. Whittlesey, he
13   has answered that question.
14   Q.  You may answer, Mr. Kastanis.
15   A.  Again, he assisted in all areas of planning and
16       strategies, so I don't recall specifically if he
17       helped us with this matter or not.
18   Q.  In his assistance with the Caritas closure -- let me
19       move on.
20        The e-mail below the top e-mail, the one from
21       you, Mr. Kastanis, do you see in the body, "This is
22       the draft report that we plan to submit to Senator Mal
23       Smith, as well as other elected officials"?
24   A.  Yes, I see it.
25   Q.  Did you ever submit the plan to any elected officials?

53

1    A.  What plan?
2    Q.  The attached memo that we were discussing earlier.
3        I'm sorry.  It's the third page of this exhibit.
4    A.  That I don't recall.
5    Q.  In planning to submit this, did you have any
6        conversations with Mr. Dowling?
7    A.  I don't recall.
8    Q.  Did you have any conversations with anyone regarding
9        the plan to submit the memos to Senator Malcolm Smith?
10   A.  I'm not recalling anybody specifically at this time.
11   Q.  Any conversations, regardless of who they were with?
12   A.  Yes.
13   Q.  What were those conversations about?
14   A.  I don't recall, other than the contents of this draft,
15       and I don't recall if we actually sent it.
16   Q.  Okay.  On the third page of this version of the draft,
17       it's a little further down on the page than the
18       earlier versions we've looked at, but it's still under
19       "Background," second paragraph.
20   A.  Right.
21   Q.  Do you see any mention of intermingling of funds in
22       this second paragraph?
23   A.  No.
24   Q.  Do you recall seeing this draft in Exhibit 8?
25   A.  I don't recall.

14  (Pages 50 to 53)

54

```
1   Q.  As CEO of Caritas in January of 2009, did you take any
2       other actions to seek funding from state agencies,
3       aside from drafting this memo?
4           MS. HOEY:  Objection to form.  I don't believe --
5       unless I'm mistaken, Ms. Whittlesey, I don't think the
6       witness testified that he drafted the memo.
7           MS. WHITTLESEY:  I will rephrase.
8           MS. HOEY:  Thank you.
9   Q.  During January of 2009, as CEO are you aware of any
10      action taken by anyone at Caritas seeking state
11      funding aside from the drafting of this particular
12      memo to Senator Malcolm Smith?
13          MS. HOEY:  Objection to form.
14  Q.  You may answer.
15  A.  I don't recall.
16  Q.  Was the plan to send this letter in Exhibit 8 the only
17      action taken by Caritas to seek state funding during
18      2009?
19  A.  I don't recall.
20  Q.  If a version of this letter was sent to Senator
21      Malcolm Smith, what process would it have to undergo
22      to be approved and sent out by you or on your behalf?
23  A.  It would be myself and the board of trustees and
24      perhaps some legal counsel.
25  Q.  So, the board of trustees, legal counsel and yourself
```

55

```
1       would have to approve a memo like this before it could
2       be sent out?
3   A.  Normally, that's what would happen, but I don't recall
4       what happened in this case, if we did send this letter
5       at all.
6   Q.  Okay.  All right.  So, looking back at Exhibit 7,
7       which we looked at earlier, on the second page, let me
8       know when you have that in front of you, please.
9   A.  I have it.
10  Q.  All right.  So, back to that second sentence in the
11      second paragraph under "Background."
12  A.  Yes.
13  Q.  In this earlier version draft of this letter that was
14      planned to be sent, but we don't know if it was sent,
15      "The CFO of Wyckoff also intermingled Caritas funds
16      with Wyckoff funds as needed to meet Wyckoff's
17      shortfalls and very quickly after initiating
18      operations, Caritas began to fail," correct?
19          MS. HOEY:  Objection to form.  Is there a
20      question here?  I honestly don't know what your
21      question is.  You just read the witness something from
22      this letter.  Is there a question?
23  Q.  Do you see it?
24          MS. HOEY:  Yes, we all see it, with all due
25      respect.
```

56

```
1           MS. WHITTLESEY:  I'm here to depose Mr. Kastanis,
2       not you.
3           MS. HOEY:  Ms. Whittlesey, we all see the
4       statement.  Do you have a question?
5   Q.  Mr. Kastanis, do you see the second sentence in the
6       second paragraph that states "The CFO of Wyckoff also
7       intermingled Caritas funds with Wyckoff funds as
8       needed to meet Wyckoff's shortfalls and very quickly
9       after initiating operations, Caritas began to fail"?
10  A.  I see it.
11  Q.  Great.  Exhibit 8, the one that we were looking at
12      previously, on the second page or I guess the third
13      page, the first page of the memo, second paragraph
14      under "Background," do you see that sentence is
15      not included in this version?
16  A.  Yes.
17  Q.  Did someone at the hospital make the decision to
18      exclude that sentence from this memo?
19  A.  I don't recall.
20  Q.  Was that sentence not included because it would not
21      benefit Caritas to reveal that the hospitals had
22      intermingled funds in the past to meet Wyckoff
23      shortfalls?
24          MS. HOEY:  Objection.  Asked and answered.
25          MR. LOUGHLIN:  I'll object, too.  Ms. Whittlesey,
```

57

```
1       this is, you know -- I don't know whether you're
2       trying to be affirmatively misleading or whether you
3       just don't know the facts.  As I indicated before, the
4       episode that you're referring to that was alluded to
5       in the draft --
6           MS. WHITTLESEY:  Mr. Loughlin --
7           MR. LOUGHLIN:  Just a second.  Let me put this on
8       the record.  Occurred, as the language that you keep
9       quoting indicated, shortly after Caritas opened, which
10      was in the first quarter of 2007.
11          It was not concealed from anyone.  When it came
12      to light, all the officials at the Department of
13      Health were notified, and the person who was
14      responsible for the unauthorized transfers was fired.
15      That's not disputed.
16          If you want a stipulation that the sentence that
17      appears in one draft does not appear in the other
18      multiple drafts which you sent along as exhibits, I
19      will stipulate to that.
20          MS. HOEY:  I will stipulate to that.  The
21      sentence appears in what looks like a first draft.  It
22      doesn't appear in the other drafts.  I will also
23      stipulate that we all agree that, as Mr. Loughlin
24      points out, the individual who was responsible for
25      those transfers was terminated in 2007, approximately
```

15 (Pages 54 to 57)

58

1   18 months before Mr. Kastanis was ever hired.
2       I cannot testify for Mr. Kastanis, but I don't
3   think he ever met or had any contact with that person.
4       MS. WHITTLESEY: Ms. Hoey, I completely agree
5   that you cannot testify on behalf of Mr. Kastanis.
6       MS. HOEY: So, why don't you ask him the
7   questions. Ask him whether he knows anything about
8   any unauthorized transfers. Ask him whether he ever
9   met or had any conversation with anyone about any
10  unauthorized transfers, and then you'll get the
11  testimony on the record and we can be done.
12      MS. WHITTLESEY: I'd like to object to these
13  extended speaking objections. I'd also like to object
14  to any coaching of the witness that is occurring.
15      MS. HOEY: Nobody is coaching the witness. I'd
16  like to take the deposition for you. Please, Ms.
17  Whittlesey, please move it along. Ask the questions.
18      MR. LOUGHLIN: The witness did testify in the
19  earlier portion of this deposition that he had no
20  knowledge of the intermingling of funds, period.
21      MS. HOEY: You're correct. That's correct.
22  That's why I objected.
23      MS. WHITTLESEY: That was not my last question.
24      MS. HOEY: Then what was your last question?
25      MS. WHITTLESEY: Court Reporter, could you please

