# Exhibit 57

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ APR 06 2009 ★

BROOKLYN OFFICE

- - - - - - - - - - - - - - - - - - - - - - x

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,  :

                Plaintiff,  :

                          :

     – against –  :

BROOKLYN-QUEENS HEALTH CARE, INC.,  :

               Defendant.  :

**09    1410**

**COMPLAINT**
**Jury Trial Demanded**

**MATSUMOTO, J.**

**MANN, M.J.**

- - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Ross University School of Medicine, Ltd. ("Ross"), by its attorneys, Mayer Brown LLP, as and for its complaint against defendant Brooklyn-Queens Health Care, Inc. ("BQHC"), alleges as follows:

### Nature of the Action

1.    This is an action for specific performance and other relief. Ross, a medical school, and BQHC, a hospital holding company, entered into a prepaid contract to place Ross medical students in clinical clerkship rotations at two BQHC hospitals. Those two hospitals have gone out of business, a prospect contemplated and addressed in the parties' contract, which provides: "In the event the [now defunct] Hospitals are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its other facilities." This action seeks specific performance of BQHC's obligations under that contract and other relief stemming from BQHC's failure to supply the promised clerkships.

## Parties

### *Ross*

2.    Ross is a corporation organized under the laws of the Commonwealth of Dominica.  Its principal place of business is in Dominica.

3.    Ross is a medical school located in the Commonwealth of Dominica, West Indies.  Ross provides a four-year course of medical education to qualified students, leading to a medical degree recognized by the United States Department of Education and all fifty States.

4.    Ross' student body is overwhelmingly composed of students who come from the United States and who intend to become physicians in the United States.

### *BQHC*

5.    BQHC is a corporation organized under the laws of the state of New York.  Its principal place of business is in Brooklyn, New York.

6.    BQHC owns and controls teaching hospitals that provide clinical clerkships to medical schools.

7.    BQHC, through its wholly owned subsidiary, Caritas, owns and controls two hospitals in Queens, St. Johns Queens Hospital and Mary Immaculate Hospital (the "Caritas Hospitals").

8.    BQHC also owns and controls Wyckoff Heights Medical Center ("Wyckoff") in Brooklyn.

### Jurisdiction and Venue

9.   Subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.   Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because the sole defendant, being a corporation headquartered in this District, is deemed under 28 U.S.C. § 1391(c) to reside in this District.  Furthermore, the parties' agreement requires that any litigation between them be conducted in Brooklyn.

### Factual Allegations

*Clinical Clerkships*

11.   The final two years of the four-year M.D. degree program at Ross entails two years of clinical science instruction, which is typically conducted in teaching hospitals in the United States under pre-established arrangements between Ross and the teaching hospitals.  The clinical education is provided by a series of successively scheduled clinical "clerkships."

12.   The first year of a Ross medical student's two-year clinical clerkship rotation consists of "core" clerkships – compulsory courses of clinical study in the teaching hospitals – each lasting a number of weeks.  The second year consists of rotations of "elective" clerkships in those hospitals.

13.   Ross students intend and expect to complete their clinical clerkship training in U.S. teaching hospitals in order to secure their M.D. degrees from Ross, which then enables them to obtain medical residency in U.S. hospitals.  They rely upon Ross' ability to place them in clinical clerkships in U.S. teaching hospitals. Ross' ability to place

3

students in clinical clerkships at hospitals in the United States, therefore, is essential to Ross' ability to deliver a medical education to its students and to Ross' students' ability to complete their medical educations.

14.   The supply of clinical clerkships at U.S. teaching hospitals is very limited and increasingly inadequate to accommodate demand from the growing number of medical students who need to complete clinical training in order to complete their medical educations.

15.   Ross competes for clinical clerkship slots with medical schools from state-sponsored universities, private universities in the U.S., and international medical schools.

16.   One way in which Ross is able to achieve a competitive advantage, to secure a reliable supply of clinical clerkships for its students, and simultaneously to control the cost of the clerkship slots is by locking in future supplies of clinical clerkship slots at fixed costs under pre-paid contracts with teaching hospitals.  These arrangements are attractive to the teaching hospitals, in part, because Ross pre-pays for the slots, thereby providing operating capital for the hospitals.

***Importance of the Location of Clerkships to Ross and Its Students***

17.   The location and type of the clinical clerkships offered by Ross are of great importance to Ross' medical students.

18.   Over the two years of their clerkship training at institutions in the U.S., medical students begin to develop academic and professional relationships and connections with clinicians at these institutions.

4

19.    Following graduation, many Ross graduates will start residencies at the hospitals at which they completed their clinical clerkships.  Many others will start residencies at hospitals in the same geographic area where they trained in their clerkship programs.

20.    Thus, the location of the clerkships at issue here, *viz.*, New York City, is significant to Ross and its students.

**Timing of Clerkships**

21.    The timing of entry into the clerkships dictates the completion date upon which students will earn their medical degrees, and thus is of critical importance to Ross' students, particularly as it impacts the students' commencement of their requisite post-graduate residency training.

22.    Hospital residency positions are allocated once each year on May 31st through a nation-wide process conducted by the National Residency Match Program.  This program matches medical students with hospitals offering residency training.

23.    A student who intends to start a residency must have completed all academic, financial and other requirements no later than May 31st of that year.  Students who do not complete their course of clinical rotations by the May 31st deadline will miss qualifying for the nationwide match program.

24.    Thus, if a student misses that May 31st deadline for completion of his or her clinical instruction, the student will be prevented from beginning his or her residency for another entire year.

25.    In addition to the harm caused in and of itself by that delay, the failure to begin residency on time can have other drastically adverse consequences.  In many

5

cases, a hiatus in full-time medical education will trigger repayment obligations for student loans. Such loans typically defer repayment only as long as a student is a full-time medical student or resident, subject to a single 6-month grace period.

26.   Thus, any interruption, even for a short time, in the course of a medical student's clinical clerkship can have devastating consequences on a student's medical education, financial circumstances, and career.

27.   The loss of clinical clerkship slots therefore causes financial and reputational loss to Ross' academic program, the probable loss of current students, the probable loss of incoming students, and irreparable harm to Ross' reputation and goodwill.

28.   The fact that medical schools currently are attempting to secure an increasing number of clinical clerkship slots in a market in which supply is very limited is a fact that is generally known by all those who are engaged in clinical education and is and was at all material times known by defendant BQHC.

29.   The importance of the timing of the clerkships to the students and Ross is a fact that affects and is generally known by all who are engaged in clinical education and is and has been at all material times known by defendant BQHC.

