UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,                      09 Civ. 1410 (KAM) (RLM)

Plaintiff,

– against –

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-----------------------------------------------X

## PLAINTIFF ROSS UNIVERSITY'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO PRECLUDE DEFENDANTS' EXPERT WITNESS

**BAKER & HOSTETLER LLP**

George Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel.: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

**THIS DOCUMENT CONTAINS
CONFIDENTIAL INFORMATION SUBJECT
TO PROTECTIVE ORDER**

## INTRODUCTION

The Court should preclude the testimony of defendants' proffered damages expert, Anthony G. Duffy, because he has conceded his lack of expertise concerning the only topic on which his opinions differ from that of plaintiff's damages expert, *viz.*, the prices that Ross will be required to pay in the future to replace the clinical clerkship rotations lost as a result of the breach of contract at issue here. At deposition, he testified as follows:

> Q. Do you consider yourself an expert about the pricing of clerkship rotations provided by hospitals to medical schools –
> A. No.
> Q. -- for their students?
> A. No.

Deposition of Anthony G. Duffy, at p. 84:9-14, attached hereto as Exhibit 1. The remainder of the opinions that he offers simply parrot those of plaintiff's damages expert. Thus, his testimony should be precluded as unqualified or cumulative.

## APPLICABLE LEGAL STANDARDS

In the Court's determination of whether to preclude testimony of a proffered "expert" under Fed. R. Evid. 702, the issue of "[w]hether a purported expert witness is qualified as such by his or her 'knowledge, skill, experience, training or education' is a 'threshold question' to be resolved prior to the other inquiries." *Arista Records LLC v. Lime Group LLC*, No. 06-5936, 2011 WL 1674796, *2 (S.D.N.Y. May 2, 2011) (citations omitted). The party offering the "expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met." *Id.* at *1. Where the purported expert concedes a lack of expertise, the testimony should be precluded. *See, e.g., Bloom v. ProMaxima Mfg. Co.*, 669 F. Supp. 2d 321, 329 (W.D.N.Y. 2009) ("[I]n its gatekeeper function, [the Court] should not permit [a proffered expert] to testify" where "[a]t his pretrial deposition, [he] candidly conceded that he was not competent to testify on the issue[.]"). Expert testimony is also subject to preclusion

under Fed. R. Evid. 403—which "is particularly important in the context of expert testimony"—where the testimony would result in the "needless presentation of cumulative evidence." *Arista Records LLC*, 2011 WL 1674796 at *4.

## BACKGROUND

From earlier proceedings in this action, the Court is familiar with the basic outline of this breach of contract case. In short, the contract at issue provided that through January 31, 2018, BQHC would cause its subsidiaries St. John's and Mary Immaculate Hospitals (the "Hospitals") to provide a guaranteed number of clinical clerkship rotations for Ross' medical students and, if the Hospitals cease to operate, would provide the clerkships at another of BQHC's facilities. The only such other facility is BQHC's subsidiary Wyckoff Heights Medical Center. The Hospitals filed for bankruptcy in February 2009 and closed in March 2009. Defendants have refused to provide replacement clerkships.

Under the contract: (1) Ross had advanced $13 million in prepayments for clinical clerkship rotations; (2) the prepayment balance bore interest at LIBOR + 1% and was to be reduced at a contractually specified rate per week, per clerkship as clerkships were provided to Ross; and (3) once the prepayment was exhausted, Ross was to pay an agreed rate for clerkships provided through the end of the contract term, January 31, 2018. At the time that the Hospitals closed, over $6 million of the prepayment remained unearned. Following the Hospitals' closure, Ross has paid millions of dollars to other hospitals to obtain replacement clerkships and will be required to do so through the January 31, 2018 end of the contract term.

## ARGUMENT

Ross' damages expert, Elizabeth K. Davis, calculated Ross' damages in three categories: (1) the balance of the prepayments, including interest at the contractually specified rate, that

remains unearned; (2) the incremental cost in excess of the contract rate that Ross spent through June 30, 2011 to replace clerkships lost under the breached contract; and (3) a projection (reduced to present value) of incremental costs in excess of the contract rate that Ross will be required to spend from June 30, 2011 through the January 31, 2018 end of the contract term to replace lost clerkships. Report of Elizabeth K. Davis, attached hereto as Exhibit 2. The exhibit to her report that summarizes the damages calculation is reproduced below:

| Exhibit A Summary of Damages | |
|---|---|
| Outstanding Pre-Payment Balance | $ 6,277,266 |
| Incremental Costs on Replacement Clerkships Through June 30, 2011 | 1,073,501 |
| Present Value of Future Incremental Costs on Replacement Clerkships From July 1, 2011 Through January 31, 2018 | 12,738,735 |
| Total | $ 20,089,501 |

Exhibit 2, Ex. A.

I. **Duffy's Opinions Concerning Prepayment Balance And Past Incremental Cost Of Replacement Clerkships Should Be Precluded As Cumulative.**

Defendants' proffered damages expert, Anthony G. Duffy, calculated Ross' damages in a nearly-identical manner. Report of Anthony G. Duffy, attached hereto as Exhibit 3. The exhibit to that report that summarizes his damages calculation is reproduced below:

| Exhibit A Summary of Damages | |
|---|---|
| Outstanding Pre-Payment Balance [1] | $ 6,277,266 |
| Incremental Costs on Replacement Clerkships through June 30, 2011 [1] | 1,073,501 |
| Present Value of Future Incremental Costs on Replacement Clerkships from July 1, 2011 through January 31, 2018 [2] | 5,525,367 |
| Total | $ 12,876,134 |
| Sources: | |
| 1. The Davis Report | |
| 2. Calculated in Exhibit B | |

Exhibit 3, Ex. A.

