UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X

ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                                    09 Civ. 1410 (KAM) (RLM)

Plaintiff,

– against –

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-----------------------------------------------X

## PLAINTIFF ROSS UNIVERSITY'S RESPONSE TO DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

**BAKER & HOSTETLER LLP**

George Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois, 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

# TABLE OF AUTHORITIES

Page

**Cases**

*American Fuel Corp. v. Utah Energy Development Co.*,
   122 F.3d 130 (2nd Cir. 1997) ........................................................ 28

*American Protein Corp. v. AB Volvo*,
   844 F.2d 56 (2nd Cir. 1988) ................................................... 25, 28

*Anderson v. City of New York*,
   --- F. Supp. 2d ----, No. 06-5363, 2011 WL 4403622 (E.D.N.Y. Sept. 20, 2011) ................... 3

*Bogosian v. All American Concessions*,
   No. 06-1633, 2011 WL 4460362 (E.D.N.Y. Sept. 26, 2011) ................................ 31

*Brito v. DILP Corp.*,
   282 A.D.2d 320, 723 N.Y.S.2d 459 (1st Dept. April 19, 2001) ............................ 29

*Charlebois v. J.M. Weller Assocs., Inc.*,
   72 N.Y.2d, 587, 535 N.Y.S.2d 356 (1988) ............................................ 15

*Connecticut Nat'l Bank v. Trans World Airlines, Inc.*,
   762 F. Supp. 76 (S.D.N.Y. 1991) .................................................... 4

*Del Turco v. Speedwell Design*,
   623 F. Supp. 2d 319 (E.D.N.Y. 2009) (Matsumoto, J.) ................................. 3

*First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P.*,
   300 A.D.2d 112, 755 N.Y.S.2d 63 (1st Dept. 2002) .................................. 25

*Goya Foods, Inc. v. Unanue*,
   233 F.3d 38 (1st Cir. 2000) ........................................................ 30

*Healthnet Systems Consulting, Inc. v. Brooklyn-Queens Healthcare, Inc., et al.*,
   2009 N.Y. Misc. Lexis 4239 (Sup. Ct. Queens Co. July 27, 2009) ...................... 16

*Int'l Equity Inv., Inc. v. Opportunity Equity Partners, Ltd.*,
   475 F. Supp. 2d 456 (S.D.N.Y. 2007) ............................................... 26

*Johnson v. Medisys Health Network*,
   No. 10-1596, 2011 WL 5222917 (E.D.N.Y. June 1, 2011) ............................. 28

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) ............................................... 29

*Network Enters., Inc. v. APBA Offshore Prods., Inc.*,
   264 Fed. Appx. 36 (2nd Cir. 2008) ................................................. 31

*Solow v. Domestic Stone Erectors, Inc.*,
    269 A.D.2d 199, 703 N.Y.S.2d 94 (1st Dept. 2000)...................................................... 29

*Tetra Tech., Inc. v. Harter*,
    823 F. Supp. 1116 (S.D.N.Y. 1993) ......................................................................... 14

*TNS Holdings, Inc. v. MKI Sec. Corp.*,
    92 N.Y.2d 335, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998)...................................... 30

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131 (2nd Cir. 1991)............................................................................ passim

## STATUTES & REGULATIONS

N.Y. Bus. Corp. L. § 203; *Chiat/Day Direct Marketing, Inc. v. National
    Car Rental System, Inc.*, No. 93-2717, 1994 WL 524982 (S.D.N.Y. Sept. 27, 1994) ............ 30

10 N.Y.C.R.R § 405.2.............................................................................................. 15

10 N.Y.C.R.R. § 405.3............................................................................................. 15

8 N.Y.C.R.R. § 3.2.................................................................................................. 14

8 N.Y.C.R.R. § 59.9................................................................................................ 14

8 N.Y.C.R.R. § 60.2................................................................................................ 14

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SUMMARY JUDGMENT STANDARD ............................................................. 3

ARGUMENT ........................................................................................................ 3

I.    Summary judgment is inappropriate on Ross' prayer for specific performance .............. 3

    A.    Facts relevant to the claim for specific performance ............................................. 4

    B.    This Court cannot adjudicate the remedy of specific performance before deciding Ross' veil piercing claim ..................................................................... 13

    C.    New York's Public Health Law does not prohibit the Court from ordering BQHC to cause Wyckoff to provide clerkships .................................................. 14

    D.    Defendants cannot avoid specific performance on the ground that they entered into additional clerkship contracts ......................................................... 17

II.    Issues of fact preclude summary judgment on Ross' veil-piercing claim ...................... 17

    A.    Facts relevant to veil piercing .............................................................................. 17

    B.    The Record Evidence More Than Supports A Jury Finding For Piercing ........... 24

    C.    Defendants' arguments improperly assume factual disputes in favor of Defendants and are wrong on the law ................................................................. 27

    D.    There is sufficient evidence from which a jury could conclude that Wyckoff used BQHC to wrongfully obtain money from Ross ............................ 29

CONCLUSION ................................................................................................... 30

## INTRODUCTION

Plaintiff Ross University School of Medicine. Ltd. ("Ross") is a medical school with a campus located in the Caribbean nation of Dominica.  Defendant Brooklyn Queens Health Care, Inc. ("BQHC") is the sole member of defendant Wyckoff Heights Medical Center ("Wyckoff"), a large hospital in New York.  Ross and Wyckoff have long been parties to a contract in which Ross pays Wyckoff to provide for clinical clerkship rotations at Wyckoff for Ross' students.

When Wyckoff decided to purchase St. John's and Mary Immaculate Hospitals (the "Hospitals") out of bankruptcy, Wyckoff's President and CEO proposed a transaction in which Ross would advance a substantial prepayment in exchange for clerkships at the Hospitals for a guaranteed term and rate.  Wyckoff in fact purchased the Hospitals and set up a hospital group that consisted of BQHC as the sole member of both Wyckoff and a newly-formed entity called Caritas Healthcare Planning, Inc. ("Caritas") that held title to the Hospitals.

The parties ultimately agreed to a written contract.  The basic financial terms of the agreement were that Ross would prepay $5 million for a guaranteed minimum number of clerkships at the Hospitals.  The balance of the prepayment was to be reduced at an agreed rate as clerkships were provided.  The unamortized balance was to bear interest.  The contract anticipated that the prepayment would be exhausted before the contract expired and provided that thereafter Ross would be invoiced and pay at an agreed rate for clerkships delivered during the remaining term of the contract.  The contract was amended twice to add $8 million more in prepayments, increase the number of clerkships guaranteed, and extend the contract term.

During contract negotiations Ross demanded and defendants agreed that a "contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is (sic) not provided to Ross University during the terms of this agreement."  When Ross inquired about the relationship of

the Wyckoff-affiliated entities, defendants represented that "Caritas encompasses Saint John's Queens Hospital and Mary Immaculate Hospital under the auspices of Brooklyn Queens Healthcare (BQHC), which also operates Wyckoff Heights Medical Center."

Accordingly, the final contract includes the following provision that is at the center of this dispute (hereinafter the "Guaranty Clause"):

> In the event the Hospitals are not operative, and the University is not in breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.

