UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,                                        09 Civ. 1410 (KAM) (RLM)

Plaintiff,

– against –

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-----------------------------------------------X

**PLAINTIFF ROSS UNIVERSITY'S RESPONSE TO
DEFENDANTS' 56.1 STATEMENT OF UNDISPUTED FACTS &
ADDITIONAL FACTS REQUIRING THE DENIAL OF SUMMARY JUDGMENT**

**BAKER & HOSTETLER LLP**

George Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois, 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

*Counsel for Plaintiff Ross University School
of Medicine, Ltd.*

Plaintiff Ross University School of Medicine, Ltd., by its attorneys Baker & Hostetler LLP, submits its response to Defendants' Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment:

1. Originally known as the German Hospital Society of Brooklyn, Wyckoff was formed on September 18, 1889. *See* Declaration of Justin H. Roeber, Esq., sworn to on December 2, 2011 ("Roeber Dec."), submitted herewith, Exh. 1, at BQHC 00368. For more than a century, Wyckoff's stated mission has been to "maintain a public Hospital . . . in the City of Brooklyn . . . ." *Id.* at BQHC 00367.

**RESPONSE:**        Undisputed.

2. Consistent with that mission, Wyckoff's corporate Bylaws provide that Wyckoff's purpose is:

> [T]o establish[,] maintain, and operate, on a not-for-profit basis, a Medical Center facility for the prevention, diagnosis, treatment and/or rehabilitation of inpatients, ambulatory service patients and out-patients who visit, live and work in the community . . . in compliance with the spirit and letter of the law and all pertinent regulatory and accreditation standards . . . .

Roeber Dec., Exh. 1, at BQHC 00344-00345

**RESPONSE:**        Undisputed.

3. In New York, the delivery of healthcare services by a licensed hospital is a highly regulated activity. For instance, among the statutory and regulatory requirements that Wyckoff must follow are those set forth in Article 28 of New York's Public Health Law ("Article 28"). *See* Declaration of David N. Hoffman, Esq., sworn to on November 30, 2011 ("Hoffman Dec."), submitted herewith, ¶¶ 6, 12-13 & Exh. 1.

**RESPONSE:**        Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

4. Article 28 provides, among other things, that:

A hospital may not operate in New York State unless it has been "established" by New York's Public Health and Health Planning Council (formerly known as the Public Health Council) ("PHHPC") and has received an "operating certificate" from New York State's Commissioner of Health (the "Commissioner");

A corporation may not file a "certificate of incorporation . . . which includes among its corporate purposes or powers the establishment or operation of any hospital" without PHHPC's written approval;

PHHPC must similarly approve "[a]ny change in the person" who operates a hospital or "[a]ny transfer . . . of ten percent or more of the stock of a corporation which is the operator of a hospital"; and

PHHPC shall not approve an entity to operate a hospital unless it is "satisfied" as to the "character, competence, and standing in the community" of the operator, and is further satisfied that the proposed operator provides "a substantially consistent high level of care."

*See id.* at Exh. 1, at N.Y. Pub. Health Law §§ 2801-a(1), 2801-a(2), 2801-a(3), 2801-a(4)(a), 2801-a(4)(c), and 2805(1)(a).

**RESPONSE:**        Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.


5.        In accordance with these statutory provisions, PHHPC has "established" Wyckoff, which maintains an "operating certificate" from the Commissioner permitting Wyckoff to operate a hospital in New York State. *See* Hoffman Dec., ¶ 14 & Exh. 2 (Wyckoff s operating certificate).

**RESPONSE:**        Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.


6.        Article 28's implementing regulations further define the "operator" of a hospital as the person or entity with "decision-making authority" over any of a number of enumerated items, including: (a) hospital operating procedures; (b) hospital debt; and (c) "hospital contracts for management or for clinical services." *See* Hoffman Dec, Exh. 1, at 10 N.Y.C.R.R. § 405.1(c).

**RESPONSE:**        Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

2

7.      Article 28's implementing regulations also require each hospital operating in New York State to have a governing body that is "legally responsible for directing the operation of the hospital," and expressly prohibit any limitation on that governing body's powers, stating:

> No contracts/arrangements or other agreements may limit or diminish the responsibility of the governing body in any way.

*Id.* at 10 N.Y.C.R.R. § 405.2(b)(1).

**RESPONSE:**      Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

8.      Finally, Article 28's implementing regulations require each hospital operating in New York State to have a Chief Executive Officer ("CEO") responsible for the "daily management and operational affairs of the hospital."  Hoffman Dec., Exh. 1, at 10 N.Y.C.R.R. § 405.3; *see also id.* at §§ 405.2(d), 405.3(a), 405.3(b).  Article 28's implementing regulations permit a hospital operating in New York State to delegate certain of the CEO's powers by contract provided that the Commissioner expressly consents to the delegation.  *See id.* at 10 N.Y.C.R.R. §§ 405.3(f)(1)-(2), 405.3(f)(3)(iii).  However, certain of the CEO's powers may not be delegated under any circumstances; these powers include "the authority to incur on behalf of the [hospital] liabilities not normally associated with the day-to-day operation of a facility."  *Id.* at 10 N.Y.C.R.R. § 405.3 (f)(3)(iii); *see also id.* at §§ 405.3(f)(1)-(2).

**RESPONSE:**      Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

9.      In accordance with these implementing regulations, Wyckoff's Bylaws provide that Wyckoff is governed by a Board of Trustees that is tasked with, among other things:

a.      Ensuring compliance with federal, state, and local laws;

b.      Appointing Wyckoff's officers, including its President/CEO; and

c.      Appointing Wyckoff's medical staff, including its medical director.

*See* Roeber Dec., Exh. 1, at BQHC 00345-00349.

**RESPONSE:**      Objection.  The first clause of this paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt.

of Undisputed Facts.  The remaining portions of this paragraph are undisputed.

10.     Wyckoff's Bylaws further grant Wyckoff's President/CEO "the general powers . . . necessary to operate [Wyckoff] and all of its activities," including responsibility "to maintain [Wyckoff]'s compliance with statutory and regulatory requirements."  *Id.* at BQHC 00350.

**RESPONSE:**          Undisputed.

11.     Wyckoff's Board and corporate officers have abided by the requirements of Article 28, its implementing regulations, and New York's Public Health Law generally since those statutes and regulations went into effect.  *See* Hoffman Dec., ¶ 18; *see also* Declaration of A.C. Rao, M.D., sworn to on November 14, 2011 ("Rao Dec."), submitted herewith, ¶ 14.  In particular, Wyckoff's Board and corporate officers have strictly adhered to Article 28's requirement that only an entity licensed under Article 28 may operate a hospital located in New York State.  Wyckoff's Board has never permitted any Wyckoff-affiliated entity to operate Wyckoff's hospital facilities.  *See* Rao Dec., ¶¶ 14-15.

**RESPONSE:**          Objection.  This paragraph contains improper argument and is not

supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed

Facts.

12.     On July 5, 2005, St. Vincent's Catholic Medical Centers ("St. Vincent's") filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.  *See In re Saint Vincent's Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Jt. Admin. Ch. 11 Case No. 05-14945 (Bankr. S.D.N.Y.).

**RESPONSE:**          Undisputed.

13.     Two of the hospitals within the St. Vincent's system at the time were Mary Immaculate Hospital ("Mary Immaculate") and St. John's Queens Hospital ("St. John's Queens"), located in the Queens, New York neighborhoods of Elmhurst and Jamaica, respectively.  *See id.* at Dkt. No. 437 (October 3, 2005 schedule of St. Vincent's assets and liabilities showing ownership of St. John's Queens and Mary Immaculate); *see also* Roeber Dec., Exh. 2 (Deposition Transcript of John St. James ("St. James Tr.")), p. 49:9-19; *id.* at Exh. 3 (Deposition Transcript of David N. Hoffman, Esq. ("Hoffman Tr.")), p. 49:9-24.

**RESPONSE:**          Undisputed.

14.     In connection with its bankruptcy, St. Vincent's planned to close Mary Immaculate and St. John's Queens permanently if a buyer could not be found.  *See* Roeber Dec.,

Exh. 4, at BQHC 00195 (minutes from the March 6, 2008 meeting of BQHC's Board of Trustees, reporting that St. Vincent's planned to close St. John's Queens and Mary Immaculate "if Wyckoff had not submitted a bid" for them). Prior to May 2006, Wyckoff approached St. Vincent's and offered to rescue Mary Immaculate and St. John's Queens from closure. *See id.* at BQHC 00195; *see also* Hoffman Tr., p. 100:16-20 (describing Wyckoff's efforts to "rescue" Mary Immaculate and St. John's Queens).

**RESPONSE:**        The first sentence of this paragraph is undisputed. The second

sentence of this paragraph is disputed to the extent that Wyckoff's acquisition of Mary

Immaculate and St. John's Queens is characterized as a "rescue." App. 58, Rucigay Dep. Ex. 14

at BQHC 04340 (describing the acquisition of St. John's and Mary Immaculate to Acting

Department of Health Commissioner Daines: "Wyckoff's interest was primarily in St. John's

Queens campus due to its close proximity to Wyckoff."); App. D, McDonald Dep. 83:11-85:9,

Ex. 13 at BQHC07620-07621 ("Wyckoff, through BQHC, has taken control of two institutions

that combined have an operating budget 18% larger than Wyckoff's.").

15.    Subsequently, Wyckoff and St. Vincent's executed a May 9, 2006 Asset Purchase Agreement for the acquisition of St. John's Queens and Mary Immaculate (the "Acquisition Agreement"). *See* Roeber Dec., Exh. 5 ("Acquisition Agreement"), at BQHC 00558-00663.

**RESPONSE:**        Undisputed.

16.    Pursuant to the Acquisition Agreement, Wyckoff agreed that St. John's Queens and Mary Immaculate would "continue to [follow] the ethical and religious directives of the [C]onference of Catholic Bishops for so long as the hospitals were known as St. John's [Queens] and Mary Immaculate." Hoffman Tr., p. 113:16-23; *see also* Acquisition Agreement § 8.9, at BQHC 00636-00637.

**RESPONSE:**        Objection. This paragraph is not supported by the cited material.

Hoffman's testimony was that that "one of the quid pro quos for [St. Vincent's] provid[ing] that

financing was that St. John's and Mary Immaculate continue to the ethical and religious

directives of the [C]onference of Catholic Bishops for so long as the hospitals were known as St.

John's and Mary Immaculate." *See* Hoffman Tr., p. 113:16-23.

5

17.    The ethical and religious directives in effect from the time the Acquisition Agreement was signed in May 2006 through November 2009 prohibited certain practices, centering on reproductive and end-of-life issues, which could conflict with Roman Catholic Church doctrine. *See* Roeber Dec., Exh. 6. The directives also prohibited "cooperation between institutions that honor the [Conference's] ethical and religious directives and those that do not." Hoffman Tr., p. 112:5-8; *see* Roeber Dec., Exh. 6, at Directives 67-72.

**RESPONSE:**          Objection. The second sentence of paragraph 17 is not supported

by the cited material. *See* Roeber Dec., Exh. 6, at Directive 70 (stating that "Catholic health care

organizations are not permitted to engage in *immediate material cooperation in actions* that are

intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.")

(emphasis added). The first sentence of paragraph 17 is undisputed.


18.    Due to the increasing trend of consolidation among hospitals throughout the country, many hospitals and hospital systems have undergone changes in their corporate structure when secular hospitals merged with, or acquired, Catholic hospitals. *See* Roeber Dec., Exh. 7 (news articles describing these trends over the last 20 years);[1] Hoffman Dec., ¶¶ 26-27.

**RESPONSE:**          Objection.   This paragraph is not supported by admissible

evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.


19.    Because Wyckoff was a secular institution, it could not comply with the ethical and religious directives from the Conference of Catholic Bishops without altering its corporate structure. *See* Hoffman Tr., pp. 111:23-115:2 (noting that "the whole purpose behind the particular passive parent sole corporate member structure that we adopted" for the acquisition of St. John's Queens and Mary Immaculate was that Wyckoff did "not adhere to the ethical and religious directives" of the Conference of Catholic Bishops); *see also* Hoffman Dec., ¶ 5.

---

[1] Specifically, the news articles attached as Exhibit 7 to the Roeber Declaration are: (a) Mark Hayward, *Proposed CMC Deal Given Boost,* N.H. UNION LEADER, Dec. 12, 2009, at 01; (b) Melanie Evans, *Faith Permeates Hospital Merger; Miller-Dwan Strives to Prevent Catholic Influence From Limiting Patient Choices,* DULUTH NEWS-TRIBUNE, Sept. 7, 2001, at 01A; (c) Roni Rabin, *Takeover Deal for 2 Hospitals,* NEWSDAY, Feb. 4, 1998, at A30; (d) Julie Sneider, *Mixing Catholic, Secular Hospitals a Delicate Balancing Act,* BUSINESS JOURNAL-MILWAUKEE, July 9, 1994, at 1; (e) Bruce Japsen, *Church Puts Faith in System Mergers in Light of Healthcare Reforms, Catholic Hospitals Face the Challenge of Non-Catholic Collaborations,* MODERN HEALTHCARE, June 6, *1994,* at 32; and (f) John George, *Two Montco Hospitals Form Partnership to Mesh Services,* PHILADELPHIA BUS. J., Sept. 7, 1992, at 6.

**RESPONSE:**        Undisputed that Wyckoff is a secular institution.   Disputed that

Wyckoff's lack of religious affiliation was why BQHC was created.  *See* Roeber Dec., Exh. 6, at

Directive 70 (stating that "Catholic health care organizations are not permitted to engage in

*immediate material cooperation in actions* that are intrinsically immoral, such as abortion,

euthanasia, assisted suicide, and direct sterilization."); App. 37, Rucigay Dep. Ex. 1 at

BQHC03721 (Minutes of Wyckoff February 9, 2006 board meeting, explaining efficiencies of

"ambulance service, residency programs, and clinical advantages" and that "Wyckoff could

realize a substantial savings if we were to share the costs associated with administrative items,

i.e., medical records, radiology, laboratories and financial offices.").

