# APPENDIX B

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
                   09 Civ.1410(KAM)(RLM)
     -------------------------------


ROSS UNIVERSITY SCHOOL OF           DEPOSITION UPON
MEDICINE, LTD.,                     ORAL EXAMINATION
          Plaintiff,                       OF
     vs.                            PAUL GOLDBERG


BROOKLYN-QUEENS HEALTHCARE,
INC. and WYCKOFF HEIGHTS
MEDICAL CENTER,
          Defendants.
     -------------------------------


WEDNESDAY, JULY 6, 2011


          REPORTING SERVICES ARRANGED THROUGH
```

4

1  TRANSCRIPT of the deposition of PAUL
2  GOLDBERG, the witness, having been called for Oral
3  Examination by the respective parties in the
4  above-entitled action pursuant to the Civil Rules of
5  Practice and Procedure of the State of New Jersey,
6  said deposition being taken by and before LUANN J.
7  COFONE, a Certified Court Reporter and Notary Public
8  of the State of New Jersey, at the Jersey City
9  Medical Center, 355 Grand Street, Jersey City, New
10 Jersey, on Wednesday, July 6, 2011, commencing at
11 10:33 in the morning.
12
13
14
15
16
17             A P P E A R A N C E S
18
19 BAKER HOSTETLER
20 191 North Wacker Drive - Suite 3100
21 Chicago, Illinois  60606
22 (312) 416-6225
23 BY:  GEORGE J. TZANETOPOULOS, ESQ.
24 Attorneys for the Plaintiffs.
25

1             I N D E X
2
3  WITNESS        DIRECT CROSS REDIRECT RECROSS
4  PAUL GOLDBERG
5  BY: Mr. Tzanetopoulos  5
6  BY: Mr. Loughlin         47
7
8             E X H I B I T S
9
10 NUMBER       DESCRIPTION           PAGE
11
12 Goldberg-1   Packet of Documents, #12250
13              through #12608          15
14 Goldberg-2   Caritas Health Care, Inc.
15              Consolidated Financial Statements  22
16 Goldberg-3   E-mail and memorandum   25
17 Goldberg-4   Affiliation Agreement   28
18 Goldberg-5   Amendment to Goldberg-4  28
19 Goldberg-6   Second Amendment to Goldberg-4  28
20 Goldberg-7   Service Agreement       31
21 Goldberg-8   Board of Trustees Resolution  32
22 Goldberg-9   Board of Trustees Minutes,
23              12/20/07                35
24 Goldberg-10  Board of Trustees Minutes,
25              1/10/08                 38

3

1       A P P E A R A N C E S  (Cont'd.)
2
3  K&L GATES, LLP
4  599 Lexington Avenue
5  New York, New York  10022
6  (212) 536-4085
7  BY:  WALTER P. LOUGHLIN, ESQ.
8  Attorneys for the Defendants.
9
10 JONES DAY
11 222 East 41st Street
12 New York, New York  10017
13 (212) 326-3939
14 BY:  THOMAS H. SEAR, ESQ.
15 BY:  EMILY A. POSNER, ESQ.
16 Attorneys for the Paul Goldberg.
17
18
19
20
21
22
23
24
25

5

1  Goldberg-11  Memo from Claire Mullally to
2               Raymundo Wilfredo      44
3  Goldberg-12  E-mail from Paul Goldberg
4               dated 3/25/08          45

2 (Pages 2 to 5)

**Page 6**

1  P A U L  G O L D B E R G, 355 Grand Street, Jersey
2  City, New Jersey, having been first duly sworn
3  according to law by the Officer, testified as
4  follows:
5
6  DIRECT EXAMINATION BY MR. TZANETOPOULOS:
7
8      Q.   Good morning, Mr. Goldberg.
9      A.   Good morning.
10     Q.   Have you ever given a deposition
11 before?
12     A.   Years ago, yes.
13     Q.   Just once, or only once?
14     A.   Just once.
15     Q.   I'll give you the brief set of the
16 ground rules, I'm sure you talked to counsel. As
17 you know, I'll be asking a series of questions,
18 you'll be giving the answers, the court reporter
19 will write down what's said.
20         If at any time you don't hear me or
21 don't understand me, let me know that and I'll say
22 the question again or differently. All right?
23         That's the next rule, that's the trick
24 question, you have to answer out loud in words.
25     A.   I hear you, yes.

**Page 7**

1      Q.   She can't write down nods of the head.
2      A.   Okay.
3      Q.   And if you need a break, let us know,
4  we'll be happy to do that as well.
5      A.   Yes.
6      Q.   I know you've given it to her, but
7  would you please state your full name for the
8  record?
9      A.   My name is Paul Goldberg.
10     Q.   What's your home address?
11     A.   100 Warren Street, Jersey City, New
12 Jersey.
13     Q.   How old are you, sir?
14     A.   Sixty.
15     Q.   And by whom are you presently
16 employed?
17     A.   Liberty Health, which is the owner of
18 this hospital, Jersey City Medical Center.
19     Q.   In what capacity?
20     A.   Chief financial officer.
21     Q.   What is the highest level of education
22 that you've attained?
23     A.   I have a Master's degree in healthcare
24 finance from Temple University.
25     Q.   What year did you receive your

**Page 8**

1  Master's Degree?
2      A.   1984.
3      Q.   And where did you get your Bachelor's?
4      A.   Temple University also.
5      Q.   And what year?
6      A.   1974.
7      Q.   We can go with the short version but
8  if you could take us through the Paul Goldberg CV
9  from when you got out of school to present?
10     A.   Graduate or undergraduate?
11     Q.   Let's start with undergrad.
12     A.   Undergraduate, 1974, my father had a
13 small business in Philadelphia, he was an auto
14 mechanic, I worked with him until I started grad
15 school in 1979; left that, then started a career in
16 hospitals, primarily in the Philadelphia area.
17         Then around 1999, because of a merger,
18 I wound up working for Cambio Health Solutions,
19 they're a turnaround group, a hospital turnaround
20 group. Cambio then later on became part of FTI and
21 I stayed with them until 19 -- I'm sorry, 2008.
22         That's the short version.
23     Q.   All right. In 2008, you came here?
24     A.   About three or four months later in
25 early 2009 I started here as the interim CFO and

**Page 9**

1  then stayed.
2      Q.   When you first started at Cambio
3  Health Solutions, what was that firm's business?
4      A.   They were part, I believe at that
5  point they were a part of Quorum Health and they
6  were basically the turnaround group.
7      Q.   And in layman's terms what is a --
8      A.   That was the group that worked with
9  financially distressed hospitals trying to get them
10 un-distressed.
11     Q.   Okay. What was your position at
12 Cambio Health Solutions and later at FTI/Cambio?
13     A.   Well, I started out as probably a
14 manager or a senior manager, I forget the exact
15 title, wound up the equivalent of a vice-president,
16 and was at that level when I went later to FTI,
17 different names but that was basically the position.
18     Q.   And did you have a particular
19 specialty within the group?
20     A.   Yeah, most of the time I spent with
21 Cambio and/or FTI it was an interim CFO positions, I
22 would go in early in the process to kind of help
23 manage the hospitals, they were going through
24 assessments and later on implementation support.
25         THE WITNESS: I'm sorry, you can't

Page 10

