# APPENDIX C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X

ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                    Plaintiff,

                                    Case No.
          -against-                 09 Civ. 1410
                                    (KAM) (RLM)

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS
MEDICAL CENTER,

                    Defendants.

--------------------------------------------X


                    Baker Hostetler
                    45 Rockerfeller Plaza
                    11th Floor
                    New York, New York 10111


                    June 1, 2011
                    10:09 a.m.



          CONFIDENTIAL DEPOSITION of DAVID
HOFFMAN, taken on behalf of the Plaintiff and
held before Ashley Shugar, a certified court
reporter and Notary Public of the State of
New York.

CONFIDENTIAL

**Page 2**

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

BAKER HOSTETLER
191 North Wacker Drive
Suite 3100
Chicago, Illinois 60606
(312) 416-6225
BY: GEORGE J. TZANETOPOULOS, ESQ.

ON BEHALF OF THE DEFENDANT:

K & L GATES LLP
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
BY: WALTER P. LOUGHLIN, ESQ.

* * *

**Page 3**

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein that the sealing,
filing and certification of the within
deposition be waived; that such deposition
may be signed and sworn to before any officer
authorized to administer an oath with the
same force and effect as if signed and sworn
to before a Judge of this court.
IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to form, are
reserved to the time of trial.

* * *

**Page 4**

(The following transcript has been
deemed confidential.)
D A V I D   H O F F M A N,
a witness, after having been first
duly sworn by a Notary Public of
the State of New York, was examined
and testified as follows:
MR. TZANETOPOULOS:  This is the
deposition of David Hoffman.
Defense counsel and I have agreed
that, really, for the convenience of the
parties and the court reporter, for
present, we'll designate the whole
deposition as confidential under the
Court's protective order.  And we can
confer to try to undesignate it if that
ever becomes important to do.
I'd also like to make Exhibit No. 1
to the deposition transcript the
protective order's acknowledgement as
signed by our court reporter.
(Hoffman Exhibit No. 1, Protective
Order signed by the court reporter, was
marked for identification.)

**Page 5**

Confidential - D. Hoffman
DIRECT EXAMINATION
BY MR. TZANETOPOULOS:
Q.  Mr. Hoffman, have you given
depositions before?
A.  Yes.
Q.  How many, approximately?
A.  Less than a hundred.
Q.  All right.  More than ten?
A.  Possibly.
Q.  You're familiar enough then, we'll
give you the short version of the ground
rules.
As you know, I'll be asking a
series of questions and you'll be giving
answers.  If you do not hear me, please let
me know that.  All right?
A.  Uh-huh.  Yes.
Q.  That's what the next rule is:  Nods
of the head and uh-huhs don't work.  Please
say "yes," "no."
If you need a break, let us know,
and we'll be happy to take one.
Did you give a deposition in the
litigation between Wyckoff Heights Medical

2 (Pages 2 to 5)

CONFIDENTIAL

6

1          **Confidential - D. Hoffman**
2     **Center and American University of the**
3     **Caribbean?**
4          A.  Not that I recall.
5          **Q.  Was your testimony taken in any**
6     **fashion in that case?**
7          A.  We had a court ordered mediation
8     session.
9          MR. LOUGHLIN:  I don't believe
10         there were any depositions in that case.
11         I could be mistaken.
12         THE WITNESS:  The only deposition I
13         recall is a deposition taken of the CFO.
14         I don't recall giving a deposition,
15         which does not mean I didn't, it just
16         means I don't recall.
17    BY MR. TZANETOPOULOS:
18         **Q.  All right.  What have you done to**
19    **prepare for today's deposition?**
20         A.  Nothing.
21         **Q.  Did you review any documents in**
22    **advance of it?**
23         A.  I review lots of documents in my
24    role as general counsel, not in preparation
25    for this deposition.

7

1          Confidential - D. Hoffman
2          **Q.  Would you please take us through**
3     **the -- I guess from the end of college**
4     **forward, the short version of David Hoffman's**
5     **CV.**
6          A.  Education and employment?
7          **Q.  Employment.**
8          A.  I was admitted to practice in 1987.
9     I was first employed out of law school at the
10    firm of Martin Clearwater & Bell until
11    January of 1988.  I commenced employment as
12    an associate at Kanterman Taub & Brightner in
13    1988.  I became a partner in 1993.  In 1994,
14    Brightner and I left and formed Brightner &
15    Hoffman.  We practiced as Brightner & Hoffman
16    until 1999 and then formed a new firm and was
17    joined by Daniel Arshack.  We formed Hoffman
18    & Arshack.  We practiced together until 2003
19    when I became general counsel at Wyckoff
20    Heights Medical Center.  I'm also employed as
21    an adjunct professor of law at Cardozo Law
22    School where I teach bioethics.
23         **Q.  Have you been employed as general**
24    **counsel of Wyckoff Heights Medical Center**
25    **from 2003 to the present?**

8

1          **Confidential - D. Hoffman**
2          A.  I have been employed by Wyckoff
3     from 2003 to present.  I had a brief period
4     when I was not general counsel but remained
5     as an employee of the hospital from the very
6     end of 2007 until November 2008.
7          **Q.  What were the circumstances that**
8     **led to you not being general counsel from the**
9     **end of 2007 through November 2008?**
10         A.  Tom Singelton insisted that I be
11    fired.
12         **Q.  What was Mr. Singelton's position**
13    **at that time?**
14         A.  He was a restructuring consultant
15    retained at the direction of the commissioner
16    of the New York State Department of Health to
17    serve as chief restructuring officer.
18         **Q.  You said that Mr. Singelton**
19    **insisted that you be fired.  Fired from the**
20    **hospital's employment or just removed from**
21    **the position of general counsel?**
22         A.  Fired from the hospital's
23    employment.
24         **Q.  Did that happen?**
25         A.  Pursuant to a severance, agreement,

9

1          Confidential - D. Hoffman
2     I remained employed through the date of
3     Mr. Singelton's firing and was then
4     reinstated and the severance agreement was
5     nullified.
6          **Q.  Did Mr. Singelton tell you why it**
7     **was that he wished you to be dismissed?**
8          A.  No.
9          **Q.  Did anybody else tell you why**
10    **Mr. Singelton wished you to be dismissed?**
11         A.  No.
12         **Q.  Do you have a sense of why he**
13    **wanted you out?**
14         A.  Objection to form.
15         I don't know what you mean by
16    "sense."
17         **Q.  Do you have any understanding of**
18    **why it is that he wanted you no longer to be**
19    **general counsel?**
20         A.  I can't answer the question the way
21    you asked it.
22         **Q.  Do you have a belief as to why it**
23    **is that Singelton wanted you out?**
24         A.  A belief?  No.
25         **Q.  Do you have any idea why it is that**

3  (Pages 6 to 9)

CONFIDENTIAL

**10**

1    Confidential - D. Hoffman
2    he wanted you out?
3        A.  Yes.
4        Q.  What is your idea?
5        A.  I'm going to object to that
6    question on the grounds that it calls for
7    disclosing privileged communication between
8    me and members of the Board of Trustees, my
9    client.
10       Q.  Let's see if we can establish
11   whether or not there's a foundation for a
12   claim of privilege.
13       Do all of your ideas about why
14   Mr. Singelton wanted you out come from
15   communications that you had with Board
16   members of Wyckoff Heights Medical Center?
17       THE WITNESS:  Can you read that
18   back.
19       (The requested portion of the
20   record was read back.)
21       THE WITNESS:  Yes.
22   BY MR. TZANETOPOULOS:
23       Q.  Who informed you that you were
24   fired as general counsel?
25       A.  Rick Zall.

**11**

1        Confidential - D. Hoffman
2        Q.  And what was his position?
3        A.  Partner at Proskauer Rose.
4        Q.  The conversations with Board
5    members in which you got information about
6    why Singelton wanted you out, did those occur
7    before or after you spoke with Mr. Zall or
8    both?
9        A.  Objection.  Foundation.
10       Q.  I'm sorry, you don't get to object.
11       A.  Yeah, I do.
12       Q.  No, you don't.
13       A.  Yeah, in New York.  Yeah, I've gone
14   for rulings on this.
15       Q.  That's fine.
16       As you know, we're on foundational
17   questions so you have to answer subject to
18   the objection.
19       A.  I can't.  It's like asking me if
20   I've stopped beating my dog.  We haven't
21   established if I own a dog.
22       MR. LOUGHLIN:  Why don't you
23   rephrase it, George, and see.
24   BY MR. TZANETOPOULOS:
25       Q.  The conversations with Board

**12**

1    Confidential - D. Hoffman
2    members on which you're claiming privilege,
3    did they occur before Mr. Zall informed you
4    you were fired?
5        A.  I'm not claiming privilege
6    concerning conversations. I'm claiming
7    privilege concerning the basis for my ideas
8    about why Singelton insisted that I be fired.
9    That was your question:  Ideas.
10       Q.  And as I understand it, your ideas
11   came from conversations with Board members;
12   is that correct?
13       A.  I believe my prior testimony was
14   that disclosing to you ideas that I have
15   about why Singelton insisted that I be fired
16   would require that I -- or would amount to my
17   disclosing information -- privileged
18   communication.
19       MR. LOUGHLIN:  Privileged
20   communication.
21       THE WITNESS:  Which is privileged
22   communication between myself and members
23   of the Board.
24   BY MR. TZANETOPOULOS:
25       Q.  My question to you, sir, is:  The

**13**

1        Confidential - D. Hoffman
2    ideas that you had, did they come from
3    communications with Board members?
4        A.  In part, yes.
5        Q.  Those communications, did they
6    occur before or after you had been informed
7    that you were fired?
8        A.  Before.
9        Q.  Did any occur after?
10       A.  I don't recall.
11       Q.  The communications you had with
12   Board members that form the basis of your
13   ideas, were any of those in writing?
14       THE WITNESS:  Can you read that
15   back.
16       (The requested portion of the
17   record was read back.)
18       THE WITNESS:  There were written
19   communications that I had with Board
20   members that relate to the subject
21   matter of your question.
22   BY MR. TZANETOPOULOS:
23       Q.  Were those writings e-mails?
24       A.  I don't believe so, no.  But I
25   can't say with certainty.

4 (Pages 10 to 13)

CONFIDENTIAL

14

1     Confidential - D. Hoffman
2     Q.  Memoranda?
3     A.  Written documents provided to the
4  Board.
5     Q.  Were those documents written by
6  you?
7     A.  Uh-huh.  Yes.
8     Q.  And you provided them to the Board?
9     A.  Yes.
10    Q.  The Board as a whole or certain
11 Board members?
12    A.  At a meeting -- an ad hoc meeting
13 with Board members.
14    Q.  And the Board we're talking about,
15 that would be the Wyckoff Heights Medical
16 Center Board?
17    A.  Yes.
18    Q.  Which Board members were present?
19    A.  I don't recall.
20    Q.  Was Mr. Rucigay present?
21    A.  Mr. Rucigay has been present at
22 meetings that I've participated in.  I don't
23 know if he was present at meetings where I
24 had communications with Board members that
25 relate to my ideas about why Tom Singelton

15

1     Confidential - D. Hoffman
2  demanded that I be fired.
3     Q.  Did you ever complain to the
4  Wyckoff Heights Medical Center Board that
5  Mr. Singelton was engaging in activities that
6  he was not authorized to engage in on behalf
7  of Wyckoff Heights Medical Center?
8     A.  Objection.  Privilege.
9     Q.  Are you claiming the
10 attorney-client privilege with respect to
11 that question?
12    A.  Yes.
13    Q.  Did the Wyckoff Heights Medical
14 Center Board -- Well, we know the answer to
15 that.  I'm sorry.
16    Before Mr. Singelton fired you was
17 one of your duties to attend meetings of the
18 Wyckoff Heights Medical Center Board of
19 Trustees?
20    A.  Objection to form and foundation.
21 I never testified that Mr. Singelton fired
22 me.
23    Q.  All right.  Before you were fired
24 from your position as -- Strike that.
25    Who is it that fired you?

16

1     Confidential - D. Hoffman
2  Mr. Zall?
3     A.  The severance agreement prepared by
4  Mr. Zall's firm was signed by Mr. Rucigay.
5     Q.  So Mr. Rucigay was aware,
6  obviously, that you had been fired?  He
7  signed the agreement, right?
8     A.  (Nods head.)
9     Q.  Before your firing was one of your
10 jobs to attend Board meetings?
11    A.  Yes.
12    Q.  After you were fired as general
13 counsel and before you were reinstated,
14 during that period, did you attend Board
15 meetings?
16    A.  No.
17    Q.  Did you actually work at the
18 hospital?
19    A.  No.
20    Q.  Were you paid essentially not to
21 work at the hospital?
22    A.  Pursuant to the severance agreement
23 I continued to receive my salary, and would
24 have continued to receive my salary through
25 the end of January of 2009, but I returned to

17

1     Confidential - D. Hoffman
2  my position as general counsel before then.
3     Q.  Right.
4     And during that period before you
5  returned, did you do any work on behalf of
6  the hospital?
7     A.  No.
8     Q.  Have you ever held positions at
9  Brooklyn-Queens Health Care?
10    A.  Yes.
11    Q.  What positions?
12    A.  I was the general counsel.
13    Q.  Is there a written contract between
14 you and Brooklyn-Queens Health Care regarding
15 that position?
16    A.  I don't recall.
17    Q.  Is there a written contract between
18 you and Wyckoff Heights Medical Center
19 regarding your employment as general counsel
20 at Wyckoff?
21    A.  Yes.
22    Q.  Did you hold any positions at
23 Caritas -- Let me go back a step.  The names
24 changed so I want to be sure I got it right.
25    Is it Caritas Health Care?  Caritas

18

1      Confidential - D. Hoffman
2   Health Care Planning?  What is the entity
3   that is Wyckoff's affiliate that was called
4   Caritas?
5      A.  Objection to form.  And I can't
6   answer the question the way you asked it.
7   It's not answerable.
8         MR. LOUGHLIN:  I think the
9      affiliate issue is something that you
10      may want to rephrase.  I'm sure the
11      witness can describe the two different
12      Caritas entities that you described,
13      what they are and what they mean.
14   BY MR. TZANETOPOULOS:
15      Q.  Was Brooklyn-Queens Health Care a
16   member of an entity or entities with Caritas
17   in its name?
18      A.  No.
19      Q.  Before they closed, what was the
20   entity that held ownership interests in
21   St. Mary's -- or I'm sorry, St. John's
22   Hospital and Mary Immaculate Hospital?
23      A.  Caritas Health Care, Inc. was an
24   Article 28 licensed not-for-profit
25   corporation in the state of New York.  And

19

1      Confidential - D. Hoffman
2   Brooklyn-Queens Health Care was the sole
3   member of that corporation.
4      Q.  During the time that
5   Brooklyn-Queens Health Care was sole member
6   of Caritas -- Strike that.
7         During the time that it was
8   affiliated with Brooklyn-Queens Health Care,
9   was Caritas Health Care, Inc. called by any
10   other names?
11      A.  I don't recall as to the precise
12   chronology.  But prior to Caritas Health
13   Care, Inc. becoming an Article 28 licensed
14   operator of St. Johns and Mary Immaculate
15   hospitals, Caritas Health Care, Inc. was
16   incorporated as Caritas Health Care Planning,
17   Inc.
18      Q.  When did -- For ease of use, can we
19   agree to call that entity Caritas?
20      A.  We can.
21      Q.  All right.
22         When did Caritas become a licensed
23   operator of hospitals?
24      A.  On or about December 27th, 2006.
25      Q.  Have you ever held any positions at

20

1      Confidential - D. Hoffman
2   Caritas?
3      A.  Yes.
4      Q.  Which positions?
5      A.  I was the general counsel of
6   Caritas.
7      Q.  Is there a written employment
8   agreement between you and Caritas concerning
9   that position?
10      A.  I don't recall.
11      Q.  How is it that you were appointed
12   to become general counsel of Brooklyn-Queens
13   Health Care?
14      A.  I don't recall.
15      Q.  How about for Caritas?
16      A.  I don't recall.
17      Q.  Is there any documentation
18   concerning your appointment as general
19   counsel of Brooklyn-Queens Health Care?
20      A.  I don't recall.
21      Q.  Same for Caritas.
22      A.  I don't recall.
23      Q.  Was any portion of your salary or
24   benefits during the time that you were
25   general counsel of Brooklyn-Queens Health

21

1      Confidential - D. Hoffman
2   Care allocated to Brooklyn-Queens Health
3   Care?
4      A.  I don't know.
5      Q.  Is the same true of your time at
6   Caritas as general counsel?
7      A.  Yes.
8      Q.  Who would know that?
9      A.  I don't know.
10      Q.  If you wished to find out, where
11   would you start?
12      A.  If I wanted to find out, I would
13   ask the people in the business office at
14   Wyckoff Heights Medical Center or I would ask
15   the consultant who currently operates
16   Caritas.
17      Q.  And who is that consultant?
18      A.  John Lavan.
19         I might also ask Tom Singelton, the
20   prior consultant who operated Caritas.
21      Q.  I've seen on some of the signature
22   blocks of documents that you have signed an
23   indication that you are -- you have a
24   position.  I don't know if you're the ethics
25   officer or the ethics vice president.

