# APPENDIX D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------------

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,

Plaintiff,

vs.      No. 09 CV 01410(KAM)(RLM)

BROOKLYN-QUEENS HEALTH CARE, LTD. And WYCKOFF
HEIGHTS MEDICAL CENTER,

Defendants.

------------------------------------------------

DEPOSITION OF HAROLD McDONALD

New York, New York

Monday, June 27th, 2011

Reported by:
Jeremy Frank, MPM
JOB NO. 77969

**2**

June 27th, 2011
10:26 a.m.

Deposition of HAROLD McDONALD, held at
the offices of Baker Hostetler, Esqs, 45
Rockefeller Plaza, New York, New York,
pursuant to Subpoena, before Jeremy Frank,
a Notary Public of the State of New York.

**4**

IT IS HEREBY STIPULATED AND AGREED, by
and between counsel for the respective
parties hereto, that the filing, sealing and
certification of the within deposition shall
be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the time of the
trial;

IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed before any
Notary Public with the same force and effect
as if signed and sworn to before the Court.

**3**

A P P E A R A N C E S:

BAKER HOSTETLER, ESQS.
Attorneys for Plaintiff
    191 North Wacker Drive, Suite 3100
    Chicago, IL 60606
BY:   GEORGE J. TZANETOPOULOS, ESQ.

K&L GATES LLP
Attorneys for Defendants
    599 Lexington Avenue
    New York, NY 10022
BY:   WALTER P. LOUGHLIN, ESQ.

GARFUNKEL WILD, P.C.
Attorneys for Nonparty Witness
    111 Great Neck Road
    Great Neck, NY 11021
BY:   ANDREW L. ZWERLING, ESQ.

**5**

McDonald

H A R O L D   M c D O N A L D,   called as a
witness, having been duly sworn by a Notary
Public, was examined and testified as follows:
EXAMINATION BY
MR. TZANETOPOULOS:
    Q.   Mr. McDonald, have you ever given
a deposition before?
    A.   Yes.
    Q.   How many times?
    A.   Two or three times.
    Q.   You have been through the drill,
we will go through the short version.  As you
know I'll be asking you a series of questions
and you will answer, the court reporter will
take down what is said.  If at any time you
don't understand me or don't hear me, please
let me know and I'll be happy to rephrase or
say it again.
        All right?
    A.   Yes.
    Q.   That's the next thing, you have to
answer out loud in words.
        Please state your full name and
home address for the record.

2  (Pages 2 to 5)

**www.uslegalsupport.com**

McDonald

A.   Harold E. McDonald, 28 Overlook Road, Lattingtown, New York, 11560.

Q.   By whom are you presently employed?

A.   Kingsbrook Jewish Medical Center.

Q.   In what capacity?

A.   Senior vice president for network development and long-term care.

Q.   In general terms what are your responsibilities in that position?

A.   To manage the operations of a nursing home, develop relationships with physicians, and manage the development of an undergraduate medical education program.

Q.   How long have you been in your present position?

A.   Since November 2010.

Q.   How old are you, sir?

A.   60.

Q.   What is the highest level of education that you have obtained?

A.   Masters.

Q.   From what university did you get your master's degree?

McDonald

A.   Long Island University.

Q.   When did you receive your master's degree?

A.   I don't remember the exact date.

Q.   Give or take the decade will do.

A.   Within the past 10 years.

Q.   What was the degree in?

A.   In public administration with an emphasis in health care administration.

Q.   How about your bachelor's degree?

A.   Also from Long Island University in business management.

Q.   We don't need to spend a lot of time on this.  If you can take us through the Harold McDonald CV short version from college forward.

A.   It has been a mix of for-profit and not-for-profit health care.  I started in 1972 in the hospital business, from there moved into a not-for-profit nursing home, got out of the business for a couple of years, number of years, got into construction, back into health care where I was CFO for a chain of for-profit nursing homes, moved on from

McDonald

that organization to a not-for-profit nursing home, a member of the New York Presbyterian health care system.  Spent about 14-plus years, 17 years with the New York Presbyterian system working at different nursing home care agencies, hospitals primarily doing turnarounds.

Q.   Were you employed for a period of time at the Wyckoff Heights Medical Center?

A.   Yes.

Q.   What positions did you hold at Wyckoff?

A.   My initial position was as chief financial officer, that was back in 1996, though I quickly moved into the chief operating officer's position after a turnaround at the hospital.

Q.   What was that last part?

A.   After a turnaround at the hospital.

Q.   In laymen's terms, what does that mean?

A.   If a business isn't functioning appropriately financially it is putting

McDonald

together a corrective action plan, a management action plan and implementing the plan to correct the financial condition of the hospital.

Q.   How long did you work at Wyckoff?

A.   I worked at Wyckoff from September '96 to November, November 2010.

Q.   What were the circumstances of your departure from Wyckoff?

A.   I had a job offer which I pursued.

Q.   From the time that you became chief operating officer shortly after 1996 through November 2010, were you continuously the chief operating officer at Wyckoff?

A.   From about 1997 to the time I left I was chief operating officer.

Q.   During the time that you were chief operating officer to whom did you report, if it changed at different times, let me know that too.

A.   I reported to the CEO, president/ CEO my entire month stay at the hospital.

Q.   During that time did different people occupy that position?

10

McDonald

1
2     A.   Yes.
3     Q.   Who were those people?
4     A.   Primarily it was Dominick Gio, was
5  there from beginning back in '96 until 2007
6  roughly.
7     Q.   After Mr. Gio?
8     A.   There was a succession of CEOs.
9     Q.   Who were they?
10    A.   Dr. Nirmal Mattoo, N-I-R-M-A-L
11 M-A-T-T-O-O.
12    Q.   After Dr. Mattoo?
13    A.   It was a consulting firm, it was
14 FTI Cambio.
15    Q.   And the person from FTI Cambio,
16 was that Tom Singleton?
17    A.   Yes.
18    Q.   During what period of time did you
19 report to Mr. Singleton?
20    A.   From mid-2007 to the Fall 2009,
21 could have been '08.
22    Q.   I think '08.
23    A.   '08.
24    Q.   After Mr. Singleton to whom did
25 you report?

11

McDonald

1
2     A.   To Rajiv Garg.
3     Q.   That closes it out?
4     A.   That is a wrap.
5     Q.   All right.
6          Did hold any position at Caritas
7  Health Care?
8     A.   Yes.
9     Q.   What positions?
10    A.   Chief operating officer.
11    Q.   During what period of time were
12 you chief operating officer at Caritas Health
13 Care?
14    A.   From January 1st, 2007 to mid-
15 2007.
16    Q.   What were the circumstances that
17 led you to cease being chief operating officer
18 at Caritas in 2007?
19    A.   When FTI Consultants came in and
20 took over management control.
21    Q.   The people from FTI moved you out?
22    A.   Yes.
23    Q.   Who replaced you in the COO
24 position at Caritas in mid-2007?
25    A.   I'm not sure what the management

12

McDonald

1
2  structure was.
3     Q.   Have you ever held positions at
4  Brooklyn-Queens Health Care?
5     A.   Yes.
6     Q.   What positions?
7     A.   Chief operating officer.
8     Q.   During what period of time were
9  you chief operating officer at Brooklyn-Queens
10 Health Care?
11    A.   It would have been similar to the
12 length that I was COO of Caritas.
13    Q.   So again approximately beginning
14 2007 through mid-2007?
15    A.   Correct.
16    Q.   Circumstances of departure also
17 was that FTI moved you out?
18    A.   Right, yes.
19    Q.   Is it correct that for the period
20 of time roughly beginning 2007 through
21 mid-2007, you were simultaneously chief
22 operating officer of Wyckoff Heights Medical
23 Center, Caritas Health Care and Brooklyn-
24 Queens Health Care?
25    A.   Yes.

13

McDonald

1
2     Q.   Which of the entities paid your
3  paycheck?
4     A.   Wyckoff Heights Medical Center.
5     Q.   Did either of the others pay you?
6     A.   No.
7     Q.   Okay.
8          Did you serve on the Board of
9  Trustees of Wyckoff Heights Medical Center?
10    A.   Yes.
11    Q.   During what periods?
12    A.   From my inception through to my
13 departure.
14    Q.   For that entire time I take it you
15 were a management member of the board?
16    A.   Yes.
17    Q.   Did you serve on the board at any
18 time of Brooklyn-Queens Health Care?
19    A.   No.
20    Q.   About how about Caritas Health
21 Care?
22    A.   You know, I never that I can
23 recall attended any of the --
24    MR. ZWERLING:  Just to the best of
25 your recollection.

4  (Pages 10 to 13)

**14**

McDonald

1
2    A.   I can't recall.
3    Q.   What did you do to prepare for
4    today's deposition?
5    A.   Had a brief meeting a week or so
6    ago with my attorney.
7    Q.   Did you do anything else to
8    prepare for the deposition?
9    A.   No.
10   Q.   Did you review any documents?
11   A.   Yes.
12   Q.   The meeting with your attorney,
13   who was present?
14   A.   Just this gentleman and Robert
15   Wild.
16   Q.   By this gentleman are you
17   referring to Mr. Loughlin?
18   A.   Yes.
19   Q.   In substance who said what to whom
20   during the course of that meeting?
21   A.   It was an open dialogue.
22   Q.   What was the substance of the
23   conversation?
24   A.   To explain to me what this process
25   would be like and to inform me of what

**15**

McDonald

1
2    potential questions that might be related to
3    the agreement between Ross and Caritas.
4    Q.   What did Mr. Loughlin tell you
5    about the positions of Wyckoff and of Ross in
6    this lawsuit?
7    A.   Can you --
8    MR. ZWERLING:   You mean generally
9    what did he say about the dispute?
10   A.   That there is an allegation on the
11   part of Ross that if Caritas was not in a
12   position to fulfill its obligations to Ross,
13   that either Brooklyn-Queens Health Care or
14   Wyckoff would be responsible for fulfilling
15   those obligations.
16   Q.   Did Mr. Loughlin tell you anything
17   else about Ross' position here?
18   A.   Not that I can recall.
19   Q.   What did Mr. Loughlin tell you
20   about the defendants' position in this case?
21   A.   That the belief on the part of
22   Brooklyn-Queens Health Care and Wyckoff was
23   that they were not responsible for the
24   liabilities of Caritas.
25   Q.   Anything else?

**16**

McDonald

1
2    A.   That was in general what was
3    discussed.
4    Q.   Do you recall anything else about
5    the conversation concerning either side's
6    position?
7    A.   Nothing significant.
8    Q.   Anything at all?
9    A.   No.
10   Q.   You said that Mr. Loughlin
11   discussed with you what questions might be
12   asked of you.
13   What did he say about what
14   questions might be asked?
15   A.   I read through the agreement
16   between Caritas and Ross.
17   Q.   What did he say might be a source
18   of questions?
19   A.   That there would be questions
20   related to the agreement.
21   Q.   You say you looked at the
22   affiliation agreement.  Did you look at any
23   other documents?
24   A.   No.
25   Q.   How long did you meet with Mr.

**17**

McDonald

1
2    Loughlin?
3    A.   About an hour or so.
4    Q.   Is Wyckoff either paying for or
5    reimbursing you for the cost of your counsel
6    today?
7    A.   They are paying for my counsel
8    today.
9    Q.   Is Wyckoff reimbursing you for
10   your time today?
11   A.   Unfortunately, no.
12   Q.   At present do you have any type of
13   financial arrangements with Wyckoff, a
14   separation agreement of any kind, a financial
15   arrangement with the hospital following your
16   departure?
17   A.   No, I don't.
18   Q.   Any noncompete?
19   A.   No.
20   Q.   Let's take you back in time to the
21   period of time around 2005-2006, what
22   responsibilities did you have at Wyckoff in
23   connection with the acquisition, Wyckoff's
24   acquisition of St. John's and Mary Immaculate
25   Hospitals?

5  (Pages 14 to 17)

18

McDonald

A.   During 2006 it was to work with the team at Wyckoff to put the deal together, and from September '06 to January '07 I was the acting executive director of St. John's and Mary Immaculate, working and reporting to St. Vincent's Medical Center.

Q.   During what period of time did you say?

A.   This was prior to the closing, this was '06, fall, early fall to January when they the deal was closed.

Q.   Let's focus on your work as part of the team that put the deal together for Wyckoff.

Who was on that team?

