# APPENDIX E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------X

ROSS UNIVERSITY SCHOOL OF

MEDICINE, LTD.,

               Plaintiff,

      -against-           Index No.:
                              09CIV1410

BROOKLYN QUEENS HEALTH CARE,

INC., and WYCKOFF HEIGHTS MEDICAL

CENTER,

               Defendants.

-------------------------------------------X

                  45 Rockefeller Plaza
                  11th Floor
                  New York, New York

                  July 1, 2010
                  10:12 p.m.


     EXAMINATION BEFORE TRIAL of

JULIUS ROMERO, a representative of the

Defendants in the above-entitled action,

taken on behalf of the Plaintiff, held at

the above time and place, and taken before

Binita Shrestha, a reporter and Notary

Public within and for the State of New York.

**2**

```
1    A P P E A R A N C E S :
2
3    BAKER HOSTETLER, LLP.
4        Attorneys for Plaintiff
5        45 Rockefeller Plaza, 11th Floor
6        New York, New York, 10111
7        Tel: 212-589-4200
8    BY: GEORGE J. TZANETOPOULOS, ESQ.
9
10   K & L GATES, LLP.
11       Attorneys for Defendants
12       599 Lexington Avenue
13       New York, New York, 10022
14       Tel: 212-536-3900
15   BY: WALTER P. LOUGHLIN, ESQ.
16
17   Also Present:
18       Michael Augusta - Legal Intern
19            K & L Gates, LLP.
20
21
22
23
24
25
```

**3**

```
1        IT IS HEREBY STIPULATED AND AGREED by
2    and between the attorneys for the respective
3    parties herein that the sealing, filing and
4    certification of the within deposition be
5    waived; that such deposition may be signed
6    and sworn to before any officer authorized
7    to administer an oath, with the same force
8    and effect as if signed and sworn to before
9    whom said deposition was taken.
10       IT IS FURTHER STIPULATED AND AGREED that
11   all objections, except as to form, are
12   reserved to the time of trial.
13       IT IS FURTHER STIPULATED AND AGREED that
14   counsel for the witnesses appearing herein
15   shall be furnished with a copy of the within
16   deposition without cost.
17
18
19
20
21
22
23
24
25
```

**4**

```
1            J. ROMERO
2    JULIUS ROMERO,
3        the witness herein, having first been
4        duly sworn by a Notary Public of the
5        State of New York, was examined and
6        testified as follows:
7    EXAMINATION BY
8    MR. TZANETOPOULOS:
9            (Documents premarked as Romero
10           Exhibits 1 through 7 for
11           identification as of this date.)
12   Q.  Please state your name for the
13   record.
14   A.  Julius Romero.
15   Q.  Please state your business address.
16   A.  Wyckoff Heights Medical Center, 374
17   Stockholm Street, Brooklyn, New York, 11237.
18   Q.  Mr. Romero, have you ever given a
19   deposition before?
20   A.  No.
21   Q.  Let me tell you a little bit -- I'm
22   sure Mr. Loughlin has talked to you but let
23   me tell you a little bit about what will
24   happen today.  I'll ask a series of
25   questions.  I'll ask you to answer them.  A
```

**5**

```
1            J. ROMERO
2    court reporter will write down what's said.
3    Because she is writing it down, just a few
4    rules that people sometimes forget:  You do
5    have to answer in words, so nodding your
6    head or saying uh-huh or uh-uh doesn't work.
7    You're likely to forget that.  Between the
8    two of us, we'll help you remember, but if
9    you can try that, it will be great, okay?
10   A.  Okay.
11   Q.  If at any time you need a break, let
12   us know.  I'll be happy to take one.  If you
13   don't understand me or don't hear my
14   question, just ask me to say the question
15   again, and I'll be happy to repeat it, okay?
16   A.  Okay.
17   Q.  What did you do to prepare for
18   today's deposition?
19   A.  Can you be more specific?
20   Q.  Sure.  Did you meet with anyone to
21   prepare for today?
22   A.  Yes.
23   Q.  With whom?
24   A.  With Mr. Loughlin.
25   Q.  Was anybody else present when you
```

6

```
 1              J. ROMERO
 2  met with Mr. Loughlin?
 3      A.  Yes.
 4      Q.  Who else was there?
 5      A.  Mr. Rober, R-O-B-E-R.
 6          MR. LOUGHLIN:  That's an
 7      associate of mine.
 8      Q.  Was anybody else present other than
 9  Mr. Loughlin and Mr. Rober?
10      A.  No.
11      Q.  Where did you meet them?
12      A.  At Wyckoff Heights Medical Center.
13      Q.  And for how long?
14      A.  About half a day.
15      Q.  Did you review documents to help
16  refresh your memory about events?
17      A.  Yes.
18      Q.  What documents did you look at?
19      A.  Some e-mails.
20      Q.  Anything else?
21      A.  I believe the contract.
22      Q.  Anything else?
23      A.  No.
24      Q.  Aside from Mr. Loughlin and Mr.
25  Rober, have you talked to anybody at the
```

7

```
 1              J. ROMERO
 2  hospital about the events to help refresh
 3  your recollection for today?
 4      A.  Yes.
 5      Q.  With whom did you speak?
 6      A.  David Hoffman.
 7      Q.  And in substance, what did you and
 8  Mr. Hoffman say to one another?
 9          MR. LOUGHLIN:  Objection.
10      That's privileged.  I instruct you
11      not to answer.
12          MR. TZANETOPOULOS:  I asked it
13      to refresh his recollection.
14          MR. LOUGHLIN:  You can't probe
15      communications between Mr. Romero
16      and the general counsel of the
17      hospital in preparation of his
18      testimony today.  That's privileged.
19          MR. TZANETOPOULOS:  Under Rule
20      612 it's admissible and it's
21      discoverable.
22          MR. LOUGHLIN:  I'm instructing
23      him not to answer just because you
24      phrased the question in a way to
25      trick him into saying that he spoke
```

8

```
 1              J. ROMERO
 2  to the general counsel about the
 3  subject of his testimony today
 4  doesn't affect the fact that it's
 5  privileged.
 6          MR. TZANETOPOULOS:  We can take
 7      that up later.
 8      Q.  Mr. Romero, other than Mr. Hoffman,
 9  did you speak to anyone at the hospital to
10  refresh your recollection about events?
11          MR. LOUGHLIN:  Objection to
12      form.
13          MR. TZANETOPOULOS:  You can
14      answer.
15          THE WITNESS:  What is the
16      question, please?
17      Q.  Sure.  You say you talked to Mr.
18  Loughlin, Mr. Rober, and Mr. Hoffman.  My
19  question is is there anybody else at Wyckoff
20  that you talked with to refresh yourself
21  about the events that might come up today?
22      A.  No.
23      Q.  Have you spoken with Harold McDonald
24  in the last week?
25      A.  No.
```

9

```
 1              J. ROMERO
 2      Q.  When is the last time that you did
 3  speak with Mr. McDonald?
 4      A.  About a month ago.
 5      Q.  And what was the topic of your
 6  conversation between you and he?
 7      A.  It was about hiring an attending
 8  physician for him at Kingsbrook.
 9      Q.  How old are you, sir?
10      A.  38.
11      Q.  What is your home address?
12      A.  2 Bay Club Drive, Bayside, New York.
13      Q.  What is the highest level of
14  education which you've attained?
15      A.  Bachelors.
16      Q.  Where did you take your Bachelor's
17  degree?
18      A.  New York University.
19      Q.  In what year did you receive that
20  degree?
21      A.  1995.
22      Q.  In what was your degree?
23      A.  Health administration.
24      Q.  If you could give us the short
25  version of the Julius Romero CV from when
```

3 (Pages 6 to 9)

10

J. ROMERO

1  you got out of school to the present?
2      A. I was employed at Wyckoff since
3  college, NYU, since 1990, intermittently
4  employed, laid off in '95 for six months,
5  went back to Wyckoff again. So it's pretty
6  much Wyckoff Heights Medical Center all
7  throughout, 21 years.
8      Q. You started at Wyckoff in 1990.
9  What was your position then?
10     A. I was a night clerk.
11     Q. What did you do?
12     A. Data entry for ER records.
13     Q. And then after the night clerk
14 position, what was next?
15     A. Manager of medical records.
16     Q. During what period of time did you
17 hold that position?
18     A. I believe '92 to '95.
19     Q. And the '95 layoff, was it from the
20 medical records position?
21     A. Yes. In '95 I worked at the Long
22 Island College Hospital.
23     Q. When did you return to Wyckoff?
24     A. October '95.

11

J. ROMERO

1      Q. When you returned to Wyckoff, in
2  what position were you employed?
3      A. Yes.
4      Q. What was your position then?
5      A. Manager of gastroenterology.
6      Q. What did you do as the manager of
7  gastroenterology?
8      A. I managed the GI unit of the
9  institution, and I did special projects for
10 the hospital.
11     Q. And when you say you managed the GI
12 unit, the day-to-day tasks, what does that
13 involve?
14     A. It would be payroll, billing,
15 scheduling, staffing.
16     Q. And the payroll and scheduling,
17 would that be payroll and scheduling for
18 staff or also for physicians?
19     A. Only staff.
20     Q. How long did you hold the position
21 as manager of the GI unit?
22     A. About five years.
23     Q. So until about 2000. What did you
24 do next?

12

J. ROMERO

1      A. In 2000 I was hired as coordinator
2  for medical education.
3      Q. How long did you hold that position?
4      A. A good two years.
5      Q. Give or take 2002?
6      A. 2002.
7      Q. What did you do as coordinator for
8  medical education?
9      A. I was asked to schedule and to form
10 affiliation agreements with medical schools
11 under my supervisor.
12     Q. Who was your supervisor?
13     A. Dr. Ken Freiberg, F-R-E-I-B-E-R-G.
14     Q. Did your position as coordinator for
15 medical education encompass tasks with
16 respect to residence, or just medical
17 students, or both?
18     A. It's both.
19     Q. Is it correct that at Wyckoff
20 Heights at the time, the hospital provided
21 clinical clerkship rotations for students
22 who were in medical school, correct?
23         MR. LOUGHLIN: Are you saying
24 around 2000?

13

J. ROMERO

1         MR. TZANETOPOULOS: 2000 to
2  2002.
3         THE WITNESS: Correct.
4      Q. Also, the hospital provided
5  residencies for graduates of the medical
6  schools also, correct?
7      A. Yes.
8      Q. And your job encompassed managing
9  schedules and affiliation contracts with
10 respect to both?
11     A. With respect to medical schools.
12     Q. Let me try it again. So you had
13 affiliations contracts with medical schools
14 for medical students, right?
15     A. Right.
16     Q. You scheduled medical students in
17 their rotations at Wyckoff?
18     A. For medical students, yes.
19     Q. What did you do with respect to
20 residency?
21     A. I assisted the director of medical
22 education in orientation, and scheduling,
23 and credits.
24     Q. And that director would be Dr.

4 (Pages 10 to 13)

14

J. ROMERO

1  Freiberg?
2     A. Correct.
3     Q. Is there anything else that your job
4  encompassed in the 2000-2002 time frame?
5     A. Just daily administrative tasks.
6     Q. In and around residency of medical
7  students?
8     A. That's correct.
9     Q. After being coordinator of medical
10 education, what was the next job?
11    A. Assistant director.
12    Q. Assistant director for medical
13 education?
14    A. That's correct.
15    Q. At the time, was there a department
16 of medical education or something like that
17 at Wyckoff?
18    A. Yes.
19    Q. What was the name of the department?
20    A. It's the department of medical
21 education.
22    Q. During what period of time were you
23 assistant director?
24    A. I believe 2002 to 2006.
25

15

J. ROMERO

1     Q. Did your tasks change at all with
2  the change of title?
3     A. It was, in my opinion, the same.
4     Q. Hopefully pay raise at least?
5     A. Yes.
6     Q. So better title, pay raise, but same
7  job?
8     A. It is the same job.
9     Q. During the period from 2002 through
10 2006 when you were a coordinator for medical
11 education and assistant director for medical
12 education at Wyckoff, did you do the actual
13 negotiating with medical schools for
14 affiliation agreements?
15    A. I was involved.
16    Q. During that period of time, who else
17 was involved?
18    A. My supervisor, Dr. Frieberg.
19    Q. Anybody else?
20    A. It would be our president and CEO at
21 that time.
22    Q. Is that Dominick Gio?
23    A. Yes.
24    Q. Anyone else?
25

16

J. ROMERO

1     A. From the hospital side, no.
2     Q. During that period of time, I take
3  it, it was Mr. Gio who had final say so on
4  your side on contract terms?
5        MR. LOUGHLIN:  2002 to 2006?
6        MR. TZANETOPOULOS:  Yes.
7        THE WITNESS:  Yes.
8     Q. Let's roll forward.  After the
9  assistant director for medical education,
10 what was your next job?
11    A. Assistant vice president.
12    Q. For medical education?
13    A. Yes.
14    Q. During what period of time were you
15 assistant vice president for medical
16 education?
17    A. 2006 to 2010.
18    Q. Did your job change at all with this
19 change of title?
20    A. Not in function.
21    Q. Did it change at all?
22    A. Yes.
23    Q. How did it change?
24    A. It was just more expansive
25

17

J. ROMERO

1  volume-wise as far as the demand for time
2  and hours spent.
3     Q. Is it correct then that the tasks
4  were the same but you got assigned more of
5  them?
6     A. Correct.
7     Q. To whom did you report when you were
8  assistant vice president for medical
9  education?
10    A. To the CEO, CFO, and the COO.
11    Q. So is it correct that once you
12 became assistant vice president for medical
13 education, you no longer reported to Dr.
14 Freiberg?
15    A. I still worked with Dr. Freiberg.
16    Q. My question is supervising and
17 reporting relationships.  Once you became
18 assistant vice president, was Dr. Freiberg
19 your boss, or the CEO, or CFO, or COO --
20    A. Yes, he was still my boss.
21    Q. What was Dr. Freiberg's title again?
22    A. He's vice president for medical
23 education and director of medical education.
24    Q. After the assistant vice president
25

5  (Pages 14 to 17)

J. ROMERO

18

1  for medical education position, what's next?
2  A. Associate vice president.
3  Q. How did your task change once you
4  became associate vice president for medical
5  education?
6  A. I had additional responsibilities.
7  Q. What were those?
8  A. Budgeting, departmental budgeting,
9  and physician payment.
10  Q. Any other additional
11  responsibilities?
12  A. No.
13  Q. Did you continue to have the
14  responsibility that you did before for
15  affiliation agreements and scheduling?
16  A. Yes.
17  Q. Is the associate vice president for
18  medical education position the one that you
19  hold today?
20  A. Yes.
21  Q. In any period of time did you hold a
22  position for Brooklyn Queens Health Care?
23  A. No, I'm not aware.
24  Q. And at any period of time, did you

J. ROMERO

19

1  hold a position for Caritas Health Care?
2  A. Yes.
3  Q. What was your position there?
4  A. Assistant vice president.
5  Q. For medical education?
6  A. Medical education.
7  Q. During what period of time did you
8  hold the position as assistant vice
9  president of medical education for Caritas
10  Health Care?
11  A. I believe 2007 until closure.
12  Q. Closure was February or March of
13  2009?
14  A. I'm not sure.
15  MR. TZANETOPOULOS:  Let's mark
16  these as Exhibits 8 and 9.
17  (Whereupon, the aforementioned
18  documents were marked as Romero
19  Exhibit 8 and 9 for
20  identification as of this date.)
21  Q. Mr. Romero, let me show you a
22  document that the court reporter has marked
23  as Exhibit 8.  It appears to be a paper
24  filed in the case in the United States

J. ROMERO

20

1  District Court Southern District of Florida
2  captioned American University of the
3  Caribbean and some others v. Caritas Health
4  Care.  It's a notice of filing supplemental
5  declaration of Julius Romero, and then
6  attached to the notice is the supplemental
7  declaration of Julius Romero.  I'll show you
8  that.  Take a minute to look at it and then
9  I'll have some questions.
10  A. Ready.
11  Q. Mr. Romero, have you had a chance to
12  review Exhibit Number 8?
13  A. Yes.
14  Q. And on page 2 of 2 of the affidavit,
15  is that your signature?
16  A. It is.
17  Q. This is a declaration that you
18  signed in connection with the lawsuit
19  between American University of the Caribbean
20  and Caritas, Wyckoff, and Brooklyn Queens
21  Health Care, is it not?
22  A. Yes.
23  Q. Are the statements set forth in the
24  this declaration correct?

J. ROMERO

21

1  A. Yes.
2  Q. Is it correct then that you were
3  assistant vice president for medical
4  education for Brooklyn Queens Health Care,
5  Inc.?
6  A. As stated on the document, yes.
7  Q. Is there any other way that you
8  were?
9  MR. LOUGHLIN:  If you don't
10  remember whether or not you were
11  ever appointed to that position, you
12  can say that, but just, you know,
13  explain to him whether you believe
14  at that time that you had that
15  position.
16  THE WITNESS:  At that time, I
17  believed I was working at Wyckoff
18  Heights Medical Center and Caritas
19  Health Care.
20  Q. My question, sir, is was there a
21  time that you signed the declaration in
22  Exhibit 9 as assistant vice president for
23  medical education for Brooklyn Queens Health
24  Care?

