# APPENDIX F

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CASE NO. 1:09-CV-01410-KAM-RLM
------------------------------------------X
ROSS UNIVERSITY SCHOOL OF MEDICINE,

                        Plaintiff,

vs.

BROOKLYN QUEENS HEALTH CARE, LTD., INC.
and WYCKOFF HEIGHTS MEDICAL CENTER,

                        Defendants.
------------------------------------------X
```

374 Stockholm Street
Brooklyn, New York

June 23, 2011
10:10 a.m.

DEPOSITION of EMIL J. RUCIGAY, a Witness herein, taken by the Plaintiff, pursuant to Article 31 of the Civil Practice Law & Rules of Testimony, held at the above-mentioned time and place, before SARA FREUND, a Shorthand Reporter and a Notary Public of the State of New York.

Page 2

```
 1   APPEARANCES:
 2
 3   BAKER & HOSTETLER, LLP
        Attorneys for Plaintiff
 4      191 North Wacker Drive - Suite 3100
        Chicago, Illinois 60606
 5   BY: GEORGE J. TZANETOPOULOS, ESQ.
 6
 7   K&L GATES, LLP
        Attorneys for Defendants
 8      599 Lexington Avenue
        New York, New York 10022
 9   BY: WALTER P. LOUGHLIN, ESQ.
10
11   ALSO PRESENT:
12   David N. Hoffman, Esq., V.P. General Counsel
13   Amee Patel
```

Page 3

```
 1        IT IS HEREBY STIPULATED AND AGREED by and
 2   between counsel for the respective parties hereto,
 3   that the filing, sealing, and certification of the
 4   within deposition shall be and the same are hereby
 5   waived;
 6        IT IS FURTHER STIPULATED AND AGREED that
 7   all objections, except as to the form of the
 8   question, shall be reserved to the times of trial;
 9        IT IS FURTHER STIPULATED AND AGREED that
10   the within deposition may be signed before any
11   Notary Public with the same force and effect as if
12   signed and sworn to before this court.
```

Page 4

```
 1                       E.J. RUCIGAY
 2        E M I L  J.  R U C I G A Y, after having first been
 3   duly sworn by a Notary Public of the State of New
 4   York, was examined and testified as follows:
 5   EXAMINATION BY
 6   MR. TZANETOPOULOS:
 7        Q.   State your name and address for the
 8   record.
 9        A.   Emil Rucigay, 87-07 Union Turnpike,
10   Glendale, New York 11385.
11        Q.   Mr. Rucigay, have you ever given a
12   deposition before?
13        A.   Yes.
14        Q.   Taken some?
15        A.   Yes.
16        Q.   So, you know the rules; we'll skip
17   through the short version.  As you know, I'll be
18   asking you some questions.  If you don't hear me or
19   don't understand, please let me know and I'll
20   repeat or restate.  If you need a break, let us
21   know that, too.
22        MR. LOUGHLIN:  I think with the air
23        conditioning, you may have to speak more
24        loudly and more distinctly in order for Mr.
25        Rucigay to hear you.
```

Page 5

