# APPENDIX 22

| | |
|---|---|
| From: | Julius Romero |
| To: | Shepherd, Dr. Thomas; jur9004@nyp.org |
| Cc: | St. James, John; Perri, Dr.Nancy; ham9001@nyp.org; djg9001@nyp.org |
| Sent: | Thursday, December 28, 2006 10:07 AM |
| Subject: | Re: Ross Agreement |

Tom,

Thank you for the information. The file document was reviewed and determined to be acceptable EXCEPT for any reference to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b), (i)]. The Caritas agreement remains separate from the Wyckoff agreement.

The agreement without the referenced item will be signed and faxed to Nancy Perri's office today for her and John St. James' signatures.

A decision was made by Caritas that this agreement, has exhausted a lot of resources already, including time and opportunity.

Caritas will cease any more discussions or negotiations after the end of business day today, December 28, 2006.

I am on vacation as well, but will be available by cell and email.

Julius
(203) 252-1081

*"Shepherd, Dr. Thomas" <TShepherd@RossU.edu>* wrote:

> Julius,
>
> I am sorry for the delay in getting the clarifications to you, which are attached. If we have a signed agreement, then we can proceed with the transfer.
>
> I will be leaving town for a wedding in the morning. Please call John St. James or Nancy Perri (both be in the office tomorrow) and are the signatories for the agreement. They have my authorization to proceed with signing and transfer if the attached is approved and signed.
>
> Thank you for working with us on this, and I believe both organizations will benefit.
>
> Tom
> **Thomas C. Shepherd DHA**
> President
>
> Ross University
> School of Medicine and Veterinary Medicine
>
> 499 Thornall St., 10th Floor
> Edison, NJ 08837
> 732.978.5300 x 2675
> tshepherd@RossU.edu
> www.RossU.edu
> Assistant: Camille DeSanto 732.978.5300 x2671


PLAINTIFF'S EXHIBIT
Romero 020
July 1, 2011
B. Shrestha

ROSS00847

| | |
|---|---|
| From: | Shepherd, Dr. Thomas |
| To: | Raymundo, Wilfredo R.; Caggiano, Christopher |
| Cc: | St. James, John; Perri, Dr. Nancy |
| Sent: | Wednesday, December 27, 2006 5:38 PM |
| Subject: | RE: Wyckoff Agreement |

John and Nancy have a copy of what I forwarded this afternoon. We will need signed agreement in order to proceed. I will talk with John later this evening.

Tom

-----Original Message-----
From: Raymundo, Wilfredo R.
Sent: Wed Dec 27 17:23:56 2006
To: Caggiano, Christopher; Shepherd, Dr. Thomas
Cc: St. James, John; Perri, Dr.Nancy
Subject: RE: Wyckoff Agreement

Did anybody call BQHS to let them kno where we were and that barring any issue/revision, we will wire the $5MM first thing tomorrow?

-----Original Message-----
From: Caggiano, Christopher
Sent: Wed Dec 27 17:00:56 2006
To: Shepherd, Dr. Thomas
Cc: St. James, John; Raymundo, Wilfredo R.
Subject: Wyckoff Agreement

Dr. Tom,

I just spoke with John St. James and explained that you were still continuing to review and revise the agreement and that the wire would not be executed today.

John is almost home, he will call you early this evening to touch base and discuss.

Chris

ROSS008478

**From:** Perri, Dr. Nancy
**To:** Raymundo, Wilfredo R.
**Sent:** Wednesday, December 27, 2006 5:32 PM
**Subject:** RE: Wyckoff Agreement

Tom spoke with them this afternoon.

-----Original Message-----
From: Raymundo, Wilfredo R.
Sent: Wed Dec 27 17:23:56 2006
To: Caggiano, Christopher; Shepherd, Dr. Thomas
Cc: St. James, John; Perri, Dr.Nancy
Subject: RE: Wyckoff Agreement

Did anybody call BQHS to let them kno where we were and that barring any issue/revision, we will wire the $5MM first thing tomorrow?

