# APPENDIX 40

**PROSKAUER ROSE LLP**
Proposed Counsel for the Debtors and Debtors-in-Possession
Jeffrey W. Levitan (JL-6155)
Adam T. Berkowitz (AB-3714)
1585 Broadway
New York, New York 10036-8299
Tel: (212) 969-3000
Fax: (212) 929-2900

**UNITED STATES BANKRUPTCY COURT,
EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
In re:                                                 :
                                                       :        Chapter 11
                                                       :
**CARITAS HEALTH CARE, INC., et al.,**[1]              :        Case Nos. 09-    (   )
                                                       :        through 09-    (   )
                                                       :
            **Debtors.**                               :        (Jointly Administered)
------------------------------------------------------- x

**AFFIDAVIT OF JOHN LAVAN, THE CHIEF RESTRUCTURING OFFICER OF
CARITAS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK     )

       John Lavan, hereby affirms, under penalty of perjury, as follows:

       1.     I am the Chief Restructuring Officer of Caritas Health Care, Inc.

("Caritas"), one of the above-captioned debtors and debtors in possession (the "Debtors").   In

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Caritas Health Care, Inc. (0364), Caritas Anesthesia Services, P.C. (4765), Caritas Cardiology Services, P.C. (1247), Caritas Emergency Medical Services, P.C. (5881), Caritas Family Health Services, P.C. (4113), Caritas Medical Services, P.C. (1143), Caritas OB/GYN Services, P.C. (1289), Caritas Pediatric Services, P.C. (6649) and Caritas Radiology Services, P.C. (1325). The mailing address for all of the Debtors is 152-11 89th Avenue, Jamaica, New York 11432.


EXHIBIT
Hoffman 9

my capacity as Chief Restructuring Officer, I am necessarily familiar with the Debtors'

operations, business affairs and books and records.

### JURISDICTION

2.      The Court has jurisdiction over this matter under 28 U.S.C. § 1334, which

is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

3.      As of the Petition Date, the Debtors filed voluntary petitions for relief

under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code").  The Debtors remain in possession of their assets and continue to manage

their operations as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

No trustee, examiner or committee of creditors has been appointed in these cases and to the best

of my knowledge, information and belief there have been no informal committees formed prior

to the filing of these Chapter 11 cases.

**A.      Organizational Structure; Overview of the Debtors' Operations**

4.      Caritas is a New York not-for-profit corporation that was formed by

Wyckoff Heights Medical Center, also a New York not-for-profit corporation ("Wyckoff"),[2] on

March 9, 2006, for the purpose of acquiring from St. Vincents Catholic Medical Centers of New

York ("SVCMC"), and thereafter operating, two hospitals and ancillary facilities in Queens,

---

[2]      Wyckoff owns and operates a 350 bed hospital in Brooklyn, New York.

New York:· Mary Immaculate Hospital ("Mary Immaculate") and St. John's Queens Hospital

("St. John's") (collectively, the "Caritas Hospitals").

   5.  Brooklyn-Queens Health Care, Inc., a New York not-for-profit

corporation ("BQHC"), is the sole member of both Caritas and Wyckoff.[3] As such, BQHC has

the power to appoint the members of the Caritas and Wyckoff boards of trustees (the board of

trustees of Caritas is herein referred to as the "Board," and the boards of trustees of Wyckoff and

Caritas are together referred to as the "Boards").  Although there is some overlap in membership

of the Boards, each of the Boards independently oversees the operations of its respective

hospitals.

   6.  In 2008, the Caritas Hospitals provided 20,759 general acute inpatient

admissions, 1,231 births, 621 inpatient psychiatric admissions, 1,244 detoxification admissions,

65,876 treat-and-release emergency department visits, and approximately 150,000 methadone

maintenance patient encounters.  The Caritas Hospitals also had a 95% census in its 115 skilled

nursing facility beds during that year.

---

[3]  Caritas and BQHC entered into an Administrative Services Agreement (the "Administrative Services
Agreement"), dated as of August 21, 2006, pursuant to which BQHC, as an independent contractor, was to
provide certain administrative services to Caritas respecting the Caritas Hospitals, including: development
of certain budgets, financial projections, and financial statements; selection and administration of financial
and accounting systems; and development of clinical and administrative policies and procedures.  BQHC
and Wyckoff entered into an Administrative Services Subcontract (the "Administrative Services
Subcontract"), dated as of August 21, 2006, pursuant to which Wyckoff provided the administrative
services required under the Administrative Services Agreement to Caritas, and Wyckoff would be paid the
fees due thereunder.  Wyckoff was never paid such fees, and to alleviate the resulting deficit, Caritas
agreed in May, 2008 to become the employer of certain Wyckoff employees, including certain employees
who were providing the administrative services to the Caritas Hospitals.  All employees of Caritas who
provided services for Wyckoff have since become employees of Wyckoff, and Caritas reimburses Wyckoff
for the costs associated with those Wyckoff employees who are providing services to Caritas.  To formalize
this arrangement, on February 5, 2009, Wyckoff and Caritas entered into a new administrative services
agreement pursuant to which Wyckoff is now providing to Caritas certain administrative services, such as
billing and collection services.  The fee therefor is equal to the allocable portion of such employees'
salaries and benefits attributable to the time spent on behalf of Caritas.

7.     St. John's has 227 general acute hospital beds and an emergency

department.  In addition to providing outpatient services at the hospital, it provides outpatient

services at St. John's Family Health Center, located at 95-25 Queens Boulevard in Rego Park.  In

2008, St. John's had 12,551 acute care discharges, provided 5,799 ambulatory surgery

procedures, 32,560 emergency room treat and release visits and 54,674 outpatient visits.

8.     Mary Immaculate has on its campus 189 general acute hospital beds, an

emergency department, and the 115-bed Monsignor Fitzpatrick Skilled Nursing Pavilion.  In

addition to providing outpatient services at the hospital, it provides outpatient services at the St.

