# APPENDIX 65

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-20374-CIV-JORDAN/TORRES

AMERICAN UNIVERSITY OF THE
CARIBBEAN, N. V., a Netherlands Antilles
company, ROBERT BERNAUER, a citizen of
Louisiana, JODIE GWIN, a citizen of Hawaii,
AMIT MISRA, a citizen of California, CALIN
NEAGOE, a citizen of Massachusetts and
VIKRAM SHAKER, a citizen of California.

      Plaintiffs,

v.

CARITAS HEALTHCARE, INC. f/k/a
CARITAS HEALTHCARE PLANNING,
INC., a New York corporation, WYCKOFF
HEIGHTS MEDICAL CENTER, a New York
corporation and BROOKLYN QUEENS
HEALTHCARE, INC., a New York corporation.

      Defendants.

_____/

## THIRD AMENDED COMPLAINT

    Plaintiff, AMERICAN UNIVERSITY OF THE CARIBBEAN N.V., sues Defendants,

WYCKOFF HEIGHTS MEDICAL CENTER and BROOKLYN QUEENS HEALTHCARE,

INC., and says:

### Subject Matter Jurisdiction

    1.    Plaintiff, AMERICAN UNIVERSITY OF THE CARIBBEAN N.V. ("AUC," the

"University," or "Plaintiff"), is and was at all material times a company organized and existing

under the laws of St. Maarten, the Netherland Antilles, having its principal place of business in

St. Maarten.

2.      CARITAS   HEALTHCARE,   INC.,   f/k/a   CARITAS   HEALTHCARE PLANNING, INC. ("Caritas"), originally listed as the prime Defendant in this case, is and was at all material times a corporation organized and existing under the laws of the State of New York, having its principal place of business in New York.

3.      Caritas is in bankruptcy and proceedings against it are subject to the automatic stay.   Plaintiff is not proceeding against Caritas in this case and it is no longer a Defendant herein.   Nothing stated herein is intended to violate the automatic stay.   The facts regarding Caritas are alleged solely in order to set up the claims against WYCKOFF HEIGHTS MEDICAL CENTER and BROOKLYN QUEENS HEALTHCARE, INC. (collectively the "Defendants") as guarantors of the obligations undertaken by Caritas, as is further alleged below.

4.      Defendant, WYCKOFF HEIGHTS MEDICAL CENTER ("Wyckoff"), is and was at all material times a corporation organized and existing under the laws of the State of New York, having its principal place of business in New York.

5.      Defendant, BROOKLYN QUEENS HEALTHCARE, INC. ("Brooklyn Queens"), is and was at all material times a corporation organized and existing under the laws of the State of New York, having its principal place of business in New York, and is, upon information and belief, the parent corporation of both Caritas and Wyckoff.

6.      The matter in controversy exceeds $75,000.00 exclusive of interest and costs.

7.      This court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. §1332.

**Personal Jurisdiction and Venue**

8.      AUC is incorporated in the Netherlands Antilles where it has its principal place of business.   It is qualified with the State of Florida as a foreign profit corporation and has its

2

registered mailing address at 901 Ponce De Leon Boulevard, Suite 401, Coral Gables, Florida 33134.

9.     Two of AUC's officers, Yife Tien, the Chief Operating Officer and Paul Suid, the Chief Financial Officer, have their business offices at that Ponce de Leon Boulevard address. Both are full-time residents of South Florida. Two of AUC's Board of Directors, Carol Holden, Ph.D. and John Byrnes, M.D., are full-time Miami residents. During the course of the year, AUC holds a number of its regular Board Meetings at its registered office at 901 Ponce de Leon Boulevard, Coral Gables, Florida.

10.     AUC has a wholly-owned subsidiary, Medical Education Services, Inc., d/b/a "MEAS" ("MEAS"), which is incorporated in Florida and has its principal office at 901 Ponce de Leon Boulevard, the same address as AUC's Florida registered office. The President of MEAS and its sole director is Yife Tien, who also, as noted above, acts as an officer of AUC.

11.     The relationship between AUC and the Defendant, Wyckoff dates back to April 12, 2001, when Mr. Harold McDonald, Chief Operating Officer of Wyckoff Heights Medical Center visited Mr. Yife Tien, then the Chief Executive Officer of AUC at its offices at 901 Ponce de Leon Boulevard, Coral Gables, Florida, to solicit the placement of AUC clinical students for core and elective rotations at Wyckoff's hospital in New York.

12.     The initial April 21, 2001 meeting between Mr. Tien and Mr. MacDonald ultimately resulted in an affiliation agreement being entered into with Wyckoff in November 2002 whereby AUC placed its students at Wyckoff's hospital in New York.

13.     AUC and Wyckoff entered into a further affiliation agreement in 2004, whereby AUC continued to place its students at Wyckoff's hospital in New York.

14. AUC and Wyckoff entered into a further affiliation agreement on April 2006, whereby AUC continued to place its students at Wyckoff's hospital in New York. This agreement was current when AUC entered into the contracts at issue in this lawsuit.

15. In the course of the administration of those contracts, Wyckoff regularly invoiced AUC in Coral Gables, Florida for clerkship fees due. Copies of examples of the cover pages of such invoices, from 2007 and 2008, are attached as Composite Exhibit "A." The total fees paid by AUC to Wyckoff, according to the MEAS ledger, between January 1, 2006 and February 29, 2008, amounts to $1,854,000.00. See Exhibit "B." Total fees over the entire relationship approximate $3.4 million.

