# REDACTED

Walter P. Loughlin
Brian D. Koosed
Justin H. Roeber
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

*Attorneys for Defendants Brooklyn-Queens Health
Care, Inc. and Wyckoff Heights Medical Center*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,                         :
                                                                  :
                              Plaintiff,                          :
                                                                  :
               - against -                                        :    09 Civ. 1410 (KAM) (RLM)
                                                                  :
BROOKLYN-QUEENS HEALTH CARE, INC. and                            :
WYCKOFF HEIGHTS MEDICAL CENTER,                                  :
                                                                  :
                              Defendants.                         :
                                                                  :
------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION AND PRELIMINARY STATEMENT ...................................................1

COUNTER-STATEMENT OF FACTS ........................................................................2

ARGUMENT ...................................................................................................10

I.    Ross's Motion Should Be Denied Because Factual Issues Exist As To BQHC's Liability Under the Affiliation Agreement ........................................................10

    A.    The Provision is ambiguous as a matter of law, which alone precludes Ross's Motion as to BQHC's liability ................................................11

    B.    Factual issues exist as to whether Ross and BQHC intended the Provision to exclude Wyckoff ........................................................14

    C.    Factual issues exist as to the viability of Defendants' Affirmative Defenses, precluding summary judgment on BQHC's liability at this time ...........................................................................................18

II.    Ross's Motion Should Be Denied As To Defendants' Affirmative Defenses Because Those Defenses Are Valid Or, At The Very Least, Factual Issues Exist As To Their Viability ..............................................................................................19

    A.    Ross's Motion fails as to Defendants' Fourth, Fifth, Seventh, and Eighth Affirmative Defenses because Defendants never received any payments from Ross pursuant to the Affiliation Agreement ...........................19

    B.    Defendants' Sixth Affirmative Defense – that BQHC acted as agent for a disclosed principal, Caritas – is valid and should stand for trial ...........20

III.    Ross's Motion Should Be Denied Because Factual Issues Exist As To Damages ...........22

    A.    The damages calculated by Ross's expert are in dispute ........................23

    B.    Contrary to Ross's claims, the parties' experts do not agree on a minimum amount of Ross's damages ................................................25

CONCLUSION ................................................................................................27

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander & Alexander Services v. These Certain Underwriters at Lloyd's,
London*, 136 F.3d 82 (2d Cir. 1998) ....................................................................11, 12

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ........................................25

*Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525 (2d Cir. 1990) .........................11

*Consolidated Risk Services, Inc. v. Automobile Dealers WC Self Insurance Trust*,
2010 WL 2735701 (N.D.N.Y. July 9, 2010) ....................................................................24

*D.C. Comics v. Kryptonite Corp.*, 336 F. Supp. 2d 324 (S.D.N.Y. 2004) ..........................13

*Even Street Products, Ltd. v. Shkat Arrow Hafer & Weber LLP*,
643 F. Supp. 2d 317 (S.D.N.Y. 2008) ............................................................................13

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) ............................................19

*Giles v. Rhodes*, 171 F. Supp. 2d 220 (S.D.N.Y. 2001) ....................................................23

*Hard Rock Café International v. Hard Rock Hotel Holdings, LLC*,
--- F. Supp. 2d ---, 2011 WL 2945842 (S.D.N.Y. July 11, 2011) ..................................13

*Lerner v. Amalgamated Clothing and Textile Workers Union*,
938 F.2d 2 (2d Cir. 1991) ..............................................................................................22

*Ramos v. SimplexGrinnell LP*, 2011 U.S. Dist. LEXIS 65593
(E.D.N.Y. June 21, 2011) ..............................................................................................24

*Record Club of America, Inc. v. United Artists Records, Inc.*,
890 F.2d 1264 (2d Cir. 1989) ....................................................................................11, 14

*Royal Industries, Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407 (S.D.N.Y. 1996) ...............21

*Ruggieri v. Harrington*, 146 F. Supp. 2d 202 (E.D.N.Y. 2001) ...................................13, 14

*Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000) ...........................21, 22

*Sayers v. Rochester Telegraph Corp. Supplemental Management Pension Plan*,
7 F.3d 1091 (2d Cir. 1993) ............................................................................................14

*Valley Juice, Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604 (2d Cir. 1996) ...............14

## STATE CASES

*CV Holdings, LLC v. Artisan Advisors, LLC*, 9 A.D.3d 654,
780 N.Y.S.2d 425 (3d Dep't 2004)..................................................................12

*Eliopoulous v. Lake George Land Conservancy, Inc.*,
50 A.D.3d 1231, 854 N.Y.S.2d 601 (3d Dep't 2008)...................................12

*Fernandez v. Price*, 63 A.D.3d 672, 880 N.Y.S.2d 169 (2d Dep't 2009) .............15, 16, 17

*Leonard Holzer Associates v. Orta*, 250 A.D.2d 737,
672 N.Y.S.2d 915 (2d Dep't 1998)..................................................................22

*Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 217 N.Y.S.2d 55 (1961) ...................................21

**INTRODUCTION AND PRELIMINARY STATEMENT**

Defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center ("Wyckoff") (together, "Defendants") respectfully submit this memorandum of law in opposition to the motion by Plaintiff Ross University School of Medicine, Ltd. ("Ross") for partial summary judgment on three aspects of its case against Defendants (the "Motion").

Specifically, Ross's Motion contends that Ross is entitled to summary judgment:  (1) finding BQHC liable to Ross under the parties' December 28, 2006 affiliation agreement ("the Affiliation Agreement") because, according to Ross, BQHC was obligated to provide Ross with "replacement clinical clerkships" at Wyckoff under the Agreement but has failed to do so, *see* Motion, pp. 1, 8-9; (2) dismissing a number of Defendants' affirmative defenses because, Ross contends, Ross made payments to Defendants pursuant to the Affiliation Agreement that Defendants have kept and not returned to Ross, *see id.* at pp. 9-12; and (3) setting a minimum damages amount of at least $12,876,134 because, Ross contends, Defendants' expert witness "adopted" the damages calculations of Ross's expert. *Id.* at pp. 4-8.

Notably, Ross's Motion glosses over, or outright ignores, the countless factual issues that preclude judgment in Ross's favor as a matter of law, including:

1.  The documentary evidence showing that Wyckoff was intended to be excluded from the Affiliation Agreement from the very beginning, and thus, at a minimum, that factual issues exist as to whether BQHC breached the Agreement by failing to provide Ross with "replacement" clerkships at Wyckoff. *See infra*, pp. 10-18.

2.  The undisputed evidence showing that *Defendants* never received any payments from Ross under the Affiliation Agreement – rather, Ross's payments went exclusively to Defendants' affiliate, Caritas Health Care, Inc. ("Caritas") – and thus, at the very least, factual issues exist as to the viability of Defendants' affirmative defenses. *See infra*, pp. 19-22.

3.  The fact that Defendants' expert did not "adopt" the calculations of Ross's expert, which, combined with the flawed methodology and unsupported assumptions of Ross's expert, at the very least raise factual issues as to the amount of damages that Ross may recover if successful at trial. *See infra*, pp. 22-26.

- 1 -

Because it fails to address any of these basic facts, Ross's Motion should be denied. Defendants' pending motion for summary judgment dismissing Ross's principal theories of liability as to Wyckoff should be granted, and this case should proceed to trial solely on Ross's remaining claims against BQHC.

