UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
::
ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,:
:
Plaintiff,:
:
- against - : 09 Civ. 1410 (KAM) (RLM)
:
BROOKLYN-QUEENS HEALTH CARE, INC. and :
WYCKOFF HEIGHTS MEDICAL CENTER,:
:
Defendants.:
:
------------------------------------------------------------------X

### DEFENDANTS' RESPONSE TO PLAINTIFF'S
### LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center ("Wyckoff") (together, "Defendants") respectfully submit this Response to the Local Rule 56.1 Statement of Material Facts that Plaintiff Ross University School of Medicine, Ltd. ("Ross") submitted in support of its Motion for Partial Summary Judgment, dated December 2, 2011. Defendants respond to Ross's Local Rule 56.1 Statement (the "Ross 56.1 Statement") as follows:

### General Response I

Defendants object generally to Ross's use of the terms "the Hospitals," "Wyckoff," "Caritas," and/or "BQHC" to the extent that those terms have not been defined in the Ross 56.1 Statement and are therefore ambiguous, vague, and potentially misleading. For purposes of this Response, Defendants assume that: (1) "the Hospitals" shall have the meaning ascribed to that term in the Memorandum of Law, dated December 2, 2011, that Ross submitted in support of its motion for Partial Summary Judgment (the "Ross Mem."), namely St. John's Queens Hospital

and Mary Immaculate Hospital; (2) "BQHC" means Brooklyn-Queens Health Care, Inc.; (3) "Wyckoff" means Wyckoff Heights Medical Center; and (4) "Caritas" means Caritas Health Care, Inc. (formerly known as Caritas Healthcare Planning, Inc.). To the extent that Ross implied or intended for the terms "Hospitals," "BQHC," "Wyckoff," and/or "Caritas" to have any other meaning, Defendants object to Ross's characterization.

### Specific Responses

Ross 56.1 Statement, ¶ 1: BQHC is a New York not-for-profit corporation and is the sole member of Wyckoff and Caritas, which held the Hospitals. App. A, Second Am. Compl. & Answer ¶ 3; App. B at ROSS0056.

**Defendants' Response:** Undisputed, subject to the clarification that Caritas alone held the Hospitals; Wyckoff did not do so. *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Partial Summary Judgment, dated December 2, 2011 ("Def'ts' 56.1 Statement"), ¶¶ 31-33 (citing Declaration of David N. Hoffman, Esq. in Support of Defendants' Motion for Partial Summary Judgment, sworn to on November 30, 2011 ("Hoffman Dec."), Exh. 5 (Caritas operating certificate)); *id.* at ¶ 10; *see also* Declaration of Justin H. Roeber, Esq., in Support of Defendants' Motion for Partial Summary Judgment, dated December 2, 2011 ("Roeber Orig. Dec."), Exh. 5, at BQHC 00630-631; *id.* at Exh. 17, at BQHC 00512; *id.* at Exh. 16, at BQHC 00535; *id.* at Exh. 3 (Deposition Transcript of David N. Hoffman, Esq.) ("Hoffman Tr."), pp. 19:22-24, 49:9-24.

Ross 56.1 Statement, ¶ 2: The Affiliation Agreement Between Ross University School of Medicine, School of Veterinary Medicine, Limited, Portsmouth, Dominica and Brooklyn Queens Health Care, Inc. (the "Initial Affiliation Agreement") is attached hereto as Appendix B. App. B; App. C, Deposition of H. McDonald, at pp. 20:3-21:6.

**Defendants' Response:** Undisputed.

<u>Ross 56.1 Statement, ¶ 3</u>:   The Initial Affiliation Agreement was executed on December 28, 2006.  App. B at ROSS0066.

**Defendants' Response:**   Undisputed.

<u>Ross 56.1 Statement, ¶ 4</u>:   The first amendment to the Initial Affiliation Agreement (the "First Amendment") is attached hereto as Appendix D.  App. D; App. E, Deposition of J. Romero, at pp. 39:24-40:19.

**Defendants' Response:**   Disputed to the extent that Ross characterizes the cited document, Bates-labeled Ross 0052-0055, as a valid amendment to the Affiliation Agreement executed on December 28, 2006 by Ross and BQHC (the "Affiliation Agreement").

