UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                        **Plaintiff,**

        -against-

BROOKLYN-QUEENS HEALTH
CARE, INC., et al.,

                        **Defendants.**
-------------------------------------------------------------x

                        **REPORT AND
RECOMMENDATION/
MEMORANDUM AND ORDER**

                        **09-CV-1410 (KAM)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

In this breach of contract action, plaintiff Ross University School of Medicine, Ltd.

("Ross") and defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights

Medical Center ("Wyckoff") (collectively, "defendants") have cross-moved for partial

summary judgment.  Specifically, Ross seeks summary judgment on its breach of contract

claim against BQHC, both as to liability and the amount of damages that Ross incurred as a

result of the alleged breach.  Ross also moves to dismiss several of defendants' affirmative

defenses.  As for defendants' motion for summary judgment, they seek to dismiss two limited

aspects of Ross's breach of contract claim -- namely, piercing the corporate veil and specific

performance.  Not to be outdone, Ross has filed two additional motions in connection with the

summary judgment cross-motions -- a motion to strike certain paragraphs contained in

defendants' Rule 56.1 Statement and a motion to preclude defendants' rebuttal damages expert.

On July 18, 2012, the Honorable Kiyo A. Matsumoto referred all pending motions in

this matter to the undersigned magistrate.  <u>See</u> Order (July 18, 2012).  For the reasons stated

below, this Court denies Ross's motions to strike and to preclude defendants' expert, and

recommends that Ross's and defendants' respective motions for partial summary judgment be

granted in part and denied in part.

**BACKGROUND**[1]

Ross, which operates a medical school in the Caribbean commonwealth of Dominca,

regularly contracts with hospitals around the United States to obtain clerkship positions for its

medical students.  See Defendants' Rule 56.1 Statement of Undisputed Facts in Support of

Partial Summary Judgment ("Def. 56.1") ¶¶ 36-37, Electronic Case Filing Docket Entry

("DE") #97-1.  The instant litigation arises out an alleged promise by defendants to guarantee

Ross a certain number of medical clerkship positions in exchange for, among other things,

Ross's up-front "prepayments" totaling approximately $13 million.  See generally Second

Amended Complaint ("SAC"), DE #24.

**I.      The Ross-BQHC Agreement**

In 2006, in the wake of the bankruptcy of New York-based St. Vincent's Catholic

Medical Centers ("St. Vincent's"), defendant Wyckoff entered into an agreement with St.

Vincent's to acquire two of its hospitals -- Mary Immaculate Hospital ("Mary Immaculate")

and St. John's Queens Hospital ("St. John's").  See Def. 56.1 ¶¶ 13-15, DE #97-1; Asset

Purchase Agreement (May 9, 2006), DE #97-7.  Wyckoff, which operates a hospital in

Brooklyn under the same name, ultimately decided that it did not want to directly own Mary

---

[1]  Unless otherwise noted, all facts set forth in this opinion are undisputed.

Immaculate and St. John's and it therefore made certain changes to its corporate structure.[2]
See Def. 56.1 ¶ 25, DE #97-1. First, Wyckoff created an affiliate called Caritas Health Care,
Inc. ("Caritas"),[3] which would directly acquire Mary Immaculate and St. John's (hereinafter
collectively referred to as the "Caritas Hospitals"). See Caritas Corporate Records,
DE #97-10. Second, Wyckoff renamed a pre-existing affiliate, WHMC Properties, as
defendant BQHC. See WHMC Properties Corporate Records, DE #97-13 at 10.[4] Finally,
Wyckoff made BQHC the sole parent of both Wyckoff and Caritas. See Def. 56.1 ¶ 24, DE
#97-1.

In August 2006, while Wyckoff was seeking regulatory approval of Caritas's
acquisition of the Caritas Hospitals, Wyckoff's Chief Executive Officer ("CEO"), Dominick
Gio ("Gio"), wrote to Ross (hereinafter, the "Gio Proposal Letter"). See Letter to Nancy
Perri (Aug. 21, 2006), DE #106-5. At that time, Ross had a clerkship agreement with

---

[2] The parties dispute the exact reason why Wyckoff made changes to its corporate structure.
See, e.g., Plaintiff's Response to Defendants' 56.1 Statement and Additional Facts ("Pl. Resp.
56.1") ¶¶ 19, 25, DE #102 at 8, 10-11. Defendants contend that the corporate structure was
adopted in order to "allow a non-Catholic institution to work with a Catholic one." See
Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment
("Def. SJ Mem.") at 1, DE #97-2.

[3] Caritas was originally incorporated under the name Caritas Health Care Planning, Inc. See
Caritas Corporate Records, DE #97-10.

[4] Where the citation to a docket entry ("DE #__") is followed by the notation "at [page
number]," the referenced page is the one that was electronically imprinted on the upper right
corner when the document was docketed into the ECF system. For certain documents (i.e.,
legal briefs and deposition transcripts), this opinion uses the original pagination, and those
page numbers precede the "DE" number.

Wyckoff with respect to Wyckoff's namesake hospital[5] and a separate agreement with St. Vincent's with respect to Mary Immaculate and St. John's. See Pl. Resp. 56.1 ¶ 2, DE #102 at 28; Def. 56.1 ¶ 37, DE #97-1. In the Gio Proposal Letter, Wyckoff's CEO informed Ross, among other things, that Wyckoff would be sponsoring the Caritas Hospitals and that there were plans to expand the number of clerkships at those facilities; he invited Ross to invest in additional prepaid clerkships. See Gio Proposal Letter at 1-2, DE #106-5.

In the months following the Gio Proposal Letter, negotiations with Ross over clerkship placements at the Caritas Hospitals continued. See Def. 56.1 ¶ 38, DE #97-1. Julius Romero, who was in charge of clerkships at Wyckoff and the Caritas Hospitals, was the point-person for these negotiations regarding the Caritas Hospitals.[6] See, e.g., Email from Julius Romero (Oct. 5, 2006) ("10/5/06 Romero Email"), DE #106-11; Email from Julius Romero (Oct. 24, 2006), DE #106-12; Email from Julius Romero (Oct. 31, 2006) ("10/31/06 Romero Email"), DE #106-14; see also Deposition Transcript of Julius Romero (July 1, 2010) ("Romero Tr.") at 114-15, DE #97-24.

On December 28, 2006, Ross and BQHC -- the parent entity of Caritas and Wyckoff --

_____

[5] Wyckoff's agreement with Ross, dated December 29, 1997, will hereinafter be referred to as the "Wyckoff-Ross Agreement." See Wyckoff-Ross Agreement, DE #106-2.

[6] Throughout the relevant time period, Romero represented himself as working on behalf of various entities. See Email from Julius Romero (Nov. 29, 2006) ("11/29/06 Romero Email"), DE #106-17 (signed on behalf of both Caritas and Wyckoff); Email from Julius Romero (Dec. 16, 2006) ("12/16/06 Romero Email"), DE #106-18 (signed on behalf of Caritas); Email from Julius Romero (Jan. 29, 2007) ("1/29/07 Romero Email") (signed on behalf of BQHC, Wyckoff and Caritas), DE #107-10; see also Supplemental Declaration of Julius Romero (Apr. 14, 2008) (filed in Southern District of Florida), DE #107-27 (averring that, as Assistant Vice President for Medical Education at BQHC, Romero oversees "the clinical clerkship programs at [the Caritas Hospitals] and at Wyckoff").

entered into a final agreement, in which Ross agreed to pay $5 million as a "prepayment" for a guaranteed number of medical clerkships at the Caritas Hospitals (the "Agreement"). See Affiliation Agreement between Ross and BQHC, DE #97-41. Under the Agreement, as clerkships were provided, the contractually agreed-upon rate would be credited against Ross's prepayment, until such time as the balance of Ross's prepayment was exhausted. Caritas, which directly owned the Caritas Hospitals, was not a party or signatory to the Agreement, although it is referred to in the Agreement as the BQHC subsidiary that "own[ed] and operate[d]" the Caritas Hospitals. See id., DE #97-41 at 2. BQHC's other subsidiary, Wyckoff, was not expressly mentioned in the Agreement. See generally Agreement. Critical to the dispute in this case, Exhibit B to the Agreement provided the following:

> In the event the [Caritas] Hospitals are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its facilities.

See id., DE #97-41 at 10 (hereinafter, the "Equivalent Clerkship Provision"). The term "facilities" was not defined in the Agreement.

## II.     Caritas's Financial Troubles and Subsequent Amendments to the Agreement

On December 28, 2006, in accordance with the Agreement, Ross deposited $5 million into a bank account specifically requested by Romero. See Email from Susan O'Leary (Dec. 28, 2006), DE #110-12 (listing fund beneficiary as Caritas Healthcare); Email from Julius Romero (Dec. 22, 2006) ("12/22/06 Romero Email"), DE #110-10. The bank account was in the name of Caritas, not BQHC. See id.; Ross JP MorganChase Bank Statement (Dec. 2006), DE #110-11. In the days following the Agreement's execution, Wyckoff's then-Chief

Financial Officer ("CFO") transferred more than $6 million from Caritas to Wyckoff.  See

Email from Dominick Gio (March 2, 2007), DE #97-51 at 3.  The parties dispute whether

these transfers were authorized.  Compare Def. 56.1 ¶ 57 (claiming that transfers from Caritas

were made "without authorization"), with Pl. Resp. 56.1 ¶ 57, DE #102.

Less than two months after Ross and BQHC executed the Agreement, a BQHC senior

vice president contacted the New York State Department of Health ("NYSDOH") concerning

"working capital shortfalls at Caritas" and notified the NYSDOH that "Caritas ha[d] 7 to 10

days of cash left and time [wa]s of the essence . . . ."  See Email from Edward Dowling (Feb.

8, 2007), DE #107-14 at 4.  The NYSDOH, in investigating whether to grant Caritas an

emergency loan, discovered that Wyckoff owed Caritas more than $6.7 million.  See Special

Board Meeting Minutes (Mar. 12, 2007), DE #107-16 at 4.  As a condition to loaning Caritas

money, the NYSDOH required that Caritas retain an outside consulting firm to oversee the

restructuring of BQHC, Caritas and Wyckoff.  See Deposition Transcript of Harold McDonald

(June 27, 2011) ("McDonald Tr.") at 87-89, DE #105-4.  To this end, defendants retained

FTI/Cambio, LLC ("FTI"), and, in July 2007, Thomas Singleton ("Singleton") of FTI was

named Chief Restructuring Officer of BQHC.  See id.; Deposition Transcript of David

Hoffman (June 1, 2011) at 94-95, DE #105-3.  In this position, Singleton was responsible for

overseeing the day-to-day management of BQHC, Caritas and Wyckoff.  See Memorandum

from Emil Rucigay (July 30, 2007), DE #106-29 (Singleton "has been charged with the

responsibility to assume full and overall management authority of BQHC, Wyckoff and Caritas

. . . ."); McDonald Tr. at 88, DE #105-4 (NYSDOH insisted that Singleton "be given control,

management control," of BQHC, Wyckoff and Caritas).

As a means of generating additional capital for Caritas during this period, Singleton, along with Gio and Romero, started to negotiate with Ross to expand its clerkship agreement with BQHC. See Wyckoff Board Meeting Minutes (Dec. 20, 2007) ("12/20/07 Minutes"), DE #107-18 at 5. Subsequently, on December 5, 2007, BQHC and Ross amended the Agreement, whereby Ross agreed to pay another $4 million in exchange for additional guaranteed clerkship placements at the Caritas Hospitals (the "First Amendment"). See Amendment to Affiliation Agreement (Dec. 5, 2007), DE #106-25. Romero and BQHC CFO Paul Goldberg signed the First Amendment on behalf of BQHC. See First Amendment, DE #106-25 at 5. A few weeks later, Singleton informed the Wyckoff Board of Trustees that the First Amendment had been entered into and that, pursuant to it, Ross had paid Caritas $3.7 million. See 12/20/07 Minutes, DE #107-18 at 5.[7]

A few months later, Ross and BQHC entered into a second amendment to the Agreement, pursuant to which Ross would make an additional payment of $4 million in exchange for further increasing the number of clerkships (the "Second Amendment"). See Second Amendment to Affiliation Agreement (Feb. 28, 2008), DE #106-26.[8] The Second Amendment was signed by Romero, as Assistant Vice President of Medical Education of BQHC, and Singleton, as CEO of BQHC. See Second Amendment, DE #106-26 at 6.

---

[7] Specifically, Ross paid $3,777,645, which represented the $4 million prepayment, minus $223,545 in interest due and payable under the original Agreement. See Email from Claire Mullally (Nov. 30, 2007) ("11/30/07 Mullally Email"), DE #110-15.

[8] Caritas, Wyckoff and BQHC were sued by American University of the Caribbean ("AUC"),which claimed that the additional clerkship positions sold to Ross had previously been contractually promised to AUC. See AUC Third Amended Complaint, DE #107-26; see generally infra p. 43.

