UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

Plaintiff,

– against –

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-------------------------------------------------X

09 Civ. 1410 (KAM) (RLM)

**PLAINTIFF ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.'S
RULE 72(a) OBJECTIONS TO THE MAGISTRATE JUDGE'S
ORDER OF DECEMBER 7, 2012**

Sammi Malek
Baker & Hostetler LLP
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

George J. Tzanetopoulos
Baker & Hostetler LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

## TABLE OF CONTENTS

**Page**

Part I ............................................................................................................................. 2

      A.     Defendants' "Expert" Should Be Precluded From Offering Opinions
About Future Costs For Replacement Clerkships.................................................. 2

      B.     Applicable Legal Standards ................................................................................... 3

      C.     The Calculations Of Ross' Expert .......................................................................... 5

      D.     Duffy's Opinions, Lack Of Qualification, And Lack Of Basis .............................. 6

      E.     Duffy's Testimony Should Be Precluded ............................................................... 9

Part II ........................................................................................................................... 11

      A.     The Court Should Preclude Testimony From Duffy On The Prepayment
Balance And Past Incremental Cost Of Replacement Clerkships ....................... 11

      B.     Striking Defendants' Impermissible Rule 56.1 Statements ................................. 12

On December 7, 2012, Magistrate Judge Mann entered a combined Report and Recommendation / Memorandum and Order (the "Recommendation") that addresses both sides' motions for partial summary judgment and Ross University School of Medicine, Ltd.'s ("Ross") Motion To Preclude Defendant's Expert Witness and Ross' Motion To Strike Portions Of Defendants' Rule 56.1 Statement Of Undisputed Facts.

Pursuant to Fed. R. Civ. P. 72(a), Ross respectfully objects to the Magistrate Judge's denial of Ross' Motions to preclude and strike.[1] Ross has set out its objections in two parts. The first part sets forth Ross' objection to the Magistrate Judge's denial of Ross' motion to preclude defendants' expert from testifying as to the calculation of damages that would remedy the future costs above the contract price that Ross will incur in replacing the clerkships lost as a result of the breach of contract at issue here (the "Agreement"). The second part of the objections sets forth Ross' objections to the Magistrate Judge's denial of (1) Ross' motion to preclude defendants' expert from testifying as to the calculation of the unearned prepayment balance and incremental clerkship replacement costs incurred by Ross through June 30, 2011, and (2) Ross' motion to strike portions of defendants' Rule 56.1 statement. We place these latter objections in a separate section because, if the Court grants partial summary judgment in Ross' favor as set forth in the Recommendation, these objections will be immaterial to the outcome. Ross has asserted them here simply to preserve the right to assign error on the points should it later become necessary to do so. *See* Fed. R. Civ. P. 72(a).

---

[1] Ross has filed separately, pursuant to Fed. R. Civ. P. 72(b), objections to portions of the Magistrate Judge's Report and Recommendation on the cross-motions for partial summary judgment.

# Part I

### A.   Defendants' "Expert" Should Be Precluded From Offering Opinions About Future Costs For Replacement Clerkships

The Agreement obligates defendant Brooklyn-Queens Health Care ("BQHC") to provide clerkships for Ross' students through January 31, 2018. Accordingly, one component of the damages award that will be necessary to place Ross in the position that it would have been had BQHC not breached is an award of the present value of the difference between the sums that Ross would have paid to BQHC for those clerkships at the contract price and the sums that Ross will be required to pay at market prices to replace the undelivered quantities of clerkships during this future period. Both sides to this case have proffered expert witnesses to opine about the calculation of this figure, which each called the "Present Value of Future Incremental Costs on Replacement Clerkships."[2] *See* Report of Elizabeth K. Davis, DE #99-3 (hereinafter DE #99-3), at Ex. D; Report of Anthony G. Duffy, DE #99-2 (hereinafter DE #99-2), at p. 3.

Ross moved to preclude defendants' proffered expert, Anthony Duffy, from offering testimony regarding this category of damages because Duffy is unqualified to do so and his opinions were without appropriate basis. The Magistrate Judge denied this motion. Ross objects and respectfully submits that the Magistrate Judge's decision on this motion should be set aside and Duffy precluded from testifying.

