UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                                       09 Civ. 1410 (KAM) (RLM)

Plaintiff,

-- against --

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-----------------------------------------------X

**PLAINTIFF ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.'S RULE 72(b)
OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION OF DECEMBER 7, 2012**

Sammi Malek
Baker & Hostetler LLP
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

George J. Tzanetopoulos
Baker & Hostetler LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School
of Medicine, Ltd.*

# TABLE OF CONTENTS

**Page**

Background ................................................................................................... 2

Objections Part I ........................................................................................... 3

    A.    The Court Should Deny Defendants' Request for Summary Judgment on Ross's Claim For Specific Performance Against BQHC ...................................... 3

    B.    The Court Should Grant Partial Summary Judgment On The Amount Of Damages ................................................................................................ 9

Objections Part II ......................................................................................... 14

    A.    The Contract Is Not Ambiguous .............................................................. 14

On December 7, 2012, Magistrate Judge Mann entered a combined Report and Recommendation / Memorandum and Order (the "Recommendation") that addresses both sides' motions for partial summary judgment and Ross University School of Medicine, Ltd.'s ("Ross") Motion To Preclude Defendant's Expert Witness and Ross' Motion To Strike Portions Of Defendants' Rule 56.1 Statement Of Undisputed Facts.

Pursuant to Fed. R. Civ. P. 72(b), Ross respectfully objects to the Recommendation to the extent that it recommends that the Court: (1) grant partial summary judgment against Ross as to Ross' specific performance claims against Brooklyn Queens Health Care, Inc. ("BQHC"); (2) deny Ross' motion for partial summary judgment as to the amount of damages for the future cost of replacing clerkships lost as a result of the breach of contract at issue here; and (3) find that the terms of the contract in dispute (the "Agreement") are ambiguous.[1]

Ross has set out its objections in two parts. The first part states Ross' objections to the Magistrate Judge's recommendation concerning the specific performance claim and the amount of damages. The second part states Ross' objections to the Magistrate Judge's recommendation concerning a finding of ambiguity. We place this latter objection in a separate section because, if the Court grants partial summary judgment in Ross' favor as set forth in the Recommendation, any finding of ambiguity will be immaterial to the outcome. Ross has asserted the objection here simply to preserve the right to assign error on this point should it later become necessary to do so. *See* Fed. R. Civ. P. 72(b).

---

[1] Ross has filed separately, pursuant to Fed. R. Civ. P. 72(a), objections to portions of the Magistrate Judge's Order on the motions to preclude and strike.

## Background

The Court is familiar with the basic outline of this breach of contract case. In short, the Agreement between Ross and BQHC provided that BQHC would cause its subsidiaries St. John's and Mary Immaculate Hospitals (the "Hospitals") to provide a guaranteed number of clinical clerkship rotations for Ross' medical students through January 31, 2018 and, if the Hospitals ceased to operate, would cause provision of the clerkships at another of BQHC's facilities. The only such other facility is BQHC's subsidiary Wyckoff Heights Medical Center ("Wyckoff"). The Hospitals filed for bankruptcy in February 2009 and closed in March 2009. Defendants have refused to provide replacement clerkships.

Under the Agreement: (1) Ross had advanced $13 million in prepayments for clinical clerkship rotations; (2) the prepayment balance bore interest and was to be reduced at a contractually-specified, per week, per clerkship rate as clerkships were provided to Ross; and (3) once the prepayment was exhausted, Ross was to be invoiced and pay at an agreed rate for clerkships provided through the end of the contract term, January 31, 2018. At the time that the Hospitals closed, a substantial balance of the prepayment remained unearned. Ross has paid other hospitals to obtain replacement clerkships and will be required to do so through the January 31, 2018 end of contract term.

As described in more detail below, the damages experts proffered by both sides calculated in an identical manner the amount of damages for future costs in excess of the contract price that Ross will be required to incur for replacement clerkships—with one exception. Ross' expert calculated a rate of increase in future prices from years of information about Ross' purchases of clerkships from hundreds of hospitals and publicly available information about purchases of clerkships by other schools from other hospitals. Using this rate, she calculated future cost damages to be $12,738,735. Defendants' proffered expert, Anthony Duffy, used

exactly the same method of calculating this component of damages as did Ross' expert, but used

a projection of the Consumer Price Index for All Urban Consumers ("CPI-U") as the rate of

future price increases.  His calculation resulted in a future cost damages component of

$5,525,367.

