Walter P. Loughlin
Brian D. Koosed
Justin H. Roeber
K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900
Facsimile: (212) 536-3901

*Attorneys for Defendants Brooklyn-Queens Health
Care, Inc. and Wyckoff Heights Medical Center*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.,  :
                                           :
                    Plaintiff,             :
                                           :
            - against -                    :        09 Civ. 1410 (KAM) (RLM)
                                           :
BROOKLYN-QUEENS HEALTH CARE, INC. and      :
WYCKOFF HEIGHTS MEDICAL CENTER,            :
                                           :
                    Defendants.            :
-------------------------------------------------------------------X


**DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE
MANN'S REPORT AND RECOMMENDATION ON THE PARTIES'
<u>CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STANDARD OF REVIEW ............................................................................................2

ARGUMENT ................................................................................................................3

I.    The R&R Erred Because It Failed To Consider The Extrinsic Evidence Cited By
      Defendants That, At A Minimum, Would Permit A Reasonable Jury To Conclude
      That The Equivalent Clerkship Provision Was Not Intended To Apply To
      Wyckoff. .........................................................................................................3

      A.    The R&R ignored key testimony from Julius Romero. ..........................4

      B.    The R&R ignored the relevant testimony and contemporaneous  conduct
            of Wyckoff's Board of Trustees. .......................................................7

      C.    The R&R ignored the relevant drafting history of the Affiliation
            Agreement. ........................................................................................8

II.   The R&R Erred Because Its Legal Analysis Of Ross's  Veil Piercing Claim Was
      Flawed. ........................................................................................................10

      A.    The R&R erred because no triable issue exists as to the first prong of
            Ross's Veil Piercing Claim, whether Wyckoff completely dominated
            BQHC *with respect to the Affiliation Agreement.* ..................................11

      B.    The R&R erred in finding that a triable issue exists as to the second prong
            of Ross's Veil Piercing Claim because the R&R rested on a faulty
            understanding of wrongfulness under New York law. ...........................13

III.  The R&R Erred By Finding That No Triable Issues Exist As To Ross's Damages
      For Its Present Replacement Costs. .................................................................16

CONCLUSION............................................................................................................18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Al Sayegh Bros. Trading (LLC) v. Doral Trading & Exp., Inc.*,
    219 F. Supp. 2d 285 (E.D.N.Y. 2002) ...................................................................10

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
    122 F.3d 130 (2d Cir. 1997) ......................................................................10, 11, 13

*Am. Protein Corp. v. AB Volvo*,
    844 F.2d 56 (2d Cir. 1988) .................................................................................15

*Corbett v. Napolitano*, --- F. Supp. 2d ---, 2012 WL 4447553,
    (E.D.N.Y. Sept. 25, 2012) ....................................................................................6

*Favour Mind Ltd. v. Pacific Shores, Inc.*,
    No. 98 Civ. 7038 (GBD), 2004 WL 97649 (S.D.N.Y. Jan. 20, 2004) ..............16

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) ...............................................................................13

*Hurst v. Conopco, Inc.*,
    08-cv-1422, 2011 U.S. Dist. Lexis 71584 (D. Conn. July 5, 2011) ..................10

*In re Adelphia Commc'ns Corp.*,
    322 B.R. 509 (Bankr. S.D.N.Y. 2005)................................................................11

*Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*,
    28 F. Supp. 2d 91 (E.D.N.Y. 1999) ...................................................................11

*Network Enters. v. APBA Offshore Prods.*,
    264 Fed. Appx. 36 (2d Cir. 2008).......................................................................16

*Topps Co., Inc. v. Cadbury Stani S.A.I.C.*,
    526 F.3d 63 (2d Cir. 2008) ...................................................................................6

*United States v. Gellerstein*,
    No. 08-CV-2702 (KAM) (JO), 2011 WL 710446 (E.D.N.Y. Feb. 22, 2011) ....2

*United States v. Male Juvenile*,
    121 F.3d 34 (2d Cir. 1997) ...................................................................................3

*Vendetti v. Fiat Auto S.p.A.*,
    802 F. Supp. 886 (W.D.N.Y. 1992).....................................................................13

## STATE CASES

*Baccash v. Sayegh,*
    53 A.D.3d 636, 862 N.Y.S.2d 564 (2d Dep't 2008) ..............................................15

*F&M Precise Metals, Inc. v. Goodman,*
    Index No. 6546-04, 2004 WL 2059567 (Sup. Ct. Nassau Co. Aug. 25, 2004) ................14

*Sheridan Broadcasting Corp. v. Small*, Index No. 603681/2003,
    2004 WL 5833748 (Sup. Ct. N.Y. Co. July 30, 2004) ....................................14

## STATUTES

28 U.S.C. § 636 (2012) ............................................................................2

Fed. R. Civ. P. 72(b)(2) ..........................................................................1

Fed. R. Civ. P. 72(b)(3) ..........................................................................2

Pursuant to Fed. R. Civ. P. 72(b)(2), Defendants Brooklyn-Queens Health Care, Inc.

