UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

                                                      09 Civ. 1410 (KAM) (RLM)

Plaintiff,

– against –

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

Defendants.
-----------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO
MAGISTRATE JUDGE MANN'S REPORT AND RECOMMENDATION ON
THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Sammi Malek
Baker & Hostetler LLP
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

George J. Tzanetopoulos
Baker & Hostetler LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

*Counsel for Plaintiff Ross University School of
Medicine, Ltd.*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

DISCUSSION ........................................................................................................... 2

I.    The Magistrate Judge Correctly Recommended Holding That BQHC Breached ............. 2

    A.   Ross' Motion And The Magistrate Judge's Recommendation .............................. 2

    B.   Defendants' Objections To A Finding Of Breach Should Be Overruled ............. 3

    C.   Legal Standards For Admissibility Of Extrinsic Evidence .................................... 5

    D.   McDonald's "Concerns" Are Inadmissible Uncommunicated Subjective
        Intent ................................................................................................................. 5

    E.   The Declarations That The Wyckoff Board "Did Not Consent" Are
        Likewise Inadmissible .......................................................................................... 7

    F.   The AUC Contract Is Inadmissible And Does Not Support Defendants'
        Position ................................................................................................................ 8

    G.   Romero's Demand To Remove "References To Wyckoff" Does Not
        Relate To The Equivalent Clerkship Provision ...................................................... 9

    H.   Romero's Testimony Is Inadmissible And/Or Does Not Support
        Defendants' Argument ....................................................................................... 11

    I.   The Extrinsic Evidence Is One-Sided In Favor Of Ross .................................... 13

II.   The Court Should Adopt The Magistrate Judge's Recommendation And Deny
    Summary Judgment in Defendants' Favor on Ross' Veil Piercing Claim ..................... 15

    A.   The Magistrate Judge Correctly Found That There Were Triable Issues Of
        Fact As To Whether Wyckoff Dominated BQHC With Respect To The
        Agreement ......................................................................................................... 16

    B.   The Magistrate Judge Correctly Found There Was A Triable Issue Of Fact
        As To Whether Wyckoff Used BQHC To Commit A Wrong Or Fraud
        Against Ross ...................................................................................................... 20

III.  Defendants' Objection To Summary Judgment On The Amount Of Present
    Replacement Costs Should Be Overruled ................................................................... 24

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Am. Protein Corp. v. AB Volvo,*
    844 F. 2d 56 (2d Cir. 1988) .................................................................................. 16

*Arista Records LLC v. Lime Group LLC,*
    784 F. Supp. 2d 398 (S.D.N.Y. 2011) ................................................................. 17

*Bickerstaff v. Vassar Coll.,*
    196 F. 3d 435 (2d Cir. 1999) ................................................................................ 9

*Bogosian v. All Am. Concessions,*
    No. 06-1633 (RRM) (RML), 2011 WL 4460362 (E.D.N.Y. Sept. 26, 2011) ........................ 23

*Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.,*
    701 F. Supp. 2d 340 (E.D.N.Y. 2010) ............................................................. 2, 16

*Chapman v. Ourisman Chevrolet Co.,*
    No. AW-08-2545, 2011 WL 2651867 (D. Md. July 1, 2011) .................................. 9

*F & M Precise Metals, Inc. v. Goodman,*
    Index No. 6546-04, 2004 WL 2059567 (Sup. Ct. Nassau Co. Aug. 25, 2004) ...................... 22

*Faulkner v. Nat'l Geographic Soc.,*
    452 F. Supp. 2d 369 (S.D.N.Y. 2006) ............................................................. 5, 7, 8

*Fletcher v. Atex, Inc.,*
    68 F. 3d 1451 (2d Cir. 1995) .............................................................................. 19

*JA Apparel Corp. v. Abboud,*
    682 F. Supp. 2d 294 (S.D.N.Y. 2010) ........................................................... 5, 7, 8

*Johnson & Johnson Consumer Cos. v. Aini,*
    No. 02-CV-6624 (DLI) (RLM), 2009 WL 6055841 (E.D.N.Y. Dec. 1, 2009) ...................... 16

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Grp. LLC,*
    268 F.3d 58 (2d Cir. 2001) ................................................................................. 19

*Marriott v. County of Montgomery,*
    426 F. Supp. 2d 1 (N.D.N.Y. 2006) ...................................................................... 9

*Silva v. Peninsula Hotel,*
    509 F. Supp. 2d 364 (S.D.N.Y. 2007) ................................................................. 17

*Sinta v. CDC Ind. N.A., Inc.,*
    445 F. 3d 161 (2d Cir. 2006) .............................................................................. 18

*Stage Club Corp. v. West Realty Co.,*
    622 N.Y.S. 2d 948 (N.Y. App. Div. 1995) ........................................................ 5, 13

*TNS Holdings v. MKI Secs. Corp.,*
    92 N.Y. 2d 335 (1998) ................................................................................................ 20

*Vendetti v. Fiat Auto S.p.A.,*
    802 F. Supp. 886 (W.D.N.Y. 1992) ....................................................................... 19

## INTRODUCTION

Defendants' objections to the Magistrate Judge's Report and Recommendation of December 7, 2012 (the "Recommendation") should be overruled.  The Magistrate Judge's recommendation that the Court grant partial summary judgment in favor of plaintiff Ross University School of Medicine, Ltd. ("Ross") holding that: (1) defendant Brooklyn-Queens Health Care, Inc. ("BQHC") breached the parties' contract (the "Agreement") by not providing clerkships to replace those that were lost when the Caritas Hospitals ceased to operate; and (2) the amount of damages for the "Present Replacement Costs" category of damages was $1,073,501.00 is correct on both the record evidence and governing law.  The Magistrate Judge's recommendation that the Court deny defendants' motion for partial summary judgment on "veil piercing" is similarly well-grounded.

Defendants' objections are meritless.  The "extrinsic evidence" to which defendants' objection points does not create a genuine issue of material fact in support of defendants' attempt to interpret the disputed clause (the "Equivalent Clerkship Provision") to exclude defendant Wyckoff Heights Medical Center ("Wyckoff") from BQHC's promise to provide replacement clerkships at "one or more of its other facilities" and is, in any event, immaterial to the finding of breach by BQHC — BQHC did not provide the promised replacement clerkships at *any* facility. Similarly, the Magistrate Judge correctly concluded that there is sufficient evidence Wyckoff both dominated BQHC with respect to the Affiliation Agreement and committed several wrongs that injured Ross to sustain Ross' veil piercing claim.  And defendants' only remaining criticism of this part of the Recommendation — that the Magistrate Judge applied a "more lenient" legal standard for veil piercing — is wholly unfounded and transparently unsound.  Defendants' objection to the Recommendation's finding on the amount of damages for Present Replacement

Costs rests on a mischaracterization of the record evidence that supports a finding in that amount and ignores the utter absence of evidence to support a finding of any lesser amount.

