UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ROSS UNIVERSITY SCHOOL OF
MEDICINE, LTD.,

              Plaintiff,

              -against-

BROOKLYN-QUEENS HEALTH CARE,
INC. and WYCKOFF HEIGHTS MEDICAL
CENTER,

              Defendants.
---------------------------------------------------------X

**ORDER ADOPTING IN PART
AND MODIFYING IN PART
REPORT AND
RECOMMENDATION**

09-cv-1410 (KAM) (RLM)

**MATSUMOTO, United States District Judge:**

        On April 6, 2009, plaintiff Ross University School of Medicine, Ltd. ("plaintiff"

or "Ross") commenced this action for specific performance and consequential damages against

defendants Brooklyn-Queens Health Care, Inc. ("BQHC") and Wyckoff Heights Medical Center

(("Wyckoff") and together with BQHC, ("defendants")), alleging that defendants breached an

agreement with Ross to provide clinical clerkships at defendants' medical facilities to Ross'

medical students.  (ECF No. 1, Complaint.)  Ross filed a Second Amended Complaint on

September 29, 2009 (ECF No. 25, Second Amended Complaint ("S. Am. Compl.")), which

defendants answered on October 6, 2009 (ECF No. 29, Answer to Second Amended Complaint).

After extensive discovery, on January 24, 2012, Ross moved for partial summary judgment on its

claims for relief and defendants moved for partial summary judgment, as discussed in detail

below.  The parties opposed each other's motion for partial summary judgment and submitted

declarations, exhibits, and Rule 56.1 statements in support of their respective motions.  (*See*

*generally* ECF Nos. 95-98, 101-107, 110-115, 120, 122, 124, 125, 129, 130.)  Ross also moved

to strike certain paragraphs of defendants' Rule 56.1 statement and to preclude the testimony of

defendants' rebuttal damages expert; defendants opposed these motions as well.  (*See generally*
ECF Nos. 99-100, 108-109, 116-119, 121, 123.)  On July 18, 2012, the court referred the parties'
cross-motions for summary judgment and Ross' motions to preclude defendants' expert and to
strike to Magistrate Judge Roanne L. Mann.  (*See* Order dated 7/18/12; *see also* Orders dated
2/13/12 and 7/16/12.)

## DISCUSSION

Presently before the court is the Report and Recommendation/Memorandum and
Order issued by Magistrate Judge Mann on December 7, 2012.  (ECF No. 134, Report and
Recommendation/Memorandum and Order dated 12/7/12 ("R&R").)  Judge Mann denied Ross'
non-dispositive motions to strike and to preclude the testimony of defendants' rebuttal damages
expert, Anthony G. Duffy, and recommended that the court deny in part and grant in part each of
the parties' respective motions for summary judgment.  (*See generally* R&R.)  In regard to the
parties' cross-motions for summary judgment, Judge Mann recommended that the court: (1)
grant Ross' motion for partial summary judgment as to BQHC's liability for breach of contract;
(2) grant Ross' motion for summary judgment as to Ross' entitlement to damages in the amount
of the Prepayment Balance[1] and the Present Replacement Costs, but deny summary judgment on
Ross' entitlement to damages of the Future Replacement Costs; (3) grant Ross' motion for partial
summary judgment seeking dismissal of defendants' Fourth through Eighth Affirmative
Defenses; (4) deny defendants' motion for partial summary judgment seeking dismissal of Ross'
request for the equitable relief of reverse-veil piercing as to BQHC; and (5) grant defendants'
motion for summary judgment seeking dismissal of Ross' specific performance request against
BQHC, but deny it as to Wyckoff, pending resolution at trial of the veil-piercing issues.  (*Id*. at

---

[1]   Unless otherwise noted, all capitalized terms in instant Memorandum and Order have the same meaning as those
in Magistrate Judge Mann's Report and Recommendation/Memorandum and Order dated December 7, 2012.

62-63.)  As explicitly stated in the R&R, any objections to the R&R's recommendations were to be filed by December 27, 2012.  (*Id*. at 63.)

On December 21, 2012, Ross timely filed objections to Judge Mann's Memorandum and Order on its motions to strike and to preclude the testimony of defendants' rebuttal damages expert[2] (ECF No. 135, Plaintiff's Rule 72(a) Objections filed 12/21/12 ("Pl. 72(a) Obj.")), and also timely filed objections to Judge Mann's recommendations in the R&R regarding the summary judgment motions (ECF No. 136, Plaintiff's Rule 72(b) Objections ("Pl. 72(b) Obj.")).  On December 27, 2012, defendants filed objections to Judge Mann's recommendations in the R&R regarding the summary judgment motions, and also responded to Ross' objections regarding Judge Mann's Memorandum and Order denying the motions to strike and to preclude.  (ECF No. 137, Defendants' Objections ("Def. Obj.").)  On January 4, 2013, Ross timely responded to defendants' objections regarding Judge Mann's recommendations on the summary judgment motions.  (ECF No. 138, Plaintiff's Response in Opposition ("Pl. Resp. Obj.").)  On January 10, 2013, defendants timely responded to Ross' objections regarding Judge Mann's recommendations on the summary judgment motions.  (ECF No. 139, Defendants' Response in Opposition ("Def. Resp. Obj.").)

Because the court's determination of Ross' objections to Judge Mann's Memorandum and Order denying its motions to preclude the testimony of defendants' rebuttal damages expert and to strike portions of defendants' Rule 56.1 statement will necessarily impact the evidence to be considered with respect to the parties' objections to the R&R's recommendations regarding the summary judgment motions, the court will first address Ross' Rule 72(a) objections.  For the reasons discussed below, the court denies Ross' objections to and

---

[2] Pursuant to Fed. R. Civ. P. 72(a), which governs referrals of non-dispositive motions to a magistrate judge, a party must object to a magistrate judge's order on a non-dispositive motion within 14 days.  Ross' objection to Judge Mann's order on the non-dispositive motions was filed within 14 days of the order and is thus timely.

affirms Judge Mann's Memorandum and Order denying Ross' motions to preclude defendants' rebuttal damages expert and to strike on a clear error review, and would decide the same on a *de novo* review.

## I.      Factual Background

Although Judge Mann's R&R provides a detailed, comprehensive account of the history and relationship of the parties regarding the instant dispute (*see* R&R at 2-9), a brief statement of the relevant undisputed facts, taken from the parties' Rule 56.1 statements unless otherwise noted, is provided below for context.

The origin of the instant dispute is the Agreement entered into between Ross and BQHC on December 26, 2007, and two subsequent amendments.  Ross is a medical school located in the commonwealth of Dominica, and regularly contracts with hospitals around the United States to obtain clerkship positions for its medical students.  Defendant Wyckoff is both the subsidiary of defendant BQHC and the operator of a hospital in Brooklyn, also called Wyckoff, which provides medical clerkship positions of the kind sought by Ross.  Defendant BQHC is the sole parent and member of both defendant Wyckoff and an affiliate known as Caritas Health Care ("Caritas"), which operated two hospitals in New York, Mary Immaculate and St. John's (collectively, the "Caritas Hospitals").  The parties' Agreement provided for, *inter alia*, payments by Ross totaling approximately $13 million in exchange for an alleged promise by BQHC to guarantee Ross a certain number of clerkship placements until January 31, 2018. The provision of the Agreement at issue in this case (the "Equivalent Clerkship Provision") reads as follows:

> In the event the [Caritas] Hospitals are not operative, and [Ross] is not in material breach of the Agreement, BQHC agrees to provide [Ross] with an equivalent number of clerkships as agreed to herein at one or more of its facilities.

On December 5, 2007, Ross and BQHC amended the Agreement such that Ross, at the direction of BQHC, advanced additional prepaid fees in exchange for additional guaranteed clerkship placements at the Caritas Hospitals (the "First Amendment").  A few months later, on February 28, 2008, Ross and BQHC entered into a second amendment, pursuant to which Ross paid additional fees at the direction of BQHC in exchange for increased guaranteed clerkship placements (the "Second Amendment").  Notably, the Second Amendment expressly provided that in the event the Caritas Hospitals did not have the capacity to provide the increased number of clerkships guaranteed in the Second Amendment, then "BQHC shall deliver thirty five (35) core clerkship slots at the Wyckoff Heights Medical Center ("Wyckoff") to replace the remaining core clerkship slots the [Caritas] Hospitals are unable to deliver at such time."  Neither the First nor Second Amendments to the Agreement modified or referenced the Equivalent Clerkship Provision found in the original Agreement.

On February 6, 2009, Caritas filed for bankruptcy in this District, ceasing operations thereafter.  Initially, a number of Ross' students who were then slated to begin clerkships at the Caritas Hospitals were transferred to Wyckoff's namesake hospital, the only BQHC-affiliated facility still in operation, although BQHC had apparently attempted to acquire additional facilities without success.  Eventually, however, Wyckoff took the position that it was not obligated to provide replacement clerkships to Ross' students as guaranteed by the Equivalent Clerkship Provision in the Agreement.

Ross commenced this litigation on April 6, 2009, and after twice amending its complaint and adding defendant Wyckoff, Ross asserted a breach of contract claim against BQHC, and sought to hold Wyckoff vicariously liable for BQHC's breach pursuant to the equitable doctrine of piercing the corporate veil.  (*See generally* S. Am. Compl.)  Ross requests

specific performance of the Agreement against both BQHC and Wyckoff, as well as damages for the costs of replacing clerkship slots "lost to Ross."  (*Id*. ¶ 80.)