59

1   read back my last question.
2       MS. HOEY: Oh, Lord.
3       (The reporter read back the record as requested.)
4   **Q. Mr. Kastanis, you may answer.**
5   A. I don't know.
6   **Q. Was the sentence removed because it would hurt**
7   **Caritas' chances of receiving state funding?**
8       MS. HOEY: Objection.
9   **Q. You may answer.**
10  A. I have no response. I don't know.
11      MS. WHITTLESEY: I believe that was all I need to
12  cover.
13      MS. HOEY: I have no questions for the witness.
14  Mr. Loughlin, do you have any questions for Mr.
15  Kastanis?
16      MR. LOUGHLIN: No, I don't. Thank you, Mr.
17  Kastanis.
18      MS. WHITTLESEY: Thank you, Mr. Kastanis.
19      MS. HOEY: Thank you, Mr. Kastanis.
20      THE WITNESS: You're welcome.
21      (Whereupon the deposition ended at 12:22 P.M.)
22
23
24
25

60

1           C E R T I F I C A T E
2       I, Carol A. Whitney, a Certified Shorthand
3   Reporter and a Notary Public in and for the
4   Commonwealth of Massachusetts, do hereby certify that
5   the deposition of JOHN N. KASTANIS was taken and
6   transcribed by me; that the witness provided
7   satisfactory evidence of identification as prescribed
8   by Executive Order 455 (03-13) issued by the Governor
9   before being duly sworn by me; that he was thereupon
10  examined upon his oath and that the transcript
11  produced by me is a true record of the proceedings to
12  the best of my ability; that I am neither counsel for,
13  related to, nor employed by any of the parties to the
14  action in which this deposition was taken, and further
15  that I am not a relative or employee of any attorney
16  or counsel employed by the parties thereto, nor am I
17  financially or otherwise interested in the outcome of
18  the action.
19  My Commission Expires:
20  June 13, 2014                    Notary Public
21
22  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
23  NOT APPLY TO ANY REPRODUCTION OF THE SAME IN ANY
24  RESPECT UNLESS UNDER THE DIRECT CONTROL AND/OR
25  DIRECTION OF THE CERTIFYING REPORTER.

16 (Pages 58 to 60)

**A**

ability 7:17 8:1
  60:12
accepted 29:15
access 17:10,11
accessible 26:18
accommodate 48:16
accurate 7:13
action 54:10,17
  60:14,18
actions 54:2
active 21:23
addressed 16:17
addressing 27:16
administration
  14:13
administrative
  18:1
affirmatively 57:2
afternoon 47:16,23
agencies 52:9 54:2
ago 40:16
agree 57:23 58:4
agreement 41:9
ahead 4:8,10 8:12
  19:17
AL 1:12
alcoholic 7:21
allow 36:19 40:1
alluded 57:4
AND/OR 60:24
Annette 19:3
answer 6:13,25
  7:12,18 8:7,11
  9:16,23 10:8,19
  11:10,12,13 12:4
  12:6,17 15:15
  16:22 17:2,3,4
  20:1,3 23:16,24
  24:11 25:14 27:2
  27:5 28:8,18
  30:3 36:23 37:8
  39:12 45:1 50:9
  50:20 52:14
  54:14 59:4,9
answered 15:23
  23:23 30:13 33:9
  33:19 52:4,13
  56:24
answering 7:8 9:17
answers 6:10 7:15
anybody 9:4 53:10
anymore 49:6
appear 46:15 57:17
  57:22
appearance 5:2
appearances 4:23
appeared 45:9

appears 21:13
  38:17 42:12
  43:18 57:17,21
applicable 1:19
APPLY 60:23
appreciate 33:16
approval 28:2,4
  30:1 35:23 36:4
  36:21 37:6 42:21
approve 35:19 55:1
approved 54:22
Approx 31:19
approximately
  14:14 15:3,24
  49:23 57:25
Arcuri 18:8
area 11:18 39:6
  52:8
areas 52:15
argue 10:20,23
arrange 47:14
arrangement 9:18
  23:7 24:7,8
arrangements 10:16
  10:17
arrived 47:8
aside 10:2 25:4
  54:3,11
asked 23:23 30:12
  33:8,19 56:24
asking 6:8 12:13
  12:14,16 32:4
  33:13 34:6 40:4
  40:21
assignments 12:15
assist 14:7 27:15
  33:7
assistance 52:18
assistant 18:1
  22:14
assisted 27:14,16
  52:15
assume 6:25 21:12
  47:3
assuming 21:8
attached 53:2
attention 20:23
  46:23 51:6
attorney 9:1 60:15
attorneys 9:13
attorney's 11:9
attorney-client
  50:15
AUC 31:18
Authority 17:9
  39:18,24
available 52:7
Avenue 2:16,24
avoid 39:25

aware 22:24 23:18
  23:21 46:9,13
  54:9
A.M 1:22

**B**

B 31:14
back 12:20,21 16:9
  16:10 18:18 41:1
  41:7 43:19 49:13
  49:23 50:5 55:6
  55:10 59:1,3
background 11:4
  14:12 42:25,25
  43:24 45:8 53:19
  55:11 56:14
Baker 2:7 4:24
balance 15:6
bankruptcy 15:4,25
  16:20,25 17:13
  17:14 19:20,23
  26:22 39:7,25
Barbara 2:22 4:19
  5:5 9:11 30:25
basis 9:21 12:11
  12:24 13:1,4
  15:5 20:12 50:10
  50:11,14
bates 21:3 25:20
  30:14,17,19
  37:16 45:6 51:10
began 16:13 43:9
  45:23 46:6 55:18
  56:9
beginning 30:22
behalf 4:3,5,6,12
  4:14,24 35:12
  54:22 58:5
believe 26:8 51:1
  54:4 59:11
benefit 6:17 56:21
best 13:15 60:12
BHoey@littler.com
  3:2
bit 48:17
block 22:11,12
  51:18
board 13:11 14:7
  17:17,22 18:7,19
  28:16 49:3 54:23
  54:25
board's 28:4
body 38:1 52:21
borrowings 17:7,10
  17:12 39:17
bottom 20:21 51:16
  51:17,19,20
BQHC 4:5 5:4 9:4
  14:25 19:9,11

20:20 22:15
  30:22
BQHC12653 51:7,10
BQHC12658 51:7
BQHC12669 44:1
BQHC12670 45:7
BQHC12673 44:2
BQHC12682 37:16
BQHC12683 39:21
BQHC12784 37:17
BQHC15550 34:18
BQHC15551 34:19,21
BQHC17412 25:20
BQHC17415 28:21
BQHC17428 30:15
  31:10
BQHC17447 25:20
break 7:6,9 31:16
  49:24 50:2 51:4
breaking 37:3 43:4
brief 24:22
briefly 8:18
bring 51:6
broad 16:12
broke 45:24
Brooklyn 1:11
  17:18 26:8,9
  51:24
brought 12:11,12
  12:23 13:1,3
  15:21
Buzz 33:24 34:3,8