30.   In sum, when BQHC accepted very substantial pre-payments from Ross and in return guaranteed clerkships to Ross, BQHC knew the importance to Ross of that guaranty and the catastrophic harm that Ross would suffer, should BQHC breach the parties' agreement.

***Affiliation Agreement Between Ross and BQHC***

31.   On or about December 28, 2006, BQHC and Ross entered into the "Affiliation Agreement" reproduced as Exhibit 1 hereto.

6

32.   Under the terms of the Affiliation Agreement, Ross advanced $5,000,000 to BQHC.  In exchange, BQHC guaranteed that it would cause the Caritas Hospitals to provide 50 core clerkships and 50 elective clerkships to Ross for use by Ross' students.

33.   The Affiliation Agreement provides that the rate for those clerkship slots would be $312.50 per week and that Ross would be entitled to the clerkship slots until the prepaid sums and accrued interest at the contractually provided rate had been exhausted by provision to Ross of clerkship slots at that rate.

34.   Exhibit B to the Affiliation Agreement also expressly provides that "[i]n the event the [Caritas] Hospitals are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its other facilities."

35.   The parties have amended the Affiliation Agreement to increase the sums advanced by Ross and the number of Caritas Hospital clerkships guaranteed to Ross by BQHC.  Exhibit 2 hereto is a true and correct copy of the First Amendment to the Affiliation Agreement.  Exhibit 3 hereto is a true and correct copy of the Second Amendment to the Affiliation Agreement.  Exhibit 4 is a true and correct copy of a letter agreement entered into by Ross and BQHC.

36.   At present, under the Affiliation Agreement as amended, Ross has advanced more than $6.1 million to BQHC that remains unearned through the provision of Caritas Hospital clerkship slots, and Ross is entitled to 135 core clerkship slots and 135 elective clerkship slots per week until January 31, 2015.

7

*Closure of the Caritas Hospitals*

37.   In early 2009, BQHC announced that it was closing St. Johns and Mary Immaculate Hospitals.

38.   On February 6, 2009, Caritas and the Caritas Hospitals filed for protection under Chapter 11 of the Bankruptcy Code, *In re Caritas Healthcare, Inc. et al.*, Jt. Admin. Ch. 11 Case No. 09-B-40901 (Bankr. E.D.N.Y.).

39.   The Caritas Hospitals are now closed.  As a result of the fact that the Caritas Hospitals are not operating, Ross students scheduled for rotation at the Caritas Hospitals do not have access to clerkships at the Caritas Hospitals.

*BQHC's Breach*

40.   Initially, BQHC provided clerkships at Wyckoff for 34 Ross students who were scheduled for clerkships at the now-closed Caritas Hospitals.

41.   However, in breach of the parties' contract, the other guaranteed clerkships were denied to the Ross students who had been scheduled to use them.

42.   Ross has been able to place some but not all of those displaced students at other facilities.

43.   Ross has paid to those other facilities sums in excess of the Affiliation Agreement's contract rate for clinical clerkships.  Ross has also incurred other losses in connection with placing students in other facilities for clerkships.

44.   Ross has not been able to place at other facilities all of the students that were scheduled for clerkships at the Caritas Hospitals.

45.   Recently, BQHC has informed Ross that BQHC will no longer provide any additional replacement clerkship slots at Wyckoff.

8

Case 1:09-cv-01410-KAM-RLM   Document 97-57   Filed 01/24/12   Page 10 of 38 PageID #:
2403
Case 1:09-cv-01410-KAM-RLM   Document 1   Filed 04/06/09   Page 9 of 37 PageID #: 9

**Claim for Relief**

46.   Ross repeats and realleges the allegations of paragraphs 1 through 45 as if fully set forth herein.

47.   BQHC's failure to provide replacement slots to Ross for all Ross students displaced when the Caritas Hospitals ceased to operate is a breach of the parties' contract.

48.   BQHC's refusal to provide to Ross additional clerkships at Wyckoff is a breach of BQHC's contractual obligation to provide at its other facilities an equivalent number of clerkships to those lost to Ross when the Caritas Hospitals ceased to operate.

49.   The contracts for clinical clerkships at these New York City hospitals are unique.  They cannot be replicated exactly at any other institution.

50.   On information and belief, contracts between BQHC (and/or Wyckoff) and other medical schools for the provision of clerkship slots at Wyckoff expire during the term of the contract between BQHC and Ross.

51.   Clerkships that are in any sense reasonably comparable are in extremely short supply and the market cost for the few that can be found is well above the rate established in the Affiliation Agreement, as amended.  The guarantee of a reliable future supply of clinical clerkships at attractive hospital locations and at fixed rates was what enticed Ross to pre-pay several millions of dollars to BQHC.

52.   To the extent that any sufficiently similar American institution can be located to provide a reasonably comparable clinical clerkship program, the cost of those clerkships will be greatly in excess of the price for which BQHC agreed to provide clerkship slots to Ross.

53.    To build and maintain credibility and viability in the provision of quality medical education for international medical schools is extremely difficult.  The loss of goodwill occasioned by adverse circumstances is correspondingly rapid.

54.    The loss to Ross caused by BQHC's threatened conduct has and will cause enormous loss of reputation and goodwill within the current student body, diminish the value of Ross degrees in the medical community and with the future employers of Ross' students, and likely would discourage many potential students from even considering enrolling at Ross in the future.

55.    The loss of the New York slots also will cause substantial "backing up" throughout the clerking system and put many more of Ross' students out-of-synch with residency programs.

56.    By reason of the matters aforesaid, an order of specific performance of the contract is appropriate.

### Jury Trial Demand

Ross demands trial by jury of all issues so triable.