3

Duffy's opinion concerning the amount of the first two categories of damages (Outstanding Pre-Payment Balance and Incremental Costs on Replacement Clerkships through June 30, 2011) is identical to the amounts calculated by Ross' damages expert. Indeed, at his deposition, Duffy conceded that while he reviewed Ms. Davis' calculations of these elements of damages, he did not evaluate their reasonableness, had no criticism of the calculations, and simply plugged Ms. Davis' amounts into his damages calculations. Ex. 1 at pp. 43:11-46:19, 83:6-17.

This cumulative testimony, which merely parrots the work of Ross' expert, should be precluded.

## II. Duffy's Opinions About Future Incremental Costs Of Replacement Clerkships Should Be Precluded Because He Conceded His Lack Of Qualification Regarding Rates For Clerkships.

While there is one component of the damages calculation on which Duffy offers an opinion that is different than that of Ross' damages expert, it is a component on which Duffy has conceded that he lacks expertise. Duffy opined that the amount of the Present Value of Future Incremental Costs on Replacement Clerkships from July 1, 2011 through January 31, 2018, the end of the contract term, is lower than the amount calculated by Ross' expert. However, as we noted at the outset, at his deposition he conceded that he *is not* an expert concerning rates for clerkships. Ex. 1 at p. 84:9-14. Because the only different opinion expressed by Duffy is in an area where he concedes a lack of expertise to opine, the Court should preclude his testimony.

Inasmuch as Duffy's opinion concerning the present value of incremental future costs consists solely of plugging a different rate into the formula created by Ross' expert, a brief description of Ms. Davis' work may be helpful to the Court (a more detailed description is contained in her attached report). Using Ross' business records, Ms. Davis and her staff analyzed the last five years of Ross' payments to the nearly 700 different hospitals and health

care systems from whom Ross has obtained clerkships. From that data, she calculated, *inter alia*: (1) the weighted average rate as of June 30, 2011 (the end of Ross' fiscal year) that Ross paid for the two types of clerkships at issue here, core clerkships and elective clerkships provided in New York; (2) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding three-year period; and (3) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding five-year period. She and her staff also interviewed the relevant employees at Ross and researched the publicly available information about rates charged by New York hospitals for medical school clerkships.

Ms. Davis then calculated the present value of future incremental replacement costs by: multiplying for each remaining future year of the contract term the number of clerkships guaranteed under the contract by the weighted average rates that Ross paid for clerkships in New York (increased each year by the 3-year compound annual growth rate—which was the lower of the two calculated growth rates); subtracting from that result the contract price for that same number of clerkships; and then reducing the total to present value. The details of the calculation are set forth in Exhibit D to her report.

Duffy arrived at his results by simply plugging into Ms. Davis' formula a "compound annual growth rate" that was equal to a projected increase in the Consumer Price Index for All Urban Consumers ("CPI-U"). Ex. 1 at p. 53:6-15. At his deposition, Duffy conceded the obvious, *viz.*, that the future price of a particular good or service may differ from the increase in CPI-U (*id.* at p. 63:8-16), and as noted at the outset, conceded that he had no expertise about rates charged for clerkships (*id.* at p. 84:9-14). Thus, Duffy does not have expertise sufficient under Rule 702 to opine that the increase in CPI-U was a reasonable projection for the increase in future rates for the clerkships at issue. Indeed, at his deposition, Duffy expressly conceded

5

that, "I don't have the ability to check and see if [this projection for future incremental cost is] reasonable." *Id.* at p. 77:4-23.[1] In short, the only work that Duffy did here was to take the formula that Ross' expert created for projecting the present value of future incremental costs and arrive at a lower total by plugging into that formula a rate of future price increase about which he is admittedly unqualified to opine.

The Court should plainly preclude this testimony.

## CONCLUSION

The Court should preclude the testimony of Anthony G. Duffy. His proposed testimony as to the unearned balance of prepayments and past incremental costs is cumulative of that of plaintiff's damages expert. He lacks qualifications to opine about future incremental costs.

Respectfully submitted,

**BAKER & HOSTETLER LLP**

/ s/ George Tzanetopoulos

|  |  |
|---|---|
| Sammi Malek | George Tzanetopoulos |
| 45 Rockefeller Plaza, 11th Floor | 191 North Wacker Drive, Suite 3100 |
| New York, New York 10111 | Chicago, Illinois, 60606 |
| Tel: (212) 589-4200 | Tel: (312) 416-6200 |
| Fax: (212) 589-4201 | Fax: (312) 416-6201 |
| smalek@bakerlaw.com | gtzanetopoulos@bakerlaw.com |

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

---

[1] In addition to his admitted lack of qualifications to project future rates for these clerkships, Duffy's projection here was without reasonable basis. He conceded that, *inter alia,* the **only** thing that he did to learn about the prices for these clerkship rotations was to review the report of plaintiff's damages expert. Ex. 1 at p. 67:19– 68:3. He did not: review the underlying transactional documents that show the prices that Ross has paid to hospitals for these clerkships (*id.* at p. 32:4–25); perform any research of his own or even read the publicly available articles concerning prices that plaintiff's expert cited in her report (*id.* at p. 68:4-9); or obtain from defendant Wyckoff information about the prices that Wyckoff charges other medical schools for clerkships (*id.* at p. 68:17-20).