It is undisputed that Wyckoff is the only other BQHC facility that can provide these clerkships.[1]

Events unfolded as contemplated by the Guaranty Clause. Caritas filed for bankruptcy and the Hospitals closed. Millions of dollars of the prepayments remain unearned, and millions of dollars more worth of clerkships remain to be provided following exhaustion of the prepayments. BQHC and Wyckoff, however, refuse to provide the promised clerkships.

Ross brought the present action for breach of contract. BQHC apparently is and always was without assets other than its interest in Caritas and Wyckoff. Ross seeks, *inter alia*, an order of specific performance requiring the provision of clerkships at Wyckoff and an award "piercing the corporate veil" to require Wyckoff to pay for Ross' damages.

---

[1] Defendants' had held themselves out to other medical schools in a similar manner. The contract between Defendants and the American University of the Caribbean ("AUC"), the other school that entered into a prepaid transaction with Defendants for clerkships at the Hospitals, provides that "Caritas is "a wholly-owned subsidiary of Brooklyn Queens Healthcare, Inc. ("Brooklyn Queens")" and "Brooklyn Queens also operates Wyckoff Heights Medical Center." The AUC contract contains its own Guaranty Clause in which BQHC promised to provide back up clerkships at Wyckoff: "Brooklyn Queens acknowledges and agrees, on behalf of its wholly-owned subsidiary Wyckoff, that a Default . . . by Brooklyn Queens, Caritas, [and the Hospitals] (individually and collectively) will obligate Wyckoff to assume responsibility for" the contract obligations."

2

Defendants' motion for partial summary judgment contends that there is insufficient evidence from which a jury could find for veil piercing and that specific performance cannot be ordered because, notwithstanding the plain language of the Guaranty Clause, BQHC did not and could not agree to provide clerkships at Wyckoff.  Defendants' motion should be denied because, as discussed in detail below, the evidence in Ross' favor on both points is overwhelming.  It is certainly sufficient to create a genuine issues of material fact that precludes defendants' motion.

## SUMMARY JUDGMENT STANDARD

"Under Federal Rule of Civil Procedure 56, the court may grant summary judgment only if, after taking into account all the pleadings, the discovery and disclosure materials on file, and any affidavits, the movant can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Anderson v. City of New York*, --- F. Supp. 2d ----, No. 06-5363, 2011 WL 4403622, *3 (E.D.N.Y. Sept. 20, 2011) (*quoting* Fed. R. Civ. P. 56(c)(2)) (Matsumoto, J.).  "In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried."  *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 333 (E.D.N.Y. 2009) (Matsumoto, J.).  "The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party."  *Id.*  "The moving party carries the burden of demonstrating the absence of a genuine issue of material fact."  *Id.*

## ARGUMENT

**I.      Summary judgment is inappropriate on Ross' prayer for specific performance.**

Ross seeks specific performance of the Guaranty Clause because, as defendants admit, BQHC is unlikely to satisfy any award of damages.  *See Connecticut Nat'l Bank v. Trans World Airlines, Inc.*, 762 F. Supp. 76, 79–80 (S.D.N.Y. 1991) (specific performance will be ordered if

"the plaintiff has no adequate remedy at law" for a defendant's breach of contract); *Restatement (Second) of Contracts* § 360 (2010) (plaintiff has no adequate remedy at law if there is a "likelihood that an award of damages could not be collected").  Defendants assert that this Court may not grant specific performance because Article 28 of New York's Public Health Law precludes BQHC from contracting to cause Wyckoff to provide clerkships.  Defs.' Mem. at 23-27.  Defendants' argument is unavailing for several reasons: first, it is premature to resolve this issue before Ross' veil-piercing claim is decided at trial; further, nothing in New York's Public Health Law bars this Court from ordering specific performance of the contract term; and finally, the evidence at a minimum raises genuine issues of material fact on the question.

### A.     Facts relevant to the claim for specific performance.

The fact that BQHC indisputably entered into the contract with Ross that included the Guaranty Clause, signed two amendments that incorporate that clause by reference, and collected nearly $13 million from Ross those contracts presents an insurmountable hurdle to the argument that BQHC would not enter into such a contract.  Defendants attempt to sidestep this hurdle by suggesting that Ross slipped the Guaranty Clause into the contract the day before it was signed.

The record flatly contradicts defendants' version of events.  Although we are unaware of any authority holding that contractual terms agreed upon the day before a contract is signed are any less binding than those agreed upon earlier in negotiations, the evidence here demonstrates that Ross demanded and defendants agreed to the inclusion of a Guaranty Clause weeks before the final contract was approved by Wyckoff's CEO and legal counsel, and then executed.

Wyckoff's Assistant Vice President for Medical Education, Julius Romero, was assigned to negotiate with Ross, but Wyckoff's CEO, Dominick Gio and its COO, Harold McDonald, retained decision making authority. So, Romero obtained their prior approval before sending proposals or counterproposals to Ross. Pl. ¶¶16, 18, 19.[2] Vice President for Academic Affairs Dr. Nancy Perri, CFO John St. James, and President Dr. Tom Shepherd negotiated on Ross' behalf. Pl. ¶¶16, 29, 34. St. James testified that during the negotiations:

> I asked for some back up. Let's say if the new entity could not deliver what would our fallback position be. They were asking us for millions of dollars, and we want to mitigate our risk. One was the back up plan to take care of our students if either of the hospitals would not be able to deliver the rotations.

Pl. ¶¶28, 29. As St. James further explained: "We wanted to be protected. If we are going to give five million dollars, we wanted to make sure out students would be protected. This is the way we wanted a back up. . . I told him [Romero] I wanted it in writing." Pl. ¶29.

On December 3, 2006, following one of the conversations about which Mr. St. James testified, Romero sent an email to Ross' Dr. Perri in which he wrote:

> I've informed Rich and [Wyckoff's COO] Harold [McDonald] that the draft agreement will be coming from your office with approval from John St. James and Tom Shepherd. . . . *In addition, as a backup, I have designed a contingency plan in effect for at least the next four years at Wyckoff, that can collateralize any committed core clerkship at Caritas. This can be expressed or implied on the business agreement.*

Pl. ¶30. On December 16, 2006, Romero sent another confirmation to Mr. St. James (with a copy to McDonald), in which Romero agreed that: "A contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any

---

[2] Citations to Plaintiff's Additional Facts Requiring the Denial of Partial Summary Judgment are made as "Pl. ¶___."

guaranteed, prepaid core clerkship at Caritas is (sic) not provided to Ross University during the terms of this agreement." Pl. ¶31.

Inasmuch as the parties' discussions had included negotiations over obligations flowing from Wyckoff, on December 20, 2006, Dr. Perri wrote an email to Romero, asking "The organization now called 'Caritas'; does that include Wyckoff in addition to SJ [St. John's] and MI [Mary Immaculate]?" Pl. ¶33. Romero sent an email response later on December 20th stating that, "Caritas encompasses Saint John's Queens Hospital and Mary Immaculate Hospital under the auspices of Brooklyn Queens Healthcare (BQHC), which also operates Wyckoff Heights Medical Center." *Id.*

Romero's representations that Caritas was "under the auspices of BQHC" and "that BQHC operates Wyckoff" caused Ross to insist that BQHC be made the contracting party. Thus, on December 22, 2006, two days after Romero emailed Dr. Perri, Ross President Dr. Shepherd sent a revised and redlined draft contract to Wyckoff's CEO, Dominick Gio, that incorporated (and highlighted) the changes to the contract that flowed from Romero's representation about the nature of the Wyckoff affiliated entities. Pl. ¶34. Consistent with Romero's representations about the entities, this draft made the contract one between Ross and "Brooklyn Queens Healthcare, Inc." and conformed the operative provisions of the contract to reflect what Romero had said about BQHC, Caritas, and Wyckoff. Pl. ¶¶35-36. No one from defendants' side of the negotiations objected to doing so and all subsequent drafts were in this form. Pl. ¶37.