20.      Accordingly, five individuals who were senior members of Wyckoff's Board of
Trustees created a new, separate and distinct Wyckoff affiliate – Caritas Health Care Planning,
Inc., later renamed Caritas Health Care, Inc. ("Caritas") – to acquire and operate Mary
Immaculate and St. John's Queens.  *See* Acquisition Agreement, at BQHC 00558; *see also*
Hoffman Tr., p. 19:7-17 (discussing Caritas's corporate history); Roeber Dec., Exh. 8, at BQHC
00522-00523 (Caritas certificate of incorporation).  Those five individuals – Emil Rucigay, Esq.,
Adam Figueroa, John H. Cook, Jr., Esq., Vincent Arcuri, and Frederick T. Haller, Esq. – were
also the initial Trustees of Caritas.  *See* Roeber Dec., Exh. 8, at BQHC 00522-00523.

**RESPONSE:**        The first sentence is disputed.  App. 38, Rucigay Dep. Ex. 4 at

BQHC03784 (Wyckoff Board meeting minutes from December 14, 2006 reporting formation of

BQHC and showing that the board did not formally approve of the creation of BQHC); App. F,

Rucigay Dep. 16:11-17:20 (Wyckoff Board Chairman Emil Rucigay testifying he did not know

who created BQHC); App. 38, Rucigay Dep. Ex. 4 at BQHC03784 (showing that only aspect of

Wyckoff's reorganization that the board voted on was the approval of logos for Wyckoff and

Caritas).  The second sentence is undisputed.

21.      Caritas's certificate of incorporation, as amended, describes its corporate purpose
as being:

> To establish, maintain and/or operate a hospital or hospitals within the State of New York for the medical and surgical care and treatment of inpatients and outpatients and to operate residency and related programs in connection with the provision of such care.

*Id.* at BQHC 00530.  Caritas was thus "formed to be the license holder of St. John's [Queens] and Mary Immaculate" for Article 28 purposes.  Roeber Dec., Exh. 9, at BQHC 03784 (minutes from the December 14, 2006 meeting of Wyckoff's Board of Trustees).

**RESPONSE:**          Undisputed.

22.   To ensure Caritas's adherence to the ethical and religious directives of the Conference of Catholic Bishops, the Bishop of the Roman Catholic Diocese of Brooklyn was entitled, pursuant to Caritas's corporate Bylaws, to designate one or more members of the Caritas Board of Trustees.  *See* Roeber Dec., Exh. 10, at BQHC 01833-01834.

**RESPONSE:**          Objection.  This paragraph is not supported by the cited material.

Caritas's corporate Bylaws states that the Bishop of the Roman Catholic Diocese of Brooklyn was entitled to designate one or more members of the Caritas Board of Trustees.  The Bylaws do not state that the Bishop was so entitled "to ensure Caritas's adherence to the ethical and religious directives of the Conference of Catholic Bishops."  *See* Roeber Dec., Exh. 10, at BQHC 01833-01834.

23.   From 2007-2009, Caritas's Board of Trustees included two members nominated by the Bishop of the Roman Catholic Diocese of Brooklyn – Reverend Patrick Frawley, a Roman Catholic priest, and Mark Lane, a layperson – neither of whom served on Wyckoff's Board of Trustees.  *See* Declaration of Emil Rucigay, Esq., sworn to on November 17, 2011 ("Rucigay Dec."), submitted herewith, ¶ 32.

**RESPONSE:**          Undisputed.

24.   Pursuant to Section 8.9 of the Acquisition Agreement and the Conference of Catholic Bishops' directives, Wyckoff: (a) took a pre-existing affiliate entity, WHMC Properties, Inc.; (b) renamed that affiliate entity as BQHC; and (c) made BQHC the "sole member" of both Wyckoff and Caritas.  *See* Roeber Dec., Exh. 11, at BQHC 00466-00469 (BQHC's Certificates of incorporation and Amendment); *see also id.* at Exh. 8, at BQHC 00531 (Caritas's August 25,

2006 Certificate of Amendment noting BQHC is Caritas's "sole member"); Hoffman Tr., pp. 26:16-27:10.

**RESPONSE:**    Undisputed that Wyckoff took a pre-existing affiliate entity, WHMC Properties, Inc., renamed that affiliate entity as BQHC, and made BQHC the "sole member" of both Wyckoff and Caritas.  Objection to the remainder of the paragraph as not supported by the cited material.  Section 8.9 of the Acquisition Agreement and the Conference of Catholic Bishops' directives do not specify Wyckoff's corporate restructuring and creation of BQHC.  *See* Roeber Dec., Ex. 5 (Acquisition Agreement); Roeber Dec., Ex. 6 (Conference of Catholic Bishops' directives).

25.    As Wyckoff's General Counsel testified, BQHC was created because:

> The only way that we could accomplish that requirement [of ensuring that St. John's Queens and Mary Immaculate did not cooperate with institutions that did not honor the Conference of Catholic Bishops's ethical and religious directives] and also be able to operate Caritas was to have a passive parent entity that didn't engage in practices which violate the ethical and religious directives.  BQHC was that nonclinical passive parent entity.  That's a standard mechanism used when you have Catholic institutions put under the management of non-Catholic institutions.

Hoffman Tr., p. 112:9-18; *see generally* Roeber Dec., Exh. 7.

**RESPONSE:**    Undisputed that Wyckoff's General Counsel so testified.  Disputed that this was the reason BQHC was created.  *See* Roeber Dec., Exh. 6, at Directive 70 (stating that "Catholic health care organizations are not permitted to engage in *immediate material cooperation in actions* that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization."); App. 37 at BQHC03721 (Minutes of Wyckoff February 9, 2006 board meeting, explaining efficiencies of "ambulance service, residency programs, and clinical advantages" and that "Wyckoff could realize a substantial savings if we were to share the

costs associated with administrative items, i.e., medical records, radiology, laboratories and financial offices.").

26.    Because it was created as a "nonclinical" entity, BQHC is not licensed to operate a hospital under Article 28 of New York's Public Health Law. *See* Hoffman Tr., p. 112:9-18; *see also* Declaration of Vincent Arcuri, sworn to on November 14, 2011 ("Arcuri Dec."), submitted herewith, ¶ 12; Rucigay Dec., ¶ 14; Declaration of John H. Cook, Jr., Esq., sworn to on November 16, 2011 ("Cook Dec."), submitted herewith, ¶ 12; Declaration of Adam Figueroa, sworn to on November 29, 2011 ("Figueroa Dec."), submitted herewith, ¶ 12. Indeed, BQHC's certificate of incorporation expressly states that:

> Nothing contained in this certificate of incorporation shall authorize [BQHC] to establish, operate, construct, lease or maintain a hospital . . . as defined in and covered by Articles 28, 36, 40 and 44, respectively, of the Public Health Law.

Roeber Dec., Exh. 11, at BQHC 00467-00468.

**RESPONSE:**    Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts. Undisputed that a portion of BQHC's certificate of incorporation contains the language quoted.

27.    Accordingly, BQHC has separate Bylaws, which, unlike Wyckoff s Bylaws, provide that BQHC's corporate purpose is to:

> [F]urther, support or benefit Wyckoff [] and Caritas [], which [] operate, or will operate upon receiving requisite regulatory approvals, the hospitals in Kings and Queens Counties, respectively known as Wyckoff Heights Medical Center, St. John's Queens Hospital and Mary Immaculate Hospital . . . for the purpose of serving as a holding corporation . . . .

Roeber Dec., Exh. 12, at BQHC 00443.

**RESPONSE:**    Objection. This paragraph contains improper argument. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts. Further, this paragraph is not supported by

the cited material, which says nothing about Wyckoff's bylaws. *See* Roeber Dec., Ex. 12, at BQHC 00443. Undisputed that BQHC's bylaws include the language quoted. However the quotation is incomplete; following "Wyckoff Heights Medical Center, St. John's Queens Hospital and Mary Immaculate Hospital," the Bylaws state in relevant part "and such other hospitals and health care facilities as may be established or otherwise become part of the Hospital Corporations in the future, including without limitation, *for the purpose of serving as a holding corporation* for one or more other Not-For-Profit corporations . . . . " (Emphasis supplied.)

28.     Consistent with its role as a "nonclinical passive parent" of both Caritas and Wyckoff, BQHC has no substantial assets, salaried employees, revenues, or bank accounts of its own. *See* Arcuri Dec., ¶ 13; Cook Dec., ¶ 13; Rucigay Dec., ¶ 15; Figueroa Dec., ¶ 13; *see also* Hoffman Dec., Exh 4 (BQHC's 2007 Form 990 tax return showing BQHC does not pay any employees directly, but instead allocates compensation and benefits from Wyckoff).

**RESPONSE:**          Objection. This paragraph contains improper argument. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts. Disputed. App. 39, Rucigay Dep. Ex. 6 (subordination agreement showing BQHC loan to Caritas of $1,000,000 in cash); App. 40, Hoffman Dep. Ex. 9 at ¶ 28 (Affidavit of John Lavan, The Chief Restructuring Officer Of Caritas, In Support Of [Caritas'] Chapter 11 Petitions And First Day Pleadings) (same);  App. 41, Garg Dep. Ex. 8 at BQHC00088 (showing that in 2008 BQHC paid out over $360,000 in salary and fringe benefits and made a $1.9 loan to Wyckoff); App. 43, Rucigay Dep. Ex 3 at BQHC03771 (Wyckoff board minutes reflecting "Compensation Package" for "the corporate officers of Brooklyn Queens Health Care . . . "effective upon the closing of the SVCMC asset purchase"; and that "the remaining seven years of [Wyckoff CEO Dominick Gio's] employment contract will be assumed by BQHC"); App. 45 at BQHC03941 (December 27, 2006 Employment Agreement between Wyckoff COO Harold McDonald and BQHC with "an annual

base salary of $423,787" and "insurance and other benefits"); App. 46 at BQHC56093-56104 (February 2008 Employment Agreement and General Release between Wyckoff CEO Dominick Gio and Wyckoff, BQHC, and Caritas); App. 47 at BQHC03947 (January 2007 Employment Agreement between Edward J. Dowling, Jr. and BQHC as "Senior Vice President for Strategic Planning and Business Development" and providing an annual base salary of $375,000 and $400,000);   App. 48 at BQHC47342 (February 20, 2007 email to Wyckoff COO Harold McDonald from Romero: "Thank you for meeting with me before the medical board meeting on Thursday, and for your assurance of my role at BQHC.");   App. 49 at BQHC 48037 (email correspondence listing Romero as official of BQHC).

     29.   BQHC's Bylaws specify that BQHC's powers are limited to two functions with respect to Wyckoff and Caritas:

> Electing and removing members of Wyckoff's and Caritas's Boards of Trustees; and

> Authorizing certain discrete corporate acts by Caritas and/or Wyckoff, specifically, the amendment and restatement of their certificates of incorporation and bylaws, their merger or consolidation with another entity, the disposition of their assets, and/or their voluntary dissolution.

*See* Roeber Dec., Exh. 12, at BQHC 00443-00444.

    **RESPONSE:**    Undisputed that this paragraph paraphrases BQHC's Bylaws. Disputed to the extent that this paragraph attempts to set for limitations on BQHC's authority, particularly with respect to Affiliation Agreement. App. D, McDonald Dep. 83:11-85:9, Ex. 13 at BQHC07620-07621 (report stating that "Wyckoff, through BQHC, has taken control of two institutions that combined have an operating budget 18% larger than Wyckoff's."); App. 7, Romero Dep. Ex. 3 at p.1 (AUC Promissory Note Agreement stating that "Brooklyn Queens also operates Wyckoff Heights Medical Center.").

30.     Under this new corporate structure, Wyckoff and Caritas were licensed hospital operators, with BQHC as their "passive parent" to preserve Wyckoff's and Caritas's separate identities, as required by the Conference of Catholic Bishops and Section 8.9 of the Acquisition Agreement. *See* Hoffman Tr., pp. 111:23-115:2; Acquisition Agreement § 8.9, at BQHC 00636-00637; Roeber Dec., Exh. 13 (Deposition Transcript of P. Goldberg ("Goldberg Tr.")), pp. 10:2-12, 27:20-22, 44:5-8 (BQHC's outside consultant who testified that "[t]here was a clear delineation, which was the point of BQHC, [] to make sure that one organization [wasn't] responsible for the other organization's debts").

**RESPONSE:**          Undisputed that "Wyckoff and Caritas were licensed hospital

operators." Disputed that "BQHC [was created] as their 'passive parent' to preserve Wyckoff's

and Caritas's separate identities, as required by the Conference of Catholic Bishops and Section

8.9 of the Acquisition Agreement." *See* Roeber Dec., Ex. 5 (Acquisition Agreement); Roeber

Dec., Ex. 6 (Conference of Catholic Bishops' directives); App. 37 at BQHC03721 (Minutes of

Wyckoff February 9, 2006 board meeting, explaining efficiencies of "ambulance service,

residency programs, and clinical advantages" and that "Wyckoff could realize a substantial

savings if we were to share the costs associated with administrative items, i.e., medical records,

radiology, laboratories and financial offices.").


31.     One of the conditions to closing Caritas's acquisition of St. John's Queens and Mary Immaculate was that Caritas obtain a license, pursuant to Article 28, to operate those hospitals from New York State's Department of Health ("DOH"). *See* Acquisition Agreement § 8.4(a), at BQHC 00630-631; *see also* Roeber Dec., Exh. 14, at BQHC 00791 (Schedule 53(a)(1) to the Acquisition Agreement, requiring that DOH approval be obtained before closing); *id.* at Exh. 15, at BQHC 00881 (Schedule 10.3(d) to the Acquisition Agreement, also requiring "DOH approval"). DOH, in turn, conditioned its approval of Caritas' Article 28 license on, among other things, Caritas and Wyckoff being separate operating entities. *See* Hoffman Dec., ¶ 10.

**RESPONSE:**          Undisputed.


32.     In late December 2006, Caritas received DOH approval to operate St. John's Queens and Mary Immaculate and thus became the "licensed operator" of those hospitals under Article 28. *See* Roeber Dec., Exh. 16, at BQHC 00535; *see also* Hoffman Tr., pp. 19:22-24, 49:9-24; Hoffman Dec., Exh. 5 (Caritas operating certificate, effective January 1, 2007).

**RESPONSE:**          Undisputed.

33.     Caritas's acquisition of St. John's Queens and Mary Immaculate closed shortly thereafter, on or about January 1, 2007.  *See* Roeber Dec., Exh, 17, at BQHC 00512.

**RESPONSE:**          Undisputed.


34.     Ross is a corporation organized under the laws of Dominica that operates a medical school.  See Roeber Dec., Exh. 18 (Ross's Second Amended Complaint ("SAC")), ¶¶ 5-6.