```
 1   read my fingers.
 2        Q.   In connection with your work at either
 3   Cambio or FTI, at some point did you receive an
 4   assignment to work at Brooklyn-Queens Healthcare and
 5   its affiliates?
 6        A.   Yes.
 7        Q.   When did you do so?
 8        A.   I believe it was in 2007.
 9        Q.   Were you part of a team from
10   FTI/Cambio that was assigned to Brooklyn-Queens
11   Healthcare?
12        A.   Yes.
13        Q.   Who was on that team?
14        A.   Well, there were a couple different
15   phases.  The first phase was an assessment and that
16   was myself, Tom Singleton, gosh, I'm trying to
17   remember who else was there.  I don't recall the
18   other members of the team.  There were various
19   professionals looking at various pieces of the
20   operation.
21        Q.   We'll talk in some more detail about
22   that first phase.  Were there other phases of your
23   work at Brooklyn-Queens Healthcare?
24        A.   After the assessment phase we went on
25   and were retained to do implementation support and
```

Page 11

```
 1   then to provide interim executives.
 2        Q.   Was that two-phase approach to an
 3   assignment like this something fairly common in your
 4   work?
 5        A.   Normally that's how it worked.
 6        Q.   And if you could describe --
 7             MR. LOUGHLIN:  George, if I could just
 8   say for a second, I'm not sure the record is clear,
 9   I wasn't sure whether the first phase that Mr.
10   Goldberg was referring to was solely the Caritas
11   project which preceded the agreement that FTI/Cambio
12   entered into with BQHC, Caritas and Wyckoff.
13             It's your deposition, but I think
14   there's the potential for lack of clarity there.
15             MR. TZANETOPOULOS:  Okay, we'll try to
16   clear that up as we go along.
17             MR. LOUGHLIN:  I just noticed that the
18   witness paused when you asked about the first phase
19   being related to BQHC and its affiliates and I
20   believe we don't have any dispute that there was an
21   initial assignment that was solely related to
22   Caritas.
23        Q.   If you would, Mr. Goldberg, in
24   layman's terms for folks not familiar with
25   healthcare turnarounds, describe that two-phase
```

Page 12

```
 1   approach you've testified about?
 2        A.   The assessment phases where we'd come
 3   in with a team of professionals where we'd look at
 4   the finances, financial operations, in some cases
 5   operations, clinical operations, normally all
 6   manners of operations of the hospital or hospitals
 7   that are involved.
 8             We then issue a report on our thoughts
 9   as to how to fix any problems that we find or
10   uncover, that the team found or uncovered.  That's
11   then presented to the board and depending on the
12   situation, we may or may not then get retained to do
13   implementation work, if the board so chooses to go
14   in that direction.
15        Q.   And the implementation work would be
16   implementing the plan that you presented to the
17   board in the assessment phase?
18        A.   Correct, correct.
19             And I want to stress that's the normal
20   way that that works.
21        Q.   Okay.  Did you play any part in the
22   discussions with anyone from Brooklyn-Queens
23   Healthcare or any of its affiliates leading up to
24   the assignment for Phase 1, the assessment phase?
25        A.   Did I have any direct discussions?
```

Page 13

```
 1        Q.   Yes.
 2        A.   I did not.  I was not marketing, I was
 3   there when the team was brought in after the
 4   agreement was signed.
 5        Q.   All right.  Who worked from FTI, if
 6   you know, on reaching an agreement with the
 7   hospitals on FTI's first phase work?
 8        A.   My recollection is, I believe it was
 9   E.M. Briggs.
10        Q.   And who led your team for the
11   assessment phase?
12        A.   That would have been Tom Singleton.
13        Q.   As you understood it, what was your
14   assignment in the assessment phase?
15        A.   It was to work with the financial
16   professionals looking at records, financial
17   statements and any other information that would have
18   been available to be able to guide us as to what was
19   wrong financially with the organization.
20        Q.   And which of the organizations were
21   you looking at?
22        A.   It was only the Caritas.
23        Q.   What information had you been -- or
24   were you provided during the course of that
25   assessment?
```

14

1   A.   It was extremely difficult because
2   there was very little accurate information when we
3   arrived.  My recollection is I had just gone through
4   an acquisition with BQHC buying the two Caritas
5   hospitals and it had only been a couple of months,
6   they did not have accurate financial records, they
7   did not have working computer systems, they weren't
8   getting bills out the door, it was a real problem,
9   and they were having significant cash flow problems
10  and the only real information we had was basically
11  the checkbook, you know, and they were writing
12  checks and also the receipts, and that was it.
13       Q.   With which people who are presently at
14  the BQHC or Caritas organizations did you interact?
15       A.   There was a gentleman Harold McDonald
16  who I would talk with regularly.  There was a CFO
17  for Caritas at that time and I'm blanking on the
18  gentleman's name who we worked with, plus members of
19  the finance group that were existing at Caritas at
20  that time.  But basically not too many people at
21  Wyckoff at all, other than Harold.
22       Q.   During the course of your assessment
23  phase, did you interact with any authorities from
24  State of New York regulatory agencies in connection
25  with your work?

15

1   A.   We would have discussions with those
2   in the Department of Health primarily, not so much
3   (word inaudible) but there's the dormitory authority
4   but more the Department of Health.
5       Q.   And what were the topics of the
6   discussion with the Department of Health during that
7   phase?
8       A.   I have very little recollection of
9   those discussions other than they were curious as to
10  what we were finding and that's basically it, that's
11  what I recall.
12       Q.   Let's see if we can get there quicker
13  rather than later.  The defendants in this case have
14  produced a number of records that have discussed
15  unauthorized transfers of funds between the Caritas
16  organization and Wyckoff.  Was one of your
17  assignments to look into those transfers?
18       A.   No, there was a separate forensic
19  audit being performed.  If I recall, it was PWC
20  Cooper, I may be mistaken, who was looking at those
21  types of issues.  We were not charged with looking
22  at forensics or doing any forensics.
23       Q.   At some point in time were you and
24  your team engaged to do the second phase of
25  implementation?

16

1   A.   We were, the company was engaged to
2   provide implementation support to try and fix what
3   was broken, as well as to provide interim
4   executives.
5       Q.   Did the scope of that assignment
6   change over time?
7       A.   There may have been people added to
8   that list depending on what the needs of the
9   organization were.  Normally that would happen.
10  This may have happened here but I don't recall any
11  specifics.
12       MR. TZANETOPOULOS:  Goldberg-1.
13       (Whereupon Exhibit No. Goldberg-1 was
14  marked for identification.)
15       Q.   Mr. Goldberg, let me show you the
16  document that the court reporter has marked as
17  Goldberg Deposition Exhibit No. 1.  For clarity of
18  the record, that document has been stamped with
19  identification numbers BQHC 12550 through 12608.
20  I'll give you this, take a minute, and once you've
21  had a chance, I'll have some questions.
22       A.   Is there an exam?
23       Q.   We'll get to that part.
24       Mr. Goldberg, what is Exhibit 1?
25       A.   Well, there were various operating

17

1   scenarios that were developed for the board and also
2   discussed at some point with the State, if I recall,
3   about what we could expect to get financially out of
4   the operations of St. John's Queens and Mary
5   Immaculate, they're basically the two Caritas
6   hospitals.  This was one of those plans that was put
7   together and there were a couple different ones that
8   were put together.
9       Q.   Let me call your attention back to
10  that first page of the exhibit, which is an E-mail.
11  Is that an E-mail that you sent to that list of
12  people?
13       A.   Yes.
14       Q.   Where were you office-ed at this time?
15       A.   I believe my office at that point was
16  the BQHC offices on Queens Boulevard, I don't recall
17  the exact address.
18       Q.   I want to just briefly take you
19  through who the people were to whom you sent this.
20  Who is Richard Zall, Z-A-L-L?
21       A.   Richard Zall was the attorney who
22  represented the board from Proskauer Rose.
23       Q.   Tom Singleton?
24       A.   Tom Singleton was the leader of the
25  engagement from FTI.

Page 18