6  (Pages 18 to 21)

CONFIDENTIAL

22

1        Confidential - D. Hoffman
2        What is your title with respect to
3    ethics?
4        A.   At Wyckoff I am the vice president
5    for ethics and compliance and general
6    counsel; that's what it says on my business
7    card.
8        Q.   All right.  Did you hold those
9    ethics and compliance positions at
10   Brooklyn-Queens Health Care?
11       A.   I don't remember.
12       Q.   How about at Caritas?
13       A.   I don't remember.
14       Q.   How long have you had an ethics and
15   compliance component to your position?
16       A.   I first became employed by Wyckoff
17   in January of 2003 as the corporate
18   compliance officer, which was a part-time
19   employment.  I became employed in a full-time
20   capacity as the vice president for ethics and
21   compliance and general counsel at Wyckoff on
22   June 30th, 2003.
23       Q.   And with respect to ethics, what
24   duties do you -- Let me ask a better
25   question.

23

1        Confidential - D. Hoffman
2        What are your duties with respect
3    to ethics at Wyckoff?
4        A.   I am the bioethics consultant for
5    clinical matters.  I provide education and
6    training in ethics to the staff and students
7    of Wyckoff Heights Medical Center.  And I am
8    in charge of ensuring ethical business
9    practices in the governance and operation of
10   the hospital, Wyckoff.
11       Q.   And how about the compliance
12   portion of the job, what are your duties with
13   respect to compliance?
14       A.   Currently?
15       Q.   Let's start there.
16       A.   The corporate compliance officer
17   and the director of internal audit and
18   corporate compliance report to me.  I make
19   sure that they're properly maintaining our
20   mandatory corporate compliance program.
21       Q.   Has that been different in the past
22   while you were at Wyckoff?
23       A.   Prior to sometime last year I was
24   the corporate compliance officer.
25       Q.   During the time that you were not

24

1        Confidential - D. Hoffman
2    general counsel, who was?
3        A.   Prior to my becoming general
4    counsel in 2003, for a brief time an
5    individual named Diane or Diana Goldwasser
6    served as general counsel.  Prior to that,
7    there was no general counsel.
8        Q.   During the end of 2007 through the
9    November of 2008 period who was general
10   counsel?
11       A.   There was no general counsel.
12       Q.   Before Mr. Singelton arranged for
13   your dismissal -- Strike that.
14       Before you were dismissed at the
15   end of 2007 as general counsel were there any
16   other in-house lawyers at Wyckoff other than
17   you?
18       A.   Claire Mullally was employed in
19   some capacity prior to my being dismissed.  I
20   don't recall what her title was but she was,
21   at the time, an attorney admitted to practice
22   law in the state of New York.
23       Q.   Did she report to you?
24       A.   Yes.
25       Q.   Did you hire her?

25

1        Confidential - D. Hoffman
2        A.   Yes.
3        Q.   Was it Mr. Singelton or someone
4    from FTI who arranged for her to be hired at
5    the hospital?
6        A.   No.
7        Q.   Did Ms. Mullally remain at the
8    hospital after you were discharged as general
9    counsel?
10       A.   I'm sorry.  I couldn't hear you,
11   you turned the pages.
12       Q.   Did Ms. Mullally remain at the
13   hospital after you were discharged?
14       A.   Yes.
15       Q.   To your understanding did she serve
16   as the chief legal officer during that time?
17       A.   I believe during that period of
18   time she was associate general counsel.
19       Q.   For this next set of questions,
20   just so you know where I'm going and we can
21   get you out of here a little quicker, what
22   I'd like to do is talk about the corporate
23   structure of the different entities on the
24   defendant's side that appear to be involved
25   in this case.

7 (Pages 22 to 25)

CONFIDENTIAL

26

1          Confidential - D. Hoffman
2          So Brooklyn-Queens Health Care is a
3   New York not-for-profit?
4      A.  Yes.
5      Q.  Did it used to be called WHMC
6   Properties, Inc.?
7      A.  Yes.
8      Q.  So WHMC Properties, Inc. and
9   Brooklyn-Queens Health Care are the same
10  entity, just different names for the same
11  entity?
12     A.  Correct.
13     Q.  Wyckoff Heights Medical Center is
14  also a New York not-for-profit?
15     A.  Yes.
16     Q.  Is Brooklyn-Queens Health Care the
17  sole member of Wyckoff Heights Medical
18  Center?
19     A.  Yes.
20     Q.  Has that always been the case
21  during your time at the hospital?
22     A.  No.
23     Q.  Who was the member or members of
24  Wyckoff Heights Medical Center when you began
25  at the hospital?

27

1          Confidential - D. Hoffman
2      A.  There were none.
3      Q.  Caritas, at least before the
4   bankruptcy, also was a New York
5   not-for-profit?
6      A.  Was and is.
7      Q.  All right.  And BQHC -- or I'm
8   sorry, Brooklyn-Queens Health Care is the
9   sole member of Caritas?
10     A.  Correct.
11     Q.  Does Brooklyn-Queens Health Care
12  still exist?
13     A.  Yes.
14     Q.  Does it have holdings in any
15  entities other than Wyckoff Heights Medical
16  Center or Caritas?
17     A.  No.
18     Q.  Does Brooklyn-Queens Health Care
19  have a physical location or offices?
20     A.  No.
21     Q.  Has it ever had them?
22     A.  It has an address registered with
23  the New York State Secretary of State for
24  service of process.  That address is Wyckoff
25  Heights Medical Center, at 374 Stockholm

28

1          Confidential - D. Hoffman
2   Street, Brooklyn, New York.
3      Q.  And that has been the only
4   offices -- Strike that.
5          Other than the address for service
6   of process has Brooklyn-Queens Health Care
7   ever had offices?
8      A.  No.
9      Q.  Does Brooklyn-Queens Health Care
10  have any bank accounts?
11     A.  No.
12     Q.  Has it ever had them?
13     A.  No.
14     Q.  Does Brooklyn-Queens Health Care
15  have any employees?
16     A.  No.
17     Q.  Has it ever had any?
18     A.  No.
19     Q.  Does Brooklyn-Queens Health Care
20  have its own telephones?
21     A.  Nope.
22     Q.  Has it ever had them?
23     A.  No.
24     Q.  Does Brooklyn-Queens Health Care
25  have its own computers?

29

1          Confidential - D. Hoffman
2      A.  Not insofar as I'm aware.
3      Q.  Has it ever had them?
4      A.  Not that I'm aware of.
5      Q.  Are you aware of Brooklyn-Queens
6   Health Care ever having paid money to anyone?
7      A.  Brooklyn-Queens Health Care doesn't
8   have a bank account, so it couldn't.
9      Q.  Does Brooklyn-Queens Health Care
10  have corporate officers?
11     A.  Yes.
12     Q.  Who are they?
13     A.  Emil Rucigay is the chairman of the
14  Board of Brooklyn-Queens Health Care.  I
15  can't remember off the top of my head who the
16  other officers are.  But there's a secretary,
17  a treasurer, and a vice chair.
18     Q.  And the offices you just mentioned,
19  secretary, treasurer, and vice chair, are
20  those secretary, treasurer, and vice chair of
21  the Brooklyn-Queens Health Care Board of
22  Trustees?
23     A.  Yes.
24     Q.  Does the corporation,
25  Brooklyn-Queens Health Care, have officers

8 (Pages 26 to 29)

30

Confidential - D. Hoffman
1
2  other than the officers of its Board of
3  Trustees?
4     A.  It had a chief executive officer at
5  the time of its creation as the sole
6  corporate member and passive parent of
7  Wyckoff and Caritas.
8     Q.  Who is that?
9     A.  Initially Dominick Gio.
10     Q.  From the time of its creation to
11  the present has it always had a CEO?
12     A.  I can't speak to what went on
13  during the period that I was not general
14  counsel.
15     Q.  All right.  Exclude that period.
16  Other than that.
17     A.  I don't know as a technical matter
18  whether Brooklyn-Queens Health Care currently
19  has a chief executive officer.
20     Q.  Other than Mr. Gio, are you aware
21  of anybody ever having been chief executive
22  officer of Brooklyn-Queens Health Care?
23     A.  I don't know if Tom Singelton was
24  designated as chief executive officer of
25  Brooklyn-Queens Health Care.  I know that he

31

1        Confidential - D. Hoffman
2  was the chief restructuring officer for
3  Brooklyn-Queens Health Care at a point in
4  time.
5     Q.  If the Court were to enter a
6  multimillion dollar award against
7  Brooklyn-Queens Health Care in this case in
8  favor of Ross, could Brooklyn-Queens Health
9  Care pay that judgment?
10     A.  I don't know.
11     Q.  We've discussed that
12  Brooklyn-Queens Health Care doesn't have a
13  bank account and we've talked about its
14  memberships in Caritas and Wyckoff.
15        Does Brooklyn-Queens Health Care
16  have any other assets?
17     A.  I would object to the form of the
18  question in that it asserts that membership
19  in a not-for-profit corporation is an asset.
20        Notwithstanding that objection,
21  Brooklyn-Queens Health Care has a single
22  asset, which is a parking lot in Brooklyn.
23     Q.  And where is that parking lot?
24     A.  It's located between Stanhope
25  Street and Himrod Street opposite Wyckoff

32

1        Confidential - D. Hoffman
2  Heights Medical Center.
3     Q.  Other than the parking lot, any
4  other assets?
5     A.  Nope.
6     Q.  As the sole member of Wyckoff
7  Heights Medical Center, does Brooklyn-Queens
8  Health Care have the power to appoint
9  trustees to the Wyckoff Heights Medical
10  Center Board of Trustees?
11     A.  Yes.
12     Q.  Does it have the power to discharge
13  trustees from the Wyckoff Heights Medical
14  Center Board of Trustees?
15     A.  Yes.
16     Q.  Does Wyckoff Heights Medical Center
17  have any bank accounts?
18     A.  Yes.
19     Q.  Does Wyckoff Heights Medical Center
20  have any employees?
21     A.  Yes.
22     Q.  How many?
23     A.  I don't know exactly.  Something in
24  excess of 1800.
25     Q.  Does Wyckoff Heights Medical Center

33

1        Confidential - D. Hoffman
2  have telephones?
3     A.  Yes.
4     Q.  Does Wyckoff Heights Medical Center
5  have corporate officers other than the
6  officers of its Board of Trustees?
7     A.  Yes.
8     Q.  Does Wyckoff Heights Medical Center
9  have its own computers?
10     A.  Yes.
11     Q.  Let's move from corporate structure
12  to generally about what we should talk about,
13  and what you don't know about because you
14  weren't there or didn't work on it.
15        Did you perform --
16     A.  I'm just going to object to that
17  preface as being part of any question.
18     Q.  It's not.  I'm just trying to
19  orient you.  I'm shifting gears and just
20  trying to be fair to you.
21     A.  No need.
22     Q.  Did you perform any work in
23  connection with a contract that is entitled,
24  "Affiliation Agreement Between Ross
25  University School of Medicine, School of

9  (Pages 30 to 33)

CONFIDENTIAL

---

34

1          Confidential - D. Hoffman
2     Veterinary Medicine, Limited, Portsmouth,
3     Dominica and Brooklyn-Queens Health Care,
4     Inc."?
5          A.   Is that referring -- Objection
6     to form.
7               Is that referring to a particular
8     document?
9          Q.   The document is the contract
10    itself.  I'm just wondering if you worked on
11    the deal.
12         A.   Objection to form.
13              There have been many deals between
14    Wyckoff and Ross proposed, executed,
15    modified.  I've been consulted about many
16    issues related to Wyckoff's relationship with
17    Ross University Medical School over the
18    course of the years.
19         Q.   I'm just trying to sort out which
20    ones.
21         A.   Huh?
22         Q.   I'm just trying to sort out which
23    ones right now.
24         A.   Yeah.  If you show me a document,
25    I'll tell you if it looks familiar.

---

35

1          Confidential - D. Hoffman
2          (Hoffman Exhibit No. 2, Affiliation
3     Agreement Between Ross School of
4     Medicine, School of Veterinary Medicine,
5     Limited, Portsmouth, Dominica and
6     Brooklyn-Queens Health Care, Inc., Bates
7     numbered ROSS0056 through ROSS006, was
8     marked for identification.)
9     BY MR. TZANETOPOULOS:
10         Q.   Mr. Hoffman, let me show you a
11    document that the court reporter has marked
12    as Hoffman Exhibit No. 2.  It's entitled,
13    "Affiliation Agreement Between Ross School of
14    Medicine, School of Veterinary Medicine,
15    Limited, Portsmouth, Dominica and
16    Brooklyn-Queens Health Care, Inc."  It starts
17    at Bates numbers ROSS0056 through ROSS0066.
18              I'll talk about the document itself
19    in some detail.  But after you've looked at
20    it, my question is:  Did you work on this
21    deal at all?
22         A.   No.
23         Q.   During the November, December 2006
24    time frame, were you aware that this
25    transaction was being discussed between Ross

---

36

1          Confidential - D. Hoffman
2     and BQHC or any of BQHC's affiliates?
3          A.   Yes.
4          Q.   As you understood it, who were the
5     business people in charge of the deal from
6     the hospital's side?
7          A.   Harold McDonald.
8          Q.   Had Mr. McDonald been charged with
9     negotiating affiliation agreements with
10    Caribbean Medical Schools --
11         A.   I don't know.
12         Q.   -- at that period of time?
13         A.   I don't know.
14         Q.   Were you aware of anybody else who
15    was working on this particular deal for the
16    hospitals?
17              MR. LOUGHLIN:  Was he aware in --
18              MR. TZANETOPOULOS:  Right.  In
19    2006.
20              MR. LOUGHLIN:  -- 2006?
21              MR. TZANETOPOULOS:  Yes.
22              THE WITNESS:  I was not aware, no.
23    BY MR. TZANETOPOULOS:
24         Q.   This contract was amended in
25    December of 2007.

---

37

1          Confidential - D. Hoffman
2          Did you do any work in connection
3     with that first amendment?
4          A.   You'd have to show me the document
5     in order for me to answer the question.
6          (Hoffman Exhibit No. 3, Amendment
7     to Affiliation Agreement Between Ross
8     School of Medicine, School of Veterinary
9     Medicine, Limited, Portsmouth, Dominica
10    and Brooklyn-Queens Health Care, Inc.
11    Through Caritas Health Care, Inc., Bates
12    numbered ROSS0052 through ROSS0055, was
13    marked for identification.)
14    BY MR. TZANETOPOULOS:
15         Q.   Mr. Hoffman, the court reporter has
16    handed you a document but I think it's
17    misstapled.
18              MR. TZANETOPOULOS:  Let's go off
19    the record for a second.
20              (Discussion off the record.)
21    BY MR. TZANETOPOULOS:
22         Q.   We've corrected the exhibit, so let
23    me start over with the exhibit.
24              Hoffman Exhibit No. 3 is entitled,
25    "Amendment To Affiliation Agreement Between

---

CONFIDENTIAL

38

1      **Confidential - D. Hoffman**
2      Ross University," and it goes on.  It begins
3      with Bates number ROSS0052 and concludes with
4      ROSS0055.
5            Mr. Hoffman, did you do any work in
6      connection with this amendment?
7        A.  No.
8            (Hoffman Exhibit No. 4, Second
9            Amendment to Affiliation Agreement
10           Between Ross School of Medicine, School
11           of Veterinary Medicine, Limited,
12           Portsmouth, Dominica and Brooklyn-Queens
13           Health Care, Inc. Through Caritas Health
14           Care, Inc., Bates numbered ROSS0105
15           through ROSS0109, was marked for
16           identification.)
17     BY MR. TZANETOPOULOS:
18       Q.  Mr. Hoffman, the court reporter has
19     handed you a document marked Hoffman Exhibit
20     No. 4.  It's entitled, "Second Amendment to
21     Affiliation Agreement Between Ross University
22     School of Medicine," and it goes on.  It
23     begins with Bates number ROSS0105 and
24     concludes with ROSS0109.
25           Did you do any work on this deal?