A.   It was David Hoffman, Emil Rucigay, Dominick Gio, myself, and Rich Sarli.

Q.   What was Mr. Hoffman's role?

A.   Mr. Hoffman managed all of the legal aspects.

Q.   At that time was David Hoffman general counsel of Wyckoff Heights Medical Center?

A.   Yes, to my knowledge.

19

McDonald

Q.   His too.

What was your role?

A.   As chief operating officer.

Q.   On the team?

A.   On the team, it was to develop a transition plan.

Q.   Mr. Rucigay?

A.   Was to manage or oversee as a board member, he was chair of the board.

Q.   Mr. Sarli?

A.   Chief financial officer for Caritas.

Q.   And Mr. Gio?

A.   President and CEO of Wyckoff Caritas and Brooklyn-Queens Health Care.

MR. TZANETOPOULOS:  Let's mark these as Plaintiff's 1, 2 and 3, for identification.

(Plaintiff's Exhibits 1 through 3, affiliation agreement and letters, marked for identification, as of this date.)

Q.   Take a minute, look at them, when you're ready, I'll ask you questions.

Are you ready?

20

McDonald

A.   Yes.

Q.   Mr. McDonald, have you ever had a chance to review Exhibits 1, 2 and 3?

A.   Yes.

MR. TZANETOPOULOS:  For the record, Exhibit 1 is entitled the affiliate agreement between Ross University School of Medicine and Brooklyn-Queens Health Care, it has been marked with Bates numbers ROSS0056 through ROSS0067.  The last page, 0067, is a fax cover sheet.

Exhibit 2 is a two-page letter from Dominick Gio president and chief executive officer of Wyckoff Heights Medical Center, to Nancy Perri, vice president academic affairs Ross University School of Medicine dated August 21st, 2006, Bates numbered ROSS031314 through 031315.

And Exhibit 3 is another letter from Mr. Gio dated August 21st, 2006 this time to Yife Tien, chief executive officer of the American University of the Caribbean that has been marked ROSS0607

21

McDonald

and 0608.

Q.   The first question is easy, I hope, the signature on Exhibit 1 on the page marked ROSS0066, is that yours?

A.   Yes.

Q.   Okay.

If you look at the last sentence of what appears to be identical letters except for the addressee in Exhibits 2 and 3, is the Harold E. McDonald to which Mr. Gio refers you?

A.   Yes.

Q.   What responsibilities did you have at this time a little before in connection with the medical student clerkship proposals that are contained in Mr. Gio's letters in Exhibits 2 and 3?

A.   The responsibility was to develop a plan with the medical schools to ramp up as quickly as possible to the number of clerkship rotations that we were planning which involved a considerable amount of work.

Q.   My next question is what work was done in the development of that plan?

6 (Pages 18 to 21)

22

McDonald

1
2    A.   It was developing faculty,
3  developing the curriculum, finding the space,
4  making sure that the curriculum was acceptable
5  to the medical school, and also to the staff
6  at the hospital that the undergraduate medical
7  education program was integrated with the
8  graduate medical education program, space for
9  lectures, space for rotations in the clinics,
10 space for lockers, its administrative staff to
11 manage all of the paperwork involved with the
12 programs.
13   Q.   Just so we are clear on terms,
14 when you refer to undergraduate medical
15 education programs, the reference is to
16 students who are in medical school?
17   A.   Correct.
18   Q.   When you speak of graduate medical
19 education program that refers to residents who
20 have finished medical school?
21   A.   Yes.
22   Q.   Mr. Gio's letters in Exhibits 2
23 and 3 refer to some prepaid clerkship
24 opportunities, we will talk in more detail
25 about the Ross 1, but in general terms what

23

McDonald

1
2  were Wyckoff's plans for the money that would
3  be raised by such contracts?
4    A.   To build the infrastructure which
5  was necessary to support the medical student
6  program at Caritas.
7    Q.   Did you have other plans for the
8  money?
9    A.   Yes.
10   Q.   What other plans?
11   A.   Initially there was going to be a
12 cash need as receivables ramped up at Caritas,
13 so the money would be used to fund the
14 operations of the hospital.  Once the
15 receivables ramped up and cash was collected
16 on a regular basis, the money would be spent
17 to improve the facilities and the faculty and
18 the infrastructure at the medical student
19 program.
20   Q.   All right.
21        Were there also plans to use some
22 of the funds raised by these contracts to
23 build a central business office for the
24 Brooklyn-Queens Health Care system?
25   A.   There were a central business

24

McDonald

1  office that was being developed.  I don't
2  recall that the money was being used to
3  develop the business, the business office was
4  there already, it was operated by Catholic
5  Medical Centers, so it was staff from CMC and
6  staff from Wyckoff coming together in one
7  central location.
8    Q.   Let's see if we can discuss what
9  you testified to regarding the ramping up of
10 receivables in laymen's terms.  Let me put it
11 to you in laymen's terms.
12        When you're talking about using
13 money while receivables are ramping up, can
14 you describe that in more plain English?
15   A.   When the transaction closed on
16 January 1st, 2007, there was a certain amount
17 of working capital to carry on the day-to-day
18 operations of the Caritas hospitals.  New
19 revenue coming in would take time to build up.
20 You can't bill for an inpatient until their
21 discharged.  As the patients are seen in the
22 clinic, bills are dropped within a week or
23 two, it would take a month for the cash to
24 come in.  As your whole revenue cycle ramping

25

McDonald

1  up for the new organization which it was,
2  Caritas was it a new organization at that
3  point, there was going to be a period of time
4  where there would be a cash shortage that
5  would be supplemented by these funds.  And
6  within 60 to 90 days if everything went
7  smoothly with the accounting system and the
8  patient accounting process, the new cash
9  should have been flowing in and Wyckoff and
10 Caritas and Brooklyn-Queens Health Care,
11 everybody would have been in a better cash
12 position.
13   Q.   So is it correct then that the
14 plan was for late 2006 Wyckoff anticipated
15 that in the initial period after acquiring St.
16 John's and Mary Immaculate Hospitals Caritas
17 would be providing or paying to provide
18 services but there would be some time before
19 payment for those services would be received.
20        Is that correct?
21   A.   Correct.
22   Q.   One of the plans for the funds
23 raised by these prepayment contracts for
24 medical school clerkships was to fund hospital

7 (Pages 22 to 25)

McDonald

1   operations during a period of time before you
2   received that money?
3        A.   Correct, which typically is a 60
4   to 90-day period.
5        Q.   To what medical schools were
6   offers like those reflected in Mr. Gio's
7   letters in Exhibits 2 and 3 made?
8        A.   What additional schools?
9        Q.   Yes, sir.
10       A.   I'm not sure.
11       Q.   Were there any?
12       A.   I can't recall.
13       Q.   Who was responsible for selecting
14   the medical schools to whom offers would be
15   made?
16       A.   I would have to speculate and I
17   don't remember, if I remembered I could state,
18   but I don't remember exactly.
19       Q.   Are you familiar with someone
20   named Julius Romero?
21       A.   Yes.
22       Q.   What is Mr. Romero's job at this
23   time?
24       A.   He ran the undergraduate program

McDonald

1   agreement.
2        Q.   In terms of putting together the
3   business terms of negotiations for these
4   contracts at that time, who on the Wyckoff
5   side had responsibility for conducting
6   negotiations with medical schools?
7        A.   It would have been David Hoffman,
8   Julius Romero and Dominick Gio.
9        Q.   Was it Dominick Gio that assigned
10   to you the role that you had in connection
11   with putting together these medical school
12   clerkship programs?
13       A.   Yes.
14       Q.   Was it Dominick Gio that made the
15   assignments to David Hoffman and Julius Romero
16   that you have testified about?
17            MR. ZWERLING:  If you know.
18       A.   It would have been his recommenda-
19   tion to have Julius and David work on the
20   contracts.
21       Q.   Did Mr. Romero report to you?
22       A.   He reported to a Dr. Ken Freiberg
23   who was responsible for overall education.
24       Q.   To whom did Dr. Freiberg report?

27

McDonald

1   at Wyckoff.
2        Q.   Was Mr. Romero in the 2006 time
3   frame also working on these proposals?
4        A.   Yes.
5        Q.   What was Mr. Romero's job in
6   connection with the proposals to medical
7   schools?
8        A.   He was working with Dominick Gio
9   and David Hoffman to develop their
10   relationships.
11       Q.   Who was responsible for following
12   up with the medical school if a medical school
13   expressed interest in the offers outlined in
14   Mr. Gio's letters in Exhibits 2 and 3?
15       A.   It would have been those three
16   parties.
17       Q.   Mr. Gio and Mr. Hoffman and Mr.
18   Romero?
19       A.   Correct.
20       Q.   How is it that your name was the
21   person to contact in Mr. Gio's letter?
22       A.   Because I was the person
23   responsible for all the operational issues
24   which is the most significant part of the

29

McDonald

1        A.   Dr. Freiberg reported to Dr.
2   Nirmal Mattoo.
3        Q.   Ultimately up to Mr. Gio?
4        A.   And Mattoo reported to Dominick
5   Gio.
6        Q.   Did you perform any work in
7   putting together the offer letters that are
8   contained in Exhibits 2 and 3?
9        A.   Not to my recall.
10       Q.   Who did?
11       A.   I would just, I'm not sure.
12       Q.   Given what we know about the
13   hospital operation at that time, in the
14   ordinary course whose job would it be to
15   prepare such an offer letter?
16       A.   It would have been either, could
17   have been one of the three people, it could
18   have been their assistants.
19       Q.   The three people is Dominick Gio,
20   David Hoffman and Julius Romero?
21       A.   Correct.
22       Q.   Did any medical schools in
23   response to the offers contained in Exhibit 2
24   and 3 or other offers like them get in touch

30

McDonald

1
2  with you?
3      A.  Not that I can recall.
4      Q.  Did you participate in the
5  discussions with any of the interested schools
6  about the prepaid clerkship contracts?
7      A.  Related to the operations.
8      Q.  Which schools did you talk with?
9      A.  AUC, I can't remember if I spoke
10 to Ross.  It would have been strictly related
11 to the ability to train a certain number of
12 students and certain clerkships and faculty,
13 those operational type issues.
14     Q.  AUC is the American University of
15 the Caribbean.
16         Is that correct?
17     A.  Correct.
18     Q.  Other than AUC and perhaps Ross,
19 did you speak with any other medical schools
20 about these prepaid clerkship offers?
21     A.  Not that I can recall.
22     Q.  You're aware, are you not,
23 obviously that there was a contract with Ross,
24 correct?
25     A.  Correct.

31

McDonald

1
2      Q.  There was also a contract reached
3  with American University of the Caribbean?
4      A.  Yes.
5      Q.  Okay.
6          Were contracts reached at this
7  time with any other medical schools for
8  prepaid clerkship contracts?
9      A.  I can't recall.
10     Q.  So the only two that you know of
11 are AUC and Ross?
12     A.  Correct.
13     Q.  You have said that you have
14 responsibilities for the operational aspect of
15 negotiations.
16         Who had responsibilities for
17 negotiating the commercial terms with the
18 medical schools?
19     A.  I'm not sure but it would have
20 been one of the three, Julius, David Hoffman
21 or Dominick.
22         MR. ZWERLING:  If I can interject,
23 are you asking about this specific
24 contract or just generally what would
25 normally be involved in that process?

32

McDonald

1
2          MR. TZANETOPOULOS:  This set of
3  offers.
4      A.  This set of offers.
5      Q.  Exhibit 2 and 3 offers.
6          MR. ZWERLING:  Do you recall who
7  was involved?
8      A.  It would have been Julius.
9          MR. ZWERLING:  Do you know?
10         THE WITNESS:  I don't know.
11         MR. ZWERLING:  Listen carefully to
12 counsel's question, he wants accurate
13 answers.
14     A.  I'm not sure.
15     Q.  Did you ever meet with anybody
16 from Ross?
17     A.  I can't recall.
18     Q.  Do you have any notes concerning
19 your work on medical school clerkship
20 contracts?
21     A.  Not that I recall.
22     Q.  Did you receive from Mr. Gio or
23 anybody else I guess any guidelines for your
24 negotiations regarding this these contracts?
25     A.  Not that I can recall.