22

```
1                  J. ROMERO
2        A.  Yes, in that capacity.
3        Q.  Is it true that it is in your
4   capacity as assistant vice president for
5   medical education for Brooklyn Queens Health
6   Care that you oversaw the clinical clerkship
7   programs at Caritas's two hospitals and at
8   Wyckoff?
9        A.  Yes.
10       Q.  You were aware, were you not, at the
11  time you signed the declaration marked
12  Exhibit 8 that Wyckoff and Brooklyn Queens
13  Health Care and Caritas Health Care were in
14  a lawsuit with the American University of
15  the Caribbean?
16       A.  Yes.
17       Q.  You knew that AUC was looking to
18  recover money from Caritas, and Wyckoff, and
19  BQHC, correct?
20       A.  Could you restate that question?
21       Q.  At the time you signed this, you
22  knew that AUC was suing to get money from
23  the hospitals.
24       A.  I knew that AUC was suing for money
25  from Caritas.
```

23

```
1                  J. ROMERO
2        Q.  Did you know that they wanted money
3   from Wyckoff and Brooklyn Queens also?
4        A.  I don't remember.
5        Q.  When you signed this declaration,
6   did you understand it to be the case that
7   the declaration would be filed to support
8   the hospital's position in this lawsuit,
9   this lawsuit being the AUC lawsuit?
10       A.  No, I have a vague recollection of
11  the time when I signed the declaration.
12       Q.  Did you know what this declaration
13  was going to be used for?
14       A.  In a limited way, yes.
15       Q.  What did you understand its purpose
16  to be?
17       A.  It would be used by our counsel to
18  attest to the clerkship placements made to
19  AUC students.
20       Q.  Did you understand at the time that
21  you signed it that what was said in here
22  must be true?
23       A.  Correct.
24       Q.  And you understood at that time that
25  if it were untrue, you were stating this
```

24

```
1                  J. ROMERO
2   under the penalty of perjury?
3        A.  Yes.
4        Q.  Mr. Romero, let me show to you a
5   document that the court reporter has marked
6   as Exhibit Number 9.  Exhibit 9 is a
7   different notice of filing supplemental
8   declaration of Julius Romero, and the
9   caption is American University of the
10  Caribbean and others versus Caritas Health
11  Care and others pending in the United States
12  District Court for the Southern District of
13  Florida and attached to that another and
14  different supplemental declaration of Julius
15  Romero.  Again, sir, take a moment to look
16  at that and I'll ask you questions.
17       A.  Okay.
18       Q.  Mr. Romero, have you had a chance to
19  review Exhibit Number 9?
20       A.  Yes.
21       Q.  On page 7 of 7 of the declaration,
22  is that your signature?
23       A.  Yes.
24       Q.  And again, you understood, at the
25  time you signed this, that you were making
```

25

```
1                  J. ROMERO
2   these statements under penalty of perjury?
3        A.  Yes.
4        Q.  Are the statements in the
5   declaration marked Exhibit 9 true?
6        A.  Yes.
7        Q.  If I can direct your attention,
8   please, to paragraph 6 of your declaration,
9   it says, "As I stated in my original
10  declaration, I was directly involved in the
11  negotiations that led to the execution of a
12  December 1, 2006 promissory note agreement
13  between Defendant Caritas and Plaintiff
14  American University of the Caribbean."  Is
15  that correct?
16       A.  Yes.
17       Q.  Who else from the hospital side was
18  involved in those negotiations?
19       A.  Our general counsel, Mr. Hoffman.
20       Q.  David Hoffman?
21       A.  Yes, our COO at that time, Harold
22  McDonald, our CEO at that time, Dominick
23  Gio, our CFO at that time, Wah Chung Hsu,
24  W-A-H, C-H-U-N-G, H-S-U, and the Caritas
25  CFO, Richard Sarli, S-A-R-L-I, from Caritas
```

7  (Pages 22 to 25)

26

J. ROMERO

1   J. ROMERO
2   Planning.
3      Q.  Anybody else from the hospital side?
4      A.  In a limited way, Dr. Freiberg.
5      Q.  Anybody else?
6      A.  None that I can recall.
7      Q.  How about for the American
8   University of the Caribbean, with whom did
9   you deal with from AUC?
10     A.  Cynthia Holden, counsel; the
11  clinical dean, I can't recall his name,
12  sorry; their clinical manager at that time,
13  I don't have the name; Mr. Yife Tien, and
14  there was another lawyer, I believe, Robert
15  Black.
16     Q.  As indicated in paragraph 6 of your
17  declaration, those negotiations did in fact
18  lead to the execution of the December 1,
19  2006 promissory note agreement, correct?
20     A.  Correct.
21     Q.  Mr. Romero, I have handed to you a
22  document that the court reporter has marked
23  as Deposition Exhibit Number 4 entitled
24  Promissory Note, December 1, 2006.  Is
25  deposition Exhibit 4 the promissory note to

27

J. ROMERO

1   J. ROMERO
2   which you referred in paragraph 6 of the
3   declaration?
4      A.  I believe this is the promissory
5   note.
6      Q.  If I could refer back to the
7   declaration, Exhibit 9, and in particular to
8   paragraph 10 of your declaration, I'm
9   summarizing, it says that from the inception
10  of the AUC Caritas relationship of December
11  2006, 50 of the -- let me just ask you this:
12  Caritas owned, did it not, two hospitals?
13     A.  Operated two hospitals.
14     Q.  And those hospitals were Mary
15  Immaculate Hospital and St. John's Hospital,
16  correct?
17     A.  Yes.
18     Q.  Who owned those hospitals?
19     A.  I didn't know.
20     Q.  Did Caritas operate any other
21  hospitals other than Mary Immaculate
22  Hospital and St. John's?
23     A.  Not to my knowledge.
24     Q.  Is it correct that during the 2006
25  to March 2008 time frame, there were only

28

J. ROMERO

1   J. ROMERO
2   100 medical student core clerkships at the
3   two Caritas hospitals?
4      A.  Yes.
5      Q.  Were there more than 100 core
6   clerkships ever provided at those two
7   hospitals during that time frame?
8      A.  No.
9      Q.  Is it also correct that for core
10  clerkships, only two medical schools
11  provided medical students for those
12  rotations?
13     A.  Only two to my knowledge.
14     Q.  And that was Ross University School
15  of Medicine and the American University of
16  the Caribbean; is that correct?
17     A.  That's correct.
18     Q.  How many elective clerkship
19  rotations were offered at St. John's and
20  Mary Immaculate?
21     A.  It varied.
22     Q.  What was the range?
23     A.  The range would be 20 to 50 to my
24  recollection.
25     Q.  Did the American University of the

29

J. ROMERO

1   J. ROMERO
2   Caribbean send its students through those
3   elective clerkships?
4      A.  At certain times.
5      Q.  Did Ross?
6      A.  Yes.
7      Q.  Were there any other medical schools
8   that had students for elective rotations at
9   the Caritas hospitals?
10     A.  Yes.
11     Q.  Which other schools?
12     A.  New York Medical College.
13     Q.  How many clerks at any given time
14  did you have from New York Medical College?
15     A.  I don't know.  I didn't operate
16  them.  I didn't place them.
17     Q.  Who did the placing of medical
18  schools for clerkships at the two Caritas
19  hospitals?
20     A.  I believe at that time New York
21  Medical College.
22     Q.  And from the hospital side, who made
23  the arrangements?
24     A.  I don't know.
25     Q.  Administratively did the New York

30

J. ROMERO

1 college clerks run outside the ambit of your
2 group?
3     A.  They were absolutely separate and
4 distinct.
5     Q.  So when you were assistant vice
6 president for medical education for BQHC,
7 you had a group of clerks for whom you had
8 administrative responsibility, and New York
9 Medical did their own thing; is that
10 correct?
11     A.  That's correct.
12     Q.  For those that you had
13 responsibility for, were the only two
14 schools who had clerks at the Caritas
15 hospitals Ross and AUC?
16     A.  From my recollection, yes.  Every
17 now and then, physicians would bring in an
18 observer or two, which did not go through my
19 office, which I objected to.
20     Q.  Is it correct that the only medical
21 student clerks at the Caritas hospitals for
22 whom any BQHC affiliate was paid by a
23 medical school were from AUC or from Ross?
24     A.  From my recollection, yes.

31

J. ROMERO

1     Q.  Mr. Romero, let me show you two
2 documents that the court reporter has marked
3 as Exhibits 1 and 2.  Have you had a chance
4 to look at Exhibits 1 and 2?
5     A.  Yes.
6     Q.  Exhibit 1 is a letter dated
7 August 21st, 2006, from Dominick Gio,
8 president and chief executive officer of
9 Wyckoff Heights Medical Center to Yife Tien,
10 chief executive officer of the American
11 University of the Caribbean.  It's been
12 marked with Bates numbers ROSS 0607 and ROSS
13 0608.  Exhibit 2 is an August 21st, 2006,
14 letter from Dominick Gio, president and
15 chief executive officer of Wyckoff Heights
16 Medical Center to Nancy Perri, vice
17 president, academic affairs, Ross University
18 School of Medicine.  Mr. Romero, did you work
19 on preparing these offer letters?
20     A.  No.
21     Q.  Who put these together?
22         MR. LOUGHLIN:  If you know.
23         THE WITNESS:  I don't.
24     Q.  Before August 21st, 2006, had you,

32

J. ROMERO

1 either on your own or with anybody else,
2 worked on plans for prepaid clinical
3 rotation contracts for the Caritas
4 hospitals?
5     A.  No.
6     Q.  Did you know who did?
7     A.  From what I recall, it was Dominick
8 Gio and Harold McDonald.
9     Q.  And at that time, Mr. Gio was
10 president and chief executive officer of
11 Wyckoff, wasn't he?
12     A.  Yes.
13     Q.  And Mr. McDonald was chief operating
14 officer of Wyckoff.
15     A.  Yes.
16     Q.  Do you know if offer letters like
17 Exhibits 1 and 2 went to any other medical
18 schools?
19     A.  Yes.
20     Q.  Which schools did they go to?
21     A.  From what I recall, St. Matthews
22 University, and Hope Medical Institute.
23     Q.  Any other schools?
24     A.  No, none that I can recall.

33

J. ROMERO

1     Q.  Now, you said you worked on the
2 negotiations that led up to the AUC
3 agreement.  Did you also work on the
4 negotiations that led up to the agreement
5 with Ross?
6     A.  Yes.
7     Q.  Who directed you to work on those
8 agreements or on these negotiations?
9     A.  Mr. Gio and Mr. McDonald.
10     Q.  What was your role in the
11 negotiations with Ross?
12     A.  In my terms, a liaison for messages
13 between the hospital and the school.
14     Q.  What was your role in the
15 negotiations with American University of the
16 Caribbean?
17     A.  It would be the same way, as a
18 liaison.
19     Q.  For the hospital side of things,
20 were you the business person with
21 decision-making authority on deal points in
22 these negotiations?
23     A.  No.
24     Q.  For the hospital side, let's talk

9  (Pages 30 to 33)

34

J. ROMERO

1  for a moment about the negotiation with
2  Ross, and then we'll talk about AUC, but
3  with respect to negotiations leading up to
4  the Ross contract, was it the usual practice
5  on the hospital side, when a substantive
6  deal point came up, that you got direction
7  either from Mr. Gio or Mr. McDonald to
8  transmit to Ross?
9     A. I would always check on deal points
10  with my superiors.
11     Q. Which people?
12     A. Mr. Gio, Mr. McDonald, at times Dr.
13  Freiberg, Mr. Hoffman, and even sometimes
14  the chairman, chairman of the clinical
15  services involved in teaching the medical
16  students.
17     Q. Who was that person?
18     A. For medicine it would be doctor
19  Chandra Pradeep, C-H-A-N-D-R-A,
20  P-R-A-D-E-E-P.
21     Q. Anybody else?  Was there
22  Dr. Denton involved here?
23     A. That's for the Caritas side later
24  on. The answer is no.

35

J. ROMERO

1     Q. Well, on the hospital side in terms
2  of money, price, interest, guarantees --
3  would it be fair, as a general matter, to
4  call those commercial terms of these
5  contracts?
6        MR. LOUGHLIN:  Objection, form.
7     Q. In terms of price, the amount of the
8  money to be prepaid and guarantees that were
9  involved, who were the business people on
10  the hospital side that had decision-making
11  authority about those kinds of terms?
12     A. It would be the CEO, COO, and CFO.
13     Q. Mr. Gio, Mr. McDonald, and Mr.
14  Sarli?
15     A. And Mr. Hsu, H-S-U.
16     Q. Anybody else?
17     A. None that I can recall.
18     Q. Now, in your negotiations with
19  American University of the Caribbean, would
20  that be the same arrangement, those were the
21  four people who would have decision-making
22  authority about the price, deposits,
23  interest, and guarantees?
24     A. Yes.

36

J. ROMERO

1     Q. Let's talk about the AUC promissory
2  note again, that's Exhibit 4.  Mr. Loughlin
3  pointed to this part earlier but what I
4  would like to direct your attention in
5  Exhibit 4 is paragraph 4 on page 6 of 10.
6  If I could direct your attention to the
7  signature page, the last page of the
8  exhibit.  Is that Mr. Gio's signature for
9  each of Brooklyn Queens Health Care, and
10  Caritas Health Care Planning, and Wyckoff
11  Heights Medical Center?
12     A. I believe so.
13     Q. Paragraph 4 on page 6 of 10 reads,
14  "Brooklyn Queens acknowledges and agrees on
15  behalf of its wholly-owned subsidiary,
16  Wyckoff, that a default, as defined in
17  section 2 paragraph 5 herein, by Brooklyn
18  Queens, Caritas, MIH, and SJQH collectively
19  during the term of the note agreement will
20  obligate Wyckoff to assume responsibility to
21  this note agreement," and then it goes on to
22  talk about what the responsibilities are. In
23  your role as liaison on in this negotiation,
24  did you have discussions about this term or

37

J. ROMERO

1  something like that with AUC?
2     A. I had some vague discussions with
3  the clinical director of AUC.
4     Q. Who was that person?
5     A. I don't remember her name.
6     Q. Were those discussions in person, by
7  telephone, by e-mail?
8     A. In person and by telephone.
9     Q. And however your recollection works,
10  it works.  Can you recall any of those
11  distinctly or just the topic never just
12  merged together?
13     A. Just a general discussion on
14  placement of students should they require
15  students to be placed at Wyckoff.
16     Q. In substance, what do you recall
17  about those discussions, what you said to
18  them and what they said to you?
19     A. At that time AUC had an agreement at
20  Wyckoff, and at that time I informed the
21  clinical manager, the lady that I was
22  speaking with, that she can place her
23  students at Wyckoff should anything occur
24  with Caritas.

10  (Pages 34 to 37)

**38**

J. ROMERO

1
2  Q.  Is there anything else of substance
3  that you recall concerning your discussions
4  with AUC of the topic matter set forth in
5  paragraph 4?
6  A.  I just recall she did -- I do recall
7  she did say that she was discussing this
8  with her superiors including at that time
9  Mr. Tien and Cynthia Holden.
10  Q.  Is there anything else that you
11  recall with the substance of those
12  discussions?
13  A.  No.
14  Q.  Were you present when anybody else
15  on behalf of the hospital discussed this
16  topic matter with the folks at AUC?
17      MR. LOUGHLIN:  Do you understand
18  the question?
19      THE WITNESS:  If you could
20  restate the question, please?
21  Q.  Sure.  We've talked about the
22  discussions you personally had with AUC
23  about the topic in paragraph 4.
24  A.  Right.
25  Q.  The next question is were you

**39**

J. ROMERO

1
2  present when anybody else from the hospital
3  talked to AUC about that topic?
4  A.  Not about the topic.
5  Q.  Were you involved in any way in the
6  exchange of drafts between AUC and the
7  hospitals for this promissory note as it was
8  negotiated?
9  A.  Yes.
10  Q.  What I would like to talk about is
11  once the parties get close and then
12  ultimately agree to a draft, the mechanism
13  by which it got to Mr. Gio to sign, did
14  somebody send that to you to give to Mr. Gio
15  or did that happen elsewhere?
16  A.  All drafts were transmitted to
17  Wyckoff via fax or e-mail.  If it's e-mail,
18  either through my office or Mr. Hoffman's
19  office.
20  Q.  In this case, Exhibit 4, were you
21  the one that presented it to Mr. Gio to be
22  signed?
23  A.  I don't recall.
24  Q.  Mr. Romero, I have handed to you a
25  document that the court reporter has marked

**40**

J. ROMERO

1
2  as Exhibits Number 5, 6, and 7.  Number 5 is
3  entitled Affiliation Agreement between Ross
4  University School of Medicine and Brooklyn
5  Queens Health Care.  Exhibit 6 is entitled
6  Amendment to Affiliation Agreement between
7  Ross University School of Medicine and
8  Brooklyn Queens Health Care.  Exhibit 7 is
9  the Second Amendment to the Affiliation
10  Agreement between Ross and Brooklyn Queens
11  Health Care.  Did you work on each of these
12  agreements in some respect?
13  A.  Yes.
14  Q.  I would like to direct your
15  attention to the signature page of
16  Exhibit 6, that's the amendment.  Is that
17  your signature in the signature block on the
18  last page?
19  A.  Yes.
20  Q.  If I could direct your attention to
21  the signature block in Exhibit 7, on
22  Exhibit 7 there is a signature block at the
23  end of the amendment on the page with
24  identification number BQHC 42915.  Is that
25  you?

**41**

J. ROMERO

1
2  A.  Yes.
3      MR. LOUGHLIN:  I don't know if
4  you intended it, but Exhibit 7 does
5  include, in addition to the second
6  amendment, a side letter.  I just
7  called it to your attention.  I
8  didn't know whether you wanted it
9  included.
10  Q.  Have you signed affiliation
11  agreements on behalf of any of the BQHC
12  affiliated entities -- strike that.
13      On behalf of BQHC or any of the
14  affiliated entities, have you signed
15  affiliation agreements with medical schools
16  other than the two we've just looked at?
17  A.  No.
18  Q.  In Exhibit 6, who directed you to
19  sign that?
20  A.  To my recollection, it was Mr.
21  Singleton.
22  Q.  And in Exhibit 7, who directed you
23  to sign the amendment where you signed on
24  Exhibit 7?
25  A.  That's correct.

11  (Pages 38 to 41)

42

J. ROMERO

Q. The question was who directed you?

A. Thomas Singleton.

MR. LOUGHLIN:  Just so the testimony is clear, because there may have been a little bit of a misunderstanding there, I think the testimony was that Mr. Singleton instructed Mr. Romero to sign Exhibit 6 and Exhibit 7.

Q. Is that correct?

A. That's correct.

Q. During the time that Mr. Singleton was at the hospitals -- and we'll talk about that in more detail, but let's focus on that period of time when we're talking signatures. Now, during the time that Mr. Singleton was at the hospitals, did he sign other medical school affiliation agreements or their amendments?

A. None that I can recall.

Q. During the time that Mr. Singleton was at the hospitals, did any of the hospitals enter into amendment affiliation agreements for medical student clerkships?

43

J. ROMERO

A. I just want to capture that question one more time.

Q. I'll ask it in a more precise form. You've said Mr. Singleton signed these two. I'm just wondering if there were any others. So let me ask a question that captures that. During the time that Mr. Singleton was at the hospital, were there any other affiliation agreements or amendments to affiliation agreements that were executed on behalf of any of the affiliated hospital entities?

A. I don't remember.

Q. Up until the time in December 2006 when the AUC promissory note was executed, had Wyckoff entered into prepaid contracts with medical schools for clerkships or was that the first prepaid deal?

A. 2006 was the first prepaid.

Q. So AUC was the first?

A. Yes.

Q. I take it Ross was the second.

A. Ross was the second.

Q. There has been other testimony in

44

J. ROMERO

this matter to the effect that the Caritas acquisition closed 1st of January 2007. At that time, at the closing in 2007, were the only prepaid contracts for clerkships at the Caritas hospitals the promissory note with AUC and the Ross contract?

A. Yes.

Q. Throughout the time when the Caritas hospitals were open, did that continue to be true that Ross and AUC were the only ones that had prepaid deals?

A. Yes.

(Romero Exhibit 10 marked for identification as of this date.)

Q. Mr. Romero, the court reporter has handed you a document that has been marked as Deposition Exhibit Number 10. Exhibit 10 is an e-mail chain and attachment marked with identification numbers ROSS 009216 through ROSS 009223.

MR. LOUGHLIN:  In the copy of the exhibit, I have the just one e-mail.