```
 1                       E.J. RUCIGAY
 2        MR. TZANETOPOULOS:  I agree.
 3        Q.   And if you don't hear me, just let me
 4   know, because I can have the tendency to talk to
 5   fast.
 6        Q.   What is your business or occupation?
 7        A.   I am presently semi-retired.  I
 8   practiced law for many years.
 9        Q.   And for how many years did you practice
10   law?
11        A.   Since 1953.
12        Q.   What type of practice was or is your
13   practice?
14        A.   General practice.
15        Q.   And how long have you had some sort of
16   position here at Wyckoff Heights Medical Center?
17        A.   At least 40 years.
18        Q.   In what different roles have you served
19   here?
20        A.   Trustee; treasurer of the hospital at
21   one time; chairman of the board.
22        Q.   And, presently, are you chairman of the
23   board of Wyckoff Heights Medical Center?
24        A.   Yes, I am.
25        Q.   And by "board," we mean Board of
```

Page 6

E.J. RUCIGAY

Trustees?
A. Yes.
Q. Are you presently chairman of the board of Brooklyn Queens Health Care?
A. Yes.
Q. Are you presently chairman of the board of Caritas Health Care?
A. Yes.
Q. How long have you been chairman at Wyckoff?
A. Some ten or twelve years.
Q. And for Brooklyn Queens Health Care?
A. Since its inception.
Q. And Caritas?
A. Same.
Q. Well, let's dive right in. When is it that Wyckoff first began to consider acquiring Saint John's and Mary Immaculate hospitals?
A. Sometime in -- I guess it would be 2006.
Q. And in general terms, why was Wyckoff interested in acquiring these hospitals?
A. Some trustees thought it was the right thing to do.
Q. Were you among that group?

Page 7

E.J. RUCIGAY

A. At times, yes.
Q. Who from the board of trustees and from hospital management were primarily responsible for putting together Wyckoff's offer and negotiating that offer?
A. That would have been our CEO.
Q. Dominick Gio?
A. Yes.
Q. Who was responsible for putting funding together for Wyckoff's potential acquisition?
A. Exactly who I don't know.
Q. Would it had fallen within Mr. Gio's responsibilities either to do it or to find somebody to do that?
A. Probably.
Q. Where was the funding to come from? How were you going to raise the money, or did you have it?
A. I don't know.
    (Whereupon, Plaintiff's Exhibit 1 was marked for identification.)
Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Deposition Exhibit 1. Is this a copy of the Wyckoff Heights

Page 8

E.J. RUCIGAY

Medical Center Board of Trustees' meeting minutes for the meeting on February 9, 2006?
A. Yes.
Q. Was it the board's regular practice to have minutes of its meetings prepared and made?
A. Oh, yes.
Q. You could take a look at it as much of it as you'd like. I would like direct your attention to page 4, and at the bottom of the page the minutes read, "Mr. Rucigay stated that if this acquisition is accomplished, the success can be attributed to the actions of Mr. Gio and Mr. McDonald, who worked diligently on this project." Who is Mr. McDonald?
A. He was the chief financial officer.
Q. Of Wyckoff?
A. Of Wyckoff.
Q. His first name is Harold, correct?
A. Harold.
    (Whereupon, Plaintiff's Exhibit 2 was marked for identification.)
Q. Let me show you a document that the court reporter has marked as Deposition Exhibit number 2. Is Exhibit number 2 a copy of the

Page 9

E.J. RUCIGAY

Wyckoff Heights Medical Center Board of Trustees' meeting minutes for the meeting held January 11, 2007?
A. Yes.
Q. And, again, you can look at it as much as you'd like. If I can direct your attention to page number 3, at the very bottom there is a statement "Report of the President and CEO." Do you see where I am? It reads, "Mr. Gio thanked the Mr. Rucigay and the other Executive Committee members who were appointed as board members of Brooklyn Queens Health Care, as well as Caritas, for taking on that responsibility. The first meeting was held today, and the budgets that were prepared by Harold McDonald, Hal McNeil and Richard Sarli, the CFO of Caritas, were represented." Was it, in fact, the case that January 11, 2007 is the first time that the Brooklyn Queens Health Care board met?
A. I don't know if that's the first.
Q. Any reason to believe that the minutes are inaccurate in that regard?
A. Well, you said the first.
Q. Yes. It says, "The first meeting was

Page 10

E.J. RUCIGAY

held today."
A. If it says so, then it must have been.
Q. There is also reference that the Executive Committee members were appointed as board members of Brooklyn Queens Health Care, as well as Caritas. To your understanding, was that a reference to the Executive Committee members of the Wyckoff board?
A. Would you repeat that, please?
Q. My question was, to your understanding, is the reference to the Executive Committee members who were appointed, is that a reference to the Wyckoff Heights Medical Center board's Executive Committee members?
A. I don't know, but it appears as though they were the executive members of the BQH.
Q. Let me try it a different way. Is it the case that the Executive Committee members of the Wyckoff board were appointed as the initial board members of the BQHC and Caritas?
A. I don't quite follow.
Q. Let me try again. Does the Wyckoff Heights board have an Executive Committee?
A. We do, yes.

Page 11

E.J. RUCIGAY

Q. Is it the case that at the time of this meeting, January of 2007, that it was the Wyckoff board's Executive Committee who was appointed to be the board of BQHC and Caritas?
A. It could be.
Q. Who were those people at that time?
A. It would have been myself, Adam Figueroa, John Cook, Fred Heller -- I'm not sure.
Q. Who was it that appointed the BQHC board members? Who did the actual selecting?
A. We did it amongst ourselves.
(Whereupon, recess was taken.)
Q. You said that the BQHC board members were selected amongst yourselves. Does that mean that the Wyckoff Heights Board of Trustees was the group that selected the BQHC board members?
A. The Wyckoff Heights board is much, much larger.
Q. Was it the Executive Committee of Wyckoff's board that selected the board members of BQHC?
A. It was a group of us got together and we formed BQHC. We formed a new corporation.
Q. And that group would be the group you

Page 12

E.J. RUCIGAY

discussed earlier: You, Mr. Figueroa, Mr. Cook and Mr. Heller?
A. There was someone else -- Vinnie -- that's it, Vinnie Acuri.
Q. So, the five of you?
A. Yes.
Q. Let me go backwards in time just a little bit -- again, fair warning, going back to 2006.
(Whereupon, Plaintiff's Exhibit 3 was marked for identification.)
Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Deposition Exhibit number 3. Is Exhibit 3 a copy of the Wyckoff Heights Medical Center Board of Trustees' meeting minutes for their meeting held October 5, 2006?
A. Yes.
Q. If I may direct your attention to page 3 of those minutes, please, again, we have a report from the president and CEO. Was it Mr. Gio's regular practice to make a report of each of your meetings?
A. Yes.

Page 13

E.J. RUCIGAY

Q. And a little bit down that page there is a sentence right here that says, "Mr. Gio reported that the Executive Committee met prior to this meeting and voted on the following issues," and then there is a list of three. Take a moment, review that, and when you're ready I'll have questions about those issues.
The Executive Committee, it says, voted on a resolution authorizing Wyckoff Heights Medical Center to loan up to $10 million to Caritas for startup operations. Is that correct? That will be the first question.
A. Apparently.
Q. Why was it that the Executive Committee was voting on this rather than the full board? Was there a division of responsibility?
A. No. I don't know why that happened.
Q. Further down in the minutes it reads, "Mr. Gio stated that the Executive Committee approved the resolution," and "2, Mr. Gio stated that he presented a compensation package to the committee for approval outlining the compensation of the corporate officers of Brooklyn Queens Health Care." Did that, in fact, occur?

```
                                        14
 1           E.J. RUCIGAY
 2      A.  I presume so. I don't know. I wasn't
 3   at this meeting.
 4      Q.  You're right. You had heart surgery at
 5   the time, did you not?
 6      A.  Yes.
 7      Q.  At some point, did somebody bring you up
 8   to speed about what had occurred at the meetings
 9   that you missed?
10      A.  I don't know. I was in pretty bad
11   shape.
12      Q.  In 2006, did Brooklyn Queens Health Care
13   have corporate officers?
14      A.  I don't know when it occurred.
15      Q.  Were corporate officers of Brooklyn
16   Queens Health Care ever paid money? Did they have
17   compensation?
18      A.  No -- I wish they were.
19      Q.  Do you have any idea what it was the
20   Executive Committee and Mr. Gio were up to in
21   putting together compensation packages for Brooklyn
22   Queens Health Care's corporate officers?
23      A.  No.
24      Q.  Further down, toward the bottom of the
25   page, it goes on to say, "Mr. Gio stated that the
```