-----Original Message-----
From: Caggiano, Christopher
Sent: Wed Dec 27 17:00:56 2006
To: Shepherd, Dr. Thomas
Cc: St. James, John; Raymundo, Wilfredo R.
Subject: Wyckoff Agreement

Dr. Tom,

I just spoke with John St. James and explained that you were still continuing to review and revise the agreement and that the wire would not be executed today.

John is almost home, he will call you early this evening to touch base and discuss.

Chris

ROSS008479

| | |
|---|---|
| **From:** | Raymundo, Wilfredo R. |
| **To:** | Caggiano, Christopher; Shepherd, Dr. Thomas |
| **Cc:** | St. James, John; Perri, Dr.Nancy |
| **Sent:** | Wednesday, December 27, 2006 5:24 PM |
| **Subject:** | RE: Wyckoff Agreement |

Did anybody call BQHS to let them kno where we were and that barring any issue/revision, we will wire the $5MM first thing tomorrow?

-----Original Message-----
From:   Caggiano, Christopher
Sent:   Wed Dec 27 17:00:56 2006
To:     Shepherd, Dr. Thomas
Cc:     St. James, John; Raymundo, Wilfredo R.
Subject:        Wyckoff Agreement

Dr. Tom,

I just spoke with John St. James and explained that you were still continuing to review and revise the agreement and that the wire would not be executed today.

John is almost home, he will call you early this evening to touch base and discuss.

Chris

AFFILIATION AGREEMENT

BETWEEN

ROSS UNIVERSITY SCHOOL OF MEDICINE,
SCHOOL OF VETERINARY MEDICINE, LIMITED
Portsmouth, Dominica

AND

BROOKLYN QUEENS HEALTH CARE, INC.

This Agreement is made between **Ross University School of Medicine, School of Veterinary Medicine, Limited**, hereinafter referred to as the "University", and **Brooklyn Queens Health Care, Inc.** ("BQHC"), which through its subsidiary, Caritas Healthcare Planning, Inc., owns and operates Mary Immaculate Hospital and Saint John's Queens Hospital in New York, hereinafter referred to as "Caritas" or "the Hospitals", (collectively, BQHC and the University shall be "the Parties").

WHEREAS, the Hospitals have facilities for furnishing a clinical medical education to the University's students; and

WHEREAS, the University has an established Clinical Curriculum; and

WHEREAS, the University has determined that it would be beneficial for students to participate in clinical clerkships at the Hospitals.

NOW, THEREFORE, in consideration of the premises and the mutual promises and undertakings of the parties set forth below, the Parties agree to conduct structured core, required and elective clinical clerkships for the University's medical students at the Hospitals according to the terms and conditions set out below:

SECTION I

The parties agree:

1. That this Agreement will commence January 1, 2007 and will continue until December 31, 2010. It may be earlier terminated by either party only for material breach of this Agreement, remaining un-remedied for thirty days after written notice of such breach, and only after a subsequent notice of intention to terminate this agreement has been delivered by registered mail to the other party in writing, allowing sufficient time for response. In event of such termination, the students

    who have commenced clerkships at the Hospitals will be allowed to complete their scheduled clerkships.

2. The Hospitals acknowledge that they have received and reviewed the University's Clinical Curriculum Guide (incorporated into this Agreement by reference and attached hereto as Exhibit A), and BQHC agrees to direct the Hospitals to provide clinical medical education consistent with all requirements therewith, as a minimum standard.

3. After considering the number of qualified University medical students, the number of clinical faculty in various disciplines at the Hospitals, the availability of relevant patient populations, and the total number of clerkships to be apportioned between the medical schools affiliated with the Hospitals, the Parties have agreed that the Hospitals shall provide the clerkships set forth in Exhibit B, attached hereto and incorporated by reference herein.

4. The provisions of this Agreement shall be construed and interpreted and all rights and obligations hereunder determined in accordance with New York law. The Parties consent that jurisdiction and venue of any dispute arising from this Agreement shall be in Kings County, New York.

5. The relationship of the Parties is that of independent institutions, which shall be observed at all times. No partnership, agency, or fiduciary relationship is implied, and none shall be construed.