Dominic's Family Health Center, located at 114-39 Sutphin Boulevard in Jamaica, Queens, and

at two methadone maintenance clinics on Archer Avenue in Jamaica, Queens.  In 2008, Mary

Immaculate had 8,208 general acute admissions, 1,335 alcohol detoxification admissions and

612 inpatient psychiatry admissions.  In that year it also provided 1,930 ambulatory surgery

procedures, 33,316 emergency department treat and release visits, and 65,209 outpatient clinic

visits.

9.     Caritas acquired the Caritas Hospitals on January 1, 2007 from SVCMC

pursuant to an Asset Purchase Agreement, dated May 9, 2006, which was approved by the

Bankruptcy Court overseeing the SVCMC Chapter 11 Case (the "SVCMC Transaction").  The

purchase price in the SVCMC Transaction was comprised of a $3,500,000 cash payment,

$10,000,000 in secured notes (as described more fully below) and the assumption by Caritas of

approximately $26,000,000 of SVCMC liabilities.  At the closing, Caritas sold Parsons Manor (a

building located on the Mary Immaculate campus) for a $10,000,000 cash payment.

Additionally, SVCMC agreed to continue to provide transitional information technology and

other services to the Caritas Hospitals until Caritas had its own capability to do so (the "SVCMC Transitional Services"), and Caritas agreed to reimburse SVCMC for the associated costs.

10. As set forth below, from the time of the SVCMC Transaction, the Debtors have struggled to achieve financial stability. As of November 30, 2008, Caritas had aggregate assets (at book value) and liabilities on a consolidated, unaudited basis of approximately $87,234,264 and approximately $188,277,388, respectively. For the fiscal year ended December 31, 2008, the Debtors incurred a net loss of approximately $64,000,000.

**B.      Pre-Petition Term Loan[4]**

11. The cash portion of the purchase price paid by Caritas to SVCMC upon the closing of the SVCMC Transaction was financed in part by a term loan in the initial amount of $15,000,000 provided by HFG Healthco-5 LLC (the "HFG Term Loan Lender"), pursuant to the following agreements among Caritas, the HFG Term Loan Lender, HFG Healthco-4 LLC (the "HFG Revolving Loan Lender") and Healthcare Finance Group, Inc. ("HFG"), as Administrative Agent and Collateral Agent for the HFG Term Loan Lender and HFG Revolving Loan Lender:[5] (a) a Revolving and Term Loan and Security Agreement, dated as of January 1, 2007; (b) a First Amendment and Extension, dated as of June 29, 2007; (c) a Second Amendment, dated as of August 3, 2007; (d) a Third Amendment and Extension, dated as of December 28, 2007; (e) a Fourth Amendment, dated as of November 30, 2008; (f) a Fifth

---

[4]      The description of the Caritas pre-petition indebtedness contained herein is without prejudice to Caritas's or other parties' rights, claims and defenses respecting, inter alia, the nature, extent, priority, amount, validity, allowance, avoidance and classification of any such indebtedness, and all such rights, claims and defenses are expressly reserved except to the extent set forth in the DIP Financing Term Sheet, the DIP Financing Agreement and any DIP Financing Orders entered by the Court.

[5]      HFG, the HFG Term Loan Lender and the HFG Revolving Loan Lender being referred to collectively as the "HFG Entities."

Amendment and Extension, dated as of December 30, 2008; (g) various related agreements, including (i) a Subordination Agreement, dated as of January 1, 2007, among Caritas, the HFG Entities and SVCMC (discussed below) and (ii) an Affiliate Subordination Agreement, dated as of January 1, 2007, among Caritas, the HFG Entities, Wyckoff and BQHC (discussed below); and (h) other ancillary documents and instruments.[6]

12.     In order to fund a portion of the costs of the Debtors' Pre-Petition operations and to pay certain liabilities assumed from SVCMC, Caritas borrowed an additional $7,500,000 from the HFG Term Loan Lender pursuant to the Pre-Petition HFG Loan Documents. As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition HFG Term Loan was approximately $13,900,000[7], plus interest, costs, fees, expenses and other charges due pursuant to the Pre-Petition HFG Loan Documents (collectively, the "Pre-Petition HFG Credit Obligation").

13.     To secure repayment of the Pre-Petition HFG Credit Obligation, HFG, as collateral agent for the HFG Term Loan Lender, was granted a first priority lien on and security interest in substantially all of the assets of Caritas, including (a) the following real property:  (i) the five buildings located on the campus of Mary Immaculate at 152-11 89th Avenue, Jamaica, New York; (ii) the main hospital building of St. John's located at 90-02 Queens Boulevard, Elmhurst, New York; (iii) a parking garage located on the campus of Mary Immaculate; (iv) a parking garage located at 87-28 58th Street, Elmhurst, New York; (v) two parking lots located on

---

[6]     The term loan provided by the HFG Term Loan Lender, as amended or modified, is hereinafter referred to as the "Pre-Petition HFG Term Loan," and the documents, as amended or modified, described in clauses (a) through (h) of the paragraph to which this footnote is appended are hereinafter collectively referred to as the "Pre-Petition HFG Loan Documents."

[7]     The HFG Term Loan Lender applied Caritas cash collections to reduce the aggregate principal amount outstanding to this amount.

88th Avenue in Jamaica, New York; and (vi) parking lots located at 57-28/58-00 Hoffman Drive,

57-30 Hoffman Drive and 57-32 Hoffman Drive, Elmhurst, New York;[8] (b) all other tangible and

intangible property of all kinds; (c) all receivables;[9] and (d) all proceeds of the foregoing

(collectively, the "Pre-Petition HFG Collateral").

## C.   Seller Financing and Additional Notes

14.   As part of the purchase price for its acquisition of the Caritas Hospitals,

Caritas, as borrower, delivered to SVCMC, as lender, two secured promissory notes, each in the

principal amount of $5,000,000, pursuant to the following instruments and agreements:  (a) a

Secured Promissory Note, dated January 1, 2007 (the "Seller Financing Note"); (b) a Secured

Promissory Note, dated January 1, 2007 (the "Additional Seller Note"); (c) a Mortgage, Security

Agreement, Assignment of Leases, Rents and Profits, Financing Statement and Fixture Filing,

dated as of January 1, 2007; and (d) other ancillary documents and instruments.  (The documents

described in clauses (a) through (d) above, as amended or modified, are hereinafter collectively

referred to as the "Pre-Petition SVCMC Loan Documents").