16. By letter dated August 21, 2006, on behalf of itself and the other Defendants, the President and CEO of Wyckoff, one Dominick J. Gio, wrote to Yife Tien, Chief Operating Officer of AUC, at his Florida office, announcing that Caritas planned to acquire the Hospitals out of bankruptcy and that as a part of Wyckoff's "Transition/Turnaround Plan" for the Hospitals, they were soliciting international medical schools to advance them the capital required to upgrade and expand the clerkship programs at those hospitals.

17. The inducement to advance that capital was the offer of a number of "Guaranteed Clerkship Slots" for the institution's medical students at those hospitals for a period of years. The sums sought for such prepaid slots ranged from a low of $2.5 million to a high of $20 million depending on the number of slots and the length of time they would be "guaranteed." A true copy of this letter is attached as Exhibit "C."

18. The offer attracted a response from AUC. On October 11, 2006, Mr. Tien replied on behalf of AUC, from Florida, expressing its interest in advancing the money needed to secure

4

guaranteed clerkships for its students for a period of years.  A true copy of the letter is attached as Exhibit "D."

19.    The parties thereafter negotiated an elaborate multi-million dollar contract, divided into two instruments.  One was labeled the "Promissory Note Agreement" (a copy of which is attached as Exhibit "E") and the other was termed the "Affiliation Agreement" (a copy of which is attached as Exhibit "F").  Pursuant to these agreements, AUC advanced $3.5 million to Caritas to secure a number of guaranteed slots for the education of AUC students at Caritas hospitals.

20.    Part of the performance of the contract (the education of the medical students) was required to be performed in New York and part of the performance of the contract (the quarterly remittances of interest; the periodic submission of student evaluations; the periodic accounting for the balance due; the submission of student census information; the provision of written advice of events of default; the collaborative communications between the Caritas hospitals and AUC and MEAS personnel in Florida to manage the AUC student rotations; and the final repayment of any principal and interest, when it fell due) was required to be rendered by Caritas (and if it failed or refused to do so, by the other Defendants) to AUC at its registered office in Florida.

21.    Following entry into the agreements, and in accordance with their mutual understanding and the requirements of Promissory Note Agreement, page 2, para. 2, AUC invoiced Caritas, from Florida for payment of periodic interest.  Examples of the face pages of such invoices (omitting attached detail) are attached as Composite Exhibit "G."

22.    The failure to make any such interest payment was stated to be an instance of contractual default under the Promissory Note Agreement, page 3, para. 5.

23.     During the course of 2007, the parties orally agreed to amortize interest while clerkships were being supplied, and the liability for interest payments was compounded with the overall obligation intended to be offset by future clerkship fees.

24.     Following entry into the agreements, and in accordance with their mutual understanding and the contractual requirements of the Promissory Note Agreement, page 2, para. 4, Caritas sent to AUC's Yife Tien, at its registered office in Florida, periodic invoices setting out what amount of the obligation had been set off in clerkships.  Examples of the face pages of such invoices (omitting attached detail) are attached as Composite Exhibit "H."

25.     The Promissory Note Agreement, page 4, Section 3, para. 3 provided that Caritas was obliged to render student census information to AUC and that the failure of Caritas to render such student census information to AUC would be a "material breach."  It was contemplated by the parties that such information would be rendered to AUC at its Florida registered office.

26.     The Promissory Note Agreement, page 4, Section 3, para. 4 provided that Caritas was obliged to advise AUC in writing of events of default and that the failure to do so constituted a "serious and substantial breach."  It was contemplated by the parties that such information would be rendered to AUC at its Florida registered office.

27.     The Promissory Note Agreement, page 7, Section 11, provided that the two Caritas hospitals would "identify employees at those facilities responsible for regular communication with designated agents of [AUC] to manage and coordinate Core and Elective Rotations for AUC medical students."  Pursuant to this clause, there were regular communications between Caritas and AUC and MEAS personnel in Florida to "manage and coordinate" the AUC student rotations.  It was contemplated by the parties that such information would be rendered to AUC at its Florida registered office.

28.    The Promissory Note Agreement, page 9, Section 4, para. 19, provided that AUC was entitled to send a representative to Board meetings of Brooklyn Queens Healthcare, Caritas and the two Caritas hospitals.

29.    The Affiliation Agreement also contained performance obligations on the part of Caritas that were to be rendered to AUC, implicitly at its Florida registered office. These included: informing AUC in a timely and confidential manner of any inappropriate student behavior; to submit timely written clinical evaluations on each student at the conclusion of clerkships, "which shall be delivered to the University within six weeks of completion of the clerkship" (these are critical for documenting the requirements for graduation and are forwarded to State licensing authorities to enable AUC graduates to be licensed as physicians); to provide AUC with accurate and contemporary data on patient census information, current affiliations with institutions and residency programs and changes in such as they occurred. Affiliation Agreement, Section II, paras. 5, 7, 8. It was contemplated by the parties that such information would be rendered to AUC at its Florida registered office.

30.    AUC also agreed that the Caritas physicians who acted as Site Directors and Clerkship Directors would be appointed as "adjunct clinical faculty" members of AUC. Affiliation Agreement, Section III, para. 1. Pursuant to this clause, in 2007 there were six physicians at the Caritas hospitals who were given the title of "Adjunct Clinical Professor" as adjunct faculty of AUC.