## COUNTER-STATEMENT OF FACTS

A full recitation of the facts is set forth in: (a) Defendants' Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Partial Summary Judgment, dated December 2, 2011 ("Def'ts' 56.1 Statement"); and (b) Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts, dated January 10, 2012 and submitted herewith ("Def'ts' 56.1 Response"). Defendants incorporate by reference herein the facts set forth in their 56.1 Statement and 56.1 Response, respectively, and summarize the most pertinent facts below.

### *Caritas's Acquisition of The Hospitals*

In 2006, Defendants attempted to rescue two hospitals – St. John's Queens and Mary Immaculate (together, the "Hospitals") – from the brink of closure. Def'ts' 56.1 Statement, ¶¶ 12-17. In order to do so:

- Several members of Wyckoff's Board of Trustees created a new affiliate – Caritas – to operate the Hospitals separate and apart from Wyckoff;

- Wyckoff renamed a pre-existing affiliate entity BQHC; and

- Wyckoff's and Caritas's Boards each respectively voted to make BQHC the "sole member" and "passive parent" of Wyckoff and Caritas.

*See id.* at ¶¶ 18-30. Caritas alone then acquired St. John's Queens and Mary Immaculate on January 1, 2007. *See id.* at ¶¶ 31-33.

### *BQHC's Affiliation Agreement with Ross*

Around the time that Caritas began preparations to take over the Hospitals, Ross and Caritas began negotiating an agreement that would: (a) allow Ross's medical students then at St.

John's Queens and Mary Immaculate to continue their clerkships after the Hospitals became part of Caritas; and (b) provide Ross's students with future clerkships at the Hospitals.  Def'ts' 56.1 Statement, ¶¶ 37-39.  In return for these clerkships, Ross agreed to give Caritas a "prepayment" of clerkship funds that Caritas could use to get the Hospitals up and running.  *See id.* at ¶ 39.

From Fall 2006 until late December 2006, Ross and Caritas negotiated the terms of this proposed "Affiliation Agreement."  *See* Def'ts' 56.1 Statement, ¶¶ 40-45.  On December 22, 2006, just days before signing, Ross demanded, for the first time, that BQHC be the contracting party to the Affiliation Agreement instead of Caritas, even though all prior drafts of the Affiliation Agreement had listed Ross and Caritas as the only parties to that Agreement.  *See id.* at ¶¶ 41-43.  This change was made at the insistence of Virginia Smith, Esq., in-house counsel for DeVry, Inc. ("DeVry"), the for-profit educational conglomerate that owns Ross.  *See id.* at ¶¶ 34-35, 42-43.  BQHC eventually assented to Ross's demand.  *See id.* at ¶ 46.

On or about December 28, 2006, mere hours before Ross and BQHC were scheduled to sign it, Ross sent BQHC a revised draft of the Affiliation Agreement that added, for the first time, an ambiguous provision at the end of Exhibit B to the Agreement, which stated that:

> In the event [Mary Immaculate and St. John's Queens] are not operative, and [Ross] is not in material breach of the [Affiliation] Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships . . . at one or more of its other facilities.

*See id.* at ¶ 45 (the "Provision"); *see also* Declaration of Justin H. Roeber, Esq., in Support of Defendants' Motion for Partial Summary Judgment, dated December 2, 2011 ("Roeber Orig. Dec."), Exh. 37, at Ross 015137 (also adding a provision to the Affiliation Agreement referring to the separate Wyckoff-Ross agreement).[1]

---

[1]      Since 1997, Ross and Wyckoff have had a separate agreement for clinical clerkships at Wyckoff, which remains in place today. *See* Def'ts' 56.1 Statement, ¶ 60.

Upon receiving this draft of the Affiliation Agreement, representatives of BQHC, Caritas, and Wyckoff contacted Ross and, among other things, repeatedly told Ross that Wyckoff would not be part of the Affiliation Agreement, which was intended to bind Caritas alone. *See* Def'ts' 56.1 Statement, ¶¶ 58-59. In particular, the evidence adduced during discovery reveals the following chain of events in the hours shortly before the Affiliation Agreement was signed:

December 28, 2006, 10:07 a.m.: Julius Romero – one of the individuals communicating with Ross about the Affiliation Agreement on behalf of Caritas – sent Ross an e-mail *expressly rejecting* Ross's proposed addition to the Affiliation Agreement of a "reference to [Ross's] existing Wyckoff Heights Medical Center agreement." *See* Roeber Orig. Dec., Exh. 38, at Ross 015124. In that e-mail, Mr. Romero advised Ross that this proposed addition was unacceptable because "[t]he Caritas agreement remains separate from the Wyckoff agreement," and Mr. Romero gave Ross a deadline of "the end of business day today, December 28, 2006," to finalize the Affiliation Agreement for Caritas's Hospitals. *Id.*

December 28, 2006, 11:20 a.m.: One hour after e-mailing Ross and rejecting any reference to Wyckoff in the Affiliation Agreement, Mr. Romero spoke by telephone with Virginia Smith, Esq., DeVry's in-house counsel. *See* Roeber Orig. Dec., Exh. 51, at Ross 08387 (e-mail summarizing December 28, 2006 telephone conversation). During that call, Mr. Romero advised Ms. Smith that:

- *The Affiliation Agreement "should (will) not have any references to Wyckoff Heights Medical Center"*;

- "A finalized agreement between Ross and Caritas will be signed after the abovementioned reference [to Wyckoff] is deleted"; and

- "The Ross-Wyckoff agreement is *separate from* the Ross-Caritas agreement."

*Id.* at Ross 08387 (emphasis added).   Ms. Smith later confirmed that Mr. Romero's understanding of their December 28, 2006 conference call was accurate in a January 2007 e-mail. *Id.*

December 28, 2006, 12:17 p.m.: Less than an hour after concluding their telephone call, Ms. Smith sent Mr. Romero a revised draft of the Affiliation Agreement "[i]n accordance with our conversation earlier this morning." *See* Roeber Orig. Dec., Exh. 39, at Ross 015104.   In that revised draft, Ms. Smith assented to Mr. Romero's demands and *removed* all references to Wyckoff from the Affiliation Agreement. *Id.*

With these negotiations completed, Ross and BQHC executed the Affiliation Agreement during the afternoon of December 28, 2006.   Def'ts' 56.1 Statement, ¶ 46.   Wyckoff's Board of Trustees did not consent to, or accept, Wyckoff assuming any liability or responsibility under the Affiliation Agreement. *Id.* at ¶ 61.   Likewise, the executed Affiliation Agreement contains no mention of Wyckoff. *See* Roeber Orig. Dec., Exh. 40.

*Ross Prepays Caritas for Clerkships at the Hospitals*

After executing the Affiliation Agreement, Ross transferred $5 million in clerkship "prepayments" to a bank account held exclusively by Caritas – not by BQHC, Wyckoff, or any other person or entity. *See* Def'ts' 56.1 Response, pp. 14-15.   The Affiliation Agreement was purportedly amended on December 5, 2007 and on February 28, 2008.   Def'ts' 56.1 Statement, ¶ 47.   BQHC disputes the validity of these amendments because its Board of Trustees never authorized any amendments to the Affiliation Agreement. *See* Def'ts' 56.1 Response, ¶¶ 4, 6.   Rather, these purported amendments were the initiative of a consultant whose firm's Administrative Services Agreement explicitly prohibited him or his firm from incurring any liabilities on behalf of Wyckoff, Caritas, or BQHC. *See id.*   Nevertheless, each of Ross's

payments pursuant to these purported amendments to the Affiliation Agreement went directly to a bank account held exclusively by Caritas. *See* Def'ts' 56.1 Response, pp. 14–15.