On August 13, 2007, BQHC, Caritas, and Wyckoff entered into an Administrative Services Agreement ("ASA") with FTI Cambio, LLC, a healthcare restructuring firm ("FTI"). *See* Declaration of Justin H. Roeber, Esq., dated January 10, 2012 and submitted herewith ("Roeber Opp. Dec."), Exh. 1.  Among other things, the ASA provided that:

- FTI's Thomas Singleton would be appointed Chief Restructuring Officer ("CRO") of BQHC for a limited "Term" running from July 19, 2007 through July 31, 2008, *see id.* at BQHC 00491, 00504;

- FTI's Paul Goldberg would be appointed Chief Financial Officer ("CFO") of BQHC for the same "Term," *see id.*;

- Wyckoff and Caritas, through their respective Boards of Trustees, would continue to "exercise . . . *ultimate authority, supervision, direction, and control over the[ir] business, policies, operation, personnel, and assets,*" *see id.* at 00489 (emphasis added); and

- FTI would at all times act "as an independent contractor" and would not have "*any express or implied authority to assume or create any obligation or responsibility* on behalf of or in the name of" BQHC, Wyckoff, or Caritas. *Id.* at 00490 (emphasis added).

Consistent with these restrictions on FTI's powers, the ASA specifically provided that FTI's representatives had *no* authority to:

- 3 -

- Take "responsibility for the day-to-day operations" of Wyckoff or Caritas, *see* Roeber Opp. Dec., Exh. 1, at BQHC 00490;

- "[H]ire or fire any [Wyckoff or Caritas] employee without the approval of the [Wyckoff or Caritas] Board[s]," *see id.*;

- ***"[I]ncur any liability on behalf of"*** Wyckoff or Caritas, *see id.* (emphasis added);

- "Enter into or terminate contracts with" physicians or outside consultants "on behalf of" Wyckoff or Caritas, *see id.* at BQHC 00495-496; and/or

- "Manage any of the clinical operations of" Wyckoff or Caritas. *Id.* at BQHC 00496.

The document Bates-labeled Ross 0052-0055 was executed by or at the direction of FTI personnel. S*ee* Roeber Orig. Dec., Exh. 23 (Deposition Transcript of Julius Romero) ("Romero Tr."), pp. 41:10-42:12, 111:9-112:14, 141:11-23 (testifying that FTI's CRO, Mr. Singleton, was the "decision maker . . . on deal points" in the negotiations between BQHC and Ross over possible amendments to the Affiliation Agreement, was the person "who was responsible for the substance of the negotiation . . . on the [BQHC] side," and was the one who directed Mr. Romero to sign the document Bates-labeled Ross 0052-0055). Defendants dispute that the document Bates-labeled Ross 0052-0055 was a valid amendment to the Affiliation Agreement because the ASA did not authorize the CRO or the CFO to incur any liabilities on behalf of BQHC, Wyckoff, or Caritas, to enter into any contracts on behalf of those entities, or to negotiate, sign, or otherwise modify Wyckoff's or Caritas's clinical clerkship agreements with medical schools. *See* Roeber Opp. Dec., Exh. 1, at BQHC 00492-00494 (defining the CRO's and CFO's duties).

Ross 56.1 Statement, ¶ 5:   The first amendment was executed on December 5, 2007. App. D at ROSS0055.

**Defendants' Response:** Disputed for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 4, above. Defendants do not dispute that the document Bates-labeled Ross 0052-0055 was executed on December 5, 2007.

Ross 56.1 Statement, ¶ 6: The second amendment to the Initial Affiliation Agreement and accompanying side letter agreement (collectively, the "second amendment") is attached hereto as Appendix F. App. F; App. G, Deposition of T. Singleton, at pp. 11:10-13:3.

**Defendants' Response:** Disputed, for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 4, above, to the extent that Ross characterizes the cited documents – Bates-labeled BQHC 42911–42915 and BQHC 42916–42917 – as valid amendments to the Affiliation Agreement. *See* Defendants' Response to Ross 56.1 Statement, ¶ 4, above (citing Roeber Opp. Dec., Exh. 1, at BQHC 00489-00511; Romero Tr., pp. 41:10-42:12, 111:9-112:14, 141:11-23).