According to the terms of the Second Amendment, and consistent with an accompanying letter agreement executed the same day,[9] in the event the Caritas Hospitals did not have the capacity to provide the increased number of clerkships guaranteed in the Second Amendment, then "BQHC shall deliver thirty five (35) core clerkship slots[10] at Wyckoff Heights Medical Center ('Wyckoff') to replace the remaining core clerkship slots the [Caritas] Hospitals are unable to deliver at such time" (hereinafter the "Capacity Provision"). <u>See</u> Second Amendment, DE #106-26 at 3. Thus, the Second Amendment's Capacity Provision applied where the Caritas Hospitals were operating but were unable to provide the requisite number of clerkships due to overcapacity. In contrast, the Agreement's Equivalent Clerkship Provision applied in the event the Caritas Hospitals were "not operative." <u>See</u> Agreement, DE #97-41 at 10. Tellingly, neither the First Amendment nor the Second Amendment modified or referenced the Equivalent Clerkship Provision contained in the original Agreement.

Ultimately, the funds paid by Ross pursuant to the First and Second Amendments were not sufficient to save Caritas. On February 6, 2009, Caritas filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York. <u>See</u> Def. 56.1 ¶ 63, DE #97-1. Thereafter, the Caritas Hospitals ceased operations. <u>See id.</u> ¶ 66. A number of Ross students who were slated to begin clerkships at the Caritas Hospitals were initially transferred to Wyckoff, <u>see</u> Email from John St. James (Mar. 5, 2009) ("3/5/09 St. James Email"),

---

[9] The letter, dated February 28, 2008, on BQHC/Caritas letterhead, was signed by Singleton as CEO of Wyckoff. <u>See</u> Letter to Ross (Feb. 28, 2008), DE #106-26 at 7-8.

[10] The Agreement stated that the Caritas Hospitals would provide "core" clerkships (compulsory courses) and "elective" clerkships. <u>See</u> Agreement, DE #97-41 at 8; SAC ¶ 20, DE #24.

DE #93-14 at 2, but Wyckoff eventually took the position that it was not obligated to provide the clerkships guaranteed under the Agreement.  See Confidential Memorandum from Patrick Unzicker (Oct. 7, 2009) ("10/7/09 Memorandum"), DE #97-55 at 2.

### III.     The Instant Litigation

On April 6, 2009, Ross commenced this litigation against BQHC, see Complaint, DE #1, and, a few months later, served an amended complaint adding Wyckoff as a second defendant.  See Amended Complaint (Aug. 20, 2009), DE #20.  Shortly thereafter, on September 22, 2009, Ross filed a Second Amended Complaint.  See generally SAC, DE #24. In the Second Amended Complaint, Ross asserted a breach of contract claim against BQHC, see SAC ¶¶ 54-64, and sought to hold Wyckoff vicariously liable for BQHC's breach, pursuant to the equitable doctrine of piercing the corporate veil.  See id. ¶¶ 65-80.  In terms of remedies, Ross requested specific performance of the Agreement, as well as damages "for the costs of replacing clerkships slots lost to Ross."  See SAC at 13.   Following the conclusion of discovery, the parties cross-moved for partial summary judgment.

### A.     Ross's Motion for Partial Summary Judgment

Ross argues that it is entitled to summary judgment on various aspects of its breach of contract claim against BQHC.  First, Ross contends that under the plain language of the Agreement's Equivalent Clerkship Provision, BQHC was obligated to provide an equivalent number of clerkships at one or more of its facilities in the event the Caritas Hospitals ceased to operate.  See Plaintiff Ross University's Memorandum of Law in Support of Its Motion for Partial Summary Judgment ("Pl. SJ Mem.") at 8-9, DE #95.  As it is undisputed that BQHC did not provide the clerkships, Ross requests that summary judgment be granted on the issue of

BQHC's breach of the Agreement. See id.

Ross also seeks summary judgment on various affirmative defenses. See id. at 9-12. Specifically, Ross moves to dismiss the Fourth, Fifth, Seventh and Eighth Affirmative Defenses — impossibility, *ulta vires*, lack of authority, and mutual mistake, respectively — because it is undisputed that defendants have not returned to Ross the more than $6.2 million in prepayments that remain unearned. See id. In addition, Ross contends it is entitled to summary judgment on defendants' Sixth Affirmative Defense, which denies liability on the ground that BQHC acted as agent for its disclosed principal, Caritas. See id. at 11-12.

Finally, Ross moves for partial summary judgment as to damages. See id. at 4-8. In particular, Ross argues that defendants' rebuttal damages expert, Anthony G. Duffy ("Duffy"), conceded that Ross was damaged, at a minimum, in the amount of $12,876.134. See id. at 6-7. Further, assuming that the Court grants Ross's separate motion to preclude Duffy as an expert, see *infra* pp. 14-18, Ross asserts that it is entitled to summary judgment as to damages in the amount of $20,089,501, i.e., the total calculated by Ross's damages expert. See Pl. SJ Mem. at 7, DE #95.

### B. Defendants' Motion for Partial Summary Judgment

Defendants move for partial summary judgment on two issues. First, defendants challenge Ross's attempt to hold Wyckoff responsible for BQHC's breach because, defendants contend, Ross cannot meet the heavy burden required to pierce BQHC's corporate veil. See Def. SJ Mem. at 14-23, DE #97-2. Second, defendants move for summary judgment on the equitable remedy of specific performance, pursuant to which Ross requests a court order

requiring BQHC to direct Wyckoff to provide Ross with the clerkships to which Ross claims it was entitled under its Agreement with BQHC. See id. at 23-27. In particular, defendants contend that such an order would be improper, as it would require BQHC to take actions in contravention of Article 28 of New York's Public Health Law. See id.

C.    Ross's Motions to Strike and Preclude

In response to defendants' motion for partial summary judgment, Ross moves to strike several paragraphs set forth in Defendants' Rule 56.1 Statement of Undisputed Facts, DE #97-1, on the ground that the facts asserted therein are conclusory, improper legal argument or inadmissible. See Plaintiff Ross University's Motion to Strike Portions of Defendants' 56.1 Statement ("Pl. Strike Mem.") at 2-6, DE #108. In addition, Ross separately moves to preclude proof from defendants' damages expert, Anthony Duffy. See Plaintiff Ross University's Memorandum of Law in Support of Its Motion to Preclude Defendants' Expert Witness ("Pl. Exp. Mem.") at 1-3, DE #99. Because the outcome of these two stand-alone motions necessarily impacts the evidence and facts considered by the Court in determining the underlying partial summary judgment motions, the Court will first address Ross's motions to strike a portion of defendants' Rule 56.1 Statement and to preclude defendants' expert.

## ROSS'S MOTION TO STRIKE

Ross moves to strike several paragraphs set forth in Defendants' Rule 56.1 Statement, which Ross characterizes as containing conclusory statements and improper legal arguments and as relying on inadmissible evidence. See Pl. Strike Mem. at 2-6, DE #108. Defendants disagree, arguing that Ross has failed to meet the "heavy burden" required to justify striking

defendants' statements. <u>See</u> Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Strike ("Def. Strike Opp.") at 1, DE #118 (citing <u>Pharmacy, Inc. v. Am. Pharm. Partners, Inc.</u>, No. 05-CV-776 (DRH) (AKT), 2007 WL 2728898, at *1 (E.D.N.Y. Sept. 14, 2007) (noting that motions to strike are generally disfavored)).

In the Eastern and Southern Districts of New York, Local Civil Rule 56.1 requires that a motion for summary judgment be accompanied by "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." U.S. Dist. Ct. Rules S. & E.D.N.Y., Local Civ. R. 56.1; <u>see also</u> Fed. R. Civ. P. 56(c). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 74 (2d Cir. 2001). "Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative or do not cite to supporting evidence." <u>Epstein v. Kemper Ins. Cos.</u>, 210 F.Supp.2d 308, 314 (S.D.N.Y. 2002).

In response to Ross's challenge to defendants' Rule 56.1 Statement, defendants argue, *inter alia*, that it is appropriate to quote and describe legal statutes (such as Article 28 of the Public Health Law) to provide context for the factual issues in the case. <u>See</u> Def. Strike Opp. at 2, DE #118. Defendants further contend that their characterization of the evidence and use of "descriptive adjectives" does not warrant striking entire Rule 56.1 paragraphs as argumentative. <u>See</u> <u>id.</u> at 3-4.

Even assuming that certain of defendants' clauses cross the line, the drastic measure sought by Ross is not warranted here. Indeed, courts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions. <u>See, e.g.</u>, <u>Mihalik v. Credit Agricole Cheuvreux N. Am.</u>, No. 09 Civ. 1251(DAB), 2011 WL 3586060, at *4 (S.D.N.Y. July 29, 2011) (despite improper assertions, court "decline[d] to engage in the time-consuming task of formally striking each statement at issue [and] [i]nstead, follow[ed] the practice of several other courts in the district" and "disregard[ed] any statements that lack[ed] support or [were] otherwise inadmissible"); <u>M.V.B. Collision, Inc. v. Allstate Ins. Co.</u>, 728 F.Supp.2d 205, 209 (E.D.N.Y. 2010) ("in the exercise of its broad discretion," court denied motion to strike portions of Rule 56.1 statement but held that challenged portions would not be considered); <u>Primmer v. CBS Studios, Inc.</u>, 667 F.Supp.2d 248, 255 (S.D.N.Y. 2009) (denying motion to strike where court would "disregard any materials contained in the affidavits or Local Rule 56.1 Counterstatement that [it] found to be improper"). Ross has articulated no reason to follow a different course in this case. Consequently, the Court denies Ross's motion to strike but will disregard any statement that is conclusory, argumentative or unsupported by admissible evidence. <u>See, e.g.</u>, Def. 56.1 ¶¶ 6-8, DE #97-1 (setting forth legal interpretation of Article 28 regulation as undisputed fact); <u>id.</u> ¶ 18 (citation to news articles).[11]

---

[11] Ross also objects to paragraphs 48 through 51 on the ground that the assertions therein are "based only on conclusory affidavits filed by a handful of BQHC and Wyckoff board members." <u>See</u> Pl. Strike Mem. at 4, DE #108. Ross cites no authority to support its objection, which affects the weight to be accorded the allegations contained in defendants' Rule

(continued…)

## ROSS'S MOTION TO PRECLUDE DEFENDANTS' EXPERT

As an initial matter, before addressing Ross's objections to defendants' rebuttal damages expert, Anthony G. Duffy, the Court summarizes the damage calculations being asserted by Ross's own expert, Dr. Elizabeth Davis ("Davis"). In her expert report (which was issued on August 31, 2011 and revised on October 25, 2011), Davis broke down Ross's total damages into three separate components: (1) the balance of the prepayments, including contractually-specified interest that remained unearned as of June 30, 2011 (hereinafter, the "Prepayment Balance"); (2) the incremental costs incurred by Ross (through June 30, 2011) to replace clerkship rotations that were lost after the Caritas Hospitals ceased to operate (hereinafter, the "Present Replacement Costs"); and (3) the future incremental costs, for the period from July 1, 2011 through January 31, 2018, that Ross will likely incur in replacing clerkship rotations through the lifetime of the Agreement (hereinafter the "Future Replacement Costs"). See Expert Report of Elizabeth Kroger Davis (revised Oct. 25, 2011) ("Davis Report"), DE #119 at 6. In her report, Davis calculated the Prepayment Balance as $6,277,266; the Present Replacement Costs as $1,073,501; and the Future Replacement Costs as $12,738,735. See id.

Duffy's rebuttal to the Davis Report did not specifically address or contest the first two components calculated by Davis. See Rebuttal Expert Report of Anthony G. Duffy ("Duffy Report"), DE #121 at 19 (citing Davis Report in setting forth calculation of Prepayment

---

[11](…continued)
56.1 Statement, but does not warrant the wholesale striking of those assertions. See Primmer, 667 F.Supp.2d at 254-55.

Balance and Present Replacement Costs). Duffy did, however, object to Davis's methodology in estimating the Future Replacement Costs, which Duffy calculated as $5,525,367. See id.

Ross now moves to preclude defendants from offering proof from Duffy, their damages expert. First, Ross argues, to the extent that Duffy merely "adopts" Davis's calculation of the first two components, the Court should preclude Duffy's testimony under Rule 403 of the Federal Rules of Evidence ("FRE") as cumulative of Davis's Report. See Pl. Exp. Mem. at 1-2, DE #99. Second, Ross argues that Duffy's opinions should be precluded under Rule 702 of the FRE; according to Ross, Duffy is not qualified as an expert on damages in this matter because Duffy conceded at his deposition that he lacked expertise in the area of medical clerkship pricing. See Pl. Exp. Mem. at 4-7, DE #99.