As described in more detail below, the work of defendants' proffered expert, Anthony Duffy, consisted of copying the calculation of this sum prepared by work of Ross' expert, Elizabeth Davis, but arriving at a lower damages figure for the cost of replacing lost future

---

[2] Each calculated "future" costs beginning at July 1, 2011 because June 30, 2011 was the end of the last Ross fiscal year preceding the expert disclosure deadline in this action.

clerkships by simply plugging into Davis' calculation a lower rate than Davis had calculated for the rate at which future prices for clerkships would increase. Duffy used as his rate of increase for future prices the Consumer Price Index for All Urban Consumers ("CPI-U") rate that Ms. Davis had calculated for the CPI-U escalator for the price contained in the Agreement. Deposition of Anthony G. Duffy, DE #99-1 (hereinafter DE #99-1), at p. 53:6-15.

At deposition, Duffy conceded that he: is not an expert about the prices that hospitals charge to medical schools for clerkships; did review Ms. Davis' report, but did nothing else to learn about prices for medical student clerkships; did not review the material that Ross produced, including about five years' worth of its payments to more than 700 hospitals for clerkships; did not request or review any records from Wyckoff about Wyckoff's prices for clerkships; did not review any publicly available material about prices for clerkships provided at other hospitals or to other medical schools – not even the material about those topics specifically cited in Ms. Davis' report. He was unable to tie the use of CPI-U here to anything to do with the market for medical student clerkships and, indeed, conceded that he had no ability even to check whether CPI-U was a reasonable estimate for the increase in the future price of clerkships.

In short, Duffy grabbed the most convenient "price increase" rate available to him that was lower than that calculated by Ross' expert – in this case, the CPI-U rate that Ms. Davis had calculated for another purpose – and, without expertise or basis for opining that CPI-U is the rate at which prices for medical school clerkships will rise in the future, dropped it into Ms. Davis' formula to arrive at a lower figure for future cost damages than Ms. Davis had calculated.

Duffy should be precluded from offering this testimony at trial.

### B.   Applicable Legal Standards

While the requirements for "expertise" under FRE 702 are to be liberally construed, they do exist.

3

> "The Second Circuit has instructed that a trial court, in determining whether a witness is qualified to render an expert opinion, must first ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court should *further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert . . . to testify only if the expert's particular expertise . . . enables the expert to give an opinion that is capable of assisting the trier of fact.*"

*Am. Home Assurance Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 447 (S.D.N.Y. 2006) (citations and internal quotation marks omitted; brackets and ellipses in original, emphasis supplied). Where the proffered expert concedes a lack of expertise, the testimony should be excluded. *See, e.g., Bloom v. Promaxima Mfg. Co.*, 669 F. Supp. 2d 321, 329 (W.D.N.Y. 2009) ("The Court agrees that in its gatekeeper function, it shout not permit [a proffered expert] to testify" where "[a]t his pretrial deposition [he] candidly conceded that he was not competent to testify on the issue[.]").

Even where an expert is qualified to render an opinion, the Court's "gate-keeper" function for expert testimony goes well beyond the exclusion of "junk science" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Recommendation at 18. Instead, "[t]he criteria for evaluating the admissibility of expert testimony under *Daubert* and its progeny, including *Kumho Tire Co. v. Carmichael* . . . apply equally to the softer sciences of valuation, accounting, economics and financial services." *J.E.H. Knutson v. Walker & Assocs., Inc.*, Nos. 03-01973, 04-02112, 2005 WL 6088668, *1 (D. Colo. Sept. 7, 2005) (citation omitted).

Thus, when proffered "expert" testimony is challenged, a trial court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In carrying out this role, a trial judge is "to make certain that an expert, whether basing his testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "Even where an

4

expert's methodology is reliable, if the analysis is not based upon relevant and reliable data, the expert's opinion will be inadmissible." *Johnson Elec. N.A., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).