Ross moved to preclude plaintiff's expert for lack of qualification and basis for his

opinion.  Ross also moved for partial summary judgment on the amount of future cost damages

on two alternative bases.  If the Court precludes defendants' expert, Ross seeks a finding that the

amount of future cost damages is the $12,738,735 calculated by Ross' expert.  If the Court

declines to preclude defendants' expert, then Ross seeks a finding that future cost damages are at

minimum the $5,525,367 calculated by defendants' expert.  Damages proceedings at trial, then,

would be limited to resolving the dispute between these two figures.

Defendants moved for partial summary judgment, contending, *inter alia*, that the Court

cannot lawfully order BQHC to specifically perform the Agreement.

### Objections Part I

**A.      The Court Should Deny Defendants' Request for Summary Judgment on Ross's Claim For Specific Performance Against BQHC.**

The Magistrate Judge incorrectly recommended that summary judgment should be

entered in defendants' favor on Ross's claim for specific performance against BQHC.

Defendants argued that the Court could not order BQHC to direct Wyckoff to provide clerkships

under the Agreement because doing so would violate Article 28 of New York's Public Health

Law.  Defendant's Mem. in Support of M.S.J., DE #97-2 (hereinafter DE #97-2), at pp. 23-27.

Unable to point to a single law or regulation that actually prohibits BQHC from ordering

Wyckoff to provide clerkships, defendants patched together an argument based on an amalgam

of regulations ranging from governing bodies of hospitals to the delegation of the powers of a

hospital CEO. *Id.* at pp. 24-25. The Magistrate Judge ultimately agreed in principle with defendants' position, although not for any reason that they articulated. Instead, the Magistrate Judge recommended finding that the Agreement to provide clerkship rotations for medical students was a "hospital contract[] for clinical services" within the meaning of the New York Public Health Law, *see* 10 N.Y.C.R.R. § 405.1(c)(6), and that decision-making authority over such contracts required an Article 28 license that BQHC does not possess. Recommendation at p. 61. Alternatively, the Magistrate Judge recommended finding that even if Article 28 did not regulate contracts for medical clerkships, specific performance could not be ordered because it "would require BQHC to direct the operations of a hospital without the requisite Article 28 license, in violation of state law[.]" *Id.*

Respectfully, the Magistrate Judge erred in arriving at each of these conclusions.

The starting point for this analysis is New York's Not-For-Profit Corporation Law. It is undisputed that BQHC is organized as a corporation under the Not-For-Profit Corporation Law and is the sole member of Wyckoff. Def. 56.1 Stmt., DE #97-1 (hereinafter DE #97-1), at Roeber Dec. Ex. 12 at BQHC00443. As a "sole member," BQHC may lawfully exercise over Wyckoff all of the governance powers granted to a controlling shareholder corporation over its subsidiary. *See* Robert H. Iseman, *Active Parents in Passive Clothing?*, 17 NYSBA Health Law Journal 1, 26 (2012) ("The concept of one not-for-profit corporation . . . exercising the governance authority given to members under the NPCL[] has provided the foundational legal basis and the structural building blocks for virtually all health care systems in the state of New York for at least the last 30 years."). And although "often referred to as 'passive' control exercised by a 'passive parent' entity," *id.*, the exercise of governance authority by a member corporation extends to any lawful purpose set forth in the Not-For-Profit Corporation Law.

4

Indeed, even defendants concede that BQHC has the authority to elect and remove members of Wyckoff's Board of Trustees, Pl.'s. Stmt. Add'l. Facts, DE #102 (hereinafter DE #102), at ¶29, thereby empowering BQHC to control Wyckoff just like any other parent corporation controls a wholly-owned subsidiary.