("BQHC") and Wyckoff Heights Medical Center ("Wyckoff") (together, "Defendants"),

respectfully submit the following objections to the Report and Recommendation of Magistrate

Judge Roanne L. Mann, dated December 7, 2012 (the "R&R").[1]

## PRELIMINARY STATEMENT

The R&R resolved a number of issues raised by the parties' competing summary

judgment motions, but made three critical errors to which Defendants object.

*First*, the R&R correctly concluded, in the context of this breach of contract action, that

the contract provision BQHC allegedly breached – the "Equivalent Clerkship Provision" – is

ambiguous.  However, in the face of this acknowledged ambiguity, the R&R recommended

summary judgment be granted to Ross on the ground that no reasonable jury could agree with

Defendants' interpretation of this ambiguous provision.

This was error.  As the R&R acknowledged, the near-universal rule is that a contractual

ambiguity precludes summary judgment as a matter of law.  As demonstrated below, the R&R's

error in treating this case as coming within the "rare" exception rather than the near-universal

rule resulted from the Magistrate Judge's failure to appreciate the substantial amount of evidence

of Defendants' intent concerning the Equivalent Clerkship Provision.  In sum, while Defendants

agree that that provision is ambiguous as a matter of law, the R&R erred by determining the

meaning of the provision on summary judgment.  The Court should not accept that portion of the

R&R and should instead allow a jury to determine the meaning of the Equivalent Clerkship

Provision at trial.

---

[1]      Capitalized terms not defined herein have the meaning attributed to them in Defendants' summary
judgment papers (ECF Dkt. Nos. 97-1, 97-2, and 120) and/or the R&R (ECF Dkt. No. 134).  Rather than repeat the
factual and procedural history of this litigation, which is now approaching the fourth anniversary of its filing, this
submission addresses solely the Defendants' objections and respectfully refers the Court to the descriptions of the
facts that gave rise to the dispute contained in the parties' summary judgment motions and in the R&R.

*Second*, the R&R denied Defendants' motion for summary judgment dismissing Ross's Veil Piercing Claim – which seeks to pierce BQHC's corporate veil and hold Wyckoff liable for BQHC's alleged breach of the Equivalent Clerkship Provision – primarily because, according to the R&R, BQHC failed to comply with that provision. Because the R&R's veil piercing analysis flowed directly from the erroneous summary judgment ruling on the claim of breach, the R&R erred in denying Defendants' motion. This error was compounded when the R&R misconstrued New York's law of piercing the corporate veil and applied an unduly lenient standard that effectively relieved Ross of its burden of proof. Finally, the R&R failed to appreciate the significance of the undisputed fact that Ross alone chose BQHC as its preferred counter-party to the Affiliation Agreement, a fact which conclusively establishes that Wyckoff did not use – or misuse – BQHC's corporate form to deceive or otherwise harm Ross. For these reasons, Defendants' motion for summary judgment dismissing the Veil Piercing Claim should be granted and the R&R's contrary recommendation should not be accepted.

*Third*, the R&R erred by recommending summary judgment be granted to Ross on the damages for its Present Replacement Costs because the R&R mistakenly held that Defendants failed to identify factual issues that call into question Ross's expert's methodology in calculating that component of damages.

## STANDARD OF REVIEW

When a Magistrate Judge makes a report and recommendation as to the suggested outcome of a dispositive motion, a District Judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636 (2012); *see also* Fed. R. Civ. P. 72(b)(3). "Where, as here, a party makes specific objections to a magistrate judge's findings, the court must make a *de novo* determination" of those findings. *United States v. Gellerstein*, No. 08-CV-2702 (KAM) (JO), 2011 WL 710446, at *3 (E.D.N.Y.

- 2 -

Feb. 22, 2011) (declining to adopt magistrate judge's report and recommendation) (citing *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)).

## ARGUMENT

Reviewing the evidence *de novo*, this Court should conclude that the R&R erred in recommending that: (i) Ross's summary judgment motion as to BQHC's liability under the Affiliation Agreement be granted; and (ii) Defendants' summary judgment motion with respect to Ross's Veil Piercing Claim be denied.

**I.     The R&R Erred Because It Failed To Consider The Extrinsic Evidence Cited By Defendants That, At A Minimum, Would Permit A Reasonable Jury To Conclude That The Equivalent Clerkship Provision Was Not Intended To Apply To Wyckoff.**

As the R&R acknowledged, Ross's breach of contract claim against BQHC turns on the meaning of the Equivalent Clerkship Provision in the Affiliation Agreement between Ross and BQHC. R&R, pp. 19-20. That provision requires BQHC to provide Ross with replacement clerkships "at one or more of [BQHC's] other facilities" in the event the Caritas Hospitals cease to operate. *Id.* at 19. In its motion for summary judgment, Ross argued that this provision unambiguously obligated BQHC to provide Ross with replacement clerkships at Wyckoff when Caritas filed for bankruptcy in 2009. Defendants, on the other hand, argued that the Equivalent Clerkship Provision is ambiguous, thereby precluding summary judgment in Ross's favor. *Id.* at 19-20.