Accordingly, the Court should overrule defendants' objections and adopt the Recommendation on each of these points.[1]

## DISCUSSION[2]

**I.      The Magistrate Judge Correctly Recommended Holding That BQHC Breached.**

**A.      Ross' Motion And The Magistrate Judge's Recommendation.**

The Agreement provides that, in exchange for a multimillion dollar prepayment, "BQHC shall cause the [Caritas] Hospitals to provide clinical clerkships" to Ross' medical students. App. B to Pl.'s Mem. in Support of MSJ, DE #95-2 (hereinafter DE#95-2).  The "Equivalent Clerkship Provision" provides that:

> In the event the [Caritas] Hospitals are not operative, and the University [Ross] is not in breach of the Agreement, BQHC agrees to provide the University with an equivalent number of clerkships as agreed to herein at one or more of its other facilities.

*Id.* at 10.  It is undisputed that: (1) at all times Wyckoff is and was the only "other facility" of BQHC that could provide the promised replacement clerkships (Recommendation at 27); (2) the Caritas Hospitals have ceased to operate (*id.*); and (3) defendants have not provided replacement

---

[1] In addition, we note that defendants did not object to the Magistrate Judge's recommendation that the Court: (1) grant partial summary judgment in favor of Ross finding that the amount of damages for the Unearned Prepayment Balance is $6,277,266.00 (Recommendation at 46); (2) grant partial summary judgment in favor of Ross dismissing the Fourth through Eighth Affirmative Defenses (Recommendation at 30); and (3) deny defendants' motion for summary judgment on specific performance as to Wyckoff (Recommendation at 60).  Accordingly, the Court should enter partial summary judgment finding in accordance with the Recommendation on those points. *See Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 701 F. Supp. 2d 340, 345 (E.D.N.Y. 2010).

[2] For the sake of brevity, we have not repeated here the full discussion of the record evidence that is contained in Ross' briefs and the parties' Rule 56.1 statements, which are incorporated herein by reference.  We respectfully refer the Court to those papers to the extent that a more fulsome discussion of the evidence than is presented here is helpful.  Unless otherwise indicated, this response follows the Recommendation's usage of capitalized terms.

clerkships at Wyckoff or at any other facility (*id.*).  Accordingly, Ross seeks partial summary judgment holding that BQHC breached.

Defendants opposed the motion, claiming that the Equivalent Clerkship "Provision 'could reasonably be interpreted to include or to exclude [Wyckoff]'; the Provision is thus ambiguous and summary judgment should be denied."  Defs'. Mem. in Opp. Pl.'s MSJ, DE #110 (hereinafter DE #110), at 18 (internal quotation marks and brackets in original).  The Magistrate Judge recommended holding that the Equivalent Clerkship Provision is ambiguous, but that the Court should grant partial summary judgment holding that BQHC breached because:

> after considering all of the extrinsic evidence cited by defendants, the Court is constrained to conclude that this is the "rare" case where the relevant extrinsic evidence is so one-sided in one party's favor that no reasonable person could reach the contrary conclusion. *See Compagnie Financiere*, 232 F.3d at 158.  The weight of the extrinsic evidence, both as to the parties' negotiations and course of conduct, overwhelmingly supports Ross's interpretation — namely, that the parties understood and agreed that Wyckoff would provide equivalent clerkships to collaterize the clerkships promised in the Agreement.  Simply put, defendants have not identified any genuine issue of material fact concerning the interpretation of the Equivalent Clerkship Provision.

Recommendation at 29.

**B.      Defendants' Objections To A Finding Of Breach Should Be Overruled.**

Defendants object to this portion of the Recommendation, asserting that the Magistrate Judge failed to recognize "extrinsic evidence" that they assert creates a genuine issue of material fact about whether or not the parties intended to exclude Wyckoff from the "other facilities" at which BQHC is obligated to provide replacement clerkships.  This objection should be overruled.  First, BQHC has not provided replacement clerkships at any "other facility." Accordingly, it has breached as a matter of law regardless of whether or not Wyckoff was intended to be one of the "other facilities."  More fundamentally, the Magistrate Judge was correct when she concluded that "the parties understood and agreed that Wyckoff would provide

3

[replacement] clerkships" and the extrinsic evidence to which defendants point does not create "any issue of material fact concerning the interpretation of the Equivalent Clerkship Provision." *Id.*[3]

Defendants' objections cite five items of "extrinsic evidence" that they claim the Magistrate Judge "failed to recognize":

(1)     Deposition testimony of Wyckoff's COO, Harold McDonald, that he had "concerns from the very beginning that Wyckoff shouldn't be assuming any debts of Caritas" and "other members of Wyckoff's senior management and Board" thought likewise (Defs.' Obj. to Report and Recommendation, DE #137 (hereinafter DE #137), at 9);

(2)     Statements in declarations signed by Emil Rucigay, who was chairman of the board of Wyckoff, Caritas, and BQHC, and four other Wyckoff board members that Wyckoff's board did not "consent" to Wyckoff "taking on any liability" in the Agreement with Ross (*id.* at 7);

(3)     Statements in those same declarations that assert that the Wyckoff Board approved the December 1, 2006 promissory note with the American University of the Caribbean ("AUC"), which specifically refers to Wyckoff in BQHC's promise to cause provision of replacement clerkships at Wyckoff in the event that BQHC did not deliver clerkships that it promised to provide to AUC at the Caritas Hospitals (*id.* at 7-8);

(4)     BQHC, Wyckoff and Caritas Assistant Vice President Julius Romero's demand that the Agreement "should (will) not have references to Wyckoff" (*id.* at 9); and

(5)     Romero's deposition testimony that he had no discussions with Ross about Caritas shutting down and when he wrote to Ross in a December 3, 2006 email to offer "a contingency plan in effect for at least the next four years at Wyckoff that can collateralize any core committed clerkship at Caritas" and in a December 16, 2006 email to confirm that "an equal number of core clerkship slots at Wyckoff will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is [sic] not provided to Ross University

---

[3] Moreover, as Ross noted in its Objections to the Recommendation, the Court should grant partial summary judgment finding a breach by BQHC without need to reach these issues because the Magistrate Judge erred in recommending that the Court find that the Equivalent Clerkship Provision is ambiguous.  The language of BQHC's promise to provide replacement clerkships "at one or more of its other facilities" does not exclude any "facility" from its reach.  Reading that clause to exclude provision of replacement clerkships at Wyckoff — the only other BQHC facility that ever could provide them — is not a reasonable construction of the contract language.  Moreover, New York Law prohibits creating ambiguity with extrinsic evidence, which is the only means by which defendants can make a claim that the all-encompassing language of the Equivalent Clerkship Provision means less than it says. Pl.'s Obj. to Report and Recommendation, DE #136, at 14-17.

during the term of this agreement," what he really meant was that clerkships at Wyckoff would be available to resolve "scheduling gaps" that might occur during operation of the Caritas Hospitals. *Id.* at 5-6, 9; Recommendation at 24-25.