On January 24, 2012, Ross moved for summary judgment on various aspects of its breach of contract claim against BQHC, the counterparty to the Agreement.  (ECF No. 95, Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment ("Pl. SJ Mem."), at 6-7.)  Specifically, Ross requested summary judgment on its breach of contract claim against BQHC, and also sought judgment dismissing defendants' Fourth through Eighth Affirmative Defenses.  (*Id*. at 8-11.)  Ross also moved for partial summary judgment as to damages.  (*Id*. at 4-8.)  These damages have been calculated by plaintiff's damages expert in three categories: (1) the balance of the prepayments still owed to Ross (including contract-specified interest) as of June 30, 2011 (the "Prepayment Balance"); (2) the incremental costs incurred by Ross (through June 30, 2011) to replace clerkship rotations that were lost after the Caritas Hospitals ceased to operate (the "Present Replacement Costs"); and (3) the future incremental costs, for the period from July 1, 2011 until January 31, 2018, that Ross will likely incur in replacing clerkship rotations throughout the life of the Agreement and amendments (the "Future Replacement Costs").  (*Id*.)  Assuming the court were to grant Ross' motion to preclude Duffy's testimony regarding the Future Replacement Costs, Ross moved for all of its requested damages, in the amount of $20,089,051, as calculated by its expert, Elizabeth Davis.  (*Id*. at 6.)  In the alternative, Ross contended that because Duffy purportedly conceded that Ross' Future Replacement Costs would be a minimum of $5,525,367, Ross is entitled to summary judgment at least in that amount, leaving the jury to decide the final amount of Future Replacement Costs. (*Id*. at 6-7.)

Also on January 24, 2012, defendants moved for partial summary judgment on two issues.  (ECF No. 97, Defendants' Memorandum in Support of Motion for Partial Summary Judgment ("Def. SJ Mem.").)  First, defendants sought summary judgment dismissing Ross' request that Wyckoff be held vicariously responsible for BQHC's breach under the equitable doctrine of piercing the veil, because they argue Ross cannot meet the heavy burden required to pierce the corporate veil under New York law.  (*Id.* at 14-23.)  Second, defendants moved for summary judgment seeking dismissal of Ross' request for specific performance under the Agreement, contending that, at least with respect to BQHC, a court cannot legally compel BQHC to perform under the Agreement because BQHC is not a licensed operator of hospitals pursuant to Article 28 of the New York State Public Health law.  (*Id*. at 23-27.)

## II. Ross' Rule 72(a) Objections to Judge Mann's Memorandum and Order Denying Its Motions to Preclude and to Strike Are Overruled

### A. Ross' Rule 72(a) Objections

Ross' Rule 72(a) objections to Magistrate Judge Mann's Memorandum and Order denying its motion to preclude defendants' rebuttal damages expert and its motion to strike parts of defendants' Rule 56.1 statement are set forth in two parts.  Part one of Ross' Rule 72(a) objections challenges Judge Mann's denial of Ross' motion to preclude Duffy from testifying as to the calculation of the Future Replacement Costs likely to be incurred by Ross as a result of the BQHC's alleged breach of the Agreement.  (Pl. 72(a) Obj. at 1.)  Second, Ross objects to Judge Mann's denial of Ross' motion to preclude Duffy from testifying as to the calculation of the Prepayment Balance and the Present Replacement Costs, *i.e*., the first two of Ross' three claimed categories of consequential damages in this case.  (*Id*.)  Ross also objects to Judge Mann's refusal to strike portions of defendants' Rule 56.1 statement.  (*Id*.)  According to Ross, the

second part of its Rule 72(a) objections need not be decided if the court adopts the R&R's recommendation to grant partial summary judgment in Ross' favor. (*Id*.)

As discussed *infra* Section III.B.1, the court is adopting Judge Mann's recommendations in the R&R that partial summary judgment be granted in Ross' favor. Consequently, the court will only address the portion of Ross' Rule 72(a) objections that remain pending, specifically, Ross' objection to Judge Mann's denial of its motion to preclude Duffy from testifying as to the calculation of Future Replacement Costs. (*See id*. at 1.)

Ross objects to Duffy's testimony regarding the calculation of Future Replacement Costs based on (1) Duffy's alleged lack of expertise in valuing clinical clerkship rates and (2) Duffy's alleged lack of proper foundation for his conclusion. (*Id*. at 2-10.) Specifically, Ross contends Duffy is only an expert in the field of "general business valuation," not an expert "about the price of clerkships," and has not gained any relevant expertise through performing studies or analyses to learn about the price of clinical clerkships. (*Id*. at 6-10.) Ross also argues that because Duffy's calculation of the Future Replacement Costs differs from the calculation by Ross' damages expert, Elizabeth Davis, in only one respect – *i.e.*, the specific multiplier to apply when calculating the Future Replacement Costs – Duffy does not have a proper foundation to conclude that the Future Replacement Costs will be lower than the amount posited by Davis. (*Id*. at 5-6.)

Defendants' response correctly notes that Ross previously raised these identical arguments in support of its motion to preclude all aspects of Duffy's testimony. (Def. Resp. Obj. at 3-7; *see also* ECF No. 99, Plaintiff's Motion to Preclude Defendants' Expert Witness, at 4-7 (arguing that Duffy is not an expert in clinical clerkship rates and has no foundation to offer an opinion on Future Replacement Costs).) Defendants also argue that Ross' objections fail to

identify any legal error or contrary controlling authority overlooked by Judge Mann, and that the court should overrule them for the same reasons Judge Mann denied Ross' motion in the first instance.  (Def. Resp. Obj. at 3-7.)

### B.        Standard of Review Under Fed. R. Civ. P. 72(a)

Pursuant to Federal Rule of Civil Procedure 72(a), when reviewing a non-dispositive ruling of a magistrate judge, a district court shall "modify or set aside any part of [a magistrate judge's order] that is clearly erroneous or is contrary to law."  Rule 72(a) provides for "a highly deferential standard of review."  *Wynder v. McMahon*, No. 99-cv-772, 2008 WL 111184, at *1 (E.D.N.Y. Jan. 9, 2008) (internal quotation marks omitted).  Rule 72(a) "'imposes a heavy burden on the objecting party,' and 'only permits reversal where the magistrate judge abused [his or her] discretion.'"  *Cadet v. Miller*, No. 05-cv-5042, 2007 WL 4324102, at *1 (E.D.N.Y. Dec. 7, 2007) (quoting *Mitchell v. Century 21 Rustic Realty,* 233 F. Supp. 2d 418, 430 (E.D.N.Y. 2002)).

"Under the clearly erroneous standard of review of Rule 72(a), the magistrate judge's findings should not be rejected merely because the court would have decided the matter differently."  *Nielsen v. N.Y.C. Dep't of Educ.*, No. 04-cv-2182, 2007 WL 1987792, at *1 (E.D.N.Y. July 5, 2007) (internal quotation marks omitted).  Instead, "'the district court must affirm the decision of the magistrate judge unless the district court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Regan v. Daimler Chrysler Corp.*, No. 07-cv-1112, 2008 WL 2795470, at *1 (E.D.N.Y. July 18, 2008); *accord In re Comverse Tech., Inc. Deriv. Litig.*, No. 06-cv-1849, 2006 WL 3511375, at *2-3 (E.D.N.Y. Dec. 5, 2006).  Moreover, a magistrate judge's "order is contrary to law when it fails to apply or

misapplies relevant statutes, case law or rules of procedure." *E.E.O.C. v. First Wireless Grp., Inc.*, 225 F.R.D. 404, 405 (E.D.N.Y. 2004) (internal quotation marks omitted).

### C.   Analysis

Upon reviewing Judge Mann's Memorandum and Order denying Ross' motion to preclude Duffy from testifying as to the Future Replacement Costs, Ross' objections, defendants' response, and the relevant case law, the court is satisfied there is no clear error in Judge Mann's Memorandum and Order and that her decision was not contrary to any applicable law.  Indeed, Ross' objections do not identify any such error in the Memorandum and Order; Ross has merely repeated the same arguments, almost verbatim, that it previously presented in its moving papers. (*Compare* Pl. 72(a) Obj. at 2-10 (objecting to Duffy's testimony regarding the calculation of Future Replacement Costs based on Duffy's alleged lack of expertise in valuing clinical clerkship rates and his alleged lack of proper foundation for his conclusion) *with* ECF No. 99, Plaintiff's Motion to Preclude Defendants' Expert Witness, at 4-7 (arguing that Duffy is not an expert in clinical clerkship rates and has no foundation to opine on the Future Replacement Costs).)

The R&R demonstrates that Judge Mann properly applied the relevant law regarding an expert witness' qualifications under Federal Rule of Evidence 702 to opine in a particular field, and also properly found that Ross' complaints regarding Duffy's purported lack of foundation for his conclusion went to the weight of Duffy's testimony, not its admissibility under the Federal Rules of Evidence.  (R&R at 14-18.)  Judge Mann correctly noted that in the Second Circuit, courts liberally construe an expert's qualification requirements and have not required preclusion merely because an expert witness lacks expertise in a particular specialized area.  (*Id.* at 17 (citing *Arista Records LLC v. Lime Group LLC*, No. 06-cv-5936, 2011 WL

1674796, at *3 (S.D.N.Y. May 2, 2011).)  As the district court in *Arista Records* observed, in the Second Circuit, "'[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'"  2011 WL 1674796, at *3.  Ross concedes that Duffy is an expert in the field of "general business valuation," (*see generally* Pl. 72(a) Obj. at 2-10), but "fails to articulate why clerkship placements are so unique that the opinion of a general business valuation expert would be rendered unsuitable."  (R&R at 18.)  The court agrees with Judge Mann that Duffy's accepted field of expertise is sufficiently related to the issues in this case so as to assist the trier of fact and that he is qualified under Rule 702 to render his opinion.  (*See id*. at 16-18 (citing *Valentin v. New York City*, No. 94-cv-3911, 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997).)