**C**

C 2:3 60:1,1
caffeine 7:19
call 13:14,17
  48:18,20 49:10
called 5:8 13:10
  13:12
calling 27:4
Calls 44:25
Cardiology 31:13
Care 1:11 13:9
  17:18 26:9 29:17
  29:25 38:19
  51:24
career 11:4,8
Caritas 13:8,10,21
  14:4,15 15:2,7
  15:11,12 16:14
  16:14,19 17:17
  18:18,19,21
  19:18,22,23
  20:19,21 22:8,15
  22:19 24:15,16
  24:20 25:11,18
  26:14,19,21 27:9
  27:13,19,21 28:6

29:17,21,25 30:1
31:7,13 32:2,9
32:18 33:4,25
35:8,13,21 36:19
38:19,25 43:7,9
45:21,23 46:3,6
52:3,18 54:1,10
54:17 55:15,18
56:7,9,21 57:9
59:7
**Carol** 1:19 60:2
**case** 5:24 6:1,3
47:4 50:13,18
55:4
**caution** 8:7 21:10
**Center** 1:23
**CEO** 10:12 11:19
12:10 13:23 15:3
17:22 19:22
24:14 25:18 30:1
35:8,13 36:19
38:19 54:1,9
**CERTIFICATION**
60:22
**Certified** 1:20
60:2
**certify** 60:4
**CERTIFYING** 60:25
**cetera** 12:10
**CFO** 43:6 45:20
46:3 47:6 55:15
56:6
**chain** 21:14
**chair** 18:7,8
**chairs** 24:23
**challenged** 16:17
**challenges** 12:9
**chances** 59:7
**change** 7:5 19:19
20:6,7
**Chapter** 20:5
**characteristics**
11:21,23 12:2,17
12:18
**checks** 27:23
**Chicago** 2:9
**chief** 19:11
**Christopher** 18:15
**circumstances** 37:4
**cite** 50:18
**civil** 1:19 5:23,25
**Claire** 21:18
**Clara** 19:5
**clarify** 11:22
**clear** 6:14 16:19
32:7
**clerkship** 23:22
24:19 25:1,5,10
**clerkships** 23:19

24:2,3,15
**clients** 11:20,21
11:25 12:2
**clinical** 24:22
**closed** 24:25 25:7
29:21
**closing** 27:13
34:13
**closure** 20:5,9,12
20:13 27:9,14,18
27:21 29:17,25
31:7 32:10,21,24
33:23 34:7,9,10
34:16 38:24 39:8
40:1 52:18
**coaching** 58:14,15
**come** 18:17
**comes** 42:4
**commencing** 1:22
**comments** 41:10
44:20
**Commission** 60:19
**common** 12:1,17,18
36:2
**Commonwealth** 1:21
60:4
**communicate** 14:9
**communities** 40:3
**community** 26:17
**complete** 50:21
**completely** 7:13
58:4
**compound** 20:2
**concealed** 57:11
**concise** 11:1
**confer** 8:15
**conference** 48:6
49:9,11,14
**conferred** 8:5,13
8:17
**consultant** 11:19
**consultative** 15:5
**contact** 58:3
**contacted** 14:11
**contents** 53:14
**continue** 39:19
40:22 41:4,10
47:25 48:1
**continued** 15:5
39:23 49:22
**continuing** 17:7
19:24 31:16
39:14,16
**contract** 23:10
25:17 31:21
32:11
**contracts** 23:18,22
**contractual** 21:23
22:24 23:7

**contribute** 30:5,7
41:13
**contributed** 32:24
**CONTROL** 60:24
**conversation** 13:19
58:9
**conversations** 8:8
24:14,18 25:16
32:1,5,13,17
35:7 36:6,9,16
44:17 50:2 53:6
53:8,11,13
**copied** 21:8,18
22:3
**corner** 30:22
**Corporation** 17:18
**correct** 8:9 17:14
17:15 21:18
22:20 26:3 37:22
38:7 46:11 55:18
58:21,21
**corrections** 7:14
**correspondence**
25:3 36:2
**counsel** 4:15 8:8
8:10,13,15,17
10:6,9,17 18:9
19:5 54:24,25
60:12,16
**count** 33:12
**court** 4:16 6:8,17
12:19 16:8 49:4
49:9,10 51:2,5
58:25
**cover** 50:6 59:12
**created** 42:15
**criminal** 5:24
**crises** 10:14
**currently** 11:18
**cut** 4:7 31:2 38:2
41:22 44:21,24
45:3
**C.A** 1:10

─────────────────
D
─────────────────

**D** 3:3
**Dated** 51:14
**David** 9:8 21:25
**day-to-day** 14:7
**dealt** 19:14
**decision** 16:25
19:19 56:17
**decision-making**
17:16
**defendant** 6:3
**defendants** 1:13
2:13 4:5,14
**delve** 23:4
**Department** 17:8

20:16 26:16
27:17 29:16,23
39:17,23 57:12
**departments** 24:23
**dependent** 17:7
**depending** 48:15
**depends** 41:3
**DEPONENT** 2:21 3:5
**depose** 56:1
**deposed** 5:13
**deposition** 1:17
5:17,23 6:6 7:4
8:4 9:2 10:11,18
28:25 38:6 40:11
47:12,21,25 48:2
50:3,22 58:16,19
59:21 60:5,14
**describe** 11:4,8
15:7,11 28:5,11
**described** 15:9
**desire** 47:25 48:1
**detail** 11:6
**details** 14:3 23:20
23:25 24:1,5,7,8
**development** 40:1
**different** 18:24
19:22 24:23
**difficulties** 6:19
**direct** 9:15 50:8
60:24
**directed** 11:11
**directing** 9:23
10:7 50:19
**DIRECTION** 60:25
**directly** 18:20
19:14 28:15
**discovery** 48:7
**discuss** 10:2 27:9
27:12 40:25 41:6
49:19
**discussed** 13:19
14:2 45:9 46:2
46:15
**discussing** 53:2
**discussion** 13:24
45:14
**discussions** 24:22
24:24 32:10
41:15,18 46:18
**disorderly** 39:25
**disputed** 57:15
**distress** 12:1
15:22
**distributed** 35:21
35:25 36:3,20
37:1,5
**document** 28:21,23
29:2,10,12,14,25
30:5,10,14 34:22

35:1, 3 40:5
**documents** 8:23
  35:12
**doing** 6:12
**Dormitory** 17:8
  39:18, 24
**Dowling** 26:3, 5, 11
  26:19, 21, 25 27:7
  27:10, 12, 20 28:5
  28:10 33:7, 24
  34:3, 8, 8, 11, 14
  34:16 37:20
  41:20, 21, 22, 25
  41:25 42:2, 4, 9
  44:6, 15, 17, 20
  45:4 51:12 52:2
  52:10 53:6
**Dowling's** 27:23
  28:1 51:18
**dozen** 33:9
**draft** 29:6 33:5
  34:7, 16 35:10
  38:17 41:11, 22
  42:2, 9, 17 45:3
  45:10 46:19, 21
  47:5 52:22 53:14
  53:16, 24 55:13
  57:5, 17, 21
**drafted** 29:2, 4
  32:19 33:12 34:9
  34:13, 14 35:3, 5
  35:12 39:2, 3
  54:6
**drafting** 30:5, 10
  32:9, 24 33:7
  34:10 41:13
  43:15 54:3, 11
**drafts** 46:23 57:18
  57:22
**drama** 48:7
**draw** 20:22
**drink** 7:21
**Drive** 2:8
**drugs** 7:16
**due** 55:24
**duly** 5:9 60:9