WHEREFORE, Ross respectfully requests that the Court enter judgment in favor of Ross and against BQHC:

A.    Decreeing specific performance of the Affiliation Agreement and ordering BQHC to provide to Ross during the term of the parties' contract with all clerkships presently available at Wyckoff or that become available by reason of the expiration of contracts with other medical schools (or that otherwise become available);

B.    Awarding damages in an amount to be proved at trial for the costs of replacing clerkships slots lost to Ross;

10

C.   Awarding the other incidental and consequential damages flowing from BQHC's breaches; and,

D.   Granting interest; costs and such other relief as to the Court appears just and proper.

Dated: New York, New York
          April 6, 2009

MAYER BROWN LLP

By:

Michael O. Ware
*mware@mayerbrown.com*
Andrew J. Calica
*acalica@mayerbrown.com*

1675 Broadway
New York, N.Y. 10019
(212) 506-2500

*Attorneys for plaintiff*

*Of Counsel:*

George J. Tzanetopoulos
Daniel L. Ring
David K. Cole, III
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, Ill. 60606
(312) 782-0600

11

**AFFILIATION AGREEMENT**

**BETWEEN**

**ROSS UNIVERSITY SCHOOL OF MEDICINE,
SCHOOL OF VETERINARY MEDICINE, LIMITED
Portsmouth, Dominica**

**AND**

**BROOKLYN QUEENS HEALTH CARE, INC.**

This Agreement is made between **Ross University School of Medicine,
School of Veterinary Medicine, Limited**, hereinafter referred to as the
"University", and **Brooklyn Queens Health Care, Inc.** ("BQHC"), which through
its subsidiary, Caritas Healthcare Planning, Inc., owns and operates Mary
Immaculate Hospital and Saint John's Queens Hospital in New York, hereinafter
referred to as "Caritas" or "the Hospitals", (collectively, BQHC and the University
shall be "the Parties").

WHEREAS, the Hospitals have facilities for furnishing a clinical medical
education to the University's students; and

WHEREAS, the University has an established Clinical Curriculum; and

WHEREAS, the University has determined that it would be beneficial for students
to participate in clinical clerkships at the Hospitals.

NOW, THEREFORE, in consideration of the premises and the mutual promises
and undertakings of the parties set forth below, the Parties agree to conduct
structured core, required and elective clinical clerkships for the University's
medical students at the Hospitals according to the terms and conditions set out
below:

**SECTION I**

**The parties agree:**

1. That this Agreement will commence January 1, 2007 and will continue
until December 31, 2010. It may be earlier terminated by either party
only for material breach of this Agreement, remaining un-remedied for
thirty days after written notice of such breach, and only after a
subsequent notice of intention to terminate this agreement has been
delivered by registered mail to the other party in writing, allowing
sufficient time for response. In event of such termination, the students

who have commenced clerkships at the Hospitals will be allowed to complete their scheduled clerkships.

2. The Hospitals acknowledge that they have received and reviewed the University's Clinical Curriculum Guide (incorporated into this Agreement by reference and attached hereto as Exhibit A), and BQHC agrees to direct the Hospitals to provide clinical medical education consistent with all requirements therewith, as a minimum standard.

3. After considering the number of qualified University medical students, the number of clinical faculty in various disciplines at the Hospitals, the availability of relevant patient populations, and the total number of clerkships to be apportioned between the medical schools affiliated with the Hospitals, the Parties have agreed that the Hospitals shall provide the clerkships set forth in Exhibit B, attached hereto and incorporated by reference herein.

4. The provisions of this Agreement shall be construed and interpreted and all rights and obligations hereunder determined in accordance with New York law. The Parties consent that jurisdiction and venue of any dispute arising from this Agreement shall be in Kings County, New York.

5. The relationship of the Parties is that of independent institutions, which shall be observed at all times. No partnership, agency, or fiduciary relationship is implied, and none shall be construed.

6. BQHC shall ensure that the Hospitals shall make no distinction in the admission of students to a clinical clerkship on the basis of race, sex, creed, color, national origin, age, marital status, height, weight or handicap status.

7. This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged or hypothecated in any way, without the written consent of the other party, except in the case of a sale of all or a majority of assets, or otherwise by operation of law, in which case transfer is permitted without consent; provided, however, that any successors in interest shall be obligated to comply with all of the terms and conditions of this Agreement.

**SECTION II**

**BQHC AGREES that the Hospitals shall:**

1. permit students of the University appropriate access to patients in the Hospitals while they are formally enrolled in clerkships.

2. provide appropriate clinical supervision and training of University students, including their performance of relevant clinical procedures, while taking core clerkships in Internal Medicine, Surgery, Obstetrics & Gynecology, Psychiatry, and Family Medicine as well as elective rotations at the Hospitals. The Parties may agree to add or delete elective clerkships from time to time in writing during the term of this Agreement, provided that such agreement is mutual.

3. inform the appropriate officials of the University, in a timely and confidential manner, of any substantially inappropriate behavior, as defined by the Hospitals code of conduct and/or professional standards of conduct (copies of which shall be provided), on the part of any student, which may indicate the need for sustained counseling or correction.

4. provide any orientation, administrative guidance and procedures and other media deemed essential to the student's experience.

5. be responsible for the activities of the students during the clerkship, to directly supervise such activities and to provide students with appropriate and timely counsel/feedback/notification, no less than every three weeks, concerning performance and behavior in relation to their assigned rotation.

6. submit, in a timely and appropriate manner, a written Clinical Evaluation on each student at the completion of clerkships by the supervising physician, and where appropriate countersigned by the Director of Undergraduate Medical Education, which shall follow a format mutually acceptable to the parties and be delivered to the University within six weeks of completion of the clerkship.

7. provide to the University accurate and contemporary data concerning student clinical activities as reasonably requested by the University, but in no event less than weekly. Documentation will include patient census (i.e. average daily census) for each course area of clinical instruction.

8. make available the following health services to the University's students while they are assigned to clerkships at the Hospitals, provided that the usual fees and costs for such services shall be paid by the students:

  a. Medical referrals through the Hospitals' Employee Health Services

  b. Emergency services provided by the Emergency Department; and

  c. Basic health services as required by regulatory agencies from time to time.

9. permit the use of its medical library by and computer access to the University's students while they are assigned to clerkships at the Hospitals on the same basis as any other personnel.

10. provide the following support services to the University's students while they are assigned to clerkships at the Hospitals:

  a. Housing referrals, if available; and

  b. In house accommodations for on-call personnel, including call rooms, shared lockers as available, dietary, uniform and linen services.

11. provide the University a right of first refusal as to half of all new core/elective clerkships slots developed by the Hospitals; provided, however, that the Hospitals will not hold any new slots empty unless payment of the Pre-payment Funds has been made in accordance with Exhibit B. The Hospitals shall provide the University with written notice, sent by registered mail, of such new core/elective clerkship slots and thereafter hold such slots available for the University for no less than 30 calendar days following delivery of such notice. The University shall notify in writing the Hospitals of its decision to exercise (or not) its right of first refusal within such notice period. BQHC shall provide, or shall cause the Hospitals to provide, on a quarterly basis, the University with a certified report of available clinical rotation slots at the Hospitals, on which the available slots guaranteed to the University was calculated.