The record also contradicts defendants' contention that the Guaranty Clause cannot be enforced because Romero demanded during negotiations that references to Wyckoff be removed from the contract. The evidence shows that Romero's demand was wholly unrelated to the

Guaranty Clause, and in fact concerned Ross' attempt to freeze the price for clerkships under the

parties' preexisting contract with Wyckoff. Pl. ¶¶38-45. ("[Ross] want[ed] a price freeze to

apply at Wyckoff, not only with the Caritas rotation[s] . . . We wanted the current price at

Wyckoff to be frozen for a period of years"). In an email to Dr. Shepherd, Romero said that

Wyckoff would agree to the price freeze, but wanted that portion of the bargain not to be

documented in the contract for clerkships at the Hospitals:

> The Clinical Affiliation Agreement with Wyckoff Heights Medical Center is
> current, and separate from the Caritas-Ross Agreement. The clerkship rate at
> WHMC is $312.50 per week. On a separate executed agreement or addendum to
> the existing WHMC-Ross Agreement, this clerkship rate can be locked in for four
> years from January 1, 2007 – December 31, 2010. As discussed, it is best that this
> item not hinge on the Caritas-Ross Agreement, but rather once executed, a
> goodwill gesture from the BQHC/Wyckoff leadership.

Pl. ¶40.

Indeed, the draft contracts exchanged between the parties confirm that such references to

Wyckoff relate only to the price freeze and that defendants very intentionally agreed to the

Guaranty Clause. On December 27, Dr. Shepherd sent a redlined draft contract to Romero that

specifically highlighted several additions that Ross wanted included in the final draft. Pl. ¶¶41-

44. The first addition was another attempt insert the Wyckoff price freeze at Exhibit B,

paragraph (b)(i) of the draft. Pl. ¶42. The other two additions, inserted elsewhere, were items on

which the parties had agreed, but had not made their way into a draft contract: (1) a provision

permitting Ross to offset promised payments for library support with interest due on its

prepayment; and (2) the Guaranty Clause. Pl. ¶¶43-44.

Romero received instructions from Wyckoff's CEO, Dominick Gio, to tell Ross that all

of Ross's proposed changes were acceptable, except for the proposed addition of the provision in

Exhibit B, (b)(i) concerning the price freeze for clerkships at Wyckoff. Pl. ¶45. Romero then

emailed Dr. Shepherd, with copies to McDonald and Gio: "The file document was reviewed and

7

determined to be acceptable EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b)(i)]. The Caritas agreement remains separate from the Wyckoff agreement. The agreement without the referenced item will be signed and faxed to Nancy Perri's office today for her and John St. James' signatures." Pl. ¶¶45-46. Ross agreed to remove Wyckoff price freeze language in Exhibit B(b)(i) and sent to Romero a revised final draft with Exhibit B(b)(i) removed. Pl. ¶47. This draft is the one that the parties executed. Wyckoff COO McDonald signed for BQHC. Pl. 48-49.

The testimony of Romero and McDonald about BQHC's execution of the final contract also contradicts defendants' contention that BQHC did not and could not commit Wyckoff to provide clerkships under this agreement. Romero testified that "agreements were submitted to McDonald and Hoffman [Wyckoff General Counsel] at the time." Pl. ¶46. He also testified that he delivered the final draft to Gio and McDonald, received word that the signed agreement was ready for him to pick up, and then faxed the executed contract to Ross. Pl. ¶48. McDonald did not specifically recall this particular contract but testified that it was his regular practice to obtain the concurrence of both Gio *and* Wyckoff's legal counsel before signing contracts; moreover, he confirmed that he would not have signed a contract like this one "if it hadn't first been reviewed by counsel and Mr. Gio." Pl. ¶49. Thus, the finder of fact will be well supported in concluding that, notwithstanding the affidavits submitted by Wyckoff's trustees and general counsel, defendants' highest levels of management and legal counsel agreed to the Guaranty Clause. And on this motion, Ross is entitled have all such disputes resolved in its favor.

Likewise, BQHC's execution of the contract amendments contradicts defendants' contentions. Thomas Singleton was the Chief Restructuring Officer for BQHC, Wyckoff, and Caritas at the time the amendments were executed. Pl. ¶55. Singleton directed Paul Goldberg,

BQHC's then-CFO, and Romero to sign the First Amendment. Pl. ¶59. Singleton and Romero signed the Second Amendment. Pl. ¶60. Defendants dismiss Singleton as a "Consultant" and contend that he did not have authority to sign the contracts. The evidence to the contrary is overwhelming.

Following the acquisition, all three hospitals were in financial trouble and they sought monetary aid from the State of New York. Pl. ¶51. The State agreed to provide assistance, but only if an independent restructuring officer was retained. Pl. ¶¶52-54. Accordingly, Singleton from FTI Cambio was appointed Chief Restructuring Officer of BQHC, Wyckoff, and Caritas. Pl. ¶55. The State demanded—and BQHC, Wyckoff, and Caritas agreed—that Singleton would have control of the organizations. Pl. ¶¶52-54. Indeed, Emil Rucigay, Chairman of the boards for BQHC, Wyckoff, and Caritas sent a memo to all senior personnel at the three entities stating that "[a]s CRO, Tom Singleton has been charged with the responsibility to assume full and overall management authority of BQHC, Wyckoff, and Caritas. Pl. ¶63. In addition, Chairman Rucigay told Singleton "[he had] the authority to sign contracts." Pl. ¶¶63, 67-69. Further, "to [Singleton's] recollection, [he] never signed a contract at BQHC, Caritas or Wyckoff without the approval of Rick Zall [Proskauer Rose partner and Wyckoff's outside counsel] and Mr. Rucigay, and they would tell [him] whether it had to go to the board or not." Pl. ¶¶69, 72.

The contemporaneous documents support Singleton's account that he had authority to enter into the contract amendments. Wyckoff Board meeting minutes from December 2007 show that Singleton reported that he had entered into the First Amendment to the Ross/BQHC contract and that the approximately $4 million prepayment under that amendment had been received. Pl. ¶¶110-11. Deponents who were at the meeting all testified consistently: No one at the meeting objected to Singleton authorizing execution of the amendment. Indeed, to the extent

there was any discussion about the contract, it consisted of the expressions of gratitude from the board members because the contract resulted in cash "coming into the door." Pl. ¶111.