**RESPONSE:**          Undisputed.


35.     Ross is owned by DeVry Inc. ("DeVry"), a for-profit, publicly traded corporation which, according to its most recent SEC filings, has annual revenues of more than $2 billion. *See* St. James Tr., p. 45:20-21; Roeber Dec., Exh. 19, p. 49 (DeVry Form 10-K filed with the SEC for the fiscal year ending June 30, 2011).

**RESPONSE:**          Undisputed.


36.     Ross regularly contracts with dozens of hospitals around the United States to obtain medical clerkship positions for Ross's students.  *See* Roeber Dec., Exh. 20, at Ross 038243-038279 (August 2011 document discussing Ross's "Affiliated Clinical Training Sites," including          **REDACTED**          ; St. James Tr., pp. 12:22-13:25.

**RESPONSE:**          Undisputed.


37.     Since at least 1998, eight years before BQHC and Caritas were formed, Ross had an agreement with St. Vincent's for Ross students to have clerkships at St. John's Queens and Mary Immaculate Hospitals.  *See* St. James Tr., p. 49:6-8; *see also id.* at Exh. 21, at Ross 032636-032640 (February 2, 1998 agreement between Ross and St. Vincent's); *id.* at Exh. 22, at Ross 032641-032642 (Addendum to February 2, 1998 agreement between Ross and St. Vincent's).

**RESPONSE:**          Undisputed.


38.     In Fall 2006, Ross and Caritas began negotiating an agreement that would: (a) allow Ross's students then at St. John's Queens and Mary Immaculate to continue their clerkships after those hospitals were transferred from St. Vincent's to Caritas; and (b) provide Ross's students with future clerkships at St. John's Queens and Mary Immaculate for a period of years.  *See* Roeber Dec., Exh. 23 (Deposition Transcript of Julius Romero ("Romero Tr.")), pp. 31:2-35:18, 57:3-14, 83:7-23 (testifying that "the Ross contract with St. Vincent's" "would be null and void" after Caritas's acquisition of St. John's Queens and Mary Immaculate, and that there was "concern[] about the [students'] continuation of their clerkships"); *see also* St. James

14

Tr., pp. 8:24-13:25; Roeber Dec., Exh. 24, at Ross 033055-033056 (December 16, 2006 email from Julius Romero to Ross's then-Chief Financial Officer).

**RESPONSE:**          Undisputed.

39.     In exchange for these clerkships, Ross agreed to make a "prepayment" for Caritas clerkships, which Caritas intended to use as working capital for St. John's Queens and Mary Immaculate. *See* Roeber Dec., Exh. 25 (Deposition Transcript of Harold McDonald ("McDonald Tr.")), pp. 22:22-26:5, 70:11-24, 86:2-24; Hoffman Tr., p. 100:17-20 (noting "management was entering into prepayment arrangements in order to raise additional funds to support the rescue of St. John's [Queens] and Mary Immaculate"); St. James Tr., pp. 44:14-45:10; Romero Tr., pp. 43:15-44:13.

**RESPONSE:**          Undisputed that Ross agreed to make a prepayment for clerkships

to be provided as set forth in the Affiliation Agreement.  Disputed as to any other "exchange"

and as to the use of Ross funds as working capital for St. John's Queens and Mary Immaculate.

App. 9, Garg Dep. Exh. 6 at BQHC07605 (showing Ross' $5 million prepayment received on

December 29, 2006); App. 54, McDonald Dep. Ex. 12 at BQHC06981 (showing $4.5 million

was transferred from Caritas to Wyckoff on December 29, 2006).

40.     From Fall 2006 until late December 2006, Ross and Caritas negotiated the terms of this proposed "Affiliation Agreement."  *See generally* Romero Tr., pp. 44:16-102:15; St. James Tr., pp. 8:24-61:13; *see also* Roeber Dec., Exh. 26, at Ross 0023753 (November 7, 2006 emails regarding initial proposal for clerkships at Caritas's hospitals).

**RESPONSE:**          Undisputed.

41.     From December 8, 2006 through December 21, 2006, drafts of the Affiliation Agreement listed Ross and Caritas as the only parties to that Agreement. *See* Roeber Dec., Exh. 27, at Ross 015361-015366 (December 8, 2006 draft); *id.* at Exh. 28, at Ross 015333-015340 (December 15, 2006 draft); *id.* at Exh. 29, at Ross 015322-015329 (December 17, 2006 draft); *id.* at Exh. 30, at Ross 015297-015302 (December 19, 2006 draft); *id.* at Exh. 31, at Ross 015255-015261 (December 21, 2006 draft); *id.* at Exh. 32, at Ross 015224-015246 (December 22, 2006 drafts showing proposed changes made on December 21, 2006).

**RESPONSE:**          Undisputed.

42.     On the morning of December 22, 2006, DeVry's in-house counsel, Virginia Smith, Esq., suggested to Ross that BQHC, not Caritas, be the contracting party to the Affiliation

Agreement opposite Ross.  *See* Roeber Dec., Exh. 33, at Ross 015209 (redline showing Ross's replacement of "Caritas Health Care Planning, Inc." with "Brooklyn Queens Health Care, Inc."); *see also* St. James Tr., p. 23:17-24.

**RESPONSE:**      Objection.  This paragraph is not supported by the cited material, which shows only that on December 22, 2006, DeVry's in-house counsel sent a draft Affiliation Agreement to Ross University President Thomas Shepard.  Undisputed.

43.    Later that same day, Ross sent a draft of the Affiliation Agreement to Dominick J. Gio, the President and CEO of BQHC, that, among other things: (a) removed Caritas as a signatory to the Agreement; and (b) made BQHC the contracting party to the Affiliation Agreement opposite Ross.  *See* Roeber Dec., Exh. 34, at Ross 00630-00643.  Ross's e-mail to Mr. Gio stated that "[t]he notated changes [to the Affiliation Agreement] are the result of our DeVry legal and financial department's review."  *Id.* at Ross 00630.

**RESPONSE:**      Undisputed.

44.    Although both parties believed the Affiliation Agreement was in final form and ready to be executed before Christmas 2006, execution of the Agreement was delayed until after Christmas due, apparently, to a ski trip by Daniel Hamburger, DeVry's President and CEO.  *See* Roeber Dec., Exh. 35, at Ross 15144-15145 (email chain including December 22, 2006 email to Ross transmitting a "finalized Clinical Training Affiliation Agreement [] between Ross University and Caritas"); *id.* at Exh. 36, at Ross 015152-015154 (December 22, 2006 emails reflecting Ross's belief that the Agreement was ready for "sign off" and that execution was delayed because of Mr. Hamburger's "snow time"); *see also id.* at Exh. 19, at p. 42 (DeVry Form 10-K identifying Mr. Hamburger as DeVry's President and CEO).

**RESPONSE:**      Objection.  This paragraph is not supported by the cited material, which does not show that "parties believed the Affiliation Agreement was in final form and ready to be executed before Christmas 2006" or that "execution of the Agreement was delayed until after Christmas due, apparently, to a ski trip by Daniel Hamburger."  Disputed.  Before and after Christmas 2006 the parties continued to discuss the inclusion and deletion of a number of terms of the written contract.  App. 4, Romero Dep. Ex. 18 at Ross023701; App. 27 at Ross015142 (Romero email of December 27, 2006 discussing potential contract term); App. I, St. James Dep. 64:21-66:2; App. 22, Romero Dep. Ex. 20 at Ross008477, Ross008481-91

16

(Shepherd email of December 27, 2006 with redlined draft Affiliation Agreement); App. E, Romero Dep. 92:22-99:23 (response to draft Affiliation Agreement); App. 22, Romero Dep. Ex. 20 at Ross008477 (Romero email of December 27, 2006 responding to draft Affiliation Agreement); App. 23, Romero Dep. Ex. 21 at Ross0614 (final Affiliation Agreement ready for execution).

45.     Between the evening of December 27, 2006 and the morning of December 28, 2006, Ross circulated to BQHC a revised draft of the Affiliation Agreement that added, for the first time, the following language: "In the event [Mary Immaculate and St. John's Queens] are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships . . . at one or more of its other facilities." *See* Roeber Dec., Exh. 37, at Ross 015127-015140 (December 27, 2006 internal Ross draft adding the quoted language); *id.* at Exh. 38, at Ross 015124 (Ross transmitting the draft to BQHC between December 27, 2006 and December 28, 2006); *id.* at Exh. 39, at Ross 015104-15115 (December 28, 2006 email from DeVry's counsel to BQHC attaching the final copy of the Affiliation Agreement as "suitable for execution"); St. James Tr., pp. 55:10-56:17.

**RESPONSE:**     Objection.  Disputed that the cited draft and email was the first writing between the parties to include a promise that clerkships provided at Wyckoff would serve as collateral for the transaction.  App. 13, Romero Dep. Ex. 16 at Ross09019 (December 3, 2006, email from Romero to Ross stating: ***In addition, as a backup, I have designed a contingency plan in effect for at least the next four years at Wyckoff, that can collateralize any committed core clerkship at Caritas.***  This can be expressed or implied on the business agreement.") (emphasis supplied); App. 18 at Ross33055 (December 16, 2006 email from Romero to Ross stating: "A contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is not provided to Ross University during the term of this agreement.").  Undisputed that the references email and drafts were sent.

46.     On December 28, 2006, Ross and BQHC executed the Affiliation Agreement. *See* Roeber Dec., Exh. 40.  Later that day, Ross sent $5 million to Caritas.  *See* Roeber Dec., Exh. 41, at Ross 036437 (email noting "[t]he wire transaction was confirmed this afternoon").

**RESPONSE:**      The first sentence is undisputed.  The second sentence is not supported by the cited material to the extent that it asserts Ross sent money "to Caritas." Disputed to the extent that it claims Ross wired money to an account different than instructed than Julius Romero.

47.     On December 5, 2007 and on February 28, 2008, Ross signed two documents entitled, respectively, "Amendment" and "Second Amendment" to the Affiliation Agreement. *See* Roeber Dec., Exhs. 42 & 43.[2]

**RESPONSE:**      Undisputed.

48.     After Caritas acquired Mary Immaculate and St. John's Queens, Wyckoff and Caritas operated their respective hospitals in accordance with applicable laws and regulations, including Article 28.  *See* Rucigay Dec., ¶¶ 10, 28; Arcuri Dec., ¶ 26; Cook Dec., ¶ 26.

**RESPONSE:**      Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

49.     Despite having certain overlapping Board members since January 2007, the Boards of Wyckoff, Caritas, and BQHC at all times acted independently of one another, with each Board making its own decisions as appropriate for its specific corporation.  *See* Arcuri Dec., ¶ 15; Rucigay Dec., ¶ 17; Cook Dec., ¶ 15, Rao Dec., ¶ 10; Figueroa Dec., ¶ 15.  Wyckoff and Caritas operated their respective hospitals cooperatively in terms of shared services and purchasing, which is common for health care systems in New York.  Hoffman Dec., ¶ 27.

---

[2] Although not pertinent to Defendants' summary judgment motion, it is nonetheless appropriate to note that the validity of these amendments is disputed.  BQHC's Board of Trustees never authorized any amendments to the Affiliation Agreement, which were done on the initiative of a consultant whose Administrative Services Agreement explicitly prohibited him and his firm from incurring any liabilities on behalf of Wyckoff, Caritas, or BQHC.

**RESPONSE:**        Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.  Disputed.  *See, e.g.,* Pl.'s Stmt. of Add'l Material Facts at ¶¶11, 63, 81, 84-87, 103-06, 108.

50.    Since BQHC's creation as a "passive parent," Wyckoff's Board of Trustees has not sought to make decisions for BQHC or to influence or control BQHC's decision making in any way.  *See* Cook Dec., ¶ 23-24; Rao Dec., ¶ 12-13; Arcuri Dec., ¶ 23-24; Rucigay Dec., ¶ 26-27; Figueroa Dec., ¶ 23-24.  As Wyckoff's General Counsel explained at his deposition:

> Wyckoff has not, does not, and could not, given the nature of the structure agreed to with St. Vincent's, control BQHC because BQHC, in turn, was the passive parent and sole corporate member of Caritas and that would constitute prohibited cooperation between an entity that conforms to the ethical and religious directives [of the Conference of Catholic Bishops] and one that does not.

Hoffman Tr., p. 132:13-22.

**RESPONSE:**        Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.  Undisputed that Wyckoff's General Counsel so testified.  Disputed that "[Wyckoff] has not sought to make decisions for BQHC or to influence or control BQHC's decision making in any way."  *See, e.g.,* Pl.'s Stmt. of Add'l Material Facts at ¶¶11, 63, 81, 84-87, 103-06, 108.

51.    Since its creation as a "passive parent," BQHC's Board has not sought to make decisions for Wyckoff or to influence or control Wyckoff's operational decision making in any way, including with respect to clinical clerkship programs.  *See* Figueroa Dec., ¶ 17-18, 28; Rucigay Dec., ¶ 19-20, 30; Arcuri Dec., ¶ 17-18, 28; Cook Dec., ¶ 17-18, 28.

**RESPONSE:**        Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.  Disputed.  *See, e.g.,* Pl.'s Stmt. of Add'l Material Facts at ¶¶11, 63, 81, 84-87, 103-06, 108.

52.     Since BQHC's formation in late 2006, BQHC's Board of Trustees has had fewer than half the members of Wyckoff's Board of Trustees.  BQHC's Board of Trustees is currently comprised of 10 members (all of whom are also members of Wyckoff's Board), while Wyckoff's Board of Trustees is comprised of 22 members.  *See* Arcuri Dec., ¶ 19; Cook Dec., ¶ 19; Rucigay Dec., ¶ 21; Figueroa Dec., ¶ 19.

**RESPONSE:**          Undisputed.


53.     From January 1, 2007 on, Wyckoff's Board of Trustees always met separately from the Boards of BQHC and Caritas, and BQHC's and Caritas's Boards always met separately from Wyckoff's Board, with the exception of a single "special" meeting of Wyckoff's and Caritas's Boards held on an emergency basis.  *See* Arcuri Dec., ¶ 15 n.1; Rucigay Dec., ¶ 17 n.1; Figueroa Dec., ¶ 15 n.1; Rao Dec., ¶ 10 n.1; Cook Dec., ¶ 15 n.1; *see also* Roeber Dec., Exh. 44, at BQHC 03811 (minutes from March 12, 2007 "special" meeting of Wyckoff and Caritas Boards).