```
 1   Q.  Kristi Lee?
 2   A.  Was one of the specialists working on
 3  part of what's called revenue cycle, she was working
 4  on a patient access registration type issues.
 5   Q.  From FTI?
 6   A.  Yes.
 7   Q.  John Siedlecki?
 8   A.  John Siedlecki was one of the senior
 9  managing directors for FTI that was kind of more of
10  a marketing guy but was also working with Tom in
11  terms of what the presentation should look like, not
12  a technical person involved with the analysis.
13   Q.  John Southworth?
14   A.  John Southworth was in-house counsel
15  to FTI, actually FTI/Cambio.
16   Q.  Harold McDonald you've talked about.
17       Dominick Gio?
18   A.  Dominick Gio was the CEO of BQHC,
19  Caritas, Wyckoff BQHC at that time.
20   Q.  Richard Sarli?
21   A.  Richard Sarli was the Caritas CFO.
22  That was the name that I couldn't remember.
23   Q.  Edward Dowling?
24   A.  Was I believe the BQHC chief strategic
25  planner, I may not have his title right but that was
```

Page 19

```
 1  his role.
 2   Q.  David Hoffman?
 3   A.  Was in-house counsel to Wyckoff,
 4  Caritas, BQHC.
 5   Q.  And Joann Purcell?
 6   A.  May have been one of the
 7  administrative assistants, I don't remember that,
 8  I'm not clear.
 9   Q.  I had the advantage of going through
10  these last night but it looks as if there were Plan
11  A, Plan B, and a number of scenarios considered
12  here, but is it correct to say that the overall
13  approach here was to consider the potential for
14  continuing to operate both St. John's Hospitals and
15  Mary Immaculate Hospitals or, instead, to consider
16  what would occur, what might occur if Mary
17  Immaculate were closed but St. John's continued to
18  operate?
19   A.  I think that's an accurate
20  description.
21   Q.  And if I might direct your attention
22  to the page on the exhibit marked BQHC 12552, the
23  second page in?
24   A.  Uh-huh.
25   Q.  What follows that section would be the
```

Page 20

```
 1  highlights for operating both hospitals?
 2   A.  Uh-huh.
 3   Q.  You have to use words.
 4   A.  I'm sorry, yes.
 5   Q.  That's okay, twenty minutes in the
 6  first time, that's not bad.
 7       If we get to the page marked BQHC
 8  12561, is what follows there consideration of what
 9  might occur should the board choose to close Mary
10  Immaculate but continue to operate St. John's
11  Hospital?
12   A.  Yes.
13   Q.  Now, was this presented to the board?
14   A.  I believe my recollection is that this
15  was presented to the board.
16   Q.  And which board?
17   A.  It would have been the BQHC board, and
18  I do not recall if it was presented to the Caritas
19  board, I believe it was BQHC.
20   Q.  Now, where did you obtain the -- let
21  me go back a step.  Who prepared the material that's
22  in this presentation in Exhibit 1?
23   A.  FTI/Cambio.
24   Q.  And what people?
25   A.  I would have been included in that,
```

Page 21