39

1      **Confidential - D. Hoffman**
2        A.  No.
3        Q.  Did you perform any work in
4      connection with the affiliation agreement or
5      promissory note between Wyckoff and the
6      American University of the Caribbean?
7        A.  I have no particular recollection
8      whether I did or did not participate in the
9      drafting of any agreements with AUC.  I have,
10     from time to time, been involved in
11     discussions about agreements with AUC, some
12     of which were consummated, some of which were
13     not.
14       Q.  We'll talk about the specific
15     documents in some detail in a little bit.
16     But again, just to find out what we should
17     talk about.
18           Some of the documents that the
19     defendants have produced in this case discuss
20     a transfer of money from Caritas to Wyckoff
21     in late 2006 and early 2007.
22           Did you perform any work in
23     connection with the issues raised by those
24     transfers?
25       A.  I can't answer the question the way

40

1      Confidential - D. Hoffman
2      that you asked it.
3        Q.  You're aware that in late 2006,
4      early 2007 money was transferred from Caritas
5      to Wyckoff?
6        A.  Is that a question?
7        Q.  Yes.
8        A.  What's the question?
9            MR. LOUGHLIN:  Do you have that
10           knowledge?
11     BY MR. TZANETOPOULOS:
12       Q.  Are you aware of that?
13       A.  I have no specific recollection of
14     any particular transfers of money.  I know
15     that Wyckoff and Caritas were jointly engaged
16     in a venture to establish a Central Business
17     Office.  And it was my understanding that
18     were due to/due from transactions related to
19     that joint venture.
20       Q.  And any time from 2006 to the
21     present while you were working at Wyckoff
22     have you performed any work in connection
23     with establishing, or I guess revising,
24     policies for Brooklyn-Queens Health Care or
25     any of its affiliates regarding approvals for

41

1      **Confidential - D. Hoffman**
2      transfers of money between the entities?
3        A.  I don't recall.
4        Q.  Are there any such policies?
5        A.  I don't recall.
6        Q.  If you wanted to find out if there
7      were policies, how would you do so?
8        A.  I don't know.
9        Q.  Does Wyckoff have an official
10     custodian of contracts into which it enters?
11     Do you have a central repository,
12     departmental repositories, is what I'm
13     fishing at?
14       A.  Pursuant to the requirements of the
15     anti self-referral statute, commonly known as
16     the Stark Law, Wyckoff maintains a central
17     contract repository in an electronic form.
18       Q.  Who is the custodian of that
19     repository?
20       A.  Objection to form and foundation.
21     The repository is a virtual
22     repository.  So I don't know that you could
23     say that there is a custodian.  There are
24     paper copies of many contracts that are
25     maintained in the administrative offices.

11 (Pages 38 to 41)

CONFIDENTIAL

42

```
 1            Confidential - D. Hoffman
 2     Q.   Let's first address the virtual
 3   aspect of that.
 4            Who is the person or position who
 5   is in charge of the maintenance of that
 6   repository?
 7     A.   From a legal perspective, me.  From
 8   an IT perspective, the IT department.
 9     Q.   The paper copies of contracts, who
10   is the person or department who is
11   responsible for maintaining those copies?
12     A.   Those are generally maintained in
13   the hospital's administrative office.
14     Q.   And who is the person or position
15   who's responsible for maintaining them?
16     A.   It's been a number of different
17   people over the years.  And for obvious
18   reasons, I don't know what happened during
19   most of 2007.
20     Q.   Right.
21            What is the position called?
22     A.   It's been a number of different
23   individuals and positions.
24     Q.   Is there a particular position who
25   is in charge of maintaining the contracts --
```

43

```
 1            Confidential - D. Hoffman
 2   Let me start again.
 3            Is there a particular position or
 4   person who has been in charge of maintaining
 5   affiliation agreements with medical schools?
 6     A.   Those agreements are maintained in
 7   the Wyckoff Heights Medical Center contract
 8   repository.  And I'm in charge of that.
 9     Q.   During the time that you were at
10   the hospital through the present, when
11   Wyckoff entered into an affiliation
12   agreement, would the hospital's policies
13   require that you get a copy of that contract
14   once it was signed?
15     A.   The current version of the contract
16   repository is a recent creation which was
17   formed by pulling together electronic
18   versions of documents from many different
19   sources.  There's no requirement that I can
20   recall, per se, that obligates anyone to give
21   me personally a copy of a contract.
22     Q.   In December of 2006, January 2007,
23   were the policies such that a contract, like
24   Exhibit No. 2, be sent to you once it was
25   signed?
```

44

```
 1            Confidential - D. Hoffman
 2     A.   No.  We had no such formal policy
 3   at that time.
 4     Q.   At that time, once a contract was
 5   entered into, what would happen to the actual
 6   written contract itself if policies were
 7   followed?
 8     A.   Objection to form.
 9            I've previously testified that
10   there were no formal policies for BQHC,
11   Caritas, or Wyckoff in December 2006 and
12   January 2007 regarding custody of signed
13   documents.
14            MR. TZANETOPOULOS:  Can we take a
15   quick five-minute one here?
16            MR. LOUGHLIN:  Sure.
17            (A brief recess was taken from
18   11:16 a.m. to 11:26 a.m.)
19            (Hoffman Exhibit No. 5,
20   Administrative Services Agreement by and
21   between Caritas Health Care Planning,
22   Inc. And WHMC Properties, Inc. Dated as
23   of August 21, 2006, Bates numbered BQHC
24   00306 through BQHC 00328, was marked for
25   identification.)
```

45

```
 1            Confidential - D. Hoffman
 2            (Hoffman Exhibit No. 6,
 3   Administrative Services Subcontract,
 4   Bates numbered BQHC 01056 through BQHC
 5   01064, was marked for identification.)
 6   BY MR. TZANETOPOULOS:
 7     Q.   Mr. Hoffman, I'm showing you two
 8   documents that the court reporter has marked
 9   as Hoffman Exhibits Nos. 5 and 6.
10            Exhibit No. 5 is titled,
11   "Administrative Services Agreement By and
12   Between Caritas Health Care Planning, Inc.
13   and WHMC Properties, Inc. Dated as of August
14   21, 2006." It begins with Bates numbers BQHC
15   00306 and concludes with BQHC 00328.
16            Exhibit No. 6 is titled,
17   "Administrative Services Subcontract," also
18   dated August 21, 2006.  It's stamped BQHC
19   01056 through 01064.
20            I'll let you take a look at these
21   to refresh yourself.  When you're ready, let
22   me know.
23     A.   (Document review.)
24            Okay.
25     Q.   If I can direct your attention to
```

12 (Pages 42 to 45)

CONFIDENTIAL

46

1      Confidential - D. Hoffman
2    Exhibit No. 5, second to the last page, which
3    is BQHC 00327 --
4      A.  Yes.
5      Q.  -- it lists what it says are
6    "Personnel provided by contractor will
7    include, among others, the following
8    individuals."  You're included there.
9      A.  Uh-huh.
10        MR. LOUGHLIN:  Can I just ask a
11   question?  Do we have two copies of
12   this?  It seems awfully thick.
13        MR. TZANETOPOULOS:  Let's go off
14   the record.
15        (Discussion off the record.)
16   BY MR. TZANETOPOULOS:
17     Q.  Let's talk about who these other
18   people are.
19        Who is Mr. Gio?  What was his
20   position at the hospital or hospital
21   entities?
22     A.  In August of 2006?
23     Q.  Yes, sir.
24     A.  He is the president and CEO of
25   Wyckoff Heights Medical Center.

47

1      Confidential - D. Hoffman
2      Q.  And Mr. McDonald?
3      A.  Was the chief operating officer of
4    Wyckoff Heights Medical Center.
5      Q.  Mr. McNeil?
6      A.  Was the chief financial officer of
7    Wyckoff Heights Medical Center.
8      Q.  And we know who you are.
9        Did you work on this administrative
10   services agreement?
11     A.  I didn't prepare the agreement.
12   Proskauer Rose prepared all of these
13   agreements.  But I was involved and consulted
14   about the terms of the agreements.
15        THE WITNESS:  Off the record.
16        (Discussion off the record.)
17   BY MR. TZANETOPOULOS:
18     Q.  If I can direct your attention to
19   the page Bates numbered BQHC 00326.
20        MR. LOUGHLIN:  In Exhibit 5?
21        MR. TZANETOPOULOS:  Exhibit No. 5.
22        THE WITNESS:  Yeah.
23   BY MR. TZANETOPOULOS:
24     Q.  Do you recognize Mr. McDonald's
25   signature there?

48

1      Confidential - D. Hoffman
2      A.  I don't recognize his signature; I
3    recognize that it says Harold McDonald and
4    there is a signature.
5      Q.  Do you know Mr. McNeil's signature?
6      A.  Again, I don't recognize his
7    signature but I recognize there is a
8    signature and his name appears.
9      Q.  At this period of time, August
10   2006, was Mr. McNeil, in fact, the treasurer
11   of WHMC Properties?
12     A.  Yes.
13     Q.  And at this time was Mr. McDonald,
14   in fact, the executive vice president and
15   chief operating officer of Caritas Health
16   Care Planning?
17     A.  Yes.
18     Q.  Was the general nature of this
19   transaction, as you understood it, that WHMC
20   Properties was contracting with Caritas to
21   provide the administrative services outlined
22   in the agreement?
23        MR. LOUGHLIN:  This is Exhibit 5?
24        MR. TZANETOPOULOS:  Yes.
25        THE WITNESS:  The document speaks

49

1      Confidential - D. Hoffman
2    for itself.  I'm not going to
3    characterize the document.
4    BY MR. TZANETOPOULOS:
5      Q.  I'm looking for your understanding,
6    sir.
7      A.  I don't remember the agreement, so
8    I don't have an understanding.
9      Q.  And the administrative services
10   subcontract in Exhibit No. 6, were you also
11   at the time generally familiar with -- or did
12   you perform work with respect to that
13   transaction?
14     A.  I was consulted regarding all of
15   these transactions which related to Wyckoff,
16   BQHC, and Caritas Health Care Planning, Inc.
17   providing services to St. Vincent's Catholic
18   Medical Center to provide intramanagement of
19   St. John's and Mary Immaculate Hospitals
20   pending the completion of the asset purchase
21   agreement and approval of licensure of
22   Caritas Health Care Planning, Inc. to become
23   an Article 28 licensed operator of two
24   hospitals in Queens County, New York.
25     Q.  All right.  And I appreciate that,

CONFIDENTIAL

50

Confidential - D. Hoffman
1
2    sir, because I think it gets us where we want
3    to go.
4         Is it, in fact, the case that these
5    two contracts are related to the provision of
6    services to Caritas before the closing of BQH
7    or of Caritas's purchase of the hospitals?
8    A.  No.
9    Q.  All right.  Had Caritas purchased
10   the hospitals yet as of August 2006?
11   A.  No.
12        THE WITNESS:  Could you read that
13   back.
14        (The requested portion of the
15   record was read back.)
16   BY MR. TZANETOPOULOS:
17   Q.  Let me ask a different question.
18        Were these agreements, Exhibit Nos.
19   5 and 6, intended to address Wyckoff's
20   provision of services to Caritas after
21   January 1, 2007?
22   A.  No.
23   Q.  Are there written agreements that
24   address Wyckoff provision of services to
25   Caritas from January 1, 2007, and after?

51

Confidential - D. Hoffman
1
2    A.  I don't recall.
3    Q.  If they existed would they be in
4    the contract repository that you testified
5    about earlier?
6    A.  Probably not, but I can't be
7    certain.
8    Q.  If such contracts existed, where
9    would they be maintained?
10   A.  In the asset purchase agreement and
11   related documents as prepared by Proskauer
12   Rose.
13   Q.  In order to respond to the
14   plaintiff's discovery request in this case,
15   were you the person who performed the
16   document search on behalf of the defendants?
17   A.  Was I the sole person?
18   Q.  Were you one of them?
19   A.  I did engage in searches for
20   documents related to this lawsuit, yes.
21   Q.  Who else did?
22   A.  I couldn't answer comprehensively.
23   Q.  Of whom are you aware having
24   participated in the search?
25   A.  Our administrative staff, our IT

52

Confidential - D. Hoffman
1
2    staff, the medical education department,
3    Claire Mullally with regard to the Caritas
4    transaction.  And I'm sure lots of other
5    people.
6    Q.  If there were -- Strike that.
7         If written agreements governing the
8    provision of service between or by Wyckoff to
9    Caritas for the period January 1, 2007, and
10   after, in fact, exist, would your searches
11   have found those contracts?
12   A.  Objection to form.
13        I can't answer the question the way
14   you asked it.
15   Q.  Do you think that if the defendants
16   had such contracts that we also would have
17   them, and the fact that we don't have them
18   suggests that you don't?
19   A.  Because I don't know what was done
20   with contracts during what we now refer to as
21   my sabbatical, from the end of December 2007
22   to the beginning of October 2008, I can't
23   speak to where any contracts would
24   necessarily be.  You can ask Mr. Singelton
25   that question.