33

McDonald

1
2      Q.  Are you aware of any guidelines
3  being discussed for negotiations concerning
4  the commercial terms of these contracts?
5      A.  Not that I can recall.
6      Q.  All right.
7          I would like to focus now if we
8  can on the discussions leading up to the
9  contracts between Ross and Brooklyn-Queens
10 Health Care that has been marked as Exhibit 1.
11 Did you receive and comment on contract drafts
12 as they went back and forth between Ross and
13 the hospital?
14     A.  I can't recall.
15     Q.  Were there any kind of regular
16 meetings about these contracts?
17     A.  I can't recall.
18         At the time six months, not six
19 months, from September through December I was
20 at St. John's Mary Immaculate managing the day
21 to day operations of those two hospitals.  So
22 the focus was on managing the day-to-day
23 operations, and then it was a weekly
24 conference call where everybody just gave an
25 update on where they stood with the

9  (Pages 30 to 33)

McDonald

1      transition.

2      Q.   Thank you.

3        Let's talk about that a little

4      bit, that may be helpful to the jury. You

5      were employed under a contract, were you not,

6      in the Fall 2006 to work at Mary Immaculate

7      and St. John's before the transaction closed?

8      A.   Yes.

9      Q.   What did you do there?

10      A.   I was acting as executive director

11      of the two hospitals and managing day to day

12      operations.

13      Q.   So at that time you would have

14      been the senior business executive of those

15      two hospitals?

16      A.   The senior administrator at the

17      hospitals.

18      Q.   I think you said there was a

19      weekly conference call then with the

20      acquisition team where everyone brought each

21      other up to speed on acquisition issues?

22      A.   Correct.

23      Q.   Who participated in those calls?

24      A.   The staff of St. Vincent's and the

---

36

McDonald

1      A.   I can't recall.

2      Q.   It also shows a copy going to

3      Wah-Chung Hsu.

4        Whose Mr. Hsu?

5      A.   Mr. Hsu was one of the chief

6      financial officers.

7      Q.   Of which entity?

8      A.   In November 2006 Wyckoff, Wyckoff

9      Heights Medical Center.

10      Q.   The subject line makes reference

11      to an amendment to a CMC agreement.

12        What does CMC refer to as you

13      understand it?

14      A.   Catholic Medical Center.

15      Q.   Did you have any discussions with

16      anybody at Wyckoff before Mr. Romero sent this

17      out or was he keeping you in the loop with

18      what he was up to?

19      A.   I can't recall.

20        MR. TZANETOPOULOS: Mark this as

21      Exhibit 5, for identification.

22        (Plaintiff's Exhibit 5, e-mail

23      chain, marked for identification, as of

24      this date.)

---

35

McDonald

1      staff of Caritas and the staff of Wyckoff.

2      Q.   Staff would be administrative

3      staff?

4      A.   The administrative staff, the vice

5      president for the organizations.

6      Q.   Was Mr. Gio a regular participant

7      in those calls?

8      A.   No.

9      Q.   How about Mr. Romero?

10      A.   I can't recall.

11        MR. TZANETOPOULOS: Can you mark

12      this as the next one please, for

13      identification.

14        (Plaintiff's Exhibit 4, e-mail and

15      amendment, marked for identification, as

16      of this date.)

17      Q.   Mr. McDonald, let me show you a

18      document that the court reporter has marked as

19      deposition Exhibit 4. It's a two-page

20      document Bates numbered BQHC24771 to 24772, an

21      e-mail from Julius Romero to Nancy Perri.

22        Mr. McDonald, the Exhibit 4 is an

23      e-mail that shows a copy going to you. Did

24      you get a copy of this?

---

37

McDonald

1      Q.   Mr. McDonald, let me show you a

2      document the court reporter has marked as

3      Deposition Exhibit 5. Exhibit 5 is an e-mail

4      string two pages, bears Bates numbers

5      ROSS009019 to 009020. Look at it as much as

6      you would like, you seem to come into it in

7      the middle of the page.

8        Mr. McDonald, the e-mail in

9      Exhibit 5 that is dated Friday, December 1st

10      shows a copy going to you. Did you receive a

11      copy?

12      A.   I can't recall.

13      Q.   The other cc lines show an RIS9022

14      and NYP.org.

15        Is that to Mr. Sarli?

16      A.   I'm not sure, but, I'm not sure.

17      Q.   The NYP.org is an e-mail address

18      that you used at times at Wyckoff, was it not?

19      A.   Yes.

20      Q.   What does the NYP stand for?

21      A.   New York Presbyterian.

22      Q.   Was Wyckoff at that time part of

23      the New York Presbyterian system?

24      A.   Yes.

38

McDonald

1
2      Q.   The DNH9901, was that to Mr.
3  Hoffman, David Hoffman?
4      A.   I'm not sure.
5      Q.   Mr. Romero's December 1st e-mail
6  begins, "Dear Dr. Perri, per our telephone
7  meeting this morning," then it goes on to some
8  items.
9          Were you a part of that telephone
10 meeting?
11     A.   I can't recall.
12     Q.   Item two indicates that, "A call
13 from Mr. McDonald is requested by Mr. St.
14 James, a Mr. McDonald has returned a call to
15 Mr. St. James today and will be followed up by
16 Mr. Rich Sarli."
17         Did you in fact call John St.
18 James?
19     A.   I can't recall.
20     Q.   Have you ever spoken with him?
21     A.   I'm not sure.
22     Q.   Do you recall anything of
23 substance of any conversation that you ever
24 had with John St. James?
25     A.   No.

39

McDonald

1
2      Q.   Do you recall anything of
3  substance in your conversation you ever had
4  with anybody from Ross?
5      A.   No.
6          MR. TZANETOPOULOS:  Mark this
7  Plaintiff's 6, for identification.
8          (Plaintiff's 6, e-mail
9  chain, marked for identification, as of
10 this date.)
11     Q.   Mr. McDonald, have you had a
12 chance to review Exhibit 6?
13     A.   Yes.
14     Q.   Exhibit 6 is a one-page e-mail
15 string bearing ROSS027421.
16         The second e-mail in the string is
17 one that says it is from Julius Romero to John
18 St. James dated December 16th, 2006.  It shows
19 a copy going to you.
20         Did you receive a copy?
21     A.   I don't recall.
22     Q.   The e-mail address showed in this
23 cc section of Exhibit 6, was that your e-mail
24 address at Wyckoff?
25     A.   Yes.

40

McDonald

1
2      Q.   Mr. Romero writes to Mr. St. James
3  opening, "I thought our teleconference meeting
4  today was proactive," he goes on to discuss
5  it.
6          Were you a part of that telephone
7  conference meeting?
8      A.   I don't recall.
9      Q.   In the ordinary course of
10 negotiations with medical schools about these
11 contracts, if there were telephone conferences
12 in which Mr. Romero was negotiating with
13 medical schools, would you have been part of
14 that?
15     A.   Not necessarily.
16     Q.   Were you part of some?
17     A.   Not that I can recall.
18     Q.   Okay.
19         Midway through the page Mr. Romero
20 writes, "A summary of our discussions are
21 outlined below."  He uses a series of points.
22 Point seven states, "A contingency of an equal
23 number of core clerkship slots at Wyckoff
24 Heights Medical Center will serve as
25 collateral should any guaranteed, prepaid core

41

McDonald

1
2  clerkship at Caritas is not provided to Ross
3  University during the term of this agreement."
4          Do you see where I am?
5      A.   Yes.
6      Q.   At any time before or at any time
7  during this December 2006 time frame have you
8  been a part of any discussion internally at
9  Wyckoff concerning using slots at Wyckoff as
10 collateral for the prepaid deals for
11 clerkships at Caritas?
12     A.   Not that I recall.
13     Q.   You would agree, would you not,
14 that assuming the e-mail came to you, you had
15 information available to you from Mr. Romero
16 that at least as of December 16th he was
17 discussing with Ross using clerkships slots at
18 Wyckoff as collateral for prepaid core
19 clerkships at Caritas?
20         MR. ZWERLING:  Objection form, can
21 you rephrase that?
22         MR. TZANETOPOULOS:  Sure.
23     Q.   Mr. McDonald, if you got the
24 e-mail in Exhibit 6, you would agree that Mr.
25 Romero had provided you with the information

11 (Pages 38 to 41)

42

McDonald

1
2  that he was discussing with Ross?
3      MR. ZWERLING: As outlined in his
4  e-mail?
5      MR. TZANETOPOULOS: Correct.
6      Q.  Using core clerkship slots at
7  Wyckoff to serve as collateral for prepaid
8  core clerkships at Caritas?
9      MR. ZWERLING: Same objection.
10     A.  I would have objected to that one.
11     Q.  If you got the e-mail you had at
12 least available to you, the information that
13 he lists in his point seven --
14     MR. LOUGHLIN: Had he got the
15 e-mail and read it he would have gotten
16 the e-mail, it is just a hypothetical.
17 Objection to form.
18     Q.  You can answer.
19     A.  I could speculate if you want me
20 to speculate.
21     Q.  Sure.
22     A.  If I did receive the e-mail and I
23 did read it, I would have been aware of it.
24     Q.  Whether or not you aware of it, if
25 you received the e-mail --

43

McDonald

1
2      A.  I would have disagreed with it.
3      MR. LOUGHLIN: Let him finish the
4  question.
5      Q.  Let me finish.
6      A.  I would have disagreed with it,
7  but if I had received it and read it, I would
8  have been aware of it.
9      Q.  Do you have any reason to think
10 you did not receive this e-mail?
11     A.  Only that I don't recall it.
12     Q.  Does the fact that you don't
13 recall it make you think you didn't receive
14 it?
15     MR. LOUGHLIN: Objection.
16     MR. ZWERLING: Objection.
17     MR. LOUGHLIN: You're inviting him
18 to speculate.
19     MR. ZWERLING: He's already
20 answered he can't recall it.
21     Q.  I'm asking do you have a reason to
22 think that you didn't get it?
23     A.  I don't recall receiving the
24 e-mail.
25     Q.  Do you dispute that you received

44

McDonald

1
2  it?
3      MR. LOUGHLIN: Objection.
4      MR. ZWERLING: He already answered
5  the question, if he doesn't recall it,
6  that's the answer.
7      A.  If I don't recall it how can I
8  dispute it?
9      MR. TZANETOPOULOS: Mark this
10 Exhibit 7, for identification.
11     (Plaintiff's Exhibit 7, e-mail
12 chain and affiliation agreement, marked
13 for identification, as of this date.)
14     MR. TZANETOPOULOS: Let's go off
15 the record.
16     (Whereupon, an off-the-record
17 discussion was held.)
18     (Time noted: 11:43 a.m.)
19     (Time noted: 11:50 a.m.)
20     MR. TZANETOPOULOS: We are back on
21 the record.
22     Q.  Mr. McDonald, have you had a
23 chance to review Deposition Exhibit 7?
24     A.  Yes.
25     Q.  Exhibit 7 is an e-mail string and

45

McDonald

1
2  an attachment bearing Bates numbers ROSS008477
3  through 8492.
4      The very first page is an e-mail
5  from Mr. Romero to Dr. Thomas Shepherd which
6  shows a copy going to the e-mail address
7  HAM9001@NYP.org.
8      Was that your e-mail address?
9      A.  Yes.
10     Q.  The next e-mail address on the cc
11 line is DJG9001@NYP.org.
12     Is that Mr. Gio's e-mail address?
13     A.  I'm not sure.
14     Q.  Did you receive a copy of this
15 e-mail?
16     A.  I don't recall.
17     Q.  Did you have any discussions at
18 this time with Mr. Romero about what parts of
19 Ross' contract proposal that are discussed
20 here would be acceptable to the hospital and
21 what wouldn't?
22     A.  I don't recall.
23     Q.  Is there anything that would
24 refresh your recollection on that point that
25 you can think of?