MR. TZANETOPOULOS:  There is one

45

J. ROMERO

from Mr. Romero to Dr. Perri and one from Dr. Perri to Mr. Perri.

MR. LOUGHLIN:  Oh, I see.

Q. Have you had an opportunity to review Exhibit 10?

A. Yes.

Q. Before we start on the exhibit, did you know Dr. Nancy Perri before August of 2006?

A. Yes.

Q. How did you know Dr. Perri?

A. I knew Dr. Perri as the clinical dean of Ross University.

Q. Ross had, did it not, medical students doing clerkship rotations at Wyckoff before any of the Caritas deals?

A. Yes.

Q. And was it in connection with your work placing and supervising at medical students at Wyckoff that you knew Dr. Perri?

A. Yes.

Q. Up until then or up until the negotiations for the Ross affiliation agreement concerning clerkships at the

12  (Pages 42 to 45)

46

J. ROMERO

1
2  Caritas hospitals, what had your interaction
3  with Dr. Perri been?
4      A.  Clinical placement, slots,
5  disciplinary issues.
6      Q.  So in short, scheduling students,
7  and if there was a problem with the
8  students, dealing with that problem?
9      A.  Correct, and billing.
10     Q.  At this period of time, that is fall
11 of 2006, was the contract between Wyckoff
12 and Ross for placement of medical students
13 for clerkships at Wyckoff pay as go?
14     A.  Yes.
15     Q.  Let's focus back on Exhibit 10.
16 Exhibit 10, if we ignore the forwarding
17 portion from Mr. Perri to Dr. Perri, the
18 original message as it's marked there in the
19 attachment, is that an e-mail and attachment
20 that you sent to Dr. Perri?
21     A.  Yes.
22     Q.  I guess you did copy Philip Perri.
23     A.  Right.
24     Q.  Did you know Mr. Perri from
25 scheduling students as well?

47

J. ROMERO

1
2      A.  Yes.
3      Q.  You write, "To complement a proposal
4  submitted by the Brooklyn Queens Health
5  Care, Inc. last month, I am attaching a
6  matrix analysis based on current clerkship
7  slots at the Catholic Mary Medical Center
8  campuses (Mary Immaculate and St. John's.)
9  Is the proposal by the Brooklyn Queens
10 Health Care, Inc., to which you refer in
11 this e-mail Mr. Gio's letter of August 21st,
12 2006 that we have marked as Deposition
13 Exhibit Number 2?
14     A.  It's in relation to the proposal of
15 August 21st, 2006.
16     Q.  Maybe I need to be more clear with
17 my question.  Your e-mail of October 5, 2006
18 in Exhibit 10 refers to a proposal submitted
19 by the Brooklyn Queens Health Care, Inc.  My
20 question is is the proposal that you
21 referred to the letter on Exhibit 2?
22     A.  Yes.
23     Q.  Your e-mail in Exhibit 10 has some
24 numbered points where you describe the deal
25 and then the attached matrix.  In layman's

48

J. ROMERO

1
2  terms, can you describe what it is you were
3  proposing?
4      A.  The proposal was a discussion on
5  possible opportunities for Ross University
6  at the proposed site at the then Catholic
7  Medical Center of Brooklyn for clerkship
8  placements.
9      Q.  And you have numbers 1 through 5.
10 We can go through individually if it helps
11 with your recollection or as a group if that
12 works, either way your recollection works,
13 but there is discussion of continuous
14 back-to-back scheduling, continuing of
15 WYCKOFF2, and things like that.  In layman's
16 terms, do you have a recollection of the
17 overall structure of what the proposal at
18 this time was?
19     A.  It was a discussion on slots at
20 St. John's and Mary Immaculate Hospital,
21 should we offer it and should they agree to
22 continue to send students there after
23 January 2007.
24     Q.  In paragraph 2, there is discussion
25 of continuous back-to-back scheduling of

49

J. ROMERO

1
2  core rotations.  For those who aren't
3  involved in the day-to-day of medical
4  student clerkships, in layman's terms what
5  is that that it refers to?
6      A.  It means that students who are
7  scheduled at Caritas are scheduled in
8  rotation blocks, and rotation blocks are
9  continuous, and it basically allows a
10 medical student to be placed in a rotation
11 from one block to the next without any gaps,
12 any time gaps.
13     Q.  So you are proposing here or at
14 least the advantage of what you were
15 proposing is that at a single hospital, one
16 student could do a number of rotations back
17 to back without having to move between
18 places?
19     A.  Not having to move between places.
20 If I may, Ross University, in the past, over
21 the past ten years or six years that we have
22 been working together, had always requested,
23 if not demanded, slots from hospitals like
24 Wyckoff for continuous rotations for their
25 students because of (i), there aren't enough

50

J. ROMERO

1 slots for their students to place, and (ii),
2 they have what they call scheduling gaps,
3 which are reported in some sort of the
4 matrix, from what I recall, from Phil Perri
5 at the school.
6 Q. From your understanding, from the
7 student's perspective, it's advantageous to
8 be able to do a number of different kinds of
9 rotations at a single hospital without
10 having a time gap so that you can get the
11 clerkships done as quickly was possible
12 without moving?
13 A. At different hospitals, at different
14 hospitals.
15 Q. In Exhibit 10, point 3 of your
16 e-mail, it says, "All contingency slots
17 listed under WYCKOFF2 for five years."  In
18 layman's terms, what's the proposal on that
19 point?
20 A. This proposal was a discussion.  I
21 was trying to get a discussion on slots that
22 could be -- core clerkship slots that can be
23 created for Ross University outside of their
24 current agreement at the time.

51

J. ROMERO

1 Q. And the slots that were being
2 discussed in point 3 would be slots to be
3 provided at Wyckoff?
4 A. Yes.
5 Q. Is it correct that between
6 August 21, 2006, when Mr. Gio sent to the
7 letter to Dr. Perri, and your e-mail, I
8 guess it appears that you hadn't talked
9 about Mr. Gio's proposal yet with Dr. Perri
10 but were trying to provoke a discussion with
11 this e-mail; is that correct?
12 A. No, I had spoken with Dr. Perri and
13 Mr. Perri on the phone in between.
14 Q. Tell me what you remember about
15 those discussions.
16 A. They were very brief, and it was
17 merely an update of whether or not they
18 received the proposal and what they plan on
19 doing about it.
20 Q. What did they say to you?
21 A. It was a basic "We'll get back to
22 you, and we are reviewing the proposal."
23 And that's pretty much it.
24 (Whereupon, a recess was taken.)

52

J. ROMERO

1 Q. Mr. Romero, before the break we were
2 discussing Deposition Exhibit Number 10,
3 your October 5, 2006 e-mail to Dr. Perri.
4 If I could direct your attention to the
5 attachment to the e-mail which is entitled,
6 Draft Ross University School of Medicine
7 Medical Student Matrix.  Did you prepare the
8 attachment or did somebody else?
9 A. I did.
10 Q. Your attachment begins, "From the
11 data presented, BQHC provides and guarantees
12 'green-book' clerkships at its Caritas
13 campuses (Mary Immaculate Hospital and Saint
14 John's Queens Hospital) for sixty (60) core
15 slots each year for five consecutive years."
16 Where did you get that information from?
17 A. The information was gathered from
18 interviewing academic-type faculty at Mary
19 Immaculate Hospital and Saint John's Queens
20 Hospital.
21 Q. What are green-book clerkships?
22 A. Green-book clerkships are rotations
23 that are approved by the accreditation
24 counsel for graduate medical education

53

J. ROMERO

1 allowing medical student clerkships to be
2 completed under the auspices of the ACGMA
3 residency training programs.
4 Q. After you had prepared the
5 attachment, did anybody else in the hospital
6 review it before you sent it out to
7 Dr. Perri?
8 A. I don't recall.
9 Q. Would it have been your usual
10 practice at this time to have somebody else
11 at the hospital review a piece like this
12 before you sent it out?
13 A. Yes.
14 Q. And per your usual practice, who
15 would you submit it to for reading?
16 A. Dr. Freiberg.  I would also send it
17 to Mr. Gio's office and Mr. McDonald's
18 office.
19 Q. Was it your usual practice to get
20 approval from those people before you sent
21 out a piece like this?
22 A. Yes.
23 (Document marked as Romero
24 Exhibit 11 for identification as

54

J. ROMERO

1
2  of this date.)
3      Q. Mr. Romero, let me show you a
4  document that the court reporter has marked
5  as Exhibit Number 11. It's an e-mail
6  exchanged between you and Dr. Perri which
7  appears to be labeled ROSS 009186. Is
8  Exhibit 11 an e-mail that you sent to
9  Dr. Perri and her reply to you?
10     A. Yes.
11     Q. Your e-mail dated October 24, 2006
12 says that it's a follow-up to a conversation
13 that morning. Did you talk to Dr. Perri
14 that morning?
15     A. I can't recall. However, it is my
16 practice to document my conversations
17 usually on the day of the conversation.
18     Q. So your standard practice at work
19 would be to, if you have a conversation of
20 substance, follow up with an e-mail noting
21 what was discussed?
22     A. Yes.
23     Q. Is Exhibit 11 such an e-mail?
24     A. Yes.
25     Q. Was Mr. Gio in on this conversation?

55

J. ROMERO

1
2      A. I don't recall.
3      Q. Do you recall who else was?
4      A. No.
5      Q. Other than what is written in the
6  e-mail, do you remember anything else about
7  this phone call?
8      A. No.
9      Q. At this point in time, had AUC
10 expressed an interest in the slots that had
11 been offered for the clerkships at the
12 Caritas hospitals?
13     A. I'm not certain about the timeline
14 for that.
15     Q. Had any other schools expressed
16 interest in those slots?
17     A. No.
18     Q. Your e-mail asks Dr. Perri to advise
19 preferably within the next two days so that
20 you can hold these clerkship slots for Ross.
21 Was that negotiating attempt on your part to
22 move them along on the process?
23     A. On the hospital's part.
24     Q. Had someone asked you to indicate to
25 them that they needed to act quickly?

56

J. ROMERO

1
2      A. Absolutely.
3      Q. Who asked you to do that?
4      A. It would be the president of the
5  hospital, Dominick Gio.
6      Q. And the reason, at least as you
7  understood it, of why Mr. Gio wanted Ross to
8  act quickly was to get money into the
9  hospitals quickly, correct?
10         MR. LOUGHLIN: Objection to the
11     form. You can go ahead and answer.
12     You can give your testimony subject
13     to the objections.
14         THE WITNESS: I believe so,
15     including the placement of students
16     who might be vacated in January of
17     2007, from my perspective.
18     Q. So let's sort that out if we can.
19 From your perspective, one issue is that
20 beginning January 7, 2007, you would be in
21 charge of scheduling students at the two
22 Caritas hospitals, correct?
23     A. I didn't assume that at the time.
24 However, from my perspective, my concern was
25 the displacement of CMC-based medical

57

J. ROMERO

1
2  students.
3      Q. I understand. So your concern was
4  that students who were presently doing
5  rotations at St. John's and Mary Immaculate
6  Hospital might be displaced once the deal
7  closed unless you made other arrangements?
8      A. From my recollection, we had a
9  number of students who were starting
10 rotations in December of 2006, and if Ross
11 did not have an agreement at then St.
12 Vincent's Brooklyn Queens, those same
13 students will be displaced in the middle of
14 their rotations.
15     Q. And that was an issue with which you
16 were concerned because that's part of your
17 job?
18     A. Absolutely.
19     Q. Mr. Gio's concern was, was it not,
20 getting money at the door as quickly as he
21 could, at least as you understood it?
22     A. It's possible.
23     Q. Well, is it correct to say to your
24 understanding?
25     A. Yes.

15 (Pages 54 to 57)

58

J. ROMERO

Q. Did you have an understanding as to what that money was going to be used for?

A. No.

(Document marked as Romero Exhibit 12 for identification as of this date.)

Q. Mr. Romero, let me show you a document that has been marked as Deposition Exhibit Number 12. It has been marked as identification numbers ROSS 009177 through 9179. Is Exhibit 12 an e-mail and its attachment that you sent to Dr. Perri?

A. Yes.

Q. What, if anything, had occurred between the October e-mail and this one that caused you to send a new e-mail and a new attachment?

A. From what I recall, it was a follow up.

Q. Is it correct then it was just one more effort to get Ross to move?

A. Yes.

Q. It notes that you sent copies to Keisha, K-E-I-S-H-A, Cole, Harold McDonald

59

J. ROMERO

and Dominick Gio. Who is Ms. Cole?

A. From what I recall, Ms. Cole was one of Dr. Perri's assistants and a hospital liaison.

Q. Had Mr. McDonald and Mr. Gio both asked you to do this or were they copied just to keep them on the loop?

A. It would be both.

Q. So they had asked to see if you could move Ross?

A. Yes.

Q. And then you sent this e-mail?

A. Yes. It's important to note that I have a standing order to follow up on these things.

(Document marked as Romero Exhibit 13 for identification as of this date.)

Q. The court reporter has handed to you a document marked as Exhibit 13. Exhibit 13 has been stamped with identification numbers BQHC 24771 and 24772. Is Exhibit 13 a November 13, 2006 e-mail and its attachment that you sent to Dr. Perri?

60

J. ROMERO

A. Yes.

Q. You write, "Per our discussion, please review comment as needed and sign. The clinical affiliation agreement with CMS is intact except for the compensation agreement during the term covered in this amendment (four years, $5 million or until prepaid clerkship fees are exhausted)." And then attached to your e-mail is a draft of the amendment. Who prepared the draft amendment that's attached here?

A. I don't recall.

Q. Did you?

A. No.

Q. In the ordinary course of the hospital's business, is this something that likely came from legal?

MR. LOUGHLIN: If you know.

THE WITNESS: I'm not certain.

Q. This was provided to you to send to Ross?

A. Yes.

Q. Who provided it to you?

A. I'm not certain who in particular

61

J. ROMERO

but at the time all correspondence for CMC would be coming from Mr. McDonald's office.

Q. So as you sit here today, do you think it likely that somebody in Mr. McDonald's office provided this document to you to send to Ross?

MR. LOUGHLIN: Objection. Don't ask him to speculate.

MR. TZANETOPOULOS: It's discovery deposition.

MR. LOUGHLIN: You're asking him is it likely that the source of it was a particular person when he said he doesn't recall who gave it to him.

Q. Do you think this came from Mr. McDonald's office to be forwarded to Ross?

A. Probably.

Q. Your e-mail refers to a discussion with Dr. Perri that afternoon. Was anybody else on that call?

A. None that I can recall.

Q. In substance what did you say to Dr. Perri and she to you?

16  (Pages 58 to 61)

62

J. ROMERO

1
2      A. Could you repeat that question?
3      Q. I wouldn't expect you to remember
4   the exact words, but in substance, what did
5   Dr. Perri say to you and you to her during
6   this telephone call?
7      A. Whenever I had conversations with
8   Dr. Perri, including this, Dr. Perri would
9   ask general questions on the agreement, and
10  in this particular discussion, from what I
11  recall, it was a discussion on CMC in
12  particular at that time, Catholic Medical
13  Center, and the students that they have
14  there, and in response to my concern of what
15  would happen to their students at CMC once
16  Caritas takes over.
17     Q. What is it that you recall of you
18  and she saying to each other about those
19  topics?
20     A. Simply we had to get it done.
21     Q. Other than what you've testified to
22  and what's written down here, do you
23  remember anything else about that
24  conversation?
25     A. No.

63

J. ROMERO

1
2      Q. I would note that the attachment you
3   sent to Dr. Perri on November 13, 2006 is in
4   the form of an amendment to a contract
5   between Ross and Catholic Medical Center of
6   Brooklyn and Queens, Inc. Did an entity
7   called Catholic Medical Center of Brooklyn
8   and Queens, Inc. exist at this point in
9   time?
10     A. From what I recall, yes. To be
11  specific, from what I recall, it's St.
12  Vincent's Catholic Medical Center Brooklyn
13  and Queens.
14     Q. So at least your thought at the time
15  was that the mechanism by which Ross and the
16  BQHC entities would amend the contract was
17  simply to amend that earlier agreement as
18  it's set forth here?
19     A. It was that discussion, yes.
20        (Document marked as Romero
21        Exhibit 14 for identification as
22        of this date.)
23     Q. Mr. Romero, let me show you a
24  document that the court reporter has marked
25  as Deposition Exhibit Number 14. It's been

64

J. ROMERO

1
2   stamped with identification number ROSS
3   009110 and 9111. Is Exhibit 14 a copy of an
4   e-mail to that you sent to Dr. Perri, her
5   apply to you, and your response to her reply
6   on November 16, 2006?
7      A. Yes.
8      Q. Your first e-mail of November 2006,
9   the one time stamped 12:56 p.m., has a
10  series of points under the heading, Current
11  Understanding. Had you and she talked about
12  those deal points that are listed under
13  Current Understanding?
14     A. Yes.
15     Q. What's your recollection of where
16  the two of you stood on those deal points on
17  that date?
18     A. Dr. Perri and I had numerous
19  discussions over the phone, and for the most
20  part, she would not commit to any specific
21  monetary payments or agreements. However,
22  she was always positive in her response as
23  to getting the agreement done as far as
24  student slots are concerned.
25        MR. TZANETOPOULOS: Read the

65

J. ROMERO

1
2   answer back, please.
3        (Whereupon, the referred answer
4        was read back by the Reporter.)
5      Q. For the hospital side of the
6   monetary payments and agreements deal points
7   that you just testified about, were those
8   provided to you by others to communicate to
9   Ross?
10     A. These were discussions with the
11  president of the hospital.
12     Q. Discussions between?
13     A. Between myself and the president of
14  the hospital.
15     Q. So Mr. Gio would communicate with
16  you about those points and you with Dr.
17  Perri?
18     A. Mr. Gio and I would discuss them,
19  and then he would say, Well, send it to or
20  call Dr. Perri.
21     Q. And at this point, Dr. Perri
22  wouldn't commit on those points but was
23  positive about getting the deal done?
24     A. Yes.
25     Q. At the top of the exhibit, you sent

17  (Pages 62 to 65)

66

J. ROMERO

1 another e-mail at 1:40 p.m. which reads,
2 "Okay, thanks Dr. Perri. I can hold the
3 offer at bay for possibly a week." Again,
4 were there really bidders at the doorstep or
5 were you again trying to move Ross along?
6     A. We were trying to get the agreement
7 done.
8     Q. Was there anybody else ready to grab
9 those slots at that time?
10     A. We had AUC, American University of
11 the Caribbean, on the other side of the
12 negotiating table.
13     Q. Did you really think at that point
14 in time that those slots would be gone in a
15 week if Dr. Perri didn't commit right then
16 and there?
17     A. Possibly.
18     Q. But not for sure?
19     A. But not for sure.
20         (Document marked as Romero
21          Exhibit 15 for identification as
22          of this date.)
23     Q. Mr. Romero, let me show you a
24 document the court reporter has marked as

67

J. ROMERO

1 Exhibit 15. It has been stamped with
2 identification number ROSS 009048. Is
3 Exhibit 15 a copy of an e-mail that you sent
4 to Dr. Perri on November 29, 2006 and her
5 response to you?
6     A. I acknowledged the e-mail.
7     Q. The bottom part is an e-mail from
8 you; is that correct?
9     A. Yes.
10     Q. And the top part is hers back to
11 you.
12     A. That's correct.
13     Q. You write, "Kindly acknowledge ,
14 receipt of this draft agreement submitted
15 earlier and the terms by way of a formal
16 letter. I have informed our board that you
17 have agreed, in principle, to take and
18 prepay a specific number of core and
19 elective slots beginning January 2007 at a
20 set prepayment schedule (December 15, 2006,
21 and January 15, 2007)." Had you in fact
22 informed the board of this fact?
23     A. Yes, I informed the Caritas planning
24 board about this.