```
                                        15
 1           E.J. RUCIGAY
 2   Executive Committee approved that the remaining
 3   seven years of the employment contract" -- let me
 4   start at the beginning. Number 3 reads, "Mr. Gio
 5   advised the board members that a proposal to have
 6   Caritas assume his employment contract for the
 7   remaining seven years of his contract, except for
 8   the agreed compensation as outlined in the
 9   compensation package. All other terms and
10   conditions will remain unaltered. Mr. Gio stated
11   that the Executive Committee approved that
12   remaining seven years of the employment contract
13   will be assumed by the BQHC." Did BQHC ever assume
14   Mr. Gio's employment contract?
15      A.  I don't know.
16      Q.  At this point in time, Mr. Gio was CEO
17   of Wyckoff, was he not?
18      A.  Yes.
19      Q.  And he had an employment contract with
20   Wyckoff?
21      A.  Yes.
22      Q.  As you read these minutes, do you think
23   that the references here to the assumption of an
24   employment contract referred to the assumption of
25   his employment contract with Wyckoff?
```

```
                                        16
 1           E.J. RUCIGAY
 2      A.  I don't know.
 3      Q.  When the Executive Committee of
 4   Wyckoff's board met, were minutes kept of those
 5   meetings?
 6      A.  Usually.
 7      Q.  Are they retained here at the hospital?
 8      A.  They would be if they were taken.
 9           (Whereupon, Plaintiff's Exhibit 4 was
10   marked for identification.)
11      Q.  Mr. Rucigay, let me show a document that
12   the court reporter has marked as Deposition Exhibit
13   number 4. Is Exhibit 4 a copy of the Wyckoff
14   Heights Board of Trustees' meeting minutes for the
15   meeting of December 14, 2006?
16      A.  They appear to be.
17      Q.  Let me direct your attention to the
18   third page, Mr. Gio's report, the report of the
19   president and CEO. Take a minute to take a look at
20   that and I have a couple of questions there.
21           The minutes read that "Mr. Gio presented
22   the new logos for Caritas and Wyckoff Heights
23   Medical Center. He explained that due to the
24   acquisition of Saint John's and Mary Immaculate
25   hospitals, new companies had to be formed, one of
```