6. BQHC shall ensure that the Hospitals shall make no distinction in the admission of students to a clinical clerkship on the basis of race, sex, creed, color, national origin, age, marital status, height, weight or handicap status.

7. This Agreement and the rights, interests, and benefits hereunder shall not be assigned, transferred, pledged or hypothecated in any way, without the written consent of the other party, except in the case of a sale of all or a majority of assets, or otherwise by operation of law, in which case transfer is permitted without consent; provided, however, that any successors in interest shall be obligated to comply with all of the terms and conditions of this Agreement.

SECTION II

BQHC AGREES that the Hospitals shall:

1. permit students of the University appropriate access to patients in the Hospitals while they are formally enrolled in clerkships.

2. provide appropriate clinical supervision and training of University students, including their performance of relevant clinical procedures, while taking core clerkships in Internal Medicine, Surgery, Obstetrics & Gynecology, Psychiatry, and Family Medicine as well as elective rotations at the Hospitals. The Parties may agree to add or delete elective clerkships from time to time in writing during the term of this Agreement, provided that such agreement is mutual.

3. inform the appropriate officials of the University, in a timely and confidential manner, of any substantially inappropriate behavior, as defined by the Hospitals code of conduct and/or professional standards of conduct (copies of which shall be provided), on the part of any student, which may indicate the need for sustained counseling or correction.

4. provide any orientation, administrative guidance and procedures and other media deemed essential to the student's experience.

5. be responsible for the activities of the students during the clerkship, to directly supervise such activities and to provide students with appropriate and timely counsel/feedback/notification, no less than every three weeks, concerning performance and behavior in relation to their assigned rotation.

6. submit, in a timely and appropriate manner, a written Clinical Evaluation on each student at the completion of clerkships by the supervising physician, and where appropriate countersigned by the Director of Undergraduate Medical Education, which shall follow a format mutually acceptable to the parties and be delivered to the University within six weeks of completion of the clerkship.

7. provide to the University accurate and contemporary data concerning student clinical activities as reasonably requested by the University, but in no event less than weekly. Documentation will include patient census (i.e. average daily census) for each course area of clinical instruction.

8. make available the following health services to the University's students while they are assigned to clerkships at the Hospitals, provided that the usual fees and costs for such services shall be paid by the students:

      a. Medical referrals through the Hospitals' Employee Health Services
      b. Emergency services provided by the Emergency Department; and
      c. Basic health services as required by regulatory agencies from time to time.

9. permit the use of its medical library by and computer access to the University's students while they are assigned to clerkships at the Hospitals on the same basis as any other personnel.

10. provide the following support services to the University's students while they are assigned to clerkships at the Hospitals:

      a. Housing referrals, if available; and
      b. In house accommodations for on-call personnel, including call rooms, shared lockers as available, dietary, uniform and linen services.

11. provide the University a right of first refusal as to half of all new core/elective clerkships slots developed by the Hospitals; provided, however, that the Hospitals will not hold any new slots empty unless payment of the Pre-payment Funds has been made in accordance with Exhibit B. The Hospitals shall provide the University with written notice, sent by registered mail, of such new core/elective clerkship slots and thereafter hold such slots available for the University for no less than 30 calendar days following delivery of such notice. The University shall notify in writing the Hospitals of its decision to exercise (or not) its right of first refusal within such notice period. BQHC shall provide, or shall cause the Hospitals to provide, on a quarterly basis, the University with a certified report of available clinical rotation slots at the Hospitals, on which the available slots guaranteed to the University was calculated.

12. maintain the confidentiality of the students' personal information in accordance with State and Federal laws and regulations.

13. provide the University, upon reasonable request therefor, with proof of insurance in commercially reasonable amounts and with such coverages as may be standard for hospitals in the area in which the Hospitals are located.