15.   As of the Petition Date, the aggregate principal amount outstanding under

the Seller Financing Note and Additional Seller Note was approximately $9,100,000, plus

interest, costs, fees, expenses and other charges due pursuant to the Pre-Petition SVCMC Loan

Documents (collectively, the "Pre-Petition SVCMC Credit Obligation").

---

[8]   The Pre-Petition HFG Term Loan provides that if no event of default is continuing thereunder, HFG will
release its lien in the real property described in clauses (iii) through (vi) and such other collateral pertaining
thereto, in connection with Caritas's obtaining of a mortgage upon the sale or mortgage of one or more
parcels of such real property for fair value.

[9]   HFG's lien on the Caritas's receivables excludes the gross receipts relating to the primary care facility
known as the St. Dominic Family Health Center, discussed below.

16.     To secure repayment of the Pre-Petition SVCMC Credit Obligation, SVCMC was granted a lien on and security interest in the real property and related collateral located at 152-11 89th Avenue, Jamaica, New York, and 90-02 Queens Boulevard, Elmhurst, New York (the "Pre-Petition SVCMC Collateral").

17.     Pursuant to a Subordination Agreement, dated as of January 1, 2007 (as same may have been amended or modified, the "Subordination Agreement"), HFG and SVCMC agreed that SVCMC's lien and security interest in the Pre-Petition SVCMC Collateral would be subordinate to the lien and security interest of HFG in that collateral. The Subordination Agreement further provides that upon payment of the Pre-Petition HFG Term Loan,[10] SVCMC's lien and security interest in the Pre-Petition SVCMC Collateral would be superior to the lien and security interest of HFG in that collateral.

D.     **Events of Default Under the HFG and SVCMC Agreements**

18.     In a letter dated March 1, 2007, HFG notified Caritas of the occurrence and continuance of events of default under the Pre-Petition HFG Loan Agreement. As a consequence thereof, no funds were ever advanced by the HFG Revolving Loan Lender to pay and discharge the Pre-Petition HFG Term Loan.

19.     As a result of its being in default under the Pre-Petition HFG Loan Agreement, Caritas was prohibited by the Pre-Petition HFG Loan Documents from making payments to SVCMC under the Pre-Petition SVCMC Loan Documents for a period of 180 days. Caritas was also financially unable to pay SVCMC for the SVCMC Transitional Services.

---

[10]     Under the Pre-Petition HFG Loan Agreement, upon the satisfaction of certain conditions precedent, the HFG Revolving Loan Lender was to provide a revolving credit facility that was to be used to pay and discharge the Pre-Petition HFG Term Loan.

SVCMC thereupon withheld from Caritas approximately $6,000,000 in accounts receivable that had been collected on Caritas's behalf by SVCMC, and litigation respecting the foregoing was commenced in the Bankruptcy Court overseeing the SVCMC bankruptcy case.

20.    Caritas and SVCMC settled their dispute and, together with HFG, entered into a Settlement Agreement, dated as of May 4, 2007, which provided, among other things, for the payment by SVCMC to Caritas of its accounts receivable and for the payment by Caritas to SVCMC, as prepayments of principal under the Pre-Petition SVCMC Credit Obligation, of certain Medicaid reimbursement adjustment receipts as and when received by Caritas. Subsequently, Caritas, HFG and SVCMC negotiated a second settlement agreement that provided for Caritas to pay to SVCMC certain of the Medicaid receipts used by Caritas to pay operating expenses.

**E.    DASNY Loans**

21.    In order to enhance liquidity and provide additional working capital, Caritas sought and received several loans from the Dormitory Authority of the State of New York ("DASNY") pursuant to the following agreements with DASNY:  (a) a Reimbursement Agreement, dated as of March 22, 2007 (the "First DASNY Loan Agreement"); (b) a Second Reimbursement Agreement, dated as of August 24, 2007; (c) a First Amended Reimbursement Agreement, dated as of November 21, 2007; (d) a Second Amended Reimbursement Agreement, dated as of February 21, 2008; (e) a Third Amended Reimbursement Agreement, dated as of March 14, 2008; (f) a Fourth Amended Reimbursement Agreement, dated as of May 15, 2008; (g) a Fifth Amended Reimbursement Agreement, dated as of July 16, 2008; (h) a Sixth Amended Reimbursement Agreement, dated as of August 14, 2008; (i) a First Amended March 2007

Reimbursement Agreement, dated as of October 22, 2008; (j) a Reimbursement Agreement dated as of October 22, 2008; (k) a Reimbursement Agreement dated as of November 13, 2008; (l) a Reimbursement Agreement dated as of November 26, 2008; (m) a First Amended November 26, 2008 Reimbursement Agreement, dated as of December 11, 2008; (n) a Second Amended November 26, 2008 Reimbursement Agreement, dated as of December 24, 2008; (o) a Third Amended November 26, 2008 Reimbursement Agreement, dated as of January 6, 2009; (p) a Reimbursement Agreement dated as of January 21, 2009; and (q) a Reimbursement Agreement dated as of February 4, 2009 (collectively, the "Pre-Petition DASNY Loans").

22.    As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition DASNY Loans was approximately $60,950,000 (the "Pre-Petition DASNY Loan Obligation").

23.    To secure repayment with respect to $20,000,000 of the Pre-Petition DASNY Loan Obligation, DASNY was granted a lien on and security interest in the real property and related collateral located at 152-11 89th Avenue, Jamaica, New York, and 90-02 Queens Boulevard, Elmhurst, New York (collectively, the "Pre-Petition SVCMC Collateral"). Pursuant to agreements between DASNY and each of the HFG Entities and SVCMC, DASNY's lien on and security interest in the Pre-Petition SVCMC Collateral are subordinate to HFG's and SVCMC's liens on and security interests in such collateral.