31.    The Promissory Note Agreement incorporated the Affiliation Agreement by reference. The Promissory Note Agreement called for the mandatory resolution of all disputes in Florida under Florida law. It follows that the choice of Florida forum and choice of Florida law pertains to the whole deal, not just a part of it.

32.     The selection of Florida forum and choice of law was a purposefully negotiated term in a contract between sophisticated parties bargaining at arm's length. It was not boilerplate hidden in an adhesion contract. For the reasons detailed above and elaborated upon below, the choice of law and forum had a rational relationship to Florida.

33.     From beginning to end, the contracts themselves, and the contacts, correspondence, reports and invoices pertaining to the agreements between the parties were sent from Caritas and/or the other Defendants to AUC and/or MEAS at their Florida offices and vice versa. There has been no contact between Caritas and AUC headquarters in St. Maarten relative to the administration of this agreement.

34.     By declaration submitted in this action, the Chief Financial Officer of Defendant Brooklyn Queens Healthcare, Inc., Paul Goldberg, admits that he is a Florida resident and performs part of his "duties and responsibilities as CFO of BQHC" from Florida.

35.     By virtue of the above and what is further stated below, the Defendants have submitted themselves to the jurisdiction of the Courts of this State for this cause of action which arises out of "conducting, engaging in, or carrying on a business or business venture in this State" under Fla. Stat. § 48.193(1)(a).

36.     By virtue of the above and what is further stated below, the Defendants have, by their anticipatory repudiation of the entire contract between the parties, submitted themselves to the jurisdiction of the Courts of this State, for this cause of action which arises out of their anticipatory repudiation of the agreements as a whole and therefore "their breaching a contract in this state by failing to perform acts required by the contract to be performed in this state" under Fla. Stat. § 48.193(1)(g).

37.    Accordingly, by virtue of the above and what is further stated below, the Defendants have "engaged in substantial and not isolated activity within this state" and have submitted themselves to the Courts of this state, generally, under Fla. Stat. § 48.193 (2).

38.    Venue and jurisdiction in Miami-Dade County and therefore in this District is proper by virtue of the parties' forum selection clause in the "Promissory Note Agreement" at issue in this case.  Exhibit "E," p. 8, para. 15.

<u>**Background Facts**</u>

**(a)  AUC**

39.    The Plaintiff, AUC, is a University located on the island of St. Maarten in the Netherlands Antilles engaged in the provision of a four-year course of medical education to qualified students, leading to a medical degree recognized by the United States Department of Education and all 50 States of the U.S.A.  It is what is sometimes referred to as an "international medical school."

40.    The University has been in business for some 30 years.  It has approximately 850 medical students enrolled at any one time.  Its student body is overwhelmingly composed of students who come from the U.S. who intend to return to the U.S. upon graduation and become physicians in the U.S.

41.    The University is approved for participation in the student loan program guaranteed by the U.S. Department of Education and more than 85% of its student body is composed of American students who have embarked on a medical education with the assistance of such student loans.

42.    As detailed above, the University is qualified to do business in Florida and the administration of its U.S. clerkship program is supervised by several AUC agents who are full-

time Florida residents, and by executives of its wholly-owned Florida subsidiary MEAS, from offices in Coral Gables, Florida.

**(b) "Clinical Clerkships"**

43.     The four-year M.D. degree course at AUC entails two years of basic science instruction conducted at the University on the island of St. Maarten, followed by two years of clinical science instruction in hospitals, mainly on the American mainland.   The clinical education is provided by a series of successively scheduled "clinical clerkships."

44.     Primarily, the first year of clinical clerkship covers six compulsory courses of clinical study, each lasting a number of weeks, termed "core rotations."   The second year mostly covers courses of study in other areas, termed "elective rotations."

45.     The vast majority of incoming AUC students intend and expect to complete their training in U.S. hospitals and take up residency in U.S. hospitals after securing their M.D. degrees and they rely on AUC's ability to place them in clinical clerkships at hospitals in the U.S. for their clerkships.

46.     The great majority of the clinical clerkship slots which the University has negotiated for its students are therefore at hospitals in the U.S.

**(c) Importance of Clerkships to the Students**

47.     The location and type of the clinical clerkships offered are of great importance to the University's medical students.

48.     Over the two years of their clerkship training, at particular institutions in particular regions of the U.S., medical students begin to develop academic and professional relationships and connections with clinicians at that institution and in that geographical area.

49.     The medical students thereby become exposed to opportunities in that area and they start the interviewing process through which they will later gain entrée to residencies in the U.S. after graduation from medical school.

50.     Following graduation, many AUC graduates will start residencies at the hospitals at which they completed their clerkships.  Many others will start residencies at hospitals in that same area where they trained in their clerkship programs.

51.     Since the place of clerkship is likely to have a significant effect on the location of their future careers, students factor long-term considerations such as proximity to family and friends in their preferences for the location of their intended clerkships.

**(d)  Timing of Clerkships**

52.     The timing of entry into the clerkships - which in turn dictates the completion date of their medical degrees - is of critical importance to the students with regard to the commencement of residency.

53.     This is because hospital residency positions are allocated on July 1, annually.  A student aiming to qualify on July 1 needs to have completed all academic, financial and other requirements by the first Friday in June, that year, at the latest.

54.     Missing that June deadline means that the student will miss qualifying for the nationwide "matching program" conducted by the National Resident Match Program through which students desiring residencies at hospitals in particular specialties are "matched" for residency places at hospitals offering the desired specialties.