*Caritas Acquires the Hospitals and BQHC Contemplates Further Acquisitions*

After Caritas acquired St. John's Queens and Mary Immaculate, Caritas and Wyckoff operated their respective hospitals separately under BQHC's passive ownership. Def'ts' 56.1 Statement, ¶¶ 48-57. During this time, BQHC also considered acquiring additional medical facilities. In particular, throughout much of 2008, BQHC and Caritas engaged in negotiations for possible acquisitions, affiliations, or strategic partnerships with at least four different hospitals or healthcare systems: (i) North Shore-Long Island Jewish; (ii) Mount Sinai; (iii) MediSys; and (iv) Parkway. *See* Def'ts' 56.1 Response, ¶ 10. Indeed, by June 2008, MediSys, a three-hospital system, had "submitted a proposal to merge" its health system with "the BQHC System," consisting of Caritas's Hospitals and Wyckoff, and Parkway, another hospital that had "expressed an interest" in merging with BQHC and MediSys. *See id.* Despite these efforts, BQHC did not ultimately acquire or affiliate with any other hospitals. *See* Def'ts' 56.1 Response, ¶ 10.

*Caritas Files for Bankruptcy and Ross Sues BQHC and Wyckoff*

In February 2009, Caritas filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York. Def'ts' 56.1 Statement, ¶¶ 62-63.[2] The Hospitals closed shortly thereafter. *See* Def'ts' 56.1 Response, ¶ 8. Ross did not file a proof of claim in Caritas's bankruptcy as a typical creditor would do. Def'ts' 56.1 Statement, ¶ 64. Instead, Ross responded to Caritas's bankruptcy by demanding that *Wyckoff* replace the clerkships previously in place for Ross's students at *Caritas's* Hospitals. *See id.* at ¶ 66. In particular, Ross's position

---

[2]        Wyckoff invested $17 million in Caritas's effort to rescue the Hospitals from closure. *See* Def'ts' 56.1 Statement, ¶ 65. That investment was lost in its entirety when Caritas filed for bankruptcy. *See id.*

was that the Provision obligated Wyckoff to either: (a) repudiate its existing contracts with other medical schools and expel the students from those schools who were clerking at Wyckoff to make room for Ross's students; or (b) hire enough new physicians as teaching faculty to accommodate Ross's students at Wyckoff. *See id.* at ¶¶ 64, 66.

At the time, Wyckoff could not offer Ross additional clerkships due to existing contractual commitments to other medical schools, nor could Wyckoff feasibly hire enough new faculty to meet Ross's demands. *See* Def'ts' 56.1 Statement, ¶¶ 67-68. In fact, Wyckoff's capacity to provide clinical clerkships is constrained by practical considerations such as the number of teaching faculty and patients that its hospital can accommodate at any given time, as well as Wyckoff's policy, guided by regulatory recommendations, of maintaining a ratio of between four and eight medical students per teaching physician. *See id.* at ¶ 68.

Having chosen not to file a claim in Caritas's bankruptcy, Ross sued BQHC and Wyckoff on April 6, 2009. Def'ts' 56.1 Statement, ¶ 69. Ross subsequently filed a Second Amended Complaint (the "SAC"), which Defendants answered on October 6, 2009. *Id.* at ¶¶ 70-72. Among other things, Defendants' Answer asserts the following affirmative defenses to Ross's SAC:

- **Fourth Affirmative Defense:** The SAC is "barred by the doctrine of impossibility." Roeber Orig. Dec., Exh. 59, ¶ 84.

- **Fifth Affirmative Defense:** The Affiliation Agreement "is unenforceable by reason[] of the doctrine of ultra vires." *Id.* at ¶ 85.

- **Sixth Affirmative Defense:** The SAC is barred because "BQHC acted as agent for a disclosed principal, Caritas." *Id.* at ¶ 86.

- **Seventh Affirmative Defense:** The SAC is barred because "BQHC lacked the authority to enter into" the purported amendments to the Affiliation Agreement. *Id.* at ¶ 87.

- **Eighth Affirmative Defense:** The SAC is "barred by the doctrine of mutual mistake." *Id.* at ¶ 88.

- 7 -

### *Ross and Defendants Serve Their Respective Expert Reports*

The parties concluded fact and expert discovery in November 2011. *See* Roeber Opp. Dec., ¶ 10. On August 31, 2011, Ross served on Defendants the Expert Report of Elizabeth Kroger Davis. *See* Roeber Opp. Dec., Exh. 5 (the "Davis Report"). The Davis Report purports to quantify the costs that have been, and will be, incurred by Ross as a result of BQHC's alleged breach of the Affiliation Agreement. *Id.*

In particular, the Davis Report divides its damages analysis into three components: (i) the outstanding "balance of unearned prepayment funds," representing those prepayments that Ross made under the Affiliation Agreement that were never compensated via clerkships due to Caritas's bankruptcy, *see* Davis Report, pp. 7-8; (ii) the "incremental costs incurred by Ross to replace clerkships through June 30, 2011," which accounts for Ross's alleged cost of placing those students who would have clerked at St. John's Queens or Mary Immaculate between 2009 and June 30, 2011 into clerkships at other hospitals, *see id.* at pp. 8-12; and (iii) the present value of Ross's projected "future incremental costs" for obtaining "replacement clerkships from July 1, 2011 through January 31, 2018." *Id.* at pp. 12-16.[3] To estimate this third component of Ross's alleged damages, Ms. Davis calculated a rate at which she expects clerkship costs in the market to increase over the next seven years (the "Clerkship Cost Growth Rate"), and used that Rate to predict the future clerkship costs that Ross will incur through 2018. *Id.* The Davis Report calculated Ross's total alleged damages to be $21,669,975. Davis Report, p. 3.

On October 10, 2011, Defendants served on Ross the "Rebuttal Expert Report of Anthony G. Duffy." *See* Ross's Local Rule 56.1 Statement of Material Facts in Support of its

---

[3]     Ms. Davis's damages calculation includes projected costs until 2018 because Ross contends that the 2006 Affiliation Agreement gave Ross a contractual right to extend the Agreement, which Ross would have exercised as the contract term expired between 2011 and 2018. *See* Davis Report, pp. 6, 12.

Motion for Partial Summary Judgment, dated December 2, 2011 (the "Ross 56.1 Statement"), Appendix K (the "Duffy Report"). The Duffy Report critiques the valuation methodology used by Ms. Davis with respect to the third component of her damages analysis. *Id.* Mr. Duffy specifically did "not assess[] the reasonableness" of the first two components of Ross's alleged damages set forth in the Davis Report. *Id.* at pp. 2-3.