Defendants further dispute any characterization of the two cited documents – Bates-labeled BQHC 42911–42915 and BQHC 42916–42917 -- as constituting a single document.

Ross 56.1 Statement, ¶ 7: The second amendment was executed on February 28, 2008. App. G at BQHC 42915, 42917.

**Defendants' Response:** Disputed for the reasons expressed in Defendants' Responses to Ross 56.1 Statement, ¶¶ 4 & 6, above. *See* Roeber Opp. Dec., Exh. 1, at BQHC 00489-00511; Romero Tr., pp. 41:10-42:12, 111:9-112:14, 141:11-23. Defendants do not dispute that the two documents Bates-labeled BQHC 42911–42915 and BQHC 42916–42917 were executed on February 28, 2008.

Ross 56.1 Statement, ¶ 8: The Hospitals filed for bankruptcy in February 2009 and have ceased to operate. App. A, Second Am. Comp & Answer ¶¶ 46, 47.

**Defendants' Response:** Disputed. Assuming that "the Hospitals" refers to St. John's Queens and Mary Immaculate (*see* Defendants' General Response I, *supra*), Defendants dispute Ross 56.1 Statement, ¶ 8 because neither Hospital filed for bankruptcy in February 2009. Rather, Caritas – the company that owned and operated the Hospitals – filed for bankruptcy at that time. *See* Def'ts' 56.1 Statement, ¶ 63 (citing *In re Caritas Healthcare, Inc., et al.*, Jt. Admin. Ch. 11 Case No. 09-40901 (Bankr. E.D.N.Y. Feb. 6, 2009)); Roeber Orig. Dec., Exh. 53 (Deposition Transcript of John Kastanis), pp. 17:11-21:21; *see also* Hoffman Tr., pp. 110:19-111:10. Defendants do not dispute that St. John's Queens and Mary Immaculate ceased to operate as a result of Caritas's bankruptcy filing.

Ross 56.1 Statement, ¶ 9: Wyckoff and its clinics provide clinical clerkships. App. E, Deposition of J. Romero, at p. 108:3-20.

**Defendants' Response:** Disputed to the extent that "its clinics" is vague, ambiguous, and potentially misleading. Wyckoff operates several clinics. *See* Hoffman Dec., Exh. 2 (Wyckoff's operating certificate from the New York Department of Health, which permits Wyckoff to operate the following facilities in addition to Wyckoff Heights Medical Center: (1) Family Health Center, in Brooklyn, New York; (2) Family Health Center Bushwick High School, in Brooklyn, New York; (3) Queensbridge Family Health Center, in Long Island City, New York; (4) Women's Health Center Extension Clinic, in Brooklyn, New York; and (5) Wyckoff Heights Medical Center Extension Clinic, in Brooklyn, New York). Defendants do not dispute that Wyckoff Heights Medical Center and/or the clinics identified in Wyckoff's operating certificate from New York's Department of Health provide clinical clerkships. *See id.*

<u>Ross 56.1 Statement, ¶ 10:</u>    Defendants have refused to provide to Ross clerkships to replace all of the clerkships lost as a result of the closure of the Hospitals. App. H, Deposition of R. Garg, at pp. 58:11-59:23.

**Defendants' Response:**    Disputed because Ross 56.1 Statement, ¶ 10 is vague, argumentative, and unduly prejudicial. Defendants further dispute Ross 56.1 Statement, ¶ 10 to the extent it suggests that *Wyckoff* is obligated to provide clerkships to Ross, because Wyckoff was not mentioned in the Affiliation Agreement and, throughout the process of negotiating that Agreement, Ross was advised that Wyckoff was not intended to be part of the Affiliation Agreement. *See* Def'ts' 56.1 Statement, ¶¶ 58, 59, 61. In particular, the documentary evidence reveals the following chain of events on December 28, 2006, the day the Affiliation Agreement was signed:

*December 28, 2006, 10:07 a.m.*: Julius Romero sent an e-mail to Ross rejecting Ross's proposed addition to the Affiliation Agreement of a "reference to [Ross's] existing Wyckoff Heights Medical Center agreement."[1] *See* Roeber Orig. Dec., Exh. 38, at Ross 015124.