## I.    Cumulative Testimony

Ross's motion to preclude based on the "cumulative" nature of Duffy's testimony can be swiftly rejected. First, where, as here, no trial date has been set, preclusion on this basis is premature. See United States v. Jamil, 707 F.2d 638, 643 (2d Cir. 1983) (reversing trial court's pretrial ruling that evidence was cumulative: "At this stage of the litigation, when the trial has not yet commenced and no evidence has yet been put before a jury, it is premature to conclude that this evidence is cumulative."). In any event, the Duffy Report makes clear that Duffy did not draw any conclusions as to the reasonableness of the first two components of Davis's analysis. See Duffy Report, DE #121 at 4-5 (stating that he did not assess the reasonableness of Davis's calculation of the Prepayment Balance or Present Replacement

Costs).  Thus, because Duffy does not purport to offer any opinion on those aspects, his report is not cumulative.[12]

## II.     Duffy's Qualifications as an Expert

Ross's challenge to Duffy's qualifications is likewise unavailing.  A court enjoys broad discretion in determining whether an expert is qualified.  See United States v. Russo, 74 F.3d 1383, 1394 (2d Cir. 1996); Valentin v. N.Y. City, No. 94 CV 3911(CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997).  "In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."  Valentin, 1997 WL 33323099, at *14.

Duffy is a partner with the financial consulting firm Bonadio & Co., LLP and "has extensive experience working on hundreds of engagements related to predictive cash flows and business valuation[.]"  See Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Preclude ("Def. Exp. Opp.") at 9, DE #116.  In addition to being a Certified Public Accountant, Duffy has also been designated as an Accredited Business Valuator by the

---

[12]  In a one-paragraph argument advanced for the first time on its reply, Ross contends that, to the extent Duffy has any opinion on the first and second damage components that is not cumulative of Davis's conclusions, he would be barred from offering that opinion at trial, "having failed to prepare or disclose" it.  See Plaintiff Ross University's Reply in Support of Its Motion to Preclude Defendants' Expert Witness (Jan. 24, 2012) at 2-3, DE #123.  Ross cites no supporting authority, but presumably premises its argument on Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedure, which requires that the report of a retained trial expert include "a complete statement of all opinions the witness will express and the basis and reasons for them . . . ."  Fed. R. Civ. P. 26(a)(2)(B)(i).  Because this argument was not raised until Ross filed its reply, the Court need not consider it.  See, e.g., Gruss v. Zwirn, 276 F.R.D. 115, 142 (S.D.N.Y. 2011); Fisher v. Kanas, 487 F.Supp.2d 270, 278 (E.D.N.Y. 2007).

American Institute of Certified Public Accountants, as well as a Certified Valuation Analyst by the National Association of Certified Valuation Analysts.  See id.

Despite Duffy's educational and professional experience, Ross seeks to preclude his opinions on the basis of his qualifications because, when asked at his deposition whether he considered himself to be "an expert about the pricing of clerkship rotations provided by hospitals to medical schools," he replied in the negative.  See Pl. Exp. Mem. at 1, DE #99. At his deposition, however, Duffy also testified that he does consider himself an expert in the field of calculating the present value of expected future payments -- which forms the basis for his criticism of the third component of Davis's damage calculation.  See Deposition Transcript of Anthony G. Duffy at 84, DE #117; see generally Duffy Report, DE #121.  Further, courts in this Circuit liberally construe expert qualification requirements, and, as such, have not required preclusion solely because an expert "witness lacks expertise in the specialized areas directly pertinent" to the case.  See Arista Records LLC v. Lime Grp. LLC, No. 06 CV 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (collecting cases); Sullivan v. Ford Motor Co., No. 97 Civ. 0593 (RCC), 2000 WL 343777, at *5 (S.D.N.Y. Mar. 31, 2000) ("One [who is] knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.") (internal quotations and citation omitted); Valentin, 1997 WL 33323099, at *15 ("[T]he lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying."). Moreover, as defendants note in their opposition papers, Ross's own expert, Davis, admittedly has no prior experience evaluating medical school clerkships.  See Def. Exp. Opp. at 10, DE

#116.  In fact, Ross fails to articulate why clerkship placements are so unique that the opinion of a general business valuation expert would be rendered unsuitable.

Finally, to the extent that Ross's challenge to Duffy's qualification as an expert is based on a critique of Duffy's methodology, see Pl. Exp. Mem. at 5-6, DE #99, these arguments are best left for the jury.  See Clarke v. LR Sys., 219 F.Supp.2d 323, 333 (E.D.N.Y. 2002) ("Disputes about the strength of an expert's credentials, faults in the expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion 'go to the weight, not the admissibility, of his testimony.'") (citations omitted); Valentin, 1997 WL 33323099, at *15 ("Once the determination is made that a witness is properly qualified as an expert by training and experience, the weight to be accorded his testimony is a matter for the jury to decide.").  While Ross may view Duffy's method as less reliable or accurate than that employed by Davis, nothing in the record reflects that Duffy was relying on "junk science" in reaching his conclusions, such that the Court should act as a gate-keeper for the jury.  See generally Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

Therefore, Ross's motion to preclude expert proof from Duffy is denied.

### ROSS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court now turns to the parties' cross-motions for partial summary judgment.

**I.**     **Partial Summary Judgment Legal Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a party may move for partial summary judgment on a claim or defense, or on "part of each claim or defense."  Fed. R. Civ. P. 56(a); see also In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F.Supp.2d

188, 231 (E.D.N.Y. 2003) (Rule 56 "authorizes partial summary judgment that falls short of a final determination to limit the issues to be determined at trial."). Summary judgment may not be granted unless the record "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). Once the movant has done so, the non-moving party may not rest upon the allegations or denials of its pleading but must set forth specific facts that raise a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996). "In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party." Sista v. CDC Ixis N.A., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citations omitted).

## II.     Breach of Contract – Liability

Ross contends that the plain language of the Equivalent Clerkship Provision unambiguously requires BQHC to provide replacement clerkships "at one or more of its other facilities" in the event the Caritas Hospitals ceased to operate. See Pl. SJ Mem. at 8-9, DE #95. According to Ross, because it is undisputed that the Caritas Hospitals ceased to operate and that Wyckoff, the only other BQHC facility that offered clerkships, refused to provide them, there is no genuine issue of fact as to whether BQHC breached the Agreement. Id. Not

surprisingly, defendants take the position that the Equivalent Clerkship Provision is ambiguous

as a matter of law, thereby precluding summary judgment.  See Defendants' Memorandum of

Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. SJ Opp.") at

10-18, DE #110.   In particular, defendants cite the following extrinsic evidence that, they

contend, demonstrates the existence of genuine factual issues as to whether the parties intended

the term "facilities" to include Wyckoff: (1) a series of emails reflecting defendants' desire to

omit any reference to Wyckoff in the Agreement; and (2) a series of board meeting minutes

suggesting that BQHC contemplated partnering with other facilities that could provide

clerkships.  See id. at 14-18.

### A.      Governing Legal Principles

To establish liability for breach of contract under New York law, Ross must prove (1)

that a contract existed; (2) that one party performed the contract; (3) that the other party

breached the contract; and (4) damages.  See Terwilliger v. Terwilliger, 206 F.3d 240, 245

(2d Cir. 2000).[13]   In opposing Ross's motion for summary judgment on liability for breach of

---

[13]  The instant case was brought pursuant to diversity jurisdiction under 28 U.S.C.
§ 1332(a)(2).  Courts have noted that "[i]t is black letter law that in a diversity action . . . ,
state substantive law applies."  See, e.g., Bison Capital Corp. v. ATP Oil & Gas Corp., No.
10 Civ. 0714(SHS), 2010 WL 2697121, at *6 (S.D.N.Y. June 24, 2010) (citing Contri v.
Yellow Freight Sys., Inc., 92 Civ. 2603, 1996 WL 87237, at *2 (S.D.N.Y. Feb. 29, 1996)),
adopted by 2010 WL 3733927 (S.D.N.Y. Sept. 16, 2010).  In this case, the Agreement
contained a choice-of-law clause providing that the Agreement "shall be construed and
interpreted . . . in accordance with New York law."  Agreement § 1 ¶ 4, DE #97-41.  The
Second Circuit has stated that where "the parties agree that New York substantive law governs
. . . and 'where the parties have agreed to the application of the forum law, their consent
concludes the choice of law inquiry.'"  Texaco A/S (Denmark) v. Commercial Ins. Co., 160
F.3d 124, 128 (2d Cir. 1998) (citation omitted).  Accordingly, New York state law governs the
(continued...)

contract, defendants principally argue that the Equivalent Clerkship Provision is ambiguous as a matter of law, "mak[ing] it impossible to determine, at this stage of the litigation, whether BQHC has breached any obligation at all." See Def. SJ Opp. at 11.[14] This case thus implicates a threshold issue: whether the pertinent contractual language is unambiguous. See Cont'l Ins. Co. v. Atlantic Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010). This initial contractual interpretation is for judicial resolution as a matter of law. See id.; Morgan Stanley Grp., Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000).

"The terms of a contract are clear and unambiguous when the language used has a definite and precise meaning, unattended by danger of misconception . . . ." Fernandez v. Price, 880 N.Y.S.2d 169, 172 (2d Dep't 2009) (collecting cases); accord Photopaint Tech., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003). Conversely, "[a]mbiguous language is that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 191 (2d Cir. 2006) (citation and internal quotations omitted).

---

[13](...continued)
inquiry herein.

[14] Defendants also argue that factual issues exist with respect to their Fourth through Eighth Affirmative Defenses, thereby precluding an award of summary judgment on the breach of contract claim. See Def. SJ Opp. at 18, DE #110. These issues are addressed below. See infra pp. 30-40.

A court faced with this threshold determination must "give effect to the intention of the parties as expressed in the unequivocal language they have employed[,]" without considering extrinsic or parol evidence. Terwilliger, 206 F.3d at 245; see also Del Turco v. Speedwell Design, BFK Enters., LLC, 623 F.Supp.2d 319, 334 (E.D.N.Y. 2009) ("Unless the court gleans some ambiguity from looking at the face of the contract, it will not look beyond the contract's four corners.") (collecting cases). Moreover, courts should give words "the meanings ordinarily ascribed to them[,] and absurd results should be avoided." Mastrovincenzo v. City of N.Y., 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted). Where the disputed language is unambiguous, the Court may interpret the contract as a matter of law on summary judgment. See Cont'l Ins., 603 F.3d at 180.

If, on the other hand, the Court concludes that the contractual language is ambiguous, then it may examine the extrinsic evidence that illuminates the intent of the parties, such as the parties' negotiations and their course of conduct during the performance of the Agreement. See, e.g., Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am., No. 07-CV-5415 (KAM)(VVP), 2010 WL 3735786, at *3 (E.D.N.Y. Sept. 20, 2010) (quoting N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010)). Where a reasonable jury could find that the extrinsic evidence supported the non-movant's interpretation of the contract, summary judgment must be denied. See Park Electrochem. Corp. v. Cont'l Cas. Co., No. 04-CV-4916 (ENV)(ARL), 2011 WL 703945, at *3 (E.D.N.Y. Feb. 18, 2011); Ruggieri v. Harrington, 146 F.Supp.2d 202, 223 (E.D.N.Y. 2001). In rare cases, however, a court may interpret ambiguous language as a matter of law, if the evidence

of the parties' intent is so one-sided that no reasonable person could reach the contrary

conclusion or if the non-moving party fails to point to any relevant extrinsic evidence

supporting that party's interpretation of the contractual language. See, e.g., Compagnie

Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,

232 F.3d 153, 158, 159 (2d Cir. 2000) (Sotomayor, J.); accord Topps Co. v. Cadbury Stani

S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).

**B.     Application of the Law to the Facts**

**1.      The Equivalent Clerkship Provision is Ambiguous**

Defendants argue that the Equivalent Clerkship Provision is ambiguous as to whether

the term "facilities" used therein included Wyckoff. See Def. SJ Opp. at 11-14, DE #110.

The Court agrees. Looking solely at the four corners of the Agreement, it is not clear which

of BQHC's "facilities" the Equivalent Clerkship Provision was meant to encompass. First, the

Agreement does not define the term "facilities," nor does it include a reference to Wyckoff.

See generally Agreement, DE #97-41. The Agreement's only other reference to "facilities" is

found in a "whereas" clause at the beginning of the document; that clause notes that BQHC's

subsidiary, Caritas, owned and operated the Caritas Hospitals, which in turn had "facilities for

furnishing a clinical medical education" to Ross's medical students. See id. at 1. Obviously,

if the Caritas Hospitals ceased to operate, those referenced facilities would not be in a position

to provide back-up clerkships for Ross students. All that is clear from the plain language of

the Equivalent Clerkship Provision and the contract as a whole is that BQHC owned (or

contemplated acquiring) facilities, other than those available through Caritas and the Caritas

Hospitals, that could provide clinical clerkships. Which facilities were encompassed within the Equivalent Clerkship Provision is not clear from the face of the Agreement and, as such, the term "facilities" is ambiguous, requiring the Court to consider extrinsic evidence of the parties' intention in drafting the Agreement.