### C. The Calculations Of Ross' Expert

Because Duffy's opinion on the present value of incremental future costs consists solely of plugging a different rate for future price increases into the calculation created by Ross' expert, a brief description of Ms. Davis' work will be helpful to the Court (a more detailed description is contained in her report). Ms. Davis calculated the quantity of clerkships to be supplied under the Agreement during future periods, the contract rate in those future periods under the CPI-U escalator provision, and the base rate that Ross has to replace clerkships lost when the Caritas Hospitals closed.[3] Using Ross' business records, Ms. Davis and her staff analyzed the last five years of Ross' payments to the nearly 700 different hospitals and health care systems from which Ross has obtained clerkships during that period. From that data, she calculated: (1) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding three-year period; and (2) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding five-year period. She and her staff also interviewed the relevant employees at Ross and researched the publicly available information about rates charged by other New York hospitals for medical school clerkships provided to other medical schools. DE #99-3 at pp. 14-16.

Ms. Davis then calculated the present value of future incremental replacement costs by: multiplying for each remaining future year of the contract term the number of clerkships

---

[3] We note that Duffy conceded that each of those calculations was reasonable and that he had no criticism of them. *E.g.*, DE #99-1 at pp. 43:11-46:19; 83:6-17.

5

guaranteed under the contract by the weighted average rates (increased each year by the 3-year compound annual growth rate, which was the lower of the two calculated growth rates); subtracting from that result the contract price for that same number of clerkships; and then reducing the total to present value. The details of the calculation are set forth in Exhibit D to her report. DE #99-3 at Ex. D.

At deposition, Duffy testified that Ms. Davis approach to calculating this component of damages was a reasonable one:

> Q. Leaving aside your disagreement about replacement rates, does this approach at calculating the future incremental future costs of replacement clerkships from July 1, 2011, through January 31, 2018, is that, in your opinion, a reasonable approach?
>
> A. Yes, it is.
>
> Q. Any criticisms of the approach itself, leaving aside the question of rates?
>
> A. No. No, sir.

DE #99-1 at pp. 58:22-59:7.

### D. Duffy's Opinions, Lack Of Qualification, And Lack Of Basis

In contrast to the extensive study and work performed by Ross' expert, Duffy simply plugged into Ms. Davis' formula a "compound annual growth rate" that was equal to the rate that Ms. Davis had projected for the increase CPI-U. DE #99-1 at p. 53:6-15.

> Q. The growth rate that you chose for purposes of making your calculation was simply the projected increase in CPI-U, correct?
>
> A. That is correct.

DE #99-1 at p. 65:2-6. In every other respect, his work mirrored that of Ms. Davis and differed *only* where the use of CPI-U as the rate of future price increase led to a different result in the calculation:

6

Q. But is it correct that the only difference between the calculations that Ms. Davis did in Exhibit D and the work that you did in Exhibit B is the use of a different growth rate applied to the base rates, and then the different calculations that result from that different growth rate?

A. That is absolutely correct.

Q. So each of you, in the first column, use identical periods of time to be considered in each row?

A. Yes.

Q. And the months period, that would identical?

A. Yes.

Q. And minimum weeks per month guaranteed identical?

A. Yes.

Q. Forecasted weeks to be used identical?

A. Correct.

Q. The replacement rate, that's different.

A. That's where we're different.

Q. Contract rate is the same?

A. Yes.

Q. The incremental cost is different. But only because replacement rate is different?

A. That is correct.

Q. And the PV factor, that's identical?

A. Yes.

Q. So the present value is different. But, again, only because you used different rates?

A. That is correct.

Q. And the difference in the amounts that the two of you arrived at is the result, solely, of the use of those different replacement rates?

7

>   A.   Yes.

DE #99-1 at pp. 57:4-58:21.

Duffy's rationale for opining that CPI-U was the appropriate rate of increase for future prices of medical student clerkships was completely unconnected with any information about the market for clerkships:

>   Q.   My question wasn't why did you chose 2.201 as the growth rate for CPI-U, but rather in attempting to project the prices that Ross will have to pay in the future for clerkships for its medical students to replace those that were lost in this matter, why do you think that CPI-U is the right rate for the increase in that price?
>
>   A.   Because it's -- it is a rate, an expected growth rate, that is based on a very, very broad market segment.
>
>   Q.   Any other reasons?
>
>   A.   And it's not based upon individual motivation conditions in specific circumstances.
>
>   Q.   Any other reasons?
>
>   A.   No. That's it.

DE #99-1 at pp. 65:23-66:15.