Further, "[t]he exercise of such membership-derived governance authority *has never required the licensure of a hospital member as an 'established' operator* under the laws of New York or any other state." Iseman, *Active Parents in Passive Clothing?*, 17 NYSBA Health Law Journal 1, at 26 (emphasis supplied). In fact, it is only when a member actually "operates" a hospital that Article 28 of New York's Public Health Law potentially restricts the wide grant of membership authority under the Not-For-Profit Corporation Law. *See* 10 N.Y.C.R.R. § 405.1(c). A member is considered an "operator" of a hospital only if it has decision-making authority over seven specifically-delineated subject areas, one of which is the "approval of hospital contracts for management or for clinical services[.]" *See id.* § 405.1(c)(6). Construing this regulation, the Magistrate Judge erroneously decided that the Agreement was a contract for "clinical services" that required an Article 28 license (which BQHC does not have) for approval. Recommendation at p. 61.

This conclusion is not supported by any evidence. The Magistrate Judge cited no facts to support her finding that the Agreement is a contract for "clinical services," *see id.* at pp. 59-62, which is not surprising given that defendants did not provide any. *See* DE #97-2 at pp. 23-26. Further, neither the Magistrate Judge nor defendants cite any laws or regulations defining medical clerkships as "clinical services" under the Public Health Law. Again, this is not surprising because the regulation of the provision of clerkships to medical students, including review and approval of contracts with international medical schools, is provided by the New

York State Department of Education, not the Department of Health. *See* 8 N.Y.C.R.R. § 3.2(d)(5)(xii); § 59.9(g),(h); § 60.2. Indeed, it is undisputed that the Agreement and other affiliation agreements for clerkships are governed by, were submitted for approval to, and approved by the New York Department of Education. DE #102 at ¶29. In short, there is simply no evidence to support the Magistrate Judge's conclusion that the Agreement to provide clerkships to medical students is a "hospital contract[] for . . . clinical services" and, as discussed, there is evidence in the record to support the proposition that the clerkships do not fall within the meaning of that term.

But even assuming the Agreement is a "hospital contract[] for . . . clinical services," Article 28 does not prohibit the Court from ordering BQHC to direct Wyckoff to provide replacement clerkships. The same regulations cited by the Magistrate Judge expressly permit a passive parent to exercise decision-making authority over such contracts if doing so is consistent with the mission and philosophy of the hospital subsidiary. Section 405.1(d) provides:

> (d) Nothing in subdivision (c) of this section [405.1] shall require the establishment of any member of a not-for-profit corporation, which operates a hospital, based upon such member's reservation and exercise of the power to require that the hospital operate in conformance with the mission and philosophy of the hospital corporation.

10 N.Y.C.R.R. § 405.1(d). As recently explained by a leading authority in the area of corporate governance of New York hospitals, "[t]he exception [in Section 405.1(d)] permits passive parent entities to exercise the active parent powers enumerated in Section 405.1(c) ***without Article 28 establishment and licensure*** as long as the passive parent corporation's authority over an active power is limited to ensuring compliance with mission and philosophy." Iseman, *Active Parents in Passive Clothing?*, 17 NYSBA Health Law Journal 1, at 27.

And in this case, Wyckoff's "mission and philosophy" expressly includes the provision of clinical medical education.  As its bylaws provide:

## PURPOSE AND PHILOSOPHY

> The role and purpose for which Wyckoff Heights Medical Center has been formed are to establish and maintain, and operate, on a not-for-profit basis, a Medical Center facility for the prevention, diagnosis, treatment and/or rehabilitation of [patients] . . . and strengthen quality programs of clinical, education and preventative medicine and to provide skillful and compassionate medical care, health services and clinical research . . . .

> The [Wyckoff Heights] Medical Center is part of The New York and Presbyterian Healthcare System.  The mission of the System is providing a single standard of the highest quality care by . . . increasing the commitment to excellence in teaching and research . . . . This will be achieved through an integrated academic health care delivery system that provides the highest quality medical care in a compassionate, caring and cost-effective manner to the people of the New York City Metropolitan area.

DE #97-1, at Roeber Dec. Ex. 12 at BQHC00344-45 (Wyckoff By-Laws).  Accordingly, even if the Agreement is deemed to be a "hospital contract for . . . clinical services" (which it cannot on this record), BQHC may lawfully exercise decision-making authority over this contract with respect to Wyckoff because doing so is consistent with ensuring compliance with Wyckoff's mission and philosophy.  *See* 10 N.Y.C.R.R. § 405.1(d).[2]