The Magistrate Judge agreed with Defendants that the Equivalent Clerkship Provision is ambiguous as a matter of law. R&R, pp. 23-24. Defendants, of course, take no issue with this finding. The R&R went on, however, to take the extraordinary step of weighing the extrinsic evidence of the contract parties' intent, ultimately determining that this evidence was so "one-sided" in Ross's favor that it constituted one of those "rare" cases where a Court can interpret ambiguous contract language as a matter of law. *Id.* at 29-30. Based on this reasoning, the R&R

- 3 -

determined that "no reasonable person" could disagree with Ross's interpretation that the parties intended the Equivalent Clerkship Provision to apply to Wyckoff. *Id.*

Defendants object to this aspect of the R&R, which erred in failing to recognize or appreciate the evidence supporting Defendants' position that the Equivalent Clerkship Provision was not intended to apply to Wyckoff. As set forth below, this evidence includes:

(a) Julius Romero's sworn testimony that his references to a Wyckoff "contingency plan" in emails sent before the Affiliation Agreement was signed only referred to clerkship scheduling matters and did not speak to the meaning of the Equivalent Clerkship Provision;

(b) The sworn declarations of five Wyckoff Board members that they never consented to Wyckoff assuming any liability under the Affiliation Agreement;

(c) The contrast between the Ross Affiliation Agreement, which nowhere mentions Wyckoff, and BQHC's separate clerkship agreement with another Caribbean medical school, which includes Wyckoff's specific and express guarantee of Caritas' obligations; and

(d) The Equivalent Clerkship Provision's drafting history, which strongly suggests that the parties had different interpretations of that provision from the outset.

This evidence, when viewed in conjunction with the undisputed fact that BQHC repeatedly told Ross that the Affiliation Agreement could make no reference to Wyckoff, provides ample support for Defendants' interpretation of the concededly ambiguous Equivalent Clerkship Provision. *See* R&R, pp. 25-26, 28. At the very least, this evidence raises a triable issue that precludes summary judgment in Ross's favor.

A.    The R&R ignored key testimony from Julius Romero.

In concluding that no reasonable jury could decide that the Equivalent Clerkship Provision had a meaning other than Ross's interpretation of it, the R&R regarded a series of emails written by Julius Romero in the months leading up to the execution of the Affiliation Agreement as being of evidentiary importance. *See* R&R, pp. 24-27. In those emails, Mr. Romero described a "contingency plan" that would "collateralize" Caritas clerkships at Wyckoff.

- 4 -

*Id.* at 24-25.  The R&R referred to these emails as "one-sided" extrinsic evidence supporting Ross's interpretation that the Equivalent Clerkship Provision obligated Wyckoff to provide Ross students with replacement clerkships in the event Caritas ceased to operate.  *See* R&R, pp. 24-25. This analysis, however, ignored the context and timing of Mr. Romero's emails and his sworn testimony about them.

Specifically, Mr. Romero explained during his deposition that his emails discussing a "contingency plan" to "collateralize" clerkships was not intended to create a guarantee that Wyckoff would replace any clerkships that Caritas could not provide to Ross in the event Caritas ceased operating.  Romero Tr., pp. 78:9-80:24.  Rather, the "plan" was intended to address a very specific contingency – if a core clerkship at Caritas (e.g., pediatric medicine) was not available, a medical student could be slotted into a clerkship at Wyckoff in order to create a "more fluid scheduling process within the facilities."  *Id.* at 78:9-79:2.  In other words, the "plan" was one of logistics and spill-over arising from the need to avoid "scheduling gaps" for Ross's students by placing them in clerkships at Wyckoff when "there [weren't] enough slots" in certain rotations at Caritas.  *Id.* at 49:13-50:15.[2]

Mr. Romero's sworn testimony on this point is nowhere mentioned in the R&R, even though that testimony makes clear that the emails merely addressed a contingency for cross-scheduling clerkships between the Caritas Hospitals and Wyckoff, and had no bearing on the meaning of the ambiguous Equivalent Clerkship Provision, which addressed an entirely different contingency – the possible closure of the Caritas Hospitals.  Romero Tr., p. 80:21-24; *see generally* R&R.  Indeed, as Mr. Romero testified, there was "no discussion" at all about the risk

---

[2]     This arrangement is further confirmed by the Second Amendment to the original Ross-BQHC Affiliation Agreement, entered into in February 2008, which specified that:  "If BQHC is unable to provide a minimum of 135 core clerkship slots to Ross at the [Caritas] Hospitals . . . 35 core clerkship slots [will be provided] at Wyckoff" until the "availability of additional clerkship slots" at Caritas "results in Ross no longer requiring the use of the clerkship slots at Wyckoff. . . ."  Roeber Orig. Dec., Exh. 43, at BQHC 42916-42917.

of Caritas shutting down and "having their students [] added to Wyckoff" during the negotiations of the Affiliation Agreement.  Romero Tr., p. 80:21-24.