As discussed below, under settled New York law, this "extrinsic evidence" is not admissible and/or simply does not support defendants' position.

### C.    Legal Standards For Admissibility Of Extrinsic Evidence.

Extrinsic evidence may be introduced "to clarify an ambiguity caused by the absence of particulars from the writing, provided that the parol evidence to be introduced does not contradict the written agreement." *Stage Club Corp. v. West Realty Co.*, 622 N.Y.S. 2d 948, 950-51 (N.Y. App. Div. 1995). Extrinsic evidence that is admissible to clarify contractual ambiguity includes "relevant course of performance, course of dealing, and usage of trade, as well as a party's own admissions. . . ." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010) (citations and internal quotation marks omitted). However, because "only objective manifestations of intent are relevant under New York law. . . . statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." *Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 377-378 (S.D.N.Y. 2006) (citations and internal quotations omitted); *JA Apparel Corp.*, 682 F. Supp. 2d at 303 ("[a] court is prohibited, however, from considering the parties' [u]ncommunicated subjective intent") (citations and internal quotation marks omitted).

### D.    McDonald's "Concerns" Are Inadmissible Uncommunicated Subjective Intent.

Defendants' citation to Wyckoff COO Harold McDonald's testimony as extrinsic evidence here is meritless. Whatever McDonald's "concerns" might have been regarding BQHC's promises to provide replacement clerkships at Wyckoff, his deposition testimony was

clear that the communications that he had about those concerns were entirely within defendants'

organizations and that Wyckoff's CEO, Dominick Gio, overruled him on the point:

> Q.     At any time when you were still at Wyckoff did you have discussions with anybody concerning the decision not to provide placement clerkships to Ross at Wyckoff when the Caritas hospitals closed?
>
> A.     I had concerns from the very beginning that Wyckoff shouldn't be assuming any of the debts of Caritas, and that there should be protections in place to make sure that none of those liabilities fell back to Wyckoff; that was my position.
>
> Q.     When the hospitals closed did you talk, before we get there, when you stated your position, to whom did you express that position?
>
> A.     I expressed it to the board, to Dominick Gio, to the senior management team.
>
> Q.     If we can refer back to Exhibit 10 which is the promissory note we looked together at paragraph four, we know Mr. Gio signed an agreement that said that, "Brooklyn-Queens acknowledges and agrees it would obligate Wyckoff as is reflected," right?
>
> A.     Yes.
>
> Q.     So Mr. Gio overrode your position in that case?
>
> A.     Correct.

Deposition of Harold McDonald, DE #97-26 (hereinafter DE #97-26), at 93:23-94:25.

Not only were McDonald's "concerns" communicated solely within the defendant

organizations and overruled, McDonald testified that he did not recall receiving or commenting

on drafts of the Agreement with Ross, ever meeting with anyone from Ross, ever speaking to

anyone from Ross or, if he did, anything of substance in any conversation that he ever had with

someone from Ross. *Id.* at 32:15-25; 33:7-17. Indeed, although McDonald did acknowledge

that the signature on the Agreement was his when he was presented with a copy of the

Agreement, he testified that he did not even recall "signing the document." *Id.* at 47:9-48:15.

Thus, McDonald's subjective "concern" — both overruled by a more senior executive and uncommunicated to Ross — is not admissible extrinsic evidence here. *See Faulkner,* 452 F. Supp. 2d at 377-78; *JA Apparel Corp.*, 682 F. Supp. 2d at 303.  Accordingly, the Magistrate Judge correctly disregarded it.

### E.     The Declarations That The Wyckoff Board "Did Not Consent" Are Likewise Inadmissible.

The statements that the Wyckoff board "did not consent" to providing replacement clerkships at Wyckoff under the Agreement are likewise inadmissible.  We first note that at his deposition Board Chairman Rucigay testified that *no* medical school clerkship contract with any school, including the Agreement with Ross, was ever presented to the Wyckoff board for approval — a proposition that was confirmed by defendants' Rule 30(b)(6) witness.  Pl.'s Stmt. Add'l Facts, DE #102 (hereinafter DE #102), at ¶109.  Nonetheless, Rucigay did concede that the board was informed that management had entered into the Agreement with Ross and that no board member objected to management doing so.  Deposition of Emil Rucigay, DE #105-6 (hereinafter DE #105-6), at 27:2-28:9.  It is disingenuous in the extreme for defendants to advance as "extrinsic evidence" of intent the lack of board approval for this a particular contract when no contract of this type was ever presented for board approval.

But, whatever were the internal workings of Wyckoff's board with respect to "consent" to the Agreement, those internal discussions are uncommunicated subjective intent that are inadmissible as "extrinsic evidence" here. *Faulkner,* 452 F. Supp. 2d at 377-78.; *JA Apparel Corp.*, 682 F. Supp. 2d at 303.  Thus, this evidence does not create an issue of fact that precludes partial summary judgment.

F.     **The AUC Contract Is Inadmissible And Does Not Support Defendants'
Position.**

The board chairman and member declarations also assert that "in December 2006,

Wyckoff's Board of Trustees was presented with, and consented to the signing of a promissory

note with a different medical school (American University of the Caribbean) in which Wyckoff

explicitly guaranteed Caritas's obligation to repay an advance of funds if clerkships were not

provided by Caritas." Pl.'s Declarations of Vincent Arcuri, John Cook, Adam Figueroa, A.C.

Rao, and Emil Rucigay, DE #97-66, DE #97-67, DE #97-68, DE #97-69, DE #97-70 at ¶29, ¶29,

¶29, ¶9, ¶31, respectively.  Defendants point to the reference to "Wyckoff" in the AUC

promissory note's "equivalent clerkship provision" as extrinsic evidence that supports their

position with respect to the Ross Agreement.  This argument fails for several reasons.

First, once again, Wyckoff's internal dealings with respect to the AUC promissory note,

including the terms of that contract, were not communicated to Ross.  Thus, as was the case with

other "evidence" of intent that was not communicated to Ross, such evidence is inadmissible

here. *See Faulkner,* 452 F. Supp. 2d at 377-78; *JA Apparel Corp.*, 682 F. Supp. 2d at 303.