As Judge Mann also observed, Duffy's choice of a particular valuation methodology undergirded his criticism of Davis' opinion regarding the Future Replacement Costs' value.  (R&R at 17.)  Ross' own objections recognize that Duffy's criticism of Davis' use of a particular multiplier when calculating the Future Replacement Costs was grounded in his accepted field of expertise of general business valuation.  (*See* Pl. 72(a) Obj. at 6-8 (quoting Duffy's deposition testimony that he utilized the same calculation methodology as Davis, aside from Davis' application of the CPI-U growth rate only to the future contract prices and not to the future replacement rates, for which Davis instead used a specific growth rate derived only from Ross' historical records, and defending his own choice of using the CPI-U growth rate for both the future contract prices and the future replacement rates, because CPI-U is "an expected growth rate . . . based on a very, very broad market segment," and "not based upon individual motivation conditions in specific circumstances" like Davis' specific replacement rate was).)

11

Whether Duffy's choice of a more general, unspecific growth rate should be given more weight than Davis' choice of a growth rate based only on Ross' business records is for the jury to decide. (*See* R&R at 18 (citing *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333 (E.D.N.Y. 2002) ("Disputes about the strength of an expert's credentials, faults in an expert's decision to use a particular methodology . . . 'go to the weight not the admissibility, of his testimony.'")).)

For the reasons stated above, there is no clear error that would warrant setting aside Judge Mann's Memorandum and Order denying Ross' motion to preclude Duffy from testifying regarding the Future Replacement Costs, and, in fact, the court agrees with Judge Mann's reasoning even under a *de novo* review. Ross' objections to Judge Mann's Memorandum and Order denying its motion to preclude Duffy's testimony regarding the Future Replacement Costs are, therefore, overruled and Judge Mann's Memorandum and Order is affirmed as to this issue. Because, as discussed *infra* Section III.B.1, the court is adopting Judge Mann's recommendations in the R&R that partial summary judgment be granted in Ross' favor, Ross' second Rule 72(a) objection – regarding Judge Mann's denial of Ross' motion to preclude Duffy from testifying as to the calculation of the Prepayment Balance and the Present Replacement Costs, and her denial of Ross' motion to strike portions of defendants' Rule 56.1 statement – is moot and need not be addressed. (*See* Pl. 72(a) Obj. at 1.)

III.   **The Court Adopts All of the R&R's Recommendations Regarding the Parties' Summary Judgment Motions Except for the Recommendation Regarding Ross' Request for Specific Performance**

For the reasons set forth below, the court adopts as the opinion of the court all of Judge Mann's recommendations in the R&R regarding the parties' cross-motions for summary judgment, except for the R&R's recommendations regarding defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance. Specifically, for the reasons set forth below, the court grants defendants' motion for summary judgment seeking

dismissal of Ross' requests for specific performance as to both defendants and not just BQHC, as Judge Mann recommended.  Because the parties' respective objections to Judge Mann's recommendations in the R&R regarding their cross-motions for summary judgment overlap to some extent, the court has consolidated its analysis below.

A.      **Standard of Review**

In reviewing a Report and Recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  Where a party makes specific and timely objections to a magistrate judge's findings or recommendations as to dispositive motions, the district court must apply a *de novo* standard of review to the portions of the R&R to which the objection is made.  Fed. R. Civ. P. 72(b); *Mazzei v. Abbott Labs. & Co.*, Nos. 10–cv–1011, 10-cv-2233, 2012 WL 1101776, at *1 (E.D.N.Y. Apr. 2, 2012) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010)); *see also* 28 U.S.C. § 636(b)(1).  However, "'general or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error.'"  *Caldarola v. Town of Smithtown*, No. 09-cv-272, 2011 WL 1336574, at *1 (E.D.N.Y. Apr. 4, 2011); *see also Vega v. Artuz*, No. 97-cv-3775, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002) (noting that "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke *de novo* review").  Additionally, the court is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed.  *Caldarola*, 2011 WL 1336574, at *1 (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985)).

As set forth below, the court has reviewed the aspects of the R&R to which the parties have objected under the appropriate standards and the above controlling principles of law.

In addition, the court has reviewed for clear error the R&R's recommendations to which there have been no objections by either party, *Caldarola*, 2011 WL 1336574, at *1, specifically, the R&R's recommendation that the court (1) grant Ross' motion for summary judgment seeking dismissal of defendants' Fourth through Eighth Affirmative Defenses and (2) grant Ross' motion for summary judgment as to the Prepayment Balance.  (*See* R&R at 30-40, 44-46.)  Because the court finds no clear error in Judge Mann's thorough and well-reasoned recommendations in the R&R regarding these aspects of Ross' motion for summary judgment, they are hereby adopted as the opinion of the court.  For the reasons explained below, the court also adopts the R&R's remaining recommendations, except for the R&R's recommendation regarding defendants' motion for summary judgment seeking dismissal of Ross' requests for specific performance, which is modified as discussed herein.

> **B.  Defendants' Objections to Judge Mann's Recommendations Regarding Ross' Summary Judgment Motion**
>
> > **1.  Defendants' Objections Regarding Breach of the Agreement**
> >
> > > **a.  Consideration of Extrinsic Evidence Regarding the Equivalent Clerkship Provision**

Judge Mann recommended that the court grant Ross' motion for summary judgment finding BQHC liable for breach of the Agreement.  (R&R at 23-30.)  In making this recommendation, Judge Mann first found that the Equivalent Clerkship Provision in the Agreement is ambiguous as to whether the term "facilities," as used therein, included Wyckoff's namesake hospital.  (*Id*. at 23-24.)  This finding enabled Judge Mann to consider certain extrinsic evidence in interpreting that term as used in the Agreement.  (*Id*. at 24-27.)  The extrinsic evidence relied upon by Judge Mann included: the pre-execution drafting history of the Agreement and Equivalent Clerkship Provision; the First and Second Amendments to the Agreement; emails between and among the parties in the months preceding execution of the

Agreement; meeting minutes of Wyckoff's board; defendants' internal memoranda discussing their performance under the Agreement; the fact that Ross' students were temporarily given equivalent clerkships at Wyckoff after the Caritas Hospitals went into bankruptcy and ceased operations; and another, separate agreement between Ross and Wyckoff that predated the subject Agreement, pursuant to which Ross' students were given clerkships at Wyckoff's namesake hospital (the "Ross-Wyckoff Agreement").  (*Id.*)

After considering the above undisputed evidence regarding the parties' understanding of the Equivalent Clerkship Provision in the Agreement, Judge Mann found that this case presented the "rare event" on summary judgment where the extrinsic evidence of the parties' intent is "so one-sided in one party's favor that no reasonable person could reach the contrary conclusion."  (*Id.* at 29 (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 158 (2d Cir. 2000).)  Although Judge Mann thoroughly reviewed and considered the evidence which defendants contended established a genuine issue of material fact as to whether or not the term "facilities" in the Equivalent Clerkship Provision was intended to include Wyckoff's namesake hospital, Judge Mann identified no genuine issue of material fact in the admissible evidence on this point and recommended that the court grant summary judgment in Ross' favor.  (*Id.* at 28-30.)

Defendants agree with Judge Mann's recommendation that the court find the Equivalent Clerkship Provision ambiguous.  (Def. Obj. at 3.)  Defendants object, however, to Judge Mann's recommendation that the court find the extrinsic evidence so "one-sided" as to warrant summary judgment on Ross' breach of contract claim against BQHC.  (*Id.* at 3-4.)  Specifically, defendants contend that Judge Mann erred by failing to "recognize or appreciate" the evidence purportedly supporting defendants' argument that the Equivalent Clerkship

Provision was not intended to apply to Wyckoff.  Defendants identify four such categories of extrinsic evidence:

> (1) the sworn testimony of Julius Romero, who held himself out as a representative for BQHC, Caritas, and Wyckoff during the Agreement's negotiation, that his references to a "Wyckoff 'contingency plan'" in emails sent to Ross before the Agreement was signed only referred to "clerkship scheduling matters and did not speak to the meaning of the [Equivalent Clerkship Provision]";

> (2) the sworn declarations of five Wyckoff Board members, submitted in connection with defendants' motion for summary judgment, stating that they never consented to Wyckoff assuming any of Caritas' liabilities under the Agreement;

> (3) the contrast between the Agreement in this case, which does not mention Wyckoff, and a separate clerkship agreement between BQHC and unrelated Caribbean medical school, American University of the Caribbean ("AUC"), which includes express guarantees of Wyckoff's obligations with respect to Caritas (the "AUC Agreement"); and

> (4) the Equivalent Clerkship Provision's drafting history reflecting the parties' negotiations concerning whether a freeze on the rate for clerkships that Ross paid to Wyckoff under the independent Ross-Wyckoff Agreement would be included in the Agreement that is the subject of this lawsuit, specifically the deposition testimony of Romero and Harold McDonald, Romero's boss and former COO of Wyckoff.