---
**E**
---

**E** 2:3, 3 3:3 60:1, 1
**earlier** 7:3 39:16
  46:3 47:5 52:4
  53:2, 18 55:7, 13
  58:19
**early** 16:23
**echo** 4:20
**education** 22:15
**Edward** 26:2, 5
  37:20 51:12, 17
**eight** 7:21

**either** 7:12
**elected** 39:6 52:23
  52:25
**Emil** 18:7
**employed** 10:12
  13:17 60:13, 16
**employee** 26:8
  60:15
**ended** 59:21
**enlightening** 39:7
**enter** 4:23 5:1
**entire** 36:20
**episode** 57:4
**especially** 40:6
**ESQ** 2:6, 14, 22
**essential** 40:2
**et** 1:12 12:9
**evidence** 60:7
**evolve** 16:15
**EXAMINATION** 3:8
  5:12 49:22
**examined** 5:10
  60:10
**exclude** 56:18
**Excuse** 4:7 8:6
  11:10 37:14
**executive** 11:5
  12:7 14:20 60:8
**exhibit** 20:23 21:3
  21:5, 7 22:10
  25:4, 20, 21, 24
  26:2 28:20 29:2
  29:4, 6 30:15
  31:7 34:18 35:5
  35:7, 10, 17, 19, 21
  35:24 36:6, 9, 12
  36:17 37:16, 18
  37:20 38:1, 15
  41:6, 11, 13, 16, 23
  42:10, 13, 15, 17
  42:23 44:1, 1, 2
  45:6, 9, 19 46:2
  46:14, 21 51:3, 7
  53:3, 24 54:16
  55:6 56:11
**exhibits** 8:13, 24
  30:17, 20 38:6
  57:18
**expand** 11:25 24:9
**expansion** 12:8
**expect** 7:4 40:19
  48:11
**expected** 26:25
**expenses** 9:12
**experience** 11:16
  14:6
**Expires** 60:19
**explain** 15:16 24:8
**extended** 58:13

**extensive** 11:16
  14:6, 12
**extent** 27:22
**externally** 24:19
  25:18
**e-mail** 21:14, 15, 20
  22:3, 10, 22 26:2
  31:4 37:20, 24
  41:21 42:4 44:5
  48:18 49:12
  51:11, 17, 20
  52:20, 20
**e-mails** 44:14

---
**F**
---

**F** 60:1
**facilities** 27:19
  38:25
**fact** 8:10 21:11
  26:22 43:15
**facts** 33:22 47:3, 3
  57:3
**fail** 43:9 45:23
  46:6 55:18 56:9
**fair** 6:22 7:1, 9
**familiar** 21:4
  26:21 28:21
  34:22
**feeling** 7:23
**fees** 9:13 50:7
**Fellows** 31:13
**fifth** 42:24
**file** 17:13
**filed** 15:25 29:18
  29:23
**filing** 17:12 20:4
**final** 29:7, 9, 14, 23
  42:15, 18
**finalized** 29:12
**financial** 12:1, 9
  14:5 15:21 16:14
  16:17
**financially** 16:16
  60:17
**find** 31:9
**fine** 8:10 12:17
  48:25
**finish** 7:8 41:7
  48:21 50:22 51:1
**finished** 19:7
**fired** 57:14
**firm** 9:19
**first** 21:22 22:21
  26:2 37:17, 19
  38:1, 2 41:20, 21
  41:22 42:2, 23
  44:21 45:3 47:17
  51:10 56:13
  57:10, 21

**five** 33:13
**flash** 16:1
**flexible** 48:17
**flight** 48:22
**focus** 20:8 24:12
**focused** 26:16
**follows** 5:11
**FOREGOING** 60:22
**form** 11:7, 12, 22
  12:4, 13 15:14
  16:21 17:1 19:17
  19:25 24:6, 10
  25:12 26:23 28:3
  28:7, 17 29:23
  30:2, 12 32:4, 22
  32:25 36:22 37:7
  38:10, 17 39:11
  41:24 42:3, 15
  52:12 54:4, 13
  55:19
**former** 47:6
**forward** 9:24 11:3
  47:11
**found** 14:9
**foundation** 37:11
  50:17
**four** 14:18, 19, 23
  33:12
**front** 20:23 25:21
  44:2 51:8 55:8
**fully** 16:7
**funding** 52:3, 6
  54:2, 11, 17 59:7
**funds** 43:7, 7, 12, 14
  45:21, 21 46:4, 4
  46:13 52:9 53:21
  55:15, 16 56:7, 7
  56:22 58:20
**further** 53:17
  60:14

---
**G**
---

**Gates** 2:15 5:3
**general** 14:4 19:5
  33:3
**generally** 12:16
**George** 40:16
**getting** 33:18
**Gillian** 2:6 4:2, 7
  4:11, 19, 23 12:23
  15:16 30:16
  32:14 43:4
**gist** 45:24
**give** 44:20 46:23
**given** 5:20, 23
**giving** 37:6
**go** 4:8, 10 6:5, 6
  8:12 11:6 16:19
  16:25 19:17, 19

41:4,8 47:11
48:15
**going** 6:5,25 10:8
14:16 18:5 19:23
26:22 33:23
40:23 43:22 47:1
48:4 50:8 51:1
**good** 38:11
**Governor** 39:22
60:8
**great** 6:24 31:12
49:16,21 50:25
56:11
**grounds** 50:20
**group** 36:20 37:1,5
**guess** 51:16 56:12
**guidelines** 20:9
**guts** 10:15
**gwhittlesey@ba...**
2:11

### H

**half** 33:9
**halfway** 51:21
**hand** 16:18
**happen** 55:3
**happened** 47:7 55:4
**happy** 6:21
**harass** 33:20
**harassing** 33:18
**hard** 31:16
**Hastings** 19:3
**head** 6:15
**health** 1:11 11:15
13:8,21 14:4,8
15:12,17 17:6,8
17:17,18 18:21
20:16,21 26:8,14
26:17 27:17
29:16,17,19,25
33:4 38:19 39:18
39:23 51:24
57:13
**healthcare** 15:18
**hear** 6:20 32:14,15
32:16 43:3 46:17
**heard** 7:1 43:16
**helped** 52:17
**hired** 15:25 23:5
58:1
**history** 11:5,8
**hit** 47:13
**Hoey** 2:22 4:6,7,10
4:14,19 5:5,5
8:6,12 9:11,15
9:18,23 10:5,7
10:22 11:2,7,10
11:22 12:4,13,19
12:22 13:2,7

15:9,14,16,23
16:4,21 17:1,3
19:17,25 20:2
21:10 23:14,23
24:6,10 25:6,12
26:23 27:3 28:3
28:7,17 30:2,12
30:16,19,24 31:2
31:5,9 32:4,7,22
32:25 33:8,16
34:1,5,15 36:22
37:2,7,9 38:10
39:11 40:13,21
41:2,9,24 42:3
43:4,21 44:25
47:14,17 48:1,13
48:16 49:1,4,8
49:16,20 50:8,11
50:16,18,25
52:12 54:4,8,13
55:19,24 56:3,24
57:20 58:4,6,15
58:21,24 59:2,8
59:13,19
**Hoffman** 9:8,25
**hold** 14:16,25
25:22
**Hon** 38:21
**honestly** 55:20
**hope** 41:4
**Hopefully** 49:9
**hospital** 10:13
11:15 12:10
14:12 16:15,16
17:5 19:24 20:20
56:17
**hospitals** 11:17
14:14,18,19,23
22:15 23:12
24:16,21,23,25
25:7,11 35:22
39:14 56:21
**Hostetler** 2:7 4:24
**hour** 7:4,5 8:19
**hours** 7:21
**hurt** 59:6
**H-a-s-t-i-n-g-s**
19:3