12. maintain the confidentiality of the students' personal information in accordance with State and Federal laws and regulations.

13. provide the University, upon reasonable request therefor, with proof of insurance in commercially reasonable amounts and with such coverages as may be standard for hospitals in the area in which the Hospitals are located.

**SECTION III**

**THE UNIVERSITY AGREES:**

1. upon mutual agreement of the Parties, to offer and confer, upon those hospital teaching faculty satisfying University requirements, a clinical appointment as "adjunct faculty" to the University. Such appointment shall not

create, nor be construed to create, an employer/employee relationship between any adjunct faculty and the University. In addition, conferment of adjunct faculty status on Hospital teaching faculty is not intended to, nor shall be construed to, mean that the University accepts the responsibility for teaching faculty's or the Hospitals' acts or omissions.

2.      In a timely manner, to inform the Hospitals of any substantive changes in its Clinical Curriculum Guide.

3.      To appoint for clinical clerkship only those students who have satisfactorily completed the prerequisite instructional portion of the curriculum, in the pre-clinical sciences in the University's sole discretion.

4.      To state as its policy that the Hospital Medical Director shall have the authority to immediately suspend any student of the University, whose behavior is sufficiently inappropriate to warrant this action, provided that the student is allowed a timely opportunity to appeal and the University is notified immediately.

5.      To require each student enrolled in clerkships to maintain at least $1,000,000/$3,000,000 malpractice coverage, protecting both the University and the Hospitals from liability which could occur as a result of the student's fault or negligence. The University shall maintain on file evidence of the existence of insurance required and shall provide a copy of the insurance to the Hospitals upon request. Each party agrees to give the other notice in writing within thirty (30) days of any claim made against it which is covered by this section.

6.      To provide medical library and secretarial support for the students engaged in clerkships, as set forth in Exhibit B.

7.      To require each student, prior to the commencement of the clinical experience, to provide results to the Hospital of physical examination which complies with the requirements of section 405.3 of the New York Code of Rules and Regulations. All clinical clerks will be offered by the University the opportunity to receive a Hepatitis B vaccination. In addition, all clinical clerks will have completed the OSHA Bloodborne Pathogens Workshop prior to beginning clerkships.

8.      In the event of impending bankruptcy, BQHC will give to the University ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████

9.      In the event that the Hospitals are unable to accept the specified number of students, as set forth in exhibit A, for the core or elective rotations, BQHC will refund to the University that portion of the prepayment funds which have not then been earned.

**EXHIBIT A**

**UNIVERSITY'S CLINICAL CURRICULUM GUIDE**

**[TO BE ATTACHED]**

**EXHIBIT B**

This exhibit sets forth the financial terms of the above Agreement, whereby the University hereby agrees that it will pay BQHC as follows:

a.      The University will deposit with BQHC $5,000,000 US Dollars (the "Pre-Payment Funds") on or before December 27, 2006, by wire transfer or such other commercially reasonable manner as may be agreed upon between the Parties;

b.      In consideration of such payment, BQHC shall cause the Hospitals to provide clinical clerkships to the University's eligible students during the term of this Agreement, and until the Pre-Payment Funds have been exhausted; and

c.      The University will pay for subsequent clinical clerkships at the Hospitals on a "service performed" basis, at the rate set forth below, once the Pre-payment Funds have been fully amortized.

The Pre-Payment Funds represent an advance payment for core and elective clerkship weeks, calculated at a rate of $312.50 per week, per clerkship, at either of the Hospitals, for a total of sixteen thousand (16,000) instructional weeks. For avoidance of all doubt, the Pre-Payment Funds are intended to cover the total number of weeks for each clinical clerkship guaranteed hereunder until the Pre-Payment Funds have been exhausted.

During the term of this Agreement, BQHC guarantee that the Hospitals shall provide the University with a minimum number of fifty (50) core clerkship slots, allocated as follows:

| | |
|---|---|
| Surgery | 16 |
| Medicine | 20 |
| Ob/Gyn | 8 |
| Family Medicine | 6 |

In addition, BQHC further guarantees that the Hospitals shall provide the University with fifty (50) elective clerkship slots during the term of the Agreement, to be allocated in accordance with the mutual agreement of the Parties.

The clerkship rate of $312.50 per week is guaranteed for the entire term of the Agreement. In other words, once the University has exhausted the Pre-Payment Funds deposited with BQHC, the University shall be entitled to pay for additional clinical clerkships at this rate for the remaining balance of the term of the Agreement.

The University will provide to BQHC, on behalf of the Hospitals, annual library support of $10,000.00 USD paid semi-annually in consideration for the use of the Hospitals' library facilities by University students engaged in clinical clerkships during the term of the Agreement.

The University also agrees that it will pay BQHC, on behalf of the Hospitals, for reasonable secretarial support required to implement this Agreement. The amount to be paid by the University for secretarial support will be determined by the Parties, based upon the size of the student program and shall be agreed upon in writing. In no event shall the amount paid by the University for secretarial support for any given year be less than $36,000.00 USD, so long as the Hospitals are providing at least fifty (50) core clerkship positions for the University's students.

The Hospitals will submit invoices for such expenses and the invoices will be supported by appropriate documentation.  Payment terms are net 30 days.

In consideration of the Pre-Payment under this Agreement, BQHC shall pay, or shall cause the Hospitals to pay, the University an amount equivalent to interest, paid at a rate of LIBOR + 1% per annum and calculated on the unamortized amount of prepayment (the "Monetary Consideration").  Such amortization is based upon the amount expended for the clinical clerkships on a monthly basis over the term of this Agreement, as set forth in Exhibit C, which is attached hereto and incorporated by reference herein.

The Monetary Consideration is due and payable on or before the end of the month following the period set forth in the amortization schedule.  If unpaid within 60-days following the applicable period, a late fee, in the same rate as the effective rate for the amortization period, will accrue, beginning with the first day of the second month following the amortization period.

The University reserves the right to apply any Monetary Consideration against any monies to be paid by the University under this Agreement for secretarial support, library support, or additional clerks.  In the event the University elects to exercise such right, BQHC shall provide, or cause the Hospitals to provide, within the same time frame as the payment schedule in the paragraph above, a written accounting of such disbursements from the Monetary Consideration owed the University.

In the event of failure to pay the Monetary Consideration hereunder and/or the filing of bankruptcy by BQHC, or by one or both of the Hospitals, BQHC agrees, and shall cause the Hospitals to agree, that the University shall be considered a secured creditor in the amount of any unpaid Monetary Consideration and any unamortized portion of the Pre-Payment Amount.