Likewise, the contemporaneous documents show that Singleton received clearance from defendants' legal counsel before entering into these agreements. Pl. ¶61. Indeed, defendants' in-house attorney Claire Mullally both reviewed the First Amendment on behalf of BQHC and exchanged signature pages with Ross. Pl. ¶62. Defendants' lawyer, Proskauer Rose Senior Counsel Lee Barken, sent drafts of the Second Amendment back and forth from defendants to Ross. Pl. ¶62.

Thus, as with the original contract, a fact-finder can conclude that defendants' highest levels of management and legal counsel concurred in the execution of the Amendments.

Defendants have submitted affidavits of Wyckoff trustees that, in identical language, make two critical assertions. First, that each did not approve the BQHC contract; and second, that "in December 2006, Wyckoff's Board of Trustees was presented with, and consented to the signing of a promissory note with a different medical school (American University of the Caribbean) in which Wyckoff explicitly guaranteed Caritas's obligation to repay an advance of funds if clerkships were not provided by Caritas."[3] *See* Pl.'s Declarations of Vincent Arcuri, John Cook, Adam Figueroa, A.C. Rao, and Emil Rucigay. The evidence shows this second sworn statement to be demonstrably false.

---

[3] Defendants have obviously made these averments in order to try to sidestep the fact that in a similar lawsuit by brought by AUC for breach of the Guaranty Clause in its agreement with Defendants, the U.S. District Court for the Southern District of Florida entered summary judgment on liability and ultimately a nearly $5 million final judgment. Pl. ¶¶23-24.

First, at his deposition board Chairman Rucigay flatly denied that the AUC Promissory Note was even brought to the attention of any board:

> Q.    Was this [AUC] promissory note ever brought to the attention of any of the boards of BQHC, Wyckoff or Caritas before it was signed?
> A.    Not to my knowledge.

Pl. ¶109. Rucigay's contradiction of the affidavits, including his own, by itself creates a triable issue. Further, both board chairman Rucigay and defendants' Rule 30(b)(6) witness, Rajiv Garg, testified that contracts with medical schools for prepaid clerkship arrangements were not in fact ever presented to the Wyckoff board for approval.

> Q.    At any time, when you served on any of these boards, was a prepaid clerkship contract with [a] medical school ever produced to the board, for the board's approval or rejection?
> A.    No.
> Q.    That sort of thing was left to management?
> A.    Yeah, I think so. I think that was Tom Singleton's world.

Pl. ¶109.

Moreover, the contemporaneous evidence shows that the AUC promissory note was never presented to the Wyckoff Board for approval. The note was executed on December 1, 2006 and defendants' records show that AUC wired its $3.5 million prepayment for the transaction that same day. Pl. ¶14. But Wyckoff's board did not meet in December 2006 until December 14th. Pl. ¶110. Obviously, the board could not have granted permission to enter into the promissory note at a meeting that occurred two weeks after it was already executed and paid out. Not surprisingly, the very detailed minutes of this meeting do not anywhere reflect the board's grant of such permission. Pl. ¶110.

Ross is entitled at this stage of the proceedings to have all inferences drawn in its favor. However, even if the Trustees' affidavits are credited on this point, such consent contradicts other averments in defendants' affidavits. Each affidavit denies that BQHC "operated" Wyckoff

11

or that BQHC by contract would or could obligate Wyckoff under a Guaranty Clause.  *See* Pl.'s

Declarations of Arcuri, Cook, Figueroa, Rao, and Rucigay.  However, the AUC promissory note

that Wyckoff's board purportedly approved expressly states that that "***Brooklyn Queens [Health***

***Care, Inc.] also operates Wyckoff Heights Medical Center***."  Pl. ¶11.  .  It also expressly states

that "Brooklyn Queens acknowledges and agrees, ***on behalf of its wholly-owned subsidiary***

***Wyckoff***, that a Default" by Caritas "will obligate Wyckoff."  Pl. ¶12.  Had the Wyckoff Board

in fact approved the note, such approval would create triable issues, including very troubling

issues of credibility, that defeat this motion.

That is not to say, however, that Wyckoff's board was unaware that management had

entered into agreements with Ross and AUC.  The record reflects that the board knew that

management was raising millions of dollars from the schools by executing these contracts and

left the authority to do so with management.  Board minutes from December 2006 note that

"[r]ecent efforts to solicit prepayment of clerkships at Caritas from several medical schools are

being coordinated with [Wyckoff's Division of Graduate Medical Education]."  Pl. ¶110-11.  A

June 2007 report from Wyckoff's president and CEO, Dominick Gio, notes that, "[p]repayment

for clerkships was secured from Ross University and American University of the Caribbean for

Caritas in the amount of $8.5 million . . . All affiliation agreements have been reviewed and

approved by the New York State Education Department."  Pl. ¶110.  And as noted above, the

Wyckoff board expressed its gratitude when Singleton reported to the that he had entered into the

First Amendment to the Ross/BQHC contract.  Pl. ¶14.

In addition, defendants' records consistently show they recognized that the Guaranty

Clause means what it says.  In response to an Singleton's inquiry about the potential downside to

providing Ross more clerkships at the Hospitals in exchange for an additional $4.5 million

prepayment, Romero wrote: "In a worst case scenario, a fall-out by the residency programs or institution will make us responsible for unamortized payments plus interest of up to $9.5M (initial $5M plus $4.5M). ***Slots lost at Caritas are guaranteed at Wyckoff as per both contracts***." Pl. ¶115. Board discussions around the time the Hospitals closed also recognized the obligation. Pl. ¶116. ("Hoffman advised the Board of Trustees of the major contractual obligations of Wyckoff, the temporary Nursing Agency, ***Medical School training (off shore Medical School)***, the Non-Union Pension, and Meditech") (emphasis supplied); Pl. ¶117 (in response to an inquiry "as to Wyckoff's Caritas related contractual obligations," "Hoffman replied that at this time ***there are two which we are aware of; one is a medical school obligation*** and the other is a pension obligation") (emphasis supplied); Pl. ¶118. ("In closing, Mr. Rucigay stated that there are three issues we will concern ourselves with, and follow up on, ***Ross University***, Meditech and the Pension issue") (emphasis supplied).

**B.    This Court cannot adjudicate the remedy of specific performance before deciding Ross' veil piercing claim.**

As a procedural matter, defendants' request for summary judgment is fatally premature. defendants' argument hinges entirely on its contention that because BQHC is not authorized to "operate" a hospital, it has no authority contract to cause Wyckoff to provide clerkships. Defs.' Mem. at 23-27. But defendants overlook the fact that if the jury finds (or the Court directs a verdict) for Ross on the veil piercing claim, then the Court may directly order Wyckoff to make Ross whole by providing clerkships, regardless of Article 28's purported limitations on BQHC. Thus, for this reason alone summary judgment must be denied.

**C.      New York's Public Health Law does not prohibit the Court from ordering BQHC to cause Wyckoff to provide clerkships.**

Further, defendants' motion must be denied because the facts of record strongly support the conclusion that New York's Public Health Law does not prohibit the Court from ordering BQHC to cause Wyckoff to provide clerkships.

Defendants contend that this Court would be enforcing an illegal contract term if it granted Ross specific performance of BQHC's promise to cause Wyckoff provide replacement clerkships. Defs.' Mem. at 23-27. But both the facts and the law favor Ross on this point.