**RESPONSE:**          Undisputed.


54.     Each of BQHC, Wyckoff, and Caritas has filed its own, separate tax returns and maintained its own corporate books and records.  *See* Rao Dec., ¶ 11; Arcuri Dec., ¶ 14, *25;* Rucigay Dec., ¶ 16, 25; Cook Dec., ¶ 14, 25; Figueroa Dec., ¶ 14, 25; *see also* Hoffman Dec., Exh. 4 (BQHC's 2007 Form 990 tax return); *id.* at Exh. 3 (Wyckoff's 2007 Form 990 tax return); Roeber Dec., Exh. 45, at BQHC 14000-14030 (Caritas's 2007 Form 990 tax return).

**RESPONSE:**          Disputed.  App. B, Goldberg Dep. 13:23-14:12 ("[T]here was very little accurate information when we arrived. . . .  [T]hey did not have accurate financial records, they did not have working computer systems, they weren't getting bills out the door, it was a real problem[.]").


55.     Further, each of Wyckoff and Caritas kept detailed records of any financial obligations due to or from the other entity from January 2007 forward.  *See* Roeber Dec., Exh. 46, at BQHC 04006-04071 (logs reflecting amounts due to/due from Caritas and Wyckoff).

**RESPONSE:**          Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.  Disputed.  App. 42, Garg Dep. Ex. 3 at BQHC00031 n. (g) (Wyckoff's 2007 Audited Consolidated Financial Statements confirming receipt by Wyckoff of "a loan in the amount of

$1.9 million from BQHC"); App. A, Garg Dep. 44:5 – 45:9 (Rule 30(b)(6) deponent's concession that defendants unable to explain how or why BQHC lent $1.9 million to Wyckoff); App. 54, McDonald Dep. Ex. 12 at BQHC06981 (December 8, 2006 transfer of $2 million from Caritas to Wyckoff; December 22, 2006 transfer of $1.4 million from Caritas to Wyckoff); App. 54, McDonald Dep. Ex 12 (transfer of more than $17 million dollars from Caritas to Wyckoff in late 2006 and early 2007); App. D, McDonald Dep. 64:3-25 (McDonald testified that funds were being moved around to "cover the cash needed for a specific point in time. So there were Caritas funds going to pay for Wyckoff liabilities and Wyckoff funds going to pay for Caritas liabilities . . . whichever entity had cash, those funds were being used to pay bills regardless of the entity whose bills they were."); App. 55, Rucigay Dep. Ex. 13 at BQHC03812 (minutes from March 12, 2007 special board meeting stating "Last Thursday, Mr. Rucigay received a telephone call from Dr. Daines, Acting Commissioner of Health, regarding the misapplication of funds and notification of the Boards."); App. D, McDonald Dep. 66:21-67:10 (stating that McDonald believed that more individuals that Harold McNeil were involved in making improper transfers).

    56.    Wyckoff and Caritas maintained separate payrolls to ensure that one entity was not assuming the financial obligations of the other. *See* Goldberg Tr., pp. 40:2-45:6, 48:1651:11; *see also id.* at p. 44:5-8 ("There was a clear delineation, which was the point of BQHC [] to make sure that one organization [wasn't] responsible for the other organization's debts."); Roeber Dec., Exh. 47 (Deposition Transcript of Thomas Singleton), pp. 60:7-63:10, 86:12-87:15, 108:10-17; *id.* at Exh. 48, at BQHC 03874-03875 (minutes from November 1, 2007 meeting of Wyckoff's Board); *id.* at Exh. 49, at BQHC 03882 (minutes from the December 20, 2007 meeting of Wyckoff's Board).

    **RESPONSE:**    Objection. This paragraph contains improper argument and is not supported by admissible evidence. *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts. Disputed. Individuals often performed services for all three entities and Wyckoff transferred its employees to the Caritas payroll so that the cost of their salary would be reimbursed by State funds that could not be used to compensate Wyckoff. App. 43, Rucigay

Dep. Ex. 3 at BQHC03771 (Wyckoff board minutes reflecting "Compensation Package" for "the corporate officers of Brooklyn Queens Health Care . . . "effective upon the closing of the SVCMC asset purchase"; and that "the remaining seven years of [Wyckoff CEO Dominick Gio's] employment contract will be assumed by BQHC"); App. 45, Rucigay Dep. Ex. 5 at BQHC03941 (December 27, 2006 Employment Agreement between Wyckoff COO Harold McDonald and BQHC with "an annual base salary of $423,787" and "insurance and other benefits" and providing that McDonald would report to the "System President and Chief Executive Officer"); App. D, McDonald Dep. 13:1-6, 107:1-8 (McDonald testified that he did work for "all three entities" but that Wyckoff was the entity that in fact paid his salary); App. 46 at BQHC56093-56104 (February 2008 Employment Agreement and General Release between Wyckoff CEO Dominick Gio and Wyckoff, BQHC, and Caritas); App. B, Goldberg Dep. 43:22-24 (explaining Wyckoff intercompany receivable from Caritas for Wyckoff employees performing services to Caritas hospitals: "the State would loan money to make sure that Caritas remained in operation but would not loan money if it was going to be funded back to Caritas."); App. 56, Goldberg Dep. Ex. 10 at BQHC55989-55990 (reflecting transfer of more than fifty employees from Wyckoff to Caritas's payroll, many of whom did not have day to day responsibilities at Caritas); App. H, Singleton Dep. 63:3-64:10 (stating that object of this transfer of employees was to benefit Wyckoff).

57.     Indeed, Wyckoff terminated its Chief Financial Officer ("CFO") in early 2007, upon discovering that he had transferred funds from Caritas to Wyckoff without authorization. The unauthorized transfers were promptly reported to DOH.  *See* Roeber Dec., Exh. 50, at BQHC 04072-04073 (March 2, 2007 email from Wyckoff CEO Dominick Gio); *see id.* at Exh. 4, at BQHC 00196 (minutes from March 6, 2008 meeting of BQHC's Board of Trustees).

**RESPONSE:**     Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed

Facts. Disputed. Board minutes reflect that the NYDOH notified the board of the unauthorized transfers. App. 55, Rucigay Dep. Ex. 13 at BQHC03812 (minutes from March 12, 2007 special board meeting stating "Last Thursday, Mr. Rucigay received a telephone call from Dr. Daines, Acting Commissioner of Health, regarding the misapplication of funds and notification of the Boards."); *see also* App. D, McDonald Dep. 66:21-67:10 (stating that McDonald believed that more individuals than Harold McNeil were involved in making improper transfers).

58.     During the course of negotiating the 2006 Affiliation Agreement with Ross, one goal of Wyckoff's Chief Operating Officer was to maintain the separateness between Wyckoff and Caritas. *See* McDonald Tr., pp. 8:12-9:17, 93:23-94:19.

**RESPONSE:**     Undisputed as to the Chief Operating Officer.  Disputed as to Wyckoff.  App. D, McDonald Dep. 94:16-25; App. 13, Romero Dep. Ex. 16.

59.     During the course of negotiating the 2006 Affiliation Agreement with Ross, Wyckoff personnel insisted that there be no reference to "Wyckoff" in the Affiliation Agreement.  *See* Roeber Dec., Exh. 38, at Ross 015124 (December 28, 2006 email accepting certain of Ross's proposed changes to the draft Affiliation Agreement "EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement" with Ross) (emphasis in original); *id.* at Exh. 51, at Ross 008387 ("The Ross-Caritas agreement should (will) not have any references to Wyckoff Heights Medical Center.").

**RESPONSE:**     Undisputed that the referenced document was sent.  Disputed that in the referenced document Romero insisted that there be no reference to Wyckoff in the Affiliation Agreement.  The relevant passage of the document reads: "The file document was reviewed and determined to be acceptable EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b)(1)]."  The referenced paragraph to which Romero objected, Exhibit B, (b)(1) reads: "(i) for a period of time co-extensive with the term of this Agreement, charge the clerkship rate of $312.50 per week per clerkship, to those clerkships provided by BQHC through its Wyckoff Hospital facilities, under the terms of that certain Agreement, dated December 29, 1997, as amended."  Roeber Dec., Exh. 38.  Other proposed

changes in the referenced contract draft that Romero's email says were "reviewed and determined to be acceptable include the provision that "Absent material breach of this Agreement by the University, the Hospitals shall not withhold Services while the Hospitals remain operative.  In the even the Hospitals are not operative, the University is not in material breach of the Agreement, BQHC shall provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities."  Roeber Dec., Exh. 38.

60.     Shortly after the Affiliation Agreement was signed, in January 2007, both parties agreed upon the need for, and began negotiating the terms of, a separate agreement to extend the existing Ross-Wyckoff clerkship agreement, which had been in place since 1997 and remains in place today. *See* Roeber Dec., Exh. 51, at Ross 008387-008389.

**RESPONSE:**          Undisputed.

61.     At no time did Wyckoff's Board of Trustees advocate for, consent to, or accept Wyckoff's taking on any liability or responsibility with respect to the Affiliation Agreement. *See* Rucigay Dec., ¶ 31; Arcuri Dec., ¶ 29; Rao Dec., ¶ 9; Cook Dec., ¶ 29; Figueroa Dec., ¶ 29. By contrast, in December 2006, contemporaneously with the negotiation of the Affiliation Agreement between Ross and BQHC, Wyckoff's Board of Trustees was presented with, and did consent to, the signing of a promissory note with a different medical school (American University of the Caribbean) in which Wyckoff explicitly guaranteed Caritas's obligation to repay an advance of funds if clerkships were not provided by Caritas.  See Rucigay Dec., ¶ 31; Arcuri Dec., ¶ 29; Rao Dec., ¶ 9; Cook Dec., ¶ 29; Figueroa Dec., ¶ 29; see also Roeber Dec., Exh. 52, at Ross 031414-031423 (December 1, 2006 Promissory Note Agreement between American University of the Caribbean, BQHC, Caritas, and Wyckoff).[3]

**RESPONSE:**          Objection.  This paragraph contains improper argument and are not

supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed

Facts.  Disputed.  The boards were aware that management had entered into the Ross and AUC

Affiliation Agreements, but the Ross and AUC Affiliation Agreements were not presented to the

---

[3] Defendants' footnote has been added to the text of this paragraph in order to respond to the factual allegations contained therein.

boards for approval.  App. F, Rucigay Dep. 23:1- 24:12; App. A, Garg Dep. 41:7-16 ("At any time, when you served on any of these boards, was a prepaid clerkship contract with [a] medical school ever produced to the board, for the board's approval or rejection?   No."); App. 38, Rucigay Dep. Ex. 4 at BQHC03793 (minutes to the December 14, 2006 meeting of the Wyckoff Board of Trustees: "[r]ecent efforts to solicit prepayment of clerkships at Caritas from several medical schools are being coordinated with this division"); App. 60, Rucigay Dep. Ex. 11 at BQHC54897 (Wyckoff President and CEO Gio reported at June 7, 2007 Wyckoff Board of Trustees Meeting that: "[p]repayment for clerkships was secured from Ross University and American University of the Caribbean for Caritas in the amount of $8.5 million . . .   All affiliation agreements have been reviewed and approved by the New York State Education Department."); App. 57, Rucigay Dep. Ex. 23 at BQHC03883 (at the December 20, 2007 meeting of the Wyckoff Board of Trustees, Singleton reported that, with the assistance of Gio and Romero, he had entered into the First Amendment to the Ross/BQHC contract and that the approximately $4 million prepayment due under that amendment had been received; no one at the board meeting objected to execution of the amendment; instead, the discussion consisted of expression of gratitude that the contract resulted in cash "coming into the door."); App. B, Goldberg Dep. 31:22-39:16; App. H , Singleton Dep. 54:3-12; App. D, McDonald Dep. 92:24-93:22; App. F, Rucigay Dep. 42:3-43:10.

62.    From January 2007 until February 2009, Caritas operated St. John's Queens and Mary Immaculate in accordance with its Article 28 license to do so.  *See* Hoffman Dec., ¶ 25.

**RESPONSE:**    Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

63.     On February 6, 2009, Caritas filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York.  *See In re Caritas Healthcare, Inc., et al.,* Jt. Admin. Ch. 11 Case No. 09-40901 (Bankr. E.D.N.Y.); *see also* Roeber Dec., Exh. 53 (Deposition Transcript of John Kastanis ("Kastanis Tr.")), pp. 17:13-21:21; Hoffman Tr., pp. 110:19-111:10.

**RESPONSE:**          Undisputed.

64.     Although it could have done so, Ross has not entered a proof of claim in Caritas's bankruptcy.  *See In re Caritas Healthcare, Inc., et al.,* Jt. Admin. Ch. 11 Case No. 09-40901 (Bankr. E.D.N.Y.), at Dkt. No. 162 (April 3, 2009 schedule of assets and liabilities listing all claims, none of which was filed by Ross); *see also* Roeber Dec., Exh. 54, at Ross 035728 (March 5, 2009 internal Ross e-mail explaining decision not to file a proof of claim in Caritas's bankruptcy proceedings).

**RESPONSE:**          Undisputed.

65.     Wyckoff's own substantial investment in the rescue of St. John's Queens and Mary Immaculate was lost.  *See* Roeber Dec., Exh. 46, at BQHC 04071 (log reflecting a total debt of more than $17 million due from Caritas to Wyckoff).

**RESPONSE:**          Objection.  This paragraph contains improper argument and is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

66.     Ross's former CFO testified that, once St. John's Queens and Mary Immaculate ceased operations, Ross expected Wyckoff to replace the clerkships previously in place at those hospitals by either: (a) repudiating contracts with other medical schools and expelling the students who were then clerking at Wyckoff; or (b) hiring additional physicians as teaching faculty at Wyckoff. St. James Tr., pp. 6:15-25, 33:14-24 ("Our expectation was [Wyckoff] had the ability to either take those other schools out and put the Ross folks in, or invest in Wyckoff to add enough faculty for our students to keep the rotations.").

**RESPONSE:**          Undisputed.

67.     At the time, Wyckoff's "capacity to offer clinical clerkships was fully utilized by students from other medical schools."  *See* Roeber Dec., Exh. 55, at Ross 002827 (October 7, 2009 internal DeVry memorandum discussing BQHC's initial response to Ross's demands).

**RESPONSE:**          Objection.   This paragraph is not supported by admissible evidence.  *See* Pl.'s Mot. to Strike Defs.' 56.1 Stmt. of Undisputed Facts.