```
 1  there would have been other financial analysts that
 2  would have been involved on the project, there would
 3  have been input from a variety of people within the
 4  organization.
 5   Q.  And from whom did you obtain the
 6  information that, the underlying information with
 7  regard to the presentation?
 8   A.  It would have been from Richard Sarli.
 9   Q.  Mr. Sarli, I think you said was --
10   A.  He was the CFO for Caritas.
11   Q.  Let me direct your attention to a
12  portion of the exhibit where the discussion is about
13  what would happen if Mary Immaculate were closed,
14  and in particular on the page marked BQHC 12568.
15       And, I apologize, let me just have
16  you, because that's a continued page, turn one page
17  earlier and we'll start the discussion at the
18  beginning.
19       There's a heading in the presentation
20  entitled borrowing and repayment.  What was being
21  presented in that section?
22   A.  This was basically cash that may have
23  been available to help basically provide working
24  capital for the organization and then what was being
25  borrowed and what would be paid back, that's my
```

**Page 22**

1  recollection of what this is.
2   Q.   On the second page, on page 18 of the
3  presentation marked BQHC 12568, the third bullet
4  point on the slide reads, the 8.5 million dollars of
5  deferred revenue accrued for medical student
6  education will be amortized by later rotations done
7  at SJQH and Wyckoff with no impact on cash flow, do
8  you see where I am?
9   A.   Yes, sir.
10   Q.   Were you and your team made aware that
11  funds had been received from medical schools for
12  medical student education?
13   A.   Yes.
14   Q.   And what was your understanding of
15  those arrangements?
16   A.   Depending on the arrangements, that,
17  prior to our getting there Wyckoff, and I don't
18  recall Caritas, but Wyckoff had relationships with
19  medical schools for medical students rotating
20  through, not interns or residents but medical
21  students, and that the slots, there were a number of
22  slots that were desirable and the schools had agreed
23  to pay so much per slot and in some cases paying out
24  into the future for those slots.
25   Q.   Let me see if I can aid the discussion

**Page 23**

1  with one other document.
2       MR. TZANETOPOULOS:  Exhibit 2, if you
3  would, please.
4       (Whereupon Exhibit No. Goldberg-2 was
5  marked for identification.)
6   Q.   Mr. Goldberg, let me show to you a
7  document the court reporter has marked as Exhibit
8  No. 2.
9   A.   Uh-huh.
10   Q.   Which we've stapled, for ease of use,
11  these two documents together, the consolidated
12  financial statements for Caritas Health Care, Inc.
13  for year ended December 31, 2007, and towards the
14  back there's Wyckoff Heights Medical Center for the
15  same period of time.
16   A.   Uh-huh.
17   Q.   I take it during the course of your
18  work you became familiar with --
19   A.   Actually, this was issued after I
20  left.
21   Q.   Oh, was it really?
22   A.   Yeah.  I think if I recall the dates,
23  these were issued July 31st, 2008, and I was no
24  longer on that assignment at that point so I've
25  never seen these before.

**Page 24**

1   Q.   During the course of your work, were
2  you given access to the monthly, weekly, whatever,
3  financial reporting of both Caritas and ultimately
4  Wyckoff?
5   A.   Monthly only for Wyckoff, more along
6  the lines of daily and weekly because of the crisis
7  at Caritas.
8   Q.   Were you familiar then with the fact
9  that Ross University School of Medicine was one of
10  the medical schools that had prepaid for clerkships?
11   A.   Yes, I was aware.
12   Q.   Let's go back then to Exhibit-1, if we
13  may, on page 18 of your presentation.  The eight and
14  a half million dollars of deferred revenue that's
15  referred to there, did you understand that to
16  include money that had been advanced by Ross?
17   A.   This was a financial plan, I don't
18  recall which schools may have been involved in that.
19   Q.   Okay.  Who is it that for FTI would
20  have gathered and assimilated into your plan the
21  information about medical school contracts?
22   A.   It would have been Tom Singleton.
23   Q.   Okay.  Are you at all familiar with
24  why it is that the presentation concludes that that
25  eight and a half million dollars of deferred revenue

**Page 25**

1  could be amortized by later rotations done by both
2  St. John's and Wyckoff?
3   A.   No.
4   Q.   This would have been Mr. Singleton's
5  part of the project?
6   A.   Yeah.
7   Q.   Okay.  As a result of these
8  presentations, did the board reach --
9       MR. LOUGHLIN:  The presentation that's
10  Exhibit 1?
11       MR. TZANETOPOULOS:  Mr. Goldberg's
12  talked about other presentations too and I'm willing
13  to include them all.
14       MR. LOUGHLIN:  Okay.
15   Q.   Did the board settle on a plan?
16       MR. SEAR:  I object to the form but
17  you can answer it.
18   A.   I think the overriding plan was to try
19  and keep both hospitals open.  There was never any
20  other discussion about closure of Mary Immaculate,
21  to my recollection, so whatever we put together was
22  always with the thought that both hospitals would
23  stay open.
24       MR. TZANETOPOULOS:  This will be
25  marked 3.

7 (Pages 22 to 25)

26

1    (Whereupon Exhibit No. Goldberg-3 was
2 marked for identification.)
3    Q.  Mr. Goldberg, let me show you a
4 document that the court reporter has marked as
5 Deposition Exhibit No. 3.  It's a July 30, 2007
6 E-mail and attached memorandum and has been stamped
7 with identification numbers BQHC 13451 through
8 13453.
9    I take it you understood that Mr.
10 Rucigay was chairman of the board?
11   A.  Correct.
12   Q.  All three entities?
13   A.  Yes.
14   Q.  Mr. Rucigay's memo states that Mr.
15 Singleton is being made chief restructuring officer
16 and you chief financial officer.  Was that your
17 understanding at the time?
18   A.  Yes.
19   Q.  How is it that you learned that you
20 would be CFO of any of these entities?
21   A.  It was actually at the board meeting
22 where it was decided that we would be retained and
23 specifically they asked for Tom Singleton to be CRO
24 and for me to be CFO.
25   Q.  And you attended that board meeting?

27

1   A.  Yes.
2   Q.  Which board?
3   A.  I believe it was the BQHC board.
4   Q.  Mr. Rucigay's memo in discussing Mr.
5 Singleton's responsibilities says that, and I quote,
6 as CRO, Tom Singleton has been charged with
7 responsibility to assume full and overall management
8 authority of BQHC Wyckoff at Caritas and to only
9 address our current financial and operational
10 circumstances.
11   During the board meeting that you
12 attended, was there discussion giving to Mr.
13 Singleton full and overall management authority of
14 those entities?
15   A.  I don't recall that discussion.
16   Q.  Did you receive a copy of this
17 memorandum?
18   A.  I don't have any recollection of
19 receiving this memo.
20   Q.  Of which entities did you understand
21 yourself to be chief financial officer?
22   A.  Brooklyn-Queens Healthcare.
23   Q.  And what did you understand your
24 responsibilities to be as chief financial officer of
25 Brooklyn-Queens Healthcare?

28

1   A.  It was to oversee all of the financial
2 fares of both Caritas and Wyckoff.
3   Q.  Was it the case that either directly
4 or indirectly all of the people who worked in the
5 financial departments of those entities reported to,
6 or through somebody to you during that period of
7 time?
8   A.  That was the working relationship that
9 I believe we had.
10   But I want to add something to that is
11 that there was also a pool, a central pool of
12 finance people that worked for all the organizations
13 that also were under, came under my
14 responsibilities.  So they didn't report to either
15 CFO, they reported to me.
16   Q.  So if we can understand this in an
17 overall sense, each of Wyckoff and Caritas had
18 financial people that reported to you?
19   A.  There were two CFO's, one for Caritas,
20 one for Wyckoff who reported up through me.  They
21 also reported, it was kind of a dotted line because
22 they also reported to the CEO's of those
23 organizations and also the executive directors of
24 the Caritas hospitals.
25   But then there were just day-to-day

29

1 functions like payroll and accounts payable and
2 billing that serviced all the hospitals, so that
3 came under our direction and control through BQHC.
4   MR. TZANETOPOULOS:  I'm sorry, could
5 we go off the record for a second?
6   (A discussion is held off the record.)
7   MR. TZANETOPOULOS:  If we can mark
8 these as the next three?
9   (Whereupon Exhibit No. Goldberg-4 was
10 marked for identification.)
11   (Whereupon Exhibit No. Goldberg-5 was
12 marked for identification.)
13   (Whereupon Exhibit No. Goldberg-6 was
14 marked for identification.).
15   Q.  Mr. Goldberg, the court reporter has
16 marked as Exhibit 4 a document that's the
17 affiliation agreement between Ross University School
18 of Medicine and Brooklyn-Queens Healthcare, and as
19 Exhibit 5 the amendment to that agreement and as
20 Exhibit 6 the second amendment.  I've marked them
21 all so you'd have them all there.
22   Now, the first question is with
23 respect to Exhibit 5, that's the amendment.  If I
24 could direct your attention to the signature page of
25 the agreement marked Ross 55, is that your

Page 30