53

Confidential - D. Hoffman
1
2    Q.  I apologize if I have asked it this
3    way before but just to close it out, let me
4    do it again.  Are you aware of any such
5    written agreement governing provision of
6    services by Wyckoff to Caritas from
7    January 1, 2007, or later?
8    A.  Objection to form.
9         I recall there being agreements to
10   which Wyckoff and Caritas were parties.  I
11   don't recall if they were, per se, services
12   agreements.
13   Q.  During the time that you have
14   worked as general counsel, who is it that
15   prepares the minutes for Wyckoff Heights
16   Medical Center Board of Trustees meetings?
17   A.  There are a number of people
18   involved in that process.
19   Q.  How does the process work then?
20   A.  Somebody takes notes at the meeting
21   and then prepares minutes.
22   Q.  As general counsel, is that your
23   job or is that somebody else's?
24   A.  It is typically somebody else's
25   job.  I take minutes on occasion,

14  (Pages 50 to 53)

CONFIDENTIAL

54

Confidential - D. Hoffman
1
2  particularly when the Board meets in
3  executive session or when it's an ad hoc or
4  emergency meeting.
5      Q.  And in the ordinary course of
6  Wyckoff Heights Medical Center's business,
7  once those minutes are prepared by whomever,
8  what are the next steps in the process of
9  having them approved and maintained at the
10 hospital?
11     A.  They're presented for approval at
12 the following meeting, they're signed by the
13 secretary to the Board or the assistant
14 secretary to the Board and the chairman
15 typically, and then they were placed in
16 binders.  In subsequent years those binders
17 were scanned and are maintained in an
18 electronic repository.
19     Q.  Is that also the process for
20 Brooklyn-Queens Health Care's Board of
21 Trustees meetings' minutes?
22     A.  Objection to form.
23         That's generally the process for
24 maintaining minutes in any not-for-profit
25 corporation.  Other than that, I can't

55

Confidential - D. Hoffman
1
2  answer.
3      Q.  There are references in some of the
4  Board of Trustees minutes to Executive
5  Committee meetings.
6          What is the Executive Committee?
7      MR. LOUGHLIN:  Which entity?
8      MR. TZANETOPOULOS:  Wyckoff.
9      THE WITNESS:  The Executive
10 Committee is a standing committee of the
11 Board.  The composition of which is
12 provided for in the bylaws.
13 BY MR. TZANETOPOULOS:
14     Q.  Does it have -- Or what powers or
15 purpose does the Executive Committee have?
16     A.  The powers and purpose of the
17 Executive Committee of Wyckoff Heights
18 Medical Center are set forth in the corporate
19 bylaws.
20     Q.  In general, what do you understand
21 them to be?
22     A.  In general, I understand them to be
23 the powers and responsibilities set forth in
24 the bylaws.
25     Q.  Are you able to describe them at

56

Confidential - D. Hoffman
1
2  all without looking at those bylaws?
3      A.  It is my custom and practice to
4  refer to the source document when making
5  representations under oath.
6      Q.  Do you have any understanding at
7  all, as you sit here today, about the powers
8  and purpose of the Executive Committee that
9  you can describe without looking at the
10 bylaws?
11     A.  Yes.
12     Q.  What is that understanding?
13     A.  It is the Executive Committee of
14 the Board of Trustees which has the authority
15 to act on behalf of the corporation and the
16 Board at times when the Board is not able to
17 meet.
18     Q.  When the Executive Committee meets,
19 are minutes kept of those meetings?
20     A.  Yes.
21     Q.  In connection with this lawsuit,
22 did the defendant search for minutes of those
23 Executive Committee meetings?
24     A.  Wyckoff Heights Medical Center
25 searched for all materials that were properly

57

Confidential - D. Hoffman
1
2  the subject of the demand for production, and
3  produced documents which were identified,
4  which were responsive to those demands.
5      Q.  Are the Executive Committee meeting
6  minutes -- Strike that.
7          Where are the Executive Committee
8  meeting minutes kept?
9      A.  They are typically maintained by
10 the assistant secretary to the Board, except
11 under extraordinary circumstances.
12     Q.  Who is that?
13     A.  Who's what?  What was the question?
14     Q.  Who is that person?
15     A.  It was, up until recently, Pat
16 Millspaugh.  As you are, no doubt, aware
17 having reviewed all of these minutes.
18     Q.  Are the Executive Committee meeting
19 minutes kept in the same binders -- I'm
20 sorry -- Are they in the same binders as the
21 Board minutes?
22     A.  I don't know.
23     Q.  Was it Ms. Millspaugh who keeps or
24 kept the minutes themselves?
25     A.  When they were maintained in

CONFIDENTIAL

58

Confidential - D. Hoffman
1
2    physical form, they were maintained in
3    physical form in her office.
4        (Hoffman Exhibit No. 7, October 5,
5        2006, Wyckoff Heights Medical Center
6        Board of Trustees Meeting Minutes, Bates
7        numbered BQHC 03769 through BQHC 3774,
8        was marked for identification.)
9    BY MR. TZANETOPOULOS:
10   Q.   Mr. Hoffman, the court reporter has
11   handed you a document that's been marked as
12   Hoffman Deposition Exhibit No. 7.  It's an
13   October 5th, 2006, set of Board of Trustees
14   meeting minutes from the Wyckoff Heights
15   Medical Center Board of Trustees, stamped
16   beginning BQHC 03769 through 03774.
17       This set of minutes shows that you
18   were at this meeting, correct, on the front
19   page?
20   A.   That's what it says.
21   Q.   Do you have any independent
22   recollection of this meeting?
23   A.   Yes.
24   Q.   If I can direct your attention,
25   please, to Page 3 of the minutes, it's been

59

1        Confidential - D. Hoffman
2    marked BQHC 03771.  There are some numbered
3    paragraphs.  In particular, I'd like to call
4    your attention to the numbered Paragraphs 2
5    and 3 and the sentence below those two
6    paragraphs.  So if you can take a look and
7    then I have some questions.
8    A.   (Document review.)
9        I've read Paragraphs 2 and 3.
10   Q.   The minutes say that, and I quote,
11   Paragraph 2, "Mr. Gio stated that he
12   presented a compensation package to the
13   committee for approval outlining the
14   compensation for corporate officers of
15   Brooklyn-Queens Health Care the new
16   compensation structure will become effective
17   upon closing of the SBCMCS at purchase.
18   Mr. Gio stated that the compensation package
19   was approved by the Executive Committee."
20       What corporate officers at
21   Brooklyn-Queens Health Care were approved for
22   compensation under this package?
23   A.   I have no idea.
24   Q.   Was the plan that Brooklyn-Queens
25   Health Care could pay anybody?

60

1        Confidential - D. Hoffman
2    A.   Objection to form.
3    Q.   As you understood -- Let me start
4    again.
5        The paragraph here discussions
6    compensation for corporate officers of
7    Brooklyn-Queens Health Care.
8        To your understanding, who was to
9    pay that compensation?
10   A.   I don't recall.
11   Q.   Was the plan that Brooklyn-Queens
12   Health Care would, in fact, have assets that
13   would permit it to pay corporate officers?
14   A.   Objection.  Asked and answered.
15   Q.   One more time, please.
16   A.   Objection.  Asked and answered.
17   Q.   I'd like the answer, please.  Do
18   you know what the plan was?
19   A.   Objection to form.
20       What the plan was for what.
21   Q.   Do you understand the question?
22   A.   No.
23   Q.   All right.  At this time do you
24   have any understanding of whether the plan
25   being discussed here anticipated that

61

1        Confidential - D. Hoffman
2    Brooklyn-Queens Health Care would have assets
3    to pay corporate officers?
4    A.   Meaning cash assets?
5    Q.   Any assets.
6    A.   As far as I am aware, no one was
7    ever paid by barter of physical goods.
8    Q.   All right.  That leaves us with
9    cash.  So the same question with respect to
10   cash.
11   A.   Brooklyn-Queens Health Care was
12   designed and established as the passive
13   parent sole corporate member of Wyckoff
14   Heights Medical Center and Caritas Health
15   Care, Inc.  And as such, never had a checking
16   account, never has had a checking account,
17   and never maintained any cash assets that I
18   am aware of.
19   Q.   Your understanding of the plan
20   being discussed here, who was to pay the
21   compensation for the corporate officers of
22   Brooklyn-Queens Health Care that are
23   discussed in these minutes?
24   A.   I don't recall.
25   Q.   Were there any entities in the mix

16 (Pages 58 to 61)

CONFIDENTIAL

62

Confidential - D. Hoffman
2  of the discussions at this time other than
3  Caritas or Wyckoff who could do so?
4      A.  Objection to form. I can't answer
5  the question the way you asked it.
6      THE WITNESS: Can we go off the
7      record for a second?
8      (Discussion off the record.)
9  BY MR. TZANETOPOULOS:
10     Q.  Paragraph 3 says that, and I quote,
11 "Mr. Gio advised the Board that a proposal to
12 have Caritas assume his employment contract
13 for the remaining seven years of his
14 contract, except for the agreed compensation
15 as outlined in the compensation package, all
16 other terms and conditions will remain
17 unaltered."
18     As you understood it, whose
19 decision was it to have Mr. Gio's contract
20 assumed by Caritas?
21     A.  I don't know. I was not a party to
22 that discussion, or that meeting, excuse me.
23     Q.  And the sentence below that states,
24 and I quote, "Mr. Gio stated that the
25 Executive Committee approved that the

63

Confidential - D. Hoffman
2  remaining seven years of the employment
3  contract will be assumed by BQHC."
4      As you understand it, could BQHC
5  even assume Mr. Gio's employment contract?
6  Let me ask a better question: We would agree
7  that BQHC had no money with which it could
8  pay Mr. Gio, correct?
9      A.  Objection. Asked and answered.
10     As I have previously testified,
11 Brooklyn-Queens Health Care did not have, and
12 to date, as far as I'm aware, does not have a
13 checking account and has no cash assets. A
14 corporation can assume liabilities as a
15 matter of corporate law and can take any
16 number of steps to fulfill its obligations
17 without having a checking account.
18     Q.  Mr. Hoffman, the documents the
19 defendants have produced refer to a
20 department of graduate medical education.
21     Are you familiar with that
22 department?
23     A.  Department of graduate medical
24 education of what entity?
25     Q.  As far as I can tell, Wyckoff

64

Confidential - D. Hoffman
2  Heights Medical Center.
3      A.  Wyckoff Heights Medical Center
4  does, in fact, have a department of medical
5  education, yes.
6      Q.  And in general terms, what does
7  that department do?
8      A.  It manages the education of medical
9  students and has some responsibility for the
10 administration of the residency programs.
11     MR. TZANETOPOULOS: Can you read
12 his answer back.
13     (The requested portion of the
14 record was read back.)
15 BY MR. TZANETOPOULOS:
16     Q.  Did Caritas have a separate
17 department to make arrangements for medical
18 students whose training would take place at
19 the Caritas hospitals?
20     A.  St. John's Hospital and Mary
21 Immaculate Hospital had departments of
22 medical education. And those departments
23 remained operational after Caritas became the
24 Article 28 licensed operator of those
25 facilities.

65

Confidential - D. Hoffman
2      Q.  Did the St. John's and Mary
3  Immaculate medical education departments have
4  responsibility for making arrangements for
5  students of Ross who did clerkships at
6  St. John's or Mary Immaculate?
7      A.  On what date? Prior to or
8  following the closing on January 1st, 2007?
9      Q.  Following. Thank you.
10     A.  I don't know.
11     (Hoffman Exhibit No. 8, e-mail from
12     Dr. Thomas Shepherd to Dominick Gio
13     dated December 22, 2006, Bates numbered
14     ROSS0630 through ROSS0643, was marked
15     for identification.)
16 BY MR. TZANETOPOULOS:
17     Q.  Mr. Hoffman, the court reporter has
18 provided you with a document that has been
19 labeled Hoffman Deposition Exhibit No. 8.
20     A.  Uh-huh.
21     Q.  The top says Virginia Smith but it
22 looks like an e-mail from Dr. Thomas Shepherd
23 to Dominick Gio dated December 22, 2006. It
24 begins with Bates stamp ROSS0630 and
25 concludes with ROSS0643.

17 (Pages 62 to 65)

CONFIDENTIAL

66

```
 1          Confidential - D. Hoffman
 2          In the December of 2006 time frame,
 3    was the draft of the contract that's attached
 4    to the e-mail provided to you by anybody?
 5          A.  On December 22nd, 2006?
 6          Q.  Any time in that December or
 7    January 2006 -- Let's just stick with the
 8    December 2006 time frame.
 9          A.  I can't answer the question the way
10    you asked it.
11          Q.  Do you know if anybody gave it to
12    you?
13          A.  Parts of this document look vaguely
14    familiar as being a draft of a document that
15    was ultimately signed.  I didn't have a role
16    in the negotiation of this agreement.
17          Q.  Did you comment on any of the
18    drafts that went back and forth between the
19    parties?
20          A.  I have no idea.
21          (Hoffman Exhibit No. 9, Affidavit
22    of John Lavan, was marked for
23    identification.)
24    BY MR. TZANETOPOULOS:
25          Q.  Mr. Hoffman, the court reporter has
```

67

```
 1          Confidential - D. Hoffman
 2    handed to you a document that has been
 3    labeled Hoffman Exhibit No. 9 titled,
 4    "Affidavit of John Lavan, the Chief
 5    Restructuring Officer of Caritas, in support
 6    of Chapter 11 Petitions and First Day
 7    Pleadings."
 8          Just to ask an overall question:
 9    Did you work on the project of taking Caritas
10    into bankruptcy?
11          A.  No.
12          Q.  Let me, then, just refer you to one
13    other thing and see if you know about it or
14    if you don't.  If you would, please, turn to
15    Page 12 of Mr. Lavan's affidavit.
16          THE WITNESS:  Off the record.
17          (Discussion off the record.)
18          THE WITNESS:  Page 12?
19    BY MR. TZANETOPOULOS:
20          Q.  Page 12, please.  And in particular
21    Footnote 13.  Take a minute.
22          A.  I have read Footnote No. 13.
23          Q.  Are you generally familiar with the
24    subordination agreement or subordination
25    agreement and loan documents discussed in
```

68

```
 1          Confidential - D. Hoffman
 2    that note?
 3          A.  Yes.
 4          Q.  Did you work on those agreements in
 5    that December -- In that 2006, 2007 time
 6    frame did you work on those agreements?
 7          A.  They were prepared and negotiated
 8    by the attorneys at Proskauer Rose.  But I
 9    was part of the consultation and discussion.
10          Q.  Does the footnote in Footnote 13
11    comport with your general
12    understanding -- Strike that.  Let me try
13    again.
14          Is the statement made in Footnote
15    13 accurate, given your understanding of
16    those agreements?
17          A.  That's my general recollection.
18    HFG insisted that they have first right of
19    all money from Caritas, and that any loans
20    made by Wyckoff to Caritas would not be
21    repaid until HFG had gotten all of its money.
22    It being a commercial lender, and Wyckoff
23    being a not-for-profit corporation trying to
24    rescue two struggling hospitals in Queens.
25          Q.  I have a number of employment
```

69

```
 1          Confidential - D. Hoffman
 2    agreements between Mr. Donnelley and
 3    Mr. McDonald, and maybe a couple of others, I
 4    can't remember till I look, that were entered
 5    into in 2006 and 2007.  Did you work on those
 6    employment agreements or was that the folks
 7    at Proskauer?
 8          A.  It would be impossible for me to
 9    answer that question without having a
10    document in front of me.
11          Q.  Okay.
12          (Hoffman Exhibit No. 10, e-mails
13    and Caritas Health Care Organization
14    Period and Start-Up document, Bates
15    numbered BQHC 07617 through BQHC 07623,
16    was marked for identification.)
17    BY MR. TZANETOPOULOS:
18          Q.  Mr. Hoffman, let me show you a
19    document that the court reporter has marked
20    as Hoffman Exhibit No. 10.  It's Bates
21    numbered BQHC 07617 through 07623.  It's an
22    e-mail string of a number of e-mails dated
23    February 22, 2007.  And then behind the
24    e-mails, let's just go through the exhibit.
25          Just to orient you to where I'm
```

CONFIDENTIAL

70

1          Confidential - D. Hoffman
2   going, if you take a look at the last e-mail
3   string from a Tracy Raleigh to -- is it
4   Wah-chung Hsu?  Is that how he says it?
5       A.  Uh-huh.
6          MR. LOUGHLIN:  Were these
7   documents, in fact, produced stapled
8   together?
9          MR. TZANETOPOULOS:  Let's go off
10  the record.
11         (Discussion off the record.)
12  BY MR. TZANETOPOULOS:
13      Q.  We've had a discussion with
14  Mr. Loughlin and Mr. Hoffman and I about
15  whether or not the entire Exhibit No. 10 is
16  part of the same document or not.  Let me
17  just ask a couple of questions for the
18  record, Mr. Hoffman, and then we can move on
19  to other things.
20         Do you know one way or the other
21  whether these documents were all part of the
22  same message or not?
23      A.  No.
24      Q.  When you see references to CBO in
25  the e-mails and the documents themselves, do

71

1          Confidential - D. Hoffman
2   you think that that means the Brooklyn-Queens
3   Health Care system Central Business Office?
4       A.  We referred to the Wyckoff-Caritas
5   joint venture Central Business Office as
6   being the CBO.  Other than that, I can't
7   answer your question.
8       Q.  Let me direct your attention to the
9   third page of the exhibit, which is BQHC
10  07619, entitled, "Caritas Health Care
11  Organization and Start-Up."  In particular,
12  let me direct your attention to paragraph
13  following "Anticipated potential periods of
14  cash shortage."
15         Do you see where I am?
16      A.  No.  How far down?
17      Q.  Counsel has pointed you there.
18      A.  Yeah.
19      Q.  And it reads, "Two potential
20  periods of cash shortage related to the
21  Caritas acquisition were identified early on.
22  The first period was anticipated just prior
23  to closing as some of the expenses related to
24  the installation of the Caritas Meditech
25  computer system and the development of the

72

1          Confidential - D. Hoffman
2   BQHC Central Business Office would need to be
3   paid."
4          Does that comport with your
5   understanding of what was anticipated as a
6   period of cash shortage?
7       A.  I have no recollection of
8   discussions of a period of cash shortage at
9   the time.
10      Q.  It goes on to say that, "Wyckoff
11  had long standing relationships with two
12  international medical schools that had
13  expressed interest in investing in the
14  Caritas project.  These pre-closing cash
15  needs were expected to be funded and were
16  funded with prepaid Caritas clerkship fees."
17         Does that comport with your
18  understanding of how these cash needs were
19  funded?
20      A.  I can't answer that question.  I'm
21  reading the same sentence you're reading, and
22  the words suggest that that's what the author
23  of this document believed.
24      Q.  And my question is:  Do you have
25  any recollection of that being what was

73

1          Confidential - D. Hoffman
2   anticipated in late 2006?
3       A.  No.
4       Q.  Do you have a recollection it's
5   different or you just don't recall?
6       A.  I don't recall.
7       Q.  It goes on to say, "Caritas
8   received $3.5 million from the American
9   University of the Caribbean on December 1st
10  and $5 million from Ross University on
11  December 28th."
12         At that time were you aware that
13  those sums were coming in from AUC and from
14  Ross?
15      A.  Not those particular sums.  But I
16  was aware that there were discussions with
17  medical schools to whom we provided clerkship
18  training for prepayment of those clerkships.
19      Q.  If you wanted to find out who the
20  author of this document was, what would you
21  do?
22      A.  Pass it around to everyone I know
23  and ask them if they wrote it.
24      Q.  Where would you start?  Who were
25  the most likely candidates in your mind?