12 (Pages 42 to 45)

48

McDonald

1
2  A.  I recall general discussions
3  related to residency programs and the
4  undergraduate programs focusing on the ability
5  of the hospitals to absorb the students.
6  Q.  **Anything else?**
7  A.  No.
8  Q.  **All right.**
9       **Let me direct your attention back**
10 **again to Exhibit 1, that's the affiliation**
11 **agreement.  Let's start at the very last page**
12 **which is the fax cover sheet, it is titled St.**
13 **Vincent's CMC.**
14      MR. LOUGHLIN:  Are you referring to
15 Exhibit 1?
16      MR. ZWERLING:  I don't have that
17 page, but --
18      MR. TZANETOPOULOS:  Here you go.
19 Q.  **At this time were you located at**
20 **St. John's Hospital, is that where you were**
21 **officed?**
22 A.  I was back and forth between St.
23 John's and Mary Immaculate.
24 Q.  **Who asked you to sign this**
25 **contract in Exhibit 1?**

47

McDonald

1
2  A.  I don't recall.
3  Q.  **Who presented it to you?**
4  A.  I don't recall.
5  Q.  **Had the final version of the**
6  **contract been presented to the hospital's**
7  **legal counsel for check off before you signed?**
8  A.  I'm not sure, I don't recall.
9  Q.  **In the ordinary course of how you**
10 **conducted your business at the time, would you**
11 **have signed a contract like that in Exhibit 1**
12 **without first knowing that the hospital's**
13 **legal counsel had checked off?**
14 A.  In the normal course of business,
15 I would have made sure the hospital's legal
16 counsel agreed to it and had reviewed it.
17 Q.  **Had Dominick Gio checked off on**
18 **this contract before you signed it?**
19 A.  In the normal course of business,
20 Dominick who have reviewed it and
21 approved it.
22 Q.  **Before you signed it?**
23 A.  Before I signed it.
24 Q.  **Do you think that's what happened**
25 **here?**

McDonald

1
2      MR. ZWERLING:  Are you asking him
3  to speculate?
4      MR. TZANETOPOULOS:  I'm asking what
5  he thinks.
6      MR. ZWERLING:  You're asking him to
7  speculate, he said he can't recall.  If
8  you're asking him to speculate, he's
9  speculating.
10 A.  I don't recall signing the
11 document.  I recall all the operational
12 issues, I recall working with Dr. Mandava,
13 that was the medical director at Caritas to
14 assure that we would be able to manage the
15 education of the students.
16      MR. LOUGHLIN:  Let's go off the
17 record.
18      (Whereupon, an off-the-record
19 discussion was held.)
20      (Time noted:  11:56 a.m.)
21      (Time noted:  11:57 a.m.)
22      MR. TZANETOPOULOS:  Let's go back
23 on the record.
24 Q.  **To be thorough, let me ask one**
25 **more question about Exhibit 1.  Did you read**

49

McDonald

1
2  it before you signed it?
3  A.  In the normal course of business,
4  I would have.
5  Q.  **Did you in this case?**
6  A.  I don't recall.
7  Q.  **All right.**
8      **At any time before you left**
9  **Wyckoff had anyone criticized you for signing**
10 **the contract that is in Exhibit 1?**
11 A.  No, that I would recall.
12 Q.  **At any time before you left**
13 **Wyckoff, has anyone from Wyckoff or Brooklyn-**
14 **Queens Health Care or Caritas suggested that**
15 **you did not have the authority to sign the**
16 **contract that is in Exhibit 1?**
17 A.  No.
18 Q.  **Did you have anything to do with**
19 **negotiating or having signed the first**
20 **amendment to the affiliation agreement that's**
21 **Exhibit 1?**
22 A.  Not that I can recall.
23 Q.  **The second amendment to this**
24 **contract?**
25 A.  I can't recall amendments to the

13  (Pages 46 to 49)

50

McDonald

1   McDonald
2   contract.
3       MR. TZANETOPOULOS: Mark these as
4   Exhibits 8 and 9, for identification.
5       (Plaintiff's Exhibits 8 and 9,
6   affiliation agreements, marked for
7   identification, as of this date.)
8       Q.   Mr. McDonald, have you had a
9   chance to review Exhibits 8 and 9?
10      A.   Yes.
11      Q.   Did you perform any work in
12  connection with the first amendment in
13  Exhibit 8?
14      A.   No.
15      Q.   Did you perform any work in
16  connection with the second amendment to the
17  contract in Exhibit 9?
18      A.   No.
19      MR. TZANETOPOULOS: I'll leave it
20  to the rest of the group, I probably have
21  an hour, we can break for a lunch break
22  or take five minutes or carry on.
23      Let's go off the record.
24      (Whereupon, an off-the-record
25  discussion was held.)

52

1   McDonald
2       Did you work on this transaction?
3       A.   I was involved in the initial
4   discussions, I was at the dinner meeting and
5   that was my extent of involvement.
6       Q.   Who was at that dinner meeting?
7       A.   Representative from AUC and
8   representatives from Wyckoff.
9       Q.   Who from Wyckoff?
10      A.   I don't recall exactly.
11      Q.   Do you remember anybody other than
12  you?
13      A.   I seem to recall just myself and
14  the attorney for AUC.
15      Q.   Okay.
16      A.   Those are the two that stand out
17  in my mind.
18      Q.   You do believe others from Wyckoff
19  were there?
20      A.   Yes, and I think others from CMC,
21  but I'm not sure.
22      Q.   Where was that meeting?
23      A.   At a restaurant in Queens.
24      Q.   I know you're not going to know
25  the precise date give or take, what's the best

51

1   McDonald
2       (Time noted: 12:08 p.m.)
3       (Time noted: 12:17 p.m.)
4       MR. TZANETOPOULOS: Let's go back
5   on the record.
6       Q.   Let's go back sir and talk about
7   the original affiliation agreement. Was the
8   money that Ross promised to pay in the
9   original affiliation agreement in Exhibit 1
10  received?
11      A.   It is my recollection that it was
12  received, I don't recall the exact amount.
13      Q.   Was it spent?
14      A.   Everything was spent.
15      MR. TZANETOPOULOS: Mark this
16  Exhibit 10, for identification.
17      (Plaintiff's Exhibit 10, promissory
18  note agreement, marked for identifica-
19  tion, as of this date.)
20      Q.   Mr. McDonald, the court reporter
21  has handed you a document marked Exhibit 10.
22  Exhibit 10 is entitled promissory note, on the
23  last page it has signatures for AUC, NV,
24  Brooklyn-Queens Health Care Caritas Health
25  Care and Wyckoff Heights Medical Center.

53

1   McDonald
2   you can do in terms of its time frame?
3       A.   Would have been the Fall of 2006,
4   early winter, could have been late winter.
5       MR. ZWERLING: Of 2007?
6       A.   2006.
7       Q.   You think its sometime --
8       A.   Now that I have got a better grasp
9   of the seasons, it would have been most likely
10  the fourth quarter 2006, we will leave out the
11  seasons.
12      Q.   Was it before the December 1st,
13  2006 date of this promissory note?
14      A.   Yes.
15      Q.   All right.
16      The purpose of the meeting was to
17  discuss the potential transaction?
18      A.   Yes.
19      Q.   Again, I know you're not going to
20  recall the exact words, but in substance who
21  said what to whom?
22      A.   It was a social dinner meeting and
23  so there was discussion with different people
24  as the night progressed.
25      Q.   Were the terms of the potential

14  (Pages 50 to 53)

54

McDonald

1  clerkship contract discussed?
2      A.   You know what, I'm not sure what
3  terms were discussed, but it was a social
4  business dinner.
5      Q.   Let me direct your attention if I
6  may to paragraph four of Exhibit 10 that's on
7  page six of the exhibit.  That paragraph
8  begins, "Brooklyn-Queens acknowledges and
9  decrees on behalf of its wholly owned
10  subsidiary Wyckoff, any default as defined in
11  section two paragraph five herein by
12  Brooklyn-Queens, Caritas, MIH, SJQH
13  individually and collectively during the term
14  of the note will obligate Wyckoff to assume
15  responsibility for this note agreement."
16          Did the potential of using Wyckoff
17  as a backstop for this sort of transaction
18  come up during your dinner?
19      A.   I don't remember.
20          My focus for the evening was on
21  the quality and number of the rotations at
22  Caritas and how he would be able to manage the
23  education.
24      Q.   All right.

55

McDonald

1          Again, if I can direct your
2  attention to the last page of the exhibit,
3  page 10 of 10, do you recognize Mr. Gio's
4  signature?
5      A.   Yes.
6      Q.   I take it you were familiar with
7  his signature?
8      A.   Yes.
9      Q.   That is his signature on behalf of
10  Brooklyn-Queens Health Care and of Caritas
11  Health Care Planning and on behalf of Wyckoff
12  Heights Medical Center?
13      A.   Yes.
14      Q.   Other than what you have testified
15  to, did you do any other work in connection
16  with the AUC prepaid contract described in the
17  promissory note in Exhibit 10?
18      A.   Just the management of the
19  rotations at Caritas.
20      Q.   Who was responsible for placing
21  schedules of students, placing them in the
22  rotation?
23      A.   Julius Romero.
24      Q.   Was Mr. Romero responsible for

56

McDonald

1  placement of scheduling at both Caritas and
2  Wyckoff?
3      A.   Yes.
4      Q.   We know there were medical student
5  clerks at the Caritas hospitals.
6          Is that correct?
7      A.   Yes.
8      Q.   They were also medical student
9  clerks at Wyckoff?
10      A.   Yes.
11      Q.   Did Brooklyn-Queens Health Care
12  have an interest in any other facilities where
13  medical students did clerkships?
14      A.   At Caritas?
15      Q.   We knew there were Caritas, we
16  know there were at Wyckoff, did the system
17  have any other Brooklyn-Queens Health Care
18  system have any other affiliates with --
19      A.   Kennedy Medical Center.
20      Q.   What's the Kennedy Medical Center?
21      A.   It is an or it was an ambulatory
22  facility at Kennedy Airport.  St. John's had a
23  large ambulatory site at 95-25 Queens
24  Boulevard, outpatient, it is a detox program

57

McDonald

1  that Mary Immaculate had.  Part of Mary
2  Immaculate was also they had a 110-bed skilled
3  nursing facility Monsignor Fitzpatrick, and
4  they had a psych operation at Mary Immaculate
5  also.
6      Q.   When St. John's Hospital and Mary
7  Immaculate Hospitals closed in early 2009, did
8  Wyckoff or Brooklyn-Queens Health Care
9  continue to have an interest in any of those
10  facilities that you just described?
11      A.   Not to my knowledge.
12      Q.   Is it correct that once Mary
13  Immaculate and St. John's closed in 2009, the
14  only Brooklyn-Queens Health Care facility with
15  medical student clerkships was Wyckoff?
16      A.   No, actually there was another
17  site I think that was sold off to Addabo
18  (phonetic), it was a family practice site and
19  ambulatory family practice site in I forget
20  the address, I forget the name of it.
21      Q.   When was that site sold off?
22      A.   I don't remember.  I wasn't
23  involved with the operations at the Caritas
24  from the Spring '07 on.

15  (Pages 54 to 57)

McDonald

Q.   I guess what I'm trying to get my arms around, one, Caritas closed.

Is it correct that the only Brooklyn-Queens Health Care facilities with medical student clerks was Wyckoff?

A.   I wasn't involved with any of the bankruptcy closings at Caritas so I'm not sure if there were educational opportunities that remained after the fact.

Q.   Are the only ones that you knew of at Wyckoff?

A.   I know that Wyckoff did try to, actually submitted a grant to maintain the clinics at 95-25, and that wasn't approved. And I just wasn't involved, the only Wyckoff effort towards maintaining any of the Caritas facilities to my knowledge was just the clinics at St. John's which were substantial, it was a fairly large operation. I think the family practice site is still in operation but I'm not sure, under somebody else, a different sponsorship.

MR. TZANETOPOULOS:  Mark this as Exhibit 11, for identification.

---

59

McDonald

(Plaintiff's Exhibit 11, memo, marked for identification, as of this date.)

Q.   Mr. McDonald, the court reporter has handed to you a document he marked as Exhibit 11. It's a two-page memo from Emil Rucigay dated July 30th, 2007 bears Bates numbers BQHC13452 and 13453. The first question on terminology, a number of documents that the defendants have produced in this case refer to the senior cabinet of different hospital entities.

To your understanding what's the reference, whose encompassed in the senior cabinet?

A.   It is the executive team and the vice presidents.

Q.   All right.

So in this case at this time that would include you?