68

J. ROMERO

1     Q. Mr. Romero, Mr. Rucigay,
2 R-U-C-I-G-A-Y, testified at a deposition in
3 the last two weeks that the first meeting of
4 the Caritas board of trustees occurred some
5 time in January of 2007. Did you in fact
6 report this to the Wyckoff board?
7     A. This was the Caritas Planning board,
8 from what I understood it, at that time.
9     Q. Who made up the Caritas Planning
10 board?
11     A. I don't know.
12     Q. Do you remember anybody on it?
13     A. From what I understood at that time,
14 it was Mr. McDonald, and Dr. Mandava,
15 M-A-N-D-A-V-A. By way of that statement, I
16 was alluding to the board where Mr. McDonald
17 was a participant at Caritas.
18     Q. So to your understanding, was the
19 board, to which you referred, a group of the
20 hospital administration that was planning
21 for the acquisition of the Caritas
22 hospitals?
23     A. During that time leading to 2007, I
24 participated in several meetings of what

69

J. ROMERO

1 they would refer as a board of physicians
2 and administrators at St. Vincent's at that
3 time, and discussions were, of course, made
4 during those meetings regarding planning
5 purposes including this proposed clerkship
6 prepayment by Ross University.
7     Q. Mr. Romero, during those meetings
8 that you attended of this board, was there
9 any discussion of the use to which the
10 prepayment money would be brought?
11     A. No.
12         (Document marked as Romero
13          Exhibit 16 for identification as
14          of this date.)
15     Q. Mr. Romero, the court reporter has
16 handed to you a document marked Deposition
17 Exhibit Number 16. It's a two-page document
18 marked as identification numbers ROSS 009019
19 and 9020. Is Exhibit 16 a December 1st
20 e-mail from you to Dr. Perri, her reply to
21 you, and your response back to her?
22     A. Yes.
23     Q. The first e-mail from you to Dr.
24 Perri on this exhibit is dated December 1st,

18 (Pages 66 to 69)

70

J. ROMERO

1
2  2006, and shows some carbon copies. One is
3  to Mr. McDonald, correct?
4      A. Yes.
5      Q. And I think people have told us
6  throughout the course of depositions here
7  that the nyp.org section of the e-mail
8  address is a reference to New York
9  Presbyterian.org which Wyckoff used at the
10 time?
11     A. That's correct.
12     Q. That's because Wyckoff was part of
13 the New York Presbyterian system.
14     A. Yes.
15     Q. The carbon copy shown after Mr.
16 McDonald is ris9022@nyp.org. Is that to Mr.
17 Richard Sarli?
18     A. From what I recall, yes.
19     Q. And then another copy to
20 dnh9001@nyp.org, is that to David N.
21 Hoffman?
22     A. Yes.
23     Q. So you sent a copy of this e-mail to
24 Dr. Perri and a copy to Mr. McDonald, Mr.
25 Sarli, and Mr. Hoffman, correct?

71

J. ROMERO

1
2      A. Yes.
3      Q. You write, "Per our telephone
4  meeting this morning, the following items
5  were discussed," and then you list them. Is
6  this another of your confirming e-mails
7  following the conversation with Dr. Perri?
8      A. Yes.
9      Q. And in fact, did each of those
10 points come up in the conversation with her
11 that day?
12     A. Yes.
13     Q. At point 2, you write, "A call from
14 Mr. McDonald is requested by Mr. St. James.
15 Mr. McDonald has returned the call to Mr.
16 St. James today and will be followed up with
17 Mr. Rich Sarli (Caritas CFO)." Do you see
18 where I am?
19     A. Yes.
20     Q. At that point, was it the case that
21 during the call with Dr. Perri on
22 December 1st, she asked you to have Mr.
23 McDonald call Mr. St. James?
24     A. I don't recall.
25     Q. And you write that Mr. McDonald has

72

J. ROMERO

1
2  returned the call to Mr. St. James. Had Mr.
3  McDonald told you that he had done so?
4      A. From what I recall, in my practice I
5  would have called the different people
6  involved and asked them where they are in
7  their own individual responsibilities
8  leading to this agreement.
9      Q. So what you knew at the time that
10 you wrote this was that earlier that morning
11 Dr. Perri asked you have Mr. McDonald call
12 Mr. St. James. Mr. McDonald had done so and
13 said that Mr. Sarli would follow up.
14     A. It may not be. It may have been a
15 telephone call that I received from John St.
16 James or had asked me to call Mr. McDonald
17 or have Mr. McDonald call him regarding the
18 terms of the agreement.
19     Q. So as of this time, it's possible
20 that you had heard this from Mr. McDonald or
21 Mr. St. James?
22     A. That's correct.
23     Q. Do you know which?
24     A. I was merely trying to put everyone
25 on the same page with the conversation.

73

J. ROMERO

1
2      Q. At this point in time, do you
3  remember who gave you the information?
4      A. No. At that time, I would be making
5  calls to Mr. McDonald's office, and he had
6  three secretaries and an administrator. As
7  far as Dr. Perri and Mr. St. James, I would
8  usually be dealing with them directly on the
9  phone.
10     Q. Did you understand Mr. St. James to
11 be the CFO at Ross?
12     A. Yes.
13     Q. In the course of your earlier
14 dealings with Ross, was it the case that
15 negotiations would proceed or did proceed
16 with you and Dr. Perri working out the
17 academic arrangements and then later
18 Mr. St. James coming into talk about the
19 commercial and money arrangements?
20         MR. LOUGHLIN: Objection. Are
21     you referring to the agreement
22     between Ross and Wyckoff or the
23     negotiations that led to the
24     BQHC-Ross agreement for the Caritas
25     purchase.

19 (Pages 70 to 73)

74

J. ROMERO

MR. TZANETOPOULOS:  The later
one, I think, I took off the table.

MR. LOUGHLIN:  Okay, I
misunderstood.

MR. TZANETOPOULOS:  I was
talking about your earlier dealings
with Ross.

THE WITNESS:  Kindly restate.

Q.  Sure.  What I'm trying to find out
is in the usual course of your negotiations
with Ross started with Dr. Perri in the
academic group to talk about those topics,
and then once you got through those, the
money guys like Mr. St. James entered?

A.  No, this would be the first time.

Q.  So was it the case in this
negotiation that you and Dr. Perri first
talk about the academic issues, and then Mr.
St. James comes in to talk about money?

A.  That's correct.

Q.  I suppose on your side of things,
the divide was you and perhaps Dr. Freiberg
on the academic side of things, and Mr.
McDonald, and Mr. Sarli, and Mr. Gio on the

75

J. ROMERO

money side of things?

MR. LOUGHLIN:  Objection to
form.

THE WITNESS:  In the past, Dr.
Perri would be handling all of the
negotiations and the transactions,
both academic and commercial.

Q.  And let me make my question a little
more clear.  For this particular negotiation
on the BQHC-Ross affiliation agreement on
the hospital side of things, was it you and
Dr. Freiberg on the academic side, and then
Mr. Sarli, Mr. McDonald, and Mr. Gio on the
money side?

A.  That would pretty much sum it up.

Q.  And just to help orient you, Dr.
Perri writes back in this exhibit that Mr.
Sarli spoke with Mr. St. James this
afternoon about a new agreement, and she
writes that she will be meeting with John
St. James and Dr. Shepherd, and that he is
scheduled to follow up with Mr. Sarli
afterwards.  Do you know who Dr. Shepherd
was?

76

J. ROMERO

A.  Yes.

Q.  Who is Dr. Shepherd?

A.  Dr. Thomas Shepherd is or was at the
time the president of Ross University School
of Medicine and School of Veterinary
Medicine.

Q.  And then you write back to Dr.
Shepherd -- referring back again to
Exhibit 16, on December 3rd you write back
to Dr. Perri that you have informed Rich and
Harold that the draft agreement will be
coming from your office with approval from
John St. James and Tom Shepherd.  Rich and
Harold, is that Rich Sarli and Harold
McDonald?

A.  Yes.

Q.  Had you informed both of them about
the fact?

A.  Yes.

Q.  Is it the case that Dr. Perri had
told you that Ross would be sending his
draft agreement?

A.  Yes.

Q.  And then a couple of lines down, you

77

J. ROMERO

write, "In addition as a backup, I have
designed a contingency plan in effect for at
least the next four years at Wyckoff that
can then collateralize any committed
corporateship at Caritas.  This can be the
expressed or implied on the business
agreement."  Did you have a discussion about
that point over the telephone with Dr.
Perri?

A.  I believe on numerous occasions.

Q.  Numerous occasions before this
e-mail?

A.  Before this e-mail, yes.

Q.  Had you had discussions on the
hospital side within your group about that
point?

A.  Yes.

Q.  Let's start with the discussions
within your group.  With whom did you speak
and what was the substance of those
discussions?

A.  I had spoken with Dominick Gio, CEO
at Wyckoff and Harold McDonald, the
administrator at Caritas Planning, and the

20  (Pages 74 to 77)

78

```
 1              J. ROMERO
 2   discussions were basically to get things
 3   moving and to get things done.  There are
 4   certain requests that Ross, in particular
 5   Dr. Perri and Phil Perri, have insinuated or
 6   requested directly from me regarding
 7   clerkship placements at Wyckoff and at
 8   Caritas.
 9        Q.  With respect to collateralizing
10   Wyckoff and committed clerkships at Caritas,
11   what was the substance of internal
12   discussions on the hospital side?
13        A.  The discussion was, from my
14   recollection, a parallel program wherein the
15   core clerkship capacities at Caritas would
16   have an equal or more of the same core
17   clerkship capacities at Wyckoff.  And in
18   this case, my discussion with Mr. Gio and
19   Harold McDonald at that time was that should
20   Ross decide to use Wyckoff or should Ross
21   decide to use Caritas, their students,
22   within those capacities, are portable in as
23   far as placing the students.  This was part
24   of my discussion internally with them that I
25   wanted from my perspective a more fluid
```

79

```
 1              J. ROMERO
 2   scheduling process within the facilities.
 3        Q.  Had Dr. Perri expressed to you
 4   Ross's concern -- strike that.
 5        Had Dr. Perri expressed to you
 6   Ross's wish that if the Caritas hospitals
 7   could not provide the promised clerkships,
 8   that Ross wanted those at Caritas?
 9        MR. LOUGHLIN:  You mean at
10   Wyckoff?
11        MR. TZANETOPOULOS:  At Wyckoff,
12   sorry.
13        MR. LOUGHLIN:  Do you understand
14   the question?
15        THE WITNESS:  I do understand
16   the question but specifically that
17   question, no.
18        Q.  Had Mr. Sarli or Mr. McDonald
19   reported to you at the time you wrote this
20   e-mail that Mr. St. James had expressed to
21   either of them the desire on Ross's part to
22   have, as part of this arrangement, a
23   provision that required a provision of
24   clerkships at Wyckoff if they couldn't be
25   provided at Caritas?
```

80

```
 1              J. ROMERO
 2        A.  No.
 3        Q.  At this point in time, had Mr.
 4   McDonald or Mr. Sarli reported to you
 5   discussions with Mr. St. James in which Mr.
 6   St. James had expressed concern about
 7   finding protection for the $5 million
 8   prepayment if anything happened to the
 9   Caritas hospitals?
10        MR. LOUGHLIN:  When you say at
11   this point in time, do you mean the
12   first week of December?
13        MR. TZANETOPOULOS:  December
14   3rd, 2006.
15        THE WITNESS:  From what I
16   recall, the only discussion that Mr.
17   Sarli mentioned or at least conveyed
18   to me is that Mr. St. James wanted
19   Ross to be a secured creditor, and
20   that's what I recall about that.
21        There was no discussion on the
22   hospital going -- Caritas going --
23   shutting down and having their
24   students be added to Wyckoff.
25        Q.  Other than what's written in
```

81

```
 1              J. ROMERO
 2   Exhibit 16 and what you've testified about
 3   today, is there anything else that you
 4   recall about the conversations that you and
 5   Dr. Perri had reflected in the exhibit?
 6        A.  Dr. Perri and I and Phil Perri --
 7        MR. LOUGHLIN:  The question is
 8   directed to a recollection that you
 9   may have about the conversation on
10   or about that date, not generally
11   your recollection of all of your
12   conversations with Dr. Perri during
13   this period.
14        THE WITNESS:  The answer is no.
15        Q.  Was one of your e-mail addresses at
16   Wyckoff jur9004@nyp.org?
17        A.  Yes.
18             (Document marked as Romero
19             Exhibit 17 for identification as
20             of this date.)
21             (Whereupon, a recess was taken.)
22        Q.  Mr. Romero, let me show you a
23   document that the court reporter has marked
24   as Deposition Exhibit Number 17.  It's been
25   marked with identification numbers ROSS
```

21  (Pages 78 to 81)

82

J. ROMERO

033055, 056. They were marked at an earlier
deposition. Is Exhibit 17 an e-mail that
you sent to Mr. St. James on December 16,
2006?

   A. Yes.

   Q. Did you also send copies to Mr.
Sarli and to Mr. McDonald?

   A. Yes.

   Q. Your e-mail begins with, "I thought
our telephone conference meeting today was
productive" and so forth. Is this another
one of your e-mails where you summarized a
phone call that you had?

   A. Yes.

   Q. Had you in fact spoken with Mr. St.
James on December 16th?

   A. I remember speaking with him.

   Q. Was anybody else on the telephone
call?

   A. None that I recall.

   Q. How is it that it came to be the
case that you and Mr. St. James were talking
about these deal points without others?

   A. From my recollection, he had called

83

J. ROMERO

me about the proposals at Caritas for Ross.

   Q. And this is on a Saturday, holiday
time. Were you in the office at the time?

   A. I don't recall. I do work from my
BlackBerry and computer at home.

   Q. If you go down a little to the
summary points that you write about, point 2
reads, "The current affiliation agreement
between and Ross and St. Vincent's Catholic
Medical Center would be null and void after
December 31, 2006 when Caritas takes over
management and ownership of the hospitals."
What was the discussion between you and Mr.
St. James on that point?

   A. From my recollection, my main
concern was, again, the students who were
there rotating during that month who would
be continuing on to January, and since their
contract, the Ross contract with St.
Vincent's, would be null and void, then I
would be concerned about their continuation
of their clerkships.

   Q. Going down to point 7 on Exhibit 17,
you write, "A contingency of an equal number

84

J. ROMERO

of clerkship slots at Wyckoff Heights
Medical Center will serve as collateral
should any guarantee prepaid core clerkship
at Caritas is not provided to Ross
University during the term of this
agreement." What was your discussion with
Mr. St. James with respect to that point?

   A. This discussion point on number 7
is, from what I recall, the continued
discussion between Caritas and Ross
regarding slots at Caritas. The concept of
this being that there is a parallel capacity
of slots at Wyckoff that we can use for
Caritas students. Mr. St. James, at that
time, was the one who brought up this
discussion.

   Q. Other than what you just testified
to, do you recall anything about the
conversation between you and Mr. St. James
on that point?

   A. None that I can recall.

   Q. Point 8 in your e-mail says, "A
separate agreement on clerkship training
including a set allocated for clerkships

85

J. ROMERO

will remain at Wyckoff Heights Medical
Center." What was the discussion between
you and Mr. St. James on that?

   A. From what I recall from this
conversation, I was explaining to Mr. St.
James that in the past Dr. Perri and I were
talking about the core clerkships at Wyckoff
Heights Medical Center, and at that point I
just reiterated to Mr. St. James that
Wyckoff is a separate clinical site and is
not the same site as Caritas.

   Q. Anything else about that point that
you recall discussing with Mr. St. James?

   A. None that I recall.

   Q. Other than what's written in this
e-mail and what you just testified to, do
you remember anything else about the
conversation between you and Mr. St. James
on December 16, 2006?

   A. No, not from my recollection.

   Q. At any point after December 16, 2006
through the time when the affiliation
agreement was signed between the two
parties, did you ever again speak to

86

J. ROMERO

1
2  Mr. St. James?
3       A.  I may have.
4       Q.  Do you recall one way or another?
5       A.  I don't recall.
6       Q.  Other than your confirming e-mails
7  you testified about, did you keep notes of
8  conversations that you had with people from
9  Ross about this contract?
10      A.  I took notes for myself, yes.
11      Q.  Did you retain those notes?
12      A.  No.  I would use sticky notes and
13  yellow pads and would summarize them by
14  e-mail right after.  After the e-mail is
15  submitted, I'll dispose off my rough notes.
16      Q.  Is it your practice to jot down, in
17  any sort of calender or journal, telephone
18  conversations that you had with Ross?
19      A.  At that time, yes.
20      Q.  Would it be a calender or a journal?
21      A.  It would just be a pad, a legal pad.
22      Q.  Did you retain those notes?
23      A.  No.
24      Q.  When did you dispose off the notes
25  that you just testified about?

87

J. ROMERO

1
2       A.  The rough drafts were disposed as
3  soon as I typed up the summary for my own
4  records.
5       MR. LOUGHLIN:  I think the
6       record should reflect that
7       Mr. Romero, in answering the
8       question, was, at various times,
9       pointing to Exhibit 17 as an example
10      of one of his e-mail records of
11      telephone conversation.
12      (Document marked as Romero
13      Exhibit 18 for identification as
14      of this date.)
15      Q.  Mr. Romero, the court reporter has
16  handed to you a document marked Deposition
17  Exhibit Number 18.  Exhibit 18 is a string
18  of e-mails marked with identification
19  numbers ROSS 023723 through 23730.  There is
20  an awful lot of back and forth here.  You
21  can look as much as you would like.  I'll
22  tell you that it is your e-mail to Dr. Perri
23  on December 20, 2006 that I will have
24  questions, but take your time as much as you
25  like and let me know when you're ready.