```
                                        17
 1           E.J. RUCIGAY
 2   them being BQHC, Brooklyn Queens Health Care, which
 3   is the parent company of Caritas and Wyckoff. He
 4   went on to say that Caritas was formed to be the
 5   licensed holder of Saint John's and Mary Immaculate
 6   hospitals. Mr. Gio circulated the logos and asked
 7   for approval from the board for the new logos."
 8   And then below that in capital letters the minutes
 9   reflect an actual recommendation which says, "On a
10   motion properly made by Mr. Cook, seconded by Dr.
11   Rao, all in favor, the logos for Caritas and
12   Wyckoff Heights Medical Center were unanimously
13   approved by the board of trustees." My question
14   is, is it the case that the corporations were
15   already formed at this time and the only thing the
16   Wyckoff board approved were the logos?
17      A.  Apparently.
18      Q.  Who was it that actually formed the
19   corporations?
20      A.  I don't know.
21           (Whereupon, Plaintiff's Exhibit 5 was
22   marked for identification.)
23      Q.  Mr. Rucigay, let me show you a document
24   that the court reporter has marked as Exhibit
25   number 5. It says that it is an employment
```

18

E.J. RUCIGAY

agreement by and between Brooklyn Queens Health Care, Wyckoff Heights Medical Center and Caritas and Harold McDonald. I take it this is the Mr. McDonald we were talking about just a moment ago?

A. Yes.

Q. The agreement, at the very top you see, defines Brooklyn Queens Health Care for purposes of this contract as the "system," correct?

A. Yes.

Q. If we go down to paragraph 1 it says "System shall employ as executive vice president," etc.

A. Yes.

MR. LOUGHLIN: Objection. The document, as lawyers often say, speaks for itself. Mr. Rucigay didn't sign this document; it's signed by Mr. McDonald and Mr. Gio, I think, and perhaps someone else, as well -- I can't read the signatures very clearly. Going through the document and asking Mr. Rucigay to confirm that something that is a defined term is indeed a defined term, or that the sentence indeed contains the language that's typed out in that sentence, doesn't seem to

19

E.J. RUCIGAY

be a very useful way to proceed. But, you know, it's your deposition.

MR. TZANETOPOULOS: Thank you.

Q. Did Brooklyn Queens Health Care do the actual paying of Mr. McDonald. Did he get paid by Brooklyn Queens Health Care?

A. I don't know.

Q. Mr. Loughlin got ahead of me a little. If we can look at the signature page, page 4, do you recognize that it's Mr. Gio's signature in each case: For Brooklyn Queens Health Care; Wyckoff Heights Medical Center and Caritas Health Care?

A. It appears that way, yes.

Q. I take it you've seen Mr. Gio's signature an awful lot over the years?

A. I've seen it, yes.

(Whereupon, Plaintiff's Exhibit 6 was marked for identification.)

Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Deposition Exhibit number 6. It's entitled "Affiliate Subordination Agreement" dated as of January 1, 2007. If I can direct your attention to the last three pages which are the signature pages. Are

20

E.J. RUCIGAY

those your signatures for Brooklyn Queens Health Care, Wyckoff Heights Medical Center? Page 437 is the identification number.

A. That's my signature, yes.

Q. So, for Brooklyn Queens Health Care and Wyckoff, both?

A. Yes.

Q. And then if we can go two further pages back to the one identified as 439, the very last page of the exhibit, that's your signature also?

A. Yes.

Q. Again, you can look at it as much as you'd like, but it's the third paragraph on the first page that I have questions about. That portion of the agreement says that "BQHC has loaned the borrower $1 million in cash, the BQHC obligation, and Wyckoff has entered into lease obligations for equipment provided to the borrower with a fair value of not less than $3.2 million." Later down at the very bottom it says, "The BQHC obligation is now documented between BQHC and the borrower, and the Wyckoff obligation is now documented between Wyckoff and the borrower." Did, in fact, BQHC lends $1 million to Caritas?

21

E.J. RUCIGAY

A. I would not personally know. It's whatever it says, it says. I don't know.

Q. Has BQHC ever had a million dollars?

A. To my knowledge, I don't know. I really couldn't say.

Q. Do you have any idea why it is you signed a document that says BQHC has lent a million dollars?

A. Counsel told us to handle these things. We would be presented documents and we signed it. Advice of counsel was just generally where we were at.

Q. So, you believe this document was prepared by the hospital's legal counsel?

A. I don't know who prepared it.

Q. Do you believe that it was reviewed by hospital's legal counsel before you signed it?

A. Someone had to -- yes.

MR. LOUGHLIN: I think the signature page includes reference to the Kaye Scholer law firm. I'll just note emphatically that Exhibit 6 is a subordination agreement. It's the sort of thing that would be drafted by outside counsel, one would imagine.

6 (Pages 18 to 21)

22

E.J. RUCIGAY

    (Whereupon, Plaintiff's Exhibit 7 was marked for identification.)

Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Exhibit number 7. Is Exhibit 7 the Wyckoff Heights Medical Center Board of Trustees' meeting minutes for the meeting of February 8, 2007?

A. Yes.

Q. If I can direct your attention to the third page, again, the president's report, there is a discussion toward the bottom that says, "The business plan calls for Wyckoff to begin dropping bills in January" -- let's go to the very top. Go ahead and read the whole thing and then I'll just ask questions. My question is, in layman's terms, what is it that went wrong here?

A. I don't understand what you mean by what went wrong.

Q. There's a discussion about that "due to unforeseen circumstances, we were not able to drop bills in a timely manner, which resulted in cash flow problems and a three-week delay." What is it that happened?

A. I haven't the foggiest idea.

23

E.J. RUCIGAY

    (Whereupon, Plaintiff's Exhibit 8 was marked for identification.)

Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Exhibit 8. It's an August 21, 2006 letter that Mr. Gio sent to Dr. Nancy Perri at Ross University School of Medicine. Let's go back a step before we get to the letter itself. I've seen references and documents produced by the defendants that we may talk about a bit that discuss using money raised through prepayment contracts with medical schools to pay for the expense of a central business office. Was that the plan in about 2006?

A. I have no idea.

Q. Were you aware that Mr. Gio was soliciting prepayment contracts through Caribbean medical schools at this time?

A. No.

Q. Was any of that brought to the attention of the board?

A. Not to my knowledge.

Q. Were you aware that in 2006 and before, Wyckoff Heights had entered into contracts where medical schools paid to send students through

24

E.J. RUCIGAY

clinical rotations here?

A. No.

Q. Was entering into contracts with medical schools for clerkships the sort of contract that was left to the discretion of hospital management?

A. I have no idea what was going on in that capacity at the time.

Q. Had any contract between a medical school and Wyckoff for medical student clerkships ever been brought to the board for its approval?

A. Not to my knowledge.

    (Whereupon, Plaintiff's Exhibit 9 was marked for identification.)

Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Exhibit 9. It's an affiliation agreement between Ross University School of Medicine, School of Veterinary Medicine Limited and Brooklyn Queens Health Care. Before today, have you ever seen a copy of this contract?

A. Not to my knowledge.

Q. Was it ever presented to the Wyckoff board for approval?

A. Not to my knowledge.

25

E.J. RUCIGAY

Q. To the BQHC board?

A. Not to my knowledge.

Q. Or to the Caritas board?

A. Not to my knowledge.

    (Whereupon, recess was taken.)

    (Whereupon, Plaintiff's Exhibit 10 was marked for identification.)

Q. Mr. Rucigay, let me show a document that the court reporter has marked as Exhibit number 10. It's a promissory note dated December 1, 2006. If you look at the back page, the signatories are AUC N.V., Brooklyn Queens Health Care, Caritas Health Care and Wyckoff Heights Medical Center. The three signatures there for Brooklyn Queens, Caritas and Wyckoff, that's Mr. Gio?

A. Yes.

Q. Was this promissory note ever brought to the attention of any of the boards of BQHC, Wyckoff or Caritas before it was signed?

A. Not to my knowledge.

Q. Did any board member take any position to approve or disapprove it?

A. I have no idea.

    (Whereupon, Plaintiff's Exhibit 11 was

26

E.J. RUCIGAY

marked for identification.)

Q. Mr. Rucigay, let mow show you a document that the court reporter has marked as Exhibit 11. It's a June 7, 2007 document entitled "President's Letter, Wyckoff Heights Medical Center, Board of Trustees."

A. Yes.

Q. I will tell you, I pulled this from a board package that the defendants produced in this case. Was it Mr. Gio's usual practice to prepare a president's letter to include in board packages that were given to the trustees before meetings?

A. Yes.

Q. And this is one such letter?

A. Apparently.

Q. If I can direct your attention to the page that bears identification number BQHC 54897, at the top of that page is a heading "Undergraduate Medical Education," and if you read that section I have a couple of questions about it.

A. Go ahead.

Q. Does the hospital have a Graduate Medical Education Division?

A. Apparently.

27

E.J. RUCIGAY

Q. In any event, Mr. Gio's letter says, "This division continues to coordinate all placement and support to an average of 400 medical students from eight affiliated medical schools at Wyckoff Heights Medical Center and Caritas Health Care." And a couple of lines down he continues to write, "Prepayment for clerkships was secured from Ross University and American University of the Caribbean for Caritas in the amount of $8.5 million. Prepayment for clerkships was secured from American University of Antigua, Saint Matthew's University and Education International Consulting (Saba and Nevis) for Wyckoff Heights Medical Center in the amount of $3.25 million. All affiliation agreements have been reviewed and approved by the New York State Education Department." Do you see where I am?

MR. LOUGHLIN: Again, it's your deposition, but I object to just reading from the document. If you direct the witness's attention to something, he can read it and you could ask him a question.

Q. We can agree, can we not, that Mr. Gio had at least informed the Wyckoff Heights board of

28

E.J. RUCIGAY

the entry into a contract with Ross under which Ross paid money, correct?

MR. LOUGHLIN: Object to form.

A. I guess.

Q. Did anyone on the board ever object to hospital management entering into the contracts referred to in Mr. Gio's letter in Exhibit 11?

A. Not to my knowledge. I don't know.

MR. LOUGHLIN: The witness has already testified that he has no knowledge of any of these education matters or contracts being brought to the attention of the board.

(Whereupon, Plaintiff's Exhibit 12 was marked for identification.)

Q. Mr. Rucigay, let me show you a document that the court reporter marked as Exhibit number 12. Exhibit 12 is, is it not, the audited financial statement for Caritas for the year ended 2007?

A. Yes.

Q. Was it your practice to review the audited financial statements of Caritas when they were issued?

A. We were supposed to, apparently.

29

E.J. RUCIGAY

Q. Did you or the board take any part in the preparation of those financial statements?

A. No.

Q. If I can refer you, sir, to page 4 of the financial statement, and under the heading "Liabilities and Net Asset Deficiency" there is a line for "Current portion of deferred revenue (note 4)," and another one further down "Deferred revenue, less current portion (note 4)."

A. Yes.

Q. If I can direct your attention to note 4, which is on page 18, it reads, "Caritas received advances from Ross University and American University of the Caribbean to essentially prepay Caritas for the training of Ross and AUC medical students in the various rotations required at a discount per-week rate. Amounts of $5 million and $4 million were received from Ross on December 26, 2006 and December 27, 2007 respectively." Would you agree, sir, that if you had reviewed these financial statements, you would have had available to you the information -- let me ask a better question. Do you agree that had you reviewed Caritas Health Care's financial statement for 2007,