SECTION III

THE UNIVERSITY AGREES:

1. \_\_\_\_upon mutual agreement of the Parties, to offer and confer, upon those hospital teaching faculty satisfying University requirements, a clinical appointment as "adjunct faculty" to the University. Such appointment shall not create, nor be construed to create, an employer/employee relationship between any adjunct faculty and the University. In addition, conferment of adjunct faculty status on Hospital teaching faculty is not intended to, nor shall be construed to, mean that the University accepts the responsibility for teaching faculty's or the Hospitals' acts or omissions.

2. \_\_\_\_In a timely manner, to inform the Hospitals of any substantive changes in its Clinical Curriculum Guide.

3. \_\_\_\_To appoint for clinical clerkship only those students who have satisfactorily completed the prerequisite instructional portion of the curriculum, in the pre-clinical sciences in the University's sole discretion.

4. \_\_\_\_To state as its policy that the Hospital Medical Director shall have the authority to immediately suspend any student of the University, whose behavior is sufficiently inappropriate to warrant this action, provided that the student is allowed a timely opportunity to appeal and the University is notified immediately.

5. \_\_\_\_To require each student enrolled in clerkships to maintain at least $1,000,000/$3,000,000 malpractice coverage, protecting both the University and the Hospitals from liability which could occur as a result of the student's fault or negligence. The University shall maintain on file evidence of the existence of insurance required and shall provide a copy of the insurance to the Hospitals upon request. Each party agrees to give the other notice in writing within thirty (30) days of any claim made against it which is covered by this section.

6. \_\_\_\_To provide medical library and secretarial support for the students engaged in clerkships, as set forth in Exhibit B.

7. \_\_\_\_To require each student, prior to the commencement of the clinical experience, to provide results to the Hospital of physical examination which complies with the requirements of section 405.3 of the New York Code of Rules and Regulations. All clinical clerks will be offered by the University the opportunity the opportunity to receive a Hepatitis B vaccination. In addition, all clinical clerks will have completed the OSHA Bloodborne Pathogens Workshop prior to beginning clerkships.

8. \_\_\_\_In the event of impending bankruptcy, BQHC will give to the University such notice as promptly as they are legally permitted to provide. On a quarterly basis, no later than 90 days after the close of the quarter, BQHC shall cause the Hospitals to provide the University with a report on its financial condition.

9. In the event that the Hospitals are unable to accept the specified number of students, as set forth in exhibit A, for the core or elective rotations, BQHC will refund to the University that portion of the prepayment funds which have not then been earned.

*Formatted: Indent: Left: 0"*

THIS AGREEMENT IS SIGNED AND DATED AS FOLLOWS:

Brooklyn Queens Health Care, Inc.

_____
Date                                                                                      Deleted: .

_____
Date                                                                                      Deleted: .

On Behalf of ROSS UNIVERSITY SCHOOL OF MEDICINE, SCHOOL OF VETERINARY MEDICINE:

_____ Nancy Perri,         Deleted: ¶
M.D., Vice President, Academic Affairs

Date                                                                                      Deleted: ..

_____                              Deleted:
John St. James, Chief Financial Officer

Date                                                                                      Deleted: ....

ROSS008487

EXHIBIT A

UNIVERSITY'S CLINICAL CURRICULUM GUIDE

[TO BE ATTACHED]

**EXHIBIT B**

This exhibit sets forth the financial terms of the above Agreement, whereby the University hereby agrees that it will pay BQHC as follows:

a. The University will deposit with BQHC $5,000,000 US Dollars (the "Pre-Payment Funds") on or before December 27, 2006, by wire transfer or such other commercially reasonable manner as may be agreed upon between the Parties;

b. In consideration of such payment, BQHC shall

(i) for a period of time co-extensive with the term of this Agreement, charge the clerkship rate of $312.50 per week, per clerkship, to those clerkships provided by BQHC through its Wyckoff Hospital facilities, under the terms of that certain Agreement, dated December 29, 1997, as amended; and

(ii) cause the Hospitals to provide clinical clerkships to the University's eligible students during the term of this Agreement, and until the Pre-Payment Funds have been exhausted; and

c. The University will pay for subsequent clinical clerkships at the Hospitals on a "service performed" basis, at the rate set forth below, once the Pre-payment Funds have been fully amortized.