24.    $40,950,000 of the Pre-Petition DASNY Loan Obligation are not secured by any assets of the Debtors.[11]

## F.    Primary Care Development Corporation

25.    In 1996, SVCMC's predecessor, Catholic Medical Center of Brooklyn and Queens, Inc. ("CMC"), entered into a sale-leaseback transaction with DASNY and Primary Care Development Corporation ("PCDC"), pursuant to which CMC obtained financing to develop the St. Dominic Family Health Center on real property owned by CMC at 114-39-41 Sutphin Boulevard, Jamaica, New York (the "Sutphin Property").

26.    Among the real property acquired by Caritas from SVCMC on January 1, 2007, was the Sutphin Property.  Accordingly, in connection with that acquisition, Caritas assumed the obligations under the sale-leaseback arrangement, including SVCMC's obligations under an operating lease with PCDC (the "PCDC Operating Lease").

27.    As of the Petition Date, the aggregate amount outstanding under the PCDC Operating Lease was approximately $5,540,000, plus any applicable attorneys' fees and disbursements.

## G.    Affiliate Obligations

28.    Prior to January 1, 2007, in anticipation of cash flow and accounting system needs upon the acquisition of the Caritas Hospitals, BQHC loaned Caritas $1,000,000 and Wyckoff entered into lease obligations for equipment provided to Caritas with an

---

[11]    Caritas's payment obligation to DASNY with respect to the $6,000,000 borrowed pursuant to the First DASNY Loan Agreement is guaranteed by BQHC and secured by a mortgage on certain real property owned by BQHC.

11

approximate value of not less than $3,000,000.[12]  In addition, approximately $10,000,000 is

owed by Caritas to Wyckoff for services provided by Wyckoff employees to Caritas.  The

obligations described in this paragraph are hereinafter collectively referred to as the "Affiliate

Obligations."

29.     As of the Petition Date, no part of the Affiliate Obligations has been

repaid.[13]

30.     In addition, the Debtors acknowledge the existence of an unsecured debt

owed to "The Savings Plan for Employees of Wyckoff Heights Medical Center," a money-

purchase plan in which the Debtors and Wyckoff are joint participants, in the approximate

amount of $3,090,444.

**H.     Events Leading to the Chapter 11 Filing**

31.     The Caritas Hospitals were financially troubled institutions for a

significant period preceding the SVCMC Transaction.  In fact, the only viable alternative to the

SVCMC Transaction was to close the Caritas Hospitals, which SVCMC was prepared to do if

the SVCMC Transaction was not consummated.  Wyckoff, the only bidder for the Caritas

Hospitals, believed that it could successfully return them to viability based on its experience of

operating a financially distressed hospital in a low-income urban area.

---

[12]    To evidence the lease obligations incurred by Wyckoff, Caritas executed an unsecured Promissory Note in
favor of Wyckoff, dated April 6, 2007, in the principal amount of $3,000,000.

[13]    Prior to the Petition Date, Caritas, the HFG Entities, BQHC and Wyckoff entered into an Affiliate
Subordination Agreement, dated as of January 1, 2007.  In general, and as more fully set forth therein, that
agreement provides that so long as any amounts are owed by Caritas to any of the HFG Entities, payments
due from Caritas to BQHC and Wyckoff shall be subordinate in right of payment to the HFG Entities.

32.    Unfortunately, the Debtors have experienced financial difficulties from the date of Caritas's formation up to the Petition Date, and have incurred regular losses.  The Debtors' difficulties are caused both by problems in existence prior to Caritas's acquisition of the Caritas Hospitals, and those arising in the course of the subsequent turn-around efforts. Moreover, the anticipated benefits and synergies of BQHC's joint administration of Wyckoff and Caritas have not fully materialized, and have fallen short of expectations.  It was contemplated that by consolidating the responsibility for general policies, financial management, strategic planning, legal counseling, and billing operations (among other things) of Wyckoff and Caritas, the financial situation of both entities would be enhanced.  Unanticipated setbacks, delays, and disruptions in cash flow, mainly due to integration difficulties, impeded the turnaround effort. The additional burden of a January 1, 2008 drop in Medicaid reimbursement rates and the general difficulties of the currently tightened fiscal environment have further accelerated the Debtors' losses.

33.    To address these financial difficulties, prior to the Petition Date, the Debtors attempted, through various means, to achieve financial sustainability.  In early 2007, Caritas obtained the first of the Pre-Petition DASNY Loans, and also increased its borrowing from the HFG Term Loan Lender.  Caritas also disposed of certain non-core assets, including two vacant parcels located at 88-09 153rd St. and 153-10 88th Avenue in Jamaica, New York. These loans and sales provided much needed liquidity, but the Debtors still struggled to achieve financial stability.  Accordingly, in June, 2007, Caritas retained a healthcare restructuring firm to assist in its turnaround efforts.  The firm provided Caritas with one of its principals to serve as the Chief Restructuring Officer of Caritas, as well as a new Chief Financial Officer, a new Patient Financial Services Director, a new Patient Access Director, and numerous support

personnel.  The firm undertook several initiatives in an effort to improve the financial

performance of the Debtors, including employing additional physicians and upgrading and

modernizing certain medical equipment.  Unfortunately, these efforts did not result in a

significant reduction of operating losses.

34.    The Debtors also investigated the possibility of a strategic combination.
The Debtors were able to identify several parties with an interest in a strategic transaction.  The

parties signed confidentiality agreements, conducted extensive due diligence and engaged

Caritas in detailed negotiations over possible transaction structures.  However, no combination

was ever effectuated.

35.    Caritas elected not to renew its agreement with the aforementioned
restructuring firm when the term thereof expired at the end of September 2008.  Instead, on

October 1, 2008, Caritas retained JL Consulting LLC and its principal, John Lavan, as Chief

Restructuring Officer, and on December 1, 2008, Caritas retained Montclair Partners LLC, and

its principal, John Bruno, as financial advisors.  In addition, in December, 2008, Caritas retained

John Kastanis as its Chief Executive Officer, and in January, 2009, it retained Jerry Castoria as

its Chief Financial Officer.