55.     Missing that June deadline also means that a student has to "mark time" for a year.  In many cases that hiatus in full-time medical education will trigger repayment obligations

for student loans which typically require students to be in full-time medical education, subject to a single 6-month grace period.

56.     This, in turn, may lead to a student having to take time out to earn money to start loan repayment, which may lead to further delays and further exacerbate the problem.

57.     Thus, any interruption, even for a short while, in the course of a medical student's clinical clerkship, can throw his or her entire medical career seriously off track.

**(e) The Short Supply of Clinical Clerkships**

58.     The supply of U.S. clinical clerkships has been getting progressively tighter over recent years.

59.     This is partly due to the fact that there is a shortage of physicians.  While the medical schools are gearing up to turn out more graduates, as is required by the Association of American Medical Colleges, the number of teaching hospitals, teaching staff, and therefore clerkship and residency positions is relatively static.

60.     It therefore, typically, takes many months in the current market for an institution such as AUC to negotiate just a few additional clinical clerkship slots.  Lost slots cannot be replaced on short notice.

**(f) Loss of Clinical Clerkship Slots**

61.     The loss of scheduled clinical clerkship slots has massive repercussions on both the medical school and the students affected.

62.     With regard to the students, there are all the effects outlined above with regard to lost "matching" for residencies, lost time and the possible early student loan re-payment obligations.

63.     There is also the fact that students have contracted for living-space in the locale where the clerkship is offered.  The loss of slots will likely cause significant moving and relocation expense, the possible forfeiture of security deposits, exposure to rent claims on now-useless leases, and possible attorneys' fees and other, associated financial loss.

64.     In sum, moving to a city to take up a clerkship and then have it canceled means a huge amount of wasted time and money that the students, typically, do not have.

65.     The repercussions to the University of the loss of clerkship slots are correspondingly severe.

66.     Just the rumor of lost slots and the consequences - which are all too evident to the students - is likely to cause panic in the student body, as the threatened cancellation of slots at the New York hospitals at issue here did in fact do.

67.     The loss of clerkship slots during the academic year on short notice will also cause the immediate "backing up" of students "on hold" and unable to be placed.

68.     As the first of the students on hold are placed, they will be taking places that have already been notionally allocated to students behind them, causing their own loss of places.

69.     The loss of slots therefore causes huge loss of confidence in the academic program offered, the probable loss of current students, the probable loss of incoming students and repercussions in terms of loss of credibility and prestige to the University.

**(g)  Knowledge in the Industry**

70.     The fact that medical schools are currently chasing an increasingly smaller number of available clinical slots is a fact that is generally known by all those who are engaged in clinical education and is and was at all material times known to the Defendants, who are

hospital operators and intimately involved in the mechanics and the economics of clinical clerkships.

71.     The importance of the timing of the clerkships to the students and their sponsoring institution is not a particularized issue with regard to AUC, but is a fact that affects and is generally known by all who are engaged in clinical education and is and has been at all material times known to the Defendants.

72.     The general nature and extent of the damages that would likely result from the cancellation on short notice of a clinical clerkship program, as outlined above, is generally known by all who are engaged in clinical education and is and has been at all material times known to the Defendants.

73.     In sum, when the Defendants offered the "guaranteed clerkships" discussed below, the Defendants knew exactly what they were offering, why the University would be extremely interested in the proposal and the catastrophic harm that would result from their repudiation of the deal.

### Entry Into The Contracts

74.     The Defendants operate several hospitals in New York, including, of particular concern here, Mary Immaculate Hospital and St. John's Queens Hospital ("the Hospitals") operated by Caritas, where they offer clinical clerkships to medical schools for their students.

75.     As detailed above, Wyckoff already had an agreement in place for the clinical education of AUC students and had developed a relationship with AUC as a result.

76.     By letter dated August 21, 2006, on behalf of itself and the other Defendants, Wyckoff represented to AUC, at its Florida offices, that Caritas had acquired the Hospitals out of bankruptcy and that as a part of Wyckoff's "Transition/Turnaround Plan" for the Hospitals, they

were soliciting international medical schools to advance them the capital required to upgrade and expand the clerkship programs at those hospitals. The inducement to advance that capital was the offer of a number of "Guaranteed Clerkship Slots" for the institution's medical students at those hospitals for a period of years. A true copy of this letter is attached as Exhibit "C."

77.   This was an unusual offer in that it is usual to "pay as you go" for the provision of clinical slots. However, the extremely tight market supply of such slots - as the offering Defendants knew - might well provide the needed incentive for medical schools to make very large cash advances for this very scarce commodity.

78.   Moreover, these were slots at *New York* hospitals. New York is in the middle of a highly populated medical educational "catchment area," ranging from Boston in the North to Washington, D.C. in the South, containing a multitude of large teaching hospitals. Placement in New York for their clinical education is highly attractive to a great number of medical students hoping to eventually find residencies and ultimately establish careers in that area.

79.   International medical school graduates, furthermore, are generally accepted within the medical profession in the State of New York, as is witnessed by the fact that some 40% of the licensed physicians practicing in the State of New York graduated from such schools.

80.   Upon information and belief, an estimated one-third of the residency programs offered in the entire United States are offered within that catchment area.

81.   The offer attracted a response from AUC. On October 11, 2006, Mr. Tien wrote from AUC's Florida offices to express the University's interest in advancing the money needed to secure guaranteed clerkships for its students for a period of years. A true copy of the letter is attached as Exhibit "D."