On October 25, 2011, Ross served on Defendants a revised Expert Report from Ms. Davis. *See* Appendix I to Ross's 56.1 Statement (the "Revised Davis Report"). According to Ross's counsel, the Revised Davis Report corrected a "data entry error" that had resulted in the original Davis Report overestimating the third component of Ross's alleged damages by more than $1.5 million. *See* Roeber Opp. Dec., Exh. 6. The Revised Davis Report provided a new total damages estimate for Ross of $20,089,501. *See id.*

On November 1, 2011, Defendants took Ms. Davis's deposition. Roeber Opp. Dec., Exh. 9 ("Davis Tr."). There, Ms. Davis testified that none of her past work had dealt with medical school clerkships in any way. *Id.* at p. 13:9-11. Ms. Davis further admitted that when calculating her Clerkship Cost Growth Rate, she used only Ross's records of historical clerkship costs, and failed to isolate Ross contracts that contained prepayments or multi-year terms (like the Affiliation Agreement) from those that did not. *Id.* at pp. 66:13-20, 70:21-71:1, 81:21-82:4.

On November 3, 2011, Ross took Mr. Duffy's deposition. Roeber Opp. Dec., Exh. 8 ("Duffy Tr."). Among other things, Mr. Duffy testified that he took no position as to the accuracy or reliability of Ms. Davis's calculations as to the first two components of Ross's alleged damages because they were beyond the scope of his retention. Duffy Tr., pp. 44:19-46:8. Instead, Mr. Duffy's critique focused on the fact that the Clerkship Cost Growth Rate used by Ms. Davis to predict the rise in Ross's future clerkship costs was not indicative of the overall

marketplace because it was calculated using only Ross's historical payment records. *Id.* at p. 79:7-13.[4]

### ARGUMENT

In its Motion, Ross contends that it is entitled to judgment as a matter of law finding that: (1) BQHC is liable under the Affiliation Agreement; (2) five of Defendants' affirmative defenses should be dismissed; and (3) Ross is entitled to recover a minimum of $12,876,134 at trial. *See generally* Motion. As set forth below, factual disputes permeate each of these three issues. Ross's Motion should therefore be denied.

**I.     Ross's Motion Should Be Denied Because Factual Issues Exist As To BQHC's Liability Under the Affiliation Agreement**

To the extent it seeks a ruling that BQHC is liable under the Affiliation Agreement as a matter of law, Ross's Motion should be denied because factual issues exist as to BQHC's liability here. Initially, Defendants note the contrast between the significance of the relief Ross seeks – judgment as a matter of law as to BQHC's liability – and the vacuity of Ross's treatment of this issue, which barely covers a page, and nowhere cites to any facts demonstrating, among other things, Ross's performance under the Affiliation Agreement, or its payment of any funds to the Defendants. *See* Motion, pp. 8-9; *see also infra*, pp. 19-20.

Instead, Ross's lone argument, in both its SAC and its Motion, is that, because Ross has not received "replacement clinical clerkships" at *Wyckoff*, BQHC has breached the Provision of the Affiliation Agreement stating that:

---

[4]     Concurrent with its Motion, Ross has filed a motion to preclude Mr. Duffy's testimony at trial on the basis that: (1) it is "cumulative" of Ms. Davis's testimony as to the first two components of Ross's alleged damages; and (2) Mr. Duffy lacks expertise as to the third component of Ross's alleged damages. *See* Ross's Memorandum of Law in Support of Its Motion to Preclude Defendants' Expert, dated December 2, 2011 (the "Motion to Preclude"). Defendants have submitted herewith a separate opposition to the Motion to Preclude explaining why Ross's Motion to Preclude is premature and without merit. *See* Defendants' Memorandum of Law in Opposition to Ross's Motion to Preclude, dated January 10, 2012 ("Def'ts' Expert Opp.").

- 10 -

> In the event the Hospitals are not operative, and [Ross] is not in
> material breach of the [Affiliation] Agreement, BQHC agrees
> to provide [Ross] with an equivalent number of clerkships . . .
> at one or more of its other facilities.

Roeber Orig. Dec., Exh. 40, at Ross 0064.  Despite its exclusive reliance on this Provision,

however, Ross nowhere addresses the only issue that matters for determining BQHC's liability –

what this Provision *actually means. See* Motion, pp. 1, 8-9.  Because the Provision is ambiguous

as a matter of law, and because factual issues exist as to whether the parties intended it to include

Wyckoff (as Ross contends) or exclude Wyckoff (as Defendants contend and the parties

discussed in the hours leading up to the Affiliation Agreement's execution), Ross's Motion

should be denied.  Simply put, the dispute surrounding the Provision's meaning makes it

impossible to determine, at this stage of the litigation, whether BQHC has breached any

obligation at all.  Rather, only a trial can resolve this dispute.

### A.  The Provision is ambiguous as a matter of law, which alone precludes Ross's Motion as to BQHC's liability

The Provision upon which Ross relies is ambiguous and thus summary judgment finding

that BQHC is liable for breaching that Provision is inappropriate here.  It is black-letter law that

a contractual provision is ambiguous "if it is reasonably susceptible of more than one

interpretation." *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990)

(reversing district court's grant of summary judgment because contract term was ambiguous and

extrinsic evidence was conflicting).  Such an ambiguity "can arise either from the [contract]

language itself or from inferences that can be drawn from this language."  *Alexander &*

*Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.

1998).  The Second Circuit has repeatedly held that "[s]ummary judgment as to the meaning of a

contract term may not be granted when the term's meaning" is ambiguous, even if one of the

competing interpretations of the term is considered "improbable."  *Record Club of America, Inc.*

- 11 -

*v. United Artists Records, Inc.*, 890 F.2d 1264, 1270-71 (2d Cir. 1989) (noting that "the differing interpretations of the contract present a triable issue of fact") (internal citation omitted); *see also Alexander*, 136 F.3d at 86 ("If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist."). This rule of law is fatal to Ross's Motion because, under any objective reading, the Provision is ambiguous.

In particular, while the Provision uses the seemingly simple phrase "one or more of [BQHC's] other facilities" to describe the scope of BQHC's obligation under the Provision, the inferences to be drawn from that phrase are anything but clear, because neither the Provision nor the Affiliation Agreement defines – let alone identifies by name, address, or other location-specific marker – the "other [BQHC] facilities" to which the Provision refers. *See* Roeber Orig. Dec., Exh. 40, at Ross 0064. Instead, the Provision merely uses the vague and generic term "other facilities," without ever describing what "facilities" were intended to be included or excluded by that term. *See id.*

New York courts have regularly found provisions that fail to identify what is included or excluded by a generic term to be ambiguous. Consider:

- *CV Holdings, LLC v. Artisan Advisors, LLC*: Provision determining defendant's right to a finder's fee was ambiguous because the generic term "transaction" might include or exclude a deal in which the defendant had no involvement. 9 A.D.3d 654, 656, 780 N.Y.S.2d 425, 427-28 (3d Dep't 2004) (reversing trial court's grant of summary judgment because contract was ambiguous).

- *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*: Insurance contract exclusion was ambiguous because the term "client or account" might include or exclude policyholders whose business originated from independent insurance brokers instead of plaintiff. 136 F.3d at 87-88 (2d Cir. 1998) (reversing trial court's grant of summary judgment in part because contract was ambiguous).