*December 28, 2006, 11:20 a.m.*: One hour after sending his e-mail to Ross, Mr. Romero spoke by telephone with Virginia Smith, Esq. – in-house counsel for Ross's parent company, DeVry, Inc. *See* Roeber Orig. Dec., Exh. 51, at Ross 0838. During that call, Mr. Romero advised Ms. Smith that:

- *The Affiliation Agreement "should (will) not have any references to Wyckoff Heights Medical Center"*;
- "A finalized agreement between Ross and Caritas will be signed after the abovementioned reference [to Wyckoff] is deleted"; and

---

[1] Since 1997, Ross and Wyckoff have had a separate agreement for clinical clerkships at Wyckoff, which remains in place today. *See* Def'ts' 56.1 Statement, ¶ 60.

- "The Ross-Wyckoff agreement is *separate from* the Ross-Caritas agreement."

Roeber Orig. Dec., Exh. 51, at Ross 08387-88 (e-mail summarizing the parties' December 28, 2006 "telephone conversation") (emphasis added). Ms. Smith confirmed Mr. Romero's understanding of their December 28, 2006 conference call in a subsequent e-mail. *Id.*

*December 28, 2006, 12:17 p.m.*: Less than an hour after concluding their conference call, Ms. Smith sent Mr. Romero a revised draft of the Affiliation Agreement "[i]n accordance with our conversation earlier this morning." *See* Roeber Orig. Dec., Exh. 39, at Ross 015104. That draft of the Affiliation Agreement *removed* all references to Wyckoff. *Id.*

Further, Defendants dispute Ross 56.1 Statement, ¶ 10 to the extent it implies, as Ross argues in its Memorandum of Law, that "Wyckoff . . . is the only other subsidiary of BQHC that can provide replacement clinical clerkships." Ross Mem., p. 1. Ross provides no factual support for this assertion and it is contradicted by the evidence set forth above.

BQHC could have acquired additional medical facilities at any time after the Affiliation Agreement went into effect. For example, throughout much of 2008, BQHC and Caritas engaged in negotiations for possible acquisitions, affiliations, or strategic partnerships with at least four different hospitals or healthcare systems: (i) North Shore-Long Island Jewish; (ii) Mount Sinai; (iii) MediSys; and (iv) Parkway. *See* Roeber Opp. Dec., Exh. 2, at BQHC 00204 (minutes from the April 3, 2008 meeting of BQHC's Board of Trustees) & Exh. 3, at BQHC 51948 (minutes from the October 30, 2008 meeting of Caritas's Board). Indeed, by June 2008, MediSys, a three-hospital system, had "submitted a proposal to merge" its health system with: (a) "the BQHC System," consisting of Caritas's Hospitals and Wyckoff; and (b) Parkway. *See* Roeber Opp. Dec., Exh. 4, at BQHC 00135 (minutes from the June 5, 2008 meeting of Wyckoff's Board of Trustees). Defendants therefore dispute Ross 56.1 Statement, ¶ 10 to the

extent that it implies that *Wyckoff* is obligated to provide Ross with the clerkships that Ross lost when the Caritas Hospitals closed.

Finally, Defendants dispute Ross 56.1 Statement, ¶ 10 to the extent that it wrongly ascribes motive to Wyckoff's practical inability to provide Ross with the number of clerkships that it demands. It is not feasible for Wyckoff to replace all of the 135 clinical clerkships per week that Ross lost when the Caritas Hospitals closed because Wyckoff's capacity to provide clinical clerkships is currently fully utilized by Ross and other medical schools. *See* Appendix F to Ross's 56.1 Statement, at BQHC 42913-42914; *see also* Defendants' Response to Ross 56.1 Statement, ¶ 8, above; Def'ts' 56.1 Statement, ¶ 68 (citing Romero Tr., pp. 153:8-156:13 & Roeber Orig. Dec., Exh. 56 (Wyckoff's Responses and Objections to Plaintiff's Second Set of Interrogatories, dated May 24, 2011, at Interrogatories 1(a), 2)). Wyckoff's ability to provide clinical clerkships beyond that capacity is constrained by practical considerations such as: (a) the number of teaching faculty and patients that it can accommodate at any given time; and (b) Wyckoff's policy, guided by regulatory recommendations, of limiting its clinical clerkships to a ratio of between four and eight medical students to each teaching physician. *See* Def'ts' 56.1 Statement, ¶ 68 (citing Romero Tr., pp. 153:22-154:6, 155:2-156:13).