### 2. The Extrinsic Evidence of the Parties' Intent Is One-Sided

The Court first considers the extrinsic evidence of events preceding the execution of the Agreement. Following the Gio Proposal Letter in August 2006, Romero, on behalf of BQHC, forwarded to Ross a detailed analysis of what would be entailed in a clerkship placement agreement between Ross and the Caritas Hospitals. See 10/5/06 Romero Email, DE #106-11 at 2 (referring to the "proposal submitted *by the Brooklyn Queens Healthcare, Inc.*" concerning clerkships at the Caritas Hospitals ) (emphasis added). As part of this analysis, Romero indicated that "contingency core clerkship slots" not initially offered at the Caritas Hospitals would be "offered and guaranteed at the Wyckoff campus." See id. at 2, 4. Defendants repeated this guarantee in a November 1, 2006 email – i.e., that Wyckoff would provide limited spots to Ross for "rotations not currently offered at the Caritas campuses such as Pediatrics and Family Medicine . . . ." See Email from Julius Romero (Nov. 1, 2006), DE #106-15 at 3. As negotiations continued, defendants apparently broadened their offer. In a December 3, 2006 email, Romero wrote to Ross:

> In addition, as a backup, I have designed a contingency plan in effect for at least the next four years at Wyckoff, that can *collateralize any committed core clerkship at Caritas*. This can be expressed or implied on [sic] the business agreement.

Email from Julius Romero (Dec. 3, 2006) (emphasis added), DE #106-13. A few weeks later, John St. James, the CFO for Ross, had a telephone conference with Romero to discuss concerns Ross had with the draft agreements that had been circulating between the parties. See 12/16/06 Romero Email, DE #106-18 (summarizing points raised during telephone call). During the call, the parties agreed that:

> A contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is [sic] not provided to Ross University during the term of this agreement.

Id., DE #106-18 at 3.

At this point, the draft agreements previously circulated included Ross and Caritas as the signatories to the agreement. On December 22, 2006, however, Ross forwarded defendants a revised agreement, in which it inserted BQHC as the contracting party in place of Caritas. See Email from Thomas Shepherd to Dominick Gio (Dec. 22, 2006), DE #97-35. In this same email, Ross confirmed that in a discussion with Julius Romero, the parties had reached an understanding that the clerkship (monetary) rate for the Caritas Hospitals would also apply to agreed-upon clerkships at Wyckoff, and that that understanding would be reflected "under a separate agreement." See id.

On December 27, 2006, Romero confirmed with Ross that the then current Wyckoff clerkship rate ($312.50 per week) could be locked in as part of "a separate executed agreement or addendum to the existing [Wyckoff-Ross Agreement]." See Email from Julius Romero to Thomas Shepherd (Dec. 27, 2006), DE #106-27. Later that day, Ross circulated a new draft that included, *inter alia*, two changes to the contract's Exhibit B that are relevant to this

dispute.  First, under subsection (b)(i) of Exhibit B, Ross inserted language confirming that the

clerkship rate it was agreeing to pay for the Caritas Hospitals (i.e., $312.50 a week) would be

locked in, for the same period of time, for those Ross clerkships at Wyckoff that were the

subject of the preexisting Wyckoff-Ross Agreement.  See Draft Agreement, Email from Dr.

Nanci Perri (Dec. 27, 2006) ("12/27/06 Draft"), DE #97-38 at 12; Def. 56.1 ¶ 45, DE #97-1.

Second, at the conclusion of Exhibit B, Ross inserted the Equivalent Clerkship Provision.  See

12/27/06 Draft, DE #97-38 at 14.

On December 28, 2006, defendants sent Ross an email informing them that:

[The 12/27/06 Draft] was reviewed and determined to be acceptable EXCEPT for any
reference to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b),
(i)].  The Caritas agreement remains separate from the Wyckoff agreement.

Email from Julius Romero (Dec. 28, 2006) ("12/28/06 Romero Email"), DE #97-39

(emphasis and second brackets in original).[15]  In an email to Julius Romero later that same day,

Ross's counsel confirmed that the "sole change to the document is the deletion in Exhibit [B]

of the paragraph referencing the existing agreement between Ross and Wyckoff."  See Email

from Virginia Smith (Dec. 28, 2006), DE #97-40.  She further confirmed that defendants

agreed to memorialize in a separate writing, following the execution of the Agreement, that it

was defendants' intention that the Wyckoff clerkship rate under the Wyckoff-Ross Agreement

be coextensive with the Caritas Hospitals clerkship rate under the Agreement.  See id.

Thereafter, the parties executed the Agreement.  Defendants did not specifically object to the

---

[15]  Although emails earlier in the drafting process limited the contingency spots to "core"
clerkships (as opposed to "elective" clerkships), the final language of the Agreement as agreed
to by the parties is not limited to core clerkships.

Equivalent Clerkship Provision, and it thus remained in the Agreement. See 12/28/06 Romero Email, DE #97-39; Agreement, DE #97-41 at 10. It is undisputed that, at the time the Agreement was executed, Wyckoff was the only other BQHC facility that could provide clerkships equivalent to those at the Caritas Hospitals. See Romero Tr. at 107-08, DE #97-24.

Thereafter, during the course of contractual performance, defendants acknowledged that Wyckoff had obligations under the Agreement. See Email from Julius Romero (Oct. 25, 2007), DE #107-22 at 3 ("Slots lost at Caritas are guaranteed at Wyckoff . . . ."); see also Draft Wyckoff Board Meeting Minutes (Dec. 4, 2008), DE #107-23 at 3 (noting that if Caritas filed for bankruptcy, it would impact Wyckoff's "Graduate Medical Education"). Indeed, not long after Caritas filed for bankruptcy and the Caritas Hospitals ceased operating, thirty-four Ross students who were to start clerkships with the Caritas Hospitals under the Agreement were reassigned to Wyckoff. See 3/5/09 St. James Email, DE #93-14; 10/7/09 Memorandum, DE #97-55 at 2 ("Subsequent to closing [the Caritas Hospitals], BQHC continues to provide Ross with a limited number of additional clinical clerkships at Wyckoff, but not nearly enough to offset the void created by the closure of its other two hospitals.").

### 3.      Absence of Any Genuine Issue of Material Fact

Despite the overwhelming evidence demonstrating the parties' intent to include Wyckoff as one of the BQHC "facilities" that would guarantee clerkships in the event the Caritas Hospitals ceased to operate, defendants argue that the existence of genuine issues of material fact defeats Ross's motion for partial summary judgment on its breach of contract claim.

First, citing the parties' pre-signing email exchange concerning the clerkship rate at Wyckoff, defendants argue that substantial evidence demonstrates defendants' intent to omit any mention of Wyckoff from the Agreement and that therefore the contractual reference to "facilities" should be construed to exclude Wyckoff. <u>See</u> Def. SJ Opp. at 15, DE #110. However, considering the parties' entire negotiation and course of conduct, no reasonable juror would interpret those emails as illuminating the meaning of "facilities" in the Equivalent Clerkship Provision. Rather, that email exchange makes clear that defendants' sole objection to the draft agreement circulated one day earlier related to paragraph (b)(i) in Exhibit B; that paragraph concerned the clerkship rates under the existing Wyckoff-Ross Agreement, and was entirely unrelated to the Equivalent Clerkship Provision. Defendants' desire to keep the Wyckoff clerkship rates under the Wyckoff-Ross Agreement distinct from the Caritas Hospitals clerkship rates under the Agreement was expressed throughout the negotiation and, indeed, the parties ultimately continued renegotiating the Wyckoff clerkship rates after the Agreement was executed. <u>See, e.g.,</u> 1/29/07 Romero Email, DE #107-10. In short, the extrinsic evidence cited by defendants concerning the parties' negotiations is irrelevant to the Equivalent Clerkship Provision.[16]

---

[16] Moreover, the Capacity Provision in the Second Amendment, which specifically authorized clerkships at Wyckoff in the event that the Caritas Hospitals were operating but did not have the capacity to provide the minimum number of Ross clerkships, tends to undermine defendants' claim that they *never* intended Wyckoff to be a part of the Agreement in any manner. <u>See</u> Def. SJ. Opp. at 15, DE #110 (arguing that substantial evidence shows that defendants' intent, "before, during and after" Agreement was executed, was to exclude Wyckoff from Agreement).

As further support for finding a genuine issue of material fact, defendants argue that extrinsic evidence shows that BQHC "contemplated additional expansion to other 'facilities' at which clinical clerkships might have been provided." Def. SJ Opp. at 17, DE #110. Defendants cite board meeting minutes throughout 2008, wherein the BQHC, Caritas, and Wyckoff boards considered various partnerships and/or mergers with area hospitals. See id. at 17-18. The fact that these internal discussions were occurring in 2008 -- while Caritas's cash flow continued to hemorrhage -- has no bearing on the parties' understanding at the time they negotiated and executed the Agreement in late 2006.

The Court is acutely sensitive to the procedural posture of this case, in that, if relevant extrinsic evidence reasonably supported defendants' interpretation of "facilities" (i.e., as excluding Wyckoff), then summary judgment should be denied, and a jury should be tasked with weighing the conflicting evidence. Nevertheless, after considering all of the extrinsic evidence cited by defendants, the Court is constrained to conclude that this is the "rare" case where the relevant extrinsic evidence is so one-sided in one party's favor that no reasonable person could reach the contrary conclusion. See Compagnie Financiere, 232 F.3d at 158. The weight of the extrinsic evidence, both as to the parties' negotiations and course of conduct, overwhelmingly supports Ross's interpretation -- namely, that the parties understood and agreed that Wyckoff would provide equivalent clerkships to collaterize the clerkships promised in the Agreement. Simply put, defendants have not identified any genuine issue of material fact concerning the interpretation of the Equivalent Clerkship Provision. See Gurney's Inn Resort & Spa Ltd. v. Benjamin, — F.Supp.2d —, 2012 WL 2951373, at *16-17 (E.D.N.Y.

July 20, 2012) (granting summary judgment to plaintiff, despite arguably ambiguous corporate documents, where, in light of extrinsic evidence, "[n]o rational trier of fact" could find in defendant's favor); Faulkner v. Nat'l Geographic Soc'y, 452 F.Supp.2d 369, 379-81 (S.D.N.Y. 2006) (granting partial summary judgment on breach of contract claims where undisputed evidence of parties' course of dealings supported movant's interpretation of ambiguous contractual provision, and non-movant offered extrinsic evidence that was "nothing more than *post hoc* interpretations" of that provision).

Accordingly, Ross's entitlement to partial summary judgment on liability on its breach of contract claim turns on the viability of defendants' fourth through eighth affirmative defenses.

## III.    Defendants' Affirmative Defenses

In opposing Ross's motion for partial summary judgment on liability for breach of contract, defendants assert that factual issues exist with respect to their Fourth through Eighth Affirmative Defenses.  See Def. SJ Opp. at 18, DE #110.  This Court disagrees, and recommends that Ross be granted summary judgment dismissing each of those defenses.

### A.       Fourth, Fifth, Seventh and Eighth Affirmative Defenses

Defendants' Fourth, Fifth, Seventh and Eighth Affirmative Defenses allege, respectively, impossibility, *ulta vires*, lack of authority, and mutual mistake.  See Answer to Second Amended Complaint ¶¶ 84, 85, 87, 88, DE #29.  Ross contends that these affirmative defenses all fail as matter of law, inasmuch as BQHC never returned the more than $6.2 million in prepayments that remained unearned.  See Pl. SJ Mem. at 9-11, DE #95.

Defendants counter that in the absence of admissible evidence that BQHC received any payment under the Agreement, there is, at the very least, a genuine issue of material fact with respect to each of these defenses. <u>See</u> Def. SJ Opp. at 19, DE #110. For the reasons that follow, defendants' argument is unavailing.

## 1.  Governing Legal Principles

Under New York law, in order to rescind or repudiate a contract on the basis of impossibility, *ultra vires*, lack of authority or mutual mistake, the party seeking to rescind must not have retained the benefit under the contract. <u>See, e.g.</u>, <u>Univ. of Minn. v. Agbo</u>, 673 N.Y.S.2d 812, 813 (2d Dep't 1998) (rejecting impossibility defense because "[d]efendant cannot keep the benefit without paying for it"); <u>Bank of N. Am. v. Shapiro</u>, 298 N.Y.S.2d 399, 401 (1st Dep't 1969) (rejecting corporation's claim that loans with plaintiff bank were unauthorized, where corporation made use of loans); <u>Woodard v. Southampton Fed. Sav. & Loan Ass'n</u>, 161 N.Y.S.2d 522, 526 (N.Y. Sup. Ct. 1957) ("[I]t is now well settled that a corporation cannot avail itself of the defense of *ultra vires* where the contract has been, in good faith, fully performed by the other party, and the corporation has had the benefit of the performance of the contract.");[17] <u>Pallister v. N.Y. Stamping Co.</u>, 202 N.Y.S. 173, 176 (1st Dep't 1923) (holding that, in order to secure rescission of contract based on mistake, party seeking rescission cannot keep property as his own).

---

[17] In fact, Section 203 of the New York Business Corporation Law, which was enacted in 1961, "precludes the use of the defense of ultra vires in proceedings against a corporation to enforce a contract." <u>Chiat/Day Direct Mktg., Inc. v. Nat'l Car Rental Sys., Inc.</u>, No. 93 Civ. 2717 (JFK), 1994 WL 524982, at *3 (S.D.N.Y. Sept. 27, 1994) (citing N.Y. Bus. Corp. L. § 203).