He conceded that the change in price of any particular good or service, such as provision by hospitals of clerkships for medical students, can change at a rate different than CPI-U, DE #99-1 at p. 63:8-12, and further conceded that he did not perform any work to learn about the market for medical student clerkships (although he did review Ms. Davis' report):

>   Q.   Is it correct that everything that you did to understand the price that medical schools must pay to hospitals to obtain clerkships for their students was to review the information in Elizabeth Davis's report?
>
>   A.   Yes. Yeah. Or contained therein, yes.
>
>   Q.   And you did no other study?
>
>   A.   No, we did not.

8

> Q. As you noted, Ms. Davis's report notes some articles that she and her staff reviewed about other school's transactions, did you review those articles?
>
> A. We did not review the articles themselves.
>
> Q. And just to sum up, you had, from counsel, information about Ross's actual transactions. But other than the material in the Davis report, did not review it?
>
> A. No. Not any substantial, no.
>
> Q. And you did not -- Excuse me. You did not obtain from Wyckoff itself information that Wyckoff had about its sales to medical schools other than Ross?
>
> A. No.

DE #99-1 at pp. 67:19-68:20.

In the end, Duffy conceded what had become strikingly obvious during his deposition, *viz.*, he is not an expert about the prices on which he has been proffered by defendants to opine:

> Q. Do you consider yourself an expert about the pricing of clerkship rotations provided by hospitals to medical schools --
>
> A. No.
>
> Q. -- for their students?
>
> A. No.

DE #99-1 at p. 84:9-14.

### E. Duffy's Testimony Should Be Precluded

It is proper to exclude "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). And Duffy's opinion that the cost of clerkships will rise by only the increase in CPI-U is nothing more than his *ipse dixit*. He offered no reliable foundation for its use to forecast future price increases for clerkships. This lack of foundation is hardly surprising. Far from meeting the requirement that an expert "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field," *Kumho Tire Co.*, 526 U.S. at 152, Duffy admitted that, aside from reviewing the report of Ross' expert, he engaged in *no* study or research on which to base this opinion. Duffy's work consisted entirely of dropping a CPI-U rate forecast into Ms. Davis' calculations, which calculations Duffy conceded were a sound means of arriving at the appropriate sum for this component of damages. Duffy offers nothing to assist the finder of fact beyond this unsupported *ipse dixit*. Thus, we respectfully submit that the Magistrate Judge's decision should be set aside on these grounds alone.

Moreover, Duffy is, by his own admission, not an expert about the price of clerkships. His qualifications as a "general business valuation expert," which the Magistrate Judge cited as sufficient, Recommendation at 18, may or may not have qualified him to render an opinion about the future price of these clerkships had he performed appropriate study and analysis to learn about the price of clerkships. But the utter lack of study and analysis to which he admitted are, under settled law, disqualifying. *See Am. Home Assurance Co.*, 462 F. Supp. 2d at 447 (the "court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert . . . to testify only if the expert's particular expertise . . . enables the expert to give an opinion that is capable of assisting the trier of fact").[4]

---

[4] We note that the Magistrate Judge's comment that Ross' expert had "no *prior* experience evaluating medical school clerkships" does not salvage Duffy's lack of qualifications to offer the opinions proffered here. Recommendation at 17 (emphasis supplied). Indeed, comparison of Ms. Davis' work, which defendants correctly concede to be admissible, *see* Def. Resp. to Ross S.J., DE #110, at 24, with Duffy's utter lack of study and analysis highlights why Duffy's opinions should not be admitted. Ms. Davis did what qualified experts in this field do to make projections about financial transactions for established businesses; *viz*, she prepared projections based on review and analysis of years of data about similar transactions between Ross and more than 700 other hospitals, interviewed those with knowledge at Ross, chose a conservative projection supported by that data, and compared her projection with publicly available information about transactions between other medical schools and hospitals. *See, e.g., Travellers Int'l. A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994) (financial projections based on "historical operating statistics" of an established business provide an appropriate

*continued on next page...*

Accordingly, the Magistrate Judge's decision should also be set aside on the grounds that Duffy lacks qualifications to offer the proffered opinions.