---

[2] The Magistrate Judge also found that "[i]t is undisputed that, in order to effectuate the Agreement's Equivalent Clerkship Provision, BQHC would have to cause Wyckoff to hire additional medical staff, repudiate clerkship contracts it maintains with other schools and alter its clerk-physician ratio. *See* DE #97-1, at ¶¶ 66, 68." Recommendation at p. 61.  However, this finding is not supported by the record.  It was only undisputed that (a) at the time of the Caritas closure, Ross *expected* Wyckoff to provide replacement clerkships by either repudiating other contracts or hiring other medical staff, *id.* at ¶66, and (b) at the time of filing (January 2012), Wyckoff's clinical capacity was being fully realized, *id.* at ¶68.  There is no record evidence that an order of specific performance *in the future* would actually require the hiring of additional medical staff or the repudiation of any contracts.

Moreover, such member governance is entirely consistent with the record of evidence of defendants' own conduct. Not only did BQHC legally enter into agreements for the provision of clerkships at its subsidiary hospitals in its own name, but it also legally entered into contracts with vendors and nursing staff providers to provide nursing services at Wyckoff and Caritas. DE #102 at ¶¶90-93. Moreover, BQHC entered into a consulting agreement with FTI Cambio—with the New York Department of Health's approval—under which FTI, among other things, would "improv[e] the management, financial stability, *and clinical performance* of WYCKOFF and CARITAS, and tak[e] steps to provide . . . high quality health care services in the communities they serve." *Id.* at  ¶¶52-55, ¶90 (emphasis supplied). In fact, even though the contract was entered into between FTI and BQHC, the state regulators "insisted" that FTI be given "management control" over Wyckoff and the Caritas hospitals. *Id.* at ¶54. This lawful exercise of authority by BQHC is wholly inconsistent with the Magistrate Judge's reading of Article 28 and its regulations and fully supports Ross's position that specific performance is available in this case.

This type of membership governance is also consistent with case law that permits arrangements in which a party without a license to perform a particular act contractually commits to cause a licensed party to perform the act on the contracting party's behalf. *See, e.g., Tetra Tech., Inc. v. Harter*, 823 F. Supp. 1116, 1118 (S.D.N.Y. 1993) (signatory of contract need not be "licensed under an applicable state statute" where the contract contemplates that a party with a proper license will be caused to perform the regulated obligation); *Charlebois v. J.M. Weller Assocs., Inc.*, 72 N.Y.2d 587, 591-95, 535 N.Y.S.2d 356 (1988) (same). The Magistrate Judge distinguished these cases on the ground that "it is the decision to approve the contract that itself triggers the licensing requirement" and thus cannot be subcontracted, Recommendation at p. 61;

however, as explained above, the Magistrate Judge's interpretation of the applicable regulations fails to appreciate that a passive parent may exercise the active parent powers enumerated in Section 405.1(c) without Article 28 establishment and licensure as long as it is ensuring compliance with its subsidiary's (or here, subcontractor's) mission and philosophy. *See* Iseman, *Active Parents in Passive Clothing?*, 17 NYSBA Health Law Journal 1, at 27.

In sum, the Magistrate Judge erred in concluding that the Agreement was a "hospital contract[] for . . . clinical services." The Magistrate Judge also erred by concluding that, as a contract for clinical services, the Court could not lawfully order BQHC to direct Wyckoff to provide replacement clerkships without running afoul of Article 28. To the contrary, specific performance is available in this case because BQHC's governance authority with respect to the Agreement is not limited by Article 28. At a minimum, the factual disputes about the nature of these clerkships cannot be resolved on a motion for summary judgment.

## B.     The Court Should Grant Partial Summary Judgment On The Amount Of Damages.

The Magistrate Judge recommended denying Ross' motion for partial summary judgment on the amount of damages on the grounds that defendants seek to pursue an argument that Ross' expert's "assumptions and deposition testimony render the *entire* category of Future Replacement costs unduly speculative." Recommendation at p. 45. We respectfully submit that this recommendation improperly reverses New York law's burden of proof on uncertainty regarding the amount of damages in breach of contract actions. It also overlooks the fact that defendants have provided no admissible evidence of facts to carry their burden on this question.

"It has long been established under New York law that when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever

for the breach." *Blue Moon Media Group, Inc. v. Field*, No. 08-1000, 2011 WL 4056068, *6 (Apr. 11, 2011) (internal quotation marks and citations omitted).  Thus, in a breach of contract case, "plaintiff need only show a stable foundation for a reasonable estimate of damages to which he is entitled as a result of the breach . . . [t]he wrongdoer must shoulder the burden of uncertainty regarding the amount of damages." *Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 391-392 (2d Cir. 2006) (internal quotation marks and citations omitted).