The R&R also failed to take into account the timing of Mr. Romero's emails, which were written in October and early December 2006.  *See* R&R, pp. 24-25.  At that time, BQHC was not yet a party to the draft Affiliation Agreement, and the Equivalent Clerkship Provision had not yet been included by Ross in any draft.  SOUF, ¶¶ 40-45.  Viewing this evidence "in the light most favorable to the non-moving party," a reasonable juror might well conclude that Mr. Romero's email reference to Wyckoff's "collateral" clerkships meant exactly what he testified to – that they served as a safety valve to ensure fluid scheduling – rather than concluding, as the R&R did, that they shed light on the meaning of an ambiguous contract provision which, at the time the emails were written, had not even been proposed by Ross in any draft.  *See* R&R, pp. 24-25, 29-30; *Corbett v. Napolitano*, --- F. Supp. 2d ---, 2012 WL 4447553, at *7 (E.D.N.Y. Sept. 25, 2012) (setting forth summary judgment standard).[3]

At a minimum, Mr. Romero's sworn testimony is clearly not so "one-sided" as to preclude a reasonable jury from crediting it and concluding that Mr. Romero's emails were not evidence of an intent to create a "Wyckoff guarantee" under the Affiliation Agreement.  *See Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) ("To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence *that is itself capable of only one interpretation . . . .*") (emphasis added).  For this reason, alone, the Court should not accept the R&R as to the meaning of the ambiguous Equivalent Clerkship Provision.

---

[3]        Understood in context, a reasonable juror could conclude that Mr. Romero's emails were aimed at persuading Ross that one benefit to the clerkships at Caritas was the possibility of a certain amount of cross-scheduling of clerkship rotations.  Ross was familiar with the clerkship opportunities at Wyckoff by virtue of a Ross-Wyckoff clerkship contract that has been in existence since 1997 and has never been the subject of dispute. *See* SOUF, ¶ 60; Pl. Resp., ¶ 60.

B.     The R&R ignored the relevant testimony and contemporaneous
       conduct of Wyckoff's Board of Trustees.

Although it expressly considered extrinsic evidence of the parties' intent, the R&R

nowhere addressed either:  (i) the sworn declarations of five Wyckoff Board Members, or (ii) the

significance of the contemporaneous clerkship agreement that BQHC negotiated with another

Caribbean medical school, American University of the Caribbean ("AUC").  The R&R's failure

to address this relevant evidence further demonstrates that it erred in deciding the meaning of the

concededly ambiguous Equivalent Clerkship Provision on summary judgment.

In their sworn statements, each of five different members of Wyckoff's Board of Trustees

expressly stated that he "did not consent" to Wyckoff "taking on any liability with respect to" the

Affiliation Agreement, and that, as a group, "Wyckoff's Board of Trustees" did not "consent to

such liability."  *See* ECF Dkt. No. 97, Attachs. 66-70 (Declarations of Vincent Arcuri, John H.

Cook, Jr., Esq., Adam Figueroa, A.C. Rao, M.D, and Emil Rucigay, Esq.), ¶¶ 29, 29, 29, 9, and

31, respectively.  The R&R nowhere mentioned these sworn statements, which present powerful

evidence of Wyckoff's intention not to be bound by the Affiliation Agreement.  *See* R&R.

The sworn statements of Wyckoff's Board Members are particularly significant in light

of the undisputed fact that, just weeks before BQHC signed the Affiliation Agreement with Ross,

it entered into a separate clerkship agreement with AUC that Wyckoff also signed and pursuant

to which Wyckoff *explicitly guaranteed* Caritas' clerkship obligations.  *See* Roeber Orig. Dec.,

Exh. 52, at Ross 031419 (emphasis added).  The fact that BQHC and Wyckoff spelled out an

explicit "Wyckoff guarantee" in a similar clerkship agreement negotiated and executed

contemporaneously with Ross's Affiliation Agreement, coupled with the sworn statements of

Wyckoff's Board members, supports Defendants' contention that the Affiliation Agreement

between Ross and BQHC was never intended to apply to Wyckoff.

- 7 -

Surely, a reasonable juror could conclude from this evidence that, when Wyckoff wanted to guarantee clerkships at Caritas, it did so in clear, unambiguous terms such as the explicit guarantee in the agreement with AUC. *See id.* And the absence of similarly clear and unambiguous language indicating an intent to create a "Wyckoff guarantee" of Ross's clerkships at Caritas could lead the same reasonable juror to infer that no such guarantee was intended here. At a minimum, this evidence – which is nowhere mentioned in the R& R – further shows that a triable issue exists as to the meaning of the ambiguous Equivalent Clerkship Provision. *See* R&R.

C.    The R&R ignored the relevant drafting history of the Affiliation Agreement.

Finally, the R&R ignored, or failed to appreciate, the significance of the Affiliation Agreement's drafting history, which further demonstrates BQHC's intent to exclude Wyckoff from any obligations related to Ross's clerkships at Caritas.  For example, the R&R acknowledged that, throughout the negotiation process, BQHC objected to including any mention of Wyckoff in the Affiliation Agreement. *See* R&R, pp. 26-28.  Nonetheless, according to the R&R, this fact was irrelevant to the meaning of the ambiguous Equivalent Clerkship Provision because BQHC's objections related solely to references to the rates to be paid under Ross's separate clerkship agreement with Wyckoff, and not to the Equivalent Clerkship Provision or the Affiliation Agreement generally.  R&R, p. 28.  This was error.