Moreover, the identically worded statements in these declarations that the AUC

promissory note was presented to and approved by the Wyckoff board are inadmissible on other

grounds — and deeply troubling.  As noted above, at deposition both Board Chairman Rucigay

and defendants' Rule 30(b)(6) witness testified that *no* medical school clerkship contracts were

presented to the board for approval.  Indeed, at his deposition Rucigay was directly confronted

with the AUC promissory note and expressly denied that it was ever brought to the board's

attention before it was signed:

Q.     Was this [AUC] promissory note ever brought to the attention of any of
the boards of BQHC, Wyckoff or Caritas before it was signed?

A.     Not to my knowledge.

DE #102 at ¶109.  Defendants' attempt to create an issue of fact by contradicting the sworn deposition testimony of defendants' board chairman and Rule 30(b)(6) witness is flatly impermissible.  *Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 455 (2d Cir. 1999); *Chapman v. Ourisman Chevrolet Co.*, No. AW-08-2545, 2011 WL 2651867, *4-5 (D. Md. July 1, 2011); *Marriott v. County of Montgomery*, 426 F. Supp. 2d 1, 9 n.8 (N.D.N.Y. 2006).

In addition, it bears noting that comparison of the language in the Equivalent Clerkship Provision in the Ross Agreement with the language in the AUC promissory note to which defendants point does not support their position.  Indeed, such a comparison leads to exactly the opposite conclusion.  Ross, in fact, contracted for broader replacement clerkship rights from BQHC than did AUC.  The Equivalent Clerkship Provision in the Ross Agreement requires that if the Caritas Hospitals are not operative, BQHC must provide replacement clerkships at "one or more of its other facilities."  The clause excludes no "other facility" from its reach.  Thus, if BQHC had in fact acquired facilities other than Wyckoff that could provide replacement clerkships, Ross' rights would have reached Wyckoff *and* those after-acquired facilities, too.  AUC's rights to replacement clerkships were, on the other hand, limited only to clerkships at Wyckoff.

Thus, this "extrinsic evidence" is both inadmissible to create a fact issue here and, in any event, does not support defendants' argument.

### G. Romero's Demand To Remove "References To Wyckoff" Does Not Relate To The Equivalent Clerkship Provision.

Defendants argue that Romero's demand that the Agreement should "not have any references to Wyckoff" creates an issue of fact with respect to interpretation of the Equivalent Clerkship Provision.  This assertion is patently false.  The Magistrate Judge was correct when

she recommended finding that "no reasonable juror would interpret those emails as illuminating the meaning of 'facilities' in the Equivalent Clerkship Provision." Recommendation at 28.

The undisputed evidence of record shows that Romero's demand cited in defendants' objections was wholly unrelated to the Equivalent Clerkship Provision. In fact, it concerned Ross' attempt to use its offer of a multimillion dollar prepayment for clerkships at the Caritas Hospitals to obtain, in addition, a freeze in the price that it paid for clerkships under the parties' preexisting Wyckoff-Ross Agreement. DE #102 at ¶¶38-45. ("[Ross] want[ed] a price freeze to apply at Wyckoff, not only with the Caritas rotation[s] . . . . We wanted the current price at Wyckoff to be frozen for a period of years"). In an email to Ross' President, Dr. Tom Shepherd, Romero said that Wyckoff would agree to a price freeze for clerkships at Wyckoff, but wanted that portion of the bargain not to be documented in the Agreement for clerkships at the Caritas Hospitals. Romero wrote:

> The Clinical Affiliation Agreement with Wyckoff Heights Medical Center is current, and separate from the Caritas-Ross Agreement. The clerkship rate at WHMC is $312.50 per week. On a separate executed agreement or addendum to the existing WHMC-Ross Agreement, this clerkship rate can be locked in for four years from January 1, 2007 – December 31, 2010. As discussed, it is best that this item not hinge on the Caritas-Ross Agreement, but rather once executed, a goodwill gesture from the BQHC/Wyckoff leadership.

*Id.* at ¶40.

Indeed, the draft contracts exchanged between the parties confirm that such references to Wyckoff relate only to the Wyckoff price freeze and that defendants very intentionally agreed to the Equivalent Clerkship Provision. On December 27, 2006, Dr. Shepherd sent a redlined draft contract to Romero that specifically highlighted several additions that Ross wanted included in the final draft. *Id.* at ¶¶41-44. The first addition was another attempt to insert the Wyckoff price freeze at Exhibit B, paragraph (b)(i) of the draft. *Id.* at ¶42. The other two additions, inserted elsewhere, were items on which the parties had agreed, but had not made their way into a draft

contract: (1) a provision permitting Ross to offset promised payments for library support against interest that BQHC promised to pay on Ross' prepayment; and (2) the Equivalent Clerkship Provision. *Id.* at ¶¶43-44.

Romero received instructions from Wyckoff's CEO, Dominick Gio, to tell Ross that all of Ross' proposed changes were acceptable, except for the proposed addition of the provision in Exhibit B, paragraph (b)(i) concerning the price freeze for clerkships at Wyckoff. *Id.* at ¶45. Romero then emailed Dr. Shepherd, with copies to McDonald and Gio:

> The file document was reviewed and determined to be acceptable EXCEPT for any reference *to the existing Wyckoff Heights Medical Center agreement [Exhibit B, (b)(i)]*. The Caritas agreement remains separate from the Wyckoff agreement. The agreement without the referenced item will be signed and faxed to Nancy Perri's office today for her and John St. James' signatures.

*Id.* at ¶¶45-46 (emphasis supplied).

Ross agreed to remove the Wyckoff price freeze language in Exhibit B(b)(i) and sent to Romero a revised final draft with Exhibit B(b)(i) removed. *Id.* at ¶47. This draft is the one that the parties executed. Wyckoff COO McDonald signed for BQHC. *Id.* at ¶¶48-49.

Thus, the Magistrate Judge's Recommendation is correct — this "extrinsic evidence cited by defendants concerning the parties' negotiations is irrelevant to the Equivalent Clerkship Provision." Recommendation at 28.

**H.     Romero's Testimony Is Inadmissible And/Or Does Not Support Defendants' Argument.**

Defendants' final effort to create a fact issue on the interpretation of the Equivalent Clerkship Provision is to cite Romero's deposition testimony to the effect that he had no discussions with Ross about Caritas shutting down and when he wrote to Ross in a December 3, 2006 email to offer "a contingency plan in effect for at least the next four years at Wyckoff that can collateralize any core committed clerkship at Caritas" and in a December 16, 2006 email to

confirm that "an equal number of core clerkship slots at Wyckoff will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is [sic] not provided to Ross University during the term of this agreement," what he really meant was that clerkships at Wyckoff would be available to resolve "scheduling gaps for Ross' students by placing them in clerkships at Wyckoff when there weren't' enough slots in certain rotations at Caritas." DE #137 at 5-6, 9 (citations and internal quotation marks omitted); Recommendation at 24-25. Again, the Magistrate Judge's Recommendation made no error on this point.