(*Id*. at 4, 8-10.)  According to defendants, each of these categories of evidence taken alone or together creates a genuine dispute of material fact as to whether the Equivalent Clerkship Provision could reasonably be interpreted to exclude Wyckoff's namesake hospital.  (*Id*. at 4-10.)

Ross responds that the much of the evidence defendants proffer to create an issue of material fact is inadmissible on a motion for summary judgment in a breach of contract action, and the evidence that is admissible only supports the R&R's recommendations.  (Pl. Resp. Obj. at 3-14.)  Specifically, Ross argues that under New York law, extrinsic evidence may only be introduced "'to clarify an ambiguity caused by the absence of particulars from the writing,

provided that the parol evidence to be introduced does not contradict the written agreement.'"
(*Id*. at 5 (quoting *Stage Club Corp. v. West Realty Co*., 212 A.D.2d 458, 459-60 (1st Dep't
1995)).)  Additionally, only objective, communicated statements of subjective intent are relevant
to construing the terms of a contract.  (*Id*. (citing *Faulkner v. Nat'l Geo. Soc'y*, 452 F. Supp. 2d.
369, 377-78 (S.D.N.Y. 2006)).)  Ross thus contends that the some of the drafting history relied
upon by defendants in their objections should not be considered by the court because it
contradicts the written agreement and/or was never communicated to Ross during the relevant
period.  (*Id*. at 5-9, 11-13.)

Ross argues that the deposition testimony of Harold McDonald, Wyckoff's
former COO, proffered by defendants in their instant objections is inadmissible, because
McDonald testified that he never communicated *to Ross* his "concerns" regarding BQHC's
alleged promise to provide replacement clerkships at Wyckoff, which concerns arose from
McDonald's view that Caritas' liabilities should not flow to Wyckoff.  (*Id*. at 5 (citing Def. SJ
Mem., Ex. 26, Deposition of Harold McDonald ("McDonald Dep."), at 32-33, 93-94).)
Although McDonald communicated these concerns to Dominick Gio, Wyckoff's CEO, Gio
overrode McDonald by expressly obligating Wyckoff to fulfill Caritas' obligations to Ross in the
Second Amendment to the Agreement.  (*Id*. at 6 (citing McDonald Dep. at 93-94); *see also
generally* Second Amendment.)  Therefore, McDonald's subjective concerns were never
communicated to Ross and were expressly contradicted by Wyckoff's choice to obligate itself
under the Second Amendment.  (*Id*.)

Ross also asserts that the portions of the Wyckoff Board members' sworn
declarations regarding the Board's purported "lack of consent" to Wyckoff "taking on any
liability with respect to" the Agreement, and stating that, as a group, Wyckoff's Board did not

"consent to such liability," are inadmissible because they were never communicated to Ross. (Pl. Resp. Obj. at 7.)  Ross further contends that these statements are irrelevant to the questions at bar because defendants' own representatives, Wyckoff Board Chairman Emil Rucigay and defendants' Rule 30(b)(6) deponent, testified during their respective depositions that no medical school clerkship contract with any school, including the Agreement with Ross, was ever presented to the Wyckoff Board for approval.  (*Id*.)  Moreover, Rucigay testified that the Wyckoff Board was eventually informed of the execution of the Agreement, without objection. (*Id*. (citing ECF No. 105, Plaintiff's Appendix A-I, Ex. 6, Deposition of Emil Rucigay, at 27-28).)

Similarly, Ross maintains that it had no knowledge of the separate AUC Agreement between BQHC and non-party AUC referenced in the Wyckoff Board members' sworn declarations.  (*Id*. at 8.)  Specifically, the Wyckoff Board members' sworn declarations state that a few weeks prior to executing the instant Agreement, Wyckoff executed the AUC Agreement clerkship agreement, which explicitly guaranteed that Wyckoff's namesake hospital would fulfill Caritas' clerkship placement obligations to AUC.  (*Id*.)  The fact of the AUC Agreement and its terms, however, was never communicated to Ross.  (*Id*.)  Moreover, Ross notes that the Wyckoff Board members' sworn statements that they were presented with and approved the AUC Agreement contradicts the aforementioned sworn testimony by the Wyckoff Board's Chairman and defendants' 30(b)(6) designee that the Wyckoff Board was never presented with any contract for clerkship placements for approval.  (*Id*. at 8-9.)  In any event, Ross claims the AUC Agreement's explicit provision guaranteeing Wyckoff's obligation to fulfill Caritas' clerkship placement obligations supports Ross' position in this case, insofar as it merely demonstrates that the terms of the instant Agreement – obligating BQHC to provide

18

clerkships "at one or more of its facilities" – is broader than the AUC Agreement, because BQHC's placement obligations extended to facilities beyond Wyckoff's namesake hospital, if such a facility had ever existed. (*Id*. at 9.)

Ross also contends that defendants' reliance on Julian Romero's demand to Ross during the negotiation of the Agreement that the Agreement should "not have any references to Wyckoff" does not impugn the R&R's recommendations, because the balance of the record demonstrates that Romero's demand was unrelated to the Equivalent Clerkship Provision at the core of Ross' claims. (*Id*. at 10.)  To the contrary, Ross asserts that the emails and draft contracts exchanged during negotiations all confirm that Romero's request to exclude "any references to Wyckoff" was actually related to Ross' attempt to include in the Agreement a provision freezing the clerkship rate Ross paid under the independent Ross-Wyckoff Agreement. (*Id*.)  At the behest of Wyckoff's CEO, Romero wrote to Ross' President, Dr. Tom Shepherd, after Ross inserted into a draft of the Agreement a reference to Ross' desired price freeze in the Ross-Wyckoff Agreement:

> The file document was reviewed and determined to be acceptable EXCEPT for any reference to the existing [Ross-Wyckoff Agreement].  The Caritas [Hospitals] agreement remains separate from the [Ross-Wyckoff Agreement].  The agreement without the referenced item will be signed and faxed . . . .

(*Id*. at 11.)  Ross subsequently removed the reference to the existing Ross-Wyckoff Agreement, and the resulting draft was executed by the parties.  (*Id*. at 11.)  Ross, therefore, argues that defendants' isolated reliance on Romero's "demand" to remove "any references to Wyckoff" from the Agreement fails to create a genuine issue of material fact regarding whether the Equivalent Clerkship Provision was intended to apply to Wyckoff.  (*Id*.)

Further, Ross asserts that Romero's deposition testimony stating that the emails Romero sent to Ross while negotiating the Agreement describing a "Wyckoff 'contingency

plan,'" only referred to "clerkship scheduling matters and did not speak to the meaning of the [Equivalent Clerkship Provision]," is inadmissible because it contradicts the written Equivalent Clerkship Provision itself.  (*Id*. at 12.)  Ross observes that the Equivalent Clerkship Provision's express terms obligate BQHC to provide replacement clerkships at its other facilities "'[i]n the event the [Caritas] Hospitals are ***not*** operative.'"  (*Id*. (emphasis added).)  Yet, Ross argues, defendants ask the court to improperly credit Romero's inadmissible deposition testimony that his intent in creating this "Wyckoff contingency plan" was to address "scheduling gaps" that could occur when the Caritas Hospitals *are* operating.  (*Id*.)  Because defendants' proffered reading of Romero's testimony and emails would contradict the express terms of the written agreement at issue, Ross asserts that Romero's testimony is inadmissible.  (*Id*. (citing *Stage Club Corp*., 212 A.D.2d at 459-60).)

        As a threshold matter, Ross is correct that there are limits to the types of extrinsic evidence a court may consider on summary judgment in interpreting an ambiguous contractual provision under New York law.  Generally, "unexpressed subjective views have no proper bearing" on the court's determination of the parties' intent.  *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd,* 166 F.3d 1201 (2d Cir. 1998).  "Only the parties' objective manifestations of intent are considered."  *Id*. at 302; *see also Capital Ventures Int'l v. Verenium Corp*., No. 09-cv-4261, 2011 WL 70227, at *4 (S.D.N.Y. Jan. 4, 2011) (same).  Additionally, in New York, the parol evidence rule bars admission of extrinsic evidence that is inconsistent with the express terms of a written contract.  *See Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 517 (2d Cir. 2001) (citing *Stage Club Corp*., 212 A.D.2d at 459-60).

        In light of the above controlling principles of contract interpretation under New York law, the court agrees with Ross that certain of defendants' extrinsic evidence detailed in

their objections to the R&R's recommendation to grant Ross's breach of contract claim as to

BQHC is inadmissible, and Judge Mann properly disregarded it in arriving at her

recommendation.  Because evidence of a party's uncommunicated, subjective intent with respect

to an ambiguous contractual provision may not be considered by the court, defendants' proffered

evidence of (1) McDonald's "concerns" about Wyckoff's potential liability expressed only to

Wyckoff's CEO; (2) the AUC Agreement and the provision therein explicitly guaranteeing

Wyckoff's performance of Caritas' clerkship obligations; and (3) the Wyckoff Board members'

purported lack of consent to the Agreement, are inadmissible and will not be considered by the

court in resolving defendants' instant objections.  *See Nycal Corp.*, 988 F. Supp. at 301-02;

*Capital Ventures Int'l*, 2011 WL 70227, at *4.