### I

**idea** 44:23
**identification**
60:7
**identified** 5:9
**ignore** 33:17
**ill** 7:23
**Illinois** 2:9
**immediate** 13:20
**Imminent** 38:24

**impair** 7:17 8:1
**important** 6:13
**improper** 42:6
**inappropriate**
10:24
**included** 56:15,20
**including** 11:20
20:20 48:19
**incomplete** 7:12
**inconvenience** 49:5
**inconvenienced**
47:19
**incorporated** 33:22
33:25
**indicated** 57:3,9
**individual** 57:24
**information** 26:14
27:20 32:21
33:24 34:3 50:12
**informed** 17:9
**initial** 48:6 49:11
**initiating** 43:8
45:22 46:5 55:17
56:9
**inquiring** 33:21
**instances** 13:3
36:25 37:15
**institution** 10:12
15:12,17,19,25
**instructing** 10:18
**intended** 15:18,20
**intention** 33:20
**interaction** 22:7
22:19
**interested** 60:17
**interim** 11:19
12:11,24 13:1,4
15:3
**intermingled** 43:6
45:20 46:3 55:15
56:7,22
**intermingling**
43:12,14 46:13
53:21 58:20
**internal** 36:9
**internally** 20:17
24:18 25:17
36:16 41:15
**intervention** 39:22
**involved** 17:16
30:9 47:4 48:7
**in-house** 19:5
**issued** 60:8
**issues** 12:9 16:18
50:12

### J

**January** 16:24
21:16 37:21

**impair** 7:17 8:1
**John** 1:17,23 3:5
5:6,8 11:10
19:12 30:19
34:24 38:18 49:1
60:5
**judge** 48:5
**Julius** 21:15 22:5
22:11
**July** 1:22
**juncture** 17:5,6
**June** 60:20

### K

**K** 2:15 5:3
**Kastanis** 1:17,23
3:5 4:2,11,16
5:6,8,13 8:3,12
9:19 10:14 11:3
11:8 12:6 16:2,6
16:11,22 17:3
20:1,22 21:4,10
21:13 23:16,24
25:14,21 27:2,5
30:21 31:10
32:15 33:15 34:6
34:12,16,18,24
37:12,18 38:5,18
40:18 41:11 42:7
42:9 43:23 44:3
47:8,17 48:3,19
49:23 50:6,22
51:6 52:14,21
56:1,5 58:1,2,5
59:4,15,17,18,19
60:5
**keep** 33:13 39:14
43:22 57:8
**kind** 11:25 51:20
**knew** 19:23
**know** 6:7,21 7:6,13
14:11 15:17 17:3
18:17 22:3,5
23:9,12,20,25
24:1,2,3,7 26:5
26:17,24 27:1,6
29:6,12,14 30:25
33:3 35:1 38:9
38:12 43:12,14
43:21 45:12,14
45:16 46:10,16
46:17 47:2,2,3
52:7 55:8,14,20
57:1,1,3 59:5,10
**knowing** 17:13
**knowledge** 9:14
58:20
**knowledgeable**

26:19
knows 48:5 58:7

_____

L

L 2:15 5:3
labor 12:9
lack 50:21
language 6:14 57:8
Lavin 19:12
Leader 38:22
leaders 20:18
leadership 11:16
  12:7 13:20
learned 17:11
leave 21:24 47:15
  48:22
leaving 47:22
left 16:14 41:5
legal 5:21 9:12
  18:9 50:7 54:24
  54:25
legalities 21:24
letter 36:25 37:5
  43:15 44:18,21
  54:16,20 55:4,13
  55:22
letters 36:19
let's 5:7 11:3
  47:17 49:8,8
level 14:21
Lexington 2:16
light 47:6 57:12
LINDSAY 2:6
line 4:13,15 40:9
  40:12 47:1,8
  49:14
liquidation 20:5
literally 40:17
little 40:25 53:17
Littler 2:23 5:5
  10:5
long 8:17 10:25
  11:11 15:2 23:3
  48:5 49:10
longer 17:10 41:2
looked 53:18 55:7
looking 11:25 16:2
  21:22 34:21
  37:17 38:1,15
  39:13,18 42:23
  45:6,8 46:14
  55:6 56:11
looks 57:21
Lord 59:2
losing 34:5
lot 10:14 28:22
  50:23
Loughlin 2:14 4:4
  4:13 5:1,3,3

39:20,20 40:8,10
47:1,10,11,21
48:21,25 56:25
57:6,7,23 58:18
59:14,16
Loughlin's 41:9
L-a-v-i-n 19:12

_____

M

M 37:21 44:12
Majority 38:22
making 28:5
Mal 52:22
Malcolm 38:2,3,9
  38:12,21 39:6
  42:18,20 53:9
  54:12,21
management 12:9
  17:21 18:4,11,24
  20:18 33:3
manner 11:1
man's 10:11
Massachusetts 1:21
  1:24 60:4
Mastromanno 18:15
matter 24:12 36:17
  40:16 52:17
mean 11:23 12:23
  15:16 19:21 24:4
  26:15 39:5,15
  47:2
means 24:9
meant 22:1,22
  31:24
medical 1:23 22:14
  22:25 23:19
  24:15,20 31:14
  31:18 32:18
medications 7:16
Medicine 1:8 4:4
  4:13,25 23:8
meet 43:7 45:21
  46:4 55:16 56:8
  56:22
meeting 48:3,8
  49:3
meetings 27:7
memo 35:24 36:25
  37:5 38:2,3,9,12
  38:14,17 39:2
  42:9,12,17,20,24
  45:3 53:2 54:3,6
  54:12 55:1 56:13
  56:18
memoranda 25:3
memory 51:3
memos 36:2,19 53:9
Mendelson 2:23 5:5
  10:5

mention 53:21
mentioned 39:16
  52:5
met 8:10 58:3,9
metropolitan 11:18
middle 10:13 31:15
mind 26:24
minimal 23:3,6
minute 25:22
minutes 14:16
  40:17,18,22 41:5
  47:15 48:13,14
misleading 57:2
mistaken 54:5
moment 20:25
money 23:12
months 15:4,24
  58:1
morning 7:17 47:22
motivation 39:9
move 10:19 11:2
  33:19 40:19
  50:22,24 52:19
  58:17
Moving 9:24 11:3
Mullally 19:6,8
  21:18
multiple 57:18
M-u-l-l-a-l-l-y
  19:8

_____

N

N 1:17,23 2:3 3:3
  3:5 5:8 60:5
name 4:2,11 18:16
  19:2,2 36:3 37:6
names 18:2,6,10,13
  18:22,23 33:2
  35:15
Nashville 47:22
near 31:14
necessary 7:14
  49:6
need 7:5 10:16
  13:20,20 49:18
  59:11
needed 14:6 43:7
  45:21 46:4 55:16
  56:8
neither 60:12
new 2:17,17,25,25
  11:18 16:23 17:7
  20:16 29:15,18
  39:17,23
news 16:1
nodding 6:15
noon 48:20
Normally 55:3
North 2:8