Absent material breach of this Agreement by the University, the Hospitals shall not withhold Services while the Hospitals remain operative.  In the event the Hospitals are not operative, and the University is not in material breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.

**NOTE:  Neither the Hospital's provision of services nor the payment to the University of any monetary consideration under this Agreement in exchange for the Pre-Payment Funds constitutes a lending arrangement. The University is not a lender or a financial institution, and is not in the business of making commercial loans or financial transactions, which may be subject to state or federal regulation.  Pre-payment for services is at the express request of BQHC, and is solely for the convenience of BQHC and the Hospitals.**

**EXHIBIT C**
[agreed upon amortization table]

**THIS AGREEMENT IS SIGNED AND DATED AS FOLLOWS:**

Brooklyn Queens Health Care, Inc.

_Harold E. McDonald_    Executive Vice President and Chief Operating Officer
            Date   12/28/06

_N. Gandal MD_    CMO    , CARITAS
            Date   12/28/06

On Behalf of **ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE:**

_Nancy Perri MD_
Nancy Perri, M.D., Vice President, Academic Affairs

Date   December 28th 2006.

_John St. James_
John St. James, Chief Financial Officer

Date   12/28/2006

**AMENDMENT TO AFFILIATION AGREEMENT BETWEEN**

**ROSS UNIVERSITY SCHOOL OF MEDICINE SCHOOL OF VETERINARY MEDICINE LIMITED ("RUSM")**

**Portsmouth, Dominica**

**And**

**BROOKLYN QUEENS HEALTH CARE, INC. THROUGH CARITAS HEALTH CARE, INC. (formerly known as Caritas Health Care Planning, Inc.)**

**374 Stockholm Street, Brooklyn, New York 11237**

WHEREAS, Ross University School of Medicine, School of Veterinary Medicine, Limited, (the "University") and Brooklyn Queens Health Care, Inc. ("BQHC"), which through its subsidiary, Caritas Healthcare Planning, Inc. ("Caritas"), owns and operates Mary Immaculate Hospital and Saint John's Queens Hospital in New York (the "Hospitals") (collectively, the "Parties") have entered into a certain Affiliation Agreement relating to the participation of the University's medical students in clinical clerkships at the Hospitals during the period from January 1, 2007 to December 31, 2010 (the "Agreement"); and,

WHEREAS, the Parties wish to continue their Agreement, but make certain modifications to it, effective as of December 1, 2007 (the "Amendment");

NOW, THEREFORE, in consideration of the premises and the mutual promises and undertakings of the Parties set forth below, the Parties hereby amend the Agreement as follows:

Except for those changes expressly indicated in this Amendment, the Parties' Agreement shall otherwise remain in full force and effect according to its terms and those of its Exhibits.

**AMENDMENTS TO SECTION I OF THE AGREEMENT**

The first sentence of the first paragraph of Section I shall be deleted and replaced with the following: "That this Agreement will commence January 1, 2007 and continue until January 31, 2011. The University shall have an option to extend the Agreement, as amended, for two additional years, from January 31, 2011 until January 31, 2013, subject to the terms hereinafter set forth. The University shall be deemed to have exercised this option unless it provides BQHC written notice of its intention not to exercise its option right on or before October 31, 2010."

Additionally, the following language shall be added at the end of paragraph 1 of Section I: "In the event of termination by either Party, Caritas shall return within 7 days of the

Case 1:09-cv-01410-KAM-RLM   Document 97-57   Filed 01/24/12   Page 27 of 38 PageID #: 2420
Case 1:09-cv-01410-KAM-RLM   Document 1   Filed 04/06/09   Page 26 of 37 PageID #: 26
12-06-07.03.13PM:

termination date, all unamortized Prepayment Funds, Additional Prepayment Funds, Monetary Consideration and any other amounts due and owing the University."

**AMENDMENT TO SECTION II OF THE AGREEMENT**

Section II, paragraph 11, shall be deleted and replaced with the following: "provide the University a right of first refusal for all new core/elective clerkship slots developed by the Hospital and/or existing core/elective rotations that become available during the term of the Agreement and any amendments thereof or extensions thereto pursuant to the University's exercise of its option set forth in Section I, paragraph 1. Such right of first refusal shall be exercised by The University within thirty (30) days of Written Notice provided to Ross by Caritas of the availability of clerkships and shall be under such terms and conditions as may be agreed to by the Parties.   In the event the Parties are not able to agree to terms within an additional thirty (30) day period after Written Notice is provided to The University, then this "right of first refusal" shall be null and void."

**AMENDMENTS TO EXHIBIT B TO THE AGREEMENT**

The following shall be added to the end of subpart "a" of the first paragraph of Exhibit B:: "The University shall deposit or cause to be deposited with BQHC,  within 7 business days of the signing of this Amendment, by wire or such other commercially reasonable manner as may be agreed upon by the Parties, an additional $4,000,000 US Dollars less the aggregate amount of interest through October 31, 2007 owed to the University on the prior Pre-Payment of $5,000,000 (the "Additional Pre-Payment Funds").  The University has calculated the amount of interest owing to the University to be $223,545.  The University will submit for BQHC's review its calculation of the interest owing and the Parties shall work cooperatively to perform a reconciliation no later than February 15, 2008 and make any necessary adjustments no later than February 28, 2008."

The third paragraph of Exhibit B, including the table, shall be deleted and replaced with the following:

"Effective January 21, 2008  BQHC guarantees that the Hospitals shall provide the University with a minimum of one hundred and ten  (110) core clerkship slots, allocated as follows:

| | |
|---|---|
| Surgery | 36 |
| Medicine | 36 |
| OB/GYN | 14 |
| Family Medicine | 14 |
| Psychiatry | 10 |

The fourth paragraph of Exhibit B shall be deleted and replaced with the following: "In addition, BQHC further guarantees that the Hospitals shall provide the University with one hundred and ten (110) elective clerkship slots during the term of the Agreement, as amended, and the two year option period, to the extent exercised by the University, to be allocated in accordance with the mutual agreement of the Parties."

The fifth paragraph of Exhibit B, shall be deleted and replaced with the following: "The Clerkship rate under this Agreement shall be $325 per student/per week and this rate shall be fixed for the initial term of this Agreement from January 1, 2007 until January 31, 2011. . In the event the University exercises its option to extend the Agreement for an additional two years (through 1/31/2013), the Clerkship rate paid per student/per week shall be increased by a percentage equal to the increase, if any, in the Consumer Price Index for All Urban Consumers (CPI-U) in the then most recently ended federal fiscal year, as determined by the Bureau of Labor Statistics of the United States Department of Labor."