First, even if BQHC lacks the proper credentials to "operate" a hospital, it is clear that BQHC controls Wyckoff's board. Although defendants aver that BQHC's board members do not make up a majority of Wyckoff's board, those same affidavits concede that BQHC can elect and remove the members of Wyckoff's board. Thus, BQHC sits in the same position as any other holding company that enters into contracts to cause controlled subsidiaries to fulfill contractual obligations.

Defendants do not dispute that there is anything unlawful about Wyckoff providing clerkships. Arrangements in which a party without a license to perform a particular act contractually commits to cause a licensed party to perform the regulated act on the contracting party's behalf are common and lawful. *See, e.g.*, *Tetra Tech., Inc. v. Harter*, 823 F. Supp. 1116, 1118 (S.D.N.Y. 1993) (signatory of contract need not be "licensed under an applicable state statute" where the contract contemplates that a party with a proper license will be caused to perform the regulated obligation); *Charlebois v. J.M. Weller Assocs., Inc.*, 72 N.Y.2d 587, 591-95, 535 N.Y.S.2d 356 (1988) (same). Thus, on these grounds alone, defendants' motion fails.

Moreover, there is overwhelming evidence that Article 28 does not regulate the provision of those clerkships and defendants have (until this case) conducted themselves in a fashion that

admits the point.  Regulation of the provision of clerkships to medical students, including review and approval of contracts with international medical schools, is provided by the New York State Department of Education.  *See* 8 N.Y.C.R.R. § 3.2(d)(5)(xii); § 59.9(g),(h); § 60.2.  And defendants' records reflect that the agreement with Ross had in fact "been reviewed and approved by the New York State Education Department."  Pl. ¶110.

To support their argument, defendants stitch together an amalgam of snippets from Article 28 and its regulations that simply do not sustain the conclusion they assert.  Thus, 10 N.Y.C.R.R § 405.3(f) provides requirements for "hospital management contracts", which are plainly not involved here; § 405.3(b) provides that the "chief executive officer" develops personnel policies for items such as equal employment, identification tags, personnel records, and the like; §405.3(a) provides that the CEO is responsible for plans to "correct operation deficiencies identified by regulatory agencies"; § 405.2(d) requires a hospital to appoint a CEO or enter into a "management authority contract" approved by the commissioner; and § 405.2(b)(1)  provides that the hospital's governing body must carry out the functions specified in "this Part" of the regulation and cannot by contract limit or diminish the body's responsibility to do so, which the contract as issue here does not do.  In short, defendants' "Article 28 argument" is simply unfounded.

There is also overwhelming evidence demonstrating that defendants have carried out their affairs (at least until this action was filed) in a fashion that recognizes the enforceability of the Guaranty Clause.  Defendants took millions of dollars from both Ross and AUC under contracts with Guaranty Clauses.  Defendants' legal counsel approved the execution of the original contract and each of the amendments. Pl. ¶¶49, 61.  There is a dispute as to whether these contracts were ever provided to Wyckoff's board for approval, but it is undisputed that the

board was informed of them and never objected. Defendants submitted all affiliation agreements to the New York Department of Education, which approved them. Pl. ¶110. Finally, BQHC not only entered into clerkship contracts in its own name, but also entered into contracts with vendors and nursing staff providers on behalf of Wyckoff and Caritas. Pl. ¶¶90-93. At minimum, this evidence of defendants' conduct raises a genuine issue of material fact that precludes summary judgment.

Indeed, that is in fact what defendants' cited authority holds. Defendants cite, but flatly mischaracterize, the Short Form Order in *Healthnet Systems Consulting, Inc. v. Brooklyn-Queens Healthcare, Inc., et al.*, 2009 N.Y. Misc. Lexis 4239 (Sup. Ct. Queens Co. July 27, 2009). In that case, defendants asserted this very argument in an attempt to escape liability for a breach of contract with a vendor. The court denied summary judgment on a number of grounds, including that there were "issues of fact" that prevented resolution of the parties' positions on "New York's statutory and regulatory scheme governing the operation of hospitals."

The passages that defendants cite to make it appear as if the court adopted their position are in fact quotes taken not from the court's holding, but from the court's recitation of defendants' position:

> Based on this evidence, ***defendants claim*** that on May 8, 2008, a Consulting Letter of Agreement was sent by Plaintiff HealthNet to Paul Goldberg at FTI Healthcare. ***According to [Wyckoff's in-house counsel] Mullally***, the Letter was prepared by Clifton Jay, President of plaintiff and apparently signed by Paul Goldberg, an employee of FTI, as CFO. It seems that FTI is a Maryland Limited Liability Company providing consulting services to the health care industry. FTI was retained by BQHC, Wyckoff and Caritas to provide certain consulting and administrative services pursuant to an agreement entered into on August 13, 2007. Neither Goldberg nor BQHC itself was authorized to enter into the Consulting Letter Agreement for services at Caritas or Wyckoff. ***BQHC had no such authority because it did not and legally could not operate any hospitals.*** Furthermore, based on the Administrative Services Agreement and Mullally's statement, Paul Goldberg was a "special employee," specifically a CFO….

16

The decision obviously is not binding here, but even if taken in consideration, does not actually delineate the limits of BQHC's contractual authority under Article 28, much less support defendants' contention that their argument in this case has already been accepted by another New York court. In short, Article 28 cannot be read to preclude this Court from ordering BQHC to direct Wyckoff to provide clinical clerkships.

### D. Defendants cannot avoid specific performance on the ground that they entered into additional clerkship contracts.

Finally, defendants assert that they cannot be ordered to specifically perform because Wyckoff is currently at capacity with clerkships. Defs.' Mem. at 12. This argument has no merit. Defendants were well-aware of their obligation to provide replacement clerkships in the event the hospitals closed, and certainly they knew when Ross brought the instant action seeking specific performance that they may be called upon to do so. Contracts entered into thereafter despite these obligations were executed at defendants' own peril.

This defense is particularly inappropriate here because Ross' preexisting Wyckoff includes a right of first refusal for Ross on clerkships that become available at Wyckoff. Pl. ¶3. If defendants entered into contracts that purport to tie up these slots, they did so in flagrant breach of Ross' contractual rights. Such conduct plainly cannot be asserted as an "equitable" defense to a claim for specific performance.

## II. Issues of fact preclude summary judgment on Ross' veil-piercing claim.

### A. Facts relevant to veil piercing.

Defendants assert there is not sufficient evidence to support a jury finding in favor or Ross' veil piercing claim. Defendants are flatly wrong. BQHC has no physical location separate from Wyckoff, no bank accounts, no telephones, no computers, and no meaningful assets other than its interest in Wyckoff and Caritas. Pl. ¶74. The BQHC and Wyckoff boards largely

overlap.  Pl. ¶76.  Their officers, at least when they were able to identify whether BQHC had

any, did so as well.  Pl. ¶76 (remarkably, defendants have not been able to discern whether

BQHC had corporate officers after September 2008.  Pl. ¶75).