68.    Currently, Wyckoff has the capacity to provide clinical clerkships for 406 students at a time, all of which has been fully utilized by Ross and other medical schools.  *See* Romero Tr., pp. 153:8-156:13; Roeber Dec., Exh. 56 (Wyckoff s Responses and Objections to Plaintiff's Second Set of Interrogatories, dated May 24, 2011), at Interrogatories 1(a), 2. Wyckoff's ability to provide clinical clerkships beyond that capacity is constrained by practical considerations such as: (a) the number of teaching faculty and patients that it can accommodate at any given time; and (b) Wyckoff's policy, guided by regulatory recommendations, of limiting its clinical clerkships to a ratio of between four and eight medical students to each teaching physician.  *See* Romero Tr., pp. 153:22-154:6, 155:2-156:13.

**RESPONSE:**          Undisputed.


69.    On April 6, 2009, Ross sued BQHC and Wyckoff in this Court.  *See* Roeber Dec., Exh. 57 (original Complaint).

**RESPONSE:**          Undisputed.


70.    Ross subsequently amended its complaint on August 20, 2009 and on September 22, 2009, *see* Roeber Dec., Exhs. *58* (First Amended Complaint) and 18 (SAC).

**RESPONSE:**          Undisputed.


71.    Among other things, Ross's SAC alleges that:

When St. John's Queens and Mary Immaculate ceased operations, BQHC became obligated to provide Ross's students with clerkships at Wyckoff, *see* SAC¶ 1-4;

Ross is therefore entitled to "an order of specific performance" forcing BQHC to direct Wyckoff to give Ross students clerkships at Wyckoff, *id.* at ¶¶ 55-64;

Ross is further entitled to "pierce the corporate veil and impose [BQHC's] liability for breach of the Affiliation Agreement . . . upon Wyckoff" because, according to Ross, BQHC: (a) has "few, if any assets"; (b) has no employees or offices; (c) has "overlapping officers and directors" with Wyckoff; and (d) is "controlled" by Wyckoff. *Id.* at 1166-80.

**RESPONSE:**          Undisputed.


72.    Defendants filed their answer to Ross's SAC on October 6, 2009.  *See* Roeber Dec., Exh. 59.

**RESPONSE:**          Undisputed.

## ADDITIONAL FACTS REQUIRING
## THE DENIAL OF PARTIAL SUMMARY JUDGMENT
### Ross And Wyckoff's Original Clerkship Contract

1.     Wyckoff sells clinical clerkship rotations to medical schools.  App. 1, Declaration of Julius Romero, ¶ 7.

2.     At the time the parties entered into the Affiliation Agreement, Ross and Wyckoff were parties to a contract for Wyckoff to provide clinical clerkship rotations to Ross' students. App. 2, Wyckoff Affiliation Agreement at Ross1003; App. 3, Wyckoff Affiliation Agreement at Ross31957.  As of 2006, the Ross/Wyckoff contract did not contain: a guaranteed number of clerkships to be provided; a term for when the contract would conclude; or a provision for the price of clerkships.  App. 2, Wyckoff Contract, Ross1003.  In practice, Ross paid to Wyckoff $325 per clerkship.  App. 4, Deposition of Julius Romero, Ex. 18 at Ross23701.

3.     Ross' contract with Wyckoff includes a right of first refusal for Ross on clerkships that become available at Wyckoff.   App. 3, Wyckoff Affiliation Agreement at Ross31957.

### Wyckoff's Solicitation of Investment for Clerkships At The Cartias Hospitals

4.     In an August 21, 2006 letter to Ross' Vice President of Academic Affairs, Nancy Perri, Wyckoff's Chief Executive Officer, Dominick Gio, made a proposal for the sale clerkships at Mary Immaculate and St. John's hospitals.  App. 5, Romero Dep. Ex. 2 at BQHC31314.

5.     The August 21, 2006 letter was sent on Wyckoff stationary and signed by Gio in his capacity of "President and Chief Executive Officer Wyckoff Heights Medical Center."  App. 5, Romero Dep. Ex. 2 at 31314.  The "re line" of the letter read: "Investment Opportunity in the Development of the Brooklyn Queens Healthcare System and the Expansion of Wyckoff's International Medical Student Clinical Training Program."  App. 5, Romero Dep. Ex. 2 at 31314.

6.     The August 21, 2006 contained the following passages (reproduced without ellipses):

> As you may have already heard, *Wyckoff Heights Medical Center (WHMC) will soon be the sponsor* of Mary Immaculate and St. John's Queens Hospitals.
>
> *Brooklyn Queens Healthcare (BQHC), the name of the new three hospital system to be formed, will be comprised of Wyckoff Heights Medical Center (WHMC), Mary Immaculate Hospital (MIH), and St. John's Queens Hospital (SJQ).*
>
> *WHMC, in conjunction with Saint Vincent's, has developed a Transition/Turnaround Plan for MIH & SJQ* which is currently being implemented and will be complete as of the closing date and transfer of sponsorship of the two hospitals.  Included in the Transition/Turnaround Plan is the significant expansion of medical student clerkships at MIH & SJQ.  WHMC is currently the medical student clinical training site for 325 clerkships.  *It is conservatively estimated that when the WHMC medical student education model is rolled out at MIH & SJQ, each hospital will accommodate in excess of 200 clerkships.*
>
> *There will be BQHC System wide free transportation for residents & students, as well as housing at MIH and WHMC.  Development of a fifth semester training site for students is currently being explored as well as teleconferencing capabilities between the BQHC hospitals and affiliated international medical schools.*
>
> Attached is a Caritas matrix of Prepaid Clerkship Fees opportunities we are offering to the international medical schools which currently have rotation agreements with Wyckoff Heights Medical Center.  *The faculty and administration here at Wyckoff are very proud of the medical student clinical training program we have developed.  We are excited about the prospects of the expanded and enhanced BQHC System academic program.*
>
> If you have any questions or are in need of additional information, please contact Harold E. McDonald [Wyckoff's Chief Operating Officer] at (718) 963-7717.

App. 5, Romero Dep. Ex. 2 at 31314-15 (emphasis supplied); App. E, Romero Dep. 32:7-16.

7.     Dominick Gio sent an identical letter to the CEO of the American University of the Caribbean ("AUC").  App. 6, Romero Dep. Ex. 1.  AUC is another medical school with whom Wyckoff had a preexisting clerkship contract.  App. 6, Romero Dep. Ex. 1.

## AUC's Prepaid Contract For Clerkships At The Caritas Hospitals

8.      AUC reached an agreement for prepaid clerkships at the Caritas hospitals.  The AUC transaction was documented in two written contracts: (1) a Promissory Note Agreement ("AUC Promissory Note Agreement") dated December 1, 2006, that sets forth financial terms of the transaction; and (2) an Affiliation Agreement that deals generally with academic requirements.  App. 7, Romero Dep. Ex. 3 (Promissory Note Agreement); App. 8 (American University of the Caribbean Affiliation Agreement).

9.      AUC agreed to advance $3.5 million in exchange for provision of a maximum of 75 core rotations and 30 elective rotations at St. John's and Mary Immaculate Hospitals.  App. 7, Romero Dep. Ex. 3 at p.1.  AUC's advance was to be "earned down" at an agreed upon rate by provision of clerkships at St. John's and Mary Immaculate, backed by a promise that, should the Hospitals be unable provide the promised clerkships, BQHC would obligate Wyckoff to provide them.  App. 7, Romero Dep. Ex. 3 at p.1.

10.     The AUC Promissory Note Agreement was executed by Wyckoff's President and CEO, Dominick Gio.  App. 7, Romero Dep. Ex. 3 at p.1.  Gio signed on behalf of BQHC as its "Chairman," Caritas Healthcare Planning, Inc. as its "Chairman," and Wyckoff as its "President and CEO."  App. 7, Romero Dep. Ex. 3 at p.1.

11.     The AUC Promissory Note Agreement reflects the "loan" amount of $3.5 million and defines Caritas Healthcare Planning, Inc. as the "Borrower."  App. 7, Romero Dep. Ex. 3 at p.1.  It also recites that Caritas is "a wholly-owned subsidiary of Brooklyn Queens Healthcare, Inc. ("Brooklyn Queens")" and that "*Brooklyn Queens also operates Wyckoff Heights Medical Center*."  App. 7, Romero Dep. Ex. 3 at p.1 (emphasis supplied).

12.   The AUC Promissory Note Agreement also contains the following provision:

Brooklyn Queens acknowledges and agrees, on behalf of its wholly-owned subsidiary Wyckoff, that a Default . . . by Brooklyn Queens, Caritas, MIH, and SJQH (individually and collectively) . . . will obligate Wyckoff to assume responsibility for this Note Agreement, including the scheduling of the maximum of fifty (50) AUC students receiving medical student clinical education in the Core Disciplines at MIH and SJQH and the maximum of twenty (20) AUC students receiving medical clinical education in the Elective Disciplines at MIH and SJQH.

App. 7, Romero Dep. Ex. 3 at p.6.

13.   The AUC Promissory Note Agreement states that Wyckoff's unwillingness or inability "to assume responsibility for performance hereunder" constitutes an "Early Termination Event." App. 7, Romero Dep. Ex. 3 at p. 3. The AUC Promissory Note also contains an acknowledgment that BQHC and Wyckoff are "lawfully authorized" to make these commitments. App. 7, Romero Dep. Ex. 3 at p.6.

14.   AUC wired its $3.5 million prepayment on December 1, 2006. App. 9, Deposition of Rajiv Garg Ex. 6 at BQHC07605 (Row entitled "Prepaid Clerkships"). The AUC deal was scheduled to close on January 1, 2007. App. D, Deposition of Harold McDonald, 76:3-6.

15.   The AUC Promissory Note Agreement contained a promise to AUC that BQHC would cap the total number of medical students rotating through clerkships at St. John's and Mary Immaculate. App. 7, Romero Dep. Ex. 3 at p.5.

### Negotiation Of The Ross/BQHC Affiliation Agreement

16.   Wyckoff's CEO assigned to Julius Romero the day to day negotiation of the prepaid clerkship contracts with Ross and AUC. App. 10, Declaration of Dominick Gio, ¶4 (submitted in connection with AUC lawsuit); App. E, Romero Dep. 33:2-10. For Ross, most of the early discussions were handled by Dr. Perri. App. 11, Romero Dep. Ex. 10 at Ross09216;

App. 12, Romero Dep. Ex. 11 at Ross09186; App. 13, Romero Dep. Ex. 16 at Ross09019; App. 14 at Ross09812.

17.    In a sworn declaration submitted in a lawsuit brought by AUC, Romero testified that "I am the Assistant Vice President for Medical Education at Defendant Brooklyn Queens Healthcare, Inc." and "[i]n my capacity as Assistant Vice President for Medical Education for BQHC, I oversee the clinical clerkship programs at Caritas' two hospitals and at Wyckoff." App. 1, Romero Dec., ¶5.

18.    At his deposition in this lawsuit, Romero testified that he served as a liaison in the negotiations, but did not have final authority on any of the material terms.  App. E, Romero Dep. 33:11-24, 35:1-13.  Romero testified that Wyckoff's CEO, COO, and CFO had final decision making authority on those terms.  App. E, Romero Dep. 33:11-24, 35:1-13.

19.    Romero testified that before he sent proposals or counterproposals to Ross, he would send them to his immediate supervisor, Dr. Kenneth Frieberg; Wyckoff CEO, Dominick Gio; and Wyckoff COO, Harold McDonald, to obtain their approval before communicating the offer to Ross.  App. E, Romero Dep. 53:10-23.

20.    On October 5, 2006, Romero wrote to Dr. Perri: "To complement a proposal submitted by the Brooklyn Queens Healthcare, Inc. last month, I am attaching a matrix analysis based on current clerkship slots at the Catholic Medical Center campuses (Mary Immaculate and Saint John's)."  App. 11, Romero Dep. Ex. 10 at Ross 009216.  The attachment to that email contained a proposal in which Ross would make a prepayment and in exchange "BQHC provides and guarantees 'green-book' clerkships at its Caritas campuses (Mary Immaculate Hospital and Saint John's Queens Hospital) for sixty (60) core slots each year for five consecutive years." App. 11, Romero Dep. Ex. 10 at Ross 009216.

21.     On October 31, 2006, Romero wrote to Dr. Perri: "I tried to contact you several times during the past few days as a follow up to our conversation on 10/24/06 regarding the Caritas/Catholic Medical Center clerkship sites.  The telephone meeting is based on the 8/21/06 letter submitted by Brooklyn Queens Healthcare, Inc."  App. 14 at Ross009182.

22.     On October 31, 2006, Romero asked Dr. Perri to commit quickly because "other bidding medical schools have already submitted their proposals."  App. 14 at Ross009182.

23.     When Romero made this statement, he had no other proposals from other medical schools.  App. E, Romero Dep. 55:9-17.  Gio directed Romero to move these transactions forward because Gio wanted the money that they would generate to be paid in quickly.  App. E, Romero Dep. 55:18-56:17; 57:19-25.

24.     On November 1, 2006, Romero wrote Dr. Perri about the proposal with a note whose subject line was "Wyckoff/CMC [Catholic Medical Center] Details – Follow up to 8/21/06 letter."  App. 15, Romero Dep. Ex. 12 at Ross009177.

25.     Romero believed that the prepaid clerkship arrangement could be accomplished simply by amending Ross' existing contract with SVCMC.  App. E, Romero Dep. 63:1-19.

26.     On November 13, 2006, Romero sent an email to Dr. Perri with a subject line "Student Clerkships: Amendment to CMC Agreement."  App. 16, Romero Dep. Ex. 13 at BQHC 24771.  Romero attached to the email a draft amendment to that contract and wrote: "Per our discussion, please review, comment as needed, and sign.  The clinical affiliation agreement with CMC is intact, except for the compensation agreement during the term covered in this amendment (four years, $5M or until prepaid clerkship fees are exhausted)."  App. 16, Romero Dep. Ex. 13 at BQHC 24771.

27.     On November 29, 2006, Romero wrote to Dr. Perri: "We may also need to redraw the entire clinical affiliation agreement between Caritas Healthcare and Ross University since the current affiliation agreement may become null or void after Caritas completes the acquisition closing of Mary Immaculate Hospital and Saint John's Hospital Queens next month." App. 17 at Ross009046.