```
 1  signature?
 2      A.   Yes.
 3      Q.   How is it that you came to sign this
 4  contract?
 5      A.   Um, normally in the course of business
 6  at BQHC, if I was being asked to sign a document
 7  like this, it was only because for some reason Mr.
 8  Singleton was not available.
 9      Q.   So in the usual practice when Mr.
10  Singleton was chief reconstruction officer and you
11  were chief financial officer, Mr. Singleton would be
12  the party signing contracts?
13      A.   Normally.
14      Q.   On what occasions -- and you would
15  sign it if he wasn't available to?
16      A.   Correct.
17      Q.   Was it Mr. Singleton that directed you
18  to sign this contract?
19      A.   He asked that I sign this contract and
20  my general recollection is that he was not
21  available.  I would have had some discussions with
22  him, I would have had discussions with attorneys
23  before inking something like this.
24      Q.   Was it your usual practice as chief
25  financial officer at Brooklyn Queens to get checkoff
```

Page 31

```
 1  from the hospital's legal counsel before signing a
 2  contract on behalf of the organization?
 3      A.   Yes, for a variety of reasons, but
 4  absolutely.
 5      Q.   Did you do so in this case?
 6      A.   My recollection is that I did.
 7      Q.   Which legal counsel did you consult
 8  with?
 9      A.   There could have been one of two, it
10  could have been in-house counsel at that point or it
11  could have been someone from Proskauer Rose.
12      Q.   Did you perform work on the underlying
13  deal itself?
14      A.   Not really, that was more, the
15  negotiations were really handled by Tom Singleton
16  and Julius Romero, those were the principals and
17  then I would come in behind it just to make sure we
18  understood what the payment terms, kind of the
19  financial aspects of it or if there was cash
20  changing hands, when we receive it, what the lock
21  boxes were, that kind of stuff.
22      Q.   And would your work have been the same
23  in connection with the second amendment?
24           MR. SEAR:  I object to the form.
25           THE WITNESS:  Excuse me?
```

Page 32

```
 1           MR. SEAR:  I just object to the form,
 2  you can answer.
 3      A.   The first agreement, I believe, was in
 4  place.  The amendment was here, the second amendment
 5  would have been nothing more than this is when you
 6  expect the cash, this is what you have to do with
 7  it, this is the accounting for it.
 8      Q.   And would it have been Mr. Singleton
 9  and Mr. Romero who worked on the deal aspects of the
10  contract?
11      A.   That was my recollection.
12      Q.   Had you signed other contracts on
13  behalf of Brooklyn-Queens Healthcare or any of its
14  affiliates?
15      A.   It's a possibility but I don't recall
16  anything specifically.
17           MR. TZANETOPOULOS:  This is the one I
18  have, mark that next, please.
19           (Whereupon Exhibit No. Goldberg-7 was
20  marked for identification.)
21      Q.   Mr. Goldberg, the court reporter has
22  handed you a document that she has marked as Exhibit
23  7.  It's entitled service agreement and marked with
24  identification numbers BQHC 51650 through 51653.  Is
25  that your signature on the signature block?
```

Page 33