19 (Pages 70 to 73)

CONFIDENTIAL

74

1        Confidential - D. Hoffman
2        A.   I would start with all the people
3    referenced in the e-mails in front of the
4    Caritas Health Care organization period and
5    Start-Up document.
6        MR. TZANETOPOULOS:  Do you want to
7    take a short lunch?
8        (A luncheon recess was taken from
9    12:31 p.m. to 1:10 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75

1        Confidential - D. Hoffman
2        AFTERNOON SESSION
3        (Time noted:  1:10 p.m.)
4    D A V I D   H O F F M A N,
5        resumed and testified as follows:
6        (Hoffman Exhibit No. 11, March 2,
7    2007, string of e-mails, Bates numbered
8    BQHC 06856 through BQHC06860, was marked
9    for identification.)
10   CONTINUED DIRECT EXAMINATION
11   BY MR. TZANETOPOULOS:
12       Q.   Mr. Hoffman, the court reporter has
13   handed you a document marked as Hoffman
14   Deposition Exhibit No. 11, a March 2, 2007,
15   e-mail -- actually string of 2007 e-mails.
16   And it has been stamped with BQHC 06856,
17   finishing at 6860.
18       When you get a chance, take a
19   minute to review it and let me know when
20   you're finished and we'll visit a little bit
21   about it.
22       A.   (Document review.)
23       Q.   All set?
24       A.   Always.
25       Q.   Mr. Hoffman, the e-mail message

76

1        Confidential - D. Hoffman
2    shows that a copy went to you, at least
3    Mr. Gio's message.  Did you participate at
4    all in any work in connection with any of the
5    events described in Mr. Gio's e-mail?
6        A.   Meaning that if . . .
7        Q.   I know you got a copy but did you
8    do anything?
9        A.   Meaning that if I had anything to
10   do with any one of these events I would
11   answer yes?
12       Q.   Correct.
13       A.   Yes.
14       Q.   Which ones?
15       A.   To answer that question I would
16   have to go through each and every one of
17   them.
18       Q.   Okay.
19       A.   (Document review.)
20       I was consulted with regard to all
21   of the events described in Dominick Gio's
22   e-mail dated March 2nd, 2007.
23       Q.   Let's focus for a moment, if we
24   can, on the events discussed at the bottom of
25   the second page of the exhibit at our

77

1        Confidential - D. Hoffman
2    January 11, 2007 Wyckoff Board of Trustees.
3        Do you see where I am?
4        A.   Uh-huh.
5        Q.   Mr. Gio goes on to write in that
6    paragraph, "Equally disturbing, he" -- Let's
7    start with the whole thing.
8        A.   "He" refers to Hal McNeil, the
9    chief financial officer.
10       Q.   "Mr. McNeil, in the days following
11   the Caritas closing, had transferred funds
12   from Caritas Health Care, Inc. to Wyckoff
13   Heights Medical Center.  This was done in
14   amounts that exceeded the dollar totals
15   necessary to repay the authorized loan made
16   to Caritas by Wyckoff pursuant to order
17   resolution."
18       What investigations were done --
19   Let's go back a step.
20       As you understand it, how did
21   Mr. McNeil transfer funds from Caritas to
22   Wyckoff?
23       A.   I don't know.
24       Q.   Is the process for -- Strike that.
25   Start all over again.

20 (Pages 74 to 77)

CONFIDENTIAL

78

1       **Confidential - D. Hoffman**
2       **In December of 2006 and January**
3   **of 2007, was there a means of making**
4   **intercompany transfers between Wyckoff and**
5   **Caritas other than writing a check or going**
6   **to the bank and making a wire?**
7       A.  I don't know.
8       **Q.  Who would know that?**
9       A.  I imagine Hal McNeil.
10      **Q.  Anybody presently at Wyckoff that**
11  **you can think of?**
12      A.  Not that I can think of.  And there
13  may be people in the finance office now who
14  were there then.  Whether they would know
15  anything about this, I don't have a clue.
16      **Q.  Do you know, in fact, how these**
17  **particular funds were transferred?**
18      A.  Nope, I don't.
19      **Q.  Do you know what investigation was**
20  **done concerning who might have known about**
21  **the transfers other than Mr. McNeil?**
22      A.  Prior to this report being made?
23      **Q.  Yes, sir.**
24      A.  According to Mr. Gio, nobody did.
25      **Q.  Right.  And what I'm asking is:  Do**

79

1       **Confidential - D. Hoffman**
2   **you know what investigation was done to**
3   **determine that?**
4       A.  I can't recall particularly with
5   reference to investigations completed as of
6   March 2nd, 2007.  But I do know that there
7   was an initial internal review, there was
8   then a retention of FTI Cambio to do a
9   financial review, there was then a review
10  done by Dewitt Consulting, and then there was
11  the retention of FTI Cambio to serve as
12  restructuring officer.  That's not
13  necessarily an exhaustive list, but I know at
14  least those reviews occurred.
15      **Q.  So one of the jobs that FTI was**
16  **given when it came to Wyckoff was to make a**
17  **review of these transfers, and I suppose,**
18  **other things?**
19      A.  Excuse me?
20      **Q.  Let's just start with that.  Was**
21  **one of the tasks that FTI was given to look**
22  **into these transfers?**
23      A.  Sitting here today, I don't
24  specifically remember what the terms of their
25  retention were.  But clearly they were

80

1       Confidential - D. Hoffman
2   retained to evaluate the internal controls of
3   the finance departments of Wyckoff and
4   Caritas.
5       (Hoffman Exhibit No. 12, Caritas
6   Health Care Inc.  Weekly Cash
7   Projections, was marked for
8   identification.)
9   BY MR. TZANETOPOULOS:
10      **Q.  Mr. Hoffman, the court reporter has**
11  **given you a document that's been labelled**
12  **Hoffman Exhibit No. 12.  It says it is a**
13  **Caritas Health Care, Inc. Weekly Cash**
14  **Projections.  It's a five-page exhibit.  It**
15  **doesn't have Bates numbers.**
16      **If I recall correctly, there was a**
17  **stretch there where the defendant's**
18  **production of some spreadsheets came**
19  **separately and not Bates stamped.  I believe**
20  **that that's where this comes from.**
21      **Are you familiar with this type of**
22  **document?**
23      A.  Only in the most general sense.
24      **Q.  Let me direct your attention and**
25  **see if you're the right person to talk to**

81

1       **Confidential - D. Hoffman**
2   **about this topic or not.**
3       **Towards the middle of the first**
4   **page under "cash disbursements" there's a**
5   **line, "payments to affiliates."  And then**
6   **below that line another that says, "Wyckoff**
7   **Heights Medical Center."  And if you travel**
8   **that row there's some transfers.**
9       **Do you know whether the transfers**
10  **shown on these cash projections are the**
11  **transfers of funds referred to in Mr. Gio's**
12  **e-mail to which you just referred?  Is that**
13  **the money that Mr. McNeil transferred over?**
14      A.  This document is a projection so it
15  would seem not to indicate that it is a
16  historical record.  But I have no independent
17  recollection or knowledge of these dollar
18  amounts or whether they correspond to
19  anything referred to in Dominick Gio's March
20  2nd, 2007, e-mail previously marked as
21  Hoffman No. 11.
22      **Q.  Do you think that this is a**
23  **forward-looking document, then, that reflects**
24  **plans for cash projections?**
25      A.  I'm just reading the heading:

21 (Pages 78 to 81)

CONFIDENTIAL

**82**

```
1         Confidential - D. Hoffman
2    "Caritas Health Care, Inc. Weekly Cash
3    Projections."
4         Q.  Uh-huh.
5            Do you know who prepared these?
6    A.  Nope.
7         Q.  Do you know for what purpose they
8    were prepared?
9    A.  I think the document speaks for
10   itself.
11        Q.  My question is:  Do you know for
12   what purpose these projections were prepared?
13   A.  Objection to form.
14           I can only say that this is a cash
15   flow projection, which is a routine business
16   management tool.
17        Q.  What were -- Let me start over
18   again.
19           In December 2006, for what purposes
20   did Caritas Health Care make weekly cash
21   projections such as are shown in Hoffman
22   Exhibit No. 12?
23   A.  I couldn't give you an exhaustive
24   answer.  But clearly, two purposes for which
25   cash flow projections were prepared was to
```

**83**

```
1         Confidential - D. Hoffman
2    anticipate what cash would be available to
3    meet Caritas's operating needs and to report
4    to the commercial lender, HFG, and to the
5    State of New York regarding Caritas's cash
6    flow.
7         Q.  During the Board meetings that you
8    attended, were Caritas Health projections
9    shared with the Caritas Board on a regular
10   basis?
11   A.  The Board of Caritas received
12   financial reports from the chief financial
13   officer.  I don't recall whether at any given
14   point in time cash flow projections were part
15   of those reports.
16        Q.  How about for the Wyckoff Board
17   meetings that you have attended, are cash
18   projection reports regularly made at those
19   Board meetings?
20   A.  I don't recall off the top of my
21   head.
22        (Hoffman Exhibit No. 13, Wyckoff
23   Heights Medical Center Board of Trustees
24   President's Letter June 7, 2007, Bates
25   numbered BQHC 54890 through BQHC 54900,
```

**84**

```
1         Confidential - D. Hoffman
2    was marked for identification.)
3    BY MR. TZANETOPOULOS:
4         Q.  Mr. Hoffman, the court reporter has
5    handed you a document she's marked as Hoffman
6    Deposition Exhibit No. 13.  It's titled,
7    "Wyckoff Heights Medical Center Board of
8    Trustees President's Letter June 7, 2007."
9    It's been marked with Bates numbers BQHC
10   54890 through 54900.
11   A.  Uh-huh.
12        Q.  Were letters from -- I take it at
13   this time Mr. Gio was president and CEO of
14   Wyckoff?
15   A.  That is what is indicated by the
16   signature line of the document, yes.
17        Q.  Did you get, in the 2007 time frame
18   before your sabbatical, the Board packages in
19   advance of Wyckoff Heights Medical Center
20   Board meetings?
21   A.  Generally not.  I reviewed
22   materials that were to be distributed to the
23   Board, but I didn't get the actual book.
24        Q.  From your experience reviewing that
25   material and being at the Board meetings, was
```

**85**

```
1         Confidential - D. Hoffman
2    it Mr. Gio's regular practice to submit a
3    president's letter in advance of Board
4    meetings?
5    A.  At least quarterly, yes.  Not
6    necessarily at every meeting.
7         Q.  Let me -- One last question.  At
8    least as you understand it, is Exhibit No. 13
9    one such letter?
10   A.  The document speaks for itself.
11   It's a Wyckoff Heights Medical Center Board
12   of Trustees President's Letter dated
13   June 7th, 2007.
14        Q.  Looking at this, do you think it
15   was submitted to the Board by Mr. Gio?
16   A.  The June meeting is the annual
17   meeting of the hospital, so I would imagine
18   that it would have been, yes.
19        Q.  Let me direct your attention, if I
20   may, to the page of Exhibit No. 13 stamped
21   with Bates number BQHC 54897.  And in
22   particular, to the section at the top of the
23   page titled "Undergraduate Medical
24   Education."
25           Mr. Gio writes, about midway down
```

22 (Pages 82 to 85)

CONFIDENTIAL

**86**

Confidential - D. Hoffman

1
2 through that section, and I quote, "Payment
3 for clerkships was secured from Ross
4 University and American University of the
5 Caribbean in the amount of $8.5 million."
6 To your understanding, is the Ross
7 component of that the money that was paid
8 under the affiliation agreement that we have
9 marked earlier as Hoffman Exhibit No. 2?
10 A. I don't know.
11 Q. Going down a little bit in that
12 same paragraph, Mr. Gio writes, "All
13 affiliation agreements have been reviewed and
14 approved by the New York State Education
15 Department."
16 What is the process for getting
17 State approval for such affiliation
18 agreements?
19 A. I don't recall ever having a direct
20 role in submitting them to the New York State
21 Education Department for approval. But based
22 on my general dealings with the New York
23 State Education Department, it need not be
24 any more complicated than supplying them with
25 a copy of the agreement and getting a letter

**87**

1 Confidential - D. Hoffman
2 back saying that it's approved.
3 Q. At Wyckoff, who was responsible for
4 making those submissions at this period of
5 time?
6 A. I'm not certain. But I would
7 imagine it would be Julius Romero.
8 (Hoffman Exhibit No. 14,
9 Administrative Services Agreement, Bates
10 numbered BQHC 004889 through BQHC 00511,
11 was marked for identification.)
12 BY MR. TZANETOPOULOS:
13 Q. Mr. Hoffman, the court reporter has
14 handed to you a document that she has marked
15 as Hoffman Exhibit No. 14 entitled
16 "Administrative Services Agreement." It
17 looks to be one between BQHC and Wyckoff and
18 Caritas and FTI Cambio. It's been stamped
19 BQHC 00489 through 00511.
20 Did you work on this agreement?
21 A. Yes.
22 Q. Is this the contract under which,
23 as you described earlier, FTI supplied people
24 to be the chief restructuring officer, CFO,
25 and provide other consulting services?

**88**

1 Confidential - D. Hoffman
2 A. Yes.
3 Q. Did you play a role in negotiating
4 the deal with FTI that's in this contract?
5 A. In part, yes.
6 Q. Who else did?
7 A. Rick Zall from Proskauer Rose and
8 other attorneys from his firm.
9 Q. Were there any nonlawyer people
10 from the hospitals involved in the
11 negotiations? I was going to say business
12 people, but you're a hospital.
13 A. I think to some extent or another,
14 everyone would have been involved in Wyckoff
15 entering into this agreement. Everyone in
16 the administrative office.
17 Q. Who at FTI did you negotiate with?
18 A. Tom Singelton, obviously. And
19 there was a lawyer who I was in contact with
20 by phone, and I don't recall if he was in
21 Tennessee or in some other FTI Cambio
22 location, and I can't recall his name.
23 Q. Fair enough.
24 Let me direct your attention, if I
25 may, to Page 11 of the agreement. That's the

**89**

1 Confidential - D. Hoffman
2 one stamped BQHC 00499. And when you get
3 there, what I'd like to ask you to look at,
4 in particular, is Sections 5.11, 5.12, and
5 5.2.
6 A. Uh-huh. Yep.
7 Q. In 5.11, the agreement says that
8 BQHC will pay FTI Cambio a fixed monthly fee,
9 and then it describes the calculation.
10 And then 5.12, the agreement
11 provides that "The fee payable to FTI Cambio
12 shall be allocated between Caritas and
13 Wyckoff in proportion of the number of
14 prospective licensed inpatient beds. BQHC
15 shall be responsible, however, for payment of
16 the fee and shall make all commercially
17 reasonable efforts to collect payment from
18 Caritas and Wyckoff."
19 Why was BQHC made responsible for
20 payment to FTI?
21 A. Because FTI Cambio asked for the
22 agreement to be created that way.
23 Q. Something to which your side
24 agreed, obviously?
25 A. Was that a question?