A.   Yes.

Q.   I take it you remember the arrival of FTI at the hospitals?

A.   Absolutely.

---

McDonald

Q.   Did you receive the memo in Exhibit 11?

A.   I don't recall the memo but I certainly recall everything that is in the memo.

Q.   Were you involved in the discussions with the State that led to FTI's arrival at the hospitals?

A.   Yes.

Q.   What was your involvement in those discussions?

A.   It was my responsibility to go to the central business office to determine the fix that is needed to be implemented and to put together a corrective action plan to get those fixes in place as quickly as possible.

Q.   With whom at the State did you speak?

A.   We spoke to a number of people. There were numerous conference calls, there were a couple of meetings, it was Jim Klein was the primary individual that we dealt with.

Q.   A fellow named Benjamin?

A.   Neil Benjamin, Neil reported to

---

61

McDonald

Jim at the time.

Q.   Okay.

What were the problems that required the fixes that you have just testified about?

A.   The most significant fixes were to the computer systems to correct the problems with the billing process at Caritas.

Q.   What were those problems?

A.   The inability to create a bill, the inability to submit the bill to a payer, the inability for the edits in the hospital system to let the bill as they say in the business go out the door.  The ability for the payers to receive the bill from Caritas, so there were a series of problems in the system that needed to be corrected.

Q.   What other problems were there that you were to address?

A.   It was business office growing pains that needed to be corrected.  Before that time there was a CMC central business office and Wyckoff had its own business office located at Wyckoff.  So Wyckoff moved its

16  (Pages 58 to 61)

62

McDonald

1
2  business office and consolidated with the
3  Catholic Medical Center business office, and
4  it was the integration of the systems and the
5  integration of the staff, and while going up
6  on a new computer system made the whole
7  process challenging, to say the least.
8      Q.   What are the problems that were
9  addressed?
10     A.   In reference to?
11     Q.   Whatever corrective action you
12 have testified about?
13     A.   In reference to the leadership at
14 the business office which was the CFO in
15 charge, the business office was Hal McNeil and
16 to sit with him and take a look and see what
17 was working and what wasn't working and what
18 was reported timely to management and what
19 wasn't reported timely, and the movement of
20 funds from one organization to another
21 organization. Cash flow projections, so the
22 operations of the business office and also the
23 reporting of the financial condition of the
24 individual business entities.
25     Q.   On that last point of the movement

63

McDonald

1
2  of funds between entities, defendant produced
3  some documents that you can look at that have
4  indicated that funds from Caritas were
5  commingled with funds from Wyckoff and to pay
6  Wyckoff's bills.
7          Were you involved in the
8  investigation or the remedy regarding that
9  commingling?
10     A.   Yes.
11     Q.   Were you involved in the investi-
12 gation?
13     A.   Yes.
14     Q.   How did the problem come to light?
15     A.   The problem came to light when we
16 received notice at St. John's that we couldn't
17 drop bills. So I mentioned earlier where your
18 receivables ramp up, there comes a point in
19 time, three weeks, four weeks, five weeks into
20 the new sponsorship where we should start
21 dropping bills and generating cash flow, and
22 it was announced to myself and Rich Sarli that
23 there was a problem with the computer system
24 and we couldn't drop the bill.
25     Q.   How did that lead to learning

64

McDonald

1
2  funds had been commingled?
3      A.   Well, at that point we are burning
4  through cash rather quickly and the announce-
5  ment that we couldn't drop a bill was pretty
6  devastating. So at that point it was all
7  hands over to the business office and let's
8  find out what's happening there, what do we
9  need to do to pull together to get the problem
10 fixed.
11     Q.   Is it the case that Caritas' funds
12 were in fact used to pay Wyckoff's bills?
13     A.   Funds were being moved around to
14 cover the cash needed for a specific point in
15 time. So there were Caritas funds going to
16 pay for Wyckoff liabilities and Wyckoff funds
17 going to pay for Caritas liabilities. There
18 was a thorough accounting done and it was
19 determined exactly who owed who what.
20     Q.   So what you found when you looked
21 into it was that whichever entity had cash,
22 those funds were being used to pay bills
23 regardless of the entity whose bills they
24 were?
25     A.   Correct.

65

McDonald

1
2      Q.   During what period of time was
3  cash being moved between entities in that
4  fashion?
5      A.   I can't remember the exact date,
6  but it would have been the early part of first
7  quarter of 2007.
8      Q.   Who had authorized the use of one
9  entity's funds for the other entity's bills?
10     A.   It wasn't authorized.
11     Q.   Who had done it?
12     A.   Hal McNeil.
13     Q.   How did he do that, mechanically
14 how did he move the money?
15     A.   He would be paying different
16 vendors from different accounts.
17     Q.   So in some instances Mr. McNeil
18 would pay Wyckoff's vendors with Caritas'
19 funds and in other instances Caritas' vendors
20 with Wyckoff's funds?
21     A.   Correct.
22     Q.   All right.
23          During that period of time when
24 Mr. McNeil was doing so, what was the process
25 for getting a vendor paid for either of the

17  (Pages  62 to 65)

McDonald

entities?

A.   There should have been a voucher system in place where the expense invoice would be identified for the correct institution and it would have been processed for that institution and paid through the funds of that specific institution.

MR. TZANETOPOULOS:  Can you read the question back, please.

(Whereupon the aforementioned testimony was read back by the Court Reporter.)

Q.   You described what should have been done.

My question was what was done?

A.   There were improprieties related to the transfer of funds and the use of funds, I can't recall exactly what they were, but it was done inappropriately.

Q.   Were there more people during that period of time when there were improprieties involved in the actual receipt and writing of checks to pay vendors than Mr. McNeil, or was he just a one-person shop?

---

67

McDonald

A.   Mr. McNeil was in charge of a large business office, and there were numerous departments and numerous employees.

Q.   In order to engage in the transfer of funds that you described as being improper, more people than Mr. McNeil would have been involved in getting those bills paid from whatever funds were available?

A.   Yes.

Q.   Which people?

A.   Accounts payable, purchasing.

Q.   What did you do to investigate?

A.   Went in, took a look at what was happening in the business office, and we had Deloitte come in and do forensic audit.  We brought in FTI Cambio initially to take a look at the receivables, and we brought in a number of consultants that were familiar with the Meditech computer system to get the fixes in place for the computer system.

And so it was bringing in additional staff and additional expertise to fix the problems that were happening in the business office and to determine what the

---

McDonald

systems and the policies and procedures were in the office that needed to be corrected.

Q.   Who was in charge of the investigation?

A.   The internal investigation or the audit?

Q.   The internal investigation.

A.   I was in charge of the internal investigation.

Q.   Did you determine that anybody other than Mr. McNeil knew about the fact that the funds were being transferred from one entity to another?

A.   Yes, I'm not sure who knew Hal McNeil had the authority to release the checks.

Q.   My question was did your investigation determine that anybody else knew that this was being done?

A.   My investigation was focused on the revenue cycle.  We had thousands of employees who needed to live on that paycheck they got every other week, so the bulk of my time that was spent in the business office was

---

69

McDonald

trying to figure out how to fix the problems with the accounting system so we would get bills out the door, we can start getting cash in.

The investigation of Hal McNeil was relatively quick and it was clear that there were cash flow statements that were produced that were inaccurate and that the cash was moving back and forth.  And it was a quick decision to terminate Hal McNeil for two reasons, one because the problems with the system and I believed he was aware of early enough that something could have been done to prevent the catastrophe we had.

The other was covering up in the problem, moving cash around to make it appear we had enough cash that we weren't running into a problem.  The third piece was producing cash flow statements that were totally inaccurate when the problem was pretty significant.  He was terminated because he covered up because he moved funds and because he didn't ask for help when he needed help.

Q.   Okay.

McDonald

1
2       Let's go back to my precise
3   question which was in your investigation did
4   you determine whether anybody other than Mr.
5   McNeil knew that money was being moved
6   inappropriately?
7       A.  I can't recall.
8       Q.  You testified earlier about
9   Caritas having a limited amount of working
10  capital in the revenue cycle.
11      How much working capital was
12  available to Caritas during those initial
13  months?
14      A.  About 10 million if I remember
15  correctly.
16      Q.  From whom was that working capital
17  provided?
18      A.  It was a combination of borrowing
19  advance payments and part of the deal with St.
20  Vincent's.
21      Q.  The advance payments, those would
22  be advance payments from Ross and AUC on the
23  clerkship contracts?
24      A.  Part of it.
25      You know what, I'm not sure if it

McDonald

1
2       Q.  Was Mr. Hsu part of your team that
3   investigated the issues that you described?
4       A.  Yes.
5       Q.  At this time what was his
6   position?
7       A.  He was the chief financial officer
8   for Wyckoff.
9       Q.  Do you recognize the document
10  that's a spreadsheet?
11      A.  You know, I know that there was a
12  spreadsheet, I can't say this is the exact
13  spreadsheet, but there was an accounting of
14  the to due from.
15      Q.  Mr. Hsu was given the task of
16  preparing?
17      A.  Yes.
18      Q.  Do you understand the spreadsheet
19  in the exhibit enough to be able to describe
20  it?  Describe what is being described there.
21      A.  I can say it is a reconciliation
22  of funds that went from Caritas to Wyckoff and
23  from Wyckoff to Caritas.
24      Q.  There is a column headed Caritas
25  to Wyckoff Heights Medical Center.

71

McDonald

1
2   was 10 million, I'm not sure of the exact
3   amount.
4       Q.  Was some or all of the Caritas
5   money that was used to pay Wyckoff bills funds
6   received from Ross and AUC?
7       A.  I don't recall the details.
8       MR. TZANETOPOULOS:  Mark this
9   Exhibit 12, for identification.
10      (Plaintiff's Exhibit 12, e-mail,
11  marked for identification, as of this
12  date.)
13      Q.  Mr. McDonald, the court reporter
14  has handed to you a document marked deposition
15  Exhibit 12.  The exhibit itself is a two-page
16  document, an e-mail dated March 6th, 2007 from
17  Wah-Chung Hsu to a number of people, and
18  another page Bates labeled BQHC06981.
19      So the record is clear, the e-mail
20  and attachments were produced in a native
21  format, some documents were very large.  In
22  order make the document manageable we selected
23  one of the attachments, just a spreadsheet
24  that you see there.
25      A.  Yes.

73

McDonald

1
2       What do you understand that to
3   reflect?
4       A.  These were funds that went from
5   Caritas to Wyckoff.
6       Q.  As you understand it, were the
7   funds first transferred from a Caritas account
8   to a Wyckoff account and then Wyckoff bills
9   were paid or was it the case Wyckoff bills
10  were paid out of the Caritas account?
11      A.  Can you restate the question.
12      Q.  Sure.
13      The round numbers make me curious.
14  Is it the case --
15      A.  It was just moving lump sums of
16  money to cover specific checks that would be
17  cut.
18      Q.  So when checks were cut to a
19  Wyckoff vendor, the check was from a Wyckoff
20  account but money was moved from Caritas to
21  cover it?
22      MR. ZWERLING:  If you know.
23      A.  And back and forth.
24      Q.  All right.
25      Mr. McDonald, let me refer you

McDonald

back to Exhibit 10, it is the AUC agreement. The agreement reflects that AUC was to pay $3.5 million.

Did AUC in fact pay that money?

A.   I don't recall the exact amount.

Q.   They did pay in though?

A.   They paid, yes.

Q.   If we can go back to Exhibit 1 which is the Ross affiliation agreement, if I can direct your attention to Exhibit B to the Ross contract, it provides that the university will deposit with Brooklyn-Queens Health Care $5 million.

I would like to see if I can trigger some recollections from your investigation.  AUC agreements says that as of December 1st it was going to pay $3.5 million, and we see that on December 8th and December 22nd about $3.4 million went from Caritas to Wyckoff.

Is that correct?

MR. ZWERLING:  Are you referring Exhibit 12, the second page?

Q.   Yes.

---

McDonald

Then we have the Ross contract as of December 28th and Ross promised to pay $5 million, on December 29th Exhibit 12 reflect four and a half million going from Caritas to Wyckoff.

Was it the case that Mr. McNeil was using the AUC funds, the $3.5 million to make the 3.4 million transfer and the Ross $5 million to make the December 29th four and a half million dollars transfer?