88

J. ROMERO

1
2       A.  Okay.
3       Q.  Have you had a chance to review
4  Exhibit 18?
5       A.  Yes.
6       Q.  Toward the top of Exhibit 18 there
7  is a message marked from Julius Romero on
8  December 20, 2006 to Dr. Nancy Perri,
9  subject, Final Affiliation Agreement.  Is
10  that an e-mail message that you sent to Dr.
11  Perri?
12      A.  Yes.
13      Q.  Your note says, "I was relieved to
14  have the teleconference with you, Mr. Gio,
15  Dr. Freiberg, and Mr. Shepherd yesterday,"
16  and then you go on.  Were you a part of the
17  teleconference that is referenced there?
18      A.  Yes.
19      Q.  And so the participants were Dr.
20  Perri, you, Mr. Gio, Dr. Freiberg, and Tom
21  Shepherd?
22      A.  From what I recall, yes.
23      Q.  Was anybody else on the line?
24      A.  I'm not certain only because there
25  are multiple sites when the telephone

89

J. ROMERO

1
2  conferences happened at Wyckoff, Caritas,
3  and at Ross, and historically, when speaking
4  with Ross administrators, there would be
5  instances where someone would be listening
6  in from other lines either from Chicago
7  DeVry or Dominica.
8       Q.  Do you remember anybody else
9  participating in this telephone conference?
10      A.  I don't.
11      Q.  In substance, who said what to whom
12  during that conversation?
13      A.  I believe mainly it was a discussion
14  between Mr. Gio and Dr. Shepherd.
15      Q.  So we've moved on to the bosses
16  speaking to each other about the points; is
17  that correct?
18      A.  From what I recall, yes.
19      Q.  Toward the bottom of your message,
20  you write, "As for the rate, the standard
21  medical student clerkship set by BQHC for
22  Caritas and Wyckoff affiliates is $350."
23  Who set that clerkship rate at BQHC?
24      A.  It would have been Mr. Gio and Mr.
25  Hsu, and Mr. Sarli based on the current

23  (Pages 86 to 89)

90

1          J. ROMERO
2   market.
3       Q.  What was the rate for the AUC
4   clerkships that were offered as part of that
5   December 1, 2006 agreement?
6       A.  I don't recall.
7       Q.  During this conversation, had the
8   representatives of Ross asked the hospitals
9   to promise to lock in the weekly rate for
10  clerkships at Wyckoff at a rate of $312.50
11  per week for the four-year term of the
12  Caritas agreement?
13      A.  I believe that was a negotiating
14  point from Ross.
15      Q.  So they asked for that?
16      A.  Yes.
17      Q.  And as the discussions evolved, they
18  did, did they not, ask that a provision
19  promising that the Wyckoff rate would be
20  $312.50 per week for four years be included
21  in the BQHC Ross affiliation agreement; did
22  they not?
23      A.  I'm sorry, can you restate that?
24      Q.  On the Ross side they were pressing,
25  were they not, to have the $312.50 weekly

91

1          J. ROMERO
2   rate at Wyckoff be included as part of the
3   BQHC-Ross contract?
4       A.  From what I recall -- I'll try to
5   answer this the best way I can.  From what I
6   recall, the Caritas agreement and the
7   separate Wyckoff agreement had the same
8   rates.
9       Q.  And their point, was it not, is they
10  wanted their rate at Wyckoff to be
11  guaranteed for four more years?
12      A.  On a separate agreement, Ross --
13  Dr. Perri had requested to lock in $312.50
14  for four years at Wyckoff.
15          (Document marked as Romero
16          Exhibit 19 for identification as
17          of this date.)
18      Q.  Mr. Romero, the court reporter has
19  handed to you a document marked Deposition
20  Exhibit Number 19.  It's been stamped with
21  identification numbers ROSS 0630 through
22  0643.  And it looks like it's an e-mail from
23  Dr. Shepherd to Mr. Gio.  It shows copies
24  going to Dr. Perri, John St. James, Virginia
25  Smith and Richard Gunst.  And I would note

92

1          J. ROMERO
2   that you're not on the CC list here.  My
3   first question is did you end up getting a
4   copy of this e-mail and this draft?
5       A.  I don't recall getting a copy of
6   this e-mail, but I recall having seen this
7   draft in the past.
8       Q.  At or about the time of the e-mail,
9   in the December 22, 2006 time frame?
10      A.  I don't recall.
11      Q.  What I'm trying to sort out is I'm
12  sure you've looked at a lot to prepare for
13  today.  What I'm trying to sort out is
14  whether you saw this during the course of
15  the deal or whether you saw it later?
16          MR. LOUGHLIN:  For instance, in
17          preparation of your testimony today?
18          THE WITNESS:  Yes.
19      Q.  Can you recall whether you saw it at
20  the time that you were working on the deal?
21      A.  No, I can't recall.
22          (Document marked as Romero
23          Exhibit 20 for identification as
24          of this date.)
25      Q.  Mr. Romero, let me show you a

93

1          J. ROMERO
2   document that the court reporter has marked
3   as Exhibit 20.  It's an e-mail string and an
4   attachment that has been marked ROSS 008477
5   through 8492.  The first page is an e-mail,
6   it looks like an exchange between you and
7   Dr. Shepherd.  Then there's a few pages of
8   e-mails, looks as if it's internal to Ross,
9   and then a draft red line affiliation
10  agreement.  I'll tell you that's the way it
11  came out of Ross's files.  Part of my
12  question for you will be to see what went
13  with what, if you can remember.  At least
14  the first page is an e-mail exchange between
15  you and Dr. Shepherd, is it not?
16      A.  Yes.
17      Q.  Dr. Shepherd's e-mail to you, on
18  that first page says, "I am sorry for the
19  delay in getting the clarifications to you
20  which are attached.  If we have a signed
21  agreement, then we can proceed with the
22  transfer," and he goes on to talk about
23  being out of town, et cetera, et cetera.
24  You respond saying, "Thank you for the
25  information.  The file document was reviewed

**www.uslegalsupport.com**

94

```
1            J. ROMERO
2  and determined to be acceptable except for
3  any reference to the existing Wyckoff
4  Heights Medical Center agreement [Exhibit B,
5  (b), (i)].
6        On the page marked ROSS 008489, the
7  red line seems to indicate the insertion of
8  an Exhibit B, subparagraph (b)(i).  Is it
9  the case that the red line draft in
10 Exhibit 20 is the attachment that you and
11 Dr. Shepherd were discussing in your e-mails
12 on the first page of the exhibit?
13    A.  Yes.
14    Q.  So Dr. Shepherd had sent the red
15 line draft in Exhibit 20 to you and then you
16 had commented back.
17    A.  Yes.
18    Q.  You write that the file document was
19 reviewed.  Who on the hospital side reviewed
20 it?
21    A.  I don't recall, but agreements were
22 submitted to Mr. McDonald and Mr. Hoffman at
23 the time.
24    Q.  So if you followed the hospital's
25 usual business practice on entering the
```

95

```
1            J. ROMERO
2  contracts, this agreement should have been
3  submitted to Mr. McDonald and to Mr.
4  Hoffman?
5     A.  And Mr. Gio.
6     Q.  And when you wrote back to Dr.
7  Shepherd that it was acceptable except for
8  the provision that you indicated, is that a
9  decision you made on your own or is that you
10 communicating a decision that had been made
11 by others?
12    A.  I recall writing this e-mail after
13 discussing this with Mr. Gio.
14    Q.  So is it the case that Mr. Gio made
15 the decision and then asked you to
16 communicate this message to Ross?
17    A.  Yes.  It was always Mr. Gio's
18 position that Caritas and Wyckoff be
19 separate.
20    Q.  Between the time that Dr. Shepherd
21 sent the red line draft in Exhibit 20 to you
22 and you sent the return message to him, did
23 you speak with anybody at Ross?
24        MR. LOUGHLIN:  You mean other
25    than the consultation that he
```

96

```
1            J. ROMERO
2  described with Mr. Gio?
3        MR. TZANETOPOULOS:  I asked him
4  if he spoke to anybody else.
5        THE WITNESS:  I don't recall.
6  However, at this time I would be
7  calling Dr. Perri's office or Phil
8  Perri for any updates or
9  Mr. St. James.
10    Q.  Do you remember doing so between the
11 time Dr. Shepherd sent this draft to you and
12 you sent it back to him?
13    A.  I don't recall receiving this draft
14 from Dr. Shepherd.  I recall receiving this
15 draft internally at the hospital.  Then I
16 responded to the draft.
17        MR. LOUGHLIN:  That's your
18 recollection?
19        THE WITNESS:  I don't recall
20 ever receiving a direct e-mail from
21 Dr. Shepherd on the draft agreement.
22 We did go through multiple drafts
23 with Virginia's input and without,
24 with Mr. St. James's input and
25 without, so in this particular case,
```

97

```
1            J. ROMERO
2  I don't recall receiving this
3  particular draft from Tom Shepherd.
4     Q.  The draft that's in Exhibit 20, from
5  whom at the hospital did you receive it?
6     A.  I don't recall.
7     Q.  In any event, once you did get it
8  and spoke with Mr. Gio about it, the message
9  Mr. Gio sent you to communicate to Ross is
10 contained in your e-mail in Exhibit 20?
11    A.  Yes.
12    Q.  The third paragraph down, you write,
13 "A decision was made by Caritas that this
14 agreement has exhausted a lot of resources
15 already including time and opportunity.
16 Caritas will cease any more discussions or
17 negotiations after the end of the business
18 day today, December 28, 2006."  Do you see
19 that?
20    A.  Yes.
21    Q.  I take it Mr. Gio told you to send
22 that message as well?
23    A.  It was a combination of Mr. Gio and
24 Mr. McDonald.
25    Q.  And the message they wanted
```

25  (Pages 94 to 97)

98

J. ROMERO

delivered to Ross was take it or leave it at
this point, correct?

A. That's correct.

Q. If we could stay for just a moment
on Exhibit 20, in the course of your work at
the hospital, I take it you've worked with
red line or track changes documents?

A. Yes.

Q. So if we can look at Exhibit 20,
what I would like to talk about is your
understanding of how the red line or the
track changes works in this draft, all
right?  Let's look, if we might, at that
Exhibit B language we were discussing on
ROSS 8489.  And so if we look on that page,
under (b)(i), there is some language and
some underlining.  Do you understand that to
be language that Ross had added to the prior
draft?

A. Yes.

Q. Now, if we look at subparagraph (c),
there are some boxes in the right-hand
margin that says deleted.  Do you understand
that to be language that Ross had taken out

99

J. ROMERO

from the prior draft?

A. Yes.

Q. And if we go to the last two pages
of Exhibit B of this draft marked ROSS 8490
and 8491, there is some other underlined
language on those two pages, correct?

A. Correct.

Q. And do you understand that those
underlined portions to be language that Ross
added to a prior draft?

A. Ross or its attorneys, yes.

Q. And on your e-mail at the first page
of Exhibit 20, what you wrote back to Dr.
Shepherd was that the file document was
reviewed and determined to be acceptable
except for any reference to the existing
Wyckoff Heights Center agreement, Exhibit B,
(b), (i), correct?

A. Correct.

Q. That reference is, is it not, the
language on page ROSS 008489 under (b)(i)?

A. Yes.

(Document marked as Romero
Exhibit 21

100

J. ROMERO

for identification as of this
date.)

Q. Mr. Romero, let me show you a
document that the court reporter has marked
as Exhibit 21.  It's an e-mail and an
attachment from Virginia Smith to, it looks
like, you and Mr. Gio, but we'll discuss
that, and it's been marked as Ross 0614 to
0625.  Is the e-mail address jur9004@nyp.org
yours?

A. Yes.

Q. And djg@nyp.org Mr. Gio's?

A. Yes.

Q. And is this an e-mail that Virginia
Smith sent to you on December 28, 2006?

A. Yes.

Q. Virginia Smith, as you understood,
she was an inhouse lower for DeVry, correct?

A. No, I did understand that she was an
attorney for Ross -- or DeVry.

Q. And she writes to you, "Attached is
a revised draft of the above-referenced
agreement.  This is a clean copy, suitable
for execution.  In accordance with our

101

J. ROMERO

conversation earlier this morning, the sole
change to the document is the deletion in
Exhibit of the paragraph referencing the
existing agreement between Ross and Wyckoff.
As we discussed, the Wyckoff agreement
currently provides for a rate of $312.50 per
week, per clinical clerkship, until the
parties mutually agree otherwise."  What did
you do with this version of the agreement
when you got it?

A. From what I recall, I printed it and
left a copy to be read by Mr. Gio, and I
left a printed copy for Mr. McDonald of
Caritas.

Q. Did you compare the draft that Ms.
Smith sent in Exhibit 21 with the red line
in Exhibit 20 at this time?

MR. LOUGHLIN:  By this time, he
means the morning of December 28th.

THE WITNESS:  I don't recall
comparing it.

Q. In the ordinary course of the
hospital's business, would comparing drafts
of contracts like this be your job or would

102

J. ROMERO

1
2  that be something for Mr. Gio or Mr.
3  McDonald to take care of?
4     A. It would be for Mr. McDonald and Mr.
5  Gio to delegate.
6     Q. Did they delegate that to you?
7     A. I don't recall.
8     Q. Can you recall taking any further
9  steps with the draft of the agreement in
10 Exhibit 21?
11    A. I just recall reading it and giving
12 copies to both administrators.
13    Q. Anything else that you did with the
14 draft?
15    A. No.
16    Q. Mr. Romero, let me direct your
17 attention back to Deposition Exhibit
18 Number 5. It's the affiliation agreement
19 that's signed. Now, if I can direct your
20 attention to the last page whenever you're
21 ready, which is a fax cover sheet, indicates
22 from you to Mr. St. James and Dr. Perri, did
23 you in fact fax or cause to be faxed this
24 signed agreement to Mr. St. James and Dr.
25 Perri?

103

J. ROMERO

1
2     A. I recall sending the document.
3     Q. So you faxed this yourself?
4     A. Yes.
5     Q. Were you the person who provided the
6  draft to Mr. McDonald to be signed?
7     A. I don't recall giving the final
8  draft for him to sign, but I do recall
9  giving him the draft.
10    Q. The signature below Mr. McDonald's
11 on the signed document is Dr. Mandava's, is
12 it not?
13    A. Yes.
14    Q. Did you provide a draft for Dr.
15 Mandava to be signed?
16    A. I left a draft in his office -- I
17 left a draft in McDonald's office for Dr.
18 Mandava.
19    Q. In terms of the process of -- let's
20 take a step back. What I am driving at here
21 is I'm trying to understand the process by
22 which Mr. McDonald came to sign it and then
23 you sent it to Ross, so let me ask questions
24 about that. Were you the person who
25 shepherded the final draft through the

104

J. ROMERO

1
2  signature process before sending it to Ross?
3     A. Yes.
4     Q. Tell us about every step you took in
5  the process.
6     A. From my recollection, the draft that
7  I received was submitted -- was printed from
8  my e-mail and given to Mr. Gio's office and
9  to McDonald's office at St. John's Hospital.
10 These are two locations. So I would leave a
11 draft in Brooklyn at Wyckoff, and I would
12 leave a draft in Queens with Mr. McDonald at
13 Caritas. And then I would leave it with the
14 administrative assistant and then ask that
15 they call me once there are any comments or
16 directives from both administrator. At
17 Caritas, of course, my request at that time
18 was to call me once the signatures were
19 executed.
20    Q. And you physically were located at
21 the time at Wyckoff?
22    A. Yes.
23    Q. When is it that you received a call
24 that the document had been signed?
25    A. From my recollection, when I

105

J. ROMERO

1
2  received the call, it was the same day as I
3  picked up the agreement, the signed
4  agreement, and I faxed it from my McDonald's
5  office.
6     Q. So if we have this right, first you
7  left a copy with Mr. Gio's office and then
8  you went to Queens and left one with Mr.
9  McDonald.
10    A. Yes.
11    Q. Then you went to your office.
12    A. Yes.
13    Q. Then when you received word that Mr.
14 McDonald and Dr. Mandava had signed the
15 agreement, you went back to Queens and faxed
16 it back to Ross from there?
17    A. That's correct. Just for the
18 record, the day I left the draft with Mr.
19 Gio and Mr. McDonald is not necessarily the
20 same day it was signed.
21       (Document marked as Romero
22       Exhibit 22 for identification as
23       of this date.)
24    Q. Mr. Romero, the court reporter has
25 marked as Exhibit 22 a two-page document

27 (Pages 102 to 105)

**106**

J. ROMERO

1   J. ROMERO
2   stamped BQHC 47342 and 343. Is that an
3   e-mail that you sent to Mr. McDonald with a
4   copy to Mr. Gio on February 10, 2007?
5       A.  Yes.
6       Q.  You write, "Sir, thank you for
7   meeting with me before the medical board
8   meeting on Thursday and your assurance of my
9   role at BQHC."  What were the discussions
10  that you had with Mr. McDonald about that?
11      A.  Mr. McDonald at the time of his
12  first few months at Caritas wanted to define
13  several roles that I had in medical
14  education in particular with medical
15  students, and he wanted me to summarize my
16  role at Caritas in what I can do at Caritas.
17      Q.  Under point 1, which is Caritas
18  clerkships, you write, "Orientation for all
19  BQHC students will be at the MIH cafeteria."
20  What orientation are you referring to here?
21      A.  It would be the general introductory
22  orientation of hospital rules and policies
23  for students, for Caritas students, at the
24  MIH cafeteria, and on the second line there
25  is, "All students will be at Wyckoff for

**107**

1   J. ROMERO
2   more orientation."
3       Q.  I misread that, and I apologize to
4   you. Let me start again.  Under point 1,
5   you write, "AUC and Ross students are
6   scheduled to begin at Caritas on 2/21/07.
7   Briefing will be at the MIH cafeteria."
8   Let's talk about the next sentence.  You
9   write, "Orientation for all BQHC students
10  will be at Wyckoff on February 20, 2007."
11  What students would be included in the "all
12  BQHC students" that you discuss there?
13      A.  It would encompass all students from
14  affiliated medical schools at all the
15  clinical sites.
16      Q.  So that would include Wyckoff, Mary
17  Immaculate and St. John's medical students?
18      A.  That's correct.
19      Q.  Were there any other clinical sites?
20      A.  We had satellite sites which are
21  out-patient clinics at Caritas and at
22  Wyckoff.
23      Q.  But in each case, those students
24  would be running through either St. John's,
25  or Mary Immaculate, or Wyckoff?