```
                                    30
1              E.J. RUCIGAY
2   you would have had available to you the knowledge
3   or information that Ross had paid $5 million and $4
4   million for prepaid medical student clerkships?
5         MR. LOUGHLIN: Objection to form.
6      A.   Probably.
7      Q.   Were the financial statements in Exhibit
8   12 circulated to all the board members?
9      A.   I believe so.
10           (Whereupon, Plaintiff's Exhibit 13 was
11     marked for identification.)
12     Q.   Mr. Rucigay, the court reporter handed
13  you a document marked Deposition Exhibit 13. Is
14  Exhibit 13 the minutes from a special Board of
15  Trustees meeting of the board of Wyckoff and
16  Caritas?
17     A.   Yes.
18     Q.   On the second page, the minutes begin
19  and say, "Mr. Rucigay explained that the reason
20  this meeting was called is because of events
21  relating to the current fiscal situation," and it
22  goes on to be some discussion of co-mingling of
23  funds by the former chief financial officer. Do
24  you recall the event?
25     A.   I think I have an idea what this is,
```

```
                                    31
1              E.J. RUCIGAY
2   yes.
3      Q.   What do you recall of the co-mingling of
4   funds that are referred to in these minutes?
5      A.   I couldn't tell you any details other
6   than I think it was an incident involving Hal
7   McNeil. I can't recall the details.
8      Q.   The minutes refer in the second sentence
9   to an investigation. It says, "Upon investigation,
10  it was discovered." Who conducted the
11  investigation?
12     A.   I really don't recall.
13     Q.   Do you know how it is that the
14  co-mingling came to light?
15     A.   No, I don't recall it.
16     Q.   In response to this co-mingling event,
17  did the State of New York Department of Health
18  require Wyckoff to engage a restructuring
19  consultant?
20     A.   I can't quite follow this. You give me
21  two things here.
22     Q.   Wyckoff did, in fact, engage FTI Cambio
23  as a restructuring consultant.
24     A.   Yes.
25     Q.   Why did it do so?
```

```
                                    32
1              E.J. RUCIGAY
2      A.   At the behest of the state.
3      Q.   What did the state say about why the
4   state required the engagement of a restructuring
5   consultant?
6      A.   I don't remember the details of it.
7      Q.   In any event, the state did require the
8   hospital to engage this consultant, correct?
9      A.   Yes.
10           (Whereupon, Plaintiff's Exhibit 14 was
11     marked for identification.)
12     Q.   Mr. Rucigay, let me show you a document
13  that the court reporter has marked as Exhibit 14.
14  It looks to be a draft letter from you to a
15  commissioner -- I assume -- of the State Department
16  of Health.
17     A.   Daines. Yes.
18     Q.   Commissioner Daines?
19     A.   Yes.
20     Q.   Was a final version of this letter ever
21  prepared and sent to Commissioner Daines. We have
22  a draft here, sir. Was a final version of this
23  letter prepared by you and sent to Commissioner
24  Daines?
25     A.   I believe so.
```

```
                                    33
1              E.J. RUCIGAY
2      Q.   Did you personally have discussions with
3   Commissioner Daines about the engagement of a
4   restructuring consultant?
5      A.   No.
6      Q.   Did you have discussions with
7   Commissioner Daines about this co-mingling of funds
8   incident?
9      A.   No.
10           (Whereupon, Plaintiff's Exhibit 15 was
11     marked for identification.)
12     Q.   Mr. Rucigay, let me show you a document
13  that the court reporter has marked as Exhibit
14  number 15. It appears to be a September 27, 2007
15  petition to the Internal Revenue Service on behalf
16  of Wyckoff for a relief of penalties and interest.
17  Were you aware that such a petition was being made?
18     A.   I don't recall.
19     Q.   Do you know who Charles Barragato is?
20     A.   Frankly, no.
21     Q.   How about Angelo Pirossi?
22     A.   No.
23     Q.   Do you know if the commission granted
24  relief?
25     A.   I have no idea.
```