[Deleted: b]
[Deleted: Thereafter, t]

The Pre-Payment Funds represent an advance payment for core and elective clerkship weeks, calculated at a rate of $312.50 per week, per clerkship, at either of the Hospitals, for a total of sixteen thousand (16,000) instructional weeks. For avoidance of all doubt, the Pre-Payment Funds are intended to cover the total number of weeks for each clinical clerkship guaranteed hereunder until the Pre-Payment Funds have been exhausted.

During the term of this Agreement, BQHC guarantee that the Hospitals shall provide the University with a minimum number of fifty (50) core clerkship slots, allocated as follows:

| Surgery | 16 |
| Medicine | 20 |
| Ob/Gyn | 8 |
| Family Medicine | 6 |

In addition, BQHC further guarantees that the Hospitals shall provide the University with fifty (50) elective clerkship slots during the term of the Agreement, to be allocated in accordance with the mutual agreement of the Parties..

ROSS008489

The clerkship rate of $312.50 per week is guaranteed for the entire term of the Agreement. In other words, once the University has exhausted the Pre-Payment Funds deposited with BQHC, the University shall be entitled to pay for additional clinical clerkships at this rate for the remaining balance of the term of the Agreement.

The University will provide to BQHC, on behalf of the Hospitals, annual library support of $10,000.00 USD paid semi-annually in consideration for the use of the Hospitals' library facilities by University students engaged in clinical clerkships during the term of the Agreement.

The University also agrees that it will pay BQHC, on behalf of the Hospitals, for reasonable secretarial support required to implement this Agreement. The amount to be paid by the University for secretarial support will be determined by the Parties, based upon the size of the student program and shall be agreed upon in writing. In no event shall the amount paid by the University for secretarial support for any given year be less than $36,000.00 USD, so long as the Hospitals are providing at least fifty (50) core clerkship positions for the University's students.

The Hospitals will submit invoices for such expenses and the invoices will be supported by appropriate documentation. Payment terms are net 30 days.

In consideration of the Pre-Payment under this Agreement, BQHC shall pay, or shall cause the Hospitals to pay, the University an amount equivalent to interest, paid at a rate of LIBOR + 1% per annum and calculated on the unamortized amount of prepayment (the "Monetary Consideration"). Such amortization is based upon the amount expended for the clinical clerkships on a monthly basis over the term of this Agreement, as set forth in Exhibit C, which is attached hereto and incorporated by reference herein.

The Monetary Consideration is due and payable on or before the end of the month following the period set forth in the amortization schedule. If unpaid within 60-days following the applicable period, a late fee, in the same rate as the effective rate for the amortization period, will accrue, beginning with the first day of the second month following the amortization period.

The University reserves the right to apply any Monetary Consideration against any monies to be paid by the University under this Agreement for secretarial support, library support, or additional clerks. In the event the University elects to exercise such right, BQHC shall provide, or cause the Hospitals to provide, within the same time frame as the payment schedule in the paragraph above, a written accounting of such disbursements from the Monetary Consideration owed the University.

<u>In the event of failure to pay the Monetary Consideration hereunder and/or the filing of bankruptcy by BQHC, or by one or both of the Hospitals, BQHC agrees, and shall cause the Hospitals to agree, that the University shall be considered a secured creditor in the amount of any unpaid Monetary Consideration and any unamortized portion of the Pre-Payment Amount.</u>

<u>Absent material breach of this Agreement by the University, the Hospitals shall not withhold Services while the Hospitals remain operative. In the event the Hospitals are not operative, and the University is not in material breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.</u>

NOTE: Neither the Hospital's provision of services nor the payment to the University of any monetary consideration under this Agreement in exchange for the Pre-Payment Funds constitutes a lending arrangement. The University is not a lender or a financial institution, and is not in the business of making commercial loans or financial transactions, which may be subject to state or federal regulation. Pre-payment for services is at the express request of BQHC, and is solely for the convenience of BQHC and the Hospitals.

EXHIBIT C
[agreed upon amortization table]