36.    Following the retention of JL Consulting LLC, the Debtors instituted
further initiatives in an effort to reduce operating losses.  Notwithstanding those initiatives, it

became clear that in order to keep the Caritas Hospitals open, the Debtors needed to continue to

receive financing from DASNY.  However, DASNY and the New York State Department of

Health (the "DOH") indicated that they no longer have the ability to continue to subsidize

Caritas's operating losses.

37.     Despite these and other efforts to complete a successful turnaround, the Debtors, like many entities in this difficult economic environment, continued to experience significant losses. As the Debtors' financial condition continued to worsen, they found themselves unable to maintain their ongoing operations.

38.     In early January, the Board directed management to develop a plan for closure of the Caritas Hospitals and related programs. Caritas's management developed several draft plans and solicited review and comment from the DOH. While working with the DOH to develop a closure plan, Caritas's management also consulted with area hospitals that will be impacted by the closures of the Caritas Hospitals and has reached out to alternate sponsors for several important ambulatory care programs.

39.     After incorporating the various recommendations of the DOH, Caritas's management submitted a closure plan as per a direction issued by the Board at a February 5, 2009 meeting. At a joint conference call with DOH and Caritas's management on February 6, 2009 agreement was reached on major elements of the closure plan and DOH indicated their conditional approval of the plan. Following receipt of DOH's conditional approval letter, which is expected today or over the weekend, Caritas will initiate implementation of the closure plan. After considering the alternatives, the Debtors determined to file for chapter 11 protection in order to obtain the financing necessary to implement the closure and to obtain protection from creditor actions in an effort to preserve and maximize the value of their assets for the benefit of all stakeholders, while at the same time safeguarding the welfare of their patients.

## FIRST DAY MOTIONS AND ORDERS

40.     To enable the Debtors to operate during the pendency of these Chapter 11 cases, the Debtors have requested various forms of relief in "first-day" motions (the "First Day Motions") filed contemporaneously herewith.  In general, the First Day Motions seek to provide the Debtors with relief necessary to implement the closure plan with minimal disruption while safeguarding patient welfare and complying with the necessary protections afforded to the Debtors' key constituencies under the Bankruptcy Code.  I believe that such relief is crucial to the Debtors' prospects for successfully implementing the closure plan.

41.     I submit this affidavit in support of the First Day Motions.[14] Except as otherwise indicated, all facts set forth below are based on my personal knowledge of the Debtors' operations, business affairs and books and records or on my review of relevant documentation.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this affidavit on behalf of the Debtors.  I have reviewed each of the First Day Motions and I believe that the relief sought in such motions (a) is necessary to enable the Debtors to operate within the parameters of Chapter 11 with a minimum of disruption while preserving and protecting the value of the Debtors' estates and (b) constitutes a critical element in implementing the closure plan.

42.     The First Day Motions consist of the following:

    I.      motion for financing orders (i) authorizing the Debtors to incur postpetition indebtedness with administrative superpriority and secured by senior liens on substantially all assets pursuant to sections

---

[14]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Motions in which context they are used.

364(c) and (d) of the Bankruptcy Code, (ii) granting adequate protection, (iii) granting other relief, and (iv) scheduling a final hearing (the "Post-Petition Financing Motion");

II.      motion of Debtors for an order (i) enjoining utilities from altering, refusing or discontinuing service, (ii) deeming utilities adequately assured of future payment and (iii) establishing procedures for determining adequate assurance of payment (the "Utilities Motion");

III.     motion of Debtors for an order (i) maintaining cash management system and existing bank accounts, (ii) authorizing the Debtors to use the existing business forms, (iii) granting a limited waiver of section 345 investment and deposit requirements and (iv) granting related relief (the "Cash Management Motion");

IV.     motion of Debtors for entry of an order (i) authorizing, but not requiring, Debtors to pay pre- and post-petition wages, salaries and other compensation, (ii) maintain benefits programs, (iii) authorizing and directing financial institutions to honor all related checks and electronic payment requests and (iv) authorizing payment of obligations relating to medical providers (the "Employee Wage Motion");

V.      motion of Debtors pursuant to Bankruptcy Rule 1007 for an order granting an extension of time to file a statement of financial affairs and schedules of (i) assets and liabilities, (ii) current income and expenditures and (iii) executory contracts and unexpired leases (the "Schedules Motion");

VI.     motion of the Debtors for an order (i) waiving the requirement for filing a list of creditors and mailing matrix, (ii) establishing noticing procedures and (iii) authorizing the Debtors or their agent to mail notices (the "Noticing Procedures Motion");

VII.    motion of debtors pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures for

joint administration and procedural consolidation of cases (the "Joint Administration Motion");

VIII.   motion of Debtors for an order, pursuant to Sections 105(A) and 363 of the Bankruptcy Code, (i) approving entry into an administrative services agreement on an interim basis and (ii) scheduling a hearing for final approval of such agreement (the "Administrative Services Motion"); and

IX.   motion of Debtors for an order authorizing the retention of Epiq Bankruptcy Solutions, LLC as claims, noticing and balloting agent to the Debtors and Debtors-in-possession pursuant to 28 U.S.C. § 156(c) (the "Epiq Retention Motion").

**MOTION FOR FINANCING ORDERS (I) AUTHORIZING THE DEBTORS TO INCUR POSTPETITION INDEBTEDNESS WITH ADMINISTRATIVE SUPERPRIORITY AND SECURED BY SENIOR LIENS ON SUBSTANTIALLY ALL ASSETS PURSUANT TO SECTIONS 364(C) AND (D) OF THE BANKRUPTCY CODE, (II) GRANTING ADEQUATE PROTECTION, (III) GRANTING OTHER RELIEF, AND (IV) SCHEDULING A FINAL HEARING**

43.   The Debtors are finalizing debtor in possession financing arrangements with HFG and DASNY to provide funding for the Debtors to effectuate a closure of the Caritas Hospitals and for the Chapter 11 process. It is anticipated that a motion requesting approval of such financing will be filed shortly.

44.   The Debtors have an immediate need for post-petition financing to maintain their post-petition operations, pay administrative expenses and ensure the safety and welfare of their patients. In addition, such financing is critical to preserve the remaining value of the Debtors' assets, thereby maximizing the returns to all creditors.