82.    The parties thereafter entered into a course of negotiation whereby they eventually agreed that AUC would advance the Defendants $3.5 million, completely unsecured, at a low rate of interest, which the Defendants would "pay off" through the provision of a guaranteed number of clerkships, 50 core clerkships and 20 elective clerkships to be provided at any one time, at the two hospitals.

83.    On or about December 1, 2006, the University entered into a contract with all the Defendants termed a "Promissory Note Agreement."  A copy is attached as Exhibit "E."  It was signed for AUC in Florida.

84.    Also on or about December 1, 2006, the University entered into a related contract with Caritas, only, termed an "Affiliation Agreement."  A copy is attached as Exhibit "F."  It was signed for AUC in Florida.

### The Promissory Note Agreement

85.    Under the "Promissory Note Agreement," the University agreed to advance $3.5 million to Caritas, at a low rate of interest, for an open-ended period of time.  The University further agreed to forbear from demanding repayment while the funds advanced were "paid off" incrementally by the provision of: "an equivalent value of medical student clinical education services [i.e. the clinical clerkships] rendered to students of the Lender at [the Hospitals] pursuant to an Affiliation Agreement to be executed by the Borrower and the Lender."  Page 1, recital 4; page 2, para. 1.

86.    It was the express purpose of the Promissory Note Agreement that Caritas have the benefit of money paid in advance and that, so long as the Defendants had the ability to provide clinical clerkship positions, the University had a guaranteed number of slots.

Repayment was only to be made in cash if the Defendants were unable to provide the clerkships or some other default or early termination event occurred.

87.     Brooklyn Queens and Wyckoff also entered into the agreement as back-up obligors if Caritas should fail to perform.

88.     The University is in full compliance with its obligations under the Promissory Note Agreement.

89.     All conditions precedent to suit have been satisfied.

### The Affiliation Agreement

90.     Under the Affiliation Agreement, Caritas agreed to provide a maximum of 75 core clerkships and 30 elective clerkships at the two stated New York Hospitals at a price to be agreed from time to time, until December 31, 2009.

91.     There is a current agreed rate in place for all clinical clerkships.

92.     The University is in full compliance with its obligations under the Affiliation Agreement.

93.     All conditions precedent to suit have been satisfied.

### Effect of the Agreements

94.     After the parties entered into the agreements, the University paid the $3.5 million promised, which, upon information and belief, Caritas used to better its clerkship program at the two hospitals and a number of AUC students began to rotate through clerkship at the Hospitals.

95.     Under the Promissory Note Agreement, the Defendants are obliged to continue to supply clinical clerkships until the outstanding balance is paid off.   The current balance outstanding is approximately $2.7 million.

96. Even assuming, *arguendo*, that Caritas has the right to pre-pay the balance remaining under the Promissory Note Agreement in cash, Caritas has an independent obligation to continue to provide clinical clerkships under the Affiliation Agreement until the end of 2009, at the current agreed rate of payment or such other rate as may be agreed.

## Anticipatory Repudiation

97. AUC is not a financial institution. It is not in the business of lending money to anyone. Least of all did it intend to lend millions of dollars to prop up institutions that had just emerged from bankruptcy protection - by definition in a precarious situation - at an extremely low rate of interest, without any collateral, merely to be repaid whenever the institutions desired.

98. The Defendants knew that they were agreeing to provide a guaranteed number of clinical clerkship positions at the Hospitals. Defendants further knew that they could not refuse to provide those slots to AUC students and simply offer them to a competitor school if and whenever some competitor might come along and offer it more money. That would strike at the heart of the deal that the parties negotiated and be a breach of the parties' mutual obligation of good faith and fair dealing. Yet that is exactly what has happened here.

## Breach of Contract

99. Just a year after AUC provided Caritas with the capital needed to expand and upgrade its clinical instruction program, thereby making Caritas's clinical clerkships more valuable and more marketable, Caritas attempted to walk away from its obligations to AUC and sell the slots to a higher bidder, leaving the AUC students in the lurch.

100. Upon information and belief, towards the end of 2007, Caritas entered into negotiations with a competitor of AUC's, believed to be Ross University. It is further believed

that the Defendants had been given or have been promised financial incentives by Ross University for them to breach their contracts with AUC.

101.   On or about January 30, 2008, Caritas stated that unless AUC was willing to agree to new terms that would allow the immediate cancellation at will of both agreements, Caritas would re-pay the total remaining balance remaining under the Promissory Note Agreement before March 3, 2008 and would refuse to provide any new clerkships at the Hospitals thereafter.

102.   Caritas did not at that time tender payment.  Nor has it at any time made effective tender.  Nor does it have any such right of pre-payment under the Promissory Note Agreement in any event.

103.   Moreover, regardless of whether the Promissory Note Agreement allows pre-payment, Caritas had an independent obligation under the Affiliation Agreement to continue to provide clinical clerkships until the end of 2009, at the current agreed rate of payment or such other rate as may be agreed from time to time and there was an agreed rate then in force.

104.   It appeared increasingly likely to AUC that Caritas would, indeed, breach the agreement, and refuse to admit AUC students for the upcoming March 3, 2008 rotations.

105.   In an attempt to avoid that eventuality, AUC wrote to Caritas on January 31, 2008 and gave notice that it was scheduling its students for every available slot from March 3, 2008 through the end of the Affiliation Agreement, in December 2009, and pledged to "pay" (i.e. allow Caritas credit) for all such slots.  A true copy is attached as Exhibit "I."