- *Eliopoulous v. Lake George Land Conservancy, Inc.*: Property deed was ambiguous as to whether it included or excluded a specific parcel of land. 50 A.D.3d 1231, 1232-33, 854 N.Y.S.2d 601, 602-03 (3d Dep't 2008) (reversing trial court's grant of summary judgment because deed was ambiguous).

- *D.C. Comics v. Kryptonite Corp.*:   Contract terms "security devices" and "accessories" were ambiguous because they might include or exclude other biking-related items, beyond the handle bars and bike locks expressly contemplated by the parties.  336 F. Supp. 2d 324, 329-30 (S.D.N.Y. 2004) (denying summary judgment in light of contract's ambiguity).

- *Even Street Prods., Ltd. v. Shkat Arrow Hafer & Weber LLP*:   Assignment agreement was ambiguous because the term "any and all claims" did not identify "Defendant by name as someone included or excluded." 643 F. Supp. 2d 317, 324-25 (S.D.N.Y. 2008) (denying motion to dismiss in light of ambiguity).

- *Hard Rock Café Int'l v. Hard Rock Hotel Holdings, LLC*:   Licensing agreement provision covering certain "locations" was ambiguous as to whether it included or excluded geographical regions where both parties advertised but did not operate. *See* --- F. Supp. 2d ---, 2011 WL 2945842, at *11 (S.D.N.Y. July 11, 2011) (denying motion to dismiss in light of license agreement's ambiguity).

Chief Judge Amon's decision in *Ruggieri v. Harrington* is particularly instructive.  146 F. Supp. 2d 202 (E.D.N.Y. 2001).  There, Catherine Ruggieri had settled a discrimination case against her employer, St. John's University, pursuant to a settlement agreement by which Ms. Ruggieri agreed not to apply for any "administrative position" at St. John's for a period of years. *Id.* at 206-07.  When Ms. Ruggieri subsequently sued St. John's for alleged retaliation against her, St. John's counterclaimed, alleging that Ms. Ruggieri had breached the parties' settlement by applying for the "administrative position" of Chair of St. John's Department of Administration and Economics. *Id.* at 208-09, 223.  When St. John's later moved for summary judgment on its counterclaim, Chief Judge Amon denied the motion, finding that the generic term "administrative position" was ambiguous because "[i]t [was] not readily apparent whether the term 'administrative position' includes department chairs.  The term could reasonably be interpreted to either include or to exclude department chairs," particularly in light of the conflicting extrinsic evidence presented by the parties. *Id.* at 223-24.

Here, similarly, the Provision uses the generic term "facilities" to define the scope of BQHC's alleged obligation to provide Ross with "replacement" clerkships.  Motion, p. 1; *see*

- 13 -

*also* Roeber Orig. Dec., Exh. 40, at Ross 0064.  Just as in *Ruggieri*, however, "[i]t is not readily apparent" what falls inside, or outside, the scope of that generic term "facilities." *Ruggieri*, 146 F. Supp. 2d at 223.  The Provision could, as Defendants understood and the substantial evidence adduced during discovery shows, be interpreted to *exclude* Wyckoff, which would be consistent with the parties' discussions, mere hours before signing the Affiliation Agreement, that "[t]he Affiliation Agreement *"should (will) not* have any references to Wyckoff" and would instead address Caritas alone.  *See infra*, pp. 4-5.  Or the Provision could, as Ross perfunctorily contends, be interpreted to include Wyckoff, even though that interpretation is not evident from the Provision itself and is inconsistent with the parties' discussions leading up to the Affiliation Agreement's signing.  Motion, p. 1.  As in *Ruggieri*, then, the Provision "could reasonably be interpreted to either include or to exclude [Wyckoff]"; the Provision is thus ambiguous and summary judgment should be denied.  146 F. Supp. 2d at 223-24.

The Provision's ambiguity alone is sufficient to defeat Ross's Motion.  *See Record Club*, 890 F.2d at 1270-71.  This is especially so where, as here, that ambiguity is the handiwork of Ross's counsel and should therefore be interpreted against Ross.  *See, e.g., Valley Juice, Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 n.5 (2d Cir. 1996) (noting "the long-settled principle of contract law that ambiguities are interpreted against the drafter").  Accordingly, Ross's Motion should be denied, and the Provision's ambiguity should be resolved at trial.

B.    Factual issues exist as to whether Ross and BQHC
       intended the Provision to exclude Wyckoff

Because the Provision is ambiguous as a matter of law, the Court may properly consider extrinsic evidence of the parties' intent with respect to the Provision, specifically its reference to "one or more of [BQHC's] other facilities."  *See, e.g., Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095-96 (2d Cir. 1993) (reversing trial court's

- 14 -

grant of summary judgment because contract was ambiguous and "conflicting extrinsic evidence of the contracting parties' intent exists"). Here, substantial evidence exists showing that, as Ross was well aware, the intent of BQHC, Wyckoff, and Caritas – before, during, and after the Affiliation Agreement was signed – was to exclude Wyckoff from the Affiliation Agreement entirely, including, necessarily, from the scope of the Provision.

For example, on December 28, 2006, just hours before the Affiliation Agreement was signed:

- Julius Romero responded to Ross's draft adding both the Provision and an explicit reference to Wyckoff by immediately *rejecting* any "reference to the existing Wyckoff Heights Medical Center agreement" in the Affiliation Agreement for Caritas's Hospitals. Roeber Orig. Dec., Exh. 38, at Ross 015124.

- One hour later, Mr. Romero and DeVry's in-house counsel, Ms. Smith, discussed the Affiliation Agreement and agreed that it *"should (will) not have any references to Wyckoff Heights Medical Center." Id.* at Exh. 51, at Ross 08387.

- Less than an hour after that discussion, Ms. Smith sent Mr. Romero a revised draft of the Affiliation Agreement confirming Mr. Romero's understanding and removing any references to Wyckoff from the Agreement. Roeber Orig. Dec., Exh. 39, at Ross 015104.

Similarly, shortly after the Affiliation Agreement was signed, Ms. Smith confirmed her understanding of Mr. Romero's intent in a subsequent e-mail summarizing their December 28, 2006 conference call. Roeber Orig. Dec., Exh. 39, at Ross 015104. Together, this evidence shows that, whatever else the Provision might have been intended to mean, it was not, at the time the parties executed the Agreement, intended to include Wyckoff; rather, any reference to Wyckoff was expressly excluded from the Affiliation Agreement in its entirety.

The Second Department's decision in *Fernandez v. Price* is right on point. 63 A.D.3d 672, 880 N.Y.S.2d 169 (2d Dep't 2009). There, Fernandez and Price entered into a settlement agreement splitting the proceeds from their sale of a lucrative piece of property. 63 A.D.3d at 674, 880 N.Y.S.2d at 171. While Fernandez's initial draft of the settlement agreement provided

for a simple "50/50" split of the proceeds, Price sent back a revised draft adding that "taxes, expenses, [and] upkeep" would be deducted from Fernandez's share. *Id.* The final settlement agreement kept Price's addition of the term "expenses," but omitted the terms "taxes" and "upkeep." *Id.* After a bench trial, the trial court found that the term "expenses" was ambiguous and that the extrinsic evidence showed that "expenses" was intended to encompass "all costs" relating to the property, not just those associated with the property's sale. *Id.* On appeal, however, the Second Department reversed, finding that:

> [T]he trial court correctly concluded that the term "expenses" . . . was ambiguous . . . [But] the extrinsic and parol evidence, ***including the fact that "expenses" was included in the settlement agreement without the addition of "taxes" and "upkeep" as [Price] suggested***, leads us to conclude that "expenses" means only those costs associated with the sale of [the property].