<u>Ross 56.1 Statement, ¶ 11</u>: The report of Ross' damages expert, Elizabeth K. Davis, is attached hereto as Appendix I. App. I; App. J, Dep. of E. Davis, at pp. 14:14-15:3.

**Defendants' Response:** Undisputed, subject to Defendants' clarification that the report attached as Appendix I to Ross's 56.1 Statement is Ms. Davis's *revised* expert report. Ross served Ms. Davis's original report, titled "Expert Report of Elizabeth Kroger Davis," on August 31, 2011. *See* Roeber Opp. Dec., Exh. 5. Nearly two months later, Ross served a revised report, titled "Revised Expert Report of Elizabeth Kroger Davis," which corrected a "data entry

- 9 -

error" in Ms. Davis's original report that had led Ms. Davis to overestimate Ross's alleged damages by more than $1.5 million. *See* Roeber Opp. Dec., Exh. 6 (October 26, 2011 letter from Ross's counsel to Defendants' counsel describing this "error"). Defendants do not dispute that the "Revised Expert Report of Elizabeth Kroger Davis" is attached as Appendix I to Ross's 56.1 Statement.

Ross 56.1 Statement, ¶ 12:   Ross' damages expert calculated Ross' damages in three components:   (1) the Outstanding Pre-payment Balance that remains unearned; (2) the Incremental Costs on Replacement Clerkships Through June 30, 2011; and (3) the Present Value of Future Replacement Costs From July 1, 2011 Through January 31, 2018. App. I, Ex. A.

**Defendants' Response:**     Undisputed.

Ross 56.1 Statement, ¶ 13:   The report of Anthony G. Duffy, whom defendants have tendered as a damages expert, is attached hereto as Appendix K. App. K; App. L, Deposition of A. Duffy, at p. 7:22-24.

**Defendants' Response:**     Disputed to the extent that Ross 56.1 Statement, ¶ 13 characterizes Mr. Duffy as a "damages expert," because Defendants retained Mr. Duffy as a rebuttal expert. *See, e.g.*, Appendix K to Ross's 56.1 Statement (noting that Mr. Duffy's report is entitled "***Rebuttal*** Expert Report") (emphasis added); Roeber Opp. Dec., Exh. 7 (Defendants' September 26, 2011 letter to Magistrate Judge Roanne Mann regarding Defendants' "expert rebuttal report to the plaintiff's expert report on damages"). Mr. Duffy stated, both in his expert report and at his deposition, that his engagement extended solely to opining on the valuation methodology that Ross's expert, Ms. Davis, used to calculate the third category of Ross's alleged damages, i.e., Ross's damages from July 1, 2011 through 2018. *See* Appendix K to Ross's 56.1 Statement, pp. 2-3 (stating that "the focus of [his] engagement" was to "calculate[] the present

value of the future incremental costs . . . that would arguably be incurred by Ross"); *see also* Roeber Opp. Dec., Exh. 8 (Deposition Transcript of Anthony G. Duffy ("Duffy Tr.")), pp. 16:10-17:14, 42:12-19 (testifying that Mr. Duffy "was asked to investigate alternative approaches to valuing the damage claim associated with the damages resulting of an alleged breach from July 2011 out through the middle of 2018" and nothing else).

Ross 56.1 Statement, ¶ 14: Defendants' damages expert calculated damages using the same three categories as Ross' expert. App. K, Ex. A.