### 2. Application of the Law to the Facts

Notably, defendants do not dispute Ross's characterization of New York law on this point. See Def. SJ Opp. at 19-20, DE #110. Rather, they take issue with Ross's contention that BQHC actually received the prepayments. See id. Defendants argue that the evidence establishes that Ross's prepayments were all made by wire to an account exclusively held in Caritas's name. See id. at 20. On reply, Ross points to evidence establishing that the Agreement identified BQHC as the payee and, in accordance with the Agreement, Ross wired the prepayments into an account specified by Romero and BQHC's in-house counsel, Claire Mullally. See Plaintiff Ross University's Reply in Support of Partial Summary Judgment ("Pl. SJ Reply") at 9, DE #124.

The language of the Agreement is instructive on this issue. Under the Agreement, Ross was obligated to pay $5 million to BQHC. See Agreement, DE# 97-41 at 8. Further, "[i]n consideration of such payment," BQHC was obligated to cause the Caritas Hospitals to provide the clinical clerkships. See id. Romero, who, throughout the negotiations, identified himself as working on behalf of Caritas, Wyckoff and BQHC, specifically directed Ross to wire the prepayment into an account in the name of Caritas. See 12/22/06 Romero Email, DE #110-10. Claire Mullally, counsel for BQHC, Caritas and Wyckoff, provided similar instructions with respect to Ross's payment under the First Amendment. See 11/30/07 Mullally Email, DE #110-15. For the Second Amendment, Romero, again, directed Ross to wire the funds into Caritas's account. See Email from Julius Romero (Feb. 28, 2008), DE #110-17 at 2. In

transmitting the prepayments to Caritas's account, Ross thus was complying with BQHC's payment instructions.

On these facts, BQHC clearly received the benefit of its bargain with Ross, as it is undisputed that only by virtue of the Agreement did BQHC secure the right to control and direct payment to Caritas. Simply put, defendants take too narrow a view of the "benefit" required to defeat Ross's affirmative defenses: it is well settled that payment to a third party designated by the contracting party can constitute consideration for a contractual agreement. See, e.g., In re Asia Global Crossing, Ltd., 344 B.R. 247, 252-53 (S.D.N.Y. 2006) ("[I]t is fundamental that a benefit flowing to a third person or legal entity constitutes a sufficient consideration for the promise of another.") (quoting Mencher v. Weiss, 306 N.Y. 1, 8 (N.Y. 1953)); RESTATEMENT (SECOND) OF CONTRACTS § 71, cmt. e (1981) ("It matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous."). Therefore, this Court recommends granting Ross's motion for summary judgment dismissing defendants' Fourth, Fifth, Seventh and Eighth Affirmative Defenses.[18]

---

[18] Although defendants, in passing, challenge Singleton and Goldberg's authority to enter into the First and Second Amendments without approval from BQHC's Board of Trustees, see Def. SJ Opp. at 5, DE #110, defendants do not dispute that Ross made the prepayments under those Amendments or that BQHC's counsel and Romero had both actual and apparent authority to direct where the funds were to be deposited. Therefore, as BQHC obtained the benefit of its bargain with Ross, BQHC's *ultra vires* challenge is unavailing.

**B.** **Sixth Affirmative Defense**

Finally, Ross moves to dismiss defendants' Sixth Affirmative Defense, which asserts that BQHC, in executing the Agreement, was acting as an agent for a disclosed principal, Caritas, and therefore cannot be held liable for any breach.  See Pl. SJ Mem. at 11-12, DE #95.  In opposition, defendants contend that disputed factual issues preclude the Court from dismissing the defense at this time.  See Def. SJ Opp. at 21-22, DE #110.

**1.** **Governing Legal Principles**

In New York, "an agency relationship is established where there is evidence of (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; (4) control by the principal; and (5) power of the agent to alter the legal relations between the principal and third persons and between the principal and himself." Mouawad Nat'l Co. v. Lazare Kaplan Int'l, Inc., 476 F.Supp.2d 414, 422 (S.D.N.Y. 2007) (citation and internal quotations omitted).  If an agent enters into an agreement on behalf of a disclosed principal, the agent typically will not incur personal liability in the event of the principal's breach.  See Savoy Record Co. v. Cardinal Exp. Corp., 254 N.Y.S.2d 521, 523 (N.Y. 1964); CBS Outdoor Grp., Inc. v. Beifeld, 864 N.Y.S.2d 658, 659 (1st Dep't 2008).  An agent, however, may be liable for the breach if there is clear and explicit evidence that the agent intended to "substitute or superadd his personal liability for, or to, that of his principal." News Am. Mktg., Inc. v. Lepage Bakeries, Inc., 791 N.Y.S.2d 80, 82 (1st Dep't 2005) (quoting Savoy Record, 254 N.Y.S.2d at 523).

Where it is clear from the face of the written agreement either that the agent intended to be personally liable or, on the other hand, that the agent signed the agreement solely in his or her representational capacity, then New York courts will enter judgment accordingly, without considering extrinsic or parol evidence as to the agent's intent. See, e.g., Mencher, 306 N.Y. at 6-7 (reversing judgment dismissing complaint against president of corporation, directing entry of judgment in plaintiff's favor, and holding that oral evidence of intent was improperly received where the prefatory clause in the contract named the president as party to the agreement); Yellow Book of N.Y. Inc. v. Shelley, 904 N.Y.S.2d 216, 217 (2d Dep't 2010) (affirming grant of summary judgment against president of corporate defendant who signed contract in his individual capacity and expressly agreed to accept personal liability; "[s]ince the written contracts between the parties were unambiguous, parol evidence with respect to a contrary intent was not admissible"); News Am. Mktg., 791 N.Y.S.2d at 83 (affirming grant of summary judgment where the case "involve[d] no contractual ambiguity or omission, only a well-settled question of law"); Tender Loving Care Agency, Inc. v. Hladun, 488 N.Y.S.2d 790, 792 (2d Dep't 1985) (dismissing claim against signatory who, according to the "clear and unambiguous language of the document . . .[,] signed as an agent for a disclosed principal," and holding that "parol evidence may not be used to contradict this clear and unambiguous language"); cf. Brooklyn Union Gas Co. v. Gorgerman, 791 N.Y.S.2d 868, 2004 WL 1753452, at *1 (N.Y.C. Civ. Kings Co. July 15, 2004) (denying motion to add agent as a party where she "simply signed the bottom of the document as an agent for disclosed principal" pursuant to a general power of attorney).

Conversely, where a contract is ambiguous or contains conflicting provisions as to the agent's intention, a court will consider extrinsic evidence and/or deny summary judgment and allow the issue to be resolved at trial.  See, e.g., Star Video Entm't, LP v. J & I Video Distrib., Inc., 702 N.Y.S.2d 91, 92 (2d Dep't 2000) (issue of fact as to whether president of company could be held personally liable under contract where he signed as president but the contract included language that the signatory would personally guarantee payment); Paribas Props., Inc. v. Benson, 536 N.Y.S.2d 1007, 1009 (1st Dep't 1989) (although corporate officer signed agreement in official capacity, there was "a triable issue as to whether [officer and related entity] personally may be held as parties to the agreement on the basis on that one signature").

## 2.    Application of the Law to the Facts

As an initial matter, nothing in the original Agreement itself suggests that BQHC signed the Agreement solely as agent for Caritas.  In essence, defendants contend that a material factual issue exists because, although early drafts of the agreement were between Ross and Caritas, Ross decided "at the eleventh hour . . . to *ask BQHC* to sign the Affiliation Agreement *on behalf of* Caritas. . . ."  Def. SJ Opp. at 21, DE #110 (emphasis added) (citing Def. 56.1 ¶¶ 40-45, DE #97-1).  However, the referenced evidence does not support an inference that Ross asked BQHC to sign "on behalf of" Caritas – rather, it is undisputed that Ross's legal counsel decided to change the contracting party from Caritas to BQHC, and that defendants acquiesced to the change.  See Email from Virginia Smith (Dec. 22, 2006), DE #97-34 at 3 (Ross "changed the parties to the agreement as a means of obtaining additional

security"). Even if the Court were inclined to look beyond the four corners of the Agreement, defendants have failed to point to any evidence, by way of affidavit, documents or deposition testimony, that Ross was seeking to have BQHC act solely as Caritas's agent with respect to the Agreement or that it was the contracting parties' understanding that BQHC's role was limited to that of Caritas's agent.[19]

In any event, because the contractual documents reflect that BQHC explicitly assumed liability under the Agreement, it is immaterial whether BQHC was, in fact, acting as agent for Caritas. The four corners of the Agreement make clear that even if acting as Caritas's agent, BQHC also assumed liability on behalf of its alleged principal. First and foremost, the only two parties to the Agreement were Ross and BQHC. See Agreement, DE #97-41 at 2, 12; compare Interactive Motorsports & Entm't Corp. v. Dolphin Direct Equity Partners, LP, 419 F.App'x 60, 62 (2d Cir. Apr. 6, 2011) (corporate officer's argument that he signed only in official capacity was defeated by the fact that the agreement listed him as a party without any reference to any official capacity); Mencher, 306 N.Y. at 6 (fact that prefatory clause defined individual, but not his corporation, as party to the contract evidenced agent's intent to assume liability), with Veera v. Janssen, No. 05 Civ. 2145 (SHS), 2005 WL 1606054, at *5 (S.D.N.Y. July 5, 2005) (finding that plaintiffs signed contract as agents because, *inter alia*,

---

[19]  In fact, the First and Second Amendments further weaken defendants' claim.  Whereas the prefatory section of the Agreement refers solely to BQHC, the prefatory section of the First and Second Amendments refers to "Brooklyn Queens Health Care, Inc. *Through* Caritas Health Care, Inc." -- which tends to suggest that it was *Caritas* that was to act as BQHC's agent (in providing clerkship slots at the Caritas Hospitals) and not the other way around.  See, e.g., First Amendment, DE #106-25 at 2 (emphasis added).

they were not listed as parties to the contract); <u>Walz v. Todd & Honeywell, Inc.</u>, 599

N.Y.S.2d 638 (2d Dep't 1993) (in affirming lower court's granting of defense motion for

summary judgment, court held that agent did not intend to be bound where he was not a party

to the contract).

Here, the text of the Agreement contains only one mention of Caritas, to wit, its

identification as the subsidiary through which BQHC owns the Caritas Hospitals.[20]  <u>See</u>

Agreement, DE #97-41 at 2.  Furthermore, throughout the Agreement, BQHC obligates itself

to perform, whereas Caritas assumes no obligation under the Agreement; rather, the Caritas

*Hospitals* are the vehicles through which BQHC was to perform its contractual obligations.

<u>See, e.g.</u>, Agreement, Ex. B, DE #97-41 at 8 (in consideration of Ross's $5 million payment,

"BQHC shall cause the [Caritas] Hospitals to provide clinical clerkships . . . ."); <u>id.</u> ("During

the term of the agreement, BQHC guarantee [sic] that the [Caritas] Hospitals shall provide

. . . .").

Finally, the Agreement's signature line reads "*Brooklyn Queens Health Care, Inc.*"

<u>See id.</u> at 11.  There is no language limiting BQHC as signing "on behalf of" or "as agent of"

Caritas.   Even if a juror were to credit defendants' strained argument that the parties had an

understanding that BQHC was acting as Caritas's agent, it does not alter the fact that BQHC,

---

[20]  Although the Agreement's text contains only one reference to Caritas, one of BQHC's two
signatories, Neal Mandava, identifies himself as Chief Medical Officer of Caritas.  <u>See</u>
Agreement, DE #97-41 at 12.  (The other signatory, Harold E. McDonald, was BQHC's
Executive Vice President and was also Chief Operating Officer ("COO") of BQHC, Wyckoff
and Caritas.  <u>See</u> Employment Agreement (Dec. 27, 2006) ("McDonald Employment
Agreement"), DE #107-6.)

as agent, could and did voluntarily assume liability on its purported principal's behalf.  See N.Y. Times Co. v. Glynn-Palmer Assocs., Inc., 525 N.Y.S.2d 565, 567 (N.Y. Co. Feb. 29, 1988) (An "agent may voluntarily bind itself to a contract.") (collecting cases).

The cases relied upon by defendants are inapposite.  For example, Ryan v. Volpone Stamp Co., 107 F.Supp.2d 369, 389-91 (S.D.N.Y. 2000), involved a motion to add an agent as a necessary party to a contract dispute, pursuant to Rule 19 of the Federal Rules of Civil Procedure.  Although the agent and principal both signed the contract, the agent was mentioned several times throughout the agreement, was characterized as a party to the agreement, and was granted rights under the agreement.  See id. at 390.  This combination of factors led the court to conclude that the agent was a necessary party to the action.  See id.  Apart from the dissimilar procedural posture of that case, it is obvious that the ambiguities present in the Ryan agreement are absent from the Agreement here.  Furthermore, in granting the motion to add the agent, the court observed that "[t]he more reasonable interpretation [of the agreement] is that [the agent] superadded its personal liability to that of the principal."  Id. at 389.