## Part II

### A. The Court Should Preclude Testimony From Duffy On The Prepayment Balance And Past Incremental Cost Of Replacement Clerkships

The Magistrate Judge recommended granting partial summary judgment in favor of Ross on the amount of damages claimed by Ross for the prepayment balance that remains unearned and the incremental cost to Ross of replacing clerkships lost as a result of the breach of contract. If the Court adopts this recommendation, the Magistrate Judge's order denying Ross' motion to preclude Duffy from testifying concerning these amounts will be immaterial to the outcome. However, in order to preserve Ross' right to assign that denial as error should it become necessary to do so in later proceedings, Ross objects to the denial, respectfully notes that it should be set aside, and requests that the Court preclude Duffy from testifying as to these categories of damages.

The sums disclosed in Duffy's report concerning the amount of the Outstanding Pre-Payment Balance and Incremental Costs on Replacement Clerkships through June 30, 2011 are identical to the amounts calculated by Ross' damages expert. At his deposition, Duffy conceded he had no criticism of the calculations and, while he reviewed Ms. Davis' calculations of these elements of damages, he did not evaluate their reasonableness, simply plugged Ms. Davis' amounts into his report on damages calculations, and considered them to be outside the scope of

---

*...continued from previous page*

foundation for financial projections used in an expert's damages calculations). By contrast, the only study that Duffy undertook was to review Ms. Davis report. The difference in approach should be outcome-determinative here.

his engagement. *See* DE #99-1 at pp. 43:11-44:18; 45:7-46:19; 83:6-17. Thus, Ross moved to preclude this testimony, which merely parrots the work of plaintiffs' expert, as cumulative.

The Magistrate Judge's decision, citing *United States v. Jamil*, 707 F.2d 638 (2d Cir. 1983), held that it was premature to determine whether Duffy's testimony would be cumulative. Recommendation at 15-16. We respectfully note that *Jamil* is inapposite to the present issue. *Jamil* involved a criminal prosecution for violation of the Arms Export Control Act. In that case, the Court held that it was premature before trial to bar as cumulative the government from playing a secretly recorded audio tape of the defendant's dealings particularly because the government had the discretion to select which item of potentially duplicative evidence it might present. *Id*. *Jamil* simply does not apply here where the issue is whether defendants should be prohibited from introducing opinion testimony of their expert that simply parrots that of Ross' expert. Courts consistently hold that "an expert's opinion must be excluded if that expert is merely 'parroting' some other person's opinion." *See, e.g., Flagstone Dev., LLC v. Joyner*, No. 08-100, 2011 WL 5040663, *3 (D. Mont. Oct. 24, 2011); *Duetz Corp. v. City Light & Power, Inc.*, No. 05-3113, 2009 WL 2986415, *6 (N.D. Ga. Mar. 21, 2009) (the rules of evidence do "not permit an expert simply to parrot the opinions of other experts").

Thus, Duffy should be precluded here.

**B.      Striking Defendants' Impermissible Rule 56.1 Statements**

Ross moved to strike a number of defendants' Rule 56.1 statements because they were conclusory, inadmissible, or otherwise violated Rule 56.1. The Magistrate Judge's decision denied that motion, but indicated that she would simply disregard improper statements. Ross notes that moving to strike was proper, *see LaPine v. Seinfeld*, No. 08-128, 2009 WL 2902584, *4 (S.D.N.Y. Sept. 10, 2009); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00-4763, 2006 WL 2136249, *3 (S.D.N.Y. Aug. 1, 2006); *Rowe Entm't, Inc. v. William*

*Morris Agency, Inc.*, No. 98-8272, 2005 WL 22833, *1 n.1 (S.D.N.Y. Jan. 5, 2005), and objects only to preserve rights in the event that an assignment of error regarding the failure to disregard an inadmissible matter should later be required.

December 21, 2012

Respectfully submitted,

**BAKER & HOSTETLER LLP**

/ s/ George J. Tzanetopoulos

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

George J. Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

## CERTIFICATE OF SERVICE

I, George J. Tzanetopoulos, an attorney, certify that on December 21, 2012, I caused a true copy of the foregoing PLAINTIFF ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.'S RULE 72(a) OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER OF DECEMBER 7, 2012 to be served on counsel of record below by the United States District Court's ECF system and by email:

>Walter P. Loughlin
>Justin H. Roeber
>K&L Gates
>599 Lexington Avenue
>New York, New York  10022-6030

/s/ George J. Tzanetopoulos