As an initial matter, we note that both experts opined that the price of replacement clerkships in the future will exceed the contract price to which the parties agreed.  Thus, there is no genuine dispute that there are future cost damages that flow from the breach of the Agreement here.  Recommendation at pp. 14-15.

Ms. Davis' calculations plainly provide a stable foundation for the estimate of these damages.  Using the terms of the Agreement and Ross' financial records, she calculated the quantity of clerkships to be supplied under the Agreement during future periods, the contract rate in those future periods, and the base rate that Ross has already paid to replace lost clerkships. From Ross' business records, Ms. Davis and her staff analyzed the last five years of Ross' payments to the nearly 700 different hospitals and health care systems from whom Ross has obtained clerkships during that period.  From that data, she calculated: (1) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding three-year period; and (2) the compound annual growth rate by which Ross' New York clerkship costs increased over the preceding five-year period.  She and her staff also interviewed the relevant employees at Ross and researched publicly available information about rates charged by other New York hospitals for medical school clerkships provided to other medical schools.  *See* Report of Elizabeth K. Davis, DE #95-9 (hereinafter DE #95-9), at pp. 14-16.

Ms. Davis then calculated the present value of future incremental replacement costs by: multiplying for each remaining future year of the contract term the number of clerkships guaranteed under the contract by the weighted average rates (increased each year by the 3-year compound annual growth rate, which was the lower of the two calculated growth rates); subtracting from that result the contract price for that same number of clerkships; and then reducing the total to present value.  The details of the calculation are set forth in Exhibit D to her report.  *See* DE #95-9 at Ex. D.

Defendants' proffered expert conceded that this means of calculating future costs damages is reasonable and, with the exception of using a different rate for the amount by which prices will increase in the future, adopted Ms. Davis' method in its entirety in his own calculations:

> Q.    Leaving aside your disagreement about replacement rates, does this [Ms. Davis'] approach at calculating the future incremental future costs of replacement clerkships from July 1, 2011, through January 31, 2018, is that, in your opinion, a reasonable approach?
>
> A.    Yes, it is.
>
> Q.    Any criticisms of the approach itself, leaving aside the question of rates?
>
> A.    No.  No, sir.

Deposition of Anthony G. Duffy, DE #99-1 (hereinafter DE #99-1), at pp. 58:22-59:7.

> Q.    But is it correct that the only difference between the calculations that Ms. Davis did in Exhibit D and the work that you did in Exhibit B is the use of a different growth rate applied to the base rates, and then the different calculations that result from that different growth rate?
>
> A.    That is absolutely correct.

DE #99-1 at pp. 57:4-58:21.

This is hardly surprising.  Use of "historical operating statistics" of a business, as was done here by both sides' experts, is well-established as an appropriate foundation for financial projections used in an expert's damages calculations.  *See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1579 (2d Cir. 1994).

Thus, if the Court does not exclude Duffy, it should award partial summary judgment on the amount of damages at a minimum in the amount that he calculated and set proceedings on damages at trial to address the difference between the figures provided by the two proffered experts.  Partial "[s]ummary judgment with respect to damages is appropriate when there is no genuine issue of material fact regarding the amount of damages claimed."  *Textron Fin. Corp. v. Seven Falls Golf & River Club, LLC*, No. 09-00312, 2011 WL 25115, *6 (W.D.N.C. Jan. 25, 2011).  Where the submissions on a motion for summary judgment establish a range of damages, the Court may appropriately order that trial proceedings on damages to be limited to establishing the amount within that range.  *See Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 362 (E.D.N.Y. 1998).

Given the burden established by New York law, defendants' arguments about uncertainty of amount cannot preclude partial summary judgment here.  As noted above, under New York law, "there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach."  *Blue Moon Media Group, Inc.*, 2011 WL 4056068 at *3.  Ross has submitted a "stable foundation for a reasonable estimate of damages" – indeed, a foundation that defendants' expert has conceded to be an appropriate means of arriving at this figure.  The ***only*** difference between the calculations of the two experts is Duffy's use of CPI-U as the rate of future price increase and Ms. Davis' use of a rate calculated from actual transactions.  If Duffy is permitted to testify, the finder of fact will be tasked with deciding between the two rates of

increase.  But, contrary to the defendants' argument, there simply is no basis for an award of a sum less than that calculated by Duffy.