It is undisputed that, from the Fall until late December 2006, Ross and Caritas exchanged numerous drafts of the proposed Affiliation Agreement.  SOUF, ¶¶ 40-41; Pl. Resp., ¶¶ 40-41.  It was not until December 27, 2006 – mere hours before the Affiliation Agreement was executed – that Ross first added the ambiguous Equivalent Clerkship Provision (which did not mention Wyckoff by name), along with a second provision concerning clerkship rates that specifically identified Wyckoff's separate agreement with Ross.  SOUF, ¶ 45.  Immediately upon receiving

- 8 -

these last minute changes, Mr. Romero e-mailed Ross's in-house counsel to object to the reference to Wyckoff. Roeber Orig. Dec., Ex. 38, at ROSS 015124. The two then spoke and agreed that the Affiliation Agreement *"should (will) not have any references to Wyckoff."* Roeber Orig. Dec., Exh. 51, at Ross 08387 (emphasis added).

This drafting history, reflecting Ross's 11th hour insertion of the ambiguous Equivalent Clerkship Provision, plus BQHC's insistence at all times that there be no references to Wyckoff in the Affiliation Agreement, is persuasive evidence that there was no intent to have Wyckoff guarantee Ross's clerkships in the event of a Caritas bankruptcy. Indeed, Mr. Romero testified as much at his deposition, stating that, throughout the parties' drafting history, there was "no discussion" about the risk of Caritas shutting down and "having [Ross] students [] added to Wyckoff." Romero Tr., p. 80:21-24. Mr. Romero's boss, Harold McDonald, the Chief Operating Officer at Caritas who formerly held a similar position at Wyckoff, further supported this interpretation of the drafting history, testifying that he "had concerns from the very beginning that Wyckoff shouldn't be assuming any of the debts of Caritas, and that there should be protections in place to make sure that none of those liabilities fell back to Wyckoff." McDonald Tr., p. 93:23-94:9; *see also id.* at 109:10-110:2 (testifying that other members of Wyckoff's senior management and Board shared his view that Caritas's obligations should not flow to Wyckoff).

This evidence – all of which the Magistrate Judge had before her – calls into question the R&R's conclusion that, when Mr. Romero objected to any reference to Wyckoff in the Affiliation Agreement, his objection related solely to the clerkship rates under Ross's separate agreement with Wyckoff. R&R, p. 28. While this could be one possible interpretation of Mr. Romero's emails, the full context of the last minute insertion of the Equivalent Clerkship

- 9 -

Provision – including the testimony of Messrs. Romero and McDonald – shows that a reasonable jury could conclude that Mr. Romero's objection reflected a broader intent to exclude Wyckoff from any obligation under the Affiliation Agreement.

*       *       *

At the very least, these facts – Mr. Romero's testimony regarding the negotiations surrounding his Fall 2006 emails, the uncontested declarations of Wyckoff's Board members, and the Affiliation Agreement's drafting history – demonstrate that the evidence is not so "one-sided" as to justify summary judgment in Ross's favor here. The R&R correctly concluded that the Equivalent Clerkship Provision is ambiguous as a matter of law, and thereby subject to different and varying interpretations. But the R&R erred in proceeding to weigh the evidence supporting the parties' competing interpretations. To conclude otherwise would permit courts to conduct "a highly-factual inquiry [on summary judgment] involving credibility determinations" – determinations that are "appropriate for the jury, not for the Court." *Hurst v. Conopco, Inc.*, 08-cv-1422, 2011 U.S. Dist. Lexis 71584, at *20 (D. Conn. July 5, 2011); *see also Al Sayegh Bros. Trading (LLC) v. Doral Trading & Exp., Inc.*, 219 F. Supp. 2d 285, 292 (E.D.N.Y. 2002) (denying summary judgment because factual issues existed regarding plaintiff's intent as to ambiguous contract provision in light of conflicting evidence and testimony). The jury alone should make those determinations at trial.

## II.   The R&R Erred Because Its Legal Analysis Of Ross's Veil Piercing Claim Was Flawed.

The R&R found that genuine factual issues existed as to both prongs of Ross's Veil Piercing Claim: (a) whether Wyckoff exercised complete domination and control over BQHC with respect to the Affiliation Agreement; and (b) whether Wyckoff misused BQHC's corporate form to perpetrate a fraud or wrong on Ross. *See, e.g., Am. Fuel Corp. v. Utah Energy Dev. Co.*,

122 F.3d 130, 134 (2d Cir. 1997).  But the R&R's legal analysis was flawed in a number of respects, most notably its reliance on BQHC's purported breach of the Affiliation Agreement, which, as noted, was itself error.  *See supra*, pp. 3-10.  Accordingly, and as set forth below, the Court should decline to accept the R&R as to Ross's Veil Piercing Claim and, instead, should grant Defendants' motion for summary judgment dismissing that Claim as a matter of law.

> A.   <u>The R&R erred because no triable issue exists as to the first prong of Ross's Veil Piercing Claim, whether Wyckoff completely dominated BQHC *with respect to the Affiliation Agreement.*</u>

The R&R found that triable issues exist as to the first prong of Ross's Veil Piercing Claim on the ground that sufficient evidence exists "to support a finding that Wyckoff dominated and controlled BQHC, including but not limited to matters related to the [Affiliation] Agreement."  R&R, p. 53.