To the extent that defendants seek to use this testimony to illuminate the meaning of the Equivalent Clerkship Provision, it is inadmissible on the grounds that it would contradict the writing. The Equivalent Clerkship Provision by its express terms addresses BQHC's obligation to provide replacement clerkships "[i]n the event the [Caritas] Hospitals *are not operative*." DE #95-2 at 10. In contrast, defendants' objections advance a reading of Romero's emails as discussing a plan for addressing "scheduling gaps" when the Caritas Hospitals *are operating*. Thus, if this explanation is credited, it is inadmissible because it would contradict the language of the Equivalent Clerkship Provision, which expressly requires BQHC to replace clerkships lost in the event the Caritas Hospitals cease to operate. *Stage Club Corp.*, 622 N.Y.S. 2d at 950-951 (holding extrinsic evidence may be introduced "to clarify an ambiguity caused by the absence of particulars from the writing, provided that the parole evidence to be introduced does not contradict the written agreement"). Thus, this "extrinsic evidence" cannot be admitted to support defendants' contentions regarding the Equivalent Clerkship Provision.

And, if the evidence is not (as it may not be) proffered to inform the meaning of the Equivalent Clerkship Provision, then it simply is immaterial to defendants' attempt to gin up a fact issue on the interpretation of the Equivalent Clerkship Provision. For, even if the Court

concludes that Romero's *post hoc* explanation of his emails should remove those emails from

consideration here, defendants remain without evidence to rebut the Magistrate Judge's

conclusion that "the relevant extrinsic evidence is so one-sided in one party's favor that no

reasonable person could reach the contrary conclusion." Recommendation at 29. And, as we

discuss in the next section, the Magistrate Judge was absolutely correct about the fact that the

remaining admissible extrinsic evidence overwhelming supports the view that the parties

intended that replacement clerkships would be provided at Wyckoff if the Caritas Hospitals

ceased to operate.

## I.     The Extrinsic Evidence Is One-Sided In Favor Of Ross.

The undisputed extrinsic evidence on the question, both before execution of the

Agreement and during the course of its performance, shows that the parties intended that

replacement clerkships would be provided at Wyckoff.

Although Romero now claims not to have discussed with Ross replacement clerkship

contingencies in the event of "Caritas shutting down," it is undisputed that Wyckoff's controller,

Rich Sarli, did so. When negotiations reached the stage of serious discussions over financial

terms, Sarli and Ross' CFO, John St. James, spoke with each other to address those terms. Mr.

St. James' undisputed deposition testimony about those discussions noted that:

> I asked for some back up. Let's say if the new entity could not deliver, what
> would our fall back position be. They were asking us to pay them many millions
> of dollars, and we want to mitigate our risk. One was the back up plan to take
> care of our students if either of the hospitals would not be able to deliver the
> rotations.

DE #102 at ¶29.

As discussed above, following these discussions Ross provided to Romero a draft

redlined contract proposing a price freeze under the Wyckoff-Ross Agreement, an interest

payment offset, and the Equivalent Clerkship Provision to effect Ross' demand for "back up."

Wyckoff's CEO Dominick Gio directed Romero to respond that the only item to which BQHC objected was the Wyckoff price freeze and that all other terms proposed by Ross were acceptable to defendants. *Id.* at ¶45; *cf.*, DE #97-26 at 93:23-94:25 (Gio "overruled" COO McDonald's concerns about using Wyckoff as a backup for Caritas' obligations). Ross agreed to remove from the Agreement the language for the Wyckoff price freeze and the Agreement was executed in that form. "It is undisputed that, at the time the Agreement was executed, Wyckoff was the only other BQHC facility that could provide clerkships equivalent to those at the Caritas Hospitals. Recommendation at 27.

The undisputed evidence of the parties' course of performing the contract also shows that the parties "understood and agreed that Wyckoff would provide equivalent clerkships to collateralize the clerkships promised in the Agreement." *Id.* at 29. After the execution of the original Agreement, the parties engaged in discussions about amending the contract to increase Ross' initial $5 million prepayment by another $4.5 million in exchange for BQHC increasing the number of clerkships that would be committed to Ross. Thomas Singleton, the chief restructuring officer who then had managerial authority over Wyckoff and all of its affiliates, asked Romero about the potential downside of entering into such a contract amendment. Romero responded that, "In a worst case scenario, a fall-out by the residency programs or institution will make us responsible for unamortized payments plus interest of up to $9.5M (initial $5M plus $4.5M). ***Slots lost at Caritas are guaranteed at Wyckoff as per both contracts***." DE #102 at ¶115 (emphasis supplied).

Similarly, defendants' board discussions around the time that the Caritas Hospitals closed also recognized the obligation to provide replacement clerkships at Wyckoff. Wyckoff General Counsel David "Hoffman advised the Board of Trustees of the major contractual obligations of

Wyckoff, the temporary Nursing Agency, ***Medical School training (off shore Medical School)***, the Non-Union Pension, and Meditech." *Id.* at ¶116 (emphasis supplied).  In response to an inquiry "as to Wyckoff's Caritas related contractual obligations," "Hoffman replied that at this time ***there are two which we are aware of; one is a medical school obligation*** and the other is a pension obligation." *Id.* at ¶117 (emphasis supplied).  And, "[Board Chairman] Rucigay stated that there are three issues we will concern ourselves with, and follow up on, ***Ross University***, Meditech and the Pension issue." *Id.* at ¶118.  Indeed, for a short time a handful of replacement clerkships were in fact provided at Wyckoff.  Recommendation at 27.

Thus, the Magistrate Judge's Recommendation that the Court grant partial summary holding that BQHC breached is correct and should be adopted by the Court.

## II.   The Court Should Adopt The Magistrate Judge's Recommendation And Deny Summary Judgment in Defendants' Favor on Ross' Veil Piercing Claim.

The Magistrate Judge concluded that summary judgment could not be entered against Ross on its veil piercing claim for two principal reasons: (1) sufficient evidence exists from which a jury could conclude that Wyckoff dominated BQHC with respect to the Agreement; and (2) sufficient evidence existed from which a jury could conclude that this domination was used to commit a fraud or wrong that injured Ross.  Recommendation at 50-57.  Defendants, while baldly asserting both findings were erroneous, advance only a handful of narrow challenges to limited aspects of the Magistrate Judge's ruling.  Indeed, even if the Court sustained the objections (which it should not), the remaining evidence is sufficient to require denial of defendants' partial summary judgment motion.  *See Caldwell*, 701 F. Supp. 2d at 345 ("As to those portions of a report to which no 'specific written objections' are made, the Court may accept the findings contained therein, as long as the factual and legal bases supporting the

15

findings are not clearly erroneous."). In any event, defendants' few objections to the Recommendation should be overruled.