    Romero's deposition testimony concerning the "Wyckoff contingency plan" is

also inadmissible, because these statements are precluded by the parol evidence rule's bar against

admission of extrinsic evidence that contradicts the plain meaning of the written agreement at

issue.  Romero wrote to Ross on December 3, 2006 offering "a contingency plan in effect for at

least the next four years at Wyckoff that can collaterize any core committed clerkships at

Caritas," and again on December 16, 2006, representing that "an equal number of core clerkship

slots at Wyckoff will serve as collateral should any guaranteed, prepaid core clerkships at Caritas

[not be] provided to [Ross]."  (ECF No. 106, Plaintiff's Appendix 1-39, Exs. 3, 13.)

Nevertheless, Romero testified at his deposition that he intended his statements to convey that

the clerkships at Wyckoff would be available to resolve "scheduling gaps for Ross' students by

placing them in clerkships at Wyckoff when there weren't enough slots in certain rotations at

Caritas [Hospitals]."  (Def. Obj. at 5 (quoting Romero Deposition).)

Defendants suggest Romero's testimony shows that defendants' true "plan was intended to address a very specific contingency – if a core clerkship at Caritas . . . was not available, a medical student could be slotted into a clerkship at Wyckoff in order to create a 'more fluid scheduling process within the facilities.'"  (Def. Obj. at 5 (quoting Romero Deposition at 78-79).)  This putative "overflow" concept, however, plainly contemplates the Equivalent Clerkship Provision being in effect while the Caritas Hospitals are operating, and directly contradicts the explicit language in Equivalent Clerkship Provision that BQHC would provide replacement clerkships at its other "facilities," "[i]n the event the [Caritas] Hospitals are *not operative*."  (Pl. Resp. Obj. at 12 (emphasis added).)  Romero's deposition testimony regarding his purported intent when drafting these emails, therefore, contradicts the Equivalent Clerkship Provision's express, written terms.  Because the parol evidence rule bars such contradictory extrinsic evidence, Romero's testimony regarding his purported understanding of his emails referring to the "Wyckoff contingency plan" is inadmissible.  *See, e.g.*, *Stage Club Corp.*, 212 A.D.2d at 459-60.

Accordingly, the only admissible extrinsic evidence upon which defendants rely in their objections to the R&R's recommendation that the court grant summary judgment on Ross' breach of contract claim as to BQHC, are the emails between Romero and Ross' representatives wherein Romero communicated defendants' request that "any reference" to the Ross-Wyckoff Agreement be excluded from the near-final draft of the Agreement that is the subject of this suit.  (*See* Def. Obj. at 4, 8-10.)  Given that defendants previously raised this exact argument in support of their summary judgment motion (*see* ECF No. 110, Defendants' Opposition to Plaintiff's Summary Judgment ("Def. SJ Opp."), at 15-16), and Judge Mann soundly rejected it in her R&R (R&R at 25-28), the court doubts defendants' objection on this

ground warrants *de novo* review.  *See Caldarola*, 2011 WL 1336574, at *1 (observing that "objections which merely recite the same arguments presented to the magistrate judge" are reviewed for "clear error" by district judge); *see also Vega*, 2002 WL 31174466, at *1 (same).

Nonetheless, the court has performed an independent review of the relevant, undisputed admissible facts and finds no reason to disagree with Judge Mann's incisive analysis of the law and the admissible evidence in the record.  The court agrees with Judge Mann that the emails between Romero and Ross, which defendants claim support their interpretation that the parties intended to exclude any reference to Wyckoff *generally* from the Agreement, do not actually support defendants' position when read in their entirety and in the context of the admissible evidence.  On a *de novo* review, the court adopts Judge Mann's recommendation that summary judgment be granted on Ross' breach of contract claim against BQHC as the opinion of the court.

## 2. Defendants' Objections Regarding Ross' Request for Reverse Veil-Piercing Equitable Relief

Defendants object to the R&R's recommendation that the court deny defendants' motion for summary judgment seeking dismissal of Ross' request that the court reverse-pierce the corporate veil[3] between defendant BQHC and its wholly owned subsidiary, defendant Wyckoff.  (R&R at 50-57.)  Defendants proffer two bases for their objections.

First, defendants argue that Judge Mann applied an erroneous veil-piercing standard under New York law, and that the evidence she relied upon in denying defendants' motion demonstrates only "overall" dominance by Wyckoff of BQHC, not "specific" dominance with respect to the Agreement at issue.  (Def. Obj. at 11-13.)  According to defendants, Judge

---

[3] As Judge Mann observed, the doctrine of "reverse" veil-piercing is applicable where, as here, a party attempts to hold a subsidiary corporation (Wyckoff) liable for the actions of its parent or shareholders (BQHC).  (R&R at 49.)  The standard for "reverse" veil-piercing is identical to the standard applied to traditional veil-piercing.  (*Id.* (citing cases).)

Mann applied a "far more lenient" standard than that prescribed under New York law when she

stated in the R&R that, "'case law makes clear that proof of overall domination – even if

unrelated to the transaction at issue – is nonetheless relevant to [] whether there is proof of

domination with respect to the challenged transaction.'"  (*Id*. at 11 (quoting R&R at 53, n.28)

(emphasis omitted).)  Defendants thus argue that Judge Mann's recommendation that a

reasonable jury could find, based on the totality of undisputed evidence, that "'Wyckoff

dominated and controlled BQHC, including but not limited to matters related to the

Agreement,'" was erroneous because she relied upon evidence of "overall" domination in

addition to evidence of "specific" domination relating to the Agreement.  (*Id*. at 11-13 (quoting

R&R at 53).)

   According to defendants, even if "generalized" or "background" evidence of

domination were sufficient to pierce the corporate veil under New York law, the evidence the

R&R cited in finding a triable issue of fact as to this question was "insufficient."  (*Id*. at 12.)

Defendants point to only one example of allegedly insufficient evidence relied upon by Judge

Mann: the history of money transfers between Wyckoff and Caritas (both wholly owned

subsidiaries of their mutual parent, defendant BQHC) cited by Judge Mann as evidence that the

entities commingled funds and failed to maintain their separateness.  (*Id*.)  Defendants argue that

because all the "authorized" transfers between Wyckoff and Caritas were documented in

"extensive 'due to/due from' logs," these transfers were merely "documented intercompany

transfers" that are "insufficient," as a matter of law, to establish commingling of funds for veil-

piercing purposes.  (*Id*. at 13.)  Further, to the extent Judge Mann relied on evidence of any

unlogged or improper money transfers between Wyckoff and Caritas, defendants contend that it

cannot be "reasonably disputed" that these transfers were not authorized by Wyckoff's Board

and, hence, do not support the inference drawn by Judge Mann that Wyckoff and Caritas

commingled funds through their mutual parent, BQHC.  (*Id*. at 13, n.5.)

        Defendants' objection to the legal standard Judge Mann applied with respect to

whether Wyckoff dominated BQHC under New York's veil-piercing test is meritless.  The

R&R's statement of the requirements under New York to pierce the corporate veil was correct,

and was properly applied by Judge Mann.  (*See* R&R at 46-49, 52-54.)  Judge Mann's comment

that evidence of "overall" domination is "not irrelevant" to the question of whether a corporate

party dominated another with respect to a specific transaction, was by no means the sole or

primary ground for her sound legal analysis and recommendation – it was a footnote specifically

responding to defendants' argument in their reply brief that evidence of overall domination

cannot ever, "as a matter of law," create a genuine issue of material fact regarding whether a

corporate party was dominated with respect to a specific transaction.  (*See* R&R at 53-54, n.28.)

In any event, Judge Mann's footnote accurately states New York law as set forth in many

reported cases, including the cases cited by defendants in support of their summary judgment

motion.  (*See* ECF No. 120, Defendants' Reply Memorandum in Support of Defendants' Motion

("Def. Reply SJ Mem."), at 3 (citing *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131

F.3d 95, 97 (2d Cir. 1997) (first part of New York's veil-piercing test is whether "the owner

exercised complete domination over the corporation with respect to the transaction at issue," and

noting that test was satisfied by evidence of overall "complete domination" of corporate

defendant).)

        Moreover, defendants have advanced the same arguments regarding the money

transfer logs and other evidence of domination by Wyckoff of BQHC in their objections as they

have previously in support of their summary judgment motion.  (*See* Def. Obj. at 11-13 (arguing

that evidence of "general domination" is not sufficient to establish specific domination, that the "authorized" money transfers were properly logged and thus were mere "documented intercompany transfers" insufficient to establish commingling as a matter of law); Def. SJ Mem. at 18-19 (arguing that Ross' proffered evidence of BQHC's lack of independent assets, salaried employees, bank accounts, separate office space, and different board members from Wyckoff "has nothing to do with the [Agreement]," and that there is no evidence "Wyckoff ever used BQHC's funds for its own purposes" or that the funds were ever improperly commingled); Def. Reply SJ Mem. at 4-5 (arguing that Ross' proffered evidence of BQHC's lack of independent assets, salaried employees, bank accounts, separate office space, and different board members from Wyckoff and evidence that funds were improperly transferred between entities "ha[s] nothing to do with the [Agreement] and thus cannot, as a matter of law, create a genuine issue of material fact").)  Judge Mann plainly addressed these arguments in the R&R and recommended that the court reject them.  (*See* R&R at 51-53.)  Because defendants have merely repeated in their objections the same arguments that they made in their motion papers, the court has reviewed the R&R's recommendations on this issue for clear error.  *Caldarola*, 2011 WL 1336574, at *1; *see also Vega*, 2002 WL 31174466, at *1.  After reviewing the parties' objections and responses, defendants' submissions in support of their motion, the R&R's recommendation on this point, the controlling case law, and the undisputed, admissible evidence, the court finds no error in either Judge Mann's statement of New York law or her recommendation that a reasonable jury could find from the aforementioned undisputed facts that piercing the veil between Wyckoff and BQHC was warranted, and also adopts the R&R's recommendation in this respect on *de novo* review.