Notary 1:20 5:10
  60:3,20
note 27:3 39:21
  40:13 41:9
notes 9:25 25:3
Notice 31:12,18
notified 57:13
November 13:16
number 30:14,21
  45:7 51:10
numbers 24:3 30:17
  30:19
NYS 39:24

_____

O

oath 45:17 49:25
  60:10
object 47:1 56:25
  58:12,13
objected 58:22
objecting 11:9
  12:22 40:8 50:14
  50:19
objection 8:6,12
  9:15,21 10:7
  11:7,12,22 12:4
  12:13 13:7 15:9
  15:14 16:21 17:1
  19:17,25 23:14
  23:23 24:6,10
  25:6,12 26:23
  27:3 28:3,7,17
  30:2,12 32:4,22
  32:25 33:8 36:22
  37:2,7 38:10
  39:11 41:24 42:3
  44:25 50:8 52:12
  54:4,13 55:19
  56:24 59:8
objections 10:24
  10:25 33:17
  58:13
obligation 21:23
  41:8
obligations 22:25
  23:2 31:21
obtain 13:8
obviously 49:4
occasions 5:15
occurred 12:14
  37:10 57:8
occurring 58:14
occurs 7:11
office 17:17,19,20
  17:21 47:23
officer 19:11
offices 1:23
official 39:6
officially 17:9

**officials** 52:23,25 57:12
**Oh** 4:9 51:20 59:2
**okay** 5:20,23 6:5 7:3,20 8:3,21 9:10,17,24 13:2 16:13 17:23 19:4 19:7 21:1,9,20 23:21 25:23 30:24,25 31:5,18 32:7,17 34:5,15 34:18,20 37:16 42:4 44:1 49:1,8 49:15 50:25 51:10,22 53:16 55:6
**once** 5:16 19:19,22
**ongoing** 39:24
**open** 39:14
**opened** 57:9
**operating** 39:25
**operational** 14:5
**operations** 11:15 14:8,20 43:9 45:23 46:6 55:18 56:9
**orally** 6:13
**Order** 60:8
**orderly** 20:8 27:18
**outcome** 60:17
**outside** 18:1
**Overall** 26:16
**overboard** 10:9
**overseeing** 25:10

**P**

**P** 2:3, 3, 14
**page** 3:7 6:7 26:2 28:20 30:14,22 31:6,7,10,15 34:19,21 37:17 37:18,19 38:1,15 41:20 42:23,24 45:6 46:2 51:10 51:11,16,19,21 53:3,16,17 55:7 56:12,13,13
**paragraph** 39:21 42:24 43:6,24 45:7 46:14 53:19 53:22 55:11 56:6 56:13
**part** 17:19
**particular** 40:12 51:17 54:11
**parties** 33:1 60:13 60:16
**partner** 40:16
**party** 6:1

**paying** 9:12 50:7
**pending** 7:7 39:7
**people** 17:23 18:10 20:11,15 47:20
**perform** 27:23
**period** 58:20
**permanent** 13:4
**permissible** 37:4
**person** 5:17,19 26:18 42:5 47:18 57:13 58:3
**persons** 19:14
**phone** 4:21 5:18 6:12 8:21 13:19 47:24 49:10
**physician** 20:18
**pick** 41:1,7 43:19 47:14
**placement** 32:13,18
**plaintiff** 1:9,18 2:5 4:3,12,25 6:3
**plan** 27:14 29:17 30:1 31:8,12 32:10,19,21,24 33:7,12,23,25 34:7,9,10,13,16 40:2 52:22,25 53:1,9 54:16
**planned** 55:14
**planning** 20:11 26:9,14,15 51:23 52:8,15 53:5
**plans** 26:16
**plate** 10:14 50:23
**please** 6:21 21:12 24:17 28:9 29:3 33:19 35:15 37:3 50:21 55:8 58:16 58:17,25
**plus** 11:14
**point** 7:5 14:24 33:18 40:4
**pointing** 40:10
**pointless** 47:9
**points** 57:24
**political** 39:3,5 39:13
**portion** 40:7 58:19
**position** 13:4,8,23 13:24
**positions** 14:19,25 23:22 24:20 25:1 25:5,10
**practice** 36:2
**predominantly** 11:17 17:22
**preparation** 9:5 28:25 38:6

**prepare** 8:3
**preparing** 9:2
**prescribed** 60:7
**preserves** 40:2
**president** 22:14 38:19 51:23
**presidents** 18:5,13 18:21,24
**president's** 19:2
**previous** 7:12,15 45:9
**previously** 56:12
**pricing** 24:4
**printed** 31:3
**priorities** 20:8 23:4 24:13
**privilege** 9:22 50:15,20
**privileged** 50:11
**probably** 16:23 18:12 33:9 39:3 48:14
**problems** 6:11 18:15
**Procedure** 1:19
**proceed** 7:11
**proceeding** 5:21
**proceedings** 4:1 60:11
**process** 17:16 28:5 28:11 54:21
**produced** 60:11
**programs** 12:8
**provide** 6:24 18:2 27:18 33:2 35:15 39:24
**provided** 8:14,24 24:15 26:14 32:21 33:22 34:4 60:6
**providing** 11:19 24:2 27:20 33:24
**provision** 23:19 24:19 25:10
**Public** 1:20 5:10 60:3,20
**pun** 15:18,20
**purpose** 40:6
**pursuant** 1:18
**put** 57:7
**P.C** 2:23
**P.M** 21:16 37:22 44:10 59:21

**Q**

**quarter** 57:10
**Queens** 1:11 17:18 26:8,10 40:3 51:24

**question** 6:2,19,22 6:24 7:1,7,8 11:11 12:5,19,20 12:22 15:23 16:4 16:6,11 19:21 20:2 32:23 33:14 33:19 42:6 52:4 52:13 55:20,21 55:22 56:4 58:23 58:24 59:1
**questioning** 40:9 40:12
**questions** 6:8,9,13 7:18 10:15,21 34:9 40:5,18,22 48:10 58:7,17 59:13,14
**quick** 50:6
**quickly** 40:20 43:8 45:22 46:5 55:17 56:8
**Quincy** 1:23,24
**quite** 16:12
**quoted** 40:7
**quoting** 57:9

**R**

**R** 2:3 60:1
**range** 21:3 25:20 37:16
**read** 12:20,21 16:8 16:10 43:23 55:21 59:1,3
**reader** 26:25
**reading** 38:13
**ready** 50:24
**real** 48:6
**realize** 45:17
**really** 10:8 21:6 23:3 31:16 41:3
**reason** 4:20 6:20 7:25 46:16,18
**recall** 8:16,17 14:3 18:10 19:1 21:11,20 22:9,18 23:15,17 25:8 27:25 28:12,14 28:19,22 29:5,9 29:13,24 30:8,11 31:25 32:8,12,20 33:6 34:13,17,23 35:2,4,6,9,16,20 35:23 36:1,5,8 36:11,13,14,18 36:24 37:24 38:11,14 41:12 41:14,19 42:11 42:14,16,19 43:25 44:14,19