The following shall be added to the ninth paragraph of Exhibit B: "In addition, for the same consideration, BQHC shall pay, or shall cause the Hospitals to pay the University an amount equivalent to interest paid at a rate of LIBOR + 1% per annum and calculated on the unamortized amount of Additional Pre-Payment Funds, which amounts shall also be considered "Monetary Consideration"). Such amortization is based upon the amount of clinical clerkships actually provided to University students on a monthly basis through October 31, 2007.

Effective November 1, 2007 through the end of the Agreement, and any extension of the Agreement by virtue of the University's exercise of its two-year option right, The University will continue to earn interest on the Pre-Payment and the Additional Pre-Payment Funds at the monthly rate of LIBOR + 1% on the unamortized balance plus interest earned. However, beginning November 1, 2007, the Monetary Consideration earned monthly by the University shall be paid to the University in kind by adding them back to the Pre-Payment and Additional Pre-Payment amounts and then reducing those amounts as additional clinical rotations are utilized by University students.

For example, if the sum of the unamortized Pre-Payment and Additional Pre-Payment amounts was $2.0 million at the end of January 2008, and $2.5 million at the beginning of the month, the average Pre-Payment and Additional Pre-Payment balance for the month would be $2.25 million. Assuming a LIBOR rate of 5% plus 1%, the Hospitals would owe The University $11,250 in interest for the month. Under this amendment, instead of paying The University $11,250 in cash, the $11,250 in interest income would be added to the Pre-payment resulting in a month end Pre-Payment and Additional Pre-Payment of $2,011,250."

12/05/2007  14:12     718-963-6791          FINANCE                    PAGE  02

12-05-07:01:29PM:

THIS AMENDMENT IS SIGNED AND DATED AS FOLLOWS:

For Brooklyn Queens Health Care, Inc.

_____ 12/5/2007      Date:
Paul Goldberg, Chief Financial Officer

_____ 12/5/2007      Date:
Julius Romero, AVP Medical Education


For Ross University School of Medicine School of Veterinary Medicine Limited

_____       Date:  12/05/07
Nancy Perri, MD, Vice President Academic Affairs

_____       Date:  12/05/07
John T. St. James, Vice President, Chief Financial Officer

17.57:41   02-28-2008   2/10

7185581818   •   Administration

## SECOND AMENDMENT TO AFFILIATION AGREEMENT BETWEEN
## ROSS UNIVERSITY SCHOOL OF MEDICINE SCHOOL OF VETERINARY
## MEDICINE, LIMITED
## Portsmouth, Dominica

### And

### BROOKLYN QUEENS HEALTH CARE, INC. THROUGH CARITAS HEALTH
### CARE, INC. (formerly known as Caritas Health Care Planning, Inc.)
### 374 Stockholm Street, Brooklyn, New York 11237

WHEREAS, Ross University School of Medicine School of Veterinary Medicine, Limited, (the "University") and Brooklyn Queens Health Care, Inc. ("BQHC"), which through its affiliate, Caritas Healthcare Inc. ("Caritas"), owns and operates Mary Immaculate Hospital and Saint John's Queens Hospital in New York (the "Hospitals") (collectively, the "Parties"), have entered into that certain Affiliation Agreement on December 28, 2006, as amended December 5, 2007, relating to the participation of the University's medical students in clinical clerkahips at the Hospitals during the period from January 1, 2007 to December 31, 2010 (the "Agreement"), as amended; and

WHEREAS, the Parties wish to continue the Agreement, but make certain additional amendments and modifications to it, effective as of December 1, 2007, as set forth herein (the "Amendment").

NOW, THEREFORE, in consideration of the premises and the mutual premises and undertakings of the Parties set forth below, the Parties hereby amend the Agreement as follows:

Except for those changes expressly indicated in this Amendment, the Agreement shall otherwise remain in full force and effect according to its terms and those of its Exhibits.

### AMENDMENTS TO SECTION I OF THE AGREEMENT

The first sentence of the first paragraph of Section I shall be deleted and replaced with the following: "That this Agreement will commence January 1, 2007 and will continue until January 31, 2015. The University shall have the option (the "Option") in its sole discretion to extend the Agreement, as amended, for three (3) additional years, from January 31, 2015 until January 31, 2018, subject to the terms hereinafter set forth. The University shall be deemed to have automatically exercised the Option unless it provides BQHC written notice on or before October 31, 2014 of its intention not to exercise the Option."

Additionally, the following language shall be added at the end of paragraph 1 of Section I: "In the event of termination by either Party in accordance with the terms of this paragraph, BQHC or Caritas, as appropriate, shall return within seven (7) days of the termination date, all unamortized Prepayment Funds, Additional Prepayment Funds (which includes without limitation any additional prepayments made after December 5, 2007), Monetary Consideration and any other amounts due and owing the University."

### AMENDMENTS TO EXHIBIT B TO THE AGREEMENT

The following shall be added to the end of subpart "a" of the first paragraph of Exhibit B: "The University shall deposit or cause to be deposited with BQHC or Caritas on or before February 28,

5198542.3
4471/20937-004 Current/10820242v2

Received Time Feb. 28.   4:17PM

7185581818          Administration                                                                    17:58:01      02-28-2008          3/10

2008, by wire or such other commercially reasonable manner as may be agreed upon by the
Parties, an additional $3,000,000 US Dollars. The University shall deposit or cause to be
deposited with BQHC or Caritas on or before April 1, 2008, by wire or such other commercially
reasonable manner as may be agreed upon by the Parties, an additional $1,000,000 US Dollars;
provided, that BQHC is not in breach at such time of any material obligation under the
Agreement, as amended, or this Amendment following the University's delivery of written notice
to BQHC of such breach. If, on April 1, 2008, BQHC is in breach of any material obligation
under the Agreement, as amended, or this Amendment following the delivery of such notice by
the University to BQHC, then the deposit of the additional $1,000,000 US Dollars will be
deferred until BQHC has cured such breach to the reasonable satisfaction of the University;
provided, that BQHC shall forfeit the additional $1,000,000 US Dollars if such breach remains
uncured for thirty (30) days following the delivery by the University of its written notice of such
breach (unless such thirty (30) day cure period is mutually extended in writing by the Parties, or
unless the breach cannot reasonably be cured within such thirty (30) day cure period and BQHC
or Caritas has begun effectuating a cure within such thirty (30) days and uses commercially
reasonable efforts to complete the cure. For the avoidance of doubt, BQHC's obligation under
this Amendment to provide the University with a minimum of one hundred thirty five (135) core
clerkship slots shall constitute a "material obligation" of BQHC.