Nonetheless, when it solicited millions from Ross (and AUC), Wyckoff held out BQHC

as a system of three hospitals "sponsored" by Wyckoff.  Wyckoff's CEO sent the initial offering

letter to Ross on Wyckoff's stationary and made the following representations:

- "Wyckoff Height Medical Center (WHMC) will soon be the sponsor of Mary Immaculate and St. John's Queens Hospitals,"
- "Brooklyn Queens Healthcare (BQHC), the name of the new three hospital system to be formed will be comprised of Wyckoff Heights Medical Center (WHMC), Mary Immaculate Hospital (MIH), and St. John's Queens Hospital (SJQ),"
- "when the WHMC medical student education model is rolled out at MIH and SJQ, each hospital will accommodate in excess of 200 clerkships,
- "there will be BQHC System wide free transportation,"
- "development of a fifth semester training site for students is currently being explored as well as teleconferencing capabilities between the BQHC hospitals and affiliated international medical schools," and
- "[w]e are excited about the prospects of the expanded and enhanced BQHC System academic program."

Pl. ¶6.

Correspondence to Ross following this offer stated "BQHC provides and guarantees

'green-book' clerkships at its Caritas campuses (Mary Immaculate Hospital. and Saint John's

Queens Hospital)."  Pl. ¶20.  The subject line of another follow up email bore the subject line

"Wyckoff/CMC [Catholic Medical Center Details – Follow up to 8/21/06 letter.)"  Pl. ¶24.

Further, defendants' records show that they treated the Hospitals acquisition as one by

Wyckoff.  For example, when Wyckoff COO McDonald wrote a report to the State describing

the financial difficulties that the acquisition presented, he stated that "***Wyckoff, through BQHC,***

***has taken control of two institutions*** that combined have an operating budget 18% larger than

Wyckoff's."  Pl. ¶108.  In a draft letter to the Department of Health, Rucigay described the

motivation for the transaction: "[i]n December of 2005 Wyckoff learned that Mary Immaculate and St. John's Queens Hospitals were being sold at auction. Wyckoff's interest was primarily in St. John's Queens campus due to its close proximity to Wyckoff." Pl. ¶107.

Contrary defendants' story about the formation of BQHC and Caritas, Wyckoff board meeting minutes show that the "restructuring" of corporate entities was actually the work of management, presented to the board by CEO Dominick Gio as a *fait accompli*, and that the board voted only on the design of the new corporate logo. Pl. ¶80. Board chairman Emil Rucigay, when confronted with these minutes, testified:

> Q. My question is, is it the case that the corporations were already formed at this time and the only thing the Wyckoff board approved were the logos?
> A. Apparently.
> Q. Who was it that actually formed the corporations?
> A. I don't know.

Pl. ¶79.

In addition, there is substantial evidence of improper commingling of corporate funds both before and after the acquisition closing. Defendants' records show that more than $17 million dollars was funneled from "Caritas" accounts to Wyckoff from December 2006 into early 2007, including most of Ross' $5 million prepayment. Pl. ¶88. COO McDonald testified that Funds were being moved around to "cover the cash needed for a specific point in time. So there were Caritas funds going to pay for Wyckoff liabilities and Wyckoff funds going to pay for Caritas liabilities . . . whichever entity had cash,  those funds were being used to pay bills regardless of the entity whose bills they were." Pl. ¶99.

Further, Ross' $5 million prepayment was received on December 28, 2006. Def. ¶46. The next day, $4.5 million was transferred from Caritas to Wyckoff. Pl. ¶97. Similarly, AUC's $3.5 million prepayment was received on December 1, 2006. Pl. ¶14. By December 22, $3.4 million had been transferred from Caritas to Wyckoff. Pl. ¶96. Defendants claim that this

compelling evidence for piercing should be viewed in their favor because Wyckoff purportedly self-reported these transfers and fired Hal McNeil, allegedly the only employee involved. But there is substantial evidence from which the jury could reach the opposite conclusion. Board minutes show that, in fact, the State demanded action after discovering the commingling in connection with Wyckoff's request for a loan. Pl. ¶100. Also, there is evidence that "McNeil was in charge of a large business office" with "numerous departments and numerous employees" and that "more people than Mr. McNeil would have been involved in" making the improper transfers. Pl. ¶101. Indeed, as noted above, following discovery of these transfers, the State demanded that management of all of three entities be turned over to an outside restructuring officer as a condition of any further aid. The Chief Restructuring Officer fired CEO, Dominick Gio whom the State "from the very beginning of our assignment . . . wanted Mr. Gio terminated." Pl. ¶102. It is a fair inference that the State's demand reflected the conclusion that the CEO was complicit.

And there is plentiful additional circumstantial evidence surrounding the Ross contract to support that conclusion. Romero was under pressure from Gio to get money from the prepaid clerkship proposals quickly, and Romero fabricated claims to Ross that other schools were on the verge of taking the clerkship slots so as to induce Ross to act more promptly. Pl. ¶22-23. The fact that the bulk of that Ross' money was swept into Wyckoff's account the very day after receipt supports the view that the urgency of the demands for money were Wyckoff's.

There is also substantial evidence that contradicts defendants' contention that BQHC engaged in only two activities: (1) appointment and removal of Caritas and Wyckoff trustees: and (2) discrete corporate acts relating to certificates of incorporation, by-laws and the like.

Defendants operated a substantial business operation, funded largely by Wyckoff, that they held out as "BQHC" when they found it to be convenient to do so.

For example, in AUC's suit for breach of contract, defendants submitted two separate declarations in which Romero averred: "I am Assistant Vice President for Medical Education *for Defendant Brooklyn Queens Healthcare, Inc. ("BQHC")*" and *"[in] my capacity as Assistant Vice President for Medical Education for BQHC*, oversee the clinical clerkship programs at Caritas' two hospitals and at Wyckoff." Pl. ¶17.  Plainly, the sworn statements submitted to a U.S. District Court by experienced counsel is more than sufficient to create a triable issue about whether defendants held out Romero to be an employee of BQHC who directed the clinical clerkship programs at all three hospitals, including negotiating clerkship contracts for them.

And Paul Goldberg, who came to BQHC with the Chief Restructuring Officer, was appointed CFO of BQHC, but not the other entities.  Pl. ¶55.  His duties were not limited to the election of trustees or the tending of corporate bylaws; instead, he "overs[aw] all of the financial affairs of both Caritas and Wyckoff." Pl. ¶94.  Not only did the financial departments of Caritas and Wyckoff report to him, but BQHC had "a central pool of finance people that worked for all organizations that were also under, came under [his] responsibilities." Pl. ¶94.

An organization chart for the "BQHC Financial Department" is reproduced below:



BQHC 26442

It is simply impossible to square the organization outlined in this chart with the one

described by defendants.  *See also* Pl. ¶73 (organization chart).  Moreover, although defendants

claim BQHC had no salaried employees and Wyckoff never controlled BQHC, Wyckoff board

minutes show that the Executive Committee met and approved: (1) a "Compensation Package"

for "the corporate officers of Brooklyn Queens Health Care . . . "effective upon the closing of

[the acquisition of Hospitals] "; and (2) that "the remaining seven years of [Wyckoff CEO,

Dominick Gio's] employment contract will be assumed by BQHC."  Pl. ¶84.