28.     The Affiliation Agreement was the first prepayment arrangement Ross entered into for clerkships. App. I, Deposition of John St. James, 33:25-34:3. Given the financial health of the Caritas hospitals and the amount of the $5 million prepayment, Ross asked BQHC to ensure that it would provide replacement clerkships for Ross' students in the event that the Caritas hospitals closed. App. I, St. James Dep. 16:10-23, 32:17:24, 33:25-34:3.

29.     During negotiations over the Affiliation Agreement, John St. James was Ross' Chief Financial Officer. John St. James testified in response in a Rule 30(b)(6) deposition that: "I asked for some back up. Let's say if the new entity could not deliver what would our fall back position be. They were asking us to pay them many millions of dollars, and we want to mitigate our risk. One was the back up plan to take care of our students if either of the hospitals would not be able to deliver the rotations." App. I, St. James Dep. 16:10-23. Mr. St. James further testified that: "[i]t was a key element for us. We had never prepaid anything, much less five million dollars. So we were very focused on that." App. I, St. James Dep. 33:25-34:3. "We wanted to be protected. If we are going to give five million dollars, we wanted to make sure our students would be protected. This is the way we wanted a back up. . . . I told him [Julius Romero] I wanted it in writing." App. I, St. James Dep. 32:17:24.

30.     On December 3, 2006, Romero wrote Dr. Perri:

Sounds good Dr. Perri. I have informed Rich and Harold that the draft agreement will be coming from your office with approval from John St. James and Tom

> Shepherd. . . . *In addition, as a backup, I have designed a contingency plan in effect for at least the next four years at Wyckoff, that can collateralize any committed core clerkship at Caritas.*  This can be expressed or implied on the business agreement.

App. 13, Romero Dep. Ex. 16 at Ross09019 (emphasis supplied).

31.     On December 16, 2006, following a telephone conference that day, Romero sent another email stating: "A contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is not provided to Ross University during the term of this agreement."  App. 18 at Ross33055.

32.     On December 8, 2006, Wyckoff's general counsel, David Hoffman, sent John St. James a draft Affiliation Agreement that cast the contract as between Ross and "Cartias Healthcare Planning, Inc."  App. 19 at Ross008943-44.  At his deposition, Hoffman denied performing any work on this transaction.  App. C, Deposition of David Hoffman, 35:1-22.

33.     On December 20, 2006, Dr. Perri wrote Romero: "The organization now called 'Caritas'; does that include Wyckoff in addition to SJ [St. John's] and MI [Mary Immaculate]?"  App. 20 at Ross008748.  Romero responded: "Caritas encompasses Saint John's Queens Hospital and Mary Immaculate Hospital under the auspices of Brooklyn Queens Healthcare (BQHC), which also operates Wyckoff Heights Medical Center."  App. 20 at Ross008748.

34.     On December 22, 2006, Ross President Dr. Tom Shepherd send a revised and redlined draft contract to Wyckoff's CEO, Dominick Gio.  App. 21, Romero Dep. Ex. 19 at Ross0630.

35.     The draft made the contract one between Ross and "Brooklyn Queens Healthcare, Inc."  App. 21, Romero Dep. Ex. 19 at Ross0631.

36.     The draft also revised the opening paragraph to read:

<u>This Agreement is made between</u> **Ross University School of Medicine, School of Veterinary Medicine, Limited,** <u>hereinafter referred to as the "University"</u>, <u>and</u> ~~Caritas Healthcare Planning, Inc.~~<u>Brooklyn Queens Health Care, Inc. ("BQHC"), which</u> <u>through its subsidiary, Caritas Healthcare Planning, Inc., owns and</u> <u>operates Mary Immaculate Hospital and Saint John's Queens Hospital in New York,</u> <u>hereinafter referred to as</u> ~~("Caritas" "~~<u>or</u> "the Hospitals"~~)~~, <u>(collectively, BQHC and the University shall be</u> "the Parties<u>).</u>

App. 21, Romero Dep. Ex. 19 at Ross0631.

37.     All succeeding drafts, the final contract, and the contract amendments reflect BQHC as the operative party that will perform or cause affiliates under its control to perform the contract obligations that the agreements say BQHC undertook.  App. 21, Romero Dep. Ex. 19 at Ross00630; App. 24, Romero Dep. Ex. 5 at Ross0056; App. 25, Romero Dep. Ex. 6 at Ross0052; App. 26, Romero Dep. Ex. 7 at BQHC42911; App. 22, Romero Dep. Ex. 20 at Ross08477-81; App. 23, Romero Dep. Ex. 21 at Ross0614-15.

## References to "Wyckoff" in the Affiliation Agreement

38.     Ross attempted to use the promise of prepayment of clerkships at St. John's and Mary Immaculate to obtain, in addition, a freeze in the prices for clerkships that Wyckoff was providing to Ross under the preexisting contract between Wyckoff and Ross.  App. I, St. James Dep. 43:15-44:8 ("[W]e want[ed] a price freeze to apply at Wyckoff, not only with [the] Cartias rotation[s]. . . .  I can't recall if the price was the same.  We wanted the current price at Wyckoff to be frozen for a period of years.").

39.     On December 22, 2006, Dr. Perri wrote Romero: "[Ross officials] are still asking if the lock in rate of 312.50 per week applies to Wyckoff for the 4 years."  App. 4, Romero Dep. Ex. 18 at Ross023701.  Romero agreed to the freeze, but insisted that it not documented in the Ross/BQHC agreement.  App. 27 at Ross015142.

40.     On December 27, 2006, responding to a telephone message and email from Ross President Dr. Tom Shepherd on the topic of freezing the "cost per week" for clinical clerkships at Wyckoff, Romero wrote:

> The Clinical Affiliation Agreement with Wyckoff Heights Medical Center is current, and separate from the Caritas-Ross Agreement. The clerkship rate at WHMC is $312.50 per week. On a separate executed agreement or addendum to the existing WHMC-Ross Agreement, this clerkship rate can be locked in for four years from January 1, 2007 – December 31, 2010. As discussed, it is best that this item not hinge on the Caritas-Ross Agreement, but rather once executed, a goodwill gesture from the BQHC/Wyckoff leadership."

App. 27 at Ross015142.

41.     On December 27, 2006, Dr. Shepherd emailed Romero a redlined draft Affiliation Agreement along with a cover note that indicated Ross' willingness to go forward with the transaction on the terms indicated. App. I, St. James Dep. 64:21-66:2; App. 22, Romero Dep. Ex. 20 at Ross008477; App. 22, Romero Dep. Ex. 20 at Ross008481-91.

42.     The redlines draft contained the following changes. A proposed addition to the draft Affiliation Agreement read that BQHC shall:

> (i)     for a period of time co-extensive with the term of this Agreement, charge the clerkship rate of $312.50 per week per clerkship, to those clerkships provided by BQHC through its Wyckoff Hospital facilities, under the terms of that certain Agreement, dated December 29, 1997, as amended;

App. 22, Romero Dep. Ex. 20 at Ross008489.

43.     Another proposed addition to the draft Affiliation Agreement stated that:

> The Monetary Consideration is due and payable on or before the end of the month following the period set forth in the amortization schedule. If unpaid within 60-days following the applicable period a late fee in the same rate as the effective rate for the amortization period, will accrue, beginning with the first day of the second month following the amortization period.
>
> The University reserves the right to apply any Monetary Consideration against any monies to be paid by the University under this Agreement for secretarial support, library support, or additional clerks. In the event the University elects to exercise such right, BQHC shall provide, or cause the Hospitals to provide within

37

the same time frame as the payment schedule in the paragraph above, a written accounting of such disbursements from the Monetary Consideration owed the University.

In the event of failure to pay the Monetary Consideration hereunder and/or the filing of bankruptcy by BQHC, or by one or both of the Hospitals, BQHC agrees and shall cause the Hospitals to agree, that the University shall be considered a secured creditor in the amount of any unpaid Monetary Consideration and any unamortized portion of the Pre-Payment Amount.

App. 22, Romero Dep. Ex. 20 at Ross008490-91.

44.     A third proposed addition to the draft Affiliation Agreement stated that:

Absent material breach of this Agreement by the University, the Hospitals shall not withhold Services while the Hospitals remain operative.  In the event the Hospitals are not operative, and the University is not in material breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.

App. 22, Romero Dep. Ex. 20 at Ross008490-91.

45.     Romero received instructions from Wyckoff CEO Dominick Gio to tell Ross the changes were acceptable, except for the proposed addition of the provision in Exhibit B, (b)(i) concerning the price freeze for clerkships at Wyckoff.  App. E, Romero Dep. 92:22-99:23.  On December 28, 2006, Romero wrote an email to Dr. Shepherd, with copies to Harold McDonald and Dominick Gio, that read:

The file document was reviewed and determined to be acceptable EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b)(i)].  The Caritas agreement remains separate from the Wyckoff agreement. The agreement without the referenced item will be signed and faxed to Nancy Perri's office today for her and John St. James' signatures.

App. 22, Romero Dep. Ex. 20 at Ross008477.

46.     Romero testified that "agreements were submitted to Mr. McDonald and Mr. Hoffman at the time" and that if he "followed the hospital's usual business practice on entering the contracts," the agreement should have been submitted to McDonald, Hoffman, and Gio.

App. E, Romero Dep. 94:18-95:5.

47.     On December 28, 2006, Ross' in-house counsel sent Romero and Gio a clean copy of a contract with the Wyckoff price freeze provision in Exh. B., (b)(i) removed.  App. 23, Romero Dep. Ex. 21 at Ross0614.  A cover note to the contract read:

> Attached is a revised draft of the above-referenced agreement.  This is a clean copy, suitable for execution.
>
> In accordance with our conversation earlier this morning, the sole change to the document is the deletion in Exhibit of the paragraph referencing the existing agreement between Ross and Wyckoff.  As we discussed, the Wyckoff agreement currently provides for a rate of $312.50 per week, per clinical clerkship, until the parties mutually agree otherwise.
>
> You have represented to me that it is your intention that the term of Wyckoff rate be, at a minimum, co-extensive with the term of the rate of the Caritas agreement.  You have agreed to confirm this in writing, subsequent to our closure of the Caritas agreement.
>
> If the agreement is now satisfactory to you, please print two copies, sign both, and provide them to Ross.  They should sign both and return one fully executed original for your records.

App. 23, Romero Dep. Ex. 21 at Ross0614.

48.     When Romero received this document, he printed off copies and left them with Gio and McDonald.  App. E, Romero Dep. 99:24-105:20.  When Romero learned that McDonald and a second signatory, Neal Mandava, had signed it, Romero picked up the executed contract and faxed it to Ross.  App. E, Romero Dep. 99:24-105:20.

49.     McDonald signed the agreement.  App. D, McDonald Dep. 21:3-6.  It was McDonald's usual practice to obtain the concurrence of the hospital's legal counsel and Gio before signing contracts and that McDonald testified that he would not have signed a document like it "if it hadn't been reviewed by counsel and by Mr. Gio."  App. D, McDonald Dep. 46:9-47:23; 95:21-96:18.

50.     On January 10, 2007, Ross' in-house counsel wrote Romero: "we agreed that you would provide written confirmation of your intention that the Wyckoff rate be $312.50 per week and that the term be, at a minimum co-extensive with the term of the rate for the Caritas.   To date, I have not received a draft of this confirmation for my review."  App. 28 at BQHC48037, 48041-48042.  On January 29, 2007, Romero sent an email to Ross' in-house counsel insisting that Ross agree to an additional "prepayment" to Wyckoff in exchange for the promised price freeze.  App. 28 at BQHC48037.

### Thomas Singleton Is Appointed Chief Restructuring Officer
### With Full Management Authority At BQHC, Wyckoff, and Caritas

51.     Following the acquisition of St. John's and Mary Immaculate, the financial performance of all three hospitals was poor, with much of the financial distress caused by the inability to collect sufficient receivables to fund the ongoing expenses of operations.  App. D, McDonald Dep. at 87:14-25 (McDonald testified that Wyckoff and the Caritas hospitals "couldn't afford or didn't have the cash to carry the expenses of the organizations through this ramp up of the receivables period").

52.     BQHC sought financial assistance from the New York Dormitory Authority and the New York Department of Health.  App. D, McDonald Dep. 87:14-88:13.  The Department of Health agreed to provide assistance only if there was a restructuring officer in place.  App. D, McDonald Dep. 87:14-25.

53.     The New York state agencies required that a restructuring officer be given management control of BQHC, Caritas and Wyckoff.   App. D, McDonald Dep. 88:15-19. BQHC, Caritas and Wyckoff agreed to do so.  App. D, McDonald Dep. 82:8-14.

54.     On behalf of BQHC, Wyckoff, and Caritas, McDonald headed up the discussions with the State concerning the request for aid and the State's insistence that BQHC, Wyckoff, and

Caritas retain of an outside restructuring officer if aid were to be provided. App. D, McDonald

Dep. 82:8-14. McDonald testified about those discussions as follows:

> Q. Okay. What authority over the hospitals' operations did the State insist the restructuring officer be given?
> A. That they be given control, management control of the organization.
> Q. By organization, that's Brooklyn-Queens Health Care, Caritas and Wyckoff?
> A. Yes.
> Q. Did Brooklyn-Queens Health Care, Caritas and Wyckoff agree?
> A. Yes.
> Q. Who was the restructuring consultant that was engaged in response to the states' demand?
> A. FTI Cambio.
> Q. What people did FTI Cambio supply in its role as restructuring consultant?
> A. They had a team of management staff, management and staff.
> Q. Who was in charge of that team?
> A. Tom Singleton.
> Q. Once in place was Mr. Singleton in charge of the hospital organizations?
> A. Yes.
> Q. That would be each of Brooklyn-Queens Health Care, Caritas and Wyckoff?
> A. Yes.
> Q. He brought with him somebody named Paul Goldberg, did he not?
> A. Yes.
> Q. What was Mr. Goldberg's function while he was at the hospital organizations?
> A. I'm not sure of his exact title, but he acted as chief financial officer.
> Q. Once Mr. Singleton was in place at the hospital organizations, did all management at Brooklyn-Queens Health Care, Wyckoff and Caritas either report to Mr. Singleton or through someone else to Mr. Singleton?
> A. Yes.

App. D, McDonald Dep. 88:14-90:6.