```
 1      A.   Yes, yes.
 2      Q.   What was the purpose of this
 3  agreement?
 4      A.   I believe that at that time Deborah
 5  Vance was filling a role as the director of case
 6  management for Caritas and this was an interim
 7  agreement to retain her services.  It was kind of
 8  outside of FTI, she was not an FTI person but an
 9  independent person, and this would have been an
10  agreement that would have been worked out with her,
11  approved by Mr. Singleton, who then would tell me
12  whether it was okay to proceed with it.
13           (Whereupon Exhibit No. Goldberg-8 was
14  marked for identification.)
15      Q.   Mr. Goldberg, let me show you a
16  document that the court reporter has marked Exhibit
17  8.  It's entitled Wyckoff Heights Medical Center
18  Board Resolution, stamped with identification
19  numbers BQHC 55797.  I take it from Exhibit 8 you
20  were given authority to sign -- well, let me ask
21  you, the resolution says that you and Mr. Singleton
22  have been approved as signatories to the hospital
23  operating account.  What was the hospital operating
24  account?
25      A.   Well, normally when you have to make
```

## Page 34

1  payroll or make accounts payable payments, someone's
2  got to sign checks and it would be solely to sign
3  checks for hospital business, normal hospital
4  business.
5      Q.  And so is it correct then that what
6  this resolution did was enable you and Mr. Singleton
7  to sign checks on Wyckoff's bank account?
8      A.  That would be, I think the short
9  answer is yes but in the normal course of business.
10     Q.  Is it the case that during your time
11 as CFO of BQHC that, in fact, you signed contracts
12 and checks on behalf of all of the affiliated
13 entities?
14     A.  Because we had central processing of
15 accounts payable and payroll, the odds are either
16 there was an electronic stamp, which this would give
17 us the authority to run tons of checks with
18 somebody's signature on it, or there was a special
19 need for a check to go out for a specific purpose or
20 a wire transfer, so that gave me the ability as CFO
21 to sign off on those checks for special wires.
22     Q.  And my question really is in the
23 course of your work there, you said you were CFO of
24 BQHC but we've seen contracts on behalf of Caritas
25 and now checks on behalf of Wyckoff that either you

## Page 35

1  signed or were given authority to sign, so my
2  question is during the course of your work there,
3  did you sign contracts and checks on behalf of BQHC
4  and Wyckoff and Caritas?
5      A.  I don't recall any specific checks.
6  It could have happened, it may have happened, I
7  can't specify, and there may have also been wire
8  transfers that had to be made on behalf of the
9  corporations.
10     But, again, we had central processing
11 of that stuff so we had to have that ability to get
12 stuff out if, for example, one of the other CFO's
13 was not available as well.
14     Q.  So as the hospital entities ran their
15 business at that time, is it correct that, because
16 you say at the top the central function, you had
17 authority to act on behalf of each of those
18 entities?
19     A.  Not to make decisions as much as just
20 process things that had to be processed.  It was not
21 to spend money outside of the scope of whatever the
22 budget or the plan was for those organizations.
23     Q.  Let's go back, if you would, go to
24 Exhibit No. 7, that's the service contract with Ms.
25 Vance?

## Page 36

1      A.  Uh-huh.
2      Q.  That's a contract where Caritas
3  healthcare is the party.  Did you think that you
4  were doing anything wrong signing on behalf of
5  Caritas?
6      A.  No.
7      Q.  Why did you think that you could sign
8  on behalf of Caritas Healthcare?
9      A.  Because as CFO for BQHC, which was the
10 parent, I believe that I had that authority as long
11 as there was administrative approval to go ahead and
12 sign that agreement.
13     Q.  Is that also true in connection with
14 Exhibit 5, the amendment to the contract with Ross?
15     A.  From my perspective it's the same,
16 it's the same issue to the extent that there was
17 administrative and/or the appropriate approvals were
18 in place, then I could go ahead and sign on behalf.
19     MR. LOUGHLIN:  Could we go off the
20 record for a second?
21     (A discussion is held off the record.)
22     (Whereupon Exhibit No. Goldberg-9 was
23 marked for identification.)
24     Q.  Mr. Goldberg, let me show you a copy
25 of what the court reporter has marked as Exhibit 9.

## Page 37

1  It's the minutes from the December 20, 2007 Wyckoff
2  Heights Medical Center Board of Trustees meetings.
3  You can look at as much of this as you'd like or I'm
4  going to have some questions.  Just to give you a
5  fair warning, we'll be at the top of page 4 but take
6  a minute and look at it and then we'll talk.
7      All set?
8      A.  Yes.
9      Q.  Let's start out with asking, was it
10 your practice during the time you were at the
11 hospitals to attend the Wyckoff board meetings?
12     A.  Yes.
13     Q.  And did you also attend the Caritas
14 board meetings?
15     A.  Yes, yes.
16     Q.  And the Brooklyn-Queens Healthcare
17 meetings?
18     A.  Yes.
19     Q.  The minutes show that you were at this
20 one.  Is that consistent with your recollection?
21     A.  Yes.
22     Q.  The exhibit, the minutes in Exhibit 9
23 reflect --
24     A.  What page are you on?
25     Q.  Pages 3 and 4 of the minutes.

38

1  -- reflect a report of the chief
2  restructuring officer. Was that Mr. Singleton's
3  report to the board?
4      A.  From what I can see in the minutes,
5  this seems to be consistent. I don't recall word
6  for word but, yeah.
7      Q.  Okay. Page 4 of the minutes says
8  that, and I quote, Mr. Singleton reported that he,
9  along with Mr. Gio and Julius Romero, have been
10 negotiating with the Caribbean medical schools over
11 the last two months to generate additional cash for
12 Wyckoff and Caritas. He stated that we have been
13 successful in both cases. Wyckoff received a wire
14 transfer today from Ross University in the amount of
15 4 million dollars for prepaid medical student
16 clerkship rotations. This should help relieve some
17 cash flow problems for Wyckoff. He mentioned that
18 Caritas received 3.7 million dollars last week from
19 Ross University, closed quote.
20     Do you recall anybody at this meeting
21 objecting to Mr. Singleton having entered into those
22 deals?
23     A.  I have no recollection of anybody
24 saying, no, you shouldn't do this.
25     Q.  Did anybody, except Mr. Rucigay, thank

39

1  Mr. Singleton for his report, but other than that,
2  did anybody comment on the report that Mr. Singleton
3  had been entering into contracts with medical
4  schools?
5      A.  I don't recall any specific
6  discussions where anybody might have said, no, you
7  shouldn't be doing this. Frankly, more of my
8  recollection would be they would say, great, we have
9  some additional cash.
10     Q.  The reaction of the board was that
11 these reports, was it not, an expression of
12 happiness that cash was coming in the door for these