23 (Pages 86 to 89)

CONFIDENTIAL

90

```
1           Confidential - D. Hoffman
2       Q.  It was, but then I pulled up short.
3       A.  Objection to form.
4       Q.  Who actually paid FTI for its
5   services under this contract?
6       A.  I don't know who physically wrote
7   checks.  But payments would have been made by
8   Wyckoff and/or Caritas and resolved and
9   allocated through due to/due from entries in
10  the financials of each corporation.
11          (Hoffman Exhibit No. 15, November
12          7, 2007, Caritas Health Care, Inc.
13          Meeting of the Board of Trustees
14          minutes, Bates numbered BQHC 51896
15          through BQHC 51901, was marked for
16          identification.)
17  BY MR. TZANETOPOULOS:
18      Q.  Mr. Hoffman, the court reporter has
19  handed you a document labeled Hoffman Exhibit
20  No. 15.  It's titled, "Caritas Health Care,
21  Inc. Meeting of the Board of Trustees," dated
22  November 7, 2007, and has been stamped with
23  BQHC 51896 through 51901.
24          If I can take you to the last page
25  once you have a chance.
```

91

```
1           Confidential - D. Hoffman
2       A.  Uh-huh.
3       Q.  I take it it's one of the days
4   where you drew duty for being the meeting
5   secretary?
6       A.  Well, that is not my signature as
7   indicated by the letter with a circle around
8   it.  But this would seem to indicate that I
9   acted as secretary at the meeting.
10      Q.  Do you recognize who signed your
11  name to the minutes?
12      A.  No, I don't.
13          When was this?  November of '07.
14  There was a secretary at Mary Immaculate
15  Hospital that was the secretary of
16  Mr. Singelton, whose name I cannot recall off
17  the top of my head.  But since the meeting
18  was first called to order at 4:40 in the
19  afternoon, I can imagine that I took notes
20  because she was going home.  And that might
21  be her mark indicating that she signed on my
22  behalf.  But I don't recall.
23      Q.  Let me direct your attention, if I
24  may, to the first page of Exhibit No. 15 and
25  particularly to the list of invitees.  It
```

92

```
1           Confidential - D. Hoffman
2   lists Thomas Singelton as chief executive
3   officer of BQHC.
4           Was, in fact, Mr. Singelton chief
5   executive officer of BQHC at that time?
6       A.  I don't recall.
7       Q.  It lists Mr. Goldberg as chief
8   financial officer of BQHC.
9           Was Mr. Goldberg CFO of BQHC at
10  that time?
11      A.  Yes.  Mr. Goldberg was never
12  anything other than chief financial officer
13  of BQHC.
14      Q.  What records does BQHC keep as to
15  who its officers are at any given time?
16      A.  Minutes, contracts, memoranda.
17          Dominick Gio had been the CEO of
18  Brooklyn-Queens Health Care up until a point
19  in time when he was removed from that
20  position by Tom Singelton.  I don't recall
21  there being a particular meeting where
22  Mr. Singelton either designated himself or
23  was designated by someone else as the chief
24  executive officer in addition to being the
25  chief financial officer.  This was literally
```

93

```
1           Confidential - D. Hoffman
2   weeks before my first phone conversation with
3   Mr. Zall where he informed me that my
4   services were no longer desired.
5       Q.  This may be a good time to ask you
6   another set of questions that I was going to
7   ask:  When is it that Mr. Gio stopped being
8   chief executive officer of Wyckoff?
9       A.  Of Wyckoff?
10      Q.  Yes, sir.
11      A.  He left Wyckoff's employment in
12  early 2008 after I had begun my sabbatical.
13  But I seem to recall that there was a period
14  of time when Mr. Singelton changed his title.
15  And he may have been the site administrator
16  or some other title just at Wyckoff.  But I
17  can't recall the time frame or the specifics.
18      Q.  And you mentioned that
19  Mr. Singelton removed Mr. Gio as CEO of
20  Brooklyn-Queens Health Care.
21          When did that happen?
22      A.  I don't know.  But the fact that
23  these minutes indicate that Singelton was
24  listed as chief executive officer of BQHC,
25  which suggests that Dominick Gio could no
```

24  (Pages 90 to 93)

CONFIDENTIAL

94

Confidential - D. Hoffman
1 longer be the chief executive officer;
2 because you can't have two of those.
3
4     **Q.  Was it Mr. Singelton's decision to**
5 **fire Mr. Gio from Brooklyn-Queens Health**
6 **Care?  Was he the one that made the decision?**
7     A.  I don't recall.
8     THE WITNESS:  Off the record.
9     (Discussion off the record.)
10 BY MR. TZANETOPOULOS:
11    **Q.  Mr. Hoffman, when is it that**
12 **Mr. Singelton first began working at the**
13 **hospitals, give or take?  I'm just looking**
14 **for a general time frame.**
15    A.  Well, according to the
16 administrative services agreement previously
17 marked as Hoffman 14 of today's date, the
18 administrative services agreement was entered
19 into on August 13, 2007, but was effective
20 July 19th, 2007.
21     And there is a reference, which I
22 recall, I believe in the compensation section
23 of the agreement on Bates Page 00499.  The
24 document states, "Notwithstanding the
25 foregoing in as much as the CRO will not be

95

Confidential - D. Hoffman
1
2 working full time during the month of July,
3 the fee for the month of July 2007 will be
4 the sum of 67,000."
5     So he was transitioning into the
6 position in the month of July.  He had a
7 residual responsibility at an earlier
8 engagement, as I recall.
9     MR. LOUGHLIN:  And this was
10 obviously separate and apart from the
11 other FTI work that was done earlier in
12 2007, that there has been testimony
13 about today.
14     THE WITNESS:  Right.  This was in
15 his role as chief restructuring officer.
16 BY MR. TZANETOPOULOS:
17    **Q.  Correct.  I understood that.**
18     **As a practical matter, did there**
19 **come a time between when Mr. Singelton**
20 **arrived as chief restructuring officer and**
21 **the beginning of your sabbatical where, for**
22 **practical purposes, Mr. Singelton was the**
23 **highest authority at Wyckoff, leaving aside**
24 **the Board of Trustees?**
25     A.  Well, I think the administrative

96

Confidential - D. Hoffman
1
2 services agreement speaks for itself in the
3 duties designated to the CRO on Page 4 of 23,
4 Bates stamped 00492 of Hoffman 14.
5     **Q.  All right.  Well, I appreciate what**
6 **the contract says.  But your testimony**
7 **suggests that it was Mr. Singelton who was**
8 **doing the hiring and firing at some point in**
9 **time?**
10    A.  Objection to form.
11    **Q.  Is that true?**
12    A.  Items A and B under the list of
13 duties of the CRO at Page 4 of 23 Bates
14 stamped 00492 specifically provides that the
15 CRO will direct and hold accountable all
16 senior management in day to day and long
17 range activities.  And item B says that it is
18 the CRO's responsibility to review the
19 performance of management, including the
20 executive management team, and recommend to
21 the Board any changes deemed necessary.
22 That's my recollection of his
23 responsibilities at the time.
24    **Q.  My question to you is really the**
25 **question of whether, in practice, his conduct**

97

Confidential - D. Hoffman
1
2 **was different than what the contract says.**
3 **And that is:  Was it Mr. Singelton who was**
4 **really doing the hiring and firing of senior**
5 **management at some point in time?**
6     A.  I can't answer the question the way
7 you asked it.
8     **Q.  You discussed Mr. Singelton**
9 **rearranging the responsibilities of Mr. Gio**
10 **earlier.  I don't want to characterize it**
11 **because it was lengthy, but whatever those**
12 **changes were that Mr. Singelton decided for**
13 **Mr. Gio, did Mr. Singelton take those**
14 **requests to any of the Boards?**
15    A.  Not that I recall.
16    **Q.  So to your recollection, he made**
17 **those decisions on his own, correct?**
18    A.  I can't answer that question.
19    **Q.  At least he did so, as far as you**
20 **know, without bringing these decisions to the**
21 **Board?**
22    A.  I was the principal liaison between
23 Mr. Singelton and the Board and I don't
24 recall his asking me for Board consultation
25 on those decisions, or other decisions, that

25 (Pages 94 to 97)

CONFIDENTIAL

98

1       Confidential - D. Hoffman
2  he made regarding senior management,
3  including myself.
4     Q.  At any time before what you've
5  described as your sabbatical began, did the
6  Board reverse -- Let me ask a better question
7  because there's lots of boards.
8       At any time between when
9  Mr. Singelton began his role as chief
10  restructuring officer and when you departed
11  in November of 2007 --
12     A.  No.  I departed at the end of
13  December 2007.
14     Q.  Okay.  Thank you.
15       So from the time Mr. Singelton
16  arrived as chief restructuring officer until
17  you departed in 2007, are you aware of the
18  Board reversing any decision that
19  Mr. Singelton made?
20     A.  Never.
21     Q.  Is that true for all three boards:
22  Wyckoff, BQHC, and Caritas?
23     A.  Yes.
24       THE WITNESS:  Can I consult with my
25  attorney?  We'll step out.

99

1       Confidential - D. Hoffman
2      (Mr. Loughlin and the deponent left
3  the room for a discussion off the
4  record.)
5       THE WITNESS:  To continue my
6  answer, to the best of my recollection,
7  Mr. Singelton never consulted with the
8  Board to receive its support or
9  endorsement of decisions that he made
10  concerning personnel and other matters.
11  BY MR. TZANETOPOULOS:
12     Q.  At any time while you have been
13  general counsel and attending Board meetings
14  for any of these entities, has -- Let me ask
15  a better question.  That got convoluted.
16       During your time as general counsel
17  at Wyckoff, have any of the affiliation
18  agreements between Ross and Wyckoff been
19  presented to the Wyckoff Board before they
20  were signed?
21     A.  The documents themselves?
22     Q.  Yes.
23     A.  Up to the time that I left on my
24  sabbatical, no.  Though they were certainly
25  discussed in the context of the formation of

100

1       Confidential - D. Hoffman
2  Caritas and Brooklyn-Queens Health Care in
3  the context of the boards authorizing
4  expenditure of up to $10 million to assist
5  Caritas in the attempted rescue of St. John's
6  and Mary Immaculate.
7     Q.  So is it fair that the contracts
8  were discussed in general, but the actual
9  documents were not presented to the Board?
10     A.  I don't recall the initial -- What
11  is this?  12/28/2006 document signed by
12  Harold McDonald as executive vice president
13  and chief operating officer of
14  Brooklyn-Queens Health Care having been
15  presented to the Board for their review,
16  though the Board was certainly consulted and
17  was aware that management was entering into
18  prepayment arrangements in order to raise
19  additional funds to support the rescue of
20  St. John's and Mary Immaculate.
21     Q.  Since your return in 2008 -- Before
22  we get there.
23       Before your departure at the end of
24  2007, were the contract documents themselves
25  of any affiliation agreement between a

101

1       Confidential - D. Hoffman
2  Caribbean medical school and Wyckoff or BQHC
3  or Caritas presented to the Board before they
4  were signed?
5     A.  I can't delineate Caribbean medical
6  school agreements in particular.  But in the
7  latter months of my tenure before my
8  sabbatical, I brought to the Board's
9  attention agreements, contracts, and
10  employment arrangements that Mr. Singelton
11  sought approval for or intended to execute on
12  behalf of the three entities where I had
13  concerns about the appropriateness of those
14  documents, ending, obviously, when I was
15  fired.
16     Q.  In any of the cases where you
17  raised concerns, did the Board refuse to
18  approve the contracts that you brought to its
19  attention?
20     A.  Yes.  On a number of occasions the
21  Board instructed me to communicate to
22  Mr. Singelton that he was not authorized to
23  continue to incur debt or incur obligations
24  on behalf of Wyckoff for the benefit of
25  Caritas.

26 (Pages 98 to 101)

102

1      Confidential - D. Hoffman
2      Q.   In which instances?
3      A.   There were a number of instances
4   including some employment arrangements for
5   additional consultants that Singelton wanted
6   to bring in.  And in one particular case that
7   I can recall, a very costly apartment lease
8   arrangement for one of these consultants.
9   And in general with regard to incurring
10  contractual liability for Wyckoff as a
11  guarantor of service agreements to Caritas.
12     Q.   Can you remember specifically any
13  others, other than those that you
14  specifically testified about?
15     A.   There was a constellation of
16  agreements and obligations and efforts to use
17  Wyckoff as a guarantor for provision of
18  services to Caritas.  I don't remember off
19  the top of my head the names of the
20  individual parties and agreements; some of
21  them have been subject of litigation since
22  Mr. Singelton was fired in September of 2008.
23     Q.   From your recollection of the Board
24  meetings in 2006 that you attended, was the
25  structure of the contract between American

103

1      Confidential - D. Hoffman
2   University of the Caribbean and
3   Brooklyn-Queens Health Care Wyckoff at
4   Caritas brought to the Board's attention
5   before it was executed?
6      A.   I don't know which contract you're
7   referring to, so I can't answer your
8   question.
9      Q.   I'll be more specific.
10         You're aware, of course, through
11  the litigation and otherwise that American
12  University of the Caribbean, Brooklyn-Queens
13  Health Care, Wyckoff Heights Medical Center,
14  and Caritas were parties to a promissory
15  note?
16     A.   Objection to form.
17         And I'm not clear what you're
18  referring to.
19     Q.   Are you aware that
20  American University of the Caribbean, Wyckoff
21  Heights Medical Center, Brooklyn-Queens
22  Health Care, and Caritas executed a
23  promissory note agreement with one another?
24     A.   I know that there is a promissory
25  note with AUC.  I don't, off the top of my

104

1      Confidential - D. Hoffman
2   head, know which entities were parties to the
3   note.
4      Q.   Was the structure of that note
5   brought to the Board's attention before it
6   was executed?
7      A.   Since I don't remember when it was
8   executed, it would be impossible for me to
9   answer that question.
10     Q.   When is it that Rajiv Garg became
11  either interim or full CEO -- When is it that
12  Rajiv Garg became interim CEO of Wyckoff?
13     A.   I'm going to object to the form of
14  the question, just to the extent that that
15  prefatory language is part of the question.
16     Q.   It's not, I started over.  I'll
17  start over.
18         When is it that Rajiv Garg became
19  interim CEO of Wyckoff?
20     A.   I don't remember the exact date off
21  of the top of my head.  But it was at and
22  around the time that I returned from my
23  sabbatical.
24     Q.   Would it have been after Singelton
25  and the FTI group left?

105

1      Confidential - D. Hoffman
2      A.   Yes.  Sometime around November
3   of 2008, maybe mid-November.
4      Q.   Was there a CEO at Wyckoff between
5   the time that Mr. Gio was dismissed and
6   Mr. Garg was engaged as interim CEO?
7      A.   From review of documents in the
8   course of this litigation, I can recall
9   references to Mr. Singelton holding himself
10  out as CEO.  And at one point during my
11  sabbatical, I believe that Dr. Nirmal Mattoo,
12  who has been a long-time member of the
13  medical staff was named as either site
14  administrator, executive director, and/or
15  president and CEO of Wyckoff during the
16  Singelton tenure.
17         (Hoffman Exhibit No. 16, January 8,
18  2009, Brooklyn Queens Healthcare, Inc.
19  Board of Trustees Meeting Minutes, Bates
20  numbered BQHC 00211 through BQHC 00214,
21  was marked for identification.)
22  BY MR. TZANETOPOULOS:
23     Q.   Mr. Hoffman, the court reporter has
24  handed to you a document she's marked as
25  Hoffman Exhibit No. 16.  It's entitled

CONFIDENTIAL

106

Confidential - D. Hoffman
1
2  "Brooklyn Queens Healthcare, Inc. Board of
3  Trustees Meetings Minutes January 8, 2009."
4  And it's been marked BQHC 00211 through 214.
5      A.  Uh-huh.
6      Q.  I'd like to direct your attention
7  to a couple places in the document and ask
8  you questions about it.  We'll skip around a
9  little bit.
10      First, the second full paragraph
11  following the word "resolution" reads,
12  "Mr. Garg advised the Board Members that
13  there is need to establish a new tax ID
14  number for BQHC.  Following some discussion,
15  it was decided that this issue would be
16  discussed further at a separate meeting with
17  Mr. Garg, Mr. Hoffman, and Mr. Haller.
18  Discussion then ensued regarding the tax laws
19  and review of the properties owned by Wyckoff
20  Heights Medical Center.  Mr. Garg reported
21  that we have an opportunity to potentially
22  raise $4 million through the financing of
23  certain real estate owned by Wyckoff and/or
24  BQHC."
25      Let me just start there.