MR. ZWERLING:  Only if you know.

A.   I don't remember, I don't recall.

Q.   Were there other sources of funds available to Caritas at that time for Mr. McNeil to make those transfers?  Let me preface that question for a second.

The Caritas transaction closed December 1st, 2007, right?

A.   Yes.

Q.   Did Wyckoff have access to Caritas funds at any time before January 1st, 2007?

MR. ZWERLING:  You gave the wrong date.

MR. TZANETOPOULOS:  I'll start

---

McDonald

over.  Strike that.

Q.   The Caritas purchase closed January 1st, 2007.

Is that correct?

A.   Yes.

Q.   Did Wyckoff have access to Caritas' funds at any time before January 1st, 2007?

A.   I don't recall the exact date, but there was a period of time where because there was no Caritas until it was provided by New York State where there were expenses related to the acquisition that were being paid for by Wyckoff with the understanding that the money that Wyckoff was laying out would eventually be returned, these were in the millions of dollars.  And then there were additional expenses that Wyckoff began assuming for the closing of the deal prior to January 1st.  The establishment of the business office began in Fall 2006, definitely long before the close took place there was money that was being sent by Wyckoff prior to January 1st.

Q.   Those would be Wyckoff's

---

McDonald

expenditures of Wyckoff's funds, correct?

A.   They would be liabilities of the Caritas organization that were being paid for by Wyckoff.

Q.   That was Wyckoff's funds?

A.   Out of Wyckoff's funds they were limited.

Q.   My question is running the other direction which is before January 1st, 2007, did Wyckoff have access to Caritas' funds?

A.   They had access to funds once the funds were deposited and with the organization.

Q.   Is it your testimony that Wyckoff had access to --

A.   Caritas had access.

MR. ZWERLING:  The question was asking also for a specific time as to a specific time frame.  Not just generally; am I correct?

MR. TZANETOPOULOS:  Right, let me start again, this is a very precise question.

Q.   Let me, I'll be transparent in

---

20  (Pages 74 to 77)

78

McDonald

1  
2  what I am asking. Exhibit 12 reflects that
3  money was moved in December 2006 from Caritas
4  accounts to Wyckoff Heights Medical Center.
5  That's a period of time before the acquisition
6  of Caritas closed.
7       The question is did Wyckoff have
8  access to Caritas' funds before January 1st,
9  2007?
10      A.  I'm not sure, I don't think, I'm
11  not sure.
12      MR. ZWERLING:  Then that's the
13  answer.
14      A.  There should be an accounting --
15      MR. ZWERLING:  Do you know?
16      THE WITNESS:  I don't know.
17      MR. ZWERLING:  That's the answer.
18      Q.  Okay.
19      Are you aware of any source of
20  funds during December 2006 other than funds
21  received from AUC or Ross that Mr. McNeil
22  could have moved from Caritas to Wyckoff?
23      A.  I don't recall.
24      Q.  While on Exhibit 12 if I can
25  direct you to the e-mail on the first page of

79

McDonald

1  
2  the exhibit.
3      Mr. Gio we know, who was Neil
4  Benjamin?
5      A.  Neil Benjamin was an employee of
6  the Department of Health.
7      Q.  Edward Dowling?
8      A.  Was an employee of Brooklyn-Queens
9  Health Care.
10      Q.  What was Mr. Dowling's job?
11      A.  Strategic planning.
12      Q.  Mr. Hoffman we know, do you know
13  who DSB10 from the State, do you know who that
14  is?
15      A.  No.
16      Q.  DVW?
17      A.  I'm not sure.
18      Q.  Lora L-E-F-E-B-V-R-E?
19      A.  From the Department of Health.
20      Q.  MVG?
21      A.  Not sure.
22      Q.  And Richard Zall, Z-A-L-L?
23      A.  Attorney from Proskauer, Wyckoff's
24  attorney.
25      MR. TZANETOPOULOS:  Mark this

80

McDonald

1  
2  Exhibit 13, for identification.
3      (Plaintiff's Exhibit 13, e-mail
4  chain and attachment, marked for
5  identification, as of this date.)
6      Q.  When was all of this reported to
7  the State?
8      MR. ZWERLING:  When was all of what
9  reported to the State?
10      MR. TZANETOPOULOS:  The commingling
11  of funds.
12      MR. LOUGHLIN:  I object to the use
13  of the term commingling of funds.  I
14  think the document is actually headed
15  transfers, and I think the witness has
16  testified these were unauthorized
17  transfers leading to the termination of
18  the CFO.
19      Q.  When were these transfers in
20  Exhibit 12 reported to the State?
21      MR. LOUGHLIN:  I object as well,
22  you say the State in your exhibit which
23  is Exhibit 13.  There are references both
24  to the Dormitory Authority of the State
25  of New York and also the Department of

81

McDonald

1  
2  Health.
3      MR. TZANETOPOULOS:  Go ahead.
4      MR. LOUGHLIN:  The witness can
5  specify, but I don't know whether you're
6  referring to either the Dormitory
7  Authority or the Department of Health.
8      MR. TZANETOPOULOS:  You've made
9  your objection.
10      A.  As per this document, it was March
11  6th, 2007, the exact amounts were sent to
12  them.
13      Q.  Had the fact that funds been
14  transferred between entities been reported to
15  state agencies earlier than March 6th?
16      A.  I'm not sure, I don't recall.
17      Q.  All right.
18      Who was in charge on the hospital
19  side of interacting with the State concerning
20  this issue, the State Department of Health?
21      A.  It was a team.
22      Q.  Who was on that team?
23      A.  Dominick Gio, myself, Ed Dowling,
24  David Hoffman.
25      Q.  Did any of those people have

21 (Pages 78 to 81)

McDonald

1 principal day to day responsibility for the
2 interactions?
3    A.   The interactions weren't
4 day-to-day, they were week to week.  No set
5 time schedule, but as I can recall probably
6 once a week on average.
7    Q.   On your side was there someone who
8 was the principal liaison for communications
9 with the State Department of Health?
10    A.   It was again the phone calls, the
11 correspondence was usually everybody was cc'd,
12 so if you're looking for one person who headed
13 up the communications, probably me.
14    Q.   Let me show you what has been
15 marked as Deposition Exhibit 13.  It is an
16 e-mail string and attachment that has been
17 marked with Bates numbers BQHC07617 through
18 7623, and again so the record is clear, there
19 were a few attachments produced by the
20 defendants but to keep the size manageable, we
21 attached here only the one.  Go ahead, take a
22 look, let me know when you are ready.  I take
23 it back, we have attached two of the three
24 attachments.

McDonald

1    Q.   Where did you get that?
2    A.   From documents in the business
3 office, the legal documents, documents at the
4 executive offices.
5    Q.   Did you interview --
6    A.   Past history.
7    Q.   Did you interview any people?
8    A.   Not that I recall.
9    Q.   Did others interview people and
10 report the results of those interviews to you?
11    A.   The financial information would
12 have been provided for me, that likely would
13 have come from either Rich Sarli or Wah-Chung
14 Hsu or a combination of the two.
15    Q.   Any other interviews that were
16 reported to you as a source for this report?
17    A.   No, just a narrative that was
18 created by myself, written by myself.
19    Q.   Having reviewed it as you just
20 did, is there anything in this report prepared
21 in Exhibit 13 that you think now would be
22 inaccurate?
23    A.   At this point in time, there has
24 been too much time so I can't remember the

83

McDonald

1    Mr. Hsu's e-mails in the exhibit
2 have the subject line references to a Wyckoff
3 investigation report and relevant cash flows.
4    Is the attachment to the e-mail a
5 report that was prepared under your
6 supervision?
7    A.   I think I prepared it myself.
8    Q.   All right.
9    A.   If I remember correctly.
10    Q.   The attachment in Exhibit 13 is
11 your work?
12    A.   Yes.
13    Q.   What was the purpose of which you
14 prepared this report?
15    A.   To explain to the Dormitory
16 Authority and the Department of Health exactly
17 what the situation was leading up to the
18 present state of the situation at the business
19 office.
20    Q.   What were the sources of
21 information from which you drew when you
22 prepared this report?
23    A.   The information that was available
24 to me.

McDonald

1 accuracy of the numbers.  I remember the
2 document, I can't recall whether something
3 after reading it now whether it is accurate or
4 inaccurate.
5    Q.   Is the report that you prepared in
6 Exhibit 13 an accurate reflection of what you
7 knew at the time that you prepared the report?
8    A.   Yes.
9    Q.   When is it that you prepared the
10 report in Exhibit 13?
11    A.   I don't remember the exact date,
12 but if it was attached to the e-mail that was
13 sent out on February 22nd, I'm speculating
14 that it was prepared prior to the 22nd of
15 February.
16    Q.   If I can direct your attention to
17 the first page of your report in Exhibit 13,
18 that's the one that has the identification
19 number BQHC07619, and I would like to direct
20 your attention to the passages following the
21 heading anticipated potential periods of cash
22 shortage.
23    Do you see where I am?
24    A.   Yes.

85

86

McDonald

Q.   You write that, "The first period was anticipated just prior to the closing as some of the expenses related to the installation of the Caritas Meditech computer system and the development of the BQHC central business office would need to be paid. Wyckoff had longstanding relationships with two international medical schools that had expressed interest in investing in the Caritas project.  These preclosing cash needs were expected to be funded and were funded with prepaid Caritas clerkship fees."

It goes on to say Caritas received three and a half million from AUC and five million from Ross.  Is that correct that passage there that it was anticipated that, is it correct that the expenses for the installation of the Meditech computer system and the development of the Brooklyn-Queens Health Care central business office were expected to be funded and were funded with those prepaid clerkship fees?

A.   Yes.

And in addition to those funds

87

McDonald

there were Wyckoff funds that were allocated for the acquisition or the establishment of Brooklyn-Queens Health Care and Caritas, and then there were additional expenses in addition to the business office and computer expenses related to just closing the transaction.

Q.   At some point did one or more state agencies insist that Brooklyn-Queens Health Care Caritas and Wyckoff engage a restructuring consultant?

A.   Yes.

Q.   And what were the circumstances that led up to the State insisting that the hospitals do so?

A.   When Caritas and Wyckoff couldn't afford or didn't have the cash to carry the expenses of the organizations through this ramp up of the receivables period.  So there was a request made by Brooklyn-Queens Health Care to the Department of Health for assistance, and the Department of Health said that we will provide assistance but only if there is a restructuring officer in place.

88

McDonald

Q.   By assistance you mean the State provided money to the hospitals?

A.   Yes.

Q.   Were you part of the discussions with State agencies in which they insisted on a restructuring officer?

A.   Yes.

Q.   Which State agencies were involved in those discussions?

A.   The Dormitory Authority and the Department of Health, the Department of Health took the lead.

Q.   Okay.

What authority over the hospitals' operations did the State insist the restructuring officer be given?