**108**

1   J. ROMERO
2       A.  Yes.
3       Q.  At the present time, is the only
4   BQHC affiliate that has the capacity to
5   provide clinical clerkship rotations for
6   medical students Wyckoff?  I'm talking about
7   today.
8       A.  I'm not certain about your question
9   because BQHC does not exist in my view.
10      Q.  Is the only entity to which you're
11  affiliated -- let me ask you a better
12  question.  Does Wyckoff have any other
13  affiliates at which it can place medical
14  students for clinic clerkship rotations?
15      A.  Only within its clinical sites which
16  includes the out-patient clinic that I
17  mentioned.
18      Q.  In those instances, it would be
19  Wyckoff's outpatient clinics?
20      A.  Only Wyckoff's.
21          (Document marked as Romero
22          Exhibit 23 for identification as
23          of this date.)
24      Q.  Mr. Romero, the court reporter has
25  handed to you a document that has been

**109**

1   J. ROMERO
2   marked as Deposition Exhibit Number 23.
3   It's been stamped with identification
4   numbers BQHC 13451 through 13453, and it is
5   an e-mail from someone named Joann Purcell,
6   P-U-R-C-E-L-L, to MIH Distribution A, SJQ
7   Distribution A, and WHMC Distribution A.
8   Were you included on any of these
9   distribution lists?
10      A.  I'm not sure.
11      Q.  Did you get this memo?
12      A.  I don't recall.
13      Q.  There was, was there not, a time
14  when Tom Singleton became chief
15  restructuring officer at all the hospital
16  entities?
17      A.  Yes.
18      Q.  At some point in time, for your
19  purposes in dealing with medical education,
20  was it Mr. Singleton who was ultimately
21  making the decisions about those topics?
22      A.  Yes.
23      Q.  And at that point, Mr. Gio was no
24  longer making those decisions.
25      A.  For the most part.

28 (Pages 106 to 109)

110

J. ROMERO

1
2    Q. As you understood it, during the
3  period of time Mr. Singleton was at the
4  hospitals, he had the final say so?
5    A. Yes, except --
6    Q. What exception?
7    A. For a few matters.
8    Q. Which matters were those?
9    A. May I say as an example?
10    Q. Sure.
11    A. And example would be when Ross
12  University decided to renew or revise their
13  agreement with Wyckoff, Mr. Singleton had
14  instructed me to involve Mr. Gio.
15    Q. And there was, was there not, an
16  amendment in 2007 or 2008 to the
17  Wyckoff-Ross affiliation agreement?
18    A. Yes.
19    Q. And so Mr. Singleton directed you to
20  involve Mr. Gio in that process?
21    A. Yes.
22    Q. And Mr. Singleton was the one who
23  actually signed that amendment, did he not?
24    A. I'm not certain.
25    Q. Wyckoff continues to supply to Ross

111

J. ROMERO

1
2  clinical clerkships for Ross's medical
3  students at Wyckoff under that amendment,
4  correct?
5    A. Yes.
6    Q. And Ross pays Wyckoff for those
7  clerkships?
8    A. Yes.
9    Q. At some point in time, did you begin
10  discussing with Ross the potential for
11  amending the affiliation agreement in
12  Exhibit 5 to add additional prepayments and
13  additional clerkship slots?
14    A. May I review that?
15    Q. Absolutely.
16    A. Yes.
17    Q. Were those discussions about
18  amendment of the agreement, when you had
19  them, primarily with someone named Joseph
20  Chu, C-H-U?
21    A. Yes.
22    Q. What did you understand Mr. Chu's
23  role at Ross to be?
24    A. Dr. Chu was, at that time, the
25  clinical dean for Ross University and is in

112

J. ROMERO

1
2  charge of developing clinical agreements
3  with hospitals for Ross University.
4    Q. So at that point, your liaison for
5  contract negotiations at Ross changed from
6  being Dr. Perri to Dr. Chu?
7    A. Yes.
8    Q. On your side of things, on the
9  hospital side of things, the major deal
10  points -- strike that.
11    Is it the case that once Mr.
12  Singleton arrived at the hospital, that the
13  decision maker for you on deal points became
14  Mr. Singleton?
15    A. Yes.
16    (Document marked as Romero
17    Exhibit 24 for identification as
18    of this date.)
19    Q. Mr. Romero, the court reporter has
20  marked as Exhibit 24 an e-mail that's been
21  stamped with identification number BQHC
22  40627.  Is that an e-mail from you to Dr.
23  Chu and it looks like it returned back.
24  It's kind of tough to figure.
25    A. The body of this e-mail is from Dr.

113

J. ROMERO

1
2  Chu.
3    Q. What confuses me is your signature
4  block is up there some place.  Before we get
5  to the document, let's take a sideline.
6  There's a number of documents that the
7  defendant has produced in this case, e-mails
8  where your signature block lists you as
9  assistant vice president medical education
10  for Brooklyn Queens Health Care, Inc.,
11  Wyckoff Heights Medical Center, Caritas-Mary
12  Immaculate, and Caritas-St. John's.  During
13  the period of time when your e-mail lists
14  facilities at which you were -- strike that.
15    The signature block on this e-mail
16  lists you as assistant vice president
17  medical education for Brooklyn Queens Health
18  Care, Inc., Wyckoff Heights Medical Center,
19  Caritas-Mary Immaculate Hospital and
20  Caritas-St. John's Queens Hospital.  During
21  the time when your signature block on your
22  e-mail listed different facilities, did you
23  hold that office at each of those entities
24  listed?
25    A. I held that office at Wyckoff and at

29  (Pages 110 to 113)

114

1          J. ROMERO
2   Mary Immaculate physically.
3          MR. LOUGHLIN:  I'm not sure that
4   you understood the question.  I
5   don't think it refers to where you
6   actually had a physical office.
7          MR. TZANETOPOULOS:  Right. I
8   was not asking about where your
9   office was physically located.  My
10  question is were you vice president
11  at the entities listed in your
12  signature block whenever they were
13  on your signature block?
14         MR. LOUGHLIN:  You should just
15  describe what roles you had.
16  Whether or not you wrote this or
17  Joseph Chu wrote this, if there are
18  other e-mails that list you as
19  having those roles, you should just
20  describe your understanding of what
21  those roles involved.
22         THE WITNESS:  It was indeed my
23  understanding that I represent
24  student-related activities for
25  Wyckoff Heights Medical Center and

115

1          J. ROMERO
2   the Caritas hospitals.
3          (Document marked as Romero
4          Exhibit 25 for identification as
5          of this date.)
6   Q.  Mr. Romero, the court reporter has
7   handed you a document marked Exhibit 25.
8   It's been marked as identification numbers
9   ROSS 007674 and 7675.  Is it, is it not, an
10  e-mail exchange between you and Dr. Chu?
11  A.  Yes.
12  Q.  And the bottom e-mail is the one
13  that you sent to Dr. Chu on October 15,
14  2007?
15  A.  Yes.
16  Q.  And if you look, your signature
17  block or your identification block in your
18  e-mail to Dr. Chu lists you as assistant
19  vice president medical education Brooklyn
20  Queens Health Care, Inc., Wyckoff Heights
21  Medical Center, Caritas-Mary Immaculate
22  Hospital, and Caritas-St. John's Queens
23  Hospital.  Would you ever send out, sir, an
24  e-mail listing as you as an officer of an
25  entity where you were not an officer?

116

1          J. ROMERO
2   A.  No.
3   Q.  So we could agree, can we not, that
4   at this time you were assistant vice
5   president of medical education at Brooklyn
6   Queens Health Care, Inc., correct?
7          MR. LOUGHLIN:  Objection to
8          form.
9          THE WITNESS:  In that role, in
10         those particular roles for those
11         hospitals.  There is no -- Brooklyn
12         Queens Health Care was established
13         by Mr. Gio or whoever it is that
14         established it.  There was no formal
15         appointment for individuals to have
16         specific titles, although we all had
17         our roles marked for us
18         individually, and in this case,
19         these were marked for my role with
20         the medical education program.
21  Q.  Let's go back to the topic that came
22  up earlier.  At this period of time, you had
23  an office at Wyckoff, did you not?
24  A.  Yes.
25  Q.  And you also had an office at St.

117

1          J. ROMERO
2   John's?
3   A.  No.
4   Q.  Was your only physical office at
5   Wyckoff?
6   A.  No, I had an office at Mary
7   Immaculate Hospital and at Wyckoff.
8   Q.  That's 50-50.  Did Brooklyn Queens
9   Health Care have a physical location?
10  A.  None that I recall.
11  Q.  If I can take your attention back to
12  Exhibit 24, Dr. Chu writes to you, "As we
13  discussed on the telephone yesterday and
14  today, Ross University has reached an
15  agreement with Caritas and Wyckoff Heights
16  Medical Center.  Ross University will prepay
17  $4.5 million to Caritas for the following:"
18  and then there is a list.  What do you
19  recall about those discussions?
20  A.  Dr. Chu, from my recollection, was
21  renegotiating the existing agreement at
22  Caritas and was also trying to renegotiate
23  the agreement at Wyckoff.
24  Q.  There are references throughout the
25  text to positions for XXX.  Do you see where

**www.uslegalsupport.com**

118

J. ROMERO

1   I am in 2 and 3, 1?
2       A. Yes.
3       Q. Did you have an understanding of
4   what XXX meant?
5       A. No.
6       Q. Is it the case that you were really
7   discussing with Dr. Chu positions then
8   contractually committed to AUC?
9       A. It's possible
10          (Document marked as Romero
11          Exhibit 26 for identification as
12          of this date.)
13      Q. Mr. Romero, the court reporter has
14  handed you a document that's marked as
15  Exhibit 26. It's an e-mail string marked
16  with identification numbers BQHC 19857
17  through 19861. This is, is it not, an
18  e-mail exchange between you and Mr.
19  Singleton, and a little bit later, there is
20  an inclusion of Barbara Aubel, A-U-B-E-L,
21  Paul Goldberg, and Ajay Lodha, A-J-A-Y,
22  L-O-D-H-A; is that correct?
23      A. Yes.
24      Q. What was the purpose of your e-mails
25

119

J. ROMERO

1   to Mr. Singleton?
2       A. Mr. Singleton had, at that time,
3   asked all the parties concerned, myself
4   included, to evaluate the contracts that we
5   had at Wyckoff and at Caritas.
6       Q. And who other than you had Mr.
7   Singleton asked to do so?
8       A. Mr. Paul Goldberg from his company,
9   Dr. Ajay Lodha, chief medical officer of
10  Caritas, Lee Barkan. I think that's all I
11  can recall.
12      Q. Mr. Barkan was an attorney at the
13  Proskauer Rose law firm?
14      A. I believe so.
15      Q. And he was the hospital's legal
16  counsel outside?
17      A. I believe from my recollection, Mr.
18  Barkan came on board after Mr. Hoffman left.
19  I would add Mr. Hoffman to this discussion.
20      Q. Mr. Singleton asked you to evaluate
21  whether additional funds could be raised for
22  the hospitals by entering into amendments or
23  additional affiliation agreements with
24  medical schools?
25

120

J. ROMERO

1       A. Yes.
2       Q. And is that what you were evaluating
3   in the different scenarios that are listed
4   in this e-mail?
5       A. I wanted to open up a discussion for
6   them to review the contracts, and I wanted
7   them to have a summary of my own discussions
8   regarding possibilities between the two
9   medical schools involved at Caritas at that
10  time, AUC and Ross.
11      Q. And are the scenarios listed in this
12  exhibit a result of that work?
13      A. Yes, the scenarios are the
14  discussions of that.
15      Q. If I can direct your attention to
16  the page stamped BQHC 19859, that looks to
17  be your first e-mail to Mr. Sarli, Mr.
18  Hoffman, and Mr. Singleton in this exhibit,
19  correct?
20      A. I'm not certain if this is the first
21  e-mail.
22      Q. But at least in this exhibit.
23      A. Yes, this is my e-mail.
24      Q. And you write, "The attached is
25

121

J. ROMERO

1       AUC's counteroffer." Counter to what?
2       A. In the fall of 2007, AUC had
3   proposed to revise the agreement, the
4   promissory note, with Caritas, and
5   discussions were made between Dr. Kaplan,
6   the clinical dean at AUC and Mr. Singleton,
7   and myself present in some of those
8   discussions, to modify their existing
9   promissory note.
10      Q. And what modifications were they
11  looking for?
12      A. They were looking for -- in my
13  recollection, they were basically looking
14  for two modifications, qualitative and
15  quantitative modifications in the number of
16  slots that are placed and the number of
17  slots that are vacated, whether or not they
18  should pay for vacated or unscheduled slots.
19  Qualitative-wise they wanted limitations in
20  the number of students that are seen by
21  faculty by way of a ratio, and they wanted
22  to increase clinical cases just for their
23  own students separate from Ross, as I recall
24  it.
25

31 (Pages 118 to 121)

122

```
 1            J. ROMERO
 2      Q. Let me see if I can fairly translate
 3  that in layman's terms.  Is it the case that
 4  the hospitals wanted AUC to be charged for
 5  clerkship rotations if it had been reserved
 6  for AUC but AUC didn't provide a student,
 7  and then AUC did not want to be charged for
 8  those instances?
 9      A. Yes.
10      Q. And that was the one point.  They
11  also, at AUC, wanted a limit on the number
12  of clerks that would be present at the
13  hospitals based on some ratio --
14      A. Yes.
15      Q. -- of clerks to doctors?
16      A. Correct.
17      Q. And they wanted special treatment on
18  clinical cases just for their own students.
19      A. That's correct.
20      Q. And what is it that you were looking
21  for in this negotiation?
22      A. I believe -- if I may, I believe I
23  was looking for some balance between Ross
24  University and AUC.  I could not make a
25  comment on the clinical and the quality
```

123

```
 1            J. ROMERO
 2  issues, but at the time I was pushing for
 3  balance.
 4      Q. And you were also, were you not,
 5  looking for the opportunity -- let's go back
 6  a step.  Was it a problem between the
 7  hospitals and AUC that AUC would have
 8  reserved slots but then not turn up students
 9  for those slots?
10      A. Yes.
11      Q. Did you have such a problem with
12  Ross?
13      A. Yes.
14      Q. To the same degree?
15      A. No.
16      Q. I take it AUC was the bigger
17  problem?
18      A. To that extent, yes.
19      Q. Now, your e-mail goes down on that
20  same page to reflect that "Ross is offering
21  Caritas $4.5 million for AUC's share of
22  Caritas slots (Plan B)."  And then if you go
23  on your e-mail, there is a Plan B on the
24  next page.  Is it the case that you were in
25  discussions with Dr. Chu in which he had
```

124

```
 1            J. ROMERO
 2  offered to pay $4.5 million prepayment if
 3  you were willing to commit to him the 50
 4  slots that AUC held at the Caritas
 5  hospitals?
 6      A. To the extent that the 50 slots are
 7  vacant.
 8      Q. And you write on your plan B,
 9  "Release the cap."  Does that reference the
10  fact that if you vacated AUC and replaced
11  those slots would Ross students, you
12  wouldn't have the issue of having this ratio
13  cap of a number of clerkships offered by the
14  hospital?
15      A. There was a cap on the promissory
16  note with AUC, and that was the cap I was
17  alluding to.
18      Q. So if you replaced AUC with Ross,
19  that cap would be released, correct?
20      A. Yes.
21      Q. And the reason that was advantageous
22  to the hospitals is that it would mean that
23  you could offer more clinical clerkship
24  rotations, correct?
25      A. Yes.
```

125

```
 1            J. ROMERO
 2      Q. And by offering additional
 3  rotations, potentially raise additional
 4  funds by charging for those rotations.
 5      A. The reason for the release of the
 6  cap, the reason I requested for the release
 7  of the cap is because we opened up electives
 8  and core rotations particularly in
 9  psychiatry, and that's one of the main
10  reasons why I needed the cap released.
11      Q. It is the case, is it not, though,
12  that releasing the cap would enable the
13  hospitals to earn more money by selling more
14  clerkships slots?                         ,
15      A. We would be able to charge for more
16  clerkship slots.
17      Q. And then there is a Plan C, and
18  there is some discussion of modifications.
19  In layman's terms, is it the case that what
20  you were conveying there, one was that an
21  option was to attempt to negotiate with both
22  Ross and AUC modifications which would have
23  students from both schools there but change
24  caps, and ratios, and prices?
25      A. Specific to the interest payments
```

32  (Pages 122 to 125)

126

J. ROMERO

1    and the caps. I was trying to encourage Mr.
2    Singleton to have a dialogue with both
3    medical schools in this plan.
4        Q. So if you can summarize Plans A, B
5    and C on a very high level, Plan A is no
6    change but deal with the interest payments,
7    Plan B is replace AUC with Ross, and Plan C
8    is talk to both schools but modify the
9    contracts.
10       A. Correct.
11       Q. If we go to page BQHC 19859, Mr.
12   Singleton responds, and he writes, "It seems
13   the Plan B produces $1.3 million of
14   immediate cash plus gives us additional
15   slots to sell. If this is correct, Plan B
16   is tough to beat. What is the down side to
17   plan B?" Did you understand what he was
18   talking about there?
19       A. Yes.
20       Q. The 1.3 in cash that Mr. Singleton
21   discusses there that would be produced for
22   the hospitals is the result of the fact that
23   there was $3.2 million of unamortized
24   prepayment from AUC for slots that Ross had

127

J. ROMERO

1    offered $4.5 million to acquire, correct?
2        A. That's my understanding.
3        Q. So if you swapped out AUC and
4    replaced it with Ross at those prices, that
5    would generate an immediate gain of
6    $1.3 million, correct?
7        A. Yes.
8        Q. Also, you lose the cap; you like
9    that part, correct?
10       A. Yes.
11       Q. And then he asked you what's the
12   down side.
13       A. That's correct.
14       Q. Your response to Mr. Singleton's
15   question about the down side begins, does it
16   not, at BQHC 19857 at the bottom of the
17   page?
18       A. Yes.
19       Q. So your response to Mr. Singleton's
20   question begins at the bottom of the first
21   page of Exhibit 26.
22       A. Yes.
23       Q. And what you write to Mr. Singleton
24   in response to his question about the down

128

J. ROMERO

1    side is, "We could indeed infuse some cash
2    with Plan B (and it is still available). I
3    was exploring our long-term relationship
4    with the schools and the possibility of a
5    monopoly by one school," right?
6        A. Yes.
7        Q. The next thing you say is, "Plan B
8    Scenario:" The Plan B Scenario refers, does
9    it not, to the Plan B of your first e-mail
10   and the Plan B in Mr. Singleton's question?
11       A. Yes.
12       Q. Then you write, "AUC is pulled out
13   of Caritas. Ross gets exclusivity for of
14   the next three years, options for year 4 and
15   5. We get $1.3 million." What discussions
16   had you had with Ross about a three-year
17   term in options?
18       A. This discussion, from my
19   recollection, is what Dr. Chu was trying to
20   propose to Caritas at the time.
21       Q. And your statement, "We get
22   $1.3 million," that is a reference to the
23   difference between the price that you
24   testified about earlier?