```
                                                                34
1            E.J. RUCIGAY
2       Q.   If I can direct your attention to page 4
3    of the petition.
4       A.   Go ahead.
5       Q.   It says, "The Wyckoff longtime nine-year
6    CFO, as a responsible officer and substantial
7    influence with the organization, blatantly and
8    consistently misrepresented to his direct reports,
9    Wyckoff's COO, CEO and Board of Trustees, that its
10   payroll tax withholdings were being timely
11   deposited." Assuming this is a reference to Hal
12   McNeil, the CFO, isn't it the case that Mr. McNeil
13   reported directly to Wyckoff's chief operating
14   officer?
15           MR. LOUGHLIN: Objection to form.
16      A.   I don't follow that.
17      Q.   At the time this co-mingling event
18   occurred, was Mr. McNeil Wyckoff's chief financial
19   officer?
20           MR. LOUGHLIN: You mean the co-mingling
21   referred to in Exhibit 14?
22           MR. TZANETOPOULOS: Yes.
23      A.   I'm not sure.
24      Q.   Do you know to whom Mr. McNeil reported?
25      A.   As far as I'm concerned, Dominick Gio.
```

```
                                                                35
1            E.J. RUCIGAY
2            (Whereupon, recess was taken.)
3            (Whereupon, Plaintiff's Exhibit 16 was
4       marked for identification.)
5       Q.   Mr. Rucigay, let me show you a document
6    that the court reporter has marked as Exhibit
7    number 16. Is Exhibit 16 the engagement letter
8    that you signed to engage FTI Cambio as a
9    consultant?
10      A.   Yes.
11           (Whereupon, Plaintiff's Exhibit 17 was
12      marked for identification.)
13      Q.   I show you a document that's been marked
14   as Exhibit number 17. Is Exhibit 17 an
15   Administrative Services Agreement with FTI that you
16   signed on behalf of Brooklyn Queens Health Care,
17   Caritas Health Care and Wyckoff?
18      A.   Yes.
19      Q.   If I can direct your attention to page
20   11 of the contract.
21      A.   Yes.
22      Q.   In paragraph 5.1.1, it states that "BQHC
23   will pay to FTI Cambio a fixed monthly fee," and
24   then lists them. And in the next section, 5.1.2:
25   "The contract provides that the fee payable to FTI
```

```
                                                                36
1            E.J. RUCIGAY
2    Cambio shall be allocated between Caritas and
3    Wyckoff in some proportions. BQHC shall be
4    responsible, however, for payment of fee." Why was
5    it that BQHC was made responsible for payment here?
6       A.   I have no idea.
7       Q.   Did BQHC have a bank account from which
8    payment could be made at this point in time?
9       A.   I have no idea.
10           MR. LOUGHLIN: I'll state for the record
11   that I think a portion of 5.1.,2 which you
12   didn't read, indicates that BQHC would make
13   commercially reasonable efforts to collect
14   the payment from Caritas and Wyckoff in
15   connection with the fee for FTI Cambio.
16           Mr. TZANETOPOULOS: You quarrel with me
17   when I read the whole thing and you quarrel
18   with me when I don't. I try to avoid the
19   quarrel.
20           (Whereupon, Plaintiff's Exhibit 18 was
21      marked for identification.)
22      Q.   Mr. Rucigay, let me show to you a
23   document that the court reporter has marked as
24   Exhibit number 18. Is Exhibit 18 a memo that you
25   issued to the Senior Cabinet of BQHC, Wyckoff and
```