45.   Because virtually all of the Debtors' assets are encumbered by the pre-petition liens and security interests, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, including, but not limited to, rent

and utility obligations, all of which are vital to sustain a safe level of operations. Due to the nature and magnitude of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, the Debtors' immediate access to the post-petition financing is essential to prevent irreparable harm to the Debtors' estates. The post-petition financing also is necessary to provide assurance to employees, landlords, utilities and other parties that they will be paid on a timely basis for post-petition services.

46.     The Debtors also submit that, other than the proposed post-petition financing, there are no viable financing alternatives available to them under the circumstances. In that regard, prior to the Petition Date, the Debtors and their advisors contacted certain well-known alternative sources of post-petition financing, but no viable alternative financing was forthcoming for a number of reasons, including the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, the pre-existing liens and the current state of the financial markets.

47.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by liens and security interests. Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their chapter 11 cases at the outset and the Debtors' ability to provide ongoing patient care.

48.     Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by junior liens on the Debtors' assets.  In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the proposed post-petition financing to be provided by HFG and DASNY pursuant to the DIP Term Sheet that is being negotiated will be the most favorable under the circumstances and provide the Debtors the liquidity necessary to maintain a safe level of operations pending the conclusion of the Debtors' closure plan.

## MOTION OF DEBTORS FOR AN ORDER (I) ENJOINING UTILITIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICE, (II) DEEMING UTILITIES ADEQUATELY ASSURED OF FUTURE PAYMENT AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT

49.     In connection with their operations, the Debtors obtain electricity, water, heat, natural gas, oil, trash removal, telephone, communications, and/or other services of this general character (collectively, the "Utility Services") from various Utility Companies.  The Utility Services are vital to the Debtors' operations, and due to the essential public health nature of the Debtors' operations, including the paramount need to care for their patients, it is essential that the Utility Companies continue to provide Utility Services to the Debtors through the course of the closure plan.

50.     If the Utility Companies are permitted to terminate Utility Services, the Debtors would be unable to operate and there would be potentially life-threatening hazards for the Debtors' patients.  To avert such harm, the Debtors could be required to pay substantial sums demanded by the Utility Companies to avoid the cessation of necessary Utility Services.  The

immediate payment of such sums, however, would severely restrict the Debtors' cash flow and their ability to conduct the closure plan in an expeditious and effective manner.

51.     To avoid such a situation, the Debtors intend to pay on a timely basis, in accordance with their pre-petition practices, all undisputed invoices in respect of post-petition utility services rendered by the Utility Companies to the Debtors.  In addition, the Debtors shall, within three (3) business days of the Court entering an order approving the Motion, serve (i) each Utility Company listed on the Utilities Service List with a copy of the Motion and Order, and (ii) a notice of the proposed deposit equal to 50% of the Debtors' estimated monthly cost of Utility Services (the "Adequate Assurance Deposit") into an interest-bearing, newly created, segregated account  (the "Utility Deposit Account") within twenty (20) days of the Petition Date.  Such Adequate Assurance Deposit shall be held in escrow, pending further order of the Court, for the purpose of providing each Utility Company adequate assurance of payment of their post-petition utility services to the Debtors.  The Utility Deposit Account shall be maintained with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Service charges for each one of the Utility Services, regardless of any requests made for additional assurance of payment.

52.     The Debtors contend that the proposed Adequate Assurance Deposit is adequate assurance of payment and complies with sections 366(c)(1)(A) and (c)(2).  In addition, the Debtors propose to protect the Utility Companies further by establishing Additional Assurance Procedures, whereby any Utility Company can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to their providing post-petition services to the Debtors that would merit greater protection.

53.     The Debtors' therefore submit that the proposed method of furnishing adequate assurance of payment for post-petition utility services is not prejudicial to the rights of the Utility Providers, and is in the best interests of the Debtors' estates, creditors and other parties in interest.

## MOTION OF DEBTORS FOR AN ORDER (I) MAINTAINING CASH MANAGEMENT SYSTEM AND EXISTING BANK ACCOUNTS, (II) AUTHORIZING THE DEBTORS TO USE EXISTING BUSINESS FORMS, (III) GRANTING A LIMITED WAIVER OF SECTION 345 INVESTMENT AND DEPOSIT REQUIREMENTS AND (IV) GRANTING RELATED RELIEF

**A.     Description of Cash Management System**

54.     Like most health care providers, in the ordinary course of their operations, the Debtors maintain an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds (the "Cash Management System"). This network is comprised of approximately 15 bank accounts (the "Bank Accounts") maintained at JPMorgan Chase & Co. (the "Cash Management Bank"), through which the Debtors collect, transfer and disburse funds generated through their operations and facilities. The Debtors also maintain a system designed to accurately record such collections, transfers and disbursements as they are made.

55.     The Debtors' Cash Management System is similar to those commonly employed by health care providers of comparable size and complexity. The continued use of the Debtors' Cash Management System allows for, among other things, the efficient tracking and control of funds, while at the same time reducing administrative costs. Moreover, the Debtors' pre-petition secured lenders are intimately familiar with the Debtors' cash management system, which is likely to help facilitate the transition into the Chapter 11 process.

### B.    Maintenance of the Cash Management System and Existing Bank Accounts

56.    The Debtors' ability to continue and maintain their cash management system, existing bank accounts and existing business forms is critically intertwined with the efficient administration of these Chapter 11 cases and is essential to the Debtors' ability to effectuate the closure plan.  Indeed, any disruption in the means by which the Debtors manage their financial affairs and satisfy their ordinary course post-petition obligations (and certain pre-petition obligations for which separate approval is being sought) would severely hamper their operations, thereby jeopardizing the Debtors' Chapter 11 cases at the outset.  Given the size and complexity of the Debtors' operations, and more significantly, the brevity of the time within which the Debtors expect to complete the closure plan, the Debtors simply cannot efficiently facilitate their Chapter 11 efforts if there is substantial disruption in the Debtors' Cash Management System.  Moreover, to comply with the Operating Guidelines, the Debtors would need to, among other things, create a new system for manually issuing checks and paying post-petition obligations.[15] It is highly unlikely that the Debtors would even be able to meet such requirements (e.g. by opening new accounts, revising cash management procedures and instructing various parties to redirect payments) prior to the anticipated shut-down date, making implementation of a new system futile and causing the Debtors to suffer from operational paralysis in the meanwhile.  Therefore, the Debtors believe it is in the best interests of their estates, creditors and other parties in interest that the Debtors be authorized to maintain their prepetition bank accounts.