106.   There was no contractual obligation for AUC to schedule students so far in advance or pledge to "pay" for all the slots so far in advance.  Nor was AUC seeking anything more of Caritas than that it fulfill its existing agreement.  In sum, there was no consideration supporting the offered modification.

107.    On February 1, 2008, Caritas responded that it would refuse to allow those students to continue their education at the Hospitals and gave notice that it intended to terminate all students currently in the clinical clerkship program at the end of their current rotations and that it would, at some time, prior to March 3, 2008, be tendering repayment of the balance remaining under Promissory Note Agreement.  A true copy is attached as Exhibit "J."

108.    The parties attempted to resolve their differences despite most of AUC's students being refused for their March 3, 2009 rotations as scheduled.

109.    The Defendants took some AUC students while they negotiated, with both sides completely reserving all their rights.  During negotiations, some 17 AUC students were offered electives for the March 3, 2008 intake.  However, due to the mistreatment of AUC students by the Defendants at that intake and the Defendants continuing stated refusal that they would refuse to admit further AUC students, no AUC students were scheduled to rotate at the hospitals for the April 14, 2008 intake.

110.    Despite AUC having managed to arrange substitute placements for them, six AUC students decided to show up on April 14, 2008, at Caritas, to see if they could get placed. Those six were accepted (three in core rotations and three in electives).

111.    By its actions, Caritas was in anticipatory breach of and repudiated both contracts.

112.    Caritas spoke for all the Defendants and Brooklyn Queens and Wyckoff were therefore also in anticipatory repudiation of the Promissory Note Agreement.

### Entry of the Preliminary Injunction

113.    The contracts for clinical clerkships at these New York hospitals are unique. They are for the provision of medical education at particular institutions, by particular teaching

staff, in one of America's greatest cities. They cannot be replicated exactly at any other institution.

114. Moreover, clerkships that are in any sense reasonably comparable are in extremely short supply. It was to guarantee that such would be available for its students that the University was willing to pre-pay several years' worth of clerkships to financially precarious recipients at minimal interest.

115. To the extent that any sufficiently similar American institution could have been located to provide a reasonably comparable clinical clerkship program, it could not be done in any reasonable period of time.

116. Nonetheless, the University made every effort to find temporary slots in New York to avert the threatened harm to the maximum extent possible.

117. However, AUC could not locate any reasonably comparable clerkship program in the U.S. in time to avert the threatened harm.

118. The harm caused to the students by the threatened cancellation of this clerking program was extremely severe. The clerking programs are synchronized to the post-graduation residency programs, which are on an annual basis. As outlined above, missing a single four-to-six week rotation puts a student one whole year out of synch with targeted residency programs, causes corresponding delay in embarking on their careers and possibly triggers early repayment obligations on student loans and further career delay.

119. The repercussions to the University by the threatened cancellation were likely to be similarly irreparable. The business environment that all international medical schools operate in is a precarious one. All such institutions are tarred by the practices of "fly-by-night" operations and institutions that offer less than acceptable education. There is a wide-spread

belief that *all* such institutions are just not as good as institutions located within the United States.

120.     To build and maintain credibility and viability in the provision of quality medical education for international medical schools is extremely difficult.   The loss of credibility occasioned by adverse circumstances is correspondingly rapid.

121.     AUC has built itself up from nothing to a very substantial, fully-accredited institution in the space of some 30 years.  It has produced thousands of fine, practicing American physicians through those years.

122.     In those 30 years it has had to rebuild extensively after massive hurricane destruction in 1989 and has even had to move islands and completely re-build again after the total destruction of its original Montserrat campus by volcanic eruption in 1995, both of which caused enormous setbacks.

123.     However, such natural disasters are much more understandable and excusable by existing and prospective students than the loss of a clinical educational program, which, regardless of the complete absence of fault on the part of the institution, carries with it an unavoidable stigma.

124.     The loss of this clerking program would have caused enormous dismay within the current student body, diminish the value of the "AUC degree" in the medical community and the future employers of these students, and would likely discourage many potential students from even considering enrolling at the University in the future, perhaps for several years.

125.     The loss of the New York slots would also have caused substantial "backing up" throughout the clerking system and put many more AUC students out of synch with residency programs.

126.  The damage that would have been caused to AUC's reputation and ability to compete for incoming students by the loss of this clerking program would have been massive.

127.  The Defendants had no reasonable prospect of defending this case on the merits. Their professed stance - that they could pay off the note and deny AUC and its students the entire bargained-for benefit of the contract - was obviously not legally tenable.

128.  The Defendants were not going to stop offering clinical clerkships. The clerkships that AUC paid for were all available. The Hospitals just wanted to fill those clerkships with students from another institution, in all probability because now, with the enhancement of the capital infusion provided by AUC, other institutions were then willing to pay a higher price.

129.  On or about February 20, 2008, therefore, the University sought a preliminary injunction against Caritas and the other Defendants restraining the threatened breach of the contracts at issue, restraining them from offering such clerkship slots to other institutions if it would disable them from performing the agreements between the parties.

130.  At that time, the University was joined by five of its affected students, who also claimed a preliminary injunction under their status as third-party beneficiaries of the operative agreements.

131.  On May 6, 2008, the Court entered a preliminary injunction in favor of the University and the student plaintiffs, which alleviated much of the harm immediately threatened.