63 A.D.3d at 675-76, 880 N.Y.S.2d at 173 (emphasis added).

Here, similarly, the Provision's use of the term "facilities" – like the term "expenses" in *Fernandez* – is ambiguous, which alone justifies denying Ross's Motion. 63 A.D.3d at 675-76, 880 N.Y.S.2d at 173. Further, just as the initial drafts of the settlement agreement in *Fernandez* did not include the terms "expenses," "taxes," or "upkeep," the initial drafts of the Affiliation Agreement contained neither the Provision nor any references to "Wyckoff," though Ross later sought to add both. *See* Def'ts' 56.1 Statement, ¶¶ 40-45, 58-61; 63 A.D.3d at 674, 880 N.Y.S.2d at 171. Just as in *Fernandez*, however, the parties only included one of those proposed additions (the Provision) in the final Affiliation Agreement "without the addition of [the references to Wyckoff] as [Ross] suggested." 63 A.D.3d at 675-76, 880 N.Y.S.2d at 173. As in *Fernandez*, then, the parties' drafting history – specifically, their addition of the Provision, but removal of all references to Wyckoff – is strong evidence that the parties intended to exclude Wyckoff from the Affiliation Agreement. If the Second Department correctly found that such

- 16 -

# REDACTED

evidence was sufficient to reverse a bench verdict in *Fernandez*, then *a fortiori*, Ross's Motion – which is made on summary judgment when all inferences must be resolved in Defendants' favor – necessarily fails. *Fernandez*, 63 A.D.3d at 675-76, 880 N.Y.S.2d at 173.

In the end, Ross's Motion – which contends, in conclusory fashion, that "Wyckoff . . . is the only other subsidiary of BQHC" to which the Provision applies – cannot be squared with the Second Department's decision in *Fernandez* or the evidence surrounding the Affiliation Agreement's execution.  Motion, p. 1.  Ross is a sophisticated party that is affiliated with approximately                    Def'ts' 56.1 Statement, ¶¶ 34-36.  Surely, if it had wanted Wyckoff to provide "replacement" clerkships, Ross could have added express language to the Affiliation Agreement to that effect.  But it did no such thing and, instead, expressly agreed to remove any references to Wyckoff from that Agreement.[5]  *See supra*, pp. 4-5.  Ross cannot now renegotiate the bargain it struck simply because Caritas went bankrupt.  Indeed, to the extent that Ross now contends that the Provision was intended to include Wyckoff, this at the very least raises factual issues as to whether the parties ever reached a meeting of the minds on the meaning and scope of the Provision.

Further, and lest there be any doubt, the intent to exclude Wyckoff at the time the Affiliation Agreement was signed does not render the Provision meaningless.  The evidence shows that BQHC contemplated additional expansion to other "facilities" at which clinical clerkships might have been provided.  For example, throughout 2008, BQHC considered various strategic partnerships, affiliations, and mergers with other area hospitals.  *See* Def'ts' 56.1

---

[5]       By contrast, in December 2006, contemporaneously with the negotiation of the Affiliation Agreement between Ross and BQHC, Wyckoff signed a promissory note with a different medical school (American University of the Caribbean) in which Wyckoff explicitly guaranteed Caritas's obligation to repay an advance of funds if clerkships were not provided by Caritas. *See* Def'ts' 56.1 Statement, ¶ 61 n.3; *see also* Roeber Orig. Dec., Exh. 52, at Ross 031414-031423 (December 1, 2006 Promissory Note Agreement).

Response, ¶ 10. Had those efforts been successful, the Provision would have applied to those additional "facilities." The fact that BQHC's efforts to acquire additional "facilities" ultimately failed does not, as Ross apparently contends, transform the Provision from one that was intended to exclude Wyckoff (as the weight of the evidence surrounding the Affiliation Agreement's execution shows) into one that was intended to specify Wyckoff (as Ross alleges). Put another way, BQHC's failure to acquire, or affiliate with, additional "facilities" at which it might provide Ross with "replacement" clerkships does not alter the intent to exclude Wyckoff from the scope of the Provision or the Affiliation Agreement generally. Motion, p. 1. Nor does it suggest that BQHC has breached the Provision by failing to provide Ross with clerkships at Wyckoff. To the contrary, this evidence simply shows that there is no performance left for BQHC to provide here.

In sum, the Provision's ambiguity, coupled with the evidence surrounding the Affiliation Agreement's drafting history and execution, suggests that Defendants' interpretation of the Provision is the better one. At the very least, Defendants' interpretation is reasonable. Accordingly, factual issues exist as to the meaning of the Provision that preclude summary judgment, and Ross's Motion seeking to establish BQHC's liability based on a breach of that Provision should be denied. The Court should hear testimony at trial regarding the parties' intent in entering into the Provision.

C.   Factual issues exist as to the viability of Defendants' Affirmative Defenses, precluding summary judgment on BQHC's liability at this time

As set forth below in Part II, factual issues exist with respect to Defendants' Fourth, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses. *See infra*, pp. 19-22. Ross's Motion for summary judgment as to BQHC's liability under the Affiliation Agreement is therefore premature. BQHC's liability cannot be determined until after the factual issues surrounding its Affirmative Defenses are addressed at trial.

II.   **Ross's Motion Should Be Denied As To Defendants' Affirmative**
      **Defenses Because Those Defenses Are Valid Or, At The Very Least,**
      **Factual Issues Exist As To Their Viability**

In its Motion, Ross contends that certain of Defendants' affirmative defenses should be dismissed because: (a) "[D]efendants have not returned to Ross" the "unearned" portion of Ross's "prepayments" under the Affiliation Agreement, *see* Motion, p. 9; and (b) BQHC signed the Affiliation Agreement on its own behalf, not as an agent for Caritas. Motion, pp. 11-12. Once again, Ross is wrong on both the facts and the law. Its Motion should therefore be denied.

A.   Ross's Motion fails as to Defendants' Fourth, Fifth, Seventh, and Eighth
     Affirmative Defenses because Defendants never received any payments
     from Ross pursuant to the Affiliation Agreement

To the extent it seeks to dismiss Defendants' Fourth, Fifth, Seventh, and Eighth Affirmative Defenses, Ross's Motion should be denied because it rests on a faulty factual premise that – consistent with Ross's pattern throughout this litigation – ignores the separate corporate identities of BQHC, Wyckoff, and Caritas. In particular, Ross's sole argument for dismissing Defendants' Fourth, Fifth, Seventh, and Eighth Affirmative Defenses is that "[D]efendants have not returned to Ross" the portion of Ross's "prepayments" under the Affiliation Agreement that "remains unearned." Motion, p. 9. Because, according to Ross, Defendants have kept Ross's prepayments under the Affiliation Agreement, Ross contends that Defendants may not assert their Fourth, Fifth, Seventh, and Eighth Affirmative Defenses. *See id.*

As an initial matter, Ross fails to cite to any admissible evidence to support its contention that Defendants received "prepayments" from Ross pursuant to the Affiliation Agreement. *See* Motion, p. 9; *see generally* Ross's 56.1 Statement. This alone justifies denying Ross's Motion. *See, e.g., Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (holding that "where the movant fails to fulfill its initial burden of providing admissible evidence of the

material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented") (internal citations omitted).