**Defendants' Response:** Disputed for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 13, above. Defendants further dispute that Mr. Duffy made any calculations with regard to Ms. Davis's first two categories of Ross's purported damages, or that Mr. Duffy adopted Ms. Davis's conclusions as to those categories of alleged damages. *See* Appendix K to Ross's 56.1 Statement, p. 2 (Mr. Duffy's expert report, stating that "[b]ased on the scope of the engagement, I have not assessed the reasonableness of" Ms. Davis's calculation of the first category of Ross's alleged damages); *see id.* at p. 3 (same statement for Ms. Davis's calculation of the second category of Ross's alleged damages). Mr. Duffy further testified at his deposition that he "did not assess the reasonableness" of either the first or the second category of Ms. Davis's calculations of Ross's alleged damages:

> Q. Do you agree with her conclusion . . . [a]s to the calculation of the outstanding pre-payment balance as of June 30, 2011?
> A. *I don't know if I agree with it.* I haven't really done enough work to disagree or agree with it.
> * * *
> Q. Did you do any work in connection with calculating the incremental replacement costs through June 30, 2011?
> A. Just [a] very cursory basis.
> Q. You looked at it, but didn't work on it?
> A. Correct. . . .

- 11 -

> Q. *And so are we in the same place where you don't agree or disagree with her conclusions?*
>
> A. *Correct.*

Duffy Tr., pp. 43:11–46:19. Defendants therefore dispute Ross 56.1 Statement, ¶ 14.

Ross 56.1 Statement, ¶ 15: Both parties' experts calculated the Outstanding Pre-payment Balance to be $6,277,266. App. I, Ex. A; App. K, Ex. A.

**Defendants' Response:** Disputed for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 14, above. Mr. Duffy made no such calculation, nor did he evaluate or adopt Ms. Davis's calculation of this first component of Ross's alleged damages. *See* Appendix K to Ross's 56.1 Statement, p. 2 ("Based on the scope of the engagement, I have not assessed the reasonableness of this computation . . . ."); Duffy Tr., pp. 43:11–46:19. Defendants do not dispute that Ross's expert, Ms. Davis, calculated the Balance Of Unearned Prepayment Funds Advanced By Ross (which Ross refers to in its Memorandum of Law as the "Outstanding Pre-payment Balance") to be $6,277,266. *See* Appendix I to Ross's 56.1 Statement, p. 7.

Ross 56.1 Statement, ¶ 16: Both side's experts calculated the Incremental Costs on Replacement Clerkships through June 30, 2011 to be $1,073,501. App. I, Ex. A; App. K, Ex. A.

**Defendants' Response:** Disputed for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 14, above. Mr. Duffy made no such calculation, nor did he evaluate or adopt Ms. Davis's calculation of this second component of Ross's alleged damages. *See* Appendix K to Ross's 56.1 Statement, p. 3 ("Based on the scope of this engagement, I have not assessed the reasonableness of this computation . . . ."); Duffy Tr., pp. 43:11–46:19. Defendants do not dispute that Ross's expert, Ms. Davis, calculated the Incremental Costs Incurred By Ross To Replace Clerkships Through June 30, 2011 to be $1,073,501. *See* Appendix I to Ross's 56.1 Statement, p. 9.

<u>Ross 56.1 Statement, ¶ 17:</u>   Ross' expert calculated the Present Value of Future Replacement Costs From July 1, 2011 Through January 31, 2018 to be $12,738,735. App. I, Ex. A.

**Defendants' Response:**   Undisputed, subject to Defendants' Response to Ross 56.1 Statement, ¶ 11, above. In Ms. Davis's original report, Ms. Davis calculated this portion of Ross's alleged damages to be $14,319,208. *See* Roeber Opp. Dec., Exh. 5, p. 12. Defendants do not dispute that, after serving a revised report that corrected a "data entry error," Ms. Davis calculated this portion of Ross's damages to be $12,738,735. *See* Appendix I to Ross's 56.1 Statement.

<u>Ross 56.1 Statement, ¶ 18:</u>   Defendants' expert calculated the Present Value of Future Replacement Costs From July 1, 2011 Through January 31, 2018 to be $5,525,367. App. K, Ex. A.