Equally unavailing is defendants' reliance on the Second Department's opinion in Leonard Holzer Associates, Inc. v. Orta, 672 N.Y.S.2d 915 (2d Dep't 1998).  Other than the fact that the agent, a corporate officer, signed the document without noting his official capacity, the opinion provides no detail concerning the agreement itself, such as whether the

agent or the principal was identified as a party to the agreement. See id. at 916.[21] Indeed, the agreement presumably was ambiguous in this respect, as the Second Department, in affirming the lower court's decision, looked to the "facts and circumstances surrounding the agreement." See id.

Therefore, this Court recommends that Ross's motion for summary judgment dismissing defendants' Sixth Affirmative Defense be granted. Cf. News Am. Mktg., 791 N.Y.S.2d at 83 (where contract unambiguously made clear that agent did not assume liability, court so ruled as a matter of law and declined to consider extrinsic evidence as to custom and usage).[22]

Inasmuch as no triable issue exists with respect to BQHC's liability for breach of contract, Ross should be granted partial summary judgment on that claim.

## IV.    Breach of Contract - Damages

Ross also moves for partial summary judgment on the three components of contractual damages calculated by its expert, Dr. Elizabeth Davis -- the Prepayment Balance, the Present Replacement Costs and the Future Replacement Costs. See Pl. SJ Mem. at 4-8, DE #95. As

---

[21]  However, the opinion notes that the real estate transaction for which the plaintiff was seeking a fee was between the defendant's *corporation* (not the defendant) and a third party. See 672 N.Y.S.2d at 916.

[22]  To be sure, in the narrow context of a corporate officer alleged to have signed in his individual capacity, courts have looked beyond the four corners of the agreement in determining whether the officer intended to be personally bound, consistent with the Second Circuit's opinion in Cement and Concrete Workers District Council Welfare Fund v. Lollo, 35 F.3d 29, 35 (2d Cir. 1994) (factors include, *inter alia*, "the signatory's role in the corporation"). This Court has uncovered no case in which a court applied the Lollo factors outside the context of the corporate officer as signatory. In any event, neither Ross nor defendants have raised this issue.

for the first two components, Ross essentially contends that Anthony Duffy, defendants' expert, "conceded" that these amounts were properly calculated, when "he did not evaluate their reasonableness and had no criticism of the calculations." See id. at 7. Ross also seeks partial summary judgment in the amount of $5,525,367 for Future Replacement Costs, the amount estimated by defendants' expert in rebuttal to the Davis Report. See id.[23]

In opposition, defendants counter that a party may raise genuine issues of material fact sufficient to preclude summary judgment, even where that party does not retain a rebuttal expert witness. See Def. SJ Opp. at 23, DE #110. Here, defendants proffer that genuine disputes exist as to the reliability of Davis's calculations because her testimony will be subject to "intense scrutiny and cross-examination at trial." See id. To this end, defendants cite various examples in the record that they believe "cast doubt on the reliability of [Davis's] methods and subsequent calculations, and at the very least raise factual issues that preclude summary judgment in Ross's favor as to its alleged damages." Id. at 24 (collecting cases).[24]

---

[23] In the alternative, in the event that the Court were to grant Ross's motion to preclude defendants' expert, Ross requests that summary judgment be entered in its favor as to the entire amount of Future Replacement Costs calculated by Davis. See Pl. SJ Mem. at 7, DE #95. Assuming that the District Court agrees that Ross's motion to preclude should be denied, see discussion *supra* pp. 14-18, this argument is moot.

[24] While this motion was pending, Ross sought permission to cite recent authority from the Eleventh Circuit in another medical clerkship action involving defendants. See Letter to Judge Matsumoto (July 13, 2012), DE #129. This Court granted the motion and has considered the new authority in formulating its recommendation. See Order (July 30, 2012), DE #133; see also *infra* p. 43.

### A.    Governing Legal Principles

The issue before the Court is what showing must be made in order to defeat a motion for summary judgment filed by the party having the burden of proof, where the moving party has proffered expert testimony on a material issue, but the opposing party has not.  An examination of relevant case law in this Circuit makes clear that the mere absence of a rebuttal expert opinion does not mandate the grant of summary judgment where the opposing party has raised genuine issues of material fact with respect to the methodology of the moving party's expert.  See Ramos v. SimplexGrinnell LP, 796 F.Supp.2d 346, 377 (E.D.N.Y. 2011) (denying plaintiffs' motion for summary judgment on damages where, *inter alia*, their expert's calculations were inconsistent with documentary evidence); Brown v. Cnty. of Nassau, 736 F.Supp.2d 602, 620 (E.D.N.Y. 2010) ("As set forth below, even in the absence of its own expert reports, the County is clearly challenging the methodology and conclusions of plaintiff's ADA expert . . . . "); Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Trust, No. 1:06-CV-871 (FJS/RFT), 2010 WL 2735701, at *7 (N.D.N.Y. July 9, 2010) (denying summary judgment on breach of contract counterclaim where plaintiff challenged the qualifications of defendant's expert and his methodology in calculating damages).

Nevertheless, although, in the above-cited cases, the parties opposing summary judgment and challenging the methodology of the moving parties' experts failed to proffer rebuttal expert opinions, they did point to the evidentiary record -- for example, the expert's report or deposition testimony – in articulating the alleged flaws.  See Ramos, 796 F.Supp.2d at 377 (documentary evidence contradicted expert calculation of damages); Brown, 736

F.Supp.2d at 621 (criticizing specific assumptions contained in plaintiff's expert report). In other words, even absent a rebuttal expert, a party may defeat summary judgment by citing evidence in the record that arguably suggests flaws in an expert's methodology, thereby impeaching the expert's conclusions. See Brown, 736 F.Supp.2d at 621-22.

Accordingly, the law in this Circuit comports with the Eleventh Circuit's recent decision in American University of the Caribbean, N.V. v. Caritas Healthcare, Inc., No. 10-12836, 2012 WL 2383021 (11th Cir. June 26, 2012), another medical clerkship breach of contract case involving Caritas, BQHC and Wyckoff. In that case, BQHC and Wyckoff conceded liability on a promissory note that they had executed in connection with an affiliation agreement between AUC and Caritas. See id. at *2. Thereafter, AUC, relying on expert evidence, successfully moved for summary judgment for breach of contract damages, see AUC, 2012 WL 2383021, at *4, and the Eleventh Circuit affirmed the judgment. See id. at *4-5. Emphasizing the burden-shifting mechanism applicable to Rule 56 motions, the Court of Appeals concluded that the defendants had failed to counter AUC's expert analysis with any evidence in the record, whether by way of a rebuttal expert, deposition testimony, or documentary evidence. See id. Rather, the defendants had relied mainly on the pleadings, which "left the district court to choose between a concrete damages calculation on the one hand, and unsupported conjecture on the other." Id. at *5. In short, the appellate court held, "the district court did not err by accepting AUC's uncontradicted evidence" as to damages. Id.

### B.     Application of the Law to the Facts

As an initial matter, Ross's contention that Duffy, the defense expert, has "conceded" the first two components of damages in Davis's calculations is without merit.  Duffy clearly testified that he did not assess the reasonableness of those calculations, as they were outside the scope of his retention as an expert, and thus he offered no opinion as to those damages.  <u>See</u> discussion *supra* pp. 15-16.  Hence, the question before this Court is whether defendants have cited other evidence in the record that creates a genuine issue of material fact with respect to the Prepayment Balance and the Present Replacement Costs; if so, Ross's motion for summary judgment must be denied.

In opposing Ross's motion, defendants point to both the Davis Report and Davis' deposition testimony in suggesting that her methodology was flawed.  <u>See</u> Def. SJ Opp. at 23-24, DE #110.  Upon close scrutiny, however, the flaws identified by defendants relate solely to the third component, Future Replacement Costs, and not to Prepayment Balance or Present Replacement Costs.  <u>See</u> <u>id.</u> (arguing, *inter alia*, that Davis's calculation of the Clerkship Cost Growth Rate cast doubt on the reliability of her testimony); <u>id.</u> at 24 (citing assumptions listed in Future Replacement Cost section of the Davis Report).  As defendants have not identified any evidence in the record that specifically calls into question Davis's methodology in calculating the Prepayment Balance or Present Replacement Costs, no genuine issue of material fact has been raised as to these components of damages.[25]  <u>See</u> <u>Ross v.</u>

---

[25]  Defendants' reliance on <u>Giles v. Rhodes</u>, 171 F.Supp.2d 220 (S.D.N.Y. 2001), for the proposition that a jury is free to reject an expert's opinion, even without rebuttal testimony, is

(continued…)

Thomas, No. 09 Civ. 5631 (SAS), 2010 WL 3952903, at *5-7, *9 (S.D.N.Y. Oct. 7, 2010) (granting summary judgment in favor of plaintiffs on breach of contract damages).

As for the third component, Future Replacement Costs, Ross argues that, at a minimum, summary judgment is warranted as to $5,525,367 – i.e., the amount calculated by defendants' own expert in rebuttal to Davis's calculation. See Pl. SJ Mem. at 7, DE #95; Pl. SJ Reply at 3, DE #124. If this aspect of Ross's motion were granted, the jury would then decide between the $5,525,367 proffered by defendants' expert and the $12,738,735 asserted by Davis. See Pl. SJ Reply at 4, DE #124. This argument is facially appealing and has been adopted by at least one court in this Circuit. See Monsanto Co. v. Haskel Trading, Inc., 13 F.Supp.2d 349, 362 (E.D.N.Y. 1998).

Nevertheless, here, defendants have made clear that Duffy's engagement was limited to *rebutting* Davis's method in valuing the Future Replacement Costs. See Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts ¶ 13, DE #110-1. This limited retention does not preclude defendants from pursuing their alternative argument that Davis's various assumptions and deposition testimony render the *entire* category of Future Replacement Costs unduly speculative. See Def. SJ Opp. at 24-25, DE #110. Thus, defendants' specific

---

[25](...continued)
misplaced, see Def. SJ Opp. at 23, DE #110, as that case dealt with a motion for judgment as a matter of law following a jury trial, and is procedurally distinguishable from a summary judgment motion. Furthermore, the expert's opinion related to causation, not damages, and acceptance of the plaintiff's expert's testimony that the plaintiff's documented injuries were consistent with a beating by the defendant correction officers would necessarily require a rejection of the defendants' testimony denying that they had beaten the plaintiff. See Giles, 171 F.Supp.2d at 226.

factual attacks on Davis's calculation of Future Replacement Costs create a genuine issue of material fact sufficient to preclude summary judgment as to this component of damages.

Therefore, the Court recommends granting Ross's motion for summary judgment as to the Prepayment Balance ($6,277,266.00) and Present Replacement Costs ($1,073,501), for a total of $7,350,767. However, Ross's motion for summary judgment as to Future Replacement Costs should be denied.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.  Piercing the Corporate Veil

In moving for partial summary judgment, defendants seek to dismiss Ross's claim against Wyckoff, which is based solely on a theory of piercing BQHC's corporate veil; according to defendants, Ross has failed to meet the heavy burden imposed under New York law.[26]  See Def. SJ Mem. at 14-23, DE #97-2.  In opposition, Ross argues that there are genuine issues of material fact precluding dismissal of its veil-piercing allegations on summary judgment.  See Plaintiff Ross University's Response to Defendants' Motion for Partial Summary Judgment ("Pl. SJ Opp.") at 17-30, DE #101.  This Court agrees with Ross that summary judgment is not warranted on this issue.

#### A.  Legal Standard

New York law recognizes that corporations are presumed to be separate from their owners.  See Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988) ("A

---

[26]  Because BQHC is incorporated in the state of New York, this Court will apply New York law to Ross's veil-piercing claim.  See, e.g., Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993).

corporation is an entity that is created by law and endowed with a separate and distinct

existence from that of its owners.").  One limited exception to this general rule is known as the

doctrine of piercing the corporate veil, whereby a court disregards the corporate form in order

to impose an obligation of the corporation on the entity's parent corporation or owners.  See

id. (applying New York law); Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135,

140 (1993).  The party seeking to pierce the corporate veil must make a two-prong showing:

(1) that the parent or owner exercised complete domination of the corporation with respect to

the challenged transaction; and (2) that such domination was used to commit a fraud or wrong

against the complaining party, which thereby resulted in injury to that party.  See Am. Protein,

844 F.2d at 60; Morris, 82 N.Y.2d at 141; accord ABN AMRO Bank, N.V. v. MBIA Inc., 17

N.Y.3d 208, 229 (2011).

In considering whether a party has satisfied the "domination" prong, courts consider

many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3)
> intermingling of funds; (4) overlap in ownership, officers, directors, and
> personnel; (5) common office space, address and telephone numbers of
> corporate entities; (6) the degree of discretion shown by the allegedly dominated
> corporation; (7) whether the dealings between the entities are at arms length; (8)
> whether the corporations are treated as independent profit centers; (9) payment
> or guarantee of the corporation's debts by the dominating entity; and (10)
> intermingling of property between the entities.

MAG Portfolio Consult, GmbH v.Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001)

(quoting Freeman v. Complex Computing Co., 119 F.3d 1044, 1053 (2d Cir. 1997)).  The

complaining party must show actual domination, and not just an opportunity to control.  See

De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 69 (2d Cir. 1996); McAnaney v. Astoria

Fin. Corp., 665 F.Supp.2d 132, 143, 145 (E.D.N.Y. 2009) (noting that a controlling ownership interest, consolidated financial report and overlapping officers "are commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness").