Moreover, if Duffy is precluded, then the Court should enter partial summary judgment in the amount calculated by Ms. Davis.  As noted above, Ross has provided an appropriate foundation for that award.  Thus the burden of any uncertainty of amount falls on defendants.  Accordingly, at this stage of the proceedings defendants must come forward with admissible evidence to support a different amount or else have judgment entered against them.  Summary judgment, as the Second Circuit has observed, is the time "to put up or shut up."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Without Duffy's testimony, defendants have no such evidence.  Although defendants quibble with Ms. Davis's opinions, they do not offer any admissible *evidence* that would create an issue of material fact regarding the amount of Ross' damages.  Defendants argue that Ms. Davis' opinions are subject to question because she looked only at Ross' payment records and failed to account for contracts that involved multi-year terms or prepayment structures.  Def. Opp. to M.S.J., DE #110 (hereinafter DE #110), at pp. 23-24.  But not only is this contention untrue—her expert report confirms she reviewed market rates, including for multi-year contracts, *see* DE #95-9 at pp. 14-15—but defendants offer no actual evidence to support their argument that other data would have yielded a lower damages amount.

Similarly, defendants complain that Ms. Davis assumed that Ross will fully utilize all clerkships available through the end of the Affiliation Agreement.  DE #110 at p. 24.  Even defendants' expert agreed that Ross would exercise its option to renew the Affiliation Agreement through 2018 and fully utilize every clerkship slot available, which seems obvious given that both experts project a future price for clerkships that is higher than the contract price.  *See* Report

13

of Anthony G. Duffy, DE #95-11 (hereinafter DE #95-11), at p. 6. ("I assumed that Ross would continue to utilize the full number of clerkship slots pursuant to the Second Amendment."). Thus, there is no factual basis to attack Ms. Davis on these grounds.

In addition, defendants argue that "Ms. Davis also assumes that Ross will not take any steps to mitigate its damages . . . [such as] raising tuition." DE #110 at p. 24. But raising tuition is not mitigation. If Ross were in fact be able to raise tuition, it would be entitled to retain the proceeds of doing so and still demand that defendants supply the promised clerkships at the promised price.

Defendants' final critique relies on citing a newspaper article as support for the statement that "Ms. Davis fails to acknowledge that a variety of legislative, political, or economic factors may dramatically alter the marketplace for medical school clerkships." DE #110 at p. 25. But not only do defendants fail to articulate how such changes would lower the damages amount, the newspaper article is inadmissible on summary judgment. *See Century Pac. Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 217 (S.D.N.Y. 2007) ("Newspaper articles offered for the truth of the matter asserted are inadmissible hearsay.").

In short, because defendants bear the burden of any uncertainty in the amount of future cost damages and have submitted no other admissible evidence on that amount, if the Court precludes Duffy's testimony, judgment should be entered in the amount calculated by Ms. Davis.

### Objections Part II

#### A.     The Contract Is Not Ambiguous.

In recommending that the Court enter partial summary judgment in favor of Ross with respect to BQHC's liability for breach of contract, the Magistrate Judge correctly notes that the undisputed extrinsic evidence is so one-sided in showing that "Wyckoff would provide equivalent clerkships to collateralize the clerkships promised in the Agreement" that "no

reasonable person could reach the contrary conclusion." Recommendation at p. 29. Ross does not object to this portion of the Recommendation.

However, in reaching this conclusion, the Magistrate Judge recommended finding that the language of the Agreement's Equivalent Clerkship Provision[3] is ambiguous. If the Court adopts the Magistrate Judge's Recommendation to find in favor of Ross on BQHC's liability for breach of contract, the recommendation regarding ambiguity will be immaterial to the outcome. However, in order to preserve Ross' right to assign any finding of ambiguity as error should it become necessary to do so in later proceedings, Ross respectfully notes that a finding of ambiguity would be mistaken and, accordingly, objects to that portion of the Recommendation.