The R&R's finding on this point reflects a misapplication of New York law.  In order to satisfy the first prong of New York's veil piercing test, a party must prove that there was "complete domination over the corporation [whose veil is sought to be pierced] ***with respect to the transaction at issue***" in the litigation.  *Am. Fuel Corp.*, 122 F.3d at 134 (emphasis added); *see also In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 524 (Bankr. S.D.N.Y. 2005) ("Control must be demonstrated with respect to the transaction attacked . . ."); *Mars Elecs. of N.Y., Inc. v. U.S.A. Direct, Inc.*, 28 F. Supp. 2d 91, 99 (E.D.N.Y. 1999) (denying plaintiff summary judgment because it failed to present evidence that the defendant shareholder "used his domination of [the corporation] to commit fraud with respect to" certain of the transactions at issue).

Instead of applying this well-settled legal standard, the R&R substituted a far more lenient one here, stating that "*the case law makes clear* that proof of overall domination – *even if unrelated to the transaction at issue* – is nonetheless relevant to the [sic] whether there is proof of domination with respect to the challenged transaction."  R&R, pp. 53-54 n.28 (emphasis

- 11 -

added).  But the R&R did not cite any such "case law" to support this departure from settled principles of New York law.  *See id.*  The R&R's novel approach effectively rewrote New York's veil piercing test to eliminate any requirement that domination and control relate to the transaction at issue.  This was error warranting the Court's refusal to accept the R&R's finding on the first prong of Ross's Veil Piercing Claim.

Further, even if generalized or background evidence of domination were sufficient (and it is not), the evidence that the R&R relied upon to find a triable issue as to this prong of Ross's Veil Piercing Claim is insufficient.  For example, the R&R emphasized certain "monetary transfers" between Wyckoff and Caritas as evidence of alleged commingling of funds suggestive of a failure to maintain the separateness of these entities.  *See* R&R, p. 52.  But it is undisputed that all authorized transfers between Wyckoff and Caritas were documented in extensive "due to/due from" logs that recorded the value of the services provided by one entity to the other as well as the costs related to those services.  *See* SOUF, ¶ 55; Roeber Orig. Dec., Exh. 46, at BQHC 04006-04071; *see also* Goldberg Tr., pp. 9:2-24, 27:20-22, 44:5-8 (testimony of Paul Goldberg, a restructuring consultant who temporarily served as BQHC's CFO, that, during 2007 and 2008, there was "a clear delineation" between Wyckoff and Caritas, and that the "point of BQHC [was] to make sure that one organization [wasn't] responsible for the other[]'s debts.").[4]

---

[4]    Among other things, these due to/due from logs reflect the undisputed fact that Wyckoff itself invested over $17 million of its own money in Caritas that was never repaid due to Caritas's bankruptcy.  SOUF, ¶ 65.  Wyckoff's own substantial losses from its investment in Caritas undermine the R&R's theory that Defendants created a fraudulent corporate structure and used BQHC as part of a scheme to "induce" clerkship prepayments for profit.  *See* R&R, p. 54.  Far from it, as David Hoffman, Wyckoff's former General Counsel, testified at his deposition, BQHC was created in order to comply with the Ethical and Religious Directives for Catholic Health Care Services issued by the Conference of Catholic Bishops, so that Wyckoff, a secular hospital, would be permitted to operate alongside Caritas's Hospitals, which were governed by Catholic Directives.  *See* SOUF, ¶ 25.  Adherence to these Directives was a condition of the Acquisition Agreement by which the Caritas Hospitals, formerly part of the St. Vincent's Catholic Medical Center, were acquired.  SOUF, ¶ 16.  To ensure that Caritas did not violate these directives, which primarily relate to the Catholic Church's teaching about the sanctity of human life in connection with birth and end of life health care issues, the Bishop of the Diocese of Brooklyn was empowered to appoint a Catholic priest and lay person to the Caritas board.  SOUF, ¶¶ 22-23.

- 12 -

And, contrary to the R&R's findings, courts have repeatedly held that documented intercompany transfers are insufficient evidence of "commingling" for veil piercing purposes. *See, e.g., Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) (affirming summary judgment dismissing veil piercing claim under Delaware law, finding that a "centralized cash management system . . . where the accounting records always reflect the indebtedness of one entity to another, is not the equivalent of intermingling funds and is insufficient to justify disregarding the corporate form") (internal citations omitted); *Vendetti v. Fiat Auto S.p.A.*, 802 F. Supp. 886, 895 (W.D.N.Y. 1992) (holding that "routine inter-corporate transactions" including "intercompany loans and transfers of idle cash" do not provide a "basis to infer . . . undue interference" and control for alter ego purposes).[5]

> B.  <u>The R&R erred in finding that a triable issue exists as to the second prong of Ross's Veil Piercing Claim because the R&R rested on a faulty understanding of wrongfulness under New York law.</u>

The second prong of its Veil Piercing Claim requires Ross to prove that Wyckoff used its purported domination of BQHC to perpetrate a fraud on or otherwise injure Ross. *See, e.g., Am. Fuel Corp.*, 122 F.3d at 134. As to this prong, the R&R found that:

> "***First and foremost*** . . . it was Wyckoff that . . . induced Ross to enter into the [Affiliation] Agreement ***by promising an equal number of clerkship slots at Wyckoff*** in the event the Caritas Hospitals did not provide the agreed-upon slots . . .