**A.     The Magistrate Judge Correctly Found That There Were Triable Issues Of Fact As To Whether Wyckoff Dominated BQHC With Respect To The Agreement.**

The Magistrate Judge first found that there were triable issues of fact with respect to whether Wyckoff dominated BQHC. Recognizing the well-settled standard that "'piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury,'" Recommendation at 49 (*quoting Johnson & Johnson Consumer Cos. v. Aini*, No. 02-CV-6624 (DLI) (RLM), 2009 WL 6055841, *7 (E.D.N.Y. Dec. 1, 2009); *Am. Protein Corp. v. AB Volvo*, 844 F. 2d 56, 59 (2d Cir. 1988)), the Magistrate Judge cited numerous facts (set forth more fully below) from which a reasonable jury could conclude "that Wyckoff dominated and controlled BQHC, including but not limited to matters related to the Agreement," *id.* at 53.

Defendants raise only two objections to this finding. They claim that (1) the Magistrate Judge substituted a more lenient legal standard for veil piercing than appropriate; and (2) the evidence relied upon was insufficient to preclude summary judgment. Both arguments are flatly wrong.

**1.     The Magistrate Judge used an appropriate legal standard to evaluate Ross' veil piercing claim.**

Defendants' first objection focuses on a footnote in the Recommendation in which the Magistrate Judge rejected defendants' argument that evidence of domination unrelated to the Affiliation Agreement was irrelevant for purposes of summary judgment:

> Defendants argue that "the vast majority of Ross' supposed factual issues . . . have nothing to do with the Affiliation Agreement and thus cannot, as a matter of law, create a genuine issue of material fact" with respect to the issue of Wyckoff's domination of BQHC. However, although the party seeking to pierce the corporate veil must establish a connection between the domination and the injury to the complaining party, *see* cases cited *supra* p. 47; *see also* discussion *infra* pp.

> 54-56, the case law makes clear that proof of overall domination — even if
> unrelated to the transaction at issue — is nonetheless relevant to the whether there
> is proof of domination with respect to the challenged transaction.

Recommendation at 53 n.28 (citation omitted). Based only on this footnote, defendants argue

that "the R&R substituted a far more lenient" legal standard "warranting the Court's refusal to

accept the R&R's finding on the first prong of Ross's Veil Piercing Claim." DE #137 at 11-12.

Defendants' argument is unavailing for two reasons.

First, this footnote is nothing more than the unremarkable observation that evidence of

domination generally is relevant to showing domination with respect to a particular transaction.

As courts regularly recognize, relevance is a broad concept: "on a motion for summary

judgment, evidence is relevant if it has 'any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence.'" *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 419

(S.D.N.Y. 2011) (*quoting* Fed. R. Evid. 401). Defendants' contention — evidence that Wyckoff

completely dominated BQHC generally cannot make it more probable that Wyckoff dominated

BQHC with respect to the Agreement — conflicts with this well-established rule.

More importantly, the Magistrate Judge specifically found there was sufficient evidence

to conclude "that Wyckoff dominated and controlled BQHC" with respect to "matters related to

the Agreement." Recommendation at 53. And defendants fail to point to any "unrelated"

evidence cited in the Recommendation on which this finding is based. *See Silva v. Peninsula

Hotel*, 509 F. Supp. 2d 364, 366 (S.D.N.Y. 2007) ("If . . . the party makes only conclusory or

general objections . . . the Court reviews the Report and Recommendation only for clear error.")

(quotation marks omitted). Accordingly, defendants' assertion that the Magistrate Judge

"eliminate[d] any requirement that domination and control relate to the transaction at issue" is

simply incorrect. *See* DE #137 at 12. In any event, as detailed immediately below, the

17

Magistrate Judge cited ample evidence from which a jury could conclude that Wyckoff

dominated BQHC with respect to its dealings with Ross.

### 2. Defendants fail to show that the evidence the Magistrate Judge relied on was insufficient.

While defendants broadly contend that "the evidence that the R&R relied upon to find a

triable issue as to [the first] prong of Ross's Veil Piercing Claim is insufficient," *id.*, their

objection is actually limited to only one narrow finding: that a jury might conclude that the

commingling of funds between the defendant entities evidenced that the entities did not deal with

one another at arms' length. *Id.*; *see also* Recommendation at 52-53.  Defendants argue that the

transfers at issue were "documented in extensive 'due to/due from' logs" and that courts have

held "that documented intercompany transfers are insufficient evidence of 'commingling' for

veil piercing purposes" DE #137 at 12-13.  However, there is substantial evidence that the

commingling of funds was improper, Recommendation at 52-53, and defendants' CFO was fired

when the State's demand for information from defendants brought this commingling to light.

*See* Def.'s 56.1 Stmt., DE #97-1, at ¶57; DE #102 at ¶¶ 100-01.  Defendants' objection boils

down to a demand that on defendants' motion for summary judgment, the inferences to be drawn

from the evidence be drawn in favor of defendants, not Ross.  The governing rule, of course,

requires exactly the opposite. *Sinta v. CDC Ind. N.A., Inc.*, 445 F. 3d 161, 169 (2d Cir. 2006).

Thus, as the Magistrate Judge correctly recognized, "the availability of alternative

explanations does not warrant an award of summary judgment . . . particularly given the

additional evidence of domination." Recommendation at 52.  Again, regardless of whether

certain transfers between the companies were in fact logged, the Magistrate Judge pointed to

several facts from which a jury could conclude that Wyckoff and BQHC did not deal with one

another at arms' length, including: (a) the entities shuffled funds between them based on which

entity had sufficient assets, rather than for any demonstrated business purpose; (b) Ross'
prepayment was transferred immediately from Caritas to Wyckoff; and (c) defendants' inability
to explain the reason for their books reflecting a $1.9 million loan from assetless BQHC to
Wyckoff. *Id.* at 52-53.

Further, the cases cited by defendants do not support the broad proposition that
"intercompany transfers are insufficient evidence . . . for veil piercing purposes." DE #137 at 13.
In the first case, *Fletcher v. Atex, Inc.*, 68 F. 3d 1451, 1459 (2d Cir. 1995), the court concluded
that that a centralized cash management system was not evidence of an alter ego relationship
where there was no evidence of "a 'complete commingling' of funds or a means by which [the
parent] sought to 'siphon all of [its subsidiary's] revenues into its own account.'" Here, by
contrast, as the Magistrate Judge properly found, there was evidence from which "a reasonable
factfinder could conclude that Wyckoff was treating BQHC as its personal bank."
Recommendation at 56. The second case defendants cite, *Vendetti v. Fiat Auto S.p.A.*, 802 F.
Supp. 886 (W.D.N.Y. 1992), is simply an analysis of personal jurisdiction — not alter ego
liability, as defendants represent — and thus has no application here.