26

Defendants further object that the R&R "misunderstood" New York law's requirement that a dominating corporate entity must use its domination to perpetrate a fraud or otherwise injure the complaining party in order to pierce the corporate veil.  (Def. Obj. at 14.)  Specifically, Judge Mann recommended denial of defendants' summary judgment motion based on her conclusion that, when drawing all inferences in favor of the non-movant, Ross, a reasonable jury could find that Wyckoff "'led Ross to believe that the BHCQ 'system' had the authority to provide clerkship slots with Wyckoff'" at its namesake hospital if the Caritas hospitals were "not operative," and that Wyckoff's repudiation of that understanding could be viewed as the "'requisite wrongful act that injured Ross.'"  (*Id*. at 14 (quoting R&R at 55).)

According to defendants, the court should not accept this recommendation for three reasons.  First, defendants contend the R&R based this recommendation "almost entirely" on its other erroneous determination that BQHC had breached the Agreement.  (*Id*.)  As discussed *supra* Section III.B.1, however, the court has adopted Judge Mann's recommendation that there is no genuine issue of material fact as to whether BQHC breached the Agreement, and thus this objection is overruled as well.  Second, defendants argue that even if BQHC had breached the Agreement, a party's breach of contract cannot satisfy the second prong of New York's veil-piercing test, which requires that the dominating party perpetrate a fraud or otherwise injure the complaining party.  (*Id*.)  Third, even if a party's breach of contract could satisfy the second prong of New York's veil-piercing test, defendants claim that the R&R still erred by "failing to appreciate the significance of the fact – undisputed on summary judgment – that the only reason BQHC signed the [Agreement] was because Ross asked it to do so."  (*Id*. at 15.)  Consequently, defendants contend that they did not use or misuse BQHC's corporate form

27

with respect to the Agreement, because Ross "alone insisted on substituting BQHC for Caritas" as the counterparty to the Agreement.  (*Id.*)

Defendants object that Judge Mann misstated the relevant New York law in recommending that the court deny defendants' motion for summary judgment seeking dismissal of Ross' request for veil-piercing.  Contrary to defendants' objection, the R&R correctly analyzed the controlling law and determined that a reasonable jury could find based on the undisputed facts, and when drawing all inferences in favor of Ross, the non-movant, that defendants' "repudiation" of the parties' shared understanding that the BQHC "system" had authority to provide replacement clerkship slots at Wyckoff was the requisite wrongful conduct that injured Ross.  (R&R at 55.)  *Bogosian v. All Am. Concessions*, No. 06-cv-1633, 2011 WL 4460362, at *9 (E.D.N.Y. Sept. 26, 2011) ("Entry into a transaction without the 'present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes.'" (quoting *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 264 F. App'x 36, 41 (2d Cir. 2008)); *see also Network Enters.*, 264 F. App'x at 41 (finding that controlling principal's use of dominated corporation to enter into contract with knowledge that performance and payment were impossible was sufficient "wrong" to pierce corporate veil under, *inter alia*, New York law); *cf. Lego A/S v. Best-Lock Const. Toys, Inc.*, 886 F. Supp. 2d 65, 80 (D. Conn. 2012) (describing Second Circuit's decision in *Network Enterprises* as axiomatic example of grounds to pierce corporate veil).

Neither of the two cases cited by defendants in support of their instant objections requires a different outcome.  (*See* Def. Obj. at 14 (citing S*heridan Broadcasting Corp. v. Small*, Index No. 603681/2003, 2004 WL 5833748 (Sup. Ct. N.Y. Co., July 30, 2004), *aff'd*, 19 A.D.3d 331 (1st Dep't 2005), and *F&M Precise Metals, Inc. v. Goodman*, Index No. 6546-04, 2004 WL

2059567, at *3-4 (Sup. Ct. Nassau Co., Aug. 25, 2004).)  *Sheridan Broadcasting* and the authorities cited therein merely recite the unremarkable proposition that a party's breach of contract, without evidence of fraud or corporate misconduct, is not sufficient to pierce the corporate veil, which is an equitable remedy at its core.  2004 WL 5833748 (citing *Morris v. N.Y. Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141 (1993)); s*ee Morris*, 82 N.Y.2d at 141 ("The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.").  By contrast, *F&M Precise Metals* does not even address this issue.  *See* 2004 WL 2059567, at *3-4.  There is thus no merit to defendants' contention that Judge Mann misapplied New York law in recommending denial of defendants' motion for summary judgment seeking dismissal of Ross' veil-piercing request.

Furthermore, defendants previously raised their instant argument, regarding the supposed significance of Ross' "insistence" that BQHC be substituted for Caritas as the counterparty to the Agreement, in their moving and reply briefs in support of their motion for summary judgment.  (*See* Def. SJ Mem. at 20-21 (arguing that Ross "insisted" that BQHC replace Caritas as the counterparty to the Agreement just a few days before signing at the behest of Ross' counsel and so Ross cannot allege that *Wyckoff* used BQHC's corporate form to commit wrongdoing for veil-piercing purposes); Def. Reply SJ Mem. at 5-6 (asserting that Ross' veil-piercing claim must fail because it was "Ross' own decision, at the behest of its counsel, to make BQHC the contracting party to the [Agreement] instead of Caritas," and thus an injury arising therefrom was "solely attributable to Ross' own actions, not [defendants']").)  Judge Mann addressed and soundly rejected defendants' argument.  (*See* R&R at 55, n.29.)  The court has

thus reviewed Judge Mann's recommendation on this issue for clear error.  *See Caldarola*, 2011 WL 1336574, at *1; *Vega*, 2002 WL 31174466, at *1.

When considering all the admissible, undisputed evidence in the record and cited by Judge Mann in the R&R, the parties' submissions in support of their motions, defendants' objections, Ross' response, and the applicable law, the court finds no error in Judge Mann's analysis rejecting defendants' argument that, as a matter of law, Ross' "insistence" that BQHC become the counterparty to the Agreement requires the court to reject Ross' veil-piercing request.  Indeed, the court would reach the same determination on a *de novo* review. Defendants' objections to Judge Mann's recommendation that the court deny defendants' motion for summary seeking dismissal of Ross' veil piercing request  are, therefore, overruled.

### 3. Defendants' Objections As to the Prepayment Balance and the Present Replacement Costs

The R&R recommended that the court grant Ross' motion for summary judgment entitling it to two of Ross' three claimed categories of damages: the Prepayment Balance and the Present Replacement Costs.  (R&R at 44-46.)  Defendants object to this aspect of the R&R on the ground that Judge Mann "failed to appreciate" that Ross' damages expert's calculation of the Present Replacement Costs depends on the "assumption" that Ross "would" fully utilize "all of the clerkship slots that would have been available to it under the [Agreement]."  (Def. Obj. at 16-17.)  The R&R recommended against granting summary judgment on Ross' claim for the Future Replacement Costs because Judge Mann deemed too speculative the expert's opinion that going forward, from 2011 until 2018, Ross would utilize *all* possible clerkship slots available under the Equivalent Clerkship Provision and Agreement.  (R&R at 44-46.)  According to defendants, because Judge Mann found this "assumption" to present a triable issue of fact with respect to the

*Future* Replacement Costs, as set forth *infra*, Section III.C.2, she erred by not also finding that it created a triable issue of fact with respect to the *Present* Replacement Costs.  (Def. Obj. at 17.)

Like their prior objections, defendants' objection to Judge Mann's recommendation regarding Ross' entitlement to the Present Replacement Costs was previously presented in their opposition to Ross' motion for summary judgment on damages.  (Def. SJ Opp. at 23-24.)  The court has thus reviewed Judge Mann's recommendation on this point for clear error.  *See Caldarola*, 2011 WL 1336574, at *1; *Vega*, 2002 WL 31174466, at *1.  Judge Mann considered and rejected defendants' argument regarding Davis' calculation of the Present Replacement Costs because Davis based her calculation of the Present Replacement Costs on a known, actual quantity: the number of clerkship slots used by Ross through June 30, 2011.  (*See* R&R at 44.)  This was in contrast to Davis' calculation of the Future Replacement Costs based on an *assumed* number of clerkship slots Ross would use in the future, in regard to which Judge Mann recommended the court deny Ross' motion for summary judgment.  (*See id*. at 44-46.)

After assessing the admissible, undisputed evidence in the record and cited by Judge Mann in the R&R, the parties' submissions in support of their motions, defendants' objections, Ross' response, and the applicable law, the court finds no clear error in Judge Mann's analysis rejecting defendants' argument that Ross should not be granted summary judgment on damages for the Present Replacement Costs.  The R&R's recommendation that the court grant Ross damages for the Prepayment Balance and the Present Replacement Costs is adopted as the opinion of the court.  Upon independent review of the above submissions, the court would also adopt Judge Mann's recommendations in the R&R to grant Ross damages for the Prepayment Balance and the Present Replacement Costs on a *de novo* review.