44:22 45:5 46:20
46:22 52:11,16
53:4,7,14,15,24
53:25 54:15,19
55:3 56:19
**recalling** 18:6
53:10
**receive** 13:14
37:24 39:16
**received** 13:17
21:12 23:12
29:15 30:16
**receiving** 21:11,20
44:14 59:7
**Recess** 49:17
**recollection** 13:15
**recommendations**
27:24 28:1,6,10
28:13,15
**reconvene** 40:15
48:21 49:13
**record** 7:3 12:21
16:10 57:8 58:11
59:3 60:11
**recording** 6:9
**reference** 47:4
**referring** 57:4
**refers** 41:21
**reflected** 40:11
**refrain** 6:15
**refresh** 51:2
**regarding** 24:19
25:4,16 32:1,10
32:13,17 44:18
45:20 50:3 53:8
**regardless** 53:11
**regards** 24:25
27:12 28:6,20
52:9
**regular** 20:12
**regulations** 20:9
27:16,21
**regulatory** 33:24
34:3
**related** 60:13
**relations** 26:17
**relative** 60:15
**relevance** 50:21
**relevant** 10:21
50:12
**rely** 27:20
**remember** 13:13
14:3 18:12,17
33:11 37:25
46:25
**remembering** 18:16
**removed** 59:6
**reorganization**
40:2

**repeat** 24:17 28:9
37:3
**repeatedly** 33:10
**rephrase** 6:22
16:13 54:7
**report** 18:18 52:22
**reported** 18:20
**reporter** 1:21 4:16
6:9,17 12:20,21
16:8,10 49:4
51:2,5 58:25
59:3 60:3,25
**represent** 9:8
**representative**
13:10
**representing** 5:6
9:10 10:3,10
**REPRODUCTION** 60:23
**request** 1:18
**requested** 12:21
16:10 59:3
**require** 12:8 13:25
28:1 30:1 35:24
42:20
**required** 28:4
**respect** 10:24 40:7
55:25 60:24
**respond** 45:3
**response** 32:8
59:10
**responsibilities**
19:18
**responsible** 25:9
57:14,24
**rest** 41:7
**restate** 6:21 46:1
**restructuring**
19:11
**retain** 10:5,17
**retained** 10:9,10
11:24 13:5
**return** 31:20 32:1
39:10
**reveal** 8:7 56:21
**review** 8:23 35:17
41:22 42:12
46:21
**reviewed** 8:13 38:5
**revisions** 44:20
**right** 4:23 10:14
16:23 17:5 18:6
18:13 19:18
20:22 28:20 45:6
49:7,16 50:5
51:16 53:20 55:6
55:10
**right-hand** 30:22
**role** 13:21,22 18:2
19:22 26:9

**roles** 11:5,16 12:7
12:10 15:8,10
**Romero** 21:15 22:5
22:7,11,19
**Ross** 1:7 4:3,12,25
21:3 23:7,12
25:17 31:18,20
32:11 36:6
**ROSS022148** 21:3
**routinely** 17:24
**Rucigay** 18:7
**Rules** 1:19
**run** 6:11,14,18
**running** 11:16 14:7

_____

|            **S**           |

**S** 2:3
**safe** 20:8 27:18
**satisfactorily** 5:9
**satisfactory** 60:7
**saying** 15:24 31:17
46:9
**says** 21:14 29:6
31:12,14,18,19
34:24 38:13,18
38:21 39:21 44:5
51:23
**scene** 47:8
**schedule** 43:19
48:8 49:12
**scheduled** 47:21
**School** 1:7 4:4,12
4:25 23:8
**schools** 21:23
22:25 31:19
**second** 34:19,21
39:21 42:23,24
43:5,5,24 45:7,8
46:2,14 53:19,22
55:7,10,11 56:5
56:6,12,13 57:7
**see** 21:8,14 22:12
22:16 25:3 29:7
29:23 31:14,22
34:24 38:18,21
38:24 39:19
41:20 43:5,10,11
44:5 45:10 51:11
51:17,19,24
52:21,24 53:21
55:23,24 56:3,5
56:10,14
**seeing** 37:6 53:24
**seek** 12:2 39:22,22
52:3 54:2,17
**seeking** 39:3,10
52:6,9 54:10
**seen** 21:7 28:23
36:12,14

**Senate** 38:22
**Senator** 42:18,20
44:18,21 52:22
53:9 54:12,20
**send** 42:2 44:23
49:12 54:16 55:4
**Senior** 51:23
**sent** 21:15 33:5
37:21 42:18,21
46:24 53:15
54:20,22 55:2,14
55:14 57:18
**sentence** 21:22
22:22 43:5,23,24
45:8,10,12,19
46:1,7,12,15,19
55:10 56:5,14,18
56:20 57:16,21
59:6
**series** 10:13
**services** 11:19
12:3 40:1,2
**serving** 24:14
**set** 40:17
**setting** 48:7 49:11
**shortfalls** 43:8
45:22 46:5 55:17
56:8,23
**Shorthand** 1:20
60:2
**shortly** 57:9
**signature** 22:11,11
51:18
**similar** 42:17
**simply** 13:6 48:7
**sit** 47:24 49:5
**situation** 20:4
39:4
**six** 33:13
**small** 30:21
**Smith** 37:21 38:2,3
38:9,12,21 39:6
42:18,20 44:12
44:18,21 52:23
53:9 54:12,21
**somebody** 47:24
**sorry** 53:3
**sort** 5:21 44:21
**space** 49:2
**speak** 9:1,4,7
**speaker** 4:21
**speaking** 10:24
39:20 58:13
**speaks** 40:5
**specific** 12:15
17:23
**specifically** 11:5
11:24 14:10 52:5
52:16 53:10

specifics 33:11
speculating 45:15
speculation 27:4
  44:25
spent 11:14
spoke 9:8,24 40:15
St 31:12
staff 20:18 26:18
  35:14 52:8
start 4:10
started 5:7 49:19
state 16:15 17:8
  20:9,16 29:16,18
  39:14,15,17
  46:12 52:3,6,9
  54:2,10,17 59:7
stated 7:3
statement 45:19
  56:4
states 22:14 56:6
stays 48:19
step 14:6
stipulate 57:19,20
  57:23
stipulation 57:16
stipulations 27:17
stop 40:23,24
Strategic 51:23
strategies 52:16
Street 1:24
students 21:24
  23:19 24:16,20
  31:14,20 32:2,18
  35:21,25
subject 9:20 36:17
  37:21 38:24
  44:12
submit 52:22,25
  53:5,9
substance 8:9 23:9
  50:5
subtitle 42:25
suburban 11:17
suggest 34:10
  48:16
Suite 2:8
support 26:18 39:3
  39:5,13,14,15,19
  39:23,25 52:8
sure 6:2,6 16:12
  19:21 31:5 38:4
  39:13
sworn 5:9 60:9
system 14:4,8 17:6
  20:20
systems 11:15