The third paragraph of Exhibit B, including the table, shall be deleted and replaced with the
following:

"BQHC guarantees that the Hospitals shall provide the University with a minimum of
one hundred thirty five (135) core clerkship slots, beginning March 3, 2008, allocated as
follows:

| | |
|---|---|
| Surgery | 46 |
| Medicine | 44 |
| OB/GYN | 17 |
| Family Medicine | 18 |
| Psychiatry | 10 |

Desirous of being able to provide the entire one hundred thirty five (135) core clerkship
slots listed above and recognizing the Hospitals temporary limited capacity to provide all
one hundred thirty five (135) core clerkship slots, BQHC guarantees that, during the
period of time the Hospitals are unable to deliver all one hundred thirty five (135) core
clerkship slots due to capacity limitations at the Hospitals (the "Interim Period"), on
March 3, 2008, (a) the Hospitals shall provide the University with the following one
hundred (100) core clerkship slots, allocated as follows:

| | |
|---|---|
| Surgery (on-going) | 20 |
| Medicine (on-going) | 20 |
| OB/GYN (new) | 20 |
| Family Medicine (new) | 20 |
| Psychiatry (new) | 20 |

and (b) pursuant to the terms of that certain letter agreement, dated as of the date hereof,
by and between BQHC and the University, BQHC shall deliver thirty five (35) core
clerkship slots at Wyckoff Heights Medical Center ("Wyckoff") to replace the remaining
core clerkship slots the Hospitals are unable to deliver at such time. Following the
expiration of the Interim Period, but not later than the commencement of the first clinical

2

5198542.3
4471/20937-004 Current/10820242v2

Received Time Feb. 28.   4:17PM

7185581818        Administration

rotations scheduled immediately following the expiration of the Interim Period, BQHC will, through the Hospitals, deliver one hundred thirty five (135) core clerkship slots to Ross as set forth in the first allocation listed above.

BQHC represents that, to the best of its knowledge, and except as set forth in the paragraph below entitled "Litigation," there are no impediments or obstacles that would inhibit its ability to deliver on March 3, 2008 the one hundred thirty five (135) core clerkship slots as provided in this Amendment.

The fourth paragraph of Exhibit B shall be deleted and replaced with the following: "In addition, BQHC further guarantees that the Hospitals shall provide the University with a minimum of one hundred thirty five (135) elective clerkship slots during the term of the Agreement, as amended, and the term of the three year option period, to the extent the Option is exercised by the University, in each case to be allocated in accordance with the mutual agreement of the Parties."

The fifth paragraph of Exhibit B shall be deleted and replaced with the following: "The clerkship rate under this Agreement shall be a fixed $325 per student per week for the first year of the term of this Agreement, commencing March 3, 2008. The clerkship rate shall be increased each year thereafter (commencing on March 1, 2009) by a half of the percentage increase, if any, in the "CPI" (as defined below) from the first day of the immediately preceding year to the first day of the year in which the clerkship rate is being increased; The "CPI" means the Consumer Price Index for All Urban Consumers (CPI-U) in the then most recently ended federal fiscal year, as determined by the Bureau or Labor Statistics of the United States Department of Labor. The Parties agree that the University shall pay the clerkship rate for all guaranteed clerkships, whether or not the University fills such clerkships."

The seventh paragraph of Exhibit B is hereby amended whereby the annual secretarial support of $36,000 will increase to $60,000, effective on the earlier of March 3, 2008 or when the Hospitals shall have delivered to Ross all one hundred thirty five (135) core clerkship slots as provided herein.

In the event that BQHC enters into bankruptcy proceedings or receivership, the Hospitals will make every effort to continue to provide all contracted services during this period. Once a financial settlement has been made with all creditors (including the University), the weekly clerkship rate shall be reduced by the same percentage as the debts to other creditors have been reduced. As an example, if the bankruptcy court settlement is determined to be $0.50 on a $1.00, the weekly clerkship fee will be reduced from $325/week to $162.50/week for the remainder of the contract term.

**LITIGATION**

The Parties acknowledge that American University of the Caribbean ("AUC") has commenced a lawsuit against Caritas and BQHC, in the United States District Court for the Southern District of Florida, entitled, *American University of the Caribbean, et al. v. Caritas Healthcare, Inc., et al.* (Case No. 08-20374), seeking to enjoin Caritas from terminating its relationship with AUC. The Parties Caritas and BQHC deny the material allegations of the complaint in that action. The Parties agree that if the court in that matter, or any other court of competent jurisdiction, enjoins Caritas from terminating its relationship with AUC or enters any other order that results in Caritas and/or BQHC not performing the transactions contemplated by this Amendment, and if as a result of such injunction or other court order BQHC is unable to provide one hundred thirty five (135) core

3

Received Time Feb. 28.   4:17PM

17:58:44    02-28-2008
7185581818          Administration

clerkship slots to Ross as guaranteed hereunder, then (a) Caritas or BQHC, as appropriate, shall promptly (but in no event later than seven (7) days following the entry of such injunction or order) return to the University all Pre-payment funds from the first amendment and second amendment on a pro rated basis, based upon the actual number of core rotations provided, and (b) if BQHC is unable to provide more than one hundred ten (110) core clerkship spots, this Amendment shall automatically terminate and be of no further force and effect, except with respect to the following indemnification provision.

For example, if it is determined that the University:

1.  will go back to its original 50 core clerkship spots pursuant to the Agreement, then all funds paid to BQHC pursuant to the first amendment to the Agreement, dated December 5, 2007, ($4 million) and this Amendment ($3 million +$1 million) must be returned to the University within seven (7) days;

2.  will have 100 core clerkship spots, then a pro rating of funds for the first amendment to the Agreement, dated December 5, 2007, will be:

    (50 new/60 contracted new) = 0.833 proportion of cores spots actually provided

    0.833 times $4 million = $3.332 million pro rated adjustment

    $4 million less $3.332 million = $668,000 refund to the University along with all monies from this Amendment ($4 million) within seven (7) days;

3.  will have 120 core clerkship spots, then a pro rating of the funds for this Amendment will be:

    (10 new/25 contracted new) = 0.40 proportion of cores spots actually provided

    0.4 times 4 million = $1.6 million

    $4 million less $1.6 million = $2.4 million refund to the University within seven (7) days.