Consistent with the these minutes, Wyckoff's COO, Harold McDonald, entered into a

December 2006 Employment Agreement that defined BQHC as the "System" and provided that

the "System shall employ" him, the "System will pay [him] an annual base salary of $423,787,"

he would "be entitled to insurance and other benefits in accordance with the System's applicable policies," and that he would report to the "System President and Chief Executive Officer." In short, under the employment agreement, McDonald was BQHC's employee, to be paid by BQHC, with benefits from BQHC, and reporting to BQHC's CEO. Pl. ¶85. However, McDonald also testified that he did work for "all three entities" and was paid by Wyckoff" Pl. ¶86. Edward J. Dowling, Jr. entered a similar contract with nearly identical terms. Pl. ¶88.

For the most part, Wyckoff paid the central office employees. Wyckoff had carried on its own books a portion of their pay as an intercompany receivable from Caritas. This intercompany receivable was in all practical terms unrecoverable from Caritas' accounts, however, because "the State would loan money to make sure that Caritas remained in operation but would not loan money if it was going to be funded back to Wyckoff." Pl. ¶104.

In order to pay off this receivable without alerting the State, Wyckoff transferred upwards of fifty-nine employees from its payroll to Caritas', despite the fact that many of these employees did not have day to day responsibilities at the Hospitals. Pl. ¶105. The net effect of this transfer meant that, although these employees would be performing some or all of their work for Wyckoff, Caritas (in effect funded by the State) would pay for the entirety of their salaries, with the State being none the wiser. Wyckoff's Board of Trustees was fully informed of this stunt. Pl. ¶106. Indeed, the admitted object of this maneuver was to benefit Wyckoff. Pl. ¶106.

The evidence also shows that defendants used BQHC to move money into and out of Wyckoff as they found convenient. Although BQHC had no bank account or funds, it made a $1.9 million loan to Wyckoff, which is reflected in both BQHC's and Wyckoff's financial statements. Pl. ¶82. Similarly, Chairman Rucigay entered into an subordination agreement on behalf of BQHC, Caritas, and Wyckoff that states that "BQHC loaned to Borrower [Caritas]

$1,000,000 in cash (the "BQHC Obligation") and Wyckoff has entered into lease obligations for equipment provided to the Borrower with a fair value of not less than $3,200,000 (the "Wyckoff Obligation") . . . The BQHC obligation is not documented between BQHC and Borrower and the Wyckoff obligation is not documented between Wyckoff and the Borrower." Pl. ¶81. This $1,000,000 loan from BQHC to Caritas was also confirmed in other documents. Pl. ¶81.

BQHC also entered into more than twenty contracts since 2006 on behalf of all three entities to perform core hospital functions. The contract with Chief Restructuring Officer Singleton and the restructuring officer that succeeded him both provided that BQHC was responsible for payments to the consultants on the hospitals' behalf. Pl. ¶92. In addition, BQHC entered into hospital vendor contracts with Abbott Labs and Siemens; a collection agreement with CBHV, Inc.; a service contract with Deman Data Systems, LLC; and  a consulting agreement with HealthNET. Pl. ¶92. Further, BQHC also entered into contracts with two nurse staffing providers for nursing services at the Wyckoff and Caritas hospitals. Pl. ¶93.

### B.    The Record Evidence More Than Supports A Jury Finding For Piercing

In New York, piercing is a question for the jury's determination. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 136-37 (2nd Cir. 1991). Piercing is warranted if: (1) Wyckoff dominated BQHC ; and (2) Wyckoff's control over BQHC was used to commit a wrong or inequity against Ross. *Id.* As New York courts have recognized, "veil-piercing is a fact-laden claim that is not well suited for summary judgment resolution." *First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P.*, 300 A.D.2d 112, 117, 755 N.Y.S.2d 63, 67 (1st Dept. 2002) (quotation marks omitted).

Indeed, to determine whether one corporation dominated another, the trier of fact must consider a multiplicity of factors. *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 136-37. A non-exclusive list of those factors include: the absence of the formalities and paraphernalia that are

part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like; inadequate capitalization; whether funds are put in and taken out of the corporation for other than corporate purposes; overlap in ownership, officers, directors, and personnel; common office space, address and telephone numbers of corporate entities; the amount of business discretion displayed by the allegedly dominated corporation; whether the related corporations deal one another at arms length; whether the corporations are treated as independent profit centers; the payment or guarantee of debts by others in the corporate group; and whether the corporation in question had property that was used by other of the corporations as if it were its own. *Id.* at 139.

No one factor or combination of factors is necessarily determinative of corporate domination.  Instead, as "[t]he Second Circuit has made clear[,] . . . there is an 'infinite variety of situations' that might warrant disregarding the corporate veil and that the ultimate question of veil piercing must be decided by 'considering the totality of the evidence.'" *Int'l Equity Inv., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (quoting *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139).  It is precisely the fact-specific nature of the claim why veil piercing is reserved for the jury. *See Wm. Passalacqua Builders, Inc.*, 933 F.2d at 137 ("[I]gnoring the corporate form and imposing liability on affiliated corporations or shareholders . . . is the sort of determination usually made by a jury because it is so fact specific."); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2nd Cir. 1988) ("[T]he issue of corporate disregard is generally submitted to the jury.").

In this case, the "totality of the evidence" demonstrates why Ross' veil piercing claim must go to the jury.  The following summary of facts—which are either undisputed or must be

viewed in Ross' favor here—are sufficient to support a finding that Wyckoff dominated BQHC

with respect to the Affiliation Agreement:

(a)     Wyckoff's CEO and his designees solicited funds from Ross using BQHC as the
vehicle to do so;

(b)     They represented to Ross and executed contracts promising that Wyckoff would
guarantee BQHC's contractual promises to provide clerkships;

(c)     BQHC was and has always been undercapitalized;

(d)     Ross's payments for clerkships were immediately transferred to Wyckoff and
used to pay Wyckoff's bills;

(e)     Funds and employees were improperly transferred funds between entities;

(f)     Wyckoff employees were paid as though they actually worked for other affiliates;

(g)     Contracts were signed by the same person for both Wyckoff and BQHC;

(h)     The credit of Wyckoff and BQHC was used interchangeably;

(i)     The boards and officers of Wyckoff and BQHC were largely identical;

(j)     BQHC apparently now has no corporate officers; and

(k)     BQHC used Wyckoff's physical assets as if they were its own.

When considered together, these facts are more than sufficient for a jury to find that Wyckoff

dominated BQHC with respect to its dealings with Ross.

Indeed, one of the Second Circuit's leading decisions on veil piercing, *Wm. Passalacqua

Builders, Inc. v. Resnick Developers South, Inc.*, demonstrates precisely why summary judgment

cannot be entered here.  In that case, the court of appeals held that evidence strikingly similar to

that presented here was sufficient to justify sending a veil piercing claim to the jury; specifically:

(a)     the dominated corporation was "severely undercapitalized";

(b)     the related "corporations shared a common office . . . , had the same office staff,
and essentially the same officers and directors, albeit in different permutations
and combinations";

26

(c)     "[e]mployees of one . . . corporation were sometimes paid as though they actually worked for another corporation, and employees would represent to clients that they were an officer of one of the corporations when in fact they actually occupied that position in another . . . corporation."