55.   In July 2007, Thomas Singleton from FTI Cambio was named Chief

Restructuring Officer of BQHC, Wyckoff, and Caritas. App. D, McDonald Dep. 89:2-11. Paul

Goldberg from FTI Cambio was named Chief Financial Officer of BQHC. App. D, McDonald

Dep. 89:6-20; App. 29, Deposition of Emil Rucigay, Ex. 18 at BQHC13452 (memorandum from

Emil Rucigay stating that "[a]s CRO, Tom Singleton has been charged with the responsibility to assume full and overall management authority of BQHC, Wyckoff, and Caritas.").

56.     Once FTI Cambio had been engaged, management at BQHC, Wyckoff and Caritas reported to Singleton or through someone else to Singleton.   App. D, McDonald Dep. 89:25-90:6.

### First & Second Amendments

57.     Under Singleton's management, BQHC sought to raise cash by amending the prepaid clerkship contracts into which it had already entered.   App. H, Deposition of Tom Singleton, 90:9-91:22.

58.     BQHC and Ross entered into the First Amendment, which provided, *inter alia*, for Ross to make an additional prepayment of approximately $4 million in exchange for additional clerkships and an extension of the term of BQHC's commitment to provide clerkships. App. 25, Romero Dep. Ex. 6.

59.     The First Amendment was executed on behalf of BQHC by its CFO, Paul Goldberg, and by Romero, each of whom were directed by Singleton to execute the contract. App. E, Romero Dep. 41:18-21; App. B, Deposition of Paul Goldberg, 30:17-23.   Goldberg "would have had discussions with attorneys before inking something like this."   App. B, Goldberg Dep. 30:21-23.

60.     The Second Amendment added an additional $4 million to the prepayment for promises of even more clerkships and a longer term.   App. 26, Romero Dep. Ex. 7 at BQHC042911-12.   Singleton and Romero, again at Singleton's direction, signed the Second Amendment.   App. H, Singleton Dep. 12:19-13:3; App. E, Romero Dep. 41:22-25.

61.     Singleton reviewed the amendments with legal counsel before authorizing the agreements.  App. H, Singleton Dep. 95:8-21.

62.     Wyckoff's in-house counsel Claire Mullally reviewed the First Amendment on behalf of BQHC and was the person who exchanged signature pages with Ross.  App. 30 at BQHC39559; App. 31 at Ross031619; App. 32 at Ross031623.   BQHC's outside counsel, Proskauer Rose Senior Counsel Lee Barken, exchanged drafts of the Second Amendment with Ross on behalf of Mr. Singleton.  App. 33 at BQHC43171.

### Singleton's Authority

63.     Wyckoff Board Chairman Rucigay sent a memo to senior personnel at BQHC, Wyckoff, and Caritas that announced the appointment of Singleton as Chief Restructuring Officer of BQHC, Wyckoff and Caritas.  App. 29, Deposition of Emil Rucigay, Ex. 18.   The memo states that "[a]s CRO, Tom Singleton has been charged with the responsibility to assume full and overall management authority of BQHC, Wyckoff, and Caritas."  App. 29, Deposition of Emil Rucigay, Ex. 18 at BQHC13452.

64.     The FTI/BQHC engagement contract provides that FTI "shall have no authority to incur any liability" or "to hire or fire any Hospital employee without approval of the Board."  App. 34, Rucigay Dep. Ex. 17 at BQHC00490.

65.     Mr. Singleton fired BQHC CEO, Dominick Gio.  App. F, Rucigay Dep. 46:17-25; App. H, Singleton Dep. 55:14-56:4.   Wyckoff and BQHC Board Chairman Rucigay acknowledged that Mr. Singleton had not consulted with the board before doing so.  App. F, Rucigay Dep. 46:23-47:5.

66.     After learning that Mr. Singleton had fired Gio, the board did not seek to reverse the decision.  App. F, Rucigay Dep. 47:2-5.  There was not a single decision that Mr. Singleton made as chief restructuring officer that any board ever reversed.  App. C, Hoffman Dep. 98:8-23.

67.     Singleton was told by Richard Zall (chair of Proskauer Rose's Health Care Department and outside counsel to BQHC, Wyckoff, and Caritas), David Hoffman, and Emil Rucigay that he had authority to sign contracts on behalf of the hospitals.  App. H, Singleton Dep. 76:17-77:24, 104:18-22.  Singleton also discussed the scope of his authority with attorneys at FTI.  App. H, Singleton Dep. 76:17-77:24.

68.     As to the actual practice regarding entering into contracts on behalf of all three entities, Mr. Singleton testified as follows:

> Q.     Did the boards know that you were signing contracts on behalf of each of the entities?
> A.     Yes.
> Q.     Did they object to you doing so?
> A.     No.
> Q.     How did they know that?
> A.     Because most of the contracts I would have signed, I got approval by the board before.  Or certainly communicated with Mr. Rucigay, who was my main contact with the board outside the board meetings.
>
> *     *     *
>
> Q.     What did Mr. Rucigay tell you about your authority to sign contracts?
> A.     He said I had the authority to sign contracts.

App. H, Singleton Dep. 40:3-14, 104:18-22.

69.     As to Paragraph 1.1(d) in the Administrative Services Agreement between defendants and FTI, Singleton testified that as follows:

> A.     . . . I did ask people in authority, and attorneys, given the agreement, did I have the -- the whole agreement that we had signed, did I have the authority to sign contracts. The answer came back yes.
> Q.     Can you tell me what -- first identify the people who you discussed this with.
> A.     Rick Zall [Chair of Proskauer Rose's Health Care Department], David

44

Hoffman, Mr. Rucigay.  People in authority at the hospital.  I don't sign contracts that they don't think I should sign, or that I didn't have the authority to sign.  I also discussed it with the attorneys at FTI.  Not this particular clause, but what is the scope of my authority under this agreement.

Q.  Could you describe what the process would be when you enter into a -- excuse me.  What procedure was established for you to submit contracts for board approval?

A.  To my recollection, I never signed a contract at BQHC, Caritas or Wyckoff without the approval of Rick Zall and Mr. Rucigay, and they would tell me whether it had to go to the board or not.

App. H, Singleton Dep. 76:17-77:24 (objections omitted); App. 35, Singleton Dep. Ex. 7.

70.    The Wyckoff, BQHC, and Caritas boards were aware that Mr. Singleton was signing contracts on behalf of all three entities.  App. H, Singleton Dep. 40:3-14.

71.    It was Singleton's regular practice to obtain the approval of the legal counsel for BQHC, Wyckoff, and/or Caritas before signing contracts on their behalf.  App. H, Singleton Dep. 50:23-51:6 ("I would never sign anything unless legal counsel told me to do that.").

72.    Singleton never signed a contract at BQHC, Caritas or Wyckoff without the approval of Richard Zall and Emil Rucigay.  App. H, Singleton Dep. 76:17-77:24.  They would tell him whether it had to go to the board or not.  App. H, Singleton Dep. 76:17-77:24.

### BQHC's Corporate Structure

73.    Portions of defendants' corporate structure is illustrated in charts attached as Appendix 69.  App. 69 (BQHC Organizational Charts).

74.    BQHC has no physical location, no bank accounts, no telephones, no computers, no assets other than its interest in Wyckoff and Caritas.  App. C, Hoffman Dep. 27:18-29:4, 31:15-22.  Hoffman also testified that BQHC has no employees and has never had any.  App. C, Hoffman Dep. 28:14-18.

75.     In discovery, defendants have been unable to identify whether or not BQHC has had any corporate officers after September 2008. App. 36, Letter of P. Loughlin, at 3-5.

76.     The Boards of BQHC, Wyckoff, and Caritas substantially overlap.   App. 36, Loughlin letter at 3-5.  Individuals serving as corporate officers generally hold the same position in BQHC, Wyckoff, and Caritas.  App. 36, Letter of P. Loughlin, at 3-5.

77.     Before acquiring the Hospitals, Wyckoff had been a New York not-for profit corporation with no members.  App. C, Hoffman Dep. 26:13-27:2.  WHMC Properties, Inc. was a subsidiary of Wyckoff whose sole asset was a parking lot across the street from Wyckoff. App. C, Hoffman Dep. 27:18-29:5.

78.     Minutes of a Wyckoff board meeting on February 9, 2006 state: "Open discussion ensued whereby a few issues were clarified to include the ambulance service, residency programs, and clinical advantages.  It was also mentioned that Wyckoff could realize a substantial savings if we were to share the costs associated with administrative items, i.e., medical records, radiology, laboratories and financial offices."  App. F, Rucigay Dep. Ex. 1 at BQHC03721.

79.     The Wyckoff Board did not formally approve of the creation of BQHC.  App. F, Rucigay Dep. Ex. 4 at BQHC03784 (Wyckoff Board meeting minutes from December 14, 2006 reporting formation of BQHC).  Wyckoff Board Chairman Emil Rucigay did not know who created BQHC.  App. F, Rucigay Dep. 16:11-17:20.  Board Chairman Emil Rucigay testified:

Q.     My question is, is it the case that the corporations were already formed at this time and the only thing the Wyckoff board approved were the logos?

A.     Apparently.

Q.     Who was it that actually formed the corporations?

A.     I don't know.

App. F, Rucigay Dep. 16:11-17:20.

80.     The only aspect of Wyckoff's reorganization that the board voted on was the

approval of logos for Wyckoff and Caritas.  App. 38, Rucigay Dep. Ex. 4 at BQHC03784.  The

"Report of the President and CEO" in Wyckoff Board meeting minutes from December 14, 2006

states:

> Mr. Gio presented the new logos for Caritas and Wyckoff Heights Medical
> Center.  He explained that due to the acquisition of Saint John's and Mary
> Immaculate Hospitals, new companies had to be formed, one of them being
> BQHC, Brooklyn Queens Healthcare, which is the parent company of Caritas and
> Wyckoff.  He went on to say that Caritas was formed to be the license holder of
> Saint John's and Mary Immaculate Hospitals.  Mr. Gio circulated the logos and
> asked for approval from the Board for the new logos.
>
> **ACTION/RECOMMENDATION: ON A MOTION PROPERLY MADE BY
> MR. COOK, SECONDED BY DR. RAO, ALL IN FAVOR, THE LOGOS
> FOR CARITAS AND WYCKOFF HEIGHTS MEDICAL CENTER WERE
> UNANIMOUSLY APPROVED BY THE BOARD OF TRUSTEES.**

App. 38, Rucigay Dep. Ex. 4 at BQHC03784.

### Subordination Agreement

81.     Emil Rucigay signed on behalf of BQHC, Caritas, and Wyckoff an affiliate

subordination agreement that states: "BQHC has loaned to Borrower [Caritas] $1,000,000 in

cash (the "BQHC Obligation") and Wyckoff has entered into lease obligations for equipment

provided to the Borrower with a fair value of not less than $3,200,000 (the "Wyckoff

Obligation") . . . .  The BQHC obligation is not documented between BQHC and Borrower and

the Wyckoff Obligation is not documented between Wyckoff and the Borrower."  App. 39,

Rucigay Dep. Ex. 6 at BQHC00043.  This $1,000,000 loan from BQHC to Caritas was also

averred in the Affidavit of John Lavan, The Chief Restructuring Officer Of Caritas, In Support

Of [Caritas'] Chapter 11 Petitions And First Day Pleadings.  App. 40, Hoffman Dep. Ex. 9 at ¶

28.

82.     BQHC's Financial Statements report that BQHC made a $1.9 loan to Wyckoff. App. 41, Garg Dep. Ex. 8 (BQHC's 2008 Financial Statement) at BQHC00079, BQHC00080 .

83.     Wyckoff's 2007 Audited Consolidated Financial Statements confirm the receipt by Wyckoff of "a loan in the amount of $1.9 million from BQHC." App. 42, Garg Dep. Ex. 3 at BQHC00031.

### BQHC Employment Agreements

84.     On October 5, 2006, the Wyckoff Board of Trustees Executive Committee met and approved: (1) a "Compensation Package" for "the corporate officers of Brooklyn Queens Health Care . . . "effective upon the closing of the SVCMC asset purchase"; and (2) that "the remaining seven years of [Wyckoff CEO Dominick Gio's] employment contract will be assumed by BQHC."  App. 43, Rucigay Dep. Ex. 3 at BQHC03769, BQHC03771.   Gio was paid $883,317 by Wyckoff.  App. 44 (Wyckoff's 2008 IRS Form 990).

85.     Effective December 27, 2006, Wyckoff COO Harold McDonald entered into an Employment Agreement that defined BQHC as the "System" and provided that the "System shall employ" McDonald,  the "System will pay Employee an annual base salary of $423,787," McDonald would "be entitled to insurance and other benefits, in accordance with the System's applicable policies," and that McDonald would report to the "System President and Chief Executive Officer."  App. 45, Rucigay Dep. Ex. 5 at BQHC03941-42.

86.     McDonald testified that he did work for "all three entities."  App. D, McDonald Dep. 107:4-8.  Wyckoff was the entity that in fact paid his salary.  App. D, McDonald Dep. 13:2-6.

87.     In February 2008, Wyckoff CEO Dominick Gio entered into an employment Agreement and General Release with Wyckoff, BQHC, and Caritas.  App. 46 at BQHC56093-56104.

88.     In January 2007, Edward J. Dowling, Jr.  entered into an Employment Agreement that defined BQHC as the "System" and provided that: the "System shall employee as Senior Vice President for Strategic Planning and Business Development" and that "the System will pay Employee an annual base salary" starting at $375,000.  App. 47 at BQHC03947.

89.     In an February 20, 2007 email to Wyckoff COO Harold McDonald, Romero wrote, "Thank you for meeting with me before the medical board meeting on Thursday, and for your assurance of my role at BQHC."  He went on to report to McDonald that "[o]rientation of all BQHC students will be at Wyckoff on 2/20/07."   App. 48, Romero Dep. Ex. 22 at BQHC47342.  Romero's email correspondence listed him as an official of BQHC.  App. 49 at BQHC 48037.

### BQHC Contracts

90.     In or around August 2007, BQHC entered into a consulting services agreement with FTI Cambio Health Solutions.  App. 34, Rucigay Dep. Ex. 17.  FTI was retained, among other things, to "improv[e] the management, financial stability, and clinical performance of WYCKOFF and CARITAS, and tak[e] steps to provide . . . high quality health care services in the communities they serve."  App. 34, Rucigay Dep. Ex. 17 at BQHC00492.  The consulting agreement provides that BQHC is financially responsible for payments under the contract.  App. 34, Rucigay Dep. Ex. 17 at BQHC00499 ("BQHC will pay [fees]," "BQHC will reimburse FTI CAMBIO's. . . reasonable costs," and "BQHC shall be responsible . . . for payment of the Fee,

and shall make all commercially reasonable efforts to collect payment from CARITAS and WYCKOFF.").