13 contracts?
14     A.  I would have to agree with that. I
15 don't recall anything negative about those
16 discussions.
17     Q.  During the time that you were working
18 at Brooklyn-Queens Healthcare, did BQHC have any
19 assets?
20     A.  None that I recall. My recollection
21 was that BQHC was what was termed the passive
22 parent, it did not really have anything of its own.
23          MR. TZANETOPOULOS: Do that one as the
24 next one, please.
25          (Whereupon Exhibit No. Goldberg-10

40

1  was marked for identification.)
2      Q.  Mr. Goldberg, the court reporter has
3  handed you a document that she's marked as Exhibit
4  10. It's a January 10, 2008 -- strike that.
5          Exhibit 10 is the minutes from the
6  January 10, 2008 Wyckoff Heights Medical Center
7  Board of Trustees meeting. It's been marked with
8  identification numbers BQHC 55989 through 94.
9  Again, you can look at it as much as you care to but
10 where I will have questions is again Mr. Singleton's
11 report, the bottom of page 4 and the top of
12 page 5.
13     A.  Okay.
14     Q.  The minutes reflect a discussion of
15 transferring any senior management employees from
16 Wyckoff Heights Medical Center payroll to Caritas
17 payroll. This was, in fact, a transfer that was
18 done. Correct?
19     A.  Yes.
20     Q.  What was the reason for doing so?
21     A.  The reason is that the employees,
22 because I remember the issue, the reason is that the
23 employees were on Wyckoff's payroll and every pay
24 period Caritas did not have the cash to pay Wyckoff
25 back, building what was called an intercompany

41

1  receivable. So the amount of money that was owed to
2  Wyckoff from Caritas kept growing and growing.
3          The one way to ameliorate that would
4  be to actually take those employees, put them on the
5  books of Caritas and then as part of the
6  restructuring, make sure that there was capital from
7  the State, which is part of the 50 million dollar
8  ask noted in the minutes, so that the money owed
9  Wyckoff could stop and that there would be no longer
10 a growing liability to Wyckoff from Caritas.
11         Now, I don't know if that's clear, but
12 in essence there are receivables, like when I had
13 multiple hospitals here, we had money to float back
14 and forth. In this case the amount of money being
15 paid to these executives or these employees, and
16 nonunion, if I recall, nonunion employees, kept
17 driving the amount of money due to Wyckoff higher
18 and higher putting Wyckoff in jeopardy.
19         To keep that from happening, we
20 decided to put, again with the board's okay, put the
21 employees on Caritas' books so when they got paid,
22 it had to be out of money from Caritas, meaning that
23 whether the money came as loans from the State or
24 other cash flows that were available, we had to make
25 payroll. And that stopped the hemorrhaging at

11 (Pages 38 to 41)

42

1  Wyckoff and put it squarely on the shoulders of
2  Caritas.
3  Q. So let's break this down into layman's
4  terms, but you correct me. Is it correct that for
5  services of senior management employees who were
6  providing services to more than one entity, there
7  were book entries that kept track of which entity
8  owed how much for those services?
9  A. There were employees that could have
10 worked at either organization but the payroll was
11 coming from cash belonging to Wyckoff. So Caritas
12 had to pay back Wyckoff. But that became a problem
13 in funding primarily because when there wasn't cash
14 available when we were not getting support from the
15 State of New York, the State was going, not my
16 problem, it's Wyckoff's.
17      So to stop that we put them on the
18 payroll of Caritas, open to the board so that they
19 understood it, so that we knew we had to fund
20 payroll, we knew if we went back to the State, we
21 would get some money from the State to help to make
22 sure we could make payroll and not jeopardize
23 Wyckoff.
24      The goal was to protect Wyckoff at
25 that point from any more exposure relative to the

43

1  poor financial performance of Caritas.
2  Q. In order to make this arrangement
3  work, Caritas would have to have sufficient cash at
4  this time to pay the entire amount of these
5  executives' pay?
6  A. Uh-huh.
7  Q. You have to say words.
8  A. Yes, I'm sorry.
9  Q. If Caritas did have sufficient cash to
10 make those payroll payments, why was the choice to
11 instead r -- strike that, let me start again.
12      Since Caritas had sufficient cash to
13 make the entire payroll payments for these
14 executives, why was the choice made not to simply
15 have Caritas pay in cash to Wyckoff what it owed?
16 A. Caritas did not have the cash and the
17 only way to secure the cash at that time was from
18 additional loans from the State of New York. And we
19 couldn't, we couldn't arrange for the loans to pay
20 back Wyckoff.
21      It was kind of Catch 22, if you will,
22 in that the State would loan money to make sure that
23 Caritas remained in operation but would not loan
24 money if it was going to be funded back to Wyckoff.
25 Q. So the choice that's reflected in

44

1  Exhibit 10 to have these employees put on the
2  Caritas payroll was a choice made to protect Wyckoff
3  from further financial --
4  A. Exposure from Caritas.
5      There was a clear delineation, which
6  was the point of BQHC, was to make sure that one
7  organization didn't be responsible for the other
8  organization's debts.
9  Q. Did anybody at the board object to
10 this transfer?
11 A. I don't recall anybody objecting to
12 that.
13     MR. LOUGHLIN: Can you specify which
14 board?
15     MR. TZANETOPOULOS: Any of the boards.
16 A. Well, I mean it was noted at the, I
17 believe this was a Wyckoff board meeting, I don't
18 recall them objecting and I don't recall any
19 objection from anybody on the Caritas board as well.
20 And I don't have any knowledge as to whether it ever
21 really went to the BQHC board.
22 Q. It is correct, is it not, that the
23 majority, if not all, of the BQHC board was also on
24 the Wyckoff board at this time?
25 A. I believe that's correct.

45

1  Q. So if you told the folks at the
2  Wyckoff board, at least the majority of the BQHC
3  board knew. Correct?
4      MR. LOUGHLIN: Objection.
5  A. I think that's an assumption, I'm not
6  sure there was ever a vote.
7  Q. All right. Is it true that -- well,
8  I'm not going to argue about it, strike that.
9      Now, if we can take five here, I'll be
10 able to streamline and get you out of here really
11 quick.
12     MR. SEAR: Good, excellent.
13     (A brief recess is taken.)
14     MR. TZANETOPOULOS: The next exhibit.
15     (Whereupon Exhibit No. Goldberg-11 was
16 marked for identification.)
17 Q. Mr. Goldberg, I'm going to show you a
18 document that the court reporter has marked as
19 Deposition Exhibit 11. It's an E-mail from Claire
20 Mullally to Wilfredo Raymundo and an attached
21 document marked with identification numbers Ross
22 1564 and 1565.
23     On the second page of the exhibit
24 marked Ross 1565, is that your initial at the bottom
25 in the margin?

Page 46