107

Confidential - D. Hoffman
1
2      Why was it that the Board thought
3  there was a need to establish a new tax ID
4  number for Brooklyn-Queens Health Care?
5      A.  I don't specifically recall.  But
6  it would appear from these minutes that it
7  would be related to the dormitory authority
8  making a loan to BQHC.
9      Q.  Were you involved in any of those
10  discussions about the dormitory authority
11  making a loan?
12      A.  Yes.
13      Q.  What was the purpose of the loan
14  that was being discussed?
15      A.  I don't recall specifically.  But
16  it would have been related to the need for
17  operating cash.
18      Q.  For Caritas, for Wyckoff, or for
19  both?
20      A.  It would appear from these minutes
21  that it would have been related to a loan to
22  Caritas.  But I'm just interpreting the
23  document that you presented to me.
24      Q.  If you go to the second page of the
25  exhibit, down toward the bottom, the minutes

108

Confidential - D. Hoffman
1
2  read, "Mr. Garg mentioned that there is an
3  opportunity to raise working capital of
4  approximately $4 million through the
5  financing of certain BQHC and/or Wyckoff
6  properties.  The potential financing was
7  discussed in great detail by the Board
8  members.  And it was suggested that the
9  following resolution be adopted as following:
10  Resolve that the BQHC Board members voted to
11  transfer all ancillary properties currently
12  owned by BQHC, Inc. into a new holding
13  corporation with a new tax ID number."
14      At this point, were there
15  properties that BQHC held other than the
16  parking lot that you discussed earlier?
17      A.  No.
18      Q.  Were properties ever transferred
19  into a holding corporation with a new tax ID?
20      A.  No.
21      Q.  Can you think of why it was if
22  BQHC's only asset was an already heavily
23  encumbered parking lot, it would have helped
24  to transfer it to a new holding corporation
25  with a new tax ID?

109

Confidential - D. Hoffman
1
2      A.  Well, the parking lot was an asset
3  of Wyckoff.  BQHC didn't pay any value to
4  Wyckoff for the asset.  It just transferred
5  along with the corporate entity when it
6  flipped from being a subordinate holding
7  corporation to a superior passive parent
8  corporation.  And all of these discussions
9  were related to requirements of DASNY in
10  connection with the making of these loans.
11  We were, as you can probably imagine,
12  struggling desperately to keep Caritas alive.
13      (Hoffman Exhibit No. 17, Brooklyn
14      Queens Health Care Board of Trustees
15      Meeting Minutes, March 5, 2009, Bates
16      numbered BQHC 51800 through BQHC 51803,
17      was marked for identification.)
18  BY MR. TZANETOPOULOS:
19      Q.  Mr. Hoffman, the court reporter has
20  handed you a document labeled Hoffman Exhibit
21  No. 17 entitled, "Brooklyn Queens Health Care
22  Board of Trustees Meeting Minutes, March 5,
23  2009," stamped with Bates numbers BQHC 51800
24  through 51803.
25      If I can refer your attention to

CONFIDENTIAL

110

1    Confidential - D. Hoffman
2    the top of the second page, it reads, "In
3    open discussion it was noted that 20 AUC
4    medical students currently training at
5    Caritas will finish out their current
6    rotations at Wyckoff.  Approximately 100 AUC
7    students have been reassigned to other
8    hospitals for their training."
9        Those other hospitals for the 100
10   AUC that is referred to, is that hospitals
11   unrelated to Wyckoff or Caritas?
12       A.  Yeah.  I mean, that was all AUC's
13   doing.  I told the dean of AUC that in order
14   to not prejudice the students currently at
15   Caritas in the middle of their rotations that
16   I would, in some way, make sure that they got
17   educated at Wyckoff, even if I had to do it
18   myself.
19       Q.  All right.  Going down the line a
20   little bit, there is discussion that the
21   Caritas bankruptcy enclosure was discussed.
22   Let's stop there.
23       When did Caritas file for
24   bankruptcy?
25       A.  February 8th or 12th, something

111

1    Confidential - D. Hoffman
2    like that.
3        Q.  2009?
4        A.  Early part of 2009.
5        Q.  And between the time the bankruptcy
6    petition was filed, how long before the doors
7    were closed?
8        A.  I don't recall the specific dates.
9    It's obviously a matter of public record.  It
10   went quicker than people thought it would.
11       Q.  Weeks?
12       A.  I think it was about a month, plus
13   or minus.  But I really don't recall.
14   Clearly by March 5th they're talking about it
15   having happened.  So . . .
16       Q.  Further down in that same paragraph
17   the minutes read that, "Mr. Rucigay stated
18   that we should plan to dissolve BQHC by that
19   time."
20       Why was it that the thought was
21   that BQHC should be dissolved?  What was the
22   discussion?
23       A.  It no longer served its intended
24   purpose.  It was only created to accommodate
25   the requirements of St. Vincent's, that the

112

1    Confidential - D. Hoffman
2    ethical and religious directives of the
3    conference of Catholic Bishops in America be
4    able to be honored for St. John's and Mary
5    Immaculate.  And one of those provisions is
6    the prohibition against cooperation between
7    institutions that honor the ethical and
8    religious directives and those that do not.
9    The only way that we could accomplish that
10   requirement of the asset purchase agreement
11   and also be able to operate Caritas was to
12   have a passive parent entity that didn't
13   engage in practices which violate the ethical
14   and religious directives.  BQHC was that
15   nonclinical passive parent entity.  That's a
16   standard mechanism used when you have
17   Catholic institutions put under the
18   management of non-Catholic institutions.
19       Q.  This one has always puzzled me:
20   How was it that the arch diocese was able to
21   insist on such requirements?
22       A.  It was a term of the asset purchase
23   agreement.  And in particular the financing
24   back for a significant part of the purchase
25   price by St. Vincent's; it was a term that

113

1    Confidential - D. Hoffman
2    they insisted on.
3        Q.  Did the asset purchase take place
4    under the auspices of bankruptcy court?
5        A.  Under the auspices of the
6    bankruptcy court overseeing the St. Vincent's
7    first bankruptcy, yes.
8        Q.  That's why I'm curious how they
9    pulled this off with their hospital in
10   bankruptcy being able to impose religious
11   requirements of the sale?
12       A.  I'm sorry.  Hold on.  I'm getting
13   my bankruptcies confused.  This was -- Yeah,
14   that was the first bankruptcy.  St. Vincent's
15   provided some of the financing, took a note
16   on part of the purchase price.  And one of
17   the quid pro quos for provided that financing
18   was that St. John's and Mary Immaculate
19   continue to the ethical and religious
20   directives of the conference of Catholic
21   Bishops for so long as the hospitals were
22   known as St. John's and Mary Immaculate
23   hospitals.  That was a provision of the asset
24   purchase agreement.  And that was all
25   approved by the bankruptcy court.

29 (Pages 110 to 113)

CONFIDENTIAL

114

1    Confidential - D. Hoffman
2        MR. LOUGHLIN:  Just as a footnote
3    to that, you may well be aware of this,
4    that the Arch Bishop of the Brooklyn
5    diocese had a right to appoint two
6    members to the Board of Caritas, Father
7    Frawley and Mr. Lane.  And part of --
8    That was obviously part of ensuring that
9    there would be adherence to the
10   religious and ethical principals that
11   Mr. Hoffman was referring to.
12       THE WITNESS:  In fact, they served
13   on the Caritas Board, but couldn't serve
14   on the BQHC Board because the BQHC Board
15   was the passive parent of Wyckoff, which
16   does not adhere to the ethical and
17   religious directives.  That was the
18   whole purpose behind the particular
19   passive parent sole corporate member
20   structure that we adopted in contrast to
21   the North Shore LIJ model, which is also
22   a passive parent sole corporate member,
23   but that's a single signature model.  It
24   gets complicated.  But that would have
25   violated the ethical and religious

115

1    Confidential - D. Hoffman
2    directives.
3    BY MR. TZANETOPOULOS:
4        Q.  Let me direct your attention to
5    Page 3 of those same minutes in
6    Exhibit No. 17, March 3, 2009, BQHC Board
7    meeting.
8        At the bottom of the page it reads,
9    "In closing, Mr. Rucigay" --
10       A.  What page?
11       Q.  Page 3 at the bottom.
12       A.  "In closing..."  Yes?
13       Q.  -- "Mr. Rucigay stated that there
14   are three issues we will concern ourselves
15   with and follow up on:  Ross University,
16   Meditech, and the pension issue."
17       Let's start with Ross.  What were
18   the issues with Ross that were discussed in
19   this meeting?  I don't see any other
20   reference to it.
21       A.  You know, I'm not sure because I
22   can't recall what this redacted part was.
23   But these were all, you know, financial
24   obligations of Caritas.  That's what we were
25   talking about then.  Two paragraphs above,

116

1    Confidential - D. Hoffman
2    "Mr. Rucigay then discussed the issue of
3    Caritas pension liability."
4        Q.  And what was the Meditech issue?
5        A.  Again, I don't recall specifically
6    what was being discussed in March of 2009.
7    But Caritas had implemented the Meditech
8    electronic medical records system and they
9    owed Meditech money for their part of the
10   implementation.
11       Q.  The Meditech contract, was that a
12   contract between Meditech and Caritas,
13   Meditech and BQHC, or Meditech and Wyckoff?
14       A.  I don't remember BQHC being a party
15   to the Meditech and I can't think of any
16   reason why it would have.
17       It would have been Caritas because
18   Wyckoff had already implemented Meditech.  We
19   had started with Meditech a year and a half,
20   two years earlier.  So I would infer that
21   that would have been the Caritas-Meditech
22   contract.
23       (Hoffman Exhibit No. 18, Wyckoff
24   Heights Medical Center Board of Trustees
25   Meeting Minutes, December 4, 2008, Bates

117

1    Confidential - D. Hoffman
2    numbered BQHC 00159 through BQHC 00167,
3    was marked for identification.)
4    BY MR. TZANETOPOULOS:
5        Q.  Mr. Hoffman, the court reporter has
6    handed to you a document that she has marked
7    as Hoffman Exhibit No. 18.  It's "Wyckoff
8    Heights Medical Center Board of Trustees
9    Meeting Minutes," dated December 4, 2008.
10       A.  Uh-huh.
11       Q.  It's Bates numbered BQHC 00159
12   through 00167.
13       THE WITNESS:  Off the record.
14       (Discussion off the record.)
15   BY MR. TZANETOPOULOS:
16       Q.  Take a look at as much of this as
17   you would find helpful.  I'd like to direct
18   your attention when you're ready --
19       A.  I'm ready.
20       Q.  -- to the page Bates labeled BQHC
21   00161.  And there on the second paragraph it
22   reads, "In open discussion the issue of the
23   Caritas closure versus bankruptcy was
24   discussed by the Board members."  This is the
25   Wyckoff Board.  "Mr. Hoffman advised the

30  (Pages 114 to 117)

CONFIDENTIAL

---

118

1            **Confidential - D. Hoffman**
2    **Board of Trustees of major contractual**
3    **obligations of Wyckoff, the temporary nursing**
4    **agency medical school and training, offshore**
5    **medical school, the nonunion pension, and**
6    **Meditech."**
7            **So it is correct, is it not,**
8    **Mr. Hoffman, that you recognized as a**
9    **contractual obligation of Wyckoff and the**
10   **potential liability there under should**
11   **Caritas close -- I should ask a better**
12   **question.**
13           **It is correct, is it not, that as**
14   **of December 4, 2008, you recognized that**
15   **should Caritas close, Wyckoff would have a**
16   **contractual obligation to Ross, did you not?**
17       A.  Objection.  Privilege.
18       Q.  **What was discussed that's reflected**
19   **in the Board meeting minutes here?**
20       A.  Objection.  Privilege.
21       Q.  **Let me just take the position**
22   **now -- you all can do what you want but --**
23           MR. LOUGHLIN:  I beg your pardon.
24       I was actually looking at this because
25       it seemed to me that it's possible that

---

119

1            Confidential - D. Hoffman
2        Exhibit 18 was a draft.  These are
3        unsigned minutes and there are black
4        lines and deletions signs in the margin.
5        I wonder if this is even a final version
6        of the minutes of the December 4, 2008.
7        It's obviously a document we produced,
8        but it may well be a draft.
9            THE WITNESS:  It clearly is a
10       draft.  But it doesn't matter, it
11       doesn't change my objection.
12   BY MR. TZANETOPOULOS:
13       Q.  **I'm happy to ask the question with**
14   **both of you here.  I will tell you this is**
15   **the only type of minutes we received from you**
16   **for this December 4, 2008, meeting; we did**
17   **not get a signed version.**
18           **So let me, Mr. Hoffman:  If this is**
19   **what we have, is there a signed version?**
20       A.  I don't remember.
21           MR. LOUGHLIN:  Were you asking him
22       a question about the invocation of the
23       privilege?
24           MR. TZANETOPOULOS:  Yeah.
25       Obviously you've produced it and I'm

---

120

1            Confidential - D. Hoffman
2        entitled to examine what's produced.
3            MR. LOUGHLIN:  Yeah.  But it seemed
4        to me that the prior question had
5        stipulated a invocation of the privilege
6        by the witness.
7    BY MR. TZANETOPOULOS:
8        Q.  **Did you advise the Board of**
9    **Trustees -- Let me ask a different question.**
10           **Are the minutes accurate in this**
11   **respect:  Did you advise the Board of**
12   **Trustees of Wyckoff Heights Medical Center**
13   **that it had major contractual obligations**
14   **with respect to the temporary nursing agency,**
15   **medical school training, offshore medical**
16   **school, the nonunion pension, and Meditech?**
17       A.  Objection.  Foundation and
18       privilege.
19       Q.  **Do you refuse to answer the**
20   **question on the basis of attorney-client**
21   **privilege?**
22       A.  And lack of foundation.
23       Q.  **That's not a basis, as you know,**
24   **for refusing to answer the question.**
25       A.  Well, I object to the question for

---

121

1            Confidential - D. Hoffman
2        both reasons.
3        Q.  **Well, my inquiry to you,**
4    **Mr. Hoffman, is:  Do you refuse to answer the**
5    **question on the basis of attorney-client**
6    **privilege?**
7        A.  That is one of the bases for my not
8        answering the question.
9        Q.  **And what's the other?**
10       A.  Foundation.
11       Q.  **And you know that that's not a**
12   **reason for avoiding answering the question.**
13       A.  I can't answer the question as you
14       asked it.
15           MR. LOUGHLIN:  It's really an
16       invocation of the privilege and,
17       perhaps, a request that you rephrase the
18       question in a way that would avoid the
19       issue of privilege and would satisfy the
20       form objection.
21           THE WITNESS:  Off the record.
22           (Discussion off the record.)
23   BY MR. TZANETOPOULOS:
24       Q.  **Mr. Hoffman, these Board minutes**
25   **read, and I quote, "Mr. Hoffman advised the**

---

31 (Pages 118 to 121)

CONFIDENTIAL

122

1        Confidential - D. Hoffman
2    Board of Trustees of the major contractual
3    obligations of Wyckoff, the temporary nursing
4    agency, medical school training (offshore
5    medical school) the nonunion pension,
6    Meditech."
7        Is that statement in the minutes an
8    accurate reflection of what occurred at that
9    meeting?
10       A.  I don't recall.  It is underlined
11   as having been edited and this is an unsigned
12   document.  I don't have a personal and
13   specific recollection of what discussions
14   occurred at the December 4th, 2008, meeting
15   of the Wyckoff Heights Medical Center Board
16   of Trustees.
17       Q.  Do you dispute that you advised the
18   Board of Trustees of Wyckoff as is reflected
19   in that sentence in the minutes?
20       A.  I can't answer that question the
21   way you asked it.
22       MR. LOUGHLIN:  I think the witness
23   has said he doesn't recall and that the
24   document, Exhibit 18, hasn't refreshed
25   his recollection.