A.   That they be given control, management control of the organization.

Q.   By organization, that's Brooklyn-Queens Health Care, Caritas and Wyckoff?

A.   Yes.

Q.   Did Brooklyn-Queens Health Care, Caritas and Wyckoff agree?

A.   Yes.

89

McDonald

Q.   Who was the restructuring consultant that was engaged in response to the states' demand?

A.   FTI Cambio.

Q.   What people did FTI Cambio supply in its role as restructuring consultant?

A.   They had a team of management staff, management and staff.

Q.   Who was in charge of that team?

A.   Tom singleton.

Q.   Once in place was Mr. Singleton in charge of the hospital organizations?

A.   Yes.

Q.   That would be each of Brooklyn-Queens Health Care, Caritas and Wyckoff?

Q.   He brought with him somebody named Paul Goldberg, did he not?

A.   Yes.

Q.   What was Mr. Goldberg's function while he was at the hospital organizations?

A.   I'm not sure of his exact title, but he acted as chief financial officer.

Q.   Once Mr. Singleton was in place at

23  (Pages 86 to 89)

90

McDonald

1    the hospital organizations, did all management
2    at Brooklyn-Queens Health Care, Wyckoff and
3    Caritas either report to Mr. Singleton or
4    through someone else to Mr. Singleton?
5        A.   Yes.
6        Q.   Let me shift gears on you.
7             At any time when you were on the
8    Wyckoff Board of Trustees, was a medical
9    school clerkship contract ever presented to
10   the board for approval or disapproval?
11       A.   I don't recall.
12       Q.   You testified earlier about a
13   request for assistance that triggered the
14   State's demand for a restructuring consultant.
15            How much did the State provide in
16   connection with that request for assistance?
17       A.   I wasn't involved with it at that
18   point in time and I can't recall exactly how
19   much was provided.
20       Q.   Would the ballpark be tens of
21   millions of dollars?
22       A.   Yes.
23       Q.   Did you perform any of the work in
24   connection with closing of the Caritas

91

McDonald

1    hospitals when they were making plans for
2    closure?
3        A.   The only involvement I had was to
4    find a hospital to accept two of their
5    patients that were having trouble.  So Wyckoff
6    took two of their patients that were difficult
7    to place, and we provided ambulance service
8    for both hospitals during the last few days of
9    operation.
10       Q.   All right.
11            Did you perform any other work in
12   connection with planning for closing or
13   closing the hospitals?
14       A.   No.
15            MR. TZANETOPOULOS:  Mark this
16   Exhibit 14, for identification.
17            (Plaintiff's Exhibit 14, minutes,
18   marked for identification, as of this
19   date.)
20            MR. TZANETOPOULOS:  Let's go off
21   the record.
22            (Time noted:  1:35 p.m.)
23            (Time noted:  1:44 p.m.)
24            MR. TZANETOPOULOS:  We are back on

92

McDonald

1    the record.
2        Q.   Mr. McDonald, the court reporter
3    has handed to you a document that he has
4    marked as Exhibit 14.  Exhibit 14 is the
5    minutes from the Wyckoff Heights Medical
6    Center Board of Trustees meeting of
7    December 20th, 2007.
8            Let's start with the first page.
9    Among the invited guests is someone named
10   Claire with an E, Mullally, Esq.
11           Who was Ms. Mullally?
12       A.   She is the corporate compliance
13   officer at Wyckoff.
14       Q.   You can take a look at much of
15   this as you would like.  Where I have a
16   question is at page four which continues a
17   report that begins on page three, the report
18   of chief restructuring officer, that's Mr.
19   Singleton.
20           Is that correct?
21       A.   Yes.
22       Q.   All right.
23           At page four the minutes reflect,
24   "Mr. Singleton reported that he along with Mr.

93

McDonald

1    Gio and Julius Romero had been negotiating
2    with Caribbean medical schools over the last
3    two months to generate additional cash for
4    Wyckoff and Caritas."  He stated that, "We
5    have been successful in both cases.  Wyckoff
6    received a wire transfer today from Ross
7    University in the amount of $4 million for
8    prepaid medical student clerkship rotations.
9    This should help relieve some of the cash flow
10   problems for Wyckoff.  He mentioned that
11   Caritas received $3.7 million last week from
12   Ross University."
13           Let's go back a step before I ask
14   a question about that.  At the beginning of
15   the minutes it reflects you were there; is
16   that correct?
17       A.   Correct.
18       Q.   Do you recall anybody at that
19   meeting objecting to Mr. Singleton entering
20   into these deals with Ross?
21       A.   No.
22       Q.   At any time when you were still at
23   Wyckoff did you have discussions with anybody
24   concerning the decision not to provide

94

McDonald

1
2 placement clerkships to Ross at Wyckoff when
3 the Caritas hospitals closed?
4      A.  I had concerns from the very
5 beginning that Wyckoff shouldn't be assuming
6 any of the debts of Caritas, and that there
7 should be protections in place to make sure
8 that none of those liabilities fell back to
9 Wyckoff; that was my position.
10     Q.  When the hospitals closed did you
11 talk, before we get there, when you stated
12 your position, to whom did you express that
13 position?
14     A.  I expressed it to the board, to
15 Dominick Gio, to the senior management team.
16     Q.  If we can refer back to Exhibit
17 10 which is the promissory note we looked
18 together at paragraph four, we know Mr. Gio
19 signed an agreement that said that, "Brooklyn-
20 Queens acknowledges and agrees it would
21 obligate Wyckoff as is reflected," right?
22     A.  Yes.
23     Q.  So Mr. Gio overrode your position
24 in that case?
25     A.  Correct.

95

McDonald

1
2      Q.  We know you signed an agreement
3 with Ross in Exhibit 1 that provides that,
4 "Absent in the event hospitals are not
5 operative and the university is not in
6 material breach of the agreement, BQHC agrees
7 to provide the university with an equivalent
8 number of clerkships as agreed to herein at
9 one or more of its other facilities."
10     MR. ZWERLING:  With the
11     understanding that the agreement speaks
12     for itself.
13     A.  I signed the document.
14     Q.  Mr. Gio I take it overrode you, if
15 your usual practice was followed in this case
16 too, correct?
17     A.  Well, it was my belief that
18 Wyckoff shouldn't be assuming liabilities for
19 Caritas, that was my belief.
20     DI
21     Q.  But if your usual habit in
22 connection with signing agreements was
23 following, Mr. Gio checked off on your signing
24 that contract.
25     Is that correct?

96

McDonald

1
2      MR. ZWERLING:  I object to the
3     question, I ask that you try to rephrase,
4     what exactly are you asking him?
5     MR. TZANETOPOULOS:  You don't even
6     have a place here to object so --
7     MR. ZWERLING:  Then don't answer
8     the question.
9     MR. LOUGHLIN:  I object, the
10     testimony he gave earlier was that it was
11     his usual practice to read a document
12     before signing it.  And he said that he
13     believed that he would not sign a
14     document if it hadn't been reviewed by
15     counsel and by Mr. Gio.
16     Q.  Does Mr. Loughlin have your view
17 correct?
18     A.  Yes.
19     MR. LOUGHLIN:  He said he had no
20     recollection of even signing this
21     document.
22     Q.  Let's go back to my original
23 question which started all of this fun.  Let
24 me start again.
25     At the time that the Caritas

97

McDonald

1
2 hospitals closed did you participate in any
3 discussions within the hospital organizations
4 concerning whether or not the placement of
5 clerkships to Ross University were to be
6 provided at Wyckoff?
7      A.  Not that I can remember.  And
8 very, I had very little involvement with the
9 closure of the Caritas hospitals.
10     Q.  In that early 2009 time frame when
11 Caritas hospitals closed, did you play any
12 part in the decision not to provide at Wyckoff
13 with placement clerkships for those that Ross
14 lost at the Caritas hospitals?
15     A.  I wasn't involved in the decision.
16     Q.  I'll tell you Mr. Garg, Rajiv Garg
17 said he was the person that made the decision,
18 he testified to that last week.
19     At any time before he did so did
20 he talk to you about any of the contract
21 negotiations concerning the original
22 affiliation agreement with Ross?
23     A.  No.
24     Q.  Did he talk to you at all about
25 the contract with Ross before he made his

25 (Pages 94 to 97)

98

McDonald

1
2  decision?
3      A.  No.
4      MR. TZANETOPOULOS:  Mark that
5  Exhibit 15, for identification.
6      (Plaintiff's Exhibit 15, minutes,
7  marked for identification, as of this
8  date.)
9      Q.  Page four is where I'm going to
10 ask, but take your time.
11     All set?
12     A.  Yes.
13     Q.  Mr. McDonald, the court reporter
14 has handed to you a document that he has
15 marked as Deposition Exhibit 15.  It is the
16 minutes to the January 10th, 2008 Wyckoff
17 Heights Board of Trustees meeting.  Again the
18 first page reflects that you were there.  If I
19 can direct your attention page four of the
20 exhibit, and in particular the passage
21 entitled chief restructuring officer.
22     The minutes recite that, "Ms.
23 Singleton reported as of January 1st, 2008
24 senior management employees from Wyckoff
25 Heights Medical Center were transferred to the

100

McDonald

1
2      A.  I don't recall.
3      Q.  If as the note suggests Caritas
4  had cash sufficient to make payroll for these
5  people, what was to be gained by switching
6  employees from the payroll of Wyckoff to
7  Caritas?
8      A.  From the inception of Caritas
9  before Caritas came into existence, Wyckoff
10 had assumed the business office from CMC, so
11 all of those employees were on the Wyckoff
12 payroll.  And there was a desire to keep them
13 on the Wyckoff payroll and not put them on the
14 appropriate hospitals because of union issues,
15 delegate issues.  So it was decided early on
16 that those employees would remain on the
17 Wyckoff payroll even though they were doing
18 work for Caritas, so over the years that
19 liability from Caritas to Wyckoff grew.
20     So instead of moving the business
21 office, rank and file staff onto the Caritas
22 payroll, Tom Singleton decided he would move
23 the Wyckoff senior staff over onto the Caritas
24 payroll to balance out the expenses.
25     Q.  Okay.

99

McDonald

1
2  Caritas payroll.  He stated it should be
3  understood that there is a commitment on the
4  part of Wyckoff to these employees and they'll
5  be hired back by Wyckoff in the event anything
6  should happen to Caritas.  Mr. Singleton
7  stated this particular move was made in order
8  to stem the growth and money owed by Caritas
9  to Wyckoff.  He went on to say there would be
10 an employer change for the employees working
11 with the central business office if anything
12 did happen to Caritas."
13     Were you one of the people who got
14 switched from Wyckoff to Caritas?
15     A.  Yes.
16     Q.  So this transfer discussed in the
17 minutes did take place?
18     A.  Yes.
19     Q.  What management employees were
20 transferred from Wyckoff's payroll to Caritas'
21 payroll?
22     A.  I don't remember exactly, there
23 was a list of senior executives, vice
24 presidents.
25     Q.  Approximately how many?

101

McDonald

1
2      Did Wyckoff's books and Caritas'
3  carry over the period you talked about, the
4  liability for those shared services?
5      A.  On the monthly basis there should
6  have been an accounting of whose on whose
7  payroll and doing work for which organization,
8  and at the end of each month it was supposed
9  to settle on who owed who.
10     Q.  The problem here was that Caritas
11 kept accruing liability but not paying
12 Wyckoff?
13     A.  Correct.
14     Q.  Which gets me back to my original
15 question that if Caritas had the cash to pay
16 the people who were transferred, what was to
17 be gained by transferring those people rather
18 than just simply having Caritas pay the cash
19 that it owed to Wyckoff, at least in those
20 sums?
21     A.  You would have to ask Tom
22 Singleton.
23     Q.  To your understanding was Wyckoff
24 a party to subordination agreements with
25 lenders to Caritas or Brooklyn-Queens Health

26  (Pages 98 to 101)

102

McDonald

1
2  Care which it would have breached had Wyckoff
3  received from Caritas payment of debts before
4  the lenders received theirs?
5      A.   Not that I'm aware of, not that I
6  can recall.
7      Q.   Was Mr. Singleton the sole
8  authority who made these decisions to transfer
9  these people?
10     A.  Yes.
11         MR. TZANETOPOULOS:  Mark this
12     Exhibit 16, for identification.
13         (Plaintiff's Exhibit 16, board
14     minutes, marked for identification, as of
15     this date.)
16     Q.  Ready?
17     A.  Yes.
18     Q.  All right.
19         Mr. McDonald, the court reporter
20  has handed you a document that he marked as
21  Exhibit 16.  It is a copy of the minutes for
22  the December 14th, 2006 Wyckoff Heights
23  Medical Center Board of Trustees.  We will see
24  page four there is some discussion of you
25  reporting to the board about the acquisition

103

McDonald

1
2  transaction.
3         That was a regular part of your
4  job at that time, I take it?
5      A.  Yes.
6      Q.  All right.
7         Where I have a question is on page
8  three of the minutes, the report of the
9  president to CEO.  The minutes say, "Mr.
10  Gio presented the new logos for Caritas and
11  Wyckoff Heights Medical Center.  He explained
12  that due to the acquisition of St. John's and
13  Mary Immaculate Hospitals, new companies had
14  to be formed, one of them being Brooklyn-
15  Queens Health Care which is the parent company
16  of Caritas and Wyckoff."
17         He went on to say that, "Caritas
18  was formed to be the license holder of St.
19  John's and Mary Immaculate Hospitals.  Mr. Gio
20  circulated the logos and asked for approval
21  from the board for the new logos."  And the
22  minutes reflect, "An action/recommendation on
23  a motion properly made by Mr. Cook seconded by
24  Dr. Rao all in favor of the logos for Caritas
25  and Wyckoff Heights Medical Center were