129

J. ROMERO

1        A. Yes.
2        Q. And then you write to Mr. Singleton,
3    "In a worst-case scenario, a fall-out by the
4    residency programs or institution will make
5    us responsible for unamortized payments plus
6    interest of up to $9.5 million (initial
7    $5 million plus $4.5 million). Slots lost
8    at Caritas are guaranteed at Wyckoff as per
9    both contracts."
10       A. That's what I wrote to Mr.
11   Singleton.
12       Q. The two contracts that you were
13   referring to in that part of your e-mail are
14   the AUC contract, the AUC promissory note,
15   and the Ross affiliation agreement, correct?
16       A. In this last line, "Slots lost at
17   Caritas are guaranteed at Wyckoff as per
18   both contracts," I was really alluding to
19   AUC. From what I recall, the promissory
20   note is what we had at Wyckoff, and what I
21   was discussing with Mr. Singleton with Ross
22   in this particular case is the monetary
23   obligation on the unamortized monies that
24   was being proposed by Dr. Chu.

130

J. ROMERO

Q. Did you have more than one contract
with AUC for the Caritas hospitals?

A. No. If I recall, we only had a
promissory note.

Q. Earlier you may have discussed about
the fact that the unamortized balance on the
AUC notes was only $3.2 million, correct?

A. Yes.

Q. So it's not the case, is it, that if
AUC pulled out of Caritas, you would be
responsible for $9.5 million, correct?

A. Correct.

Q. The contract with Ross involved a
$5 million prepayment, correct?

A. That's correct.

Q. And the proposal on the table from
Ross was an additional $4.5 million.

A. That's correct.

Q. And that adds up to $9.5 million,
correct?

A. Correct.

Q. So the responsibility for $9.5
million really refers, does it not, to the
$5 million from Ross's original affiliation

131

J. ROMERO

agreement and the four and a half from the
proposal, right?

A. That's correct.

Q. If we go down further to the bottom
of that page, you write to Mr. Singleton,
"If we go with Plan B, I recommend an
airtight exit, with a complete review of the
agreement with AUC. I sent David Hoffman a
copy of the contract last month. To
maintain good relations, we can offer them
electives and some cores (if Ross agrees)."
Your concern was, was it not, that if you
replaced AUC with Ross, AUC might sue the
hospitals?

A. Yes, it's a possibility.

Q. So your concern, as expressed to Mr.
Singleton here, was that if you were going
to engage in this transaction, you first
must decide that you really could get out of
the AUC contract?

A. At that time, AUC was in discussion
with Mr. Singleton already, so yes, I did
encourage him to have a dialogue with both
schools.

132

J. ROMERO

Q. And your concern here that you
expressed to Singleton is that if you were
going to make the swap, Ross with AUC, the
hospitals needed to know that they could get
out of the AUC contract without liability.

A. Yes.

Q. And it says here that you sent a
copy of that contract to Mr. Hoffman last
month, correct?

A. Correct.

Q. That was the AUC contract?

A. Yes.

Q. And your purpose in doing so was to
ask him to review whether or not it was
possible to get out of it?

A. Yes.

Q. At the top e-mail on the first page
of Exhibit 26, toward the top of the e-mail,
Mr. Singleton says that he would like to
meet with Julius, Paul, and Dr. L. I take
it you understand Julius to be you.

A. Yes.

Q. Paul is Paul Goldberg.

A. Goldberg.

133

J. ROMERO

Q. And Dr. L is Dr. Lodha, I take it?

A. Might have been.

Q. Was there such a meeting?

A. I don't recall the meeting.

(Document marked as Romero
Exhibit 27 for identification as
of this date.)

Q. Mr. Romero, the court reporter has
handed to you a document marked Exhibit 27.
It's been stamped with identification
numbers ROSS 7512 and 7513. It's an e-mail
exchange between you and Dr. Chu, is it not?

A. Yes.

Q. Now, just to be fair to you, I'll
fast forward to save us time. There had
been negotiations and additional e-mails
between and you Dr. Chu on mainly both the
Caritas and Wyckoff contracts during this
period of time, had there not?

A. Yes.

Q. And at this point in time, the two
of you had exchanged some draft contracts.

A. I believe so.

Q. Your e-mail to Dr. Chu on the first

134

J. ROMERO

1   page dated November 27, 2007 at 12:33 p.m.,
2   it says, "Legal reviewing final touches on
3   contract."  And then at the bottom, it says,
4   "If you can, please call me or Clair
5   Mullally, Esq. at (718)558-2001."  Who is
6   Claire Mullally?
7       A.  Claire Mullally was a counsel for
8   Caritas at that time who was involved in
9   viewing the draft issues.  M-U-L-L-A-L-L-Y.
10      Q.  So Ms. Mullally was the hospital's
11  inhouse lawyer?
12      A.  Yes, of Caritas.
13      Q.  During the course of your work
14  exchanging draft amendments to the BQHC-Ross
15  affiliation agreement with Dr. Chu, had Ms.
16  Mullally been involved in the process?
17      A.  Yes, she was the person who was
18  exchanging drafts with Dr. Chu.
19      Q.  So from your side, it was the
20  hospital's lawyer swapping drafts with Dr.
21  Chu?
22      A.  Yes, copied to me.
23      Q.  For ease of reference, Mr. Romero,
24  I'm going to put Exhibit 6, that's the

135

J. ROMERO

1   amendment to the affiliation agreement
2   before you.  Before I do that let's mark
3   this.
4           (Document marked as Romero
5           Exhibit 28 for identification as
6           of this date.)
7       Q.  Exhibit 28, as marked by the court
8   reporter, is an e-mail string marked with
9   identification numbers BQHC 47571 and 572,
10  that is, is it not, copies of an e-mail
11  exchange between you, Mr. Goldberg, Mr.
12  Sarli, and Mr. Haas, H-A-A-S?
13      A.  Yes.
14      Q.  Who is Mr. Haas?
15      A.  I can only recall that he worked for
16  Mr. Goldberg.
17      Q.  You write in the top e-mail on
18  December 4, 2007, "Final signatures to be
19  made.  Paul G will need to sign two docs
20  with me today.  Wire is set up and will be
21  sent once the signatures are received."  Do
22  you see that?
23      A.  Yes.
24      Q.  The two documents, are those the

136

J. ROMERO

1   amendments to the Ross-BQHC affiliation
2   agreement and also the Ross-Wyckoff
3   affiliation agreement?
4       A.  I can only recall the Caritas
5   agreement.  I'm not certain about the second
6   reference.
7       Q.  At least one of those documents
8   would be the amendment to the Ross-BQHC
9   agreement?
10      A.  The Ross-Caritas agreement.
11      Q.  That would be Romero Exhibit 6
12  entitled Amendment to Affiliation Agreement
13  between Ross University School of Medicine
14  and School of Veterinary Medicine and
15  Brooklyn Queens Health Care, Inc. through
16  Caritas Health Care?
17      A.  Yes.
18      Q.  Why was it that you know that Mr.
19  Goldberg was going to be signing these
20  agreements?
21      A.  I remember the particular day.  Mr.
22  Singleton nor Dr. Lodha were present at the
23  time.  We were instructed by Mr. Singleton
24  through Mr. Goldberg to take care of the

137

J. ROMERO

1   signatures through Mr. Goldberg's office.
2       Q.  So your contact on this signature
3   was from Mr. Goldberg?
4       A.  Yes.
5       Q.  I take it what he told you was that
6   Mr. Singleton was away from the hospitals,
7   so get the agreements to Mr. Goldberg for
8   signature?
9       A.  Someone had mentioned that Mr.
10  Goldberg would be handling it for Mr.
11  Singleton.
12      Q.  Do you remember who that was?
13      A.  No.
14      Q.  If we can refer back to the
15  amendment in Exhibit 6, please, the
16  amendment does, does it not, call for Ross
17  to make additional prepayments and get some
18  additional slots, correct?
19      A.  Yes.
20      Q.  Were you the one that presented the
21  final draft to Mr. Goldberg for signature or
22  was that something that Ms. Mullally did?
23      A.  Everything at that time was through
24  Ms. Mullally.

35 (Pages 134 to 137)

138

J. ROMERO

Q. So it would have been the inhouse lawyer that gave it to him to be signed?

A. And to myself, yes.

Q. Next question: Who gave it to you?

A. Ms. Mullally.

Q. Did she instruct you to sign it?

A. Yes.

Q. Let's take a ten-minute break.

(Whereupon, a recess was taken.)

(Document marked as Romero Exhibit 29 for identification as of this date.)

Q. Mr. Romero, the court reporter has handed you a document that she has marked as Exhibit 29. It's an e-mail exchange between you and Mr. Singleton forwarding material you received from Dr. Chu. It's been marked BQHC 39559 through 39560. This is an e-mail that -- the last page has been redacted but appears to be one from Dr. Chu to you and Ms. Mullally, correct?

A. Yes.

Q. Looks like a draft agreement, red line and clean copy. The first page, is

139

J. ROMERO

that your e-mail forwarding on clean and red line to Mr. Singleton?

A. Yes.

Q. I guess from your indication in your note it is correct, is it not, that Ross had already signed the contract?

A. From my understanding, yes.

Q. And Claire would be Claire Mullally?

A. Yes.

Q. The question for Mr. Singleton is whether you and Mr. Goldberg should sign it at that point?

A. Yes.

Q. He indicates you got to wait until he gets back tomorrow.

A. Yes.

Q. Does it spark any recollection about how this actually happened?

A. No.

(Document marked as Romero Exhibit 30 for identification as of this date.)

Q. Mr. Romero, I'm handing you a document which has been marked as

140

J. ROMERO

Exhibit 30. It's been stamped with identification numbers ROSS 001564 and 001565. This is, is it not, a copy of an e-mail that Claire Mullally sent to Wilfredo Raymundo, R-A-Y-M-U-N-D-O, with a copy to you and Dr. Chu?

A. Yes.

Q. And where I would like to direct your attention is to the name or signature block of Ms. Mullally. It lists her as interim counsel for Brooklyn Queens Health Care, Inc., Wyckoff Heights Medical Center, and Caritas. Earlier in your testimony, you said that Ms. Mullally was lawyer for Caritas. Does this refresh your recollection, sir, that she was also inhouse counsel for Brooklyn Queens Health Care and Wyckoff Heights Medical Center?

A. I was not aware that she was.

Q. The commercial deal points for the first amendment in Exhibit 6, were those points that were substantively negotiated between Dr. Chu and someone from the hospital other than you?

141

J. ROMERO

MR. LOUGHLIN: Objection to form. Do you understand the question?

THE WITNESS: If Dr. Chu discussed with other --

Q. I'm talking about the hospital side. Were you the deal point guy for the hospital with Dr. Chu or was there somebody else?

A. It would be Mr. Singleton as well.

Q. We've also marked as Exhibit 7 the second amendment to the affiliation agreement. The drafts of that agreement that went back and forth between the parties, were you the source of the exchange for the hospital side, or did Ms. Mullally or somebody else do that?

A. Ms. Mullally and I worked together in receiving the draft proposals.

Q. On the hospital side, who was responsible for the substance of the negotiation?

A. At that time, it was Mr. Singleton.

Q. Were you at all responsible for the substantive points?

36 (Pages 138 to 141)

142

J. ROMERO

1
2     MR. LOUGHLIN:  Objection to
3  form.  Can you answer the question?
4     MR. TZANETOPOULOS:  Actually, I
5  think he already has.  I withdraw
6  that.  I think we did that early on.
7  I apologize.
8     Q.  Again, you can look at this as much
9  as you would like.  Where I would like to
10  direct your attention ultimately is to the
11  provisions of the contract contained --
12     MR. LOUGHLIN:  Are you referring
13  to the second amendment?
14     MR. TZANETOPOULOS:  Yes,
15  Exhibit 7, the second amendment.
16  Portions on the exhibit, pages 3 and
17  4, under the heading, Litigation.
18  Take a minute, take a look, and then
19  I'll ask you some questions.
20     Q.  At the time that Ross and BQHC
21  signed Exhibit 7, AUC had sued Caritas and
22  BQHC and Wyckoff, had it not?
23     A.  Yes.
24     Q.  Had you played a part in the
25  discussions with AUC informing AUC that it

143

J. ROMERO

1
2  was the hospital's intention to prepay the
3  AUC promissory note and provide those slots
4  to a school other than the American
5  University of the Caribbean?
6     A.  Could you repeat that question?
7     (Whereupon, the referred
8     question was read back by the
9     Reporter.)
10     THE WITNESS:  I don't recall
11     that language.
12     Q.  To your understanding, were those
13  discussions conducted either by Mr.
14  Singleton or by counsel?
15     A.  I believe, from my recollection,
16  these were discussed, all of these items
17  were discussed, but I'm not particularly
18  sure about the prepaying or the -- if you're
19  referring to unamortized monies, to pay off
20  unamortized monies, I was aware of that.
21     MR. LOUGHLIN:  I think the
22     question was whether you personally
23     participated in discussing with AUC
24     the steps that would be taken
25     leading to Exhibit 7, the second

144

J. ROMERO

1
2  amendment agreement with Ross or
3  whether you know whether someone
4  else participated in those
5  discussions.
6     THE WITNESS:  I was aware of it,
7     I was aware of it.
8     Q.  Were you one of the ones that talked
9  with AUC about prepaying the unamortized
10  portion?
11     A.  I don't recall anything official to
12  AUC.
13     Q.  But anything unofficial?
14     A.  I recall, I believe, a telephone
15  discussion with an AUC employee that
16  something in that nature is being discussed
17  and that it's best to have a dialogue with
18  Caritas administration.
19     Q.  With whom did you speak with?
20     A.  I believe I spoke with Ed Kulesa,
21  former employee at Wyckoff who now works for
22  AUC.  K-U-L-E-S-A.
23     Q.  You were aware, were you not, that
24  the hospitals did in fact attempt to return
25  payment of the unamortized funds to AUC on

145

J. ROMERO

1
2  the promissory note, correct?
3     A.  I was aware of that.
4     Q.  And you were also aware, were you
5  not, that hospital administration's plans
6  for those slots were to sell them to Ross,
7  correct?
8     A.  To replace vacated slots with the
9  Ross amendment.
10     Q.  And in effect, hospital
11  administration had, had it not, executed
12  what in your e-mail in Exhibit 26 was your
13  Plan B?
14     A.  A part of that.
15     Q.  Other than the change in price, was
16  it essentially your Plan B?
17     MR. LOUGHLIN:  Meaning the
18     second amendment?
19     MR. TZANETOPOULOS:  Yes.
20     THE WITNESS:  Essentially, yes.
21     Q.  By the time the parties signed the
22  second amendment, as you testified, AUC had
23  sued the hospital entities.  Were you
24  involved in the discussions with Ross about
25  how to deal between the parties with the

37  (Pages 142 to 145)

146

J. ROMERO

1
2 fact that AUC had sued?
3     A. Yes, to an extent, yes.
4     Q. With whom did you talk at Ross about
5 that?
6     A. Dr. Chu, I believe, for the most
7 part.
8     Q. And what were the substance of the
9 conversations between you and Dr. Chu?
10     A. To my recollection, most of our
11 discussions were directly just related to
12 the vacated slots that are now available for
13 Ross to fill and for Dr. Chu's department,
14 the clinical department, to place their
15 students at Caritas.
16     Q. Did you or Dr. Chu discuss the
17 potential effect of an injunction should AUC
18 have obtained an injunction in its suit on
19 the ability to place those students?
20     A. I don't recall a direct discussion
21 with me and Dr. Chu, but I do recall -- at
22 that time I was aware of the possibility
23 from what I have heard from Lee Barkan or
24 Claire Mullally.
25     Q. Were the discussions about --

147

J. ROMERO

1
2     MR. LOUGHLIN:  Just don't
3 discuss anything about
4 communications with Mr. Barkan or
5 Ms. Mullally.  That's privileged
6 communications.
7     Q. Were the discussions about how to
8 deal about an injunction being had at least
9 to your understanding between the lawyers
10 for the two parties?
11     A. I have no idea.
12     Q. Would you have any idea as to who
13 was conducting the discussions?
14     A. No.
15     Q. Is your only understanding of the
16 communications between the parties about how
17 to handle a potential injunction what was
18 told to you by the hospital's lawyers?
19     A. No.  I have no recollection of
20 having anyone discuss the injunction with me
21 directly.
22     Q. How about indirectly?
23     A. Or indirectly for that matter.
24     Q. The litigation section of the second
25 amendment, Exhibit 7, between pages 3 and 4,

148

J. ROMERO

1
2 generally addresses what would happen if,
3 and I'm quoting on page 3, "As a result of
4 such injunction or other court order, BQHC
5 is unable to provide 135 core clerkship
6 slots to Ross guaranteed hereunder," and
7 there is some -- what do you do if that
8 happens.
9     MR. LOUGHLIN:  To make sure that
10 the record is clear, the last
11 portion of the exhibit that you were
12 reading from says that if those
13 things happen, this amendment shall
14 automatically terminate and be of no
15 further force and effect except with
16 respect to the indemnification.
17     MR. TZANETOPOULOS:  It goes on
18 to say much more than that but --
19     MR. LOUGHLIN:  Well, that is the
20 paragraph that you were reading
21 from.  That is the final sentence in
22 that paragraph.
23     Q. Here is my question for you,
24 Mr. Romero:  After this agreement was
25 signed, did in fact the hospitals provide

149

J. ROMERO

1
2 ultimately 135 core rotations to Ross's
3 students?
4     MR. LOUGHLIN:  When you say the
5 hospitals, you mean Caritas?
6     MR. TZANETOPOULOS:  St. John's
7 and Mary Immaculate.
8     THE WITNESS:  Eventually we did.
9     (Document marked as Romero
10 Exhibit 31 for identification as
11 of this date.)
12     Q. Mr. Romero, the court reporter has
13 marked as Exhibit 31 a document has been
14 stamped with identification number BQHC
15 49172.  Is that an e-mail that you sent to
16 Dr. Chu on May 23rd of 2008?
17     A. Yes.
18     Q. You write to Dr. Chu, "We will have
19 a separate meeting with the chairs on that
20 day."  You go on to say that he should feel
21 free to observe during the orientation on
22 the given day.  "Tom Singleton and the team
23 (lawyer/myself) have discussed the issues
24 including the recent preliminary injunction
25 order and will keep all Ross students in the

38 (Pages 146 to 149)

150

J. ROMERO

1 core rotations at every rotation block
2 scheduled," correct?
3     A. Correct.
4     Q. This was, was it not, an e-mail that
5 you sent to Dr. Chu after the Federal
6 District Court in Florida had entered on
7 injunction on behalf of AUC, correct?
8     A. I'm not certain about the timeline.
9     Q. You are aware, are you not, that in
10 fact the Federal District Court of Florida
11 did have an injunction on behalf of AUC?
12     A. I am aware of that, yes.
13     Q. And the injunction required, did it
14 not, that the AUC students continue to be
15 provided slots at Mary Immaculate and St.
16 John's?
17     A. I believe that was the directive.
18     Q. And I take it that posed a problem
19 for you potentially because you had hoped to
20 commit some of those slots to Ross, right?
21     A. It was a scheduling challenge.
22     Q. And the challenge being presented by
23 the fact that Ross had paid money for slots
24 that it hoped to be vacated but now weren't

151

J. ROMERO

1 as a result of the injunction?
2     A. That's correct.
3     Q. What discussions did you have with
4 the folks at Ross about how to address that
5 challenge?
6     A. From my recollection, the cap at
7 that time was released, and we kept the
8 students at Caritas as scheduled. Ross
9 would be sending the names of students and
10 the number of students to Caritas, and we
11 basically accommodated what they sent to us.
12     Q. So what the hospitals did was expand
13 a number of clerks accommodated at the
14 hospitals and then provide both schools with
15 the appropriate numbers?
16     A. Based on the agreement, yes.
17         (Document marked as Romero
18         Exhibit 32 and 33 for
19         identification as of this date.)
20     THE WITNESS: I think when I
21 mentioned agreement, what I meant
22 was the number of core clerkships in
23 the agreement.
24     MR. LOUGHLIN: Just for

152

J. ROMERO

1 avoidance of confusion, what you
2 meant, I think, is when you were
3 referring to the scheduling
4 challenge that you were able to
5 accommodate the AUC and the Ross
6 clerkships at least with respect to
7 the core clerkships identified in
8 the agreements; is that your
9 testimony?
10     THE WITNESS: Yes. Thank you.
11     Q. Mr. Romero, the court reporter has
12 handed you two documents that have been
13 marked as Exhibits 32 and 33. Exhibit 32 is
14 Plaintiff's Second Set of Interrogatories to
15 Defendants, and Exhibit 33 is Defendant
16 Wyckoff Heights Medical Center's Responses
17 and Objections to Plaintiff's Second Set of
18 Interrogatories. Mr. Romero, counsel told
19 us, I think, at Mr. Garg's, G-A-R-G,
20 deposition that you were given the task of
21 providing the answers to these
22 interrogatories; is that correct?
23     A. I was given this, yes.
24     Q. Let me start with interrogatory

153

J. ROMERO

1 number 1. What is it that you did to arrive
2 at the answers to interrogatory number 1?
3 Take your time, read it and be familiar with
4 it, and then we'll talk about how you got to
5 answers.
6     A. Go ahead.
7     Q. What did you do to arrive at the
8 answers to interrogatory number 1? Let's
9 start with 1(a).
10     A. "The current maximum number of
11 medical students for whom Wyckoff has the
12 capacity to provide clinical clerkships at
13 any one time is 406. If current business,
14 political, and economic conditions remain
15 unchanged, the maximum number of medical
16 students for whom Wyckoff has the capacity
17 to provide clinical clerkships at any one
18 time will remain 406 through the year 2020."
19     MR. LOUGHLIN: His question was
20 how did you determine that number?
21     THE WITNESS: This number is the
22 current capacity at Wyckoff Heights
23 Medical Center based on current
24 resources, meaning personnel

39 (Pages 150 to 153)

154

J. ROMERO

services and other than personnel
services, faculty, classrooms, and
the current policies of the New York
State Education Department and other
regulatory agencies.