```
                                                                37
1            E.J. RUCIGAY
2    Caritas on July 30, 2007?
3       A.   Yes.
4       Q.   Of whom is the Senior Cabinet comprised?
5       A.   The trustees.
6       Q.   Does the Senior Cabinet also include the
7    officers of the hospital corporations?
8       A.   I really don't know.
9       Q.   Who actually drafted this? Did you
10   draft it or did someone draft it for you?
11      A.   I did this with counsel.
12      Q.   And which counsel?
13      A.   David Hoffman, I think.
14      Q.   The memo recites at the top that "The
15   Board of Trustees of BQHC, Wyckoff and Caritas have
16   decided to undertake a broad restructuring
17   initiative that we believe will help create
18   financially viable and more effective health care
19   systems at Wyckoff Heights Medical Center and the
20   two Caritas hospitals, Saint John's and Mary
21   Immaculate." It goes on to identify FTI and Tom
22   Singleton as the chief restructuring officer and
23   Paul Goldberg as the chief financial officer. Do
24   you see where I am?
25      A.   Yes.
```

**Page 38**

E.J. RUCIGAY

Q. Had each of the boards, in fact, approved engaging Mr. Singleton as chief restructuring officer?
A. I don't recall.
Q. Had each of the board approved in engaging Mr. Goldberg as chief financial officer?
A. I don't recall.
(Whereupon, Plaintiff's Exhibits 19 and 20 were marked for identification.)
Q. Mr. Rucigay, let me show you what the court reporter marked as Exhibit 19 and Exhibit 20. Is Exhibit 19 bills that FTI sent to you for its consulting services?
A. Yes.
Q. And is Exhibit 20 the checks that paid those bills?
A. Yes.
Q. Given that the bills were addressed to you, were you the first person that got them?
A. I have no idea.
Q. What was the process for getting those bills paid?
A. Singleton took care of it all.
Q. So, the bills ultimately made their way

**Page 39**

E.J. RUCIGAY

to Mr. Singleton and he arranged to have them paid?
A. Apparently.
Q. Once he became chief restructuring officer, did Mr. Singleton essentially run these hospitals?
A. Yes.
Q. Was he the top executive in management for the hospitals at that time?
A. I don't know what time you're referring to.
Q. During the time he was chief restructuring officer.
A. Most of it, yes.
Q. Is it correct that all hospital management would have reported to Mr. Singleton during the time that he was chief restructuring officer?
A. A good portion of the time, yes.
Q. What portion of the time did they not?
A. I'm not sure as to the kick-in time when it started for everything. And, basically speaking, I had instructed him to concentrate on the Caritas hospitals.
Q. In terms of authority at Wyckoff, during

**Page 40**

E.J. RUCIGAY

the time Mr. Singleton was chief restructuring officer, did all other Wyckoff Heights Medical Center management report to him?
A. I believe so, but I'm not sure.
Q. During the time he was chief restructuring officer, did all Brooklyn Queens Health Care corporate officers report to Mr. Singleton?
A. I don't recall any events of that nature.
Q. Did all Caritas hospital management report to Mr. Singleton when he was chief restructuring officer?
A. I believe so.
Q. The checks that are in Exhibit 20 are from a Wyckoff Heights Medical Center account, are they not?
A. Yes.
(Whereupon, recess was taken.)
(Whereupon, Plaintiff's Exhibit 21 was marked for identification.)
Q. Mr. Rucigay, let he me show you a document that the court reporter marked as Exhibit 21. Is this a board resolution that you signed?

**Page 41**

E.J. RUCIGAY

A. Yes.
Q. And it gives to Mr. Singleton and Mr. Goldberg authority to sign checks from the hospital operating account for Wyckoff?
A. Apparently.
(Whereupon, Plaintiff's Exhibit 22 was marked for identification.)
Q. Mr. Rucigay, let me show you a document that the court reporter has marked as Exhibit 22. Is Exhibit 22 the minutes from the November 1, 2007 Wyckoff Heights Board of Trustees' meeting?
A. Yes.
Q. On the third page of the minutes in the paragraph it says, "Mr. Gio inquired as to whether or not we have backup plans. The minutes recite that Mr. Singleton replied that we do. He stated that a meeting will be scheduled with Local 1199 of the SEIU to see if they will allow us to move the employees from Wyckoff's payroll to Caritas' payroll," and there was some further discussion. What was the purpose of doing so?
A. I don't recall.
Q. Were those employees actually moved from Wyckoff's payroll to Caritas' payroll?

```
                                          42
 1            E.J. RUCIGAY
 2      A.  I have no idea.
 3          (Whereupon, Plaintiff's Exhibit 23 was
 4      marked for identification.)
 5      Q.  Mr. Rucigay, let me show a document that
 6  the court reporter has marked as Exhibit number 23.
 7  Is Exhibit 23 the December 20, 2007 minutes of the
 8  Board of Trustees of Wyckoff Heights Medical
 9  Center?
10      A.  Yes.
11      Q.  Let me direct your attention, if I may,
12  to page 4.  At the top of the page it says that Mr.
13  Singleton reported to the board that he, along with
14  Mr. Gio and Julius Romero, had been negotiating
15  with the Caribbean medical schools over the last
16  two months to generate additional cash for Wyckoff
17  and Caritas.  He stated that "We have been
18  successful in both cases.  Wyckoff received a wire
19  transfer today from Ross in the amount of $4
20  million dollars for prepaid medical student
21  clerkship rotations.  This should help to relieve
22  some of the cash-flow problems for Wyckoff."  He
23  mentioned that "Caritas received $3.7 million last
24  week from Ross University.  Mr. Singleton commented
25  that this was done without expanding slots."  And
```

```
                                          43
 1            E.J. RUCIGAY
 2  at the bottom it says you thanked him for his
 3  support, correct?
 4      A.  Yes.
 5      Q.  Did anybody object when Mr. Singleton
 6  reported to the board that he had made these deals
 7  with Ross to him making the deals?
 8      A.  I have no idea what that is.
 9      Q.  Do you recall any such objection?
10      A.  I don't recall.
11      Q.  In the ordinary course of how Wyckoff's
12  board conducted its business, if someone had an
13  objection to Mr. Singleton entering into these
14  deals, would the minutes reflect that objection?
15          MR. HOFFMAN:  Objection to form.
16      A.  I don't know how it would have been
17  taken.
18      Q.  Do you know Julius Romero?
19      A.  Yes, I do.
20      Q.  What's Mr. Romero's job?
21      A.  I'm not a hundred percent certain, but I
22  only got to know him recently.
23          (Whereupon, Plaintiff's Exhibit 24 was
24      marked for identification.)
25      Q.  Mr. Rucigay, let me hand you a document
```

```
                                          44
 1            E.J. RUCIGAY
 2  that the court reporter has marked as Exhibit 24.
 3  It states that it's a draft final of "Caritas
 4  Health Care Closure Plan."  Are you familiar with
 5  the document at all?
 6      A.  No.
 7      Q.  Who at the hospital would have been
 8  responsible for preparing plans for closing the
 9  Caritas hospital?
10      A.  I have no idea.
11          (Whereupon, Plaintiff's Exhibit 25 was
12      marked for identification.)
13      Q.  Mr. Rucigay, let me show a document that
14  the court reporter has marked as Exhibit 25.  Is
15  Exhibit 25 the minutes from the March 5, 2009
16  Brooklyn Queens Health Care Trustee board meeting?
17      A.  Yes.
18      Q.  If I may direct your attention to page
19  3, it appears, sir, that the board was discussing
20  tasks following the closure of the Caritas
21  hospitals.
22      A.  I don't know what you mean by "tasks."
23      Q.  Was the discussion what was to be done
24  following closure of the Caritas hospitals?
25      A.  I don't know.  I don't recall.
```