---

[15]    Notwithstanding anything in the Motion, the Debtors reserve their right to close their pre-petition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment and consistent with any post-petition debtor in possession financing arrangement approved by the Court.  The Debtors will give notice, however, to the United States Trustee and any official committee that may be appointed in the Chapter 11 cases prior to opening or closing a bank account.

C.    **Use of Existing Business Forms, Including Checks**

57.    Moreover, the continued use of existing checks, correspondence and other business forms relating to the Bank Accounts will allow the Debtors to continue operations while implementing a closure plan without the delay that would be expected to occur if the Debtors were required to suspend essential business functions pending the production of and transition to new forms.  Therefore the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that they continue to use all correspondence and business forms, as such forms were in existence immediately prior to the Petition Date, provided, however, that upon depletion of the Debtors' business forms stock, the Debtors will obtain new business forms reflecting their status as debtors in possession.

D.    **Waiver of the Requirements of § 345 of the Bankruptcy Code**

58.    The Debtors' funds are held in accounts with an Authorized Depository listed by the Office of the U.S. Trustee for the Eastern District of New York.[16]  Thus, the Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of Section 345(b) of the Bankruptcy Code.  Moreover, if granted an interim waiver from such section, the Debtors will not be required to incur the significant administrative difficulty and expense relating to opening new accounts to ensure that all of their funds are fully insured or invested strictly in accordance with the restrictions established by Section 345(b) of the Bankruptcy Code.

---

[16]    The list of authorized depository institutions is available at:
http://www.usdoj.gov/ust/r02/docs/chapt11/money_of_estates/EDNY_Depositories.pdf.

59.     In addition, if the relief requested the motion is granted, the Debtors will

implement appropriate mechanisms to ensure that no payments will be made on any debts

incurred by it prior to the Petition Date, other than those authorized by separate Order of this

Court.  To prevent the possible inadvertent unauthorized payment of pre-petition claims, the

Debtors will work closely with the Cash Management Bank to ensure that appropriate

procedures are in place to prevent checks issued pre-petition from being honored without this

Court's approval.  The Debtors therefore submit that the foregoing relief sought with respect to

the Cash Management System is in the best interests of their estates, creditors and other parties

in interest.

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT REQUIRING, DEBTORS TO PAY PRE- AND POST-PETITION WAGES, SALARIES AND OTHER COMPENSATION, (II) MAINTAIN BENEFITS PROGRAMS, (III) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS AND (IV) AUTHORIZING <u>PAYMENT OF OBLIGATIONS RELATING TO MEDICAL PROVIDERS</u>

60.     The Debtors' ability to continue providing competent medical care as they

navigate the Chapter 11 process and implement the closure plan depends upon the maintenance

of the Debtors' approximately 3,043 employees, as well as the independent contractors that

provide medical services to the Debtors' patients.  As a result of the bankruptcy filing, a portion

of the wages, salary, benefits and other payments owed to or in respect of such employees and

independent contractors (the "Pre-Petition Employee Obligations") have become pre-petition

obligations which, absent authorization from this Court, the Debtors would be unable to satisfy.

The decline in employee morale that accompanies a bankruptcy filing and cessation of

operations would be compounded by the Debtors' failure to provide their employees with

fundamental benefits of employment.  This would undoubtedly jeopardize the Debtors' ability to

maintain their remaining workforce and provide adequate patient care, and would likely have a

negative effect on the value of the Debtors' assets.

61.    The Debtors believe that authorization to pay the Pre-Petition Employee

Obligations is required in order to insure that there is no disruption in the Debtors' workforce.

Moreover, absent an order granting this relief, the Cash Management Bank may not be certain of

the Debtors' rights and obligations, causing both confusion and delay in the payment of the

Debtors' Pre-Petition Employee Obligations.  Any interruption in payment of wages, salaries,

related benefits and other obligations could undermine confidence in future payment and could

therefore have a host of negative implications on the Debtors' staffing and operations.

Accordingly, the Debtors believe that the relief requested in the Motion is in the best interests of

their estates, creditors and other parties in interest.

**MOTION OF DEBTORS PURSUANT TO BANKRUPTCY RULE 1007 FOR
AN ORDER GRANTING AN EXTENSION OF TIME TO FILE A
STATEMENT OF FINANCIAL AFFAIRS AND SCHEDULES OF
(1) ASSETS AND LIABILITIES, (2) CURRENT INCOME AND EXPENDITURES
AND (3) EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

62.    The Debtors and their professional advisors are working diligently to

prepare the Schedules of Assets and Liabilities, the Statement of Financial Affairs and list of

executory contracts (collectively, the "Schedules") to reflect accurately the financial

circumstances of the Debtors as of the Petition Date.  However, prior to the filing of these cases,

the Debtors were unable to direct the resources necessary to complete the Schedules due to the

fact that their management and other personnel spent a significant amount of time preparing for

the Chapter 11 filing, including designing the closure plan, seeking approval of such plan from

the DOH, addressing issues related to obtaining approval of post-petition financing arrangements and attending to their usual demanding daily duties.

63.    Furthermore, the Debtors have thousands of creditors and other parties in interest.  The Debtors are also parties to numerous real and personal property leases and other executory contracts.  Accordingly, to complete the Schedules, the Debtors will be required, among other things, to organize and review their books and records as of the Petition Date so as to compile and present all of the foregoing information, review their records to determine their liabilities to each individual creditor as of such date, identify all potential claimants to whom a bar date notice must be sent, as well as identify all payments that were made to creditors within the 90 day period prior to filing (or one year period with respect to insiders).