132.  The student plaintiffs were thereby enabled to complete their clerkships in New York and had no further interest affected by this action and they do not therefore join in this Third Amended Complaint.

133.    However, while the preliminary injunction forced Caritas to continue to take the AUC students, it did not mandate compliance with every aspect of the Promissory Note Agreement or the Affiliation Agreement.

134.    Caritas had already breached the contract between the parties, when it refused to take the agreed-upon number of AUC students on March 3, 2008.

135.    Even though Caritas thereafter took certain AUC students, under the Court's compulsion, it did not accord with its contractual obligation to "cap" the total number of students being educated at the Hospitals at 150, as provided for by contract, and the number of students taken from all schools greatly exceeded that figure.  It thereby further breached its contract.

136.    Even though Caritas took the AUC students, under compulsion, it did not accord with its contractual obligation to provide a four-to-one student to teacher teaching ratio, as provided for by contract, and the actual student to teacher ratio greatly exceeded the contacted figure.  It thereby further breached its contract.

137.    On February 6, 2009, Caritas filed for bankruptcy in the U.S. Bankruptcy Court of the Eastern District of New York, Case No. 1-09-40901 and further proceedings against it are barred by the automatic stay.  This case now proceeds solely between AUC and Wyckoff and Brooklyn Queens.

138.    On or about February 12 and 13, 2009, AUC demanded that Wyckoff and Brooklyn Queens take over the education of the AUC students stranded by the Caritas bankruptcy.

139.    Wyckoff and Brooklyn Queens refused to acknowledge any such contractual obligation.  The same constitute a breach of the contract between the parties and repudiation of the same.

140.    Wyckoff did agree, subject to a reservation of rights on both sides, to allow those AUC students who were in the midst of a core rotation at Caritas at the time it filed for bankruptcy, to complete that core rotation only at Wyckoff.  No agreement was made as to those AUC students in electives at Caritas or for any new AUC students who were looking for clerkship rotations in the future.

141.    On April 27, 2009, in light of Wyckoff's and Brooklyn Queens's repudiation of the contract, and their practical inability to cure (by observance of the mandated cap on total students and student-teacher ratios, given the fact that Wyckoff, too, was flooded with Ross students), AUC finally gave notice that it was demanding repayment or the remaining principal due under the Promissory Note Agreement, which it calculated as being $2,687,341.40.  A true copy of the demand letter is attached as Exhibit "K."

## Count I
## Declaratory Decree

Plaintiff, AUC, re-alleges paragraphs 1 through 141 against Defendants, Wyckoff and Brooklyn Queens, and says as follows:

142.    The original Complaint, filed on February 13, 2008 and amended on February 28, 2008, sought an injunction but no other relief.  AUC has now achieved all that it can by such means and no longer pursues injunctive relief.

143.    However, since the original suit was filed certain other differences between the parties have matured and are set forth here and in Count II, below.

144.    AUC understood that it had, by contract, reserved the right to schedule up to 50 students for core rotations and 20 for elective rotations, but that Caritas would only be entitled to credit under the Promissory Note Agreement for the number of slots which AUC actually used.

145.    Caritas took the position that it was entitled to credit for the total number of slots which AUC had the right to schedule, 50 core and 20 elective, regardless of how many slots were used.

146.    In the course of 2007, the parties reached an accommodation whereby AUC agreed to give notice of how many students it wished to schedule for upcoming rotations thirty (30) days in advance, and Caritas would then be free to "sell" any unused slots to other medical schools.  This was an effective modification of the contractual relationship between the parties.

147.    AUC believed that by this agreement it had resolved the dispute and that Caritas recognized that it would get credit only for slots which AUC timely scheduled.

148.    Caritas, however, contended that it was still entitled to credit for all slots for which AUC had the right to schedule students, even if released 30 days ahead of time, and even if they were actually sold by Caritas to another medical school.

149.    Although the parties had agreed that AUC would schedule rotations 30 days in advance and Caritas might thereafter offer unused slots to other schools, the parties remain in disagreement as to how to calculate the balance due under the Promissory Note Agreement:

(a)    AUC contended that Caritas should be entitled to credit only for the slots which AUC actually scheduled 30 days in advance of the start of the next student intake.

(b)    Caritas contended that it was entitled to credit for the total number of slots which AUC had the option to reserve, *i.e.*, 50 core and 20 elective, regardless of how many slots AUC timely released to Caritas for sale to other schools.

150.    The other Defendants are jointly liable with Caritas on the obligations of the contract and have an equal interest in the determination of this issue.

151.    By reason of the foregoing it is clear that the parties are in serious doubt as to the correct construction of their agreement regarding the credit to be afforded for clinical rotations.

WHEREFORE, Plaintiff, AUC, seeks a declaratory decree against Defendants, Wyckoff and Brooklyn Queens, resolving the dispute over the proper contractual method for determining set-offs against the outstanding indebtedness through the provision of clinical rotations, together with such further and other relief as the Court may deem mete.

### Count II
### Breach of Contract – Damages

Plaintiff, AUC, re-alleges paragraphs 1 through 141 against Defendants, Wyckoff and Brooklyn Queens, and says as follows:

152.    Caritas breached and repudiated the contract when it refused to admit students for the March 3, 2008 intake and the April 14, 2008 intake.