Ross's failure to cite to any evidence that Defendants received payments under the Affiliation Agreement is no coincidence, however, because no such evidence exists. Rather, the undisputed evidence shows that Ross never paid any money to the *Defendants* (BQHC and Wyckoff), pursuant to the Affiliation Agreement, but instead made all payments exclusively to *Caritas* – transferring the "prepayments" by wire to an account held exclusively by Caritas in exchange for clerkships at Caritas's Hospitals. Def'ts' 56.1 Response, pp. 14-15. Because Ross's prepayments were transmitted to Caritas, not the Defendants, there is nothing that Defendants need to pay back to Ross as a prerequisite to asserting their Fourth, Fifth, Seventh, and/or Eighth Affirmative Defenses. *See* Motion, p. 9; Def'ts' 56.1 Response, pp. 14-15. Ross's Motion as to those Defenses thus fails and the cases it relies upon are inapposite. Motion, p. 9. At the very least, the fact that each of Ross's payments went directly to Caritas – not BQHC or Wyckoff – creates a factual issue that precludes summary judgment on Defendants' Fourth, Fifth, Seventh and Eighth Affirmative Defenses. *See* Def'ts' 56.1 Response, pp. 14-15. Those Defenses should therefore be addressed at trial.

     **B.**    <u>Defendants' Sixth Affirmative Defense – that BQHC acted as agent for a disclosed principal, Caritas – is valid and should stand for trial</u>

Ross argues that Defendants' Sixth Affirmative Defense – that BQHC was acting as agent for a disclosed principal, Caritas, with respect to the Affiliation Agreement – should be dismissed because "BQHC is the contracting party" under the Affiliation Agreement. Motion, pp. 11-12. Ross's argument fails, however, because it ignores the history of the negotiations between Ross, Caritas, and BQHC, and misstates the law governing Defendants' Sixth Affirmative Defense.

*First*, Ross is wrong on the facts. The Affiliation Agreement arose solely from Caritas's acquisition of the Hospitals, dealt only with clerkships at Caritas's Hospitals, and, for the first two months of negotiations, only contemplated an Agreement between *Ross and Caritas.* Def'ts' 56.1 Statement, ¶¶ 40-45. Ross's subsequent decision – at the eleventh hour and on the advice of DeVry's counsel – to ask BQHC to sign the Affiliation Agreement on behalf of Caritas does not erase two months of prior negotiations between the parties, and certainly does not change the fact that BQHC was acting on Caritas's behalf. *See id.* At a minimum, this evidence creates a factual issue as to whether BQHC acted on Caritas's behalf with respect to the Affiliation Agreement, which precludes summary judgment dismissing Defendants' Sixth Affirmative Defense at this time. *See, e.g., Ryan v. Volpone Stamp Co.,* 107 F. Supp. 2d 369, 390 (S.D.N.Y. 2000) ("Whether an agent is personally liable [for its actions on behalf of its principal] is generally a question of fact."); *Royal Indus. Ltd. v. Kraft Foods, Inc.,* 926 F. Supp. 407, 411-14 (S.D.N.Y. 1996) (denying summary judgment because factual issues existed as to whether one corporate affiliate was acting as agent for another).

*Second*, Ross is wrong on the law. It has long been established that "an agent for a disclosed principal will not be personally bound *unless there is clear and explicit evidence* of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Salzman Sign Co. v. Beck,* 10 N.Y.2d 63, 66-67, 217 N.Y.S.2d 55, 57 (1961) (emphasis added) (internal citations omitted). Here, the only evidence that Ross has proffered is that: (a) BQHC signed the Affiliation Agreement in its name; and (b) the Agreement therefore refers to BQHC. *See* Motion, pp. 11-12. But where an agent (such as BQHC) has disclosed its relationship to its principal (here, Caritas) throughout the parties' negotiations, the agent's mere signing of a contract, without more, is not enough to establish an intent to be personally bound,

- 21 -

even where the agent's signature does not indicate that he is only signing in a representative capacity. *See, e.g., Leonard Holzer Assocs. v. Orta*, 250 A.D.2d 737, 737-38, 672 N.Y.S.2d 915, 916 (2d Dep't 1998) (reversing bench verdict in favor of plaintiff, finding that "[t]he fact that the agent signs the purported agreement in his own name is of no moment where the party alleging personal liability on the agent's part was aware that the agent was, in fact, acting as the agent for a disclosed principal"); *see also Ryan*, 107 F. Supp. 2d at 388 (finding individual agent's signature, without reference to his representative capacity, was not enough to show intent to be bound). Accordingly, Ross fails to overcome the presumption that has led New York courts to find an agent liable for its principal "only in rare cases." *Lerner v. Amalgamated Clothing and Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991). Ross's Motion should therefore be denied as to Defendants' Sixth Affirmative Defense, which should be addressed at trial.

### III.   Ross's Motion Should Be Denied Because Factual Issues Exist As To Damages

In its Motion, Ross makes two arguments as to why it is entitled to partial summary judgment setting the amount of damages that it may recover if successful at trial. First, Ross argues that if the Court grants Ross's separate Motion to Preclude Defendants' expert witness Anthony Duffy, then the report of Ross's expert, Elizabeth Davis, "will not be genuinely disputed" and therefore, Ross claims, it is entitled to summary judgment based on the damages set forth in the Davis Report. Motion, p. 7. Second, Ross argues in the alternative that if the Court denies its Motion to Preclude, then the Court should still enter summary judgment in Ross's favor holding that damages are at a minimum the amount "calculated" by Defendants' expert because, according to Ross, both experts allegedly agree on a minimum amount of Ross's damages. Motion, pp. 7-8. Because Ross's arguments ignore the facts and the law, its Motion as to damages should be denied.

A.     <u>The damages calculated by Ross's expert are in dispute</u>

As a preliminary matter, for the reasons explained in detail in defendants' opposition papers on that motion, Ross's Motion to Preclude is without merit.  *See generally* Def'ts' Expert Opp.  In particular, Ross's Motion to Preclude is both premature and based on the faulty premise that Mr. Duffy is not sufficiently qualified to critique Ms. Davis's valuation methodology, even though Ross does not contest that Mr. Duffy is a Certified Public Accountant whose area of expertise is valuation.  *Id.* at pp. 4-10; *see also* Duffy Report, Appendix A.  Given these facts, there can be little doubt that Mr. Duffy is qualified to offer an expert opinion regarding Ms.. Davis's valuation methodology.

Nevertheless, even if this Court were to grant Ross's Motion to Preclude, Ross's summary judgment motion as to damages would still fail because an expert's conclusions are not deemed undisputed simply because the opposing party does not proffer a rebuttal expert.  *See Giles v. Rhodes*, 171 F. Supp. 2d 220, 226 (S.D.N.Y. 2001) (holding that it is well established that a fact finder "can refuse to credit an expert's opinion, even if another expert was not called to rebut it").  Therefore, Ross's argument that its own expert's conclusions "will not be genuinely disputed" if it wins its Motion to Preclude is simply wrong, as Ross mistakenly conflates the admissibility of Ms. Davis's opinions with the unassailability of her conclusions. Motion, p. 7.  Even if the Motion to Preclude were granted (which it should not be), Ms. Davis's methods, conclusions, and assumptions can and will be the subject of intense scrutiny and cross-examination at trial.