**Defendants' Response:**   Disputed for the reasons expressed in Defendants' Response to Ross 56.1 Statement, ¶ 13, above. Mr. Duffy critiqued the valuation techniques employed by Ms. Davis to calculate this third category of Ross's alleged damages. *See* Appendix K to Ross's 56.1 Statement, pp. 2-3; Duffy Tr., pp. 42:12-19. Defendants do not dispute that Mr. Duffy concluded that Ms. Davis overestimated Ross's cost for replacing the Caritas clerkships allegedly promised under the Affiliation Agreement by $7,213,368. *See* Appendix K to Ross's 56.1 Statement, Ex. A.

## Defendants' Additional Material And Disputed Facts

In its 56.1 Statement, Ross does not proffer any evidence regarding payments that it may have made under the Affiliation Agreement. *See generally* Ross 56.1 Statement. Instead, Ross simply assumes in its Memorandum of Law that it made payments to Defendants pursuant to the Affiliation Agreement. *See* Ross Mem., pp. 9-11. Defendants dispute this assumption based on the following evidence of Ross's payments under the Affiliation Agreement:

1. On December 28, 2006, Ross sent a wire transfer of $5,000,000 to a J.P. Morgan Chase bank account held exclusively by Caritas. *See* Roeber Opp. Dec., Exh. 10, at BQHC 07619 (Caritas document reporting receipt of $5 million from Ross on December 28, 2006); *see also id.* at Exh. 11, at Ross 008528 (December 22, 2006 e-mail to Ross with instructions to wire the $5 million prepayment, with specific account information for Caritas's account at J.P. Morgan Chase); *id.* at Exh. 12, at Ross 0538 (Ross bank statement showing December 28, 2006 transfer of $5 million to Caritas); *id.* at Exh. 13, at Ross 0539 (Ross financial record reflecting December 28, 2006 transfer of $5 million to J.P. Morgan bank account held by Caritas).

2. On December 5, 2007, Ross sent a wire transfer of $3,776,455 to a J.P. Morgan Chase bank account held exclusively by Caritas. *See* Roeber Opp. Dec., Exh. 14, at Ross 0548-0549 (Ross bank records showing December 5, 2007 transfer of $3,776,455 to Caritas); *see also id.* at Exh. 15, at BQHC 03883 (minutes from the December 20, 2007 meeting of Wyckoff's Board of Trustees noting that Caritas received $3.7 million from Ross); *id.* at Exh. 16, at Ross 002210 (November 30, 2007 email to Ross with instructions to wire one payment to Caritas and a separate payment to Wyckoff, pursuant to Ross's separate agreements for clerkships at Caritas and Wyckoff).

3. On February 28, 2008, Ross sent a wire transfer of $3,000,000 to a J.P. Morgan Chase bank account held exclusively by Caritas. *See* Roeber Opp. Dec., Exh. 17, at Ross 0551-0552 (Ross bank records showing February 28, 2008 transfer of $3 million to J.P. Morgan Chase account held by Caritas); *see also id.* at Exh. 18, at Ross 0553-0554 (Ross emails with instructions to complete the February 28, 2008 wire transfer).

4. On April 1, 2008, Ross sent a wire transfer of $1,000,000 to a J.P. Morgan Chase bank account held exclusively by Caritas. *See* Roeber Opp. Dec., Exh. 19, at Ross 0557-0558 (Ross bank records showing April 1, 2008 transfer of $1 million to J.P. Morgan Chase account held by Caritas); *see also id.* at Exh. 20, at Ross 0559 (Ross emails with instructions to complete the April 1, 2008 wire transfer).

Dated: New York, New York
       January 10, 2012

                Respectfully submitted,

                K&L GATES LLP

                By: _____
                Walter P. Loughlin
                (Walter.Loughlin@klgates.com)
                Brian D. Koosed
                (Brian.Koosed@klgates.com)
                Justin H. Roeber
                (Justin.Roeber@klgates.com)

                599 Lexington Avenue
                New York, New York 10022
                Telephone: (212) 536-3900
                Facsimile: (212) 536-3901

                *Attorneys for Defendants Brooklyn-Queens Health Care, Inc. and Wyckoff Heights Medical Center*