It is likewise well settled that "[e]vidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance." TNS Holdings v. MKI Secs. Corp., 92 N.Y.2d 335, 339 (1998) (citation omitted); see Freeman, 119 F.3d at 1053. The wrongful conduct must proximately cause the injuries complained of by the party seeking to pierce the corporate veil. See Freeman, 119 F.3d at 1053; Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, No. 07 Civ. 9580(HB), 2008 WL 4833001, at *18 (S.D.N.Y. Nov. 5, 2008). In other words, "[w]ith respect to the second prong – i.e., whether 'such domination was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil' – courts require a nexus between the failure to maintain separate corporate formalities and the wrong suffered by the plaintiff." Johnson & Johnson Consumer Cos. v. Aini, No. 02-CV-6624 (DLI) (RLM), 2009 WL 6055841, at *7 (E.D.N.Y. Dec. 1, 2009) (citations and internal quotation omitted), adopted by 2010 WL 986550 (E.D.N.Y. Mar. 17, 2010). In that regard, "where the corporate vehicle is being used to inflict wrongful or inequitable consequences," the corporate veil may be pierced even though the entity was created for a lawful purpose. See Goya Foods, Inc. v. Unanue, 233 F.3d 38, 44 (1st Cir. 2000) (applying New York law).

Typically, where veil piercing occurs, a court disregards the corporate form in order to hold a corporation's parent or owners liable for the debt of that corporation. However, New York law also recognizes a so-called "reverse" veil-piercing doctrine, pursuant to which a party attempts to hold a corporation accountable for the actions of its parent or shareholders. See, e.g., id. at 43; Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997); Miramax Film Corp. v. Abraham, No. 01 CV 5202(GBD), 2003 WL 22832384, at *6 (S.D.N.Y. Nov. 25, 2003); Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 321 & n.21 (Bankr. S.D.N.Y. May 7, 1999). The legal standard for reverse piercing is the same as that applied in the traditional veil-piercing context. See Miramax Film, 2003 WL 22832384, at *6; Stratton Oakmont, 234 B.R. 293, 321 (citing Am. Fuel, 122 F.3d at 134).

"Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised." Morris, 82 N.Y.2d at 141 (citation omitted). As Second Circuit cases have observed, "the question of piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury." Johnson & Johnson, 2009 WL 6055841, at *7 (internal citations and quotations omitted); see Am. Protein, 844 F.2d at 59.

### B. Application of the Law to the Facts

#### 1. Wyckoff's Domination of BQHC

When properly viewed in the light most favorable to Ross (the non-movant on this issue), the record contains sufficient evidence to support a finding that Wyckoff dominated BQHC. It is undisputed that BQHC had no physical location, computer or telephone, see Pl. Resp. 56.1 ¶ 74, DE #102 at 46, and "no substantial assets, salaried employees, revenues, or bank accounts of its own." See Def. 56.1 ¶ 28, DE #97-1. Moreover, at the time the Agreement was executed, all of the members of BQHC's Board of Trustees were members of Wyckoff's Board of Trustees,[27] and Wyckoff's CEO, CFO and COO had all been appointed to the same respective positions at BQHC (and Caritas). See 8/8/11 Loughlin Let., DE #106-36 at 4-7; Wyckoff Board Meeting Minutes (Oct. 5, 2006), DE #107-4 at 3; McDonald Employment Agreement, DE #107-6. Indeed, throughout the negotiation and execution of the Agreement and amendments thereto, corporate officers interchangeably identified themselves as representing Wyckoff and BQHC. Compare 11/29/06 Romero Email at 2 (sent on behalf of Wyckoff and Caritas), with 10/5/06 Romero Email, DE #106-11 at 2 (following up on behalf of BQHC's clerkship proposal); see also First Amendment, DE #106-25 at 5 (Romero signed on behalf of BQHC as "AVP Medical Education").

In further support of a finding of Wyckoff's domination, Ross points to the Gio Proposal Letter, the catalyst for the Agreement, which was sent on Wyckoff letterhead and

---

[27] Because Wyckoff had a larger Board of Trustees than BQHC, there were members of Wyckoff's Board of Trustees who were not members of BQHC's Board of Trustees. See Letter from Walter P. Loughlin (Aug. 8, 2011) ("8/8/11 Loughlin Let."), DE #106-36 at 4, 6.

signed by Gio as president of Wyckoff; in that solicitation letter, Wyckoff explained that it would "soon be the sponsor of" the Caritas Hospitals and that the resulting three-hospital "system," which had not yet been formed, would be called "BQHC." See Gio Proposal Letter, DE #106-5 at 2. A February 2007 report from the COO of Wyckoff, BQHC, and Caritas to state regulators similarly suggests that BQHC was simply the vehicle through which Wyckoff acquired and controlled the Caritas Hospitals. See, e.g., Email from Edward Dowling (Feb. 22, 2007), DE #107-20 at 5-6 (attaching memo written by COO McDonald, stating that "Wyckoff, through BQHC has taken control of [the Caritas Hospitals]") ("McDonald Memo") (emphasis added). Ross's theory that BQHC did not function as an independent entity, but was controlled by Wyckoff, is further supported by testimony from BQHC's former officers. See Romero Tr. at 108, DE #105-5 (testifying that, in his view, "BQHC does not exist"); Deposition Transcript of Rajiv Garg (June 24, 2011) ("Garg Tr.") at 22, DE #105-1 (stating that "BQHC really did not operate at all"); id. at 33 ("BQHC is just a red herring so to speak.").

Defendants advance a number of arguments to prevent the veil-piercing issue from reaching the jury. First, they contend that the lack of BQHC bank accounts, assets, salaried employees, or revenues is consistent with BQHC's limited role as a "passive" parent of Caritas and Wyckoff. See Def. 56.1 ¶ 28, DE #97-1; cf. Am. Fuel, 122 F.3d at 135 (where alleged alter ego of corporation owned only 50% of the company and never withdrew corporate funds for his own use, fact that entity had no separate bank account did not establish domination, as entity was "a start-up company, with so little ongoing business that there was no need for

independent accounts in its name"). While the proof might well support defendants' interpretation of BQHC's purpose and role, the availability of alternative explanations does not warrant an award of summary judgment on this issue, particularly given the additional evidence of domination. <u>See generally</u> <u>Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC</u>, 402 F.App'x 623, 625 (2d Cir. 2010).

That additional evidence tends to show that the "corporations did not deal at arms length with each other" and "shuffled funds" from one to the other "with the source of the funds chosen based on which . . . had sufficient funds at the time, rather than on any demonstrated business purpose of the corporation that was the source of the funds." <u>Wm. Passalacqua Bldrs., Inc. v. Resnick Developers South, Inc,</u>, 933 F.2d 131, 140 (2d Cir. 1991); <u>see, e.g.</u>, Email from Wah-chung Hsu (Feb. 15, 2007), DE #107-14 at 2 (explaining that $1.7 million was loaned by Caritas to Wyckoff and paid back, and that "[t]here was no other basis for the loan other than Wyckoff's cash shortfall"); McDonald Tr. at 64, DE #105-4 ("Funds were being moved around [from entity to entity] to cover the cash needed for a specific point in time.").

To be sure, as defendants note, most of the monetary transfers referenced by Ross were between Wyckoff and Caritas. <u>See</u> Defendants' Reply Memorandum of Law In Further Support of Their Motion For Partial Summary Judgment Dismissing Two of Plaintiff's Principal Theories of Liability ("Def. SJ Reply") at 5, DE #120 (citing Pl. SJ Opp. at 19-20, 23, DE #101). Nevertheless, contrary to defendants' contention, <u>see</u> Def. SJ Reply at 5, DE #120, it does not follow that those transfers are irrelevant to Wyckoff's alleged domination of

BQHC: a jury could view those transfers as undermining defendants' contention that "BQHC preserved the separateness between Caritas's Hospitals, . . . and Wyckoff," see Def. SJ Mem. at 10, DE# 97-2, and as demonstrating that it was Wyckoff that controlled Caritas *through its control of BQHC*. Cf. McDonald Memo, DE #107-20 at 5-6. Indeed, at Romero's direction, after the Agreement was executed by Ross and BQHC, Ross deposited $5 million into an account controlled by Caritas, and, shortly thereafter, $6 million was transferred from Caritas to Wyckoff. See *supra* pp. 5-6. And in 2007, BQHC loaned Wyckoff more than $1.9 million, for an undisclosed reason. See Wyckoff Consolidated Financial Statements (year ending December 31, 2007), DE #107-3 at 31-32; Garg Tr. at 44-45, DE #105-1 (defendants' Rule 30(b)(6) witness could not explain the reason for $1.9 million loan from BQHC to Wyckoff). The "fail[ure] to provide a commercially reasonable explanation for such siphoning of funds from one entity to another" is yet another basis for a finding of domination. See Atateks, 402 F.App'x at 625-26.

When these pieces of proof are properly viewed in their totality, rather than in isolation, all of the circumstances, combined with BQHC's inadequate capitalization, see Def. 56.1 ¶ 28, DE #97-1, are sufficient to support a finding that Wyckoff dominated and controlled BQHC, including but not limited to matters related to the Agreement.[28] See, e.g., Atateks,

---

[28] Defendants argue that "the vast majority of Ross' supposed factual issues . . . have nothing to do with the Affiliation Agreement and thus cannot, as a matter of law, create a genuine issue of material fact" with respect to the issue of Wyckoff's domination of BQHC. See Def. SJ Reply at 4, DE #120. However, although the party seeking to pierce the corporate veil must establish a connection between the domination and the injury to the complaining party, see cases cited *supra* p. 47; see also discussion *infra* pp. 54-56, the case law makes clear that proof

(continued...)

402 F.App'x at 625-26 (sustaining finding of domination where two entities failed to adhere to corporate formalities; had overlapping owners, officers, directors, and personnel; shared office space and equipment; common owner of both diverted corporate funds from one to the other; and dominated entity was insolvent); Moras v. Marco Polo Network, Inc., No. 11 Civ. 2081(PAE)(DCF), 2012 WL 2025712, at *3-4 (S.D.N.Y. May 31, 2012) (denying defendants' motion for summary judgment; issue of fact existed as to "domination" of entities by individual owner, where there was disregard of corporate formalities, intermingling of funds and certain entities were undercapitalized).

## 2. Fraud or Wrong

Ross's factual showing on the second prong of the veil-piercing test -- whether the alleged domination was used to commit a fraud or wrong that proximately caused its injuries -- is likewise sufficient to defeat defendants' motion for summary judgment. First and foremost, as accurately described by Ross, see Pl. SJ Opp. at 18, DE #101, it was Wyckoff that actively solicited millions of dollars from Ross, describing BQHC as a "system" of three hospitals "sponsored" by Wyckoff, and induced Ross to enter into the Agreement by promising an equal number of clerkship slots at Wyckoff in the event the Caritas Hospitals did not provide the agreed-upon slots. See supra pp. 5, 25. In an apparent attempt to secure a prompt financial commitment from Ross, Romero falsely stated that other schools had already submitted their proposals for the Caritas clerkship slots, when in fact no other schools (except possibly AUC)

---

[28](...continued)
of overall domination -- even if unrelated to the transaction at issue -- is nonetheless relevant to the whether there is proof of domination with respect to the challenged transaction.

had expressed an interest in those slots.  <u>Compare</u> 10/31/06 Romero Email, DE #106-14 at 2, <u>with</u> Romero Tr. at 55, DE #105-5.