The applicable legal standards are well settled. "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Suppl. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and citations omitted). "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of the language in question, nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Milestone Shipping, SA v. Estech Trading LLC*, No. 11-14, 2011 WL 4344098, *6 (S.D.N.Y. Sept. 8, 2011) (quotation marks omitted). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the

---

[3] The Magistrate Judge's Recommendation referred to this clause as the "Equivalent Clerkship Provision." Ross' briefs referred to it as the "Guaranty Clause." For ease of reference, in this Objection we follow the Magistrate Judge's usage.

parties intended a meaning different than that expressed in the agreement." *Brad H. v. New York*, 951 N.E.2d 743, 746 (N.Y. App. 2011).

Here, the Agreement's recitals state that BQHC "through its subsidiary, Caritas Healthcare Planning, Inc., owns and operates" the two "[Caritas] Hospitals" and the "[Caritas] Hospitals have facilities for furnishing a clinical medical education to [Ross'] students." The Agreement provides that "BQHC shall cause the [Caritas] Hospitals to provide clinical clerkships" to Ross' students. In the Equivalent Clerkship Provision, the Agreement states that:

> In the event the [Caritas] Hospitals are not operative, and [Ross] is not in breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of ***its other*** facilities. (emphasis supplied).[4]

It is undisputed that, aside from the Caritas Hospitals, Wyckoff was and is the only other BQHC facility at which BQHC can provide such clerkships. *See* Recommendation at p. 27.

Accordingly, defendants concede the obvious, *viz.,* this clause can reasonably be interpreted to require that BQHC provide replacement clerkships at Wyckoff when the Caritas Hospitals ceased to operate. DE #110 at p. 14. It is this interpretation that the Magistrate Judge concluded is required by the undisputed extrinsic evidence.

Because it is reasonable to interpret the Equivalent Clerkship Provision to require that BQHC provide replacement clerkships at Wyckoff, in order to find that this provision is ambiguous here, the Court would have to find that it would also be reasonable to read BQHC's promise to provide replacement clerkships at "one or more if its other facilities" to mean that replacement clerkships ***will not*** be provided at the ***only*** BQHC facility at which replacement clerkships could be provided, *viz.*, Wyckoff. We respectfully submit that such an interpretation

---

[4] We note that the Recommendation's initial quotation of the Equivalent Clerkship Provision erroneously omits the word "other." *See* Recommendation at p. 5.

is not a reasonable construction of this language.  Accordingly, the recommendation to find ambiguity is error.

The Magistrate Judge's suggestion that a finding of ambiguity is merited on the grounds that "[w]hich BQHC facilities were encompassed within the Equivalent Clerkship Provision is not clear from the face of the Agreement," Recommendation at p. 24, misses the mark.  It is certainly the case that had BQHC acquired facilities in addition to Wyckoff that could provide replacement clerkships, the Equivalent Clerkship Provision would have required BQHC to provide Ross with replacement clerkships at either Wyckoff or another of those after-acquired facilities.  But BQHC did not do so.  The present dispute is not one over whether BQHC must provide replacement clerkships at Wyckoff or, instead, at another BQHC facility that can provide replacement clerkships.  The undisputed context of this case is that there is and was only one other BQHC facility that is able to provide replacement clerkships – Wyckoff.

Because a finding of ambiguity would require an unreasonable construction of the Equivalent Clerkship Provision, reading BQHC's promise to provide replacement clerkships at "one or more of its other facilities" to mean that BQHC *will not* provide replacement clerkships at the only other BQHC facility that could do so, as a matter of law, there is no ambiguity here.

December 21, 2012

Respectfully submitted,

**BAKER & HOSTETLER LLP**

   / s/ George J. Tzanetopoulos      

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

George J. Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

**CERTIFICATE OF SERVICE**

I, George J. Tzanetopoulos, an attorney, certify that on December 21, 2012, I caused a

true copy of the foregoing PLAINTIFF ROSS UNIVERSITY SCHOOL OF MEDICINE,

LTD.'S RULE 72(b) OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND

RECOMMENDATION OF DECEMBER 7, 2012 to be served on counsel of record below by

the United States District Court's ECF system and by email:

> Walter P. Loughlin
> Justin H. Roeber
> K&L Gates
> 599 Lexington Avenue
> New York, New York  10022-6030

/s/ George J. Tzanetopoulos