---

[5]     To the extent that the R&R's findings relied on any allegedly improper transfers between Wyckoff and Caritas, the R&R ignored the undisputed facts that: (i) any such transfer "wasn't authorized" by Wyckoff's Board; and (ii) Wyckoff "terminate[d]" its former Chief Affiliation Officer for making unauthorized transfers. *See* SOUF, ¶ 57; Roeber Orig. Dec., Exh. 25, pp. 64-65, 69. Contrary to the R&R's assertions, it cannot reasonably be disputed "whether these transfers were authorized." *See* R&R, pp. 5-6. *Compare* SOUF, ¶ 57 (stating that "Wyckoff terminated its Chief Financial Officer in early 2007, upon discovering that he had transferred funds from Caritas to Wyckoff without authorization"), *with* Pl. Resp., ¶ 57 (nowhere contesting that the transfers were unauthorized and instead merely speculating that others may have been involved in the transfers other than Wyckoff's former Chief Financial Officer). Wyckoff's termination of a Chief Financial Officer for unauthorized transfers shows Wyckoff's observance of separate corporate formalities and is inconsistent with the R&R's finding that such "monetary transfers" constituted evidence of Wyckoff's domination of Caritas through BQHC. *See* R&R, p. 52.

> A jury could reasonably find that Wyckoff . . . led Ross to
> believe that the BQHC "system" had the authority to provide
> clerkship slots with Wyckoff . . . and that Wyckoff was
> prepared to provide those slots if the Caritas Hospitals did not.
> ***The repudiation of that understanding by Wyckoff and the***
> ***"system" could thus be viewed as the requisite wrongful act***
> ***that injured Ross.***

R&R, pp. 54-55 (emphasis added). The Court should not accept this finding for three reasons.

*First*, as the R&R expressly acknowledged, its finding that triable issues exist as to the second prong of Ross's Veil Piercing Claim was almost entirely based on its determination that BQHC had breached the Affiliation Agreement. *See* R&R, p. 54. That determination was error because the extrinsic evidence of the ambiguous Equivalent Clerkship Provision is disputed and cannot be resolved on summary judgment. *See supra*, pp. 3-10. For this reason, alone, the Court should decline to accept the R&R's finding as to the second prong of Ross's Veil Piercing Claim and instead dismiss that Claim as a matter of law.

*Second*, even if the R&R did not err in finding that BQHC breached the Affiliation Agreement – a point Defendants do not concede for a moment – this finding was insufficient to pierce BQHC's corporate veil. New York courts have repeatedly found that a breach of contract cannot satisfy the second prong of the veil piercing test. *See, e.g., Sheridan Broadcasting Corp. v. Small*, Index No. 603681/2003, 2004 WL 5833748 (Sup. Ct. N.Y. Co. July 30, 2004) (holding that "plaintiffs' claim that [the allegedly dominating shareholder] made [the allegedly dominated corporation] breach the [contract at issue] does not suffice as grounds for piercing the corporate veil, inasmuch as the claim sounds in breach of contract, not fraud or corporate wrongdoing"), *aff'd*, 19 A.D.3d 331, 798 N.Y.S.2d 45 (1st Dep't 2005); *F&M Precise Metals, Inc. v. Goodman*, Index No. 6546-04, 2004 WL 2059567, at *3-4 (Sup. Ct. Nassau Co. Aug. 25, 2004) (same). This is yet another instance of the R&R's misapplication of New York law.

- 14 -

Indeed, the R&R's approach on this point would dismantle the settled legal standards governing resolution of veil-piercing claims and would allow the corporate form to be routinely disregarded in cases where breach of contract is alleged. That is simply not the law in New York, particularly given New York's "presumption of [corporate] separateness . . . which is entitled to substantial weight." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988); *see also Baccash v. Sayegh*, 53 A.D.3d 636, 639, 862 N.Y.S.2d 564, 567 (2d Dep't 2008) ("[C]ourts are loathe to disregard the corporate form for the benefit of those who have chosen that form to conduct business.").

*Third*, even if BQHC breached the Affiliation Agreement (and it did not), and even if such a breach were sufficient to pierce the corporate veil (and it is not), the R&R nonetheless erred by failing to appreciate the significance of the fact – undisputed on summary judgment – that the only reason BQHC signed the Affiliation Agreement was because Ross asked it to do so. *See* SOUF, ¶ 43; Pl. Resp., ¶ 43. This fact is dispositive because it goes to the heart of what even the R&R acknowledged as the *sine qua non* of the "wrongfulness" prong of veil piercing: the abuse of the corporate form "proximately caus[ing] the injuries complained of by the party seeking to pierce the corporate veil." R&R, p. 48. In other words, in order for Ross to assert a legally cognizable veil piercing claim, it must establish that Wyckoff misused BQHC's corporate form with respect to the Affiliation Agreement in a way that proximately caused Ross's injury.