Moreover, the commingling of these funds is only one of many factors to be considered
as part of the veil piercing analysis here. *See MAG Portfolio Consultant, GmbH v. Merlin
Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (setting forth an exhaustive list of factors).
Defendants make no objection to — in fact, completely ignore — the wealth of additional
evidence the Magistrate Judge cited that supports a finding that Wyckoff dominated BQHC with
respect to the Agreement, including:

- "It is undisputed that BQHC had no physical location, computer or
  telephone, and no substantial assets, salaried employees, revenues, or bank
  accounts of its own."

19

- "[A]t the time the Agreement was executed, all of the members of BQHC's Board of Trustees were members of Wyckoff's Board of Trustees, and Wyckoff's CEO, CFO and COO had all been appointed to the same respective positions at BQHC (and Caritas)."

- "[T]hroughout the negotiation and execution of the Agreement and amendments thereto, corporate officers interchangeably identified themselves as representing Wyckoff and BQHC."

- "[T]he Gio Proposal Letter, the catalyst for the Agreement, which was sent on Wyckoff letterhead and signed by Gio as president of Wyckoff[.]"

- "[I]n that solicitation letter, Wyckoff explained that it would 'soon be the sponsor of' the Caritas Hospitals and that the resulting three-hospital 'system,' which had not yet been formed, would be called 'BQHC.'"

- "A February 2007 report from the COO of Wyckoff, BQHC, and Caritas to state regulators similarly suggests that BQHC was simply the vehicle through which Wyckoff acquired and controlled the Caritas Hospitals."

- "Ross's theory that BQHC did not function as an independent entity, but was controlled by Wyckoff, is further supported by testimony from BQHC's former officers," including "BQHC does not exist"; "BQHC really did not operate at all"; and "BQHC is just a red herring so to speak."

Recommendation at 50-51 (citations omitted). Thus, even if defendants were to prevail on their objection with respect to the commingling of funds (which they should not), they have made no challenge to the Magistrate Judge's findings with respect to the remaining veil piercing factors, all of which show domination by Wyckoff of BQHC with respect to the Agreement. Therefore, the Magistrate Judge's Recommendation should be adopted on this issue.

**B.     The Magistrate Judge Correctly Found There Was A Triable Issue Of Fact As To Whether Wyckoff Used BQHC To Commit A Wrong Or Fraud Against Ross.**

Defendants also purport to challenge the conclusion that there is a triable issue of fact with respect to whether defendants used the corporate form to commit a wrong against Ross. *See TNS Holdings v. MKI Secs. Corp.*, 92 N.Y. 2d 335, 339 (1998) (holding veil piercing requires showing that "domination was the instrument of fraud or otherwise resulted in wrongful or

inequitable consequences"). The Recommendation cites several "wrongs" that preclude summary judgment: (1) Wyckoff "induced Ross to enter into the Agreement by promising an equal number of clerkship slots at Wyckoff in the event the Caritas Hospitals did not provide the agreed-upon slots" and later repudiated this understanding; (2) BQHC entered into the Affiliation Agreement with Ross "knowing that it did not have the authority under New York law to fulfill its contractual obligations" by causing Wyckoff to provide replacement clerkships; and (3) BQHC, which did not have substantial assets, loaned Wyckoff $1.9 million during the term of the Agreement, thereby "depleting BQHC of assets that might otherwise have been available to compensate Ross in the event of a breach." Recommendation at 54-56.

Critically, defendants fail to make any challenge to the two latter findings. Instead, they object only to the finding of a wrong in the repudiation of defendants' promise that "the BQHC 'system' had the authority to provide clerkship slots with Wyckoff . . . and that Wyckoff was prepared to provide those slots if the Caritas Hospitals did not." *Id.* at 55; DE #137 at 13-15. To support their objection, defendants advance three arguments: (1) because Ross' contract claim cannot be resolved on summary judgment, it cannot serve as a wrong for purposes of veil piercing; (2) even if there was a breach of the Agreement, it cannot constitute a wrong as a matter of law; and (3) even if there was a breach of the Agreement sufficient to pierce the corporate veil, Wyckoff cannot be deemed to have caused Ross' injury because Ross sought to add BQHC as the signatory to the Agreement. Each of these arguments should be rejected.

Defendants' first point is nonsense. Even if there was a triable issue of fact with respect to the breach (which there is not), it would not mean that summary judgment should be entered against Ross on its veil piercing claim. If this Court decided that Ross' contract claim had to be

tried to a jury (again, which it should not), that would mean only that Ross' veil piercing claim would have to await the jury's deliberation, as well.

Defendants' second point mischaracterizes the Recommendation: it is not just the breach of contract that is a wrong, it is defendants' attempted use of an assetless BQHC to shield Wyckoff from the repudiation of their promise to provide replacement clerkships at Wyckoff in the event of a Caritas closure. As the Magistrate Judge correctly noted, it is undisputed that Wyckoff solicited millions from Ross on the representation that BQHC would provide at Wyckoff replacement clerkships in the event that Caritas closed. Recommendation at 54. Defendants' repudiation of this position justifies piercing the corporate veil. Indeed, one need look no further than the first section of defendants' Opposition to see the radical change in position from the time of contracting to the present. *Compare* DE #102 at ¶30 (email from Wyckoff Assistant Vice President for Medication Education Julius Romero to Ross: "I have designed a contingency plan in effect for at least the next four years at Wyckoff, that can collateralize any committed core clerkship at Caritas."); ¶31 (Romero email: "A contingency of an equal number of core clerkship slots at Wyckoff Heights Medical Center will serve as collateral should any guaranteed, prepaid core clerkship at Caritas is not provided to Ross University during the term of this agreement."); ¶33 (Romero email "Caritas encompasses [Caritas] under the auspices of Brooklyn Queens Healthcare (BQHC), which also operates Wyckoff Heights Medical Center.") *with* DE #137 at 3-10 (arguing that the Agreement's Equivalent Clerkship Provision does not apply to Wyckoff).[4]

---

[4] In addition, the cases cited by Defendants do not hold that "a breach of contract cannot satisfy the second prong of the veil piercing test." DE #137 at 14. In fact, one of the two unreported cases that Defendants rely on for this proposition, *F & M Precise Metals, Inc. v. Goodman*, Index No. 6546-04, 2004 WL 2059567 (Sup. Ct. Nassau Co. Aug. 25, 2004), says nothing to this effect. In any event, case law makes clear that a breach of contract can

---

*continued on next page...*

And defendants' third point — that Ross could not have been injured by Wyckoff because BQHC signed the Agreement at Ross' request — was soundly and correctly rejected by the Magistrate Judge. *See* Defs.' Reply in Support of MSJ, DE #120, at 5-6. Ross asked that BQHC be the contracting party because, as the Recommendation notes, "Wyckoff . . . led Ross to believe that the BQHC 'system' had the authority to provide clerkship slots with Wyckoff, and not just with the Caritas Hospitals, and that Wyckoff was prepared to provide those slots if the Caritas Hospitals did not." Recommendation at 55.