C.     **Ross' Objections to Judge Mann's Recommendations Regarding the Summary Judgment Motions**

Ross presents three objections to Judge Mann's recommendations in the R&R regarding the parties' respective summary judgment motions.  Ross first objects to Judge Mann's recommendation that the court grant defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance against BQHC.  (Pl. 72(b) Obj. at 1.)  Ross next objects to Judge Mann's recommendation that the court deny Ross' motion for summary judgment as to the amount of the Future Replacement Costs.  (*Id*.)  Ross finally objects to Judge Mann's recommendation that the court find the Equivalent Clerkship Provision in the Agreement to be ambiguous.  (*Id*.)  Ross' latter objection, however, is moot if the court grants partial summary judgment to Ross as set forth in the R&R.  (*Id*.)

For the reasons discussed *supra* Section III.B.1, the court has adopted Judge Mann's recommendation to grant Ross' motion for partial summary judgment as to breach of contract against BQHC, and, therefore, Ross' third objection to the R&R is moot.  (*See id*.)

Ross' first two objections to Judge Mann's recommendations regarding the parties' summary judgment motions are overruled for the reasons explained below.  Although the court overrules Ross' objection to the R&R's recommendation that the court grant defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance against BQHC, this outcome is mandated by different reasons than those stated in the R&R or raised by defendants in response to Ross' objections.  By moving for summary judgment on its entitlement to the Prepayment Balance, the Present Replacement Costs, and the Future Replacement Costs, Ross has elected to pursue monetary damages for all of its injuries (past and future), and thus the equitable remedy of future specific performance is not available against either BQHC or Wyckoff.  Consequently, the R&R is adopted in part and modified in part,

insofar as the court grants defendants' motion for summary judgment seeking dismissal of Ross' requests for specific performance against *both* defendants.

### 1.   Ross' Objections Regarding Ross' Requests for Specific Performance Against BQHC and Wyckoff

The R&R recommended that the court grant defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance as to BQHC, but deny it as to Wyckoff, pending the fact-finder's resolution of the disputed veil-piercing issues. (R&R at 59-61.) Judge Mann based this recommendation on her conclusion that because BQHC was Ross' only counterparty to the Agreement, whether *Wyckoff* can be compelled to perform BQHC's obligations under the Agreement depends on whether the corporate veil between Wyckoff and BQHC should be pierced. (*Id*. at 59-60.) Given Judge Mann's determination that a triable issue of fact exists as to whether Ross can pierce the veil between Wyckoff and BQHC (adopted as the opinion of this court, *supra* Section II.B.2), the R&R recommended that the court deny defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance as to Wyckoff until the veil-piercing issue is resolved at trial. (*Id*.) In contrast, Judge Mann recommended that the court grant defendants' motion for summary judgment dismissing Ross' specific performance request as to BQHC, because a court order compelling BQHC to direct Wyckoff to provide clinical clerkships under the Agreement would violate Article 28 of New York's Public Health Law. (*Id*. at 58-62.) Although Judge Mann's analysis of the merits of defendants' motion for summary judgment seeking dismissal of Ross' specific performance requests is cogent and thorough, the court finds that defendants' motion regarding specific performance should be granted as to both defendants for reasons not discussed in the R&R or in defendants' response to Ross' objections regarding the specific performance issue. *See, e.g., Mohan v. La Rue Distribs., Inc.*, No. 06-cv-0621, 2008 WL 4822266, at *1 (E.D.N.Y

Oct. 27, 2008) ("'[T]the district judge retains the power to engage in *sua sponte* review of any portion of the magistrate's report and recommendation, regardless of the absence of objections.'") (quoting Moore's Federal Practice, ¶ 72.04[10–1], at 72-95).

   Generally, in order to justify its entitlement to the equitable remedy of specific performance under New York law, a plaintiff must first establish the existence of an enforceable contract, the defendant's breach of that contract by non-performance, the plaintiff's substantial performance of its obligations under the contract and its ability and willingness to undertake any additional steps required of it under the contract, and that the invocation of the court's powers in equity is justified by the absence of an adequate remedy at law, *i.e.*, money damages. *See, e.g.*, *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415 (2001) ("In general, specific performance will not be ordered where money damages 'would be adequate to protect the expectation interest of the injured party.'" (quoting Restatement [Second] of Contracts § 359)); *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 192-94 (1986); *Alba v. Kaufmann*, 27 A.D.3d 816, 818 (3d Dep't 2006). Specific performance may be ordered when money damages would not be an adequate remedy for the non-breaching party, as in cases in which damages will be difficult to prove with certainty, a suitable substitute performance will be difficult to obtain, or the contract involves unique goods or services. *Sokoloff*, 96 N.Y.2d at 415 (citing cases).

   Whether or not to award specific performance is a decision that rests in the sound discretion of the trial court. *Van Wagner*, 67 N.Y.2d at 191-92. The key inquiry for the court is the level of "'the difficulty of proving damages with reasonable certainty.'" *Edge Grp. WAICCS LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) (quoting *Van Wagner*, 67 N.Y.2d at 193). Specifically, in New York:

> 'The point at which breach of a contract will be redressable by
> specific performance thus must lie not in any inherent . . .
> uniqueness of the [contract's subject matter] but instead in the
> uncertainty of valuing it.  What matters, in measuring money
> damages, is the volume, refinement, and reliability of the available
> information about substitutes for the subject matter of the breached
> contract.'

*Id*. (quoting *Van Wagner*, 67 N.Y.2d at 193).  "In asserting that the subject matter of a particular

contract is unique and has no established market value, a court is really saying that it cannot

obtain, at reasonable cost, enough information about substitutes to permit it to calculate an award

of money damages without imposing an unacceptably high risk of undercompensation on the

injured promisee."  *Van Wagner*, 67 N.Y.2d at 193.  Yet, the mere fact that damages need to be

projected into the future in a given case does not mean they are too uncertain to value, such that

specific performance is warranted to compensate for future loss.  *See id*. at 194 ("[I]t is hardly

novel in the law for damages to be projected into the future.")

　　　　A court may order specific performance along with a money award for damages

that "naturally flow from the breach, are within the contemplation of the parties, and can be

proven to a reasonable degree of certainty."  *Freidus v. Eisenberg*, 123 A.D.2d 174, 177 (2d

Dep't 1986); *see also Coizza v. 164–50 Crossbay Realty Corp*., 73 A.D.3d 678, 682-83 (2d

Dep't 2010) (plaintiff purchaser awarded specific performance on a real estate contract could

also recover consequential damages stemming from the seller's breach).  A non-breaching party

may not, however, obtain an order of specific performance compelling the breaching party to

fulfill its obligations under a contract and also recover money damages that would put the non-

breaching party in the position it would have been in had the contract never been breached.  *See,*

*e.g., Safeco Ins. Co. of Am. v. M.E.S. Inc*., No. 09-cv-3312, 2010 WL 3928606, at *5-6

(E.D.N.Y. Oct. 4, 2010) (finding that existence of adequate remedy at law for defendant's breach

of promises to indemnify plaintiff precluded grant of specific performance as to those same

indemnification promises); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04-cv-10014, 2006 WL 1493132, at *12 (S.D.N.Y. May 31, 2006) (refusing to order defendant bond issuer to perform contractual obligation to issue new shares to plaintiffs, where court found money damages to be reasonably ascertainable, and further denying plaintiffs' request for declaration of their entitlement to all dividends they would have received if defendants had initially performed under contract at issue); *Maksim Grill, Inc. v. Edmund's Mineola, Inc*., 806 N.Y.S.2d 445, 445 (Sup. Ct. Nassau Co. Aug 5, 2005) (awarding money damages for breach of contract because amount was certain and denying plaintiff's request for specific performance of same contract).

Additionally, although a party may "plead inconsistent theories of recovery," because a summary judgment motion is "the procedural equivalent of a trial [in New York], a litigant must elect among inconsistent positions upon seeking expedited disposition." *Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae*, 243 A.D.2d 168, 177 (1st Dep't 1998); *Unisys Corp. v. Hercules, Inc*., 224 A.D.2d 365, 367 (1st Dep't 1996) (noting in context of breach of contract action that "[e]ven where a plaintiff may seek recovery on alternative theories, he must make an election of remedies at trial or upon submission of a motion for summary judgment, the grant of which is the procedural equivalent of a trial") (citations omitted) (internal quotation marks omitted).

Here, notwithstanding the fact that Ross' Second Amended Complaint seeks specific performance of the Agreement as to BQHC and Wyckoff as well as incidental and consequential damages, Ross moved this court for an order of summary judgment entitling it to money damages for the full extent of its alleged injuries, including damages for the Future Replacement Costs.  (*See* Pl. SJ Mem. at 4-8 (requesting total sum of $20,089,052 in damages

for its three categories of claimed damages).)  Although Ross was entitled under New York law

to seek inconsistent theories of recovery at the pleading stage, Ross chose to pursue money

damages as its full measure of recovery in its motion for summary judgment, thereby

constituting its election of damages for its future loss over future specific performance of the

Agreement.  *See Jones Lang*, 243 A.D.2d at 177; *Unisys Corp.*, 224 A.D.2d at 367.