————————— T —————————
T 60:1,1

take 7:8,13 9:25
  10:11 14:16,17
  25:23 48:4 49:9
  54:1 58:16
taken 1:17 5:17
  7:16 12:7 45:12
  46:19 49:17
  54:10,17 60:5,14
talking 4:20
teaching 11:17
team 17:21 18:4,11
  18:25 33:4
technical 6:18
TELEPHONE 2:6,14
  2:22
TELEPHONIC 1:17
tell 26:25 42:5
terminate 40:14
terminated 47:7
  57:25
terms 10:9 15:11
  26:21 48:10 52:6
testified 5:10
  37:9 38:5 54:6
testify 8:1 34:7
  41:25 58:2,5,18
testifying 45:17
testimony 5:20
  16:3 46:1,7
  58:11
Thank 17:5 19:9
  54:8 59:16,18,19
thereto 60:16
thing 48:4
things 6:5,16 41:4
  48:15 50:6 52:5
think 6:11,14 7:25
  15:25 25:22 27:3
  32:23 33:17
  37:13,15 45:24
  46:17 47:13 48:2
  48:4 54:5 58:3
third 2:24 21:13
  21:15 22:10
  44:23 46:21 53:3
  53:16 56:12
thought 52:4
three 15:3,24
  40:16 47:15
time 7:14 13:17
  14:17 15:7,11
  16:13 18:5 24:12
  25:23 29:3 32:5
  32:9,19 43:15,19
  47:14,15 53:10
times 8:15 33:10
  33:13
today 7:18,23 8:1
  40:20 45:17

47:20 49:3 50:23
told 40:17
top 29:7 51:11
  52:20
total 14:22
totally 34:5
tough 18:5
track 34:5
traditional 12:7
  12:10
transcribed 60:6
transcript 60:10
  60:22
transfers 47:5
  57:14,25 58:8,10
transitioning 34:2
traveling 47:20
trigger 17:12
trouble 14:5
true 45:13,15,16
  46:8,12 60:11
trustees 17:17
  18:7,9,19 54:23
  54:25
try 4:22 41:5
trying 52:2 57:2
tuned 48:19
Turn 44:1
Turning 30:14
  34:18 37:16
two 18:12,12 24:20
  40:16 47:7

————————— U —————————
uh-huh 6:16
um-hmms 6:16
unauthorized 47:5
  57:14 58:8,10
unclear 24:4
undergo 54:21
understand 6:20
  7:17 11:13 12:5
  16:4,6,11 20:3
  23:9 31:17 32:23
  38:13 40:4 47:19
  49:24
understanding 22:1
  22:21 23:2,6
  25:9 31:24
understood 6:25
unfortunately 48:3
University 1:7 4:4
  4:12,25 23:8,13
  31:20 32:11
untrue 45:23
urban 11:16
use 6:16
useless 40:22
uselessness 40:11

utter 40:10

————————— V —————————
vacancy 13:6
various 11:19 33:1
  35:14
version 29:9 42:18
  46:16 53:16
  54:20 55:13
  56:15
versions 53:18
vice 18:4,8,12,21
  18:24 19:2 22:14
  51:23
Vincent 18:8
Vincent's 31:13
vis-a-vis 20:9
VP 14:20
VS 1:10

————————— W —————————
Wacker 2:8
wait 49:5
Walter 2:14 5:3
  39:20 47:19
  48:17
walter.loughli...
  2:19
want 31:5 42:7
  49:5 50:6 57:16
wanted 10:11
wasn't 12:19 15:20
  23:3 45:13,15,16
  46:9,13
way 7:23 11:14
  45:4
ways 26:13 30:7
  52:2
weeks 40:16
welcome 59:20
went 15:4
we'll 6:11,14
  40:15 41:7 49:13
we're 6:6,12 31:7
  40:23 48:7
we've 6:18 53:18
Whitney 1:20 60:2
Whittlesey 2:6 3:8
  4:2,3,9,11,22,24
  5:7,12 9:21 10:8
  10:20,23 11:23
  12:25 15:20 16:2
  16:8 26:23 30:18
  30:25 31:4 32:6
  33:9,16,20 34:2
  34:12 37:10 40:8
  40:13,19,24 41:3
  42:3 43:18,21
  47:2,10,13 48:2

48:9,11,14,24
49:7,15,18,21,22
50:10,14,17,19
50:24 51:2 52:12
54:5,7 56:1,3,25
57:6 58:4,12,17
58:23,25 59:11
59:18
**Whitwell** 1:24
**widely** 36:20
**witness** 4:18 5:6,8
8:7 9:15,17
26:24 31:6 33:10
33:18,21 34:6
37:9 40:5 41:24
42:5 49:2 50:9
50:20 54:6 55:21
58:14,15,18
59:13,20 60:6
**work** 14:15 15:2
17:23 19:9 20:11
26:11 41:6 48:24
52:2,10
**workable** 48:23
**worked** 15:3 18:2,4
18:6,9 19:5,11
**working** 11:14 13:1
14:22 15:5 22:8
26:9 35:13 51:3
**works** 47:16 49:15
**worth** 40:18,22
**wouldn't** 17:11
33:17
**wrap** 41:6
**writing** 39:9
**Wyckoff** 4:5 5:4
9:4 14:25 19:10
19:15 20:20
22:15 31:20 32:2
32:19 43:6,7
45:20,21 46:3,4
50:7 55:15,16
56:6,7,22
**Wyckoff's** 43:8
45:22 46:4 55:16
56:8

---
**X**
---
**X** 3:3

---
**Y**
---
**Yeah** 40:21
**year** 15:6 16:23
**years** 11:14 12:14
14:22,24 47:7
**York** 2:17,17,25,25
11:18 17:7 20:16
29:15,18 39:17
39:23

---
**0**
---
**022149** 21:4
**03-13** 60:8
**09CIV1410** 1:10

---
**1**
---
**1:00** 47:23
**1:53** 44:10
**10:00** 1:22
**10022-3298** 2:25
**10022-6030** 2:17
**11** 20:23 21:3
22:10 25:4 40:25
**11:00** 40:14
**11:10** 43:19
**11:15** 43:22
**11:17** 47:13
**11:20** 40:14,23
49:17
**11:30** 48:4,18
**114** 1:24
**12** 25:20,21,24,25
26:2 28:20 29:2
29:4,6 30:15
31:7 37:21
**12:05** 49:17
**12:21** 21:16
**12:22** 59:21
**12:30** 48:8
**13** 34:18 35:5,7,10
35:17,19,21,24
36:7,10,12,17
44:10 51:14
60:20
**14** 30:14 31:7
**15** 40:17,18 48:13
48:14
**18** 58:1
**191** 2:8

---
**2**
---
**2** 28:20 38:15
43:24 45:6
**20** 40:25
**2007** 57:10,25
**2008** 13:16 37:21
**2009** 15:6 16:24
44:10 51:14 54:1
54:9,18
**2011** 1:22
**2014** 60:20
**212** 2:18 3:1
**27** 21:16

---
**3**
---
**30** 11:14 12:14
14:24 41:5 48:14
**3100** 2:8

**312** 2:10

---
**4**
---
**40-minute** 49:24
**416-6231** 2:10
**45** 40:21
**455** 60:8

---
**5**
---
**5** 3:8
**50** 31:19
**536-3900** 2:18
**583-9600** 3:1
**599** 2:16

---
**6**
---
**60606-1901** 2:9

---
**7**
---
**7** 1:22 20:5 37:16
37:18,20 38:1,15
41:6,11,13,16,23
42:10,13,15,17
42:23 45:19 46:2
55:6
**7:56** 37:22

---
**8**
---
**8** 51:7 53:24 54:16
56:11

---
**9**
---
**9** 44:1,1,2 45:6
46:14,21 51:5
**9:00** 47:22
**900** 2:24