## INDEMNIFICATION

BQHC (and its affiliates, successors and assigns, as applicable) agrees to indemnify and hold harmless the University, its affiliates and any agents, servants, officers, directors and employees of the University or its affiliates (collectively, the "Indemnified Parties") from and against any and all liability, claim, allegation, administrative action, cause of action, suit, damages, losses, costs and expenses (including, but not limited to, any costs and expenses of investigation and settlement and reasonable attorneys' fees and expenses) (collectively, "Claims") that arise out of any claim, action or suit brought against any of the Indemnified Parties by AUC (or any of its students or affiliates) based upon or in connection with the transactions contemplated under the Agreement, as amended, or this Amendment. This indemnity provision shall survive the termination, cancellation or expiration of the Agreement, as amended, and this Amendment. The University agrees to give BQHC prompt written notice of any Claims or the discovery of a fact upon which any of the Indemnified Parties intends to base a request for indemnification under this paragraph. The Indemnified Parties shall furnish to BQHC copies of all papers and official documents received in respect of any Claims. BQHC shall have the sole right to control the

4

Received Time Feb. 28.    4:17PM

7185581818                Administration

defense, settlement and/or trial of all Claims, provided that (a) BQHC uses counsel acceptable to the University in its reasonable discretion; (b) BQHC shall not settle any Claims without the prior written consent of the Indemnified Parties, which consent shall not be unreasonably withheld; and (c) the Indemnified Parties shall have the right to reasonably participate in any such defense at their sole cost and expense.  The parties agree that if the Indemnified Parties withhold their consent to a monetary settlement recommended by BQHC (the "Rejected Settlement") and the Claim results in a settlement or judgment that is for an amount greater than the Rejected Settlement, then the Indemnified Parties shall be responsible for the amount by which such settlement or judgment exceeds the amount of the Rejected Settlement, as well as all costs of defending the Claim arising from and after the date of the Rejected Settlement.  The parties further agree that the University has no objection to the law firm of Proskauer Rose LLP being used by BQHC to defend an Indemnifiable Claim hereunder, and BQHC has no objection to using the law firm of Mayer Brown LLP if Proskauer Rose LLP is unable to defend an Indemnifiable Claim due to a conflict.

THIS AMENDMENT IS SIGNED AND DATED AS FOLLOWS:

For Brooklyn Queens Health Care. Inc.

Julius Romero,
AVP Medical Education
Date:

Thomas W. Singleton
Chief Executive Officer
Date:

For Ross University School of Medicine School
of Veterinary Medicine Limited

Nancy Perri, MD,
Vice President Academic Affairs
Date: _____, _____, _____

John T. St. James
Vice President, Chief Financial Officer
Date: 2/28/2008

5

5198542.3
4471/20937-004 Current/108202A2v2

7185581818          Administration



St. John's Queens Hospital
90-02 Queens Boulevard
Elmhurst, NY 11373
(718) 558-1000

Mary Immaculate Hospital
152-11 89th Avenue
Jamaica, NY 11432
(718) 558-2000

February 28, 2008

Ross University School of Medicine, School
of Veterinary Medicine, Limited
499 Thornall Street-10ᵗʰ Floor
Edison, NJ 08837

Attention: Thomas Shepherd, D.H.A.

Dear Dr. Shepherd:

I am writing to confirm that Brooklyn Queens Health Care, Inc. ("BQHC"), Wyckoff Heights Medical Center ("Wyckoff") and Ross University School of Medicine, School of Veterinary Medicine, Limited ("Ross") have agreed to the following:

1. Pursuant to the terms and conditions of that certain Second Amendment (the "Amendment"), dated as of the date hereof, to Affiliation Agreement (the "Agreement") between Ross and BQHC, BQHC guarantees that Mary Immaculate Hospital and Saint John's Queens Hospital in New York (the "Hospitals"), each of which is owned and operated through its BQHC's affiliate, Caritas Health Care, Inc., shall provide the University with a minimum of 135 core clerkship slots beginning March 3, 2008.

2. If BQHC is unable to provide a minimum of 135 core clerkship slots to Ross at the Hospitals beginning March 3, 2008, BQHC shall deliver to Ross on March 3, 2008, subject to the terms and conditions of the Agreement, as amended, and the Amendment, (a) 100 core clerkship slots at the Hospitals and (b) 35 core clerkship slots at Wyckoff, allocated as follows:

**At the Hospitals:**
Surgery (on-going)      20
Medicine (on-going)     20
OB/GYN (new)            20
Family Medicine (new) 20
Psychiatry (new)        20

**At Wyckoff:**
Surgery (new-additional)         14
Medicine (new-additional)        14
OB/GYN (new-additional)           1
Family Medicine (new-additional)  1
Pediatrics (new-additional)       5

5198546.5          *Member* Brooklyn-Queens Health Care

Received Time Feb. 28.   4:17PM

3. The core clerkship slots at Wyckoff (a) shall be made available to Ross until BQHC is able to provide Ross with a minimum of 135 core clerkship slots at the Hospitals in accordance with the terms and conditions of the Agreement, as amended, and the Amendment and (b) are in addition to and are not in any way to be counted against Ross's currently contracted clerkship slots at Wyckoff.

4. If Wyckoff makes such core clerkship slots available, Ross shall pay to Wyckoff $325 per student per week for all 35 slots, whether or not they are used by Ross; provided, that Ross shall not be obligated to pay Wyckoff for any such clerkship slots that are not used as a result of the availability of additional clerkship slots at the Hospitals and which availability results in Ross no longer requiring the use of the clerkship slots at Wyckoff to offset the unavailability of those slots at the Hospitals.

5. BQHC and Wyckoff shall have no obligations under this letter agreement if the Amendment is terminated pursuant to the section therein entitled "Litigation."

Please sign a copy of this letter agreement where indicated below, acknowledging the agreement of Ross to the foregoing, and return it to me at your convenience. Thank you.

Very truly yours,

Thomas W. Singleton
Chief Executive Officer

Agreed to this 28TH day of February, 2008
Ross University School of Medicine, School of Veterinary Medicine, Limited

By: _____
Name: John T. St James
Title: V.P. Chief Financial Officer

Agreed to this __ day of _____, 2008
Wyckoff Heights Medical Center

By _____
Name:
Title: Chief Executive Officer

5198546.5

Received Time Feb. 28.   4:17PM