(d)     Defendants "shuffled funds from one to another of their corporations frequently with the source of the funds chosen based on which of their corporations had sufficient funds at the time, rather than on any demonstrated business purpose of the corporation that was the source of the funds";

(e)     "the corporations did not deal at arms length with each other" as evidenced by preferential deals between them; and

(f)     "Profit calculations were compiled that suggested that the distinctions between corporations were artificial, and it was actually the profit to the entire collection of [defendant]-controlled corporations-as opposed to each separate entity-that was being calculated[.]"

933 F.2d at 139-140. Again, each of these same factors is present here. Therefore, consistent with the Second Circuit's conclusion in *Wm. Passalacqua*, this Court should find that the evidence in this case is sufficient to send Ross' veil piercing claim to the jury.

**C.     Defendants' arguments improperly assume factual disputes in favor of Defendants and are wrong on the law.**

It is evident that defendants either ignore unfavorable evidence or resolve disputes in their favor. Defendants assert that Ross' veil piercing claim depends "at best, on evidence that BQHC lacks significant assets, salaried employees, or bank accounts, and shares offices and has overlapping Board members with Wyckoff." Defs.' Mem. at 18, 16. But as summarized above, there is ample *additional* evidence from which a jury could find that Wyckoff dominated BQHC. Defendants cannot prevail on a motion for summary judgment by assuming that evidence away.

Indeed, defendants cite no case in which a court has granted summary judgment on facts similar to these. To the contrary, in each decision defendants cite, the veil-piercing claim involved only one or two isolated factors—none had as many indicia of control as are present here. *See American Fuel Corp. v. Utah Energy Development Co.*, 122 F.3d 130, 134-35 (2nd

Cir. 1997) (denying piercing claim where company had "no contracts, no employees, [] no independent office space" and "no bank account," but "other factors weigh strongly against a finding of domination"); *American Protein Corp.*, 844 F.2d at 60 ("[t]he strongest piece of evidence to support control was the existence of interlocking directorates" and there was no evidence of lack of corporate formality, undercapitalization, or use of corporate funds by the parent); *Johnson v. Medisys Health Network*, No. 10-1596, 2011 WL 5222917, *22 (E.D.N.Y. June 1, 2011)[4] (pro se plaintiff's "allegations in support of her theory of piercing the corporate veil . . . are conclusory and fail to allege how [defendants] controlled the subject entities, what corporate formalities were ignored, whether the subject entities were inadequately capitalized, or any of the other factors");*McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 145 (E.D.N.Y. 2009) (finding that "controlling ownership interest in subsidiaries, reporting of consolidated results of such subsidiaries in public filings, and overlapping directors and officers between parent and subsidiary corporations" were "insufficient without more" to show domination); *Brito v. DILP Corp.*, 282 A.D.2d 320, 321, 723 N.Y.S.2d 459, 460 (1st Dept. April 19, 2001) (reversing denial of summary judgment where the *only* evidence to support veil piercing was that "the corporation ha[d] insufficient assets or insurance to satisfy plaintiff's potential damages").

Defendants' arguments regarding BQHC's benign "corporate purpose" are similarly unavailing. First, given the record evidence, a jury would be well-justified in choosing not to credit defendants' account that BQHC was created only to for ecclesiastical purposes. *See Solow*

---

[4] Defendants cite this decision as *Johnson v. Medisys Health Network*, No. 10-1596, 2011 WL 4101389 (E.D.N.Y. Apr. 28, 2011); however, Westlaw does not recognize this citation for the *Johnson* case and there appear to be no other decisions in this matter reported on the date given by defendants.

…

*v. Domestic Stone Erectors, Inc.*, 269 A.D.2d 199, 200, 703 N.Y.S.2d 94, 95 (1st Dept. 2000) (affirming denial of summary judgment because "a factual issue exists as to whether that decision was based on a legitimate business judgment, or was designed to achieve the fraudulent purpose of preventing plaintiffs from satisfying their judgment").Moreover, under New York law, even if BQHC was initially created by Wyckoff for a legitimate purpose, veil piecing is still warranted if it was used to cause a wrong or inequity to Ross. *See Goya Foods, Inc. v. Unanue*, 233 F.3d 38, 44 (1st Cir. 2000) ("Nevertheless, even if [a corporation's] origin is not tainted by fraud, New York still permits veil piercing where the corporate vehicle is being used to inflict 'wrongful or inequitable consequences.'") (*citing TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 680 N.Y.S.2d 891, 703 N.E.2d 749, 751 (1998)).

Likewise, to the extent defendants argue that Wyckoff could not have dominated BQHC because doing so would have violated certain terms of the Caritas Acquisition Agreement or defendants own corporate bylaws, this *ultra vires* defense is squarely barred under New York law. *See* N.Y. Bus. Corp. L. § 203; *Chiat/Day Direct Marketing, Inc. v. National Car Rental System, Inc.*, No. 93-2717, 1994 WL 524982, *3 (S.D.N.Y. Sept. 27, 1994) ("[Defendant] concedes that Section 203 of the New York Business Corporation Law precludes the use of the defense of ultra vires in proceedings against a corporation to enforce a contract.").

### D.      There is sufficient evidence from which a jury could conclude that Wyckoff used BQHC to wrongfully obtain money from Ross.

Finally, defendants' contention that Ross was not wronged or the victim of fraud is curious (and wrong).  Defendants held out BQHC as a real system that "operated" Wyckoff and Caritas, and solicited and obtained millions of dollars from Ross by promising that BQHC would and could provide clerkships at Wyckoff if the Hospitals ceased to operate.  Now that the Hospitals have closed, defendants take the position that BQHC is and always was assetless and

could not cause Wyckoff to provide the clerkships. The jury will be well supported in any finding of injury and/or fraud.[5] *See Bogosian v. All American Concessions*, No. 06-1633, 2011 WL 4460362, *9 (E.D.N.Y. Sept. 26, 2011) ("Entry into a transaction without the 'present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes.'") (*quoting Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 264 Fed. Appx. 36, 41 (2nd Cir. 2008)). And if the jury concludes that defendants engaged in fraud in connection with the Affiliation Agreement, Ross need not show domination by Wyckoff to prevail on its veil-piercing claim. *See Wm. Passalacqua Builders, Inc.*, 933 F.2d at 138 ("Liability therefore may be predicated either upon a showing of fraud *or* upon complete control by the dominating corporation that leads to a wrong against third parties.") (emphasis added) (collecting cases).

In sum, there is more than enough evidence from which a jury could reach a verdict in favor of piercing. That evidence plainly precludes defendants' motion.

## CONCLUSION

In sum, defendants' motion for partial summary judgment must be denied because there is more than sufficient evidence from which a jury could find for veil piercing, and there is no legal basis to deny specific performance at this stage of the proceedings.

---

[5] Defendants assert that Ross' veil piercing and specific performance claims are "directly at odds with" one another. Defs.' Mem. at 14. Defendants' argument is meritless. Defendants concede that BQHC has the right to elect or remove Wyckoff's directors. Thus, that control is conceded. The question of whether Wyckoff used BQHC to commit a wrong against Ross is obviously a fundamentally different inquiry.

January 11, 2012

Respectfully submitted,

**BAKER & HOSTETLER LLP**

    / s/ George Tzanetopoulos

George Tzanetopoulos

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

191 North Wacker Drive, Suite 3100
Chicago, Illinois, 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of
Medicine, Ltd.*