91.     In or around October 2008, BQHC entered into a consulting services agreement with JL Consulting, LLC.  App. 50, Garg Dep. Ex. 5.  JL Consulting was retained, among other things, to "improv[e] the management, financial stability, and clinical performance of WYCKOFF and CARITAS, and taking steps to provide . . . high quality health care services in the communities they serve."  App. 50, Garg Dep. Ex. 5 at BQHC12620.  The consulting agreement provides that BQHC is financially responsible for payments under the contract.  App. 50, Garg Dep. Ex. 5 at BQHC12626-27 ("BQHC shall pay the [fees for hourly services]," "BQHC will reimburse JL Consulting, LLC [for] reasonable costs," and "all amounts payable by BQHC . . . will be allocated equally between WYCKOFF and CARITAS.").

92.     BQHC entered into more than twenty contracts since 2006.  App. 36, Laughlin Letter at 6.  Among the contracts BQHC entered into were: hospital vendor contracts with Abbott Labs and Siemens; a collection agreement with CBHV, Inc.; a service contract with Deman Data Systems, LLC;and  a consulting agreement with HealthNET.  App. 36, Laughlin Letter at 6.

93.     In August 2007, BQHC entered into a contract with T.P.F. Nursing Registry, Inc. to provide nursing services at the Wyckoff and Caritas hospitals.  App. 51 at BQHC56127-56136.  In January 2008, BQHC entered into a contract with Nurse Staffing LLC to provide nursing services at the Wyckoff and Caritas hospitals.  App. 52 at BQHC56107-56112.

### "BQHC" Operation

94.     BQHC CFO Paul Goldberg's responsibilities included "oversee[ing] all of the financial [af]fairs of both Caritas and Wyckoff"  App. B, Goldberg Dep. 27:20-28:15 (BQHC

had "a central pool of finance people that worked for all the organizations that also were under, came under my responsibilities."). Personnel in the financial departments of Caritas and Wyckoff reported to Goldberg. App. B, Goldberg Dep. 28:3-29:3.

95.    On February 8, 2007, Edward J. Dowling, Jr. sent an email as "Sr. Vice-President, Brooklyn Queens Health Care, Inc." to a New York State Department of Health official requesting state aid. App. 53 at 24483-24484. Dowling noted that "we have been working night and day to integrate a variety of corporate functions through BQHC, including accounting, finance, payroll, payables, and materials management." App. 53 at 24483-24484.

## Co-mingling of Funds

96.    On December 8, 2006, $2 million was transferred from Caritas to Wyckoff. On December 22, 2006, $1.4 million was transferred from Caritas to Wyckoff. App. 54, McDonald Dep. Ex. 12 at BQHC06981 (or whichever one of these McDonald acknowledged).

97.    Ross' $5 million prepayment was received on December 29, 2006. Garg Dep. Ex. 6 at BQHC07605, Row entitled "Prepaid Clerkships." On December 29, 2006, $4.5 million was transferred from Caritas to Wyckoff. App. 54, McDonald Dep. Ex. 12 at BQHC06981.

98.    More than $17 million dollars was transferred from Caritas to Wyckoff in late 2006 and early 2007. App. 54, McDonald Dep. Ex 12.

99.    McDonald testified that "[f]unds were being moved around to cover the cash needed for a specific point in time. So there were Caritas funds going to pay for Wyckoff liabilities and Wyckoff funds going to pay for Caritas liabilities . . . . [W]hichever entity had cash, those funds were being used to pay bills regardless of the entity whose bills they were." App. D, McDonald Dep. 64:13-25.

51

100.    Minutes from a March 12, 2007 special board meeting state "Wyckoff submitted an application for a loan to the State for funds and they, in turn, requested a great deal of information.  Last Thursday Mr. Rucigay received a telephone call from Dr. Daines, Acting Commissioner of Health, regarding the misapplication of funds and notification to the Boards." App. 55, Rucigay Dep. Ex. 13 at BQHC03812.

101.    McDonald testified "McNeil was in charge of a large business office" with "numerous departments and numerous employees" and that "more people than Mr. McNeil would have been involved in" making the improper transfers. App. D, McDonald Dep. 66:21-67:10.

102.    Chief Restructuring Officer Thomas Singleton fired CEO, Dominick Gio.  App. H, Singleton Dep. 55:14-56:4.    Singleton testified that "from the very beginning of our assignment the state wanted Mr. Gio terminated."  App. H, Singleton Dep. 55:14-56:4.

### Transfer Of Employees Between Payrolls To Advantage Wyckoff

103.    BQHC had office employees whom Wyckoff paid.  Wyckoff employees provided services for the Caritas hospitals.  App. B, Goldberg Dep. 40:1-43:24.

104.    For its employees that provided services to the Caritas hospitals, Wyckoff recorded on its books a portion of their pay as an intercompany receivable from Caritas.  App. B, Goldberg Dep. 43:12-24.  This intercompany receivable was unrecoverable from Caritas because the State would not reimburse Caritas for money that would be transferred to Wyckoff.  App. B, Goldberg Dep. 43:12-24 ("the State would loan money to make sure that Caritas remained in operation but would not loan money if it was going to be funded back to Wyckoff.").

105.    In January 2009 Wyckoff transferred more than fifty employees from its payroll to Caritas's payroll.  App. 56, Goldberg Dep. Ex. 10 at BQHC55989-92.  Many of these

employees did not have day to day responsibilities at the Hospitals.  App. 56, Goldberg Dep. Ex. 10 at BQHC55992.

106.    Minutes of the December 2007 and January 2008 Wyckoff Board of Trustees' meetings reflect that the Wyckoff board was fully informed of this transfer of employees.  App. 57, Rucigay Dep. Ex. 23 at BQHC03880; App. 56, Goldberg Dep. Ex. 10 at BQHC55992.  The admitted object of this transfer of employees was to benefit Wyckoff.  App. H, Singleton Dep. 63:3-64:10.

### The Caritas Acquisition Was In Reality Wyckoff's Acquisition Of The Hospitals

107.    Emil Rucigay described the acquisition of St. John's and Mary Immaculate to Acting Department of Health Commissioner Daines in the following way: "In December of 2005 Wyckoff learned that Mary Immaculate and St. John's Queens Hospitals were being sold at auction.   Wyckoff's interest was primarily in St. John's Queens campus due to its close proximity to Wyckoff."  App. 58, Rucigay Dep. Ex. 14 at BQHC 04340.  (Although this letter is a draft, Rucigay testified that he believes he sent this letter in final form to Commissioner Daines.  App. F, Rucigay Dep. 32:12-25.  Defendants have not produced a copy of the final letter.)

108.    McDonald wrote a report to State officials concerning the commingling of corporate funds.  App. D, McDonald Dep. 83:11-85:9.  In the report McDonald wrote in part: "Typically when a hospital or a hospital system takes control of another hospital, the sponsoring entity is larger than the entity being sponsored. ***Wyckoff, through BQHC, has taken control of two institutions*** that combined have an operating budget 18% larger than Wyckoff's."  App. 59, McDonald Dep. Ex. 13 at BQHC07620-07621 (emphasis supplied).

53

### The Wyckoff Board Was Aware That Management
### Was Entering Into Affiliation Agreements with Medical Schools

109.    Contracts with medical schools for prepaid clerkship arrangements were not presented to the boards of Wyckoff, BQHC, or Caritas for approval.  App. F, Rucigay Dep. 23:4-24:12; App. A, Garg Dep. 41:7-16.  At his deposition board Chairman Rucigay denied that the AUC Promissory Note was even brought to the attention of any board:

> Q.    Was this [AUC] promissory note ever brought to the attention of any of the boards of BQHC, Wyckoff or Caritas before it was signed?
> A.    Not to my knowledge.

App. F, Rucigay Dep. 23:4-24:12.  Garg, defendants Rule 30(b)(6) witness testified:

> Q.    At any time, when you served on any of these boards, was a prepaid clerkship contract with [a] medical school ever produced to the board, for the board's approval or rejection?
> A.    No.
> Q.    That sort of thing was left to management?
> A.    Yeah, I think so.  I think that was Tom Singleton's world.

App. A, Garg Dep. 41:7-16.

110.    The Wyckoff Board was aware that management was entering into these prepaid clerkship arrangements.  App. 38, Rucigay Dep. Ex. 4 at BQHC03794 (minutes to the December 14, 2006 meeting of the Wyckoff Board of Trustees recites that the chairman of Wyckoff's Division of Graduate Medical Education reported to the board that "[r]ecent efforts to solicit prepayment of clerkships at Caritas from several medical schools are being coordinated with this division").  Wyckoff President and CEO Dominick Gio reported at the June 7, 2007 Wyckoff Board of Trustees Meeting that: "[p]repayment for clerkships was secured from Ross University and American University of the Caribbean for Caritas in the amount of $8.5 million . . .  All affiliation agreements have been reviewed and approved by the New York State Education Department."  App. 60, Rucigay Dep. Ex. 11 at BQHC54897.

111.    At the December 20, 2007 meeting of the Wyckoff Board of Trustees, Singleton reported to the board that, with the assistance of Dominick Gio and Julius Romero, he had entered into the First Amendment to the Ross/BQHC contract and that the approximately $4 million prepayment due under that amendment had been received.  App. 57, Rucigay Dep. Ex. 23 at BQHC03883.  No one at the board meeting objected to execution of the amendment; instead, the discussion consisted of expression of gratitude that the contract resulted in cash "coming into the door."  App. B, Goldberg Dep. 36:24-39:16; App. H, Singleton Dep. 54:3-12; App. D, McDonald Dep. 92:24-93:22; App. F, Rucigay Dep. 42:5-43:10.

### Defendants' Acknowledge The Obligation To Provide Clerkships At Wyckoff

112.    On October 25, 2007, in response to a request by Singleton, Julius Romero wrote Richard Sarli, David Hoffman, and Singleton with three potential options for amendment of the AUC and Ross contracts to raise additional funds.  App. E, Romero Dep. 118:11-120:2; Ex. 26 at BQHC19859-160.  Among the options that Romero presented was "Plan B- Return AUC monies (approx. $3.2M inclusive of interest as of 10/13/07); accept $4.5M offer from Ross on AUC's vacated slots.  Release the cap."  App. 61, Romero Dep. Ex. 26 at BQHC19860.

113.    At his deposition, Romero explained that removing AUC from these clerkships and selling them to Ross would mean that the Hospitals could sell more clerkships and raise more revenue.  App. E, Romero Dep. 124:8-125:16.  Romero further testified that, if BQHC could find a way to sell these slots, Ross had in fact offered to add $4.5 million to its initial $5 million prepayment.  App. E, Romero Dep. 123:19-124:7.

114.    Singleton replied to Romero: "It seems that plan B produces 1.3 million of immediate cash plus give (sic) us additional slots to sell.  If this is correct plan b is tough to beat. What is the downside of plan B?"  App. 61, Romero Dep. Ex. 26 at BQHC 19859.

115.    Romero responded that the downside of the plan is: "In a worst case scenario, a fall-out by the residency programs or institution will make us responsible for unamortized payments plus interest of up to $9.5M (initial $5M plus $4.5M). *Slots lost at Caritas are guaranteed at Wyckoff as per both contracts*." App. 61, Romero Dep. Ex. 26 at BQHC19858.

116.    Draft minutes of a Wyckoff board meeting on December 4, 2008 contain a discussion by Chief Restructuring Officer John Lavan (he succeeded Thomas Singleton): "A Caritas [bankruptcy] filing would impact Wyckoff's Graduate Medical Education, the education of the Medical Students and vendor obligations." App. 62, Hoffman Dep. Ex. 18 at BQHC 00160. The minutes continue: "In open discussion the issue of the Caritas closure vs. bankruptcy was discussed by the Board Members. Mr. Hoffman advised the Board of Trustees of the major contractual obligations of Wyckoff, the temporary Nursing Agency, *Medical School training (off shore Medical School)*, the Non-Union Pension, and Meditch." App. 62, Hoffman Dep. Ex. 18 at BQHC00161 (emphasis supplied).

117.    Minutes of a BQHC board meeting on January 8, 2009 state that: "Mr. Goffner inquired as to Wyckoff's Caritas related contractual obligations. Mr. Hoffman replied that at this time *there are two which we are aware of; one is a medical school obligation* and the other is a pension obligation." App. 63, Garg Dep. Ex. 16 at BQHC00212.

118.    Minutes of a BQHC board meeting on March 5, 2009 state that: "Mr. Rucigay stated that there are three issues we will concern ourselves with, and follow up on, Ross University, Meditech and the Pension issue." App. 64, Hoffman Dep. Ex. 17 at BQHC51802.

## AUC Litigation

119.    Wyckoff is the only other BQHC affiliate that provides clinical clerkships. App. E, Romero Dep. 108:3-20.

56

120.   Ross and AUC were the only medical schools that had prepaid contracts for clerkships at the Caritas Hospitals.  App. E, Romero Dep. 43:25-44:13.

121.   Following the closure of the Caritas hospitals, AUC sued Wyckoff, BQHC, and Caritas for breach of contract (among other causes of action) in U.S. District Court for the Southern District of Florida.  App. 65, AUC Third Am. Complaint.

122.   In the litigation, defendants submitted two affidavits from Julius Romero.  App. 1, Declaration of Julius Romero.  In each declaration Romero averred: "I am Assistant Vice President for Medical Education for Defendant Brooklyn Queens Healthcare, Inc. ("BQHC")" and "[in] my capacity as Assistant Vice President for Medical Education for BQHC; oversee the clinical clerkship programs at Caritas' two hospitals and at Wyckoff."  App. 1, Declaration of Julius Romero, ¶3; App. 66, Second Declaration of Julius Romero, ¶2.

123.   "In light of the defendants' concessions in open court," on September 14, 2009, the Court entered partial summary judgment against Wyckoff and BQHC as to liability.  App. 67, Sept. 14, 2009 Order.

124.   On May 28, 2010, the Court entered a final judgment against Wyckoff and BQHC jointly and severally in the amount of $4,915,948.75.  App. 68, May 28, 2010 Order.

Respectfully submitted,

**BAKER & HOSTETLER LLP**

    / s/ George Tzanetopoulos
George Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois, 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of
Medicine, Ltd.*

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com