```
 1   A.   Yes.
 2   Q.   Who was Ms. Mullally?
 3   A.   She was in-house counsel after David
 4   Hoffman.
 5        (Whereupon Exhibit No. Goldberg-12 was
 6   marked for identification.)
 7   Q.   Mr. Goldberg, I'm going to show you a
 8   document the court reporter has marked as Exhibit
 9   12. It's an E-mail and attachment marked with the
10   identification numbers BQHC 04501 through 4504. Is
11   that your signature on the signature page in the
12   contract?
13   A.   Yes.
14   Q.   What was Navin Haffty?
15   A.   Navin Haffty was the, let me see, I'm
16   not sure I remember, they were doing, providing
17   consulting support for trying to get the computer
18   systems at BQHC for both hospitals working properly.
19   They were specifically Meditech, it's called
20   Meditech Results, which was the computer system.
21   Q.   There's been a fair amount of
22   documentation on this but, to your understanding,
23   the Meditech system was generally a computer billing
24   system?
25   A.   It was more than that. It was the
```

Page 47

```
 1   general ledger, financial reporting, accounts
 2   payable, billing, admissions, registration, almost
 3   all of the financial operations of the organization,
 4   except for payroll, were Meditech, and any of the
 5   clinical systems as well.
 6   Q.   And when you arrived, were there
 7   problems with the Meditech system?
 8   A.   Yeah, it wasn't working at all.
 9   Q.   Did that affect --
10   A.   I shouldn't say that. It was somewhat
11   working for Wyckoff, not working for Caritas at all
12   because of the way it had been slammed in basically
13   and implemented.
14   Q.   And what was Navin Haffty's job with
15   respect to that system?
16   A.   To provide expertise as to how to set
17   up the system to have it work properly.
18   Q.   Did anybody ever object to your
19   entering into this agreement with Navin Haffty?
20   A.   Well, Navin Haffty had been there
21   before we arrived. This is what I'm trying to
22   remember, exactly why we entered into this. Excuse
23   me for one minute.
24        No, I don't recall anybody saying that
25   there was no reason for this, everybody knew that we
```

Page 48

```
 1   had to keep the computer systems going. And,
 2   frankly, using them was a lot cheaper than going
 3   either back to Meditech or bringing in any other
 4   firms, they were very reasonable in their pricing.
 5        And, again, this would not have been
 6   entered into without discussion with Tom Singleton
 7   to make sure we had covered everything that we
 8   needed to cover.
 9        MR. TZANETOPOULOS: Those are all the
10   questions that I have at this time.
11        MR. LOUGHLIN: Could I just ask three
12   or four questions of clarification?
13
14   CROSS-EXAMINATION BY MR. LOUGHLIN:
15
16   Q.   Mr. Goldberg, you referred earlier, I
17   think, to the financial operations at Caritas and at
18   Wyckoff but also then a sort of central function.
19   Was that known as the central business office?
20   A.   Correct.
21   Q.   Could I just ask you a question about
22   the reference in Exhibit 9, which is one of the,
23   it's the minutes of a board meeting of Wyckoff
24   trustees on December 20th? And if I could direct
25   your attention to, it's page 3 of the document, it's
```

Page 49

```
 1   BQHC 3882 is the bates number.
 2        I think you've testified about the
 3   reference here to the transfers of some employees
 4   from the Wyckoff payroll to the Caritas payroll --
 5   A.   Right.
 6   Q.   -- as a way of trying to reduce the
 7   indebtedness of Caritas to Wyckoff. Is that right?
 8   A.   To stabilize it so they didn't go
 9   further in debt.
10   Q.   Right. And there's a reference, if I
11   could direct your attention to the final paragraph
12   on that page, it says, Mr. Singleton reported that
13   he submitted a request to the State to reduce the
14   current 14 million to the board approved 10 million.
15   Do you know what that refers to?
16   A.   No, I do not recall.
17   Q.   Do you know what the extent of the
18   Wyckoff board approved investment in Caritas was?
19   A.   Not with specificity. I recall
20   somewhere along the line that Wyckoff had loaned
21   about 14 or 15 million dollars, give or take, to
22   Caritas when Caritas was formed, or acquired. And I
23   don't recall anything specific that there should not
24   have been anything further added to that other than
25   the board saying we don't want to put any more money
```

13 (Pages 46 to 49)

50

1 into this, that was kind of the limit of our
2 exposure.
3    Q.   And you mean the Wyckoff board --
4    A.   Correct.
5    Q.   -- was concerned?
6    A.   Yes.
7    Q.   And I think you referred to this as a
8 sort of hemorrhage of the Wyckoff financials?
9    A.   Well, the issue for me is that it
10 became, not to me personally but kind of the CFO
11 role, seeing that the cash that was available at
12 Wyckoff was slowly being drained and put into
13 Caritas. And depending on the survival of Caritas,
14 they would have not been able to get that cash back
15 because there was no ability to pay it back at that
16 point.
17    Q.   Do you know whether it was ever paid
18 back?
19    A.   I don't have a recollection of that
20 and, again, I left there somewhere in the Spring
21 2008, you know, March, April, May time frame,
22 probably April, and I don't recall any of the
23 ability at that point to pay it back.
24    Q.   Do you have any recollection of the
25 Wyckoff board expressing concern about the, I think

51

1 as you put it, the exposure of Wyckoff to Caritas?
2    A.   Yeah, I remember having that
3 discussion with the board about it.
4        MR. TZANETOPOULOS: I object to form,
5 but go ahead.
6    A.   I recall that discussion with the
7 board as we were talking about moving these
8 employees, and then ongoing reporting to them to
9 make sure that that liability back didn't change
10 significantly over time, which would have capped
11 their exposure.
12    Q.   There is also a reference in the, in
13 Exhibit 10, which is another January 10th, 2008
14 board minutes, to the same subject but then if you
15 turn to the next page --
16        MR. SEAR: What page are you referring
17 to?
18    Q.   I'm sorry, this is, internally in the
19 document it's page 5, it's Bates No. BQHC 55993, and
20 I'm looking at the first full paragraph on that page
21 which says, Mr. Singleton advised the board that he
22 will be attending a meeting next Tuesday in Albany
23 where he will present a very detailed plan for
24 Caritas through June of 2008. The plan includes a
25 request for 50 million dollars in funding.

52

1        Do you know whether or not there was
2 any additional funding at that level that was
3 provided in response to the request that's referred
4 to in that paragraph?
5        MR. TZANETOPOULOS: I object to form.
6 You can answer.
7        MR. SEAR: Go ahead.
8    A.   I don't recall the State ever
9 approving 50 million dollars. But normal course of
10 business, we would request money, tell them our cash
11 position, tell them what had to be paid and they
12 might funnel 5 million, 6 million, 7 million
13 dollars, maybe 3 million dollars at various points
14 in time just to continue things going but I don't
15 ever recall them committing to 50 million.
16        MR. LOUGHLIN: I don't have anything
17 further.
18        MR. TZANETOPOULOS: Thank you very
19 much, sir.
20        (Whereupon the deposition concluded at
21 12:02 p.m.)

53

1            CERTIFICATE  OF  OFFICER
2
3       I, LUANN J. COFONE, a Notary Public
4 and Certified Court Reporter of the State of New
5 Jersey, do hereby certify that prior to the
6 commencement of the examination, the witness was
7 duly sworn.
8       I DO FURTHER CERTIFY that the
9 foregoing is a true and accurate transcript of the
10 testimony as taken stenographically by and before me
11 at the time, place and on the date hereinbefore set
12 forth.
13       I DO FURTHER CERTIFY that I am neither
14 a relative nor employee, nor attorney or counsel to
15 any of the parties involved; that I am neither
16 related to nor employed by such attorney or counsel,
17 and that I am not financially interested in the
18 outcome of the action.
19
20
21 _____
22 A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
23 My Commission Expires:  January 6, 2015
24 C.C.R. License No. 1066
25

14 (Pages 50 to 53)