123

1        Confidential - D. Hoffman
2    BY MR. TZANETOPOULOS:
3        Q.  That is my question:  You just
4    don't know one way or the other at this
5    point?
6        A.  Is that a question?
7        Q.  Yes.
8        A.  What's the question?
9        Q.  The question is:  It's a fact that
10   you don't recall one way or the other whether
11   this is accurate?
12       A.  I have previously testified under
13   oath that I do not recall specifically what I
14   discussed with the Board at the meeting on
15   December 4th, 2008, and I don't know that
16   these unsigned draft minutes accurately
17   reflect what I said.
18       Q.  Does Wyckoff possess any signed
19   minutes for this meeting?
20       A.  Wyckoff has hundreds of thousands
21   of pages of documents.  We have faithfully
22   provided to you everything that we could find
23   that was responsive to your demand.  I did
24   not, prior to this moment, realize that this
25   was an unsigned draft of these minutes.  We

124

1        Confidential - D. Hoffman
2    can certainly go back and do a supplemental
3    search to see if there are a signed,
4    corrected or edited version of these minutes.
5    But right now I don't know.
6        (Hoffman Exhibit No. 19, Disclosure
7    of Ownership and Control, Bates numbered
8    BQHC 03413 through BQHC 03415, was
9    marked for identification.)
10   BY MR. TZANETOPOULOS:
11       Q.  Mr. Hoffman, the court reporter has
12   handed you a document that she's marked as
13   Hoffman Exhibit No. 19.
14       A.  Uh-huh.
15       Q.  It's titled, "Disclosure of
16   Ownership and Control."  It's has been
17   stamped with BQHC 03413 through 3415.
18       What is this document?
19       A.  It's a disclosure of ownership and
20   control form.  I know that because it says so
21   at the top of the page.
22       Q.  Do you know anything about its
23   purpose?
24       A.  No.
25       Q.  I think Medicaid but you guys are

125

1        Confidential - D. Hoffman
2    the experts.
3        A.  Forms like these are used for any
4    number of purposes, including corporate
5    compliance representations, but I don't
6    recognize the form or the annotation at the
7    bottom of the page.  I can't actually even
8    read it.  I don't know.  Sorry.
9        Q.  Let me direct you at least to the
10   second page of the exhibit.  It shows Hal
11   McNeil signing as VP corporate finance.
12       A.  Uh-huh.
13       Q.  Of which of these entities,
14   Caritas, Brooklyn-Queens Health Care, or
15   Wyckoff, if any, was Mr. McNeil vice
16   president of corporate finance at the time?
17       A.  On January 5th, 2007, he might have
18   been chief financial officer of Caritas, in
19   addition to Brooklyn-Queens Health Care.  I
20   don't recall when Rich Sarli became the chief
21   financial officer of Caritas but it was at
22   that moment that Hal McNeil became CFO just
23   of Brooklyn-Queens Health Care.
24       THE WITNESS:  Off the record.
25       (Discussion off the record.)

32 (Pages 122 to 125)

CONFIDENTIAL

126

1      Confidential - D. Hoffman
2    BY MR. TZANETOPOULOS:
3      Q.   Mr. Hoffman, let me refer you back,
4    if I may, to Hoffman Exhibit No. 2, the
5    original affiliation agreement, and in
6    particular, the page that bears the Bates
7    numbers ROSS0064.  I call your attention to
8    the sentence that I'm sure you're quite
9    familiar with now.
10     A.   What's that?
11     Q.   The sentence on that page that
12   reads, "In the event the hospitals are not
13   operative and the university is not in
14   material breach of the agreement, BQHC agrees
15   to provide the university with an equivalent
16   number of clerkships as agreed to herein at
17   one of more of its other facilities."
18         When did you first become aware
19   that Mr. McDonald had signed a contract on
20   behalf of Brooklyn-Queens Health Care that
21   made the promise we've just quoted?
22     A.   I don't recall.
23     Q.   Was it before the Caritas
24   bankruptcy?
25     A.   I don't recall.

127

1      Confidential - D. Hoffman
2      Q.   Has there ever been a time when you
3    told Ross -- Strike that.
4          Was there ever a time before the
5    Caritas bankruptcy where you told Ross that
6    that promise could not be performed?
7      A.   I don't understand your question.
8          MR. LOUGHLIN:  You mean Mr. Hoffman
9    personally?
10         MR. TZANETOPOULOS:  Mr. Hoffman
11   personally.
12         THE WITNESS:  Where I told Ross --
13   BY MR. TZANETOPOULOS:
14     Q.   That BQHC could not provide the
15   university with an equivalent number of
16   clerkships as agreed to herein, in the event
17   the hospitals were not operative?
18     A.   No, I do not remember saying that.
19         MR. LOUGHLIN:  If you have a
20   specific conversation in mind, it might
21   be helpful to refresh the witness's
22   recollection if you identified someone
23   other than just Ross as a whole.  If you
24   have a specific communication in mind.
25

128

1      Confidential - D. Hoffman
2    BY MR. TZANETOPOULOS:
3      Q.   Have you ever had a conversation
4    with anybody at Ross about the original --
5    Bad question.  Sorry.  It's late in the
6    afternoon, let me try again.
7          At any time before Exhibit No. 2
8    was signed in December of 2006, had you
9    personally spoken with anybody at Ross about
10   this transaction?
11     A.   Oh, sure.
12     Q.   With whom?
13     A.   You.
14     Q.   You didn't talk to me before 2006.
15   I'm focusing back to at the time of the deal.
16     A.   Oh, at the time of the deal?
17     Q.   Right.  Did you have interactions
18   with the people at Ross?
19     A.   When was this again?
20     Q.   2006.
21     A.   Oh, this was just before the asset
22   purchase agreement for Caritas closed.
23         No, I have no recollection of being
24   involved in the negotiation of this deal.  I
25   believe I testified to that earlier today.

129

1      Confidential - D. Hoffman
2      Q.   Right.
3          Leaving aside the negotiation, I
4    just wanted to know if you talked to anybody
5    at Ross at that time?
6      A.   No.  Frankly, I don't think I knew
7    anyone at Ross at that time.
8      Q.   Would the same be true of the first
9    and second amendments to the affiliation
10   agreement, that at the time of those deals
11   you had not talked to anybody at Ross about
12   them?
13     A.   The first and second amendments
14   being which exhibits?
15     Q.   3 and 4, which I believe are
16   December 2007 and February 2008.
17     A.   Well, considering that I was on my
18   sabbatical on both of those dates and was
19   precluded from talking to anyone about
20   anything, the answer to that question would
21   have to be no.
22     Q.   The parties obviously have had a
23   mediation session.  I know you and I and Tom
24   Shepherd met with Rajiv Garg on that one
25   instance.  Let's leave those aside.

33  (Pages 126 to 129)

CONFIDENTIAL

130

1    Confidential - D. Hoffman
2         Have you had conversations with
3    anybody at Ross about these transactions or
4    this dispute, other than the mediation and
5    our meeting with Messrs. Shepherd and Garg?
6         A.  I recall having phone conversations
7    with DeVry's general counsel -- Mr. Davis is
8    it -- on several occasions.  I have
9    absolutely no recollection of what we talked
10   about, other than having to do generally with
11   the relationship with Ross.
12        Q.  Has Wyckoff made any payments to
13   American University of the Caribbean to
14   satisfy in whole or in part the judgment that
15   American University of the Caribbean holds
16   against Wyckoff?
17        A.  I believe not.  We've had some
18   settlement discussions.  But as far as I can
19   recall, we have not made any payments.
20        MR. TZANETOPOULOS:  Those are all
21   the questions that I have at this time.
22        MR. LOUGHLIN:  I think I just have
23   one.
24        I only have one copy of this.  This
25   is the complaint.  If you can just mark

131

1    Confidential - D. Hoffman
2    this Exhibit 20.
3         (Hoffman Exhibit No. 20, Second
4    Amended Complaint, was marked for
5    identification.)
6    CROSS-EXAMINATION
7    BY MR. LOUGHLIN:
8         Q.  Mr. Hoffman, I'm placing before you
9    an exhibit which has been marked as Hoffman
10   Exhibit 20 of today's date.  It is the Second
11   Amended Complaint filed by Ross against BQHC
12   and Wyckoff.  And I'd direct your attention
13   to Paragraph 78, which reads, I believe, "In
14   all meaningful respects, Wyckoff" -- meaning
15   Wyckoff Heights Medical Center -- "controlled
16   and controls BQHC."
17        My question is:  As someone who has
18   been the chief legal officer of both of those
19   entities, are you in a position to say
20   whether that allegation is true or false?
21        MR. TZANETOPOULOS:  Objection.
22   Calls for legal conclusion.
23        THE WITNESS:  I am in a position to
24   say.  And that allegation is
25   structurally and demonstrably false

132

1    Confidential - D. Hoffman
2    based on the corporate relationship
3    between Wyckoff and BQHC.
4    BY MR. LOUGHLIN:
5         Q.  And in your experience since 2003
6    as the chief legal officer of Wyckoff and
7    then also the legal advisor to BQHC, have you
8    ever experienced a situation in which Wyckoff
9    controlled or controls BQHC?
10        MR. TZANETOPOULOS:  Objection.
11   Lack of foundation.  Calls for
12   conclusion.
13        THE WITNESS:  No.  Wyckoff has not,
14   does not, and could not, given the
15   nature of the structure agreed to with
16   St. Vincent's, control BQHC because
17   BQHC, in turn, was the passive parent
18   and sole corporate member of Caritas and
19   that would constitute prohibited
20   cooperation between an entity that
21   conforms to the ethical and religious
22   directives and one that does not.
23        MR. LOUGHLIN:  That's the only
24   question I have.
25        MR. TZANETOPOULOS:  Nothing further

133

1    Confidential - D. Hoffman
2    here.
3         Thank you for your time, sir.
4    THE WITNESS:  All right.
5         (The above deposition concluded at
6    2:53 p.m.)
7
8              * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

34  (Pages 130 to 133)

CONFIDENTIAL

**134**

**ACKNOWLEDGEMENT**

STATE OF NEW YORK   )
                    ) ss:
COUNTY OF NEW YORK  )

    I, DAVID HOFFMAN, hereby certify, I have read the transcript of my testimony taken under oath in my deposition of June 1, 2011; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____
David Hoffman

Subscribed and sworn to before me this _____ day of _____, 2011.

_____
Notary Public

**135**

**CERTIFICATION**

    I, ASHLEY SHUGAR, a Notary Public, do hereby certify:
    That the foregoing witness, DAVID HOFFMAN, was duly sworn by me on the date indicated, and that the foregoing is a true and correct record of the testimony given by said witness.
    I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.
    IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of June, 2011.

_____
Ashley Shugar
Notary Public, State of New York
Qualified in New York County
No.: 01SH6232448
Expires: December 13, 2014

**136**

**INDEX**

WITNESS: DAVID HOFFMAN                PAGE
DIRECT EXAMINATION
  BY MR. TZANETOPOULOS................ 5
CROSS-EXAMINATION
  BY MR. LOUGHLIN.................... 130

**EXHIBITS**

HOFFMAN EXHIBITS MARKED
EXHIBIT  DESCRIPTION              PAGE
No. 1   Protective Order signed by
        the court reporter............ 4
No. 2   Affiliation Agreement
        Between Ross School of
        Medicine, School of
        Veterinary Medicine,
        Limited, Portsmouth,
        Dominica and Brooklyn-Queens
        Health Care, Inc., Bates
        numbered ROSS0056 through
        ROSS006...................... 35

**137**

No. 3   Amendment to Affiliation
        Agreement Between Ross
        School of Medicine, School
        of Veterinary Medicine,
        Limited, Portsmouth,
        Dominica and Brooklyn-Queens
        Health Care, Inc. Through
        Caritas Health Care, Inc.,
        Bates numbered ROSS0052
        through ROSS0055.............. 37
No. 4   Second Amendment to
        Affiliation Agreement
        Between Ross School of
        Medicine, School of
        Veterinary Medicine,
        Limited, Portsmouth,
        Dominica and Brooklyn-Queens
        Health Care, Inc. Through
        Caritas Health Care, Inc.,
        Bates numbered ROSS0105
        through ROSS0109.............. 38

138

```
 1
 2        No. 5    Administrative Services
 3               Agreement by and between
 4               Caritas Health Care
 5               Planning, Inc. And WHMC
 6               Properties, Inc. Dated as of
 7               August 21, 2006, Bates
 8               numbered BQHC 00306 through
 9               BQHC 00328...................   44
10        No. 6    Administrative Services
11               Subcontract, Bates numbered
12               BQHC 01056 through BQHC
13               01064.........................   45
14        No. 7    October 5, 2006, Wyckoff
15               Heights Medical Center Board
16               of Trustees Meeting Minutes,
17               Bates numbered BQHC 03769
18               through BQHC 3774.............   58
19        No. 8    e-mail from Dr. Thomas
20               Shepherd to Dominick Gio
21               dated December 22, 2006,
22               Bates numbered ROSS0630
23               through ROSS0643..............   65
24        No. 9    Affidavit of John Lavan.......   66
25
```

139

```
 1
 2        No. 10   e-mails and Caritas Health
 3               Care Organization Period and
 4               Start-Up document, Bates
 5               numbered BQHC 07617 through
 6               BQHC 07623...................   69
 7        No. 11   March 2, 2007, string of
 8               e-mails, Bates numbered BQHC
 9               06856 through BQHC06860.......   75
10        No. 12   Caritas Health Care Inc.
11               Weekly Cash Projections.......   80
12        No. 13   Wyckoff Heights Medical
13               Center Board of Trustees
14               President's Letter June 7,
15               2007, Bates numbered BQHC
16               54890 through BQHC 54900......   83
17        No. 14   Administrative Services
18               Agreement, Bates numbered
19               BQHC 004889 through BQHC
20               00511........................   87
21        No. 15   November 7, 2007, Caritas
22               Health Care, Inc. Meeting of
23               the Board of Trustees
24               minutes, Bates numbered BQHC
25               51896 through BQHC 51901......   90
```

140

```
 1
 2        No. 16   January 8, 2009, Brooklyn
 3               Queens Healthcare, Inc.
 4               Board of Trustees Meeting
 5               Minutes, Bates numbered BQHC
 6               00211 through BQHC 00214......  105
 7        No. 17   Brooklyn Queens Health Care
 8               Board of Trustees Meeting
 9               Minutes, March 5, 2009,
10               Bates numbered BQHC 51800
11               through BQHC 51803............  109
12        No. 18   Wyckoff Heights Medical
13               Center Board of Trustees
14               Meeting Minutes, December 4,
15               2008, Bates numbered BQHC
16               00159 through BQHC 00167......  116
17        No. 19   Disclosure of Ownership and
18               Control, Bates numbered BQHC
19               03413 through BQHC 03415......  124
20        No. 20   Second Amended Complaint......  131
21
22
23
24
25
```

141

```
 1
 2                    ERRATA SHEET
 3            DO NOT WRITE ON THE TRANSCRIPT
              ENTER CHANGES ON THIS PAGE
 4
 5             DEPOSITION of DAVID HOFFMAN
 6                    June 1, 2011
 7
        |Page|Line|Change      |Reason
 8      |    |    |            |
 9      |    |    |            |
10      |    |    |            |
11      |    |    |            |
12      |    |    |            |
13      |    |    |            |
14      |    |    |            |
15      |    |    |            |
16      |    |    |            |
17      |    |    |            |
18      |    |    |            |
19      |    |    |            |
20      |    |    |            |
21      |    |    |            |
22      Under penalties of perjury, I declare that I
        have read the foregoing document and that the
23      facts stated in it are true.
24                    _____
25      Date          David Hoffman
```

36 (Pages 138 to 141)