104

McDonald

1
2  unanimously approved by the Board of
3  Trustees."
4         Do you see where I am?
5      A.  Yes.
6      Q.  Is this correct sir, somebody
7  formed a foreign corporation and the only
8  thing that was approved was new logos?
9      A.  No, the corporations were
10  approved.
11     Q.  Who decided to form new
12  corporations for this transaction?
13     A.  Ultimately it is the board who
14  approves.
15     Q.  Were the corporations formed
16  before December 14th, 2006?
17     A.  I don't recall the exact date.
18         MR. TZANETOPOULOS:  Mark this
19     Exhibit 17, for identification.
20         (Plaintiff's Exhibit 17, employment
21     agreement, marked for identification, as
22     of this date.)
23         MR. TZANETOPOULOS:  Mark this
24     Exhibit 18, for identification.
25         (Plaintiff's Exhibit 18, amendment

105

McDonald

1
2  to agreement, marked for identification,
3  as of this date.)
4      Q.  Mr. McDonald, the court reporter
5  has marked as Exhibit 17 what looks to be an
6  employment contract for you, and as Exhibit 18
7  what looks to be an addendum to that contract.
8         Is Exhibits 17 in fact your
9  employment agreement with the hospital group?
10     A.  It was my contract, yes.
11     Q.  Is that your signature on the last
12  page?
13     A.  Yes.
14     Q.  Around the signature block I
15  should say?
16     A.  Yes.
17         MR. TZANETOPOULOS:  Let me fix the
18     exhibit, I'll make the record clear.
19     There has been some trouble stapling
20     exhibits so let me make the record clear.
21     Exhibit 17 is entitled employment
22     agreement, it is a four-page document
23     bears Bates numbers BQHC03941 through
24     03944.  And Exhibit 18 is a two-page
25     addendum with Bates numbers BQHC03945 and

27  (Pages 102 to 105)

106

McDonald

946.

Q.   Let's go back to 17, the last page is your signature?

A.   Yes.

Q.   Is that Mr. Gio on behalf of each of the three hospital entities?

A.   Yes.

Q.   Exhibit 18, is that your signature on the last page?

A.   Yes.

Q.   And Mr. Garg on behalf of Wyckoff?

A.   Yes.

Q.   Exhibit 17 reflects that the system which is defined as Brooklyn-Queens Health Care is your employer.

Do you know why that was done?

A.   Say that again.

Q.   Sure.  I tried to do some steps to save a little time, let me break them up.

Exhibit 17 says, "The agreement is made by and between Brooklyn-Queens Health Care, Inc which contract defines as the system, Wyckoff, Caritas" and you, Mr. McDonald.  Paragraph one, employment says,

107

McDonald

"The system shall employ employees, executives, vice presidents," it goes on.

Do you know why this contract was arranged so that the system or Brooklyn-Queens Health Care would be your employer?

A.   I was doing work for all three business entities.

Q.   The addendum in Exhibit 18 is dated May 22nd, 2008, in that case only Wyckoff is your employer.

Do you know why that changed?

A.   I moved back to Wyckoff in 2007 and I had no responsibilities once Tom Singleton came in, all of my responsibilities were related solely to Wyckoff.

Q.   Is there any discussion that you recall or any work that you performed concerning the contract between Brooklyn-Queens Health Care and Ross you haven't testified yet about today?

A.   Not that I can recall.

MR. TZANETOPOULOS:  Those are all the questions I have for Mr. McDonald at this time.

108

McDonald

MR. LOUGHLIN:  I just have one or two follow up questions just as a matter of clarification.

EXAMINATION BY MR. LOUGHLIN:

Q.   Directing your attention to Exhibit 12 on your deposition, I'll hand you my copy so you don't have to fish for it.

Is it your testimony that the amounts listed on this exhibit are at least as of the date of that exhibit an accounting of the unauthorized transfers done by Mr. McNeil?

A.   Yes, it is an accounting, it is my an accounting that was done by Wah-Chung Hsu to identify the transactions that went back and forth between the business entities that were inappropriate transfers of funds.

Q.   And when those inappropriate transfers came to light, what happened to Mr. McNeil?

A.   He was terminated.

Q.   By whom?

A.   By myself, I terminated him.

Q.   Acting under the authority of the

109

McDonald

Board of Trustees and Wyckoff?

A.   Acting under --

MR. TZANETOPOULOS:  Objection, legal conclusion.

A.   Acting under the approval of the president and CEO.

Q.   Mr. Gio?

A.   Yes.

Q.   You testified earlier that it was your position from the beginning of the acquisition of the Caritas hospitals that liabilities or obligations of Caritas should not flow to Wyckoff.

Is that correct?

A.   Correct.

Q.   Were there other members of senior management at Wyckoff and members of the Board of Trustees who also shared that position?

A.   Yes.

Q.   Would you say that was essentially the position of Wyckoff?

MR. TZANETOPOULOS:  Objection, conclusion, foundation.

Q.   You can answer.

28  (Pages 106 to 109)

110

McDonald

1
2   A.   Yes.
3       MR. LOUGHLIN:  I have nothing
4   further.
5   CONTINUED EXAMINATION BY
6   MR. TZANETOPOULOS:
7       Q.   Notwithstanding that testimony, we
8   can agree Mr. Gio signed at least one contract
9   that you know of that violated that.
10      Is that correct?
11      A.   Yes.
12      MR. LOUGHLIN:  Objection, calls for
13  legal conclusion.
14      Q.   You signed a contract that said --
15      MR. ZWERLING:  Exhibit 1.
16      Q.   -- "In the event hospitals are not
17  operative and the university is not in
18  material breach of the agreement, BQHC agrees
19  to provide the university with an equivalent
20  number of clerkships as agreed to herein in
21  one or more of its other facilities."
22      Is that correct, you signed one
23  that said that?
24      MR. LOUGHLIN:  Objection.
25      A.   I signed that.

111

McDonald

1
2       Q.   At any time have you ever heard
3   anybody at Brooklyn-Queens Health Care or
4   Caritas or Wyckoff suggest that any of the
5   hospital entities return Ross' funds because
6   these contracts violated any position of the
7   hospital entities?  Let me qualify that.
8       Have you ever heard anybody from
9   any of the hospital entities suggest that the
10  funds should be returned to Ross?
11      A.   Not that I can recall.
12      Q.   We can agree Ross' funds were
13  spent.
14      Is that correct?
15      A.   Correct.
16      MR. LOUGHLIN:  I object, this has
17  been asked and answered, it really is
18  just rhetorical, argumentative questions.
19      MR. TZANETOPOULOS:  That's all I
20  have, we are done, signature.
21      Mr. McDonald, your call, you have a
22  right if you wish to have the transcript,
23  to review the transcript when it is
24  written up, make corrections and sign it,
25  and/or you can rely upon the court

112

McDonald

1
2   reporter to have transcribed it
3   accurately and waive signature.  That's
4   entirely the decision of you and your
5   counsel.
6       MR. ZWERLING:  We will take a look
7   at it.
8       MR. TZANETOPOULOS:  Signature
9   reserved, thank you.
10      Off the record.
11      (Whereupon, an off-the-record
12  discussion was held.)
13      (Time noted: 2:19 p.m.)

113

McDonald

1
2   C E R T I F I C A T E.
3
4   UNITED STATES DISTRICT COURT:
5   EASTERN DISTRICT OF NEW YORK:
6
7   Before me, this day, personally appeared
8   HAROLD McDONALD, who, being duly sworn, states
9   that the foregoing transcript of his
10  Deposition, taken in the matter, on the date,
11  and at the time and place set out on the title
12  page hereof, constitutes a true and accurate
13  transcript of said deposition.
14
15
16      HAROLD McDONALD
17
18  SUBSCRIBED and SWORN to before me this
19  _____ day of _____, 2011, in the
20  jurisdiction aforesaid.
21
22
23
24  _____    _____
25  My Commission Expires    Notary Public

29 (Pages 110 to 113)

114

```
1              McDonald
2          C E R T I F I C A T E
3   STATE OF NEW YORK   )
4               : ss.
5   COUNTY OF NEW YORK  )
6
7      I, Jeremy Frank, a Notary Public within
8   and for the State of New York, do hereby
9   certify:
10     That HAROLD McDONALD, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by the witness.
14     I further certify that I am not related
15  to any of the parties to this action by blood
16  or marriage, and that I am in no way
17  interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereby
19  set my hand on the 27th day of June, 2011.
20
21         _____
22         JEREMY FRANK, MPM
23
24
25
```

115

```
1              McDonald
2   ----------------- I N D E X ----------------
3
4   WITNESS        EXAMINATION BY      PAGE
5   MR. McDONALD      MR. TZANETOPOULOS 5, 110
6            MR. LOUGHLIN    108
7
8   ----------- INFORMATION REQUESTS -----------
9
10  DIRECTIONS:      Page 95
11
12  ------------------ EXHIBITS ----------------
13
14  Plaintiff's 1    Affiliation agreement  19
15  Plaintiff's 2    8/21/06 letter Gio to
16           Dr. Perri       19
17  Plaintiff's 3    8/21/06 letter Gio to
18           Tien        19
19  Plaintiff's 4    11/13/06 e-mail Romero
20           To Dr. Perri and amendment
21           To contract     35
22  Plaintiff's 5    12/06 e-mail chain
23           Between Dr. Perri and
24           Romero      36
25           (Exhibits continued)
```

116

```
1              McDonald
2   Exhibits continued:
3
4   Plaintiff's 6    12/06 e-mail chain
5           Between St. James and
6           Romero      39
7   Plaintiff's 7    E-mail chain and
8           Affiliation agreement  44
9   Plaintiff's 8    Amendment to affiliation
10          Agreement      50
11  Plaintiff's 9    Second amendment to
12          Affiliation agreement  50
13  Plaintiff's 10   Promissory note agreement
14          As of 12/1/06    51
15  Plaintiff's 11   7/30/07 memo Rucigay to
16          Senior cabinet   59
17  Plaintiff's 12   3/6/07 Hsu e-mail to
18          Group and attachment  71
19  Plaintiff's 13   2/22/07 e-mail chain and
20          Caritas organization
21          Period and start up  80
22  Plaintiff's 14   Wyckoff board minutes,
23          12/20/07      91
24
25          (Exhibits continued)
```

117

```
1              McDonald
2   Exhibits continued:
3
4   Plaintiff's 15   Wyckoff board minutes,
5           1/10/08     98
6   Plaintiff's 16   Wyckoff board minutes,
7           12/14/06      102
8   Plaintiff's 17   12/27/06 employment
9           Agreement      104
10  Plaintiff's 18   Addendum to employment
11          Agreement      104
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

30   (Pages 114 to 117)

118

```
1              McDonald
2       INSTRUCTIONS TO WITNESS
3
4       Please read your deposition over
5  carefully and make any necessary corrections.
6  You should state the reason in the appropriate
7  space on the errata sheet for any corrections
8  that are made.
9       After doing so, please sign the errata
10 sheet and date it.
11       You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14       It is imperative that you return the
15 original errata sheet to the deposing attorney
16 within thirty (30) days of receipt of the
17 deposition transcript by you.  If you fail to
18 do so, the deposition transcript may be deemed
19 to be accurate and may be used in court.
20
21
22
23
24
25
```

119

```
1              McDonald
2         *** ERRATA SHEET ***
3
   NAME OF CASE: ROSS v. BROOKLYN-QUEENS
4  DATE OF DEPOSITION:  June 27th, 2011
   NAME OF WITNESS:  McDonald
5  PAGE  LINE     FROM      TO
6     |      |          |          |
7     |      |          |          |
8     |      |          |          |
9     |      |          |          |
10    |      |          |          |
11    |      |          |          |
12    |      |          |          |
13    |      |          |          |
14    |      |          |          |
15    |      |          |          |
16    |      |          |          |
17    |      |          |          |
18
19       HAROLD McDONALD
20 Subscribed and sworn to before me
   this ____ day of _____, 2011.
21
   _____  _____
22 JEREMY FRANK    My Commission Expires:
23
24
25
```

31 (Pages 118 to 119)