It would be hard for us to
determine anything past this year as
far as determining what the number
might be next year, so we arrived at
this number as the status quo
number, and if everything remains
the same, I believe we will have the
same number of clerkship positions.

**Q. Do you presently, when schools
provide the maximum that they provide
whatever medical students make arrangements
with you if they do, max out at 406?**

A. I don't know of any number from
anyone.

**Q. Have you had this year 406 medical
students in the building at any one time?**

A. It's possible, yes.

**Q. Have you ever had more?**

A. Probably not.

155

J. ROMERO

**Q. The regulatory constraints that you
speak of, what are the ratios that are
involved?**

A. From what I know, there are no
specific limitations on the number of
faculty to trainees. However, there are
recommendations, and that is in the range of
1 is to 8, one faculty member to eight
trainees.

**Q. And was that number, this 406
number, calculated using that 1 to 8 ratio?**

A. Yes, and even more conservative
formula. The range is 1 is to 4 to 1 is to
8 depending on the rotation.

**Q. And you used the 1 to 8 or the 1 to
4 ratio?**

A. Depending on the rotation, we would
use 1 is to 8 on some and on other
rotations, 1 is to 4.

**Q. To get to 406, on which rotations
did you use which ratios?**

A. We currently base it on the number
of students that the chairman can take at
any given time. We did say to them, to the

156

J. ROMERO

core rotations, that the maximum is 1 is to
8. So I can say that in medicine, in
surgery, and pediatrics, and OB/GYN, and
family medicine, these rotations were
advised to use the 1 is to 8 ratio.

**Q. And what ratios were used for the
other rotations?**

A. For the most part, elective
rotations or subspecialty rotations use a
range of 1 is to 4 or 1 is to 6. It
fluctuates depending on staff vacation and
the availability of faculty and space.

**Q. Is it correct that the only prepaid
clerkship contracts with a medical school
for clerkships at Mary Immaculate and St.
John's Queens Hospital were the contracts
with Ross and AUC?**

A. From my recollection, yes.

**Q. Is it true that the only prepaid
clerkship contract between a medical school
and Wyckoff is that with Ross?**

A. No.

**Q. When plans were being made to close
Mary Immaculate and St. John's, were you**

157

J. ROMERO

given any tasks in connection with what to
do with the medical students doing rotations
at those hospitals?

A. Yes.

**Q. What tasks?**

A. To complete and secure their files.

**Q. Were you given any other tasks?**

A. During the time leading to the
closure of Mary Immaculate and St. John's
Hospital, we asked the subspecialty
departments to stop scheduling medical
students past a time in the future for the
electives.

**Q. Did you make such an instruction
with respect to the core rotations?**

A. None that I can recall. It was our
aim to continue the core rotations.

**Q. And how were you going to do that
with the hospitals being closed?**

A. I'm sorry, I was talking about the
time leading to the closure.

**Q. I'm sorry. In layman's terms, was
the plan to shut down the cores a little
earlier or rather shut down the electives a**

158

J. ROMERO

1
2 little earlier and run the course as long as
3 you could?
4 　　A. We had the rotation blocks, and our
5 immediate plan was to ensure that all
6 rotation blocks -- as long as the hospital
7 is open, we would maintain a complete
8 rotation block for each core and elective.
9 　　Q. The defendants in this case have
10 produced documents that laid out in writing
11 plans for closing St. John's and Mary
12 Immaculate, and there's discussions with
13 some of those plans about what to do with
14 those medical students. Did you participate
15 in providing information on any of those
16 plans?
17 　　A. I don't recall any particular
18 requests, but I may have given information
19 on the number of medical students we had at
20 Caritas.
21 　　Q. When you were providing information
22 for those plans, to whom did you provide the
23 information?
24 　　A. From what I recall, I probably
25 provided them to Mr. Singleton or his staff,

159

J. ROMERO

1
2 I'm not sure, but certainly to Dr. Denton.
3 　　Q. Let me help you with the time frame
4 a little bit. Mr. Singleton, I believe the
5 documents reflect, and FTI were out of the
6 hospitals in fall of 2008. Hospitals closed
7 February/March 2009. If you want some names
8 of the people who you dealt with over there,
9 see if it helps your recollection, there is
10 a John Kastanis, K-A-S-T-A-N-I-S, Buzz
11 Dowling, D-O-W-L-I-N-G, Dr. Denton,
12 D-E-N-T-O-N. Did you deal with any of those
13 folks in closure planning?
14 　　A. I believe I dealt with Dr. Denton.
15 I don't recall any of other two other
16 gentlemen you mentioned, but I also dealt
17 with Chris Mastromano, M-A-S-T-R-O-M-A-N-O,
18 who at the time was the administrator at
19 Mary Immaculate Hospital.
20 　　Q. How about a John Lavan, L-A-V-A-N?
21 　　A. I haven't spoken with Mr. Lavan at
22 all in my career.
23 　　Q. Do you now recall that before the
24 hospitals were closed, Mr. Singleton and the
25 folks at FTI left hospital administration?

160

J. ROMERO

1
2 　　A. Yes.
3 　　Q. After they left, who did you
4 understand to be in charge of hospital
5 administration?
6 　　MR. LOUGHLIN:  Which hospital?
7 　　MR. TZANETOPOULOS:  Any of them.
8 　　THE WITNESS:  Caritas was, in my
9 recollection now, being run by Chris
10 Mastromano for Mary Immaculate and
11 Annette Hastings at St. John's
12 Queens Hospital, and they did report
13 to William Buzz Dowling and John
14 Lavan, but that's the extent of what
15 I know.
16 　　Q. How about at Wyckoff? After Mr.
17 Singleton left, who was in charge at
18 Wyckoff?
19 　　A. If I recall, the administrator at
20 that time was Rajiv Garg, R-A-J-I-V,
21 G-A-R-G.
22 　　Q. And in the time between when Mr.
23 Singleton and the folks from FTI left the
24 hospital administration for any of these
25 entities  and the time Caritas hospitals

161

J. ROMERO

1
2 closed, were you ever present for any
3 discussion in which anybody suggested that
4 the contracts we have marked as Exhibits 5,
5 6, or 7 were unauthorized?
6 　　A. No.
7 　　Q. Have you ever been present during
8 that time frame for a discussion in which
9 anybody ever suggested returning to Ross the
10 money that it had paid under those
11 contracts?
12 　　A. Could you kindly restate that?
13 　　Q. During the time between when Mr.
14 Singleton and FTI left hospital
15 administration for these entities, any of
16 them, and the time the Caritas hospitals
17 closed, were you ever present when anyone
18 suggested that the money that Ross had paid
19 under these contracts be returned to Ross?
20 　　A. No.
21 　　Q. Did you have discussions with
22 anybody at Ross about what was going to
23 happen to Ross's students who were in the
24 middle of rotations when Mary Immaculate and
25 St. John's Hospital closed?

41 (Pages 158 to 161)

162

J. ROMERO

2 A. Yes, to the extent of a concern of
3 clerkship placements for the students, I
4 did.
5 Q. With whom at Ross did you speak?
6 A. I believe it was with Dr. Enrique
7 Fernandez.
8 Q. What was the substance of the
9 conversation between you and Dr. Fernandez
10 on those topics?
11 A. From what I recall, I had asked Dr.
12 Fernandez about the future rotations of the
13 students that were at Caritas at that time.
14 I offered my assistance, both personal and
15 through my office, as to -- I offered my
16 assistance as to how I can maybe assist him
17 in scheduling his students at that time.
18 Q. Were there in fact Ross medical
19 students at the Caritas hospitals who were
20 in rotation at the time the hospitals
21 closed?
22 A. I believe there were some.
23 Q. Were any of those students placed at
24 Wyckoff to complete their rotations?
25 A. Yes.

163

J. ROMERO

2 Q. How many?
3 A. I don't recall the number.
4 Q. Who made the arrangements for those
5 rotations to be completed at Wyckoff?
6 A. Dr. Fernandez and I discussed it
7 from the hospital side. I asked the
8 chairman of the departments to take some of
9 the students.
10 Q. From the hospital side, was anybody
11 else involved in that decision other than
12 you and each of the department chairs?
13 A. No.
14 Q. I believe those are all the
15 questions I have for Mr. Romero today.
16 EXAMINATION BY
17 MR. LOUGHLIN:
18 Q. Maybe I'll just follow up with one
19 or two things. Mr. Romero, you made
20 reference to the capacity of clerkships at
21 Wyckoff to be approximately 406. Are there
22 Ross students who are occupying some of
23 those clerkships today?
24 A. Yes.
25 Q. Can you approximate the number of

164

J. ROMERO

2 Ross students who are occupying clerkship
3 slots at Wyckoff?
4 A. Approximately 110 students at any
5 given day or month at Wyckoff.
6 Q. Let me direct your attention to the
7 document that's been marked as Romero
8 Exhibit 5, and in particular -- I'll show it
9 to you and what we can do is look at it side
10 by side. Directing your attention to the
11 page which is Bates stamped ROSS 0064, I'll
12 read this in order to make sure it's clear
13 what I'm referring you to. It says, "Absent
14 material breach of this agreement, the
15 university, the hospitals," which is a
16 defined term under the agreement as the
17 Caritas hospitals, "shall not withhold
18 services while the hospitals remain
19 operative. In the event the hospitals are
20 not operative, and the university is not in
21 material breach of the agreement, BQHC
22 agrees to provide the university with an
23 equivalent number of clerkships as agreed to
24 herein at one or more of its other
25 facilities."

165

J. ROMERO

2 My question to you, Mr. Romero, is
3 during the period that you were in
4 discussions with people at Ross, in November
5 and December 2006, did anyone from Ross at
6 any time, either in an e-mail, or telephone
7 conversation, or otherwise, bring this
8 language to your attention?
9 MR. TZANETOPOULOS: Object to
10 the form.
11 THE WITNESS: The answer is no.
12 Q. In your discussions in November and
13 December 2006 with people from Ross leading
14 to this affiliation agreement, which was
15 executed on December 28, 2006, do you recall
16 any conversation with anyone in which you
17 were told in substance that Ross needed to
18 have a provision in the affiliation
19 agreement, which indicated that BQHC would
20 have an obligation to find replacement
21 clerkships for Ross students in the event
22 the Caritas hospitals closed?
23 MR. TZANETOPOULOS: Object to
24 the form.
25 THE WITNESS: No.

42  (Pages 162 to 165)

166

```
1           J. ROMERO
2        MR. LOUGHLIN: I just have one
3     exhibit that I would like to have
4     marked as the next numbered exhibit.
5        (Document marked as Romero
6        Exhibit 34 for identification as
7        of this date.)
8      Q. I'm placing before you a document
9   which has been marked as Exhibit 34 of your
10  deposition. You had earlier testified that
11  it was your practice when you had telephone
12  conversations with representatives of Ross
13  that you would take notes and then translate
14  those notes into an e-mail.
15     A. Yes.
16     Q. And is Exhibit 34 an example of that
17  practice?
18     A. Yes.
19     Q. I have nothing further.
20  EXAMINATION BY
21  MR. TZANETOPOULOS:
22     Q. Mr. Romero, let me refer you back to
23  Deposition Exhibit Number 20. It's the
24  e-mail exchange between you and Dr. Shepherd
25  and the red line that we discussed earlier.
```

167

```
1           J. ROMERO
2   In particular, I would like to call your
3   attention to the page marked ROSS 8491. Are
4   you there with me?
5      A. Yes.
6      Q. Mr. Loughlin asked whether your
7   attention had been called by anything Ross
8   did, I think, or something to that effect,
9   to the language he pointed out in the final
10  agreement, Exhibit 5. This red line
11  contains, does it not, markings showing that
12  Ross proposed to add that very language,
13  correct?
14        MR. LOUGHLIN: I'll stipulate
15     that in this exhibit the language
16     that I just read is redlined.
17     Q. My question for Mr. Romero is that
18  was called out in this very draft, was it
19  not?
20        MR. LOUGHLIN: Objection to the
21     form.
22        THE WITNESS: It is on this
23     page.
24     Q. And marked as a proposed insertion;
25  is that correct?
```

168

```
1           J. ROMERO
2        MR. LOUGHLIN: It's redlined.
3        THE WITNESS: It is part of the
4   discussion, yes.
5        MR. TZANETOPOULOS: I'm done.
6   Thank you.
7        (Whereupon, at 4:15 p.m., the
8        examination of this witness was
9        concluded.)
10
11  _____
          JULIUS ROMERO
12
13
14  Subscribed and sworn to before me
15  this _____ day of _____, 2011.
16
17  _____
          NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

169

```
1              INDEX
2
3   WITNESS        EXAMINATION BY        PAGE
4   Mr. Romero     Mr. Tzanetopoulos      4
5                  Mr. Loughlin       163
6                  Mr. Tzanetopoulos  166
7
8            E X H I B I T S
9   ROMERO  DESCRIPTION                 PAGE
10  1, 2   Offer letters dated 8/21/06    31
11  3, 4   Promissory note agreements     26
12  5      Affiliation agreement       40
13  6      Amendment to affiliation       40
14         agreement
15  7      Second amendment to affiliation 40
16         agreement
17  8, 9   Notice of filing supplemental  19
18         declaration
19  10     E-mail dated 10/5/06          45
20  11     E-mail dated 10/24/06         53
21  12     E-mail dated 11/1/06          58
22  13     E-mail dated 11/13/06         59
23  14     E-mail dated 11/16/06         65
24  15     E-mail dated 11/29/06         66
25  16     E-mail dated 12/1/06          69
```

43 (Pages 166 to 169)

```
         E X H I B I T S  (Continued)
1
2   ROMERO  DESCRIPTION              PAGE
3    17   E-mail dated 12/16/06       81
4    18   E-mail dated 12/22/06       87
5    19   E-mail dated 12/22/06       91
6    20   E-mail dated 12/28/06       92
7    21   E-mail dated 12/28/06       99
8    22   E-mail dated 2/10/07       105
9    23   E-mail dated 7/30/07       108
10   24   E-mail dated 10/9/07       112
11   25   E-mail dated 10/15/07      115
12   26   E-mail dated 10/19/07      118
13   27   E-mail dated 11/27/07      133
14   28   E-mail dated 12/4/07       135
15   29   E-mail dated 12/4/07       138
16   30   E-mail dated 2/28/08       139
17   31   E-mail dated 5/23/08       149
18   32   Plaintiff's second set of  152
19        interrogatories
20   33   Defendant's responses and  152
21        objections
22   34   E-mail dated 1/12/07       166
23
24
25
```

```
            I N S E R T S
1
2   DESCRIPTION            PAGE/LINE
3   None
4
5   R E Q U E S T S  F O R  P R O D U C T I O N
6   DESCRIPTION                 PAGE
7   None
8
9     Q U E S T I O N S  M A R K E D  F O R
10              R U L I N G
11  QUESTIONING ATTORNEY     PAGE/LINE
12  None
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              C E R T I F I C A T E
2
3   STATE OF NEW YORK        )
                              ss.:
4   COUNTY OF NEW YORK       )
5
6
7        I, BINITA SHRESTHA, a Notary Public
8   for and within the State of New York, do
9   hereby certify:
10       That the witness whose examination
11  is hereinbefore set forth was duly sworn and
12  that such examination is a true record of
13  the testimony given by that witness.
14       I further certify that I am not
15  related to any of the parties to this action
16  by blood or by marriage and that I am in no
17  way interested in the outcome of this
18  matter.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this ist day of July, 2011.
21
22
23       _____
24            BINITA SHRESTHA
25
```

```
1   STATE OF NEW YORK       )
                             ss.:
2   COUNTY OF NEW YORK      )
3
4     I wish to make the following changes,
5   for the following reasons:
6
7   PAGE LINE
8   ____ ____ CHANGE:_____
9         REASON:_____
10
11  ____ ____ CHANGE:_____
12        REASON:_____
13
14  ____ ____ CHANGE:_____
15        REASON:_____
16
17  ____ ____ CHANGE:_____
18        REASON:_____
19
20  ____ ____ CHANGE:_____
21        REASON:_____
22
23  ____ ____ CHANGE:_____
24        REASON:_____
25
```