```
                                          45
 1            E.J. RUCIGAY
 2      Q.  On page 3 at the very bottom it says
 3  that "Mr. Rucigay stated that there are three
 4  issues we will concern ourselves with and follow up
 5  on: Ross University, Meditech and the Pension
 6  issue."  What issue were you to follow up on with
 7  respect to Ross?
 8      A.  I don't know what was going on.
 9          MR. LOUGHLIN:  Objection.  This is going
10      into a privileged area.  I suggest, if you
11      look at the sentence just above the one that
12      you directed the witness's attention to,
13      three of the individuals who are referred to
14      as following up on various matters are
15      lawyers.  Mr. Zall is outside counsel with
16      the Proskauer firm.  Mr. Hoffman and Ms.
17      Mullally were in-house lawyers.  It's not up
18      to me to interpret this document, but your
19      question which is really about follow-up of
20      the issues here, it suggests that it's
21      embedded in communications with counsel who
22      are going to examine some of these issues.  I
23      wasn't sure that you knew that Ms. Mullally
24      and Mr. Zall were attorneys, although you
25      know that Mr. Hoffman is.
```

```
                                          46
 1              E.J. RUCIGAY
 2       Q.  For the moment, I'm not asking you for
 3   communications with your lawyers.  It says here
 4   that you stated there are issues with respect to
 5   Ross that you concerned yourself with.
 6       A.  Yes.
 7       Q.  I'm asking for your understanding of
 8   what those issues are.
 9       A.  I don't recall.
10       Q.  Was the issue that you reference to here
11   a potential dispute with Ross about the affiliation
12   agreement between Ross and BQHC?
13       A.  I have no idea.  I don't recall.
14       Q.  Mr. Rucigay, do you keep your own files
15   with respect to board meetings?
16       A.  No.
17       Q.  During Mr. Singleton's time as chief
18   restructuring officer, did he discharge any
19   employees of Wyckoff Heights?
20       A.  He directed -- yes.
21       Q.  Who did he fire?
22       A.  Dominick Gio.
23       Q.  Did he consult with the board before
24   doing so?
25       A.  I don't believe so.
```

```
                                          47
 1              E.J. RUCIGAY
 2       Q.  After the board learned that Mr.
 3   Singleton fired Mr. Gio, did the board reverse the
 4   decision to discharge Mr. Gio?
 5       A.  No.
 6       Q.  Did Mr. Singleton fire anybody else
 7   while he was chief restructuring officer?
 8       A.  He tried to.
 9       Q.  Who did he try to fire?
10       A.  David Hoffman.
11       Q.  And what happened in Mr. Hoffman's case?
12       A.  He was put on a sabbatical.
13       Q.  Did Mr. Singleton express to you or the
14   board why it is that he had fired Mr. Gio?
15       A.  Not really.
16       Q.  You said "not really."  What information
17   do you have about why it is that Singleton fired
18   Gio?
19       A.  He mentioned the liaison with Albany.
20       Q.  By "liaison with Albany," is that a
21   reference to Assemblyman Seminerio's troubles?
22       A.  No.
23       Q.  What liaison with Albany --
24       A.  With Commissioner Daines.
25       Q.  Commissioner Daines said he wanted Gio
```

```
                                          48
 1              E.J. RUCIGAY
 2   gone?
 3       A.  Apparently there was something there.
 4       Q.  Did Mr. Singleton tell you why he wanted
 5   Mr. Hoffman to be discharged?
 6       A.  No.
 7       Q.  Did he make any indication at all to you
 8   or to the board?
 9       A.  He didn't specify any.
10           (Whereupon, a discussion was held off
11   the record.)
12       MR. TZANETOPOULOS:  Let's go back on the
13   record.  Mr. Rucigay felt that he needed to
14   stop for the day, so Mr. Loughlin and I
15   agreed that that seemed to be the right thing
16   to do.  We'll work out a means of completing
17   Mr. Rucigay's deposition when he feels a
18   little better and go from there.
19       MR. LOUGHLIN:  That's fine.  I'm sure
20   we'll be able to work out something, either
21   to agree to stipulate to the authenticity of
22   a lot of the documents that you wanted Mr.
23   Rucigay to authenticate, or if we need an
24   additional period of his testimony, I'm sure
25   we can schedule that.  We went a little over
```

```
                                          49
 1              E.J. RUCIGAY
 2   two hours today, and he is elderly and I
 3   think was losing some energy.
 4       MR. TZANETOPOULOS:  We'll take it up
 5   another time when he feels better.
 6           (Time noted: 12:30 p.m.)


 8   _____
 9            EMIL J. RUCIGAY

11   Signed and subscribed to
12   before me, this _____ day
13   of_____ 2011.


16   _____
     Notary Public
```

50

INDEX OF WITNESSES
EXAMINATION BY                              PAGE
MR. TZANETOPOULOS                              4

INDEX OF EXHIBITS
NO.    DESCRIPTION                          PAGE
1      Minutes-2/9/06                          8
2      Minutes-1/11/07                         8
3      Minutes-10/5/06                        12
4      Minutes-12/14/06                       16
5      Employment agreement                   17
6      Agreement                              19
7      Minutes-2/8/07                         22
8      Letter                                 23
9      Affiliation agreement                  24
10     Promissory note                        25
11     President's letter                     25
12     Financial statement 2007               28
13     Minutes                                30
14     Draft letter                           32
15     Petition                               33
16     Engagement letter                      35
17     Services agreement                     35
18     Memo                                   36
19     Bills                                  38

51

20     Checks                                 38
21     Board resolution                       40
22     Minutes-11/1/07                        41
23     Minutes-12/20/07                       42
24     Closure plan                           43
25     Minutes-3/5/09                         44

52

CERTIFICATE

STATE OF NEW YORK)
                 :ss.
COUNTY OF KINGS  )

    I, SARA FREUND, a Notary Public within and for the State of New York, do hereby certify:

    THAT EMIL J. RUCIGAY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

    I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

    IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of June, 2011.

_____
SARA FREUND

53

I wish to make the following changes, for the following reasons:

PAGE    LINE
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____
____    ____    CHANGE:_____
REASON:_____