64.    Based on the foregoing, and due to the other pressing activities in which the Debtors are engaged at this time, the Debtors will require additional time to finalize their Schedules.  Notwithstanding the requested extension, the Debtors hope to file their Schedules well in advance of such extended date.

## MOTION OF THE DEBTORS FOR AN ORDER (I) WAIVING THE REQUIREMENT FOR FILING A LIST OF CREDITORS AND MAILING MATRIX, (II) ESTABLISHING NOTICING PROCEDURES, AND (III) AUTHORIZING THE DEBTORS OR THEIR AGENT TO MAIL NOTICES

65.    The Debtors do not maintain a listing of the names, addresses and dollar amounts owed to each of their respective creditors in a format that is readily convertible to the required form of either a Creditor List or Mailing Matrix.  Furthermore, the total number of creditors and parties-in-interest in these Chapter 11 cases is estimated to be more than 3,000.  In light of the size and complexity of the Debtors' operations, the Debtors submit that they cannot easily comply with the mandates of Local Rules 1007-1 and 1007-3 and Bankruptcy Rule 1007,

7653/20937-009 Current/13385998v9

and that compiling the information contained in books, records and documents relating to numerous creditors and a multitude of transactions into the form of a Creditor List and Mailing Matrix would be an extremely burdensome and expensive task. Accordingly, the Debtors believe that waiver of the requirement to file a list of creditors and mailing matrix is justified, and is in the best interests of their estates, creditors and other parties in interest.

66.   Moreover, the Debtors believe that the Noticing Procedures, will relieve this Court and the Debtors' estates of an administrative burden and therefore are in the best interests of the Debtors' estates, creditors and other parties in interest.

## MOTION OF DEBTORS PURSUANT TO RULE 1015(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR JOINT ADMINISTRATION AND PROCEDURAL CONSOLIDATION OF CASES

67.   The Debtors are affiliates of each other as that term is defined in Bankruptcy Code §101(2) and as that term is used in Bankruptcy Rule 1015(b). In light of the multiple financial and operational interrelationships among the Debtors, joint administration of the Debtors' cases is appropriate. Moreover, the joint administration of the Debtors' Chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and will further the interests of judicial economy and administrative expediency for a variety of other reasons. The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

68.   Therefore, the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that an immediate order be entered providing for the joint administration of the Debtors' Chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

**MOTION OF DEBTORS FOR AN ORDER, PURSUANT TO SECTIONS 105(a) AND 363
OF THE BANKRUPTCY CODE, (I) APPROVING ENTRY INTO AN
ADMINISTRATIVE SERVICES AGREEMENT ON AN INTERIM BASIS AND (II)
SCHEDULING A HEARING FOR FINAL APPROVAL OF SUCH AGREEMENT**

69.    As a result of the Debtors' impending shut-down, all of those employees

that were providing services to both Caritas and Wyckoff have become employees of Wyckoff

only.  Consequently, Caritas entered into that certain administrative services letter agreement

between Wyckoff and Caritas, dated as of February 4, 2009 (the "ASA") to ensure that it would

not be deprived of necessary administrative services required to implement the closure plan.

70.    The Administrative Services are essential to the Caritas's ability to operate

during the pendency of these Chapter 11 cases.  Any disruption in Caritas's receipt of the

Administrative Services, even for a brief time, could severely derail the Debtors' efforts to

implement the closure plan and put Caritas's patients at risk.  Therefore, the Debtors believe it to

be in the best interests of their estates, creditors and other parties in interest that an Order be

entered, on an interim and subsequently a final basis, pursuant to sections 105(a) and 363 of the

Bankruptcy Code, approving Caritas's entry into the ASA and performance of its obligations

thereunder.

**MOTION OF DEBTORS FOR AN ORDER AUTHORIZING THE
RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS CLAIMS,
NOTICING AND BALLOTING AGENT TO THE DEBTORS AND
DEBTORS-IN-POSSESSION PURSUANT TO 28 U.S.C. § 156 (c)**

71.    The Debtors estimate that there are more than 3,000 parties in interest in

these cases.  Coordinating service of notices, claims processing and assembly of voluminous

information related to the Debtors' operations and these cases is a significant administrative

burden which would require the Debtors to, in the absence of a third party noticing and claims

agent, divert substantial resources away from efforts to implement the closure plan and complete related tasks.

72.     Accordingly, the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that they be authorized to retain Epiq so that Epiq can assume full responsibility for the distribution of notices and proof of claim forms, and the maintenance, secondary processing and docketing of all proofs of claim filed in the Debtors' Chapter 11 cases.  In addition, in connection with any plan of reorganization proposed by the Debtors, the Debtors have determined that they will require the services of Epiq to act as solicitation agent with respect to, inter alia, the mailing of a disclosure statement, the plan and related ballots, and maintaining and tallying ballots in connection with the voting on such plan.

73.     Although the Debtors have not yet filed their Schedules, they anticipate that there will be thousands of entities, if not more, which the Debtors will be required to serve with the various notices, pleadings and other documents filed in these Chapter 11 cases.  In consideration of the number of anticipated claimants and parties-in-interest, and given the nature of the Debtors' organization, the Debtors respectfully submit that the appointment of Epiq will expedite the distribution of notices and relieve the Clerk's Office of the administrative burden of processing such notices.  Accordingly, the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that they be authorized to retain Epiq to perform the above-described services, as well as other related services which may be necessary or desirable to be performed in connection with these cases, as set forth in the Motion.

## CONCLUSION

The Debtors' objective in these bankruptcy cases is to carry out the closure plan while minimizing loss to their estates and safeguarding the welfare of their patients.  I believe that, if this Court approves the First Day Motions, which are designed to allow the Debtors to implement the closure plan in an orderly fashion and in a manner consistent with the terms and objectives of the Bankruptcy Code, the prospect for achieving these objectives, to the maximum benefit of creditors, will be substantially enhanced.

/s/ John Lavan
John Lavan

Sworn to before on this 6th day
of February, 2009.

/s/ Rachel T. Darwish
Notary Public, State of New York
No. 41-5015380
Qualified in Queens County
Commission Expires: July 19, 2009

7653/20937-009 Current/13385998v9