153.    Starting with the March 3, 2008, intake, Caritas breached the contract by flooding the hospitals with medical students from Ross University, ignoring the 100 student cap provided for at Promissory Note Agreement, Section 4, 3.

154.    This "flooding" of the hospitals with Ross students resulted in far too many students being enrolled in particular rotations; non-compliance with contractually mandated student-to-teaching faculty ratios; diminution in the instruction provided to the individual students; diminution in the hands-on experience available to the individual students; and overall degradation in the quality of the education being offered.

155.    Wyckoff and Brooklyn Queens breached and repudiated the contract by (a) acquiescing in Caritas's refusal to admit AUC students scheduled for the March 3, 2008 intake and the April 14, 2008 intake; (b) joining in this suit in support of Caritas' position; (c) refusing

27

to take over performance of Caritas's obligations, thereby causing delay, disruption in AUC's clinical educational program, and damage, loss and expense to AUC.

156.   On May 6, 2008, this Court's injunction forced Caritas to start re-admitting AUC students.  The injunction did not force the Defendants to cure their continuing breaches as to the contractually mandated overall "cap" on students, or comply with the stipulated teaching ratios. The consequence was that there was continuing diminution in the instruction provided to the individual students; continuing diminution in the hands-on experience available to the individual students; and continuing overall degradation in the quality of the education being offered.

157.   Upon the bankruptcy of Caritas in February 2009, Wyckoff and Brooklyn Queens refused to accord with their obligations to provide the contracted for education themselves.

158.   The overall result is that the Defendants failed to provide the quality of education which AUC contracted for and the clinical teaching programs offered through the Defendants constitute a far less valuable resource than what AUC contracted for.

159.   This degradation in quality of the teaching program placed increasing pressure on AUC to find alternative sites for the clinical tuition of its students, which are only available at much higher cost, thus causing increased expense and damage to AUC.

160.   This degradation in quality of the teaching program has had a predictably negative effect on the morale of those students scheduled at the hospitals and the perceived desirability of the clinical program being provided at those hospitals; a predictably negative effect on AUC's reputation; and is believed to have adversely affected AUC's recruiting efforts, thus causing increased expense and damage to AUC.

161.   The Promissory Note Agreement provides for the recovery of attorneys fees. AUC has retained the undersigned attorneys to prosecute this action and is obliged to pay them a reasonable fee.

WHEREFORE, Plaintiff, AUC, demands damages against Defendants Wyckoff and Brooklyn Queens, plus interest, attorneys' fees and costs and such further and other relief as the Court may deem mete.

## Count III
## Repayment of Note

Plaintiff, AUC, re-alleges paragraphs 1 through 141 against Defendants, Wyckoff and Brooklyn Queens, and says as follows:

162.   On February 6, 2009, Caritas filed for bankruptcy in the U.S. Bankruptcy Court of the Eastern District of New York, Case No. 1-09-40901.

163.   The Promissory Note Agreement provides that "[a] 'Default' is defined as the occurrence of one, or several of the following events: . . . (c) a filing for relief or reorganization under the U.S. Bankruptcy Code." Exhibit "E," p. 3, para. 5.  In filing for bankruptcy protection, Caritas thereby triggered a "Default" under the agreement.

164.   The Promissory Note Agreement provides that "during the term of this Note Agreement [Brooklyn Queens and Wyckoff will be obligated] to assume responsibility for this Note Agreement," including the obligations with regard to the education of AUC students. Exhibit "E," p. 6, para. 4.   Caritas's breach of the Promissory Note Agreement obligated Wyckoff and Brooklyn Queens, as guarantors of the Agreement, to satisfy its terms.

165.   As alleged above, Wyckoff and Brooklyn Queens refused to perform their contractual obligations with regard to the continued education of AUC students.

166.    In reluctant acceptance that Wyckoff and Brooklyn Queens would not and could not continue to provide clerkships of the contracted-for quality to its students, on April 27, 2009, AUC demanded repayment of the principal due under the Promissory Note Agreement, as set forth in Exhibit "K."

167.    Upon information and belief, neither Wyckoff nor Brooklyn Queens will pay the balance of the note voluntarily.

168.    The Promissory Note Agreement provides for the recovery of attorneys fees. AUC has retained the undersigned attorneys to prosecute this action and is obliged to pay them a reasonable fee.

WHEREFORE, Plaintiff, AUC, demands damages against Defendants in the sum of $2,687,341.40, as demanded, or in such other sum as the Court may determine is due, together with interest thereon, attorneys' fees, costs and such further and other relief as the Court may deem mete.

Respectfully submitted,

ABALLI, MILNE, KALIL, P.A.
Counsel for the American University
of the Caribbean, N.V.
2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone: (305) 373-6600
Facsimile: (305) 373-7929

s/ Hendrik G. Milne
Hendrik G. Milne, Esq.
Florida Bar No. 335886
Craig P. Kalil, Esq.
Florida Bar No. 607282

## Certificate of Service

I hereby certify that on April 28, 2009 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on Jonathan Galler, Esq., and Matthew Triggs, Esq., of Proskauer Rose LLP, attorneys for Defendant Caritas Health Care, Inc. and Stephen Mendelsohn, Esq. of Greenberg Traurig, 5100 Town Center Circle, Suite 400, Boca Raton, Florida 33486, attorney for Wyckoff Heights Medical Center and Brooklyn Queens Healthcare, Inc., via transmission of Notices of Electronic Filing generated by CM/ECF.

s/ Hendrik G. Milne
Hendrik G. Milne