To take but one example, in calculating her Clerkship Cost Growth Rate – the estimate of the rate at which Ross's clerkship costs will rise between 2011 and 2018 – Ms. Davis admits that she:  (i) relied on data taken exclusively from Ross's historical payment records and did not incorporate contract rates paid by any other medical schools, *see* Davis Tr., p. 66:13-20; (ii)

failed to account for the fact that Ross's Clerkship Cost Growth Rate has been decreasing over time, *see id.* at p. 80:16-25; and (iii) failed to distinguish between those contracts that, like the Affiliation Agreement, involved multi-year terms and/or prepayment financial structures, and those that did not. *See* Davis Tr., pp. 70:21-71:1, 81:21-82:4.

Although, standing alone, these defects do not render Ms. Davis's testimony inadmissible, they certainly cast doubt on the reliability of her methods and subsequent calculations, and at the very least raise factual issues that preclude summary judgment in Ross's favor as to its alleged damages. *See, e.g., Ramos v. SimplexGrinnell LP*, 2011 U.S. Dist LEXIS 65593, at *79 (E.D.N.Y. June 21, 2011) (denying plaintiff's motion for summary judgment on damages because "defendant has raised material questions of fact about the accuracy of [plaintiff's expert's] calculations"); *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Trust*, 2010 WL 2735701, at *7 (N.D.N.Y. July 9, 2010) (finding "issues of fact exist that preclude granting summary judgment with respect to damages" because the method used by the opposing expert to calculate damages was challenged).

Similarly, the many questionable assumptions underlying Ms. Davis's damages calculations highlight the speculative nature of her conclusions and further preclude summary judgment. For example:

1.    Ms. Davis calculates Ross's costs for replacing clinical clerkships through the year 2018, and thus assumes that the parties will opt to renew the Affiliation Agreement throughout its term, even though there is no factual support for this assumption. *See* Davis Report, p. 13.

2.    Ms. Davis further assumes that for every year through 2018, Ross will fully utilize all of the clerkship slots that would have been available to it under the Affiliation Agreement. *See id.*

3.    Ms. Davis also assumes that Ross will not take any steps to mitigate its damages, despite acknowledging numerous means by which Ross could offset increased costs for obtaining clerkships, including raising tuition. *See* Davis Tr., pp. 85:9-87:12.

- 24 -

4.   Ms. Davis calculates the Clerkship Cost Growth Rate through 2018 based on Ross's historical data, but fails to acknowledge that a variety of legislative, political, or economic factors may dramatically alter the marketplace for medical school clerkships over the next seven years, including, among others, policy recommendations currently before New York's Department of Health. *See generally* Davis Report; *see, e.g.,* Roeber Opp. Dec., Exh. 21 (November 29, 2011 press report discussing potentially "*sharp change* for hospitals in Brooklyn") (emphasis added).

These and other assumptions render Ms. Davis's opinions unduly speculative to support a claim for summary judgment. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F. 3d 18, 21-23 (2d Cir. 1996) (holding that lower court erred in admitting "speculative" expert testimony based on unfounded assumptions regarding party's future earning capacity).

Finally, as discussed in Part II.A, Ms. Davis's conclusions regarding the outstanding prepayment balance are disputed because no prepayments were ever made to Defendants (Wyckoff or BQHC); rather, Ross made its prepayments exclusively to Caritas. *See supra*, pp. 19-20; Def'ts' 56.1 Response, pp. 14-15.

In light of these facts, Ms. Davis's conclusions can hardly be considered "undisputed" as Ross contends. Motion, p. 7. Regardless of the disposition of Ross's Motion to Preclude, then, factual issues surround the accuracy of the Revised Davis Report. Ross's Motion for summary judgment thus puts the cart before the horse – its attempt to set a minimum amount of damages based solely on Ms. Davis's unsubstantiated opinions is improper and should be denied.

B.   Contrary to Ross's claims, the parties' experts do not agree on a minimum amount of Ross's damages

In the event its Motion to Preclude is denied, Ross argues that it is still entitled to summary judgment setting damages to be at a "minimum the amount calculated by [D]efendants' expert." Motion, p. 7. Ross's theory is that Defendants' expert, Mr. Duffy, "adopted without change" Ms. Davis's opinions as to the first two components of Ross's alleged damages, and the question at trial should therefore be limited to the third component of alleged damages on which

- 25 -

the two experts' conclusions differ, namely the Clerkship Cost Growth Rate and Ross's resulting

cost of replacing clinical clerkships through 2018. *Id.* at pp. 7-8. Ross's argument in the

alternative rests on a faulty factual premise, however, because Mr. Duffy explicitly did *not* adopt

*any* of Ms. Davis's conclusions, including those relating to the first two components of Ross's

alleged damages.

Indeed, both in his report and at his deposition, Mr. Duffy was crystal clear on this point:

> Q.  Do you agree with her conclusion . . . [a]s to the calculation of
> the outstanding pre-payment balance as of June 30, 2011?
>
> A.  I don't know if I agree with it.  I haven't really done enough
> work to disagree or agree with it.
>
> * * *
>
> Q.  Did you do any work in connection with calculating the
> incremental replacement costs through June 30, 2011?
>
> A.  Just [a] very cursory basis.
>
> Q.  You looked at it, but didn't work on it?
>
> A.  Correct. ...
>
> *Q.  And so are we in the same place where you don't agree or
> disagree with her conclusions?*
>
> *A.  Correct.*

*See* Duffy Tr., pp. 44:19-46:8 (emphasis added); *see also* Duffy Report, pp. 2-3 (noting with

respect to each of the first two components of Ross's alleged damages that "I have not assessed

the reasonableness of this computation" by Ms. Davis).  The record is thus clear that the parties'

experts do not agree on any minimum amount of Ross's damages, as Ross's contention that Mr.

Duffy "adopted [Ms. Davis' conclusions] without change" simply has no basis in fact.  Motion,

p. 7.  Ross's Motion therefore fails to the extent it is premised on this mischaracterization of Mr.

Duffy's opinion.

## CONCLUSION

Triable issues of fact exist as to:  (1) BQHC's liability under the Affiliation Agreement; (2) the viability of Defendants' Fourth, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses; and (3) the amount of damages to which Ross may be entitled if it succeeds at trial.   Ross's Motion should therefore be denied and the Court should award Defendants such other and further relief as the Court deems just and proper.

Dated:  New York, New York
      January 10, 2012

                                    Respectfully submitted,

                                      K&L GATES LLP

                                      By: _____

                                        Walter P. Loughlin
                                        (Walter.Loughlin@klgates.com)
                                        Brian D. Koosed
                                        (Brian.Koosed@klgates.com)
                                        Justin H. Roeber
                                        (Justin.Roeber@klgates.com)

                                        599 Lexington Avenue
                                        New York, New York 10022
                                        Telephone:  (212) 536-3900
                                        Facsimile:  (212) 536-3901

                                        *Attorneys for Defendants Brooklyn-Queens Health Care, Inc. and Wyckoff Heights Medical Center*

- 27 -