A jury could reasonably find that Wyckoff, through its Gio Proposal Letter and subsequent negotiations with Ross, led Ross to believe that the BQHC "system" had the authority to provide clerkship slots with Wyckoff, and not just with the Caritas Hospitals, and that Wyckoff was prepared to provide those slots if the Caritas Hospitals did not.  <u>See</u> Pl. SJ Opp. at 29-30, DE #101.  The repudiation of that understanding by Wyckoff and the "system" could thus be viewed as the requisite wrongful act that injured Ross.  Furthermore, if BQHC executed the Agreement knowing that it did not have the authority under New York law to fulfill its contractual obligations, <u>see</u> <i>infra</i> pp. 57-63, that could likewise support a finding that Wyckoff engaged in a wrongful act, thereby satisfying the second prong of the veil-piercing test.  <u>See</u> <u>Bogosian v. All Am. Concessions</u>, No. 06-1633 (RRM)(RML), 2011 WL 4460362, at *9 (E.D.N.Y. Sept. 26, 2011) ("Entry into a transaction without the present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes.") (internal quotations and citations omitted).[29]

---

[29]  Defendants contend that the fact that BQHC signed the Agreement at Ross's request conclusively refutes Ross's veil-piercing claim.  <u>See</u> Def. SJ Reply at 5-6, DE #120. Defendants cite no legal authority to support this conclusion, and the Court is aware of none. The record contains ample evidence that representatives of Wyckoff described Wyckoff as having created a three-entity "system," with BQHC as the parent of both Wyckoff and Caritas. Not surprisingly, after the negotiating parties had agreed that clerkship slots at Wyckoff would "collateralize" the bargained-for slots at the Caritas Hospitals, Ross requested, and defendants agreed, that BQHC would be substituted for Caritas as the contracting party.  <u>See</u> <i>supra</i> p. 25. Having already represented that Wyckoff would guarantee the contractual slots, defendants should not be heard to move for judgment on the veil-piercing claim on the ground that Ross

(continued…)

As additional support for its showing on the second prong of the veil-piercing test, Ross cites various instances in which Wyckoff shuttled funds and employees between itself and Caritas. See Pl. SJ Opp. at 23, DE #101. While this evidence relates to Caritas, not to BQHC, Ross cites at least one instance wherein BQHC, which purportedly lacked substantial assets, apparently loaned Wyckoff approximately $1.9 million during the time period between the execution of the Agreement and the Second Amendment. See id. From this evidence a reasonable factfinder could conclude that Wyckoff was treating BQHC as its personal bank, thereby raising a genuine issue of material fact as to whether Wyckoff's domination of BQHC proximately caused Ross's injury by depleting BQHC of assets that might otherwise have been available to compensate Ross in the event of a breach. See, e.g., Atateks, 402 F.App'x at 626 (upholding district court's finding that transfer of commission payments to dominating corporation, which payments should have been made to dominated corporation, constituted a wrong resulting in plaintiffs' injury because the diversion of funds "exacerbated defendants' insolvency and rendered them less able to pay damages") (collecting cases); see also First Capital Asset Mgmt., Inc. v. N.A. Partners, L.P., 755 N.Y.S.2d 63, 67 (1st Dep't 2002) (reversing grant of summary judgment to individual defendant on veil-piercing claim, where he failed to "conclusively refute[] [plaintiff's] claim that he diverted corporate assets for his own personal use").

---

[29](...continued)
asked that the contract be signed by an entity with the apparent authority to deliver the contingency slots.

For the foregoing reasons, this Court recommends that the defense motion for summary judgment on Ross's veil-piercing claim against Wyckoff be denied.  See Network Enters., Inc. v. APBA Offshore Prods., Inc., No. 01 Civ. 11765 (CSH), 2004 WL 1837349, at *6 (S.D.N.Y. Aug. 16, 2004) (denying cross-motions for summary judgment on alter ego claim because of disputed facts that, "like so many tea leaves on the bottom of a cup, must be interpreted to make the critical factual determination as to whether or not" individual owner was alter ego of corporation).

## II.     Specific Performance

Finally, defendants move for summary judgment on Ross's claim for specific performance.  See Def. SJ Mem. at 23-27, DE #97-2.  Defendants contend that because BQHC did not have the requisite operating license, any court order requiring BQHC to direct Wyckoff to provide the clerkships under the Agreement would violate Article 28 of New York's Public Health Law, N.Y. Pub. Health Law §§ 2800 et seq.  See Def. SJ Mem. at 23-27, DE #97-2.  Ross in turn challenges defendants' interpretation of Article 28.  See Pl. SJ Opp. at 13-17, DE #101.[30]

---

[30]  Ross also argues that defendants' motion for summary judgment precluding specific performance should be denied because, although it is undisputed that BQHC was not a licensed Article 28 operator, see Pl. SJ Opp. at 14, DE #101, BQHC's actual operation of Wyckoff and Caritas -- including but not limited to its execution of affiliation agreements with Ross and AUC -- "raises a genuine issue of material fact that precludes summary judgment."  See id. at 14-16.  Even if BQHC conducted itself as if it were a licensed Article 28 operator, the legal issue in this regard is not whether BQHC had apparent authority to enter into affiliation agreements relating to its subsidiaries, but whether a court order requiring BQHC to perform under the Agreement would contravene New York law.

## A.    Governing Legal Principles

It is hornbook law that courts may not compel a party through specific performance to take actions in contravention of the law.  See Palombi v. Volpe, 249 N.Y. 194, 196 (1928); 12-64 Corbin on Contracts § 64.10 (although justice may require the payment of damages even though the promised performance is forbidden by law, "[t]he court will not often attempt to compel that which cannot in fact be done or that which is criminal or tortious."); cf. United Water New Rochelle, Inc. v. City of N.Y., 687 N.Y.S.2d 576, 580 (N.Y. Sup. Ct. 1999) ("Thus, courts will not enforce or compel the specific performance of a contract where the performance compelled thereby will bring about a result which is detrimental to the public interest.").

Article 28 of New York's Public Health Law requires that any entity seeking to operate a hospital within the state must receive written approval from the NYSDOH.  See N.Y. Public Health Law § 2801-a(1).  An entity is "an operator of a hospital if it has the decision-making authority" to, inter alia, "approv[e] hospital contracts for management or clinical services." See 10 N.Y.C.R.R. § 405.1(c)(1)-(7); see also Robert P. Borsody, Parent-Subsidiary Relationship of Not-For-Profit Corporations Raises Official Oversight Issues, 76-May N.Y. St. B.J. 20, 23 (May 2004) (New York regulations "provide that if the parent has certain operational authority over a subsidiary that is an Article 28-licensed entity, the parent has to apply to the [NYS]DOH for 'establishment' as a licensed Article 28 provider.").

### B.     Application of the Law to the Facts

It is undisputed that BQHC is not a licensed hospital "operator" under Article 28, see Def. 56.1 ¶ 26, DE #97-1; Pl. SJ Opp. at 14, DE #101, but that Wyckoff is.  See Def. 56.1 ¶ 11, DE #97-1.

### 1.     Wyckoff

Ross contends that defendants' challenge to the remedy of specific performance "is fatally premature" and cannot be adjudicated "before deciding Ross' veil piercing claim."  Pl. SJ Opp. at 13, DE #101.  More specifically, Ross argues that if it prevails on its veil-piercing allegations against Wyckoff, then "the Court may directly order Wyckoff to make Ross whole by providing clerkships, regardless of Article 28's purported limitations on BQHC."  Id. Defendants reply that their entitlement to summary judgment on the veil-piercing allegations "eliminat[es] any purported procedural obstacle to dismissing the Specific Performance Claim now."  Def. SJ Reply at 8, DE #120.  They do not opine on what should happen in the event the veil-piercing allegations remain in the case.

Contrary to the parties' assumptions, defendants' legal challenge to the availability of specific performance is ripe for resolution now, despite the pendency of the veil-piercing allegations.  Although defendants broadly demand dismissal of "Ross's Specific Performance Claim," see Def. SJ Mem. at 23, 27, 28, DE #97-2, their underlying argument is narrower in scope:  defendants claim that "*BQHC is not authorized to operate a hospital under Article 28 of the Public Health Law.*"  Id. at 23 (emphasis added); see id. at 27 ("BQHC's involvement would be contrary to that statute and its implementing regulations."); see generally id. at 25-27.  Defendants do not and cannot deny that Wyckoff, with its Article 28 license, is legally

authorized to operate its namesake hospital, including its clinical education program, and that

therefore an order compelling Wyckoff to comply with the Equivalent Clerkship Provision

would not contravene New York law.  To be sure, whether Ross is entitled to specific

performance by Wyckoff must await a final resolution of its veil-piercing claim.  Nevertheless,

because Article 28 creates no legal impediment to ordering specific performance against

Wyckoff if Ross prevails on its veil-piercing claim, defendants' motion to dismiss Ross's

demand for specific performance by Wyckoff should be denied.

### 2.  BQHC

As previously noted, decision-making authority over contracts for "clinical services"

requires an Article 28 license, see 10 N.Y.C.R.R. § 405.1(c)(6), and BQHC is not a licensed

operator.  Defendants therefore argue that the Court could not order specific performance by

BQHC.  Ross disagrees, claiming that New York law does not prohibit BQHC from *directing*

*Wyckoff* to provide clerkships to Ross.  See Pl. SJ Opp. at 14-15, DE #101.[31]  In support, Ross

cites two cases, wherein courts found that state licensing requirements did not preclude a

general contractor, who did not have an architectural or engineering license, from recovering

on a construction contract that included services requiring a license, where such services were

subcontracted to and lawfully performed by licensed professionals.  See id. at 14 (citing Tetra

Tech, Inc. v. Harter, 823 F.Supp. 1116, 1118 (S.D.N.Y. 1993), and Charlebois v. J.M.

---

[31]  Defendants correctly note that Ross's veil-piercing allegations and demand for specific
performance are in tension with one another, in that the veil-piercing claim alleges that
Wyckoff dominated BQHC, whereas the demand for specific performance is predicated on the
assumption that BQHC controls Wyckoff.  See Def. SJ Mem. at 2, DE #97-2; Pl. SJ Opp. at
14, DE #101.  For the reasons discussed below, this Court rejects Ross's arguments regarding
specific performance, and thus does not embrace the inconsistent theories espoused by Ross.

Weller Assocs., Inc., 72 N.Y.2d 587, 591-95 (1988)).  Ross's cases do not, however,

implicate Article 28 or the regulations promulgated thereunder; here, the activities for which

an Article 28 license is required include "decision-making authority over . . . approval of

hospital contracts for clinical services . . . ."  10 N.Y.C.R.R. § 405.1(c)(6).  Thus, in contrast

to the cases cited by Ross, the activity for which a license is legally mandated may not be

subcontracted to a licensed operator, as it is the decision to approve the contract that itself

triggers the licensing requirement.

Next, Ross points to evidence that the Agreement was subject to approval by the New

York State Department of Education and thus, Ross contends, would fall outside the purview

of Article 28 and the NYSDOH.  See Pl. SJ Opp. at 15-16, DE #101.  Nevertheless, Ross cites

no authority to support its assumption that the Department of Education's approval was in lieu

of or would obviate the need for approval by the NYSDOH.  Moreover, even assuming

*arguendo* that "Article 28 does not regulate the provision of [clinical medical] clerkships" per

se, Pl. SJ Opp. at 14, DE #101, but see 10 N.Y.C.R.R. § 405.1(c)(6), ordering specific

performance would require BQHC to direct the operations of a hospital without the requisite

Article 28 license, in violation of state law:  It is undisputed that, in order to effectuate the

Agreement's Equivalent Clerkship Provision, BQHC would have to cause Wyckoff to hire

additional medical staff, repudiate clerkship contracts it maintains with other schools and alter

its clerk-physician ratio.  See Def. 56.1 ¶¶ 66, 68, DE #97-1.  Thus, any direction by BQHC

to Wyckoff to offer clerkship slots commensurate with those specified in the Agreement would

undoubtedly impact Wyckoff's employee and managerial contracts, its legal liabilities and its

budget – all matters clearly falling within the exclusive purview of a licensed Article 28

"operator." <u>See</u> N.Y.C.R.R. § 405.1(c)(1)-(7).[32]  As BQHC is not licensed under Article 28, the Court should not compel BQHC to take action reserved by law for a licensed operator.

Accordingly, the Court recommends granting summary judgment in BQHC's favor on this issue and dismissing Ross's claim for specific performance as to BQHC, but not as to Wyckoff.

<strong><u>CONCLUSION</u></strong>

For the reasons explained above, this Court denies Ross's motion to strike and Ross's motion to preclude defendants from offering rebuttal expert opinions on damages.  In addition, the Court recommends that the District Court: (1) grant Ross's motion for partial summary judgment as to BQHC's liability for breach of contract; (2) grant in part and deny in part Ross's motion for summary judgment as to breach of contract damages; (3) grant Ross's motion for partial summary judgment dismissing defendants' Fourth through Eighth Affirmative Defenses; (4) deny defendants' motion for partial summary judgment on Ross's attempt to reach Wyckoff by piercing BQHC's veil; and (5) grant defendants' motion for

---

[32]  Defendants maintain that in <u>Healthnet Systems Consulting, Inc. v. Brooklyn-Queens Healthcare, Inc.</u>, 2009 N.Y. Misc. LEXIS 4239, at *6-7 (Sup. Ct. Queens Co. July 27, 2009), the court held that BQHC had no authority to enter into a consulting agreement for information and technology ("IT") services at any of its hospitals.  <u>See</u> Def. SJ Mem. at 26, DE #97-2. Ross rightly responds that the portion of the opinion on which defendants rely was not the court's holding but its summary of defendants' position.  <u>See</u> Pl. SJ Opp. at 16-17, DE #101. Relying on Article 28, the court in <u>Healthnet</u> denied plaintiff's motion for summary judgment, concluding that there were "issues of fact if BQHC could be a party to any such [IT consulting] agreement . . . ."  2009 N.Y. Misc. LEXIS, at *8.

Suffice it to say, whatever the persuasive force of the somewhat confusing <u>Healthnet</u> opinion, the instant case arises out of BQHC's approval of a contact for clinical (as opposed to IT) services -- an activity for which an Article 28 license was plainly required.  <u>See</u> 10 N.Y.C.R.R. § 405.1(c)(6).

partial summary judgment on Ross's request for specific performance against BQHC, but deny it as to Wyckoff, pending resolution at trial of the veil-piercing issues.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Kiyo A. Matsumoto on or before December 27, 2012. Failure to file objections in a timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

**Dated:**     **Brooklyn, New York**
          **December 7, 2012**

/s/ *Roanne L. Mann*

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**