No such proximate cause exists here. It is undisputed that Ross alone insisted on substituting BQHC for Caritas as its counter-party to the Affiliation Agreement. *See* SOUF, ¶ 43; Pl. Resp., ¶ 43. That decision, based on Ross's independent "legal and financial department's review," renders Wyckoff's alleged misuse of BQHC's corporate form illusory. *See* SOUF, ¶ 43; Pl. Resp., ¶ 43. Indeed, Wyckoff did not use BQHC's corporate form at all

- 15 -

with respect to the Affiliation Agreement, let alone misuse it. This precludes a finding of wrongfulness for veil piercing purposes. *Cf. Network Enters. v. APBA Offshore Prods.*, 264 Fed. Appx. 36, 41 (2d Cir. 2008) (permitting the corporate veil to be pierced where the defendant had "induced [plaintiff] to ***contract with the wrong party***") (emphasis added).[6]

For all these reasons, the Court should decline to accept the R&R's finding that triable issues exist as to Ross's Veil Piercing Claim. Instead, the Court should grant Defendants' motion for summary judgment dismissing that Claim as a matter of law for Ross's failure to point to evidence, after extensive discovery over the past several years, that could satisfy the requirements for piercing the corporate veil: Wyckoff's domination of BQHC, and Wyckoff's use of such alleged domination to deceive or injure Ross, in connection with the Ross-BQHC Affiliation Agreement.

## III.   The R&R Erred By Finding That No Triable Issues Exist As To Ross's Damages For Its Present Replacement Costs.

The R&R recommended granting summary judgment to Ross on two of the three components of its alleged damages because, according to the R&R, Defendants had identified flaws in Ross's expert's methodology relating "solely to the third component [of damages], Future Replacement Costs," but failed to identify "any evidence in the record that specifically calls into question Davis' methodology in calculating the Prepayment Balance or Present Replacement Costs . . . ." R&R, p. 44. This finding was error because one of the flaws that Defendants identified in the methodology of Ross's damages expert relates to both Future

---

[6]     *See also Favour Mind Ltd. v. Pacific Shores, Inc.*, No. 98 Civ. 7038 (GBD), 2004 WL 97649, at *6-7 (S.D.N.Y. Jan. 20, 2004) (granting summary judgment dismissing veil piercing claim because plaintiff knew about the "corporate structure and financial condition of the entity with which it sought to do business," noting that "[w]here a party is aware of the risks of dealing with a corporation, that party has assumed the risk of such dealings"). Here, Ross well knew the strengths and weaknesses of the Caritas Hospitals because its students had been taught in clinical clerkships at St. John's and Mary Immaculate when they were part of St. Vincent's, long before Wyckoff sought to create Caritas and BQHC and long before Ross entered into the Affiliation Agreement. See SOUF, ¶¶ 12, 13, 37; Pl. Resp., ¶¶ 12, 13, 37.

Replacement Costs and Present Replacement Costs. *See* Def. SJ Opp., pp. 23-24, ECF Dkt. No. 110.

Specifically, Defendants called to the attention of the Magistrate Judge the fact that Ross's damages calculation was based on a number of assumptions, including the assumption that Ross would fully utilize all of the clerkship slots that would have been available to it under the Affiliation Agreement. *See* Davis Report, p. 13. The R&R acknowledged that this assumption presents a triable issue of fact with respect to Future Replacement Costs, but failed to appreciate that this assumption was a basis of the calculation of both Future Replacement Costs and Present Replacement Costs. *Id.* at 10-11; Davis Tr., pp. 47:22-48:7. As a consequence, there are material issues in dispute with respect to Ross's calculation of two of its three damages components – Future Replacement Costs and Present Replacement Costs. Accordingly, it was error for the R&R to recommend summary judgment on the Present Replacement Costs component of Ross's damage calculation, i.e., $1,073,501.00, and the Court should decline to accept this recommendation.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that the Court:  (a) decline to accept the referenced portions of the R&R; (b) deny Ross's motion for partial summary judgment on BQHC's liability under the Affiliation Agreement; (c) grant Defendants' motion for partial summary judgment dismissing Ross's Veil Piercing Claim as a matter of law; and (d) grant Defendants such other and further relief as the Court deems just and proper.


Dated:  New York, New York
         December 27, 2012

                                   Respectfully submitted,

                                   K&L GATES LLP

                                   By: _____

                                   Walter P. Loughlin
                                   (Walter.Loughlin@klgates.com)
                                   Brian D. Koosed
                                   (Brian.Koosed@klgates.com)
                                   Justin H. Roeber
                                   (Justin.Roeber@klgates.com)

                                   599 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:  (212) 536-3900
                                   Facsimile:  (212) 536-3901

                                   *Attorneys for Defendants Brooklyn-Queens Health
                                   Care, Inc. and Wyckoff Heights Medical Center*

## CERTIFICATE OF SERVICE

I,  Walter P. Loughlin, hereby certify that on December 27, 2012, I caused a true and correct copy of the foregoing Defendants' Objections to Magistrate Judge Mann's Report and Recommendations on the Parties' Cross-Motions for Partial Summary Judgment to be filed electronically and served via the Court's ECF system.

/s/ Walter P. Loughlin
Walter P. Loughlin