The evidence on this point is undisputed and overwhelming. Inasmuch as the parties' discussions had included negotiations over obligations flowing from Wyckoff, on December 20, 2006, Ross' Vice President of Academic Affairs, Nancy Perri, wrote an email to Romero inquiring as to the relationship of the entities that were being discussed: "The organization now called 'Caritas'; does that include Wyckoff in addition to SJ [St. John's] and MI [Mary Immaculate]?" DE #102 at ¶33. Romero sent an email response later on December 20th stating that, "Caritas encompasses Saint John's Queens Hospital and Mary Immaculate Hospital under the auspices of Brooklyn Queens Healthcare (BQHC), which also operates Wyckoff Heights Medical Center." *Id.*

Romero's representations that Caritas was "under the auspices of BQHC" and "that BQHC operates Wyckoff" caused Ross to insist that BQHC be made the contracting party. Thus, on December 22, 2006, two days after Romero emailed Dr. Perri, Ross' President Dr.

---

*...continued from previous page*

constitute a wrong for veil piercing purposes under certain circumstances. *See Bogosian v. All Am. Concessions*, No. 06-1633 (RRM) (RML), 2011 WL 4460362, *9 (E.D.N.Y. Sept. 26, 2011) ("Entry into a transaction without the present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes.") (quotation omitted).

Shepherd sent a revised and redlined draft contract to Wyckoff's CEO, Dominick Gio, that incorporated (and highlighted) the changes to the contract that flowed from Romero's representation about the nature of the Wyckoff-affiliated entities. *Id.* at ¶34. Consistent with Romero's representations about the entities, this draft made the contract one between Ross and "Brooklyn Queens Healthcare, Inc." and conformed the operative provisions of the contract to reflect what Romero had said about BQHC, Caritas, and Wyckoff. *Id.* at ¶¶35-36. No one from defendants' side of the negotiations objected to doing so and all subsequent drafts were in this form. *Id.* at ¶37.[5] The suggestion that Ross invited the harm by having the contract drafted to conform with defendants' representations about the relationship of these entities is ludicrous. *See id.* at ¶¶30-31, ¶33, *supra*.

In sum, defendants' objections flatly mischaracterize the Magistrate Judge's conclusions with respect to the second prong of the veil piercing analysis. For this reason, and for the two additional reasons set forth in the Recommendation that stand unchallenged, a jury is entitled to decide this issue.

## III.   Defendants' Objection To Summary Judgment On The Amount Of Present Replacement Costs Should Be Overruled.

Defendants also object to the Recommendation that summary judgment be entered on the amount of the second component of Ross' damages, Present Replacement Costs.[6] Defendants contend that because the Magistrate Judge concluded that a triable issue with respect to the

---

[5] Defendants clearly made similar representations to AUC. Indeed, the AUC promissory note that defendants signed expressly provides that that "*Brooklyn Queens [Health Care, Inc.] also operates Wyckoff Heights Medical Center.*" . . and that "Brooklyn Queens acknowledges and agrees, *on behalf of its wholly-owned subsidiary Wyckoff*, that a Default" by Caritas "will obligate Wyckoff." DE #102 at ¶¶ 11,12.

[6] Present Replacement Costs are those incremental cost in excess of the contract rate that Ross spent through June 30, 2011 to replace clerkships lost under the breached contract.

projection of Future Replacement Costs — *viz.*, the assumption that Ross would have utilized all available clerkship slots under the Agreement — the Recommendation failed to appreciate that this same assumption underlies the calculation of Ross' Present Replacement Costs and, therefore, should compel the same result. DE #137 at 16-17.  Defendants' argument is unavailing.

Ross' calculation of Present Replacement Costs is in fact based on the full utilization of clerkship slots available under the Agreement.  However, unlike the calculation of Future Replacement Costs, the Present Replacement Costs calculation is not a projection.  To the contrary, Ross' expert's calculation of the Present Replacement Costs figure relied upon and cited Ross' business records that show that Ross actually did replace the full number of clerkships available under the Agreement from the time of breach through June 30, 2011. *See* Report of Elizabeth K. Davis, DE #95-9, at 9-11.  And defendants have not pointed to any evidence that would contradict the fact that Ross did in fact replace all of the lost clerkships during this period of time.  Thus, the Magistrate Judge's conclusion that the full utilization assumption in the Future Replacement Cost projection could present a triable issue simply does not apply to the calculation of the incremental costs that Ross actually incurred in replacing clerkships that were undisputedly purchased.  Accordingly, defendants' objection should be overruled and the Recommendation adopted on this point.

## CONCLUSION

Thus, defendants' objections to the Magistrate Judge's Recommendation should be overruled, the Court should adopt that Recommendation to enter partial summary judgment holding that BQHC breached and that the amount of damages for the Present Replacement Cost category of damages is $1,073,501.  The Court should likewise adopt the Recommendation to deny defendants' motion for partial summary judgment on Ross' veil piercing claim.

January 10, 2013

Respectfully submitted,

**BAKER & HOSTETLER LLP**

/ s/ George J. Tzanetopoulos

George J. Tzanetopoulos
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Tel: (312) 416-6200
Fax: (312) 416-6201
gtzanetopoulos@bakerlaw.com

Sammi Malek
45 Rockefeller Plaza, 11th Floor
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
smalek@bakerlaw.com

*Counsel for Plaintiff Ross University School of Medicine, Ltd.*

## CERTIFICATE OF SERVICE

I, George J. Tzanetopoulos, an attorney, certify that on January 10, 2013, I caused a true copy of the foregoing PLAINTIFF ROSS UNIVERSITY SCHOOL OF MEDICINE, LTD.'S PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE MANN'S REPORT AND RECOMMENDATION ON THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT to be served on counsel of record below by the United States District Court's ECF system and by email:

> Walter P. Loughlin
> Justin H. Roeber
> K&L Gates
> 599 Lexington Avenue
> New York, New York  10022-6030

/s/ George J. Tzanetopoulos