      Ross' summary judgment motion further demonstrates that legal damages are

adequate for its past and future harms incurred from BQHC's breach of the Agreement: Ross

asserts, based on its damages expert's report and sworn testimony, that $20,089,052 is the total

amount of its three components of claimed damages, and that the Future Replacement Costs are

ascertainable in the specific amount of $12,738,735.  (Pl. SJ Mem. at 6-8; *see also* ECF 119,

Expert Report of Elizabeth Davis, at 6.)  Indeed, Ross' request for specific performance of the

Agreement (by either or both defendants) covers the same subject matter as its request for the

Future Replacement Costs, because any specific performance of the Agreement ordered by this

court would necessarily occur in the future, and such an order would necessarily entail a

reduction of the Future Replacement Costs as defined and calculated by Ross.  (*See* Pl. SJ Mem.

at 6 (defining "Future Replacement Costs" as the projected future costs that Ross will likely

incur in replacing clerkship rotations throughout the future life of the Agreement).)  New York

law does not permit Ross, however, to obtain an order of specific performance compelling the

breaching party to fulfill its obligations under a contract and also recover money damages that

would put it in the same position it would have been in had BQHC never breached the

Agreement.  *See Safeco*, 2010 WL 3928606, at *5-6; *Aristocrat Leisure*, 2006 WL 1493132, at

*12; *Maksim Grill*, 806 N.Y.S.2d at 445.  Accordingly, the court grants defendants' motion for

summary judgment seeking dismissal of Ross' requests for specific performance as to both BQHC and Wyckoff.

Therefore, for the reasons stated above, the court adopts the R&R's recommendation to grant defendants' motion for summary judgment seeking dismissal of Ross' request for specific performance by BQHC, and modifies the R&R's recommendation as to Wyckoff, by granting defendants' motion seeking dismissal of Ross' request for specific performance as to Wyckoff as well.

### 2. Ross' Objection Regarding the Future Replacement Costs[4]

As noted above, the R&R recommended that the court grant Ross' motion for summary judgment as to the Prepayment Balance and the Present Replacement Costs, but recommended that the court deny the motion with respect to Ross' entitlement to Future Replacement Costs. (R&R at 44-46.) Ross moved for its requested damages for Future Replacement Costs in the amount of $12,738,735 (as calculated by Ross' expert), or, in the alternative, for Future Replacement Costs in the amount of $5,525,367, *i.e.*, the amount defendants' expert arguably conceded is the minimum for any calculation of the Future Replacement Costs. (Pl. SJ Mem. at 6-7; Pl. Reply SJ Mem. at 3.) Judge Mann's recommendation that the court deny Ross' motion on both grounds was based on her view that defendants have presented a genuine issue of material fact as to whether Ross expert's "assumptions and deposition testimony render the *entire* category of Future Replacement costs unduly speculative," but acknowledged defendants' expert's testimony that, if any Future

---

[4] The court's final two holdings in this Memorandum and Order – that Ross may not seek specific performance against either defendant due to its pursuit of full money damages but also that there is presently a genuine issue of material fact as to whether Ross is entitled to the Future Replacement Costs – do not restrict the jury's ability to later resolve the disputed facts in Ross' favor and award Ross future money damages against both defendants.

Replacement Costs are awarded by the court, the minimum amount would be $5,525,367.  (R&R at 45 (citing Pl. Reply SJ Mem. at 3).)

Ross objects that the R&R's recommendation denying Ross' motion for summary judgment as to the Future Replacement Costs "improperly reverses New York law's burden of proof on uncertainty regarding the amount of damages in breach of contract actions."  (Pl. 72(b) Obj. at 9.)  Ross further contends the R&R "overlooks the fact that defendants have provided no admissible evidence of facts to carry their burden on this question."  (*Id.*)  According to Ross, defendants have not met their supposed "burden" to establish – on *Ross*' motion for summary judgment – that *Ross'* requested damages are too uncertain to be calculated, and have also failed to sustain their "burden" to show that defendants' rebuttal expert's testimony creates an issue of material fact as to whether Davis' calculation of the Future Replacement Costs is correct.  (*Id.*)

As an initial matter, the court has reviewed the cases Ross cites for the proposition that New York law imposes a "burden" on a non-movant when a party claiming breach of contract moves for partial summary judgment on its entitlement to damages.  (*See id.* at 9, 13 (citing *Blue Moon Media Group, Inc. v.  Field*, No. 08-cv-1000, 2011 WL 4056068, at *6 (E.D.N.Y. Apr. 11, 2011); *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 391-92 (2d Cir. 2006)).)  Both cases are completely inapposite and do not support Ross' novel framing of the burdens in the summary judgment context.  Ross relies on the district court's statement in *Blue Moon* that "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach."  The court's statement, however, was made in the context of the plaintiff's unopposed motion for entry of default against the non-answering defendant, 2011 WL 4056068, at *6, and has no relevance whatsoever to the supposed

burden Ross claims *defendants* should be forced to carry on Ross' motion for summary

judgment. *See* Fed. R. Civ. P. 56; *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219,

1223 (2d Cir. 1994).

Nor does the portion of the Second Circuit's decision in *Boyce* upon Ross which

relies – the Circuit's observation that "plaintiff need only show a stable foundation for a

reasonable estimate of damages to which he is entitled as a result of the breach . . . [t]he

wrongdoer must shoulder the burden of uncertainty regarding the amount of damages" – support

Ross' position regarding the burdens of proof in the context of a summary judgment motion.

464 F.3d at 391-92 (internal quotation marks omitted).  In *Boyce*, the Second Circuit reversed the

district court's denial of the plaintiff's Rule 59(a) motion for a new trial after a jury found the

defendant in breach but did not award the plaintiff his full amount of requested damages.  *Id*. at

383-84.  Specifically, the *Boyce* court agreed with the plaintiff that the district court's

formulation and presentation of the so-called "wrongdoer" jury instruction was incorrect because

the district court's version "require[d] a shifting of burden from the plaintiff to defendant when

no such shift is required," and remanded the case to the district court for a new damages

determination.  *Id*. at 392.  The language quoted above by Ross in their instant objections relates

only to the standards a jury should apply *at trial* to a plaintiff's claim for damages where "all

parties agreed" that plaintiff had suffered some damages due to the defendant's breach, and the

only disputed issue was the amount thereof.  *Id*.  Ross' reliance on *Boyce* is unavailing in this

case, where, as Judge Mann correctly observed, there is a genuine issue of material fact as to

whether the entire category of Ross' Future Replacement Costs should be awarded.  (*See* R&R at

45-46 (noting that defendants' engagement of Duffy to specifically rebut Davis' calculation of

the Future Replacement Costs "does not preclude defendants from pursuing their alternative

argument that Davis's various assumptions and depositions testimony render the entire category of Future Replacement Costs unduly speculative").)

Moreover, Ross again repeats the same substantive arguments in its objection to the R&R's recommendation as to the Future Replacement Costs that it previously made in support of its summary judgment motion.  (*See* Pl. Reply SJ Mem. at 2-3.)  Judge Mann considered these arguments and, after reviewing defendants' cited evidence and arguments to the contrary, recommended that the court reject Ross' position.  (R&R at 44-46.)  Therefore, the court has reviewed the R&R's recommendation on this issue for clear error.  *See Caldarola*, 2011 WL 1336574, at *1; *Vega*, 2002 WL 31174466, at *1.  Upon review of the admissible, undisputed evidence in the record that was considered and cited by Judge Mann in the R&R, the parties' submissions in support of their motions, Ross' objections, defendants' response, and the controlling law, the court finds no clear error in Judge Mann's recommendation that the court deny Ross' motion for summary judgment as to damages for the Future Replacement Costs, and the R&R's recommendation on this point is adopted as the opinion of the court.  Even on a *de novo* review, however, the court would adopt Judge Mann's recommendation in the R&R that the court deny Ross' motion for summary judgment as to damages for the Future Replacement Costs.

## CONCLUSION

For the reasons set forth above, the court affirms Judge Mann's Memorandum and Order denying Ross' non-dispositive motions to preclude the testimony of defendants' rebuttal expert and to strike portions of defendants' Rule 56.1 statement.

Also for the reasons set forth above, the court adopts in part and modifies in part Judge Mann's Report and Recommendation regarding the parties' respective motions for partial

summary judgment.  Accordingly, the court: (1) *grants* Ross' motion for partial summary judgment as to BQHC's liability for breach of contract; (2) *grants* Ross' motion for summary judgment as to the Prepayment Balance and Present Replacement Costs, for a total of $7,350,767, but *denies* summary judgment as to the Future Replacement Costs; (3) *grants* Ross' motion for partial summary judgment dismissing defendants' Fourth through Eighth Affirmative Defenses; (4) *denies* defendants' motion for partial summary judgment seeking dismissal of Ross' request for veil piercing; and (5) *grants* defendants' motion for summary judgment seeking dismissal of Ross' specific performance requests against BQHC and Wyckoff.

The parties are also directed to confer regarding setting a date for a settlement conference before Magistrate Judge Mann.  If settlement efforts are not successful, the parties shall then confer regarding a proposed trial date and a schedule for preparation and submission of civil pretrial materials in accordance with Section V of the undersigned's Individual Practice Rules, available at *https://www.nyed.uscourts.gov/pub/rules/KAM-MLR.pdf.*

The parties are further ordered to file via ECF, within 45 days of the entry of this Memorandum and Order, a joint status letter to the court regarding their planned settlement efforts.

**SO ORDERED.**

Dated:          March 28, 2013
               Brooklyn, New York

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York